IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| In re: | Case No. 22-<u>  60043  </u> |
| FREE SPEECH SYSTEMS, LLC, | Chapter 11 (Subchapter V) |
| Debtor. | |

**DEBTOR'S EMERGENCY MOTION FOR ORDER (A) AUTHORIZING THE DEBTOR TO PAY PREPETITION OBLIGATIONS OF CERTAIN CRITICAL VENDORS, AND (B) GRANTING RELATED RELIEF**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED, IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER, IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

RELIEF IS REQUESTED NOT LATER THAN AUGUST 3, 2022.

The above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>" or "<u>FSS</u>")), in the above-referenced chapter 11 case, hereby files this emergency motion (the "<u>Motion</u>") for an order (a) authorizing the Debtor to pay the prepetition claims of certain critical vendors, and (b) granting

related relief. In support of the Motion, the Debtor submits and incorporates by reference the *Declaration of Marc Schwartz in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion, and respectfully states as follows:

## JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief sought in this Motion are sections 105(a), 363(b), 364(c), and 503 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004 and 9013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

## BACKGROUND

### A. Case Background

4. On July 29, 2022 (the "Petition Date"), the Debtor commenced the above captioned cases by filing a voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code.

5. The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to Bankruptcy Code § 1182(2). No request for the removal of the Debtor as debtor-in-possession has been made in this chapter 11 case

### B. FSS' Background[1]

6. Alex Jones began his career in the broadcasting industry fresh out of high school. Austin Public Access provided the forum for Alex's first broadcast. In 1996 he transitioned to talk

---

[1] Additional factual background and information regarding the Debtor and its operations is set forth in the *Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions*

2

radio. After leaving talk radio in 1999, he started broadcasting over the internet with a handful of employees. Revenue was largely generated from advertising and the sale of books, T-shirts, and videos.

7. What began as a family business continued to expand and in 2007 FSS was formed. The business continued to grow, adding a full-blown studio, and employing over 60 people. By 2013, FSS started selling dietary supplements to its growing listener base.

8. Despite the rapid growth in the scale, diversity of operations and revenue, FSS remained a family run business and did not retain professional management or install professional management systems.

9. FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

10. On its Infowars.com[2] website today, FSS makes available to customers dietary supplements, ranging from Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts and other products Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of dietary supplements which have traditionally been supplied by PQPR Holdings Limited, LLC ("PQPR"), an affiliated entity.

11. As of July 1, 2022, FSS employed a workforce of 58 individuals, the majority of

---

[2] FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

whom had direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios. This is the building where Jones produces his shows, including The Alex Jones Show. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a building where warehousing and product sales fulfillment takes place. All of the studios and offices are in leased space.

12. FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Approximately 80% of FSS' revenue is derived from product sales. Of the remainder, 11% is historically from advertising and the balance from a variety of sources.

13. Through its online sales channel, FSS currently sells (i) dietary supplements purchased by PQPR, (ii) dietary supplements purchased by FSS, and (i) books, DVD's, t-shirts, and other merchandise purchased by FSS. The allocation of proceeds from the sale of products after credit card processing charges varies depending upon which of the above categories the product falls under, PQPR receives a fee for of ten percent of the net proceeds (the proceeds from the sale of the products less processing charges, as a royalty for introducing the supplement and vitamin market to FSS.

14. Due to the content of Alex Jones' shows, Jones and FSS have faced an all-out ban of Infowars from mainstream online spaces. Shunning from financial institutions and banning Jones and FSS from major tech companies began in 2018. Today, Facebook, Twitter, YouTube, Spotify, PayPal, and Apple have banned Infowars and Jones. Since being deplatformed by most mainstream commercial entities in 2018, FSS has had to operate in a harsh and unfriendly commercial environment.

15. FSS purchased to sell on its website two categories of products: (a) dietary

supplements ("Supplements"), and (b) books, DVDs, t-shirts, and other merchandise ("Non-Supplements"). FSS relied on PQPR as no other vendor would supply the Supplements for Jones to advertise on his shows. PQPR ordered and paid for Supplements, which it marked up, and then sold to FSS. Jones would publicize the Supplements on his show and FSS and/or PQPR fulfilled the orders to ship to its customers.

16. As to Non-Supplements, FSS purchased the products, sold them, and fulfilled the sale through its own employees from its warehouse in Austin. Depending on whether a Supplement or Non-Supplement was sold, FSS and PQPR split the cost of the sale on an agreed to formula.

17. Since 2018 FSS has had difficulty finding third parties willing and able to fulfill product sales. In the past, both FSS and PQPR attempted to provide fulfillment services for product sales. Recently, FSS employed a fulfillment company to take over this function. All former FSS employees responsible for fulfillment have been hired by this company. The fulfillment company charges FSS a flat fee per order regardless of size. Historically, fulfillment has cost an average of ten percent of sales, without considering personnel costs, the new agreement is estimated to cost sixteen percent of sales, including personnel costs.

18. The revenues generated from the Debtor's ongoing operations will form the basis of the subchapter v plan of reorganization the Debtor will be proposing in this case.

C. **Critical Vendors**

　　i. *Vendors Necessary under Customer Contracts*

19. The Debtor derives substantially all of its revenue from advertising and product sales generated through its media operations. Continuity of these operations is dependent upon payment of vendors that provide and maintain access to the Debtor's programming content. Costs associated with the production of programming content and costs associated with purchasing

product and fulfillment of customer orders is also crucial to the Debtor's ability to generate revenue.

20. The Debtor relies on specific vendors, suppliers, and consultants to provide the Debtor with goods and services necessary for the Debtor's business to function properly and in full compliance with applicable federal and state regulations. The goods and services provided by the Debtor's vendors, suppliers, and consultants are, therefore, essential to the day-to-day operations of the Debtor's business.

21. The Debtor's failure to pay these vendors who are critical to continuing operations would be highly detrimental if not fatal to the Debtor's ability to reorganize and pay legitimate claims of creditors. Even if some of these vendors would be willing to provide goods or services on a cash on delivery or cash in advance basis, the acceleration of payment terms would swamp the current cash flow of the Debtor and harm the Debtor's ability to restructure its finances in this chapter 11 case for the benefit of its estate and creditors.

22. Given the importance of the Debtor's vendors, suppliers, and consultants to the Debtor's business enterprise, the Debtor determined that it was necessary and prudent to identify the vendors, suppliers, and consultants that are most critical to the Debtor's go-forward operations (collectively, the "Critical Vendors"). After a thorough review of its business operations and diligence regarding potential alternative vendors, suppliers and consultants, the Debtor determined, in the exercise of its business judgment, that the goods and services provided by the Critical Vendors are necessary at this critical juncture to the success of this chapter 11 case, so as to avoid irreparable harm to the Debtor's business and preserve the value of the Debtor's estate.

23. In identifying Critical Vendors, the Debtor considered the following criteria: (a) whether the vendor would be prohibitively expensive, time consuming or difficult to replace, such

as where the Debtor's existing inventory, equipment, or operations are specifically tailored to that vendor's products or services; (b) whether the vendor is a sole source or limited-source supplier of goods or services of the quality and quantity required by the Debtor, without whom the Debtor could not continue to operate without disruption; and (c) whether alternative suppliers are available and willing to provide goods and services to the Debtor.

24. Based on the forgoing criteria, the Debtor has identified the vendors in **Schedule 1** to the attached form of Order as Critical Vendors.

25. Failure to pay the Critical Vendors would create a significant risk of disruption to the Debtor's business and ability to generate revenue, resulting in a diminution of the Debtor's bankruptcy estate. Many of these vendors are necessary for the Debtor to continue programming and broadcasting and supplying customers with goods and products that are in demand. Lost revenue from even a single day of lost broadcasts is detrimental to FSS's business.

## RELIEF REQUESTED

26. The Debtor requests entry of an order, substantially in the form of the proposed order attached hereto (the "Proposed Order"), (a) authorizing the Debtor to pay prepetition obligations owed to the Critical Vendors indicated in Schedule 1 thereto, and (b) granting related relief.

27. The Debtor believes that payment of the Critical Vendors is vital to maximizing the value of the Debtor's estate for the benefit of all parties-in-interest. However, the Debtor proposes to condition, in the Debtor's discretion, the payment of the Obligations upon the agreement of each Critical Vendor to continue supplying services on terms and based on practices and programs in effect between the Critical Vendor and the Debtor in the year prior to the

Petition Date (the "<u>Customary Trade Terms</u>"), or such other trade terms as are agreed to by the Debtor and the Critical Vendor.

28. The Debtor reserves the right to negotiate new trade terms with the Critical Vendor as a condition to payment of a portion of the obligations owed to each Critical Vendor (the "<u>Obligations</u>"). Payments made on Obligations pursuant to this Motion shall be applied first to any claim of such Critical Vendors under section 503(b)(9) of the Bankruptcy Code. Nothing in this Motion or any order of this Court approving this Motion should be construed as a waiver by the Debtor of its rights to contest any invoice of a Critical Vendor under applicable non-bankruptcy law.

29. If a Critical Vendor refuses to supply services to the Debtor on Customary Trade Terms following payment of any portion of the Obligations, the Debtor seeks authority, in its discretion, and without further order of the Court, to deem any payments made to the Critical Vendor on account of the Obligations to have been in payment of then-outstanding post-petition claims of the Critical Vendor and to terminate the critical vendor status of such a vendor (the "<u>Terminated Obligor</u>").

30. If, however, the Debtor chooses not to terminate the critical vendor status of a Critical Vendor immediately upon a refusal by a Critical Vendor to provide services in accordance with Customary Trade Terms, the Debtor shall not be deemed to have waived the ability to terminate a Critical Vendor or waived the ability to deem any payments made to the Critical Vendor on account of the Obligations to have been in payment of then-outstanding post-petition claims of such Critical Vendor.

31. In the event the Debtor exercises the rights set forth in the preceding paragraph, the Debtor requests that the Terminated Obligor be required to immediately return any payments made

on account of its Obligations to the extent that such payments exceed the post-petition amounts then owed to the Terminated Obligor, without giving effect to any rights of setoff or reclamation. In the event that the Terminated Obligor refuses to acknowledge such recharacterization and to issue the repayment, the Debtor proposes that it be authorized to compel such recharacterization and repayment by a motion on such notice as is required by this Court.

32. Additionally, the Debtor requests that the order waive the 14-day stay period under Bankruptcy Rule 6004(h).

## BASIS FOR RELIEF

**A. Sections 105(a), 363(b), 363(c), and 503(b)(1) of the Bankruptcy Code Support Payment of the Critical Vendors.**

33. Section 363(c)(1) of the Bankruptcy Code provides that a debtor may use property of the estate in the ordinary course of business without notice or a hearing. The payment of the obligations to the Critical Vendors is in the ordinary course and conducted in the regular course of the Debtor's business. The Debtor's obligations to the Critical Vendors are expenses necessary to maintain operations necessary to generate required to pay creditors with allowed claims. In the absence of continuing revenues, the Debtor will not be able to pay its non-contingent secured and unsecured creditors, much less those creditors holding contingent claims, irrespective of the allowed amount (if any) of those claims.

34. Courts have recognized that it is appropriate to authorize the payment of pre-petition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World*

*Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.),* 29 B.R. 391, 398 (S.D.N.Y. 1983). In doing so, these courts acknowledge that several legal theories rooted in sections 105(a), 362(d), 363(b), and 1107(a) of the Bankruptcy Code support the payment of pre-petition claims as provided herein.

35. Additionally, pursuant to Bankruptcy Code § 363(b), a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."). *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor pre-petition claims where supported by an appropriate business justification). The Debtor has articulated a valid business justification to pay the prepetition claims of the Critical Vendors.

36. Moreover, Bankruptcy Code § 105(a) states that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. Bankruptcy Code § 503(b)(1)(A) provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including—the actual, necessary costs and expenses of preserving the estate . . . ." An order enabling a debtor-in-possession to pay the actual and necessary costs and expenses of the estate is well within the bounds of the power granted to bankruptcy courts by Bankruptcy Code § 105(a). *See, e.g., In re CEI Roofing, Inc.*, 315 B.R. 50,

59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)). Moreover, under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a); *In re CoServ, L.L.C.,* 273 B.R. at 497 (holding that the "Court has inherent authority, through section 105(a) of the Bankruptcy Code to grant this Motion, in the interest of preservation of Debtors' bankruptcy estate."); *In re CEI Roofing, Inc.,* 315 B.R. at 56; *In re Mirant Corp.,* 296 B.R. 427 (Bankr. N.D. Tex. 2003).

37. Courts in the Fifth Circuit, including the Southern District of Texas have followed *CoServ's* three-part test to determine whether a pre-petition claim of a "critical vendor" may be paid outside of the plan process on a post-petition basis:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*In re CoServ, L.L.C.,* 273 B.R. at 498; *see also In re Mirant Corp.*, 296 B.R. at 429-30.

38. Whether payment of the obligations to Critical Vendors constitutes ordinary course transactions, appropriate non-ordinary course transactions, or necessary and appropriate to facilitate the payment of expenses required to preserve the Debtor's estate or under applicable state law, the Court should enter the Proposed Order. If the Debtor fails to pay its obligations to the Critical Vendors, the Debtor's future revenue available for its estate and creditors will be jeopardized.

### B. Certain Critical Vendors Are Entitled to Administrative Expense Claims Under Section 503(b)(9) of the Bankruptcy Code.

39. In addition to the foregoing, certain Critical Vendors will be entitled to priority under section 503(b)(9) of the Bankruptcy Code. Section 503(b)(9) provides for the allowance of administrative expenses for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). Any Critical Vendor that provided the Debtor with materials or services to continue ongoing operations in the 20 days prior to the Petition Date may therefore have administrative expense priority claims that have to be paid in full. For this and the other reasons stated, the Debtor believes that it should be authorized, but not directed, to pay the Obligations of the Critical Vendors.

40. Courts in this district have routinely authorized the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business. *See, e.g.*, *In re McDermott Int'l, Inc.*, No. 20-30336 (DRJ) [Docket No. 475] (Bankr. S.D. Tex. Feb. 24, 2020) (authorizing debtors to pay certain pre-petition claims arising under section 503(b)(9) of the Bankruptcy Code); *In re Parker Drilling Co.*, No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 3, 2019) [Docket No. 176]; *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) [Docket No. 512].

### C. Cause Exists to Waive the 14-Day Stay under Bankruptcy Rule 6004(h).

41. Under Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the use of estate property pursuant to Bankruptcy Code § 363 are automatically stayed for fourteen (14) days after entry of the order. The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

42. Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a transaction to occur immediately where there has been no objection to the procedure. *See generally* 10 COLLIER ON BANKRUPTCY ¶ 6004.11 (16th ed. 2020). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file the appeal. *Id.*

43. In light of the necessity of the relief sought in this Motion, the Debtor submits that ample cause exists to justify the Proposed Order to be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rule 6004(h) be waived. To the extent a party objects to the relief sought herein, but the relief is granted over the objection, the objecting party can indicate the time needed to initiate an appeal.

## EMERGENCY CONSIDERATION

44. The Debtor requests emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case when that relief is necessary to avoid immediate and irreparable harm to the estate. The Critical Vendors are necessary for the Debtor to continue its operations and generate revenue that will be used to pay claims in this chapter 11 case and failure to timely pay the Critical Vendors places that revenue at risk. The failure to receive the requested relief during the first 21 days of the chapter 11 case could severely disrupt the Debtor's operations at this critical juncture and imperil the Debtor's restructuring. Accordingly, the Debtor requests that the Court approve the relief requested in this Motion on an emergency basis

**RESERVATION OF RIGHTS**

45. Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim on any ground, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested in this motion or a finding that any particular claim is an administrative expense claim or other priority claim, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate, (g) a waiver or limitation of the Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law, or (h) a concession from the Debtor that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtor's or any other party in interest's rights to subsequently dispute such claim.

**NO PRIOR REQUEST**

46. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Debtor respectfully requests the Court grant the relief requested herein and such other and further relief as the Court deems just and proper.

Respectfully submitted this 29th day of July, 2022.

        **LAW OFFICES OF RAY BATTAGLIA, PLLC**

        /s/*Raymond W. Battaglia*
        Raymond W. Battaglia
        State Bar No. 01918055
        rbattaglialaw@outlook.com
        66 Granburg Circle
        San Antonio, Texas 78218
        Tel. (210) 601-9405

        *Proposed Counsel to the Debtor and Debtor-In-Possession*

        -and-

        **SHANNON & LEE LLP**

        /s/*Kyung S. Lee*
        Kyung S. Lee
        State Bar No. 12128400
        klee@shannonleellp.com
        R. J. Shannon
        State Bar No. 24108062
        rshannon@shannonleellp.com
        700 Milam Street, STE 1300
        Houston, Texas 77002
        Tel. (713) 714-5770

        *Proposed Co-Counsel to the Debtor and Debtor in Possession*

## **CERTIFICATE OF ACCURACY**

I hereby certify that the forgoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

        /s/ *Raymond W. Battaglia*

## CERTIFICATE OF SERVICE

      I hereby certify that on the date of filing, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei, Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Heterhington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Cliff Walson
Walsont Bowlin Callendar, PLLC
4199 San Filipe Street, STE 300
Houston, TX 77027
cliff@wbctrial.com

Jon Maxwell Beatty
The Beatty Law Firm PC
1127 Eldridge Pkwy, Suite 300, #383
Houston, TX 77077
max@beattypc.com

                                       /s/ Raymond W. Battaglia

## USPS Service List

Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

2

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

Parties Filing Notice of Appearance

N/A

Subchapter V Trustee

N/A (Not Yet Appointed)

U.S. Trustee

Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

Additional Notice Parties

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604