```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3    Avi Moshenberg,              )  CASE NO:  22-60043
                                   )  ADVERSARY
 4                 Plaintiffs,     )
                                   )  Houston, Texas
 5         Vs.                     )
                                   )  Wednesday, August 3, 2022
 6    Free Speech Systems LLC,                       )
                                   )  10:02 a.m. - 5:05 p.m.
 7                 Defendants.     )
      ------------------------------)

 8

 9                            TRIAL

10        BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE

11

12    APPEARANCES:

13    For Plaintiffs:         MARCEL FONTAINE
                              McDowell Hetherington LLP
14                            1001 Fannin Suite 2700
                              Houston, Texas 77002
15
      For Defendant:          RAY BATTAGLIA
16                            Law Offices of Ray Battaglia, PLLC
                              66 Granburg Circle
17                            San Antonio, Texas 78218

18    Court Reporter:

19    Courtroom Deputy:       Zilde Martinez

20    Transcribed by:         Veritext Legal Solutions
                              330 Old Country Road, Suite 300
21                            Mineola, NY 11501
                              Tel: 800-727-6396
22

23

24    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
25
```

```
1                            INDEX

2   PLAINTIFFS' WITNESSES    DIRECT   CROSS   REDIRECT   RECROSS

3

4

5   DEBTOR'S WITNESSES    DIRECT   CROSS   REDIRECT   RECROSS

6   W. Marc Schwartz       52       101,      228

7                                   159,

8                                   177,

9                                   223

10  PLAINTIFFS' EXHIBITS                        RECEIVED

11

12  DEBTOR'S EXHIBITS                           RECEIVED

13  Exhibit 1      CV of W. Marc Schwartz       52

14  Exhibit 3      Plan Support Agreement       59

15  Exhibit 2      Engagement letter between

16                 W. Marc Schwartz and FSS     60

17  Exhibit 8      Forbearance agreement        70

18  Exhibit 4      8/13/20 promissory note      74

19  Exhibit 5      8/2020 security agreement    75

20  Exhibit 6      11/10/2021 promissory note   76

21  Exhibit 7      UCC 1 Financing Statement    77

22  Exhibit 11     Critical Vendor List         89

23

24

25
```

1     HOUSTON, TEXAS; WEDNESDAY, AUGUST 3, 2022; 10:02 A.M.

2                        (Call to Order)

3          THE COURT:  Good morning, everyone.  This is Judge

4     Lopez.  Today is August 3rd.  I'm going to call the Free

5     Speech Systems case here on first days.  I've completely

6     muted to the phone line so I'm going to take appearances in

7     the courtroom then I'm going to take appearances for anyone

8     on the phone.  If you wish to be recognized, you just need

9     to hit five star, give me a second and I will unmute your

10    line.

11         I'll just remind everyone who may be appearing, by

12    video that appearing by video is just the same as appearing

13    live in Court.  So, I would just ask that everyone please

14    observe the decorum that you would use if you were live in

15    the courtroom, that you would exercise that same judgment if

16    you were appearing by video.

17         So, with that said, let me go ahead and take

18    appearances.  And I will begin in the courtroom.

19         MR. BATTAGLIA:  Good morning, Your Honor.  I

20    assume this microphone is working.  Your technology is --

21         THE COURT:  We're good today.

22         MR. BATTAGLIA:  Okay, good.  Ray Battaglia on

23    behalf of Free Speech Systems.  Appearing with me today are

24    Hyung Lee and RJ Shannon.  Also present in the courtroom is

25    Marc Schwartz, the Chief Restructuring Officer for my

1    client.  And on the telephone, Norm Pattis, the Counsel for

2    the Debtor in the Connecticut State Court litigation.

3              THE COURT:  Okay, thank you.  And if -- I can --

4    good to see you in person, Mr. Battaglia.

5              MR. BATTAGLIA:  Good to see you, Judge.

6              THE COURT:  Good morning.

7              MR. MOSHENBERG:  Good morning, Your Honor.  How

8    are you?

9              THE COURT:  Good.  Good morning.

10             MR. MOSHENBERG:  I'm here on behalf of the Texas

11   Plaintiffs, Avi Moshenberg.  And also, as we had hoped, we

12   have secured Jarrod Martin and Marty Brimmage as our

13   bankruptcy counsel on behalf of the Texas Plaintiffs, Your

14   Honor.

15             THE COURT:  Okay, good morning.

16             MR. CHAPPLE:  Good morning, Your Honor.

17             THE COURT:  Good morning.

18             MR. CHAPPLE:  Nice to see you again.  Ryan Chapple

19   on behalf of the Connecticut Plaintiffs.  I have my

20   colleague, Eleanor Sterling here in the courtroom.

21             THE COURT:  Good to see you.

22             MR. CHAPPLE:  And Mr. Chris Mattei on the line as

23   well.

24             THE COURT:  Okay, good morning.

25             MR. NGUYEN:  Good morning, Your Honor, Ha Nguyen

1   appearing on behalf of the United States Trustee.  Also with

2   me in the courtroom is Assistant U.S. Trustee Millie Sall.

3          THE COURT:  Oh, pleasure.  Seen the name, a

4   pleasure.  Nice to see you.

5          MR. LEMMON:  Your Honor, Steve Lemmon.  I

6   represent PQPR Holdings Limited.

7          THE COURT:  Oh, good morning.

8          MS. HASELDEN:  Good morning, Your Honor.  Melissa

9   Haselden, the Chapter 5 Trustee.

10          THE COURT:  Good morning, Ms. Haselden.  Anyone

11   else in the courtroom wish to make an appearance?

12          MR. CHAPPLE:  Your Honor, my apologies.  I

13   neglected to make clear and introduce Mr. Brimmage as

14   counsel for the Connecticut Plaintiffs as well.

15          THE COURT:  Oh, okay, good morning.  Okay.  I

16   think we've taken all the appearances in the courtroom.  If

17   anyone wishes to make an appearance who's on the line, why

18   don't you hit five star and I will unmute your line.  Okay.

19   I've got a 361 area code.

20          MR. JORDAN:  Judge, Shelby Jordan.  I represent

21   Alex Jones.

22          THE COURT:  Okay, good morning.  Mr. Jordan, I'm

23   going to mute --

24          MR. JORDAN:  Good morning, Judge.

25          THE COURT:  -- I'm going to leave the other line

1  unmuted.  If you could just keep your phone on mute during

2  the time, but if you wish to make a statement, obviously,

3  I'll keep your line unmuted.  You don't need to hit five

4  star again.

5          MR. JORDAN:  All right, thanks.  Thank you.

6          THE COURT:  Anyone else wish to make an

7  appearance?  Okay, I've got an area code 203.

8          MR. PATTIS:  Judge, this is Norm Pattis.  I don't

9  have an appearance in the file, but I was asked to make

10  myself available today, so I am here.

11          THE COURT:  Okay.  Thank you.  Mr. Pattis, just

12  for clarification, you represent just FSS in the Connecticut

13  --

14          MR. PATTIS:  I'm sorry, sir?

15          THE COURT:  Just want --

16          MR. PATTIS:  No sir.  I represent --

17          THE COURT:  Go ahead.

18          MR. PATTIS:  I apologize, sir.  I represent Free

19  Speech Systems and Alex Jones in the Connecticut Litigation.

20          THE COURT:  Okay, thank you.  Now, I'll keep your

21  line unmuted as well.  And just keep your phone on mute,

22  sir.  Thank you.

23          MR. PATTIS:  Yes, sir.

24          THE COURT:  Would anyone else wish to make an

25  appearance?  Okay, now that we've taken all the appearances,

1    Mr. Battaglia, I'll turn it over to you.

2          MR. BATTAGLIA:  Thank you, Your Honor.  Ray

3    Battaglia for Free Speech Systems.  The matters before the

4    Court today are Docket Number 6, the cash collateral motion.

5    And with that motion, Your Honor, we have an issue that

6    lingers with the -- I'll call them the Plaintiffs' Group --

7          THE COURT:  Mm hmm.

8          MR. BATTAGLIA:  -- that I'll come back to and

9    discuss in a moment, and we can decide how to proceed.

10          THE COURT:  Mm hmm.

11          MR. BATTAGLIA:  With respect to the motion to

12    provide adequate assurance for payment of utilities, Docket

13    Number 7, the Court had suggested that a two-week segregated

14    escrow be established.  I'm wise enough to -- and have

15    inserted that in the proposed form of order.  And unless the

16    Court requires more, there's no opposition to that motion

17    with that change.

18          THE COURT:  Okay.

19          MR. BATTAGLIA:  Generally, the motion provides

20    pretty standard procedures for a utility to come in and

21    request additional adequate assurance if they think -- and

22    then a protocol for how that proceeds.  But generally,

23    between the two-week escrow and the ability to generate cash

24    flow, we've offered that as adequate assurance at this

25    juncture.

1             THE COURT:  Okay.  Let me hear from Mr. Nguyen.

2    Mr. Nguyen, have you had an opportunity to --

3             MR. NGUYEN:  Yes, Your Honor.  I've also spoke

4    with Mr. Battaglia.  We have no objection to the utilities

5    motion.

6             THE COURT:  Okay.  Is there a revised proposed

7    form of order that I can --

8             MR. BATTAGLIA:  I will upload an order this

9    evening, Your Honor.

10            THE COURT:  Okay.  Let me just hear this -- I

11   spoke to the utilities motion, which is at Docket Number 7.

12   Anyone wish to be heard in connection with that particular

13   emergency motion?  Okay, anyone on the line?  Let me just

14   check.  And if you do, you need to hit five star.

15            Okay.  I would just note then for the record that

16   at Docket Number 7, it was an emergency motion seeking entry

17   of an order approving the Debtor's proposed form of adequate

18   assurance of payment for future utility services and

19   approving adequate assurance procedures.

20            A very common first day motion to provide adequate

21   assurance to utility providers without adequate assurance,

22   Section 366 of the Bankruptcy Code would allow utility

23   providers to not -- essentially not provide services if they

24   so wish to.  So, upon the furnishing of adequate protection

25   -- actually, adequate assurance and the related procedures,

1    I'm going to ask the Debtor to ease into the Chapter 11

2    process and still maintain all of its utilities on an

3    ongoing basis.

4            So, I have proposed at the last hearing, and Mr.

5    Battaglia has kindly agreed, to take the Court's

6    consideration of a two-week deposit at -- in a segregated

7    account that would serve as adequate assurance.  Any utility

8    can come in and ask for additional assurance, but I am

9    comfortable with a two-week in a segregated account.

10            And Mr. Battaglia, it can be placed -- I've got a

11    question about the bank accounts, just so I understand the

12    cash management system.  But theoretically, I'm comfortable

13    with just it segregated with -- still held by the Debtors.

14            MR. BATTAGLIA:  Separate account, Your Honor, or

15    just accounting segregated?

16            THE COURT:  Just accounting segregation for my

17    purposes is fine.  Just something that utilities cand feel

18    comfortable, that they could look to that's accounted for on

19    the books.

20            MR. BATTAGLIA:  We are in the process of opening

21    DIP accounts with Access Bank.

22            THE COURT:  Okay.

23            MR. BATTAGLIA:  And moving the Debtor's accounts

24    to that bank.

25            THE COURT:  Okay.  It just makes it easier.  And

1    at the end of the case, then if -- depending on where we end

2    up, one can provide an order and a plan or something that,

3    you know, the deposit would then go back at the end of the

4    case.  It just makes it a little bit easier.

5            So, with the proposed change, I'll grant the

6    emergency motion at Docket Number 7.  I would just ask that

7    you run the proposed order by Mr. Nguyen before you get it

8    on file.  Make sure the Trustee's okay with it, and then

9    file it on the Docket and I'll take a look at it.  If it

10   looks good, I'll sign it, okay?

11           MR. BATTAGLIA:  Depending upon how late we go

12   today, I'll leave the -- well, Mr. Nguyen, by tomorrow,

13   Judge.

14           THE COURT:  Okay, and if any other party asks to

15   see it, just -- can I just make sure that everyone takes a

16   look at it before you upload it?  But I find this to be

17   fairly routine.  So --

18           MR. BATTAGLIA:  Your Honor, Docket Number 8 is the

19   Debtor's emergency motion for authority to pay critical

20   vendors.

21           THE COURT:  Why don't we take up 9 first and then

22   we can kind of take up 6 and 8 together?  Because I think

23   they relate.

24           MR. BATTAGLIA:  That's fine, Judge.  The Docket

25   Number 9 is the Debtor's emergency motion to extend time to

1   file schedules and statements of affairs.  There's no

2   opposition to the relief requested in that motion.

3          THE COURT:  Okay.  Does anyone wish to be heard in

4   connection with the motion to file -- I should say to extend

5   the time to file schedules and statements?  Just checking

6   online.  Okay.  This is another what I consider to be

7   procedural ordinary course, it's just providing for

8   essentially a two-week extension of the time.  I want the

9   Debtor to get the schedules right and to take the time to

10  get it right so there's no filing of amendments if that's --

11  it has the right to do that, but I'd rather you come out

12  with what you feel is right.  So --

13         MR. BATTAGLIA:  And Your Honor, the proposed

14  order, the 15th day falls on a Sunday, so I've put a date

15  certain of the following Monday.

16         THE COURT:  Okay.

17         MR. BATTAGLIA:  The Code authorizes only a 15-day

18  extension for a Sub B case without further cause.

19         THE COURT:  No, it's fine.  The 29th is fine.  I

20  want you to -- if that's the date you'll feel you can get it

21  right by, then let's do that.  Let me just -- I'm signing

22  that order right now and I'm going to send it off to

23  Docketing.

24         Mr. Nguyen, can you just talk to me, just

25  generally at the 10,000-foot level?  I just want to

1    understand the Debtor's cash management -- current cash

2    management system.  Where does it hold bank accounts and

3    what's going on there?

4              MR. BATTAGLIA:  The current bank account is at

5    Security Bank in Crawford, and it'll be moved to Access Bank

6    as a DIP account.  Security, not a DIP approved account.

7              THE COURT:  Okay.  Is Access?

8              MR. BATTAGLIA:  Yes.

9              THE COURT:  Okay.  And Mr. Nguyen, I'm sure you'll

10   -- I'm just going to -- you'll be working with them on the -

11   -

12             MR. NGUYEN:  Yes, Your Honor.

13             THE COURT:  Okay.

14             MR. NGUYEN:  We'll check the bank account to make

15   sure it's properly collateralized and approved -- on the

16   approved list.  I believe it is, but (indiscernible) I

17   imagine it is.  I haven't seen the list.

18             THE COURT:  Okay, I'll -- but if any issues come

19   up, then you'll just let me know, but I'm going to assume

20   that, if I grant debt relief related, that there's no issues

21   with the cash management system now, and we'll be -- you all

22   continue to work on that, so there's no issue for me to take

23   up on that.

24             MR. BATTAGLIA:  Yes, sir.

25             THE COURT:  Okay.  (Indiscernible) how many

1    employees (indiscernible) right now?

2              MR. BATTAGLIA:  There are 58 employees.  They're

3    employed through a PEO with ADP.  And we're current on

4    payroll.  We paid the payroll through the filing date to

5    avoid having any disruption with employees.

6              THE COURT:  Okay.  So, it's just a related

7    question, so I want to look at the budget for employee

8    payroll, that's not including any pre-petition amount?

9              MR. BATTAGLIA:  It will not.

10             THE COURT:  Okay.  How much cash on hand does the

11   Debtor have from the petition date?

12             MR. BATTAGLIA:  Your Honor, it's --

13             THE COURT:  Just roughly.

14             MR. BATTAGLIA:  -- I'll let (indiscernible) give

15   the current --

16             THE COURT:  Just on the back of the envelope.  I

17   won't hold you to the number.  I'm just trying to understand

18   just generally.

19             MR. BATTAGLIA:  As of filing date, approximately

20   $1.3 million, of which about $800,000 was not cash

21   collateral.

22             THE COURT:  About $800,000?

23             MR. BATTAGLIA:  One of the -- yeah, the Debtors

24   you will learn, receives large donations on occasion.

25             THE COURT:  Mm hmm.  Okay.

1           MR. BATTAGLIA:  And obviously there's great

2    variability in that in the sense --

3           THE COURT:  So that half a million of just what

4    you would consider cash collateral, about $1.3 million and

5    about $800,000 we would call restricted for now, and then

6    another half a million --

7           MR. BATTAGLIA:  My estimate, yes, sir.

8           THE COURT:  Okay.

9           MR. BATTAGLIA:  Now, that's the full accounting.

10          THE COURT:  So, and we'll get into this, and I

11   kind of just want to understand before we get into the cash

12   collateral motion, just when I looked at the budget, it's

13   your 13-week cash flow using -- it's just simply going week-

14   by-week.  I don't -- I didn't see kind of a beginning cash,

15   ending cash analysis there.  And that's why I was asking.

16   So, are you comfortable --

17          MR. BATTAGLIA:  It was not in the -- because as of

18   the time we filed the motion, we didn't know what the

19   beginning cash balance would be.

20          THE COURT:  Okay.

21          MR. BATTAGLIA:  But we obviously can provide that.

22          THE COURT:  Okay.

23          MR. BATTAGLIA:  It's now, as we understand it,

24   about $1.3 million.  And you know, in-flows, Judge, the

25   nature of the cash generation aspects of this business,

1    obviously the broadcast generally in and of itself doesn't

2    produce revenue except by advertising, and also by

3    generating product sales.  And product sales are dependent

4    on a number of things.  One of them is Alex Jones being the

5    broadcaster.

6              THE COURT:  Mm hmm.

7              MR. BATTAGLIA:  And another one is the

8    availability of inventory, which has been an issue in the

9    first quarter of this year, and one that we are rapidly

10   solving for.

11             THE COURT:  Okay.  And I'm going to let you turn

12   to your presentation.  I apologize for -- I just had a

13   couple of questions to understand.

14             MR. BATTAGLIA:  I'm here to answer the Court's

15   questions, Judge.

16             THE COURT:  So, I understand that the -- just from

17   the -- my knowledge from the prior cases, there were cases

18   pending in Austin and in Connecticut.  There was one of the

19   litigation claims as continuing out of assigned, an order

20   lifting a stay.  We still had the fraudulent transfer action

21   in Austin.  So, those are the two Austin actions that I was

22   aware of.  And there was, what we call the Sandy Hook

23   litigation in and -- pending in Connecticut.

24             MR. BATTAGLIA:  There's one other lawsuit in

25   Austin.  It's the Fontaine lawsuit, which is not

1    consolidated with Austin (indiscernible) lawsuit --

2              THE COURT:  Oh, that's right.

3              MR. BATTAGLIA:  -- and is not currently in trial.

4              THE COURT:  Got it, okay.  That was the --

5              MR. MOSHENBERG:  There's also -- yeah, thank you.

6    There's the Posner case, also, Your Honor.  It's another

7    Sandy Hook litigation.

8              THE COURT:  Right, yeah, no, no.  That's exactly

9    right.  But they're all kind of related.

10             MR. MOSHENBERG:  Yes sir.

11             THE COURT:  They're -- those were the ones that

12   were released on a case -- I get it there were several cases

13   on it, but this -- I'm thinking just in buckets.  In the

14   Connecticut litigation, I do remember that there were

15   potentially several lawsuits pending, but they were overall

16   related.  The same kind of set of Plaintiffs there.  Are

17   there -- is there any additional litigation with respect to

18   this Debtor that's different than the --

19             MR. BATTAGLIA:  Your Honor, I think --

20             THE COURT:  I guess what I'm looking at --

21             MR. BATTAGLIA:  Sandy Hook related?

22             THE COURT:  Well, I'm thinking -- I remember the

23   three Debtors were all actually Defendants in the -- in all

24   of these litigation, in one way or the other, whether the

25   InfoW, IW Health, and Prison Planet.  Is FSS asserting any

1    claims against -- any cross-claims, any counter-claims

2    against any other parties related to this litigation?  Are

3    they being sued separately by any party in any parts of this

4    litigation?  I'm just trying to understand.

5            I understood the last Debtors I had.  I just --

6    I'm just trying to get up to speed so if folks start

7    mentioning litigation claims, then I'm up to speed.  Is

8    there any other litigation that I should be aware of that

9    relates to Mr. Jones, any of his entities, as it relates to

10   FSS that's different or in addition to the ones that I

11   mentioned?

12           MR. BATTAGLIA:  Yes, sir.  With respect to the

13   Sandy Hook litigation, the extent the -- and I'll call it

14   the IW Defendants --

15           THE COURT:  Mm hmm.

16           MR. BATTAGLIA:  -- have been dismissed with

17   prejudice.  There are no cross-claims or counter-claims

18   between those parties.

19           There is I think one piece of litigation that does

20   join both IW and FSS, and that was a lawsuit filed in

21   Florida that the Debtor and its affiliates were successful

22   and won at trial.  And it's up on appeal.  It was a -- no

23   damages, shall we say acquittal judgment entered in the

24   Florida case.  That case has been pending for a while with

25   no action ongoing.

1           THE COURT:  Okay.

2           MR. BATTAGLIA:  In terms of other litigation, I'm

3    aware of, and there could be a few more, but these are the

4    ones I'm aware of, I know that FSS was sued for intellectual

5    property improper use, copyright infringement, a lawsuit

6    which is not extraordinary for this business.

7           And that is probably a couple of months past

8    answer date.  And there is a lawyer representing the Debtor.

9    And then I am aware of another lawsuit filed in New York, I

10   think Federal Court -- don't hold me to that -- that alleged

11   that an ADA violation for not making its website accessible

12   or its purchasing website accessible to, I think it was

13   visually impaired individuals.  And that -- it was filed at

14   or about the same time as the copyright infringement case.

15          THE COURT:  Okay.

16          MR. BATTAGLIA:  Those are the ones I'm aware of.

17          THE COURT:  Thank you.

18          MR. LEE:  Your Honor, Kyung Lee for the record.  I

19   just want to supplement that -- what Mr. Battaglia said.

20          THE COURT:  If you can just get closer to the mic.

21   I want to make sure everybody can hear you.  I appreciate

22   it.

23          MR. LEE:  I'll just tell Mr. Battaglia --

24          THE COURT:  And just considering these are

25   preliminary questions, I just want to make sure that I

1    understand the lay of the land before we --

2              MR. LEE:  For purposes of complete transparency,

3    Your Honor, there was an indemnity claim that Mr. Jones

4    filed against FSS in the Connecticut litigation last week,

5    which has been stricken by the Connecticut Judge, Honorable

6    Bellis yesterday.

7              So, I just want you to know that there was an

8    indemnity claim made by Alex Jones against FSS.  So, that's

9    another claim that existed.  And I think Mr. Jones is also

10   going to assert a proof of claim in the FSS bankruptcy case.

11             THE COURT:  Okay.

12             MR. LEE:  I just wanted to let you know that.

13             THE COURT:  So, but you said that litigation, that

14   cause of action is it -- doesn't seem like it's live

15   anymore, is that --

16             MR. BATTAGLIA:  There is an update, obviously, of

17   developments from yesterday.  And I am going to give the

18   straight version without any color on either side.

19             THE COURT:  Okay.

20             MR. BATTAGLIA:  It is that the judge preceded with

21   hearings yesterday in Connecticut and did strike the cross-

22   claim.  And then apparently, suggested that the litigation

23   should go forward and pick a jury, although FSS was still a

24   party to that litigation and had not been settled.  As a

25   consequence, FSS filed a notice of removal of that

1    litigation.

2            THE COURT:  Okay.

3            MR. BATTAGLIA:  We didn't feel it was appropriate

4    with --

5            THE COURT:  Where is it pending now, in front of a

6    bankruptcy court, like an adversary proceeding in front of

7    bankruptcy court or something?

8            MR. BATTAGLIA:  It will be pending in front of a

9    Bankruptcy Court.  Is it Bridgeport?

10           MR. LEE:  Yes.

11           MR. BATTAGLIA:  It's in Bridgeport.

12           THE COURT:  Okay, okay.

13           MR. BATTAGLIA:  So, that's the status of it.  And

14   I know the parties are having some conversation about what

15   that means for Friday, the emergency motion to lift stay.

16   Nothing further to report on it.

17           THE COURT:  Okay.  No, no, no, I just -- I

18   appreciate it.  I know that there's a lot of moving pieces

19   and I just want to just understand that before we got into

20   the motion, just so we're all on the same page.  I think you

21   answered all my basic questions.  I just wanted to

22   understand kind of the employees' insurance.  Any issues

23   with insurance that I should be aware of?

24           MR. BATTAGLIA:  We have insurance coverage.  And I

25   believe part of the payments in the critical vendor include

1    payment of the policy.

2              THE COURT:  Okay.  All righty.  I will stay quiet

3    and let you --

4              MR. BATTAGLIA:  No, you won't, Judge.

5              THE COURT:  -- turn it back over to you.

6              MR. BATTAGLIA:  This is your courtroom.

7              So, the remaining two matters, Your Honor, are the

8    cash collateral motion and the critical vendor motion.  And

9    where we stand on those, Mr. Martin and I have had several

10   conversations on the cash collateral motion.  There's

11   certain accommodations being made, and I'll -- the biggest

12   one relates to a $250,000 payment to PQPR that is shown in

13   the budget.  That is a -- the way the Debtor operates with

14   PQPR in inventory, if PQPR purchase inventory, pays for it,

15   sells it through our sales channel, the Debtor gets 20

16   percent of the net.  PQPR gets 80 percent of the net.  If

17   it's FSS's inventory, and obviously, FSS is Free Speech

18   Systems, 90 percent goes to the Debtor and 10 percent goes

19   to PQPR for its involvement in the purchasing and

20   involvement in the -- as I understand it, supplements have

21   to have, and don't hold me to this word -- be sold under

22   some certification, and Dr. Jones individually, PQPR holds

23   that certification.  That's my very basic understanding.

24             And so, there is inventory that we have agreed to

25   purchase from PQPR.  It has not been delivered yet, that

1    it's pre-paid $750,000 for.  We would like to move that

2    inventory into the FSS inventory category and sell it and

3    receive 90 percent of the net.  The profit margin on

4    supplements can be anywhere from 3X to 5X, so we think it's

5    a good investment for this estate.  And the accommodation

6    that the Plaintiffs have requested is that they have a 30-

7    day look claw back window look -- to file something, if they

8    think the payment is inappropriate.  And we're amenable to

9    that.

10           There are some other changes we've agreed to,

11   particularly strengthening the reservation and the no waiver

12   provisions that aren't intended.  We have proposed a

13   replacement lien to the equivalent validity and priority of

14   the existing PQPR pre-petition liens.  Obviously, if there's

15   no pre-petition lien, there's no replacement lien.  And the

16   -- I think the remaining -- there was also a request that we

17   limit any insider payments to not more than $20,000,

18   exclusive of that $250,000 payment I just mentioned.  And

19   we're amenable to that.  We'll put that in an order.

20           So, the hang-up here that we have, and we can

21   discuss it in a little more detail later, is that they've

22   requested that they be given challenge rights with respect

23   to the PQPR liens, like, basically, Louisiana World

24   Exposition rights.  And the Debtor is not amenable to that.

25           We have two options as far as proceeding.  One of

```
 1   course, is just to go forward with the full-blown hearing.
 2   And the other is for, I guess Mr. Martin and I, and I'm not
 3   sure who else, to stand up and say why we think the creation
 4   of the Tort Committee is a good idea or a bad idea at this
 5   point in time, and let the Court give us some direction on
 6   that.  I'm amenable to whatever the Court would like to do.
 7   But other than that, there's no opposition to the use of
 8   cash collateral.
 9           THE COURT:  Okay.  And with respect to the
10   critical vendor motion, where do things stand?
11           MR. BATTAGLIA:  The only comment I received was
12   from Mr. Nguyen, who asked that I make a proffer of the
13   critical nature of the vendors.  Otherwise, there's no
14   opposition of the critical vendors.
15           THE COURT:  Okay.  And the critical vendors, when
16   is it generally?  And we haven't taken any evidence, but I
17   just want to understand it.  When are those payments due?
18   When do you need them?  When does the Debtor need to make
19   those payments?
20           MR. BATTAGLIA:  I think they do come in.  They're
21   probably staggered, but some of them are very important.
22   You know, obviously, you're in the broadcast business in the
23   modern world.  Access to the internet and satellite and
24   other things is vital.  And if you go dark, it's extremely
25   costly.
```

```
1               So, I don't know specifically.  And Mr. Schwartz
2     may or may not know precisely when those payments are due.
3     But certainly, I would say within the next two weeks, we
4     have to make -- we have to commence making payments.
5               THE COURT:  Okay.
6               MR. BATTAGLIA:  I think they're not broken out as
7     critical vendor payments in the budget.  They're included
8     within the expense items.
9               THE COURT:  Okay, thank you.
10              MR. BATTAGLIA:  So --
11              THE COURT:  Let me hear from -- go ahead.
12              MR. BATTAGLIA:  And then as far as the remaining
13    things, you had asked at the last hearing to have Mr.
14    Schwartz address the relationship with IW.  I'm prepared to
15    do that however the Court would like.  And you know, I have
16    to make one comment.  I kept hitting five star the other day
17    because I kept hearing about $62 million going to Alex Jones
18    in the last two years -- and I think it's in the objection.
19    $62 million has been drawn on account of Alex Jones over 15
20    years, over $30 million of which was to pay income taxes,
21    which this is a flowthrough entity, and the LLC has an
22    obligation to pay the tax obligations.
23              I understand those payments were directly from FSS
24    to the IRS.  So, I just -- I'm not going to go any further
25    than that to say I can't leave that -- the misinformation
```

1    going out across the globe without offering some

2    explanation, because it's highly prejudicial.  But I'm

3    prepared to proceed however the Court would direct me.

4            THE COURT:  Okay.

5            MR. BATTAGLIA:  You want me to turn the podium

6    over?

7            THE COURT:  Yeah, let me just hear if anyone --

8    what other parties may have to say at this time.

9            MR. CHAPPLE:  Thank you, Your Honor.  Ryan Chapple

10   again, on behalf of the Connecticut Plaintiffs.  And I --

11   just a little logistics today.  And I'm sure you know

12   because you read the pleadings.  The Connecticut Plaintiffs

13   and the Texas Plaintiffs filed a joint objection.

14           THE COURT:  Mm hmm.

15           MR. CHAPPLE:  So, today, I believe Mr. Moshenberg,

16   Mr. Brimmage, and myself, collectively refer to the group as

17   the Sandy Hook Plaintiffs.

18           THE COURT:  Okay.

19           MR. CHAPPLE:  A few comments about what Mr.

20   Battaglia said with regard to just the narrow issue of cash

21   collateral.  I think it was an accurate recitation of where

22   we are in the back and forth between the parties.  But I

23   want to add a little color to one issue, and then I want to

24   raise one issue that Mr. Battaglia didn't mention.

25           The issue that he didn't mention, that has been

1    part of the discussion is discovery, the opportunity for the

2    Sandy Hook Plaintiffs, between now and a final hearing on

3    cash collateral, to depose Mr. Schwartz and a representative

4    of PQPR and to obtain written discovery from both of those

5    parties relating to the underlying debt that is really at

6    the key of all of this cash collateral discussion.  So, I

7    believe we're on the same page there, but I just wanted to

8    raise that and let the Court know that issue.

9              THE COURT:  Yeah, yeah --

10             MR. BATTAGLIA:  Ray Battaglia for FSS.  We have

11   agreed to reasonable discovery.  We're not going to oppose

12   that.  There may be some timing issues.  Apparently, this is

13   vacation time of the world and I'm happy to say that I never

14   take a vacation, so it's not my --

15             THE COURT:  I was going to say, when did people

16   start doing that?  Just kidding, everyone.  I'm glad

17   everyone takes vacation.  Go ahead.

18             MR. CHAPPLE:  So, Your Honor, that's just --

19   that's issue one that I wanted to raise, that he didn't

20   speak about earlier.  The other issue, and the issue -- he's

21   right.  The impasse that we've reached, the issue that is

22   crucial to the Sandy Hook Plaintiffs is the lien issue and

23   the ability to challenge this lien.

24             THE COURT:  So, tell me, your clients -- well,

25   from the Sandy Hook Plaintiffs' side's perspective, what

```
 1    should a cash collateral order look like, if you had your
 2    way today?  What should an interim order look like today?
 3              MR. CHAPPLE:  Today, the interim order should --
 4              THE COURT:  What do you want in it?  What do you
 5    want out of it?
 6              MR. CHAPPLE:  We are agreeable, and I think it'll
 7    be a short back and forth between the Debtor and the
 8    Connecticut, or excuse me, the Sandy Hook Plaintiffs, going
 9    line by line in the 14-day budget that they have.  We've
10    made some modifications.  The original 14-day budget I
11    believe had payments of $54,000 to Mr. Jones.  We've reduced
12    that amount.  So, we've kind of gone back and forth on all
13    of those issues.  I think the sticking point --
14              THE COURT:  So, there's an agreed form of -- well,
15    let's just call it interim -- a proposed form of interim
16    budget, where there -- the line items is -- there may be
17    agreement on buckets for line items for the next couple of
18    weeks.
19              MR. CHAPPLE:  Yes.
20              THE COURT:  Okay.
21              MR. CHAPPLE:  Yes, Your Honor.
22              THE COURT:  Okay.
23              MR. CHAPPLE:  The sticking point is whether or not
24    the Sandy Hook Plaintiffs or any party in this litigation,
25    any party in interest, has standing to challenge the
```

1    purported lien that PQPR has over the cash that's in the

2    hand of Free Speech Systems.  And so -- go ahead.

3            THE COURT:  No, no, so your objection asks for

4    some language basically saying that I'm not making any

5    findings about whether there's a lien -- a valid lien or

6    not.  If that language is included, what else do you need

7    for purposes now?  Do you want me to grant you standing on

8    an interim basis, do you?  Is that what you're asking?

9            MR. CHAPPLE:  If we --

10            THE COURT:  I'm just trying to understand.

11            MR. CHAPPLE:  Sure, sure, sure.  No, and I

12    appreciate that.  If we have the language that we put in the

13    proposed objection that basically makes the finding that you

14    just --

15            THE COURT:  Mm hmm.

16            MR. CHAPPLE:  -- that you just recited, then I

17    would want just a few minutes to confer with my co-counsel,

18    but I believe we are okay there.

19            The other thing, Your Honor, that we were talking

20    about in the hall right before this, that Mr. Battaglia

21    mentioned, is the Court's ability to appoint a Plaintiffs --

22    a Tort Plaintiffs Committee similar to what Judge Isgur did

23    in the Watson Grinding case, that gives that oversight and

24    power to a committee to challenge those liens and to

25    investigate the validity of those liens.

```
 1                THE COURT:  Right.  So, I will -- I'll tell you,

 2    Mr. Battaglia's going to have to tell me, and how he feels

 3    about that language.  I'm not telling you to agree to it or

 4    not.  I just need to understand what your position is, if

 5    that language is included for purposes of an interim order,

 6    then I'm -- the Court isn't making any findings as to

 7    whether there's a lien or not.  You'll have to let me know

 8    about that.

 9                MR. BATTAGLIA:  Your Honor, I'll do that after the

10    other side is complete -- whoever is going to present --

11                THE COURT:  Okay.  You know, I agreed 1102(a)(3) -

12    -

13                MR. CHAPPLE:  Your Honor, may I go grab my --

14                THE COURT:  Oh absolutely.  And I'm not saying

15    this is what you're asking for --

16                MR. CHAPPLE:  Mm hmm.

17                THE COURT:  -- I'm just noting 1102(a)(3) says

18    that unless the Court for cause orders otherwise of

19    committee creditors may it not be appointed in a small

20    business case or a case under Sub Chapter 5.

21                So, I'm of -- I don't believe I have authority to

22    do anything today, but I do think if someone filed a motion,

23    and we take it up as -- and then we'd find whether there

24    would be cause, unless someone can show me cause today.

25                So, if -- I'm not comfortable agreeing me just
```

1    ordering it over the objection of a party.  Someone's going

2    to have to show cause, and if there's cause then you win.

3    But someone's going to have to tee the issue up as to

4    whether there's cause to appoint a committee.  And if there

5    is -- and maybe that's what you're asking for, is to say

6    that if you're asking for a committee like the Watson

7    Grinding Committee, and that was, I believe, and Trustee

8    will have to tell me, it felt like an official committee.

9    What maybe was a -- someone will have to tell me.  But I

10   think Sub Chapter 5 is a little different.

11           MR. CHAPPLE:  Mm hmm.

12           THE COURT:  So, I don't -- the answer may not --

13   the answer just may be no today, but maybe at some point,

14   maybe you do get it at a final, if you can prove cause or

15   not.  But someone will have to show me where I would have

16   authority to do it today and based on what.  And maybe that

17   evidence comes out today.  But those'll be the questions

18   that I've got.

19           MR. CHAPPLE:  I understand, and I appreciate that

20   clarification, Your Honor.  I think what we do now is take a

21   short recess, let me confer with my colleagues on kind of

22   the question you had about the language that's in the

23   objection, and if that gets us there in the interim.  And

24   then also, I know we were absolutely interested in moving

25   for the creation of a committee for cause.  And we can also

 1   talk about that dynamic, and whether or not we feel like if

 2   we move forward today in -- while we're objecting to the

 3   motion for interim use of cash collateral, we can also prove

 4   up the cause needed to form the committee.  So, if the Court

 5   will give me that latitude, we can visit for just a few

 6   minutes and come back.

 7         THE COURT:  You're asking for time to meet, yeah.

 8   Mr. Battaglia, I just would need to know, and I'm not

 9   telling you one way or the other what you should do.

10   Obviously, I'm already suggesting it one way or the other.

11   I just need to understand that was some requested language

12   in an objection that I read, and I just need to understand

13   whether you'd be comfortable with that.  Because again, I'm

14   just trying to understand.  We haven't taken any evidence or

15   anything.  I just need to understand.

16         But I would need to hear as well -- Mr. Lemmon,

17   you have to tell me one way or the other whether there's a

18   lot of proposed changes to an order, and PQPR would have to

19   let me know whether they'd be amenable to that as well.  And

20   I'll give them the latitude to say yes or no.

21         MR. BATTAGLIA:  Your Honor, I think the changes

22   that Mr. Martin and I exchanged by email last night that are

23   agreed to are a cap on insider distributions of $20,000,

24   individual insiders.

25         THE COURT:  Mm hmm.

```
 1              MR. BATTAGLIA:  The $250,000 inventory purchase

 2      payment with the claw back provision.  The -- there's

 3      nothing in my proposed order that has this Court validating

 4      any liens or debts of anybody.  It simply says that there is

 5      a replacement lien of equal stature.  That's it.  But

 6      they've requested some reservation sand non-waiver language,

 7      and -- at least what I saw last night, and I don't know that

 8      I recall whether it's the same in the objection, we've

 9      agreed to insert that language.  We've agreed to reasonable

10      discovery.

11              And Your Honor, the problem I have with a Tort

12      Committee at this juncture, aside from the fact that there's

13      no motion, aside from the fact that we've agreed to a level

14      of discovery so they can at least take a look behind the

15      curtain, is that creation of a Tort Committee on behalf of

16      creditors who at this point have no -- they have a claim,

17      but they have an unliquidated claim, we don't know whether

18      that claim is going to swamp this Debtor or whether it's

19      going to be manageable and can be paid from operations of

20      the estate, which renders pursuit of, you know, fraudulent

21      conveyance claims as kind of a tomorrow issue.

22              But there's no limitations running on any of these

23      questions.  We just don't see it as a today issue.  If you

24      appoint a Tort Committee with the Debtor's sort of start-up

25      growth back into revenue with product deliveries, the costs
```

1    of that committee are going to swamp this case.  They just

2    are.  They're going to hire a lawyer and they're going to

3    charge it to the estate and they're going to swamp this

4    case.  We think that let them take a look and we can come

5    back and revisit the issue when it's before the Court.

6    That's our position on appointment of a committee at this

7    point.

8             THE COURT:  Okay.  So, you're okay with inserting

9    -- and I want you to confirm that -- the only language that

10   I've read obviously is the language that was in the

11   objection.  Maybe during the break, you can take a look at -

12   -

13            MR. BATTAGLIA:  I will, I will.

14            THE COURT:  -- that language, or maybe Mr. Martin

15   can confirm what that -- you know, I still want to -- and

16   again, and I know there -- still have to put up some

17   evidence.  I still need an evidentiary basis.  And maybe Mr.

18   Schwartz's declaration does the trick or whatever to support

19   critical vendor and cash collateral.

20            MR. BATTAGLIA:  Absolutely.

21            THE COURT:  And I know that.  And again, and at

22   the same time there, maybe I can -- at that time, you can

23   provide the -- I don't know, the clarity that I was looking

24   for with respect to Mr. Schwartz's relationship now with

25   these Debtors as opposed to the last cases.

1           MR. BATTAGLIA:  And if the Court's okay with a

2   proffer at that point, I'm happy to do it.  If not, I'll

3   call Mr. Schwartz (indiscernible).

4           THE COURT:  Okay, I'll let you all figure it out

5   and we'll see if we got a contested hearing or not and

6   whether the declaration's going to work or not.  So --

7           MR. CHAPPLE:  Yes, sir.

8           THE COURT:  It is 10:42.  How much time do you

9   think you all need?  Okay, I'll come back at 10:52, more or

10  less.

11          MR. LEE:  Your Honor?

12          THE COURT:  Yes?

13          MR. LEE:  I have one housekeeping administrative

14  matter.

15          THE COURT:  Okay.

16          MR. LEE:  I just wanted to alert this Court to.

17  Since we're all here today -- Kyung Lee for the record --

18  you know that we have ECF Number 15, the emergency motion

19  for relief from automatic stay scheduled for Friday --

20          THE COURT:  Mm hmm.

21          MR. LEE:  -- at 10 a.m.  And based upon some of

22  the activities that have taken place in Connecticut --

23          THE COURT:  Mm hmm.

24          MR. LEE:  -- especially the removal of the

25  litigation that took place yesterday, I've consulted, or

```
 1    I've asked the counsel for the Connecticut Plaintiffs,
 2    whether or not the hearing on Friday is moot because there
 3    is no -- going to be a jury selection, as I understand it,
 4    which was the basis for the emergency motion, whether there
 5    is going to be any jury selection on Monday, next Monday.
 6              So, I just wanted to raise that issue because I'd
 7    rather have Mr. Schwartz go up to Austin and work on other
 8    stuff rather than be here in the courtroom this week.  So,
 9    just wanted to raise that.
10              THE COURT:  I'll let the Connecticut Plaintiffs
11    tell me what you want to do.
12              MR. LEE:  Right.
13              THE COURT:  You asked for an emergency hearing,
14    I'll grant you one.  And if you want to come back another
15    day, you can do that.  If you want to go forward on Friday
16    with the Southern District of Texas, you'll get your day, if
17    you want it.  And you just tell me what you want to do.
18              If you want to take some time and talk about it,
19    I'll come back in 10 minutes, and we can talk about
20    everything.
21              MR. CHAPPLE:  Thank you, Your Honor.
22              THE COURT:  Okay.
23              MR. CHAPPLE:  As of now, we still want to go
24    forward on Friday.  We're still discussing it.  And one
25    other thing, I -- it always takes a little bit longer than I
```

1    want it to.  Could we do the top of the hour?  Could we do

2    11:00 instead of 10:42?

3            THE COURT:  Well, I was going to tell you that --

4    that was going to get tricky for me then.

5            MR. CHAPPLE:  Oh wait -- I don't want it to be

6    tricky.

7            THE COURT:  No, I'd rather -- what I was going to

8    say, I would rather just round up, so if someone would come

9    back and ask me for more time.  So, it's 10:43.  I'm going

10   to come back at 11:00, and then I'll check in.  If the

11   parties want more time, you let me know, okay?

12           MR. CHAPPLE:  Thank you, Your Honor.

13           THE COURT:  For the folks who are on the line, I'm

14   going to mute the audio.  But -- I'm going to mute the line.

15   I'm going to let the parties in here have the ability to

16   talk freely.  If there's someone you need to talk to, then

17   call them by the cell, but I'm going to mute the line

18   because I'm stepping off and I'll come back on.

19       (Recess)

20           CLERK:  All rise.

21           THE COURT:  Okay.  I'm back in on the record in

22   Free Speech Systems.  Mr. Battaglia, why don't you tell me

23   where we are?

24           MR. BATTAGLIA:  As far as the language that was

25   suggested, the -- I added one word, moreover nothing herein

1   shall grant or prejudice the rights of -- it goes on to talk

2   about the rights to challenge the liens and challenge the

3   debt.  We don't dispute any creditor and party in interest

4   that has a right to contest the debt of PQPR and the liens.

5         At this point, I just don't want it to infer going

6   further that there's any additional rights that are

7   conferred by this order.

8         THE COURT:  Okay.  Kind of status quo.  Okay.  And

9   --

10        MR. BATTAGLIA:  They stand as far as the --

11        THE COURT:  Yeah.

12        MR. BATTAGLIA:  -- Tort Committee issue.

13        THE COURT:  So --

14        MR. CHAPPLE:  Thank you, Your Honor.  Ryan

15  Chapple, thank you for the time.  Appreciate it.  We've had

16  discussions between the Connecticut Plaintiffs and Texas

17  Plaintiffs.  And our position is that cause exists today to

18  appoint a committee.  And the reason that cause exists is

19  even if we have protective language in an interim order,

20  there's still no party that has standing in this case to

21  challenge the validity of those liens.

22        And we believe that the lack of standing for any

23  party to challenge the validity of a lien is cause to

24  appoint a plaintiffs committee today.  And we think it's

25  consistent with the thoughts that the U.S. Trustee has

1    espoused on Monday, and I believe it will espouse again

2    today about the need for oversight here.

3            And really, this underlying debt and this lien is

4    a fundamental issue in this bankruptcy case.  And we feel

5    like we have to have a mechanism and the most logical

6    mechanism is a plaintiffs committee that would have the

7    oversight and the ability to challenge those liens.

8            I know that Mr. Brimmage wants to make some --

9    make a few remarks as well, but I wanted to reiterate that,

10   and I believe Mr. Ha would like to make a few remarks as

11   well.

12           THE COURT:  Okay, thank you.

13           MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

14   the U.S. Trustee.  I just want to touch base with some of

15   the first day motion.  The first thing is the critical

16   vendor motion.  Mr. Battaglia and I, we worked out some

17   language.

18           THE COURT:  Okay.

19           MR. NGUYEN:  He's going to put on some evidence to

20   show the necessity of the payments.  Every time there's a

21   payment outside the statutory scheme, you know, we need

22   (indiscernible) any (indiscernible) --

23           THE COURT:  No, no, no, I agree.  I'm looking for

24   it.

25           MR. NGUYEN:  And then, in addition to that, in the

```
 1   proposed order, there's going to be a redline for the
 2   critical vendor, there's going to be a mechanism that allows
 3   people to know which critical vendor gets paid.  And then
 4   there's a billing objection period that we put in the order
 5   to allow other creditors who object.  And then there's
 6   potential claw back from the critical vendor.  And that --
 7   you're going to see it once we submit the proposed --
 8            THE COURT:  The claw back, if someone doesn't
 9   provide ordinary --
10            MR. NGUYEN:  Correct, Your Honor.  Or they can
11   challenge the critical nature of that particular vendor.
12            THE COURT:  Yeah.
13            MR. NGUYEN:  It's going to be in a proposed order
14   that Mr. Battaglia's going to file.  And as to the cash
15   collateral, I just wanted to make sure the Court understands
16   that we -- the U.S. Trustee, we do have concerns with the
17   underlying transaction.  I said it on Monday.
18            THE COURT:  Mm hmm.
19            MR. NGUYEN:  It is an affiliate insider debt.
20   When you look at the breakdown of the company, you know, 20
21   percent essentially is owned by Dr. Jones and Alex Jones'
22   wife.  The other 80 percent is indirectly owned by another
23   company that Alex Jones has a majority stake in, someone --
24   there is dealing between parties who are -- you know,
25   there's an insider here.  They're dealing with family
```

1    members.  We pay particular important attention to it.

2             And I think it's particularly important for

3    someone to be able to take a look at this lien and be able

4    to tell the Court whether we have a legitimate debt or not.

5    And I think that's one of the burden that Debtor needs to

6    prove.  It's that before you can actually approve the use of

7    cash collateral, you've got to prove that there's an

8    underlying debt and it needs to be a valid debt.

9             There's a lot of discussion about Tort Committee.

10   On Monday, I mentioned that, you know, this is not your

11   typical Sub Chapter 5 case.  You usually don't have a $60

12   million loan in a Sub Chapter 5 case.  You don't have $62

13   million in (indiscernible) draws in a Sub Chapter 5 case.

14            And I've always urged the Court to slow the

15   process down, and also consider whether additional

16   protections are needed in this case.  And one of the things

17   I point to is maybe there is a need for a Tort Committee to

18   actually take a look at this loan.  Because usually in any

19   cash collateral case -- in any case where there's a cash

20   collateral, one of the first things I do is I always go in

21   and I preserve the challenge period for the lien for any

22   committee.  That's ordinary.  That's routine.  And any case

23   before you, where I think there's going to be a formation of

24   a committee, we preserve that challenge period.  There's no

25   challenge period here.  Quite frankly, because you know,

1    there's no one who has that standing to bring that challenge

2    to the cash collateral.

3              I'm not advocating one way or the other for the

4    Tort Committee, but I let the Court know, you know, once the

5    Court orders the forming of the committee, my office stands

6    ready, and we will get on it and we will move, and we will

7    have an appointment as quickly as possible.

8              That's all I have to say, Your Honor, and thank

9    you very much.

10             THE COURT:  Thank you.  Mr. Brimmage, good to see

11   you.

12             MR. BRIMMAGE:  Good morning, Your Honor.  It's

13   good to be before the Court.  Marty Brimmage with Akin Gump

14   Strauss Hauer & Feld here on behalf of the Texas Defendant

15   or Texas Plaintiffs as well as the Connecticut Plaintiffs.

16             It's always funny to me when the judge on the

17   bench starts citing a code and starts looking at it and

18   everybody starts scrambling to find their code and remind

19   themselves what it said.

20             But I'm glad you did that because 1102(a)(3) says

21   exactly what you said it did.  Unless the Court for cause

22   orders otherwise --

23             THE COURT:  Mm hmm.

24             MR. BRIMMAGE:  Meaning, the Court can order for

25   cause.

1          THE COURT:  Mm hmm.

2          MR. BRIMMAGE:  And I think that's exactly what you

3    have right here, right now.  It doesn't say upon an

4    evidentiary hearing and findings, and you know, dah, dah,

5    dah, in a contested matter where there's whatever the Court

6    finds cause.

7          It says, the Court for cause.  And I think you

8    have for cause, for the reasons articulated by the U.S.

9    Trustee and the reasons articulated in the cash collateral

10   order that you're being asked to consider right now.  There

11   is nobody -- if there -- typically, there's a challenge

12   period at some point, right?  30, 60, 90 days come in and

13   challenge.  There is nobody that could come in and seek

14   standing to challenge that lien right now.  Maybe by design,

15   maybe not.  That is your cause, Your Honor.  You're going to

16   enter a cash collateral order where nobody can challenge the

17   underlying lien.

18          And now, I'm not asking you to prejudge standing.

19   That's a whole different gig and we'll deal with that in due

20   time.  But right here right now, I think you have cause

21   because without it, you need to have a body that can come

22   and seek standing and attempt to prove that they should have

23   standing and go and check out these liens.  As the U.S.

24   Trustee articulated, that doesn't exist right now.

25          So, Your Honor, for all the reasons that have been

1   articulated to you right now, I think cause exists, and I

2   think under 1102(a)(3), the Court for cause can order a Tort

3   Committee.

4           You have heard about the litigation that's

5   surrounding and involved in this case.  It's predominantly,

6   overwhelmingly, 99.9 percent related to the Sandy Hook

7   Plaintiffs, whether it's a TUFTA action or it's the

8   Connecticut Plaintiffs or it's the Texas Plaintiffs.  And I

9   don't want to say they're all exactly the same, but they all

10  derive from the same facts and circumstances and the same

11  issues.

12          THE COURT:  Mm hmm.

13          MR. BRIMMAGE:  That is who the Tort Committee I

14  think should be comprised of.  We'll leave it to the U.S.

15  Trustee, who said that he can act quickly.  The U.S.

16  Trustee's Office stands ready to act quickly, so that -- and

17  that's what I think we need, Your Honor, and I think that's

18  what you need.  You need that acted quickly so that this

19  case can be adjudicated on the merits, and that we can

20  determine the validity of that lien once and for all from a

21  body that has the authority to seek standing.

22          And with that, Your Honor, I'd answer any

23  questions the Court may have.

24          THE COURT:  Yeah.  I'm going to sit here and

25  listen to a little evidence now and see where things go.

```
 1                 MR. BRIMMAGE:  Thank you, Your Honor.

 2                 THE COURT:  Thank you.

 3                 MR. LEMMON:  Your Honor, if I may, Steve Lemmon on

 4      behalf of the secured creditor, PQPR.

 5                 THE COURT:  Mm hmm.

 6                 MR. LEMMON:  I just want to make a couple of

 7      observations, Judge.

 8                 THE COURT:  Mm hmm.

 9                 MR. LEMMON:  First of all, I started with a 20-

10      page cash collateral order, and -- that had a number of

11      findings, had a number of protections for my client, had all

12      the things that we use.  And I determined that in this

13      particular case, with the level of suspicion that's out

14      there in the world, not evidence right now, but suspicion

15      that's out there in the world, that it'd be inappropriate

16      perhaps to do that, just so we could avoid this kind of

17      problem.

18                 I believe that the current cash collateral order

19      is really nothing more than a recitation of what the law is.

20      If my client has a lien and if the cash collateral is being

21      used, then I get a replacement lien to the extent that I

22      have a valid lien.  Nothing in it is a finding that

23      prohibits anybody, any party in interest from challenging

24      the lien.

25                 Now, Judge, my observation right now is that right
```

1   now the evidentiary record is nil.  And in this case, I

2   mean, I -- we heard the U.S. Trustee say that they want to

3   perhaps slow things down.  I don't see anything going really

4   fast right now from my perspective in this case.  I'm one of

5   the people with a vacation that is going to bollocks up

6   formal discovery in the next couple of weeks.  And I know

7   that there are other vacations.

8        But I've offered informal discovery, Judge, just

9   so people can assuage some of their fears, some of their

10  concerns so that they can find out what's going on.  And I'm

11  not asking anybody to give up any of their rights right now

12  in connection with this cash collateral order.  It is the

13  most bland cash collateral order I have ever seen in my

14  career.

15       And so, I -- you know, I tried to avoid this fight

16  by giving up all the things I normally would negotiate for,

17  and -- in thinking that we would just address that later in

18  a final order.  This is an interim order.  We're willing to

19  consent to it in order to let this Debtor try its business

20  plan.

21       And that's all I have to say.

22       THE COURT:  Thank you.  Mr. Battaglia, you know,

23  there's one question.  It's related, but not entirely on

24  point.  But I want to make sure I ask you the question.  And

25  it's the question that every judge asks at the beginning of

1    every case.  What does the Debtor hope to accomplish through

2    this Chapter 11 process?

3          MR. BATTAGLIA:  Well, Your Honor, the impetus for

4    filing with the Debtor's just inability to be in two places

5    and fund two trials at one time.  And you know, ultimately,

6    we don't know what the number's going to be in terms of the

7    potential exposure in Connecticut and in Texas.  Eventually,

8    some tribunal is going to give us a number.  Will it be

9    appealed?  I think there's a virtual certainty it's going to

10   be appealed, probably from either side at the end of the

11   day.

12         But this Debtor entity, which has the capacity to

13   generate significant revenue has been harmed by the manner

14   in which it operates.  And by that, let me just -- what I

15   probably said, and my co-counsel's probably getting tired of

16   hearing me.  This is kind of like the garage band that

17   became the boy band overnight, and had his girlfriend

18   running the books, and the head roadie being the business

19   manager.

20         The entity has never -- it's been run like a

21   family business.  It's never had appropriate management and

22   accounting controls.  It's an inverted T as far as

23   management, where a lot of fiefdoms exist and they go to

24   Alex, who wants to run a show.  He's not a business manager.

25         And so, implementing Mr. Schwartz and Jeff Schultz

1    into the process has really changed things considerably in a

2    very short period of time.  There have been a lot of changes

3    in a matter of months, both in the sense of getting the

4    accounting up to date, changing the manner in which product

5    is purchased and sold to increase the revenues, increasing

6    advertising revenue on the program, you know, changing the

7    cost structure in the way that fulfillment is handled of

8    product sales to reduce the overall overhead to the estate,

9    producing the headcount to the estate.  So, a lot of changes

10   have been made that we expect will generate revenue.

11          And if the goal of this bankruptcy at the end of

12   the day is to have FSS be able to pay its creditors, then

13   that effort is worthwhile to everybody in this room.  And

14   so, if you're asking me, what does the plan look like today?

15   I can't tell you.  It's premature.

16          THE COURT:  It's fine.  I wish -- what the -- the

17   estate --

18          MR. BATTAGLIA:  There are so many options that are

19   available out there in this world today, and in terms of

20   raising funds or monetizing this asset that could be

21   explored, depending again on what the numbers turn out to

22   be.

23          THE COURT:  Okay.

24          MR. BATTAGLIA:  So, that's kind of a broad brush,

25   Judge, but --

1             THE COURT:  Okay.

2             MR. BATTAGLIA:  I do want to say, I'm not clear.

3    I understand that standing to file an avoidance action is

4    limited, but I don't understand that these parties don't

5    already have the right to contest the debt.  Any party can

6    file an objection to a claim and any party can take 2004,

7    you know, examinations and, you know, we'll agree to --

8    we've already agreed to discovery.

9             So, I'm not sure that as it stands today, in terms

10   of making an initial evaluation of this claim, that they

11   don't already have the standing to do that.  They don't need

12   anything more.  They don't need a Louisiana World Exposition

13   case at this juncture.  And honestly, I mean, the cynical me

14   says I want to get a committee appointed so that the estate

15   can pay for it.  And we can't.  We'll never be able to.

16   We'll kill this case, and all of the promise that Mr.

17   Schwartz is generating through changes and operations that

18   he's made will be for naught.

19             It won't stop Alex Jones from broadcasting.

20   There'll be -- somewhere, a platform for him to continue.

21   So, if the goal here is to silence him, that's simply never

22   going to happen.  It may just kill FSS.

23             THE COURT:  Okay.  And I really want to be clear

24   about this.  We're going to run a case and focusing on the

25   Debtor that's in front of me.  And I understand that there

1    are a lot of moving pieces and a lot of folks involved and a

2    lot of emotions on both sides.  We're going to run a case

3    and I'm going to leave it there.

4            MR. BATTAGLIA:  Yes, sir.

5            THE COURT:  And we'll see where we go.  Why don't

6    you call -- what evidence do you have to support either

7    position?  How do you wish to proceed?

8            MR. BATTAGLIA:  Your Honor, if I can, I'll just

9    proffer Mr. Schwartz, and he's available and he's in the

10   courtroom.

11           THE COURT:  Oh.  Let me just ask.  Is there any

12   objection to the proffer of the witness?

13           MR. BRIMMAGE:  Your Honor, yes, we --

14           THE COURT:  Okay.  Mr. Schwartz, come on and take

15   the stand.  Let me just -- I'm going to swear the witness

16   in.  Are you -- do you swear to tell the truth, the whole

17   truth, and nothing but the truth?

18           THE WITNESS:  Yes, I do.

19           THE COURT:  Okay.  You may have a seat, sir.

20           Mr. Battaglia, how do you wish to proceed with

21   respect to any exhibits, if you wish to --

22           MR. BATTAGLIA:  I have emailed exhibits to all of

23   the parties last night, and I have a bound version to hand

24   to the witness.

25           THE COURT:  Okay.

```
 1              MR. BATTAGLIA:  And they're filed on the record.
 2              THE COURT:  So, I want to make sure folks can
 3    follow online, so if you can -- are they -- is there any --
 4    let me ask you this.  Is there any -- let me ask the
 5    Connecticut side or the U.S. Trustees.  Is there any
 6    agreement on any of the exhibits, or how are we doing this?
 7              MR. BATTAGLIA:  May I approach the witness, Your
 8    Honor?
 9              THE COURT:  Yeah.  Just a second.  I just want to
10    know, what's -- are you providing the exhibits that are
11    filed at Docket Number 26?
12              MR. BATTAGLIA:  Yes, Your Honor.
13              THE COURT:  Okay.  And Connecticut, tell me what
14    they want to do.  On 1 through 26, was there any agreement
15    on any of this?
16              MR. BRIMMAGE:  Your Honor, the Tort Plaintiffs can
17    agree to the admissibility of Exhibits -- Debtor Exhibits 1,
18    2, 9, and 10.
19              THE COURT:  1, 2, 9, and 10?
20              MR. BRIMMAGE:  Yes, Your Honor.
21              THE COURT:  Okay.  That's what there's agreement
22    on.  Mr. Nguyen?
23              MR. NGUYEN:  Yeah.  Your Honor, Ha Nguyen for the
24    U.S. Trustee.  I don't have any objection to Exhibit 1, 2,
25    3, 9, 10, 11, 12.  The rest needs to be -- foundation needs
```

1    to be laid.

2              THE COURT:  You said -- can you repeat those

3    numbers?

4              MR. NGUYEN:  1, 2, 3, 9, 10, 11, and 12.  No

5    objection from the U.S. Trustee for those exhibits.

6              THE COURT:  Okay.  All right.  It looks like there

7    is agreement on 1, 2, 9, and 10.  Everything else, you're

8    going to have to prove up.

9              MR. BATTAGLIA:  Yes, sir.  And 12 does not need to

10   be offered at this point.  It related to a motion the Court

11   has granted.

12             THE COURT:  That's correct.

13             MR. BATTAGLIA:  May I approach the witness, Your

14   Honor?

15             THE COURT:  Yes.  Just for anyone following online

16   on the Docket, you look at the Court's Docket, exhibits that

17   are -- will be shown to the witness -- Mr. Schwartz, I'm

18   going to ask that you let the examination direct you to

19   where you're going in the exhibit list.  You know, some of

20   those exhibits have not been admitted into evidence, and I

21   want to make sure that you just answer the questions that

22   are asked of you.  If there is any objection, I ask that you

23   give me an opportunity to resolve the objection, and then

24   I'll let you know if you can answer the question or not,

25   okay?

```
 1              THE WITNESS:  Yes, sir.
 2              THE COURT:  Okay.  All righty.  Mr. Battaglia, you
 3    may proceed.
 4              MR. BATTAGLIA:  Has the witness been sworn, Your
 5    Honor?
 6              THE COURT:  Yes.
 7              MR. BATTAGLIA:  I'm sorry, I didn't hear that.
 8                DIRECT EXAMINATION OF W. MARC SCHWARTZ
 9    BY MR. BATTAGLIA:
10    Q    Good morning, Mr. Schwartz.  Would you state your name
11    for the record?
12    A    Marc Schwartz.
13    Q    Would you turn to Exhibit Number 1?  Is that your CV?
14         (Exhibit 1 received into evidence)
15    BY MR. BATTAGLIA:
16    A    Yes, it is.
17    Q    Is it true, correct, and accurate?
18    A    True, correct, and I believe it is still accurate.
19    Q    Mr. Schwartz, without going into excruciating detail,
20    can you tell the Court who you are and what you do?
21    A    I'm a CPA.  I'm accredited in financial -- certified in
22    financial forensics by the American Institute of CPAs.  I'm
23    a certified fraud examiner from the Association of Certified
24    Fraud Examiners, and I'm a licensed private investigator in
25    the State of Texas.  I have practiced as a CPA since
```

1   approximately 1974, I think.

2        Became involved in working in the bankruptcy world in

3   the 80s with the collapse of the energy and real estate and

4   banking industry in Texas.  And worked in that field, along

5   with my -- I was an auditor in public accounting.  Up until

6   that point, continued as a financial statement auditor --

7   following that, but also worked extensively with litigation

8   and in restructuring and bankruptcy, primarily working for

9   Chapter 7 Trustees.

10       '93 I left my -- the firm I was associated with,

11  started my own practice, and began working as a Chapter 11

12  Trustee for the Southern District and the Western Districts

13  of Texas.  And here with that work, working also as a

14  examiner -- examiner with expanded powers.  And doing civil

15  litigation, financial economic expert witness work.

16       And the -- sometime in the back -- in the dim back --

17  dim past, I was asked to serve as a Federal Court Receiver

18  in a Federal -- in a Federal Trade Commission matter where I

19  was a receiver over two groups of companies that were

20  involved in defending themselves from a FTC matter in

21  Federal Court, and then became involved in and asked to

22  serve as a State Court Receiver.

23       So, today our practice involves Financial Restructuring

24  involving in and out of bankruptcy expert witness work in

25  the civil courts, civil litigation primarily, and as a

1    receiver in Federal and State Court matters.

2    Q    Thank you, sir.  The Judge had asked some questions at

3    the last hearing about the -- your relationship with the

4    InfoW and affiliated bankruptcy cases filed in this Court,

5    so I want to discuss that for a moment.  What was your role

6    in the InfoW cases, and by that I'm referring to all three

7    related entities?

8    A    I was engaged to be the CRO of those companies prior to

9    their filing.

10   Q    And is that case pending today?

11   A    Oh, the bankruptcy is not pending.

12   Q    And why was the case dismissed from your perspective?

13   A    Well, from my perspective the goal of the case was to

14   bring the Texas -- let's refer to the Texas and the

15   Connecticut litigation into a resolution process where we

16   could get the -- liquidation of the damages and develop a

17   plan for that.  The parties -- the Plaintiffs entered into

18   an agreement with us to dismiss their claims against the

19   Debtors with prejudice, ultimately, and as a result of that,

20   they were no longer involved in litigation.  We had two or

21   three minor creditors, which we had handled outside of

22   litigation.  So, if -- that determined to be a lot cheaper

23   to resolve that case by dismissing it, which the U.S.

24   Trustee agreed with, and let us resolve these things outside

25   of the bankruptcy process.

1    Q    And do you recall approximately when the Plaintiffs,

2    Texas and Connecticut, agreed to dismiss their claims of

3    prejudice?

4    A    I'm -- in terms of the approximate date, I don't

5    recall.  I believe the motion to dismiss, at least one of

6    them was granted on -- I think it was May 19th, that was on

7    the Texas Plaintiffs.  I don't -- I'm not recalling the

8    Connecticut Plaintiffs' date.

9    Q    Who, at the time the cases were filed, the IW cases

10   were filed, owned the interest in IW?

11   A    Concerning -- (indiscernible) the three companies?

12   Q    Yes, sir.

13   A    It was owned by a trust that had been set up prior to

14   the filing of bankruptcy, which was to be the vehicle for

15   funding, any resolution that could be -- if that had

16   occurred.

17   Q    So, what claims does, or do any of the IW affiliates

18   have against Free Speech Systems as we stand here today?

19   A    None that I'm aware of.

20   Q    What claims does Free Speech Systems have against any

21   of the IW affiliates?

22   A    None that I'm aware of.

23   Q    And how was the Plan to be funded in the IW cases?

24   A    Initially with funds submitted -- injected by Mr. Jones

25   from personal assets of his.  As I recall, it was also to be

1   funded, I think once it went effective, with the -- with

2   revenues provided -- not revenues, with income from --

3   earned by FSS, which would fund it over a five-year period.

4   Q    And what was the operative document by which those

5   revenue contributions were to be made?

6   A    It was called a Plan -- it was named a Plan Support

7   Agreement.

8   Q    Could you turn to Exhibit 3 in your binder, please?

9   Take a moment and look through it, and when you're done let

10  me know if that's a true and correct copy of the Plan

11  Support Agreement.

12  A    Yes, sir, it appears to be.

13            MR. BATTAGLIA:  Your Honor, I would offer Exhibit

14  3.

15            THE COURT:  Any objection?

16            MR. BRIMMAGE:  (Indiscernible).

17            THE COURT:  All right, a little bit more

18  foundation, Mr. Battaglia.

19            MR. BATTAGLIA:  Yes, sir.

20  BY MR. BATTAGLIA:

21  Q        You're familiar with the books and records of the

22  InfoW entity?

23  A    Entities?  Yes.  Yes.

24  Q    And did InfoWars enter into this agreement -- into a

25  Plan Funding Agreement?

1          MR. BRIMMAGE:  Your Honor, (indiscernible).

2          MR. BATTAGLIA:  Your Honor --

3          MR. BRIMMAGE:  (Indiscernible).

4          THE COURT:  Mr. Battaglia?

5          MR. BATTAGLIA:  Your Honor, the witness was the

6    CRO for these entities, and this is a business record, and

7    that's where we're headed.

8          THE COURT:  Okay, just ask him that question.

9          MR. BATTAGLIA:  Sure.

10          THE COURT:  And I'll sustain the objection.

11          MR. BATTAGLIA:  Sure.

12    BY MR. BATTAGLIA:

13    Q        Is this a record that was maintained within the

14    files of the InfoW entities?

15    A    Yes.

16    Q    And were you the custodian of those records?

17    A    Yes, I guess so.

18    Q    And --

19          MR. BRIMMAGE:  Your Honor, (indiscernible) --

20          THE COURT:  Yeah, I -- why don't you just ask a

21    few more questions.  I'm going to sustain the objection, why

22    don't you ask a few more foundational questions.  I think

23    you'll get there.

24    BY MR. BATTAGLIA:

25    Q    So, with respect to the business records of InfoW, you

1    were in physical possession of some of those records, were

2    you not?

3    A    Yes, I am.

4    Q    And is the Plan Support Agreement one of the records

5    that you maintained physical possession of?

6    A    Yes, it is.

7    Q    And you're familiar with the manner and means in which

8    those business records were maintained within your auspices

9    as a CRO?

10    A    Yes.

11    Q    And is Exhibit 3 a document that was within your

12    control and held as a business record of IW, and the

13    affiliated entities?

14    A    Yes, it is.

15    Q    And do you recognize Exhibit 3?

16    A    Yes, I do.

17    Q    Is it a true and correct copy of the business record

18    that was the Plan Support Agreement?

19    A    Yes.

20         MR. BATTAGLIA:  I would offer Exhibit 3.

21         MR. BRIMMAGE:  (Indiscernible).

22         THE COURT:  I'm going to overrule the objection.

23    I'm going to admit 3 for what it is.  It's a Plan Support

24    Agreement, and it's a public document as well.  It's been

25    filed on the Docket in the prior case in which it was the

1   CRO, so, Mr. Brimmage, you can ask -- you can cross-examine

2   about all that stuff.

3        (Exhibit 3 received into evidence)

4   BY MR. BATTAGLIA:

5   Q    Would you turn to section eight of Exhibit 3?

6        THE COURT:  I do want to make one clarification,

7   and this could be a very hyper-technical point, but the

8   version that's on the Docket is highlighted, and the version

9   that I'm admitting, for the record, that I want a clean copy

10  of it, the version that I'm seeing on Docket 26 has certain

11  language highlighted, and that's not what I'm admitting.  If

12  you're asking me for a publicly filed version of you know,

13  22-6002063, Document 63 without highlights --

14        MR. BATTAGLIA:  Yes, sir.

15        THE COURT:  I'm okay with that.  But if you're

16  asking to admit what you've -- well, the Docket Number 26,

17  that I won't admit, but I'm -- a clean version can be

18  admitted into the record.

19        MR. BATTAGLIA:  Shall I supplement, Your Honor?

20        THE COURT:  Yeah.  Yes, please.

21  BY MR. BATTAGLIA:

22  Q    When you look at the -- Section Eight, what does it

23  provide for?

24  A    It's the termination provision of the agreement.

25  Q    Under the terms under Section Eight, what is your

1    understanding about whether this agreement remains in

2    effect?

3    A    My understanding is the agreement was terminated.

4    Q    And is it true that the bankruptcy cases for the IW

5    entities were dismissed?

6    A    Yes, it is.

7    Q    Is it true that there was no order approving the

8    Litigation Settlement Trustees by April 30, 2022?

9    A    That is correct.

10   Q    And that there was no Plan on file by April 30, 2022?

11   A    That is correct.

12   Q    What is your involvement on behalf of FSS, the Debtor?

13   A    I was hired to be its Chief Restructuring Officer.

14   Q    And, can you turn to Exhibit 2, please?  And this has

15   been admitted into evidence, is that your engagement

16   agreement with Free Speech Systems?

17        (Exhibit 2 received into evidence)

18   A    Yes, it is.

19   Q    And when was that dated?

20   A    It was dated May 19th, 2022.

21   Q    When was it executed?

22   A    I believe it was June 7th.

23   Q    Of 2022?

24   A    2022.  Yes, June 6th, excuse me, of 2022.

25   Q    Can you describe what level of authority over the

1   Debtor and its operations you were afforded under this

2   agreement?

3   A    Really, it's absolute authority over the operations.  I

4   agreed to consult with Mr. Jones on major decisions.

5   Q    So, who has control over the bank accounts?

6   A    I do.

7   Q    Who has control over payroll?

8   A    I do.

9   Q    Who has control over hiring and firing of employees?

10  A    I do.

11  Q    Who has control over the records of the Debtor?

12  A    I do.

13  Q    And is it within your unilateral power to hire and fire

14  employees?

15  A    Yes.

16  Q    To open and close bank accounts?

17  A    Yes.

18  Q    Who will be the signatory on the Access DIP account?

19  A    I will be.

20  Q    Anybody else?

21  A    No.

22  Q    Do you have authority to make operational changes

23  within the Debtor's operations?

24  A    Yes.

25  Q    Have you in fact made such changes?

1    A    Yes.

2    Q    What role does Alex Jones play in any of the areas

3    we've just discussed?

4    A    Because of his experience, obviously, with the company,

5    and his knowledge of the customers -- and customers -- of

6    the vendors, and the personnel, when he's available to me to

7    consult with to get more guidance information on, if I had a

8    -- several changes I've implementing -- am implementing, I

9    went and said, this is what I'm going to do, do you have a

10   problem with it?  If it is, tell me what that problem is.

11   Q    At the time you were installed as the Chief

12   Restructuring Officer, what was the management structure of

13   Free Speech Systems?

14   A    Someone in the process of this case referred it to --

15   referred to it as an inverted T, and I think that's a good

16   description.  There is Alex, and then there's everybody

17   else.

18   Q    And is that -- in your experience, the way a successful

19   business is, or should be managed?

20   A    No.

21   Q    What was the status of the accounting controls on the

22   date that you became CRO?

23   A    As far as I can tell they were non-existent.

24   Q    Who performed the accounting on behalf of Free Speech

25   Systems?

1    A    At what time?

2    Q    Prior to you becoming a CRO.

3    A    Oh, the 17 months or so prior to my becoming CRO, it

4    appeared to me nobody did.

5    Q    Was there anybody with an accounting degree or

6    background that provided accounting services?

7    A    There was a consultant who had been hired, Mr. Roe,

8    who's a CPA, who provided some advisory consulting services.

9    He was not involved and was not permitted to be involved in

10   the actual accounting process.  The people responsible for

11   maintaining the books and records did not have accounting

12   degrees.

13   Q    What was the state of the company's accounting books

14   when you became CRO?

15   A    2021, I had -- this was on June 6th date.  2021 had not

16   been closed, which means the books were not completed, and

17   year-end closed.  There had been no recording of any entries

18   in 2022 other than automatic downloads from the bank

19   transactions.  So, they were -- 20 -- 2021 was at -- was

20   incomplete and had not -- was not able to produce any

21   financial statements of meaning, and 2022 was untouched.

22   Q    Were you able to find typical accounting reports on

23   your entry in as CRO?

24   A    No.

25   Q    So, balance sheets, income statements, there were no

1   current --

2   A     There were no financial reports that I could -- there

3   were no financial reports at all, that had ever been

4   produced in at least the last 18 months.

5   Q     What, at the time that you became CRO, what was the

6   Debtor's business relationship with PQPR Holdings, Limited?

7   And I'll just call it PQPR.

8   A     At the time I became CRO, PQPR was facilitating the

9   purchase of inventory by FSS.  In addition, PQPR was

10  purchasing and selling its own inventory and FSS was selling

11  PQPR inventory as well.

12  Q     And who to your knowledge owns PQPR?

13  A     Carol and David Jones, who are Mr. Alex Jones' parents.

14  And in -- through an intermediary entity, Mr. Alex Jones

15  himself owns.  So, about -- the -- turns out about 80 -- 72

16  percent of the interest is indirectly owned by Mr. Alex

17  Jones, and the 18 percent balance -- if that's right -- 28

18  percent balance, is owned by Carol and David Jones.

19           MR. BRIMMAGE:  (Indiscernible).

20           THE COURT:  I'm just going to -- I'm going to

21  allow it just as his understanding, and not for the truth of

22  the matter asserted.  All right.  It's a -- just testifying

23  as his understanding of the corporate structure, and I'll

24  allow him to do it.

25  BY MR. BATTAGLIA:

1    Q    So, prior to your joining FSS, what -- how were

2    proceeds of inventory sales allocated?

3    A    I've identified at least two methods.  For a period of

4    years, it appears PQPR purchased --

5              MR. BRIMMAGE:  Your Honor, I hate to interrupt.

6    (Indiscernible).

7              THE COURT:  Yeah, I think you -- yeah, I'm going

8    to sustain that objection.  Well, maybe you can ask a few

9    more background questions there.

10   BY MR. BATTAGLIA:

11   Q    Sure.  Have you reviewed the historical operations

12   between the Debtor and PQPR?

13   A    Yes.

14   Q    And what is your understanding of the allocation of

15   proceeds between PQPR and FSS from inventory sales?

16   A    Up to some date in 2021, which I don't recall the exact

17   date, I think it was in November, PQPR purchased inventory

18   at the request of FSS.  It then marked up that inventory and

19   sold it to FSS, which then marked up the inventory for sale

20   to the public.

21             MR. BRIMMAGE:  (Indiscernible).

22             THE COURT:  I'm going to let you -- I'm going to

23   just allow it just as his understanding of what it is, I'm

24   going to let you explore though -- the door's open.  I'm

25   going to let you explore, sir, where he gained that

1    information.

2    BY MR. BATTAGLIA:

3    Q    And based on your review of the books, and your

4    discussions with -- well, your review of the books and

5    records and contracts that you've seen, how did that

6    relationship change?  You said that up until November of

7    2021 --

8    A    Yeah, it changed on -- I believe it was November 2021,

9    to where the -- as opposed to marking up and selling

10   inventory to FSS, they entered into -- the arrangement

11   changed to where FSS would sell the unmarked inventory and

12   receive 20 percent of the proceeds, and 80 percent of the

13   proceeds would be paid to PQPR.

14   Q    How does the Debtor -- or how, I guess, how does the

15   Debtor effectuate sales transactions?

16   A    It's almost all over the internet.

17   Q    So --

18   A    Credit card charges by the -- through the internet.

19   Q    And, what did the Debtor pay for credit card

20   processing, prior to your involvement?

21   A    Prior to my involvement, it was paying in total about

22   14.5 to 14.9 percent.  Four point -- well, there was 10

23   percent going to a facilitator, if you will, and the balance

24   of that 14.9, 14.8, whatever it was, goes to the actual

25   credit card processor.

```
 1   Q     Why was the Debtor paying such a high rate?

 2   A     Because it needed to -- they had been de-platformed and

 3   had lost its credit card processor, so the facilitator was

 4   brought in as an intermediary to receive the proceeds from

 5   the credit card processor, and to be in fact the face that

 6   the Fed credit card processor saw, and it then distributes

 7   the money, the funds, to PQPR and FSS.

 8   Q     How were sales fulfilled, and what do you understand

 9   when I use the word fulfilled?

10   A     Yeah, what do I understand, you mean?

11   Q     Yes, yes.

12   A     Yes, well, fulfillment was and to me is once the

13   customer places an order, that someone has to go pull

14   merchandise out of the warehouse, package it, box it, put

15   postage or whatever you'd use, whether it's UPS, the UPS

16   stamp on it, there's -- put a sticker on it, and ship it to

17   the customer.  So, fulfillment's that process of -- but also

18   includes here, warehousing, managing the warehouse with

19   product in it, and that -- that is -- from when it's

20   received to the warehouse to when it's shipped to the

21   customers is fulfillment.

22   Q     And who employed the individuals that were doing

23   fulfillment prior to you becoming CRO?

24   A     FSS employed -- well, FSS employed them for a period of

25   time, and then they were transferred -- excuse me.  FSS uses
```

1   ADP for its payroll.  These employees were on that payroll.

2   Subsequently, they're then charging the fulfillment payroll

3   to PQPR, although they stayed -- still stayed on -- on the

4   FSS ADP payroll account.

5   Q    Let's turn and talk about what's happened since you

6   became the CRO.  Can you tell the Court where the Debtors

7   stands in its accounting records currently?

8   A    Well, we've closed through May 2022, those were

9   included -- those financials were included in the material

10  we filed in connection with the bankruptcy.  The -- June,

11  we've gotten all the transactions in, we have to go back and

12  do closing review and make sure that we've -- well, one

13  thing we did and critical, we got the bank accounts

14  reconciled.  I forgot to mention, there'd never been a bank

15  -- there hadn't been a bank account reconciliation we could

16  find, so we reconciled the bank accounts through May.  I

17  believe July's are done also.

18       So, we're current, we've produced financial statements,

19  we have not yet started working on we've -- going down and

20  digging up, producing managing accounting statements, but

21  we've got the primary financials done.

22  Q    Okay.  And who is responsible, primarily responsible

23  for maintenance of the accounting records for FSS?

24  A    Right now it's -- you mentioned Mr. Schultz, as I hired

25  Mr. -- we hired -- FSS hired Mr. Schultz to come in and take

1    over as business manager.  But the actual

2    bookkeeping/accounting work is being taken over by -- so, of

3    my low -- my personnel, my bookkeeping personnel, until we

4    get a bookkeeping service in place there.  So, the

5    accounting was handled by, essentially us through -- as FA's

6    and by the business manager.

7    Q    And are you familiar with Mr. Schultz's accounting

8    qualifications?

9    A    Yes.

10   Q    And what are they?

11   A    He has a bachelor's degree in accounting from

12   University of Houston.  He served as a CFO -- I mean, not

13   immediately, but through a period of years, and most

14   recently, CFO, and then CEO of companies, so he's very

15   knowledgeable of that -- accounting and financial reporting

16   aspects.

17   Q    Earlier you talked about prior relationship with PQPR,

18   has it changed?

19   A    Yes.  The entered -- FSS and PQPR entered a new

20   agreement under which sharing ratios changed, where FSS

21   inventory -- FSS gets 90 percent of the proceeds from the

22   sale of it, PQPR gets 10 percent, and inventory that is

23   acquired by PQPR for its own account, they -- and if it's

24   sold, it's 80 percent of that goes to PQPR, and 20 percent

25   goes to FSS.

1   Q    And in the process of changing that relationship, what

2   was done regarding the credit card processing costs?

3   A    I -- one of my -- I insisted that that be reduced, and

4   it was negotiated down to four percent.

5   Q    So four plus the 4.9 charged --

6   A    Correct.

7   Q    -- by the banks.

8   A    Yeah, this is for the intermediary, four percent, and

9   then the 4.9, is their regular bank processing charge.  And

10  that, by the way, varies by the type of credit cards used.

11  Q    Turn to Exhibit 8, please.  Tell the Court what that

12  is.

13  A    This is the Forbearance Agreement entered into on July

14  10th of 2022.

15  Q    And were you involved in negotiation and drafting of

16  this document?

17  A    Negotiating the document and reviewing the draft, yes.

18  Q    And is this a true and correct copy of the Forbearance

19  Agreement entered into between the parties?

20  A    Yes, it is.

21       MR. BATTAGLIA:  Your Honor, I would offer Exhibit

22  8 into evidence.

23       THE COURT:  Any objection?  It's admitted.  26-8

24  is admitted.

25       (Exhibit 8 received into evidence)

1              MR. BATTAGLIA:  Thank you, Your Honor.

2     BY MR. BATTAGLIA:

3     Q    Have there been any changes in the manner in which

4     fulfillment of product sales is handled?

5     A    Yes.

6     Q    What are those changes?

7     A    A significant one was prior to filing bankruptcy, we

8     engaged a third-party fulfillment service to take over

9     fulfillment for FSS's and PQPR's products, and FSS's

10    products.

11    Q    Who employs the individuals who actually pull product

12    and ship it?

13    A    The fulfillment service we hired.

14    Q    And how do you pay fulfillment?  Is it a flat rate per

15    month, or what's the term?

16    A    It's a flat rate per shipment.

17    Q    And overall, shifting to this vehicle, what's the

18    effect on the Debtor's expenses?

19    A    It -- based on my analysis, it should be a push in the

20    sense that there should not be much of a net increase, if

21    any, and cost -- of the actual cost, the fulfillment should

22    be -- improve our efficiency though, because that would be

23    not something that we have to manage and worry about.

24    Q    And would that answer change if volumes increased

25    significantly?

1    A    No, it should not.

2    Q    Let's talk about --

3    A    Let me stop.  It may actually it probably -- if volumes

4    increase, our cost of fulfillment per dollar may actually go

5    down, could go down.

6    Q    I want to talk about the PQPR debt now.  As the Chief

7    Restructuring Officer, do you control the business records

8    of FSS?

9    A    Yes.

10   Q    And are you familiar with the business records of FSS?

11   A    Yes.

12   Q    And the manner in which they're maintained?

13   A    Yes.

14   Q    Do you recognize Exhibit 4?

15   A    Yes.

16   Q    What is it?

17   A    The promissory note dated August 13th, 2020 between

18   Free Speech Systems, LLC and PQPR Holdings Limited, LLC.

19   Q    Is this a true and correct copy of the promissory note

20   that is within the business records of the Debtor?

21        MR. BRIMMAGE:  Your Honor, (indiscernible).

22   Hearsay.  (Indiscernible) prove this up.  (Indiscernible)

23   and any further testimony (indiscernible).

24        MR. BATTAGLIA:  Your Honor, if I may respond?

25        THE COURT:  Yes, please.

```
 1            MR. BATTAGLIA:  It's an absurd suggestion that a
 2    custodian is ineligible to testify to the authenticity of a
 3    business record, and that what one must do is find someone
 4    who is employed by the Debtor as the custodian back at the
 5    time the document was originated.  There is no requirement
 6    that a party -- that a custodian be a signatory to every
 7    document, that's equally an absurd evidentiary requirement.
 8    There's no way business records would ever come in if those
 9    requirements were required.
10            MR. BRIMMAGE:  (Indiscernible).
11            MR. BATTAGLIA:  He can authenticate a business
12    record, which is what he's done.  And legal documents are
13    business records, just as accounting records are, and any
14    other document within the control of an entity of a party.
15            MR. BRIMMAGE:  (Indiscernible).
16            THE COURT:  I'm going to admit it as a business
17    record.  I think custodian doesn't need -- just that the
18    reports that are -- it just has to be a circumstantial
19    guarantee of trustworthiness of the document, and it can be
20    brought in by someone who was just a custodian, and he's the
21    CRO.  The question that I have for you, Mr. Schwartz, is
22    when did you first view this -- have you ever viewed this
23    document before today?
24            THE WITNESS:  Oh yes, I have.
25            THE COURT:  When did you view this document for
```

1    the first time?  Do you recall what month?

2            THE WITNESS:   I would have -- June of this year.

3            THE COURT:  Okay.

4            THE WITNESS:  I would say early June.  I'd have to

5    look back at my time record so you can tell (indiscernible).

6            THE COURT:  No, it's one and the same.  I'll admit

7    it.  It's --

8        (Exhibit 4 received into evidence)

9            MR. BRIMMAGE:  Your Honor, (indiscernible).

10           THE COURT:  I'll let you take him up on cross.

11   I'm going to let you take him up on cross.

12   BY MR. BATTAGLIA:

13   Q    Can you turn to Exhibit 5, please?  Can you tell the

14   Court what that is?

15   A    This is a security agreement entered into between PKR

16   Holdings and FSS, dated August 2020.

17   Q    That's your --

18   A    Yes, I'm sorry.

19   Q    Sorry.  And have you seen this document before?

20   A    Yes.

21   Q    Would it be true you saw it at or about the same time

22   you saw the prior exhibit?

23   A    Yes.

24   Q    Does this appear to be a true and correct copy of the

25   document that is maintained within the business records of

 1    Free Speech Systems?

 2    A     Yes.

 3          MR. BATTAGLIA:  Your Honor, I would offer Exhibit

 4    5.

 5          MR. BRIMMAGE:  Objection.

 6          THE COURT:  Yeah, I understand.  I'm going to

 7    admit it as a business record, but -- and I know you're

 8    going to have questions for -- and I'm going to let you ask

 9    those questions about the scope of his knowledge of it, this

10    document, and questions about it.  It's in evidence, so you

11    get to ask questions about it, and it's relevant to the cash

12    collateral motion and critical vendors.  So, you may

13    proceed, counsel.

14         (Exhibit 5 received into evidence)

15          MR. BATTAGLIA:  Thank you, Your Honor.

16    BY MR. BATTAGLIA:

17    Q     Could you turn to Exhibit 6, please?

18    A     Yes, sir.

19    Q     And can you tell the Court what that is?

20    A     This is another promissory note that's been dated

21    November 10th, 2021 between Free Speech Systems and PQPR

22    Holdings in the amount of 25,300,000.

23    Q     And does that -- have you seen this document on or

24    about the same time as you responded to the preceding

25    documents?

1    A    Yes.

2    Q    And does this appear to be a true and correct copy of

3    that promissory note that is within the business records of

4    the Debtor?

5    A    Yes, it is.

6              MR. BATTAGLIA:  Offer Exhibit 6.

7              MR. BRIMMAGE:  (Indiscernible).

8              THE COURT:  Understood, overruled.  It's admitted.

9         (Exhibit 6 received into evidence)

10   BY MR. BATTAGLIA:

11   Q    Can you turn to Exhibit 7, please?  Can you tell the

12   Court what that is?

13   A    This is a copy of UCC financing statement, November

14   18th of 2020 for --

15   Q    And was this -- did you see this document for the first

16   time about the same time as the preceding documents?

17   A    Yes.

18   Q    And is this document maintained as a business record in

19   the Debtor's files and records?

20   A    Yes.

21   Q    Does this appear to be a true and correct copy of the

22   UCC 1 financing statement?

23   A    Yes.

24   Q    Does it bear a filing number with the Secretary of

25   State's office?

1    A    Yes, it does.

2              MR. BATTAGLIA:  Offer Exhibit 7.

3              THE COURT:  Any objection?  It's admitted.

4         (Exhibit 7 received into evidence)

5    BY MR. BATTAGLIA:

6    Q    If you would turn to Exhibit 9 and keep your finger on

7    Exhibit 10.

8    A    Yes, sir.

9    Q    Okay, do you recognize Exhibit 9?

10   A    Yes.

11   Q    What is it?

12   A    This is a copy of the 13-week cash flow forecast that I

13   had prepared for Free Speech Systems.

14   Q    Now, we're here today on an interim motion, can you

15   turn to Exhibit 10 please, and keep your finger on 9?

16   A    Yes, sir.

17   Q    What is that?

18   A    Exhibit 10 is a blow up of the first three weeks of the

19   cash flow forecast on Exhibit 9.

20   Q    They're identical in terms of the numbers displayed for

21   the three-week period, yes?  Go back to 9.  Would you tell

22   the Court generally what authority you're seeking today, to

23   use cash collateral today?  What do you want to pay?

24   A    The bills.

25   Q    A little more detail.

1    A    The bills and the cost of operating the Debtor.

2    Q    Payroll?

3    A    Payroll, lights, electricity, a lot of

4    telecommunications or internet-related vendors who provide

5    the backbone for the telemarketing and the production or --

6    of the show, if you will.

7    Q    What about product cost?

8    A    There's some product cost in here.

9    Q    There's one entry in here of a $250,000 proposed

10   payment to PQPR.  Can you tell the Court what that's for?

11   A    Yes, PQPR advanced $750,000 towards the purchase of

12   inventory --

13   Q    Advanced to who?

14   A    Advanced to FSS towards the purchase of merchandise

15   inventory.

16   Q    Did they advance to FSS or to the supplier?

17   A    The money was paid to a supplier as part of a million-

18   and-a-half-dollar prepayment that was made to -- in order --

19   to order inventory from that supplier.

20   Q    Why is it advantageous to pay to acquire -- and there's

21   two installments to pay for inventory, are there not?

22   A    Well, there are --

23   Q    PQPR inventory, I'm sorry.

24   A    Now, I'm confused.

25   Q    Okay.  So, there's a $250,000 payment --

1    A    Oh, yes.  There's --

2    Q    -- included in the budget.

3    A    There's $250,000, and there's subsequently a $500,000

4    payment in the budget to repay PQPR for that $750,000.

5    Q    Why is it advantageous for FSS to acquire that

6    inventory that PQPR is purchasing?

7    A    Because PQPR essentially was out of -- not PQPR.  FSS

8    was out of inventory essentially, of any -- of that was

9    high-value and had a high marketability to it.  And that had

10   to be replaced in order to make this plan work and make the

11   company work.  So.

12   Q    What does the Debtor get if its PQPR products sold

13   through the Debtor's sales channel?

14   A    Well, this is -- this -- well, I mean, it depends on

15   what -- which way you look at this.

16   Q    If you didn't buy it.

17   A    If we didn't buy it, that PQ -- wait a minute.

18   Q    If FSS did not pay this $250,000, what would this --

19   how would the sales proceeds be allocated?

20   A    80 percent PQPR, 20 percent Debtor.

21   Q    How are they allocated if you're allowed to purchase

22   the inventory from PQPR?

23   A    10 percent PQPR, 90 percent Debtor.

24   Q    And what's the markup on products of the type that are

25   being purchased?

1   A    300 to 400 percent.

2   Q    In your business judgment, is it better to pay the 250

3   or not pay the 250 to PQPR?

4   A    It's better to pay the 250.

5   Q    So, in coming up with these projections, can you

6   describe for the Court a little bit what your basic

7   assumptions are?

8   A    The inventories that we -- that were acquired, and that

9   are being rolled into the sales, they're being shipped in at

10   intervals as they're produced.  We had a one shipment about

11   two weeks before filing, three weeks before filing.  We had

12   a second shipment within a -- the week before filing.  As

13   those products come into the warehouse, Alex Jones starts

14   pushing them on the shelf, and we can see a marked increase

15   in daily sales, we get daily sales reports.

16       And so, what we did in watch -- and I did in watching

17   these, and one of the things I asked for was give me time to

18   see the impact of these sales.  We were able to see a

19   various -- an increase, definitely an increase, significant

20   increase in daily sales.  So, prior to filing, just prior to

21   filing, let's just look at the last five business days of

22   sales, and that's what we use as our base.  As we're -- have

23   more product coming in, we're seeing they -- these are

24   increasing sales, and they're being attracted to the market.

25       And I said, okay, well take that times 125 percent and

1    that will be our weekly sales budget, and we should be able

2    to accommodate that.

3    Q    Do you -- would you tell the Court; do you perceive

4    that as aggressive or a conservative income budgeting?

5    A    I see it as conservative.  We had -- this was two of

6    the six products, which we're still operating with these two

7    products.  The next one's coming in next week.  So, we've

8    got a layering effect coming, but -- on this, but it's not

9    at all what I consider aggressive.  If you ask Mr. Jones,

10   his -- he -- and he has the experience, he believes he'll be

11   substantially -- these are substantial understatements.

12            MR. BRIMMAGE:  (Indiscernible).

13            THE COURT:  Sustained.

14   BY MR. BATTAGLIA:

15   Q    Can you tell the Court, is there a correlation between

16   sales and Mr. Jones' broadcasting, or someone else, or a

17   repeat broadcast?

18            MR. BRIMMAGE:  (Indiscernible).

19            THE COURT:  We'll see what he -- let's hear his

20   answer.

21   BY MR. BATTAGLIA:

22   Q    Have you examined that to determine whether there's a

23   correlation?

24   A    Have I examined it?  I have -- I've had -- there are

25   people at FSS that keep track of that information.  So --

1    Q    And have you looked at that information to --

2    A    Yes.

3    Q    -- make a determination?

4         THE COURT:  And I don't think you answered the

5    question.  Why don't you ask the question again.  I don't

6    think you actually answered the question.

7         MR. BATTAGLIA:  I'm not sure I remember precisely

8    what the question was, Judge, I'm sorry.

9         THE WITNESS:  Is there a correlation?

10        THE COURT:  Yeah, is -- well, is there a

11   correlation, and --

12   BY MR. BATTAGLIA:

13   Q    Have you reviewed books and records to see if there's a

14   correlation between sales when Mr. Jones' on air or not?

15   A    Well, I've asked, what is the correlation; and I've

16   been told what it is.

17        THE COURT:  That's -- you're not answering the

18   question.  The question is, have you reviewed documents to

19   determine whether there's a correlation?  It's --

20        THE WITNESS:  I have not received a document at

21   this time.

22   BY MR. BATTAGLIA:

23   Q    You have an understanding of whether there's a

24   correlation between when Mr. Jones is on the air or not?

25   A    Yes.

1    Q     What is that understanding?

2             MR. BRIMMAGE:  (Indiscernible) I've been told.

3             THE COURT:  Yeah.  I'm going to -- I guess the

4    question that would then follow is what is your

5    understanding based on?  And that's going to then inform

6    what your answer will be.  You said you had -- you developed

7    an understanding of it.  You haven't reviewed a document,

8    but you've developed an understanding.  What is that

9    understanding based on?

10            THE WITNESS:  The person in charge of e-commerce

11   which track -- and he -- one of the things he does is he

12   tracks daily sales of product and tracks hours of all people

13   on the air, but particularly, he'll actually focus on Alex

14   Jones.  And when Alex Jones is not on the air, we see a 30 -

15   - we could see a 30 percent drop in sales.

16            THE COURT:  Yeah, but what --

17            THE WITNESS:  That's what he's --

18            THE COURT:  You're saying we.

19            THE WITNESS:  (Indiscernible), sorry, Your Honor.

20            THE COURT:  No, no, no, I mean we as in -- you

21   said you haven't reviewed a document, so what's that based

22   on?  That 30 percent?  Is that based on something someone

23   told you?

24            THE WITNESS:  Correct, that's based on Mr. Roddy's

25   data that he maintains.

1          THE COURT:  Have you reviewed that data?

2          THE WITNESS:  I -- no, I've actually been tied up

3    getting ready for this hearing.

4          THE COURT:  Okay.  I'm going to sustain the

5    objection.

6    BY MR. BATTAGLIA:

7    Q    If you are not authorized to use cash collateral today,

8    what's the -- going to be the effect on the Debtor's

9    business?

10   A    As I think I mentioned earlier, we have about 800,000

11   of cash that is not cash collateral, so we can pay our bills

12   this first week it looks -- I believe.  We could pay a --

13   most of our bills this first week, not all of them.

14   Q    And if you don't pay your bills, what's going to happen

15   to the Debtor?

16   A    It depends on which ones we don't pay, but it's going

17   to be a -- if we can't pay critical -- the critical vendors,

18   then we will be shut down.

19   Q    Well, let's turn and talk about critical vendors.

20          MR. BRIMMAGE:  Your Honor, (indiscernible).

21          THE COURT:  That's just this -- I'm going to --

22   I'm just going to (indiscernible) it -- that wasn't based on

23   any evidence, I think he's going to have to testify as to

24   why, give me a little bit more as to why.  But he's allowed

25   to say what he thinks.  Why he thinks that I think is

1   probably the more relevant question, and I think we'll get

2   there.  I think that's where Mr. Battaglia is going anyway.

3        MR. BATTAGLIA:  Yes, actually I was going to turn

4   to critical vendors, they're very related, but I'll just ask

5   that question now and put it to rest.

6        THE COURT:  Well --

7   BY MR. BATTAGLIA:

8   Q    Why do you think that it would shut the business down?

9   A    Well, if we can't broadcast, we can't sell.  So, if we

10  lose a vendor who's critical to our ability to broadcast, if

11  we can't operate our e-commerce platform, we can't sell,

12  even if we could broadcast.  If we can't fulfill orders,

13  then we're not going to be able to fulfill what we've been

14  paid for, and those revenues have to go back to those --

15  will have to go back to those customers.  So, it's -- and

16  all of these are -- we're, you know, the company's in a

17  situation right now where there's not a lot of breathing

18  room.

19  Q    Let's pick an example, it's one of the critical

20  vendors.  Do you know who Cloudflare Inc. is?

21  A    I have a bit of knowledge about Cloudflare, yes.

22  Q    What do they do?

23  A    They're part of our e-commerce platforming.

24  Q    And they provide security for purchasers, right?

25  A    Right.

1   Q    And for transactions over the internet?

2   A    Right.

3   Q    What happens if Cloudflare does not continue providing

4   services?

5   A    We're out of business.  We're shut down.  We're not out

6   of business, we're shut down until we can find a

7   replacement, if we can find one.

8   Q    There are other vendors who are identified as

9   providing, I'm going to call it internet access, I'm not a

10  troglodyte, but I'm only marginally above that, but let's

11  say contact to content users, you know who I'm talking

12  about, internet providers, satellite providers, and the

13  like.  What happens if the Debtor is unable to pay those?

14  A    The same thing, we're shut off.  We can't -- if you

15  don't have access to the satellite, you can't broadcast.

16  Q    What happens if the Debtor's unable to pay its

17  employees?

18  A    Well, I suspect that would be, it was a big issue with

19  the ability to keep going if we don't have any employees.

20  Q    If you would please turn to Exhibit 11.

21       THE COURT:  Mr. Battaglia, you were talking about

22  critical vendors, and then you talked about employees.

23       MR. BATTAGLIA:  Your Honor, I was just using the

24  critical vendors as an example of some of the uses of cash

25  collateral.  Obviously, they're critical vendors as well,

1    and I'll get to the critical vendors here.

2                THE COURT:  Okay.  But --

3                MR. BATTAGLIA:  Separately.

4                THE COURT:  -- are the employees viewed as

5    critical vendors?

6                MR. BATTAGLIA:  No, sir, but they're being paid

7    under the cash collateral budget.

8                THE COURT:  Okay.  Okay.

9                MR. BATTAGLIA:  And that was my point.

10               THE COURT:  I just wanted to make sure that we

11   were clear.

12               MR. BATTAGLIA:  Yes, sir.

13   BY MR. BATTAGLIA:

14   Q    You got Exhibit 11 in front of you?

15   A    Yes, I do.

16   Q    And do you recognize this document?

17   A    Yes, I do.

18               MR. BATTAGLIA:  Your Honor, this is attached to

19   the motion and/or order that were filed requesting the

20   authority to pay critical vendors.

21   BY MR. BATTAGLIA:

22   Q    Is this a true and correct copy of the list of vendors

23   that you proposed to have authority to pay under the

24   critical vendor motion?

25   A    Yes, it is.

1              MR. BATTAGLIA:  Your Honor, I would offer Exhibit

2    11 into evidence.

3              THE COURT:  Any objection?

4              MR. BRIMMAGE:  (Indiscernible).

5              THE COURT:  Okay.  It show for -- what truth of

6    the matter is asserted, it is a -- I can just admit it -- or

7    I'll accept it for the purpose of these are the -- that you

8    seek to pay.  And those are the amounts that you believe

9    that you need to pay them.

10        (Exhibit 11 received into evidence)

11             MR. BATTAGLIA:  That's fine, Your Honor.

12   BY MR. BATTAGLIA:

13   Q    So, there's a list of, I see 20 vendors here.  I want

14   to talk, first of all, generally about FSS's ability to

15   identify and contract with suppliers of goods and services.

16   Generally, in -- do you have an understanding as to whether

17   or not it's easy for this Debtor to replace vendors?

18   A    Yes.

19   Q    What is that understanding?

20             MR. BRIMMAGE:  (Indiscernible).

21             THE COURT:  I don't know.  Overrule it to the

22   extent of -- I want to hear it, how do you?  You can answer

23   the question.

24   BY MR. BATTAGLIA:

25   A    Yes, I do.

1   Q    What is that understanding?

2   A    It can be very difficult.  The -- starting around, I

3   think 2018, but -- today, I'd say today, if we lose a

4   vendor, it can be hard to find a replacement vendor.  Most

5   recent examples I'm aware of are the impact on the bank card

6   processing, where we ended up having to get an intermediary

7   vendor, if you will, to shield the processor from our

8   identity, if you will.  The -- (indiscernible) are unable to

9   find a bank to bank with, going from one of the big

10  international banks to a small rural, Texas State bank.

11       Even an issue of me trying to transfer our banking to

12  Access, which is a major bank on the east coast.  It's

13  actually a savings institution, does a lot of work in the

14  bankruptcy field.  And I wanted to move our banking there

15  prior to filing so that we could easily just transition

16  right into the DIP accounts without changing anything.  And

17  they concluded they would not do it per the bankruptcy

18  without an order from the Bankruptcy Court, and I could not

19  a -- they would not open the banking.  And they require that

20  I be the single signatory, period.

21  Q    Have you had experience attempting to replace the

22  controller position or bookkeeper position?

23  A    Yes, it has been very hard.

24  Q    Why?

25  A    The company's located in Austin, Texas.  And they've

1    had real trouble with finding companies who would be willing

2    to be associated with FSS in Austin, Texas.  And finding

3    somebody (indiscernible) accept having an FSS on their

4    resume.  We just lost one employee, he's coming back as a

5    consultant, contract employee.  He did not want FS -- he

6    wanted to get FSS off his resume.

7    Q    So, understanding that there's -- due to Alex Jones'

8    notoriety, there are limitations on the pool of suppliers of

9    goods and services; is that a fair statement?

10            MR. BRIMMAGE:  (Indiscernible).

11            THE COURT:  Sustained.

12   BY MR. BATTAGLIA:

13   Q    What is your understanding about the effect of Alex

14   Jones' notoriety on the ability to attract alternate

15   suppliers of goods and services?

16   A    It makes it difficult.

17            THE COURT:  Can I tell you on the critical vendor,

18   and for my purposes, Mr. Battaglia, I -- maybe you can focus

19   on -- I'm say, (indiscernible) to go into this question for

20   me, Mr. Battaglia, maybe I can ask the witness, but there

21   are three insurance providers, there's -- right?  There's a

22   -- there are three insurance providers here.  Someone who

23   does trash service, and someone that does the alarm service.

24   But I don't think you need to focus on those.  I mean,

25   unless -- but you tell me the insurance was all paid up, so

1    what is this insurance?

2            MR. BATTAGLIA:  I think they are periodic

3    installments, Your Honor, based on --

4            THE COURT:  Okay.

5            MR. BATTAGLIA:  -- the size of these.

6            THE COURT:  Okay.  All right.

7            MR. BATTAGLIA:  Your Honor, I'll -- and I'll focus

8    on the larger ones, and --

9            THE COURT:  No, I just, to me -- I can --

10   (indiscernible) can object if they want, but I don't think

11   they will.  I suspect they're more focused on the analysis

12   that went into creating this list.  But if you're telling --

13   yeah, the Debtor wants insurance, and maybe that's the

14   better answer for that.  And you've got to maintain

15   insurance.  And you can tell me why you need to maintain the

16   insurance, and that will probably get me over the hump on

17   those.  But maybe you can ask questions.  I think you've

18   already touched on Cloudflare, but maybe you can talk a

19   little bit about what Amazon Web Services does and the

20   security folks.

21           MR. BATTAGLIA:  Yes, sir.

22           THE COURT:  Okay.

23   BY MR. BATTAGLIA:

24   Q    If you'll look at Exhibit 11, and I'll just kind of run

25   down and focus on some of the more substantial -- what does

1    Amazon Web Services provide?

2    A    They do what it says, they provide our web services.

3    Amazon has a huge commercial web service operation they

4    developed for their own internal use for selling a product,

5    and which they now make available to third-parties.

6    Q    Yeah.  How important is that to Debtor's ongoing

7    operation, to maintain that relationship?

8    A    Again, it's critical, it's another component to get to

9    the -- get up -- get to the customers is having access to

10   commercial web services.

11   Q    ATXHD is a satellite uplink why are they critical to

12   the Debtor's business?

13   A    Again, to broadcast across United States is done by

14   satellite.

15   Q    And what happens if they terminate services?

16   A    We won't be broadcasting across the United States until

17   we find an alternative.

18   Q    Austin Security and Investigation is $28,000.  Why is

19   security vital to this Debtor?

20   A    Security's vital because the company and Mr. Jones are

21   extremely in the public eye, and they are extremely

22   controversial.  So, we have -- or FSS has armed security 24

23   hours a day, seven days a week in their facilities.

24            THE COURT:  Is this armed security in the

25   building?

1            THE WITNESS:  Yes, sir.

2            THE COURT:  Okay.

3            THE WITNESS:  And the buildings, there's no names

4    on the buildings.

5            THE COURT:  Okay.

6            THE WITNESS:  When you drive by you don't know

7    what's in there.

8    BY MR. BATTAGLIA:

9    Q    Cloudflare you've touched upon, so let's move to the

10   next largest one.  Getty Images, Inc., you -- tell the Court

11   what that's for?

12   A    Getty Images is a major supplier.  Think about any

13   program, talk show, whatever you've seen on television,

14   they'll bring up pictures of this, that, or the other.  They

15   get it from Getty, so it's for content for the show.  At

16   least, the shows are -- if you haven't watched one, are

17   operated as talk shows.  So, images, clips, et cetera are

18   all a very important part of the production.

19   Q    Hay Vision Network Video.  What do they do?

20   A    This is, again, I've moved a little bit up the

21   technical ladder of streaming bandwidth, which I really

22   didn't know anything about, but I know a little bit more

23   now.  But essentially, having the bandwidth to push out.  If

24   you think about streaming video and it stops and starts and

25   stops and starts, well, the bigger the bandwidth you get,

1   the better that experience is.  So, that provides the

2   ability to stream a lot of gigabytes of visuals and sound

3   out to the market.

4   Q    And if the Debtor didn't have that added bandwidth,

5   what effect would it have on the experience?

6   A    It would again, the shows would be absolutely

7   unwatchable.

8   Q    With respect to the smaller dollar items in here, are

9   each of them, to your opinion, vital to the continued

10  operations of the Debtor?

11  A    Yes.

12  Q    With respect to the insurance, can you give the Court a

13  flavor as to why those are one of the relatively minor, but

14  -- let's see towards the bottom, the Hartford, and

15  Travelers, I think there's two.

16  A    Hartford, Travelers, and then there's the Frost.  Just,

17  you know, this capacity of having insurance for the property

18  and casualty insurance on the assets.  There is a tremendous

19  investment in -- there are four studios onsite and the

20  technology in each one of those is quite large and

21  expensive.  There's a lot of dollars there to be insured and

22  protected.  If something happens, a fire in the building,

23  whatever, that's a lot of assets we've got to protect.

24  Q    Now, are you specifically asking the Court to allow you

25  to pay these, or order you to pay these amounts?

1    A    No.

2    Q    What are you asking for?

3    A    I'm asking to be able to pay up to these amounts.

4    Q    So, for example, I see Amazon Web Services at $77,000.

5    It's unusual to have a flat number like that.  What is the

6    basis for that?

7    A    These were -- what we did was go back and look at the

8    last three or four months and developed an average.

9    (Indiscernible), I suspect the average got rounded to

10   77,000.

11            MR. BRIMMAGE:  Objection, testifying, speculating.

12            THE COURT:  I'll sustain that objection.

13   BY MR. BATTAGLIA:

14   Q    Is it fair to assume that perhaps you don't have the

15   invoice yet for pre-petition services from Amazon Web

16   Services?

17            MR. BRIMMAGE:  Objection, leading.

18            THE COURT:  Sustained.

19   BY MR. BATTAGLIA:

20   Q    What information have you received about the pre-

21   petition amounts owed to Amazon Web Services to this date?

22   A    I have not received a bill yet, so I don't know.

23            MR. BATTAGLIA:  Your Honor, may I have a minute

24   consult with my co-counsel?

25            THE COURT:  Absolutely.

```
 1              MR. BATTAGLIA:  Thank you.

 2   BY MR. BATTAGLIA:

 3   Q    What conditions are imposed on the vendors if you pay

 4   them under this -- if the Court grants the relief requested?

 5   What do they have to do?

 6   A    Continue to provide service.

 7   Q    On what terms?

 8   A    Normal.  Their normal terms we've been operating under

 9   pre-bankruptcy.

10   Q    And if they don't?

11   A    If they don't?

12   Q    The order allows you to claw back --

13   A    Yeah, I can claw back but I mean from a business

14   standpoint --

15              MR. BATTAGLIA:  One more moment.  Pass the

16   witness, Your Honor

17              THE COURT:  Okay.

18              MR. BATTAGLIA:  I don't know when it would be

19   appropriate.  I think Mr. Schwartz is drying out there.

20              THE COURT:  Yeah, I was just going to ask folks.

21   I want to be respectful of -- I know folks need to -- may

22   need to eat, and I want to be respectful of that.  Does it

23   make sense to break now, come back, I don't know, 45

24   minutes, and then come back and pick up?  Okay.  Why don't

25   we come back on the record at 1:15.
```

1          Mr. Schwartz, I would remind you that you're still

2     under oath so you're not able to talk to anyone about your

3     testimony.

4          So, we will continue.  We'll break for lunch and

5     come back at 1:15.  I am going to keep Go to Meeting open.

6     I'm going to hang up the line, and then we will come back on

7     the line -- I think we will open up the line about 10

8     minutes before we start.  So, it will be sometime between

9     1:00 and 1:05, but I'll make sure if anyone's dialed in,

10    that you'll be able to hear everything.  But we'll hang up

11    the line and I'll keep Go to Meeting open for now.  Okay?

12    Thank you.

13          MR. BATTAGLIA:  Thank you, Your Honor.

14       (Off the record)

15          CLERK:  All rise.  Please be seated.

16          MR. BATTAGLIA:  Your Honor, is it okay if I have

17    this?

18          THE COURT:  Absolutely.

19          MR. BATTAGLIA:  Thank you.

20          THE COURT:  Okay.  This is Judge Lopez.  The time

21    is 1:22, back on the record in Free Speech.  Let me just --

22    I think we're going to turn to the cross-examination at this

23    time.

24          Mr. Schwartz, I remind you that you're still under

25    oath.  Okay?

 1              THE WITNESS:  Yes, Your Honor.

 2              THE COURT:  Okay.  Mr. Moshenberg.

 3              MR. MOSHENBERG:  Yes, Your Honor.  If it's all

 4    right with the Court, I'm going to be cross-examining Mr.

 5    Schwartz on behalf of the Texas Plaintiffs and Mr. Brimmage

 6    will be cross-examining Mr. Schwartz on behalf of the

 7    Connecticut Plaintiffs, Your Honor.

 8              THE COURT:  No problem.

 9              MR. BATTAGLIA:  Your Honor, I understand Mr.

10    Brimmage represents both of them.  I mean, I don't --

11    there's no sense in having the same party taking multiple

12    shots here.

13              THE COURT:  Well, they're -- they both filed a

14    joint objection.  So, I'm going to give both of them an

15    opportunity for cross.  If I do see overlap, I will -- so.

16    Go for it.

17              MR. MOSHENBERG:  Fair enough, thank you.

18              THE COURT:  They filed a joint objection, but they

19    are different.  They've always been different from the very

20    beginning.

21              MR. BATTAGLIA:  Yes, but Mr. Brimmage represents

22    both.

23              THE COURT:  He does, he does.  He's picking today.

24    Let's just see where it goes.  All your rights are

25    preserved.  If it starts to get a little out of hand, I'll

1    handle it.

2            MR. MOSHENBERG:  Your Honor, I'm going to Austin

3    later to attend the trial happening in Austin, so I have

4    every incentive to get out of here as soon as we can.

5            THE COURT:  I don't, so take your time.

6            MR. MOSHENBERG:  Fair enough.  Thank you, Your

7    Honor.

8            THE COURT:  Let me ask you this, in terms of

9    exhibits, how do you intend to show the witness?  Do you

10   have --

11           MR. MOSHENBERG:  We do have an exhibit list, Your

12   Honor.  We're going to pull them up, as --

13           THE COURT:  Well, let me ask it before you begin.

14           MR. MOSHENBERG:  Yes, Your Honor.

15           THE COURT:  Maybe I can then ask the same

16   questions.  Are you looking to -- by pull them up, is

17   someone going to ask me for permission to -- how do you

18   intend on doing this, Mr. Martin?  Okay.  Are you -- do you

19   intend to show exhibits out of 28, from Exhibit 28?  Docket

20   28, I should say.

21           Jarrod Martin, where are you?  There you are.  Mr.

22   Martin, I'm going to make you the presenter.  Let me make

23   you a presenter.  Is there -- just before you show anything.

24   Let's see, you have a number of exhibits at 28.  You just

25   want to go through them or are the parties -- is there

1   anything the parties can stipulate to now?  There may be

2   some overlap, right?

3          MR. BATTAGLIA:  Your Honor, I'm afraid that this

4   was filed while I was in my car on my way here, so I

5   actually haven't had an opportunity to look at them.

6          THE COURT:  Well, let's look at them now.  I think

7   a lot of this is public, by the way.  If you want to, Mr.

8   Battaglia, if you want to take a moment, I'll give you a

9   moment to just review them.  If not, we can just take them

10  up one by one.

11         I'll give you a few minutes to review.  It's a

12  first-day hearing, so everybody filed witness and exhibit

13  lists late.  So, I'm going to -- I will say for the parties

14  who are online, in the Go to Meeting feature, if you were to

15  hover your mouse around the right side, you'll see a plus

16  and minus.  And so, depending on the way it's shown on the

17  scroll, you'll still be able to zoom in or zoom out to be

18  able to view a particular document that is shown on the

19  screen.

20         MR. MOSHENBERG:  Your Honor, it may make more

21  sense to go one by one as we go because I may not use all

22  these exhibits anyway.  If the Court is more comfortable

23  doing that, I don't mind proceeding that way.

24         THE COURT:  It's your presentation, counsel, I'll

25  let you --

```
 1              MR. MOSHENBERG:  Yeah, my vote is to just start

 2    with the cross and I'll admit what I try to admit and take

 3    them one by one.

 4              THE COURT:  That works.

 5              MR. BATTAGLIA:  I have no issues with 1, 2, and 3,

 6    Your Honor.

 7              MR. MOSHENBERG:  Your Honor, I may not try to

 8    admit those, but it's good to know that there is no

 9    objection to 1, 2, or 3.

10              THE COURT:  Well, now it just sounds like we ought

11    to just start.

12              MR. MOSHENBERG:  Okay, fair enough.

13              CROSS-EXAMINATION OF W. MARC SCHWARTZ

14    BY MR. MOSHENBERG:

15    Q    All right.  Mr. Schwartz, you made some declarations in

16    this case, correct?

17    A    I believe I did one.

18    Q    Okay.  And you understand that the statements you made

19    in that declaration was under oath?

20    A    Yes.

21    Q    And that's the same oath that you're under today,

22    correct?

23    A    Yes.

24    Q    And you understand that it's important to tell the

25    truth in a declaration, correct?
```

1    A    Yes.

2    Q    You agree that it's important to tell the truth period,

3    correct?

4    A    I don't know what you mean by telling the truth period.

5    It's important to tell the truth.

6    Q    Okay.  And that's what I'm trying to confirm.  You

7    agree it's important to tell the truth.

8    A    I did agree with you.

9    Q    Okay.  You were hired as the CRO in the InfoW

10   bankruptcy, correct?

11   A    Yes.

12   Q    Do you recall that you spoke at the first day hearing

13   for that bankruptcy?

14   A    I recall I spoke at the first day hearing, yes.

15   Q    Do you recall that at the time you said you hadn't even

16   heard of Alex Jones before being approached to be the CRO?

17   A    Yes.

18   Q    That's still the truth?

19   A    That fact hasn't changed.  I still hadn't heard of him

20   before then.

21   Q    Do you recall telling the Court that you don't really

22   agree with his views and something to the effect of that you

23   put them in the same group as the people who denied the

24   landing on the moon?

25   A    I've missed the first part of it.  I don't agree with

1    his views?

2    Q    Sure.

3    A    I don't necessarily agree with his views.

4    Q    That's what I was confirming.  You don't agree with his

5    views, and I think he even said something to the effect of,

6    you know, you put him in the same category as the moon

7    landing deniers?

8    A    Correct.  I think I said that.

9    Q    And the point I'm raising here is that you told the

10   Court that you did not find Jones to be credible; is that

11   right?

12   A    I have to revisit what I said at that time.  I mean it

13   was -- I have to see what I said.

14   Q    Is it your testimony today that you do find Alex Jones

15   to be a credible person?

16   A    Credible, in certain respects, yes.

17   Q    Okay.  The respects relating to this bankruptcy; is

18   that what your testimony is?

19   A    Respect in leading to this bankruptcy?

20   Q    In respect to this bankruptcy is that your testimony?

21            MR. BATTAGLIA:  Objection, Your Honor.  It's

22   overbroad.

23            THE WITNESS:  Yeah, I'm confused by the question.

24            THE COURT:  Hold on a second.  I'm going to

25   sustain that objection.  You can ask a different one.

```
 1              MR. MOSHENBERG:  Okay.

 2   BY MR. MOSHENBERG:

 3   Q    Well, we'll explore that in a minute.  You understand,

 4   though, that in some contexts, Alex Jones does not tell the

 5   truth.  You understand that, correct?

 6   A    I believe that some people believe he does not tell the

 7   truth.  That's obvious from the from the litigation.

 8   Q    Okay.  I also want you to answer my question though.

 9   You understand that in some context, Alex Jones does not

10   tell the truth.

11              MR. BATTAGLIA:  Again, Your Honor, I'm going to

12   object.  This line of questioning is irrelevant

13   (indiscernible) be overbroad.

14              THE COURT:  What's the relevance of the questions?

15              MR. MOSHENBERG:  Your Honor, he's the CRO.  He's

16   relying on the information that the sole owner of the

17   company, Alex Jones, is providing him.

18              THE COURT:  Why don't you ask him if he's relying

19   on it?

20              MR. MOSHENBERG:  Okay.

21   BY MR. MOSHENBERG:

22   Q    Have you relied on any information Alex Jones has

23   provided to you directly or through his attorneys?

24   A    Well, I mean, yes, but it's information I've

25   corroborated.
```

 1   Q    Okay.  So, you're relying on information he provided

 2   you.  And what I want to know is do you understand that in

 3   certain context, Alex Jones does not tell the truth?

 4   A    Like all human beings, including yourself, he does not

 5   always tell the truth.

 6   Q    Okay.  Well, let's talk about an instance where he

 7   definitely didn't.  You understand that Jones and Free

 8   Speech Systems were determined by two different courts to be

 9   liable for intentionally lying, for defamation.  You

10   understand that, correct?

11        MR. BATTAGLIA:  Your Honor, again, I'm going to

12   object.  The entire line of questioning is irrelevant to the

13   issues before the Court today.  This is interim cash

14   collateral hearing.

15        THE COURT:  Why don't you help me with the

16   relevance of where you're going, counsel?

17        MR. MOSHENBERG:  Your Honor, what I want to

18   understand right now in a Subchapter 5 context, Your Honor,

19   where we have the CRO and we have the information that the

20   CRO is given by people who have been already adjudicated by

21   several courts to be liars, not just in underlying causes of

22   action, but also the abuses of the legal process.

23        THE COURT:  Okay.  I just asked you what the

24   relevance is.  I know you're trying to sneak stuff in, but -

25   -

```
1              MR. MOSHENBERG:  It's going to go to the

2     credibility.  I'm not trying to sneak anything, Your Honor.

3     Just to be clear, I'm just going to the credibility of the

4     of the witness.  That's all I'm trying to get at, Your

5     Honor.

6              THE COURT:  The credibility of this witness?

7              MR. MOSHENBERG:  Yes, Your Honor.

8              THE COURT:  Okay.  I'll allow a little bit of it

9     to some extent, but don't go too far.

10             MR. MOSHENBERG:  All right, Your Honor.

11    BY MR. MOSHENBERG:

12    Q    Of course, you're not Alex Jones, and I hope that at

13    least you'd agree with me that it's important in bankruptcy

14    to have transparency, oversight in an investigation.  You'd

15    agree with that?

16    A    I believe in bankruptcy, there should be transparency

17    for certain.  That's why we have oversight.  I mean, I've

18    got the Court, I've got a Sub 5 Trustee.  I'm going to not

19    intentionally obfuscate anything.

20    Q    Now, you've never worked for Free Speech Systems,

21    correct?

22    A    Before this engagement, no.

23    Q    Okay.  And before this engagement, you were never

24    contracted by Free Speech Systems in any way?

25    A     No.
```

1    Q    Okay.

2    A    Not that I'm aware of.

3    Q    Have you ever been contracted by Alex Jones or PQPR

4    before, at all, actually?

5    A    No.  I never knew they existed prior to the first

6    bankruptcy.

7    Q    Now, you -- I want to cover your declaration.  Exhibit

8    3.  (Indiscernible).  Now, Mr. Schwartz, can you see that?

9    A    Yes.

10   Q    Okay.  And that is your declaration, correct?

11   A    It appears to be, at least the second page -- the first

12   page of it.

13   Q    Okay.  And this is your statement under penalty of

14   perjury, correct?

15   A    Correct.

16   Q    I want to turn to Paragraph 4 for a moment.  It says

17   "Except as otherwise indicated, all facts as set forth in

18   this declaration are based upon my personal knowledge, my

19   review of relevant documents, or my opinion based on

20   experience, knowledge and information concerning the Debtor.

21   If called upon to testify, I would testify competently to

22   the facts set forth in this declaration."  Did I read that

23   correctly?

24   A    Yes, you did.

25   Q    What relevant documents did you review when you refer

1    to them in Paragraph 4?

2    A    Thousands of would-be pages if we printed them, out of

3    accounting records.  Of course, the general ledgers, the

4    prior general ledgers, financial statements drawn from those

5    general ledgers, contracts.  I don't have an inventory of

6    those items, but that's generally the types of documents I

7    looked at, would have looked at, and I'm sure there are

8    numerous others.

9    Q    Okay.

10   A    There's some various financial analyses, I remember

11   that.

12   Q    When  you say contracts, what contracts did you review?

13   A    Well, the -- I saw the notes.  I saw --

14   Q    Where those notes something that --

15   A    I think I saw other contracts.  I just don't recall

16   them.  If I can finish my answer.

17   Q    Sure.  I thought you were done.  Those contracts, the

18   promissory notes, were that -- was that just something you

19   found in the file when you started your investigation or

20   were those given to you?

21   A    They're probably given to me.

22   Q    They were given to you by the lawyers?

23   A    No, I don't think so.  I -- they were all recorded in

24   the books of account.  So, I said, okay, I need -- what are

25   these?  Let me see these.  And I believe Mr. Roe gave them

1    to me.

2    Q    Do you find Mr. Roe to be a credible person?

3    A    I think.  Yes, I think it's incredible like all of us,

4    we have our weaknesses.

5    Q    What sort of steps did you take to determine that Mr.

6    Roe a credible person?

7    A    Well, I worked with him for a couple of months in

8    connection with the first bankruptcy, so I had an

9    opportunity to see him in action, work with him.  I found he

10   did not try to hide things from me.  And I did test him to

11   see if he would.  He was confident, knows accounting,

12   understood accounting, and understood the problems in the

13   financial records.  So --

14   Q    Is it fair to say beyond your interactions with him

15   over a few weeks, that you didn't do any other vetting of

16   him?

17   A    No, I don't think we did any formal vetting of him.

18   Q    Okay.

19         THE COURT:  Just a second.  Just a second.  I was

20   hearing some background noise and it looks like the line got

21   unmuted.  I'm muting the line again.  If anybody wishes to

22   be heard at some point, you'll need to hit five star.  I

23   apologize.  I just wanted to make sure that you weren't

24   interrupted with background noise.

25         MR. MOSHENBERG:  Thank you, Your Honor.  I

1    appreciate it.

2           Can we look at Exhibit 10, please?  Can you scroll

3    down a little bit more?  I want to make sure Mr. Schwartz

4    has a chance to look at it.  I'm going to ask him if he's

5    ever looked at this document before.

6    BY MR. MOSHENBERG:

7    Q    So, Mr. Schwartz, when you're ready, just let me know

8    whether you've ever reviewed it.

9    A    I don't believe I've seen this before.

10   Q    Okay.  Do you have any reason to doubt that this is the

11   default judgment that was entered in the Connecticut

12   Plaintiffs' case in Connecticut?

13          MR. BATTAGLIA:  Objection, Your Honor, asked and

14   answered.  He said he has never seen it.

15          THE COURT:  I'll sustain.

16          MR. MOSHENBERG:  Okay.

17   BY MR. MOSHENBERG:

18   Q    My question is do you have any reason to doubt that

19   this is the default judgment?

20          MR. BATTAGLIA:  Objection, Your Honor, same

21   objection.  How can the witness answer when he said he has

22   never it before?

23          THE COURT:  Yeah.  That was sustained.

24   BY MR. MOSHENBERG:

25   Q    This is a publicly filed document granting the default

 1   judgment against Alex Jones.  I'll represent that to you.
 2   And what I want to look at is Page 7 --
 3           MR. BATTAGLIA:  Your Honor, I'm going to object to
 4   him asking questions about a document that's not in
 5   evidence.  It's (indiscernible) --
 6           MR. MOSHENBERG:  It's a public document, Your
 7   Honor.  It's the same standard as --
 8           MR. BATTAGLIA:  There's no indicia of reliability
 9   here.  It's a certified document and I've never seen it
10   either.
11           THE COURT:  Why don't you -- I don't -- you're
12   asking the question to a witness about a document that's not
13   been admitted into evidence.  Maybe you should move for it
14   to be admitted.
15           MR. MOSHENBERG:  Sure.  Your Honor, I would like
16   to move to admit Exhibit 10 into evidence.
17           MR. BATTAGLIA:  Objection.  No foundation.
18           THE COURT:  What's your response, counsel?
19           MR. MOSHENBERG:  Well, it's part of a publicly
20   filed document in Connecticut, Your Honor, if you go to the
21   top page.  It is a court default judgment in the Connecticut
22   Plaintiffs' case.
23           MR. BATTAGLIA:  It's not a certified copy.  There
24   is no representation that this is valid.  I've never seen it
25   before.  I have no idea what's --

1           MR. MOSHENBERG:  And it's also your --

2           MR. BATTAGLIA:  Excuse me, counsel.

3           THE COURT:  You got let him finish the objection

4    and then you can answer.  Go ahead.

5           MR. BATTAGLIA:  There's no indicia here that this

6    in accurate document.  Where it is or not, I have no idea.

7    no idea.  I've never seen it before, neither has the

8    witness.

9           MR. MOSHENBERG:  Your Honor, I'm offering it for

10   impeachment purposes only.  I don't even need to prove it

11   for the truth of the matter asserted.

12          THE COURT:  What is the purpose for the

13   impeachment that you're seeking?  On what point are you

14   seeking to impeach the witness?

15          MR. MOSHENBERG:  The court in the Connecticut case

16   determined that Mr. Roe was not credible, actually did not

17   consider his evidence because he did not find the witness to

18   be credible and that the witness had sanitized records.

19          THE COURT:  Well, what does it have to do with Mr.

20   Schwartz?

21          MR. MOSHENBERG:  He relied on him as part of this

22   bankruptcy.

23          THE COURT:  What is the impeached -- what is the,

24   what is the statement that he made that you're impeaching

25   him on?

1          MR. MOSHENBERG:  Well, excuse me.  What I mean is

2     it's going to his credibility, that he's relying on as the

3     CRO information done by Mr. Roe, who has been adjudicated by

4     a judge in Connecticut as not providing reliable

5     information.

6          THE COURT:  I'm going to sustain the objection.

7     You can come up with something that will -- maybe you can

8     come up with something, but that he hasn't said anything

9     within the scope of his direct that would warrant an

10     impeachment on that point.  And maybe this is a certified

11     copy, maybe it's not.  Maybe you can come up with something.

12     But I'm also struggling to see the relevance of this in

13     connection with a critical vendor motion and a cash

14     collateral motion.  But maybe you can get me there as well.

15          MR. MOSHENBERG:  All right, Your Honor.  Well, I'm

16     going to focus for a moment on ways to get this in before

17     you in a reliable way.

18          THE COURT:  Okay.

19          MR. MOSHENBERG:  I'm going to move on in the

20     meantime, Your Honor.  And I'll tie that to that.

21          THE COURT:  I'm sure Mr. Brimmage is already

22     thinking of stuff.  But go ahead.

23     BY MR. MOSHENBERG:

24     Q    So I have here accounting records, prior ledgers,

25     financial statements, contracts, inventory, financial

1    analyses.  Is there anything else that you relied on in your

2    work so far that you reviewed?

3    A    I'm certain there are.

4    Q    Okay.  Does anything else come to mind?

5    A    Purchase orders, sales orders, invoices.

6    Q    Is that all?

7    A    Give me a chance to think.  I mean you're asking me off

8    the top of my head.

9    Q    Sure.  Did you read any depositions?

10   A    No, not off -- I don't think so.

11   Q    Okay.  All right.  So, aside from the documents you

12   reviewed, what else did you do to make yourself comfortable

13   with the information that you're relying on, and that Free

14   Speech provided you?

15   A    Well, I talked to people, asked them -- pertinent

16   people who had knowledge of those areas.

17   Q    Okay.  Which individuals did you talk to?

18   A    Blake Roddy is one, Bob Roe is another one.  Alex Jones

19   is another one.  David Jones.  Anthony (indiscernible).  I

20   visited some with Melinda Flores.  A gentleman named

21   Zimmerman.

22   Q    Say that again, please.

23   A    A gentleman named Zimmerman.  A gentleman last name

24   Elmo, I don't remember his first name.  I believe it's Elmo.

25   Of course, I talked to counsel.  They were reviewing

1    documents as well.  Patrick -- oh, and you asked me in

2    connection with the declaration, Patrick Riley.  Those are

3    the names I can recall.

4    Q    Okay.  Let's go to Paragraph 11.  And I'm back at

5    Exhibit 3 right now.  This is your declaration we covered

6    earlier.

7              THE COURT:  Just to be clear, this is the

8    declaration that was filed in this case?

9              MR. MOSHENBERG:  Yes, Your Honor.

10             THE COURT:  Okay, thank you.

11   BY MR. MOSHENBERG:

12   Q    Okay.  I want to look at Paragraph 11 please.  It says

13   that Alex Jones, it says born in 1974, Alex Jones or Jones,

14   is the son of Carol Jones, a homemaker, David Jones, a

15   prominent dentist.  Jones moved from Dallas to Austin as a

16   teenager.  Did I read that correctly?

17   A    Yes.

18   Q    That is not based on your personal knowledge; is it?

19   A    No.

20   Q    Okay.  But you testified, you swore in this declaration

21   that that was based on -- that fact is based on your

22   personal knowledge, but you don't know that.

23   A    I said my, my declaration said it was based on

24   documents I reviewed.  I put up the three categories we

25   already talked about.  This was I saw, I read an article

1    that mentioned, I believe, it was an article that stated

2    this.

3    Q    And you just took that to be true?  You read an article

4    and you determined that it was true?

5    A    It was one of the documents I reviewed.  I mean, take

6    any one of the documents, you can say did I take it as true?

7    No, I took a look.  You know, it's a piece of information

8    that may or may not be true.  It appears to be true.  But I

9    said I saw in a couple of places and the press reported it,

10   so, my God, it must be right.

11   Q    So, let me understand this.  You didn't know if

12   something was true.  You saw it.  You thought it was true

13   and that was enough for you to swear it was true in this

14   Court --

15   A    No, I consulted with my attorneys as well, or the

16   attorneys on this case as well.  You know, it's if we go

17   through this, we got to, you know, are we certain this is

18   all right.

19   Q    And so you had no idea.  You just relied on other

20   people, and you swore to that being true?

21   A    Everything I've done in this is based on information

22   provided by others.  I didn't create any of the data I

23   looked at, any of the documents I looked at, or anything.

24   Some, you know, they could all have been fabricated and that

25   -- but I don't believe they were.  So, it's based, all based

```
 1    on someone giving me something.  And I, to some -- some
 2    vetted more than others.  And I asked, this is one that I
 3    remember talking to counsel about this one.  Are we sure
 4    this, we know this, are we comfortable with our references
 5    on this?  I saw the article.  Are we comfortable using it?
 6    Q    But you don't know if it's true and you swore that it's
 7    true to this Court?
 8              MR. BATTAGLIA:  Objection, Your Honor.  Asked and
 9    answered.  Frankly, it's badgering at this point.
10              THE COURT:  Well, no, see I think -- I think, I
11    think you get to explore a little bit.  Can we go up a
12    little bit.  I'm going to overrule the objection.  Kind of
13    scroll up to the very beginning.  Paragraphs 1 or 2.  Okay.
14              So, tell me where in this declaration it says that
15    the statements that you made are based on conversations with
16    other people?  It says, based on personal knowledge, your
17    review of relevant documents, or your opinion based upon
18    experience, knowledge, and information concerning the
19    Debtor.  And then you --
20              THE WITNESS:  I don't -- it doesn't say based on
21    conversations, but it should be because I talked to a lot of
22    people as I said.
23              THE COURT:  Okay.  You can ask your question.  I'm
24    going to overrule the objection.
25    BY MR. MOSHENBERG:
```

1    Q    So, you didn't know whether it was true, but you swore

2    that this was true, what Paragraph 11 says.  That's what I

3    wanted to confirm with you today.

4    A    Well, based on my -- it's based on my information,

5    knowledgeable, and belief at the time.  And it may not be

6    true.  Maybe he wasn't born in '74.  That --

7    Q    Not, you could know --

8         THE COURT:  I just want you to let him finish the

9    answer and then --

10        MR. MOSHENBERG:  Yes, Your Honor, I apologize.

11   BY MR. MOSHENBERG:

12   A    Based on the information I had and based on my vetting

13   of that information, I took that piece of information as

14   true.  It is important?  I don't know.

15   Q    I'm fine with you following up, but I do want to answer

16   to my question, which is you didn't know whether this was

17   true, but you swore that it was true.  And I just wanted to

18   confirm that today.  You didn't know if this was true, but

19   you swore to it.

20   A    Well, I believed it was true.  But the knowledge like

21   you knowing about 64 million, you didn't know that was true.

22   But you said it.  It's the same thing.  I didn't, you know,

23   I believed this was true.  I said it.  I believe it's still

24   true.

25   Q    But you don't know whether it's true.

1    A    I did not see him get born.

2    Q    Okay.  Let's look at Paragraph 12.  Take a moment and

3    review it.

4    A    Okay.

5    Q    Is it fair to say that you don't have any personal

6    knowledge of whether he was -- about Austin, about in the

7    early 1990s, Austin was a dirt-cheap home to artists,

8    musicians, and sign makers.  And according to Shannon Burke,

9    who's a local talk show radio host said all this

10    information.  Do you know any of these things to be

11    personally true?  Did you have personal knowledge of this?

12    A    No, you -- the -- this was cited.  I actually cited the

13    source for that.

14    Q    Okay.  And you actually reviewed that source.  Is that

15    your sworn testimony?

16    A    I looked at that.  I read it.  Yes.

17             THE COURT:  You read the Buzzfeed article?

18             THE WITNESS:  Yes, I did.  I remember this one,

19    reading it.

20             THE COURT:  Okay.

21    BY MR. MOSHENBERG:

22    Q    Okay.  How about Paragraph 13 then.  Take a moment and

23    read that.

24    A    That's also in the Buzzfeed article.

25    Q    Okay.  So, you don't actually know whether that's true.

1   You're just relying on the Buzzfeed article, correct?

2   A    Yes.

3   Q    Okay.  And are you saying you don't know whether this

4   is true in this, anywhere in here?  Do you ever make that

5   qualification?  You acknowledge Buzzfeed, but you represent

6   this as being a true statement.  You're swearing that this

7   is a true statement, sir, based on something you read on

8   Buzzfeed.

9   A    Well, I'm citing Buzzfeed to say this is where I got

10  the information from.

11  Q    Where does it say that?  It says Buzzfeed.  Where does

12  it -- where is that qualification here?

13  A    When I footnoted it -- when we footnoted it with the

14  citation, that tells you the source of it.  And that I can -

15  - you know, I'm relying on Buzzfeed and their reporting, but

16  it doesn't say that I've done anything to verify that

17  Buzzfeed did the job they were supposed to do.

18  Q    Right.  And you swore that this statement is true

19  though.  You acknowledge Buzzfeed, but you don't say I don't

20  know if this is true or not, but this is what Buzzfeed says.

21  You swore in a declaration to its truth.

22  A    That's the truth, that's a true quote from Buzzfeed.

23  Q    That's not what you wrote.  You didn't say according to

24  Buzzfeed, they said this, and I don't know if it's true.

25  You represented this as true.

1    A    I represented this came from Buzzfeed.

2    Q    You don't know if it's true?

3    A    No.

4         MR. BATTAGLIA:  Your Honor, we're just being

5    argumentative.

6         THE COURT:  I think, I think we just got the

7    answer.  I think he just said no.  And I think you're going

8    to ask another question.

9    BY MR. MOSHENBERG:

10   Q    Okay.  I'll speed this along.  Why don't we look, why

11   don't you take a moment and look at Paragraphs 14, 15.  Is

12   it the same issue?  You don't know whether it's true, you're

13   just relying on other sources?

14   A    Yes.  Those are both relying on other sources.

15   Q    Right, because you don't know whether those statements

16   are true, whether those allegations, those factual

17   statements are actually true.  You don't know?

18   A    No.

19   Q    How about Alex Jones was a natural, Number 16?  How did

20   you know that he was a natural in all of this?  Or is it you

21   didn't know?

22   A    That's a quote.  That's not something --

23   Q    I don't see a quotation mark.

24   A    I agree with you.  It's not, and it's cited directly,

25   but that should have been cited.

1    Q    That's something that you're swearing as being true in

2    your declaration.

3    A    Well, based on the evidence I've seen, which is the

4    operating results, at least from 1907 -- 2007 forward, he's

5    obviously, extremely successful at this.

6    Q    But you saw some documents and you decided based on

7    those some documents that was so true that you swore to it

8    being true in a declaration to this Court?

9    A    That Alex Jones is a natural, I don't, I don't think I

10   have a problem with that at all based on what I saw from

11   2007 forward.

12   Q    Right.

13   A    But the evidence I'm used to saying, which is numbers.

14   Q    I thought you said you hadn't heard of him until this

15   engagement.  How did you know he was a natural?

16   A    I just told you; I look at his numbers from 2007

17   forward as well.

18   Q    Okay.

19              THE COURT:  What do you mean by looking at his

20   numbers?  What --

21              THE WITNESS:  Financial results.

22              THE COURT:  From FSS?

23              THE WITNESS:  Yeah, FSS, I think started business

24   in 2007.

25              THE COURT:  I just wanted to clarify what you

```
 1    meant by his financial numbers.  Not -- you mean --
 2               THE WITNESS:  FSS's financials.
 3               THE COURT:  Okay, thank you.
 4    BY MR. MOSHENBERG:
 5    Q    I mean, we can speed this along.  Why don't we look at
 6    17, 18, 19, those three paragraphs.  Take a moment and
 7    review them.  I'll ask my questions when you're ready.
 8    A    Okay.
 9    Q    Same problem, you're swearing these things are true and
10    you don't know whether they are.  You just looked at some
11    sources and you swore that those things were true?
12    A    I swear, yeah, these are cites from those sources.
13    Q    Right, but you don't at all say this is what these
14    sources reported, but I don't know whether they're true.
15    You swore to them being true.
16    A    Well, I swear that these are proper cites from these
17    sources.
18    Q    Where does it say that?
19    A    Well, because it's based on the information I had,
20    these sources said this.  This si -- I'm telling you this is
21    what these sources said.
22    Q    That that big qualification you just gave, where's that
23    in your declaration?
24    A    I don't think you'll see that that specific wording in
25    the declaration.
```

1    Q    Right, because in your declaration, you say the

2    following, I swear under penalty of perjury is true based on

3    my personal knowledge.  And you don't know whether these

4    things are true.  You just looked at some sources and swore

5    they were true.

6    A    Well, it's -- my declaration says my personal knowledge

7    is based on the documentation I reviewed as well as the

8    other two factors like we've already covered in Paragraph 3,

9    I think.  It's based on that.  See, none of the documents

10   that I reviewed did I create everywhere.  So, you can say

11   the whole thing is not based on my knowledge.

12   Q    I agree.  And I want be very clear that my point is I

13   understand you review things, but lots of people can review

14   stuff and then not decide whether it's true or not.  You

15   reviewed those things and you decided to swear to this Court

16   without knowing whether it actually was that it's true

17   without any of your own personal knowledge.

18   A    I mean, obviously, I do what I do.  I look at other

19   stuff and I interpret it.  In this case this is material,

20   it's -- you know, that people -- other people wrote.  I

21   didn't say it's my source.  I cited to the sources they came

22   from.  But I -- yeah, everything I do is based on

23   information that has existed even before I heard the name

24   Alex Jones.

25   Q    Are you done with your answer, sir?

1    A    Yes.

2    Q    Let's look at the first sentence of Paragraph 19.

3    "When Jones started broadcasting on the radio in the late

4    1990s, he closely followed the talk radio playbook.  He

5    built a large, devoted audience of far-right conspiracy

6    believers."  Did I read that correctly?

7    A    Yes.

8    Q    There's no cite there.  Do you agree with that?

9    A    I think that all this paragraph is in SPLC, where it

10   came from.  Excuse me, there's a -- it came out of

11   Intelligencer, is what it says.

12   Q    Where does it say that?

13   A    On the last -- second to the last line.  Right.  I see

14   that sentence has the Intelligencer cited.  I'm talking

15   about the first sentence.  You represented that was true.

16   There's no cite there.  There's no qualification at all.

17   You just said it.

18   A    I think all of that, all of that came from the

19   Intelligencer.  The only thing that didn't was the last

20   sentence about the hundred stations, which came from SPLC.

21   Q    There's no cite there.  You agree with that?

22   A    I don't agree with that at all.

23          THE COURT:  That one has been asked and answered.

24   BY MR. MOSHENBERG:

25   Q    Okay.  All right.  Well, let's go to the next

1    paragraph.  Take a moment and look at that please.  Again,

2    you didn't have any personal knowledge of anything in there,

3    correct?  And take your time reading it.

4    A    Correct.  As I said, none of this is personal, well

5    except for my analysis of numbers, which I don't have

6    personal knowledge of.  But this, excuse me, could you put

7    that paragraph back?

8    Q    Number 20, thank you.

9         THE COURT:  Number 20.

10   BY MR. MOSHENBERG:

11   A    I believe that I did talk about this with Dr. Jones.

12   Q    Okay.  But you didn't know personally whether it was

13   true or not.  You just relied on Dr. Jones.  You didn't know

14   if it was true.

15   A    Right, I don't have personal knowledge of anything.

16   Q    But you swore to it being a fact.

17        MR. BATTAGLIA:  Your Honor, I'm going to object.

18   Counsel keeps saying that he says personal knowledge based

19   on documents, experience, knowledge, and information.

20        THE COURT:  I think the testimony is, is that he's

21   citing to documents, but those documents didn't really form

22   his personal knowledge.  It's just citing stuff.  I think

23   that's what this -- these paragraphs are showing.  Unless

24   Mr. Schwartz wants to tell me that he developed personal

25   knowledge based on -- personal knowledge, I should say,

```
 1    based on news articles and the deposition reference.  It
 2    sounds like you're just, in this citing --
 3             MR. MOSHENBERG:  It's not a brief, Your Honor.
 4    It's a declaration.
 5             THE COURT:  No, no, no.  I'm just going -- I think
 6    at the core of what you're doing is just citing articles to
 7    try to provide background information.  Do I understand that
 8    correctly?
 9             THE WITNESS:  Yes.  That's correct, Your Honor.
10             THE COURT:  Okay.  I'm just going to caution you.
11    The way your declaration is drafted, and I will be honest
12    with you, it does say you developed personal knowledge based
13    on this.  And as I read this, I knew this line of
14    questioning was coming.  So, that's why I'm allowing it.
15             THE WITNESS:  I apologize, Your Honor.
16             THE COURT:  I'm sure next time you'll cut all this
17    out and get right to the stuff you know.  But today, they
18    get to ask questions about it, and we'll figure out what you
19    know.
20    BY MR. MOSHENBERG:
21    Q    It is fair to say --
22             MR. MOSHENBERG:  Thank you, Your Honor.  I didn't
23    mean to cut you off.
24             THE COURT:  No, no, no.  I didn't mean to
25    interrupt your examination.
```

```
1    BY MR. MOSHENBERG:

2    Q    Is it fair to say sort of based on this exchange --

3    because earlier I asked if you read any depositions and you

4    hadn't, correct?

5    A    Yes.  I don't recall.  I may have -- I don't recall

6    reading any depositions.  I don't even recall, like, reading

7    it -- I may have read an excerpt of this deposition, but I

8    don't recall it.

9    Q    Yeah.  Well, you agree in Paragraph 20 you cite to a

10   deposition that you haven't read?

11   A    Correct.

12   Q    And it's the same problem, right, on 21, 22, 24, you're

13   citing to this deposition, and you hadn't read it.

14   A    That is correct.

15   Q    And you swore -- based on a deposition you never read;

16   you swore these things were true based on your personal

17   knowledge?

18   A    Correct.

19   Q    Let's take a break from your declaration, sir.  Why

20   don't we go --

21        MR. MOSHENBERG:  Can you pull up Exhibit 1,

22   please?  I think Jarrod quit the case because I asked him to

23   pull up exhibits for me.

24        MR. BRIMMAGE:  We are going to have to take a

25   quick break, Your Honor.  I'm sorry.  I have a Mac.
```

```
 1            THE COURT:  No, no worries.  But I think I
 2   probably need to make you a presenter.
 3            MR. BRIMMAGE:  Well, I'm on Jarrod's machine.
 4            THE COURT:  Oh.  Do you want to take a break?
 5            MR. MOSHENBERG:  I think it'll just be one moment,
 6   Your Honor.  We're looking at exhibit one please.
 7            MR. BRIMMAGE:  (Indiscernible).  And I did want
 8   (indiscernible) the issue.  Thanks, Your Honor.
 9            MR. MOSHENBERG:  We're looking at Exhibit 1,
10   please.
11            THE COURT:  What's the exhibit you're going to?
12            MR. MOSHENBERG:  Number 1, Your Honor.
13            THE COURT:  Number 1.
14            MR. MOSHENBERG:  Yes, Your Honor.
15            THE COURT:  Mr. Martin, I believe you're still the
16   presenter.  If anything has changed, if you need me to do
17   anything, you let me know.  I don't see you.  That's what --
18   oh, there you are.  You're still the presenter.
19   BY MR. MOSHENBERG:
20   Q    Can you see the document, sir?
21   A    Are you talking about the petition?  Yes, sir.
22   Q    Yes.
23   A    Yes, sir.
24   Q    I almost called you Your Honor.  Now, the -- you've
25   seen this document before, correct?
```

1    A    Yes.

2    Q    Okay.  I want to look on this first page.  And Part IV,

3    it says Debtor's address.  It says principal place of

4    business.  Do you see that?

5    A    Yes.

6    Q    Okay.  It looks like it's in Austin, Texas.

7    A    Yes, sir.

8    Q    Okay.  And I think I remember looking in your

9    declaration too, but it is your understanding that they are

10   based in Austin, correct?

11   A    They being FSS?  Yes.

12   Q    Right.  They've got an office building there.  And I

13   think also a warehouse you mentioned.

14   A    Yes.

15   Q    Okay.  All right.  Let's go to Page 3, please, Section

16   XI.  Do you see Section XI, check all that apply?  Why is

17   this case fall to this District?

18   A    Yes.

19   Q    And can you read the box that's checked please?

20   A    There it said, its domicile place, principal place of

21   business or principal assets in this district for 180 days

22   immediately preceding the date of this petition or for a

23   longer part of such 180 days than in any other district.

24   Q    Okay.  That statement is not correct; is it?

25   A    I believe it --

1          MR. BATTAGLIA:  Objection, Your Honor.  I believe

2   that calls for a legal conclusion of what the definition of

3   domicile is.

4          THE COURT:  Yeah, I'm going to sustain that

5   objection.

6   BY MR. MOSHENBERG:

7   Q    What activities are occurring in Houston on behalf of

8   Free Speech Systems?

9   A    In Houston, I don't know.

10  Q    What about in the Southern District?

11  A    Southern District --

12  Q    Yes.

13  A    Well, its business activities are occurring in the

14  state of Texas, and I understand that's the domicile.

15  Q    My understanding is it's all happening in the Austin

16  area, correct?

17  A    Well, I mean all the physical activity is in the Austin

18  area.

19  Q    Right.

20  A    But they sell all over the country.

21  Q    Right.  But you're not aware of anything in particular

22  happening in the Houston area, correct?

23  A    No.

24  Q    Galveston, Victoria, nothing there?

25  A    No.

1    Q    Okay.  So, what was the basis for you checking that

2    box?

3    A    My understanding from counsel is that there's case law

4    out there that a quick Texas entity is domiciled in the

5    state of Texas, and you can pick any district.

6    Q    Okay.  And this is -- of course, if we go to the next

7    page, Page 4, you're swearing under the penalty of perjury

8    that what's in here is correct, correct?

9    A    Correct.

10   Q    So, is it fair to put this in the same bucket of things

11   that you swore as being true even though you didn't really

12   know if it was true or not?

13   A    Well, I'm not a lawyer, so I don't consider my reading

14   of the case law definitive.  But based on the case law I

15   read; this is correct.

16   Q    That their domicile is in this district?

17   A    Yes.

18   Q    Okay.  Even though you're aware of no activities

19   happening in this area?

20        MR. BATTAGLIA:  Objection, Your Honor, asked and

21   answered.

22        THE COURT:  I'm going to sustain that.

23   BY MR. MOSHENBERG:

24   Q    Actually, let's go to Page 13 of that document.  Were

25   you the one that prepared this balance sheet?

1    A    I'm sorry.  What are you referring to?

2    Q    I'm looking on Page 13 of 17.  Excuse me, balance

3    sheet.

4    A    If you look at Page 13 of 17, at the very top, it says

5    "Comparative Profit and Loss Statement."

6    Q    I think that's 12.  Oh, it's the exhibit.  Can you go

7    to the next page, please?  I'm looking at the balance sheet.

8    Were you the one that prepared this?

9    A    No, I think I had one of my staff prepare this.

10   Q    And it's no secret I want to talk to you about the

11   numbers across the bottom.

12   A    Okay.

13   Q    The reports in 2021, 61 million, almost $62 million in

14   member draws; isn't that right?

15   A    Let me clarify your statement for you.  It reports that

16   as of 12/31/21, member draws totaled $61,937,000 -- 938,000.

17   Q    Your testimony is that there were no $61 million in

18   draws in 2021?

19   A    Draws, the total of all draws was $61 million at

20   12/31/21.  That number is correct.

21   Q    And your testimony here is when it says as of

22   12/31/2021, that means as of the date the company was

23   formed?  As of and then to 12/31/2021?

24        MR. BATTAGLIA:  Your Honor, I'm going to object to

25   the form of the question.  I'm not quite sure I understood

1    it.

2              THE WITNESS:  I didn't understand it.

3              THE COURT:  Well, that makes three of us.

4    BY MR. MOSHENBERG:

5    Q    Okay.  My point is where on this document does it say

6    the beginning date?

7    A    It doesn't.

8    Q    Right.  So, there's no -- nothing, here that represents

9    what you're saying that years earlier there was a $61

10   million in draws.

11   A    What represents that is that member draws was

12   61,937,000 as of 12/31/2021.  That's what that number

13   represents.  That is -- that's a balance sheet.  It's a

14   basic accounting.

15   Q    And you're relying on the financials that were provided

16   to your assistant in order to report that?

17   A    No.

18   Q    What were you relying on relying on?

19   A    We were relying on the general ledgers that were the --

20   QuickBooks system, which is the accounting system.  If you

21   allow me to explain the answer.

22   Q    I'd like to know what you were relying on.

23   A    Okay.  I'm relying on the general ledgers.

24   Q    Okay.  And didn't you say in your beginning testimony

25   earlier today that the financials were all messed up?

1   A    I said that 12/31/21 had not been closed when we were

2   engaged and 12/31/22 had not been posted.

3   Q    Okay.  You said more than that though.  I think you're

4   saying that the financials were a mess, right?

5            MR. BATTAGLIA:  Your Honor, I object to the

6   characterizing the witness's testimony.  He said what he

7   said.

8            THE COURT:  All right.  Well, Mr. Schwartz, do you

9   recall saying that the statements were -- financial

10  statements were a mess?

11           MR. SCHWARTZ:  I said 12/21 and 12/22 were a mess.

12  We didn't do anything to -- have to do anything to 12/20 and

13  prior.

14  BY MR. MOSHENBERG:

15  Q    Well, you said -- all right.

16           THE COURT:  Go ahead.

17  BY MR. MOSHENBERG:

18  A    You said --

19  Q    You said that the people that kept the books beforehand

20  didn't even have accounting degrees, right?

21  A    The people who were -- no.  The people who kept the

22  books when I came on board had no accounting degrees.

23  Q    Mm hmm.

24  A    My predecessor -- I do not know when she was terminated

25  but I've had several people tell me that she was an

1    excellent accountant.

2    Q    And it's based on that solely that you determined that

3    those numbers are right, the $62 million in draws.

4    A    No.  I -- okay.  This is what the financial statements

5    reflect.  I did not have to do, and I have not gone back --

6    and for any reason -- I had no reason to go back and audit

7    2020 and prior.  But I had to get 2021 and 2022 up to date

8    and current and posted.  As of 12/31/21, I will clarify for

9    the Court, from 2007 when this company was formed to

10   12/31/21, net draw was -- by Mr. Jones -- was -- to Mr.

11   Jones -- for $62 million, rounded.  From the period of -- if

12   I did that right -- what is that, 14 years, 15 years -- 14

13   years.

14   Q    Okay.  And since the lawsuits were filed, the

15   defamation cases by the Sandy Hook families, how much money

16   in draws did Alex Jones take?

17   A    My -- probably about --

18          THE COURT:  Why don't we put a date on it?  Why

19   don't we just put a date on it just so we're -- we have a

20   clean record --

21          MR. MOSHENBERG:  It was in 2018, Your Honor.

22          THE COURT:  -- because there were multiple

23   lawsuits and I just want to make sure that we're all clear.

24   So, your question if from the beginning, since 2018?

25          MR. MOSHENBERG:  Sure.  Yes, Your Honor.

1   Actually, since April of 2018.

2            THE COURT:  Okay.

3            THE WITNESS:  I can't answer since April of 2018.

4   I've not just gone -- I've got the information.  It's

5   available to me.  I haven't gone back and looked at that.

6   I'm --

7            THE COURT:  Do you know what the draws would have

8   been over the last three years?  Why don't we say it that --

9            THE WITNESS:  For the last -- well, okay.  In 20 -

10  -

11           THE COURT:  I think you can say what the -- yeah.

12  Just (indiscernible) --

13           THE WITNESS:  Did you -- okay.  2022, it was

14  $254,000 through May.  2021, I think it was $2 million.

15  2020, 2019, probably 7 million, maybe.  And this --

16           THE COURT:  Total or each year?

17           THE WITNESS:  Each year, and these are total

18  draws.  The taxes on the income of FSS are also accounted

19  for as draws when they're taken out and paid.  So, for

20  example, the $64 million, we know $30 million of that I

21  think -- what was it -- over the last -- since 2012, was

22  paid to the IRS.

23  BY MR. MOSHENBERG:

24  Q    $30 million?  How much income do you need to have pay

25  $30 million to the IRS?

1   A     You can -- well, divide that by  point four, and that's

2   the taxable income.

3   Q     That was Alex Jones' tax income?

4   A     Well, FFS is a -- this -- disregarded, thank you --

5   entity and so --

6           THE COURT:  Hold on.  So, Mr. Battaglia, I --

7   yeah.

8           THE WITNESS:  I apologize.  I'm at that age where

9   it takes time -- it takes a few minutes to --

10          THE COURT:  No.  Well, I don't --

11          THE WITNESS:  -- pull things out.  A disregarded

12  entity, so all of the income and expenses of FSS appear on

13  Mr. Jones' personal tax return and he has to pay the tax.

14  So, when there's taxable income, FSS has to -- FSS pays the

15  money to the IRS.  It doesn't flow through Mr. Jones'

16  personal accounts.

17  BY MR. MOSHENBERG:

18  Q    Okay.  Are you -- have you seen any sort of document --

19  did you know, I should say, that there was document produced

20  in the Sandy Hook litigation in Texas -- in the Fontaine

21  litigation -- by Free Speech Systems' corporate

22  representative, showing draws between 2018 and 2021 of $18

23  million?  Did you know that?

24  A    No, I'd have to see that.

25  Q    Okay.  Based on your numbers, does that sound right?

1   Between 2018 and 2021, $18 million in draws were taken out

2   of the company.

3   A    I mean, I'd have to look at the -- look at it.  I don't

4   think that ties.  We're looking -- we were looking at total

5   draws -- 60-something million and -- I do know this, that of

6   the total draws, less than half occurred after 2018.  There

7   was actually more in draws before 2018.

8   Q    Okay.  So --

9   A    But I'd have to look -- the details of the numbers, I

10  don't have them with me.

11  Q    Okay.  So, when we're talking about 2018 to present, 30

12  million-ish, that's what you were talking about?

13  A    In total draws?

14  Q    Yeah.

15  A    I don't think it's -- that's not -- I mean, we have the

16  exact number.  I don't want to give you a number that's

17  going to be -- you know, you deserve the right number not

18  that one, not something off the top of my head.

19  Q    Those are considerable draws though, you agree?

20  A    It would be to me.

21  Q    Yeah.  And you don't know what Free Speech System

22  received in return for those draws, correct?

23  A    By, you don't -- draws are the equivalent of dividends

24  in a C corp.

25  Q    Right.

1   A    Or an S corp.  So, you don't get anything in return for

2   paying -- giving return of the -- of capital or your return

3   of income to your investors.  That's what they're entitled

4   to from -- for investing in you in the first place.

5   Q    Right.  They don't receive any sort of value in return

6   for giving this draw out.

7   A    Same way you don't get -- you know, the question is, do

8   you get any in -- value in return for paying the interest on

9   the debt.

10  Q    You don't.

11  A    Or you -- you know, you receive the debt, you receive

12  the equity.

13  Q    But at the time the draw was made, there was no value

14  given to Free Speech Systems?  Like you were saying, it's

15  like a dividend.  There was no benefit to --

16  A    It's like a dividend.  It's a return of -- it's, you

17  know -- what Free Speech System got was the initial

18  investment and then the buildup of equity over time to use

19  it to invest in the business as long-term capital.

20  Q    That's not what they got when they made a draw.  When

21  they made a draw, they got nothing.  They just lost money.

22          MR. BATTAGLIA:  Objection.  Again, counsel --

23  (indiscernible) asked and answered.

24          THE COURT:  Yeah.  I -- on that one, I'm tending

25  to agree, so I'm going to sustain that objection.

1  BY MR. MOSHENBERG:

2  Q    If Alex Jones hadn't taken $62 million out of the

3  company in that time period or $30 million or $18 million

4  since 2018, he hadn't taken money out of the company, there

5  wouldn't have been a bankruptcy, correct?

6          MR. BATTAGLIA:  Objection, Your Honor.  Calls for

7  speculation.

8          THE COURT:  Sustained.

9  BY MR. MOSHENBERG:

10  Q    In your opinion, would it have needed to file

11  bankruptcy if that money had still been in there?

12          MR. BATTAGLIA:  Objection.  Calls for speculation.

13          THE COURT:  I did analyze the case and authorized

14  the filing.  You can answer that.

15  BY MR. MOSHENBERG:

16  A    If $30 million had been in the company, depending on

17  the nature of the asset it was invested in, it might or

18  might not have been bankrupt.  If it was sitting there in

19  the bank account, then no, we wouldn't be in bankruptcy.  If

20  he hadn't paid the IRS, we wouldn't -- well, we would have

21  been shut down, so --

22  Q    All right.  You've got a background in investigating

23  fraud is my understanding, correct?

24  A    I have done some of that.

25  Q    Are you familiar with what fraudulent transfers are?

1    A    I have some understanding of that.

2    Q    Okay.  You understand that Alex Jones and Free Speech

3    Systems have been accused of making fraudulent transfers to

4    insiders?

5    A    I have heard that.  I have not read the complaint.

6    Q    Okay.  You're not familiar with what the actual lawsuit

7    alleges?

8    A    I'm -- well, I understand it alleges a fraudulent

9    transfer.  A fraudulent transfer is -- that's about the

10   extent of my knowledge.

11   Q    Okay.  You don't know any of the details supporting

12   those allegations?

13   A    Not at this time I don't.

14   Q    Okay.  You understand that Free Speech Systems and

15   Jones were in fact sued for making -- let me skip that

16   question.  Have you investigated at all whether any of the

17   draws were in fact fraudulent transfers?

18   A    No.

19   Q    I want to go back to Exhibit 3, Paragraph 35.  Can you

20   read that statement out loud, please?

21   A    "The CRO's continuing to evaluate where the estate has

22   causes of action to claw back any payments or distributions

23   to Alex Jones."

24   Q    Is it fair to say that at the time this was written

25   that you hadn't evaluated it yet from your prior answer?

1    A    Correct.  We had not.

2    Q    Okay.  So, this isn't true that you're continuing to

3    evaluate?

4    A    No, we're -- I mean, we continue to be aware of the

5    possibility and if we see any evidence of it -- we have not

6    done any conservative investigation of that.

7    Q    Okay.  The statement should say --

8         THE COURT:  Let me get you where you're going.

9    The question is, are you continuing to evaluate.  Is that

10   statement accurate?

11        THE WITNESS:  Yes.  I have not made a decision

12   either way.  Are there actionable distributions or are there

13   not?  We just have not, you know, we're aware of it's -- of

14   the situation.  It's common in any company bankruptcy and if

15   we see something, we will note it and keep track of it so

16   that at least once we get started on that phase of the

17   engagement, we'll have that knowledge already.

18        MR. MOSHENBERG:  Object as nonresponsive, Your

19   Honor.

20        THE COURT:  Sustained.

21   BY MR. MOSHENBERG:

22   Q    Your testimony is you hadn't even started

23   investigating.  That's what you just me.  You hadn't started

24   yet.  So, you're not continuing, you haven't started.

25   A    Well, I don't read this this way and you're always

1    evaluating.  It's just part of the job.  Now, I have not

2    started the actual -- okay, now let's start the formal

3    investigation and start putting together the evidence and

4    focus on that.  That is not just where our focus is right

5    now.

6    Q    Okay.  So, you haven't started, correct?

7    A    Yeah.  So, like I said, our focus -- we have not

8    directed our focus there as of yet.

9    Q    You -- are the draws -- the significant draws that Alex

10   Jones has taken out of the company, do you think those

11   warrant an investigation as to whether those fraudulent

12   transfers?

13   A    I don't think whether I think they're warranted or not,

14   I think I'm obligated to look at that.

15   Q    Okay.  But from what you know right now, do you know --

16   do you think it's warranted to investigate whether those are

17   fraudulent transfers?

18   A    I don't care whether it's warranted or not.  I have to

19   look at it, so I'm going to look at it.

20   Q    I understand but I'd like an answer to my question.

21   A    Well, I don't know what warrant has to do with it.  It

22   just -- I think draws are always warranted in

23   investigations.  So, then in that context, then yes, they

24   warrant investigation because they -- draws should always be

25   investigated in a bankruptcy.

1   Q    Okay.  Now, when you were the CRO of InfoW, you were

2   part of the attempt to secure a release of Alex Jones and

3   Free Speech Systems as part of that bankruptcy plan.

4   Correct?

5   A    Not -- as I recall, that was part of a revision in the

6   Plan Support Agreement that had certain events occurred --

7   certain payments were made -- that they would get a release.

8   Q    Right.  And the goal was to pay $10 million to those

9   claimants, right?

10  A    I note the number on the table it was $10 million.

11  That's what was -- had been committed to at that time, in

12  the beginning.

13  Q    Okay.  And so, we were saying a moment ago, 18 million,

14  30 million, 60 million, the draws are something that need to

15  be investigated, whether they're fraudulent transfers.  But

16  you were trying to secure a release in that bankruptcy of

17  Jones and Free Speech Systems for $10 million while you were

18  the CRO of InfoW --

19            MR. BATTAGLIA:  Your Honor --

20  BY MR. MOSHENBERG:

21  A    -- and you hadn't disclosed --

22  MR. MOSHENBERG:  Let me finish my question, please BY MR.

23  MOSHENBERG:

24  A    -- and you hadn't disclosed that at the time that you

25  were part of that effort, you were the CRO for Free Speech

1    Systems as well, or that you were at least being engaged to

2    be.

3              MR. BATTAGLIA:  Your Honor, I'm going to object on

4    a couple of grounds.  One, relevance of any of this to a

5    cash collateral -- interim cash collateral -- hearing,

6    number one.  Number two, counsel is -- if he wants to talk

7    about what the Plan Support Agreement says, it's in

8    evidence.  It doesn't say a release for 10 million.  It says

9    a release for (indiscernible) over and over and over again.

10   So, he's mischaracterizing the record, the documents in

11   evidence --

12             THE COURT:  I'll sustain the objection on that

13   ground, and I do think he can answer the question about how

14   he was negotiating -- whether he was negotiating the Plan

15   Support Agreement or parties to Plan Support Agreement on

16   behalf of InfoW debtors and was soliciting was to be the CRO

17   of Free Speech at that same time.  And I think that goes to

18   credibility and I think you can --

19             THE WITNESS:  Is that the --

20             THE COURT:  Well, I think you can answer that

21   question.  You know, and I mean, you can ask that question

22   again but if you do want to ask a question about the Plan

23   Support Agreement, I do think it makes more sense to just --

24   it's in evidence.  You can just ask the questions about that

25   and show him a document and that way we can at least have a

1    clean record.

2              THE WITNESS:  Sure.

3    BY MR. MOSHENBERG:

4    Q    So, what's the answer?

5    A    To the Court's question?

6    Q    Yes.

7    A    The Plan Support Agreement had been terminated by April

8    30th because conditions precedent to it had not been met.

9              THE COURT:  Let me take over.  That was never --

10   was that ever told to (indiscernible)?

11             THE WITNESS:  I believe you pointed out in your --

12   at one point from the bench there, you said, this has to be

13   -- if we don't know this by April 30th, this thing's dead,

14   isn't it?

15             THE COURT:  And everybody was assuring me at the

16   time that they were going to extend it and keep working.

17             THE WITNESS:  Well, it never got signed.  Later,

18   we did continue working but by -- in May -- by May 19th for

19   certain, or prior to May 19th, we were negotiating with the

20   Plaintiffs in both cases --

21             THE COURT:  Let me get the question -- I might as

22   well ask it now because it's a good spot.  I can wait until

23   the end, or I can ask it now and don't read too much into

24   it.  I just need to understand it.  On May 19th, there was a

25   hearing before me where on May 18th, there was a request for

1    a continuation on a motion to dismiss.  The hearing on the

2    motion to dismiss -- we held an emergency hearing on the

3    19th where there was a proposed stipulation presented to me

4    to dismiss -- allow the dismissal -- of the -- what I would

5    call the Austin -- one portion of the Austin litigation, and

6    I signed it on that day.

7              And in this case, there is a letter dated by you

8    to Free Speech dated the same day.  I may be reading much

9    into this, but it seems to me that you -- either you wrote

10   the letter that day or you had been in conversation with

11   Free Speech before you wrote that -- before that day you

12   sent the letter.  And I just need to understand -- none of

13   this was ever disclosed to me in connection with the case

14   and the cases were dismissed on June the 10th officially,

15   which tells me that Mr. Jones signed a retention letter.

16   So, you were actively retained before these cases were

17   dismissed -- the last cases were dismissed -- and I just

18   need to understand, one, why that was never disclosed to me,

19   and two, when did you begin to start soliciting or having

20   conversations about representing Free Speech Systems.

21             Why don't -- that's a compound question.  I think

22   that's unfair.  When did you begin to have conversations

23   with anyone from Free Speech Systems about potentially

24   representing them?

25             THE WITNESS:  I had conversations with Mr. Lee, in

1    I believe --

2             THE COURT:  Mr. Lee was representing the Debtors

3    too.

4             THE WITNESS:  -- and Mr. Jordan who represented --

5    I think still does represent Mr. Jones.  I don't know when

6    those were, but it was after we had been substantially

7    convinced that we were going to be terminating the InfoWars

8    bankruptcy.

9             THE COURT:  You wrote the letter on May 19th.

10            THE WITNESS:  On May 19th, Mr. Lee asked me to

11   send him an engagement letter for Free Speech -- the Free

12   Speech engagement.

13            THE COURT:  Okay.

14            THE WITNESS:  And to be quite honest with you, I

15   didn't even think about it at that time.

16            THE COURT:  No, I appreciate the honesty.  I

17   appreciate disclosure.  It seeks a retainer.  When did you

18   receive that retainer?

19            THE WITNESS:  Lord --

20            THE COURT:  That month?

21            THE WITNESS:  No, it was --

22            THE COURT:  Let just say if the letter was signed

23   on June -- the letter was officially signed on June 6th --

24            THE WITNESS:  June 6th.

25            THE COURT:  When did you -- did you receive it

 1  before or after you were retained, or right about that time?

 2           THE WITNESS:  It was -- no, it was not right

 3  around -- it was after, definitely.

 4           THE COURT:  After.  Okay.

 5           THE WITNESS:  You know, it was several weeks after

 6  at least.

 7           THE COURT:  Okay.  Okay.  Sorry.  That was the

 8  question -- that was the clarification that I had mentioned

 9  I had wanted to understand the day before.  I guess Mr. Lee

10  a few questions as well at some point, but I'll need to

11  understand that as well, but today's not that day.  Today's

12  cash collateral, and so I do want -- and I know I took this

13  off on tangent.  Now, I'm going to bring it back.  I did

14  want to focus on cash collateral, and I want to focus on

15  critical vendor, and I want to understand -- I've given you

16  some leeway.  Maybe that's the better way of saying.  I've

17  given you some leeway to kind of have general conversation

18  about the CRO role and what investigation and he's done to

19  formulate in connection with the budget, but now I'm going

20  to ask you to laser focus on these two motions.

21  BY MR. MOSHENBERG:

22  Q    Okay.  Let's look at that part of Exhibit 3, the ledger

23  (indiscernible).  I want to focus on the part where it

24  provides for a budget for Alex Jones of $54,000 every other

25  week.  Do you see that part?

1   A    Not yet.

2   Q    Can you see it?

3   A    Yes.

4   Q    Okay.  And in total, it ends up being about $379,000.

5   correct?

6   A    I can't tell.  He's -- whatever it says.  I mean, I

7   can't see that.  Would you have your associate or partner

8   reduce the size?  Thank you.

9   Q    Yeah.  (Indiscernible) $379,000 and that's over a 13-

10   week period, correct?

11   A    Correct.

12   Q    Okay.  And if you translate $379,000 over a 13-week

13   period, that translates to about a salary of $1.5 million.

14   Do you understand that?

15   A    Well, I don't believe that's correct.  Mr. Jones --

16   this is a -- Mr. Jones has an appointment agreement for 1.3

17   million.  Some amount of it and I think it's about 8,000 of

18   (indiscernible) Patriot is paid through the payroll system.

19   This should be that difference.  So, you got 26 pay periods

20   in the year so you can do the math.  It will be -- should

21   add up to 1.3, those two components.

22   Q    Well, I did 379 -- 13 weeks is a quarter of a year,

23   right, 52 weeks --

24   A    Yeah, but we can't do -- you've got to do it by --

25   because we pay a biweekly, not semi-monthly.

1   Q    Okay.

2   A    So, that's -- something about the math in that

3   calculation -- you got to multiply that number by 26 to get

4   an annual rate.

5   Q    Okay.  So -- but your point is, $1.3 million salary.

6   A    Total -- his total is 1.3 million.

7   Q    Okay.

8          THE COURT:  I'm just going to tell everyone.

9   Judge -- math and don't claim to be -- (indiscernible) in

10  excel spreadsheet for you, but it's essentially treading a

11  $54,000 bimonthly, you know, but that -- if you take that

12  over 26 periods -- you multiply the 54,000 times -- you get

13  to like a $1.4 million number.

14         THE WITNESS:  That case, well --

15         THE COURT:  If you multiply it times 24, you get

16  to the 1.3.  It's --

17         THE WITNESS:  Oh, shoot.  I apologize, Your Honor.

18         THE COURT:  It's okay.

19         THE WITNESS:  Okay.

20  BY MR. MOSHENBERG:

21  Q    And that's salary separate from the draws that he's

22  taking out of the company, right?

23  A    Correct.

24  Q    Okay.  You understand that in the Free Speech Systems

25  corporate representative, that position, the document that

1   produced showed that he had an annual salary of about

2   $625,000.

3           MR. BATTAGLIA:  Objection, Your Honor.  The

4   question is about a deposition he was not present at and --

5           THE COURT:  Yeah.  I'm going to sustain that.  I

6   want you focused on the questions -- I've given you plenty

7   of room --

8           MR. MOSHENBERG:  Sure.

9           THE COURT:  -- and Mr. Brimmage is going to ask

10  questions too and I want him -- I want you all focused on --

11  you got questions about the budget, ask the budget.

12          MR. MOSHENBERG:  Well, what I'm trying to

13  understand is, if there were documents produced to us by

14  Free Speech showing that his salary was $625,000 a year, why

15  is he receiving a $1.3 million salary under this budget.

16          THE COURT:  Do you have those documents?

17          MR. MOSHENBERG:  Yes, Your Honor.  They were notes

18  provide as part of the deposition --

19          THE COURT:  No, I'm asking you are they on your

20  witness and exhibit list?

21          MR. MOSHENBERG:  They are, Your Honor.

22          THE COURT:  Why don't you show that then?

23          MR. MOSHENBERG:  It's Exhibit 12.

24  BY MR. MOSHENBERG:

25  Q   These were notes that were provided by the corporate

1    representative based on her review in preparing for her

2    30(b)(6) deposition.  They were admitted as part of the

3    deposition.  And if you look, about halfway down, it says,

4    AJ paid a salary of $625,000 a year.

5    A    As of what date?  Do you know?

6    Q    Well, this deposition occurred in -- February 15th of

7    2022, this year.

8    A    I'd have to look back and see the date of the

9    employment agreement that I was -- given to me that I have,

10   which is what the 1.3 is based on.

11   Q    Right.  And that employment agreement was created in

12   April of this year, correct?

13   A    You're probably -- you may be right.  I think you're

14   right.

15   Q    Right.  It was kind of about the same time as all the

16   bankruptcies with the InfoW started happening, right,

17   leading up to the Alex Jones trial that was first set in

18   April, 2022, right?

19   A    I don't know about the first setting of the Alex Jones

20   trial, but I do recall -- I'd have to look back and see when

21   I got involved with the InfoWars bankruptcy, if it was in

22   April or not or prior to -- after that.  I don't know when

23   they actually got started.  It was before I had -- the

24   planning for that started before I ever got involved.

25   Q    Okay.

1    A    Sometime before I got involved.

2    Q    But you relied on that $1.3 million based on an

3    agreement that was created in April of 2022, correct?

4    A    Right.  That's the contract I have (indiscernible) --

5    Q    It wasn't based on prior pay that he was receiving?

6    A    No.

7    Q    So, in --

8         THE COURT:  Okay.  Mr. Moshenberg, he's answered

9    the question.  Why don't you ask another question?  He's

10   answered the question.  Why don't you ask another one?

11        MR. MOSHENBERG:  Okay.

12   BY MR. MOSHENBERG:

13   Q    You didn't do any sort of investigation to see if $1.3

14   million was the appropriate amount to give him?  You just

15   went off of that agreement it sounds like.

16        THE COURT:  He's answered that question, Mr.

17   Moshenberg.  Why don't you ask another question?

18   BY MR. MOSHENBERG:

19   Q    Do you have any reason to doubt that he gave himself a

20   -- basically a $600,000 raise?

21   A    No, because I know he hasn't been paid anything on the

22   1.3 and during 2022, he was paid about $8,000 every two

23   weeks, which is not 625 either.  So --

24   Q    And now you're deciding in this motion that he needs to

25   get paid.  He needs to starting getting $54,000 every other

1    week.

2    A    I -- no, what I decided was, look, the agreement says

3    1.3 million.  I'm going to put you -- I'm putting into your

4    payroll.  That's what the contract says.  You know, if it

5    gets thrown, it gets thrown out.  Whatever --

6    Q    There's no emergency, right?  There's no emergency to

7    pay him those funds.  Isn't that the reality?  You were

8    saying a moment ago he wasn't even making any money.  Well,

9    what is the emergency in this motion that he receive $54,000

10   every other week?

11   A    I can't say there's an emergency.

12   Q    He doesn't need it.

13   A    I wouldn't -- I don't know.  I mean, I can't there was

14   an emergency.  He didn't --

15   Q    Certainly, from the Debtor's part, there's no

16   emergency.  There's no, we have to pay him this or Alex

17   Jones is going to quit, right?  We're not worried about

18   that.

19   A    I don't believe that's the case.

20   Q    Yeah, I don't think so either.

21         THE COURT:  Mr. Moshenberg, now is the time that

22   you start reading the room.  I want you to focus on

23   questions that relate to the budget for cash collateral or -

24   -

25         MR. MOSHENBERG:  Okay.  Fair enough, Your Honor.

 1    Give me one moment, Your Honor.

 2              THE COURT:  Take your time.

 3              MR. MOSHENBERG:  Your Honor, if it works for you,

 4    what I'll do to save time is, if I could save my line of

 5    questions for recross if needed --

 6              THE COURT:  Sure.

 7              MR. MOSHENBERG:  --  but we'll just do it that way

 8    instead just to speed things along.

 9              THE COURT:  Okay.  But before you go, is -- maybe

10    the parties can help me, and I'm just -- as I think through

11    this -- I know it's not official, but my understanding was

12    that the parties were agreeing -- and to my knowledge, Mr.

13    Jones hasn't objected to it, and if there's somebody let me

14    know -- that the $54,000 number was going to count on the

15    20,000, right?

16              MR. BATTAGLIA:  20,000 for the interim cash

17    collateral period.  Yes, sir.

18              THE COURT:  Okay.  I just wanted to make sure that

19    I understood.

20              MR. BATTAGLIA:  Yes.

21              THE COURT:  Okay.  Okay.  Actually, the reason I'm

22    asking all the questions -- regardless if it's 625 or 1.3

23    for the interim period, it would be some number below even

24    the 625 for purposes of interim, and I want to make sure all

25    of his rights are reserved to come back and prove that at

1  one point who has the right number.  I'm not getting into

2  that.  I just want to make sure that I understand what's on

3  the table now.

4          Mr. Schwartz, let me ask, are you ready to

5  continue or do you need five minutes to use the restroom or

6  something?

7          THE WITNESS:  I think I'm okay, Your Honor.

8          THE COURT:  Okay.

9          THE WITNESS:  If I turn yellow, I'll raise my

10 hand, Your Honor.

11         THE COURT:  Okay.

12         MR. BATTAGLIA:  Judge, my rule is I never waste an

13 opportunity to a bathroom (indiscernible) --

14         THE COURT:  No, no, no.  I just -- it's the

15 witness so -- just maybe two minutes?

16         MR. MOSHENBERG:  No, Your Honor.

17         THE COURT:  Okay.

18         MR. MOSHENBERG:  (Indiscernible).

19         THE COURT:  That's fine.  I'm just trying to

20 understand the deal --

21         MR. MOSHENBERG:  Yeah.

22         THE COURT:  -- where things stood --

23         MR. MOSHENBERG:  Well --

24         THE COURT:  -- and maybe they've changed.  That's

25 what I'm trying to get to.

```
 1              MR. MOSHENBERG:  Yeah.  (Indiscernible).

 2              MR. BATTAGLIA:  I didn't know that need was a

 3    basis here as entitlement to.  I mean, I don't necessarily

 4    my salary.  I'm not sure whether you need your more --

 5              THE COURT:  I get it.

 6              MR. BRIMMAGE:  By the way, there is no

 7    (indiscernible) --

 8              THE COURT:  The record says what it says, and I'll

 9    let parties make the argument based on what they want.

10              MR. NGUYEN:  Thank you, Your Honor --

11              THE COURT:  So, why don't we -- why don't you ask

12    your question and then we'll take a five-minute break and

13    then we'll continue with the cross-examination.

14              MR. NGUYEN:  Thank you, Your Honor.  I will be --

15              THE COURT:  No, no, no.  I want you to take as

16    much time as you need.  That's not --

17              MR. NGUYEN:  -- as brief as possible.

18              THE COURT:  -- that I'm trying to rush you.

19              MR. NGUYEN:  Understood, Your Honor.

20    BY MR. NGUYEN:

21    Q   I just have a couple of question, Mr. Schwartz, about

22    your engagement with FFS and your prior engagement with

23    InfoW.  The Judge asked you some questions.  I still --

24    there's still a little bit of gaps in the timeline and I

25    just -- if you can help me, just walk me through your
```

1   engagement.  So, Mr. Schwartz, can you just tell me exactly

2   when your engagement with the InfoW entities began?

3   A    I don't have -- I don't recall the date of that

4   engagement letter.

5   Q    The cases were filed back in, I believe, April --

6   A    Yeah.  It would have been in April right before the

7   case was filed.

8   Q    And presently, are you still the chief restructuring

9   officer for the InfoW entities?

10  A    Yes, I am.

11  Q    And who at the InfoW entities would have the right to

12  terminate your engagement as the CRO?

13  A    I've asked that question.  I don't know the answer.

14  Q    Well, who hired you as the CRO for the InfoW entities?

15  A    The interim Trustee.

16  Q    And who is that?

17  A    Robert Dew.

18  Q    And did Mr. Dew sign the engagement letter for the

19  InfoW entities or was it, Alex Jones?

20  A    No, it was -- well, I'm pretty sure it was Robert Dew.

21  I may have to look at that.

22  Q    And overall, how much money were you paid for your

23  services as the CRO in the InfoW entities?

24  A    I'm -- I'd have to speculate.  I don't recall.  I know

25  had leftovers from my retainer.

1   Q    How much was the retainer?

2   A    You would ask me that.  It was over $30,000, I know

3   that.

4   Q    You said you had leftovers?

5   A    Yes.

6   Q    Okay.  And who paid the retainer?

7   A    That was paid by Mr. Jones, but I -- it was paid by Mr.

8   Jones' lawyer.  I assume it was Mr. Jones' funds but --

9   Q    And as the CRO for the InfoW entities, you were the one

10  that had the authority to enter into the stipulation with

11  U.S. Trustee to dismiss those cases?

12  A    Yes, I believe I did.

13  Q    Did you need to get authority from Mr. Jones to enter

14  into that stipulation?

15  A    No.

16  Q    And earlier, you mentioned that there was an engagement

17  letter sent to FFS around -- I believe the conversation was

18  May 19th, but I think the actual engagement letter was May

19  16th; is that correct?

20  A    I believe it was May 19th.  That's -- Mr. Lee asked for

21  it.  I don't know when it got to FSS.

22  Q    And how did you got word that FSS was looking for a

23  chief restructuring officer for you to send in an engagement

24  letter to FSS?

25  A    Mr. Lee called me and asked me to send an engagement

1    letter.

2    Q    Did you speak to Mr. Jones about being the CRO for FSS?

3    A    Not until June 6th.

4    Q    Do you -- in the InfoW cases, did you file an

5    application to be employed as the CRO for the InfoW

6    entities?

7    A    I didn't file it, but it was filed.  There was one

8    filed.

9    Q    Did you submit a verified statement with your

10   application?

11   A    Yes, I believe so.

12   Q    And in your verified statement, did you disclose

13   anywhere in there that you were seeking employment from FSS?

14   A    I don't believe so.

15   Q    And you serve as a bankruptcy professional that's been

16   appointed and approved by the court before in other cases?

17   A    Yes.  But on your former question, I have -- I was not

18   talking to FSS about serving as their CRO when I was engaged

19   by InfoW.

20   Q    In your experience as a bankruptcy professional, do you

21   think there's a continuing obligation for professionals that

22   appear before the court to supplement their disclosures and

23   tell the court of any connections that occurred during the

24   case?

25   A    Yeah.  The appointment orders require that.

```
 1   Q    And that didn't happen in InfoW cases, correct?

 2   A    Correct.  There was no appointment.

 3   Q    But you still had a verified statement that was filed

 4   with the Court, and you didn't supplement that verified

 5   statement.

 6   A    No, I didn't -- I was never appointed, so --

 7   Q    And earlier, Mr. Battaglia talked about your authority

 8   as the CRO for FSS.  Who do you get your direction from as

 9   the CRO?

10   A    Me and the Court.

11   Q    Okay.  So, if Mr. Battaglia files a Chapter 11 Plan in

12   this case, you don't have to seek Alex Jones' approval of

13   that plan before it's submitted to the Court?

14   A    No.  We wouldn't look for his approval.  We'd look for

15   his input.

16   Q    Can Mr. Jones fire you as the CRO?

17   A    No.  Well, I guess he -- he'd have to (indiscernible)

18   here to get permission first.  I think actually the Court

19   would fire me.

20   Q    And earlier, there was a discussion of the PQPR notes,

21   one for about 29 million and the other was about 25 million

22   and some change.

23   A    Yes, sir.

24   Q    Do you recall that conversation?  Have you taken any

25   steps to verify that amount of the debt under the promissory
```

1   notes to ensure that those amounts are accurate?

2   A    All I've done so far is I have seen calculation of the

3   makeup of the amount that was in the first note and some of

4   the supporting documentation.  And I said I have seen it.

5   I've done nothing on vetting that.  On the second note, I

6   don't think I've seen anything.  And quite frankly, that's -

7   - right now, we're still trying to get this company

8   operating and fighting fires before we get to looking at --

9   we're going to have to do that.  We know that.

10  Q    And in your declaration at Paragraph 53 -- Karen, can

11  you blow up the declaration?

12         THE COURT:  I've got to make Mr. Martin a

13  presenter again.

14         MR. NGUYEN:  Thank you, Your Honor.

15         THE COURT:  No, no worries.  I -- it was a

16  document that was up a bit earlier and I just wanted to make

17  sure that it was taken down.  Mr. Martin, if I've done

18  anything wrong -- if I need to do it again, let me know.

19  Okay.

20         MR. NGUYEN:  Paragraph 53, Mr. Martin.

21  BY MR. NGUYEN:

22  Q    Mr. Schwartz, can you see Paragraph 53 in your

23  declaration?

24  A    Yes.

25  Q    And it says, on or about August 13th, 2020, FSS and

1    PQPR executed a promissory note in the principal amount of

2    29,588,000 made payable to PQPR which memorialized their

3    accrued obligations of FSS to PQPR through December 31st,

4    2018.  Do you see that?

5    A    Yes.

6    Q    How do you know to put in your declaration under

7    penalty of perjury that this amount was memorialized with

8    the accrued obligations?

9    A    This is one where I said I saw the detail of the

10   calculation and some of the supporting documents in it.  It

11   identifies the transactions going back -- actually, it

12   should be from 12/31/2018.

13   Q    And you mentioned some supporting documents.  What are

14   some of those supporting documents?

15   A    These were schedules of billings, (indiscernible) PQPR

16   for inventory and credits, i.e., payments, applied to those

17   billings and they were developed out of the general ledger

18   system there, accounting transactions pulled out of the

19   general ledger system.  We didn't go beyond that.

20   Q    You didn't look at any -- have you -- did you seen any

21   invoices?

22   A    No.  We haven't done that.  It's --

23   Q    Have you seen any bank statements that show some

24   payments from PQPR?

25   A    Not in this time period.  We have not gone back that

1    far yet.

2    Q    Are there any bank statements?

3    A    Well, that's good question.  Right now, there aren't.

4    I've got to go back and check and make sure when we change

5    banks, we don't lose access to those bank statements.

6    Q    So, when you put in your disclosure this was the amount

7    that was memorialized in accrued obligations, you don't know

8    that for a fact.

9    A    Well, I know for a fact and that they showed me -- I

10   have the calculation for the amount of the 29,588,000 and I

11   see from the source date that it is from invoices and

12   payments records.

13   Q    But you don't --

14   A    To me, as an accountant, that tells me that's what I'm

15   looking at.

16   Q    But you haven't seen the billings or the invoices or

17   the --

18   A    We have not vouched it yet to ensure it's actually

19   properly calculated.

20   Q    And in your declaration, you -- on the cash collateral,

21   you mentioned that there was extensive and difficult

22   negotiation with PQPR over the use of cash collateral.  Do

23   you recall that part of your declaration?

24   A    Yes.

25   Q    Who did you communicate with at the PQPR to extensively

1    negotiate the use of cash collateral?

2    A    It was primarily David Jones and his -- and Steve

3    Lemmon.

4    Q    And did Alex Jones have any input in the use of -- in

5    the negotiations for the use of cash collateral?

6    A    Yes.  He would come in to the negotiating sessions

7    intermittently.

8    Q    And is it your understanding that the 80 percent

9    ownership of PQPR is owned by an entity that Alex Jones

10   owns?

11   A    Yes.

12   Q    And I just want to take a look at the budget.  The

13   Plaintiff went over the salary to Mr. Jones, but there is --

14   there's a line item on the budget for an American Express

15   payment of about $172,000.  I think it was the first week in

16   August.  Can you just tell me what that is?

17   A    That's the amount we -- of American Express.

18   Q    So, it's a pre-petition debt?

19   A    No.  That's -- okay.  Excuse me.  Let me fix that.

20   You're right.  It's not a pre-petition debt.  Based on our

21   spending history, this is the amount that will be -- come

22   due.  Well, maybe, you know -- and that's -- you probably

23   hit it on the head.  That probably is pre-petition.

24   Q    So, why is it necessary to pay American Express for a

25   pre-petition debt in the cash collateral 13-week budget?

1   A    Well, I would have argued we should -- well, it's --

2   we're probably going to have to just let American Express

3   shave the wind and see what we can do.  We have some charges

4   that go through them but they would be on the critical

5   vendor's list so we can take care of that there.

6   Q    Have you seen the invoices for the American Express

7   charges?

8   A    I have received -- seen some of them.  They're

9   extensive.  We're spending $300,000 a month on average with

10  American Express, and one of the problems we have is the

11  accounting staff did not distribute those charges.  So, all

12  we have is, if you look at the income statement, there's a

13  line item for American Express, because we can't tell you

14  whether it's for electricity, entertainment, or electronic

15  supplies for the production studio.

16  Q    Does Mr. Jones run any of his personal expenses through

17  this American Express card?

18  A    Yes.

19  Q    What are those expenses?

20  A    I've not done an extensive look at it other than I've

21  looked at the charges being -- those are charges against his

22  distribution account, his draw account.  But there -- his

23  housekeeper has charges on it, you know, cleaning,

24  housekeeping type stuff.  And that's the biggest number of

25  line items I recall seeing is her.

1   Q   So, help me understand.  Why is it an emergency for

2   this Court to approve a payment to American Express to pay

3   Mr. Jones' housekeeper?

4   A   Well, like I said, the company has been paying the

5   credit card, but those charges are charged as distributions

6   against him.  I would not -- I'm not intending that going

7   forward by any means, and we've informed him he can't put

8   those on his credit card.

9   Q   And how long have Mr. Jones used the American Express

10   credit card to charge his personal expenses?

11   A   It goes back quite a ways.  I don't -- I didn't -- you

12   know, I looked at some of the history on the account the

13   last 18 months and said, you know, I'm not -- you know, the

14   last 18 months, it's been regular.

15   Q   How about the vehicle leases on the budget, about 14 --

16   I believe it's 14 on every two weeks.  Whose car is that?

17   A   Those are actually vans, I believe, that the production

18   studio uses.

19   Q   Does the company pay for Mr. Jones' car?

20   A   No, not that I -- not that I have seen.  I'm told not,

21   and I haven't seen evidence of it.

22   Q   And earlier, one of the questions that the Judge asked

23   you is, what do you hope to accomplish in this bankruptcy

24   case, and I believe I missed your answer, or I believe Mr.

25   Battaglia answered the question.  But, you know, what is the

1   purpose of this bankruptcy case?

2   A    I think Mr. Battaglia answered that question when asked

3   by the Judge.  It's, quite frankly, the -- we can't go to

4   trial in Connecticut and be -- I mean, we have a trial team

5   stuck here if this needs to go to Connecticut to help try

6   that case.  We don't have the money to pay for that at this

7   point in time.  That's a huge problem right there.  So, it's

8   -- we just can't afford the Connecticut case, the time, or

9   the dollars right now.  Now, it's -- Alex Jones being off

10  the air for two months is not acceptable.  We won't be here.

11  We won't last two weeks in that situation, so we have to

12  work out a way to make all this happen.

13  Q    And as the Chief Restructuring Officer of FSS and Mr.

14  Jones being the sole owner and member of FSS, have you had

15  an opportunity to talk to Mr. Jones about the purpose of

16  this bankruptcy case?

17  A    Yes.

18  Q    And is his purpose aligned with what you just stated to

19  the Court as the purpose of the filing of this bankruptcy?

20  A    Yeah.  He knows we can't go double team.  We cannot do

21  it.  I think he'd like to get it out of the Connecticut

22  court, but I don't -- you know, we told him that ain't going

23  to work.

24  Q    You know, in your declaration, Mr. Schwartz, you

25  describe Mr. Jones as a natural radio personality and the --

```
 1    and I'm assuming you've had some opportunity to observe some

 2    of the content aired by InfoWars.

 3    A    Is that a question?

 4    Q    Yes, Your Honor -- sorry, Mr. Schwartz.

 5    A    Then you assume -- I have had tried to look at the

 6    program a few times.

 7    Q    Are you aware that after the hearing that we had on

 8    Monday, Mr. Jones appeared on his radio show, and he

 9    expressly told listeners of FSS about the purpose of this

10    bankruptcy filing.  Are you aware of that video?

11    A    No.

12    Q    Okay.  And you said that based on your conversation

13    with Mr. Jones, that it's your understanding that Mr. Jones'

14    purpose here is to make sure you don't fight multiple fronts

15    in terms of litigation.  You want to bring it all here and

16    that's the purpose of the bankruptcy filing, correct?

17    A    That's -- I mean, the discussions I've been involved

18    with him, you know, relating to that is, I mean, that's been

19    an expression what we have to do.  We can't do this.

20    Q    And the purpose of the bankruptcy is not to tie up the

21    damages from the Plaintiff for years and years and years?

22    A    No.  That could be done by appeal.  You don't need to -

23    -

24    Q    Okay.

25              MR. NGUYEN:  Mr. Martin, can blow up the
```

1    (indiscernible) --

2            THE COURT:  Actually, just two questions on the

3    budget.  And just to -- just so I understand, can you just

4    go back to the budget, Mr. Martin?  Just go to the first

5    page.  It's just two simple questions.  There's a line item

6    for outsourced services and -- for about -- yeah, just on

7    the first page.  There's a line item -- let's see -- it is -

8    - where is it?  It's by the total office and admin expense.

9    Now, where'd you go?  Yeah, there's a line item for

10   outsource --

11           THE WITNESS:  Outsource services?

12           THE COURT:  -- and then consulting services.

13   Those are the only two that I just didn't -- those are the

14   two that popped out to me that I just wanted to get some

15   clarification on.

16           THE WITNESS:  Those are two categories we have got

17   to investigate.

18           THE COURT:  Okay.

19           THE WITNESS:  Because, first off, we have to get -

20   - presumably, these are contractual relationships and I want

21   to see the contracts --

22           THE COURT:  Okay.

23           THE WITNESS:  -- which I have not seen, and I want

24   to know exactly what they're doing and why we need to keep

25   paying them to do it.

1                    THE COURT:  Okay.

2                    THE WITNESS:  There's this -- there are quite a

3      number of -- I'd say, 10 or 12 entities in these two

4      categories combined that --

5                    THE COURT:  Okay.

6                    THE WITNESS:  I put them in there because we've

7      been -- they're in their regular expenditure and --

8                    THE COURT:  Can you give me an example of an

9      outsourced service and a consulting service?

10                   THE WITNESS:  Oh, for one, for example is --

11     there's an individual who does -- the Sound Simplistic does

12     web design.  What he does -- he does very sophisticated web

13     design for the company, based on a retainer of 25,000 a

14     month.  That is a little -- seems a little bit --

15                   THE COURT:  That's an outsource service or

16     consulting --

17                   THE WITNESS:  I believe that is consulting

18     services.

19                   THE COURT:  Okay.

20                   THE WITNESS:  Now -- yeah, no, that's an outsource

21     service.

22                   THE COURT:  Okay.  And then what's an example of a

23     consulting service?

24                   THE WITNESS:  Well, consulting services -- I'm

25     drawing a blank on an entity.  Consulting on the marketing.

1    You're selling product into this audience group and part of

2    it is looking at that, I believe, and --

3              THE COURT:  Okay.

4              THE WITNESS:  That's what I'm -- it's a marketing

5    service as a -- what would the market service we need be.

6    It's got to be something to do with reaching out and how do

7    we touch those people most effectively.

8              THE COURT:  Okay.

9              THE WITNESS:  That's why I said, it's -- that's

10   looking at -- it's what I think I'm going to see.  Now I

11   want to -- show me what it really is.

12             THE COURT:  Okay.

13             THE WITNESS:  Those are very definitely two areas

14   we have got to dig into.

15             THE COURT:  Okay.  Thank you.  Mr. Nguyen, I'm

16   sorry.

17             MR. NGUYEN:  No problem, Your Honor.

18   BY MR. NGUYEN:

19   Q    And before I get to Exhibit 8, I just want to clarify a

20   point.  You mention earlier that the Court was the one that

21   appoints you and the Court was the one that fired you --

22   that can fire you.  Do you remember that testimony?

23   A    Yes.  I guess I would modify that this way, by saying,

24   since I'm not appointed yet, Mr. Jones did hire me.

25   Arguably, I guess he could fire me before I'm appointed.

1   Q    So based on corporate formalities, you're an officer of

2   the company, correct?

3   A    As CRO, I am an officer of the company.

4   Q    And the owner of the company is who?

5   A    Alex Jones.

6   Q    Okay.

7        MR. NGUYEN:  Mr. Martin, can you (indiscernible)?

8   I'm almost done, Your Honor.  I would just like to

9   (indiscernible) questions (indiscernible) Exhibit

10  (indiscernible) there was a admitted (indiscernible).

11       THE COURT:  I'm sorry, Mr. Martin.  I can't hear

12  you.  Can you just get close to a mic?  I'm going to tell

13  you, why don't you go to another question.  I'm not

14  interested.

15       MR. NGUYEN:  Okay.  Your Honor, I will pass the

16  witness.  Thank you.

17       THE COURT:  Thank you.  Why don't we -- and again,

18  I don't want anyone to read one way or the other.  I'm

19  focused on cash collateral and critical vendor.  And why

20  don't we take a five-minute break.  Mr. Brimmage, can you

21  just -- I don't want to -- I want you to take as much time

22  as you want.  I just -- from a scheduling standpoint, how

23  long do you think you'll go?  Okay.

24       MR. BRIMMAGE:  (Indiscernible) start at 10 after

25  the hour.  (Indiscernible).

1           THE COURT:  Okay.  Okay.

2           MR. BRIMMAGE:  (Indiscernible).

3           THE COURT:  Okay.  Like, I know how it is.  I'm

4   just trying to get a sense from scheduling and timing.  Oh,

5   that's fine.  Okay.  Let's all take a -- I'll come back on

6   at 3:15.

7           Mr. Schwartz, you're again under oath

8   (indiscernible) remind you.  Okay.  I'll come back.

9       (Recess)

10          CLERK:  All rise.

11          THE COURT:  Anyhow.  Before we start, Mr.

12  Brimmage, in terms of your presentation, are you going to

13  have -- are you going use Mr. Martin to show --

14          MR. BRIMMAGE:  I am, Your Honor.

15          THE COURT:  Okay.

16          MR. BRIMMAGE:  What I'm going to hope to do is

17  minimize the document use and refer to documents he's --

18  we've already looked at --

19          THE COURT:  Okay.

20          MR. BRIMMAGE:  -- and kind of move from there.

21  But if we need to pull it up, we'll put it up and keep it.

22          THE COURT:  Okay.  I just want to make sure that -

23  - Mr. Martin, I'm going to make -- I think you -- oh, you're

24  still the presenter so you'll be able to proceed.  Okay.

25          And Mr. Schwartz, you understand that you're still

1    under oath?

2              THE WITNESS:  Yes.

3              THE COURT:  Okay.  Mr. Brimmage, you may proceed.

4    BY MR. BRIMMAGE:

5    Q    Mr. Schwartz, my name is Marty Brimmage and I'm with

6    Akin Gump Strauss Hauer & Feld and I'm going to question you

7    today on behalf of the Connecticut Plaintiffs.  You and I

8    have never met before that I recall; is that right?

9    A    I do not recall meeting you either.

10   Q    Okay.

11   A    I know the name.  I don't know why.

12   Q    Okay.  Good.  I'm glad my memory isn't quite that

13   faulty.  What I'm going to attempt to do is what I call

14   quick hits.  I'm going to -- some of the things I'm going to

15   talk about, I'm going to refer to your prior testimony

16   today, but I'm not going to intend to repeat that.  I'm

17   going to try to maybe ask some follow up.  So, I'm going to

18   try to be efficient with your time.  I would appreciate if

19   you would do the same.  Does that sound fair?

20   A    If I can.

21   Q    Okay.  Did you have a chance to confer with your

22   counsel during the break?

23   A    About the case?  No.

24   Q    Okay.  Did you have a chance to talk to your counsel

25   during the break?

1    A    Oh, yeah.

2    Q    Okay.  All right.  Let's pick up on a few things if we

3    could.  I think you have testified in a variety of ways to

4    what I'm going to -- I'm going to try to paraphrase -- the

5    sloppy status of the financial records when you became the

6    CRO; is that correct?

7    A    I've talked about it.  I know that.  I don't how many

8    times I've done it.

9    Q    Fair enough to say, it's sloppy records, right?

10   A    Well, that's one description.  I would say something

11   not -- they don't come up to sloppy.

12   Q    Okay.  And when you took over, the 2021 general ledger

13   had not been completed and the books had not closed, right?

14   A    Correct.

15   Q    And as a result, no financial statements were produced

16   for FSS for the 18 months preceding your engagement, right?

17   A    Well, the fact is, no financial statements were

18   produced, charity I'm saying, as a result.  Had they been

19   updated; I don't know if they would have been produced

20   financial statements even then.

21   Q    So, is my statement true?

22   A    Well, that's -- I mean, I've made assumption of a

23   result of the books not being -- but I do know they did not

24   produce financial statements.

25   Q    So that's a yes.

1    A    Yes, sir.

2    Q    Okay.  And you found no bank reconciliations for 2021

3    or 2022, right?

4    A    Correct.

5    Q    You found that FSS personnel expressed no criticism of

6    not receiving any financial reports to assist them in doing

7    their functional responsibilities, right?

8    A    Correct.

9    Q    They were -- appeared unaware of information that would

10   be available to them to timely prepare their financials,

11   right?

12   A    Timely prepare their financials?

13   Q    Right.

14   A    That statement confuses me.

15   Q    Okay.

16   A    Are you talking about the statement beforehand?

17   Q    Did you find that FSS personnel appeared to be unaware

18   of the management -- that the management information was

19   available to them from -- unaware that -- let me start over.

20   It's easy for me to say, right?

21         Were you aware that FSS personnel appeared to be

22   unaware of the management information that was available to

23   them to prepare timely and detailed financial statements and

24   analysis?

25   A    I was aware that management personnel seemed unaware of

1   the information available to them to do their jobs.  That

2   would be accounting's responsible to actually prepare

3   financial statements.  That's what -- that point there Is

4   what threw me.

5   Q    Fair enough.  You would agree with me that internal

6   accounting controls were inadequate, right?

7   A    Yes.

8   Q    There was a lack of segregation of duties?

9   A    Yes.

10  Q    Lack of supervisory review?

11  A    Yes.

12  Q    Including billings to PQPR Holdings, right?

13  A    Correct.

14  Q    When did you come on to FSS?

15  A    June 6th is when I was hired.

16  Q    And so, all these findings that we're talking about are

17  subsequent to June 6th, right?

18  A    Yes.

19  Q    Okay.

20  A    And well, let me step back.  I've been told by Mr. Roe

21  that the general ledgers were not up to speed.  I did not

22  realize the significance of that statement when he told it

23  to me.  That was prior to June 6th.

24  Q    Yeah.  You didn't realize just how bad all the

25  financials and accounting were until you got on the scene,

1    right?

2    A    Correct.

3    Q    They were a mess, right?

4    A    They were nonexistent.

5    Q    That's worse than a mess.

6    A    Yep.

7    Q    All right.  You would agree with me that the --

8    locating accurate financial records is a tedious task at

9    FSS, right?

10   A    Locating accurate financial records?

11   Q    Is a tedious task at FSS, isn't it?

12   A    In general, yes.

13   Q    And specifically yes, right?

14   A    Well, I mean, some banks can -- you know, are

15   accessible.  But in general, don't expect them to be.

16           MR. BRIMMAGE:  Mr. Martin, can we pull up

17   Defendant's -- I'm sorry -- I think it's Exhibit 3, the

18   declaration of Mr. Schwartz in this case, and go to

19   Paragraph 94, please?

20   BY MR. BRIMMAGE:

21   Q    We'll blow it up for you, Mr. Schwartz.

22   A    Oh, I can probably read it.

23   Q    Okay.  If you'll just read it to yourself.  I'm not

24   going to attempt to impeach you.  I'm just going to ask the

25   question again and see if we can move it quickly.  Does that

1    sound fair?

2    A    Yes.

3    Q    Okay.  Tell me when you're done.

4    A    Okay.  I'm done.

5    Q    All right.  Isn't it true that locating financial

6    records is a tedious task at FSS?

7    A    I think when you asked me that a minute ago, I

8    responded with another word than tedious.

9    Q    Mr. Schwartz, is that a yes or a no?

10   A    That is what this says.

11   Q    Is that true or not true?

12   A    That is not true today.

13   Q    Okay.  Do you recall when you signed your declaration?

14   A    Sometime around the time of filing.

15   Q    July 29th?

16   A    Okay.  Would you leave that paragraph up, please, or go

17   back to it?

18   Q    July 29th?

19   A    Yes.  Sounds about right.

20   Q    So it was true on July 29th?

21   A    I believed it to be true on July 29th.

22   Q    Well, hang on.  You believed it to be true, or it was

23   true?  I want the Court to understand.

24   A    No, I mean --

25   Q    You tell us.  You pick.  Was it true, or you believed

1    it to be true?

2    A    I believed it to be true.  Like everything else in

3    here, I believed it to be true.

4    Q    But it may not be true; is that correct?

5    A    True.  And everyone says something's true, it may not

6    be, and in this case, I found out that was not true.

7    Q    I think we are getting a clear picture of what you

8    think the truth is.  Let me ask you the next one.  The

9    recordkeeping for orders, invoices, expense reports,

10   American Express charge reports are not well organized;

11   isn't that correct?

12   A    That's correct.

13   Q    And other records on the computer system also require

14   additional time to retrieve, correct?

15   A    Correct.

16   Q    You testified in your declaration that you have

17   extensive experience serving as a fiduciary in bankruptcy.

18   Do you recall that?

19   A    Yes.

20   Q    What is a fiduciary in bankruptcy?

21   A    It's the same, in my opinion, a fiduciary in any --

22   many other capacities.  It's someone who takes possession of

23   assets belonging to another and owes a duty to the

24   beneficial ownership of those assets that put that -- the

25   interests of the beneficial owner first.

1   Q    Anything else?

2   A    I mean, there are some other components of fiduciary,

3   but that's the primary one that I've always known.

4   Q    Okay.  The assets in the FSS bankruptcy, who's going to

5   be the beneficial owner of those assets?

6   A    Well, the beneficial -- the beneficiary of those assets

7   right now would be the creditors, (indiscernible) first.

8   Q    Creditors.  Anybody else?

9   A    No.  First off is creditors, secured and unsecured.

10   Q    In all your experience as a fiduciary in bankruptcy,

11   who do you see as the creditors in this case?

12   A    The people that the estate owes money to.

13   Q    Who is that?

14   A    In this case we have secured creditors.  You have

15   unsecured creditors.  You have administrative claimants.

16   You have the -- and well -- I mean, yeah.  Government

17   creditors, I think they classify as unsecured, but higher

18   class.

19   Q    Okay.  What analysis or investigation did you do to

20   determine who the creditors or potential creditors are in

21   this bankruptcy?

22   A    Really, we haven't completed -- they haven't even done

23   the schedules yet.

24   Q    Okay.

25   A    We looked at who we owed money to as of the filing date

1    and listed them.  Those are creditors.

2    Q    That's all you did up to the filing date, right?

3    A    Well, I mean, we read the loan agreements and the

4    security instrument, but I can't think of a -- I mean, I

5    don't know what there was to do with the -- we know about

6    the contingent claimants in terms of your clients.  So, I

7    don't think we did any more investigation than that at this

8    time.

9    Q    No more investigation than that before you started

10   seeking the cash collateral order that you're asking the

11   Court to approve, correct?

12   A    Correct.

13   Q    Okay.  You've not done any investigation into what I'm

14   going to call the Plaintiffs -- the Texas and the

15   Connecticut and the TUFTA collective group, Plaintiffs'

16   claims, correct?

17   A    Correct.

18   Q    You don't have an opinion one way or another whether

19   they were wronged or not; is that right?

20   A    The TUFTA claimants and your clients?

21   Q    Yes.

22   A    No.  That's for a tryer.

23   Q    Have you done any analysis or estimation of potential

24   amounts of the claims that could be had?

25   A    No.

```
1    Q    Have you asked for any analysis or estimation of that?
2    A    No.
3    Q    Do you believe it's your job to ask for that or to look
4    into that?
5    A    No.
6    Q    Why is it not your job?
7    A    Well, it's up the courts to decide, liquidate those
8    claims.
9    Q    Okay.
10   A    If he came to me and said what could we settle them
11   for, you know, I may be able to come up with a number that
12   we could provide, but it's not going to be the value of the
13   claim, I suspect.
14   Q    You've testified about Mr. Jones -- I guess Alex --
15   there's multiple Joneses, right?
16   A    There's two I'm aware of.
17   Q    And who are the two?
18   A    Alex Jones and Dr. Jones was who I call them.
19   Q    Who's Dr. Jones?
20   A    Alex Jones' father.
21   Q    What's the first name of Dr. Jones?
22   A    David.
23   Q    So, father/son Alex/David Jones, right?
24   A    Yes.
25   Q    All right.  You testified that Alex Jones puts personal
```

1    expenses on the American Express card, right?

2    A    Yes.

3    Q    Do others put personal expenses on the American Express

4    card?

5    A    I don't know that.  I would --

6    Q    (Indiscernible)

7    A    -- not be surprised.

8    Q    -- if you don't know.

9    A    I don't know that yet.

10   Q    Yeah, you don't know.  You haven't looked into that?

11   A    No.

12   Q    Okay.  They could, right?

13   A    They could, yes.

14   Q    And you're asking the Court to use cash collateral to

15   pay American Express?

16   A    Yes.

17   Q    Okay.  But no investigation?

18   A    That hasn't been done yet.

19   Q    You also testified that you intend Alex Jones to not

20   charge the American Express going forward, right?

21   A    No.  He can use the American Express, but not for his

22   personal expenses.

23   Q    All right.  Have you confirmed, as you're testifying

24   today in front of this Court, that Mr. Alex Jones has not

25   used the AMEX for any personal expenses since the

1   bankruptcy's been filed?

2   A    No.  I have not had a chance to do that.

3   Q    Have you done anything to cut off Mr. Jones or anybody

4   else from using the AMEX for personal expenses?

5   A    We've started collecting the cards from all the

6   employees.  That is something to be done.

7   Q    Okay.

8   A    Okay?

9   Q    What else?

10   A    We started to collecting the cards.  I have -- as I

11   said, I have not had a chance to look at Alex's charges

12   since the filing.

13   Q    Okay.

14   A    But we'll do that.  And I was in -- I believe -- I

15   don't know if David Jones has a card or not.  We'll find --

16   we'll see what his charges are if they've come against FSS.

17   Q    You don't know if David Jones has a card, right?

18   A    I do not.

19   Q    How many cards are there?

20   A    I don't know.

21   Q    You haven't collected Mr. Alex Jones' card yet, have

22   you?

23   A    No.

24   Q    How many cards have you collected?

25   A    I don't know.  They're doing that today.

1   Q     No idea how many they've collected?

2   A     As I said, I don't know.  It's being done today.

3   Q     Before today, is it fair to say no cards were

4   collected?

5   A     That's -- not by me.  No, we have not collected cards

6   before today.

7   Q     Okay.  And you don't have any personal knowledge that

8   as you're testifying right now, any cards have actually been

9   collected, right?

10  A     No.  I've been here all day.

11  Q     So, that's correct.  You have no personal knowledge?

12  A     That's what I said.  I don't know.  I've been here all

13  day.

14  Q     Okay.  When you were asked about Mr. Jones' car, you

15  said you didn't know.  You said, I didn't -- I don't think

16  so, but I don't know.

17  A     I got confused.  I mean, the question was whether the

18  company pays for Mr. Jones' car.

19  Q     Right.

20  A     And I said no.

21  Q     No, and no expenses associated with the car; is that

22  right?

23  A     Not unless they come through on the American Express

24  and they're -- what I saw, they're charged to his draw.  So,

25  to that extent, the company paid -- would pay for them, but

1   they're charged -- they were being charged to his draw.

2   Q    Okay.  But the company initially pays for them?

3   A    Yes, because it pays the AMEX bill.

4   Q    Okay.

5   A    Now, and we say initially.  It's probably on there --

6   where he works, that'd be charged to his draw before the

7   AMEX bill gets paid.  So --

8   Q    Yeah.

9   A    You know, he gets charged for them before AMEX gets

10  paid.

11  Q    If there's a large judgment in the Austin lawsuit,

12  how's it going to get paid?

13  A    That I don't know.

14  Q    You testified that there's $800,000 in unencumbered

15  cash right now, right?

16  A    Correct.

17  Q    And where did you say -- what did you say the source of

18  that cash was?

19  A    Donations.

20  Q    Donations.  Have you done an analysis of donations over

21  the past five years?

22  A    What do you mean by an analysis of donations?

23  Q    The analysis of how many -- how much money has come in

24  for donations for FSS in the last five years?

25  A    I have looked at that number.  I -- what do you mean by

1    analysis?  I have looked at the number, the amount of the

2    donations over the last five years, seven years.

3    Q    How much is it annually?

4    A    Could I look at Exhibit -- I think it's B, the income

5    statement that's attached to the --

6    Q    Let me just ask -- we can go there if you need to --

7    can you not answer without looking at a document?

8    A    No.  You're asking me for the number.

9    Q    Can you give us a ballpark?

10   A    It varies.  It's been -- seven figures.

11   Q    Seven figures?

12   A    Yeah.

13   Q    All right.  So, in the next -- well, how much in -- and

14   is it true all the cash donations are unencumbered?

15   A    Yes.  I asked -- I asked that specific question of my

16   lawyers, is that cash collateral also?  And they said no.

17   Q    When you asked your lawyers, who did you ask?

18   A    Mr. Lee and Mr. Battaglia.  I guess they're not my

19   lawyers; they're the Debtor's lawyers.

20   Q    You have your own lawyer though, right?

21   A    No.

22   Q    You don't?

23   A    No.

24   Q    You don't have your own lawyer?

25   A    No.

1    Q    Okay.

2    A    Should I get one?

3    Q    I'm going to leave it.  Do you recall your engagement

4    letter that you talked about, with FSS?

5    A    It depends on what you're asking me to recall from it.

6    Q    Well, it was Exhibit 2 that you spoke to about your

7    lawyers.  It was actually one of the documents that was

8    admitted by agreement.  The May 19, 2022 --

9    A    Right.

10   Q    -- engagement letter?

11   A    Right.

12   Q    Do you recall that?

13   A    Yes.

14   Q    Okay.  It says in there that's CRO's counsel.  That

15   ring a bell with you?

16   A    Yeah, I believe there was a provision in there that I

17   would be permitted to engage counsel.  I have not done that.

18   Q    Okay.  It says FFS will fund $20,000 retainer to be

19   paid to SA LLC, so that SA LLC can engage Mike Ridulfo, of

20   Kane Russell Coleman Logan, to serve as legal counsel to the

21   CRO, correct?

22   A    Correct.

23   Q    You have not engaged Mr. Ridulfo?

24   A    No.

25   Q    Did the $20,000 retainer get paid?

1   A   No.

2   Q   So, prior to the commencement of the engagement, that

3   retainer was not paid?

4   A   Correct.  No retainer was paid prior to the signing of

5   that engagement letter.

6   Q   Even though the engagement letter required it?

7   A   Yes, sir.

8   Q   Do you have an opinion one way or another about whether

9   not the engagement letter is enforceable or not?

10  A   Well, I think --

11  Q   I don't think it's that funny.

12  A   What I -- I'm doing -- I think it's terribly

13  enforceable, but I'm not a lawyer and I haven't, you know --

14  I don't think anyone -- I have not asked a lawyer to look at

15  it from enforceability standpoint.

16  Q   Okay.  And you haven't required the -- all of the

17  requirements in the engagement letter to be met; is that

18  correct?

19  A   Well, I -- no, the retainer was paid.  It just wasn't

20  paid in the terms of the agreement.

21  Q   You just testified that the retainer for Mr. Ridulfo

22  was never paid.

23  A   That retainer has not been paid.

24  Q   So --

25  A   I was asked not to engage Mr. Ridulfo.

1    Q    Who asked you not to?

2    A    Mr. Battaglia.

3    Q    What did he ask you that?

4    A    Concerned over costs.

5    Q    Concerned over costs.  So let me make sure we're clear,

6    Mr. Schwartz.  You're using Mr. Battaglia as your own

7    personal CRO attorney as well as the FSS attorney, right?

8              MR. BATTAGLIA:  Objection, Your Honor.

9    (Indiscernible) question.  He can ask a question, but he's

10   putting words in the witness' mouth.  If he wants to know if

11   I'm his lawyer individually, ask that.

12             THE COURT:  I think that's what he did.

13             MR. BRIMMAGE:  I did.

14             MR. BATTAGLIA:  (indiscernible) what he asked

15   (indiscernible).

16   BY MR. BRIMMAGE:

17   A    Well, the answer is, Mr. Battaglia is not my lawyer.

18   He asked me for -- you know, very simply.  He said, I'm

19   concerned about the legal cost.  Do you need

20   (indiscernible).  And I said, well, I don't -- it doesn't

21   seem like it right now, so I'll hold off.

22   Q    The engagement letter negotiated the right for you to

23   seek your own attorney, correct?

24   A    It did.

25   Q    In fact, it said FSS will find $20,000 prior to

1    commencing the engagement, right?

2    A    Correct.

3    Q    And you took advice from FSS counsel not to engage your

4    own CRO counsel, correct?

5    A    I don't --

6    Q    That's what you just testified to.

7    A    I don't think I testified that that was advice.  He

8    asked me not to do it.  He said he's concerned about the

9    legal costs.

10   Q    Okay.

11   A    And after -- you know, I said, okay, I don't see that

12   I'm going to have to have my own counsel here; $20,000 ain't

13   going to pay for much anyway.

14   Q    As the CRO, the only counsel you consult with are FSS

15   counsel?

16   A    Correct.

17   Q    Now, let's stick with your engagement letter while

18   we're here for a little bit, Exhibit 2.  It's dated May

19   19th, 2022, correct?

20   A    Correct.

21   Q    And -- but it's signed by Mr. Jones on June 6th, 2022,

22   right?

23   A    Correct.

24   Q    Why the discrepancy?

25   A    I believe Mr. Jones was committed to signing it and

1    ready to sign it until June 6th.

2    Q    Why is that?

3    A    Well, you'd have to ask Mr. Jones.  I know we had a

4    meeting with him on June 6th to discuss the terms of the

5    engagement letter.

6    Q    Was he concerned about any particular term?

7    A    Yes.  He was concerned about the amount of authority I

8    had.

9    Q    All right.  Let's talk about amount of authority.  Was

10   he concerned about anything else?

11   A    Not specifically, no.

12   Q    Okay.  Now, I'm confused about your prior testimony,

13   and I just want to clarify.  Isn't it true that Mr. Jones

14   can fire you right here, right now, if he wanted to?

15   A    That's -- from my reading of the engagement letter,

16   that's my interpretation.  That he has -- still has the

17   authority to terminate me.

18   Q    Okay.  For whatever reason he wants to, right?

19   A    Yes.  I don't think there's a qualifier in there on

20   termination.

21   Q    Okay.  And along those lines, you testified -- and it's

22   been a while -- that you have full authority over a lot of

23   stuff, except major decisions.  Do you recall that

24   testimony?

25   A    No, I didn't say that.

1  Q    You did.

2  A    No, I didn't say that.  If I did, it's misunderstood.

3  I don't -- I had authority over major decisions, but I

4  agreed I would consult with Mr. Jones before I executed any

5  of those decisions.  I did not say that I could not execute

6  any decision I deemed necessary.

7  Q    What constitutes a major decision that you would

8  consult with Mr. Jones over?

9  A    Well, a major decision would be product line changes,

10  for example.  That would be a significant decision.  A major

11  decision would be, there are certain key personnel on the

12  area of marketing in the production area, which I think

13  would be major decisions if I determined I needed to

14  terminate somebody in those categories.  I consulted with

15  him on the termination of the previous accountant because

16  she had been there for a long time and had been a

17  significant role in the company.  Those were decisions that

18  -- and ramifications throughout the organization or in the

19  operation of the business.  And it would be insane of me to

20  have executed some decision like that without talking to Mr.

21  Jones about it.

22  Q    What about the decision to file for bankruptcy?

23  A    I mean, that was --

24  Q    Whose decision was that?

25  A    The final decision?  That's a good question.  Mr. Jones

1    agreed that we needed to file bankruptcy.  The selection of

2    the date, he concurred with.  The recommendation of the date

3    came from others.

4    Q    Well, let's be clear, Mr. Schwartz.  You were hired

5    because the decision was made to file for bankruptcy.

6    A    Well --

7    Q    You were hired to be the CRO.  You did not make that

8    decision.  That decision was already made, which is why you

9    came on the scene; isn't that right?

10   A    Well, I mean, yes.  The perception was that they needed

11   to file bankruptcy, needed to file bankruptcy.  The question

12   was, could they?  And that was part of my job was to

13   determine if the company could actually file bankruptcy.

14   Q    Okay.  Whose perception, was it?

15   A    I think it was Mr. Jones' and his counsel.

16   Q    Which counsel was that?

17   A    That would be Mr. Jordan, in addition, Mr. Lee and Mr.

18   Battaglia and Mr. Shannon.

19   Q    Okay.  They all -- FSS counsel and Mr. Alex Jones'

20   counsel all got together on whether or not to file

21   bankruptcy -- put FSS into bankruptcy?

22   A    That was that they decided it was a definite option and

23   I got -- I became involved when it was -- it didn't get

24   finalized --

25   Q    All right.

1   A    -- initially.  It wasn't final when I became -- got

2   involved that we would be filing bankruptcy.

3   Q    And when you say they, that's who you're talking about,

4   those -- that group of counsel, right?

5   A    Yes.

6   Q    For all those different Alex Jones-related entities,

7   right, and Alex Jones himself?

8   A    Well, no, these -- they represented FSS and Alex Jones,

9   that group.

10  Q    Okay.

11  A    What other entities I -- we're not there.

12  Q    Who represented the InfoWars Three Debtors prior, that

13  you were the CRO for them?

14  A    Prior was Mr. Lee, Mr. Shannon, I believe, and Mr.

15  Battaglia was involved in that.

16  Q    The same lawyers --

17  A    I'm not sure if they all represented the three of them.

18  Q    Yeah.  Same lawyers we've got here?

19  A    Yes.

20  Q    Okay.

21          MR. BRIMMAGE:  Yeah.  We're going to let the

22  witness answer.

23          MAN 1:  Sorry about that.

24          MR. BRIMMAGE:  That's okay.

25  BY MR. BRIMMAGE:

```
 1   Q    So, let me just circle back make sure that we're clear.
 2        Your testimony earlier that only the Court can fire
 3   you, that's not the case right now, right?  That's not true?
 4   A    I don't believe so.
 5   Q    Okay.  I appreciate that.  Let's circle back, if we
 6   could, to this donation topic.  Is it true that FSS has
 7   received donations in cryptocurrency?
 8   A    Mr. Jones received some donations in cryptocurrency.
 9   Q    Were those directly to him personally, or are those to
10   FSS?
11   A    They were to his personal -- whatever accounts you call
12   those things.
13   Q    Okay.  They were not to FSS?
14   A    No.
15   Q    Is your --
16   A    Not directly.
17   Q    You've investigated that, and you're rock-solid
18   positive under oath in front of this Court today that that
19   was not to FSS, right?
20   A    No.  I mean, what I'm telling you right now is those
21   donations were given to Mr. Jones.  The -- I have not -- we
22   have not done an investigation as to should they have been
23   Jones' or FSS's.
24   Q    I'm more confused than when I started.  The donations
25   were made to FSS and FSS gave those cryptocurrency donations
```

1   to Mr. Jones?

2   A    No.  FSS did not touch those currencies.  They went to

3   Mr. Jones.

4   Q    Directly?

5   A    Directly.

6   Q    You haven't investigated whether they should have come

7   to FSS?

8   A    We have not.  Although we have looked at -- no, we have

9   not done that investigation.  We've done -- seen some

10  preliminary information.

11  Q    Okay.  Was -- is the amount this year so far around $8

12  million?

13  A    I'm -- well, I haven't seen a full accounting.  We were

14  told it was $9 million.

15  Q    I'll take $9 million.  And so, the cryptocurrency, $9

16  million were donated to InfoWars, InfoWars.com?

17  A    Not to --

18  Q    Is that right?

19  A    Not to my knowledge.  I don't --

20  Q    Okay.  Well, tell the Court where -- who received those

21  donations from the very beginning, the $9 million in

22  cryptocurrency, what entity, what person received them

23  first?

24          MR. BATTAGLIA:  Objection, Your Honor.  Asked and

25  answered.  He said that it was received by Mr. Jones,

1    several times.

2            THE COURT:  He can clarify.  (Indiscernible).

3    BY MR. BRIMMAGE:

4    A    I'm not sure (indiscernible) clarify that.  They went -

5    - to my -- my understanding is that they went to Mr. Jones.

6    As I said, we have not investigated that.  But that's what

7    I've been told; that they went directly to Mr. Jones.

8    Q    Okay.  Thank you.  Does Mr. Jones have a direct place

9    where people can make donations directly to him personally?

10   A    Well, on the -- I'm not a cryptocurrency guy.  But

11   these were made, apparently, to his cryptocurrency vault, or

12   whatever they call that thing.  So, to that extent, yes, he

13   has his own bank account, people can make donations to that

14   if they have it.

15   Q    Okay.  So, it can be made directly to him --

16   A    Yes.

17   Q    Okay.  Mr. Schwartz, when I'm flipping pages, I'm

18   saving both of us a lot of time.  So, be patient with me.

19   You talked with your attorney about the Plan Support

20   Agreement, which was Exhibit 3.  Do you recall that?

21   A    Yes.

22   Q    All right.  And that was April 15, 2022 is when it was

23   signed, right?

24   A    The -- was that --

25   Q    I'll represent to you that's what it says.

1    A    Okay.  Thank you.

2    Q    That was before your time as CRO, right?

3    A    I'm not sure -- was that before I was CRO there?  I --

4    I'm out at -- and I don't remember when I was hired as CRO.

5    I thought it was prior to that.

6    Q    Hired as CRO for which entity?

7    A    The three -- all three are on the engagement letter.

8    InfoWars, IWHealth, and Prison Planet.

9    Q    What about the FSS engagement?

10   A    That was by FSS, a separate engagement letter.

11   Q    Right.  And that was after April 15th, 2022, right?

12   A    Correct.

13   Q    And you didn't do any investigation or analysis

14   regarding the Plan Support Agreement, correct?

15   A    I'm not sure what you mean.

16   Q    You -- it was given to you, right?

17   A    No.  I was -- a draft was given to me to read and

18   comment on and make recommended changes to it.

19   Q    A draft back -- before it was signed on April 15 --

20   A    Yes.

21   Q    When you were the InfoWars CRO?

22   A    Yes.

23   Q    Okay.  Got it, got it, got it.  Thank you.  Let's go to

24   the two promissory notes that you testified to.  Can we do

25   that?  I'm going to try to do them in one, but if we need to

1   break them up, we can.  Isn't it true that you've done

2   nothing to date to determine the validity of those notes?

3   A    I believe I've described to Mr. -- somebody already,

4   that all I've done is look at an analysis showing the

5   computation of the note balances and some of the supporting

6   documentation.

7   Q    But --

8   A    That is not nothing, but that is -- that's the limit of

9   it.

10   Q    For one of the notes?

11   A    For one of the notes, correct?

12   Q    But not for the other note?

13   A    I don't believe I've seen anything on the other note.

14   Q    Okay.  And for the one note that you did see something,

15   you didn't do any investigation about the veracity of the

16   information that you were provided.  You just looked at the

17   information you were provided and accepted it as true for

18   now; is that correct?

19   A    Well, I looked at it.  I did not -- have not gone -- we

20   have not started tracing out the information.  So, I -- I

21   mean, you say I looked at it and took it for true.  I don't

22   take it for anything.  It's not true.  It's not false.  It's

23   not proven.

24   Q    Okay.

25   A    To me.

```
 1   Q    All right.  Fair enough.  You don't know, testifying

 2   today, whether the notes are valid and enforceable or not,

 3   correct?

 4   A    Yeah.  That would be more of a legal question for me.

 5   Q    Okay.  Where did you get the notes from?

 6   A    Well, I was at FSS's offices, so --

 7   Q    Have you had discussions with counsel about the notes?

 8   A    Yes.  I was about to say I may have gotten them from

 9   counsel, because they were looking all of the documentation

10   before I ever got involved.

11   Q    Right.  And if you got them from counsel, do you recall

12   which counsel might have given them to you?

13   A    No.

14   Q    Okay.  Fair to say you've had conversations with

15   counsel about the notes?

16   A    Yes.

17   Q    Other than your conversations though, you've done no

18   investigations or analysis regarding the veracity of the

19   notes, correct?

20   A    That's correct.  That's not on the -- that's not come

21   up to the top of the to-do list yet.

22   Q    When does that get to the top of the to-do list?

23   A    When we get this -- get this thing stabilized and

24   operating and we didn't -- and turned it, investigating

25   claims.
```

1   Q    You're asking for use of cash collateral in large part

2   based on the notes, right?

3   A    No.  I'm asking to use the cash collateral because

4   we've got the notes out there showing the collateral right

5   now, or the -- well, I mean, noteholders do.

6   Q    Have you investigated whether or not you can forbear

7   paying on the notes during the pendency of the bankruptcy

8   for now?

9   A    Well, we entered into a forbearance agreement prior to

10   filing of the bankruptcy.

11   Q    Now, you've filed for bankruptcy.

12   A    Right.  And then part of that agreement, we can reduce

13   the payments on the notes.  But -- so now we're in

14   bankruptcy.

15   Q    Now, you're in bankruptcy.  Have you investigated what

16   your rights are as a CRO of a debtor with regard to paying

17   the notes or holding off on paying the notes for right now?

18   A    I have not had that conversation with the lawyers.

19   Q    Okay.

20   A    And I would have to talk to them.

21   Q    I get that.  But you haven't looked into that yet,

22   right?

23   A    No.

24   Q    Has anybody told you, you have to make these payments

25   right here, right now, with the cash collateral you're

```
 1   seeking from the -- the authority from the Court?  Has
 2   anybody told you, you have to do it, you must do it?
 3   A    No.  I mean, I don't think I'd be here, because --
 4   Q    Okay.  That's fair.  That's fair.  And so, you don't
 5   know that you have to do it, right?
 6   A    No.  If the Court says no, then we don't have to do it.
 7   Q    I kind of like the sound of that.  Let's go to these
 8   critical vendors.
 9             MR. BATTAGLIA:  Objection to the sidebar.
10             THE COURT:  I'll sustain.
11   BY MR. BRIMMAGE:
12   Q    Let's go to the critical vendors, if we could.  You've
13   already talked a lot about this, so I just want to make
14   sure.  The uniform security, that's a lot of money, right?
15   A    It's a lot of security.  It's 24/7.
16   Q    And is that -- is that -- if Mr. Jones wasn't there,
17   would you still need all that security?
18   A    If he was not in the building that day?
19   Q    Yeah.  Or no, not in the building.
20   A    If he was not in InfoWars at all?
21   Q    Yeah.
22   A    Very probably not.
23   Q    Okay.  All right.  Did you look at that with regard to
24   that -- whether or not that's a personal expense that should
25   be borne by Mr. Jones and paid for with his cryptocurrency
```

1    money or other money?

2    A    No.  It's an expense.  It's the provided security to

3    the employees working there.

4    Q    Well, but if Mr. Jones wasn't there, you just testified

5    the employees don't need that kind of security.

6    A    Well, they don't need that because there wouldn't be

7    any business.

8    Q    Now, you talked to the Court about the three insurance

9    companies, right?

10   A    Right.

11   Q    And you said, look, there's a lot of important assets

12   here that are vital, right?

13   A    Yes.

14   Q    Can you describe for the Court the difference between

15   the three insurance policies and what they cover?

16   A    Not -- no, I don't -- no.  Just their names.

17   Q    You don't have any --

18   A    Property casualty.  We have general liability and -- I

19   don't know what the third one is.

20   Q    I get that.

21   A    Drawing a blank.

22   Q    Apologize.  I get that.  But you can't describe for the

23   Court the three different policies and what they cover,

24   correct?

25   A    Correct.

1   Q    Has anybody told you that you need all three and you

2   must pay them right now?

3   A    Yes.  That was how -- that was the --

4   Q    Who told you that?

5   A    Well, no one told me that.  They told the people I put

6   in charge of preparing this list.  And that was based on

7   going to the employees and saying, okay, what do you have?

8   What do you have, what vendors do you use, and tell us how

9   important they are and what we need -- why we need to have

10  them on this list?

11  Q    You were talking to the Court about this little bit,

12  and you talked about claw back.  Do you recall that?

13  A    On Mr. Jones?  Yes.

14  Q    Well, I'm talking about payments to the critical

15  vendors.  You --

16  A    No.

17  Q    -- this -- you (indiscernible) a little bit?

18  A    Yes.

19  Q    And you started saying it, but you didn't finish.  You

20  said, but if we pay them, we have the right to claw back.

21  But you would agree with me, practically, that's not going

22  to happen, right?

23  A    If they're critical vendors and we want to claw back,

24  we have to assess what's the risk to the business of doing

25  that.  So, there may be a legal right, but it may not be

```
1    something we'd be able to execute on.
2    Q    And even -- that's correct.  And even if you decided
3    you wanted to claw it back and no longer have a relationship
4    with that vendor, the chances are you're not getting that
5    money back, right?
6    A    It'd be a fight.
7              MR. BRIMMAGE:  Your Honor, I'm not going to make
8    my time, but I'm going to keep moving.
9              THE COURT:  Sounds like I need to see the claw
10   back language.
11   BY MR. BRIMMAGE:
12   Q    In your declaration -- I'm going to do some quick hits
13   -- you talked about personal knowledge, relevant documents
14   in your opinion, right?
15   A    Mm hmm.  Yes.
16   Q    You would agree with me that nothing happened -- that
17   happened before your engagement that you have personal
18   knowledge of, right?
19   A    I think I even said that earlier.  But --
20   Q    Okay.  You also said that -- I'm not going to go
21   paragraph by paragraph, but a lot of your testimony is based
22   on conversations with others or stuff you've read but know
23   is true, correct?
24   A    Correct.
25   Q    And at least as we're sitting here today, the Court has
```

1   no way of knowing when you testify whether or not it's true

2   and you have personal knowledge of it, or whether you're

3   just relying on someone else, and you don't know if it's

4   true; isn't that correct?

5          MR. BATTAGLIA:  Objection, Your Honor.

6   Argumentative.

7          THE COURT:  Yeah.  Mr. Brimmage, can you break

8   that question up a little bit?  I --

9          MR. BRIMMAGE:  I --

10          THE COURT:  -- couldn't follow it myself.

11          MR. BRIMMAGE:  Absolutely.

12   BY MR. BRIMMAGE:

13   Q   We're going back to your testimony and your personal

14   knowledge.

15          MR. BRIMMAGE:  And Your Honor, I think I need to

16   ask the predicate question one more time.  It's a repeat,

17   but it gives me momentum.

18   BY MR. BRIMMAGE:

19   Q   So, you testified that some of the stuff that you've

20   testified to in your declaration and otherwise is based on

21   stuff you've read or been told, right?

22   A   Yes.

23   Q   And some of the stuff you've been -- that you've read,

24   you don't know if it's true or not true, right?

25   A   Some of the stuff I've been told; I don't know if it's

1   true or not true.

2   Q    That was my next question.  Thank you.  So, there's no

3   way for this Court to know when you're testifying in that

4   box whether or not your statements are actually true or not

5   true, correct?

6   A    Nothing that we are looking at in here, including the

7   13-week budget, is based on information that we created.

8   It's information that was -- we compiled from the records of

9   the company we booked.  But everything in there is based on

10  those records.

11          MR. BRIMMAGE:  Let me object as nonresponsive,

12  Your Honor, and let me try it one more time.

13          THE COURT:  I'm going to overrule that.  I think

14  he's trying to answer the question, but I know where you're

15  going.  But you can ask another question.

16          MR. BRIMMAGE:  All right.

17  BY MR. BRIMMAGE:

18  Q    As a fiduciary, do you have an obligation to know what

19  the truth is?  Yes, or no?

20  A    Well, I'm -- you know, sorry, I'm not a philosopher,

21  but I can tell you I can -- I have an obligation to tell the

22  truth as I know it.  But I may not know the truth.

23  Q    And if you don't know the truth, as a fiduciary do you

24  have an obligation to not make a statement unless you know

25  it's true?

1   A    If I believe it's true, then I believe it's true, then

2   I may -- and I may be wrong.  If I knew it wasn't the truth,

3   I wouldn't say it.

4   Q    But you could believe it's true based on something you

5   read or heard, right?

6   A    I could believe it's true based on an analysis of a

7   schedule.

8   Q    The last paragraph of your declaration says, "I declare

9   under penalty of perjury that the foregoing is true and

10  correct."  Do you recall that?

11  A    Yes.

12  Q    Okay.  Who drafted your declaration?

13  A    For the most part, Mr. Lee drafted a lot of it, and I

14  drafted a lot of it.

15  Q    When you drafted it and put like a citation of where it

16  came from, so-and-so's deposition, was that you or Mr. Lee,

17  or somebody else?

18  A    That -- well, my understanding that it was Mr. Lee.

19  Q    Okay.  All those citations were not yours, right?

20  A    Correct.

21  Q    Those came from Mr. Lee, right?  And do you recall the

22  deposition that was cited in here?  I'm looking for it for

23  the name and I don't recall it.

24  A    Jacobson.

25  Q    Jacobson.  Did you read Jacobson's deposition?

```
 1   A    I don't recall reading it.

 2   Q    I think that's what you testified to before.  I just

 3   wanted to see if that -- if I heard it right.

 4        Let's go to the bankruptcy filing, in your head.

 5   You've already talked about this, but I had a follow-up.

 6   Paragraph 11 is the one you talked to counsel about already,

 7   about -- in the district for 180 days, right?  Did you rely

 8   on counsel in making that checkmark on that box for this

 9   document?

10   A    Yes.

11   Q    Okay.  I think you said the case law you saw -- did you

12   read cases to help you get comfortable with checking that

13   box?

14   A    I read the -- I read the case; I understand which is

15   the one we're relying on by Judge Hale.

16   Q    But what case is that?

17   A    I knew you were going to ask me that.  Erg, or

18   something like that.  E-R-G, maybe, something like that.

19   Q    Judge Hale?

20   A    Judge Hale of the Western -- up in Fort Worth.

21   Q    Okay.  The Northern District of Texas?

22   A    Yeah.

23   Q    All right.  Who gave you that case?

24   A    I believe Mr. Lee gave it to me.

25   Q    Okay.  And when Mr. Lee gave it to you and when you
```

1    read that case, did you ask, what does it mean when it says

2    principal assets in this district?  Did you ask that

3    question of any -- Mr. Lee or anybody else?

4    A    I don't recall.  We looked at -- I looked at that case

5    back in the filing of the first bankruptcy.

6    Q    Okay.  Do you know what in this district means?

7    A    Yeah.  I assume it refers to the Federal District.

8    Q    Do you think it means the Southern District of Texas,

9    where this Court is sitting?

10   A    That's the way I always interpreted it.

11   Q    Okay.  But just to summarize, you don't recall -- you

12   testified there are no assets of FSS in the Southern

13   District, right?

14   A    Not that I'm aware of.

15   Q    Okay.  Okay.  All right.  I might get in trouble for

16   going over this because you talked to the Judge about it a

17   little bit.  So, I would like to follow up a little bit.

18   A    Okay.

19   Q    This is the discussion you had regarding when you were

20   the CRO -- you still are -- for what I call the InfoWars

21   Debtors, right, the three?

22   A    Yes.

23   Q    Right?  And your declaration or your statement of

24   disinterestedness, right?

25   A    Yes.

1    Q    And the involvement of FSS, that wasn't disclosed to

2    the Court or anybody else, right?

3    A    Correct.  When you say anybody else, I mean the people

4    involved with the InfoWars that were aware of it.

5    Q    Okay.  The public wasn't aware, right?

6    A    I don't believe so.

7    Q    And the Judge wasn't aware, right?

8    A    No.

9    Q    And the Plaintiffs' lawyers from Texas and Connecticut

10   to the best of your knowledge weren't aware or made aware,

11   right?

12   A    To the best of my knowledge.

13   Q    When you say that you were disinterested, what does

14   that mean to you?

15   A    Well, I'm -- in my opinion, it means I have no

16   conflict.  I -- there's no party that I'm involved with is

17   adverse or has an interest in what I'm doing.

18   Q    Did FSS play a role at all in the InfoWar bankruptcy?

19   A    FSS agreed to provide -- was going to provide cash flow

20   to the settlement fund.

21   Q    And who on behalf of FSS was going to authorize that or

22   approve that?

23   A    That would have been Mr. Jones.

24   Q    Mr. Jones.  And you were -- but you were the CRO at the

25   time of the InfoWar entities, right?

1    A    I was CRO of the InfoWar entities.

2    Q    Right.  So FSS was a counterparty that was going to

3    provide money to fund some of the issues in the InfoWar

4    bankruptcy, right?

5    A    Yes, under the Plan Support Agreement.

6    Q    And FSS had their own counsel, or did they have the

7    same counsel?

8    A    I have no idea who FSS's counsel was in that.

9    Q    Okay.

10   A    I don't know.

11   Q    You don't know?

12   A    Mm mm.

13   Q    When you were the CRO of the InfoWar Debtor entities,

14   did you have fiduciary duties then?

15   A    Through those Debtor entities, yes.

16   Q    Did you have fiduciary duties at that time to FSS?

17   A    Not that I'm aware of.

18   Q    Okay.  Let me ask you just a couple of what I think are

19   follow-up questions.  This goes back to the general ledgers

20   that were a mess when you arrived on the scene.  Do you

21   recall that discussion?

22   A    We had several, I believe so.

23   Q    Okay.  Does Melinda Flores ring a bell to you?

24   A    The name does, yes.

25   Q    Who is that?

```
 1   A    She was the -- I think her title was Controller when I

 2   came on the scene as CRO of FSS.

 3   Q    And do you know what time period she was responsible

 4   for preparing the FSS books?

 5   A    As I recall, she closed the 2020 books.  So, at least

 6   sometime in 2020, if not prior thereto.  She may have been

 7   there in 2019.  I just don't -- you know -- I might have

 8   heard that.  I don't know.  I know she closed the 2020

 9   books.

10   Q    You haven't looked into that at this point, right?

11   A    Yeah.  Unless -- I mean, unless someone shows me

12   there's a need for me to look into --

13   Q    Okay.

14   A    -- her administration.

15   Q    Okay.  All right.  Okay.

16        MR. BRIMMAGE:  Your Honor, if I can just have like

17   60 seconds for a quick --

18        THE COURT:  Absolutely.  Take your time.

19        MR. BRIMMAGE:  -- and continue my -- I'll consult

20   with him, but I'm also going to look at my notes real quick.

21   BY MR. BRIMMAGE:

22   Q   Mr. Schwartz, just a couple more final questions.  And

23   thank you for your patience.  Have you assisted in preparing

24   any of the witnesses that have been deposed in any of these

25   State Court actions?
```

1    A    No.  Oh, wait a minute.  Excuse me.  There was a --

2    yes, I did talk to somebody.

3    Q    Do you recall who the somebody was?

4    A    She was a corporate rep.

5    Q    Corporate rep for who?

6    A    That I don't know.  I assume FSS, but I don't know.

7    Q    Why did you help prepare this witness?

8    A    Because the knowledge we had gained on the accounting

9    and accounting records, I was asked to talk to her and

10   answer specific questions she might have to fill out her

11   knowledge.  Because prior to what we had done, the

12   accounting records were absolutely unreliable for '21 and

13   '22.

14   Q    And you don't know if you talked to her because she was

15   being deposed on behalf of FSS or some other entity,

16   correct?

17   A    She was being deposed.  I remember that.  And --

18            THE COURT:  Do you recall when that was?

19            THE WITNESS:  Might have been early in July, is

20   what I think; mid -- maybe mid-July.  But it seems like by

21   then we were heavy into --

22            THE COURT:  Okay.

23            THE WITNESS:  -- other stuff.  But we were -- it

24   had taken us until then to get enough of the accounting

25   records up to date where they were usable information coming

1    out.

2    BY MR. BRIMMAGE:

3    Q    Could it have been June 27th that the deposition took

4    place?

5    A    Is it -- Brittany is her name?

6    Q    Brittany Paz?

7    A    Yeah.  Okay.  If that was the date, then it was a

8    couple of days prior to that.

9    Q    It was prior to that, right?

10   A    Yeah.

11   Q    So you had been on the scene --

12   A    Not long.

13   Q    Less than a month?

14   A    Yes.

15   Q    Right?  All right.  With books and records that are a

16   mess, right?

17   A    Yep.

18   Q    Okay.  Have you read any of the Plaintiffs' lawsuit

19   complaints?

20   A    I read the -- was that the Fourth Amended Complaint, I

21   believe by the Connecticut complainants.  I read that

22   recently.

23   Q    Any others?

24   A    I don't -- I probably read some of the Texas complaints

25   at some point in this process.  Seems like I did but then --

1    I had to read the Fourth for some --  I guess recently to

2    prep for, I think, for something -- for some of this stuff

3    this week.

4    Q    Are you keeping up with the Austin trial?

5    A    Very little time to keep up with that then.

6    Q    You would agree with me that the Austin trial result

7    could have a significant impact on this bankruptcy, right?

8    A    I don't know.  I mean, it's going to -- I expect to

9    have a big judgment, and if we don't have a big judgment,

10   even a little judgement's going to have a -- both would have

11   an effect on the bankruptcy.  We have to recognize that.

12   Q    What is a big judgment?  What effect does --

13   A    I know that I understand that the Plaintiffs' opening

14   statements they asked for $145 million.  That would be a big

15   judgment.

16   Q    And if there's a big judgment, what impact do you

17   foresee on this bankruptcy?

18         MR. BATTAGLIA:  Objection, Your Honor.  Calls for

19   speculation.

20         THE COURT:  Yeah, well, just find out where we're

21   going with this one, Mr. Brimmage?

22         MR. BRIMMAGE:  Yeah.  Where I'm going, Your Honor

23   --

24         THE COURT:  Might have gone out of bounds on it.

25         MR. BRIMMAGE:  Absolutely.  I think what we're

```
1    hearing is that Mr. Schwartz has done nothing -- well, I'm
2    going to say this, and then I'm going to try to elicit the
3    testimony, so here we go -- has done --
4              THE COURT:  Well, just --
5              MR. BRIMMAGE:  -- nothing to look after the
6    Plaintiffs' --
7              THE COURT:  Well, no, no.  Just elicit the
8    testimony and then you can make the argument at the end.
9              MR. BRIMMAGE:  Okay.
10   BY MR. BRIMMAGE:
11   Q    Let me ask you this.  You already -- we've already
12   talked about, and you already testified that you've not done
13   anything to assess or analyze the veracity of the various
14   lawsuits by the Plaintiffs across the country, right?
15   A    Correct.
16   Q    And if you are not looking after those potential or
17   actual unsecured, unliquidated, contingent creditors, whose
18   job in this bankruptcy is it to look after them?
19   A    I'm not sure what you mean by not looking after them in
20   this.  My job, as I understand it, and always understood it,
21   is to -- is to get the estate back onto a reasonable basis
22   and generating income, whether that's going to sufficient to
23   pay the creditors or not.  But I can't do anything more than
24   protect the assets and try to increase the value of the
25   estate.  That is -- I mean, I'm not a tryer of fact, so I
```

1  can't do much on the case side.

2  Q   I appreciate that.  But it's -- you don't believe it's

3  your job to look after the various Plaintiffs and their

4  unsecured claims in this case; is that correct?

5       MR. BATTAGLIA:  Your Honor, I'm going to object.

6  I think he answered that question --

7       THE COURT:  Yeah.

8       MR. BATTAGLIA:  -- in his prior answer.

9       THE COURT:  I think he's answered the question,

10  Mr. Brimmage.

11       MR. BRIMMAGE:  All right.  I appreciate it, Mr.

12  Schwartz.  Your Honor, what I'm getting at is we need a Tort

13  Committee.  Thank you.

14       THE COURT:  Thank you.  Mr. Lemmon?

15       MR. LEMMON:  Thank you, Your Honor.

16  BY MR. LEMMON:

17  Q   Mr. Schwartz, you and I have known each other

18  professionally for over 30 years, right?

19  A   Since you were a baby lawyer.

20  Q   Yes, sir.

21       MR. BRIMMAGE:  Your Honor, just (indiscernible) --

22       THE COURT:  I was going to --

23       MR. BRIMMAGE:  -- because it seems

24  (indiscernible).

25       MR. LEMMON:  I'm getting to that point with my

 1   next question, Your Honor.

 2            THE COURT:  Let's see where this goes.

 3   BY MR. LEMMON:

 4   Q    But in this case, our relationship has been -- we've

 5   got a good relationship, you and I, professionally and we're

 6   friendly, aren't we?

 7   A    Most of the time.

 8   Q    Okay.  In this particular case, our relationship has

 9   been adversarial; is that correct?

10   A    Extremely so.

11   Q    Now, you remember, and you've been asked about the

12   discussions -- the negotiations about the forbearance

13   agreement, right?

14   A    Are you asking me if I remember the negotiations?

15   Q    Right.

16   A    I sure do.

17   Q    And those negotiations were heated, weren't they?

18            MR. BRIMMAGE:  (Indiscernible).

19            THE COURT:  Yeah.

20            MR. LEMMON:  Your Honor --

21            MR. BRIMMAGE:  (Indiscernible).

22            MR. LEMMON:  Your Honor, I'm adverse --

23            MR. BRIMMAGE:  (Indiscernible).

24            THE COURT:  Let me ask this.  How are you adverse

25   to -- at this time?

1            MR. LEMMON:  I'm adverse to the Debtor with

2    regards to issues concerning the cash collateral.  I have,

3    on behalf of my client, consented to the form of order that

4    was proposed by the Debtor.  But that was also after

5    negotiations.  So, I am not opposed to the relief that the

6    that the Debtor is seeking on an interim basis today.  But I

7    want to make clear my client's position and our

8    separateness.  And my client's position has been attacked

9    here today.

10            THE COURT:  I think you've done it.  I think you

11    done it.

12    BY MR. LEMMON:

13    Q    Why was the forbearance agreement important from the

14    Debtor's perspective?

15    A    The forbearance agreement, we needed -- needed the

16    reduction in the cost of the processor fee.  We needed to

17    change the ratio of sharing the sales proceeds.  Those two

18    were critical to the survival of the Debtor.

19    Q    And is the Debtor trying to change its business plan;

20    in other words, I mean the way it does business, the way it

21    acquires product and sells product?

22    A    Well, yes and no.  We are trying to be much more

23    selective in the product we acquire.  We are trying very

24    hard to separate so it's clear what's our product and what

25    is not because we think we get higher margins on our

1   product.  I shouldn't say ours -- the FSS's.  From the

2   standpoint of the overall business operation, it needs

3   organization.  It needs a lot of training.  Personnel are --

4   grew up in their jobs, but they don't know what they should

5   be doing and what they --how they should be making decisions

6   and on what data they should be making decisions.

7   Q    Is the Debtor attempting, in part, to transition away

8   from mostly buying products from my client to buying

9   products on its own?

10  A    Yes.

11            MR. BRIMMAGE:  Objection.

12            THE COURT:  Yeah, and Mr. Lemmon, I think none of

13  us discussed any of this.  I'm going to, kind of, keep you

14  within the bounds of where things are going.  So, if you've

15  got a couple of questions, I'm --

16            MR. LEMMON:  Thank you, Your Honor.

17  BY MR. LEMMON:

18  Q    Do you have an estimate of the legal expenses that the

19  Debtor has incurred in the Sandy Hook litigation?

20  A    I have a number, which from the accounting records, I

21  do not believe it's accurate.  And the reason is, the

22  recording of entries and legal fees don't -- the description

23  does not always tell you what case or even what firm it

24  relates to.  But best that what we can identify is what we

25  know being related to this -- the Texas case is, it's a --

```
1           MR. BRIMMAGE:  Objection.  (Indiscernible).

2           THE COURT:  Yeah, I'm going to let him finish the

3    answer because I think he's just giving his thoughts.  But

4    again, I'm -- those kinds of questions about cash collateral

5    or the critical and the emotional, I'll let you go there,

6    Mr. Lemmon, but is it really -- I just -- with your client,

7    those are cash collaterals are nothing that you're

8    interested in.

9           MR. LEMMON:  That's true, but I believe that this

10   question has to do, in part, with that.  And so, if the

11   witness could be allowed to finish his question -- his

12   answer.

13          THE COURT:  Okay, well, I'll allow it.

14   BY MR. LEMMON:

15   A    From what I can tell, FSS identified payments of

16   approximately $4.5 million through 2022, from 2018 through

17   2022.

18   Q    You were asked a few questions about cryptocurrency,

19   and whether that cryptocurrency was cash collateral.  Do you

20   recall having discussions with me and with my client where

21   we were trying to establish that it was cash collateral?

22          MR. BRIMMAGE:  Objection.  (Indiscernible).

23          THE COURT:  Sustained.

24   BY MR. LEMMON:

25   Q    Do you recall any discussions with me and my client on
```

1   that subject?

2   A    Yes.

3   Q    And to your knowledge, do you know whether we did an

4   investigation trying to prove that it was cash collateral?

5           MR. BRIMMAGE:  Objection.  (Indiscernible).

6           THE COURT:  Yeah, I'm going to sustain that.  Mr.

7   Lemmon, if your client has a position on it, then they can

8   file something or make an argument about it.  But whether

9   you've done an analysis or not, I'm sure you'll tell me at

10  some time, at some point.

11          MR. LEMMON:  Thank you, Your Honor.

12          THE COURT:  But all your rights are reserved.  I

13  mean --

14          MR. LEMMON:  Of course.  Thank you.  Thank you,

15  Your Honor.  That's all I have.

16          THE COURT:  Okay.  I'll give you a brief redirect.

17          MR. BATTAGLIA:  Your Honor, I'll be

18  proportionately brief.

19          REDIRECT EXAMINATION OF W. MARC SCHWARTZ

20  BY MR. BATTAGLIA:

21  Q    So, you were asked an awful lot of questions on cross

22  about the things that you haven't done about validating Mr.

23  Jones' draws, about validating or examining the precise

24  amounts that were advanced by PQPR, about valuating the

25  Plaintiffs' litigation claims.  Tell me again when you were

1   retained.

2   A    June the 6th of 2022.

3   Q    And tell me again when this bankruptcy case was filed.

4   A    July 29th.

5   Q    Good Lord, Mr. Schwartz, what have you been doing?  Why

6   haven't you evaluated those matters?

7   A    We have spent most of that time, substantially all of

8   the time, getting accounting books up to date so we could

9   determine what our cash flows looked like and what we --

10   whether we could or could not even file.

11   Q    And what amount of your workday is focused on FSS

12   business?

13   A    Post-petition?  I get about two hours a day, if I'm

14   lucky, on the business side.

15   Q    Okay.  But on the non-business side of FSS, total time

16   delegated to FSS?

17   A    Oh, my total time on FSS is -- honestly speaking, I'm

18   not the only one, but it's easy eight to nine hours a day.

19   Q    And are there -- how many people within the Schwartz

20   and Associates firm are dedicating time to the FSS file?

21   A    Four and a half or so.

22   Q    And you mentioned a Mr. Schultz, Schultz --

23   A    Schultz, it's pronounced Schultz.

24   Q    How much of his time is being dedicated towards FSS?

25   A    He's full-time.

1    Q    And so, all these people dedicating all this time,

2    again, you mentioned getting the books and records, what

3    else have you focused on, aside from getting the books and

4    records in a usable state?

5    A    Trying to figure out why we are constantly being

6    surprised with invoices that we didn't know were sitting out

7    there getting old.

8    Q    What about product orders?

9    A    Product orders.  Yes, definitely product orders and

10   reconciling deposits.  For example, we have one vendor that

11   we -- $1.5 million was sent to, a little over $1.5 million,

12   and $1,350,000 worth of product was actually ordered.  We

13   have a 250-something thousand- dollar credit sitting there,

14   which we were unaware of.  We had to find that, reconcile

15   that, and discuss that with Mr. Jones.  Why is that here?

16   Q    So, your focus has been on normalizing the business of

17   this juncture?

18   A    Yes.

19            MR. BRIMMAGE:  Your Honor, objection.  Leading.

20            THE COURT:  Sustained.

21   BY MR. BATTAGLIA:

22   Q    What has your focus been on this since your engagement?

23   A    I've been trying to get my arms around it and get it

24   into a standard operating mechanism where people go to work,

25   they know what their job is going to be that day, they do

1    it, and we get rid of the last-minute catastrophes that have

2    to be handled.  And that stated, we are literally right now

3    in the -- oh, you've got to pay this bill because, you know,

4    it's way past due and we're going to get cut off.

5    Q    In order of priority, to protect and preserve the value

6    of the estate and generate revenue, what are the most

7    important things to do?

8    A    Get control of the costs and get the revenue coming in

9    the door.

10   Q    Where does evaluating Alex Jones' draw come on that

11   list?

12   A    That comes when you've got all -- got the business

13   running on an even keel, maybe I can start those processes.

14   Q    Where does evaluating the PQPR debt?

15   A    It comes in the same category.

16   Q    Where does evaluating the Plaintiffs' claims fit in

17   that regard?

18   A    Well, right now, with them sitting in the courts, I

19   mean, the Court's going to determine the Plaintiffs' claims.

20   I don't -- it's hard for me to see what I need to do to

21   evaluate -- to quantify the Plaintiffs' claims.  It's not a

22   matter to come to me.

23   Q    What is your role in the litigation, the Plaintiffs'

24   litigation?

25   A    I'm -- obviously, to the extent there's discovery, my

1    role is to cooperate and assist in that, try to make sure --

2    I have the perception that information was requested that we

3    didn't have, or at least I've been told that that's not

4    something we track.  But that clearly was not made known,

5    and I also have a perception there was a lot of stuff put

6    out there by people who just didn't know what they were

7    doing.

8    Q    Did Debtor have legal representation in both of those

9    lawsuits?

10   A    Yes.

11   Q    And it's not Mr. Lee or myself?

12   A    Correct.

13   Q    What is your intention regarding investigating the

14   matters that have been discussed here, the Alex Jones draws,

15   the note balance, and ultimately, I guess, the Plaintiffs'

16   claims?

17   A    Well, there are a number of -- they fall in the

18   category of the number of deadlines we have to investigate.

19   And they are, you know, once we get past fire drill and get

20   this thing under control, which hopefully is within sight of

21   happening, we have to do a little bit more hiring.  Then we

22   can turn around and start, you know, get into the more

23   routine -- supporting the bankruptcy, supporting the Chapter

24   5 Trustee, and starting to evaluate and investigate the

25   claims.

1  Q    You were asked a series of questions regarding Mr.

2  Jones' draw -- historical draws and salary.  I want to visit

3  that a little bit here.  You've at least reviewed, from the

4  general ledger, what the distributions were to Mr. Jones for

5  the period from 2012, say, to 2022?

6  A    I've seen them, yes.

7  Q    And how -- there were some questions asked about post-

8  April 2018 draws.  Can you tell the Court, comparatively

9  speaking in the three or so years before 2018 or four years

10  -- and the four years following 2018, were they different,

11  the same?  How did they compare?

12  A    No, the draws declined following 2018 from the previous

13  period.

14  Q    The Debtor broadcast, the primary broadcast that FSS

15  transmits is called what?

16  A    The Alex Jones Show.

17  Q    Huh.  Is he important to that show?

18  A    Very much so, yes.

19  Q    In your opinion, is Mr. Jones valuable to FSS in his

20  ability to generate revenue in the future?

21  A    Yes, very much so.

22  Q    Why is that?

23  A    He has -- he's a salesman.  He's a -- his forte is

24  selling, and he's very, very, very good at it, and he can

25  sell to his audience.

1    Q    In your opinion, who at FSS is more valuable than Alex

2    Jones?

3    A    Who is more valuable?

4    Q    Yes.

5    A    Nobody.

6    Q    Do you have an opinion as to whether or not a salary of

7    a $1.3 million is appropriate for Mr. Jones and what he

8    contributes to this venture?

9    A    Well, I don't think it's anywhere near representing the

10   value that he provides.  It's quite appropriate from the

11   standpoint of FSS.  You know, it's good for FSS because I

12   think it's far below, way below what he could achieve and

13   has achieved in the past.

14   Q    You were asked some questions about why did FSS file

15   and I think you said something about because of the state of

16   litigation.  What other purposes were primary in your

17   decision to proceed with filing?

18   A    Well, the other purpose is, as I pointed out, the --

19   this organization, this business needs to be reorganized.

20   It has to become -- it's -- it does not have the internal

21   information loop to identify when it's heading into the

22   ditch and to help it make decisions to avoid that.  It has

23   gotten itself in the position where he has to get fully into

24   the ditch until it realizes it has a survival problem.  That

25   takes a reorganization and rethinking.  That takes managers

1    who begin to monitor the financial information related,

2    their operation and the overall operation.

3    Q    In 2021, now that you've closed the books, to what

4    degree was the Debtor profitable or unprofitable?

5    A    It was unprofitable.  It lost about $10 million in

6    2021.

7    Q    And to date, has that trend changed?

8    A    Well, through May 31st, I think we reported a profit

9    around a million dollars or so, but a significant part of

10   that was donations.  Donations are not operating results, so

11   it's hard to account for them.  So, it's definitely improved

12   from what it was in 2021, but I don't think we're anywhere

13   near a sound basis yet.

14   Q    Lots of questions about accounting issues, which you

15   were asked on direct and cross and everybody wants to call

16   it mess and terrible.  Was the ledger, at least up to 2021,

17   reliable?

18   A    It appears to be, yes.

19   Q    And the problem in 2022 is, that there had been no

20   postings as of --

21   A    Correct.

22   Q    Okay.  So, what information that was necessary to close

23   2021 and to book entries in 2022 was not made available to

24   you?

25              THE COURT:  I think you've covered that road.  I

1  think you've covered that road, Mr. Battaglia.

2  BY MR. BATTAGLIA:

3  Q    I just want to ask, have you been provided access to

4  all the information you need to do your job?

5  A    Yes.

6            MR. BATTAGLIA:  May I have one minute with my co-

7  counsel?

8            THE COURT:  Absolutely.

9            MR. BATTAGLIA:  I'll pass the witness.  Thank you,

10  Mr. Schwartz.

11            THE COURT:  Okay.  I think I'm ready.  I want to

12  note two technical things and then I'll get into the

13  rulings.  One is -- and I'm going to consider it an

14  oversight, but I want it corrected today.  I looked at the

15  Debtor's petition, voluntary petition, and Mr. Battaglia,

16  you didn't sign it.  I need you to sign it today.  It's --

17  I'm just looking -- I don't -- I see where your name is

18  listed, but I don't see -- I'm going to share my screen.

19  I'm going to consider that just an oversight, but I want it

20  corrected.  It's required on a voluntary petition and that's

21  what I see on the voluntary petition, so I want that

22  corrected.  I want it corrected today, unless there's an

23  amended on file, and if there is, someone let me know.

24            This case was filed in the Victoria Division and

25  in May 19th -- on May 19th, excuse me.

1          MR. BATTAGLIA:  (Indiscernible) this case?

2          THE COURT:  No, no, no.  I'm saying -- I'm saying,

3    this case was filed in Victoria and on May 19th --

4          MR. BATTAGLIA:  Okay.

5          THE COURT:  -- Bankruptcy Court entered a General

6    Order 22-3.  It deals with Division of filing locations, and

7    it amends Local Rule 1002-1, and it says, (indiscernible)

8    that cases must be filed in the division of the Debtor's

9    principal location.  Principal location, if the Debtor has

10   none, the principal location is the Houston Division, and

11   that's what would have qualified in this case.

12         I'm going to -- you know, (indiscernible) the

13   Houston Division, based on my experience with the prior

14   cases and the efficiency and the best interests of the

15   estate, I'm going to transfer the case to the Houston

16   Division, and I'm going to transfer it to myself and keep

17   the case and we're going to keep the same case number.  But

18   it should be in Houston.  I want to make sure that we're

19   observing the local rules as done.  Parties have their

20   rights, but I want to make sure that those two technical

21   things, one I'll take care of on the back end, one, Mr.

22   Battaglia, you need to sign a declaration.

23         So, that -- but before the Court are two matters,

24   the utility -- I've signed schedules extension that's on the

25   docket.  Utilities you're going to tweak.  What's left now

1    is cash collateral and the critical vendor motion.

2          And let me just excuse you.  You can have a seat.

3          Here's what I'm going to do.  I'm both -- I'm just

4    going to note that notice of today's hearings was proper,

5    the Court considered the evidence on the record, as well as

6    the testimony of Mr. Schwartz.  I appreciate Mr. Schwartz's

7    candor and his testimony.  Some of it I found very helpful.

8    Some of it I found honestly troubling.  Some of it is not

9    surprising for a Debtor early on in a case.  Management may

10   not be completely able to have its arms around a case so

11   that doesn't surprise me.  But everybody knows why these

12   last cases were filed, or the driving impetus, but driving

13   the last case and this case and that's -- there are some

14   major lawsuits going on in Austin and in Connecticut, and

15   they're very serious lawsuits that make some very serious

16   allegations.

17         It's not for me to comment on the merits of any of

18   them.  Those processed -- the process in Austin will run and

19   I don't want to say anything one way or the other about

20   what's happening in that lawsuit.  I just know that it is a

21   significant action, and I do know, and I don't want to make

22   light of it, that there are some -- they are real people and

23   real faces behind each one of them, they're real Plaintiffs

24   who have experienced real pain.  And I think Mr. Jones is --

25   and these Debtors are entitled to put on their defense and

1    it's not for me to comment one way or the other.  I just

2    know that there's a lot of seriousness and I take it as

3    such.

4            And so, I take each case that is filed before me

5    with the same degree of focus, preparation as one would hope

6    that a bankruptcy judge would.  And I've took the last cases

7    really seriously and prepared really hard and I've done the

8    same here.

9            So, there's two motions here, and really the

10   question is, is how you stabilize the company now.  There's

11   also been -- there's been oral request for the appointment

12   of a committee, and that can be done by the Court for cause.

13   I'm not going to grant that today, but I am going to express

14   some real concerns about what I heard, and I'll express what

15   they are.

16           You know, whether you realize it or not, Mr.

17   Schwartz was negotiating on both sides of a deal.  And what

18   was represented to me in the last case was that there was --

19   the parties were going to propose mediation and there was a

20   Plan Support Agreement and asking me to approve  Plan

21   Support Agreement entry into where parties were going to try

22   to -- at least what was stated to me in the last case was

23   that, parties were going to ask for mediation and to try to,

24   you know, ask the Plan, there were milestones, and third-

25   party contributors consisting of Mr. Jones and Free Speech

1    were at least offering to put some money on the table to see

2    if there could be a deal that was worked out and that didn't

3    happen.  And I'm not saying it should have happened.  Again,

4    I'm just saying the fact it did not happen, so I'm not

5    saying there was not a good reason that it shouldn't have

6    happened.  Again, I'm just pointing to the fact that that

7    did not occur.

8         But Mr. Schwartz, you spoke with both third-party

9    contributors at the time, and at least what you're telling

10   me, Mr. Lee was involved as well at the time, then both

11   parties were representing the InfoW Debtors who were --

12   quite frankly, membership interests had been transferred to

13   a trust.  And so, I haven't fully thought through, but I'm

14   concerned that you still may represent the InfoW Debtors as

15   their CRO and how you're purporting to act as the CRO in

16   this case.  And I don't -- at some point, someone's going to

17   have to make some really hard decisions.  I'm -- quite

18   frankly, I'm a little surprised you hadn't read some of the

19   litigation because at least InfoW was involved in the

20   litigation for every one of these last time.  So -- and that

21   was supposedly the purpose of the litigation.

22        So, I'm a little surprised that the CRO is telling

23   me today that he hasn't read, at least, the -- or has a good

24   working knowledge of the lawsuits, including the fraudulent

25   transfer litigation.  I didn't know whether the fraudulent

```
 1   transfer litigation has any merit.  I don't know whether --
 2   I've heard today about the potential indemnity that Mr.
 3   Jones may have against FSS.  And you may file a proof of
 4   claim.  He may file a proof of claim, he may not.  That's
 5   not surprising in a case whereas -- but the Debtor is going
 6   to have to make some tough decisions at some point.  And
 7   it's going to have to really analyze those claims and see
 8   whether those claims have any merit and whether there are
 9   claims that the estate has that it may bring on its own, and
10   I don't know if there are any.  That's certainly not for me
11   to comment on, but someone's going to have to do the hard
12   work, and I don't know how that hard work gets done from
13   what I'm hearing.
14           And I'm not sure that parties who were introduced
15   in the last case could fill that role either.  But the
16   Debtor needs to hear that from me, and I think debtors are
17   entitled, especially early on in a case, to think about what
18   the judge may have to say.  And these are certainly rare
19   comments, but these are certainly uncommon cases.
20           And I don't want to -- there's a request for the
21   appointment of a Tort Committee and I think it's not wholly
22   unfounded to ask for one.  And I think I owe them a real
23   answer as to why I'm not going to appoint one today.  The
24   fact that a Debtor has got to get its books right, that
25   doesn't surprise -- that's -- I think professionals can get
```

1   their hands wrapped around that and can drink from the

2   firehose from it and stabilize the company.  But I think

3   there's going to be some hard decisions that have to get

4   made, and maybe the answer is that there are no claims.

5   Maybe the answer is that everybody's entitled to what

6   they're saying they are.  Maybe the answer is that, you

7   know, the secured creditor is a valid secured creditor, it's

8   a validity priority to the extent that there's liens that's

9   valid.  I have no idea, but I know somebody's got to go do

10  that work.

11          Someone has to do the hard work on that, and I

12  don't know who is going to do the work.  I don't know who is

13  going to make the call if there really is something there to

14  do.  And I think the Debtor is going to have to really give

15  some thought about who is truly independent and whether

16  someone can convince me otherwise about that.

17          But for purposes of today, I'm not going to

18  appoint one, but certainly it's without prejudice and maybe

19  I hear something that tips me over.  I'm sure this is not

20  going to be the last time a request is made, but I do read

21  it as my call.  Mr. -- but I do know that if I do appoint

22  something or authorize one, that I will turn it over to the

23  Office of the United States Trustee, who will then do their

24  work.  I won't get involved in that part of it.  But I'm not

25  going to appoint one today.  I think the Debtor has to think

1    about what I'm saying today.

2         But for purposes of today, I'm going to authorize

3    the use of cash collateral on a limited basis.  And here's

4    what I'm going to approve on this, and I've got a, kind of,

5    an additional request at the end.  I have a line item,

6    "Outsource Services/Consulting Services", there'll be

7    repayments on those.  That's about $45,980, $22,670.  I've

8    heard no evidence that any of that is an emergency and

9    should be authorized today.  You can come ask for it on a

10   final.  It's without prejudice but will not get paid in the

11   interim.  The American Express bill, no.  It's about

12   $172,000.  That bill will not be -- I'm not authorizing

13   payment on -- any payments on that card.  You can ask for it

14   on a final.  Mr. Jones' employment salary.  I think the

15   parties had initially talked about a reduction to $20,000.

16   I'll authorize the payment of $20,000 for Mr. Jones.  I

17   think the employees -- my understanding is that none of the

18   work that they would be paid for is pre-petition and I want

19   -- the employees do the work, they should get paid.  So, I'm

20   going to authorize the payments up to the amounts.

21        The language that the (indiscernible) Plaintiffs

22   requested in their objection must be put in any order.  I

23   also want in the order, that I am also making no findings --

24   and this order won't be construed in any way in a similar

25   way with respect to any donations that we heard about today,

1    restricted, unrestricted, how they can be used.  I'm making

2    no findings about that.  I want to make sure that the order

3    also says that no draws are permitted in my interim order.

4           I'm going to set a final hearing on this on -- I

5    think the parties can do it August 15th I think is when cash

6    collateral runs out anyway.  Come back on August 15th at

7    10:00 a.m., and we'll just go till we're done on that.  It's

8    going to be an interim order.

9           Before the order, Mr. Schwartz, it says that it's

10   in evidence.  Your engagement letter says that you were

11   delegated those managerial duties, either Paragraph 8.01 of

12   the Free Speech Systems Company Agreement.  I don't know

13   what that is, and I want you filing it.  I want -- to the

14   extent if it's -- I don't -- I think it should be a public

15   document.  But if anybody wants to tell me it should be

16   filed under seal, it should be.  But if a CRO is going to --

17   I need to understand what your role is and what those

18   managerial duties are under 8.01.  I want that filed on the

19   Docket so all parties can see and have the ability to ask

20   questions about it.

21          And will tell you, on the -- it sounds like under

22   the budget, some of those are buckets based on historicals,

23   and that's fine.  Mr. Schwartz, you're to use your judgment.

24   I don't want to hear about some insider payments.  I don't

25   want to hear about something -- use your judgment.  If it

1    borders on problematic, the answer is kick it to the final.

2            With respect to the critical vendor motion, I'm

3    going to authorize -- I'm going to grant the critical vendor

4    motion.  But Subchapter 5 Trustee and -- has to be involved

5    and it has to see what -- exactly where these payments are

6    going to go.  It sounds like there are buckets here and I

7    want to know that these payments are being made in the

8    ordinary course of business.  In other words, if there's a

9    payment due at the end of the month, nothing is getting

10   prepaid.  If the bill is due and it's one of those entities

11   and the bill is $20,000, then that's just what they're going

12   to pay before they come to a final.  They can come ask for

13   the remainder at a final.

14           I want to see the order for the claw back.  I will

15   assure, you know, that I want that order to have some teeth.

16   And I'm not asking for anything extra and what is ordinary

17   in a critical vendor motion in the Southern District of

18   Texas.  There are plenty of examples of that.  Mr. Brimmage

19   has seen them a million times.  I'm sure Debtor's counsel

20   has seen them as well, and the Trustee can point to a

21   million examples.  Everybody knows what the standard

22   language looks like.  Put it in there.

23           But if I sign the order, it's going to have some

24   teeth, which is why I'm saying just, you know, I don't think

25   they need to sign anything saying, you know, I don't think

1    they need a critical vendor agreement for the trash person,

2    but they need to understand, and it needs to be explained to

3    them if they don't, if they can -- they don't, and I do

4    intend to enforce that order.  And so, it sounds like you

5    all are going to upload three orders, so we could sit here

6    and hack one out old school.  I'll leave it up to you.  What

7    do you want to do?

8         MR. BATTAGLIA:  Your Honor, let me take a stab

9    because I think most of the terms we've talked about prior

10   to hearing as far as cash collateral and the critical

11   vendor, the U.S. Trustees can tell me if they have any

12   federal language on claw back.  I think there's language in

13   there and I'm -- this will shock the world, but I think I

14   got the form of motion and order from a pleading that Mr.

15   Brimmage is on.  So -- but I'll run it by --

16        THE COURT:  That doesn't mean he didn't object to

17   it when he got to a hearing on it though.

18        MR. BATTAGLIA:  Understood.  And if I could have a

19   central point of contact, if Mr. Martin is the person, I

20   will share drafts of all of these orders as they're revised

21   with --

22        THE COURT:  As soon as they're signed -- I should

23   say or upon uploaded, just let my case manager know, Ms.

24   Saldana.  Have them take a look at it and if it looks okay

25   to me --

```
 1            MR. BATTAGLIA:  Share them with all three and take
 2   comments --
 3            THE COURT:  Yeah.
 4            MR. BATTAGLIA:  -- and criticisms and they'll --
 5   I'll have their agreement before we upload them.
 6            THE COURT:  You know, I'm nervous.  I mean, I get
 7   cash collateral in trial, but utilities should not trail.
 8   That one should get done pretty quickly and you should be
 9   able to add some language in the critical vendor motion, and
10   Ms. Haselden, if there's anything that you are concerned
11   about, then just kick it to a final order.  You can have a
12   hearing within two days, 24 hours on any one-off that you
13   think that you all can't agree on.  I just want -- the
14   bucket is based on historicals, and I want to make sure if
15   it's assurance and trash, I'm -- I don't need to see any of
16   those, but that relates to the business.  You know, if it
17   relates to someone -- to anything personal, don't do it.
18   That's not what I'm authorizing.  I'm only authorizing what
19   is essential for the business.  Everybody's rights are
20   preserved.
21            I think the Debtor needs to look forward to having
22   a more robust conversation with the Debtor on the 15th about
23   the things I've talked about and I'm going to give some
24   thought, as well, to where we are.  Maybe there's a good
25   answer, maybe there's not, but I take it from the
```

1    Connecticut Plaintiffs and the Texas Plaintiffs that if you

2    want to file something, file something.  If you want to

3    renew at a final, I don't -- I'm fine either way.  I don't -

4    - the Code doesn't require anything in writing, and so, I'm

5    not going to hold you all to that.  I think you can -- if

6    there's anything you wish to supplement before the final in

7    connection with a final, and I think that's standard, quite

8    frankly, then do so.  If there's some reasonable discovery,

9    then go for it.  I don't need to be involved in that, but if

10   you need me, let me know.  But that's -- I take it there's

11   going to be a lot of work between now and the 15th, but it

12   is what it is.

13          Mr. Lemmon?

14          MR. LEMMON:  The Court may recall the discussion

15   earlier this morning about the vacation schedules.

16          THE COURT:  Yep.

17          MR. LEMMON:  I am out that whole week of the 15th.

18          THE COURT:  Okay.

19          MR. LEMMON:  And I'm leaving this Sunday and out -

20   - well, I get back that Friday of that week.  I would --

21          THE COURT:  The Debtor runs out of leave -- I

22   think it runs through the 15th, so that's why I --

23          MR. LEMMON:  Yes, and so, I think it's highly

24   likely that it'll be important to -- you know, I'm just

25   saying I think it would be highly likely that we'll need to

1    have a further interim.  But I don't want to delay the

2    discovery process, and so I'd like to start some informal

3    discovery and I've mentioned that to the Plaintiffs' counsel

4    to, you know, just start, so that -- start getting some

5    information.  But I wanted to let the Court know about that

6    impending problem on the 15th.

7              THE COURT:  Okay.  Mr. Brimmage?

8              MR. BRIMMAGE:  Can I address that impending

9    problem?

10             THE COURT:  Yep.

11             MR. BRIMMAGE:  We have several on our team that

12   that week is very problematic for too.

13             THE COURT:  Okay.

14             MR. BRIMMAGE:  So --

15             THE COURT:  What works best?

16             MR. MARTIN:  We agree on it.

17             THE COURT:  I just don't want the Debtor to run

18   out of cash or have to come back.  So --

19             MR. MARTIN:  Yeah.  Yeah.  Totally in agreement.

20             THE COURT:  So --

21             MR. MARTIN:  Yeah, yeah.  Totally understand.

22             MR. BATTAGLIA:  Your Honor, I asked for 14 days,

23   but the three-week budget is included.  And I don't recall

24   if --

25             THE COURT:  So, what works best?  I'm not going to

1    -- yeah --

2             MR. MARTIN:  We discussed previously, Your Honor,

3    about extending the interim to the 23rd or 24th of August.

4             THE COURT:  All right.

5             MR. MARTIN:  To accommodate for both my vacation

6    schedule and Mr. Lemmon's vacation schedule.

7             THE COURT:  I'm looking.  Okay, I'm looking.

8             MR. BATTAGLIA:  Or the 24th and the 23rd, if

9    possible, Your Honor.

10            THE COURT:  Or the 24th?  What do I have?

11            MR. BATTAGLIA:  I have a charitable entity that

12   I'm the Board Chair of that I have a Board meeting that

13   morning, but it would be the second one I've missed in 10

14   years, so, I could miss the 24th.  I'm available the 23rd.

15            THE COURT:  You just ask -- Ms. Saldana, can you

16   take a look on the 24th, I've got something at 4:00 p.m. --

17            MR. MARTIN:  The 24th for half a day, there is a

18   Subchapter 5 Trustee Committee meeting that I've committed

19   to, but I can certainly --

20            THE COURT:  All right.  Well, you're going to take

21   a loss on that one.

22            MR. MARTIN:  I'm happy to do that.  I'll get the

23   play-by-play from Judge Norman later.

24            THE COURT:  On the 24th, Ms. Saldana, I think --

25   can I do the 24th or is there something there?  I know I've

1   got a pre-trial conference at 4:00 p.m.  Do I have anything

2   earlier?  All right.

3          MR. LEE:  Your Honor, we have an economic issue in

4   light of going to the 24th.  In light of some of the carve

5   outs you made with respect to things that we cannot pay.

6   So, that's what they're talking about right now, between Mr.

7   Schwartz and --

8          THE COURT:  Okay.  And look, if you need a break

9   to get to the 24th, and -- but if the 24th works, why don't

10  we do 10:00 a.m. on the 244th.  We'll just pencil it in and

11  if anything changes.  Do the parties -- the parties here

12  agree, if the -- what I'll call the Collective Sandy Hook

13  Plaintiff, PQPR, and the Debtor agree on a date and time and

14  some breaks, then I'm not going to stand in the way of that.

15         MR. BATTAGLIA:  So, Your Honor, I can include the

16  budgets for the three-week budget and attach that as the

17  approval on the 14 days?

18         THE COURT:  Yeah, if you all are --

19         MR. BATTAGLIA:  Thank you, Your Honor.

20         THE COURT:  Well, hold on a second.  Let me take a

21  look at that.

22         MR. BATTAGLIA:  Understood if there's --

23         THE COURT:  Because I think -- if you go out that

24  extra wait, doesn't that add a really big payment in there?

25  Another -- let me take a look at week three.  Are we going -

1    - between the 24th, right?  You're going to have to hold off

2    on the half a million dollar -- I'm just telling you now.

3    Just on the 24th.

4            MR. BATTAGLIA:  What day was that to be paid on?

5    Do you know?

6            THE COURT:  Yeah, the (indiscernible) may not be

7    (indiscernible), but I'm not going to feel comfortable with

8    a half a million-dollar payment without a final.

9            MR. BATTAGLIA:  I assumed as much, Your Honor.

10           THE COURT:  Okay.

11           MR. BATTAGLIA:  So, we'll remove that from the

12   budgeting.

13           THE COURT:  And then, I think Mr. Jones' salary

14   comes up again.  I think you can budget for the 20, but it

15   could be 54 at the final.  He has the right to come in and

16   ask on that.

17           MR. BATTAGLIA:  We're just going to do 20 in this

18   order.

19           THE COURT:  Okay.

20           MR. BATTAGLIA:  We're limiting it to 20.  We're

21   not going to change it.

22           THE COURT:  Okay.  Just subject to a final?

23           MR. BATTAGLIA:  Yes, sir.

24           THE COURT:  Okay.  And obviously continuing, no

25   AMEX, no consultant, those payments will continue.  Just --

1    so it's essentially, kind of, it should be in a lot of ways,

2    what I've approved in Week 1.  Week 3 should mirror Week 1

3    minus the $500,000 payment.

4          MR. BATTAGLIA:  Mr. Schwartz does have a concern

5    that some of those consultants may really be vital, and I

6    understand --

7          THE COURT:  Just -- no, I'm saying, just ask for a

8    hearing in two or three days and --

9          MR. BATTAGLIA:  That's what I explained to him.

10   First, we'll try to deal with counsel on the other side if

11   we can --

12         THE COURT:  Okay.  And if the parties already

13   agreed it and you all stick to it and they're necessary and

14   there's no fight about.  If not, you can get a hearing in 24

15   hours.

16         MR. BATTAGLIA:  I'll try to work on it informally

17   and if not --

18         THE COURT:  Okay, Ms. Haselden, I'm going to -- I

19   want you to take a look at that, as well, on those.

20         Mr. Brimmage?

21         MR. BRIMMAGE:  Your Honor, point of clarification

22   with regard to the motion to appoint a Tort Committee.

23         THE COURT:  Mm hmm.

24         MR. BRIMMAGE:  I just want to make sure I'm clear.

25   Are you denying that?  Are you just holding that?  What

1    would you like from us?  I just want to make sure we're

2    clear because we would want this record to be part of

3    whatever that effort is.

4            THE COURT:  No, no, I think it continues.  I

5    think, you know --

6            MR. BRIMMAGE:  Okay.

7            THE COURT:  I think you've raised the issue today.

8    It wasn't -- you haven't filed anything.  You made a formal

9    request today.  But there was a request, and I had the

10   authority.  I waived to do it today and I'm just telling

11   folks I didn't do it, but everything is cumulative.

12           MR. BRIMMAGE:  Okay.

13           THE COURT:  I don't expect, in a full evidentiary

14   record, next I mean --

15           MR. BRIMMAGE:  Okay.  You would like us to file

16   something and tee it up again and we can use today's record

17   with whatever other record we need and take it from there?

18           THE COURT:  If that's what you all want to do,

19   yeah, and we can pick a date, yeah.

20           MR. BRIMMAGE:  Okay.  All right.  Thank you, Your

21   Honor.

22           THE COURT:  Mm hmm.

23           MR. BRIMMAGE:  Do we need to do that -- can we do

24   that on an expedited basis?  Not a two-day notice, but not a

25   21-day notice?

1              THE COURT:  No, look I --

2              MR. BRIMMAGE:  We'll see?

3              THE COURT:  I know you'll be back on the 15th, so

4    I know if you --

5              MR. BRIMMAGE:  Or the 24th.  Okay.

6              THE COURT:  Oh, and that's not the 15th, the 24th.

7    Yes, that's exactly right.  So, that would make sense.  If

8    you've got something --

9              MR. BRIMMAGE:  Okay.

10             THE COURT:  -- on file this week, then just tee up

11   the issue, then maybe we can just take it up on the 24th at

12   that time, yeah.

13             MR. BRIMMAGE:  Thank you, Your Honor.

14             THE COURT:  That's what I mean.  That's a -- and

15   now that we're going further out, I think it provides -- I

16   think the Debtor needs time to think about what I said.  But

17   I think the Debtor would need a thorough and fair

18   opportunity to respond to anything, especially if something

19   got filed, and I wouldn't dare do that on short notice.  I

20   think the Debtor is entitled to that, so -- okay.  Anything

21   else we need to take care of today?

22             MR. BRIMMAGE:  No, sir.

23             THE COURT:  Okay.  So, you all are going to upload

24   orders and then get them to Ms. Saldana.  I will assure you,

25   24 hours you may get an email from her just to make sure --

1            MR. BATTAGLIA:  I'm going to try to turn them

2    tonight if I can get home quick enough.

3            THE COURT:  Yeah.

4            MR. BATTAGLIA:  If not, it'll be in the morning,

5    and I'll turn them to the parties.

6            THE COURT:  Good luck.  Thank you.  Take care.

7    Have a good day.

8            MR. LEMMON:  Thank you, Your Honor.

9        (Proceedings adjourned at 5:05 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATION</u>

2

3      I certify that the foregoing is a correct transcript from

4      the electronic sound recording of the proceedings in the

5      above-entitled matter.

6

7

8

9

10     Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  August 12, 2022