UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FREE SPEECH SYSTEMS LLC, | ) | CASE NO: 22-60043 |
| Debtor. | ) | Houston, Texas |
| | ) | Monday, August 1, 2022 |
| | ) | 8:32 a.m. to 9:30 a.m. |

TRIAL

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtor: KYUNG LEE
RJ SHANNON
Shannon & Lee LLP
700 Milam Street, Suite 1300
Houston, TX 77002

For Connecticut Plaintiffs: RYAN CHAPPLE
RANDY WILLIAMS
Cain & Skarnulis, PLLC
303 Colorado Street, Suite 2850
Austin, TX 78701

ALINOR STERLING
Koskoff & Bieder PC
27 Elm Street
New Haven, CT 06510

For Texas Plaintiffs: AVI MOSHENBERG
McDowell Hetherington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002

CORDT AKERS
The Akers Firm, PLLC
3401 Allen Parkway, Suite 101
Houston, TX 77019

For Proposed Subchapter 5 Trustee: MELISSA HASELDEN
Haselden Farrow, PLLC
700 Milam Street, Suite 1300
Houston, TX 77002

For Unites States Trustee: HA NGUYEN
Office of the United States Trustee
515 Rusk Street, Suite 3516
Houston, TX 77002

Courtroom Deputy: ZILDE MARTINEZ

Transcribed by: Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

HOUSTON, TEXAS; MONDAY, AUGUST 1, 2022; 8:32 AM

(Call to Order)

THE COURT: Please be seated. All right. Good morning, everyone. This is Judge Lopez. I'm going to call the 8:30 docket. Let me -- let me call 22-60043. I'm going to ask everyone to please put your phone on mute. If you're the person on audio, the line is completely unmuted. I'm going to try to see if we can do this if everyone mutes their line. If I have to mute the line, then everyone's going to have to hit 5* and you have to -- in order to be recognized.

Let me just remind everyone for those of you who are participating by video and phone, you're more than welcome. Again, please put your phone on mute. I'm also going to remind everyone on video that appearing by video is the same as appearing in court live. So I'd ask that you please respect all decorum that you would normally expect in the court.

Let me start by taking appearances. I'll start in the courtroom and then we will proceed with any party who wishes to make an appearance by video and phone. Thank you.

Mr. Lee, good morning.

MR. LEE: Good morning, Your Honor. Good to see you again. For the record, Kyung Lee, L-E-E, and RJ Shannon, with the law firm of Shannon & Lee, LLP, as co-

counsel for the debtor, Free Speech Systems, LLC.

On video with us today is Ray Battaglia, B-A-T-T-A-G-L-I-A. He is lead counsel for Free Speech Systems, LLC and he's out of San Antonio, Texas. And at counsel's table today is W. Marc Schwartz, the chief restructuring officer of Free Speech Systems, LLC.

THE COURT: Okay.

MR. LEE: Thank you, Your Honor.

THE COURT: Good morning.

MR. SHANNON: Good morning.

MR. CHAPPLE: Good morning, Your Honor.

THE COURT: Good morning.

MR. CHAPPLE: Ryan Chapple. Good to see you again (indiscernible) my colleague, Randy Williams, on the line, as well as (indiscernible) also have Alinor Sterling, who is present in the courtroom on behalf of the Connecticut --

THE COURT: Good to see you. I just saw you on video, on a box before.

Counsel, if I can just get you to just -- there's a mic right there. I just want to make sure you can have access to it so we can all hear you online.

MR. CHAPPLE: Absolutely. We represent David and Francine Wheeler, Jaqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto-Marino, William

Aldenberg, William Sherlach and Robert Parker.

And, Your Honor, I will refer to these folks as the Connecticut movants, the Connecticut plaintiffs interchangeably as we go throughout.

AUTOMATED VOICE: Conference muted.

THE COURT: All righty, folks. Somebody didn't mute their line, and I've muted the entire line on the phone. If you -- after we take appearances, anybody wishes to be recognized, you'll have to hit 5*.

MR. MOSHENBERG: Good day, Your Honor. I'm Avi Moshenberg. I have with me Cordt Akers. We represent the Texas plaintiffs, Your Honor, Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronica de la Rosa, Marcel Fontaine.

We are securing bankruptcy counsel, and it looks like our bankruptcy team is going to be led by Marty Brimmage and his firm. He's here today, and also Jarrod Martin and his firm, Your Honor.

THE COURT: Okay.

MR. MOSHENBERG: I'll be doing the talking today though, Your Honor.

THE COURT: Thank you. And yes, you might have noticed we've gotten technical upgrades. So all the mics (indiscernible) than the last time you all were here.

MS. HASELDEN: Good morning, Your Honor. Melissa Haselden, proposed Subchapter 5 trustee.

THE COURT: Good to see you, Ms. Haselden. Anyone else in the courtroom wish to make an appearance? Okay. If anyone on the phone wishes to make an appearance, please hit 5* and I'll recognize you. Okay. I've got a 626 area code.

MR. NGUYEN: Good day, Your Honor. Ha Nguyen, appearing on behalf of the United States trustee.

THE COURT: Okay. Mr. Nguyen, if you keep your phone on mute, I'm going to keep your line unmuted, okay?

MR. NGUYEN: Thank you, Your Honor.

THE COURT: Anyone else wish to be recognized?

Okay. Mr. Lee, I'm going to turn it over to you.

MR. LEE: Thank you, Your Honor. I have in the courtroom with me -- I don’t think I have enough for everybody. But I do have some paper, a witness and exhibit list for today's hearing.

May I approach, Your Honor?

THE COURT: Yes, please. Thank you. And if you can speak into the mic, I want to make sure that we can all hear you, and I think that mic can move.

MR. LEE: May it please the Court, Your Honor. Kyung Lee, for the record. On Friday, Free Speech Systems, LLC filed for bankruptcy with this Court, and before we get into the matter at hand --

THE COURT: Mr. Lee, if I can just get you to get closer -- just -- I want you to just move that mic over.

MR. LEE: Where is the mic?

THE COURT: Right --

MR. LEE: Oh, this one right here.

THE COURT: Yeah.

MR. LEE: Sorry about that.

THE COURT: Maybe I -- oh, we're still upgrading. You can go ahead and just speak. It's fine. That's perfect. It'll be able to pick you up.

MR. LEE: For the record, Your Honor, Kyung Lee, for the debtor, Free Speech Systems, LLC. As I was saying, the debtor filed Chapter 11 on Friday with this Court, and we need to proceed today on a motion to get the stay lifted for the Heslin and Lewis state court suits to continue the judgement.

So that the Court has a little bit of a sense of what the debtor is about, I'm going to take the Court through a bit of one of the exhibits here and then Mr. Shannon will make the legal arguments on the Heslin suit. And then to the extent the Court needs some evidence, Mr. Schwartz is here to provide that evidence. So if I may --

THE COURT: Yeah.

MR. LEE: If the Court will turn to Exhibit Number 2, which is the declaration of Mr. Schwartz, and turn with me to Page 6, Paragraphs 27, 28, 29, 30 and 31, and the reason why I ask you to turn to those paragraphs, I think

those are the paragraphs that clearly delineate what the business of Free Speech Systems is and, as it describes in Paragraph 27, FSS is presently engaged in the business of producing and syndicating Mr. Jones's radio and video talk shows and selling products targeted to Jones's loyal fan base via the internet. And Paragraph 28 discusses the supplements and the non-supplements that are stored on InfowarsStores.com.

Paragraph 29 discusses the majority of the revenues being derived from the supplement sales. Paragraph 30 talks about the number of employees we have, the buildings where they are located. And Paragraph 31 breaks down the type of revenues that we get from the sales that the company conducts.

And if the Court will indulge me, if we will turn to Exhibit A, which is the income statement attached at the back of this on Page 31 of 38, work done by Mr. Schwartz, it shows that this company, FSS, as of 2021, lost $10 million last year, and as you can see, one of the reasons why this company needed to file bankruptcy. So that is by way of background for this company and a little bit of a history about who -- what FSS does.

Your Honor, we filed an emergency motion when we filed the bankruptcy on Friday, which is Tab Number 1, the ECF Number 2, and it is the emergency motion for an order

modifying the automatic stay to allow the Heslin and Lewis state court to continue judgment. I don’t think I need to recite the facts there. The pleading itself talks about the two lawsuits that are proceeding to trial at this time in the Traffic County court.

And what the debtor seeks to do is to have the stay lifted so that that lawsuit can continue on. In fact, I think the jury is supposed to return this morning around 9 a.m., and we've announced at 5 p.m. on Friday to Judge Gamble that we would be here before Your Honor to get the relief that we need so that they can continue the trial, if in fact the Court grants the relief.

THE COURT: Okay.

MR. LEE: So with that short introduction, I'm going to turn it over to Mr. Shannon, to the extent that he's going to argue the legal points.

THE COURT: Well --

MR. LEE: And if you wish to have witness testimony --

THE COURT: Well, I just have a couple of questions.

MR. LEE: Yes, Your Honor.

THE COURT: So I just want to understand the nature of the relationships between your firm and Mr. Schwartz now as it relates to the last debtors, to the

current case.

MR. LEE: Yes, Your Honor.

THE COURT: So InfoW, IWHealth, Prison Planet in the last case were sold to a trust and Mr. Schwartz was retained by the trust.

So what is the status of your relationship with those debtors and Mr. Schwartz's relationship with those debtors? I'm just trying to understand how they're related. But my understanding was that they were previously sold entities. So they were independent of this Debtor.

MR. LEE: Yes, Your Honor. Let me state the following. Number one, the membership interest in the three entities that went into bankruptcy, InfoW, IWHealth and Prison Planet, prior to their bankruptcies, those interests were transferred into a trust. And they remain in that trust today. Mr. Schwartz was not retained by the trust. Mr. Schwartz was retained by the three entities as their chief restructuring officer --

THE COURT: Right.

MR. LEE: -- for their bankruptcy case.

THE COURT: Right.

MR. LEE: Schwartz & Associates was retained by the three companies as their financial advisor. At that time -- at that time, Parkins Lee & Rubio was retained as bankruptcy counsel for those entities. And then when I left

the firm, Kyung S. Lee, PLLC was retained --

THE COURT: Right.

MR. LEE: -- as the bankruptcy counsel. To this day, Mr. Schwartz is still the CRO of those entities, and Kyung S. Lee, PLLC is no longer in existence.

THE COURT: Right.

MR. LEE: It's now with Shannon & Lee, LLP. And we have not done any work on behalf of InfoW or the other two debtors since approximately June 7th when the case was concluded, and that is the last time we've billed the client for any work. So while we have a relationship today by virtue of an engagement letter, we have not performed any work for that entity since then.

THE COURT: And does the plan support agreement still exist?

MR. LEE: No, Your Honor. It's basically been terminated as a result of the case being dismissed, Your Honor.

THE COURT: Okay. Thank you, and when did Mr. Schwartz begin working for Free Speech?

MR. LEE: It's right in the declaration, Your Honor. I believe there's an engagement letter that was signed as of May 9th. But it was signed, and then it was executed later on.

So let me turn to that. It's on Paragraph 9 in

Exhibit Number 2. On June 7th, the Debtor confirmed his retention as the debtor's chief restructuring officer and Schwartz & Associates as financial advisors as of May 19, 2022. So basically he sent them an engagement letter on May 19th, and then the client, Alex Jones, through FSS, signed the engagement letter on June 7, 2022.

THE COURT: Okay. Thank you.

MR. LEE: Thank you, Your Honor.

THE COURT: Mr. Shannon, good morning.

MR. SHANNON: Good morning, Your Honor. RJ Shannon, on behalf of the Debtor, Free Speech Systems, LLC. As Mr. Lee said, we're here on an emergency motion to modify the automatic stay to allow the state court litigation to go forward. And, Your Honor, I think this is going to be a pretty simple motion that I don't think anyone is going to oppose. I guess we'll see.

But, you know, for relief -- or to modify the automatic stay, the standard is cause. Under Bankruptcy Code Section 362(d), that is what's required, cause. And it's not defined in the Bankruptcy Code. And, you know, therefore courts must look at the particular facts of any particular situation.

But generally relief from the automatic stay should be granted to liquidate an unsecured claim when and only when the balance of hardships favors allowing a claim

to be determined in another forum other than the bankruptcy court. I believe, Your Honor, cause is very clear here. A jury has been empaneled in the state court. The litigation is ongoing. The trial has commenced.

Both the plaintiffs and the debtor have participated in that trial and the trial court will be able to liquidate that claim very quickly. It could be as early as the end of this week. The debtor's trial counsel has already been paid for that state court trial. So it does not -- there's no increased cost to the debtor to liquidate the claim through the state court.

Additionally, Your Honor, we believe that liquidating that claim in the bankruptcy court would increase the cost. We think there would be a fight about whether the bankruptcy court could liquidate this claim and it would also require both the bankruptcy counsel for the Debtor and the state court counsel for the Debtor to both be involved in that liquidation. We believe it would add, you know, a high five- to low six-figure additional cost to liquidate the claim.

You know, Your Honor, we also believe that judicial economy would be served by allowing the trial to continue because it's already begun. And generally the debtor's business judgment is that the trial should continue. Based on that, Your Honor, we believe there is

cause to allow or to modify the automatic stay to allow the trial to continue to final judgment.

THE COURT: Thank you.

MR. SHANNON: Thank you.

THE COURT: Yes. Does anyone wish to be heard in connection with the emergency motion for relief from the automatic stay to allow what I will call the Texas state lawsuit to continue?

Mr. Moshenberg?

MR. MOSHENBERG: Thank you, Your Honor. Again, I'm here on behalf of those Texas plaintiffs. We are of course unopposed to the motion to lift the stay. I do want to have an opportunity to make some remarks about what's being said. I think Connecticut counsel did want to talk first. But as it relates to your question about the motion to lift the stay --

THE COURT: Let me just tell you, my understanding is that, based on what Mr. Shannon has told me and Mr. Lee, there's another matter that's set to begin in about 12 minutes and if no party opposes it, I'm willing to grant it right now and allow that to continue and someone can get notice to, you know, counsel who are sitting in a courtroom in Austin that I'm going to authorize and allow them to continue.

Then we can have a conversation about other

matters that relate. There are a number of first day hearing -- first day pleadings that are on file, and I think we can have a conversation about that. So I just want to deal with the emergency motion now and then give everyone a full and fair opportunity to talk about, you know, everything else while we're here today.

MR. MOSHENBERG: I appreciate -- I appreciate that, Your Honor, and I think we're unopposed to the motion to lift the stay.

THE COURT: Okay. Does anyone else -- okay. So I'd just note that just for the record that there was -- this bankruptcy case was filed on July 29th for Free Speech Systems, LLC.

A first day hearing was set just -- well, essentially just for to consider this emergency motion. The Court has some familiarity with this litigation. There were three debtors who were involved in that litigation several months ago that appeared as debtors before me and I became familiar with that litigation. So I don’t go into this blindly.

This is an emergency motion to allow litigation to continue in Austin. There was a stipulation filed in the last case dismissing the three debtors that were before me to allow the litigation to proceed against two parties, one of them which is a debtor here today. It appears that that

litigation has continued, and, based on the representations of counsel, there would be no additional cost to the estate in terms of legal fees, and the debtor is requesting to be able to continue with that litigation.

I do note, you know, when there's such an early filing in a case, the Court, in a lot of ways, stands -- gives that extra scrutiny even on an emergency motion because of the short amount of time that has gone out for parties for due process.

But an emergency motion has been filed and I have granted it and considered it, and the Bankruptcy Code authorizes the Court to lift the automatic stay upon the request of a party in interest for cause. And here we have the debtor who is a defendant seeking to lift the stay and the plaintiffs do not oppose that relief.

So here I do find that there is cause to lift the stay on an emergency basis, although I take each one of -- each emergency motion that is filed before me, especially early stages in the case, on their own merit.

In this case, I'm going to sign the proposed order that was filed. I'm going to allow that litigation to continue. I'm going to sign that order now, and I'm going to enter it on the docket now.

With that said, I did give Mr. Lee an opportunity to address the Court generally. However the parties wish to

proceed and tell me about anything else that you wish to at this time in terms of opening remarks, you're free to do so now.

MR. MOSHENBERG: Thank you, Your Honor. And if it's all right with the Court, I think I'd like to have Connecticut counsel start with the opening remarks and then I'd like to follow them.

THE COURT: Absolutely. Let me just say before you begin, I'm going to enter the order right now. Mr. Lee, if you want to get notice to the folks in Austin that I am granting the motion and am signing the order, feel free to do so.

MR. LEE: I'll do that right now by text.

THE COURT: Okay. Thank you. I just want to make sure everybody was comfortable. You're free to do that. I'm entering the order now.

MR. LEE: Thank you, Your Honor.

THE COURT: Okay. It should hit the docket any minute.

Good morning, sir.

MR. CHAPPLE: Good morning. Thank you, Your Honor. Ryan Chapple, again, for the Connecticut plaintiffs.

THE COURT: Good to see you again, sir.

MR. CHAPPLE: Good to see you. Yes, sir. Your Honor, I appreciate the opportunity to address the Court

this morning. I wanted to cover a few topics. Last night, early evening, my clients filed an emergency motion to lift the automatic stay as well.

THE COURT: Mm-hmm.

MR. CHAPPLE: I wanted to educate the Court a little bit on where we are procedurally in Connecticut. The Connecticut case was set to begin picking a jury in the morning on Tuesday, August 2nd. There is currently a trial setting of September 6th. The jury selection process in Connecticut is very different than what we have here in Texas.

In a few moments I'm going to give my colleague, Alinor Sterling, who practices regularly in Connecticut and who is counsel in the underlying defamation litigation, an opportunity to talk to the Court about that process and about the way it works and the reason for the emergency basis of our request to have our motion to lift stay heard as early as we can.

THE COURT: Okay.

MR. CHAPPLE: Ms. Sterling will expand on this a little bit. But it's my understanding that if we can get a hearing on our emergency motion any time this week and if we are able to show the Court that there is cause to get the stay lifted, that the jury selection process can begin early next week, and that would allow the Connecticut litigation

to hold that September 6th trial date. It's my understanding that the current Texas litigation is -- that the trial is going to be finalized by Friday this week. I believe that's the deadline that Judge Gamble provided.

So from our perspective, and really for all of the reasons that Mr. Shannon argued previously on the debtor's motion to lift stay, it would absolutely make sense for the stay to be lifted as to the Connecticut litigation and for us to proceed. there wouldn't be an overlap conflict with the trial going on in Texas right now, and we would be able to hold our September 6th trial date.

Ms. Sterling will talk to the Court a little bit about all of the time and effort and expense that's gone into trial preparation to hold this September 6th trial date. So that's one thing, Your Honor, and we would respectfully request a hearing on our emergency motion for relief some time this week if the Court has available --

THE COURT: Okay.

MR. CHAPPLE: -- for that -- for that scheduling purpose. The other thing that I would like to address with the Court, Your Honor, and I believe, again, Ms. Sterling may follow up and I know counsel for the Texas plaintiffs and potentially counsel for the U.S. trustee would like to talk to this Court about, overall with the filing, we have some grave concerns about the structure of this bankruptcy

case and in particular the cash collateral motion that I know the debtor is going to set for first day hearings.

In particular, Your Honor, we are very concerned about the relationship between the purported secured lender, PQPR, which is owned and controlled by Mr. Jones, and the purported secured creditor, as outlined in the cash collateral motion for the debtor.

Now one thing that I didn't see in Mr. Schwartz's declaration is a note that PQPR, the purported secured lender, along with Free Speech Systems, the debtor here, along with Mr. Jones, along with a slew of other entities that he owns and controls are defendants in a fraudulent transfer action currently pending in Travis County that attacks the validity of that purported debt.

So we are concerned that the debtor may try to use this bankruptcy court and that cash collateral motion as a means to attempt to legitimate that debt and attempt to legitimate any purported liens that relate to that debt. It's very important to the Connecticut plaintiffs, I know to the Texas plaintiffs and I believe you'll hear from the U.S. trustee for all of the parties and creditors to have an opportunity to conduct full discovery on that relationship between the debtor and PQPR, written discovery. We need to depose Mr. Schwartz.

All of those things, Your Honor, we would like to

happen as soon as possible so we can all, including the Court, go into this cash collateral hearing with a full knowledge base of that relationship, all of the documentation relating to that relationship. And I just wanted to highlight that for the Court.

I'd also -- as I said, Your Honor, Ms. Sterling came down from Connecticut. I'd like for her to be able to talk to the Court --

THE COURT: Absolutely.

MR. CHAPPLE: -- about what's going on in Connecticut and provide a little bit more color to the cash collateral issues that I was just talking about.

THE COURT: Okay. Thank you.

MR. CHAPPLE: Thank you.

THE COURT: Good morning.

MS. STERLING: Good morning. For the record, Alinor Sterling. And let me spell that since you don’t have an appearance yet from me on file. Alinor, A-L-I-N-O-R, last name Sterling, S-T-E-R-L-I-N-G. Thank you very much, Your Honor, for letting me make remarks this morning. I appreciate it, and it's nice to be here in person.

THE COURT: Welcome to Houston.

MS. STERLING: Thank you. So I represent the Sandy Hook families. That's nine families who -- and these are the families who have brought cases in Connecticut, 14

individuals. Their cases started over four years ago, and due to a series of delays, we're only now reaching jury selection.

We're fully underway with trial preparations, which has involved preparing expert witnesses, the expenditure of time and cost to do that, preparing fact witnesses, putting witnesses under subpoena, investing counsels' time on both sides. And there's also another dimension to preparation which is very human, which is the investment of mental energy as well as logistical energy for our 14 clients to prepare to be present for as much of jury selection and trial as they can be.

So I understand right now the issue is scheduling, and I'm confining my remarks very much to that because I understand the issue is when can the Court hear our motion to lift the stay. So what I wanted to do was touch on what -- how Connecticut trial scheduling is different from Texas because I realize that it may be somewhat confusing to hear that our jury selection date is tomorrow, but we don't start evidence until September 6th, and that does seem like a long gap.

And so why the urgency in our motion? And here's why the urgency. In Connecticut, individual voir dire for civil litigants is a state constitutional right. Both parties are exercising that right. And so our individual

voir dire process can take several weeks. Our trial court and counsel built that time in, and that is the time that we would need, we believe, to hold a start of evidence on September 6th. So that's the urgency in trying to commence jury selection.

Now that being said, we have looked hard at the schedule, and we believe that we have a week flexibility so that if we were to defer jury selection until the very beginning of next week, we could possibly make up the lost time. And so we've requested the Court set the lift of stay motion for this week with that very much in mind.

Then leaving aside the trial date issue, there's another issue I'd like to address, which -- and this is a much broader point, although the entry to it concerns the scheduling of the cash collateral motion. I know my clients appeared as very reluctant participants in the most recent bankruptcy by InfoW and those other entities, and I wanted to communicate to the Court that from our perspective this bankruptcy is very, very different.

The right entity has now filed. And we intend to participate fully in this process, and we feel that the transparency that should be available through the bankruptcy process is actually going to be critically important, both to ensure the preservation of the debtor's estate and to ensure our clients' rights.

And the reason for that is because we have very serious concerns based on the discovery that we have done in Connecticut that Alex Jones has been systematically siphoning large amounts of money out of Free Speech Systems, that he has been doing so since our case and the Texas cases were filed and that this supposed loan between Free Speech Systems, the debtor, and PQPR is just one example of that pattern and practice. The cash collateral motion is the first time this issue will come up. But we expect it will not be the last.

And so it is critically important in addressing those issues to build in time for us to take discovery of Mr. Schwartz and PQPR, to make a clear presentation to the Court on those issues and for the Court to have time to consider that presentation. Thank you very much, Your Honor.

THE COURT: Thank you very much. Does anyone else wish to address -- oh, go -- go for it, Mr. Moshenberg.

MR. MOSHENBERG: Thank you, Your Honor. As I mentioned, we are securing bankruptcy counsel. the reason I wanted to give some remarks today is because Cordt Akers and I are spearheading the Texas litigation under the fraudulent transfer claims, Your Honor. There is a pending trial on damages right now for these defamation and intentional infliction of emotional distress claims.

THE COURT: Right.

MR. MOSHENBERG: The Court lifted the stay today. What I can't stress enough is that trial is purely on damages because Free Speech Systems and Alex Jones abused the discovery process and the litigation process to such a degree that the Court had no choice but to render a default judgment.

Now even in that abuse of the discovery system, what we were able to uncover in that case were evidence that judgments -- that, excuse me -- that Free Speech Systems and Alex Jones were siphoning money, diverting assets to shell entities owned indirectly by Jones and his parents, benefiting him and his children in order to make Free Speech Systems and Alex Jones judgment-proof in the current trial, Your Honor.

That's precisely -- that reality is precisely why Cordt Akers and I were retained to bring this TUFTA case. And I bring that up because I want to make clear that --

THE COURT: What is the status of that litigation?

MR. MOSHENBERG: The status of the litigation is all the defendants have answered and the discovery is ongoing, Your Honor. Disclosures have been done. Discovery requests have been served. That's where we are. The suit was filed in April of this year, Your Honor. So we're in the early stages. But we are very much in the case.

THE COURT: And can you remind me who the defendants -- all the defendants are in the fraudulent transfer?

MR. MOSHENBERG: There is an alphabet soup of shell entities. So I'm sure I'm going to get them all wrong right now. But the idea --

THE COURT: I remember the three debtors that were before me --

MR. MOSHENBERG: Yes.

THE COURT: -- were parties to that litigation.

MR. MOSHENBERG: No, Your Honor. Only Infowars --

THE COURT: Only Info -- only InfoW was.

MR. MOSHENBERG: Yes, Your Honor.

THE COURT: That's right.

MR. MOSHENBERG: They've been nonsuited into the litigation.

THE COURT: So who's -- Free Speech is involved?

MR. MOSHENBERG: Yes, Your Honor.

THE COURT: Okay.

MR. MOSHENBERG: And so is Alex Jones. PQPR, entities that control and own PQPR is basically the body of parties that we're dealing with, and like I said, they all have a bunch of crazy names. But there's an AEJ Trust Holdings, various trusts and holding companies that are affiliated with that.

THE COURT: Okay.

MR. MOSHENBERG: And the evidence shows, and what we've discovered so far is that money is being moved out of Free Speech and Alex Jones to those insider companies. And I think the reality is no one really disputes that PQPR is an insider.

I mean, they've filed under Subchapter 5 claiming a $54 million debt to PQPR, and I'm sure the only reason they can do that is because the Subchapter 5 definition excludes insiders when counting -- setting a liability cap at $7.5 million. So it's not just us claiming that PQPR is an insider. Their own filing confirms it.

I bring all this up, Your Honor, not to ask for any sort of resolution today, but so the Court understands this is obviously not a normal bankruptcy and that the discovery abuses that resulted in default judgments and that, in our view, culminated in this bankruptcy need to be investigated and we need to be mindful of those things as we proceed with bankruptcy.

We are big believers in the bankruptcy process. The bankruptcy process allows for transparency, oversight and investigation normally. That said, in a Subchapter 5, at least under the default settings of a Subchapter 5, Your Honor, a lot of that transparency, oversight and investigation is not available because it's a process

designed to expedite small businesses getting back to work. And this is hardly a small business, Your Honor. The reason they filed now and not at the end of the week is because they know that there was about to be a liquidated claim against them that exceeds $7.5 million. They tried to jam this in this week in order to qualify under Subchapter 5 in order to get that lack of oversight and transparency that we normally find in a Chapter 11. That's why they did that today, Your Honor, and I want to make sure the Court is aware of that.

And I want to make sure the Court is aware that there are lots of red flags circling this bankruptcy already. For months we've been trying to get financials from Free Speech Systems and Alex Jones, and we couldn't get them. That was one of the reasons why $1 million sanctions were issued against Free Speech and Alex Jones in the defamation case because we couldn't get these financials.

But what we've learned in this bankruptcy filing is that the financials really do confirm the fraudulent transfers. Of course they filed for bankruptcy because they have relatively few assets compared to their relatively large debts. Here is why they have relatively few assets, Your Honor.

Under their own bankruptcy schedules, right, under their own filing, Alex Jones -- it says Alex Jones received

$62 million -- $62 million in draws in 2021 and 2022. That's why it doesn't have assets, because Alex Jones drew $62 million out of the business before filing for bankruptcy. And of course it's not just that he lacks assets. He claims to have large debts, or when I say he, I mean Free Speech Systems. But the debt that they're citing to you is a $54 million to PQPR that has no record of existence before the defamation cases commenced.

There is no email, no document that shows that there is an actual debt to PQPR before those lawsuits commenced. The promissory notes that are referred to were created during the defamation cases. In fact, the same week that the Austin Court of Appeals affirmed the trial court's denial of a motion to dismiss and allowed the defamation cases to proceed, that same week a promissory note for $25 million was signed by Alex Jones on behalf of Free Speech Systems to pay back PQPR. And then a default judgment was rendered in September of 2021.

And just months later, another $25 million note to PQPR on behalf of Free Speech Systems was created, Your Honor. It was also created the same week that the Connecticut claimants obtained a default judgment in their case against Alex Jones.

Now we're not asking the Court to make any sort of holdings today. There's a process for that and we're going

to raise the appropriate motions. But I bring all this up today, Your Honor, because the last thing that I want to have happen and what I hope the Court can understand, as we put on the motions and present the evidence is that we cannot have the normal Subchapter 5 under the normal default settings of a Subchapter 5.

Thankfully Subchapter 5 and other provisions in Chapter 11 authorize other strengths and allowances for oversight and investigation that we think are appropriate in this case. It allows for claimants' committees. It can strengthen the trustee, the authorities and powers of the trustee. And we think the trustee has the duty to investigate anyway those things under Subchapter 5.

But we certainly are going to consider adding any protections and strengths necessary to allow for a transparent process, to allow this debtor and Alex Jones and his shell entities to be fully investigated so there's oversight and transparency and ultimately so that the Sandy Hook families can bring Alex Jones and his company to justice by liquidating these claims and by recovering on them.

That's what we're here to do, Your Honor. And I wanted to make sure that in no uncertain terms that what we hope to have happen in this bankruptcy process, which we believe can be a benefit, is that we have that oversight,

transparency and investigation, Your Honor.

I will also add that that cash collateral motion, as Mr. Chapelle mentioned, is very concerning. And of course cash collateral motions are important to the bankruptcy process, and there's an interim and final process. And we understand that some of these things will probably need to get done. But that cash collateral motion asks this Court to hold -- literally the proposed order says that the PQPR notes are legitimate. They ask the Court to say that, and they're asking for replacement liens. And of course those underlying notes themselves are not legitimate.

And what they're asking to do is through this bankruptcy process, through you, Your Honor, they want this Court to turn fraudulent promissory notes into legitimate ones. And so while some cash collateral may need to be issued on an emergency basis, what we want to make sure we do is we reserve all rights, that the Court not make any sort of holdings or findings as to the legitimate of that underlying note.

I understand that some money needs to go out. But what we want to caution against is making some sort of finding that this debt, this supposed encumbrance is an actual true debt and a true security interest, Your Honor.

The other things I want to mention, just to preview for this cash collateral motion, this 13-week budget

provides Alex Jones, who's already reaped $62 million in member draws in the last two years, this proposed judgment in 13 weeks allows, Judge, Alex Jones to receive almost $400,000. It also says that PQPR in the same 13-week period is going to get over $500,000. And there's apparently a line for an Amex credit card that authorizes another million dollars in payments. We don't know what that credit card is for. And of course that budget provides no amount at all for any sort of investigation and oversight into the dealings of Free Speech Systems, especially as it relates to PQPR and Alex Jones, Your Honor.

Those are huge issues, and we want to bring that to the Court's attention. Again we're not asking -- we don't have a motion on file yet. We not asking the Court to resolve anything now. But there are some serious issues that require serious oversight under the normal bankruptcy processes, and we hope that the Court will apply those processes in this matter.

THE COURT: Thank you. Thank you. Does anyone else wish to address the Court at this time?

MR. NGUYEN: Good morning, Your Honor. Ha Nguyen, for the United States trustee.

THE COURT: Yes, Mr. Nguyen.

MR. NGUYEN: Can you hear me okay?

THE COURT: Just fine.

MR. NGUYEN: I apologize -- I apologize I can't be there in person. I've been out with COVID for the last week.

THE COURT: Hope you're doing okay. Please, thank you.

MR. NGUYEN: Thank you. Thank you, Your Honor. Your Honor, I've spoken to the (indiscernible) and in evaluating this case, my office has taken the position (indiscernible) fresh eyes. We know what happened in the past with InfoW. Our office had very small positions in those bankruptcy cases.

But we're committed to seeing this process through. If Mr. Alex Jones and the debtor are here for legitimate reorganizational purposes, we're going to go through the process with the debtors. However (indiscernible) for this case, transparency is a hundred percent crucial in this case. And based on the declarations that Mr. Schwartz filed, you know, at Paragraph 35 in the declaration, they made assertions about, yes, the CRO is looking at potential claw-backs from Alex Jones.

What else is in that paragraph is that there was $62 million that left Free Speech Systems within 2021 and 2022. I've never seen a Subchapter 5 case where the inside has taken $62 million out prior to the filing of a case. This is not a typical Subchapter 5 case. I agree with the

plaintiffs that there need to be additional protections. Maybe a (indiscernible) is appropriate (indiscernible) appropriate parties move for and we want to do our job (indiscernible).

Your Honor, we also have very, very grave concern about the underlying (indiscernible) cash collateral motion. We (indiscernible) Mr. Schwartz's declaration, like Paragraph 42, he states that (indiscernible) prior to his engagement, there are no financial statements. There are no bank records (indiscernible) how do we really know that those underlying transactions were really legitimate transactions.

And we're not picking on this particular case because it is the debtor and the debtor's business. But any case that comes before you, whether it's an insider loan, an insider affiliate transaction, we examine the transaction with extra scrutiny. And I would ask the Court to slow down the process for the cash collateral, give the parties the appropriate time to take a look at (indiscernible) and if the Court is willing to grant some sort of cash collateral use, it should be (indiscernible) in terms of the budget.

Your Honor, those are the U.S. trustee's comments. We are committed to the process. We're going to examine the case, and we're going to (indiscernible) file the appropriate motions when necessary, as it's appropriate.

THE COURT: Thank you. And look, today's not the day to take up first day relief related to cash collateral. But I do appreciate today's the day we set the scheduling for it, which is a little (indiscernible) in the sense that normally debtor would file its first day motions and then would have a hearing on those motions. Folks would file objections.

Today was a little bit unique because there was an emergency motion to lift the automatic stay which I think was the right thing to do, to allow that litigation to continue based on the statements that the debtors made.

So I want to talk scheduling. But let me just say overall I do agree with the overall statements of all the parties, including the debtors. And I think transparency's going to be really important. It's the heart of the bankruptcy process is transparency. Debtors file and have the protection of the automatic stay, which is incredibly powerful and occurs automatically just upon a bankruptcy filing.

And in return, the Bankruptcy Code requires transparency for all parties in interest as they can exercise their rights, state law rights and proceed against the debtor or property of the estate. They're entitled to transparency. And parties get to file motions and the Court will take them up in the order in which they are taken. So

I will note since we're talking transparency that today's not the day to answer the question.

But Mr. Schwartz, I have a -- I need to better understand -- we can take this up when we take up the first day motions. I need to better understand your role in this case and your role with this debtor, what authority you have. I need to understand as well on May 19th, which was you were representing three debtors who are on the opposite side of a proposed plan support agreement we never took up. But you were also seeking retention from Free Speech at the same time, and I don’t think I ever knew about that.

I need to understand how you were representing three debtors on one side of a plan support agreement and Free Speech, at least signing a proposed engagement letter to a party on the opposite side of a plan support agreement who was a third party contributor at the time. I need to understand that. It goes to the overall question of -- and I've been talking about this in the last case as well -- there's got to be a true independent who can really make decisions on behalf of the estate.

I need to understand better what your proposed role is in this case and what the restructuring advisor's roles are. We'll have that conversation a little bit later. Why don’t we talk scheduling.

So Mr. Lee, when do you want to come back for a

first day hearing? How soon do you want one?

MR. LEE: Mr. Schwartz -- good morning, Your Honor. Mr. Schwartz tells me that with respect to the first day motions, we need some authority to use cash collateral as well as pay critical vendors by August 3rd, Wednesday.

THE COURT: Okay.

MR. LEE: So we'd like to be able to come back and get some relief on August 3rd --

THE COURT: Okay. Yeah. Let me -- let's do August 3rd. I will tell you we'll set -- why don't we do August 3rd at 10 AM.

MR. LEE: And I believe, just for the record, Your Honor, there is a critical vendor motion, a motion to extend time to file schedules, a cash collateral motion and a utility motion.

THE COURT: Yeah.

MR. LEE: I think those are the four motions that need to be heard at that time.

THE COURT: And I will -- just so that everybody knows, as you can tell, they're doing some technical upgrades to this courtroom. So we will have a hearing. Parties will be able to appear by video, GoToMeeting, that system. We may be in a different courtroom. So I'd just ask everyone just get a little bit early. If it's this courtroom, great. If not, we'll put up a sign and I'll get

you plenty of notice.

I just need to just confirm what courtroom we'll be in. But we will be in this building on August -- on August 3rd. It may just be here on another floor. But I promise to give everyone plenty of notice on that. I will tell you on the utilities motion, I want you all to think about a two-week deposit that could be in a segregated account. I want you to think about that.

MR. LEE: Absolutely, Your Honor.

THE COURT: And we'll take up the other motions. Parties can file objections, regular first day. You can file objections. We'll take it up and we'll have an evidentiary hearing on those matters to the extent necessary. And we'll take up, just for the record, Docket Numbers 6, 7, 8 and 9 at that time.

Okay. But I am going to start off the hearing by I still want to better understand -- and maybe it'll come out in the testimony of Mr. Schwartz's support of the motions. But I do need to understand the corporate structure a little bit more and how the parties intend to proceed --

MR. LEE: Yes, Your Honor.

THE COURT: -- in this case. With respect to the motion for relief from stay, let me hear from you, Mr. Lee. What is your -- there's certainly been remarks asking me for

an emergency hearing. What are your thoughts on that? I want to give you -- I should say I'll give you an opportunity to respond.

MR. LEE: Let me do this. Let me confer with Mr. Shannon for just a minute before I do that.

THE COURT: Absolutely.

MR. LEE: Your Honor, with respect to the emergency motion by the Connecticut plaintiffs, while we do believe that the debtor will prevail on the Curtis factors, I think we have to accommodate them as a matter of fairness for a hearing by this Friday.

That is something we've requested, and I don't think I can legitimately sit here and tell you we can't have the hearing before Friday out of fairness, and that's fine. But we'll be ready to argue the points.

THE COURT: Okay. Let's set it. Let me just take a look at my calendar. Can we do Friday, August 5th at 10 AM? And I'm confident we'll be in this courtroom for that one. Okay. Any response by the debtor? Just -- I'm not going to put a time limit.

But -- I'm not going to put a time limit on that. But obviously if you file something on Friday morning, the closer we get to the hearing, you know, the more to the point (indiscernible) --

MR. LEE: (indiscernible) read it, so we'll get it

to you before then, Your Honor.

THE COURT: No, no. I mean, I get up here really early.

MR. LEE: Right.

THE COURT: And I stay up late. So don't worry about the ability -- we'll be able to go -- the parties are ready. I would ask though if there are any witness and exhibit list in connection with that hearing, that you file them really by Thursday, August the 4th, by 12 noon our time. Just witness -- like a witness and exhibit list, Thursday at noon, just so I have an idea what's coming. And again our exhibits -- I'll have to give it some thought. But our local rules are now requiring exhibits be filed online now with the demarcation, you know, filing 10-1, 10-2, 10-3. So we'll go from there.

Okay. Maybe I would ask the parties to at least speak before the hearing with respect to the exhibits. Maybe there can be some agreement on what exhibits can be agreed upon and what exhibits the parties are going to need to dispute about in terms of admissibility. And we'll take that up. But maybe we can just at least short-circuit some of that. Okay.

MR. LEE: Thank you, Your Honor.

THE COURT: Okay. Mr. Chapple, anything -- yes?

MR. CHAPPLE: Your Honor, I certainly understand

the Court's rationale with regard to setting the first day motions on Wednesday. As we've said, we have these significant concerns. We want to conduct discovery as soon as possible.

I'm wondering if there's any way that Mr. Schwartz can be made available for deposition tomorrow before the hearings on Wednesday and also whether or not -- we just have -- we have very serious concerns about any sort of action from the Court that legitimizes that PQPR debt. I know we'll get into the substance on Wednesday.

But to the extent I can, I wanted to re-urge to the Court our earnest hope to be able to get into some discovery before we have those hearings and just raise that issue.

THE COURT: Okay. I understand that. But typically if there would have been a regular, we wouldn't have had the emergency motion. The parties would have come in and the debtor would have been able to make its case on a first day without scheduling, you know, a deposition. They would have just come in. I would have set a first day hearing and the parties would have come in.

If that's what the debtor wants, I'm going to give the debtor the opportunity to make whatever case they have and you'll have whatever -- you'll have the ability to cross-examine Mr. Schwartz on all these issues if that's

what they want. You've certainly raised some questions. We didn't take up any evidence. But I think the debtor would have an opportunity to do so. But you're certainly free to raise it here.

But I'm not going to require a deposition before Wednesday. But the debtor can -- I'll let the debtor take it up. We're going to go on Wednesday at 10 o'clock in the morning. The debtor can put on its best case and you'll be able to cross-examine the witness.

MR. CHAPPLE: Understood, Your Honor.

MR. LEE: Your Honor, Kyung Lee, for the record. I just want to add that with respect to the cash collateral issue that Mr. Chapple is concerned about, we're only going for an interim order, Your Honor, for 14 days.

So I just want to give him some comfort that we're not locking parties in. It's an interim cash collateral order that we're asking for. So I just wanted to give you some comfort (indiscernible) --

THE COURT: Yeah. It's a regular first day cash collateral order, and parties will contest at the cash collateral hearing. This is not -- nothing is new here. The parties will gear up. And you've got two days to go, and we'll be ready. Anything else we need to talk about today?

MR. LEE: Thank you for accommodating us this

morning, Your Honor.

THE COURT: No, not a problem. And let me just note -- let's just -- let me just take a look at this schedule just one last time. The order has been entered, by the way, folks, on the --

MR. LEE: Thank you, Your Honor.

THE COURT: Okay. I would note that even though the courtroom will be different, the dial-in and the GoToMeeting will still be the same regardless of what courtroom we're in.

So if parties are appearing by video, there may be a physical change to the courtroom on Wednesday. But that will not affect the ability of parties to participate on GoToMeeting. So I'll make sure that that's -- whatever you used to dial in for today, you can use on Wednesday. Okay. Anything else?

MR. CHAPPLE: No, Your Honor.

THE COURT: All righty, folks. Thank you. I'll see everyone on Wednesday.

MR. LEE: Thank you, Your Honor.

(Proceedings adjourned at 9:30 AM)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya M. Ledanski Hyde

Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: August 16, 2022