```
1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
2                           HOUSTON DIVISION

3                                 )  CASE NO: 22-60043-cml
                                  )
4    FREE SPEECH SYSTEMS, LLC,    )  Houston, Texas
                                  )
5                     Debtor.     )  Friday, August 12, 2022
                                  )
6                                 )  1:01 P.M. to 5:09 P.M.
                                  )
7    ----------------------------)

8                             MOTION HEARING

9          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                  UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For Debtor:            RAYMOND W. BATTAGLIA
                            R.J. SHANNON
13                          KYUNG SHIK LEE
                            Law Offices of Ray Battaglia, PLLC
14                          66 Granburg Circle
                            San Antonio, TX 78218
15

     For Texas Plaintiffs:  MARTY BRIMMAGE
16                          Akin Gump
                            1111 Louisiana Street
17                          44th Floor
                            Houston, TX 77002
18

     For the Subchapter V
19   Trustee:               MELISSA A. HASELDEN
                            Haselden Farrow PLLC
20                          Pennzoil Place
                            700 Milam, Suite 1300
21                          Houston, TX 77002

22   For David Wheeler,
     et al.:                RYAN E. CHAPPLE
23                          Cain & Skarnulis, PLLC
                            303 Colorado Street, Suite 2850
24                          Austin, TX 78701

25
```

```
1    For U.S. Trustee:       HA MINH NGUYEN
                             Office of the United States Trustee
2                            515 Rusk Street
                             Suite 3516
3                            Houston, TX 77002

4    Court Reporter:         ZILDE MARTINEZ

5    Courtroom Deputy:       ZILDE MARTINEZ

6    Transcribed by:         Veritext Legal Solutions
                             330 Old Country Road, Suite 300
7                            Mineola, NY 11501
                             Tel: 800-727-6396
8

9

10   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2

3    DEBTOR'S WITNESSES      DIRECT   CROSS   REDIRECT   RECROSS

4    W. Marc Schwartz          21     44       87         92

5                                     82

6    Patrick Riley             97    114

7

8

9

10   DEBTOR'S EXHIBITS                        RECEIVED

11   Exhibit 2     13-Week Cash Collateral

12                 Budget                     20

13   Exhibit 3     Blue Ascension Price List  20

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          HOUSTON, TEXAS; FRIDAY, AUGUST 12, 2022; 1:01 P.M.

 2                         (Call to Order)

 3          THE COURT:  Good afternoon, everyone.  This is

 4     Judge Lopez.  I'm going to call the 1 o'clock case, Free

 5     Speech Systems LLC, here on a motion to amend the cash

 6     collateral order, 22-60043.  There are a number of parties

 7     on the line.  I'm just asking everyone to please keep your

 8     phone on mute.  I'm trying to avoid muting the entire line.

 9     But I will if I need to.  If you're addressing the Court,

10     you're obviously free to unmute the line.

11          Let me go ahead and take appearances.  Why don't I

12     start with the Debtor.  Okay.  Who wishes to make an

13     appearance on behalf of the Debtor?  Let's give some folks a

14     moment to log in again.

15          MR. SHANNON:  Your Honor, this is RJ Shannon, on

16     behalf of the Debtor, although I believe that Mr. Battaglia

17     or Mr. Lee will be presenting the arguments today.

18          THE COURT:  Okay.  I know --

19          MR. SHANNON:  They just --

20          THE COURT:  I think everybody's just dialing back

21     in.

22          MR. BATTAGLIA:  Good afternoon, Your Honor.

23          THE COURT:  No, no worries.  Go ahead, Mr.

24     Battaglia.  Why don't you make an appearance.

25          MR. BATTAGLIA:  Yes, sir, Your Honor.  Apparently
```

1  my phone disconnected.  Ray Battaglia, on behalf of the

2  Debtor, Free Speech Systems.

3            THE COURT:  Okay, and who's here?  Mr. Lee and Mr.

4  Shannon are here on behalf of Free Speech Systems as well.

5            MR. LEE:  Yes, Your Honor.  Yes, Your Honor.

6            THE COURT:  And see -- folks, all right, I'm going

7  to -- please mute your line, everyone.

8            Okay.  Mr. Nguyen, I see you here on behalf of the

9  United States Trustee.  I see Melissa Haselden on behalf of

10  the Subchapter 5 Trustee.  Good afternoon to you as well.

11  Okay.

12            On behalf of the Connecticut plaintiffs, who

13  wishes to make an appearance?

14            MR. CHAPPLE:  Good afternoon, Your Honor.  Ryan

15  Chappelle, and can you hear me okay, first of all, Your

16  Honor?

17            THE COURT:  Just fine.  Thank you.

18            MR. CHAPPLE:  Okay.  Thank you.  Ryan Chappelle,

19  and I believe Alinor Sterling is on the line as well.

20            THE COURT:  Okay.  Good afternoon, and on behalf

21  of the Austin plaintiffs, who wishes to make an appearance?

22            MR. BRIMMAGE:  Good afternoon, Your Honor.  Marty

23  Brimmage, with Akin Gump Strauss Hauer & Feld, here on

24  behalf of what we call the Texas plaintiffs.

25            THE COURT:  Okay.  Thank you.  Okay.  Does anyone

1    else wish to make an appearance for purposes of this

2    hearing?

3            Okay.  Before we get started, folks, I want to

4    just make a statement, very brief, before we get into

5    things.  There was a witness and exhibit list filed at

6    Docket 61 and 62, or excuse me, 60 and 61.  And there was

7    Exhibit 6, at Docket 60, Exhibit 7, at Docket 71, I sealed

8    before today's hearing.  I believe the public should know

9    that I'm the one who did it.  There were -- nothing has been

10   admitted into evidence.

11           There are a series of text messages that included

12   just general pictures of someone holding their child, young

13   child and I'm not putting that out there for display.  I'm

14   not doing that.  I thought it was -- somebody wants to show

15   sensitive information, you can file a motion to seal.  But

16   there's no way that I'm allowing that exhibit to show in

17   public, and it's not going to be taken up today.  And I ask

18   the parties to exercise better judgment when publicly filing

19   documents in this case.

20           With that said, let me turn it over to Mr.

21   Battaglia or whoever's going to take lead on behalf of the

22   Debtors today.

23           MR. BATTAGLIA:  Your Honor, Ray Battaglia, on

24   behalf of Free Speech Systems.  I will be taking the lead.

25   I'm sorry to take you from your -- our understanding is the

1    Court's under the weather.  My apologies.

2         THE COURT:  No worries.  I'm here.

3         MR. BATTAGLIA:  But it's an emergency that we just

4    couldn't avoid.

5         THE COURT:  Let's go ahead.

6         MR. BATTAGLIA:  Your Honor, this is a problem of a

7    little over a week ago we presented a budget to you that had

8    proposed projected sales figures based on prior history and

9    it had based on that fulfillment costs and they're directly

10   correlated; the more sales, the more orders, the more the

11   fulfillment costs.  And it's apparent we have a problem of

12   riches, I guess.  It's a good problem to have.

13        (indiscernible) sales have exploded.  Sales are

14   vastly outstripping what Mr. Schwartz estimated in the 13-

15   week budget, and the net effect of that is we don't have

16   (indiscernible) sufficient budget to handle the fulfillment

17   costs, and the problem with that is if orders aren't timely

18   shipped and essentially someone charges, it hits their

19   credit card that day and the shipment is supposed to take

20   place.

21        But if the orders don't ship, it could result and

22   does result often in cancellations, order cancellations and

23   chargebacks, which of course affects the willingness of the

24   credit card issuers to continue to service this particular

25   account.  That's a true danger for what should be something

1    that we're celebrating, is that sales have exceeded

2    projected volumes by something on the order of 60-plus

3    percent.

4              And so the purpose for this -- the reason for this

5    hearing is so that we don't run into that problem, so we can

6    find a means to fund the fulfillment costs and timely ship

7    the orders and increase the amount of money that this Estate

8    has in it, which I understand to be the purpose of

9    bankruptcy is to pay creditors, and to pay creditors, we

10   have to have money.

11             There are issues raised in the objection that if I

12   -- if I take people at their word, their concerns are who is

13   Blue Ascension, why would he change to Blue Ascension and

14   some explanation of the cost structure that Blue Ascension

15   charges.  We're prepared to present evidence through Mr.

16   Schwartz and through Patrick Riley, who is the sole owner of

17   Blue Ascension, those points.

18             Your Honor, I think to keep things short, I'll

19   just leave that as my opening remarks here.  We've got a

20   good problem to have, but one that needs to be cured

21   immediately and the proposal that we've suggested is that we

22   allow the credit card processor to fund the shipment

23   fulfillment costs directly that includes the shipping costs

24   which are paid for by the customer and a $6 handling charge

25   that Blue Ascension charges so that we don't miss fulfilling

1    orders, and the problem with coming to you with just another

2    budgeted number of a higher number is that we're receiving

3    product even as we speak and expect more product next week.

4    And with the events ongoing in the world, I think the

5    expectation here is that we could have days that approximate

6    or are close to the sales figures that were projected for a

7    single week.

8              And so it's difficult for Mr. Schwartz to say I

9    need X dollars on this week when we can't accurately project

10   what the sales are going to be because there's too many

11   variables out there.  So we've proposed a solution to allow

12   the credit card processor to fund the orders directly, and

13   that's what we're here asking the Court to do.

14             THE COURT:  Okay.  Just one question, and maybe

15   Mr. Schwartz or somebody can answer it for me.

16             MR. BATTAGLIA:  Yes, sir.

17             THE COURT:  The interim cash collateral order

18   provides for use of about $95,000 with a 10 percent variance

19   on that.  If approved, what you're requesting today, what

20   then, if any -- how is one going to account for the $105,000

21   essentially that's been approved under the order?

22             MR. BATTAGLIA:  Your Honor, three weeks of the

23   $105,000 have been paid and applied to Blue Ascension.

24   There's one week of budget left.

25             THE COURT:  Got it.

1          MR. BATTAGLIA:  I frankly would assume that what

2    we would do is we would remove that line item, and what

3    we've proposed, of course, is to provide reporting of what

4    the weekly sales were a couple of days in arrears and how

5    the money was allocated.

6          So we're trying to be transparent, and this is a

7    matter that I've had conversations with the U.S. trustee's

8    office, the sub 5 trustee, more Mr. Martin who I was told

9    would be the conduit to the plaintiffs over the last several

10   days (indiscernible).

11         THE COURT:  Okay.  Thank you.  Let me -- does

12   anyone wish to -- let me just open it up.  Does anyone wish

13   to address the Court in connection just in the form of a

14   short opening on where we are?

15         MR. CHAPPLE:  Your Honor, this is Ryan Chapple.  I

16   would like that opportunity.

17         THE COURT:  Okay.  Please go -- please proceed.

18   Folks, there's somebody that needs to put their phone on

19   mute.  I might have to mute the entire line.  Okay.  Let's

20   see how this goes.  I may have to mute the entire line.  But

21   go ahead, Mr. Chapple.

22         MR. CHAPPLE:  Thank you, Your Honor, and thank you

23   for the time today.  Your Honor, as we say in the objection,

24   sorry, the Connecticut plaintiffs aren't necessarily opposed

25   to reasonable adjustments to the cash collateral -- to the

1    use of cash collateral.  Your Honor, the Debtor's emergency

2    motion, it does raise many questions that we have.  It

3    essentially greenlights a blank check payment scheme to an

4    entity that Debtor's counsel has represented to us was very

5    recently formed, is found and owned by a longtime employee

6    of the Debtor and its staffed really with the entire

7    fulfillment staff of the Debtor.  It's my understanding that

8    they just came over a few weeks ago.

9         We've seen no evidence demonstrating why the

10   Debtor's fulfillment duties were outsourced just weeks

11   before filing, why they were outsourced to an entity owned

12   and controlled by the Debtor's former employee, if any other

13   fulfillment logistics companies were considered, whether

14   this company can adequately perform, if any analysis was

15   done to determine that outsourcing this function makes the

16   most economic sense for the Debtor, whether or not there's a

17   contract in existence between the Debtor and Blue Ascension.

18        So, Your Honor, I think we're here, the

19   Connecticut plaintiffs, along with the Texas plaintiffs,

20   just want to make sure that there's an adequate level of

21   transparency to the process and that we understand -- that

22   we understand the relationships between these parties and

23   that we get satisfactory answers today through the question-

24   and-answer section with Mr. Schwartz and with Mr. Riley as

25   well.  So with that, I'm at any time happy to answer

1    questions that the Court has.  I'm happy to follow up at the

2    end of the proceeding.  I believe, excuse me, Mr. Brimmage,

3    is going to handle any cross that we deem necessary.  I'll

4    turn it back to the Court now.  Thank you, Your Honor.

5         THE COURT:  Thank you.  Anyone else wish to

6    address the Court at this time?

7         MR. BRIMMAGE:  Your Honor?  Your Honor, Marty

8    Brimmage, just briefly if I could.

9         THE COURT:  Mm-hmm.

10        MR. BRIMMAGE:  I'd like to address two issues.

11   First, let me address the Court's sealing of the text

12   exhibits.  What I really want to say, Your Honor, is thank

13   you.  That is absolutely appropriate.  I think in the haste

14   of getting some stuff on file, we missed some things.  And

15   so, I just want to say thank you.  That was totally

16   appropriate, and I apologize for us not catching that before

17   you caught it.  But we appreciate it, and it won't happen

18   again.

19        The second point I would just like to say, Your

20   Honor, is there's nothing business as usual about what

21   you're being asked to do.  There's nothing business as

22   usual.  And what you're going to hear from the evidence is

23   all this is new.  Not a word was spoken about any of the

24   things you're about to hear at the first day hearing which

25   was just a mere little over a week ago.  So I think we would

1    respectfully request that the Court be diligent in its

2    discretion about what's going on here and let's see where

3    the evidence takes us.  Thank you, Your Honor.

4            THE COURT:  Thank you.  Anyone else wish to be

5    heard at this time?

6            MR. NGUYEN:  Your Honor, Ha Nguyen, for the U.S.

7    trustee, if I can just take a brief moment to address the

8    Court.

9            THE COURT:  Okay.

10           MR. NGUYEN:  Your Honor, right now the concerns I

11   have about this transaction is just the lack of transparency

12   that has occurred.  We were (indiscernible) August 3rd, Mr.

13   Schwartz was on the witness stand for almost six hours and

14   we heard nothing about Blue Ascension.

15           We heard nothing about the changing in the

16   fulfillment.  A week prior to the filing of the case,

17   $95,000 was approved on August 3rd, but it was approved

18   based on the lack of information, crucial information that

19   the parties were entitled to explore (indiscernible) --

20           THE COURT:  Hold on a second, Mr. Nguyen.

21           AUTOMATED VOICE:  Conference muted.

22           THE COURT:  Go ahead and hit 5*.

23           MR. NGUYEN:  Can you hear me?

24           THE COURT:  Mr. Nguyen?

25           MR. NGUYEN:  Can you hear me, Your Honor?

1          THE COURT:  Yes, I can, just fine.  Please

2    continue.  I apologize.

3          MR. NGUYEN:  Thank you so much for muting the

4    line.  Your Honor, there is a problem with transparency

5    (indiscernible) first day hearing, if the Debtor comes in,

6    they're a hundred percent transparent, we'll (indiscernible)

7    them through the process and we'll work with them.

8          The fact that we didn't learn about Blue Ascension

9    until yesterday and the fact that the Court approved $95,000

10   of payments to Blue Ascension for what (indiscernible)

11   information on the first -- on the August 3rd hearing, I

12   think there was a 40-page declaration filed in support of

13   the first day motion.  No mention of this change.  No

14   mention of (indiscernible) no mention of this relationship

15   between former FFS employees (indiscernible) and opening up

16   a new fulfillment center.

17         And what bothers me about this transaction is

18   weather stamped by the CRO a week prior to the filing and

19   there's no contract.  There's only a price sheet.  And, Your

20   Honor, I'm here with an open mind (indiscernible) as Mr.

21   Battaglia said, this is a good problem.  You know, at the

22   end of the day, more sales, more revenue means more payment

23   at the end of the day for the plaintiffs.  But at the same

24   time, we need transparency.  We need to make sure that the

25   process is done correctly, and we want to make sure that the

1    parties have all the necessary information in terms of

2    evaluating how the case is going to go.

3            With that said, you know, I'm here with an open

4    mind.  I'm ready to hear the evidence that Mr. Battaglia is

5    going to present.  But right off the bat, I do have concerns

6    about the transparency and just the lack of disclosure of

7    the relationship since we first met on August 3, 2020, about

8    a week-and-a-half ago.

9            THE COURT:  Okay.  Thank you.  Anyone else wish to

10   address the Court, I'm going to ask that you hit 5*.  Okay.

11   There's a 361 area code.

12           Mr. Battaglia, why don't you just hit 5* now.

13   Who's going to present the direct evidence?  Again, folks, I

14   was really trying to avoid this.  But clearly some folks

15   could not put their phone on mute.

16           Mr. Battaglia, if you'd hit 5*, your line.  There

17   you go.

18           MR. LEE:  -- will be presenting our --

19           THE COURT:  Okay.

20           MR. LEE:  I just (indiscernible) Mr. Battaglia

21   will be presenting our case, Your Honor.

22           THE COURT:  Okay.  Thank you.  Mr. Battaglia, did

23   I unmute your line?

24           MR. BATTAGLIA:  Your Honor?  Am I live now?

25           THE COURT:  Yes, you are.  Thank you.

1          MR. BATTAGLIA:  I think so.  Yes, sir.

2          THE COURT:  Okay.

3          MR. BATTAGLIA:  Judge, I just -- I do have to

4     respond a little bit.  There was testimony of Mr. Schwartz

5     that they had changed performance operators and that it was

6     profitable at the first day hearing.

7          So I'm a little concerned about the allegation of

8     lack of transparency inasmuch as I've been on the phone with

9     every one of these parties to discuss this issue and sent

10    emails and we've responded, providing information, not to

11    Mr. Brimmage directly but to Mr. Martin, who supposedly was

12    the conduit, as I understood things as we left them at the

13    first hearing.  So was the name Blue Ascension used?  I

14    don't recall that it was.  But I don't know that it

15    particularly matters inasmuch as Blue Ascension is not an

16    insider.

17         But with that, Your Honor, unless the Court has

18    questions, I'll go ahead and call Mr. Marc Schwartz.

19         THE COURT:  Okay.  Mr. Schwartz, why don't you hit

20    5*.  And Mr. Brimmage, why don't you hit 5*.  It looks like

21    you're handling the cross.  So I'll let you -- Mr. Schwartz,

22    can you hear me okay?  Mr. Schwartz, can you hear me?  You

23    may have muted your own line, Mr. Schwartz.

24         MR. SCHWARTZ:  Yes, sir.  Can you hear me?

25         THE COURT:  Just fine.  Thank you.  Mr. Brimmage,

1    can you hear me okay?

2              MR. BRIMMAGE:  Yes, Your Honor.  Thank you.

3              THE COURT:  Okay.  Is there anyone else?  Mr.

4    Nguyen, why don't -- I think your line is unmuted now.

5              MR. NGUYEN:  Yes, Your Honor.  Thank you.

6              THE COURT:  Okay.  Anyone need their line unmuted

7    for purposes of this examination, I'd ask that you hit 5*

8    now.

9              Okay.  Mr. Schwartz, let me ask you, raise your

10   right hand.  Do you swear to tell the truth, the whole truth

11   and nothing but the truth?

12             MR. SCHWARTZ:  Yes, I do.

13             THE COURT:  Okay, and you understand the oath that

14   you took is the same that you would take as if you were live

15   in the courtroom here with me today?

16             MR. SCHWARTZ:  Yes, I do.

17             THE COURT:  Okay.  Mr. Schwartz, before we begin,

18   we're doing this virtually.  So I'm going to ask that you

19   please inform me who, if anyone, is in the room with you

20   now.

21             MR. SCHWARTZ:  It's just me.

22             THE COURT:  Okay, and I'm going to ask that you

23   please put any papers or notes that you may have near you

24   far away.  Can I confirm for now that there are no documents

25   in front of you that we can't see?

1          MR. SCHWARTZ:  No.  There are no documents in

2     front of me that you cannot see.

3          THE COURT:  Okay.  Okay.  Again, there may be

4     parties who object to a question.  I'm going to ask that you

5     please don't refrain from answering and just give me an

6     opportunity to resolve the objection.  And once I have, I'll

7     either let you know you can answer the question or if

8     counsel needs to ask a new one, okay?

9          MR. SCHWARTZ:  Yes, sir.

10          THE COURT:  Okay, and in terms of handling

11     documents -- I'm going to get there, Mr. Brimmage.  In terms

12     of handling documents and sharing documents, Mr. Battaglia,

13     how do you wish to proceed on that?

14          MR. BATTAGLIA:  Your Honor, I think I'm capable of

15     sharing if you give me rights.  But I haven't done that on

16     GoToMeeting.  So --

17          THE COURT:  If it's easier for you, for purposes

18     of today, you don't have many exhibits.  Why don't you -- I

19     can share my screen and I can --

20          MR. BATTAGLIA:  Yes, sir.

21          THE COURT:  -- just kind of (indiscernible) that

22     way just to make sure we're efficient on time.

23          MR. BATTAGLIA:  Yes, sir.  That's fine, Judge.

24          THE COURT:  Mr. Brimmage, you had a question?  Mr.

25     Brimmage, I believe you had a question.  I want to be able

1    to --

2              MR. BRIMMAGE:  Yes.  Yes, Your Honor.  Just as a

3    matter of standard protocol, can we confirm with Mr.

4    Schwartz that he doesn't have a phone in view or any other

5    method of electronic communications other than what we're

6    seeing related to the virtual, you know, testimony and his

7    picture and so forth?

8              THE COURT:  I think it's a fair question.

9              Mr. Schwartz?

10             MR. SCHWARTZ:  (indiscernible)

11             THE COURT:  Okay, and can you confirm, Mr.

12   Schwartz, there's no other electronic device near you or

13   that we can't see?

14             MR. SCHWARTZ:  I've got -- I've got an iWatch and

15   it talks to me sometimes.

16             THE COURT:  All right.  Well, just look straight

17   ahead, okay?  We'll make sure that we keep this as -- all

18   righty.

19             So okay, Mr. Battaglia, so I'm going to operate --

20   let's see -- will you be using -- you filed a witness and

21   exhibit list at 58.  Exhibit 1 is --

22             MR. BATTAGLIA:  I expect, Your Honor, only to use

23   two and three.

24             THE COURT:  Okay.  Is two the -- two is the 13-

25   week cash collateral budget.  Is two the budget that was

1    used in the interim order that I approved or is this a new

2    one?

3            MR. BATTAGLIA:  It is -- well, the first four

4    weeks were used in the interim order and attached to the

5    interim order (indiscernible) yes, sir.

6            THE COURT:  Okay.  Let me just ask is there any

7    objection, just preliminarily to the use of -- well, one you

8    don't need to admit into evidence.  It's just a motion --

9    but two or three?  Is there any objection?

10           MR. BRIMMAGE:  Your Honor, hang on one second,

11    please, if I could.

12           THE COURT:  Yeah.  I believe three is actually one

13    of you all's exhibits, Mr. Brimmage, as well.

14           MR. BRIMMAGE:  These are -- these are the emails

15    that (indiscernible) --

16           THE COURT:  No.  No, no.  I'm sorry.  Docket 58.

17    One is the 13-week cash collateral budget, and the third is

18    what's labeled as a Blue Ascension price list.

19           MR. BRIMMAGE:  Yes.  We're fine with both of

20    those, Your Honor.

21           THE COURT:  Okay.  So I'm going to admit two and

22    three into evidence.

23        (Exhibit 2 received into evidence)

24        (Exhibit 3 received into evidence)

25           THE COURT:  One, Mr. Battaglia, is just your

1   motion, and I don't think you need to admit that.

2           MR. BATTAGLIA:  No, sir.

3           THE COURT:  Okay.  Mr. Battaglia, if you just let

4   me -- I'm going to share my -- I'll have my screen shared,

5   and everyone will be able to see.  You just direct me to,

6   you know, page numbers and we'll proceed, okay?

7           MR. BATTAGLIA:  Thank you, Your Honor.

8           THE COURT:  Okay.  You may proceed.

9               DIRECT EXAMINATION OF W. MARC SCHWARTZ

10  BY MR. BATTAGLIA:

11  Q    Mr. Schwartz, you testified about your background and

12  your relationship with Free Speech Systems just a little

13  over a week ago.  Has anything changed in the week?

14  A    I mean, now, you know, just more work for the

15  bankruptcy.

16  Q    So I'm going to pass by your background here and skip

17  to the chase here.  How does Free Speech Systems make money?

18  A    It sells merchandise over the internet, primarily

19  dietary supplements for the most part is the largest part of

20  their revenue stream.

21  Q    How do customers pay for the products that they

22  purchase?

23  A    (indiscernible) it's by credit card.

24  Q    When does the Debtor receive settlement of the credit

25  card payments by customers?  How long a delay is there?

1    A    The Debtor receives the settlement the next day --

2    well, the first business day following the date of the sale.

3    Q    With respect to the orders placed by customers, who

4    pays for shipping?

5    A    Well, the customers are charged an average of about

6    $13.40, $14 for shipping and handling.  The balance, which

7    is the total shipping and handling averages $20 an order and

8    the balance of $6 is paid by the Debtor.

9    Q    Okay.  So I'm clear, the shipping cost is essentially a

10   passthrough.

11   A    Two-thirds of it is a passthrough.  Yes.

12   Q    Well, the shipping alone, Mr. Schwartz (indiscernible)

13   --

14   A    The shipping -- yes.  Correct.  That's correct.  The

15   shipping is -- correct, the shipping is a passthrough.

16   Q    What is the dollar amount of the average order?

17   A    The dollar amount of the average order last week was

18   $186 up from $120 prefiling.

19   Q    Would you describe for the Court how orders are

20   processed and filled?

21   A    Once the customer makes the purchase and the credit

22   card is charged, the fulfillment officer in the warehouse

23   gets the report of the sale and they, you know, put out a

24   (indiscernible) for one of the workers to go ahead and go

25   through the warehouse picking up the merchandise that was

1    ordered and then package it in a box and print out a label

2    with the (indiscernible) shipping charge on it.

3    Q    Who handles fulfillment for the Debtor?

4    A    Blue Assistance.

5    Q    Is it Ascension, Mr. --

6    A    Ascension.  We spell it differently.

7    Q    And has the manner in which the Debtor has handled

8    fulfillment changed since you became CRO?

9    A    The manner, no.  It's all pretty much done the same

10   way.  However when I was initially hired as CRO it was being

11   done by FSS as opposed to Ascension.

12   Q    And approximately when did that change occur?

13   A    That change occurred early in July, around the 1st,

14   2nd, 3rd of July, somewhere around there, I believe.

15   Q    Why was the change made?

16   A    It was my understanding --

17           MR. BRIMMAGE:  Your Honor, I'll object.  I'll

18   object -- I'll object at this point to any further response.

19   If it's his understanding, he doesn't have personal

20   knowledge, and so we would object to any further response to

21   that question.

22           THE COURT:  Mr. Battaglia?

23           MR. BATTAGLIA:  Your Honor, the witness is the

24   CRO.  He's involved in the operations involved in the

25   fulfillment, obviously not on a hands-on level, but he has

1   access to information about how manners -- how fulfillment

2   was handled and how it is handled now.  And he can testify

3   to what he knows and understands about what it was changed.

4            THE COURT:  Okay.  I'm going to sustain the

5   objection.  Why don't you get a little bit more foundation

6   and then see if the question works.

7   BY MR. BATTAGLIA:

8   Q   So in your opinion, why was the manner of fulfillment

9   changed?

10           MR. BRIMMAGE:  Your Honor, lacks -- I'll object as

11  it lacks foundation.  He has no basis for an opinion of

12  that.

13           THE COURT:  I'm going -- I'm going to overrule

14  that.  I mean, he can answer.  It's his understanding of it,

15  for what it's worth.

16           MR. BRIMMAGE:  Your Honor, I assume this is a lay

17  opinion.

18           THE COURT:  Yes, yes.  Certainly.  Absolutely.

19           THE WITNESS:  Two reasons.  One (indiscernible)

20  greater efficiencies in the process of fulfillment and, two,

21  fulfillment is not -- is an important but not a core

22  function to (indiscernible) of the entity which is the

23  publishing of the radio shows and fulfilling of merchandise,

24  for getting it out of the company (indiscernible) and

25  there's no management (indiscernible) for efficiency.

1    BY MR. BATTAGLIA:

2    Q    And what --

3    A    We had been --

4    Q    Go ahead.  I'm sorry.

5    A    We had been discussing with the Debtor, but since we

6    got (indiscernible) need to try to (indiscernible) core

7    competencies.

8    Q    And is this a change that you would have made as CRO?

9         MR. BRIMMAGE:  Your Honor, I'll object.  That

10   calls for speculation, and it also highlights that he wasn't

11   there and didn't make the change and shouldn't be testifying

12   about the basis for the change.

13        THE COURT:  I'll sustain.

14   BY MR. BATTAGLIA:

15   Q    Mr. Schwartz, when did you arrive on the scene at Free

16   Speech Systems.

17   A    I think it was about June 6th.

18   Q    And you testified that this change occurred in early to

19   mid-July?

20   A    I believe that was implemented, yes, in early to mid-

21   July.

22   Q    So based on your evaluation of the operations of the

23   Debtor from June 6th, what is your opinion about whether

24   this was a valid change to make?

25        MR. BRIMMAGE:  Your Honor, I'll object.  I don't

1    know what valid change to make means.  He's already

2    testified that he wasn't involved in the change.  He gave

3    his opinion and guessed what he thought the change might

4    have been made because of.  But whether or not it's a valid

5    change, and he's not an expert to determine whether or not

6    it should be valid.

7            THE COURT:  Yeah.  Well, he's the CRO.  I'm going

8    to overrule.  He can testify as to what he thought, and you

9    can cross and ask him his reasons and his understanding of

10   it.  I'll allow it.

11           Mr. Schwartz, you can answer the question.

12           THE WITNESS:  Mr. Battaglia, could you repeat the

13   question?

14   BY MR. BATTAGLIA:

15   Q   Yes, sir.  Based on your involvement with the Debtor,

16   was this is, I'll change the word, an appropriate change to

17   make?

18           MR. BRIMMAGE:  Same objection.

19           THE COURT:  Overruled.

20           THE WITNESS:  For purposes of what it was trying

21   to accomplish, yes.  What I -- what I was interested in is

22   its impact on cost of fulfillment and there's some

23   (indiscernible) indication that the cost of fulfillment has

24   actually come down from what it was pre -- prior to -- prior

25   to the change.  Just preliminary numbers, it's not

1   (indiscernible) we haven't had enough time to really filter

2   out all the numbers and reconcile everything.  But

3   preliminary it looks (indiscernible) it's costing us less.

4   BY MR. BATTAGLIA:

5   Q    So can you describe for the Court what investigation

6   you did of Mr. Riley and/or Blue Ascension?

7   A    I met with Mr. Riley.  We had a rather lengthy meeting.

8   Talked a lot about fulfillment and particularly the cost

9   economics of it.  I did have a -- we did a background check

10  on Mr. Riley and (indiscernible) anything that popped up

11  there that caused me some concern.

12       That's -- in the amount of time we had, that's -- you

13  know, I've worked with him subsequently since this

14  particularly when we realized the problem we were in.  But

15  that's been two weeks with some involvement.

16  Q    And what investigation did you do regarding Mr. Riley's

17  relationship with Alex Jones and his other insider entities?

18  A    Well, initially --

19            MR. BRIMMAGE:  Your Honor (indiscernible)

20  clarification, about what point in time are we talking

21  about?

22            THE COURT:  I think it's a fair question.  Mr.

23  Battaglia, why don't you ask your question a little

24  differently.  I'll sustain.

25            MR. BATTAGLIA:  Your Honor (indiscernible) first,

1    I guess I'll ask a leading question.

2    BY MR. BATTAGLIA:

3    Q    Have you conducted an investigation into the

4    relationships with Mr. Jones?

5    A    It's been (indiscernible) but yes.

6    Q    And when did you start asking questions about the

7    relationship?

8    A    Subsequent to July 18th.

9    Q    And what have you determined as to any relationships

10   with Mr. Jones and Mr. Riley?

11   A    Well since then I've not -- other than I know -- I know

12   they knew each other before Blue Ascension was formed.  Mr.

13   Riley worked at FSS for a number of years.  Mr. Riley, Mr.

14   Jones both told me on several occasions there is no business

15   relationship --

16          MR. BRIMMAGE:  Your Honor, I'll object to any

17   further testimony about what he heard based on

18   conversations.

19          THE COURT:  Mr. Battaglia?

20          MR. BRIMMAGE:  He said what -- what they told me,

21   and he's going to regurgitate what they told him.

22          MR. BATTAGLIA:  Your Honor, it's not offered for

23   the truth of the matter.  It's offered for what his

24   understanding is based on.

25          THE COURT:  I'll allow it.  It's got to be limited

 1    to the -- his investigation and what he believes -- whether

 2    it was a result of his investigation.

 3         So Mr. Schwartz, with that admonition, you can

 4    answer the question.

 5         THE WITNESS:  As part of my investigation, I asked

 6    both Mr. Jones on several occasions and Mr. Riley on several

 7    occasions about potential business relationships between

 8    Blue Ascension, Mr. Riley, and Mr. Jones, Mr. Jones's

 9    family, other employees of FSS, other former employees of

10    FSS and that disclosed nothing.  When I ran a background

11    check, I did not find any possible associations between any

12    identified employees of FSS that I knew and Mr. Riley or

13    Blue Ascension.

14         THE COURT:  Just a question.  When you said it

15    revealed nothing based on your conversations with Mr. Jones

16    and Mr. Riley, what did you mean by that?

17         THE WITNESS:  I guess there weren't any

18    relationships of any sort with anybody (indiscernible) so

19    from that standpoint (indiscernible) they told me and I ran

20    the background check, that's independent and it just showed

21    nothing.

22         THE COURT:  Okay.  Thank you.

23         MR. BRIMMAGE:  Your Honor, if I can jump in here,

24    it just dawns on me do we know if Mr. Riley is attending the

25    hearing and listening to Mr. Schwartz's testimony?

 1          THE COURT:  I do see Mr. Riley at least on

 2     GoToMeeting.  I don't know if he's listening.

 3          MR. BRIMMAGE:  Your Honor, at this point then we

 4     would invoke the rule from this point forward on Mr.

 5     Schwartz's testimony.

 6          THE COURT:  Okay.  Mr. Riley, if you can hear me,

 7     and I want to make sure that someone -- maybe Mr. Lee can

 8     get in contact with Mr. Riley.  The rule has been invoked,

 9     and Mr. Riley, I'd ask that you hang up from the line, and

10     I'm going to -- I'm asking that you also remove yourself

11     from GoToMeeting.  I'll give you about 30 seconds to do so.

12     If not, I'll remove you.  Well, it sounds like he heard me.

13     He's removed himself from GoToMeeting.

14          And Mr. Lee -- Mr. Riley, if you're listening to

15     me, Mr. Lee, I want to make sure that he can hear me at

16     least on this point, that he is to just remain -- not listen

17     to any of this testimony but remain available.  Maybe we can

18     take a five-minute break after Mr. Schwartz's testimony and

19     make sure that he can get on.  But just want to make sure

20     that he's made available if needed to testify today.

21          MR. BRIMMAGE:  Thank you, Your Honor.

22          MR. LEE:  Kyung Lee, for the record, Your Honor.

23     I'll take care of that, Your Honor.

24          THE COURT:  Okay.  All righty.  Do we have -- Mr.

25     Lee, can you confirm -- and maybe we can just take a second.

```
 1   Can you confirm that Mr. Riley is off the line?  I know he's

 2   off GoToMeeting.

 3              MR. LEE:  Your Honor?  Your Honor, this is Kyung

 4   Lee for the record.  I'll take care of it right now, Your

 5   Honor.

 6              THE COURT:  Thank you.  Okay.  Why don't we just

 7   wait a minute, and then we'll proceed.

 8              MR. BATTAGLIA:  Yes.

 9              THE COURT:  Okay.  Mr. Battaglia, why don't you

10   continue.

11              MR. BATTAGLIA:  Yes, Your Honor.

12   BY MR. BATTAGLIA:

13   Q    What does Blue Ascension do for Free Speech Systems?

14   A    (indiscernible) it performs certain functions that

15   (indiscernible) what happens after an order is placed, what

16   fulfillment is involved.  It's taking the pick ticket.  It's

17   then pulling the merchandise.  It's packing the merchandise.

18   It's sealing it.  It's labeling it and turning it over to

19   the delivery service.

20   Q    Who is responsible for receiving and shelf-stocking of

21   inventory?

22   A    They perform that function as well.  They have direct

23   control of the warehouse.  So they receive inventory and

24   stock it, shelve it, whatever you call it.

25   Q    Who provides inventorying services?
```

1    A     That's a combination of the inventory personnel, the

2    warehouse personnel who work for Blue Ascension.  They

3    actually do the counting.  But the inventory management is

4    controlled by FSS.  So we know what the (indiscernible)

5    inventory system.  So we know what inventory is supposed to

6    be there.  So when you do inventory, we do cyclical ones,

7    both entities are involved which is the way it should be

8    done.

9            MR. BATTAGLIA:  Your Honor, could you share

10   Debtor's Exhibit 3, please?

11           THE COURT:  Okay.  Give me a second.

12   BY MR. BATTAGLIA:

13   Q     Can you see that, Mr. Schwartz?

14   A     I can see the top third of it, it looks like.

15   Q     This has been admitted into evidence as the Blue

16   Ascension price list.  Do you recognize it?

17   A     Yes.  I do.

18   Q     And does it appear to be a true and correct copy of the

19   price list negotiated between the Debtor and Blue Ascension?

20   A     Yes.  It does.

21   Q     So tell the Court, if you would, what contracts govern

22   the relationship between Blue Ascension and Free Speech

23   Systems.

24   A     There are no contracts, unless you consider a price

25   list a contract.

1    Q     Why did the Debtor not require a contract as opposed to

2    a price list?

3    A     Quite honestly, I was (indiscernible) when I learned of

4    Blue Ascension and what it was supposed to be doing.  I was

5    aware that Mr. Riley had a background with the company.  I

6    decided that I did not want a contract.  I wanted a price

7    list because if I needed to get out of this, I wanted to be

8    able to do it very quickly.  But I also (indiscernible) --

9    Q     (indiscernible)

10   Q     Go ahead --

11         THE COURT:  I'm sorry.  Mr. Schwartz, can you

12   finish that last part of your question?  Thank you.

13   BY MR. BATTAGLIA:

14   Q     Yes, sir.

15   A     Yes.  If you go -- if you look towards the bottom, this

16   is good for 90 days.  So it gave me a (indiscernible) a lot

17   of the time we could build (indiscernible) we could go

18   through and be working together and develop the data cost-

19   wise, what it's ultimately costing us compared to what we

20   were paying (indiscernible) advantage.  It's advantageous to

21   us.  But I did not want a contract.  Mr. Riley wanted the

22   contract.  I told him, no, I'd do a price list.

23   Q     And who negotiated the pricing in this price list?

24   A     Well, Mr. Riley and I (indiscernible) Riley was

25   involved.  But the push back and forth came between Riley

1   and me.

2   Q    I want to turn and talk about order backlogs.  Is there

3   currently a backlog of unshipped orders?

4   A    Yes, sir.  (indiscernible)

5   Q    Why haven't those shipped?

6   A    Blue Ascension would not work with us on credit.  They

7   wanted the cash in hand before they fulfill.  What happened

8   is (indiscernible) behind the week before the filing.

9   Numbers were just astronomical (indiscernible) than we had

10  been experiencing and we hadn't paid enough money in.  So we

11  (indiscernible) about 14,000 units in backlog at the day we

12  filed bankruptcy.

13       Subsequent to that we've had a week-and-a-half more of

14  orders.  We reached a peak of 30,000 or so that were in the

15  backlog which is now down to about -- I read the report from

16  yesterday.  It's something like 26,000, something, 25,000.

17       So it's really a function of having enough money to

18  (indiscernible) the project was based on approximately the

19  equivalent of 5,000 orders a week, 4,000 to 5,000.  We're

20  doing 10,000 or more and that is what's -- it's just

21  $100,000 (indiscernible) just to keep up with that

22  (indiscernible) --

23  Q    (indiscernible) I'll explore that a little further with

24  you later.  But what are the consequences of customer orders

25  going unshipped?

1  A    Well, the first one is customers get unhappy and cancel

2  their orders.  So you have to return their money to them.

3  Secondarily, if you start having a lot of complaints, stop

4  orders not being shipped, it comes to the attention of the

5  credit card processor and they can -- if they feel that it's

6  a dangerous situation (indiscernible) customer, they will

7  cancel us, can cancel us.  And so it's two negatives and

8  plus it's bad for customer relationships.

9           MR. BATTAGLIA:  So let's turn to the projections,

10  and Your Honor, if you can share Exhibit 2, please.

11           THE COURT:  Okay.  Just give me a second.

12  BY MR. BATTAGLIA:

13  Q    Can you see that, Mr. Schwartz?

14  A    Yes.

15  Q    Can you describe for the Court the correlation between

16  sales volume and fulfillment cost?

17  A    The purpose of this budget -- fulfillment cost is based

18  on the volume of sales.  It was projected I believe it was

19  at --

20  Q    I guess I'll ask the question simpler.  Is there a

21  correlation, and what is it?

22  A    Well, the correlation is it's about a 1:1 relationship.

23  For every $1 increase in sales, you're going to have about a

24  28, 25 percent increase in fulfillment cost.

25  Q    What was the basis -- up at the top, you have a line

1    item of -- let's see what it is here -- product sales.

2              MR. BATTAGLIA:  And, Your Honor, you might have to

3    scroll up just a bit.

4              THE COURT:  Okay.

5              THE WITNESS:  We took --

6              MR. BATTAGLIA:  Your Honor --

7    BY MR. BATTAGLIA:

8    Q    All right.  Go ahead.

9    A    We looked at the actual reported sales for the week

10   prior to the filing of bankruptcy.  So that would have been

11   the week ending the 22nd of July, those five days.  And we

12   knew (indiscernible) new product that hadn't been in the

13   warehouse for some time.  Mr. Jones told us we could expect

14   significant increases in sales.  So we took that number for

15   that week and put it up by 25 percent to 595 you see here

16   (indiscernible) jump in sales that was pretty significant.

17   Q    And what -- go ahead.  I'm sorry.  I don't mean to cut

18   you off.

19   A    No.  Go ahead.  And that, if you can see, is our

20   (indiscernible) as we got more sales, we got more sales

21   (indiscernible) come back and ask for modification of the

22   budget.

23   Q    And what (indiscernible)

24   A    (indiscernible)

25   Q    That had actual sales experience proven --

```
1    A    (indiscernible)

2         THE COURT:  Just a second.  Mr. Schwartz, I want

3    Mr. Battaglia to ask you the question and then you can

4    answer it.  Go ahead.

5         Can you repeat your question, Mr. Battaglia?

6         MR. BATTAGLIA:  Yes, sir.

7    BY MR. BATTAGLIA:

8    Q    What --

9         MR. BATTAGLIA:  Yes, sir.

10   BY MR. BATTAGLIA:

11   Q    What are your actual -- what are FSS's actual sales for

12   the week ending July 29th and going forward?

13   A    Week ending July 29th, it was something like $900,000

14   or so, $920,000, maybe something like that, if I recall.

15   The next week, we were down to -- let's see, the 29th, that

16   would be August 5th -- the week ending July 29th, we had

17   $900,000.

18        The week ending August 5th, we were at $880,000,

19   $890,000, something like that.  This week (indiscernible)

20   currently running at a rate of $750,000 and we expect as new

21   product productions will kick sales up again next week and

22   the week following for certain.

23   Q    What products are being received or anticipated to be

24   received in the following week?

25   A    Well, the first two products (indiscernible) that was
```

1    the first we kicked off prior to the filing of the

2    bankruptcy.  Then the vitamin/mineral fusion, another

3    product, and that one has been extremely successful since

4    the filing of the bankruptcy.

5         The next one coming I believe is a male vitality

6    product which has a very strong sales history in the past

7    and it's coming back into this market new.  That one's

8    expected to be -- it's going to put the other two products

9    to shame in terms of the sales.  I can't tell you the name

10   of these things.  I'm still trying to learn them.

11   Q    That's okay.  What I guess I'm curious about is would

12   product arrivals -- how does that affect your ability to

13   project sales on a week-to-week basis?

14   A    It is extremely hard.  We had -- I could locate data in

15   the amount of time we had to base any projections

16   (indiscernible) when we started putting the budget --

17   originally putting the budget together.  And quite frankly

18   the salesman -- Mr. Jones is a salesman, and telling me how

19   great sales are.

20        I've had -- my experience with that is you discount it.

21   So I did.  I still can't quite get a handle on it.  You

22   know, they said to expect up to $450,000 a day.  That's a

23   possibility, $350,000 on day is an average which is again

24   almost twice the volume we've been doing already.

25   Q    And if the Debtor were to achieve those levels of

1   sales, would -- can you describe for the Court whether the

2   fulfillment line item in this budget is adequate?

3   A    It's absolutely inadequate.  It's not adequate for the

4   sales that have already been, and they're going to be

5   nothing compared to what's needed.

6   Q    Why aren't you able to tell Judge Lopez that you need

7   for next week some certain number in order to satisfy

8   fulfillment costs?

9   A    Because I really have no data on which to base

10  (indiscernible) estimate of what the sales will be.  You

11  know, I had this discussion at length last night with Mr.

12  Jones.  And I said, look Alex, you know, you're telling me

13  $450,000.  How many days at $450,000?  I don't know.

14       I said, well, I've got to be able to plan for $450,000

15  if that's the high point.  That's why I want to try to go to

16  this more variable whereas when volume goes up, fulfillment

17  dollars go up.  Volume goes down, fulfillment dollars go

18  down.

19  Q    And so what are you asking the Court to allow you to do

20  with this motion today?

21  A    Well, each day we receive a settlement statement, and

22  it takes the credit card charges and determines, you know,

23  some product is owned by PQPR.  So it divides the sales

24  between whose product is sold.  It pays the processing cost

25  from the processor's fee and calculates, you know, how much

1    amount of money that it brings FSS.  It also withholds

2    $1,000 a day for debt service on the PQPR debt.

3         I mean (indiscernible) really that process, to make

4    that analysis and just as easily and say, okay, I'm going to

5    take $20 per order and send that directly to Blue Ascension

6    so it has the money to fill that order the day it should

7    start filling that order, so I'm not longer having to run

8    around trying to make sure we send the money to Blue

9    Ascension as needed.

10        This way we can get it right away.  It's there when

11   they need it, and it's more effect on bottom line

12   (indiscernible) we'd have to send them except stopping

13   shipping and saying, oh, by the way, we're out of money

14   again, send us some more.

15   Q    And what do you propose to do to ensure that this is

16   transparent to the creditors and the Court?

17   A    Well actually the information will be disclosed on

18   here, and this already discloses the other deductions that

19   are made.  There's a (indiscernible) so it's clear what they

20   are.  But we would simply -- fulfillment would become the

21   amount that's going to Blue Ascension under this

22   methodology.

23        And so if you go to product sales, what we'll have is

24   product sales.  It'll have merchant card processing, the

25   processor fee, the Blue Ascension fee and the PQPR.  It's

1    all laid out there.  That's what we get every day -- what we

2    get every day on the settlement statement.  And we could

3    also --

4    Q    (indiscernible)

5    A    (indiscernible) number of orders because that would

6    also be informative to everybody.

7    Q    And what do you propose to do with that report that you

8    just discussed?

9    A    We plan to produce it every Tuesday when we do our --

10   as part of our reporting.  Every Tuesday, we -- I itemize --

11   I want -- I do check the (indiscernible) engagements.  We

12   compare the budget to the actual so we know where we're

13   going.  So we can just produce that every Tuesday to

14   whoever's interested in it.

15   Q    The net effect of the growth in sales has -- what

16   effect has it had on the Debtor's cash balances?

17   A    It has -- when we came into bankruptcy, we had about

18   $600,000 of what is clearly cash collateral.  On the 9th, I

19   believe, when I did this analysis, it was $1 million, $1.1

20   million or something like that --

21   Q    And that's exclusive of the donation number?

22   A    Yeah.  Correct.  That does not include the donation

23   number.

24   Q    I'm sorry.  Did I cut you off?

25   A    That does not include donations.

1    Q    Yes, sir.

2              MR. BATTAGLIA:  Your Honor, I'll pass the witness.

3              THE COURT:  So before I open it up, Mr. Schwartz,

4    just a couple of -- I want to make sure that we have a clear

5    record for me on just a couple of questions.  I'm looking at

6    the budget, and it's showing $595,049.01, you know, for the

7    next three weeks, if you will, which is really what we're

8    talking about here in connection with, the outstanding

9    order.

10             Do you have a sense of how much more money, if

11   could be provided, if the relief was granted, in terms of

12   additional sales above the $595,000?  Do you have any sense

13   of that number?

14             THE WITNESS:  Well, Your Honor, we've already hit

15   $900,000 (indiscernible) we should hit --

16             THE COURT:  $900,000?

17             THE WITNESS:  -- up to $2 million --

18             THE COURT:  I'm sorry?  $900,000?

19             THE WITNESS:  Right.  $900,000.

20             THE COURT:  So is that through July 29th?  Did I

21   get that right?

22             THE WITNESS:  Yeah.  Correct.  Through July 29th.

23   The week that we filed, our sales were over $900,000.  That

24   number, product sales, was over $900,000.

25             THE COURT:  What do you project --

1                     THE WITNESS:  It was $880,000 --

2                     THE COURT:  Go ahead.

3                     THE WITNESS:  It was $880,000 the week we filed,

4     the week ending August 5th.  It looks like this week it's

5     going to be around $750,000.  Then new product will hit, and

6     we should see a jump.  So it could easily double.

7                     THE COURT:  Okay.

8                     THE WITNESS:  And matter of fact, we should

9     probably look at it and if it doesn't double, ask why not.

10                    THE COURT:  So let me ask you another question.

11    If I don't grant the relief today, is the Debtor able to

12    fulfill these orders on its own?  Do you know?

13                    THE WITNESS:  We don't have the employees anymore

14    to -- we don't have the employees to do it.  I could -- not

15    our reorders, no.  We could probably help if we used the

16    donated money, which it's unclear if that is or is not cash

17    collateral.

18                    But if it's not cash collateral, it will help.

19    But it will not get us there, and if we're doing -- we're

20    doing twice the orders we're doing this week, then next

21    week, we won't be able to catch up.

22                    THE COURT:  Okay.

23                    THE WITNESS:  That'll be 20,000 orders.

24                    THE COURT:  Okay.  Does anyone have any questions

25    for this witness who supports the relief requested?  And if

1    you are, I'm going to ask that you hit 5*.  If you support

2    the relief requested, I'm asking that you hit 5*.  Okay, and

3    if I've missed anyone, I want you to put your hand up.  But

4    I don't see anyone who has hit 5*.  So I will turn to

5    parties who oppose the relief or wish to question Mr.

6    Schwartz in the form of a cross-examination more than a

7    direct, if you will.

8            Mr. Brimmage, I hear you're taking the lead on

9    that.  So unless someone else tells me otherwise, I will

10   turn it over to you.

11           MR. BRIMMAGE:  Your Honor, I am happy to go next

12   or if the U.S. trustee would like to go, I would defer to

13   him, whoever he prefers.

14           THE COURT:  Okay.

15           MR. NGUYEN:  Judge, Your Honor, Mr. Brimmage can

16   go first.  Thank you.

17           MR. BRIMMAGE:  Mutual deferral society, Your

18   Honor.

19           CROSS-EXAMINATION OF W. MARC SCHWARTZ

20   BY MR. BRIMMAGE:

21   Q    Okay.  Mr. Schwartz, Marty Brimmage, with Akin Gump

22   Strauss Hauer & Feld here on behalf of the Texas plaintiffs.

23   You and I met for the first time on August the 3rd.  We had

24   a little chat in the court.  Do you recall that?

25   A    I did.  I do.

1    Q    Let's continue -- let's continue that, if we could.  I

2    kind of want to pick up right where you left off with the

3    judge just to make sure I'm clear.  So sales have gone up,

4    right?  You testified to that.

5    A    Yes.

6    Q    Donations have also gone up, right?

7    A    No.  A little bit.  I mean, not much at all.  We're

8    (indiscernible) but it's -- donations, if I may, you have

9    sometimes some big donations pop in sporadically and you

10   have, you know, a few thousand dollars a month of small

11   dollar donations (indiscernible) --

12   Q    Do you have an accurate count -- do you have an

13   accurate number for donations as you're testifying right now

14   for the Court, total donations to FSS as of right now?

15   A    As of today?  No.  We haven't booked today.

16   Q    As of yesterday.

17   A    No.

18   Q    As of the day before?

19   A    I think we had a number on that.

20   Q    What's the number?

21   A    I don't know.  I don't have the general ledger in front

22   of me.

23   Q    The day before that, what's your best guess on -- or

24   best recollection on what that number is for the donations?

25   A    For what period of time?

1  Q    The current amount of donations on hand that FSS has.

2  Do you know --

3  A    (indiscernible)

4  Q    Tell the Court what the dollar amount is.

5  A    How much we have on hand is about $459,000.

6  Q    All right.  It was $800,000 on the petition date.  Do I

7  recall that correctly?

8  A    No.  I don't think so.  I don't think it was that.

9  Q    Am I confused?  You didn't testify that it was $800,000

10  on August the 3rd?

11  A    I'm trying to think back.  I mean, I made the entry to

12  book it as of the petition date.  I don't remember it being

13  $800,000.

14  Q    All right.  Is it your testimony that right here now

15  you don't know how much you testified earlier were

16  donations?

17  A    I don't recall.  (indiscernible) maybe review my

18  testimony.

19  Q    Do you recall testifying that the donations in your

20  mind were not encumbered?

21  A    Yes.  That was my understanding from counsel.

22  Q    All right, and you're not changing that today, right?

23  A    Changing what?  My prior testimony?  My testimony?  No.

24  I (indiscernible) so I haven't changed it.

25  Q    Okay, and so whatever is available for donations is

1   available.  It's not encumbered and it's available to

2   fulfill orders, correct?

3   A    That is not my understanding today.

4   Q    And why is that not available to fulfill orders?

5   A    Because my counsel advised me that Judge Lopez

6   indicated it wasn't certain whether it was or was not cash

7   collateral and therefore it's not available for me to use.

8   Q    Okay.  I understand.  Okay.  All right.  So it's money

9   that is there.  But you can't use it because it's your

10  understanding that Judge Lopez won't let you use it at this

11  time, right?

12  A    My understanding is Judge Lopez did not indicate

13  whether it was or was not.  He hadn't decided that, and

14  therefore we --

15  Q    Okay.

16  A    I could not use it.

17  Q    Okay., and do you know from the time that you took over

18  to now or the time from the petition date to now, do you

19  know how much have been made in donations to FSS?

20  A    No.  I mean, that's -- we had a lot of small dollar

21  checks and we're just now adding those up.

22  Q    Okay.  You don't have an answer for that today, right?

23  A    I don't know.  No.  It was -- no, I don't.

24  Q    Okay.  I appreciate that.  Let's go to this Blue

25  Ascension.  At one point you called it Blue Assistance.  I

1    want to go into -- it's crystal clear from your testimony

2    that was not your decision to stop fulfilling orders at FSS

3    and start using Blue Ascension, correct?

4    A    Correct.

5    Q    All right.  Whose decision was it?

6    A    I was not there when that decision was made.  I can

7    only assume.

8    Q    You think it was Alex Jones, don't you?

9    A    Well, I think Alex Jones is involved with it.  I know

10   it's something -- he's told me since then it's something he

11   wanted.

12   Q    Okay, and if there's something Alex Jones wants, and he

13   controls these businesses, Alex Jones gets it, right?

14   A    Not necessarily.  That's not a true statement.

15   Q    Okay.  Name one thing that you're aware of that Alex

16   Jones has wanted in these businesses and he hasn't gotten.

17   A    Well, let's see.  He wanted Mr. Riley to apparently --

18   I assume it would be something involved with the inventory

19   control, that Mr. Riley should set up a separate

20   (indiscernible) to do that.

21   Q    Wait.  Wait a second.  When you say you assume, that

22   tells me you don't have personal knowledge.  Do you know

23   firsthand what you're testifying to or do you not?

24   A    Well, I -- well, you asked me what Mr. Jones wanted

25   that he didn't get.  So my only source of that is what Mr.

1   Jones tells me.  So --

2   Q    Okay.  Fair enough.  All right.  All right.  You don't

3   have any personal knowledge of something Mr. Jones, Alex

4   Jones has wanted and not gotten, correct?  You don't have

5   any personal knowledge.  You only know what someone might

6   have told you, including Mr. Jones, right?

7   A    I do have personal knowledge.

8   Q    Okay.  All right.  So let's keep going.  You were --

9   you came on as the CRO somewhere around June the 6th; is

10  that right?

11  A    Something like that.

12  Q    Blue Ascension came on the scene somewhere around July

13  the 2nd or 3rd; is that right?

14  A    Well, Blue Ascension, as you know, was organized back

15  in March.  Blue Ascension (indiscernible)

16  Q    (indiscernible)

17  A    Blue Ascension (indiscernible) --

18  Q    (indiscernible)

19          THE COURT:  Hold on.  Hold on, folks.  I just want

20  to make sure that we're getting one question and one answer

21  and we're not talking over each other.  It gets a little

22  tricky on video.  Just want to make sure.

23          So Mr. Schwartz, why don't you finish the answer

24  that you were going to provide and then Mr. Brimmage can ask

25  another question.

1         THE WITNESS:  Well, I really have a question now

2    based on his answer.  So when you say on the scene --

3         THE COURT:  Well, you don't get to ask questions.

4         THE WITNESS:  I don't know what he means.

5         THE COURT:  Then just you don't know what he

6    means.  I just want to make sure -- you don't get to ask

7    questions.  He gets to ask them, and you get to answer them.

8    And if you don't know the answer, then just say you can't

9    answer the question.

10         THE WITNESS:  Okay.  I can't answer the question.

11         THE COURT:  Mr. Brimmage, why don't you ask

12    another question.

13    BY MR. BRIMMAGE:

14    Q    Mr. Schwartz -- Mr. Schwartz, when did Blue Ascension

15    start providing fulfillment services for FSS?

16    A    I don't have an exact date.  It was -- it was I believe

17    close to the day -- I take that back.  It was shortly prior

18    to my meeting with Blue Ascension.  So I asked to go over

19    the calculus of what happened.

20    Q    All right.  When was your meeting with Blue Ascension?

21    A    I believe July 18th.

22    Q    All right.  That's the date of the price sheet that we

23    looked at, right?

24    A    Correct.

25    Q    Okay.  Let's go backwards a little bit.  I'm just

1    trying to make sure that we and the Court are crystal clear

2    about what happened here.  Blue Ascension started providing

3    fulfillment services shortly before your meeting on July

4    18th, correct?

5    A    That appears to be the date, yes.

6    Q    And shortly before -- well, so they were already

7    providing fulfillment services for FSS when you had your

8    meeting; is that right?

9    A    Yes.

10   Q    In fact you said you were caught flatfooted, right?

11   A    I believe that's what I said.

12   Q    You did.  And so I'm just trying to make sure I'm

13   clear.  When were the FSS employees terminated and rehired

14   by Blue Ascension, if you know?

15   A    The payroll we were working on, on July 18th, they had

16   been -- they had already been moved from the payroll at that

17   time.  So they were paid --

18   Q    Okay.

19   A    They were not paid on that payroll by FSS.

20   Q    So when were they terminated from FSS?

21   A    Like I said, all I know is they left the payroll.  They

22   had already been moved off the FSS payroll when we were

23   preparing to pay that payroll.  So (indiscernible) it would

24   have been effective the beginning of that payroll.

25   Q    All right.  Were they fired?

1    A    Yeah.  They would have been just, you know, terminated

2    and rehired, I believe, by Blue Ascension.

3    Q    Okay.  Is it fair to say that the name of their

4    employer just changed?

5    A    Well, their employer changed.  They no longer were on

6    the ADP payroll that we operate.  They're not an

7    intercompany charge or anything like that.

8    Q    But they're doing the same thing they were doing

9    before, right?

10   A    Well, the job (indiscernible) is essentially the same.

11   I don't know if they're doing it the same way.  I mean,

12   Patrick Riley, they have their own processes and procedures.

13   Q    Do you have personal knowledge of the different

14   processes and procedures that they brought in?

15   A    No.  That's why I said I don't know if they're doing

16   the same thing.

17   Q    Okay.  They're providing the same service to FSS that

18   they were providing to FSS before the name of their employer

19   changed, right?

20          MR. BATTAGLIA:  Your Honor, I'm going to object.

21   I'm going to object.  That question's been asked and

22   answered.

23          THE COURT:  I'll sustain.

24          MR. BRIMMAGE:  Okay.  Fair enough.

25   BY MR. BRIMMAGE:

1    Q    You weren't involved in terminating the employees,

2    right?

3    A    I'm sorry.  I didn't hear the earlier part.  Weren't

4    involved?

5    Q    You weren't involved in terminating the employees,

6    correct?

7    A    I was not involved, correct.

8    Q    You weren't involved in the employees being rehired by

9    Ascension, Blue Ascension, right?

10   A    Correct.

11   Q    And are the employees working in the same space that

12   they worked in before they left FSS?

13   A    Yes.  They would be in (indiscernible) --

14           THE COURT:  Mr. Schwartz, I think something broke

15   up.  Can you repeat that answer?

16           THE WITNESS:  They are working in the FSS

17   warehouse.

18           THE COURT:  Thank you.

19   BY MR. BRIMMAGE:

20   Q    All right, and so Blue Ascension operates out of the

21   FSS warehouse, right?

22   A    Well, when they're working for us, they do.

23   Q    Okay.

24   A    Working for FSS, I mean.

25   Q    Right.  Same warehouse that FSS employees worked in

1    before Blue Ascension came on, right?

2    A    And some FSS employees still work there.

3    Q    Okay.  Which warehouse is this?

4    A    It's the one on Strassman.

5    Q    Let me switch gears a little bit.  You said you did

6    some due diligence into Blue Ascension, right?

7    A    I described what I did.  Yes.

8    Q    And I just want to make sure the timeframe of that was

9    about the time of your meeting with Mr. Riley, right?

10   A    It was after my meeting with Mr. Riley.

11   Q    After the meeting with Mr. Riley.  Okay, and your

12   meeting with Mr. Riley was on July 18th, right?

13   A    Correct.

14   Q    Okay.  So you didn't do any due diligence on Blue

15   Ascension or Mr. Riley prior to that.  I just want to make

16   sure, right?

17   A    No, other than asking who he was.

18   Q    Okay.

19   A    But (indiscernible) --

20   Q    And I want to make sure we're clear on what your due

21   diligence was.  Your due diligence was you talked to Mr.

22   Riley, right?

23   A    Correct.

24   Q    You talked to Mr. Jones, Alex Jones, right?

25   A    Correct.

1   Q    You ran a background check, right?

2   A    Correct.

3   Q    Anything else?

4   A    Well, I mentioned I talked to Mr. Roddy.

5   Q    Anything else?

6   A    I may have spoken to Mr. Jones -- Dr. Jones, excuse me.

7   Q    Okay.  Anything else?

8   A    I believe that was essentially it.

9   Q    Okay.  Just for the Court, who is Mr. Roddy?

10  A    Blake Roddy is -- I believe he was the man in charge of

11  inventory and purchasing.

12  Q    For FSS?

13  A    Yes.

14  Q    Okay, and then the background check, what kind of

15  background check did you do?

16  A    I had a -- it's not a complete check.  I did criminal

17  and we did known associates, his employment history,

18  location history, property ownership, liens, litigation.

19  Q    Did you personally do this or you had someone do it?

20  A    I personally did it.  It didn't take five minutes.

21  Q    Okay.  So you spent five minutes on a background check

22  and you personally did it, right?

23  A    Correct.

24  Q    Okay.  All right.  So (indiscernible) --

25  A    Well (indiscernible) the report.  But I read it.  It

1   was a very extensive report.

2   Q    All right.  Let's go to -- you have seen the, is that

3   right, the Blue Ascension article of formation documents.

4   Do I have that right?

5   A    I have seen some things the secretary of state showing

6   the registration and organization of the LLC.  I've not seen

7   any member agreements, (indiscernible) agreement or articles

8   of association or organization, just the SOS filing.

9   Q    All right.  You haven't seen anything else other than

10  the SOS filing, right?

11  A    That's what I just said.

12  Q    Did you ask for any other documents regarding Blue

13  Ascension?

14  A    No.

15  Q    So part of your due diligence did not include for

16  asking for those.  Got it.  Blue Ascension, do you know how

17  to spell -- how it's spelled, ascension?

18  A    Probably not because it's A-S-E-N -- I mean, it's S-T-

19  I-O-N or not.

20  Q    Okay, and when did you look at the SOS document?

21  A    I don't recall.

22  Q    Where did you get it?

23  A    We probably pulled it down, I guess.  I'm trying to

24  think -- well, I don't remember.  But I know we had it

25  pulled down.

1   Q    Did you personally do that or did someone give it to

2   you?

3   A    I did not do it.  I had one of my staff would have

4   given it to me.  I didn't do that.

5   Q    Well, I mean, let's be clear.  Do you or do you not

6   know, under oath, where you got the SOS formation document

7   for Blue Ascension?

8   A    Well, I've gotten several recently from various filings

9   (indiscernible) but prior to that I don't know where I got

10   the one I remember seeing.

11   Q    All right.  You saw it was formed in March of 2022?

12   A    Correct.

13   Q    All right.  Any idea why it was formed when it was

14   formed?

15   A    That'd just be really conjecture on my part.

16   Q    You don't know, right?

17   A    (indiscernible) Alex Jones told me why it was

18   (indiscernible) --

19   Q    Okay.  All right, and you have not done any due

20   diligence into who might have an ownership interest in Blue

21   Ascension, right?

22   A    Other than, like I said, asking Mr. Riley and Mr. Jones

23   and possibly Dr. Jones.  But other than that, I've not

24   looked at any books and records on ownership.

25   Q    And you haven't asked for the organizational documents.

1    We just talked about that.  So you don't know one way or

2    another whether or not anybody other than Mr. Riley has an

3    ownership interest in Blue Ascension, correct?

4    A    I have no knowledge, personal knowledge of that.

5    Q    All right.  One way or another, right?

6    A    I just said I have no personal knowledge of it.

7    Q    Okay.  You do know that Mr. Riley has a history with

8    FSS, right?  He was employed by FSS, right?

9    A    Yes.  I'm aware of that.

10   Q    Yeah, and what kinds of jobs did he do for FSS?

11   A    From what I understand, he worked in fulfillment with

12   them for a number of years, in total up to six years.  I

13   know he -- well, I don't know.  I've heard -- I know he

14   trained, physically trained with Mr. Jones.  I don't know if

15   it was as a job or they liked to work out together.

16   Q    All right.  You say you understand he worked in

17   fulfilment.  Where is that understanding from, and do you

18   know that for a fact?

19   A    Again, I wasn't there then.  So I don't have any

20   personal knowledge of when he started work and when he left

21   work employed by FSS.  My understanding is based on what

22   I've been told.  I've been led to believe by Mr. Jones and I

23   think something I saw in connection with this hearing.

24   Q    Okay.  You know he used to work out or maybe still does

25   with Mr. Jones, right?

1    A    Well, I heard that he worked out with Mr. Jones.

2    Q    Okay.  Do you know that he also did other errands for

3    Mr. Jones?

4    A    I don't know.

5    Q    You don't know?

6    A    No.

7    Q    What was his title in -- what was his title in the

8    fulfillment group when he was with FSS?

9    A    I have no idea.  I don't know what anyone's title is

10   there.

11   Q    What were his job responsibilities when you think he

12   was in the fulfillment group at FSS?

13   A    Well the document (indiscernible) I'm sorry.

14   Q    I need to apologize.  I think I gave you two questions.

15   Let's start with what was his title in the fulfillment group

16   for FSS.

17   A    I don't know.

18   Q    What were his responsibilities in the fulfillment group

19   for FSS?

20   A    My understanding is he managed fulfillment which would

21   have been the same role in the process.

22   Q    When you say your understanding, what's your

23   understanding based on?

24   A    From talking to him about his knowledge of fulfillment

25   operations at FSS and the cost structure.

1    Q    Okay, and did you see any documents that identified him

2    actually doing any of those things at FSS?

3    A    No.  I have not seen any.

4    Q    You didn't see any documents that identified him as

5    actually having a title and working in the fulfillment

6    services group, did you?

7    A    Well, I haven't seen any documents that have titles for

8    anybody except maybe Alex Jones.  So it's very hard to find

9    out what people's titles are, if they have any.

10   Q    All right.  You don't know for a fact that he even

11   worked in the fulfillment services group, right?

12   A    No.  I've not researched if he actually was employed

13   there.

14   Q    Okay.  Let's look at a couple of emails, if we could.

15             MR. BRIMMAGE:  Your Honor, these are not those

16   emails.  These are these emails.  So let's look at Exhibit

17   2, if we could.

18             THE COURT:  So --

19             MR. BRIMMAGE:  And that would be -- I'm sorry.

20             THE COURT:  Go ahead, Mr. Brimmage.

21             MR. BRIMMAGE:  It's -- yeah, I'm messing up the

22   title of them, Your Honor.  It would be Document 60-2, which

23   --

24             THE COURT:  Okay.

25             MR. BRIMMAGE:  -- should be -- have we found it?

 1              THE COURT:  Just give me a second.

 2              MR. BRIMMAGE:  Can we -- if we can admit Nicholas

 3    Lombardi --

 4              THE COURT:  Sure.  Let me just --

 5              MR. BRIMMAGE:  I think he can put it up there or,

 6    Your Honor, if you would rather do it, if it's more

 7    efficient --

 8              THE COURT:  No, no, no, no.  If Mr. Lombardi is

 9    there, I certainly will -- I've just got to find him.

10              MR. BRIMMAGE:  Okay.

11              THE COURT:  Oh, I see him there.  All righty.  Mr.

12    Lombardi, I'm going to make you a presenter.

13              MR. BRIMMAGE:  All right.  There we go.  If we can

14    go to the next page, Nick, which is the only page of the

15    actual document.  And we're going to have to blow it up a

16    lot if Mr. Schwartz and I'm going to be able to see it.  All

17    right.  A little bit more.  Is that possible?

18    BY MR. BRIMMAGE:

19    Q    Mr. Schwartz, do you have a magnifying glass?

20    A    Oh, I can see the lower half.  I can't see the upper

21    half.

22    Q    Okay.  Good.  All right.  Let's look at the lower half

23    because, as you know, you read emails backwards.  And then

24    we'll go to the upper half.  Does that sound fair?

25              MR. BATTAGLIA:  Your Honor, I'm going to object to

1   him asking a witness to testify to an exhibit that's not in

2   evidence.

3          THE COURT:  Mr. Brimmage?

4          MR. BRIMMAGE:  Your Honor, Mr. Schwartz has

5   testified about his due diligence.  I'm not offering this

6   for the truth of the matter asserted therein.  I want to

7   know if he knows anything about any of it.  We're not going

8   to spend a lot of time on it.

9          But I want to know if he knows about any of the

10  roles that Mr. Riley actually did play or that these emails

11  say he might have played.  And if he doesn't, he doesn't and

12  we'll just reaffirm that he didn't look at these in his due

13  diligence.  It doesn't have to be in evidence to talk about

14  it.

15         THE COURT:  I agree.

16         MR. BATTAGLIA:  Notwithstanding everything Mr.

17  Brimmage just said, it's not in evidence and he's asking

18  this witness to testify to a document.  It has no

19  provenance, no foundation.

20         THE COURT:  Mr. Brimmage --

21         MR. BATTAGLIA:  And it's hearsay.

22         THE COURT:  I'm going to sustain that objection.

23  Mr. Brimmage, maybe you can get it in another way.  I just -

24  - you're not offering this to impeach the witness or in

25  cross-examination.  You're asking this witness about his due

1    diligence.  Why don't you ask him about it?

2              MR. BRIMMAGE:  Okay.  That's fair enough, Your

3    Honor.

4    BY MR. BRIMMAGE:

5    Q    Mr. Schwartz, did you look at any emails that Mr. Riley

6    was a party to in any of your due diligence?

7              THE COURT:  Counsel, before you do that, let me

8    ask the presenter to take this email down.  All righty.

9    Thank you.

10             Go ahead, Mr. Brimmage.  Mr. Brimmage?

11   BY MR. BRIMMAGE:

12   Q    Did you look, Mr. Schwartz?

13   A    Did I look?

14   Q    At any emails on which Mr. Riley was a recipient,

15   sender, cc, to identify what roles that he has played for

16   FSS prior to establishing the Ascension entity?

17   A    I did not look at any emails Mr. Riley was sender,

18   receiver, copied, mentioned at any time.

19   Q    Okay.  So whatever role he was playing in FSS, the

20   bottom line is you didn't do any due diligence to identify

21   specifically what his role was in the years leading up to

22   Blue Ascension; is that correct?

23             MR. BATTAGLIA:  Objection, Your Honor.  Asked and

24   answered.  This witness has talked about the due diligence

25   he's done and I'm not going to -- Mr. Brimmage can frame it

1    how he wants.  But the testimony stands as his testimony.

2              THE COURT:  I'll sustain.

3    BY MR. BRIMMAGE:

4    Q    Did you do any due diligence into other alternatives

5    for fulfillment services other than Blue Ascension?

6    A    At the -- when?  Excuse me.  Could you (indiscernible)

7    timeframe?

8    Q    Ever.  Ever.

9    A    Yes.

10   Q    When?

11   A    After filing the bankruptcy, I started trying to

12   familiarize myself with providers of the service in the

13   Austin market.

14   Q    All right.  Now this is when FSS was still providing

15   fulfillment services, right?

16   A    No.  Blue Ascension was providing fulfillment services

17   with --

18   Q    Not the --

19   A    (indiscernible) filing of the bankruptcy.

20   Q    Ah, I thought you meant -- okay, so before and after.

21   All right.  So before filing bankruptcy, you looked at other

22   fulfillment services; is that right?

23   A    No.  No.  I did it after.

24   Q    After the bankruptcy?

25   A    Correct.

1   Q    All right.  Did you look at Amazon fulfillment?

2   A    Actually they're one that I did look at (indiscernible)

3   --

4   Q    Did you look at FedEx fulfillment?

5   A    No.  I haven't looked at FedEx.

6   Q    Did you look at ShipBob fulfillment?

7   A    Yes.

8   Q    Do you have any documents that demonstrate that you

9   looked at Amazon fulfillment?

10  A    I didn't bother putting it into the bucket of

11  possibles.

12  Q    Did you have any documents -- do you have any documents

13  that demonstrate any due diligence that you did into other

14  fulfillment services for FSS?

15  A    I think I have a couple emails from ShipBob.

16  Q    Okay.

17  A    And with another (indiscernible) there's another one --

18  excuse me.  There's another one I've got some documentation

19  on.  I can't remember its name.

20  Q    So you've got emails from two is your testimony, right?

21  A    No.  I have documents from two.

22  Q    All right.  Do you have documents from any others other

23  than the two?

24  A    I may.  I don't know if I've (indiscernible) any others

25  yet at this time.

1    Q    All right.  Not that you can testify to, right?

2    A    Correct.

3    Q    All right, and you would agree with me, if you did some

4    due diligence, because we have that other fulfillment

5    services can do it less expensively than Blue Ascension,

6    correct?

7    A    Not sure I would agree with that based on what I have

8    seen.  In the industry it's a little hard to determine

9    unless you get really down into the nitty-gritty

10   (indiscernible) --

11   Q    All right, and is it fair to say then you haven't

12   gotten down to the nitty-gritty of your exact job for FSS in

13   fulfillment services to be able to determine whether or not

14   a fulfillment service can do it less expensively?

15   A    Well, first off, that is not only the criteria.  So I

16   have not gotten down to that level.  But I have not

17   requested proposals at this time.  I'm not ready to.

18   Q    Is that a yes, Mr. Schwartz?

19   A    I have no idea.

20        MR. BATTAGLIA:  Objection, Your Honor.

21        THE COURT:  I think he can answer the question.

22        THE WITNESS:  What was the question again then?

23   BY MR. BRIMMAGE:

24   Q    Isn't it fair to say at this point in time your

25   testimony is you have not gotten down to the nitty-gritty to

1    determine whether or not another fulfillment service can

2    provide less expensive fulfillment services to FSS than Blue

3    Ascension?

4            MR. BATTAGLIA:  Objection to form.  Nitty-gritty

5    is a rather imprecise term.

6            THE COURT:  I'm sure Mr. --

7            MR. BRIMMAGE:  I'm trying to use the witness's

8    term.

9            THE COURT:  Hold on a second, folks.

10           MR. BRIMMAGE:  Maybe I didn't.

11           THE COURT:  I'm sure Mr. Schwartz knows what that

12   means or, if not, he can explain what his understanding is

13   and answer the question.

14           THE WITNESS:  At this time I have not requested

15   proposals from anybody.  But I would like to point out that

16   price is only one factor and maybe not the most important in

17   this situation.

18   BY MR. BRIMMAGE:

19   Q    Have you done -- well, isn't it true though, Mr.

20   Schwartz, you also haven't done due diligence into the other

21   fulfillment services providers to see whether or not they

22   can provide the other services that you see are equally more

23   important?  You haven't done that work to date, correct?

24   A    Correct.  I'm still looking through potential

25   candidates and trying to get an understanding of the

1    industry in Austin.

2    Q    And why haven't you done that work?

3    A    Something called a bankruptcy and cash collateral order

4    and sales going through the roof and trying to fulfill

5    orders.  It's just -- when you look at the list of

6    priorities, it's up there.  But it's underneath burning

7    fires.

8    Q    Now going to the price list, the price list is not a

9    contract, right?

10   A    Correct.  It is not.  At least I don't think it is.

11   Q    Yeah.  It's not signed, is it?

12   A    Correct.

13   Q    You didn't sign it and Blue Ascension didn't sign it.

14           MR. BATTAGLIA:  Objection, asked and answered.

15           THE COURT:  Sustained.

16   BY MR. BRIMMAGE:

17   Q    FSS is free to change fulfillment services at any point

18   in time, correct?

19   A    Correct.

20   Q    When Blue Ascension was formed, did you do any due

21   diligence on how it was capitalized?

22   A    I wasn't there when it was formed.  So no, I didn't.

23   Q    Do you know sitting here today how it was capitalized?

24   A    I do not know.

25   Q    Do you know whether or not Mr. Alex Jones provided

1   money to Blue Ascension to get it going?

2   A    I know he told me he did not.  But I have not seen his

3   bank account or Blue Ascension's.

4   Q    If he did not, did you ever ask anybody where the money

5   came to capitalize Blue Ascension to get it started?

6   A    I asked Mr. Riley, and he said it came from his

7   personal account.

8   Q    How much did it take to capitalize Blue Ascension?

9   A    I don't know.

10   Q    How long did Mr. Riley work for FSS or Alex Jones prior

11   to becoming involved in Blue Ascension?

12   A    I think, as I said, I've been told six years.  But I

13   don't know that.

14   Q    Have you looked into FSS bringing the fulfillment

15   services back in-house?

16   A    If we changed, that would probably be the easiest thing

17   to do.  But I have not looked at it.

18   Q    Give me just one second, Mr. Schwartz.  I'm going over

19   my notes.  And as you and I discussed before, that's always

20   a good thing.  Mr. Schwartz, what was Mr. Riley's salary at

21   FSS?

22   A    I don't know.

23   Q    Did you ever look for an organization chart of FSS that

24   would identify where Mr. Riley fit in the org chart?

25   A    I can't say I looked for it.  I asked for it.

1    Q    Okay.  Did you see it?

2    A    I was told there is none, and I've never seen one.

3    Q    Who told you that?  Who told you that?

4    A    Mr. Rowe told me that.

5         THE COURT:  I'm sorry --

6    BY MR. BRIMMAGE:

7    Q    I apologize, Mr. Schwartz.  Could you repeat it?

8    Because it just blanked out and I didn't hear it.  I'm

9    sorry.  Just say it again, please.

10        THE COURT:  Yeah.

11        THE WITNESS:  Mr. Rowe told me.

12   BY MR. BRIMMAGE:

13   Q    Who is Mr. Rowe?

14   A    He's a consultant that was employed by either FSS or

15   PQPR prior to my arriving on the scene.

16   Q    Okay.  Do you know who Mr. Wheldon is?

17   A    I knew a Mr. Wheldon, but he's dead.

18   Q    Associated with FSS?

19   A    I'm sorry.  You broke up on me.  I'm missing the first

20   two or three words.  But I think you're -- my Wheldon was

21   not associated with FSS.

22   Q    Are you familiar with a Mr. Wheldon that is associated

23   or was associated with FSS?

24   A    No.  I'm not.

25   Q    Are you familiar -- well, are you familiar with a Mr.

1   Henson at FSS?

2   A      Henson?  No.

3   Q      H-E-N-S-O-N.

4   A      H-E-N-S -- no.

5   Q      So if a Mr. Henson has been involved in inventory

6   fulfillment services at FSS, you're not aware of it; is that

7   right?

8   A      Correct.  Only Mr. Riley (indiscernible) associated

9   with fulfillment services (indiscernible) associated with

10  fulfillment services.  I take that back.  I met a young lady

11  who was involved in that, a supervisor.

12  Q      She was a supervisor in the FSS fulfillment services?

13  A      She was at a supervisory level.  I'm not going to say

14  that was her title.  But she was at a supervisory level at

15  the warehousing operation.

16  Q      What is her name?

17  A      I don't remember.

18  Q      Is she now with Blue Ascension?

19  A      I don't know.  I'd have to look and see.  I would

20  assume so.  But I haven't looked.

21  Q      You don't know.  Okay.  Who is Mr. Rowe?

22  A      He's a CPA.

23  Q      Does he work for FSS?

24  A      He works for a company called Acuity.  He's a

25  consultant (indiscernible) I guess we technically hired

```
 1   Acuity to provide consultant (indiscernible) he's a
 2   consulting service to them (indiscernible) FSS and/or PQPR
 3   employed him.  I'm not too sure on that.
 4           THE COURT:  Mr. Schwartz, what's Mr. Rowe's first
 5   name?
 6           THE WITNESS:  Bob.
 7           THE COURT:  Bob Rowe.  And you said the name of a
 8   company.  Can you -- I think sometimes on the audio gets a
 9   little tricky.  Can you just, just so we have a clean
10   record, articulate the name of the company and sometimes --
11   maybe just spell it out just to make sure we've got a clean
12   record.
13           THE WITNESS:  Yes, sir.  My understanding is its
14   name is -- well, I've seen it, A-C-U-I-T-Y.
15           THE COURT:  Oh, Acuity.
16           THE WITNESS:  Yes, sir.
17           THE COURT:  Okay.  Thank you.
18   BY MR. BRIMMAGE:
19   Q    So you asked Mr. Rowe for an org chart.  Did you ask
20   anybody else at FSS for an org chart?
21   A    Yeah.  I hired a business manager and they did an
22   organization chart (indiscernible) trying to build one.
23   Q    Other than the new guy you hired and this consultant
24   that doesn't work for FSS directly, is it true you didn't
25   ask anybody else for an org chart of the FSS organization?
```

1    A    No.  I wouldn't say that's a true statement.

2    Q    Okay.  Who else did you ask?

3    A    I (probably indiscernible) a few people.  I don't

4    remember.

5    Q    Mr. Schwartz, yeah, let's be clear.  When you say I

6    probably did something, I need you to testify under oath

7    what you did or didn't do.  So can you tell the Court right

8    here, right now, other than Mr. Rowe, who's a CPA not

9    employed by FSS, a consultant, and the new guy that you

10   hired, who else did you ask for an org chart.

11   A    I asked -- I recall asking if there was an org chart

12   from a couple other people.  But again, I'm not totally

13   certain who they were.  And very likely Blake Roddy would

14   have been one of them because I talked to him a lot.

15   Q    And I guess it's true, Mr. Schwartz, you never found an

16   org chart for the FSS organization, correct?

17   A    That's what I said.

18              MR. BATTAGLIA:  Objection, asked and answered.

19              THE COURT:  I think he can answer.  I want to hear

20   the confirmation on this as well.

21              THE WITNESS:  Yeah.  That's what I said earlier.

22              THE COURT:  Okay.  Thank you.

23   BY MR. BRIMMAGE:

24   Q    Okay.  How many orders are for $30 or less?

25   A    I don't -- I didn't hear what you said.

1   Q   How many orders are placed for $30 or less?

2   A   I don't know that.

3   Q   How many orders are placed for $20 or less?

4   A   I've not looked at the distribution of orders yet

5   (indiscernible) --

6   Q   Okay.  Have you done any analysis to determine if you

7   pay up front $20 per order, how many orders you will lose

8   money on?

9         MR. BATTAGLIA:  Objection, form.  I don't know

10   whether Mr. Brimmage's question says $20 includes the

11   shipping charge of $10 or not.

12         THE COURT:  I don't know where the $10 came from.

13   But your point is well taken.  Why don't you ask it a

14   different way, Mr. Brimmage?

15         MR. BRIMMAGE:  I appreciate that.

16   BY MR. BRIMMAGE:

17   Q   So the cost -- let me just build it up here and make

18   sure I'm okay with -- or I'm on board with this.  So there's

19   $14 for shipping cost, right, shipping and handling?

20   A   Approximately, yes.

21   Q   And $6 for fulfillment cost, right?

22   A   Correct.

23   Q   So that's $20, right?

24   A   Correct.

25   Q   And tell us all what is the Debtor asking the Court to

1    do today.

2    A     The Debtor is asking the Court to allow us to charge

3    our credit card settlement for $20 for each order placed

4    since that is what we're going to be billed for fulfilling

5    those orders.

6    Q     Okay.  Have you done any analysis to determine how much

7    money the Debtor will lose on orders that are $20 or less if

8    the Court grants this relief?

9    A     No.  We've not looked at how many orders, if any, are

10   $20 or less.  I think the -- well, I won't --

11   Q     Who is the credit card processor?

12          MR. BATTAGLIA:  Your Honor, I'm going to object.

13   This is highly sensitive, and if the answer is to be given,

14   I do want it to be given under seal.  As we've explained

15   previously, the surest way to shut the Debtor down is to

16   have its credit card processor attacked in a new platform

17   and fashion and it would be literally instant death.  So I'm

18   going to object and ask that if we're going to do this, it

19   somehow needs to be under seal, which is rather unwieldly

20   inasmuch as this is a video presentation.

21          THE COURT:  Yeah.  Mr. Brimmage, for purposes of

22   today, I think we can just proceed with the credit card

23   purchaser.  But who -- just keep it basic.  But for purposes

24   of disclosure, I think everybody's rights are preserved.  I

25   think you do get to ask who it is at some point.  But I'm

1    going to ask the parties to work through that.  For the

2    purposes of today, I don't think it's relevant for the

3    analysis that I'm doing today.

4            MR. BRIMMAGE:  Your Honor, can I see if I can work

5    around it a little bit --

6            THE COURT:  Yeah.

7            MR. BRIMMAGE:  -- to get what I'm really trying to

8    get at?  Okay.

9            THE COURT:  Absolutely.

10   BY MR. BRIMMAGE:

11   Q    Let me ask you this, Mr. Schwartz.  Do you know who the

12   credit card processor is?

13   A    I know the name.  I may not have it exactly right.

14   Q    Have you been involved in negotiating the terms

15   directly with the credit card processor?

16   A    It may be helpful at this point, I mean, to make sure

17   what terms are, clarify terms.  When we refer to the

18   processor, that is not the company that actually clears the

19   credit card.

20       That is a company that takes that -- the information

21   and is funded from the credit card company and goes through

22   the analysis that we went through earlier to divide the

23   money up between us and PQPR and to pay -- make sure the

24   charges are processed by the credit cards and that the

25   processes are okay.  So that, when you refer to the

1   processes, that's what we're talking about.  That's the

2   intermediate entity.

3   Q    And that's helpful, and I appreciate that.  Are there

4   terms negotiated with the intermediary processor?

5   A    Yes.

6   Q    And have you been personally involved in negotiating

7   those terms?

8   A    I was personally involved in renegotiating those terms

9   after I was engaged.

10   Q    And is the intermediary processor entity in any way

11   related to any person or entity associated with FSS?

12   A    Could you tell me what -- I don't know what related

13   means.

14   Q    Well, has any sort of relationship of any kind.

15   A    Well, I know that the people at the processor know

16   people at FSS.

17   Q    Are they relatives?

18   A    Not to my knowledge.  I don't believe so.

19   Q    Okay.

20   A    But I've not looked into that.

21   Q    And why haven't you looked into that?

22   A    At this point I haven't had any reason to since the

23   agreement predated my coming onboard and we're

24   (indiscernible) in this bankruptcy to determine if there's

25   something there that we need to go after.

1    Q    Okay.  All right.  So if there's affiliated

2    relationships between the intermediary processor and FSS or

3    its related entities or people, you haven't investigated

4    that to date, correct?

5    A    I have not.  That is correct.

6    Q    How long has the current intermediary processor been

7    used?

8    A    Mr. Brimmage, I heard almost none of that question.  I

9    got it's been used.

10   Q    How long has the current intermediator processor been

11   used?

12   A    I'd have to go back and look at the year to get the

13   date.

14   Q    Is it a newly formed entity like Blue Ascension?

15   A    You mean like in 2022?  No.  No.  It's older than that.

16   Q    2021?

17   A    I think it's earlier than that.  But I'm -- I don't

18   want to get much more beyond that.  I don't know for certain

19   (indiscernible) --

20   Q    All right.  Let me just ask this.  Does the

21   intermediary current credit card processors, does it provide

22   or present the same privacy concerns that Mr. Battaglia

23   mentioned earlier?

24        MR. BRIMMAGE:  And Mr. Battaglia, you may want to

25   answer that.

```
 1            MR. BATTAGLIA:  It does.  I think we're talking
 2    about the same entity, Mr. Brimmage.  And I'll take the
 3    Court up on its suggestion that we find a way to deal with
 4    confidentiality on this point --
 5            THE COURT:  Yeah.
 6            MR. BATTAGLIA:  -- at an appropriate time.
 7            THE COURT:  I'm going to reiterate that, and I'm
 8    also going to tell Mr. Brimmage I've given you a lot of
 9    leeway to explore some questions.  But I want to make sure
10    that we get back on point in terms of the ask for today.
11            MR. BRIMMAGE:  I appreciate that, Your Honor.
12    BY MR. BRIMMAGE:
13    Q    Let's go back to the agreement with Blue Ascension.
14    There is no agreement other than the term sheet, right?
15            MR. BATTAGLIA:  I object, asked and answered.
16            THE COURT:  Sustained.
17            MR. BRIMMAGE:  All right.
18    BY MR. BRIMMAGE:
19    Q    So here's my question.  Sometimes in fulfilling orders,
20    product gets damaged, correct?
21    A    Correct.
22    Q    Without an agreement or a contract, how is it decided
23    how Blue Ascension is liable for any such damage?
24    A    Well, it'd have to be determined what caused the damage
25    and we've got the shipper more frequently ends up being the
```

1    source of damage.  But if it's not the shipper's, then it's

2    got to be in the packaging which would be Blue Ascension's

3    problem.  It's that simple.  It's just (indiscernible) --

4    Q    There's no contract term or agreement between r Blue

5    Ascension and FSS on how to handle damage that Blue

6    Ascension causes to product when it's fulfilling its

7    services, correct?

8    A    Correct.  That'd be just pick up a phone and call each

9    other and say you're responsible, your responsible.

10   Q    So Blue Ascension we've established is using the same

11   warehouse that FSS is using, right?

12   A    Correct.

13   Q    And does FSS own that warehouse?

14   A    No.

15   Q    Who owns the warehouse?

16   A    They lease it to us.  I don't know who they are.

17   Q    Okay.  Who pays the insurance for Blue Ascension to

18   operate as a business?

19   A    Blue Ascension pays for their insurance.

20   Q    And have you confirmed that they actually have

21   insurance for any accidents or other damage that's caused in

22   the warehouse that FSS is leasing?

23   A    I have not done that.

24   Q    If an employee gets hurt, a Blue Ascension employee

25   gets hurt in the FSS warehouse, there's no agreement that

1    controls how that will be handled, right?

2    A    That is incorrect.  They have an insurance policy,

3    their own insurance policy is the only thing I can think of.

4    Q    But you haven't confirmed that they actually have an

5    insurance policy, Blue Ascension, correct?

6    A    Correct.

7    Q    Okay.  What rent is Blue Ascension paying to FSS to use

8    the warehouse?

9    A    At this time, they're not paying rent.  We're paying

10   the rent.  We're paying the rent and utilities.

11   Q    Okay.  I'm looking at my notes, Mr. Schwartz.

12        MR. BRIMMAGE:  Your Honor, at this time I'm going

13   to pass -- well, let me ask one quick question.

14   BY MR. BRIMMAGE:

15   Q    Mr. Schwartz, did you read the Debtor's emergency

16   motion before it was filed?

17   A    This one for this hearing?  Yes.

18   Q    Yes?  You did?  Okay, and did you make any comments to

19   it before it was filed?

20   A    I believe so.  I commented on everything that's been

21   sent to me.

22   Q    All right.  You were good with everything that was said

23   in the motion; is that correct?

24   A    I think so, yes.

25        MR. BRIMMAGE:  Your Honor, at this point, I'll

1    pass the witness.

2              THE COURT:  Okay.  Thank you.  Does anyone else

3    have any questions in the form of cross-examination for this

4    witness?

5              MR. NGUYEN:  Your Honor, this is Ha Nguyen, from

6    the U.S. trustee's office.  I only have a couple of

7    questions, if I may.

8              THE COURT:  Okay.  You may proceed.

9              CROSS-EXAMINATION OF W. MARCH SCHWARTZ

10   BY MR. NGUYEN:

11   Q    Mr. Schwartz,  my name is Ha Nguyen.  I represent the

12   United States trustee, and I just have a couple of follow-up

13   questions.  Mr. Brimmage was very extensive with his cross.

14   So I won't be too long.

15        Mr. Schwartz, fulfillment is a critical function of FSS

16   operations; is that correct?

17   A    That is correct.

18   Q    And under the price list with Ascension, this is a

19   multimillion dollar a year engagement; is that correct?

20   A    The -- I'm sorry.  The fulfillment services is a

21   multimillion dollar a year?  Depending on what our sales do,

22   yes, it would be a significant engagement.

23   Q    As the chief restructuring officer for many companies,

24   do you often enter into multimillion dollar deals without a

25   contract?

1          MR. BATTAGLIA:  Objection, form, Your Honor.

2     There is no -- there is no multimillion dollar contract.  I

3     object to the characterization of the evidence.

4          THE COURT:  Mr. Nguyen, why don't you ask it a

5     different way?

6          MR. NGUYEN:  Your Honor, Mr. Schwartz testified --

7     yes, Your Honor.

8     BY MR. NGUYEN:

9     Q    Mr. Schwartz, you've testified that fulfillment is a

10    critical function of FSS and do you normally entrust a third

11    party to carry out the obligations that are critical to the

12    operation of FSS without a written contract and proper

13    terms?

14    A    I don't know what you mean by proper terms.  But it all

15    depends on a situation.  Most of the time, if you can, you

16    try to have -- you have a contract.  There's no doubt about

17    that, or a contract or an order from the Court that

18    essentially lays out responsibilities (indiscernible) --

19    Q    And you mentioned (indiscernible) what proper terms

20    were.  Can you tell me what are Blue Ascension's obligations

21    under the price list if it defaults on its obligations to do

22    fulfillment for FSS?

23    A    What is its obligation?  Its obligation is to if it

24    takes the money (indiscernible) fulfill the product, it

25    needs to fulfill the product.  It needs to ship the product.

1    That's the reason it accepts the money.

2    Q    And Mr. Schwartz, you signed a 39-, 40-page declaration

3    in support of the first day motion.  Do you recall that

4    declaration?

5    A    I recall -- I recall the declaration.  I don't recall

6    everything in it.  As I've already demonstrated, my memory's

7    not that good.

8    Q    And in your declaration, the word fulfillment was cited

9    about three times.  But it doesn't discuss anything about

10   Blue Ascension; is that correct?

11   A    That is correct.

12   Q    Have you been on the Infowars store?

13   A    Yes.

14   Q    How many items on the Infowars store are under $20?

15   A    I don't know (indiscernible) --

16   Q    Are you familiar with the item, I looked it up this

17   morning, (indiscernible) fluoride-free toothpaste?

18   A    Yes.  I'm familiar with it in that I know of it.

19   Q    And that item is listed at about $9.95 and the shipping

20   is about $10.  The tax is $1.65.  So if I go and purchase

21   that item for $21.60, how much of those revenue goes to the

22   Debtor if I make that purchase of $21.60?

23   A    Well effectively it all goes to the Debtor.  Well, I

24   guess technically the tax doesn't ever actually reach the

25   Debtor's hands.  The Debtor holds it.  The rest of it goes

1    to the Debtor effectively and then --

2    Q    Let me ask it a -- let me ask it a different way.  How

3    much of the $21.60 goes to Blue Ascension?

4    A    Well, $20 would go to Blue Ascension.

5    Q    And earlier you testified you haven't done an analysis

6    of how many of these under $20 orders exist, correct?

7    A    Correct.  I looked at the average order.

8    Q    And I'm (indiscernible) the fluoride-free toothpaste

9    and FSS has to pay for this product, correct?

10   A    Correct.

11   Q    And FSS will get nothing from this sale, correct?

12   A    Well, I mean, yeah, the $20 would eat up basically

13   everything but the taxes.

14   Q    So earlier you described the $20 fulfillment as a

15   passthrough.  It's not exactly a passthrough under this

16   scenario, correct?

17   A    No, it is in looking at the overall (indiscernible)

18   maybe $6 an order on average.  We have small orders.  Yes.

19   It's hard to make money on the small orders.

20   Q    All right.  Let's talk about -- well, that answered my

21   question.  The $21.60, there's no passthrough.  The Debtor

22   loses money if someone purchases this toothpaste, correct?

23   A    Well, that's actually not correct.  If it's all you

24   purchase is the tube of toothpaste.  If you want to buy a

25   $21 tube of toothpaste then, you know, we don't make any

1   money on that.  The Debtor doesn't make any money on that.

2   Q    Okay.  You actually lose money on that purchase,

3   correct?

4   A    On a single tube of toothpaste, yes, all day long.

5   Q    Does Blue Ascension employees operate in any other

6   warehouse other than the FSS warehouse?

7   A    To my knowledge, not at this time.

8   Q    Okay.  Are all of the Blue Ascension employees the same

9   employees that worked for FSS?

10  A    I can't say that all of them are.  I mean --

11  Q    Okay.  Blue Ascension isn't -- it isn't a charitable

12  organization, correct?  It needs to make money.

13  A    Well, I don't know about how their feelings on that.

14  To my knowledge, they're not organized as a Texas charity.

15  Q    Well, Blue Ascension has to charge FSS to cover its

16  costs, correct, from the business end?

17  A    Well, yes and no.  Ultimately it's going to be in the

18  interest of making money, but it is -- my understanding, not

19  all of its costs are being charged to FSS.

20  Q    Does Blue Ascension have any other customers?

21  A    I don't know.

22  Q    Have you ever asked?

23  A    I asked Mr. Riley on the 18th.  But I haven't talked to

24  him since about that issue.

25  Q    And what was Mr. Riley's response when you asked if

1   Blue Ascension had any other customers?

2   A    That he was working to -- that was his goal, to get

3   more customers and one of the reasons he created Blue

4   Ascension and (indiscernible) was to establish himself as a

5   niche, in this market niche.  I don't know if he's done it,

6   started with other customers or not since then.

7   Q    But as far as you know, there are no other customers of

8   Blue Ascension besides FSS at this time?

9   A    As I said, I have no idea.

10         MR. NGUYEN:  Okay.  Give me one second, Your

11   Honor.  I just want to make sure -- Mr. Brimmage covered

12   most of everything.  I just want to make sure.  Your Honor,

13   I will pass the witness.  Thank you for the opportunity.

14         THE COURT:  Okay.  Thank you.  Let's see.  Does

15   anyone else have any questions for this witness?

16         MR. BATTAGLIA:  I do have some redirect, Your

17   Honor.

18         THE COURT:  Okay.  I'm just making sure we've --

19         MR. BATTAGLIA:  Yes, sir.

20         THE COURT:  -- cleared the road on this one way.

21         Okay.  Mr. Battaglia, I'll turn it over to you for

22   redirect.

23         MR. BATTAGLIA:  Thank you.  Thank you, Your Honor.

24         REDIRECT EXAMINATION OF W. MARC SCHWARTZ

25   BY MR. BATTAGLIA:

1  Q    How many times have you been to the warehouse?

2  A    Have I been to the warehouse?

3  Q    Yes, sir.

4  A    Maybe twice.

5  Q    And how long have you spent in the warehouse?  Let me

6  rephrase that question.  Describe your ability to observe

7  the manner and means in which the fulfillment was provided

8  in the warehouse.

9  A    I've been right in the middle of it.  I've been

10  watching from the picking to the packing to the labeling.

11  Q    Based on your interactions with Mr. Riley and Blue

12  Ascension, do you have an opinion on Blue Ascension's

13  competency to provide the fulfillment services to the

14  Debtor?

15  A    Well, I'm having -- we've been with them for a few

16  weeks now.  I can tell you that it appears they're competent

17  and they know what they're doing.  They're efficient

18  (indiscernible) appears that our actual cost of fulfillment

19  per unit is coming down, which I was (indiscernible) there

20  had been a period where what I expected to be when we

21  started working with Blue Ascension and as compared to our

22  own historical experience in FSS in fulfilling, the cost of

23  fulfillment.  So I was not expecting to see that it would

24  come down below that.  It looks like it is.

25  Q    And so your opinion on their competencies?

1    A    Yes.  They appear to be competent.

2    Q    And finally if the work --

3    A    (indiscernible)

4    Q    Sorry.  What as CRO would you do if you found a

5    supplier, a fulfillment service company that was capable and

6    willing to provide services for a lower price?

7         MR. BRIMMAGE:  Your Honor, I'll object as it calls

8    for speculation and he's already testified that he hasn't

9    done the underlying work to get to that conclusion.

10        THE COURT:  I'll overrule it.  The question is

11   what would he do if he did find someone.

12        Mr. Schwartz, you can answer the question.

13        THE WITNESS:  Okay.  What if I found someone who

14   could (indiscernible) we would evaluate the cost of the

15   transition and what that might involve.  I'd be very -- I'd

16   be crazy to not look at moving fulfillment services over,

17   you know, to someone who has the capabilities and have been

18   around the business and a willingness to work with us.

19   BY MR. BATTAGLIA:

20   Q    (indiscernible) what do you mean by a willingness to

21   work with us?

22   A    A lot of the vendors are not willing to work with Alex

23   Jones or his companies.  The most recent example is ADP has

24   terminated us, not something they normally do with

25   bankruptcies.

1    Q    What are your intentions to continue to investigate

2    alternate fulfillment providers?

3    A    My intention is that -- well, we have a 90-day window

4    to give Blue Ascension a chance to show itself and to

5    demonstrate the economics that work, and I have that time to

6    begin to look at alternatives and investigate ones that are

7    willing to work with us.

8         And if that's their -- you know, if that situation

9    presents that you've described that they're competent and at

10   a lower cost for an extended period of time, then yeah, we

11   would definitely -- I'd definitely consider coming back to

12   the Court and saying we wanted to change.

13   Q    Are you able to change fulfillment vendors today and

14   have someone in place on Monday?

15   A    No.

16   Q    What would the transition time and cost be?  What do

17   you believe it would be?

18   A    Well, it depends --

19        MR. BRIMMAGE:  Your Honor, I'll object.  Lacks

20   foundation and, as he just said, it depends.

21        THE COURT:  No, he can -- I'm going to overrule.

22   He can answer the question if he has any idea.

23        You can --

24        THE WITNESS:  It just depends on the number --

25   excuse me, Your Honor.

1          THE COURT:  No.  Go ahead.

2          THE WITNESS:  On the number and the costs out

3    there, what that (indiscernible) you have to look at

4    warehousing, which is okay, not so bad (indiscernible)

5    warehouses aren't in Texas.  So if you cut out that, you've

6    got issues of technology integration.  Does it work with our

7    technology or what's it going to cost to change technology?

8          So that has to be worked out.  If we find one that

9    would fit in like a glove tomorrow or Monday, and who would

10   be willing to work with us at a price that's sensible, I

11   think that would be extremely, extremely hard to do.

12   BY MR. BATTAGLIA:

13   Q    Mr. Nguyen asked you about the $9 toothpaste.  How many

14   tubes of $9 toothpaste are you paying $21 for?

15          THE COURT:  Let me -- let me just stop you, Mr.

16   Battaglia.  I'm not interested in the toothpaste.

17          MR. BATTAGLIA:  Fine.

18          THE COURT:  I got it.  I understand why you had to

19   cover it.

20          MR. BATTAGLIA:  Okay.

21          THE COURT:  I just --

22          MR. BATTAGLIA:  With that, Your Honor, I'll pass

23   the witness.

24          THE COURT:  Okay.  Mr. Brimmage, I'll give you an

25   opportunity for a brief recross on issues if you need it.

1              MR. BRIMMAGE:  Ever so -- ever so brief.

2              RECROSS-EXAMINATION OF W. MARC SCHWARTZ

3    BY MR. BRIMMAGE:

4    Q    Mr. Schwartz, isn't it true that you have no way to

5    compare the competency of Blue Ascension to the FSS

6    fulfillment services that occurred prior to your

7    involvement, correct?

8    A    At this point in time, no, I don't have the metrics

9    from the FSS operation.

10   Q    And you never observed the FSS fulfillment operations,

11   correct?

12   A    No.  I did.  I did when I visited the warehouse the

13   first time.

14   Q    Okay.  That was the FSS?

15   A    Yes, sir.

16   Q    But it's the exact same people, right?

17              MR. BATTAGLIA:  Objection, asked and answered.

18   BY MR. BRIMMAGE:

19   Q    You didn't talk to --

20   A    Yeah.  I mean, then it's (indiscernible) --

21              THE COURT:  No.  Hold on a sec.  Mr. Schwartz,

22   hold on a second.  I'm going to sustain that.

23              THE WITNESS:  Sorry.

24              THE COURT:  He has answered that question.  It is

25   what it is.

1          MR. BRIMMAGE:  Okay.

2     BY MR. BRIMMAGE:

3     Q    Just to be clear, Mr. Schwartz, you said you have a 90-

4     day window.  There's no 90-day required window, right?

5     A    Well, if you look at the footnote to the price list, it

6     says 90-day commitment.  So we kind of look at that as,

7     okay, 90 days, we've got to look at all of this.  We've got

8     a lot of things in this facility that has to be worked out.

9     Q    But you could terminate it tomorrow if you wanted.

10    There's no obligation for 90 days.

11    A    That's the reason I did a price list.  I wanted to be

12    able to terminate if I needed to.

13         MR. BRIMMAGE:  Okay.  I'll pass the witness, Your

14    Honor.

15         THE COURT:  Okay.  Mr. Nguyen, anything else?

16         MR. NGUYEN:  No questions, Judge.  Thank you.

17         THE COURT:  Okay.  Mr. Schwartz, I've got no

18    further questions.  So thank you very much.

19         Mr. Battaglia, do you -- are you going to put on

20    the next witness?

21         MR. BATTAGLIA:  Yes, Your Honor.  I think the

22    Court wants to hear from Mr. Riley.  So we'll call Mr.

23    Riley.

24         THE COURT:  No, no.  Don't worry about what the

25    Court -- don't worry about what the Court wants to hear.  I

1    want you to put on your presentation as you see fit.

2              MR. BATTAGLIA:  Yes, sir.  Everybody wants to hear

3    from Mr. Riley.  I'm going to call Mr. Riley, Your Honor,

4    and I know we need to get him back online.

5              THE COURT:  Okay.

6              MR. BATTAGLIA:  I don't know whether the Court

7    wants a break to do that.

8              THE COURT:  Okay.  Why don't we do that.  So why

9    don't we just take -- would ten minutes work, Mr. Battaglia?

10             MR. BATTAGLIA:  I believe so.  Yes, sir.

11             THE COURT:  Okay.  So it is 3:25.  I will -- I'm

12   going to keep the line on and the line is -- so please,

13   everyone, just kind of keep that in mind, and I'll keep the

14   camera, and I'll keep the recorder going.  We'll just step

15   off and I'll come back on in ten minutes, turn my camera on

16   in ten minutes and we'll see if Mr. Riley's here.  Thank

17   you.

18             MR. BATTAGLIA:  Thank you, Your Honor.

19        (Recess)

20             THE COURT:  Okay.  Good afternoon.  Back on the

21   record in Free Speech Systems.  This is Judge Lopez.

22             Mr. Battaglia, are you there?

23             MR. BATTAGLIA:  Your Honor, I can't hear you.

24             THE COURT:  Mr. Brimmage, can you hear me?  All

25   righty, folks.

1              Mr. Nguyen, can you hear me?

2              MR. NGUYEN:  Yes, Your Honor.  I can hear you just

3       fine.

4              THE COURT:  Okay.  Mr. Brimmage, can you hear me

5       okay?  Okay.  Mr. Battaglia, can you hear me?  I don't

6       believe I've got you on 5*.  Oh, there you go.

7              MR. BATTAGLIA:  There we go.

8              THE COURT:  Mr. Battaglia, is that you?

9              MR. BATTAGLIA:  It is, Your Honor.  I'm sorry.

10             THE COURT:  Okay.  No, no.  No worries.

11             MR. BATTAGLIA:  I had to get off the line and

12      restart the video.

13             THE COURT:  All right.  Let's see.  Let's see.

14      Mr. Riley, can you hit 5*?  I want to make sure I can

15      recognize you, sir.  Mr. Riley, can you hear me okay?  I

16      think you might be on mute as well maybe.

17             Mr. Riley, can you say something?  I just want to

18      make sure we can hear you.  You may need to hit 5*.  Mr.

19      Riley?

20             MR. RILEY:  Hi, Your Honor.

21             THE COURT:  Perfect.  Thank you.

22             MR. RILEY:  Yes, sir.

23             THE COURT:  Okay.  Back on the record in Free

24      Speech Systems.  I believe we've got Mr. Brimmage, Mr.

25      Battaglia, Mr. Nguyen, Mr. Riley.  We're ready to proceed.

1          MR. BATTAGLIA:  Yes, sir.

2          MR. BRIMMAGE:  I am, Your Honor.

3          THE COURT:  Okay.  Mr. Riley, let me have you

4     raise your right hand.  Do you swear to tell the truth, the

5     whole truth and nothing but the truth?

6          MR. RILEY:  Yes, sir.  I do.

7          THE COURT:  Okay.  You can put your hand down.

8     And do you understand that the oath that you took is the

9     same that you would take if you were live in court on the

10    witness stand?

11         MR. RILEY:  Yes, sir.

12         THE COURT:  Okay.  Being that we're doing this

13    virtually, I want to make sure that we have a couple just

14    questions to ask just to confirm.  Can you confirm who's in

15    the room with you?

16         MR. RILEY:  No one.

17         THE COURT:  Okay, and how are you viewing us now?

18    What electronic device are you using?

19         MR. RILEY:  My laptop.

20         THE COURT:  Okay.  Can you confirm that there are

21    not notes in front of you or any papers in front of you?

22    Okay.  And I'm going to ask -- do you have a cell phone near

23    you?

24         Okay.  Can you just put that phone away to make

25    sure that no one is going to send a text message or anything

```
1    and I want to make sure that you're looking straight here.

2    Every time throughout the examination, Mr. Battaglia is

3    going to ask you some questions.  There might be some

4    parties who object.  I'm going to ask that you please give

5    me an opportunity to resolve the objection and then I'll let

6    you know if you can answer the question or if the attorneys

7    need to ask another one, okay?

8              MR. RILEY:  Yes, Your Honor.

9              THE COURT:  Okay.  Mr. Battaglia, you may proceed.

10             DIRECT EXAMINATION OF PATRICK RILEY

11   BY MR. BATTAGLIA:

12   Q    Good afternoon, Mr. Riley.  I'm Ray Battaglia.  I

13   represent Free Speech Systems.  This is the first time the

14   Court has heard or seen from you.  Can you tell the judge a

15   little bit about you?

16   A    My name is Patrick Riley.  I live in Austin, Texas, and

17   I run and operate Blue Ascension Logistics, a third party

18   logistics company.

19   Q    And let's go back a little bit further.  Tell the Court

20   about your college and beyond education and work background.

21   A    I went to the University of Texas.  I studied

22   kinesiology and business.  I did the business foundations

23   degree.  It's essentially a business major.  I worked for

24   myself, self-employed, for a little over a decade running a

25   personal training health and wellness company.  In 2016, I
```

1    began work for Free Speech Systems as my employer.

2    Q    So let's back up and talk about your prior -- the

3    history of your relationship with Alex Jones.  Can you give

4    the Court a sense of when you met Alex, how you met him and

5    what your relationship has been?

6    A    Yes.  I met Alex in 2014 (indiscernible) amongst my

7    other clients.  We developed a good working relationship.

8    And he, in 2016, offered me a full-time job that I took the

9    opportunity to come onboard.

10   Q    So what were you originally brought onboard to do for

11   Free Speech Systems?

12   A    He wanted me to help him and his buyers maintain good

13   health and be a beacon of wellness (indiscernible) rather

14   and in addition to that he wanted me to come and just help

15   organize and handle problems if they came up.

16   Q    And did your role change from time to time with Free

17   Speech Systems?

18   A    I don't know if it was ever consistent at all.  But

19   yes, it's dramatically changed off and on.  There's a big

20   range of variability.

21   Q    Can you describe for the Court the range of things that

22   you did during your tenure at Free Speech Systems?

23   A    It's a lot of just kind of communicating, you know,

24   what he may have wanted, whether it be from one department

25   to another or ensuring that a process got done.  It could be

1    something, you know, on the personal side.  It could be

2    something on the work side.  It could be telling somebody to

3    change something that they did or to ensure that somebody

4    got a project done.  It changed dramatically in 2020 when

5    our operations manager left.  I assumed many more

6    responsibilities at that time.  But yeah, it varied over the

7    five-plus, almost six years.

8    Q    Can you describe for the Court what your relationship

9    historically has been with PQPR?  And you know who I'm

10   talking about when I say PQPR?

11   A    No.  I don't.

12   Q    PQPR Holdings, Limited.

13   A    Oh, yes.  PQPR.  Yeah.  Essentially it's a product

14   company that supplies products for Free Speech Systems.  And

15   my involvement essentially was, you know, somewhat similar

16   in the same regards of just facilitating --

17   Q    Go ahead.  I'm sorry.  I didn't mean to cut you off.

18   A    No.  Go ahead.

19   Q    Okay, and what about a prior relationship with David

20   Jones.  You know who Dr. David Jones is?

21   A    Yeah.  Same thing.  I try to help him in his health and

22   wellness capacity and, you know, similar to Alex.

23   Q    Let's talk about your current relationships.  Are you

24   on Free Speech Systems' payroll?

25   A    No.  I felt Free Speech Systems in February of this

1    year.

2    Q    Do you own any interest in Free Speech Systems?

3    A    No.

4    Q    What interest, if any, do you own in PQPR?

5    A    None.

6    Q    What interest do you own in any entity that you're

7    aware is owned in whole or in part by Alex Jones?

8    A    None.

9    Q    What background do you have in fulfillment with Free

10   Speech Systems?

11   A    I was around, you know, when I was in a variable state

12   of proximity to the warehouse.  Originally the warehouse was

13   by the production studio and then the late operations

14   manager ended up moving it and expanding the capacity of the

15   warehouse to provide larger abilities for fulfillment, just

16   kind of ramping things up in regard of being robust.  So

17   kind of learning as it expanded and learning the processes.

18   Q    And from time to time have you had a role in

19   fulfillment, a direct role in fulfillment?

20   A    Absolutely.  From, you know, obtaining product from the

21   fulfillment house to potentially handling whatever

22   logistical integration issues to now managing my own 3PL.

23   Q    That's a 3PL?

24   A    Third-party logistics.  It's essentially a company that

25   can warehouse, store, receive, pick, pack and ship products

1   that are linked up to the back end of an e-commerce store.

2   Q    What is Blue Ascension LLC?

3   A    Blue Ascension is my company, my logistics company.

4   Q    And as an LLC, it's owned by members.  Who are the

5   members of Blue Ascension LLC?

6   A    I'm the sole member.

7   Q    Who are the managers and/or officers of Blue Ascension

8   LLC?

9   A    I'm the only manager.

10   Q    When was it formed?

11   A    March of this year.

12   Q    Why was it formed?

13   A    Because there was a need for a fulfillment company to

14   take over (indiscernible) and fulfillment of shipments and

15   it was an opportunity to start a business.

16   Q    What was the impetus for starting Blue Ascension?

17   A    Free Speech Systems essentially getting out of the

18   fulfillment business.  It was not necessarily

19   (indiscernible) efficiencies in place, and to my

20   understanding it was something that they didn't want to do

21   anymore.

22   Q    What role did Alex Jones have in your formation and

23   startup of Blue Ascension?

24   A    He was willing to give me an opportunity to fulfill for

25   Free Speech Systems.

1    Q    Did Alex Jones or Free Speech Systems provide you with

2    startup capital to form Blue Ascension?

3    A    No.  I provided my own.

4    Q    Where did -- okay.  So Blue Ascension, how many

5    employees does it have?

6    A    Currently we have 12 employees, including myself, and

7    anywhere from two to four temporary employees.  Currently we

8    have two temps.

9    Q    How many of those employees were formerly Free Speech

10   Systems employees?

11   A    The majority of employees, not all, but the majority of

12   employees were Free Speech Systems employees.

13   Q    And what experience generally do your topline employees

14   at Blue Ascension have in the fulfillment arena?

15   A    I mean, they're from the base floor of a pick packer

16   which is someone who just picks things off of a line

17   essentially and a packer that packs them into a box.

18   There's an integration manager that essentially deals with

19   the technical issues at hand, whether it be from the store

20   side or from the warehouse management system side.  We've

21   got team leads that help people on the floor and essentially

22   a daily manager or a floor manager as well.

23   Q    And this is -- I want to be real clear about this and I

24   want to talk about Blue Ascension's relationships with Alex.

25   What interest does Alex Jones have in Blue Ascension?

1    A    Zero.

2    Q    What agreements, written, unwritten, handshake is there

3    between you and/or Blue Ascension and Alex Jones to acquire

4    any interest in Blue Ascension?

5    A    There is none.

6    Q    What contractual agreements do you or Blue Ascension

7    have with Alex Jones?

8    A    What contractual obligations?  None, other than to

9    fulfill for Free Speech Systems.

10   Q    What compensation does Blue Ascension or you pay to

11   Alex Jones?

12   A    Zero.

13   Q    If I were to ask you the same series of questions about

14   PQPR, would your answers be different?

15   A    No.  They'd be the same.  They have no interest.  I

16   have not taken any money.

17   Q    How about Dr. David Jones?  Would your answers be

18   different?

19   A    They would be the exact same.

20   Q    How about any other Jones family member?

21   A    No.

22   Q    How many customers does Blue Ascension provide

23   fulfillment services for?

24   A    Seven or eight.

25   Q    And what are your intentions about growth of the

1    business to additional customers?

2    A     Since we started the company, we have been

3    (indiscernible) trying to bring in and onboard new vendors

4    to fulfill for.  We've been doing personal outreach, you

5    know, cold calls, knocking on people's doors, introducing

6    ourselves, going to fairs, you know, working with the

7    marketing team to try to specifically do some marketing in

8    our efforts to obtain new clients.

9    Q     Do you recall or can you tell the Court when it was

10   that Blue Ascension started providing fulfillment services

11   for FSS?  And when I say FSS, you know I'm speaking about

12   Free Speech Systems?

13   A     Yes.  Mid- to late July, sometime around there.

14   Q     What options are available to Free Speech Systems to

15   outsource fulfillment other than Blue Ascension?

16   A     I don't think they're --

17         MR. BRIMMAGE:  Your Honor, I'll object -- I'll

18   object as it lacks foundation, calls for speculation.  He

19   doesn't work for FSS anymore.

20         THE COURT:  Yeah.

21         MR. BATTAGLIA:  He's involved in the fulfillment

22   business, Your Honor, and he's actively pursuing clients and

23   he is aware and has information regarding this.

24         THE COURT:  I'll overrule it.  We'll see where it

25   goes.

1    BY MR. BATTAGLIA:

2    Q    Do you recall the question, Mr. Riley?

3    A    Yes.  In regards to what other options could they have

4    for fulfillment; is that correct?

5    Q    Yes, sir.

6    A    I would say little to none.  I reached out to, prior to

7    Blue Ascension having any fulfillment relationships with

8    Free Speech Systems, and I did not receive any callbacks or

9    get any response from any of the surrounding Austin-based

10   fulfillment centers.  That's probably due to the company.

11        And in addition to that, the size of orders that come

12   through monthly, I mean, I run a crew of 12 people in two

13   tents.  It's a substantial undertaking.  So it's not

14   something that anybody can generally take on, you know,

15   having the capacity to take on without wasting a ton of

16   money on labor.

17   Q    How many products are available for sale to customers

18   in the warehouse approximately just in different product

19   lines?

20   A    Free Speech Systems products?

21   Q    Yes, sir.

22   A    I would say 50 to 150, something like that.  I mean, if

23   I'm counting like individual t-shirts and stuff, maybe even

24   more.

25   Q    And what effect does the broad range of product

1    availability have on the universe of fulfillment companies

2    that would be willing to undertake Free Speech as a

3    customer?

4    A    Most --

5              MR. BRIMMAGE:  Your Honor, I object as it calls

6    for speculation and lacks foundation, what the company might

7    or might not do.

8              THE COURT:  I'll sustain.

9              THE WITNESS:  Can you ask that again, please?

10             THE COURT:  No.  He cannot.  He's going to ask

11   another question, Mr. Riley.

12             MR. BATTAGLIA:  Your Honor, can you share Exhibit

13   3 on your screen, which was the price list that we've seen?

14             THE COURT:  Sure.  Just give me a second.

15   BY MR. BATTAGLIA:

16   Q    Can you see that, Mr. Riley?

17   A    Yes, sir.

18   Q    Okay.  First I want to ask you in normal business

19   operations with Blue Ascension customers, what documents do

20   you typically require be executed to form a business

21   relation to?

22   A    A lot of times it's a price sheet.  We have recently

23   developed a master services agreement as well as a statement

24   of work agreement.

25   Q    What is the requirement that Blue Ascension has that a

1    customer execute a contractual arrangement as opposed to a

2    price list?

3    A    I mean, a lot of these have been good faith gestures

4    and basically if they can agree to that, that we do that.

5    But like I said, I was making the master services agreement

6    and the statement of work that just got completed the end of

7    this last month.

8    Q    With respect to Exhibit 3 on the screen, the price

9    list, who did you negotiate with regarding the fee

10   structure?

11   A    Mr. Schwartz.

12   Q    And pursuant to this arrangement, what services does

13   Blue Ascension provide to FSS?

14   A    Just like the list says, I mean, receiving, storage,

15   pick/pack, order inserts, supplies, returns, labels, packing

16   supplies, all the normal things that a fulfillment company

17   would do to manage the inventory, cycle counting and

18   inventory control, impact of issues with software

19   integration, that's basically making sure that the orders

20   are coming through to our management system, our warehouse

21   management system, those types of things.  Returns is a big

22   one as well.  I think I listed that.

23   Q    I believe it's further down, but yes.  So the pricing

24   that's provided --

25   A    Shipping --

1    Q    Yes, sir.  So the pricing that you've provided here,

2    how does it compare to what Blue Ascension charges its other

3    customers?

4    A    It's the same fulfillment fee across the board.

5    Q    Now let's talk about the shipping cost and I think it

6    says $14.  Where does the money come from for paying

7    shipping costs?  Originally what's the direct source, the

8    original source, excuse me.

9    A    From clients purchasing products on the website.  It's

10   an automated software based on the number of products that

11   go into the order and there's an automation involved with

12   the amount that's essentially taken in for shipping and

13   that's also based on the carrier and essentially what level

14   of shipping they're choosing.  It can vary drastically.

15   Q    I want to talk about the fulfillment services are

16   provided where.

17   A    The fulfillment services are provided in the warehouse.

18   Q    And who is the tenant in that warehouse?

19   A    The tenants of the warehouse is Free Speech Systems.

20   Q    And what efforts have you made to assume that lease

21   obligation?

22   A    Communicating --

23   Q    By you, I mean Blue Ascension.  I'm sorry.  Go ahead.

24   A    Yeah.  Just getting further down the road, trying to

25   figure all of this out and basically ready to make whatever

1    contractual agreement is necessary.  A lot of it is

2    standardized.  For instance, on the storage side of things,

3    that was included.  But essentially if anything were to

4    change as far as lease responsibilities and that type of

5    thing, we would then also have to charge for storage which

6    is an industry standard.

7    Q    The Debtor in its budget budgeted approximately

8    $104,000 per week for fulfillment.  Can you tell the Court

9    how does that compare with the current weekly fulfillment

10    cost incurred for FSS fulfillment?

11    A    It's not sufficient to cover the fulfillment needs.

12    Essentially that covers

13    A    It's not sufficient to cover the fulfillment needs.

14    Essentially that covers, you know, 25 -- 5,000 orders,

15    something like that.  You divide that by 20, right?  So it

16    doesn't -- it doesn't go very far insofar as sustaining the

17    fulfillment shipment services.

18    Q    And if Blue Ascension does not get paid to ship, what

19    does Blue Ascension do with the orders?

20    A    Essentially they stack up.  But in an effort to utilize

21    our staff and to not make them just sit and twiddle their

22    thumbs, we try our best to be proactive in the sense that we

23    do the first half of our job.  So when we're allowed and we

24    get paid to do the second half of our job, we're in a great

25    position.

1    So essentially the, you know, receiving continues.  The

2    storage continues as far as the storage, the allocations of

3    inventory, both in bulk and in the pick locations, and in

4    addition to that, we've had to be innovative in the sense

5    that we're essentially pre-picking a lot of these shipments

6    and essentially putting them -- sequestering them in totes,

7    bins, boxes, even gone to the point of, you know, putting

8    them on pallets, wrapping them so they're safe and putting

9    them on the racks for when we do receive the money for

10   fulfillment.

11   Q    Based on your experience both at Blue Ascension and

12   with FSS, what happens when orders aren't shipped?

13   A    Well, it's a slow breakdown of the business.

14   Essentially it is, you know, starting at kind of the end of

15   the process and it ultimately goes back to affect the

16   beginning of the process which is the orders being

17   cancelled, loss of revenue.  Depending on how long the

18   orders have sat not being fulfilled, it could also be a

19   chargeback nightmare for the credit processor.

20   Q    What's the total number of current backlogged orders

21   for FSS?

22   A    Probably somewhere between 23,000 and 28,000.  It was

23   down from 32,000, 33,000, you know, mid- to end of last

24   week, something like that.  It's fluctuated a lot.  It's

25   hard to say what the actual backorder is.  As we process

1    orders, it can fluctuate between 2,000, over 3,000 a day.

2         It greatly depends on the size of the orders.

3    Nothing's standardized.  No orders are the same.  As we

4    fulfill those orders, new orders continuously come in.  So

5    it's a lot to try to say.  But as of right now, the

6    backlog's probably mid-20,000, something like that.

7    Q    In connection with what you do for FSS, are you

8    familiar with products that are anticipated to be received?

9    A    Do we --

10   Q    Do you know what inventory -- do you know what

11   inventory is coming in before it's received?

12   A    Yeah.  It's up to the vendors and our client success

13   manager to communicate an order to make sure we know what

14   inventory is coming in and that way we can prepare for it.

15   And preferably they should also let us know upcoming sales,

16   that kind of thing, so we can prepare our work staff for it.

17   Q    Based on what you know to be imminent, imminently

18   arriving, what are your expectations about the level of

19   sales going forward?

20             MR. BRIMMAGE:  Your Honor, this I'll object to.

21   There's no foundation on his alleged expertise or experience

22   in sales.

23             THE COURT:  Sustained.

24             THE WITNESS:  So I don't see our sales --

25             THE COURT:  No.  Mr. --

```
 1            MR. BATTAGLIA:  Hold on, hold on, hold on.  Hold

 2   on.

 3            THE WITNESS:  Sorry.

 4            THE COURT:  Mr. Gruber -- Mr. Riley, I should say,

 5   when I sustain an objection, sometimes it means that Mr.

 6   Battaglia can ask another question.  I'll let you know when

 7   you can answer him, and I'll do a really -- I'll do a better

 8   job of letting you know if someone's going to ask another

 9   question or someone -- or you can answer that question.

10            THE WITNESS:  Sorry, Your Honor.

11            THE COURT:  No, no, no.  No.  I'm going to do a

12   better job making sure that you understand.  Thank you.

13            Mr. Battaglia, why don't you ask another question.

14            MR. BATTAGLIA:  Yes, sir.

15   BY MR. BATTAGLIA:

16   Q    What arrangements has Blue Ascension made with Alex

17   Jones to provide some funding to clear the backlog?

18   A    Alex has done a onetime payment in an attempt to make

19   sure and guarantee that his customers are getting their

20   product, to ensure that the fulfillment is paid for in the

21   event that assuming the courts and the attorneys can't

22   figure it out.

23   Q    What does Alex Jones receive in return for this

24   factoring relationship?

25   A    There's nothing.  There's no interest, nothing like
```

1    that.  And if Free Speech pays, then I believe he gets his

2    money back.  If not, then the money goes into fulfillment.

3    Q    Based on what you've received to date, what is your

4    anticipation of when Blue Ascension will stop fulfilling

5    current orders?

6    A    With all of the funds or just the funds that I've

7    received from Free Speech or the funds that I've received

8    from everyone?

9    Q    Free Speech.

10   A    Free Speech, as of today, has 2,800 orders that were

11   prepaid.  So beginning this morning, 2,800 -- it's 2,809 or

12   something like that, I believe, orders were still prepaid to

13   be fulfilled.

14   Q    And how long will it take for those to be shipped?

15   A    Oh, we'll be done with the majority of that by tomorrow

16   -- or by today.  Today's Friday.  So come Monday, we may not

17   have anymore funds directly from Free Speech to have -- for

18   prepaid fulfillment.

19           MR. BATTAGLIA:  Your Honor, I'll pass the witness.

20           THE COURT:  Okay.  Does anyone have any questions

21   for Mr. Riley who may be in support of this relief request

22   before I turn to cross?  I don't believe there was anyone

23   last time.

24           Let's see.  Mr. Brimmage, are you handling this

25   examination as well?

1          MR. BRIMMAGE:  Yes, Your Honor.  I am.

2          THE COURT:  Okay.  Okay.  Let's turn to cross-

3    examination.

4          Mr. Brimmage, you may proceed.

5          MR. BRIMMAGE:  Thank you, Your Honor.

6               CROSS-EXAMINATION OF PATRICK RILEY

7    BY MR. BRIMMAGE:

8    Q    Mr. Riley, my name is Marty Brimmage.  I'm with the law

9    firm of Akin Gump Strauss Hauer & Feld, and I represent what

10   we refer to as the plaintiffs, the Texas plaintiffs group in

11   this action, which would include the Austin lawsuit that

12   concluded I believe last week, maybe a week ago.  You're

13   familiar with that lawsuit, right?

14   A    Yes.

15   Q    All right.  Have you had any discussions with any of

16   the attorneys that represent the Debtors, including Mr.

17   Battaglia, about your testimony today?

18   A    I spoke with Mr. Battaglia and Mr. -- I'm sitting in

19   his office right now.  Let me find him on the screen.  And

20   Mr. Jordan, Shelby Jordan.  I'm so sorry.

21   Q    Okay, and Mr. Battaglia represents the Debtors in this

22   case.  Is that your understanding?

23   A    The Debtors?  Possibly.  I'm not too sure --

24   Q    If you know.

25   A    I don't know.

1    Q    Let me try it again, Mr. Riley.  Mr. Battaglia

2    represents FSS, right?

3    A    Yes, sir.

4    Q    And Mr. Jordan represents Alex Jones, right?

5    A    I assume so.  Yes, sir.

6    Q    And none of them represent you, right?

7    A    Correct.

8    Q    All right.  Why were you having discussions with Mr.

9    Jordan?

10   A    Just in regards to having this conversation here in the

11   office today.

12   Q    About your testimony that you're providing to the Court

13   today?

14   A    I spoke to -- I spoke to Ray over the phone about it in

15   Mr. Jordan's office.

16   Q    All right.  You were in Mr. Jordan's office?

17   A    I was in a conference room; yes, sir.

18   Q    A conference room in Mr. Jordan's office?

19   A    Yes, sir.

20   Q    Yeah.  And were they -- just tell me, in general, was

21   this one conversation or more than one?

22   A    Just one conversation, this morning.

23   Q    All right.

24   A    Or not this morning; this afternoon, I should say.

25   Q    When this afternoon?

1    A    Before the -- before this hearing was beginning, 12:00,

2    11:30, 12 -- I don't know what time.  I think it started at

3    12:30, so sometime before that.

4    Q    All right.  That's the only time you talked to Mr.

5    Battaglia or Mr. Jordan or anybody -- any other attorney

6    about your testimony today?

7    A    Yes.

8    Q    Okay.  And prior to today, you've never spoken to Mr.

9    Battaglia.  Is that right?

10   A    No.

11   Q    Prior today -- no, that's not right, or no, you

12   haven't?  I'm sorry.

13   A    No.  No, I haven't.

14   Q    Okay.

15   A    I mean, I've --

16   Q    (indiscernible).  Go ahead, Mr. Riley.  I'm sorry.

17   A    Go ahead.

18   Q    It's my fault.  You go ahead.

19   A    No, prior to today, outside of just making sure that I

20   was going to be, you know, here to participate via email, I

21   have not had any discussions with him other than the one

22   today.

23   Q    What about Mr. Jordan?

24   A    Have I had prior discussions with Mr. Jordan?  I've

25   talked to Mr. Jordan a few times; yes, sir.  Not about

1    today, though, I mean.

2    Q    What have you spoken to Mr. Jordan about?

3    A    Just any questions that he may have had, I guess, in

4    reference to Alex's needs, or questions regarding Alex.

5    Q    Like what?  What regarding Alex's needs or regarding

6    Alex?

7    A    I can't recall (indiscernible).

8    Q    Okay.  All right.  When were those discussions?

9    A    Maybe -- I'm not too sure.  In the past few months, I

10   mean, I can't recall.

11   Q    Okay.

12   A    They're not -- they're not very frequent.

13   Q    All right.  And before the hearing today, you spoke to

14   Mr. Battaglia and Mr. Jordan about your upcoming testimony.

15   Is that right?

16   A    Yeah, I was emailed that I had to -- to appear in the

17   court.

18   Q    Did you have any other email communications with

19   Mr. Battaglia or Mr. Jordan or any other attorneys in this

20   case?

21   A    No, sir, I don't believe so.

22   Q    Okay.

23   A    There's been --

24   Q    So, I want to follow up on --

25   A    There -- there's been, you know, all kinds of

1    correspondence with a revolving door of attorneys, but in

2    regards to correspondence about today, no.

3    Q    Okay.  Help me out, then.  The revolving door of

4    attorneys regarding what?

5    A    Regarding anything in regards to, you know, somebody

6    needing to have Alex call them or anything like that.  Just

7    more of a message to the messenger kind of thing or getting

8    something possibly linked up on a schedule.  I don't control

9    the schedule, but just relaying messages -- messages of

10   needing to communicate.

11   Q    Yeah, and that's one of the things that I wanted to

12   talk to you about, Mr. Riley.  Isn't it true that a lot of

13   people look to you to set up and get in touch with Mr. Jones

14   -- Alex Jones, that is?

15   Q    People have tried to get me to help communicate with

16   Alex or get in touch with Alex or poke Alex for Alex to call

17   them, whatever it may be.

18   Q    Including attorneys in this case, right?

19   A    I guess that you might have to be more specific.

20   Q    Well, I think you said, the revolving door of

21   attorneys, and maybe I misunderstood that, have communicated

22   with you about a variety of --

23   A    Yeah --

24   Q    -- let me finish the question, Mr. Riley, and then -- I

25   know it's hard, virtually.  And I've been more guilty than

1    you, so I'm going to try to be better.

2    A    (indiscernible).

3    Q    But I think you said, the revolving door of attorneys

4    and others that contact you about Mr. Jones's needs and to

5    get in contact with Mr. Jones.  Did I hear that correctly?

6    A    Yes, sir.

7    Q    Okay.  And it's true that's one of the roles you play

8    with regard to Mr. Jones, right?

9    A    At times.

10   Q    Okay.  Would you consider yourself a close friend of

11   Mr. Jones'?

12   A    I would say I have a close relationship.

13   Q    Would you agree with me that Mr. Jones has reached out

14   to you to help him on both personal and professional matters

15   over the years?

16   A    Yes.

17   Q    Including, without going into detail if you don't have

18   to, Mr. Riley, very personal issues, right?

19   A    All kinds of issues.

20   Q    Including very personal issues, right?

21        MR. BATTAGLIA:  Your Honor, I'm going to object to

22   form.  And again, I don't know what relevance it is, either.

23   He has a close relationship, he's testified.  What they've

24   talked about is really not particularly relevant to anything

25   before the Court today.

```
 1              THE COURT:  Yeah, I'm going to sustain that.  I
 2     want to make sure we're staying focused on the company and
 3     what I'm being asked to do today.
 4              MR. BRIMMAGE:  Your Honor, I appreciate that, and
 5     I will move on.  But this is the guy that set up a company,
 6     and we just heard about money that Alex Jones sent him, so I
 7     do think they're connected.  But let me move on.
 8     BY MR. BRIMMAGE:
 9     Q    You set up Blue Ascension in March.  Is that correct?
10     A    Yes, sir.
11     Q    All right.  And have you ever set up an LLC before?
12     A    I have; yes, sir.
13     Q    How many times?
14     A    A few, several.
15     Q    All right.  Did anybody help you with this one, or did
16     you do it on your own?
17     A    I believe I paid a company to do it.
18     Q    And you had left FSS in February, the month before,
19     right?
20     A    That's correct.
21     Q    Okay.  You were aware of all the lawsuits against
22     Mr. Jones and FSS at the time you left, right?
23     A    Yes.
24     Q    Had you been involved in any discussions about FSS
25     filing for bankruptcy at the time you left?
```

1    A    Well, he says stuff on air all the time about filing

2    for bankruptcy and all kinds of things, so I'm not too sure.

3    There's always that comment of, you know, he might need to

4    do it.

5    Q    Okay.  So, when you left, you were aware that that was

6    a possibility, right?

7    A    Yeah, I think that was a (indiscernible) possibility

8    for some period of time.

9    Q    Had you had any direct conversations with Mr. Jones

10   about FSS filing bankruptcy at the time you left?

11   A    No, not really.

12   Q    Okay.  Now, you testified about your varying jobs and

13   varying responsibilities over the years, correct?

14   A    Yes.

15   Q    What was your title when you were there?

16   A    I had (indiscernible) different titles.  I'm not too

17   sure what, you know, my official title may have been.  I was

18   kind of just a loose manager of sorts, just to organize, but

19   I was not under any department or anything like that.

20   Q    Okay.  So, if we looked at an org chart, would you be

21   in the marketing department, would you know?

22   A    No, I was more of a fitness, wellness manager more than

23   any other form of manager.

24   Q    All right.  But you would agree with me we wouldn't

25   find you in the fulfillment services department of FSS

1   before you left, right?

2   A    You wouldn't find me in any department.  Again, I was

3   kind of an admin, to a certain degree.

4   Q    Okay.  Now, you said the operations manager left in

5   2020.  Do you remember that?

6   A    Yes, I believe it was in the end of 2020.

7   Q    Was that Mr. Fruze or Frood?  I may not be saying it

8   correctly.

9   A    Yes.

10   Q    All right.  And was he replaced by Mr. Roddy?

11   A    Again, I don't believe that he was necessarily

12   replaced.  I think it was an acquisition of

13   responsibilities, kind of in a totality sense.

14   Q    Was Mr. Roddy in charge of fulfilment services for FSS

15   after Mr. Fruze left?

16   A    I don't know if he was necessarily responsible for it.

17   He was away of fulfilment and what fulfilment may have

18   needed, but he was not managing fulfilment, to my

19   understanding, or --

20   Q    Who --

21   A    -- service.

22   Q    Who was managing fulfilment for FSS at the time you

23   left?

24   A    I mean, if you had to put somebody as a name in the

25   position, it was Kelly Hebert.

1    Q    Kelly Hebert?

2    A    Yes.

3    Q    All right.  And did Kelly Hebert leave FSS and has now

4    joined Blue Ascension?

5    A    Yes.

6    Q    Doing basically the same thing Kelly Hebert was doing

7    before?

8    A    Yes and no.

9    Q    Okay.  And all the employees that are currently at Blue

10   Ascension were former FSS employees; is that right?

11   A    No.  Like I said earlier, the majority of employees

12   were Free Speech Systems employees, but not all.  We've had

13   to add to the roster.

14   Q    All right.  I'm going to try to get you to walk me

15   through this a little bit.  Let's go from a timeline

16   standpoint.  You organized this entity in March of 2022,

17   correct?

18   A    I formed the company in March of 2022.

19   Q    All right.  The operations of this company are in the

20   warehouse that FSS used to operate in its fulfilment

21   services, correct?

22   A    Correct.

23   Q    And that's -- Blue Ascension has never operated

24   fulfilment services in any other location, right?

25   A    Correct.

1    Q    All right.  When did you start operating, Blue

2    Ascension, that is, in the FSS warehouse?

3    A    It was mid-May, when we first began to sell the

4    services.

5    Q    All right.  But that wasn't for FSS at the time?

6    A    Correct.

7    Q    All right.  Where did the employees come from for mid-

8    May fulfilment services?

9    A    I hired the former Free Speech Systems employees to

10   work for Blue Ascension, initially as independent

11   contractors, and then moved them to W-2 employees.

12   Q    That's my next question.  How did the employees get

13   from FSS to Blue Ascension?  Can you walk me through that

14   process?  When and how did that work?

15   A    I offered them the job, and I told them that I was

16   starting a fulfilment company to do true 3PL, which is, you

17   know, third-party logistics, being able to fulfil for more

18   than just Free Speech Systems.

19   Q    Okay.  So, did they quit FSS and came and joined you,

20   or were they terminated by FSS, if you know?

21   A    I don't know.  I believe that they left Free Speech.

22   I'm not for sure if they were terminated.  I believe they

23   were terminated.

24   Q    Okay.  And so, did you coordinate with FSS when this

25   was going to happen and how it was going to happen?

1    A    I don't know what you mean by coordinating.

2    Q    Well, you didn't just walk into FSS's building and say,

3    hey, I'm going to hire you guys, without communicating with

4    FSS, did you?

5    A    No, no, not at all.  But as I said earlier, you know, I

6    did have an opportunity to begin fulfilment services.  There

7    was essentially a plan to -- for me to hire who I needed to

8    hire and take them, essentially, onto my payroll.

9    Q    All right.  Who did you coordinate that with, that

10   plan?

11   A    I spoke to -- I spoke to Alex a little bit about it,

12   but I mean, I don't know if there was so much a dedicated

13   plan as a, I think, you know, we can make this -- I can make

14   a successful business out of this and I can bring you on as

15   a vendor.

16   Q    Okay.  And so, you --

17   A    A lot of us here that -- I'm so sorry.

18   Q    Go ahead.

19   A    No, go ahead.  I apologize.

20   Q    So you did speak to Alex Jones about this, right?

21   A    I mean, yes, a little bit.

22   Q    You wouldn't have taken over FSS's fulfilment services

23   without Alex's -- Jones' blessing, right?

24   A    Essentially.

25   Q    Okay.  So, when -- you transitioned the employees from

1    FSS to Blue Ascension in May.  Is that what I understand?

2    A    Yes.  I started -- I started pay them as contractors.

3    Q    When did you start fulfilling FSS orders?

4    A    Free Speech System wasn't fulfilled until mid/late

5    July, just recently.

6    Q    Who fulfilled FSS Systems' orders after you took the

7    employees over to Blue Ascension?

8    A    They were still employees, Free Speech Systems'

9    warehouse employees over there, like packers and such.

10   Q    All right.  How many employees did you -- well, how

11   many employees were in FSS's fulfilment services at the time

12   you took your first group?

13   A    Not many.  I mean, 10 or 12, possibly more.

14   Q    How many did you take in May?

15   A    (indiscernible).

16   Q    How many did you take in May?

17   A    I took my -- I took the original crew, minus,

18   essentially everybody that we have now, back in May.  So,

19   everybody that came back in May -- there hasn't really been

20   any Free Speech employees hired on after the first lot of

21   Free Speech employees that were starting to be employed by

22   Blue Ascension.

23   Q    Okay.  So, is it fair to say that between the time you

24   started fulfilling Blue -- FSS inventory orders, nobody was

25   fulfilling them in that interim gap because you had taken

1   the FSS employees?

2   A    No, Free Speech Systems' (indiscernible) was being

3   fulfilled.

4   Q    But you had taken all the employees.  I guess I'm not

5   understanding.  Help me out.

6   A    No, there were, I think, four employees left at the

7   time, and they were still fulfilling orders.

8   Q    Okay.  Did a backlog -- did a backlog get created

9   because a lot of the employees had gone over to you, and you

10  weren't yet fulfilling FSS Services?

11  A    At the time, I don't believe that there was a steady

12  backlog when this initiated, and I don't believe the backlog

13  began until the surge of sales in the past few weeks.  You

14  know, we're talking a good distance of time between when

15  Blue Ascension began and, you know, shifted the employees

16  over to the backlog that we have right now.

17  Q    But we're not talking about a long period of time

18  between when you started fulfilling FSS orders, right?  Less

19  than a month.

20  A    No.  Again, I just started fulfilling Free Speech

21  orders the end of -- the end of last month, mid to end of

22  last month, July into August.

23  Q    All right.  And so, four employees fulfilled the FSS

24  orders from March to mid to late July.  Is that right?

25  A    From May -- there's still -- can you ask the question

1   again?

2   Q   Yeah.  Maybe it is May.  Four employees handled FSS's

3   fulfilment services from May, when you brought the employees

4   over, to mid to late July, when you started taking over

5   FSS's fulfillment services, right?

6   A   Yes, and we continue to fulfil for Free Speech Systems.

7   Q   Okay.  You said you capitalized the new company on your

8   own, right?

9   A   Yes.

10   Q   What did it cost to capitalize that company?

11   A   It was really just figuring out the feasibility of the

12   systems, quantitative measurement, if that would

13   (indiscernible) going forward as far as (indiscernible) and

14   such.  Maybe, you know, $6,000, $7,000, $8,000 dollars as

15   far as hardware.  Essentially, that's it.  The rest was

16   signing myself up for services that essentially were --

17   didn't require payments up front, the warehouse management

18   system, the integration software.  It really wasn't costly

19   at all until we started printing shipping tickets, which is

20   the crux of the business.

21   Q   So the upfront capital cost was roughly, all-in, what?

22   A   Less than $10,000.  Again, you don't have to pay

23   employees for two weeks, payment on a two-week interim, you

24   know, outside of literally having the hardware, which is

25   basically the only requirement to start all this.

1   Q    And you had free rent, right?

2   A    The agreement was, yeah, to essentially be able to

3   operate in that space until there was a resolution.

4   Q    Now, who was that agreement with?

5   A    Alex.

6   Q    You had an agreement with Alex Jones for free rent when

7   you started this company?

8   A    There was a verbal conversation in which he said, if

9   you find, you know, opportunity in starting a business, then

10   that's fine, and that's what began back in May.

11   Q    So the answer is yes, free rent?

12   A    Yes.

13         MR. BATTAGLIA:  Judge, objection, Your Honor.  The

14   witness gave an answer.  If Mr. Brimmage doesn't like it, he

15   doesn't get to rephrase it.

16         THE COURT:  Yeah, I'll allow it.  He gave an

17   answer.  You've got your answer, Mr. Brimmage.

18   BY MR. BRIMMAGE:

19   Q    Other than payroll, what other expenses do you have --

20   well, payroll and operating expenses, what other expenses do

21   you have in operating this business?

22   A    There's software.  There's supplies, packaging,

23   payroll, payroll insurance, all the public -- you know, we

24   provide health insurance, dental and vision for our

25   employees.  There's obviously the cost of shipping.  It has

1    to be prepaid.  One parcel company requires upfront payment.

2    Another parcel company does like a net terms, essentially.

3    Q    And did you basically inherit the infrastructure of

4    FSS's fulfillment services when you got started with your

5    FSS work?

6    A    No.  These are all my -- I had to initiate all standing

7    (indiscernible) contracts.  We didn't -- outside of, you

8    know, the temporary agreement for rental -- rental space, or

9    access to the rental space rather, there was no

10   piggybacking, essentially, of any type of systems.  Like I

11   said, I had to sign annual contracts for a lot of these

12   software integration companies, the warehouse management

13   systems, so on and so forth.

14   Q    And Mr. Jones has given you a capital infusion, right?

15             MR. BATTAGLIA:  Objection, Your Honor; asked and

16   answered.

17             THE COURT:  Yeah, sustained.

18             MR. BATTAGLIA:  Because he already said he got no

19   capital infusion.

20             THE COURT:  Yeah.

21             MR. BATTAGLIA:  Well --

22             THE COURT:  No, no, I just want to limit everyone.

23   I know I've given a little bit of leeway on the speaking

24   objections and -- but Mr. Battaglia is correct, it's been

25   asked and answered.  I want to just focus on where we're

1    going with this motion.  What else do you have,

2    Mr. Brimmage.

3              MR. BRIMMAGE:  Yeah, so maybe I'm confused, Your

4    Honor, but I'm absolutely confident that he testified that

5    Alex gave him a one-time payment, so I want to explore the

6    one-time payment.  He didn't talk about (indiscernible).

7              THE COURT:  I think that's the portion that was --

8              MR. BATTAGLIA:  I object to the

9    characterization --

10             THE COURT:  Hold on a second, folks.  I think

11   that's what I am saying was asked and answered.  But if you

12   have another question, then maybe you can ask it, and we can

13   go from there.

14   BY MR. BRIMMAGE:

15   Q    How much did Alex Jones give you in this payment?

16   A    Alex just recently sent the (indiscernible) to my bank

17   this week, and that was in the amount of $400,000 to help

18   clear the backlog.  Free Speech Systems and Alex Jones had

19   not given me any amount of money until mid to late, or maybe

20   late July at the earliest, whatsoever, so there was no cash

21   infusion from Free Speech Systems early on whatsoever.

22   Q    Is there a contract that memorializes any terms

23   associated with this $400,000 payment that you received from

24   Alex Jones?

25   A    Yes, there's a -- I forget what you call it, but

1    there's an agreement that says that he didn't get an

2    interest, and if Free Speech doesn't pay for their

3    fulfillment (indiscernible), then there's no, you know,

4    money going back to Alex Jones.

5    Q    Did you sign this agreement?

6    A    Yes.

7    Q    Did Alex Jones sign this agreement?

8    A    I believe so.

9    Q    Do you have the agreement?

10   A    I just signed the agreement today.

11   Q    Okay.  And Mr. Jones signed the agreement when you

12   signed the agreement?

13   A    I can't recall.

14   Q    You signed it today, but you don't know if Mr. Jones

15   has signed it?

16   A    There's an issue with the spelling of Blue Ascension's

17   name, which was intentional, by the way, and the original

18   contract, Alex did sign.  I don't know if he had signed the

19   current agreement.  I don't -- I don't -- I don't know if he

20   did.

21   Q    Did you sign this agreement when you were in

22   Mr. Jordan's office today?

23   A    Yes.

24   Q    And why is there an intentional misspelling in

25   Ascension's name?

1    A    Because I liked the way Blue Ascension was as far as

2    (indiscernible) and phrase, and I believe there was some

3    possible reason as to why the Security of State wouldn't

4    grant me Ascension.  So, I liked -- I liked the word

5    ascension, and spelled wrong, most people can't probably

6    spell it right, so it wasn't a concern of mine.  I just

7    liked the -- liked the two words put together.

8    Q    Let me apologize if I've asked you this.  Mr. Battaglia

9    will scream if I have, but I don't think I did, but

10   (indiscernible).  Isn't it true that you weren't in charge

11   of fulfillment services at FSS at any time before you left?

12   A    My involvement with fulfillment services varied over

13   the years.

14   Q    Isn't it true, Mr. Riley, that you were not in charge

15   of FSS's fulfillment services at any time, up until the time

16   you left?

17   A    Correct.

18   Q    And isn't it true that you had never owned or operated

19   a fulfillment services company before you started Blue

20   Ascension?

21   A    Correct.

22   Q    And isn't it true that you talked to Alex Jones before

23   you formed Blue Ascension?

24   A    Possibly.  I mean, I told him that, you know, if there

25   was an opportunity to do it, that I would -- I would do it.

1    I have the confidence in myself and my ability to run

2    something like a fulfillment company, if that's what you're

3    asking.

4    Q    Are you still providing personal training services to

5    Mr. Jones?

6    A    When he shows up, I try -- I endeavor to get him to a

7    state of healthiness.

8              THE COURT:  Mr. Brimmage, Mr. Brimmage, let me --

9    let's -- I'm sure many folks may be interested in that, but

10   I just happen not to be one of them.  Let's stick to kind of

11   where we are.

12             MR. BRIMMAGE:  Your Honor, if you're not

13   interested, I'm not interested.

14             THE COURT:  Appreciate it.

15             MR. BRIMMAGE:  Hang on one second, Mr. Riley.  I'm

16   going to look at my notes real quick.

17             MR. BATTAGLIA:  Judge, (indiscernible) Mr.

18   Brimmage says that.

19   BY MR. BRIMMAGE:

20   Q    I am going to have to ask this:  Other than in your

21   capacity as owner or whatever your title is with Blue

22   Ascension, what other services do you provide for Mr. Jones

23   these days, of any kind?

24   A    I mean, he still -- he still tries to, you know, get me

25   to help out on whatever, a lot less now that I've taken on

1    this endeavor.  But, I mean, I still, on good faith, you

2    know, continue to, you know, attempt to do some personal

3    training, which I'm (indiscernible), and that's essentially

4    it.  But that doesn't stop him from, you know, possibly

5    requesting something else.  But I mean, that's pretty much

6    the nuts and bolts of it.

7                MR. BRIMMAGE:  Your Honor, with that, I will pass

8    the witness.  Thank you.

9                THE COURT:  Okay.  Mr. Nguyen, do you have any

10   questions?

11               MR. NGUYEN:  No, Your Honor, not for this witness.

12   Thank you.

13               THE COURT:  Okay.  Mr. Battaglia, any redirect?

14               MR. BATTAGLIA:  No, Your Honor.

15               THE COURT:  Okay.  Mr. Riley, thank you very much

16   for your time.  You are (indiscernible) off the virtual

17   witness stand.

18               MR. RILEY:  Thank you, Your Honor.

19               THE COURT:  Okay.  Mr. Battaglia, where do we go

20   next?

21               MR. BATTAGLIA:  Your Honor, I have no further

22   evidence and rest.

23               THE COURT:  Okay.  Mr. Brimmage, anything from the

24   Texas Plaintiffs' side?

25               MR. BRIMMAGE:  No, Your Honor.  We rest our case

1    as well.  Thank you.

2              THE COURT:  Okay.  Does anyone have any additional

3    evidence they wish to present at this time?  It sounds like

4    both sides are resting.

5              Okay.  Mr. Battaglia, I'm just going through to

6    see if anyone's hitting five, star, Mr. Battaglia.  That's

7    all I'm doing right now.

8              Okay, I'll give -- and again, we've heard a lot of

9    evidence, and I appreciate the parties' participation.

10   Mr. Battaglia, is there anything you wish to say in closing?

11   I'll give each side a brief opportunity to provide any

12   closing statement.

13             MR. BATTAGLIA:  Yes, Your Honor.  I will be brief.

14   We've tried desperately to be transparent.  We understand

15   the relationships of the parties here and some of the issues

16   that relate to Mr. Jones.  And Mr. Schwartz, of course, is

17   not Mr. Jones.  He is drinking a bit from a firehose here.

18   He's done his best to try to make changes to this business

19   to make it more profitable, to eliminate costs, and to

20   increase sales.  And, of course, has he done it either

21   perfectly or timely?  He's been around since June 6, and

22   this case has been on trial for two weeks.  So, yes, there's

23   more work that needs to be done, and he doesn't have perfect

24   knowledge of everything that goes on with the business.

25             But what we do know is that there are changes that

1    have been made, that one of the changes was Blue Ascension;

2    that it has been good, according to Mr. Schwartz's

3    testimony, for the Debtor; that it eliminated an aspect of

4    business this Debtor did not need to be in; and it's been a

5    good change.  Does Mr. Riley have a relationship with Mr.

6    Jones?  Absolutely.  Is he an insider?  No.  Is he a friend?

7    Perhaps.  But I recall somewhere, someone said, gee, you're

8    doing business with a friend, as an accusation.  And his

9    answer was, who am I supposed to do business with, my

10   enemies?  I think Mr. Riley testified and showed his ability

11   and understanding of the business, and he has been an honest

12   broker.  He is not an insider.  He is not an affiliate.  He

13   knows Mr. Jones.  Those were the questions I heard.  I think

14   he's demonstrated ability here, and the Debtor does not have

15   any issues in terms of performance.  The Debtor's issues are

16   payment.

17          And I wish that Mr. Schwartz had been able to

18   budget with great foresight on what the sales of this

19   company would do, but he wasn't.  He wasn't able to, for

20   reasons well beyond his control.  They're variable numbers.

21   And the good news is, those variable numbers have gone up,

22   and gone up considerably, not down, and they're not affected

23   by (indiscernible) did not budget adequately for fulfillment

24   services.

25          So, what are the options?  I haven't heard anybody

1    come up with a good option here.  I assume everybody wants

2    to see the Debtor generate greater revenue and greater cash

3    and to fulfil its obligations as a debtor under the

4    Bankruptcy Code, which is to pay creditors.  And that

5    they've answered the questions that were raised in the

6    objection about the relationship between the parties, and

7    this is a profitable relationship, and it needs to go

8    forward.  But it can't go forward with the budgeted number.

9    They need to make a change.  And I wish, and I assure you

10   that I queried Mr. Schwartz at length, and (indiscernible)

11   number.  And his answer is, no.  You heard his testimony.

12   He has grave concerns that we could have broad numbers in

13   the coming days, if not weeks, due to product arrivals.  And

14   I certainly don't have to point out to the Court that with

15   what's going on both nationally and locally in the trial in

16   Austin, that traffic has increased to this website -- new

17   eyeballs, potentially more sales, with more product.

18          This is a good problem to have, and we've come to

19   you with what we think is a rational solution.  We're

20   willing to be transparent about it, allowed everybody access

21   to information, and keep growing the revenue of this company

22   so that there's more money in the estate to pay creditors.

23   And I think I'll leave it at that, Judge.

24          THE COURT:  Thank you.  Let me turn --

25   Mr. Brimmage.  Actually, you know what?  Let me turn to

1   Mr. Nguyen first.  Mr. Nguyen, let me hear from the US

2   Trustee, give you an opportunity, Mr. Nguyen.  Certainly,

3   you don't have to take it.  I'm just -- you know, we're

4   doing this virtually, so I'm just kind of going around and

5   giving you the opportunity.  Mr. Brimmage, I'll let you go

6   last.

7           MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

8   the US Trustee.  Your Honor, this deal, it happened to be 10

9   days before the filing of bankruptcy.  Mr. Schwartz

10  testified that, you know, he looked at it, and I'm very

11  concerned about the due diligence of what has been put into

12  analyzing this particular deal.

13          I'm also concerned that, you know, we had a cash

14  collateral hearing on August 3, and this wasn't brought up

15  (indiscernible) declaration, and no mention of it.  So, I'm

16  concerned that the transaction itself, a lot of other

17  transactions that occurred in the case, there's a lot of

18  alarm bells going on.  And, Your Honor, I have no opposition

19  to the Debtor (indiscernible) more cash.  At the end of the

20  day, it's going to pay of the creditors, it's going to pay

21  off the families.  That is not the issue.

22          The issue is whether the $20 per fulfillment is

23  the appropriate deal for this particular Debtor.  It hasn't

24  been market tested.  It wasn't properly documented.

25  (indiscernible) on a price list, and Mr. Schwartz took about

1    a day to analyze this and accepted that that is the best

2    deal that the Debtor would get.

3            So, Your Honor, if the Court is going to craft any

4    remedy, I would not recommend giving Mr. Schwartz a blank

5    check to pay this particular vendor.  It should be interim

6    relief.  It should be very limited, and potentially, a claw-

7    back if the payment to Blue Ascension is not appropriate.

8            I have concern with just the -- how this deal came

9    about, the timing of it, and just right before the filing of

10   the case, all of a sudden, you know, there's this deal, a

11   one-sheet deal, $20 per order is going to leave the estate.

12   Mr. Schwartz hasn't done any investigation in terms of

13   (indiscernible) orders.  We don't fully know the economic

14   impact of this particular deal.

15           So, if the Court is going to grant relief, again,

16   I'd ask that it be very limited, it be very (indiscernible),

17   including the Plaintiffs to take a look at whether these

18   payments are appropriate or not.  Thank you, Your Honor.

19           THE COURT:  Okay.  Mr. Chapple, do you have any

20   statements?  Yeah, you may be on mute, Mr. Chapple, or I may

21   need to unmute you on five, star.  Give me an opportunity.

22   Mr. Chapple, go ahead and try again, see if I can hear you.

23   No, why don't you -- why don't you hit five, star again.

24   Let me see if -- oh, I see you there.  Mr. Chapple, can you

25   hear me?

1          MR. CHAPPLE:  I can hear you.  Can you hear me,

2    Your Honor?

3          THE COURT:  Ah, perfect.  Please proceed.

4          MR. CHAPPLE:  Okay.  Thank you very much, and

5    thank you again for the opportunity.

6          Your Honor, you're correct; we have heard a lot of

7    testimony today, from both Mr. Schwartz and from Mr. Riley.

8    And I think one thing continues to shine through that

9    carries over from the first-day hearings that we had last

10   week, and that is that we have an accumulation and more and

11   more evidence that we have a CRO who, despite what he says

12   in his declaration about being in charge and about having

13   the ultimate say, he's not in charge.  We see key decisions

14   that were made with regard to fulfilment that came after

15   Mr. Schwartz was retained and that I believe his own

16   testimony says he was caught flatfooted.  He didn't know

17   anything about it.

18         And the fulfillment process, as we understand it

19   in this business, is one of the most important operational

20   aspects.  So, we continue to see Mr. Jones, Alex Jones,

21   making decisions after Mr. Schwartz's retention and without

22   Mr. Schwartz's knowledge.  I think that calls for what we've

23   been saying, additional oversight, more oversight.

24         We've also been told that there was no analysis to

25   determine whether or not the Debtor needed to make this

1    change.  We have a very new business that is owned and

2    operated, allegedly, by someone whose only exposure to the

3    fulfillment or logistics business is as an employee of Free

4    Speech Systems over time.  We still haven't been told why

5    the change was made, why the switch was made from in-house

6    from Free Speech to Blue Ascension.  And I believe the

7    testimony showed, through Mr. Riley, that apparently, this

8    fulfillment obligation for Free Speech Systems was performed

9    by four Free Speech Systems employees over a period of

10   months, from May to July.  So, again, if these obligations

11   were met with four in-house employees over a period of

12   months, we still haven't heard any testimony as to why the

13   switch was made.

14           We've also been told about a $400,000 payment that

15   was made on the same day that Mr. Riley signed a contract.

16   He couldn't articulate the terms of the contract.  We don't

17   understand what the obligations are to pay back or anything

18   like that.  So, we're again in a situation where we have a

19   huge ask from the Debtor to change their operations, to

20   change the way that they -- that they run their fulfillment

21   business, and we just don't have very much information.

22           THE COURT:  Mr. Chapple, let me ask you this.

23           MR. CHAPPLE:  Yes.

24           THE COURT:  And, Mr. Brimmage, I'm going to ask

25   you the same question.  I heard what the -- from Mr. Nguyen

1    what -- he's saying, Your Honor, look, if you're going to

2    grant relief, if you're going to, you may -- Judge, we ask

3    that you not grant relief, but if you're going to grant

4    relief, then it be limited (indiscernible) reserve.  What is

5    the specific request that the -- I know you've objected, but

6    what are you asking this Court to do today?

7              MR. CHAPPLE:  Your Honor, can I answer first, and

8    then Mr. Brimmage can answer --

9              THE COURT:  No, no, no, I'm going to ask you -- I

10   was just giving -- I was telling -- I wanted to ask you that

11   question, and then I was going to tell Mr. Brimmage I'm

12   going to ask him the same question, so I want him to think

13   about it, just what the specific ask is in light of

14   everything that you've heard in terms of summation.  I've

15   heard from, obviously, Mr. Battaglia.  I've heard from Mr.

16   Nguyen.  I want to just make sure -- I'm not saying you

17   haven't answered the question.  I just want there to be

18   rock-solid clarity on what it is that you're asking from me

19   today.

20             MR. CHAPPLE:  Understood, Your Honor.  And you're

21   right; I believe -- if you were inclined to grant the relief

22   that the Debtors are seeking today here in any way, I think

23   that we would want --

24             THE COURT:  Mr. Chapple, let me put it to you --

25   let me put it to you this way.  What is it that your client

1    is advocating today?  That's what I'm asking.

2           MR. CHAPPLE:  My client is advocating that we, the

3    Connecticut Plaintiffs, as well as the Texas Plaintiffs, as

4    well as the United States Trustee, have the opportunity to

5    continue to look back at these payments, to have some sort

6    of oversight to examine whether or not this is the most

7    efficient way to conduct this business -- or excuse me,

8    these fulfillment responsibilities -- and that we have claw-

9    back rights similar to what we talked about in the initial

10   cash collateral hearing, Your Honor, where we can look at

11   the payments that are being made, we can monitor them.  We

12   can monitor the volume of money that is going to Blue

13   Ascension from Free Speech Systems.  And we can also monitor

14   operationally, Your Honor, what is happening with regard to

15   -- if Blue Ascension falls short of its -- of the

16   performance that it is supposed to engage in here, what are

17   the repercussions?  What can the Debtor do to try to claw

18   back those $20 payments when they're made from the initial

19   purchase?

20          So, I think, Your Honor, claw-back rights, regular

21   information sharing so we can have transparency and we can

22   understand the way the payments that -- the way the payments

23   are being made and what the payments being made are keyed

24   off of.

25          THE COURT:  Thank you, Mr. Chapple.  Mr. Brimmage?

1          MR. BRIMMAGE:  Thank you, Your Honor.  And just

2    for the record, Marty Brimmage here on behalf of the Texas

3    Plaintiffs group.  I'll be brief, because I thought Mr.

4    Chapple just did a fantastic job.

5          Your Honor, in order for you to grant the relief

6    that you've been asked to grant today, the story has been

7    told to you that this is a legit deal; everything is

8    straight up; it's an arms-length transaction.  That's what

9    you have been told, and that's what they're trying to sell

10   you on.  But I want to look at a couple of critical facts

11   that will demonstrate to you this is anything but business

12   as usual, and this is not an arms-length transaction.  It

13   isn't even close.

14         Let's look at -- let's look at what the facts are

15   that you heard today.  The leader of this Blue Ascension

16   organization was never in charge of fulfillment, like

17   Mr. Schwartz thought he was, at FSS -- not even close.  He

18   was a variety guy.  He did whatever Mr. Jones needed and

19   asked, including being the go-between.  I'm not knocking him

20   for it, but that's not a guy that was equipped to go set up

21   his own standalone fulfillment services.

22         What else do we know?  Free rent.  That's not

23   arms-length.  What else do we know?  He got $400,000 very,

24   very recently.  By the way, he's testifying today, and he is

25   required to go into Alex Jones' attorney's office and sign a

 1    document today before he testifies.  That's not normal, Your
 2    Honor.  That's not business as usual.  There's no contract.
 3            Look, I feel for Mr. Schwartz, but Mr. Schwartz
 4    has left FSS completely exposed (indiscernible).  And when I
 5    -- I say that, completely exposed.  Blue Ascension could
 6    shut down tomorrow, and no contractual obligations, no
 7    nothing -- no bond, no nothing.  By the way, no insurance
 8    requirement.  That's not normal.  Nothing to cover FSS.
 9            Why is Mr. Schwartz comfortable with that?
10    Because Alex Jones is backing the whole thing.  This isn't
11    an arms-length deal.  This is a very friendly, behind-the-
12    scenes deal.  That's what this is.  There's no other way to
13    interpret the absolute, undisputed facts, Your Honor.  The
14    strong ties to Alex Jones is what makes this work, and the
15    only thing that makes this work.  It's the same employees.
16            This isn't a gift, Your Honor.  None of this is a
17    gift.  There's something else that you're just not being
18    told about.  So, leaving this company totally exposed makes
19    absolutely no sense.  Your Honor, I just don't think you can
20    buy the story that you've been given to give the relief that
21    you are being asked to give.
22            Having said that, I am absolutely confident you're
23    being torn to provide this relief.  And what you asked
24    Mr. Chapple, I think, is the critical question, and that is,
25    what do the Plaintiffs need to protect themselves going

1   forward?  One may be claw-back rights, maybe greater

2   oversight over what's really going on here.  I mean, you

3   have to admit, the timing of this Blue Ascension thing, the

4   timing of Mr. Schwartz, the lack of due diligence into

5   alternatives, I mean, all of this snowballs into, what the

6   heck is going on?

7          We need regular and timely information sharing,

8   and I want to emphasize timely, not this, well, I don't

9   know, because it's been a few days and I'm busy.  We need --

10   and we need transparency, Your Honor.  Those are the

11   protections that I think the Court absolutely must impose if

12   it's going to grant this relief.

13          And I think going forward, Your Honor, I think you

14   ought to fold this into the same story you heard at the

15   first-day with Mr. Schwartz on the stand, with a little bit

16   of a skeptical eye about what's really going on here and the

17   overlapping attorneys, the overlapping CRO, and the

18   overlapping parties and all the relationships here.

19          So, with that, Your Honor, we respectfully request

20   that you deny the relief that's been requested by the

21   Debtors.  But if you grant it, any and all possible

22   protections that you and anybody else can think of should be

23   baked into that order.  And with that, Your Honor, I'll

24   answer any questions that the Court has.

25          THE COURT:  I have no further questions, no.  I

1    appreciate the arguments of the parties.  Let me just note

2    that there was a motion to amend the interim cash collateral

3    order filed at Docket Number 55.  It was filed yesterday,

4    and the Court granted emergency consideration of the motion.

5    I'm going to find that notice of today's hearing has been

6    proper, under the circumstances.  I don't take granting

7    emergency hearings lightly, but when parties and Debtors

8    request them for emergency reasons and there's a valid basis

9    to do so, I grant them.  And I'm going to (indiscernible)

10   emergency consideration of today's request is appropriate,

11   and I believe that the Debtor has satisfied its burden that

12   today's request on an emergency basis, and that's

13   appropriate.

14          Based on Mr. Schwartz's testimony, and Mr. Riley,

15   the Debtor is going to need additional (indiscernible) and a

16   long-term cash collateral order to provide for fulfillment

17   services.  So, the number that's budgeted in the order that

18   I signed is not going to be adequate and no longer adequate

19   as of today.  So, I think Mr. Brimmage is right that, you

20   know, it's a difficult decision for a Court as to what to do

21   in these circumstances.

22          I'm going to grant the requested relief, and I'm

23   going to explain why, and I'm going to kind of give some

24   conditions here.  The reality is, is that the Debtor, based

25   on the testimony that I've heard, is experiencing a large

1    number of sales of vitamin products, health products, and

2    (indiscernible) that opportunity.  The more sales that come

3    in, the more money this estate makes; it's in the best

4    interest of the estate for that continue.  And the more

5    folks that want to buy the products, the more money the

6    estate makes; that's a good thing for the estate, and I

7    think the Debtor makes a valid point on that.

8           Reality is, as well, this is certainly a unique

9    business relationship between Mr. Riley and FSS.  I think

10   Mr. Brimmage certainly brought a lot of those facts out.

11   The Court is obviously concerned about hearing about large

12   numbers of payments today, the nature of the relationship,

13   the lack of rent that's being paid.  Those are all valid

14   concerns, and parties are allowed to explore that as another

15   example of another relationship that needs to be explored.

16          But I take Mr. Schwartz at his word that he

17   negotiated the best deal that he could under the

18   circumstances, and because he needed to get things out and

19   didn't want to enter into a contract because he wanted the

20   flexibility.  He wanted the flexibility to get out if he

21   could, if he found a better deal, and I'm not going to

22   second guess him on that.  That's just, that's what he did,

23   and -- but the relationship is certainly one that needs

24   closer examination.

25          (indiscernible) I'm granting the relief,

1    potentially, I don't know.  But certainly, the testimony

2    shows upwards of additional $1 million, maybe more, that

3    could come in, and it should come in.  And according to the

4    testimony that I've heard, there's no one other -- as of

5    today that can provide the fulfillment services, other than

6    Blue Ascension, not the Debtor, and it's going to be too

7    hard to find someone else to go do that.

8         And also, I'm really only granting the relief for

9    12 days.  There is an interim order.  There has to be a

10   final order, and everybody's rights are reserved as to what

11   happens on the final order.  The request that the Debtor

12   made was to modify the interim order, and I'm going to do

13   that.  The interim order provides that the US Trustee, the

14   Subchapter 5 Trustee, and counsel to the Plaintiffs, I

15   believe it's Mr. Jarrod Martin, are going to receive a

16   weekly report every Tuesday -- we're really only talking two

17   Tuesdays -- as to what those reports are going to be, and

18   then the parties are going to come back on the 24th.  And

19   just because it's in the interim, that doesn't mean it's

20   going to be in the final.

21        So, I'm only granting relief for 12 days, and I

22   think there's nothing -- well, there certainly is testimony

23   that Mr. Schwartz negotiated, you know, the $20 and whether

24   the, you know, $14 for shipping, $6 for essentially other

25   costs.  That wasn't market tested, really.  Mr. Riley

1    testified that that's what he charges across the board.  You

2    know, if it turns out that that's not what he charges across

3    the board, then we'll take that up; then we'll deal with

4    that.  There are other remedies.

5          I don't think there needs to be a claw-back.  I

6    think we'll keep this going for 12 days, and if something

7    comes up that says that something was -- someone was not

8    entirely accurate or dishonest, then we'll deal with that on

9    the back end.  But I haven't heard anything other than that

10   today, so I'm going to grant the relief requested.  And

11   again, this is just for 12 days.  I don't want anyone to --

12   I want all orders fulfilled that can be fulfilled.  I want

13   the Debtor to have every opportunity to be in the best

14   position it can while it's in this Chapter 11 case.  And

15   again, this is just modifying the interim order.

16   Everybody's rights are reserved.  Nothing that is provided

17   on the interim carries to the final.  The final has its own

18   hearing, and I'm sure we'll take this up at a final.

19         So, I'm going to enter the order.  Everybody's

20   rights are reserved.  If someone believes that there should

21   be a claw-back at some point, then we'll take it up, but

22   it's going to have to be based on evidence presented.  And

23   I'm sure folks are going to ask a lot of questions about the

24   nature of the relationships and what they've heard today, so

25   I suspect the 24th is going to be an interesting hearing,

1    and we'll see where all of that goes.

2         I want the parties to know that, since the last

3    hearing, I've been giving a lot of thought to various

4    sections of the bankruptcy code, and I want to make sure

5    everybody's really focused on them as well.  This is a

6    Subchapter 5 case, and everyone should really be thinking

7    about them as well.  I don't want to list which sections I'm

8    thinking about, because then that tends to create more.

9    But, everyone, just understand that we're operating under

10   Subchapter 5, and there are various code provisions.  There

11   are duties that the Debtor has under Subchapter 5.  There

12   are duties that other parties have, and I'm giving them a

13   close look, and I encourage all parties to do so as well.

14        Since I have all the parties here, I have to enter

15   a Subchapter 5, essentially what is a (indiscernible) order,

16   a very basic order (indiscernible) citing bankruptcy code

17   sections, 1188 of the bankruptcy code requires the Court to

18   conduct a status conference no later than 60 days after the

19   petition date and requires the Debtor, within 46 days of the

20   petition date, to file a status report.  And so, using what

21   I call -- they used to call it lawyer math, but judge math,

22   that roughly puts the status -- the Debtor (indiscernible)

23   file the status report September 13, 2022.  I'll need to

24   hold a status conference on September 27, and that falls on

25   a Tuesday.  And I'd like to see if I can do it at 1:00 p.m.

1    I put in this order, and it's something I like to enter on

2    every Subchapter 5 case, just so that the record is clear.

3    And unless the Court orders otherwise, the deadline to file

4    a Chapter 11 plan would be October 27, 2022.

5            And are the -- let me ask, Mr. Battaglia

6    (indiscernible) be available to September 27, and I'd like

7    the Subchapter 5 trustee (indiscernible) as well.

8            MR. BATTAGLIA:  Yes, Your Honor, I'm available.

9    Mr. Schwartz is on the line.  I think he can say if he's got

10   an issue with those dates (indiscernible) I'm pretty sure

11   we're all available.

12           THE COURT:  Ms. Haselden, I forgot, I actually got

13   to hit star, five.  Ms. Haselden, why don't you hit star,

14   five?  Let me recognize you just for a second.  All right,

15   you did.

16           MR. LEE:  For the record, Your Honor, Kyung

17   (indiscernible).  We're available on the 27th.

18           THE COURT:  Okay.  Ms. Haselden, I can't find you.

19   Can I just get (indiscernible) whether you're available on

20   the 27th?  Okay, I got the head nod.  That's what I needed.

21   Oh, I see you there.

22           MS. HASELDEN:  Yes, Your Honor, Melissa Haselden,

23   Subchapter 5 Trustee.  I'm available at the time; thank you.

24           THE COURT:  Okay.  (indiscernible).  We'll see

25   where this goes.  I really much -- Mr. Schwartz even

1    testified, I think at the beginning (indiscernible) that

2    you've been drinking from a firehose.  I suspect you will

3    continue to drink from that firehose for quite some time.

4    But just want to make sure that everybody's Septembers are

5    clear.  We'll see where this goes.

6              MR. SCHWARTZ:  Your Honor?

7              THE COURT:  Yes, as long as someone identifies

8    who's speaking.

9              MR. SCHWARTZ:  Marc Schwartz.

10             THE COURT:  Yes, Mr. Schwartz.

11             MR. SCHWARTZ:  I actually believe I'm in Europe on

12   September 27th or approximately that date.

13             THE COURT:  Okay.

14             MR. SCHWARTZ:  I can't see my calendar on my

15   iPhone, so...

16             THE COURT:  No.  Let's see.  Could you do -- could

17   you do September -- could you do the 19th or the 20th in the

18   afternoon?  The code mandates that we do it no later than 60

19   days --

20             MR. SCHWARTZ:  Right.  I'm trying to get my

21   calendar up, Your Honor.  Just --

22             THE COURT:  No worries.  Take your time.

23             MR. SCHWARTZ:  You said September --

24             THE COURT:  The 19th or the 20th.

25             MR. SCHWARTZ:  Yes, I can.

1                THE COURT:  What day is better?

2                MR. SCHWARTZ:  Tuesday.

3                THE COURT:  Can we do the 20th at 1:00 p.m.?

4                MR. SCHWARTZ:  That's fine with me.

5                THE COURT:  Ms. Haselden, I need you here.

6                MS. HASELDEN:  Yes, Your Honor, that works for me.

7                THE COURT:  Okay.  I'll set it for September 20 at

8    1:00 p.m. Central Time.  Anything else we need to talk about

9    today?

10               MR. BATTAGLIA:  Thank you, Your Honor.  No, Your

11   Honor, we're grateful for you coming out of your sick bed

12   here and (indiscernible) well.

13               THE COURT:  No, I'm just fine.  I'm fine.  Don't

14   you worry about me.  So, okay, folks.  Y'all have a good

15   day.  Thank you.

16          (Proceedings adjourned at 05:09 p.m.)

17

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATION</u>

2

3    I certify that the foregoing is a correct transcript from

4    the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7    *Sonya M. Ledanski Hyde*

8

9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  August 19, 2022