# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **Free Speech Systems LLC** | § | |
| | § | **Case No. 22–60043 (CML)** |
| **Debtor.** | § | |

---

## THE SANDY HOOK FAMILIES' MOTION TO (I) APPOINT TORT CLAIMANTS COMMITTEE AND (II) REMOVE THE DEBTOR IN POSSESSION

---

Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, and Marcel Fontaine ( the "**Texas Plaintiffs**") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (the "**Connecticut Plaintiffs**") (together the "**Sandy Hook Families**"),[1] creditors and parties-in-interest move to appoint a tort claimants' committee and remove Free Speech Systems, LLC ("**FSS**" or "**Debtor**") as debtor in possession.  For the following reasons, these essential measures should be taken to increase transparency, oversight, and the unsecured creditors' ability to participate in the process:

## I.  PRELIMINARY STATEMENT

1.     FSS has proven, both prepetition and since filing, that it cannot be trusted to operate its business or this bankruptcy in a way that maximizes the bankruptcy estate's

---

[1] Marcel Fontaine was not defamed as to the Sandy Hook mass-shooting but as to the Parkland mass-shooting. For ease of reference, however, this objection refers to all tort claimants as the Sandy Hook Families.

value and the corresponding benefit to its creditors.  Since the Sandy Hook Families filed their lawsuits, the Debtor has systematically transferred millions of dollars to Alex Jones and his relatives and insider entities.  It claims to owe a massive, secured debt to an insider that was first documented as a loan when the Sandy Hook Families were securing key wins in Connecticut and Texas, but no records show that an actual debt existed before the Sandy Hook Families sued.

2.      The Debtor's appointment of W. Marc Schwartz as its Chief Restructuring Officer has not cured—and cannot cure—these fundamental problems.  Rather, Mr. Schwartz's conduct and testimony have contributed to the Debtor's lack of credibility and transparency in the following ways: (1) Mr. Schwartz assumed fiduciary duties to the Debtor here while still owing fiduciary duties to the Infowars Debtors; (2) he was not candid with the Court nor the litigants about those conflicting fiduciary duties; (3) he actively made decisions implicating FSS and the Infowars Debtors despite that conflict; (4) he has presumed, despite the obvious insider relationships that have been present since the Infowars Debtors' Bankruptcy, that the supposed debt between PQPR Holdings Limited, LLC ("**PQPR**") and FSS is valid; and (5) he has acted on that presumption, despite significant evidence that it is not valid.  In short, it appears that Jones chose a fiduciary he could control, and Mr. Schwartz has proved to be just that.

3.      The solution is simple and authorized by subchapter V.  The Court should: (1) appoint a tort claimants' committee to investigate the Debtor's conduct and operations and offer input in the plan process; and (2) remove FSS as the debtor in possession. These

measures will ensure transparency, accountability, and maximize the Debtor's Estate for all creditors.

## II.      FACTUAL BACKGROUND

### A. The Sandy Hook Families sue Jones and the Debtor for intentional infliction of emotional distress and defamation.

4.      As this Court knows, in 2018 the Sandy Hook Families sued Jones and other entities he owns and controls, including the Debtor, (collectively the "**Jones Defendants**") for intentional infliction of emotional distress and defamation, among other claims (the "**Sandy Hook Cases**").  These Sandy Hook Cases are based on lies and conspiracy theories the Jones Defendants espoused through Jones's media outlets.[2]

5.      Except Fontaine, the claims of the Sandy Hook Families—parents and family of children and educators slain at Sandy Hook and a first responder—stem from lies the Jones Defendants spread that the mass shooting was a hoax.  Fontaine's claims arose from falsehoods the Jones Defendants spread that he murdered 17 people at a high school in Parkland, Florida.

---

[2] Cause No. D-1-GN-18-001835, *Neil Heslin v Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer*, In the 261st Judicial District Court of Travis County, Texas; Cause No. D-1-GN-18-001842, *Leonard Pozner and Veronique De La Rosa v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*, In the 345th Judicial District Court of Travis County, Texas; Cause No. D-1-GN-19-004651, *Neil Heslin v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*, In the 261st Judicial District Court of Travis County, Texas; Cause No. D-1-GN-18-006623, *Scarlett Lewis v Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC*, In the 98th Judicial District Court of Travis County, Texas; Cause No. D-1-GN-18-001605, *Marcel Fontaine v Infowars, LLC, Free Speech Systems, LLC and Kit Daniels*, In the 459th Judicial District Court of Travis County, Texas; Cause No. FSB-CV18-6075078-S, *Wheeler, et al. v. Alex Jones, et al.*, In the Judicial District of Fairfield at Bridgeport, Connecticut; Cause No. FBT-CV18-6076475-S, *Sherlock et al. v. Alex Jones, et al.*, In the Judicial District of Fairfield at Bridgeport, Connecticut; and Cause No. FBT-CV18-6081366, *Parker, et al. v. Alex Jones, et al.*, In the Judicial District of Fairfield at Bridgeport, Connecticut.

---

6.     The Sandy Hook Cases have been pending for over four years.  From the beginning, the Jones Defendants tried to obstruct the prosecution of these cases—including repeatedly removing cases to federal court; filing numerous appeals; blatantly refusing to comply with discovery orders (especially as to financial documentation); producing falsified and fabricated financial records; and moving to recuse the presiding state court judge to avoid sanctions.  Their conduct has been so egregious that courts in Texas and Connecticut entered default judgments against them on liability in September and November 2021.  Jones and FSS are the only Jones Defendants in the Connecticut and Texas cases.

**B. The Sandy Hook Families sue Jones and the Debtor for committing fraudulent transfers.**

7.     The Sandy Hook Families' investigation over the course of the Sandy Hook Cases revealed that in the summer of 2021, as defaults were entered in Texas and a default in Connecticut appeared imminent, the Debtor was transferring between $11,000 per day and $11,000 per week plus 60–80% of its sales revenue to insider PQPR, which is owned and operated directly and indirectly by Jones and his parents.  The Debtor claims these payments are part of a "financial disentanglement between the two companies[.]"[3]  The Sandy Hook families claim they are fraudulent transfers designed to siphon off the Debtor's assets to make it judgment-proof.  The Debtor; Alex Jones; PQPR Holdings Limited LLC; JLJR Holdings, LLC; PLJR Holdings, LLC; Carol Jones; David Jones; PQPR Holdings, LLC; JLJR Holdings Limited, LLC; AEJ Holdings, LLC; and AEJ Trust 2018 are all

---

[3] Ex. A, FSS Dep. at 200, Feb. 15, 2022.

defendants in the fraudulent-transfer case: *Heslin v. Jones*, Cause No. D-1-GN-22-001610, in the 200th Judicial District Court of Travis County, Texas.  The Texas Plaintiffs started this action in April 2022 (the "**Fraudulent-Transfer Case**").  The Connecticut Plaintiffs later joined it in June 2022.

### C.  The Debtor's books and records are unreliable.

8.     The Sandy Hook Families' litigation against the Jones Defendants has developed a robust evidentiary record.  The Debtor appeared for ten deposition sessions in the Sandy Hook Cases spanning 2019–2022.  Jones also testified under oath in seven sessions in that time.  Many of Debtor's employees were also deposed.  This evidentiary record establishes Jones's complete control over the Debtor.[4]  In a June 2021 deposition, the Debtor's corporate representative acknowledged Jones's exclusive control over its operations and finances.[5]

9.     In this bankruptcy, the Debtor's own CRO described its books and financial records as unreliable and inadequate as he reached the following preliminary conclusions:

- Though the company had a controller and two bookkeepers (none who appear to have any formal accounting background), the 2021 general ledger was not completed and the books for that period were not closed;

---

[4] Jones's sworn interrogatories filed in the Connecticut cases on behalf of Jones and FSS also establish his exclusive control:

> Identify: a. All business organizations and/or other entities in which you have ownership and/or control[;] b. The officers or members of all organizations and/or entities responsive to part (a)[;] c. The shareholders or other owners of all organizations and/or entities responsive to part (a)…
>
> ANSWER: a. I, Alex Jones, have ownership and/or control of the following business organizations and/or other entities: Free Speech Systems LLC. . . b. I am the sole officer and member of all the organizations and/or entities responsive to part (a). c. I am the sole shareholder and owner of all organizations and/or entities responsive to part (a).

Ex. B, Jones and FSS Sworn Interrogs.

[5] Ex. C, FSS Dep. at 89–90, Jun. 24, 2021.

---

- Few transactions had been recorded in the 2022 general ledger;

- No financial statements were produced for the company for the 18 months preceding Mr. Schwartz's engagement;

- The bank accounts had not been reconciled in 2021 or 2022;

- Internal accounting controls were completely inadequate, including lack of segregation of duties, absence of written monthly, quarterly and annual closing schedules, lack of supervisory review of key accounting functions, including vendor set up, bank reconciliations, inventory reconciliations, or intercompany billings;

- Payments to vendors were debited to an expense account, but not to the specific vendor account; and

- Credit card transactions were not recorded to specific expense accounts.[6]

10.    The Sandy Hook Families' litigation experience indicates that the books are not only unreliable and inadequate but also "sanitized" to show what Jones wants them to show and conceal what Jones wants hidden.   For example, Robert Roe, an outside consultant the Debtor retained to prepare its books, was found to be not credible by the Connecticut Superior Court in a sanctions ruling: "The Court rejected Roe's statements in his affidavit as not credible in light of the circumstances."[7]  In fact, trial balances produced in discovery in Connecticut were found to be "sanitized and incomplete":

> The Jones defendants argue that Roe combined some accounts that were not used consistently and consolidated some general accounts because various transactions all involved the same account and those records created by the Jones defendants' outside accountant were the records that were produced. But these records that removed accounts and consolidated accounts altered the information in the reports that their own accounting manager had

---

[6] ECF 9, ¶ 14.
[7] Ex. D, CT Super. Ct. Ruling, at 7:15–17, Nov. 15, 2021.

produced, and they contain trial balances that did not balance. These sanitized, inaccurate records created by Roe were simply not responsive to the plaintiffs' request or to the Court's order.[8]

11.     The Debtor's subchapter V petition, signed by Mr. Schwartz as CRO, includes FSS Balance Sheets as of May 31, 2022; a cash-flow statement for the year ended December 31, 2021 and the five months ended May 31, 2022; a comparative profit-and-loss statement for the same time-periods; and a comparative balance sheet, also for the same time-periods.[9]  Despite the Debtor's concessions about the state of its financial records, these statements are presented to the Court as if they are complete and accurate. No notation on any of these financial statements disclaims that information is missing or that the numbers cannot be relied on.

**D.  The Debtor alleges it owes insider PQPR $54 million.**

12.     A centerpiece of Jones's plan to avoid compensating the Sandy Hook Families is the claim that FSS owes PQPR an enormous debt.  The Debtor claims this debt is $53,655,082.29 in principal and $11,794.19 in interest as of the Petition Date under promissory notes and a security agreement it entered in 2020 and 2021.[10]

13.     In November 2020, just three weeks after the Connecticut Supreme Court affirmed major discovery sanctions against Jones and the Debtor, and three months after the last appellate-court decision allowing the Texas Plaintiffs litigation to proceed, PQPR filed a UCC Financing Statement claiming a security interest on substantially all the

---

[8] *Id.* at 9:9–21.
[9] ECF 1, at 9–13.
[10] ECF 6.

Debtor's assets for an alleged $54 million debt.  The Debtor admits that the supposed debt was first memorialized in 2020—*and the supposed security interest created in 2020*—even though it claims this obligation had been accruing since some time "in the past" and by 2020 amounted to $29 million dollars.  The Debtor also admits that PQPR continued to supply it with supplements during the entire period of claimed nonpayment, even though the claimed debt ballooned to $54 million.  PQPR continues to supply FSS even now.

14.    There are several troubling facts relating to this supposed debt: (1) its beneficiaries are insiders, with 72% of payments to PQPR going to Jones and the rest to his mother and father;[11] (2) even in the Debtor's best version of the facts, PQPR is controlled by Jones's father, David Jones;[12] (3) the "formula" for paying PQPR offers no actual benefit to the estate, given that "if PQPR purchase[s] inventory, pays for it, sells it through our sales channel, the Debtor gets 20 percent of the net.  PQPR gets 80 percent of the net";[13] (4) the supposed debt dwarfs the Debtor's other long-term liabilities by 50-fold;[14] and (5) a $54 million supposed debt to insiders coupled with $61 million in member draws,[15] depicts a company being drained into insolvency to benefit insiders to the detriment of creditors.

15.    As Mr. Schwartz himself states, the Debtor's financial records do not suffice to establish the PQPR debt's legitimacy: "Internal accounting controls were inadequate,

---

[11] ECF 10, ¶¶ 46–47.

[12] *Id.*, ¶ 45.

[13] Ex. E, Hrg. Tr. at 21, Aug. 3, 2022 (remarks of Mr. Battaglia).

[14] *See* ECF 1, at 13.

[15] *See id.*

including lack of segregation of duties, written monthly, quarterly, and annual closing schedules, lack of supervisory review of key accounting functions including vendor set up, bank reconciliations, inventory reconciliations, or billings to PQPR[.]"[16]

### E.  The CRO concludes the PQPR debt is legitimate without any investigation.

16.    While a debtor should have a compelling interest in avoiding a large, questionable debt, Mr. Schwartz seems set on validating it.  He already concluded the debt is legitimate—and swore to the truth of that conclusion in the first-day filings: "Invoices from PQPR for payment for product it had acquired and sold to FSS were not paid or not paid in full, resulting in a liability to PQPR in excess of $50 million."[17]  Mr. Schwartz admitted on cross-examination that this conclusion was based on his review of FSS financial records, not based on his review of invoices or bank statements.[18]  He testified this statement was based on "schedules of billings, (indiscernible) PQPR for inventory and credits, *i.e.*, payments, applied to those billings and they were developed out of the general ledger system there, accounting transactions pulled out of the general ledger system."[19]  He said, "*they showed me* -- I have the calculation for the amount of the 29,588,000 and I see from the source date that it is from invoices and payments records."[20]  In other words, someone prepared information for Mr. Schwartz to support the claimed FSS–PQPR debt,

---

[16] ECF 10, ¶ 42(c).

[17] *Id.* at ¶ 42(d).

[18] Ex. E, Hrg. Tr. at 165-66, Aug. 3, 2022.

[19] *Id.*

[20] *Id.*

and he just accepted it and swore to it even though he knew FSS financials were inaccurate and unreliable and he had never seen invoices or bank statements proving the debt.[21]

**F.   The Debtor denies the debt in its first Sandy Hook deposition only to remember its existence in another deposition taken months after default judgments were rendered.**

17.    FSS's testimony in the Sandy Hook Cases confirms the claimed debt is a cover for Jones to pay himself out of FSS's profits, while claiming FSS is insolvent.   In June 2021, FSS presented its representative, Michael Zimmerman, for deposition. Zimmerman testified that he prepared himself to testify about the Debtor's financial condition and its relationship with PQPR, in part by speaking with Jones and the Debtor's long-time CPA, Bill Love.[22]   Mr. Schwartz recently testified that Mr. Love will no longer work with FSS.

18.    Through Zimmerman, FSS testified it was "unaware" of any debt it had taken on since 2012.[23]   Before his deposition, Zimmerman asked Jones about "Free Speech Systems' business relationship with PQPR."[24]   Zimmerman revealed that Jones advised only that "PQPR is a company that basically develops and procures supplements that are then sold on the Infowars store by Free Speech Systems."[25]   Despite having Zimmerman testify on FSS's financial relationship with PQPR, Jones never mentioned the massive

---

[21] *See* ECF 10, ¶ 42; *see also* Ex. E, Hrg. Tr. at 165-66, Aug. 3, 2022.

[22] Ex. C, FSS Dep. at 27, Jun. 24, 2021.

[23] *Id*. at 88:12-16.

[24] *Id.* at 46.

[25] *Id.* at 46–47.

alleged debt to PQPR the Debtor now claims—and which, if real, could jeopardize the business.

19.      Zimmerman also discussed the relationship between the Debtor and PQPR with Love.[26] *Love did not describe "any contractual relationship between PQPR and Free Speech Systems."[27]*  That Love never referenced a debt to PQPR is telling, given that Jones testified that Love had a role in PQPR's finances too.[28]  In other words, in June 2021— when it allegedly owed over $50 million to PQPR under two promissory notes and a security agreement—the Debtor testified that it was "unaware" of any debt it had taken on since 2012.[29]

20.      This earliest testimony about FSS's debt came three months before default judgments were rendered in Texas and five months before the default in Connecticut.  But after those defaults were rendered, FSS's story about PQPR changed.

21.      In June 2022, about a year after FSS's first deposition, Jones produced: (1) a supposed promissory note between FSS and PQPR dated August 2020; (2) a supposed security agreement creating a security interest in the note, also dated August 2020; and (3) another supposed promissory note dated November 2021.[30]

22.      On June 27, 2022, the Debtor appeared for deposition on the PQPR–FSS relationship.  Mr. Schwartz prepared the representative, Ms. Paz, to testify about the

---

[26] *Id.* at 31.

[27] *Id*. (emphasis added).

[28] Ex. F, Jones Dep. at 451-53, Apr. 6, 2022.

[29] Ex. C, FSS Dep. at 88:12-16, Jun. 24, 2021.

[30] Ex. G, Jones Dep. at 900-901, Jul. 21, 2022.

alleged PQPR debt.[31]  The Debtor's trial counsel informed Ms. Paz that Schwartz "was the best person to speak to regarding the financial questions . . . noticed in the deposition," which included transactions and agreements between the Debtor and PQPR.[32]  Mr. Schwartz, as CRO, met twice with Paz to prepare her to testify for the Debtor.[33]  Their first meeting was June 17, 2022 and included Ms. Paz, Mr. Schwartz, and the Debtor's trial counsel.[34]  The second meeting was just days before her deposition—and the first time she saw the supposed promissory notes and security agreement.[35]  Based on his own description of FSS's records, Mr. Schwartz was not in a position to prepare FSS to give testimony under oath on the PQPR–FSS relationship, any more than he could under oath himself.  He did so anyway.

23.     At the June 2022 deposition, the Debtor, through Ms. Paz, told a new story about its relationship with PQPR.  In this new version, PQPR provided significant services to FSS along with supplying products.  The Debtor testified that PQPR handles sales transactions occurring over the websites infowarsstore.com and infowarsshop.com;[36] that PQPR "does all the fulfillment of the order, it houses all of the products and it, you know, generally just fulfills all of the orders;"[37] and that PQPR had its own employees and those employees performed the fulfillment and warehouse functions, not the Debtor's

---

[31] Ex. H, FSS Dep. at 557-68, Jun. 27, 2022.

[32] *Id*. at 559–61.

[33] *Id*. at 568.

[34] *Id*. at 558–59.

[35] *Id*. at 568.

[36] *Id*. at 577–78.

[37] *Id*. at 583.

employees.[38]  None of this is true.  PQPR performs no services, has no employees, and has no warehouse.

24.     When asked who authorized the Debtor to assume this supposed debt, the Debtor's June 2022 testimony was that "I don't think it was a conscious decision on anyone's part . . . I don't think I would use the word 'authorized.'"[39]

25.     In other respects, the June 2022 story resembled Mr. Schwartz's.  The Debtor testified that in December 2014, it started accruing a debt to PQPR when it failed to pay for PQPR's products.[40]  The Debtor testified the debt was "[f]or costs associated with the products, for purchasing the products.  So, PQPR purchases the products, costs associated with housing the products."[41]  But when pressed, FSS conceded that debt's basis was "billing . . . for the products":

> Q.  So, but is Free Speech Systems buying the product from PQPR?  Because that I could understand, right.  Hey, you're buying this product from us, we're selling it to you, Free Speech Systems, pay us. . . . What I understood you to be saying is PQPR buys the products and sells the products; right?
>
> A.  PQPR, I believe, buys the products and then stores the products and handles the sale end of the products and packaging the products.  *But ultimately Free Speech pays PQPR for the product.  So, it is billing Free Speech for the products.*[42]

---

[38] *Id*. at 584-86, 593–94.

[39] *Id.* at 624.

[40] *Id.* at 625.

[41] *Id*. at 625.

[42] *Id*. at 627-28 (emphasis added); *see also id.* at 631.

26.     In this deposition, FSS testified that it received monthly invoices from PQPR requesting payment for product purchased by PQPR.[43]  But no invoice was ever produced in the years of the Sandy Hook Cases—despite being requested.

**G. Jones's story about the Debtor's alleged $54 million debt to his other company, PQPR, also evolves as needed.**

27.     On June 21, 2022, the Connecticut Plaintiffs deposed Jones on the supposed debt, and he told yet another story.  Jones admitted that "since PQPR's formation, [he], either directly or indirectly, ha[s] had a controlling majority ownership stake."[44]  He testified that PQPR pays FSS most of its profits to compensate FSS for advertising.[45]  He failed to explain why PQPR would send most of its revenue to FSS when it also claims FSS owes it $54 million.

28.     Jones also testified that most of that supposed debt accrued after he was sued by the Connecticut Plaintiffs in May 2018.[46]  But he was unable to describe the nature of the debt itself:

> Q.  I understand from your testimony that you believe that David Jones is claiming that under PQPR's agreement with Free Speech Systems, Free Speech Systems was supposed to send a percentage of sale proceeds to PQPR?
>
> A.  Yeah, I forget the exact agreement.  You'd have to -- I forget the exact agreement.  The point is it's not being paid under what the agreement is.

---

[43] *Id*. at 625, 631.

[44] Ex. I, Jones Dep. at 866, Jun. 21, 2022.

[45] *Id*. at 870.

[46] *Id*. at 878-79.

Q.  Right.  And I'm just trying to figure out what's not being paid.  I take it that you -- it's a percentage of the sale proceeds that PQPR claims it was owed --

A. I don't know.  It's something -- I don't remember.[47]

Shortly after professing ignorance concerning the nature of his company's debt, Jones declared that of all the Debtor's current employees, he knows most about FSS's relationship with PQPR.[48]

29.     A month later, on July 21, 2022, Jones appeared for another deposition—scheduled specifically so he could testify about the PQPR promissory notes and the security agreement.  This time, he presented another story for the alleged debt.  He testified that the August 2020 note came about because "[a]fter deplatforming approximately four years ago and legal bills from lawsuits, we began to have to spend basically all the money from profits from PQPR to build new infrastructure and pay legal bills and taxes and when the, when the debt got so large we, we developed a plan to start pay -- try to pay down that debt, at least not to have it grow, and so that's, that's what I remember the reason it was done."[49] He later agreed that the debt started to accrue "about four years ago when this deplatforming took place."[50]   This testimony makes the Sandy Hook Families' point precisely: the Jones family ("we" in Jones's words) is using PQPR and FSS as one operating entity, with charges being shifted between PQPR and FSS as they please.

## H.  Money the Debtor pays PQPR ends up in Jones's pockets.

---

[47] *Id*. at 878–79.

[48] *Id*. at 886.

[49] Ex. G, Jones Dep. at 902, Jul. 21, 2022.

[50] *Id*. at 905, 913-14.

30.     Jones is the beneficiary of payments the Debtor now makes to service its debt to PQPR.   Through Ms. Paz, the Debtor testified that from PQPR's inception Jones controlled it through his 90% ownership interest in PLJR, which, in turn, had a 80% ownership interest in PQPR.[51]   Then in 2018—the same year the Sandy Hook Cases began—Jones formed the AEJ Trust 2018.[52]  He then transferred his ownership interest in PLJR to the AEJ Trust 2018 and made himself its income beneficiary.[53]   The Debtor's claimed debt-service payments of $11,000 a day were then routed through PQPR to the AEJ Trust 2018 and then onto Jones himself:

Q.  The trust does generate income; correct?

A.  It is generating income, yes.

Q.  How is it generating income?

A.  It is generating income on the basis of the notes that Free Speech pays to PQPR.

Q.  Which started when?

A.  So, those payments, I believe, started at the end of last year, some time toward the end of last year, maybe November.

Q.  That is November of 2021?

A.  Right.  So those payments are approximately $11,000 per business day from Free Speech to PQPR.

Q.   And the initiation of those payments of $11,000 from Free Speech Systems to PQPR was initiated why?

A.  To pay down the debt between the two companies.

---

[51] Ex. H, FSS Dep. at 595, 604, Jun. 27, 2022.

[52] *Id.* at 605.  AEJ are Alex Emric Jones's initials.

[53] *Id.* at 605–06, 615.

. . .

Q.  Free Speech Systems isn't aware of anybody else who could authorize Free Speech Systems to make $11,000 daily payment to another corporate entity; correct?

A.  No, I think Alex would have to authorize it.  He owns Free Speech.

. . .

Q.  Whatever income the trust is generating, whether it be the $11,000 daily payments beginning in November 2021 or some additional income beyond that, none of that income is being paid to any of Mr. Jones's children; correct?

A.  That's right. Yes.

Q.  It's being paid to Mr. Jones; correct?

A.  Mr. Jones is an income beneficiary of the trust, yes.

Q.  Are there any other income beneficiaries?

A.  I don't believe so, no.

. . .

Q.  So he is the sole beneficiary of any income that flows to AEJ Trust as a result of its ownership of PQPR's debt; correct?

A.  Through the trust, yes.[54]

## I.  The CRO mismanages estate resources to Jones's benefit.

31.     Mr. Schwartz simply does not seem to have an objective base of knowledge concerning the Debtor's operations—and, more to the point, does not seem inclined to get one.[55]  Since May 2022, the Debtor retained Mr. Schwartz as its CRO with "broad powers to review the company's past financial performance, analyze the condition of FSS's books

---

[54] *Id*. at 606–615.

[55] *See supra* § II(C)-(H).

and records and evaluate whether FSS is a business that can be reorganized."[56]   Mr. Schwartz "retained his firm Schwartz Associates to perform various accounting and forensic work associated with his mandate."[57]  Yet, in another example of mismanagement, the website FSS controls, Infowars.com, has "wallets" to receive donations.   Close to the time of Mr. Schwartz's retention, in April and May 2022, one wallet linked to the website started to receive large donations in cryptocurrency.[58]  A donation for over $1 million was received on April 23rd; another for over $1 million was received on April 30th; and another for $5.9 million was received on May 19th.[59]  After May 19th—the same day Mr. Schwartz undertook duties as CRO—Jones personally cashed out $4-5 million of those donations and put it into his personal bank account.[60]  He alleges he intended to transfer "most of it" to FSS "as a capital injection."[61]  When questioned more closely, Jones said "some has gone directly into Free Speech Systems, other has gone directly into legal bills, but the things, generally, you know, dealing with the operation of the company."[62]  Jones indicated that:

> [S]ome company bills have been [paid] directly out of my bank account, my private bank account, just for expediency.   Instead of just transferring it into Free Speech Systems and having that, but more than 2 million has been transferred into Free Speech Systems and paid out for back bills.   And then others has [sic] gone to legal bills.   And then other has gone to buy product so that we have product to sell . . . I may keep some to reimburse myself for past

---

[56] ECF 83, ¶ 24.

[57] Id.

[58] Ex. I, Jones Dep. at 845-46, Jun. 21, 2022.

[59] Id. at 846-47.

[60] Id. at 848-49, 851.

[61] Id. at 848.

[62] Id. at 849-50.

-- because I'm paid privately, but my intent is to currently spend about 90 percent of it in -- into keeping Free Speech afloat[.]"[63]

Jones stated he had also paid a $344,000 bill associated with this bankruptcy from these funds.[64]

## J.  The CRO has a conflict of interest but fails to disclose it.

32.     On April 17 and 18, 2022, Jones directed three of the Jones Defendants, InfoW, LLC (fka Infowars, LLC), IWHealth, LLC (fka Infowars Health, LLC), and Prison Planet TV, LLC (collectively the "**Infowars Debtors**"), to petition for bankruptcy relief under subchapter V.[65]  Mr. Schwartz, also appeared in these bankruptcies as the Infowars Debtors' CRO.  Mr. Schwartz signed the petition on behalf of the Infowars Debtors on April 18, 2022, and, in connection with that filing, presented an affidavit, in which he indicated that he had been retained to act as CRO in April 2022 but left the specific date of the retention blank.[66]  Mr. Schwartz was presumably retained before April 14th, because the Trustee of the 2022 FSS Litigation Settlement Trust, Robert Dew, indicated he authorized Mr. Schwartz to file the petition as of April 14, 2022.[67]  In connection with his retention, Mr. Schwartz received a retainer of $50,000.[68]

33.     Mr. Schwartz states that in preparing to file that bankruptcy petition, he met "with Bob Roe, a CPA retained to delve into the books of account of various entities

---

[63] *Id.* at 851.

[64] *Id.* at 852.

[65] *See In re InfoW, LLC, et al.*, No. 22-60020 (Bankr. S.D. Tex.) (the "**Infowars Bankruptcy**").

[66] Infowars Bankruptcy ECF 1, Schwartz. Decl. ¶ 6.

[67] *Id.*, attachment to Schwartz Decl.

[68] Infowars Bankruptcy ECF 7, ¶ 31.

affiliated with the Debtors and assist those entities to prepare accurate financials statements which could be relied upon by the reader to accurately reflect the financial condition and activities of the entities.  I have also met with counsel for the Debtors and Jones to obtain an understanding of the Debtors' operations.  I have also reviewed lists of assets owned by the Debtors."[69]

34.    Through May 18, 2022, Mr. Schwartz had active decision-making responsibilities as to the Infowars Debtors.  Specifically, the Infowars Debtors represented in a motion to continue various deadlines filed on May 18 that, although the Sandy Hook Families would be dismissing or withdrawing their actions against the Infowars Debtors, "the three debtors still have a number of creditors that must be treated.  Marc Schwartz, the proposed Chief Restructuring Officer, has not yet had a chance to focus on the remaining creditors.  He intends to turn his attention to determine how best to resolve them as soon as he finalizes the agreements with the Texas and Connecticut Plaintiffs . . . He could proceed to confirmation of a plan by re-negotiating the Plan Support Agreement, or he could dismiss the Chapter 11 Cases, after notice and a hearing, and handle the remaining claims outside of Chapter 11."[70]   The Infowars Debtors sought an extension to give Mr. Schwartz "a short amount of time to analyze which option to pursue,"[71] which was granted on the record in a May 19th status conference.

---

[69] Infowars Bankruptcy ECF 1, Schwartz. Decl. ¶ 7.  Prior to this, the Connecticut Superior Court had determined Mr. Roe's statements concerning the Debtor's books to be inaccurate and unreliable.  *See* Ex. D, CT Super. Ct. Ruling, at 7:15–17, 9:9–21, Nov. 15, 2021.

[70] Infowars Bankruptcy ECF 95, ¶¶ 16-17.

[71] *Id.* at ¶ 17.

35.     During the time Mr. Schwartz was supposedly working on resolving the Infowars Bankruptcy, Mr. Schwartz apparently also agreed to serve as CRO for FSS—a third-party funder of the litigation settlement trust in the Infowars Bankruptcy.   Mr. Schwartz's declaration in this bankruptcy states he acted as FSS's CRO as early as May 19, even though the retainer letter was not signed until June 7.[72]   Mr. Schwartz's affidavit makes this point in two separate paragraphs:

> Paragraph 9: "On June 7, 2022, the Debtor confirmed my retention as the Debtor's Chief Restructuring Officer (the 'CRO') and SALLC as its financial advisors *as of May 19, 2022*."[73]

> Paragraph 40: "Since *May 19, 2022*, FSS has retained Schwartz as its Chief Restructuring Officer ('CRO'), with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized.   SALLC was retained to perform various accounting and forensic work associated with his mandate."[74]

This declaration was filed with FSS's first-day motions, before Mr. Schwartz and Debtor's counsel were alerted to the Court's concerns, expressed on August 1, about the conflict between Mr. Schwartz's role as CRO for the Infowars Debtors and FSS.

36.     When testifying before the Court two days later, Mr. Schwartz contradicted his declaration and claimed he did not act as CRO until June 6th, when the retainer letter was signed. He swore he talked with Lee and Jordan while the Infowars Bankruptcy was pending; then he wrote the May 19 retainer letter at Lee's request; and "I didn't even think

---

[72] ECF 10, Schwartz Decl. ¶¶ 9, 40.
[73] ECF 10, Schwartz Decl. ¶ 9 (emphasis added).
[74] ECF 10, Schwartz Decl. ¶ 40 (emphasis added).

about it at the time," and "the letter was officially signed June 6," "June 6 is when I was hired."[75]  Mr. Schwartz's declaration is definite that he took on CRO responsibilities for FSS on May 19th.  His August 3rd about-face suggests he did not take on CRO responsibilities until June 6th.  Now, Debtor is affirming it retained Mr. Schwartz on May 19th in its application to authorize his employment.[76]

37.     If Schwartz's declaration and Debtor's application to employ Mr. Schwartz are accurate, he acted as the Debtor's CRO as of May 19—while he also had a duty of loyalty to the Infowars Debtors and actively made decisions for those entities.[77]  This retention was confirmed on June 7th after it became clear the Infowars Bankruptcy would be dismissed.[78]  But it was not disclosed to the Court in the Infowars Bankruptcy, despite Schwartz attending a status conference on May 19 and June 10th in that bankruptcy.  At that time, neither Mr. Schwartz nor the Infowars Debtors' counsel disclosed to the Court Mr. Schwartz's retention by FSS as CRO.

38.     In moving to dismiss the Infowars Bankruptcy for bad faith, the U.S. Trustee argued that "Jones and FSS hand-picked . . . three holding companies for bankruptcy as part of a scheme engineered solely to limit their own legal liability, to deny parties in

---

[75] Ex. E, Hrg. Tr. at 149, 180, Aug. 3, 2022.

[76] ECF 83, ¶¶ 24, 40.

[77] For example, on June 1, the Infowars Debtors represented in a stipulation seeking dismissal of that bankruptcy that "Marc Schwartz, the Chief Restructuring Officer of the Debtors, has determined that it is in the best interest of the Debtors' estates and their creditors not to continue the Chapter 11 Cases[.]"  Infowars Bankruptcy ECF 110, at 2.  These decisions included how to handle the claims of the Randazza Legal Group, one of the Infowars Debtors' remaining creditors.  *See* Infowars Bankruptcy ECF 61, Part 2, No. 3.23 (listing Randazza Legal Group as an unsecured creditor).  The Randazza Legal Group represented the Infowars Debtors and FSS in connection with the Sandy Hook Families' cases and is presumably also a creditor of FSS.

[78] *See* ECF 10, Schwartz Decl. ¶ 9.

interest a full accounting of their assets, and to deny individuals their day in court and imminent recovery for established liability."[79]   That Mr. Schwartz's role as CRO for FSS and the Infowars Debtors was concealed during the Infowars Bankruptcy bolsters the U.S. Trustee's conclusion that this was a "scheme."

39.    Rather than acknowledging the conflict in Mr. Schwartz's testimony to the Court on this critical issue, and rather than acknowledging Mr. Schwartz's post-May 19 conflict of interest and his failure to raise it with the Court, the Debtor attempts to minimize the problem by broadly alleging that Mr. Schwartz "acting in a similar role [for the Infowars Debtors] did not create an 'interest materially adverse' to the interests of FSS's creditors or equity security holders."[80]   The Debtor denies a dispute between it and the Infowars Debtors, disregarding clear issues with the control, management, and financial documentation across these entities.[81]   The Debtor adds that Schwartz's "mandate to lead [the Infowars Debtors'] management and personnel through the restructuring process had for all practical purposes concluded May 19," disregarding the Infowars Debtors' own assertions at that same time that Mr. Schwartz required more time to fulfill his duties to them.[82]

**K. Jones squeezes FSS into bankruptcy as a small business before time runs out.**

40.    The Sandy Hook Families' dismissals of the Infowars Debtors from their cases freed those cases to proceed in Texas and Connecticut.   In Texas, the *Heslin* and

---

[79] Infowars Bankruptcy, ECF 50, at 16.

[80] ECF 83, ¶ 44.

[81] *See id.*

[82] *Compare* ECF 83, ¶ 44 (internal quotations omitted), *with* Infowars Bankruptcy, ECF 95, ¶¶ 16-17.

*Lewis* case, brought by parents of slain six-year-old Jesse Lewis, started July 25 and was scheduled to run 10 days.  In Connecticut, the *Lafferty* cases, which involves claims of 14 family members and a first responder, was set to begin jury selection August 2 with trial starting September 6, 2022.

41.    Five days into the *Heslin/Lewis* trial, Jones had FSS petition for bankruptcy relief under subchapter V.  Days later, the jury returned verdicts of over $49 million—dwarfing the liquidated-debt eligibility limit under subchapter V by over $40 million.

## III.    ARGUMENT & AUTHORITIES

42.    Congress enacted subchapter V "to streamline the reorganization process for small business debtors because small businesses have often struggled to reorganize" under chapter 11.[83]   As part of this streamlining, many procedural safeguards that protect creditors in large reorganizations were curtailed or even eliminated.[84]   The intended beneficiaries of this process are "[s]mall businesses—typically family-owned businesses, startups, and other entrepreneurial ventures."[85]   FSS is not the type of debtor Congress envisioned needed protections under subchapter V—a debtor that earns tens of millions of dollars in yearly revenues; alleges over $54 million in secured debt; and has nearly $50 million in unsecured debt owed to two Sandy Hook plaintiffs, liquidated days after filing,

---

[83] *In re Ventura*, 615 B.R. 1, 12 (Bankr. E.D.N.Y. 2020), *r'ved on other grounds*, 638 B.R. 499 (E.D.N.Y. 2022).

[84] *See, e.g.* 11 U.S.C. § 1181 (only allowing creation of a creditor's committee for cause); 11 U.S.C. § 1183 (authorizing court to enhance default powers of subchapter V trustee).

[85] *In re Ventura*, 615 B.R. at 12 (quoting 11. H.R. Rep. No. 116-171, at 1-2 (2019)).

and with more judgments imminent.

43.     The Debtor alleges it meets the subchapter V debt limits—which it has the burden to prove—by securing alleged debt with an entity subject to Jones and his family's control and filing bankruptcy before the Sandy Hook Families' claims were liquidated.[86] It sought protection under this subchapter to avoid the necessary transparency and oversight that accompanies normal chapter 11 reorganizations.  But FSS's conduct leading up to and since filing this bankruptcy reveals an out-of-control debtor that is still operated by Jones for the sole benefit of Jones.  On its face, CRO appointments typically indicate a good-faith attempt to right the ship, but Mr. Schwartz has proven he is unable or unwilling to operate with competency and impartiality.  For the reasons here, the Court should appoint a tort claimants' committee and remove FSS as debtor in possession.

**A.  The Court has cause to appoint a tort claimants' committee.**

44.     Under subchapter V, a creditors' committee is not appointed "unless the court for cause orders otherwise."[87]  "[T]he appointment of a committee in a Subchapter V case is within the discretion of the court."[88]  While "cause" under subchapter V case is

---

[86] *See* 11 U.S.C. § 1182(1) (defining debtors under subchapter V, in part, as having liquidated debts not exceeding $7.5 million, excluding debts to affiliates or insiders).

[87] 11 U.S.C. § 1102 (a)(3); *see also* 11 U.S.C. § 1181(b).

[88] *In re Wildwood Villages, LLC*, No. 3:20-bk-02569-RCT, 2021 WL 1784408, at *4 (Bankr. M.D. Fla. May 4, 2021) (comparing the court's discretion in subchapter V to allow for a class proof of claim to the court's discretion to appoint a committee, "[t]he Court can envision possible scenarios where a creditors' committee or a class claim may be an efficient and appropriate vehicle in a Subchapter V case, particularly while the debt limits are set at a higher level"); *see also* Ex. J, *In re Sharity Ministries, Inc.*, Case No. 21-11001 (JTD) (Bankr. D. Del.), Hrg. Tr. at 60:16-25, Aug. 9, 2021 (Judge Dorsey appointing creditors' committee *sua sponte* in subchapter V case); *cf. In re Haskell-Dawes, Inc.*, 188 B.R. 515, 520 (Bankr. E.D. Pa. 1995) (explaining with respect to prior version of § 1102(a)(2) that "Congress could have altogether eliminated the requirement that a creditors' committee be appointed in cases involving small businesses.  It did not.").

undefined, at least one court has considered three factors in deciding whether "cause" exists to appoint a subchapter V committee: (1) whether a committee is necessary to provide effective oversight of the Debtor; (2) whether a committee will assist in the prompt resolution of a case; and (3) whether a committee will improve recoveries to creditors.[89] Under that standard, appointing a tort claimants' committee is not only appropriate but also critical to a fair outcome.

### i.   A tort claimants' committee is necessary for effective oversight of the Debtor.

45.   Cause exists to appoint a tort claimants' committee to provide effective oversight of the Debtor.  The Debtor's conduct and actions before and after filing this bankruptcy case demonstrate the need for close oversight.[90]  The Debtor is one of many entities subject to Jones's control and management that he uses to funnel funds for his own personal benefit.  Under Jones's control, the Debtor's financial records and documentation have been deemed unreliable, inadequate, and at times intentionally altered.[91]  At Jones's direction, Debtor blatantly refused to comply with discovery orders and took efforts to avoid disclosure of its financial affairs, subjecting it to default judgments on liability.  To avoid the liquidation of these claims, Jones directed multiple entities to file multiple bankruptcies.[92]  Jones then sought to retain the same CRO across these bankruptcies,

---

[89] *See In re Bonert*, 619 B.R. 248, 253-254 (Bankr. C.D. Cal. 2020) (setting forth the three factors to consider for the existence of a committee of creditors in a subchapter V case).

[90] *See id.* at 254.

[91] *See* Ex. D, CT Super. Ct. Ruling, at 9:9-21, Nov. 15, 2021 (finding that Debtor produced "sanitized" and "inaccurate" trial balances during discovery); *see also* ECF 9, ¶ 14 (CRO acknowledging Debtor's financial records were unreliable and inadequate).

[92] ECF 1; Infowars Bankruptcy ECF 1, 8.

despite apparent conflicts of interest, and utilized this CRO to legitimize unsupported transfers and claims between entities under Jones's direct and indirect control. Significantly, the retention of a CRO has failed to prevent Jones from personally cashing out $4–5 million in donations to FSS and placing those funds in his personal bank account.[93]  Further, since filing for bankruptcy with a CRO in place, the Debtor has proved itself unable to properly manage estate resources—allowing, for example, Amex payments to Jones's housekeeper.

46.    A tort claimants' committee would provide necessary oversight and a platform for an independent fiduciary to promote transparency and "provide access to information for creditors."[94]  The committee would be authorized to, among other powers, "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan"; "participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan"; and "perform such other services as are in the interest of those represented."[95]  Investigation and participation by a committee would ensure that essential safeguards are in place to protect creditors in this bankruptcy.

---

[93] Ex. I, Jones Dep. at 848, 851, Jun. 21, 2022.

[94] 11 U.S.C. § 1102(b)(3)(A).

[95] 11 U.S.C. § 1103(c)(2)-(3), (5).

### ii.     A tort claimants' committee will help resolve this case promptly.

47.     Cause also exists to appoint a tort claimants' committee to promptly resolve the bankruptcy case.   There are significant issues with Debtors' operations and management that impede resolution.   Appointment of a tort claimants' committee will streamline the resolution of these major issues.[96]   Specifically, a tort claimants' committee will provide a streamlined process to independently evaluate the Debtor's operations, financial records, alleged PQPR notes, pre- and post-petition conduct—including issues the Court already identified (like the CRO's conflicts of interest) without shifting the burden of such investigations onto individual creditors.   A committee also provides a single counterparty with which the Debtor can negotiate and resolve issues as they arise.[97] Further, the tort claimants' deep knowledge of this Debtor and its related entities and operations, gained from years of litigation, would be a huge asset to a committee.

### iii.     A tort claimants' committee will improve the creditors' recoveries.

48.     Finally, cause exists to appoint a tort claimants' committee because doing so will improve creditor recoveries.[98]   A critical factor in creditor recoveries here is the fate of the alleged secured debt owed to PQPR.   Specifically, the Debtor claims to owe a massive, secured debt to PQPR—an admitted insider—in the form of notes conveniently documented when the Sandy Hook Families were securing key wins in the Texas and

---

[96] *See In re Bonert*, 619 B.R. at 254.

[97] See *In re Yahweh Ctr., Inc.*, No. 16-04306-5-JNC, 2016 WL 5417363, at *3 (Bankr. E.D.N.C. Sept. 28, 2016) (considering in appointing a committee "the likelihood that effective committee counsel will aid rather than hinder the chapter 11 case process").

[98] *See In re Bonert*, 619 B.R. at 254.

Connecticut cases.  The legitimacy of the PQPR debt is already a focal point of the Sandy Hook Families' Fraudulent-Transfer Case against the Debtor and other entities directly and indirectly controlled by Jones.  In contrast, Debtor's CRO concluded the PQPR debt was legitimate without investigation or reliable documentation and admitted he had not read the Fraudulent-Transfer Case despite serving as CRO in both this and the InfoWars Bankruptcies.  The Court rightly spotted this troubling reality:

> . . . I'm concerned that you still may represent the InfoW Debtors as their CRO and how you're purporting to act as the CRO in this case.  And I don't -- at some point, someone's going to have to make some really hard decisions. I'm – quite frankly, I'm a little surprised you hadn't read some of the litigation because at least InfoW was involved in the litigation for every one of these last time.  So -- and that was supposedly the purpose of the litigation."[99]

A full and fair investigation of the validity and nature of this debt by an independent fiduciary is needed to ensure that creditors are treated fairly, and a tort claimants' committee is the most appropriate and efficient vehicle to conduct such an investigation.[100]

### iv.    A tort claimants' committee is needed even with the subchapter V Trustee.

49.    The appointment of the subchapter V Trustee does not diminish the need for a tort claimants' committee.  A committee is still best situated to represent the interests of similarly situated creditors.[101]  Further, a tort claimants' committee can investigate the

---

[99] Ex. E, Hrg. Tr. at 240:8-25, Aug. 3, 2022.

[100] *See* 11 U.S.C. § 1103(c)(2) (authorizing committee to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor").

[101] *See* 11 U.S.C. § 1102(b)(3)(A)-(B) (committee is authorized to "provide access to information for creditors who . . . hold claims of the kind represented by that committee and . . . are not appointed to the committee" and to "solicit and receive comments" from those creditors).

Debtor and its transactions and select and employ counsel and financial experts.[102]   The subchapter V Trustee cannot without further court order.[103]   Moreover, the statutes describing the subchapter V Trustee's authority—11 U.S.C. §§ 1183(b), 704(a), and 1106(a)—do not authorize the Trustee to litigate against the Debtor.  While the subchapter V Trustee will play crucial roles in this bankruptcy, there is also a crucial role for a tort claimants' committee.

50.     The Debtor may argue that appointing a tort claimants' committee would add costs to the bankruptcy estate, but the "truism that the appointment of a creditors' committee may result in additional costs to the debtor could be advanced by every small business seeking relief . . . ." and thus is insufficient to defeat such a request in cases where, as here, the oversight provided by such a committee is necessary to fairly adjudicate a chapter 11 case.[104]   Indeed, treatment of the Debtor's primary creditor constituency—the tort claimants—is the "paramount issue" here.  It is therefore critical that tort claimants have a voice.  Moreover, and especially given the nature of the creditor body here, the costs of participation by tort claimants in a fiduciary capacity and for the benefit of all similarly-situated creditors should not—and cannot—be borne by the individual victims of the Debtor's and Jones's conduct.[105]   The unique circumstances of this subchapter V case

---

[102] *See* 11 U.S.C. § 1103(a).

[103] *See* 11 U.S.C. §§ 1183(b), 704(a), 1106(a) (collectively providing that a subchapter V trustee cannot investigate a debtor absent further court order); Paul W. Bonapfel, *A Guide to the Small Business Reorganization Act of 2019*, 93 Am. Bankr. L.J. 571 (2019) (identifying that "a sub V trustee, like a chapter 12 trustee, does not have the duty to investigate the financial affairs of the debtor.").

[104] *In re Haskell-Dawes, Inc*., 188 B.R. 515, 520 (Bankr. E.D. Pa. 1995).

[105] *See* Ex. J, *In re Sharity Ministries, Inc.*, Case No. 21-11001 (JTD) (Bankr. D. Del.), Hrg. Tr. at 60:16-25, Aug. 9, 2021 (finding appointment of a creditors committee in a subchapter V case appropriate where the treatment of certain

coupled with the benefits that could be achieved through the efforts of a tort claimants'
committee greatly and unequivocally outweigh any generalized assertions about potential
costs.

**B.  The Court has cause to remove FSS as a debtor in possession.**

51.     So long as FSS possesses its assets and controls its operations, the Sandy
Hook Families' prospects of a full and fair recovery remain in jeopardy.  Along with a tort
committee, the Court should also invoke the subchapter V protection of removing FSS as
debtor in possession.  Section 1185 governs this issue.  And it requires the Court to rescind
the debtor's authority to operate its business as debtor in possession if there is "cause":

> On request of a party in interest, and after notice and a hearing, the court shall
> order that the debtor shall not be a debtor in possession for cause, including
> fraud, dishonesty, incompetence, or gross mismanagement of the affairs of
> the debtor, either before or after the date of commencement of the case, or
> for failure to perform the obligations of the debtor under a plan confirmed
> under this subchapter.[106]

In other words, removing the debtor as debtor in possession is mandatory when cause
exists.[107]

52.     This standard for removing a debtor in possession in a subchapter V case
mirrors the standard to appoint a trustee in traditional chapter 11 cases under § 1104.
Section 1104 provides that courts shall appoint a trustee "for cause, including fraud,

---

creditors would be "the paramount issue" of the case and that those creditors must therefore "have a voice in how they
are going to be treated without individual [creditors] having to incur the costs of doing so."); *see also In re Hills Stores
Co.*, 137 B.R. 4, 6 (Bankr. S.D.N.Y. 1992) ("[T]he potential added cost is not sufficient in itself to deprive the creditors
of the formation of an additional committee if one is otherwise appropriate").

[106] 11 U.S.C. §§ 1185.

[107] *In re Neosho Concrete Prod. Co.*, No. 20-30314, 2021 WL 1821444, at *8 (Bankr. W.D. Mo. May 6, 2021).

dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause[.]"[108] Given the parallel language between § 1104 and § 1185, courts interpreting § 1185 have relied on caselaw addressing whether cause exists to appoint a trustee under § 1104.[109]

53.     The statutory grounds for removing a debtor in possession and appointing of a traditional chapter 11 trustee (or examiner) are not exhaustive.[110]  Still under that caselaw, the Court has discretion to determine whether cause for removal exists.[111]  In doing so, it may consider: (1) the materiality of any misconduct, (2) the debtor in possession's evenhandedness or lack of it in dealings with insiders and affiliates when compared to other creditors, (3) the existence of pre-petition voidable preferences or fraudulent conveyances, (4) whether any conflicts of interest on the part of the debtor in possession interfere with its ability to fulfill its fiduciary duties, and (5) whether there has been self-dealing or squandering of estate assets.[112]

54.     Through that lens, cause exists here to remove FSS from debtor in possession

---

[108] 11 U.S.C. § 1104(a)(1).

[109] *In re Peak Serum, Inc.*, 623 B.R. 609, 614 (Bankr. D. Colo. 2020) (finding "where cause would exist to appoint a Chapter 11 trustee in a standard Chapter 11 case, Subchapter V affords parties-in-interest comparable remedies, including removal of the debtor-in-possession and expansion of the Subchapter V trustee's duties"); *In re Neosho Concrete Prod. Co.*, 2021 WL 1821444, at *8 (finding "[b]ecause § 1104(a) and § 1185(a) use the same language, the court may rely on authority construing § 1104 in determining whether to remove a debtor in possession under § 1185"); *In re Pittner*, 638 B.R. 255, 258-59 (Bankr. D. Mass. 2022).

A party seeking the appointment of a trustee (or, by extension, seeking removal of a subchapter V debtor in possession) has "the burden of proving appropriate grounds exist for such appointment by the preponderance of the evidence." *In re Corona Care Convalescent Corp.*, 527 B.R. 379, 384 (Bankr. C.D. Cal. 2015).

[110] *In re Pittner*, 638 B.R. at 258-60 (removal of subchapter V DIP); *In re Sillerman*, 605 B.R. 631, 641–42 (Bankr. S.D.N.Y. 2019) (collecting cases appointing trustee for various grounds of cause).

[111] *In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011).

[112] *Id.*

---

given the facts already known:

- As the U.S. Trustee's office observed, Jones and his company FSS previously attempted to exploit the subchapter V bankruptcy system to avoid paying the Sandy Hook Families.[113]

- Months before FSS commenced this bankruptcy, the Sandy Hook Families had already sued Jones and FSS in the Fraudulent-Transfer Case for committing fraudulent conveyances under the Texas Uniform Fraudulent Transfer Act based on what they discovered in the Sandy Hook Cases.[114]

- During the Sandy Hook Cases against Jones and FSS, Jones drew between $18 million and $62 million from FSS—even though it was supposedly insolvent because of its debt to insider PQPR.[115]

- After over a decade of owning and running FSS, Jones finally decided to enter into an employment agreement with FSS in April 2022, in which he increased his salary from about $625,000 a year to over $1.3 million—not including draws.[116]

- Weeks before filing this bankruptcy, Jones pocketed millions of dollars in cryptocurrency donations FSS solicited from fans to rehabilitate FSS.[117]

- The Debtor's CRO appears to have performed no inquiry into Jones's transfers—barely knowing any details about these millions in crypto donations that belong to the Debtor.[118]

- Weeks before commencing this bankruptcy, FSS outsourced the product-fulfillment operation it had done in-house for years to Blue Asension—a startup created by Jones's close friend and personal trainer,

---

[113] *See* Infowars Bankruptcy, ECF No. 50, at 16 ("Jones and FSS hand-picked these three holding companies for bankruptcy as part of a scheme engineered solely to limit their own legal liability, to deny parties in interest a full accounting of their assets, and to deny individuals their day in court and imminent recovery for established liability.").

[114] Cause No. D-1-GN-22-001610; *Heslin v. Jones*, In the 200th Judicial District Court of Travis County, Texas.

[115] *See* ECF 1, at 13.

[116] Ex. E, Hrg. Tr. at 150-55, Aug. 3, 2022.

[117] Ex. I, Jones Dep. at 845-52, Jun. 21, 2022.

[118] *See supra* at § II(I).

who not only poached FSS's entire fulfillment team without issue but also enjoys the use of FSS's warehouse to operate from at no expense.[119]

- The Debtor's CRO failed to disclose that FSS overhauled its in-house fulfillment process just weeks before bankruptcy. Instead, the CRO testified that Jones's personal trainer had spearheaded fulfillment at FSS beforehand, but the personal trainer admitted this was incorrect.[120]

- FSS hired the same CRO as Jones's other shell entities that first filed for bankruptcy without the CRO disclosing to the Court that he was working for both the Infowars Debtors and the Debtor here, which was supposed to fund the Infowars Bankruptcy in return for a release.[121]

- While the Sandy Hook Cases were pending, FSS concocted a $54 million secured debt to PQPR, which Jones (72% interest) and his parents own directly and indirectly through various shells. Specifically, FSS signed two secured promissory notes totaling over $50 million to PQPR to cover alleged past debts—even though no records of any debt to PQPR exist before the Sandy Hook Cases started. The second note, for over $25 million, was created just months after default judgments were rendered against Jones and FSS. Soon after, FSS started paying PQPR $11,000 a day. Not surprisingly Jones's and FSS's explanation for this debt and its relationship with PQPR is an evolving story with one consistent theme: PQPR is a Jones family repository designed to shift assets and obligations as best suits their needs.[122]

- Despite noting potential claw-back payments by FSS, its CRO has not investigated any fraudulent transfers and has not even read the Sandy Hook Families' TUFTA suit, which focuses on Jones's improper draws and FSS's fake secured debt to insider PQPR.[123] Instead, the CRO attested to the PQPR debt's legitimacy without investigation and asked that the Court to recognize the debt's legitimacy in a cash-collateral order.[124]

- FSS filed for bankruptcy as a small business under subchapter V mid-

---

[119] *See* ECF 55, ¶¶ 9-11; Ex. K, Blue Asension Logistics, LLC Certificate of Formation; *see also* Ex. L, Hrg. Tr. at 50-60, 97-104, 121-26 Aug. 12, 2022.

[120] Ex. L, Hrg. Tr. at 50-60, 97-104, 121-26 Aug. 12, 2022.

[121] *See supra* at § II(J).

[122] *See supra* at § II(D)-(H).

[123] Ex. E, Hrg. Tr. at 240:8-25, Aug. 3, 2022.

[124] *See supra* at § II(E); *see also* ECF 10, Schwartz Decl. ¶¶ 89-92, 97-103.

trial, days before the jury returned a verdict against it for over $49 million, which exceeds subchapter V's liquidated-debt limit by about seven-fold.[125]

55.     These facts illuminate the Debtor's misconduct, its misdealing with insiders, its pre-petition fraudulent transfers, the conflicts preventing it from fulfilling its fiduciary duties, and its squandering of estate assets.  They, therefore, establish that cause exists to remove FSS as the debtor in possession.  And because cause exists, § 1185 mandates that it be removed.[126]

56.     There are no honest debtors here.  By controlling Debtor on one side and other insider companies, including PQPR, on the other, Jones is attempting to abuse subchapter V to avoid paying the Sandy Hook Families.  The Sandy Hook Families therefore ask this Court to remove FSS as a debtor in possession under 11 U.S.C. § 1185.  And upon doing so, it should authorize and direct the subchapter V Trustee to perform the duties specified in 11 U.S.C. §§ 704(a)(8) and 1106(a)(1), (2), and (6) under 11 U.S.C. § 1183(b)(5) as subchapter V instructs.[127]

## IV.     <u>CONCLUSION AND RESERVATION OF RIGHTS</u>

For these reasons, the Sandy Hook Families respectfully ask that the Court grant this motion and that the Court invoke the added protections available under subchapter V by appointing a tort claimants' committee and removing FSS as the debtor in possession.

Date: August 25, 2022

---

[125] *See supra* at § II(K).

[126] *See* 11 U.S.C. § 1185(a) ("the court shall order that the debtor shall not be a debtor in possession for cause"); *see also In re Neosho Concrete Prod. Co.*, 2021 WL 1821444, at *8.

[127] *See* 11 U.S.C. § 1183(b)(5).

Respectfully submitted,

**MCDOWELL HETHERINGTON LLP**

Avi Moshenberg
Texas Bar No. 24083532
1001 Fannin Street, Suite 2700
Houston, Texas 77002
D: 713-337-5580
F: 713-337-8850
E: Avi.Moshenberg@mhllp.com

*Counsel for the Texas Plaintiffs*

and

**CHAMBERLAIN, HRDLICKA, WHITE,
    WILLIAMS & AUGHTRY, PC**

By: */s/Jarrod B. Martin*
Jarrod B. Martin
Texas Bar No. 24070221
1200 Smith Street, Suite 1400
Houston, Texas 77002
D: 713.356.1280
F: 713.658.2553
E: jarrod.martin@chamberlainlaw.com

*Bankruptcy Counsel for the Texas Plaintiffs*

By: */s/ Ryan Chapple*
Ryan E. Chapple
State Bar No. 24036354
Email: rchapple@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

and

Randy W. Williams
State Bar No. 21566850
Email: rww@bymanlaw.com
**BYMAN & ASSOCIATES PLLC**
7924 Broadway, Suite 104
Pearland, Texas 77581
281-884-9262

***Bankruptcy Counsel for Connecticut Plaintiffs***

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 25, 2022, a true and correct copy of the foregoing Motion was served electronically on all parties registered to receive electronic notice of filings in this case via this Court's ECF notification system.

*/s/ Jarrod B. Martin*
Jarrod B. Martin