**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT E

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3   Avi Moshenberg,              ) CASE NO:  22-60043
                                  ) ADVERSARY
 4               Plaintiffs,      )
                                  ) Houston, Texas
 5         Vs.                    )
                                  ) Wednesday, August 3, 2022
 6   Free Speech Systems LLC,              )
                                  ) 10:02 a.m. - 5:05 p.m.
 7               Defendants.      )
     -----------------------------)
 8

 9                              TRIAL

10         BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
11

12   APPEARANCES:

13   For Plaintiffs:        MARCEL FONTAINE
                            McDowell Hetherington LLP
14                          1001 Fannin Suite 2700
                            Houston, Texas 77002
15
     For Defendant:         RAY BATTAGLIA
16                          Law Offices of Ray Battaglia, PLLC
                            66 Granburg Circle
17                          San Antonio, Texas 78218

18   Court Reporter:

19   Courtroom Deputy:      Zilde Martinez

20   Transcribed by:        Veritext Legal Solutions
                            330 Old Country Road, Suite 300
21                          Mineola, NY 11501
                            Tel: 800-727-6396
22

23

24   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
25
```

```
 1  [REDACTED]
 2
 3
 4
 5
 6              MR. BATTAGLIA:  This is your courtroom.
 7              So, the remaining two matters, Your Honor, are the
 8  cash collateral motion and the critical vendor motion.  And
 9  where we stand on those, Mr. Martin and I have had several
10  conversations on the cash collateral motion.  There's
11  certain accommodations being made, and I'll -- the biggest
12  one relates to a $250,000 payment to PQPR that is shown in
13  the budget.  That is a -- the way the Debtor operates with
14  PQPR in inventory, if PQPR purchase inventory, pays for it,
15  sells it through our sales channel, the Debtor gets 20
16  percent of the net.  PQPR gets 80 percent of the net.  If
17  it's FSS's inventory, and obviously, FSS is Free Speech
18  Systems, 90 percent goes to the Debtor and 10 percent goes
19  to PQPR for its involvement in the purchasing and
20  involvement in the -- as I understand it, supplements have
21  to have, and don't hold me to this word -- be sold under
22  some certification, and Dr. Jones individually, PQPR holds
23  that certification.  That's my very basic understanding.
24  [REDACTED]
25
```

```
13            CROSS-EXAMINATION OF W. MARC SCHWARTZ
14   BY MR. MOSHENBERG:
15   Q    All right.  Mr. Schwartz, you made some declarations in
16   this case, correct?
17   A    I believe I did one.
18   Q    Okay.  And you understand that the statements you made
19   in that declaration was under oath?
20   A    Yes.
21   Q    And that's the same oath that you're under today,
22   correct?
23   A    Yes.
24   Q    And you understand that it's important to tell the
25   truth in a declaration, correct?
```

```
 1   I believe --
 2            THE COURT:  Mr. Lee was representing the Debtors
 3   too.
 4            THE WITNESS:  -- and Mr. Jordan who represented --
 5   I think still does represent Mr. Jones.  I don't know when
 6   those were, but it was after we had been substantially
 7   convinced that we were going to be terminating the InfoWars
 8   bankruptcy.
 9            THE COURT:  You wrote the letter on May 19th.
10            THE WITNESS:  On May 19th, Mr. Lee asked me to
11   send him an engagement letter for Free Speech -- the Free
12   Speech engagement.
13            THE COURT:  Okay.
14            THE WITNESS:  And to be quite honest with you, I
15   didn't even think about it at that time.
16            THE COURT:  No, I appreciate the honesty.  I
17   appreciate disclosure.  It seeks a retainer.  When did you
18   receive that retainer?
19            THE WITNESS:  Lord --
20            THE COURT:  That month?
21            THE WITNESS:  No, it was --
22            THE COURT:  Let just say if the letter was signed
23   on June -- the letter was officially signed on June 6th --
24            THE WITNESS:  June 6th.
25            THE COURT:  When did you -- did you receive it
```

1  before or after you were retained, or right about that time?
2           THE WITNESS:  It was -- no, it was not right
3  around -- it was after, definitely.
4           THE COURT:  After.  Okay.
5           THE WITNESS:  You know, it was several weeks after
6  at least.
7           THE COURT:  Okay.  Okay.  Sorry.  That was the
8  question -- that was the clarification that I had mentioned
9  I had wanted to understand the day before.  I guess Mr. Lee
10 a few questions as well at some point, but I'll need to
11 understand that as well, but today's not that day.  Today's
12 cash collateral, and so I do want -- and I know I took this
13 off on tangent.  Now, I'm going to bring it back.  I did
14 want to focus on cash collateral, and I want to focus on
15 critical vendor, and I want to understand -- I've given you
16 some leeway.  Maybe that's the better way of saying.  I've
17 given you some leeway to kind of have general conversation
18 about the CRO role and what investigation and he's done to
19 formulate in connection with the budget, but now I'm going
20 to ask you to laser focus on these two motions.
21 BY MR. MOSHENBERG:
22 Q    Okay. Let's look at that part of Exhibit 3, the ledger
23 (indiscernible).  I want to focus on the part where it
24 provides for a budget for Alex Jones of $54,000 every other
25 week.  Do you see that part?

1   A   Not yet.

2   Q   Can you see it?

3   A   Yes.

4   Q   Okay.  And in total, it ends up being about $379,000.

5   correct?

6   A   I can't tell.  He's -- whatever it says.  I mean, I

7   can't see that.  Would you have your associate or partner

8   reduce the size?  Thank you.

9   Q   Yeah.  (Indiscernible) $379,000 and that's over a 13-

10  week period, correct?

11  A   Correct.

12  Q   Okay.  And if you translate $379,000 over a 13-week

13  period, that translates to about a salary of $1.5 million.

14  Do you understand that?

15  A   Well, I don't believe that's correct.  Mr. Jones --

16  this is a -- Mr. Jones has an appointment agreement for 1.3

17  million.  Some amount of it and I think it's about 8,000 of

18  (indiscernible) Patriot is paid through the payroll system.

19  This should be that difference.  So, you got 26 pay periods

20  in the year so you can do the math.  It will be -- should

21  add up to 1.3, those two components.

22  Q   Well, I did 379 -- 13 weeks is a quarter of a year,

23  right, 52 weeks --

24  A   Yeah, but we can't do -- you've got to do it by --

25  because we pay a biweekly, not semi-monthly.

```
 1   Q    Okay.
 2   A    So, that's -- something about the math in that
 3   calculation -- you got to multiply that number by 26 to get
 4   an annual rate.
 5   Q    Okay.  So -- but your point is, $1.3 million salary.
 6   A    Total -- his total is 1.3 million.
 7   Q    Okay.
 8             THE COURT:  I'm just going to tell everyone.
 9   Judge -- math and don't claim to be -- (indiscernible) in
10   excel spreadsheet for you, but it's essentially treading a
11   $54,000 bimonthly, you know, but that -- if you take that
12   over 26 periods -- you multiply the 54,000 times -- you get
13   to like a $1.4 million number.
14             THE WITNESS:  That case, well --
15             THE COURT:  If you multiply it times 24, you get
16   to the 1.3.  It's --
17             THE WITNESS:  Oh, shoot.  I apologize, Your Honor.
18             THE COURT:  It's okay.
19             THE WITNESS:  Okay.
20   BY MR. MOSHENBERG:
21   Q    And that's salary separate from the draws that he's
22   taking out of the company, right?
23   A    Correct.
24   Q    Okay.  You understand that in the Free Speech Systems
25   corporate representative, that position, the document that
```

1  produced showed that he had an annual salary of about
2  $625,000.
3      MR. BATTAGLIA:  Objection, Your Honor.  The
4  question is about a deposition he was not present at and --
5      THE COURT:  Yeah.  I'm going to sustain that.  I
6  want you focused on the questions -- I've given you plenty
7  of room --
8      MR. MOSHENBERG:  Sure.
9      THE COURT:  -- and Mr. Brimmage is going to ask
10 questions too and I want him -- I want you all focused on --
11 you got questions about the budget, ask the budget.
12     MR. MOSHENBERG:  Well, what I'm trying to
13 understand is, if there were documents produced to us by
14 Free Speech showing that his salary was $625,000 a year, why
15 is he receiving a $1.3 million salary under this budget.
16     THE COURT:  Do you have those documents?
17     MR. MOSHENBERG:  Yes, Your Honor.  They were notes
18 provide as part of the deposition --
19     THE COURT:  No, I'm asking you are they on your
20 witness and exhibit list?
21     MR. MOSHENBERG:  They are, Your Honor.
22     THE COURT:  Why don't you show that then?
23     MR. MOSHENBERG:  It's Exhibit 12.
24 BY MR. MOSHENBERG:
25 Q   These were notes that were provided by the corporate

```
 1    representative based on her review in preparing for her
 2    30(b)(6) deposition.  They were admitted as part of the
 3    deposition.  And if you look, about halfway down, it says,
 4    AJ paid a salary of $625,000 a year.
 5    A    As of what date?  Do you know?
 6    Q    Well, this deposition occurred in -- February 15th of
 7    2022, this year.
 8    A    I'd have to look back and see the date of the
 9    employment agreement that I was -- given to me that I have,
10    which is what the 1.3 is based on.
11    Q    Right.  And that employment agreement was created in
12    April of this year, correct?
13    A    You're probably -- you may be right.  I think you're
14    right.
15    Q    Right.  It was kind of about the same time as all the
16    bankruptcies with the InfoW started happening, right,
17    leading up to the Alex Jones trial that was first set in
18    April, 2022, right?
19    A    I don't know about the first setting of the Alex Jones
20    trial, but I do recall -- I'd have to look back and see when
21    I got involved with the InfoWars bankruptcy, if it was in
22    April or not or prior to -- after that.  I don't know when
23    they actually got started.  It was before I had -- the
24    planning for that started before I ever got involved.
25    Q    Okay.
```

1    A    Sometime before I got involved.

2    Q    But you relied on that $1.3 million based on an

3    agreement that was created in April of 2022, correct?

4    A    Right.  That's the contract I have (indiscernible) --

5    Q    It wasn't based on prior pay that he was receiving?

6    A    No.

7    Q    So, in --

8         THE COURT:  Okay.  Mr. Moshenberg, he's answered

9    the question.  Why don't you ask another question?  He's

10   answered the question.  Why don't you ask another one?

11        MR. MOSHENBERG:  Okay.

12   BY MR. MOSHENBERG:

13   Q    You didn't do any sort of investigation to see if $1.3

14   million was the appropriate amount to give him?  You just

15   went off of that agreement it sounds like.

16        THE COURT:  He's answered that question, Mr.

17   Moshenberg.  Why don't you ask another question?

18   BY MR. MOSHENBERG:

19   Q    Do you have any reason to doubt that he gave himself a

20   -- basically a $600,000 raise?

21   A    No, because I know he hasn't been paid anything on the

22   1.3 and during 2022, he was paid about $8,000 every two

23   weeks, which is not 625 either.  So --

24   Q    And now you're deciding in this motion that he needs to

25   get paid.  He needs to starting getting $54,000 every other

```
 1    PQPR executed a promissory note in the principal amount of
 2    29,588,000 made payable to PQPR which memorialized their
 3    accrued obligations of FSS to PQPR through December 31st,
 4    2018.  Do you see that?
 5    A    Yes.
 6    Q    How do you know to put in your declaration under
 7    penalty of perjury that this amount was memorialized with
 8    the accrued obligations?
 9    A    This is one where I said I saw the detail of the
10    calculation and some of the supporting documents in it.  It
11    identifies the transactions going back -- actually, it
12    should be from 12/31/2018.
13    Q    And you mentioned some supporting documents.  What are
14    some of those supporting documents?
15    A    These were schedules of billings, (indiscernible) PQPR
16    for inventory and credits, i.e., payments, applied to those
17    billings and they were developed out of the general ledger
18    system there, accounting transactions pulled out of the
19    general ledger system.  We didn't go beyond that.
20    Q    You didn't look at any -- have you -- did you seen any
21    invoices?
22    A    No.  We haven't done that.  It's --
23    Q    Have you seen any bank statements that show some
24    payments from PQPR?
25    A    Not in this time period.  We have not gone back that
```

1   far yet.

2   Q   Are there any bank statements?

3   A   Well, that's good question.  Right now, there aren't.

4   I've got to go back and check and make sure when we change

5   banks, we don't lose access to those bank statements.

6   Q   So, when you put in your disclosure this was the amount

7   that was memorialized in accrued obligations, you don't know

8   that for a fact.

9   A   Well, I know for a fact and that they showed me -- I

10  have the calculation for the amount of the 29,588,000 and I

11  see from the source date that it is from invoices and

12  payments records.

13  Q   But you don't --

14  A   To me, as an accountant, that tells me that's what I'm

15  looking at.

16  Q   But you haven't seen the billings or the invoices or

17  the --

18  A   We have not vouched it yet to ensure it's actually

19  properly calculated.

20  Q   And in your declaration, you -- on the cash collateral,

21  you mentioned that there was extensive and difficult

22  negotiation with PQPR over the use of cash collateral.  Do

23  you recall that part of your declaration?

24  A   Yes.

25  Q   Who did you communicate with at the PQPR to extensively

```
 1    the information available to them to do their jobs.  That
 2    would be accounting's responsible to actually prepare
 3    financial statements.  That's what -- that point there Is
 4    what threw me.
 5    Q    Fair enough.  You would agree with me that internal
 6    accounting controls were inadequate, right?
 7    A    Yes.
 8    Q    There was a lack of segregation of duties?
 9    A    Yes.
10    Q    Lack of supervisory review?
11    A    Yes.
12    Q    Including billings to PQPR Holdings, right?
13    A    Correct.
14    Q    When did you come on to FSS?
15    A    June 6th is when I was hired.
16    Q    And so, all these findings that we're talking about are
17    subsequent to June 6th, right?
18    A    Yes.
19    Q    Okay.
20    A    And well, let me step back.  I've been told by Mr. Roe
21    that the general ledgers were not up to speed.  I did not
22    realize the significance of that statement when he told it
23    to me.  That was prior to June 6th.
24    Q    Yeah.  You didn't realize just how bad all the
25    financials and accounting were until you got on the scene,
```

1    right?

2    A    Correct.

3    Q    They were a mess, right?

4    A    They were nonexistent.

5    Q    That's worse than a mess.

6    A    Yep.

7    Q    All right. You would agree with me that the --
8    locating accurate financial records is a tedious task at
9    FSS, right?

10   A    Locating accurate financial records?

11   Q    Is a tedious task at FSS, isn't it?

12   A    In general, yes.

13   Q    And specifically yes, right?

14   A    Well, I mean, some banks can -- you know, are
15   accessible. But in general, don't expect them to be.

16              MR. BRIMMAGE: Mr. Martin, can we pull up
17   Defendant's -- I'm sorry -- I think it's Exhibit 3, the
18   declaration of Mr. Schwartz in this case, and go to
19   Paragraph 94, please?

20   BY MR. BRIMMAGE:

21   Q    We'll blow it up for you, Mr. Schwartz.

22   A    Oh, I can probably read it.

23   Q    Okay. If you'll just read it to yourself. I'm not
24   going to attempt to impeach you. I'm just going to ask the
25   question again and see if we can move it quickly. Does that

1    were at least offering to put some money on the table to see
2    if there could be a deal that was worked out and that didn't
3    happen.  And I'm not saying it should have happened.  Again,
4    I'm just saying the fact it did not happen, so I'm not
5    saying there was not a good reason that it shouldn't have
6    happened.  Again, I'm just pointing to the fact that that
7    did not occur.
8              But Mr. Schwartz, you spoke with both third-party
9    contributors at the time, and at least what you're telling
10   me, Mr. Lee was involved as well at the time, then both
11   parties were representing the InfoW Debtors who were --
12   quite frankly, membership interests had been transferred to
13   a trust.  And so, I haven't fully thought through, but I'm
14   concerned that you still may represent the InfoW Debtors as
15   their CRO and how you're purporting to act as the CRO in
16   this case.  And I don't -- at some point, someone's going to
17   have to make some really hard decisions.  I'm -- quite
18   frankly, I'm a little surprised you hadn't read some of the
19   litigation because at least InfoW was involved in the
20   litigation for every one of these last time.  So -- and that
21   was supposedly the purpose of the litigation.
22             So, I'm a little surprised that the CRO is telling
23   me today that he hasn't read, at least, the -- or has a good
24   working knowledge of the lawsuits, including the fraudulent
25   transfer litigation.  I didn't know whether the fraudulent

                    CERTIFICATION

   I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
   above-entitled matter.

   *[Signature: Sonya M. Ledanski Hyde]*

   Sonya Ledanski Hyde




   Veritext Legal Solutions

   330 Old Country Road

   Suite 300

   Mineola, NY 11501


   Date:  August 12, 2022