IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT H

Brittany Paz Volume III
June 27, 2022

STATE OF CONNECTICUT
SUPERIOR COURT
COMPLEX LITIGATION DOCKET
HELD AT WATERBURY
VOLUME III
- - - - - - - - - - - - - - - - - -X

ERICA LAFFERTY, et al.,
                    PLAINTIFFS,

            vs.                    X06-UWY-CV18-6046436-S

ALEX EMRIC JONES, et al.,
                    DEFENDANTS.

- - - - - - - - - - - - - - - - - -X

WILLIAM SHERLACH,
                    PLAINTIFF,

            vs.                    X06-UWY-CV18-6046437-S

ALEX EMRIC JONES, et al.,
                    DEFENDANTS.

- - - - - - - - - - - - - - - - - -X

WILLIAM SHERLACH, et al.,
                    PLAINTIFFS,

            vs.                    X06-UWY-CV18-6046438-S

ALEX EMRIC JONES, et al.,
                    DEFENDANTS.
- - - - - - - - - - - - - - - - - -X

    V I D E O T A P E D   D E P O S I T I O N

        The videotaped deposition of BRITTANY PAZ

was taken pursuant to notice at the offices of Koskoff

Koskoff & Bieder, PC, 350 Fairfield Avenue, Bridgeport,

Connecticut, before Viktoria V. Stockmal, RMR, CRR,

license #00251, a Notary Public in and for the State of

Connecticut, on Monday, June 27, 2022, at 10:11 a.m.

Brittany Paz Volume III
June 27, 2022

```
 1   A P P E A R A N C E S:

 2         ATTORNEYS FOR THE PLAINTIFFS:

 3         KOSKOFF KOSKOFF & BIEDER, PC
           350 Fairfield Avenue
 4         Bridgeport, CT 06604
           Tel:  203-336-4421
 5         E-mail:  asterling@koskoff.com
                    cmattei@koskoff.com
 6                  mblumenthal@koskoff.com

 7         CHRISTOPHER M. MATTEI, ESQ.
           ALINOR STERLING, ESQ. (Appearing remotely)
 8         PRITIKA SESHADRI

 9
           ATTORNEYS FOR THE DEFENDANTS:
10
           FOR ALEX EMRIC JONES, INFOWARS, LLC, FREE SPEECH
11         SYSTEMS, LLC, INFOWARS HEALTH, LLC and PRISON
           PLANET TV, LLC:
12
           PATTIS & SMITH, LLC
13         383 Orange Street, First Floor
           New Haven, CT 06511
14         Tel:  203-393-3017
           E-mail:  npattis@pattisandsmith.com
15
           ZACHARY REILAND, ESQ.
16

17         FOR GENESIS COMMUNICATIONS NETWORK, INC.:

18         BRIGNOLE,BUSH, & LEWIS, LLC
           73 Wadsworth Street
19         Hartford, CT 06106
           Tel:  860-527-9973
20         E-mail:  mcerame@brignole.com

21         MARIO KENNETH CERAME, ESQ. (Appearing remotely)

22

23         ALSO PRESENT:

24             Joseph Raguso, Videographer

25
```

Brittany Paz Volume III
June 27, 2022

1

2

3

4

5

6    EXAMINATION BY MR. MATTEI:

7         Q     Good morning, Ms. Paz.

8         A     Good morning.

9         Q     Welcome back.  We were last here for your

10    deposition on, I believe --

11        A     Back in March.

12        Q     -- March 16th.  And so, before we start today,

13    I observed that you had a set of typewritten notes before

14    you.  You've handed me a copy of those and these will be

15    marked as the next exhibit in sequence.  I don't know if

16    we know what that will be right now or if we can just do

17    that at the break.

18                    MS. SESHADRI:  126.

19                          (Plaintiff's Exhibit 126 was

20              marked for identification:  Typewritten

21              notes.)

22    BY MR. MATTEI:

23        Q     This will be Exhibit 126.

24              Ms. Paz, why don't you just explain to me what

25    these notes are?

Brittany Paz Volume III
June 27, 2022

1      A      Sure.   After the last day of deposition, I went

2   through the deposition notice that was going to be for

3   today, but I think the day got moved because Mr. Jones

4   took a date; and then I thought that I needed to speak to

5   some more people on the rest of the questions; so, I

6   spoke to Blake Roddy, who is in charge of the marketing

7   and advertising for Free Speech and I also had a couple

8   conversations with Bob Roe and Mark Schwartz, I think.

9   They are the accountants that work with Free Speech about

10  the financial aspects of it, and I took some notes about

11  my conversations with them.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    cases.

2        Q    So, everything down until the part that says

3    Notes dash, that was all information that you obtained

4    either by virtue of your interview with Mr. Roddy or your

5    review of his deposition; correct?

6        A    Yes.

7        Q    Then you get to notes at the bottom which

8    starts with "to notes" and I'm assuming this refers to

9    the documents that were produced last week purporting to

10   be some sort of debt instrument between Free Speech

11   Systems and PQPR; correct?

12       A    That is correct, yes.

13       Q    Where did you obtain the information reflected

14   here at the very bottom?

15       A    These are based on a couple conversations I

16   had.  I had a video conversation with Mark Schwartz and

17   counsel.  I also had, I believe, one video conference

18   with Bob Roe and maybe two phone calls basically

19   explaining the spreadsheets that I believe were produced

20   as well as the notes.

21       Q    When did your conversation with Mr. Schwartz

22   and counsel take place?

23       A    Within the last couple weeks after we scheduled

24   this date.  So, within the last couple weeks.

25       Q    Was it last week?

1     A     It might have been the week before.

2     Q     Okay.

3           Is that your best recollection that it was

4     probably a week before?

5     A     Yeah, I don't remember the exact date of when

6     the conversation happened, but it was after this date was

7     scheduled and we knew that this date was happening.

8     Q     Well, this date's been scheduled for quite a

9     while, so I just want to make sure I understand what your

10    best recollection is of when your conversation with

11    Mr. Schwartz and counsel may have taken place.

12    A     Well, I wasn't --

13    Q     Let me just finish.

14    A     Oh, sure.

15    Q     So, you indicated earlier that you thought it

16    was within the last couple of weeks.  So, today is June

17    27th.  Do you believe it was during the week beginning

18    June -- Sunday, June 12th?

19    A     May I look at my calendar?

20    Q     Yeah, please.  Would that be a calendar entry?

21    A     I might have put it in my calendar because it

22    was a Zoom call, so it might be in my calendar.

23    Q     That would be great.

24    A     Just give me one second.

25          So, I have it on my calendar as Friday, June

1   17th?

2        Q     Okay.

3              And that's a Zoom call involving you, a

4   gentleman named Mark Schwartz and Attorney Pattis?

5        A     It was Attorney Reiland.

6        Q     Thank you.

7              Anybody else participate in that?

8        A     No, it was just the three of us.

9        Q     What's your understanding of who Mr. Schwartz

10  is?

11       A     I believe he's an accountant working for Free

12  Speech.

13       Q     Okay.

14             Where did you get that information?

15       A     Attorney Pattis indicated he was the best

16  person to speak to regarding the financial questions that

17  were going to be in this deposition; so, that is who I

18  contacted.

19       Q     Okay.

20             The financial questions, you're referring

21  specifically to the relationship between PQPR and Free

22  Speech Systems?

23       A     The questions that were noticed in the

24  deposition, those questions.

25       Q     What specific financial issues did you believe

Brittany Paz Volume III
June 27, 2022

 1  he was going to be able to provide you information --

 2      A    He was going to be able to explain to me, for

 3  example, one of the noticed questions was about

 4  advertising.  Who advertises, paid advertising to Free

 5  Speech who -- and how we get paid for advertising.  So,

 6  he was able to pull information from our general ledger

 7  and create some spreadsheets and then he explained those

 8  to me.  For example, one of the questions was questions

 9  about Mr. Jones' compensation, he created a spreadsheet,

10  we had a conversation about the information that was in

11  there so I can cogently testify to it today.  That kind

12  of thing.

13      Q    You're referring to Mark Schwartz as having

14  been the individual who --

15      A    I had --

16      Q    Just let me finish my question.

17      A    Okay, sure.

18      Q    You collected that information and was in the

19  best position to talk about those issues on behalf of

20  Free Speech Systems?

21      A    I had also spoken to Mr. Roe about that

22  previously.

23      Q    I'm just specifically though talking about

24  Mr. Schwartz and the meeting you had with him on June

25  17th and what you were informed about his status with the

1    company, why he was in the position to give you

2    information concerning those issues.  I just want to make

3    clear that you're speaking specifically about

4    Mr. Schwartz there being the one who collected

5    spreadsheets concerning Mr. Jones's compensation and

6    spreadsheets and information concerning advertising

7    activity of Free Speech Systems; is that correct?

8         A    I don't know how to answer that question.  I

9    don't know if he created those spreadsheets.  All I know

10   is he was able to explain the spreadsheets to me.

11        Q    Those spreadsheets being the ones related to

12   Free Speech Systems' advertising and to Mr. Jones's

13   compensation?

14        A    If you would like to pull up the deposition

15   notice, I could indicate exactly which numbers I spoke to

16   him about.

17        Q    No, no, I'm asking you about the spreadsheets

18   you were just voluntarily testifying about.  So, I don't

19   want to present you -- I'm asking --

20        A    Well, you asked me a question.

21        Q    Just let me finish, Ms. Paz.

22        A    Sure.

23        Q    We have to do question and answer.  It's going

24   to go a lot quicker if you just let me finish my question

25   and then you answer; okay?

```
 1              Specifically, the spreadsheets that you were
 2   referring to that Mr. Schwartz described for you and was
 3   able to explain, you referred to them as being
 4   spreadsheets relating to Mr. Jones's compensation and
 5   advertising; is that correct?
 6        A    Yes.  Among others.
 7        Q    Okay, great.
 8              What other issues did he explain to you?
 9        A    If you would pull up the deposition notice, I
10   could tell you exactly which ones.
11        Q    Why don't we pull up the re-notice for today.
12              Do you have that in front of you, Ms. Paz?
13        A    Yes.
14        Q    So, you would like us just to advance to the
15   topic section?
16        A    Yes, that would be great.
17              If you could scroll down just a little bit
18   more.  Wait, wait, wait.  Too far, too far.
19              So, if you scroll up to No. 4.  So, one of
20   those spreadsheets was the identities of any third
21   parties who provide with you marketing service.  So, they
22   were able to -- when I say "they," I mean, Mark Schwartz
23   and Mr. Roe.  I'm not sure --
24        Q    I'm asking you specifically about Mr. Schwartz?
25        A    I don't know who created those spreadsheets,
```

Brittany Paz Volume III
June 27, 2022

1  I'm not sure, so he was able to explain them to me.

2      Q    Mr. Schwartz was?

3      A    Yes.

4      Q    And one of the spreadsheets Mr. Schwartz was

5  able to explain to you pertained to the information

6  described in item 4, third-party advertising services;

7  correct?

8      A    Yes.

9      Q    Okay.  Continue.

10     A    Then for No. 5, any third parties who had paid

11 Free Speech for advertising and our marketing service.

12     Q    Mr. Schwartz described and explained those --

13 the information contained in those spreadsheets?

14     A    Yes.

15         Then for No. 8, the compensation to Mr. Jones,

16 David Jones and Kelly Jones?

17     Q    Mr. Schwartz explained that data to you?

18     A    Yes.  We discussed that one.

19

20

21

22

23

24

25

Brittany Paz Volume III
June 27, 2022



15     A   We did discuss item 10, the transactions

16  between the two companies, Free Speech and PQPR.  And if

17  you could scroll down -- I just want to make sure I have

18  everything.  I think that's it.

19     Q   And so, Mr. Schwartz was described to you as an

20  accountant working for Free Speech Systems?

21     A   Yes, I don't know exactly what his relationship

22  is to Free Speech.  It may be a consulting relationship,

23  I'm not sure.  But I was given his information and told

24  to contact him.

25     Q   But I just want to make sure that what you

1    understand is that he is an accountant who is -- has some

2    relationship with Free Speech Systems, it sounds like you

3    believe in a consulting capacity?

4         A    I don't know what capacity he's employed by

5    Free Speech, but that was the name of the person I was

6    told to contact, so I did.

7         Q    And so, let me then just confirm that what you

8    were informed was that he was an accountant?

9         A    I believe he's an accountant, yes.

10        Q    Based on information that Attorney Pattis

11   provided to you?

12        A    Yes.

13        Q    Do you have any understanding of Mr. Schwartz's

14   involvement in Mr. Jones's recent bankruptcy petition on

15   behalf of three companies that he controls?

16        A    No, I don't.

17        Q    Were you aware that he was involved in that at

18   all?

19        A    No, I'm not.

20        Q    Did he -- okay.

21             How long was that meeting with Mr. Schwartz?

22        A    I would say it was about an hour.

23        Q    Let's pull up the two notes that were produced

24   to us last week.

25             These are -- what are these numbered?

Brittany Paz Volume III
June 27, 2022

1           MS. SESHADRI:   117 and 118.

2   BY MR. MATTEI:

3       Q    Ms. Paz, do you have before you a document

4   captioned Promissory Note, dated August 13, 2020?

5       A    Yes.

6       Q    Have you seen this document before?

7       A    Yes.

8       Q    Did you discuss this document with

9   Mr. Schwartz?

10      A    Yes.  We did discuss the two notes and their

11  relationship to the payments that Free Speech makes to

12  PQPR.

13      Q    Let's look at 18, too, if you can just identify

14  that, Ms. Paz.  This is another document captioned as a

15  Promissory Note, dated November 10, 2021.  Have you seen

16  this document before?

17      A    Yes.

18      Q    Did you discuss this with Mr. Schwartz?

19      A    Yes.

20      Q    Did you discuss both these document with

21  Mr. Roe as well?

22      A    Yes.  I had had communications with Mr. Roe

23  about the promissory -- the debt from Free Speech to

24  PQPR.  I hadn't seen these, though, when I had those

25  conversations with him, so I didn't discuss the actual

**Brittany Paz Volume III**
**June 27, 2022**

1   documents with him.  But I did discuss the debt with him.

2      Q    Understood.

3           How did you first receive these two

4   documents?

5      A    I asked for them and they were e-mailed to me.

6      Q    When were they e-mailed to you?

7      A    In the last week.

8      Q    Who e-mailed them to you?

9      A    I think Mr. Roe e-mailed them to me.

10          MR. MATTEI:  I don't believe that we have

11          that e-mail, Zach.  I don't think it was

12          included in what you provided last week.

13          MR. REILAND:  That was probably sent after

14          that disclosure was gathered together, so we'll

15          start a new one.

16  BY MR. MATTEI:

17     Q    So, you asked to see them and you asked --

18     A    I asked for them, yes.

19     Q    You believe Mr. Roe sent them to you last week?

20     A    Yes.

21     Q    Mr. Roe sent them to you last week --

22     A    Well, within the last week.  I'm not sure.

23  Within the last week.

24     Q    So, when did you discuss them with

25  Mr. Schwartz?

Brittany Paz Volume III
June 27, 2022

1        A     I had a phone call with Mr. Schwartz after the

2    Zoom meeting.

3        Q     Okay.

4              So, in addition to your Zoom meeting, you had a

5    phone call with him and that was last week?

6        A     Well, yes.  It had to be last week because

7    today is Monday; so, yes.

8        Q     The purpose of that phone call specifically was

9    to discuss these two documents?

10       A     Yes, discuss the notes and any other questions

11   I had that were lingering, which weren't many.  It was a

12   short phone call.

13       Q     But you were aware during your initial

14   conversation with Mr. Schwartz on the 17th of the

15   existence of these notes which is what prompted you to

16   then ask him for them?

17       A     Right.

18       Q     We'll go over these in substance a little bit

19   later.

20             So, your notes at the very bottom, I take it

21   those notes are taken from your conversation with

22   Mr. Schwartz concerning the actual documents; correct?

23       A     Right.  So, these notes I didn't have the

24   actual document yet, we were talking about it in our Zoom

25   call.  So, these were the notes from the Zoom call.

Brittany Paz Volume III
June 27, 2022

1      A      Right.

2      Q      And Free Speech Systems isn't prepared to

3   testify today concerning any relationship it has with the

4   website preparetoday.com; correct?

5      A      Correct.  I don't know that website.

6      Q      And Free Speech Systems is not prepared to

7   testify today concerning any relationship it has with the

8   website preparewithalex.com; correct?

9      A      Right.  I don't know that website.

10      Q      Is Free Speech Systems -- well, although Free

11   Speech Systems cannot testify as to whether it owns

12   infowarsstore.com, infowarsshop.com, Free Speech Systems

13   is aware that sales of PQPR products are transacted over

14   those websites; correct?

15      A      Yes.

16      Q      And the -- during the time period 2012 through

17   2020, proceeds from sales transacted over those websites

18   were processed by Free Speech Systems not PQPR; correct?

19      A      No, I don't know that.

20      Q      Okay.

21         So, Free Speech Systems' testimony is it does

22   not know whether it was responsible for transacting the

23   sales conducted on those websites; correct?

24      A      No, I don't think, I don't know, I think that

25   PQPR transacts -- handles those transactions.

1    Q    Okay.

2    A    So, no, that's not correct.

3    Q    So, Free Speech Systems' testimony is that PQPR

4  conducts the transactions -- the sales transactions over

5  InfoWars.com -- I'm sorry.  Strike that.  Let me begin

6  again.

7         Your testimony is that PQPR conducts the

8  transactions occurring over infowarsstore.com and

9  infowarsshop.com for the period 2012 through 2020?

10                MR. REILAND:  I'll object to the form.  I

11         think she said she didn't make the --

12  BY THE WITNESS:

13    A    I don't understand -- yeah, I don't understand

14  the question.

15    Q    Okay.

16    A    I'm sorry, can you just repeat it.

17    Q    Sure.

18         You testified that there are sales transactions

19  that occur on in for infowarsstore.com and

20  infowarsshop.com; right?

21    A    Right.

22    Q    When those sales occur during 2012 to 2020,

23  where were the sales proceeds routed?

24    A    So, PQPR handles all of the product sales.  If

25  you look at the spreadsheets, all of the product sales

```
 1   websites, infowarsstore.com and infowarsshop.com, during
 2   the period 2012 to 2019 [Verbatim], were any Free Speech
 3   Systems' employees involved in processing those
 4   transactions?
 5        A    No, PQPR processes the transactions, so they
 6   are PQPR employees.
 7        Q    How many people does PQPR employ?
 8        A    I don't know.
 9        Q    Are any Free Speech Systems' employees, during
10   the time period 2012 through 2020, involved in any
11   activities on behalf of PQPR?
12        A    I'm sorry, can you repeat the question.
13        Q    Yeah.
14             For the time period 2012 through 2020, were any
15   Free Speech Systems' employees engaged in any activities
16   on behalf of PQPR?
17        A    I don't know.  I don't know how to answer that
18   question.  I don't know.
19        Q    Okay.
20             Well, let me ask it this way then:  You
21   testified earlier that PQPR handles all transactions of
22   its products, sales; correct?
23        A    Right, it does all the fulfillment of the
24   order, it houses all of the products and it, you know,
25   generally just fulfills all of the orders.
```

Brittany Paz Volume III
June 27, 2022

1        Q     Okay.  All right.

2              So, let's break that down.  So, you say that

3    PQPR handles all the fulfillment of its -- did you say

4    products?

5        A     Right, all the products that it sells and are

6    linked back from the website, from the Free Speech's

7    website via ads to the store.  It has a staff, it has a

8    warehouse.  They package everything.  They house it.

9    They fulfill the orders.  I did tour the warehouse, so

10   they have a whole process about how that happens.  And

11   PQPR handles that.

12       Q     Okay.  So --

13       A     It's --

14       Q     Free Speech Systems' testimony is that when it

15   comes to the sale of PQPR products, PQPR owns the

16   warehouse where those products are stored; correct?

17       A     I don't know if it owns it or rents it or

18   leases it.  I don't know.

19       Q     Okay.

20             PQPR staff, by which I assume mean employees,

21   handle the fulfillment of all those orders; correct?

22       A     That's correct.

23       Q     And PQPR employees handle all the accounting

24   for PQPR's books and records; is that right?

25       A     I mean, I don't know how they do their internal

1   things.  I don't represent PQPR.  So, however they do

2   that her internal business, I don't know.

3        Q    Okay.

4             But Free Speech Systems' employees don't

5   fulfill that function for PQPR, that is the accounting

6   function?

7        A    Right.  They have -- It's separate.  They are

8   two separate entities.

9        Q    And so, on the fulfillment piece, I take it

10  that your testimony is that that involves receiving

11  notice of any sale of a PQPR product, pulling that

12  product for shipment, shipping it; anything else?

13       A    I mean, like I said, I don't know how their

14  internal operations work there.  I mean, I did tour the

15  warehouse.  They showed me how they stock everything.

16  They showed me how they pulled an item, how it was

17  labeled then for packaging.  And then where it was

18  ultimately shipped out.  Aside from that, their internal

19  processes, I don't know.  I know they have some software

20  that helps them with that.  I don't know the name of it.

21  I don't know how it works.

22       Q    Basically, anything that goes into fulfilling

23  an order once it has been made by a customer, PQPR

24  employees handle; correct?

25       A    Right.

1    Q    Free Speech Systems' employees do not?

2    A    Correct.

3    Q    Who gave you a tour of the warehouse?

4    A    I went with Attorney Blott when he was down in

5    Austin.

6    Q    Okay.

7         And she's outside counsel retained by Free

8    Speech Systems to represent them in Texas; correct?

9    A    Right.  Although I don't know if she's involved

10   any longer, but she was when I was there and so she and I

11   went.

12   Q    Who were the PQPR employees who showed you kind

13   of the fulfillment process that you were just describing?

14   A    You know what, I'm so sorry, I don't remember

15   their name.  I don't remember.

16   Q    Okay.  Okay.

17        And it's your understanding that PQPR, whether

18   it owns or leases the warehouse, pays for that facility

19   in order to use that facility; correct?

20   A    I would assume so.

21   Q    Free Speech Systems does not?

22   A    I don't know.  I don't represent PQPR, so I

23   don't know what they do to handle their warehouse.

24   Q    Okay.

25        Free Speech Systems, though, has no involvement

1   in --

2       A    That's correct.

3       Q    -- sorry, just let me finish.

4            Free Speech Systems has no involvement in

5   paying for or managing that warehouse operation;

6   correct?

7       A    Right.

8       Q    And the information that you had just been

9   testifying to about PQPR -- PQPR's activities as distinct

10  from Free Speech Systems was who?

11      A    I'm sorry, who told me that they were distinct?

12      Q    Not just distinct, but who informed you that

13  PQPR employees and resources are responsible for the

14  fulfillment and administrative activities of PQPR as

15  opposed to Free Speech Systems' employees?

16      A    I think that would be based on my conversations

17  with Mr. Jones, with Mr. Roe while I was down there, my

18  conversations with counsel which I'm not going to go

19  into.  I think that would form the basis of that.

20      Q    What, specifically, did Mr. Jones tell you

21  about PQPR?

22      A    That Free Speech and PQPR are separate and that

23  they are -- they handle essentially the product sales and

24  he is engaged in the function of being on air.  So, in

25  his mind, his business is being on the air.

1   that there wasn't any crossover between employees;

2   because I'm not sure.  And I didn't ask that specific

3   question about whether in 2012, ten years ago, maybe,

4   free Speech employees were at PQPR.  I just don't know,

5   so I don't want to mislead you and say I know when I

6   don't.

7           Is that clear?

8      Q    It is except now I want to want to go back to

9   your earlier testimony.  I take it your testimony

10  concerning the fact that PQPR employees now run all PQPR

11  business activities has to do with how -- the current

12  situation at PQPR?

13     A    Well, no.  I mean, I don't think it's just the

14  current situation.  I mean, obviously the financial

15  situations currently there have been efforts made to make

16  sure that they're more separate, there's more delineated

17  payments between the two, everything is a little bit

18  more, you know, accounting-wise, up to speed.  But as far

19  as the process goes, you know, the relationship between

20  the employees there, I'm just not sure.  And I don't

21  think it's something that's recent that's happened; so I

22  don't think that's correct.  But I just don't want to say

23  that going back ten years whether any Free Speech

24  employees have never been employed at PQPR.  I just don't

25  know the answer to that.

1      Q    So, at least -- I mean, is Free Speech Systems

2   prepared to say that, at least as of the initiation of

3   this lawsuit, the fulfillment that PQPR's maintained it's

4   own employee work force for the purpose of fulfilling all

5   of PQPR business activities?

6      A    Right.  They have their own employees.  I think

7   they always -- they've had their own employees.  I just

8   don't want to say whether or not there's been people

9   working at PQPR who've also worked for Free Speech.  I

10  just don't know the answer to that.  But they do maintain

11  their own work force.  Yes.

12     Q    Okay.  So -- and I totally understand that.

13  There might be somebody who, at one point, worked for

14  Free Speech Systems and then works fork PQPR.  But fair

15  to say that if somebody is working for PQPR they are

16  employed there; correct?

17     A    Right.

18     Q    And that has been the case as far as you know

19  going back until --

20     A    As far as I'm aware, yes.

21     Q    I would like to talk about PQPR ownership;

22  okay?

23     A    If I can help you with that --

24     Q    There's an alphabet soup.

25     A    Yes.  If I can help you there, I will do my

1    best to do so.

2          Q    You've testified about this in Texas; correct?

3          A    I did, yes.

4          Q    And when was PQPR formed, approximately?  You

5    don't need to give me a specific date?

6          A    You know what, I don't recall.

7          Q    Okay.

8               One of the reasons obviously that you're

9    required to testify about this is because you're here to

10   testify in part about Mr. Jones's compensation;

11   correct?

12         A    Yes.

13         Q    And when -- just give me one second.

14              When PQPR was first formed, Mr. Jones exercised

15   a controlling interest in it through another corporate

16   entity; correct?

17         A    Yes.

18         Q    And what was that corporate entity called?

19         A    I think it's called PLJR.  Like you said,

20   alphabet soup.  So, I believe PLJR has a 80 percent

21   interest in PQPR.  PLJR is then owned by the AEJ Trust --

22         Q    Hold on a second.

23         A    You want --

24         Q    The AEJ Trust came on later; right?

25         A    Yes.

Brittany Paz Volume III
June 27, 2022

1       A       Sure.

2       Q       PLJR was owned 90 percent by Mr. Jones

3    personally and 10 percent by Carol Jones; correct?

4       A       Prior to 2018?

5       Q       Yes.

6       A       I think so.  I think that's what that document

7    says, yes.

8       Q       And then, as a result -- and then PLJR had an

9    80 percent stake in PQPR; correct?

10      A       Right.

11      Q       And so, by virtue of his 90 percent stake in

12   PLJR and PLJR's ensuing 80 percent interest in PQPR,

13   Mr. Jones personally had, indirectly, 80 percent

14   ownership of PQPR; correct?

15      A       Of PQPR?

16      Q       Yes.

17      A       I believe the total effective number would have

18   been in the 70s.  It's, like, 72 percent effective;

19   because PQPR is owned 20 percent by Dr. and Mrs. Jones;

20   and then 80 percent by PLJR who also has a 10 percent

21   interest to Carol Jones.  So, when you average out those

22   numbers, it's something like 72 percent.

23      Q       Who did that math for you?

24      A       Mr. Roe did that math for me.  I am very bad at

25   math.

1       Q     That's okay.  I wouldn't expect you to have

2    done it.

3       A     Yes.

4       Q     So then, in 2018, I take it that your testimony

5    is that Mr. Jones transferred his personal ownership of

6    PLJR to the AEJ Trust; correct?

7       A     To the trust, right.

8       Q     And so, whereas Mr. Jones, prior to 2018, had a

9    72 some-odd percent indirect ownership interest in PQPR,

10   now the AEJ 2018 Trust does; correct?

11      A     Right.

12      Q     What instrument was -- have you seen any

13   documents reflecting that transfer of ownership?

14      A     I don't think so, no.

15      Q     Did you ask?

16      A     I don't remember if I asked or not to be

17   honest.

18      Q     So -- and Mr. Jones told you specifically that

19   that was done in order to benefit his children?

20      A     Right.  Because his children are remaindermen

21   in the trust.  So, yes.

22      Q     And what that means is that those children do

23   not receive any benefit from the AEJ Trust's ownership of

24   PQPR until Mr. Jones passes; correct?

25      A     Right.  They don't currently receive any income

1    from the trust.

2        Q    The trust does generate income; correct?

3        A    It is generating income, yes.

4        Q    How is it generating income?

5        A    It is generating income on the basis of the

6    notes that Free Speech pays to PQPR.

7        Q    Which started when?

8        A    So, those payments, I believe, started at the

9    end of last year, some time toward the end of last year,

10   maybe November.

11       Q    That is November of 2021?

12       A    Right.

13            So those payments are approximately $11,000 per

14   business day from Free Speech to PQPR.

15       Q    And the initiation of those payments of $11,000

16   from Free Speech Systems to PQPR was initiated why?

17       A    To pay down the debt between the two companies.

18       Q    Who authorized Free Speech Systems to begin

19   paying that purported debt?

20       A    I would assume Alex did.

21       Q    Are you --

22       A    I didn't ask, but there is a debt and it needed

23   to be paid.  There were efforts made to make sure that

24   there was, you know, all of this financial entanglement

25   between the two companies to separate everything and make

1    sure that everything was accounted for and paid.  So,

2    prior to that, I don't think that there was any clear

3    delineation.  And so, there have been efforts made over

4    the last year to do that.  And so, I would assume Alex

5    authorized it.

6        Q    Okay.

7             You're not aware -- Free Speech Systems isn't

8    aware of anybody else who could authorize Free Speech

9    Systems to make $11,000 daily payment to another

10   corporate entity; correct?

11       A    No, I think Alex would have to authorize it.

12   He owns Free Speech.

13       Q    And Free Speech's testimony here today is that

14   those payments, beginning in November of 2021, were

15   motivated solely to pay down a debt Free Speech Systems

16   purportedly owed to PQPR; is that your testimony?

17       A    That's my understanding of the purpose of the

18   notes, yes.

19       Q    And how did Free Speech Systems arrive at the

20   $11,000 number?

21       A    I think it's based on the terms of the note.

22       Q    Which note?

23       A    So, the first note is a 30-year note with a

24   balloon at the end.  But the second note is principal --

25   it delineates principal and interest.

**Brittany Paz Volume III**
**June 27, 2022**

```
1        Q     Why don't we pull them up.  Let's pull up
2   Exhibit 117, because I just saw you were referring to
3   your notes of your conversation with Mr. Schwartz;
4   correct?
5        A     Yes.  That's when he was explaining to me the
6   notes and the agreement between the two notes.
7        Q     All right.
8              So, we pulled up the first one.  This is dated
9   August 13th, 2020, and tell me what Free Speech Systems'
10  understanding is of the purpose of this document and
11  what, if any, obligations Free Speech Systems' undertakes
12  pursuant to it?
13       A     So, this looks like the first note for
14  approximately $29.5 million and it outlines the principal
15  balance, if you scroll down.
16       Q     Let's do that.  Yep.
17       A     It also --
18       Q     Hang on.
19             Can you just identify what that is when you say
20  principal balance; what is it you're referring to?
21       A     So, in Subsection B, it talks about the
22  principal balance, which is the 29.5 million and then
23  there's a percentage rate for interest on those days and
24  how they're calculated.
25       Q     Let me stop you right there.
```

```
 1        A     Sure.

 2        Q     In -- I'm sorry.  Go up to the stop, please,

 3   I'm sorry.

 4              On August 13th of 2020, Free Speech Systems

 5   entered this note claiming to owe $29.5 million to PQPR;

 6   correct?

 7        A     Yes.

 8        Q     And it agreed to pay an interest rate, can you

 9   scroll back down, of 1.75 -- an annual interest rate of

10   1.75 percent on that principal; correct?

11        A     Right.

12        Q     All right.

13              And it agreed to do -- make monthly payments on

14   that principal and interest pursuant to this note?

15        A     I'm not sure if the monthly -- I'm sorry, daily

16   payments are outlined here.

17        Q     I said monthly -- I meant daily.

18        A     Yeah, it's daily.

19              So, I don't know if the daily payments of the

20   $11,000 per number is in here.

21        Q     Is it your understanding that the daily $11,000

22   payment equates to a principal and interest payment on

23   this balance and interest rate set forth in this note?

24        A     You mean when you divide it up, will it come up

25   to $11,000 a business day?
```

1    Q    Yeah.  Really, what I'm asking is how did

2  Mr. Jones arrive at the $11,000 per day number and is it

3  based on this note executed in August 2020?

4    A    I don't know how the $11,000 was arrived at.  I

5  don't know if you divide it up and it comes out to

6  $11,000 per day over the period of time.  Because --

7    Q    What's the term of this note?

8    A    Because the term of the note is 30 years.

9    Q    Okay.

10   A    Because it expires in 2050.

11   Q    Is Free Speech Systems' testimony that when it

12  entered this purported promissory note, that it was

13  agreeing to pay back the some $29.5 million with the 1.75

14  interest rate over 30 years?

15   A    Right.

16   Q    But you don't know whether the $11,000 daily

17  payment is toward the arrangement set out in this note?

18   A    No, it is.

19   Q    It is.

20   A    Those two notes total -- the $11,000 per

21  business day is for both notes.  Right.

22   Q    I see.

23        Well, then --

24   A    I just don't know how they arrived at that

25  figure.  If you are asking how they arrived at it, I'm

1  not sure if you divide it up over 30 years at 1.5 percent

2  it comes out $11,000 per business day.  I just -- I'm not

3  sure.  So --

4      Q    Did Free Speech Systems start making payments

5  on this note in August of 2020, immediately?

6      A    I don't know.

7      Q    Okay.

8      A    I'm not sure.

9      Q    When did the $11,000 payments start?

10     A    I believe, based on my conversations with

11 Mr. Roe and Mr. Schwartz, those were happening towards

12 the end of last year.  So, in 2021.

13     Q    So, Free Speech Systems today is not prepared

14 to testify about any payments on this purported debt

15 prior to approximately November of 2021; correct?

16     A    Right.  I don't know if the payments had been

17 made prior to that.  I know they were definitely at the

18 end of last year.  But I don't know if they had been made

19 prior to that.

20     Q    All right.

21          So, you don't know then whether the AEJ Trust

22 2018 had any income prior to the initiation of $11,000

23 payments in November of 2021; correct?

24     A    Oh, you mean the income that's being -- that

25 would be thrown off by the $11,000 per day?

Brittany Paz Volume III
June 27, 2022

1      Q      Right.

2      A      So, I mean, there were payments being made

3   between PQPR and Free Speech.  So, PQPR was billing Free

4   Speech during this entire time period and they were

5   making payments, they just were not regular payments.

6      Q      We're talking about payments from Free Speech

7   Systems to PQPR?

8      A      Right.

9      Q      And we're talking about PQPR payments then to

10  the AEJ Trust?

11     A      Right.

12     Q      So, I'm focused right now just on paid income

13  generated by the trust as a result of it's new ownership

14  in PQPR debt.

15     A      Right.

16     Q      And what I hear you saying is that that income,

17  as far as Free Speech Systems is prepared to testify

18  today, commenced in about November of 2021; correct?

19     A      No.  Because Free Speech was still making

20  payments to PQPR.  They were just not the entire

21  payments; you understand?

22     Q      I do, but what --

23     A      So, those payments that Free Speech was making

24  to PQPR, they would still be going into the balance of

25  the trust; but you still have a debt on the note because

1    they're not paying the entire balance.  So, those

2    payments that Free Speech was making, although not the

3    entire payments, would still be going into the body of

4    the trust.  It was just not the $11,000.

5         Q    But the trust, as I understand it, doesn't own

6    any part of PQPR other than the debt; right?

7         A    I don't think that's accurate because PLJR is

8    owned 80 percent by AEJ Trust.

9         Q    But you understand if Free Speech Systems is

10   making payments to PQPR, just in the regular course of

11   business?

12        A    Mm-hm.

13        Q    That money -- is it your testimony that that

14   money, that is, money paid to PQPR in the regular course

15   of business, flows as income to the trust?

16        A    Well, if you just do it -- if you look at -- I

17   know you don't have the spreadsheet --

18        Q    I would tell you that the AEJ Trust -- I don't

19   have a spreadsheet, I don't think, that shows AEJ income.

20        A    A flowchart.

21             The flowchart -- I mean, we can try to pull it

22   up at a break --

23        Q    Why don't we do that.  But what I'm focused

24   specifically on right now is cash income flowing to the

25   trust.  And I understand one source of it to be the

1    $11,000 debt payments beginning in November of 2021?

2         A    That is one source, yes.

3         Q    Thank you.

4              What I am trying to understand is whether there

5    are -- there is any other income flowing to the trust;

6    and what you started to tell me was that regular payments

7    to PQPR, in the course of business, are also flowing to

8    the trust.  But I'm not aware of -- and that seemed odd

9    to me.  That's what I'm trying to question you on.

10        A    Maybe we can look at the flowchart at a break

11   and maybe that will answer the question.  Because it's

12   hard to do it without looking at it.  So, I -- you know,

13   if we could look at it.  I don't want to misstate

14   anything.  If we can look at the flowchart and just make

15   sure.  But my impression was -- and I could be wrong --

16   was that 80 percent of PLJR is owned by the trust.  So,

17   80 percent then or not 80 percent, but in the 70s --

18        Q    I don't want to you do, like -- I don't want to

19   you kind of sketch out here what you think might be --

20        A    Right, that's why I want to pull out -- I want

21   to pull up the --

22              MR. REILAND:  Chris, can we take five

23         and --

24              MR. MATTEI:  Yeah, we can take a break.

25         It's about time to take a break anyway.  But

Brittany Paz Volume III
June 27, 2022

1           let me just wrap this up, though.

2    BY MR. MATTEI:

3        Q    Whatever income the trust is generating,

4    whether it be the $11,000 daily payments beginning in

5    November 2021 or some additional income beyond that, none

6    of that income is being paid to any of Mr. Jones's

7    children; correct?

8        A    That's right.  Yes.

9        Q    It's being paid to Mr. Jones; correct?

10       A    Mr. Jones is an income beneficiary of the

11   trust, yes.

12       Q    Are there any other income beneficiaries?

13       A    I don't believe so, no.

14       Q    So, any income paid to the AEJ 2018 Trust as a

15   result of debt purportedly owed by Free Speech Systems or

16   any other income is directly for the benefit of

17   Mr. Jones; correct?

18       A    Mr. Jones is an income beneficiary of AEJ

19   Trust.

20       Q    So he is the sole beneficiary of any income

21   that flows to AEJ Trust as a result of its ownership of

22   PQPR's debt; correct?

23       A    Through the trust, yes.

24               MR. MATTEI:  Why don't we take a break.

25               THE VIDEOGRAPHER:  We are off the record.

1    when the debt started accruing; correct?

2        A    I don't know if I asked that specific question,

3    but these are the documents that were produced to me that

4    I reviewed.  It indicates that.  So, yes.

5        Q    And they were produced to us as well?

6        A    Yes.

7                 MR. MATTEI:  Can you take that down.

8    BY MR. MATTEI:

9        Q    Who authorized Free Speech Systems to begin to

10   go into debt to PQPR at that time?

11       A    What do you mean who authorized it?  I don't

12   know that it was ever a conscious decision.  PQPR was

13   sending us bills or sending Free Speech bills and we were

14   not paying the entire of the bills -- the entirety of the

15   bills.  I'm not sure the reason why.  I'm not sure if it

16   was -- I don't think it was a conscious decision on

17   anyone's part; but -- I don't know if -- I don't think I

18   would use the word "authorized," but --

19       Q    Okay.

20            So, this is helpful.  So, in 2014, PQPR is

21   sending -- in December 2014 PQPR is sending Free Speech

22   Systems bills; right?

23       A    Yes.

24       Q    As it had been prior to that?

25       A    Sure.

1       Q    But in December of 2014, Free Speech Systems

2   stops paying those bills in their entirety; correct?

3       A    I don't know if they stopped, but most of the

4   bills were not being paid in their entirety.

5       Q    What were those -- how was Free Speech Systems

6   billed?  Was it by paper invoice, by electronic

7   submission?

8       A    They were being invoiced, yes.  They were being

9   invoiced.

10       Q    PQPR was causing invoices to be sent to Free

11   Speech Systems?

12       A    Right.

13       Q    Who was responsible for receiving and

14   processing those invoices at Free Speech Systems

15   beginning in December of 2014?

16       A    I don't know and I don't want to guess.

17       Q    And what were those -- at that time in December

18   2014 when this debt started accruing, what was Free

19   Speech Systems being invoiced for from PQPR?

20       A    For costs associated with the products, for

21   purchasing the products.  So, PQPR purchases the

22   products, costs associated with housing the products.

23   There also may have been some advertising costs in there.

24   I know a couple of years there were advertising costs.

25       Q    Hang on one second.  Hang on one second.

1       Q     Hang on a second.  Hang on a second.

2             I thought you said they were sold on

3   infowarsstore.com and infowarsshop.com and you didn't

4   know who own those websites?

5       A     I don't know who owns those websites, but

6   ultimately, all of those products are being sold via the

7   ads that link back to those websites.  I'm not sure who

8   owns them.  But -- so, when you visit a website on the

9   InfoWars.com website, you visit any article and there are

10  banners on those articles and it clicks and you can click

11  on that link to send you to the PQPR website to purchase

12  the products.

13      Q     Okay.

14            But that would be the advertising is money that

15  PQPR has to pay Free Speech Systems; right?

16      A     Right.  And if you watch -- if you read the

17  spreadsheets, they are being given credit.  So, Free

18  Speech is being given credits for those advertising.

19      Q     I'm just asking you right now what PQPR was

20  invoicing Free Speech Systems for?

21      A     For products.

22      Q     Hang on a second.

23            So, but is Free Speech Systems buying the

24  product from PQPR?  Because that I could understand,

25  right.  Hey, you're buying this product from us, we're

1  selling it to you, Free Speech Systems, pay us.  But

2  that's not what I understood you to be staying.  What I

3  understood you to be saying is PQPR buys the products and

4  sells the products; right?

5       A    PQPR, I believe, buys the products and then

6  stores the products and handles the sale end of the

7  products and packaging the products.  But ultimately,

8  Free Speech pays PQPR for the product.  So, it is billing

9  Free Speech for the products.

10      Q    So, do you understand why this is a little bit

11  confusing -- might be a little confusing?  Because if

12  PQPR is being its product and then selling its product,

13  what is Free Speech Systems getting when it pays for the

14  product?  Isn't the product going to the third-party

15  customer?

16      A    Right, but the cost of the product is not the

17  same thing as what it is actually being sold for.

18      Q    So, why is Free Speech Systems paying for the

19  cost of the product, why wouldn't PQPR pay for that?

20      A    I don't know the answer to that.  I'm just here

21  to testify as to how it is.

22      Q    So, Free Speech Systems' testimony is that

23  beginning -- is that one of the things it was invoicing

24  PQ -- I'm sorry.  Let me start over.

25           Free Speech Systems' testimony is that one of

1    the things PQPR was billing it for was the cost of PQPR's

2    products; correct?

3         A    Right.

4         Q    And those bills were coming in on a monthly

5    basis to Free Speech Systems?

6         A    Yes.

7         Q    What else was PQPR invoicing Free Speech

8    Systems for in December 2014?

9         A    I don't remember off the top of my head.  It

10   may have been billing them for --

11        Q    I don't want you to guess.

12        A    Right.  I don't remember looking at it.  I

13   would -- there are documents there that could refresh my

14   recollection, more specifically the spreadsheets.

15        Q    You mean the spreadsheet we were just looking

16   at?

17        A    Mm-hm.

18        Q    Okay.

19             Bring that up.  Do you have it?  Okay.

20        A    So, if you could see the debits, the product

21   sales.  So, that's what I was saying that the -- that

22   PQPR is billing Free Speech for.  And then there are some

23   credits.  So --

24        Q    Hang on.

25             If we're just sitting on the debits column,

Brittany Paz Volume III
June 27, 2022

1   right, this would be, presumably, money that PQPR claims

2   it is owed by Free Speech Systems; right?

3       A    Yes.

4       Q    And the one source of that debt are product

5   sales.  At least listed here; correct?

6       A    Right.  At least listed here.

7       Q    And so, what I'm asking you is, beyond the

8   spreadsheet, is -- can Free Speech Systems testify as to

9   any other items for which PQPR was billing it or

10  invoicing it beginning in December of 2014?

11      A    PQPR billing Free Speech; right?

12      Q    Correct.

13      A    I can't tell by looking at this.

14      Q    Right.  Okay.

15           But beyond the spreadsheet, though?

16      A    Yeah, I don't know.

17      Q    Well, that's kind of important because one of

18  the issues you're here to discuss are the relationship

19  between the two entities and -- so, if we close the

20  deposition today, Free Speech Systems' testimony will be,

21  beginning in December of 2014, a debt started to accrue

22  to PQPR as a result of unpaid invoices for the cost of

23  products purchased by PQPR; correct?

24      A    Right.  Minus other things.  So, but yes.

25  Ultimately, yes.

1      Q    Amongst other things, but I'm just focused now

2   on the invoice piece.

3      A    Right.

4      Q    Beyond the debt associated with Free Speech

5   Systems not paying for the cost of products, Free Speech

6   Systems is not aware of any other source of any debt owed

7   by Free Speech Systems to PQPR; correct?

8      A    Right.

9      Q    Okay.

10          So, thank you.

11          Getting back to the question that started this

12   round then, I asked you who authorized Free Speech

13   Systems to start to accrue this debt and I want to go

14   back to that question.

15          Now, we know that PQPR is invoicing Free Speech

16   Systems for the cost of its products and Free Speech

17   Systems is not paying, or at least not paying in full;

18   right?

19      A    Right.

20      Q    So, who made the decision at Free Speech

21   Systems to stop paying?

22      A    I don't know if it was ever a conscious

23   decision.  So, I don't know if it -- I just -- I don't

24   subscribe to the word "authorized" or -- you know, I

25   don't know that it was ever a conscious decision on

Brittany Paz Volume III
June 27, 2022

1                          CERTIFICATE

2

STATE OF CONNECTICUT   )
3                      )      SS    SOUTHBURY
COUNTY OF NEW HAVEN    )

4

5

6          I, VIKTORIA V. STOCKMAL, a Notary Public duly
commissioned and qualified in and for the county of
Fairfield, State of Connecticut, do hereby certify that
7  pursuant to the notice of deposition, the said witness
came before me at the aforementioned time and place and
8  was duly sworn by me to testify to the truth and nothing
but the truth of his/her knowledge touching and
9  concerning the matters in controversy in this cause; and
his/her testimony reduced to writing under my
10 supervision; and that the deposition is a true record of
the testimony given by the witness.

11
           I further certify that I am neither attorney of
12 nor counsel for, nor related to or employed by any of the
parties to the action in which this deposition is taken,
13 and further that I am not a relative or employee of any
attorney or counsel employed by the parties thereto, or
14 financially interested in the action.

15         IN WITNESS WHEREOF, I have hereunto set my hand
and affixed my notarial seal this 18th day of July, 2022.

16

17

18         _Viktoria V. Stockmal_

19 _____
        VIKTORIA V. STOCKMAL, RMR, CRR
               Notary Public
20            CSR License #00251

21 My commission expires October 31, 2025

22

23

24

25