**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT L

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3                                  )  CASE NO: 22-60043-cml
                                    )
 4    FREE SPEECH SYSTEMS, LLC,     )  Houston, Texas
                                    )
 5                    Debtor.       )  Friday, August 12, 2022
                                    )
 6                                  )  1:01 P.M. to 5:09 P.M.
                                    )
 7    -----------------------------)

 8                          MOTION HEARING

 9         BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For Debtor:            RAYMOND W. BATTAGLIA
                             R.J. SHANNON
13                           KYUNG SHIK LEE
                             Law Offices of Ray Battaglia, PLLC
14                           66 Granburg Circle
                             San Antonio, TX 78218
15
      For Texas Plaintiffs:  MARTY BRIMMAGE
16                           Akin Gump
                             1111 Louisiana Street
17                           44th Floor
                             Houston, TX 77002
18
      For the Subchapter V
19    Trustee:               MELISSA A. HASELDEN
                             Haselden Farrow PLLC
20                           Pennzoil Place
                             700 Milam, Suite 1300
21                           Houston, TX 77002

22    For David Wheeler,
      et al.:                RYAN E. CHAPPLE
23                           Cain & Skarnulis, PLLC
                             303 Colorado Street, Suite 2850
24                           Austin, TX 78701

25
```

```
 1   For U.S. Trustee:        HA MINH NGUYEN
                              Office of the United States Trustee
 2                            515 Rusk Street
                              Suite 3516
 3                            Houston, TX 77002

 4   Court Reporter:          ZILDE MARTINEZ

 5   Courtroom Deputy:        ZILDE MARTINEZ

 6   Transcribed by:          Veritext Legal Solutions
                              330 Old Country Road, Suite 300
 7                            Mineola, NY 11501
                              Tel: 800-727-6396
 8

 9

10   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           THE WITNESS:  Well, I really have a question now

2     based on his answer.  So when you say on the scene --

3           THE COURT:  Well, you don't get to ask questions.

4           THE WITNESS:  I don't know what he means.

5           THE COURT:  Then just you don't know what he

6     means.  I just want to make sure -- you don't get to ask

7     questions.  He gets to ask them, and you get to answer them.

8     And if you don't know the answer, then just say you can't

9     answer the question.

10          THE WITNESS:  Okay.  I can't answer the question.

11          THE COURT:  Mr. Brimmage, why don't you ask

12    another question.

13    BY MR. BRIMMAGE:

14    Q    Mr. Schwartz -- Mr. Schwartz, when did Blue Ascension

15    start providing fulfillment services for FSS?

16    A    I don't have an exact date.  It was -- it was I believe

17    close to the day -- I take that back.  It was shortly prior

18    to my meeting with Blue Ascension.  So I asked to go over

19    the calculus of what happened.

20    Q    All right.  When was your meeting with Blue Ascension?

21    A    I believe July 18th.

22    Q    All right.  That's the date of the price sheet that we

23    looked at, right?

24    A    Correct.

25    Q    Okay.  Let's go backwards a little bit.  I'm just

1    trying to make sure that we and the Court are crystal clear

2    about what happened here.  Blue Ascension started providing

3    fulfillment services shortly before your meeting on July

4    18th, correct?

5    A    That appears to be the date, yes.

6    Q    And shortly before -- well, so they were already

7    providing fulfillment services for FSS when you had your

8    meeting; is that right?

9    A    Yes.

10   Q    In fact you said you were caught flatfooted, right?

11   A    I believe that's what I said.

12   Q    You did.  And so I'm just trying to make sure I'm

13   clear.  When were the FSS employees terminated and rehired

14   by Blue Ascension, if you know?

15   A    The payroll we were working on, on July 18th, they had

16   been -- they had already been moved from the payroll at that

17   time.  So they were paid --

18   Q    Okay.

19   A    They were not paid on that payroll by FSS.

20   Q    So when were they terminated from FSS?

21   A    Like I said, all I know is they left the payroll.  They

22   had already been moved off the FSS payroll when we were

23   preparing to pay that payroll.  So (indiscernible) it would

24   have been effective the beginning of that payroll.

25   Q    All right.  Were they fired?

1    A    Yeah.  They would have been just, you know, terminated

2    and rehired, I believe, by Blue Ascension.

3    Q    Okay.  Is it fair to say that the name of their

4    employer just changed?

5    A    Well, their employer changed.  They no longer were on

6    the ADP payroll that we operate.  They're not an

7    intercompany charge or anything like that.

8    Q    But they're doing the same thing they were doing

9    before, right?

10   A    Well, the job (indiscernible) is essentially the same.

11   I don't know if they're doing it the same way.  I mean,

12   Patrick Riley, they have their own processes and procedures.

13   Q    Do you have personal knowledge of the different

14   processes and procedures that they brought in?

15   A    No.  That's why I said I don't know if they're doing

16   the same thing.

17   Q    Okay.  They're providing the same service to FSS that

18   they were providing to FSS before the name of their employer

19   changed, right?

20          MR. BATTAGLIA:  Your Honor, I'm going to object.

21   I'm going to object.  That question's been asked and

22   answered.

23          THE COURT:  I'll sustain.

24          MR. BRIMMAGE:  Okay.  Fair enough.

25   BY MR. BRIMMAGE:

1    Q    You weren't involved in terminating the employees,

2    right?

3    A    I'm sorry.  I didn't hear the earlier part.  Weren't

4    involved?

5    Q    You weren't involved in terminating the employees,

6    correct?

7    A    I was not involved, correct.

8    Q    You weren't involved in the employees being rehired by

9    Ascension, Blue Ascension, right?

10   A    Correct.

11   Q    And are the employees working in the same space that

12   they worked in before they left FSS?

13   A    Yes.  They would be in (indiscernible) --

14        THE COURT:  Mr. Schwartz, I think something broke

15   up.  Can you repeat that answer?

16        THE WITNESS:  They are working in the FSS

17   warehouse.

18        THE COURT:  Thank you.

19   BY MR. BRIMMAGE:

20   Q    All right, and so Blue Ascension operates out of the

21   FSS warehouse, right?

22   A    Well, when they're working for us, they do.

23   Q    Okay.

24   A    Working for FSS, I mean.

25   Q    Right.  Same warehouse that FSS employees worked in

1    before Blue Ascension came on, right?

2    A    And some FSS employees still work there.

3    Q    Okay.  Which warehouse is this?

4    A    It's the one on Strassman.

5    Q    Let me switch gears a little bit.  You said you did

6    some due diligence into Blue Ascension, right?

7    A    I described what I did.  Yes.

8    Q    And I just want to make sure the timeframe of that was

9    about the time of your meeting with Mr. Riley, right?

10   A    It was after my meeting with Mr. Riley.

11   Q    After the meeting with Mr. Riley.  Okay, and your

12   meeting with Mr. Riley was on July 18th, right?

13   A    Correct.

14   Q    Okay.  So you didn't do any due diligence on Blue

15   Ascension or Mr. Riley prior to that.  I just want to make

16   sure, right?

17   A    No, other than asking who he was.

18   Q    Okay.

19   A    But (indiscernible) --

20   Q    And I want to make sure we're clear on what your due

21   diligence was.  Your due diligence was you talked to Mr.

22   Riley, right?

23   A    Correct.

24   Q    You talked to Mr. Jones, Alex Jones, right?

25   A    Correct.

1    Q    You ran a background check, right?

2    A    Correct.

3    Q    Anything else?

4    A    Well, I mentioned I talked to Mr. Roddy.

5    Q    Anything else?

6    A    I may have spoken to Mr. Jones -- Dr. Jones, excuse me.

7    Q    Okay.  Anything else?

8    A    I believe that was essentially it.

9    Q    Okay.  Just for the Court, who is Mr. Roddy?

10   A    Blake Roddy is -- I believe he was the man in charge of

11   inventory and purchasing.

12   Q    For FSS?

13   A    Yes.

14   Q    Okay, and then the background check, what kind of

15   background check did you do?

16   A    I had a -- it's not a complete check.  I did criminal

17   and we did known associates, his employment history,

18   location history, property ownership, liens, litigation.

19   Q    Did you personally do this or you had someone do it?

20   A    I personally did it.  It didn't take five minutes.

21   Q    Okay.  So you spent five minutes on a background check

22   and you personally did it, right?

23   A    Correct.

24   Q    Okay.  All right.  So (indiscernible) --

25   A    Well (indiscernible) the report.  But I read it.  It

1    was a very extensive report.

2    Q    All right.  Let's go to -- you have seen the, is that

3    right, the Blue Ascension article of formation documents.

4    Do I have that right?

5    A    I have seen some things the secretary of state showing

6    the registration and organization of the LLC.  I've not seen

7    any member agreements, (indiscernible) agreement or articles

8    of association or organization, just the SOS filing.

9    Q    All right.  You haven't seen anything else other than

10   the SOS filing, right?

11   A    That's what I just said.

12   Q    Did you ask for any other documents regarding Blue

13   Ascension?

14   A    No.

15   Q    So part of your due diligence did not include for

16   asking for those.  Got it.  Blue Ascension, do you know how

17   to spell -- how it's spelled, ascension?

18   A    Probably not because it's A-S-E-N -- I mean, it's S-T-

19   I-O-N or not.

20   Q    Okay, and when did you look at the SOS document?

21   A    I don't recall.

22   Q    Where did you get it?

23   A    We probably pulled it down, I guess.  I'm trying to

24   think -- well, I don't remember.  But I know we had it

25   pulled down.

1    Q    Did you personally do that or did someone give it to

2    you?

3    A    I did not do it.  I had one of my staff would have

4    given it to me.  I didn't do that.

5    Q    Well, I mean, let's be clear.  Do you or do you not

6    know, under oath, where you got the SOS formation document

7    for Blue Ascension?

8    A    Well, I've gotten several recently from various filings

9    (indiscernible) but prior to that I don't know where I got

10   the one I remember seeing.

11   Q    All right.  You saw it was formed in March of 2022?

12   A    Correct.

13   Q    All right.  Any idea why it was formed when it was

14   formed?

15   A    That'd just be really conjecture on my part.

16   Q    You don't know, right?

17   A    (indiscernible) Alex Jones told me why it was

18   (indiscernible) --

19   Q    Okay.  All right, and you have not done any due

20   diligence into who might have an ownership interest in Blue

21   Ascension, right?

22   A    Other than, like I said, asking Mr. Riley and Mr. Jones

23   and possibly Dr. Jones.  But other than that, I've not

24   looked at any books and records on ownership.

25   Q    And you haven't asked for the organizational documents.

1    We just talked about that.  So you don't know one way or

2    another whether or not anybody other than Mr. Riley has an

3    ownership interest in Blue Ascension, correct?

4    A    I have no knowledge, personal knowledge of that.

5    Q    All right.  One way or another, right?

6    A    I just said I have no personal knowledge of it.

7    Q    Okay.  You do know that Mr. Riley has a history with

8    FSS, right?  He was employed by FSS, right?

9    A    Yes.  I'm aware of that.

10   Q    Yeah, and what kinds of jobs did he do for FSS?

11   A    From what I understand, he worked in fulfillment with

12   them for a number of years, in total up to six years.  I

13   know he -- well, I don't know.  I've heard -- I know he

14   trained, physically trained with Mr. Jones.  I don't know if

15   it was as a job or they liked to work out together.

16   Q    All right.  You say you understand he worked in

17   fulfilment.  Where is that understanding from, and do you

18   know that for a fact?

19   A    Again, I wasn't there then.  So I don't have any

20   personal knowledge of when he started work and when he left

21   work employed by FSS.  My understanding is based on what

22   I've been told.  I've been led to believe by Mr. Jones and I

23   think something I saw in connection with this hearing.

24   Q    Okay.  You know he used to work out or maybe still does

25   with Mr. Jones, right?

1    A    Well, I heard that he worked out with Mr. Jones.

2    Q    Okay.  Do you know that he also did other errands for

3    Mr. Jones?

4    A    I don't know.

5    Q    You don't know?

6    A    No.

7    Q    What was his title in -- what was his title in the

8    fulfillment group when he was with FSS?

9    A    I have no idea.  I don't know what anyone's title is

10   there.

11   Q    What were his job responsibilities when you think he

12   was in the fulfillment group at FSS?

13   A    Well the document (indiscernible) I'm sorry.

14   Q    I need to apologize.  I think I gave you two questions.

15   Let's start with what was his title in the fulfillment group

16   for FSS.

17   A    I don't know.

18   Q    What were his responsibilities in the fulfillment group

19   for FSS?

20   A    My understanding is he managed fulfillment which would

21   have been the same role in the process.

22   Q    When you say your understanding, what's your

23   understanding based on?

24   A    From talking to him about his knowledge of fulfillment

25   operations at FSS and the cost structure.

1    Q    Okay, and did you see any documents that identified him

2    actually doing any of those things at FSS?

3    A    No.  I have not seen any.

4    Q    You didn't see any documents that identified him as

5    actually having a title and working in the fulfillment

6    services group, did you?

7    A    Well, I haven't seen any documents that have titles for

8    anybody except maybe Alex Jones.  So it's very hard to find

9    out what people's titles are, if they have any.

10   Q    All right.  You don't know for a fact that he even

11   worked in the fulfillment services group, right?

12   A    No.  I've not researched if he actually was employed

13   there.

14   Q    Okay.  Let's look at a couple of emails, if we could.

15            MR. BRIMMAGE:  Your Honor, these are not those

16   emails.  These are these emails.  So let's look at Exhibit

17   2, if we could.

18            THE COURT:  So --

19            MR. BRIMMAGE:  And that would be -- I'm sorry.

20            THE COURT:  Go ahead, Mr. Brimmage.

21            MR. BRIMMAGE:  It's -- yeah, I'm messing up the

22   title of them, Your Honor.  It would be Document 60-2, which

23   --

24            THE COURT:  Okay.

25            MR. BRIMMAGE:  -- should be -- have we found it?

1   and I want to make sure that you're looking straight here.

2   Every time throughout the examination, Mr. Battaglia is

3   going to ask you some questions.  There might be some

4   parties who object.  I'm going to ask that you please give

5   me an opportunity to resolve the objection and then I'll let

6   you know if you can answer the question or if the attorneys

7   need to ask another one, okay?

8          MR. RILEY:  Yes, Your Honor.

9          THE COURT:  Okay.  Mr. Battaglia, you may proceed.

10          DIRECT EXAMINATION OF PATRICK RILEY

11   BY MR. BATTAGLIA:

12   Q   Good afternoon, Mr. Riley.  I'm Ray Battaglia.  I

13   represent Free Speech Systems.  This is the first time the

14   Court has heard or seen from you.  Can you tell the judge a

15   little bit about you?

16   A   My name is Patrick Riley.  I live in Austin, Texas, and

17   I run and operate Blue Ascension Logistics, a third party

18   logistics company.

19   Q   And let's go back a little bit further.  Tell the Court

20   about your college and beyond education and work background.

21   A   I went to the University of Texas.  I studied

22   kinesiology and business.  I did the business foundations

23   degree.  It's essentially a business major.  I worked for

24   myself, self-employed, for a little over a decade running a

25   personal training health and wellness company.  In 2016, I

1    began work for Free Speech Systems as my employer.

2    Q    So let's back up and talk about your prior -- the

3    history of your relationship with Alex Jones.  Can you give

4    the Court a sense of when you met Alex, how you met him and

5    what your relationship has been?

6    A    Yes.  I met Alex in 2014 (indiscernible) amongst my

7    other clients.  We developed a good working relationship.

8    And he, in 2016, offered me a full-time job that I took the

9    opportunity to come onboard.

10   Q    So what were you originally brought onboard to do for

11   Free Speech Systems?

12   A    He wanted me to help him and his buyers maintain good

13   health and be a beacon of wellness (indiscernible) rather

14   and in addition to that he wanted me to come and just help

15   organize and handle problems if they came up.

16   Q    And did your role change from time to time with Free

17   Speech Systems?

18   A    I don't know if it was ever consistent at all.  But

19   yes, it's dramatically changed off and on.  There's a big

20   range of variability.

21   Q    Can you describe for the Court the range of things that

22   you did during your tenure at Free Speech Systems?

23   A    It's a lot of just kind of communicating, you know,

24   what he may have wanted, whether it be from one department

25   to another or ensuring that a process got done.  It could be

1    something, you know, on the personal side.  It could be

2    something on the work side.  It could be telling somebody to

3    change something that they did or to ensure that somebody

4    got a project done.  It changed dramatically in 2020 when

5    our operations manager left.  I assumed many more

6    responsibilities at that time.  But yeah, it varied over the

7    five-plus, almost six years.

8    Q    Can you describe for the Court what your relationship

9    historically has been with PQPR?  And you know who I'm

10   talking about when I say PQPR?

11   A    No.  I don't.

12   Q    PQPR Holdings, Limited.

13   A    Oh, yes.  PQPR.  Yeah.  Essentially it's a product

14   company that supplies products for Free Speech Systems.  And

15   my involvement essentially was, you know, somewhat similar

16   in the same regards of just facilitating --

17   Q    Go ahead.  I'm sorry.  I didn't mean to cut you off.

18   A    No.  Go ahead.

19   Q    Okay, and what about a prior relationship with David

20   Jones.  You know who Dr. David Jones is?

21   A    Yeah.  Same thing.  I try to help him in his health and

22   wellness capacity and, you know, similar to Alex.

23   Q    Let's talk about your current relationships.  Are you

24   on Free Speech Systems' payroll?

25   A    No.  I felt Free Speech Systems in February of this

1    year.

2    Q    Do you own any interest in Free Speech Systems?

3    A    No.

4    Q    What interest, if any, do you own in PQPR?

5    A    None.

6    Q    What interest do you own in any entity that you're

7    aware is owned in whole or in part by Alex Jones?

8    A    None.

9    Q    What background do you have in fulfillment with Free

10   Speech Systems?

11   A    I was around, you know, when I was in a variable state

12   of proximity to the warehouse.  Originally the warehouse was

13   by the production studio and then the late operations

14   manager ended up moving it and expanding the capacity of the

15   warehouse to provide larger abilities for fulfillment, just

16   kind of ramping things up in regard of being robust.  So

17   kind of learning as it expanded and learning the processes.

18   Q    And from time to time have you had a role in

19   fulfillment, a direct role in fulfillment?

20   A    Absolutely.  From, you know, obtaining product from the

21   fulfillment house to potentially handling whatever

22   logistical integration issues to now managing my own 3PL.

23   Q    That's a 3PL?

24   A    Third-party logistics.  It's essentially a company that

25   can warehouse, store, receive, pick, pack and ship products

1   that are linked up to the back end of an e-commerce store.

2   Q    What is Blue Ascension LLC?

3   A    Blue Ascension is my company, my logistics company.

4   Q    And as an LLC, it's owned by members.  Who are the

5   members of Blue Ascension LLC?

6   A    I'm the sole member.

7   Q    Who are the managers and/or officers of Blue Ascension

8   LLC?

9   A    I'm the only manager.

10  Q    When was it formed?

11  A    March of this year.

12  Q    Why was it formed?

13  A    Because there was a need for a fulfillment company to

14  take over (indiscernible) and fulfillment of shipments and

15  it was an opportunity to start a business.

16  Q    What was the impetus for starting Blue Ascension?

17  A    Free Speech Systems essentially getting out of the

18  fulfillment business.  It was not necessarily

19  (indiscernible) efficiencies in place, and to my

20  understanding it was something that they didn't want to do

21  anymore.

22  Q    What role did Alex Jones have in your formation and

23  startup of Blue Ascension?

24  A    He was willing to give me an opportunity to fulfill for

25  Free Speech Systems.

```
1    Q    Did Alex Jones or Free Speech Systems provide you with

2    startup capital to form Blue Ascension?

3    A    No.  I provided my own.

4    Q    Where did -- okay.  So Blue Ascension, how many

5    employees does it have?

6    A    Currently we have 12 employees, including myself, and

7    anywhere from two to four temporary employees.  Currently we

8    have two temps.

9    Q    How many of those employees were formerly Free Speech

10   Systems employees?

11   A    The majority of employees, not all, but the majority of

12   employees were Free Speech Systems employees.

13   Q    And what experience generally do your topline employees

14   at Blue Ascension have in the fulfillment arena?

15   A    I mean, they're from the base floor of a pick packer

16   which is someone who just picks things off of a line

17   essentially and a packer that packs them into a box.

18   There's an integration manager that essentially deals with

19   the technical issues at hand, whether it be from the store

20   side or from the warehouse management system side.  We've

21   got team leads that help people on the floor and essentially

22   a daily manager or a floor manager as well.

23   Q    And this is -- I want to be real clear about this and I

24   want to talk about Blue Ascension's relationships with Alex.

25   What interest does Alex Jones have in Blue Ascension?
```

1    A    Zero.

2    Q    What agreements, written, unwritten, handshake is there

3    between you and/or Blue Ascension and Alex Jones to acquire

4    any interest in Blue Ascension?

5    A    There is none.

6    Q    What contractual agreements do you or Blue Ascension

7    have with Alex Jones?

8    A    What contractual obligations?  None, other than to

9    fulfill for Free Speech Systems.

10   Q    What compensation does Blue Ascension or you pay to

11   Alex Jones?

12   A    Zero.

13   Q    If I were to ask you the same series of questions about

14   PQPR, would your answers be different?

15   A    No.  They'd be the same.  They have no interest.  I

16   have not taken any money.

17   Q    How about Dr. David Jones?  Would your answers be

18   different?

19   A    They would be the exact same.

20   Q    How about any other Jones family member?

21   A    No.

22   Q    How many customers does Blue Ascension provide

23   fulfillment services for?

24   A    Seven or eight.

25   Q    And what are your intentions about growth of the

1   business to additional customers?

2   A    Since we started the company, we have been

3   (indiscernible) trying to bring in and onboard new vendors

4   to fulfill for.  We've been doing personal outreach, you

5   know, cold calls, knocking on people's doors, introducing

6   ourselves, going to fairs, you know, working with the

7   marketing team to try to specifically do some marketing in

8   our efforts to obtain new clients.

9   Q    Do you recall or can you tell the Court when it was

10  that Blue Ascension started providing fulfillment services

11  for FSS?  And when I say FSS, you know I'm speaking about

12  Free Speech Systems?

13  A    Yes.  Mid- to late July, sometime around there.

14  Q    What options are available to Free Speech Systems to

15  outsource fulfillment other than Blue Ascension?

16  A    I don't think they're --

17          MR. BRIMMAGE:  Your Honor, I'll object -- I'll

18  object as it lacks foundation, calls for speculation.  He

19  doesn't work for FSS anymore.

20          THE COURT:  Yeah.

21          MR. BATTAGLIA:  He's involved in the fulfillment

22  business, Your Honor, and he's actively pursuing clients and

23  he is aware and has information regarding this.

24          THE COURT:  I'll overrule it.  We'll see where it

25  goes.

1    A    Well, he says stuff on air all the time about filing

2    for bankruptcy and all kinds of things, so I'm not too sure.

3    There's always that comment of, you know, he might need to

4    do it.

5    Q    Okay.  So, when you left, you were aware that that was

6    a possibility, right?

7    A    Yeah, I think that was a (indiscernible) possibility

8    for some period of time.

9    Q    Had you had any direct conversations with Mr. Jones

10   about FSS filing bankruptcy at the time you left?

11   A    No, not really.

12   Q    Okay.  Now, you testified about your varying jobs and

13   varying responsibilities over the years, correct?

14   A    Yes.

15   Q    What was your title when you were there?

16   A    I had (indiscernible) different titles.  I'm not too

17   sure what, you know, my official title may have been.  I was

18   kind of just a loose manager of sorts, just to organize, but

19   I was not under any department or anything like that.

20   Q    Okay.  So, if we looked at an org chart, would you be

21   in the marketing department, would you know?

22   A    No, I was more of a fitness, wellness manager more than

23   any other form of manager.

24   Q    All right.  But you would agree with me we wouldn't

25   find you in the fulfillment services department of FSS

1   before you left, right?

2   A    You wouldn't find me in any department.  Again, I was

3   kind of an admin, to a certain degree.

4   Q    Okay.  Now, you said the operations manager left in

5   2020.  Do you remember that?

6   A    Yes, I believe it was in the end of 2020.

7   Q    Was that Mr. Fruze or Frood?  I may not be saying it

8   correctly.

9   A    Yes.

10   Q    All right.  And was he replaced by Mr. Roddy?

11   A    Again, I don't believe that he was necessarily

12   replaced.  I think it was an acquisition of

13   responsibilities, kind of in a totality sense.

14   Q    Was Mr. Roddy in charge of fulfilment services for FSS

15   after Mr. Fruze left?

16   A    I don't know if he was necessarily responsible for it.

17   He was away of fulfilment and what fulfilment may have

18   needed, but he was not managing fulfilment, to my

19   understanding, or --

20   Q    Who --

21   A    -- service.

22   Q    Who was managing fulfilment for FSS at the time you

23   left?

24   A    I mean, if you had to put somebody as a name in the

25   position, it was Kelly Hebert.

1   Q    Kelly Hebert?

2   A    Yes.

3   Q    All right.  And did Kelly Hebert leave FSS and has now

4   joined Blue Ascension?

5   A    Yes.

6   Q    Doing basically the same thing Kelly Hebert was doing

7   before?

8   A    Yes and no.

9   Q    Okay.  And all the employees that are currently at Blue

10  Ascension were former FSS employees; is that right?

11  A    No.  Like I said earlier, the majority of employees

12  were Free Speech Systems employees, but not all.  We've had

13  to add to the roster.

14  Q    All right.  I'm going to try to get you to walk me

15  through this a little bit.  Let's go from a timeline

16  standpoint.  You organized this entity in March of 2022,

17  correct?

18  A    I formed the company in March of 2022.

19  Q    All right.  The operations of this company are in the

20  warehouse that FSS used to operate in its fulfilment

21  services, correct?

22  A    Correct.

23  Q    And that's -- Blue Ascension has never operated

24  fulfilment services in any other location, right?

25  A    Correct.

1    Q    All right.  When did you start operating, Blue

2    Ascension, that is, in the FSS warehouse?

3    A    It was mid-May, when we first began to sell the

4    services.

5    Q    All right.  But that wasn't for FSS at the time?

6    A    Correct.

7    Q    All right.  Where did the employees come from for mid-

8    May fulfilment services?

9    A    I hired the former Free Speech Systems employees to

10   work for Blue Ascension, initially as independent

11   contractors, and then moved them to W-2 employees.

12   Q    That's my next question.  How did the employees get

13   from FSS to Blue Ascension?  Can you walk me through that

14   process?  When and how did that work?

15   A    I offered them the job, and I told them that I was

16   starting a fulfilment company to do true 3PL, which is, you

17   know, third-party logistics, being able to fulfil for more

18   than just Free Speech Systems.

19   Q    Okay.  So, did they quit FSS and came and joined you,

20   or were they terminated by FSS, if you know?

21   A    I don't know.  I believe that they left Free Speech.

22   I'm not for sure if they were terminated.  I believe they

23   were terminated.

24   Q    Okay.  And so, did you coordinate with FSS when this

25   was going to happen and how it was going to happen?

1    A    I don't know what you mean by coordinating.

2    Q    Well, you didn't just walk into FSS's building and say,

3    hey, I'm going to hire you guys, without communicating with

4    FSS, did you?

5    A    No, no, not at all.  But as I said earlier, you know, I

6    did have an opportunity to begin fulfilment services.  There

7    was essentially a plan to -- for me to hire who I needed to

8    hire and take them, essentially, onto my payroll.

9    Q    All right.  Who did you coordinate that with, that

10    plan?

11    A    I spoke to -- I spoke to Alex a little bit about it,

12    but I mean, I don't know if there was so much a dedicated

13    plan as a, I think, you know, we can make this -- I can make

14    a successful business out of this and I can bring you on as

15    a vendor.

16    Q    Okay.  And so, you --

17    A    A lot of us here that -- I'm so sorry.

18    Q    Go ahead.

19    A    No, go ahead.  I apologize.

20    Q    So you did speak to Alex Jones about this, right?

21    A    I mean, yes, a little bit.

22    Q    You wouldn't have taken over FSS's fulfilment services

23    without Alex's -- Jones' blessing, right?

24    A    Essentially.

25    Q    Okay.  So, when -- you transitioned the employees from

1    FSS to Blue Ascension in May.  Is that what I understand?

2    A    Yes.  I started -- I started pay them as contractors.

3    Q    When did you start fulfilling FSS orders?

4    A    Free Speech System wasn't fulfilled until mid/late

5    July, just recently.

6    Q    Who fulfilled FSS Systems' orders after you took the

7    employees over to Blue Ascension?

8    A    They were still employees, Free Speech Systems'

9    warehouse employees over there, like packers and such.

10   Q    All right.  How many employees did you -- well, how

11   many employees were in FSS's fulfilment services at the time

12   you took your first group?

13   A    Not many.  I mean, 10 or 12, possibly more.

14   Q    How many did you take in May?

15   A    (indiscernible).

16   Q    How many did you take in May?

17   A    I took my -- I took the original crew, minus,

18   essentially everybody that we have now, back in May.  So,

19   everybody that came back in May -- there hasn't really been

20   any Free Speech employees hired on after the first lot of

21   Free Speech employees that were starting to be employed by

22   Blue Ascension.

23   Q    Okay.  So, is it fair to say that between the time you

24   started fulfilling Blue -- FSS inventory orders, nobody was

25   fulfilling them in that interim gap because you had taken

```
 1                          CERTIFICATION

 2

 3     I certify that the foregoing is a correct transcript from

 4     the electronic sound recording of the proceedings in the

 5     above-entitled matter.

 6

 7

 8

 9

10     Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  August 19, 2022
```