**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor. | § | |

# EXHIBIT 7

| NO. X06-UWY-CV-18-6046436 S  : | SUPERIOR COURT |
|---|---|
| ERICA LAFFERTY, ET AL : | COMPLEX LITIGATION DOCKET |
| V. : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL : | OCTOBER 19, 2021 |

| NO. X06-UWY-CV-18-6046437 S  : | SUPERIOR COURT |
|---|---|
| WILLIAM SHERLACH : | COMPLEX LITIGATION DOCKET |
| V. : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL : | OCTOBER 19, 2021 |

| NO. X06-UWY-CV-18-6046438 S  : | SUPERIOR COURT |
|---|---|
| WILLIAM SHERLACH, ET AL : | COMPLEX LITIGATION DOCKET |
| V. : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL : | OCTOBER 19, 2021 |

## MOTION TO RECUSE JUDGE BELLIS

Defendants Alex Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, through their counsel, move under Practice Book §§ 1-22, 1-23, and Conn. Gen. Stat. § 51-183 to disqualify Judge Barbara Bellis from hearing this case. The record in the above-captioned matters is rife with the appearance of judicial impropriety. The evolution of the case, including a threat made against Judge Bellis by an unknown third-party that the plaintiffs somehow attribute to Defendants, and the series of subsequent comments and rulings, would lead a reasonable person knowing all the circumstances to question Judge Bellis's impartiality.

Judge Bellis has employed a shifting standard for what constitutes specific, limited, and relevant discovery permitted under Conn. Gen. Stat. §52-196 and the Practice Book. This left Defendants victim to the plaintiffs' tireless campaign to expand the scope of the Court's discovery orders and to attempt to win on technicalities.

A reasonable person observing Defendants scramble to satisfy the shifting discovery standard and arbitrary threshold requirements for the special motion to dismiss and subsequent discovery, only to be ambushed by judicial whim and caprice, would question Judge Bellis's

1

impartiality in this proceeding. Although the decision terminating the anti-SLAPP motion was upheld by the Connecticut Supreme Court, it must be viewed as part of a course of conduct by a jurist who wound up presiding over multiple Sandy Hook cases involving the same nominal plaintiffs and their lawfirm.

Following the imposition of this sanction, Judge Bellis's rulings continued to demonstrate a high degree of antagonism towards Defendants. For example, at the first status conference following the remand of this action, Judge Bellis reminded counsel for Defendants that the Court referred Defendants' other counsel to the grievance committee (having previously given a pass to Plaintiffs' counsel's unethical pre-trial publicity). Despite being corrected factually, Judge Bellis erroneously claimed that Defendants may have violated Rule 3.3 of the Rules of Professional Conduct, "Candor Towards the Tribunal." The handling of this issue creates the appearance that Judge Bellis has prejudged the truthfulness of Defendants and their counsel. The insidious nature of this prejudice now pervades all aspects of this case, creating the appearance of impropriety that would cause a reasonable person to question Judge Bellis's impartiality. Notably, despite placing such weight on Rule 3.3, Judge Bellis, when apprised of a clear violation of that rule by Plaintiffs' counsel newly stated she did not want the parties to advise of violations. And, oddly, sanctions orders have issued against all moving defendants, even when several of them had nothing to do with the alleged misconduct. A reasonable person would believe Judge Bellis has taken sides.

## FACTS

In support of this motion, the undersigned counsel for Defendants submits attached herewith his affidavit setting forth the facts that show grounds for disqualification. The record in this matter is complex and varied, spanning multiple counsel and, at times, weekly status hearings. The attached affidavit sets out the evolution of issues creating the appearance of judicial impropriety. That chronology will not be rehashed here, but summarized, in an effort to prevent Defendants from

2

becoming the metaphorical frog boiling in a vat of impropriety.

## I.       Alleged Third-Party Threat Against Judge Bellis

On 21 June 2019 Judge Bellis issued order DN271. That order indicated that the Connecticut State Police notified the court of an ongoing federal investigation related to threatening comments made by unknown third-party/ies about Judge Bellis. The threats were posted to the comments section of a news article published on Defendant Infowars website. Affidavit, para. 16a. The ordered contained no amplifying information. *Id*. The order indicated that Judge Bellis was not aware of any further information regarding the threat and therefore did not plan to take any further action. *Id*. While there is no reason to doubt that Judge Bellis received limited information from the Connecticut State Police about the ongoing federal investigation, the assertion that the court was not aware of any further information regarding the "threat" is inaccurate.

Since its inception, this matter is replete with plaintiffs' accusations that every time Defendants make a statement about any matter in public discourse it is in fact a "call to arms" designed to "activate" a network of conspiracy theorists. *See* Compl. ¶¶7, 12-16, 40-57. For example, plaintiffs' complaint and subsequent arguments on the record refer *ad nauseum* to the actions of a third-party, not related to Defendants. The story goes that, after Defendants ran a news report on the infamous "Pizzagate" conspiracy theory, a third-party traveled to Washington DC and fired 3 rounds from a rifle into a pizzeria. Accordingly, plaintiffs argue, Defendants are responsible for the independent actions of this third-party. *Palsgraf* aside, plaintiffs trot out this *post hoc* fallacy anytime Defendants exercise their First Amendment right to express an opinion. *See e.g.*, Affidavit, para. 15c.

The threat Judge Bellis referenced in order DN271, and its ramifications for this case, lay dormant until the plaintiffs referenced it in a pleading dated 19 August 2019 before the Connecticut Supreme Court. That pleading addressed whether Judge Bellis abused her discretion by ordering a

3

sanction against Defendants for statements made during a broadcast that the plaintiffs argued were a "true threat" against plaintiffs' counsel Chris Mattei. That sanction precluded Defendants' ability to take a special interest appeal under Connecticut's anti-SLAPP statute, Conn. Gen. Stat. § 52-196a. Affidavit, para. 15a-j. Prior to this filing, neither party addressed the issue of the third-party's threat to Judge Bellis. Affidavit, para. 16a.

The plaintiffs' reference to the Judge Bellis threat consists of a single sentence and accompanying footnote. Plaintiff's claim, "Jones' audience threatened the judge in this case after the sanctions order issued and Jones turned his fire on her." *Id.* The accompanying footnote went on to claim:

> [a]fter the trial court sanctioned him, Jones posted a broadcast titled "Judicial Tyranny? Judge Says Criticism Of Democrat Lawyers Forbidden." Shortly after that broadcast was posted, the court filed a notice stating that it had been "contacted by the Connecticut State Police who were reportedly contacted by the FBI regarding threats against the undersigned made by individuals on the defendant Infowars website." Jones then apparently removed the broadcast; it is no longer accessible via the Infowars website.

*Id.* at n.22. This text appears in section III.C of the plaintiffs' brief[1]. Section III addressed whether the trial court abused its discretion in considering the broadcast by Alex Jones as a basis for the above-mentioned sanction. Here, plaintiffs argued that the speech in question was a true and immediate threat of violence, a call to his audience to engage in violent acts directed at plaintiffs' counsel.

In their pleading, the plaintiffs provides a more robust version of the argument that they presented orally during the 18 June 2019 hearing regarding sanctions,

> Jones' audience has a history; he knows it, and so does anyone who reads the news. The trial court recognized that Jones' broadcast was meant to activate his audience: "it was an intentional, calculated act of rage for his viewing audience.". . . That audience has threatened and stalked Sandy Hook family members and acted on

---

[1] The entirety of this section can be found at *Lafferty v. Jones*, Conn. Supreme Court Records & Briefs, First Term, 2019, Plaintiffs' Brief pp. 28-33.

Jones' promotion of Pizzagate to shoot up the Comet Ping Pong pizza restaurant in Washington D.C. Jones tapped into precisely that history. He called on "the patriots that are left, and 4chan and 8chan, and anonymous," and he summoned an attack: "I summon all of it against the enemy." That Jones' threat of violence says it is to be effectuated by others makes it no less a threat.

*Lafferty v. Jones*, Conn. Supreme Court Records & Briefs, First Term, 2019, Plaintiffs' Brief p. 30. (Citations omitted). Plaintiffs' pleading continues by citing to a "recently issued" FBI "Field Intelligence Bulletin." This bulletin concludes generally that broadcasts and news reports that "[are] anti-government, [are] identity based, and [pertain to] fringe political conspiracy theories *very likely* motivate some domestic extremists, wholly or in part, to commit criminal and sometimes violent activity." *Id.* (emphasis added). Plaintiffs' pleadings note that the term "'Very likely' is a term of art used by the FBI to mean an 80-95% chance." *Id.* at 31. The pleading goes on to claim that broadcasts and news reports of this type,

very likely encourage the targeting of specific people, places, and organizations, thereby increasing the risk of extremist violence against such targets.... This targeting occurs when promoters of conspiracy theories, claiming to act as 'researchers' or 'investigators,' single out people, businesses, or groups which they falsely accuse of being involved in the imagined scheme. These targets are then subjected to harassment campaigns and threats by supporters of the theory, and become vulnerable to violence or other dangerous acts.

*Id.*

It is in this context and against this backdrop that the plaintiffs insert the above quoted reference to order DN271. The not-so-subtle implication of the *post hoc* fallacy employed in the plaintiffs' pleadings is clear. Just as the plaintiffs allege the broadcast mentioning Attorney Mattei was a call to Alex Jones' audience to engage in violent acts against plaintiffs' counsel, so too are the plaintiffs alleging that the news article mentioning Judge Bellis was a call to incite violence against the court. Plaintiffs conclude, without providing evidence, that "Jones turned his fire on [Judge Bellis]" insinuating Defendants were somehow responsible for getting his audience to "threaten[] the judge... after the sanctions order issued." Affidavit, para. 16a.

Judge Bellis may have been careful to author order DN271 in a seemingly neutral and detached way—the court was made aware of an FBI investigation "regarding threats against the undersigned by individuals on the defendant Infowars website." Affidavit, para. 16a. However, the plaintiffs' accusation removes any shroud of neutrality, raising the specter that Alex Jones had a hand in the threat made against Judge Bellis. Despite offering no evidence to support this argument, from the record it appears that Judge Bellis relied on it, at least in part, to conclude that broadcast was "indefensible, unconscionable, despicable, and possibly criminal behavior." Affidavit, para. 15jiii1.

## II. Evolution Of Discovery Compliance, Sanctions, and Defendants' Opportunity to Pursue their Special Motion to Dismiss

Conn. Gen. Stat. §52-196 protects defendants facing certain types of lawsuits by allowing them an opportunity to file a special motion to dismiss. While the special motion to dismiss is pending, all discovery is stayed, unless the court "order[s] specified and limited discovery relevant to the special motion to dismiss." Conn. Gen. Stat. §52-196(d),  Initially, Judge Bellis left the parties to work discovery issues out themselves. Unremarkably, plaintiffs sought unlimited discovery and Defendants the opposite. Affidavit, para. 4. Unable to reach an agreement, in order DN148, Judge Bellis overruled all but two of Defendants' discovery objections without further explanation. Although interlocutory appeal of this order was not permitted, that denial is not an appellate endorsement of the breadth of discovery permitted.  Subsequently, Defendants agreed to comply with a discovery deadline of 23 February 2019 at the risk of facing an even shorter deadline. *Id.* Defendants sought an extension due to an inability to meet that deadline. Plaintiffs immediately sought sanctions in the form of an order precluding Defendants from having their special motion to dismiss heard.

From 13 March to 10 April 2019, Defendants' inability to comply with the broad discovery

order was the sole basis for a potential sanction precluding the special motion to dismiss. Affidavit, para. 6-8. On 13 March, Defendants found themselves without counsel familiar with the record and pleadings, due in part to the surprising denial of a *pro hac vice* application of Defendants' original counsel of choice, a denial that curiously only occurred in this and the Texas Sandy Hook cases. Affidavit, para. 6ai. Although that attorney had been the subject of then-recent discipline, none of it was for litigation conduct, and numerous courts (including Hon. Daniel Klau in Connecticut) have seen fit to admit him *pro hac vice* or as an outright member of the bar since.[2]

By 22 March, Pattis & Smith, LLC was sole counsel for Defendants and attempting to comply with discovery. At that time, Defendants were still facing the threat of the sanction. Judge Bellis decided to stay her decision on the preclusion sanction, based on representations made by Defendants regarding (1) the impact changes in prior counsel had on discovery compliance and (2) a plan for getting in compliance in short order. Affidavit, para. 7c-d.

By 26 March, Defendants made substantial steps in complying with discovery. Affidavit, para. 8. Judge Bellis, recognizing this, stated the court would take a week to decide the sanctions issue and that any material produced prior to that decision would be considered as to compliance. Affidavit, para. 8c. Opposing counsel affirmatively agreed with this course of action. Affidavit, para. 8d.

By 10 April, with regard to the sanction, Judge Bellis stated "the issue at this point for me is whether there's been substantial good faith compliance or not such that the defendant should be allowed to pursue their special motion to dismiss." Affidavit, para. 9a. "I'm not looking at this point to go through each one individually and address whether—whether every single document has been

---

[2] The only other judge to deny him *pro hac vice* admission is the Texas judge presiding over similar Sandy Hook-related matters, despite the Texas Supreme Court having previously permitted him to appear *pro hac vice*.  That only the trial court judges overseeing Sandy Hook matters would deprive Defendants of their counsel of choice plays into the reasonable person believing those judges are not impartial.

produced. . . I'm pushed at this point trying to figure out whether there's been finally an—an effort at meeting the discovery obligations." *Id.* At this hearing, Judge Bellis stated multiple times that Defendants substantially complied with the discovery orders. Affidavit, para. 9c-e. In fact, Judge Bellis expressed this view so strongly that the plaintiffs' conceded "it's apparent from the Court's comments that the Court is satisfied there is at least substantial compliance." Affidavit, para. 9e.

Despite clearly finding Defendants in substantial compliance with the ordered discovery, Judge Bellis did not address the sanction issue at that time. Rather, plaintiffs raised an issue involving the signature on a discovery related affidavit. Affidavit, para. 9f. Defendants informed the court that an affidavit bearing Alex Jones signature and indicating that signature was made in New Haven was, in fact not signed by Alex Jones. Instead, it was signed in New Haven by an authorized representative after speaking with Alex Jones telephonically. Affidavit, para. 9fii. Thereupon, she ordered a separate hearing to resolve this issue and *sua sponte* incorporated this issue as a potential second basis for a sanction preventing Defendants from having their special motion to dismiss heard:

> I am going to have a hearing on that affidavit issue. And I don't think there's any harm in proceeding. I mean, I think this is *substantial compliance* but until I deal with that affidavit issue, I'm not — I'm not going to rule on — I'll take it under advisement; the motion for reconsideration and the motion for sanctions. But I'm going to have the hearing on the affidavit first.

Affidavit, para. 9fvii. (emphasis added).

By the following appearance, the attorney for Defendants already self-referred the matter to the Grievance Committee and filed a corrected affidavit. Affidavit, para. 10b. Despite this, Judge Bellis made a second referral and then sought the plaintiffs' input on what sanctions should enter against Defendants. Affidavit, para. 10c. Plaintiffs' reaction captured their surprise at Judge Bellis's inquiry,

> we came here today believing that this issue was one between Counsel and the

> Court, frankly. . . we just don't know enough about the circumstances under which
> that affidavit was made to know whether Mr. Jones's role. . . based on what we
> know right now, we weren't prepared to argue that.

Affidavit, para. 10d. Judge Bellis prodded the plaintiffs to take a position. Affidavit, para. 10e. The

plaintiffs declined and then Judge Bellis ruled "[a]ll right. Then in light of that, I am satisfied with

not taking any further action." Affidavit, para. 10e. Ultimately, on 20 December 2019, the Grievance

Committee dismissed the complaint related to the affidavit issue, finding it to be a mistake that did

not rise to the level of an ethical violation or violate the Rules of Professional Responsibility.

Affidavit, para. 17.

> At the next hearing, on 7 May, Judge Bellis began by stating:

> I do want to just state for the record what is probably clear to everyone at this point.
> I had said a few times that I thought that there was substantial enough compliance.
> So in effect I have really extended --had extended the deadlines for the defendant
> to comply. So that would be my ruling, just for the record, on the issue of the
> additional time to comply. I understand it's not necessarily 100 percent complete
> compliance, but I think *I've seen enough of it at this point to afford the defendants
> the opportunity to pursue their special motion to dismiss.*

Affidavit, para. 11a. (emphasis added). Plaintiffs continued to raise discovery issues, the majority

of which did not affect Judge Bellis's decision to allow Defendants to pursue the special motion to

dismiss. Affidavit, para. 11b. However, this changed when plaintiffs represented to Judge Bellis

that Defendants had not produced Alex Jones' signed interrogatory responses. Judge Bellis, without

fully comprehending that the plaintiffs were referring to an early draft of signed interrogatory

responses, immediately responded by saying "this is news to me. So here's what I would say on that.

*I now retract my prior comments that there has been substantial compliance, good-faith, substantial

compliance*." Affidavit, para. 11d. (emphasis added). Despite ultimately holding that the plaintiffs

were not entitled to discovery of the draft interrogatory responses, Judge Bellis took no steps to

clarify what ruling stood with regard to whether there had been substantial enough compliance to

afford the defendants the opportunity to pursue their special motion to dismiss. Affidavit, para. 11e.

The confusion arising from Judge Bellis's contradictory statements at the 7 May hearing appeared to be resolved by 5 June. At that hearing, plaintiffs continued to raise discovery compliance issues. Affidavit, para. 13a-d. In total, these issues covered 46 transcript pages. Affidavit, para.13f. At no time did Judge Bellis indicate that any of the issues raised demonstrated that Defendants were not in substantial compliance with the discovery ordered. For example, the plaintiffs took issue with deposition testimony regarding the manner in which Defendants searched for "business marketing plans." In response, Judge Bellis ruled that

> unless you have some, you know, a good faith basis and some evidence that in fact the documents do exist, I think that you have to be satisfied with the answers under oath. And no such documents exist is a proper response. . . *This is just full and fair compliance*. And sometimes the answer is going to be it doesn't exist.

Affidavit, para. 13d-e. (emphasis added).

With discovery compliance apparently settled, and believing the next step was litigating the special motion to dismiss, Defendants, requested permission from the court to obtain discovery from the plaintiffs, stating "in our motions we suggested we'd like permission to do a little bit of discovery ourselves." Affidavit, para. 13f. Judge Bellis immediately responded "I'll take that up on the papers" and attempted to silence Defendants. Affidavit, para. 13g-h. When Defendants objected, Judge Bellis terminated the hearing. *Id*.

Following the 5 June hearing, plaintiffs' counsel informed Defendants that they had been the victim of 12 distinct acts of cyber-crime. Affidavit, para. 14e. An unidentified third-party or parties sent emails to Defendants with attachments hiding child pornography. Affidavit, para. 14b-d. The child pornography was embedded in email metadata demanded by the plaintiffs and ordered to be produced within 14 days. Affidavit, para. 14a. Initially, only a single image was located after an "electronic storage information expert" retained by the plaintiffs scoured the metadata of approximately 58,000 emails for over 15 days. Affidavit, para. 14a-b. Based on this, plaintiffs then

provided the data to the FBI, who immediately spent an additional 6 days combing through the metadata, finding 11 additional hidden images of child pornography. Affidavit, para. 14c-d. Once the FBI and DOJ concluded their investigation, they informed plaintiffs' counsel of the results and then plaintiffs' counsel contacted counsel for Defendants. Affidavit, para. 14e.

When Defendants discovered a third-party or parties attempted to frame them for possession of child pornography they were understandably enraged. Affidavit, para. 14g-h. The manner in which they were made aware of this information was equally enraging. *Id*. Being told by a non-law enforcement entity that you are the victim of 12 distinct acts of cyber-crime involving a child pornography email scam, ostensibly to frame and extort you, is unorthodox as the FBI/DOJ have a Victim Services Division specifically dedicated to liaising with crime victims. Affidavit, para. 14g. While all this information was coalescing in his mind, Alex Jones raised these issues in an emotionally charged stream of consciousness broadcast on 14 June 2019. In this broadcast, Alex Jones expressed his opinion that the perpetrator(s) of these cyber-attacks should be brought to justice and that Attorney Mattei's involvement in this entire course of events was suspicious. Affidavit, para. 14h. The following day, on 15 June 2019, Alex Jones issued another broadcast, apologizing for his emotional response and indicating that the 14 June 2019 broadcast should not be construed as suggesting that plaintiffs' attorneys were involved in any criminal activity related to the discovery of child pornography in the metadata. Affidavit, para. 14i.

At the 18 June hearing, plaintiffs attempted to capitalize on these broadcasts, requesting the court review a transcript of the 14 June Broadcast. Affidavit, para. 15a. At that hearing the plaintiffs indicated that they intended to file a written brief requesting a hearing regarding what, if any, sanctions were appropriate. *Id*. Judge Bellis declined the plaintiffs request to (1) brief the issue and (2) have a meaningful hearing, indicating that the court would rule that day on whether sanctions should enter against Defendants because of the broadcast. Affidavit, para. 15b.

11

Plaintiffs, citing no caselaw and explicitly choosing to not discuss the actual content of the broadcast, argued sanctions were appropriate based on (1) "Pizzagate;" (2) the prior issues with discovery compliance; and (3) their assertion that the apology during the 15 June 2019 broadcast was insufficient. Affidavit, para. 15c. Judge Bellis then turned to Defendants, interrupting their defense counsel two sentences into their argument. Affidavit, para. 15d. Judge Bellis challenged Defendants' characterization of both the apology and the initial broadcasts. Affidavit, para. 15d-e. Counsel for Defendants attempted to respond to this challenge, only to be told "[w]ell, but then you need — then you would want to put on evidence in that regard, because there's no evidence. The evidence before me are the broadcasts that you submitted. . . this is unchartered territory, Counsel. . . and despite my research, *I couldn't find a case that came close*." Affidavit, para. 15f. (emphasis added). The Court was already engaged in research without notice or affording Defendants the opportunity to do the same.

Judge Bellis then began a quasi-cross examination of counsel for Defendants, creating the appearance that the court was attempting to justify a predetermined outcome. Affidavit, para. 15g. Following additional argument, but without an evidentiary hearing or a meaningful opportunity to be heard, Judge Bellis denied Defendants the opportunity to pursue their special motion to dismiss. Affidavit, para. 15j. In doing so she held the 14 June 2019 broadcast was "indefensible, unconscionable, despicable, and possibly criminal behavior." Affidavit, para. 15jiii1. Judge Bellis went on to "reject Defendants' claim that Alex Jones was enraged. . . find[ing] based upon a review of the broadcast clips that it was an intentional, calculated act of rage for his viewing audience." Judge Bellis made this adverse ruling despite having admonished counsel for Defendants earlier that an evidentiary hearing was required to characterize the broadcasts. Affidavit, para. 15jiii3. Although the decisions of Judge Bellis were affirmed on appeal, her actions to that point nonetheless created the appearance of bias.

12

### III.   The Perception of Prejudice Created By Judge Bellis's Conduct Towards Defendants Following The Appeal Of The Sanction Order

Defendants appealed this sanction to the State of Connecticut Supreme Court and, then, the United States Supreme Court. Affidavit, para. 18. Ultimately the appeal was not successful and, after a second attempt at removal, Defendants returned to Judge Bellis's courtroom on 14 April 2021. Affidavit, para. 18c. Immediately upon returning from the second removal, which had been based upon Plaintiffs' strategic dismissal of the one Connecticut-resident defendant, whose sole purpose as a defendant was to thwart removal, Judge Bellis demonstrated a bias against Defendants—admonishing their counsel for not immediately apprising the Court of a United States Supreme Court order denying a stay that was received when sabbath observance was beginning. Affidavit, para. 19. Judge Bellis indicated that she viewed this as a possible violation of Rule 3.3 of the Rules of Professional Conduct, "Candor Towards the Tribunal". *Id.*

The filing at issue was filed on 6 November 2020. *Id.* In that filing, counsel for Defendants cited the fact "that there was an application for a stay filed with the U.S. Supreme Court" as one of six bases in support of an objection. *Id.* The Supreme Court docket indicates that the application for a stay referenced in that filing was denied on November 5, 2020. However, counsel for Defendants did not receive notice of the denial until 3:57 p.m. on Friday, November 6, 2020. Affidavit, para. 19c. Counsel for Defendants became aware of this notice after submitting the filing and that awareness occurred after sabbath observance, which had begun minutes after the e-mailed denial was sent to Attorney Randazza, who could not apprise the Court himself because he had been denied the ability to appear. *Id.* On the next business day, Monday November 9, 2020, the plaintiffs informed the Court of the denial. *Id.* Judge Bellis acknowledged subsequently learning that the request for a stay was no longer pending. Affidavit, para. 19d. At a hearing on the issue, Judge Bellis insinuated that counsel for Defendants violated his ethical responsibility to be candid with

the court:

> with respect to the app -- the application for the stay with the US Supreme Court,
> what you filed with the Court on that day represented something that, in fact, was
> not accurate and I -- I would say it would have been incumbent upon you to correct
> what you had filed. I did learn subsequently that it wasn't correct, but I just think just
> as we move forward, if it's your or -- or even an innocent -- and I'm not saying it was
> anything but an innocent mistake, but it would be incumbent upon you to just correct
> that mistake because I don't want to have continued problems moving forward.

*Id.* Once Plaintiffs beat Defendants to notifying the Court of the denial of the stay, there was nothing

for Defendants to do, yet Judge Bellis nonetheless chose to admonish counsel.

Judge Bellis's responses to putative ethical violations have been one-sided, as seen by her

subsequent reaction to counsel for Defendants bringing similar and far more disruptive conduct by

counsel for plaintiffs to the Court's attention. Affidavit, para. 20. The conduct at issue resulted in

the court losing subject matter jurisdiction over certain claims and voided all orders entered

regarding certain plaintiffs for a period of more than two years. Affidavit, para. 20b. This conduct

had a substantial impact on the above captioned matters that far exceeded the issue that the Court

previously admonished counsel for Defendants over. However, despite this, Judge Bellis did not

admonish counsel for Plaintiffs. Rather, counsel for Defendants was again admonished by the Court

for referencing the Rules of Professional Responsibility in this context. Ultimately, the Court

indicated that referencing the Rules of Professional Conduct in filings before the Court could subject

counsel to summary disciplinary orders by the Court. The Court indicated that it would rely on

Practice Book § 2-45 to bypass the grievance committee which had previously dismissed Judge

Bellis's earlier referral of counsel for Defendants regarding the affidavit issue. Affidavit, para. 20c.

This hostility to Defendants carried over into subsequent orders by the Court. At a deposition

of a plaintiff in this case, counsel for the plaintiffs attempted to invoke the protections of a stipulated

protective order (PO). Affidavit, para. 21b. That protective order permits counsel to designate all or

part of a deposition as confidential based upon "a *good faith determination by counsel* so

designating to the Court *that there is good cause for the material so designated* to receive the protections of" the PO. DN. 185.00 at 2-3. (emphasis added). At the start of the deposition a plaintiffs' attorney attempted to designate the entire deposition "Highly Confidential – Attorneys Eyes Only." Affidavit, para. 21b. Plaintiffs concede that this designation occurred "at the beginning of the deposition," and therefore without any knowledge of the actual information that was ultimately elicited. *Id.* Accordingly, plaintiffs' counsel failed to satisfy the PO's good faith determination threshold requirement. Affidavit, para. 21c. Because the PO was not properly invoked, counsel for Defendants believed there was no impediment to using the information disclosed during the deposition, especially information that did not fit any of the categories of information permitted to be designated confidential. Affidavit, para. 21d. Accordingly, prior to the conclusion of the deposition, and based on the information elicited, counsel for the defendants filed a motion for a commission to take the deposition of Hillary Clinton without naming the deponent. *Id.*

Plaintiffs filed a motion requesting sanctions for a purported violation of the PO. Affidavit, para. 21b. In response, Defendants argued that no violation occurred because plaintiffs failed to meet the PO's good faith determination threshold requirement. Affidavit, para. 21. In its order responding to the request for sanctions, the Court ignored Defendants' threshold requirement argument. *Id.* Instead, Judge Bellis recast Defendants' argument as an attack on whether there was good cause to issue the stipulated PO itself, characterized this argument as "frightening," and concluded that Defendants' disclosure of the information at issue was "willful misconduct." *Id.* However, Defendants made no such argument. *Id.* Even if counsel for Defendants technically violated the confidentiality order, sanctions were never appropriate where that violation was based on a good-faith view of the effect of that order and otherwise ensuring that no real confidential information (not even the deponent's name) was being revealed.

15

Judge Bellis has since sanctioned Defendants twice more, with another sanctions motion pending and the actual sanction to be determined. On August 6, 2021 (DN 428.10 & 428.11), the Court sanctioned Defendants for not having produced a "subsidiary ledger" for their accounts. Judge Bellis disregarded the fact that Defendants reasonably relied on their CPA, who provided a declaration in this case, that Free Speech Systems (the only defendant to whom the request was actually directed) does not use subsidiary ledgers. Sanctions were issued against Mr. Jones and all of his companies, even though, at worst, only Free Speech Systems was in violation of the order requiring production of subsidiary ledgers. It is one thing to compel Free Speech Systems to produce something it did not think it actually had based on a good faith interpretation of the Court's order, and it is another thing entirely to sanction four other defendants and to give no reason why an expert CPA's opinion is given no weight, finding the expert "not credible" without taking any live testimony or Plaintiffs' expert having been subjected to cross-examination. Neither did Judge Bellis explain how Plaintiffs were prejudiced when they were given an opportunity to redepose the bookkeeper (but have made little effort to do so since).

Then, on September 30, 2021 (DN 450.20 & 450.21), Judge Bellis sanctioned Defendants following a motion by Plaintiffs seeking sanctions for alleged non-compliance with their discovery requests for Google Analytics and social media analytics. In actuality, those requests were fulfilled in a timely manner. Instead of sanctioning Defendants on the bases proffered by Plaintiffs, Judge Bellis, *sua sponte*, decided that Practice Book § 10-12(a) was violated because the documents were not served on co-defendants who had not sought such discovery. Defendants are unable to find any cases in which a Connecticut court has ruled that Section 10-12(a) means that all produced documents in discovery are "papers" required to be served on all parties, not merely the requesting party. In Federal practice, the rules "only require[] the responding party to produce the requested documents to the requesting party or its representative, not to all parties in the litigation." *Zurich*

16

*Am. Ins. Co. v. BASF Corp.*, 2011 U.S. Dist. LEXIS 162697 at *8 (S.D. Fla. Nov. 4, 2011)(emphasis in original). Perhaps the Court is right that the Practice Book has a different requirement, but that sanctions would issue, in the absence of a clear and intentional violation, makes Judge Bellis appear biased.

Another sanctions motion is pending, with Plaintiffs absurdly claiming that Defendants did not produce their real trial balances. (DN 457.00). First, the request was only directed to Free Speech Systems, not all Defendants. Second, the real trial balances were produced—Plaintiffs' apparent complaint is that they were not given *incorrect* trial balances. If the Court awards sanctions on this motion, the public will have no other view of Judge Bellis than her being on the Plaintiffs' team. And, the fact that the plaintiffs are now trying to liquidate all of the above sanctions, to obtain a default, shows how this whole process is being abused.

## ARGUMENT

The foregoing is just a sampling of the perception of prejudice created by Judge Bellis's conduct in this matter. This prejudice pervades all aspects of this case creating an appearance of impropriety that would cause a reasonable person to question Judge Bellis's impartiality. Practice Book §§ 1-22, 1-23 and Conn. Gen. Stat. § 51-183 provide that any party may, by motion and affidavit, establish that a judge currently presiding over a matter is disqualified from acting because of an appearance of judicial impropriety. A claim of an appearance of impropriety under Canon 1 Rule 1.2 of the Connecticut Code of Judicial Conduct is fundamentally different from a claim of actual bias. *Abington Ltd. Pshp. v. Heublein*, 246 Conn. 815, 819 (1998).

> The Code of Judicial Conduct requires a judge to disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. The reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but *whether a reasonable person would question the judge's impartiality on the basis of all the circumstances. . . Even in the absence of actual bias, a judge must disqualify h[er]self in any proceeding in which h[er] impartiality might reasonably be questioned*, because the appearance

17

and the existence of impartiality are both essential elements of a fair exercise of judicial authority.

*State v. Webb*, 238 Conn. 389, 460-61, *aff'd after remand*, 252 Conn. 128, *cert. denied*, 531 U.S. 835 (2000) (citations omitted; internal quotation marks omitted; emphasis added). "The question is not whether the judge is impartial in fact." *Heublein*, at 820. "To prevail on [a] claim of a violation of this canon, the [moving party] need not show actual bias. The [moving party] has met its burden if it can prove that the conduct in question gave rise to a reasonable appearance of impropriety." *Id.* at 819-21.

I.   **A Reasonable Person Would Question the Court's Impartiality**

A reasonable person would question the court's impartiality based on (1) the alleged third-party threat against the court; (2) Judge Bellis's sanctioning Defendants following the 14 June broadcast; (3) Judge Bellis's indicating the Court would use Practice Book §2-45 to bypass the grievance committee and subject Counsel for Defendants to summary disciplinary orders; and (4) the perception of prejudice created by Judge Bellis's conduct towards Defendants following the appeal of the sanction order.

In addition, a reasonable person would question Judge Bellis's impartiality based on other matters over which she has presided. Prior to these matters, Judge Bellis was the presiding jurist in *D'Avino, et al. v. Starks*, Case No. FBT-CV-15-6048108-S, which were the claims of various Sandy Hook decedents against the estate of Nancy Lanza. That matter, which was consolidated with eight other matters, included many of the same plaintiffs as in this case (nominally, though in fiduciary capacity), represented by the same firm. Similarly, Judge Bellis is the presiding jurist over *Soto, et al. v. Bushmaster Firearms Int'l, LLC,* Case No. UWY-CV15-60500025-S, which is claims of various Sandy Hook decedents against the gun manufacturer and other parties. That matter, which is ongoing, also includes many of the same plaintiffs as in this case (again, nominally), represented

18

by the same firm. There is no reason for Judge Bellis to be the Sandy Hook judge, exposed to arguments and evidence in other cases that would tend to color any jurist's opinion of defendants accused of calling Sandy Hook a hoax.

Courts use an objective rather than a subjective standard in deciding whether there has been a violation of Canon 1 Rule 1.2. This objective standard is guided by "two well established propositions concerning the appearance of judicial impropriety." *Heublein*, at 822. "The first proposition is that the prevention of the appearance of impropriety is of vital importance to the judiciary and to the judicial process." *Id.* "The judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved." *Id.* at 823. "The duty to avoid creating an appearance of impropriety is one of taking reasonable precautions to avoid having a negative effect on the confidence of the thinking public in the administration of justice." *Id.* (internal quotation marks omitted.) The second proposition

> requires a sensitive evaluation of all the facts and circumstances in order to determine whether a failure to disqualify the judge was an abuse of sound judicial discretion. . . Judges who are asked to recuse themselves are reluctant to impugn their own standards. Likewise, judges sitting in review of others do not like to cast aspersions. . . Yet *drawing all inferences favorable to the honesty and care of the judge whose conduct has been questioned could collapse the appearance of impropriety standard . . . into a demand for proof of actual impropriety.*

*Id.* at 823-24. (citations omitted; internal quotations omitted; emphasis added).

### a. Judge Bellis's Personal Involvement in this Matter via the Alleged Threat Against Her Created the Appearance of Impropriety

"It is [the trial judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Internal quotation marks omitted. *State v. Echols*, 170 Conn. 11, 13 (1975), quoting *Glasser v. United States*, 315 U.S. 60, 82 (1942). In <u>Abington Ltd. Pshp. v. Heublein</u>, the

Connecticut Supreme Court held that after a judge performed an *ex parte* site visit to a property that was the subject of the matter before him, "a well-informed, thoughtful and objective observer reasonably could decide that there was. . . a significant risk of a judicial impropriety." *Heublein*, at 826. In that case, the trial judge's site visit personally involved him in the subject matter of the litigation before the court, however, the judge refused to recuse himself based "entirely on his determination that his *ex parte* site visit had not in fact caused him to be prejudiced in any way." *Id.* at 821, 824. The Connecticut Supreme Court reasoned that, "the record in the case contain[ed] persuasive evidence of an appearance of impropriety," and that the trial judge abused his discretion by failing to recuse himself. *Id.* at 824. The Supreme Court reasoned further that a "judge's lack of knowledge of a disqualifying circumstance does not eliminate the risk that h[er] impartiality might reasonably be questioned by other persons." *Heublein*, at 825.

Courts scrutinize judicial conduct from inception through a full and fair hearing on the merits to determine whether a party "received a fair trial. . . before an impartial court, and that the core danger of judicial vindictiveness has not been realized." *State v. Herbert*, 99 Conn. App. 63, 69 (2007). Here, Judge Bellis conduct is similar to the trial judge in <u>Heublein</u>, where the Connecticut Supreme Court held an objective observer could conclude there was a risk of judicial impropriety. In <u>Heublein,</u> the trial judge became personally involved with the subject matter of the litigation. In the instant matter, Defendants' speech is the subject matter of the entire litigation. The alleged third-party threat against Judge Bellis has drawn her, albeit unwillingly, into the subject matter of this litigation. If the only information before the court were the notification by the Connecticut State police of the FBI investigation, then the prejudice realized in <u>Heublein</u> might be absent here. However, that is not the case.

Plaintiffs' complaint and subsequent arguments on the record allege that when Defendants speak it is designed to activate his audience to take action against the subject of the speech. Plaintiffs

20

trot out an FBI "Field Intelligence Bulletin" of dubious reliability to claim that when Defendants speak, the subject of that speech is "very likely"—meaning an 80-95% chance—to be targeted by Defendants' audience. As proof of this plaintiffs point to "Pizzagate." Had Judge Bellis rejected this correlation implies causation argument, then again the risk of the perception of judicial impropriety found in <u>Heublein</u> might not be present.

Unfortunately, Judge Bellis did not reject this logical fallacy. Instead, she embraced it. Based on this argument, Judge Bellis found the 14 June broadcast to be a "calculated act of rage for his viewing audience," determining via a personal viewing of the broadcast that Alex Jones stated, "I'm going to kill," despite this phrase not appearing in any transcript before the court. Affidavit, para. 15jiii2. Moreover, Judge Bellis relied on this argument to characterize the broadcasts as "indefensible, unconscionable, despicable, and possibly criminal behavior." Affidavit, para. 15jiii1. This demonstrates Judge Bellis's true unfiltered view of Defendants commenting on the proceedings in this case. It is against this backdrop that the third-party threat must be evaluated. Clearly, in that context, the arguments advanced by the plaintiffs and Judge Bellis's endorsement of them creates the appearance of impropriety. Here, Judge Bellis, without an evidentiary hearing, concludes that when Defendants speak it is "indefensible, unconscionable, despicable, and possibly criminal behavior," based largely on the plaintiffs' "Pizzagate" rational. Employing an objective standard, there is no way to conclude that a reasonable person knowing all these circumstances would not question Judge Bellis's impartiality following the alleged third-party threat. To find otherwise is tantamount to collapsing the appearance of impropriety standard into a demand for proof of actual impropriety.

  **b. Judge Bellis's Rulings Over the Course of Discovery Compliance Reveal a High Degree of Antagonism, Creating the Appearance That Fair Judgment Is Impossible, Thereby Requiring Her Disqualification.**

"In assessing a claim of judicial bias, [Connecticut Courts] are mindful that adverse rulings,

alone, provide an insufficient basis for finding bias even when those rulings may be erroneous." *Massey v. Branford*, 118 Conn. App. 491, 502, *cert. denied*, 295 Conn. 913, (2010). Adverse rulings alone "cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required." *Liteky v. United States*, 510 U.S. 540, 555 (1994). However, adverse rulings "*may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.*; *Schimenti v. Schimenti*, 181 Conn. App. 385, 395 (2018).

In Berger v. United States, the United States Supreme Court held that the comments of the district judge revealed the degree of antagonism necessary to make fair judgement impossible and that the judge should have recused himself based on the alleged comments. *Liteky*, at 555-56; *Berger v. United States*, 255 U.S. 22, 36 (1921). The Supreme Court reasoned that when seeking recusal "the reasons and facts for the belief the litigant entertains . . . must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Id.*; at 33-4. The Supreme Court went on to conclude that, "[t]he facts and reasons" stated by the defendants in support of recusal "are not frivolous or fanciful but substantial and formidable and they have relation to the attitude of [the] Judge's ... mind toward defendants." *Id.*

Almost a century later, Connecticut Courts still follow the holding of Berger. In Schimenti v. Schimenti, the Connecticut Appellate Court held that a trial court judge should have recused herself from hearing a marriage dissolution proceeding. *Schimenti*, at 403-04. The appellate court reasoned that, while "a trial judge need not leave insights and common sense derived from her life's experience at the courthouse door. . . attitudes garnered from personal life experience cannot serve as a substitute for properly admitted evidence at a hearing." *Id.* at 402. By denying a request for an evidentiary hearing, "the trial judge did not follow her prescribed decision-making pathway but,

22

instead, relied exclusively on her own prejudices born of her life experiences. The court's proper focus should have been on the well-established decisional pathway." *Id.* at 403. The appellate court concluded by observing that, "[t]he floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal . . . In sum, the responsibility of the court in hearing a disputed matter is to act with impartiality. This requirement entails not only being impartial but also acting in a manner that projects impartiality." *Id.* (citation omitted; internal quotation marks omitted.) Here, Judge Bellis did not hold an evidentiary hearing before terminating the anti-SLAPP motion and she did not hold any evidentiary hearings before awarding any sanctions.

Refusing to hold evidentiary hearings, the "well established decisional pathway" employed by impartial courts, is not the only way Connecticut Courts suss out when a trial judge's adverse rulings demonstrate a level of antagonism that makes a fair judgment impossible. Courts also look to evidence that the court has prejudged a party's truthfulness. In Cameron v. Cameron, the Connecticut Supreme Court reasoned that "[t]he trial judge may be under a duty to reprimand counsel in order to protect the rights of litigants" and "also has a duty to see that no falsehood or other fraud is perpetrated in court," however, "[o]nce a [trial judge] declares that [s]he believes a party or a witness has been deceitful . . . she cannot continue to preside in h[er] role of impartial arbiter." 187 Conn. 163, 170 (1982).. While minor criticisms to correct erroneous statements on an affidavit may be justified, once a judge declares a belief a party has been deceitful, she must recuse herself.

Here, Judge Bellis adverse rulings against Defendants include both denying evidentiary hearings and taking actions indicating that she believed that either Defendants or their counsel (or their independent expert) had been deceitful. These actions continued on after the Grievance Committee dismissed the Court's referral regarding the affidavit issue. Before 10 April 2019 the position Defendants found themselves in as a result of Judge Bellis's adverse rulings were entirely

23

facially neutral. These adverse rulings alone are an insufficient basis for disqualification. However, on 10 April Judge Bellis repeated so frequently that Defendants had now substantially complied with the discovery orders that even plaintiffs' counsel remarked "it's apparent from the Court's comments that the Court is satisfied there is at least substantial compliance." Affidavit, para. 9e. Up to this point, Defendants' special motion to dismiss and the plaintiffs request for a sanction precluding it, hinged on substantial compliance with the court's discovery orders. However, at this time the issue regarding a signature on an affidavit developed.

Judge Bellis's reaction to the affidavit signature issue is analogous to the reaction of the trial judge in <u>Cameron</u>, which went beyond merely correcting the issue and demonstrated a belief that the defendant and or counsel were attempting to perpetrate a fraud on the court. By the time Judge Bellis was ready to address the affidavit issue, the matter had already been referred to the grievance counsel and a corrected affidavit submitted. However, Judge Bellis referred the matter to the grievance counsel a second time and then *sua sponte* solicited an argument from the plaintiffs for sanctions against Defendants. This was without holding an evidentiary hearing regarding the creation of the original affidavit.

Judge Bellis pressed the plaintiffs to request a sanction. When the plaintiffs refused, Judge Bellis indicated that in light of the plaintiffs refusing to argue for sanctions, the court was satisfied with not taking any further action. However, later when ultimately sanctioning Defendants Judge Bellis explicitly referenced the affidavit issue. As the United States Supreme Court reasoned in <u>Liteky</u>, the focus is on the impact of adverse rulings, not merely the presence of adverse comments in the record. Accordingly, in the context of judicial disqualification, actions speak louder, or at least as loud, as words.   And, the sanctions orders highlight these actions, once for a misunderstanding regarding the protective order, once for a differing understanding of what was supposed to be produced, and once for a *sua sponte* different interpretation of the rules where no

24

Connecticut case is known to have imposed a different requirement than in Federal practice.

This conclusion accords with the second proposition the Connecticut Supreme Court advanced in <u>Heublein</u>. In the context of disqualification due to the appearance of impropriety, requiring that a judge make comments on the record that explicitly demonstrate prejudice against a party would collapse the appearance of impropriety standard into a demand for proof of actual impropriety. Accordingly, evidence that Judge Bellis prejudged Defendants' truthfulness is found in her *sua sponte* incorporation of the affidavit issue as an additional basis for sanctioning Defendants and in rejecting Defendants' expert. This is especially true given that Judge Bellis did so both times without an evidentiary hearing.

The Grievance Committee's decision to dismiss the complaint arising from the affidavit issue only emphasizes the fact that Judge Bellis's reaction, at a minimum, creates the appearance of impropriety. The Grievance Committee reached their conclusion following an adversarial hearing at which both sides were afforded a meaningful opportunity to be heard. Affidavit para. 17. Like in <u>Cameron</u>, where the Supreme Court reasoned that once a trial judge indicates that she believes a party deceitful that judge cannot continue to preside over a matter, here Judge Bellis's conduct indicated a belief that Defendants were in some way deceitful.

Moreover, over a year after the Grievance Committee dismissed the complaint Judge Bellis continued to reference the affidavit issue, demonstrating a continued prejudice against Defendants. At a 6 May 2021 status conference, Judge Bellis threatened to refer Counsel for Defendants to the Grievance Committee again. Affidavit para. 19a. This time the conduct at issue was Counsel for Defendants' failure to violate his observance of the sabbath to inform the Court he received notice of a denial of a stay application. Affidavit para. 19c. When Counsel for Defendants referenced the stay in a filing, the reference to the status of the stay was correct based upon the available information. Despite this, Judge Bellis admonished Counsel for Defendants even though the Court

25

was made aware of the denial on the next business day. *Id.*

The Court's continued prejudice against Defendants was not confined to this single exchange. Given the Court's 6 May 2021 admonishment—in particular the importance it placed on counsel for Defendants not correcting a filing that contained a purported misrepresentation of the status of a request for a stay that lingered for a single weekend—counsel for Defendants raised similar conduct by Counsel for plaintiffs via a motion. That misconduct had a far more egregious impact on the litigation. Affidavit para. 20. Rather than similarly admonishing Counsel for Plaintiffs, Judge Bellis indicated that "[a]ny further such usage of the Rules of Professional Conduct by counsel in filings in this civil action shall result in immediate action by the court. See Practice Book §2-45." Affidavit para. 20c. Importantly, §2-45 permits a court to bypass the Grievance Committee and impose summary disciplinary orders without a complaint or hearing. Practice Book §2-45. Given the prior history in which Judge Bellis's referral of Counsel for Defendants to the grievance committee was dismissed, it is difficult to interpret this reference as anything other than threatening Counsel for Defendants with summary sanctions for referencing the Rules of Professional Responsibility.

Judge Bellis's reaction—both immediate and sustained— to the affidavit issue alone creates the appearance of impropriety that would cause an objective observer to question the courts impartiality. However, Judge Bellis based her decision to sanction Defendants on more than just the affidavit issue. Just prior to sanctioning Defendants in 2019, Judge Bellis referenced the child pornography issue and the 14 June broadcast as additional bases for the sanction.  On  information and belief, an evidentiary hearing into the inadvertent production of discovery containing child pornography would have shown the following: At plaintiffs' request, Judge Bellis ordered metadata for 58,000 emails be produced in 2 weeks. Affidavit, para. 14a. Plaintiffs then provided this data to a paid "electronic storage information expert" that spent 15 days reviewing the data. Affidavit, para.

26

14b. This was longer than the time allotted by Judge Bellis for Defendants to produce this material. In those 15 days, the experts were able to detect a single image of child pornography. *Id.* Next, the FBI spent an additional 6 days to find 11 additional emails containing child pornography. Affidavit, para. 14c-d. In total, it took 21 days, at unknown cost, for paid experts and the federal government to detect these images. Had Defendants attempted to complete this type of review prior to providing this material to the plaintiffs, they would have missed the court ordered discovery deadline by over 7 days. Undoubtedly, this would have been deemed another mark of "obfuscation and delay," most likely determined without a hearing to ascertain the reason why Defendants were not able to meet the 2-week production deadline.

Similarly, there was no evidentiary hearing regarding the 14 June Broadcast. At the 18 June hearing, plaintiffs announced their intention to file, at some future date, a motion regarding the hearing that would request sanctions. Judge Bellis declined this invitation to follow the "well-established decisional pathway" of an evidentiary hearing and meaningful opportunity to be heard, opting instead for counsels' best extemporaneous analysis sans evidence. The conflicting nature of Judge Bellis's analysis of the broadcast, demonstrates why the court in Schimenti favored the "well-established decisional pathway" of an evidentiary hearing over a judge relying on insights and common sense derived from her life's experience. Judge Bellis applied her own prejudices to what she assumed were the facts of the 14 June broadcast. For example, Judge Bellis claims to have heard "I'm going to kill" in the broadcast, despite it not appearing in any transcript before the court. Yet, when counsel for Defendants attempted to characterize the broadcasts, Judge Bellis prevented this without an evidentiary hearing.

In Schimenti, the appellate court stated that when a trial judge issues adverse rulings in this way it abandons its responsibility to act in a manner that projects impartiality. Judge Bellis's decision to assume facts, multiple refusals to hold evidentiary hearings, and rely on prejudices to

27

justify a sanction impacting the substantive rights of Defendants clearly falls far below the protective floor established by the Due Process Clause. Judge Bellis's rulings over the course of this litigation culminating in the imposition of sanctions reveals a high degree of antagonism. Notably, Judge Bellis admonished counsel for Defendants for conduct that had a minimal impact on the above captioned matters and then subsequently shielded Counsel for plaintiffs for similar conduct that had a far more substantial effect. This is evidence of actual bias. However, without even considering whether the record in this case contains evidence of actual bias, it is clear that there is an appearance of impropriety that would make an objective observer conclude it is not possible for Defendants to receive fair judgment.

Fair judgment requires a willingness to hear and evaluate the arguments of each side before executing judgment. She has repeatedly failed to do so. Therefore, Judge Bellis must be disqualified from this matter.

## CONCLUSION

For all these reasons, Defendants respectfully requests that the Court disqualify Judge Bellis from this matter and substitute another judge to hear it.

## CERTIFICATION OF COUNSEL

The undersigned Counsels for Defendants hereby certify that this motion is made in good faith.

Respectfully Submitted,

By: /s/ Jay M. Wolman /s/
Jay M. Wolman – Juris #433791 of
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103 P: 702-420-2001
F: 305-437-7662
jmw@randazza.com

*Counsel for Defendants Alex E. Jones, Free*

*Speech Systems, LLC, Infowars, LLC,
Infowars Health, LLC, and Prison Planet
TV, LLC*

And

BY: /s/ Norman A. Pattis /s/
Norman A. Pattis,
PATTIS & SMITH, LLC
Juris No. 423934
383 Orange Street
New Haven, CT 06511
V: 203-393-3017 F: 203-393-9745
npattis@pattisandsmith.com

*Counsel for Defendants Free Speech
Systems, LLC, Infowars, LLC, Infowars
Health, LLC, and Prison Planet TV, LLC*

## ORDER

The foregoing motion having been heard, it is hereby ordered: GRANTED/DENIED.

_____ , J.

## CERTIFICATION

I hereby certify that a copy of the above was mailed or electronically delivered on this day to all counsel and pro se parties of record and that written consent for electronic delivery was received from all counsel and pro se parties of record who were electronically served including:

Alinor C. Sterling
Christopher M. Mattei
Matthew S. Blumenthal
KOSKOFF & BIEDER
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com
*Attorneys for Plaintiffs*

Mario Cerame, Esq.
Brignole, Bush & Lewis
73 Wadsworth Street
Hartford, CT 06106
mcerame@brignole.com
*Attorneys for Defendant*
*Genesis Communications Network, Inc*