# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the **"Security Agreement"**) is entered into effective as of August 2, 2020 (the **"Effective Date"**) by and between PQPR Holdings Limited LLC a Nevada Limited Liability Company, 100 Congress Ave., 18th Floor, Austin, TX 78701, (the **"Secured Party"**) and Free Speech Systems, LLC, a Texas Limited Liability Company, 3005 South Lamar Blvd., Suite D109-317, Austin, TX 78704 (the **"Debtor"** or the "**Company"**).

Section I.    <u>CREATION OF SECURITY INTEREST</u>

The Debtor hereby grants to the Secured Party a security interest in the Collateral described in Section II of this Security Agreement to secure performance and payment that certain promissory note of even date herewith in the original principal amount of Twenty Nine Million Five Hundred Eighty Eight Thousand Dollars executed by Debtor in favor of Secured Party as it may be amended or modified (the "**Note**") and any and all other obligations of Debtor to Secured Party of any kind or character, now owed or hereafter arising (collectively, the **"Obligations"**). Any capitalized term herein not specifically defined will have the meaning as defined in the limited liability company agreement of the Secured Party.

Section II.    <u>COLLATERAL</u>

In order to secure the payment when due of any and all Obligations, the Debtor hereby pledges to the Secured Party and grants to the Secured Party a security interest in the following collectively, (the "**Collateral"**):

(1) all fixtures and personal property of every kind and nature, including all accounts, goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), intellectual property, domain names, trademarks (including but not limited to the nutritional supplement marks Living Cleanse, Honor Roll, ExtendaWise, Happease, Gut Fusion, Vasobeet, Ultimate Female Force, The Real Red Pill, Bodease, Icuren, Flora Life, Immune Wall, Pollen Block, Alpha Power, DNA Force, Survival Shield, and Survival Shield X-2, and the brand Infowars Life), trade names, money, deposit accounts, and any other contract rights or rights to the payment of money; and

(2) all gross revenues, receivables and proceeds and products of each of the foregoing in subparagraph (1), all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

The Secured Party is hereby granted a first priority lien and security interest in the Collateral to secure the Obligations. Debtor authorizes Secured Party to file a financing statement describing the Collateral in each and every jurisdiction necessary to perfect the

PRPR-2

EXHIBIT

5

security interest and lien granted herein.

Section III.   PAYMENT OBLIGATIONS OF THE DEBTOR

1.    Debtor is not authorized to sell, convey, dispose of encumber or dispose of the Collateral without Secured Party's agreement or until the Obligations are paid in full. The Debtor will account fully and faithfully to the Secured Party for proceeds from disposition of the collateral in any manner and will pay or turn over promptly in cash, negotiable instruments, drafts, assigned accounts or chattel paper, all the proceeds from each sale to be applied to the Debtor's Obligations to the Secured Party, subject if other than cash, to final payment or collection. Application of such proceeds to Obligations of the Debtor will be in the sole discretion of the Secured Party, provided such application of proceeds is made by the Secured Party in a reasonable manner.

2.    The Debtor will pay to the Secured Party on demand all expenses and expenditures, including reasonable attorney's fees and other legal expenses incurred or paid by the Secured Party in exercising or protecting its interests, rights and remedies under this Security Agreement.

3.    The Debtor will pay immediately, without notice, the entire unpaid Obligations of the Debtor to the Secured Party whether created or incurred pursuant to this Security Agreement or otherwise, upon the Debtor's default under Section V of this Security Agreement.

4.    Delivery of the Collateral.

(a)    All certificates and instruments evidencing or representing the Collateral (if any) will be delivered to the Secured Party upon the execution and delivery of this Security Agreement. All other certificates and instruments constituting, evidencing or representing the Collateral from time to time will be delivered to the Secured Party promptly upon the receipt thereof by and/or on behalf of the Debtor. All such certificates and instruments will be held by or on behalf of the Secured Party pursuant hereto, and will be delivered to the Secured Party in suitable form for transfer by delivery or will be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Secured Party.

(b)    If the Debtor receives, by virtue of its being or having been an owner of any Collateral, any (i) certificate, promissory note or instrument, (ii) option or right, whether as an addition to, substitution for, or in exchange for the Collateral, or (iii) distributions on dissolution, in total liquidation or from capital, capital surplus or paid-in surplus, the Debtor will receive such certificate, promissory note, instrument, payment or distribution in trust for the benefit of the Secured Party, will segregate it from the Debtor's other assets and will deliver it forthwith to the Secured Party in the exact form received, with any necessary endorsement and assignment duly executed in blank, to be held by the Secured Party as Collateral and as additional collateral security for the Obligations.

Section IV.   DEBTOR'S REPRESENTATION, WARRANTIES AND AGREEMENTS

2

PRPR-2

The Debtor makes the following representations, warranties and agreements:

1.      The pledge of the Collateral creates a valid and perfected first priority security interest in the pledged Collateral securing payment of the Obligations.

2.      The Debtor will, at its own expense,, do, make, procure, execute and deliver all acts, things, writings and assurances as the Secured Party may at any time request to protect, assure or enforce its interests, rights and remedies created by, provided in or emanating from this Security Agreement.

3.      The Debtor will sign and execute alone or with the Secured Party a Financing Statement and any and all other documents requested by Secured Party for perfection of the lien on the Collateral.

Section V.      EVENTS OF DEFAULT

The Debtor will be in default under this Security Agreement upon the happening of any condition or event set forth below (herein called an **"Event of Default"):**

1.      The Debtor's failure to pay when due any Obligations secured by this Security Agreement;

2.      Default by the Debtor in punctual performance of any of the obligations, covenants, terms or provisions contained or referred to in this Security Agreement or the Note;

3.      Any warranty, representation or statement contained in this Security Agreement or made or furnished to the Secured Party by or on behalf of the Debtor in connection with this Security Agreement or to induce the Secured Party to make a loan to Debtor proves to have been false in any respect when made or furnished;

4.      Loss, theft, sale (except as authorized in this Security Agreement) or encumbrance to or of any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon; or

5.      The Debtor's dissolution, termination of existence, insolvency or business failure; the appointment of a receiver of all or any part of the property of the Debtor; an assignment for the benefit of creditors by the Debtor; the calling of a meeting of creditors of the Debtor; or the commencement of any proceeding under any bankruptcy or insolvency laws by or against the Debtor.

6.      The Debtor shall have entered against it any judgment, arbitration award, fine or penalty for an amount in excess of $500,000, and such judgment, arbitration award, fine or penalty is not stayed or superseded within 30 days of entry.

Section VI.      SECURED PARTY'S RIGHTS AND REMEDIES

A.      Rights Exclusive of Default.

1.      This Security Agreement, the Secured Party's rights hereunder or the Obligations

3

PRPR-2

hereby secured may be assigned by Secured Party, and in any such case, the assignee will be entitled to all of the rights, privileges and remedies granted in this Security Agreement to the Secured Party.

2.      Upon the request of the Secured Party at any time, the Debtor will execute, sign, endorse, transfer or deliver in the name of the Debtor any other documents, necessary to perfect the security interest and obligations created by this Security Agreement.

3.      At its option, the Secured Party may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral. The Debtor agrees to reimburse the Secured Party on demand for any payment made, or expense incurred by the Secured Party pursuant to the foregoing authorization.

4.      Debtor will permit Secured Party, by its representatives and agents (a) to inspect the Collateral, (b) to examine and make copies of the records of Debtor relating to the Collateral, and (c) to discuss the Collateral and the related records of Debtor with, and to be advised as to the same by, Debtor's officers, employees, and accountants, all at such reasonable times and intervals as Secured Party may determine, and all at such Debtor's expense.

5.      Debtor will maintain true, complete, and accurate books and records with respect to the Collateral, and furnish to Secured Party such reasonable reports relating to the Collateral at such intervals as Secured Party shall from time to time request. Debtor will give prompt notice in writing to Secured Party of the occurrence of any Default or Event of Default and of any other development, financial or otherwise, which might materially and adversely affect the Collateral in the aggregate amount of $100,000.00 or more per calendar year.

B.      <u>Rights in Event of Default</u>

1.      Upon the occurrence of an Event of Default, Secured Party, in its sole discretion, may demand that all payments and distributions made to Debtor upon or with respect to the Collateral shall be paid and delivered to Secured Party, and Debtor agrees to take all such action as Secured Party may deem necessary or appropriate to cause all such payments and distributions to be made to Secured Party. Secured Party shall have the right, at any time after the occurrence of any Event of Default, to notify and direct any issuer to thereafter make all payments, dividends, and any other distributions payable in respect thereof directly to Secured Party. Such issuer shall be fully protected in relying on the written statement of Secured Party that it then holds a security interest which entitles it to receive such payments and distributions. Any and all money and other property paid over to or received by Secured Party hereunder shall be retained by Secured Party as additional collateral hereunder and may be applied by Secured Party to payment of the Obligations in such manner and order as Secured Party may elect in its sole discretion.

2.      In addition, Secured Party is entitled to exercise any and all contractual rights provided in this Security Agreement or any other loan document between Debtor and Secured Party, and any and all legal rights and remedies available to a secured party (whether or not the UCC applies to the affected Collateral) or under any other applicable law when a debtor is in default under a security agreement.

3.      Secured Party is also entitled to, without notice, sell, lease, assign, grant an option

4

PRPR-2

or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, credit or for future delivery, and upon such terms as Secured Party may deem commercially reasonable. Neither Secured Party's compliance with any applicable state or federal law in the conduct of such sale, nor its disclaimer of any warranties relating to the Collateral, shall be considered to affect the commercial reasonableness of such sale. Debtor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made. To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to Debtor at least ten (10) days prior to (i) the date of any such public sale or (ii) the time after which any such private sale or other disposition may be made. Secured Party shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. Subject to the provisions of applicable law, Secured Party may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by law, be made at the time and place to which the sale was postponed, or Secured Party may further postpone such sale by announcement made at such time and place.

4.    Debtor waives (to the extent permitted by law) all rights of redemption, stay, and/ or appraisal which it now has or may have at any time in the future under any rule of law or statute now existing or hereinafter enacted.

5.    Further, Secured Party may at any time after the occurrence of an Event of Default require, in its sole discretion and with notice to Debtor, that any receivables, as described in Section II above, be paid directly to Secured Party. In such event, Debtor shall, and shall permit Secured Party to, promptly notify the parties that owe the receivables to Debtor of Secured Party's interest therein and direct such parties to make payment of all amounts then or thereafter due directly to Secured Party. Upon receipt of any such notice from Secured Party, Debtor shall thereafter hold in trust for Secured Party, all amounts and proceeds (as such term is defined in *Section 9.102(a)(65)* of the UCC) received by it with respect to the receivables and immediately and at all times thereafter deliver to Secured Party all such amounts and proceeds in the same form as so received, whether by cash, check, draft or otherwise, with any necessary endorsements. Secured Party shall hold and apply funds so in such manner and order as Secured Party may elect in its sole discretion. If after the occurrence of an Event of Default, any party owing receivables fails or refuses to make payment on any Collateral when due, Secured Party is authorized, in its sole discretion, either in its own name or in the name of Debtor, to take such action as Secured Party shall deem appropriate for the collection of any amounts owed with respect to Collateral or upon which a delinquency exists. Debtor agrees that Secured Party may at any time and from time to time, if an Event of Default has occurred, compromise with the obligor on any receivable, accept in full payment of any receivable such amount as Secured Party in its sole discretion shall determine or abandon any receivable, and any such action by Secured Party shall be commercially reasonable so long as Secured Party acts in good faith based on information known to it at the time it takes any such action. Regardless of any other provision hereof, however, Secured Party shall never be liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to Collateral, nor shall it be under any duty whatsoever to anyone except Debtor to account for funds that it shall actually receive hereunder.

6.    Debtor will reimburse Secured Party for all reasonable expenses incurred by Secured Party in taking ownership of the Collateral, including payment of Secured Party's

5

PRPR-2

reasonable attorney's fees and legal expenses.

7.     The Secured Party may remedy any default and may waive any default without waiving any other prior or subsequent default.

8.     Upon request of Secured Party after an Event of Default, Debtor shall execute and deliver to Secured Party irrevocable lockbox agreements in the form provided by or otherwise acceptable to Secured Party, which agreements shall be accompanied by an acknowledgment by the bank where the lockbox is located of the lien of Secured Party granted hereunder and of irrevocable instructions to wire all amounts collected therein to a special collateral account at Secured Party.

9.     The remedies of the Secured Party hereunder are cumulative, and the exercise of any one or more of the remedies provided for herein will not be construed as a waiver of any of the other remedies of the Secured Party.

Section VII.   ADDITIONAL AGREEMENTS

1.   **"Secured Party" and "Debtor,"** as used in this instrument, include the heirs, executors or administrators, successors, representatives, receivers, trustees and assigns of those parties.

2.     No delay or omission of Secured Party to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any Event of Default, or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by Secured Party and then only to the extent in such writing specifically set forth. All rights and remedies contained in this Security Agreement or by law afforded shall be cumulative and all shall be available to Secured Party until the Secured Obligations have been paid in full.

3.     Should any Collateral come into the possession of Secured Party, Secured Party may use or operate such Collateral for the purpose of preserving it or its value, pursuant to the order of a court of appropriate jurisdiction or in accordance with any other rights held by Secured Party in respect of such Collateral. Debtor covenants to promptly reimburse and pay to Secured Party, at Secured Party's request, the amount of all expenses (including the cost of any insurance and payment of taxes or other charges) incurred by Secured Party in connection with its custody and preservation of the Collateral, and all such expenses, costs, taxes, and other charges shall bear interest at the Contract Rate (as defined in the Note) until repaid and, together with such interest, shall be payable by Debtor to Secured Party upon demand and shall become part of the secured Obligations. However, the risk of accidental loss or damage to, or diminution in value of, the Collateral is on Debtor, and Secured Party shall have no liability whatever for failure to obtain or maintain insurance, nor to determine whether any insurance ever in force is adequate as to amount or as to the risks insured. With respect to the Collateral that is in the possession of Secured Party, Secured Party shall have no duty to fix or preserve rights against prior parties to such Collateral and shall never be liable for any failure to use diligence to collect any amount payable in respect of such Collateral, but shall be liable only to account to Debtor for what it may actually collect or receive thereon. The provisions of this subparagraph are applicable whether or not an Event of Default has occurred.

6

PRPR-2

4.      Except to the extent expressly otherwise provided herein and to the fullest extent permitted by applicable law, Debtor waives (a) any right to require Secured Party to proceed against any other Person, to exhaust its rights in Collateral, or to pursue any other right which Secured Party may have; (b) with respect to any Collateral that is comprised of obligations, presentment and demand for payment, protest, notice of protest and nonpayment, notice of intent to accelerate, and notice of acceleration; and (c) all rights of marshaling in respect of any and all of the Collateral.

5.      Notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a security interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "fraudulent conveyance"), then the security interest remains enforceable to the maximum extent possible without causing such security interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this sentence.

6.      Debtor Remains Liable.  Notwithstanding anything to the contrary contained herein, (a) Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and Obligations thereunder to the same extent as if this Security Agreement had not been executed, (b) the exercise by Secured Party of any of its rights hereunder shall not release Debtor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) Secured Party shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

7.      NO RELEASE OF DEBTOR.  THE OBLIGATIONS OF DEBTOR UNDER THIS SECURITY AGREEMENT SHALL NOT BE REDUCED, LIMITED OR TERMINATED, NOR SHALL DEBTOR BE DISCHARGED FROM ANY OBLIGATION HEREUNDER, FOR ANY REASON WHATSOEVER (until the Obligations have been indefeasibly paid in full), including:

(a)     (i) any increase in the principal amount of, or interest rate applicable to, (ii) any extension of the time of payment, observance or performance of, (iii) any other amendment or modification of any of the other terms and provisions of, (iv) any release, composition or settlement (whether by way of acceptance of a plan of reorganization or otherwise) of, (v) any subordination (whether present or future or contractual or otherwise) of, or (vi) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of, the Obligations;

(b)     (i) any failure to obtain, (ii) any release, composition or settlement of, (iii) any amendment or modification of any of the terms and provisions of, (iv) any subordination of, or (v) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of, the Note or other loan documents between Debtor and Secured Party;

(c)     (i) any failure to obtain or any release of, any failure to protect or preserve, (ii) any

7

PRPR-2

release, compromise, settlement or extension of the time of payment of any Obligations constituting, (iii) any failure to perfect or maintain the perfection or priority of any lien upon, (iv) any subordination of any lien upon, or (v) any discharge, disallowance, invalidity, illegality, voidness or other unenforceability of any lien or intended lien upon, any collateral now or hereafter securing, the Secured Obligations or any other guaranties thereof;

**(d)**   any termination of or change in any relationship between Debtor and Secured Party;

**(e)**   any exercise of, or any failure or election not to exercise, delay in the exercise of, waiver of, or forbearance of or other indulgence with respect to, any right, remedy or power available to Secured Party, including (i) any election not to or failure to exercise any right of setoff, recoupment or counterclaim, (ii) any election of remedies effected by Secured Party, including the foreclosure upon any real estate constituting collateral, whether or not such election affects the right to obtain a deficiency judgment, and (iii) any election by Secured Party in any proceeding under the Bankruptcy Code of the application of Section 1111(b)(2) of the Bankruptcy Code; and

**(f)**   ANY OTHER ACT OR FAILURE TO ACT OR ANY OTHER EVENT OR CIRCUMSTANCE THAT (i) VARIES THE RISK OF DEBTOR UNDER THIS SECURITY AGREEMENT OR (ii) BUT FOR THE PROVISIONS HEREOF, WOULD, AS A MATTER OF STATUTE OR RULE OF LAW OR EQUITY, OPERATE TO REDUCE, LIMIT OR TERMINATE THE OBLIGATIONS OF DEBTOR HEREUNDER OR DISCHARGE DEBTOR FROM ANY OBLIGATION HEREUNDER.

**8.**   Notwithstanding any contrary provision, Debtor agrees that, if, but for the application of this paragraph, granting a security interest in the Collateral would constitute a fraudulent conveyance under 11 U.S.C. § 548 or a fraudulent conveyance or transfer under any state fraudulent conveyance, fraudulent transfer, or similar law in effect from time to time (each a "fraudulent conveyance"), then the security interest remains enforceable to the maximum extent possible without causing such security interest to be a fraudulent conveyance, and this Security Agreement is automatically amended to carry out the intent of this sentence.

**9.**   Further, notwithstanding anything to the contrary contained herein, (a) Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, (b) the exercise by Secured Party of any of its rights hereunder shall not release Debtor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) Secured Party shall not have any obligation or liability under any of the contracts and agreements included in the Collateral by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the Obligations or duties of any Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

**10.**   The section headings appearing in this instrument have been inserted for convenience only and will be given no substantive meaning or significance whatever in

8

PRPR-2

construing the terms and provisions of this instrument. Terms used in this instrument which are defined in the Texas Uniform Commercial Code are used with the meanings as therein defined.

11. The law governing this secured transaction will be that of the State of Texas in force at the date of this instrument. Venue for any dispute arising out of this Security Agreement will be in the state or federal courts located in Travis County, Texas.

12. Debtor will not create, incur, or suffer to exist any lien on the Collateral except (i) the security interest created by this Security Agreement, and (ii) other liens permitted in writing by the Secured Party.

13. The unenforceability of any provision of this Security Agreement will not affect the enforceability or validity of any other provision.

14. This Security Agreement may be executed in any number of counterparts and any party hereto may execute any such counterpart, each of which when executed and delivered will be deemed to be an original and all of which counterparts taken together will constitute but one and the same instrument.

15. THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

EXECUTED as of the Effective Date.

**DEBTOR:**

Free Speech Systems, LLC

Alexander E. Jones, Managing Member

**SECURED PARTY:**

PQPR Holdings Limited, LLC

David R. Jones, Manager

9

**PRPR-2**