```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3                                )   CASE NO: 22-60043-cml
                                  )
 4    FREE SPEECH SYSTEMS, LLC,   )   Houston, Texas
                                  )
 5              Debtor.           )   Tuesday, September 13, 2022
                                  )
 6                                )   1:03 p.m. - 1:49 p.m.
      -----------------------------)
 7

 8                              TRIAL

 9          BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For Free Speech Systems, R.J. SHANNON
                               Shannon & Lee LLP
13                             700 Milam Street, Suite 1300
                               Houston, TX 77002
14
                               RAYMOND WILLIAM BATTAGLIA
15                             Law Offices of Ray Battaglia, PLLC
                               66 Granburg Circle
16                             San Antonio, TX 78218

17    For Veronique De La      AVI MOSHENBERG
      Rosa, et al.:            McDowell Hetherington, LLP
18                             1001 Fannin, Suite 2700
                               Houston, TX 77002
19
                               JARROD B. MARTIN
20                             Chamberlain, Hrdlicka, White,
                               Williams & Aughtry P.C.
21                             1200 Smith Street, Suite 1400
                               Houston, TX 77002
22
      For David Wheeler,       RYAN E. CHAPPLE
23    et al.:                  Cain & Skarnulis PLLC
                               303 Colorado Street, Suite 2850
24                             Austin, TX 78701

25
```

```
 1    For the U.S. Trustee:      HA MINH NGUYEN
                                 Office of the United States Trustee
 2                               515 Rusk Street, Suite 3516
                                 Houston, TX 77002
 3
      For PQPR:                  STEPHEN LEMMON
 4                               Streusand Landon Ozburn and Lemmon
                                 1801 S Mopac Expressway, Suite 320
 5                               Austin, TX 78746

 6    For the SubChapter V       MELISSA ANNE HASELDEN
      Trustee:                   Haselden Farrow, PLLC
 7                               Pennzoil Place
                                 700 Milam, Suite 1300
 8                               Houston, TX 77002

 9    Court Reporter:            ZILDE MARTINEZ

10    Courtroom Deputy:          ZILDE MARTINEZ

11    Transcribed by:            Veritext Legal Solutions
                                 330 Old Country Road, Suite 300
12                               Mineola, NY 11501
                                 Tel: 800-727-6396
13


14


15    Proceedings recorded by electronic sound recording;
      Transcript produced by transcription service.
16


17


18


19


20


21


22


23


24


25
```

```
 1          HOUSTON, TEXAS; TUESDAY, SEPTEMBER 13, 2022; 1:03 PM
 2                          (Call to Order)
 3          CLERK:  All rise.
 4          MAN 1:  I was actually -- my door was shut because
 5   I was in the restroom when they came by.  I saw them walk
 6   past --
 7          THE COURT:  This is Judge Lopez.
 8          MAN 1:  (indiscernible).
 9          THE COURT:  Might want to put your phone on mute.
10          WOMAN 1:  -- like it scared me because we came
11   around the corner (indiscernible) and like --
12          MAN 1:  Yeah, it --
13          WOMAN 1:  You had the door shut.
14          THE COURT:  Folks, this is Judge Lopez.  I can
15   hear everything.  Yes.  I'll do it.
16          This is Judge Lopez, folks.  Good afternoon.  It
17   is now 1:03.  I'm going to call Free Speech here on
18   September 13th, one o'clock docket.  Something just got
19   filed.  My understanding is we're going to take up cash
20   collateral and then we will also take up -- talk about
21   emergency motion to compel.  So why don't I take
22   appearances.  Why don't I start in the courtroom.
23          MR. MOSHENBERG:  Good afternoon, Your Honor.  Avi
24   Moshenberg and Jarrod Martin here on behalf of the Texas
25   plaintiffs, Your Honor.
```

1          THE COURT:  Okay.

2          MR. MOSHENBERG:  Jarrod Martin has a hearing at

3    1:30, so he may be stepping out in regard to that matter.

4    And then just so the Court understands, I'm going to be

5    handling the motion to compel issue and Jarrod Martin is

6    spearheading the discussions with the other side about cash

7    collateral, so let him speak to those issues.

8          THE COURT:  Why don't we take -- well, we'll see

9    where this goes.  Okay, thank you.

10         MR. MOSHENBERG:  Thank you, Your Honor.

11         MR. NGUYEN:  Good afternoon, Your Honor.  Ha

12   Nguyen for the U.S. Trustee.  I also have Millie Sall from

13   the U.S. Trustee's office here with me.

14         THE COURT:  Good afternoon.

15         MR. LEMMON:  Your Honor, Steve Lemmon on behalf of

16   PQPR.

17         THE COURT:  Good afternoon.

18         MR. SHANNON:  Good afternoon, Your Honor.  RJ

19   Shannon on behalf of the Debtor, Free Speech Systems LLC.

20         THE COURT:  Okay.  Good afternoon.

21         MR. SHANNON:  And believe on the telephone or on

22   the -- electronically Ray Battaglia may be on as well.

23         THE COURT:  Okay.

24         MR. SHANNON:  Thank you.

25         THE COURT:  Sounds great.  Good afternoon.  Ms.

1    Haselden, good afternoon.

2           MS. HASELDEN:  Good afternoon, Your Honor.

3    Melissa Haselden and I also have with me Elizabeth Freeman,

4    proposed counsel for Subchapter V Trustee.

5           THE COURT:  Okay.  Good afternoon.  Okay.  We have

6    covered the courtroom.  Let me just open it up.  Does anyone

7    wish to make an appearance who's on video.  Mr. Chapple, I

8    see you there.  Do you wish to make an appearance?

9           MR. CHAPPLE:  Yes, Your Honor.  Thank you for

10   recognizing me.  Ryan Chapple on behalf of the Connecticut

11   plaintiffs.

12          THE COURT:  Okay.  Folks the line is completely

13   unmuted.  I'm going to try to keep it completely unmuted so

14   I don't have to -- I can focus on the arguments and -- but

15   anyone else wish to make an appearance?

16          MR. BATTAGLIA:  Yes, Your Honor.  Good afternoon.

17   This is Ray Battaglia.  On behalf of Free Speech Systems.

18          THE COURT:  Good afternoon, Mr. Battaglia.  Anyone

19   else?  Okay.  Might be easier for me if we talked about cash

20   collateral first and then took up the motions to compel.  So

21   why don't we start there.  I did see that something got

22   filed.  Read it briefly and I'm still reading it.  Maybe you

23   can give me the high points.

24          MR. MARTIN:  I can give you high points, Your

25   Honor, and Mr. Battaglia can chime in as well.  We are able

1   to reach another agreement on interim use of cash

2   collateral.  The only material changes are the PQPR payment

3   provisions from before regarding the clawback, those were

4   removed and instead there's a language in there that

5   preserves the clawback rights in the previous interim

6   orders.  To date, out of that $750,000, $250,000 has been

7   paid.  The other $500,000 has not yet been paid so you have

8   one clock kind of ticking on that.

9         Obviously, that's reserving all rights relating

10   to, you know, broader litigation, but specifically as to

11   those payments as to whether they were proper in this course

12   of business.  That's --

13         THE COURT:  Okay,

14         MR. MARTIN:  -- what the clock is ticking as far

15   as -- and then there's an updated budget as well and Mr.

16   Battaglia can speak to that.

17         THE COURT:  I did see that you all need a final

18   cash collateral hearing as well, right?

19         MR. MARTIN:  Correct, Your Honor.

20         THE COURT:  Or a time, I should say.

21         MR. MARTIN:  And we had proposed having that heard

22   at the same time as the tort committee hearing.

23         THE COURT:  Okay.  Do you think 10 a.m. would work

24   for everyone, if we're going to work through the day on

25   that?  I don't think there's a lot of hearings that are

1    going to go on at the same time there.  Would 10 a.m. work

2    for October 12th?

3                 MR. MARTIN:  It's okay for the Texas plaintiffs,

4    Your Honor.

5                 THE COURT:  Okay.  Mr. Battaglia, would that work

6    for you?

7                 MR. BATTAGLIA:  Yes, Your Honor, and I've had

8    conversations with Mr. Martin -- this is Ray Battaglia, for

9    FSS -- about frankly at the end of the day probably doing

10   another interim at that time.

11                THE COURT:  Okay.

12                MR. BATTAGLIA:  Just -- I think we're fine running

13   on that basis, but yes.  That'd be fine.

14                THE COURT:  Okay.  Is there anything you wish to

15   tell me about --

16                MR. BATTAGLIA:  And I guess one more thing, Your

17   Honor, I should point out is that Ms. Freeman had asked for

18   a couple of -- minor modification to the proposed order

19   regarding payments to insiders and that the words directly

20   or indirectly were inserted, and I don't think that does

21   injustice to anyone who had previously signed off on the

22   proposed order, but I wanted to at least mention it.

23                THE COURT:  Okay.  I looked at the budget.  There

24   were two items that I just want somebody to clarify for me.

25   One of them says Alex Jones trial cost, what is that, for

1    $80,000?

2              MR. BATTAGLIA:  Your Honor, Mr. Jones is -- has

3    required to appear at trial in Connecticut and he's unable

4    to travel, like perhaps your or I can in the sense he does

5    require security when he goes somewhere and he doesn't stay

6    in a hotel.

7              THE COURT:  Why is the Debtor paying that?

8              MR. BATTAGLIA:  I don't think that we're providing

9    --

10             THE COURT:  He's a defendant.

11             MR. BATTAGLIA:  Because --

12             THE COURT:  Isn't he -- Mr. Battaglia, isn't he a

13   defendant in the same lawsuit?

14             MR. BATTAGLIA:  He is a defendant as well as FSS.

15   Yes, Your Honor, and we had provisions in the lift stay

16   order that we could include a budget for his travel

17   expenses.  And I think some of his travel expenses really

18   relate to his being there on behalf of FSS.

19             THE COURT:  I received this 15 minutes ago.  We're

20   not going to do that.  You all can come back and ask for it,

21   but we're not paying for travel expenses for co-defendant on

22   15 minutes' notice to the Court about that.  Never seen that

23   before.  I'm not aware of it.  Somebody wants to come back

24   on additional notice, you're more than happy to do so.  It's

25   not a no, but it's not a today.  I need more information on

1    that.  So I'm just telling -- what are the other witness

2    expenses and trial costs?  What does that relate to?  Does

3    that relate to specifically to FSS or something else?

4          MR. BATTAGLIA:  They are employees of FSS that

5    plaintiffs have requested to be present or alternatively

6    FSS' counsel has requested to be present.

7          THE COURT:  Okay.

8          MR. BATTAGLIA:  At trial.

9          THE COURT:  Okay.

10          MR. BATTAGLIA:  And also was included in the lift

11    stay order that those expenses would be allowed to be

12    reimbursed.

13          THE COURT:  Relates to the FSS' defense.  I think

14    lifting the automatic stay makes perfect -- I entered an

15    order lifting the stay.  You're going to have to provide

16    some additional information, if somebody -- provide the

17    evidence today, we can take is up.  But if you want me to

18    sign an order today providing expenses for co-defendant in

19    litigation, I'm going to need more than just the parties'

20    agreement on that.  I think I have an independent duty to

21    take a look at this and I don't understand it.

22          But that's -- that just means somebody can come

23    back and ask for it.  It just means that literally this got

24    filed 15 minutes before the hearing and I've reviewed it and

25    you want me to sign it today.  That's what I'm wanting to

1     do.

2            Mr. Lemmon, let me ask you.  You're the -- far as

3     I know.  It sounds like there's agreement between the tort

4     plaintiffs and the Debtors.  You're still listed as a

5     secured party.

6            MR. LEMMON:  Yes, Your Honor.

7            THE COURT:  Your client is still listed as a

8     secured party.  I just need to make sure that you're okay

9     with this order.  It says an agreed cash collateral order.

10           MR. LEMMON:  Yes, Your Honor.  I reviewed the form

11    of order and my client has no objection.

12           THE COURT:  Okay.  Thank you.  So I know you got a

13    1:30 and Mr. Battaglia, you can tell me otherwise, but I'm

14    willing to sign the order today extending the use of cash

15    collateral to October the 12th at a hearing on the budget.

16    The rest of the budget looks fine to me.  Actually had one

17    more question.  And there was an increased cost to the

18    fulfillment expert.  What is that?  I did -- or who is that?

19           MR. BATTAGLIA:  It's Blue Ascension, Your Honor,

20    and this was the subject of the modification to the cash

21    collateral order.  It -- really travels based on estimated

22    sales for the period.

23           THE COURT:  Okay.

24           MR. BATTAGLIA:  And they're not completely

25    connected because of course the sales are presented to you

1    and all these expenses on an approval basis, but they don't

2    track day-to-day the shipping.  They happen a week later or

3    several days later, but it's an estimate of what's expected

4    to pay for both the shipping and the fulfillment cost that

5    has been presented or discussed in front of the Court

6    before.

7            THE COURT:  And that's different than the

8    fulfillment services line?  There's a line --

9            MR. BATTAGLIA:  Your Honor, I'm afraid I don't --

10           THE COURT:  There's a line item for fulfillment

11   services.

12           MR. BATTAGLIA:  I need to --

13           THE COURT:  There's a line item for fulfillment

14   services and then I see one for a fulfillment expert.  It

15   was there last time.  It just went up this time around.  I

16   just --

17           MR. BATTAGLIA:  I'm sorry --

18           THE COURT:  -- need to make sure --

19           MR. BATTAGLIA:  I'm sorry, Your Honor.  The

20   fulfillment expert is after the hearing in which Blue

21   Ascension became something of an issue.  Mr. Schwartz, in

22   trying to fulfill his obligations and resolve the questions

23   that had been presented, has hired someone to come in and

24   evaluate the fulfillment operations of Blue Ascension and to

25   evaluate the cost structure.

1          THE COURT:  I remember that.

2          MR. BATTAGLIA:  And under --

3          THE COURT:  I remember that.

4          MR. BATTAGLIA:  So.

5          THE COURT:  I remember that.  Yeah.

6          MR. BATTAGLIA:  That's what that line item is for.

7          THE COURT:  Got it.  Got it.  Got it.  Yeah, I

8     remember that and I do remember Mr. Schwartz talking about

9     that at the last interim hearing on August 24.  So that

10    makes sense to me.  I have no additional questions.

11          Mr. Nguyen, Ms. Haselden, are you all okay with --

12    if I sign this order with the provisions that I've set

13    forth?

14          MR. NGUYEN:  Yes, Your Honor.  We have no

15    objections to the cash collateral.  It was the deal that was

16    struck and we were involved.  I've taken a look at it.

17          THE COURT:  Okay.

18          MR. NGUYEN:  I'm fine with the order.  Thank you.

19          THE COURT:  Thank you.

20          MS. HASELDEN:  Yes, Your Honor.  We have no

21    objection with the changes that are --

22          THE COURT:  Okay.

23          MS. HASELDEN:  -- Ms. Freeman --

24          THE COURT:  And again, with the other part, people

25    -- I just, I don't have any evidence as to why that's

1    necessary or how it's -- why FSS should pay for it.  I'm

2    happy to hear evidence on it, if there is any.  If not,

3    we're all going to --

4              MR. BATTAGLIA:  Your Honor --

5              THE COURT:  We're all going to come back in a

6    couple weeks.  It's just -- I haven't, I'm not comfortable

7    doing it today.

8              MR. BATTAGLIA:  Your Honor, this is Ray Battaglia

9    again.  I understand.  I'll -- if you would like, I'll

10   revise the budget accordingly or with the Court, made their

11   --

12             THE COURT:  No.

13             MR. BATTAGLIA:  -- certainly says if the budget

14   doesn't, so I'll -- whatever the Court --

15             THE COURT:  I can --

16             MR. BATTAGLIA:  -- favors and then we'll come back

17   and ask the Court for --

18             THE COURT:  Okay.  I can --

19             MR. BATTAGLIA:  -- those expenses with more

20   explanation.

21             THE COURT:  I can figure it out on my end and I

22   think it's just a short line or something, either in the

23   order or just striking it --

24             MR. BATTAGLIA:  Yes, sir.

25             THE COURT:  -- from the budget, but I can sign it.

1    Mr. Lemmon, if you can just confirm you're okay with me

2    signing the order as provided.

3              MR. LEMMON:  Yes, Your Honor.  My client has no

4    objection.

5              THE COURT:  Okay.  Okay.  Thank you.  And I've

6    heard from the United States Trustee.  I've heard from

7    Subchapter V Trustee.  I will sign that order.  Looks like

8    sales are still doing really well, which is good for FSS.

9              So, okay.  I will now turn things over to, guess

10   Mr. Moshenberg, you filed the motion.  Turn it over to you,

11   sir.

12             MR. MOSHENBERG:  Thank you, Your Honor.

13             THE COURT:  You can move that mic closer to you.

14             MR. MOSHENBERG:  Sure.

15             THE COURT:  No problem.

16             MR. MOSHENBERG:  Can you hear me all right, Your

17   Honor?

18             THE COURT:  Just fine.  Thank you.

19             MR. MOSHENBERG:  Thank you very much and thank you

20   for hearing this issue so quickly, Your Honor.  So as the

21   Court is well aware, this cash collateral issue is something

22   the parties are continuing to debate and do discovery on and

23   we're preparing for that cash collateral hearing, looks like

24   on October 12th.

25             One of the issues in that cash collateral motion

1    has to do with the nature of the PQPR debt, as the Court

2    knows.  It's not only the nature of the debt but also how

3    that debt was arrived at and the actual amount of the debt

4    itself.  As the Court knows, we've worked together with Free

5    Speech Systems in terms of reaching interim cash collateral

6    orders, same thing with PQPR, and that's something we've

7    been very proud of, the fact that we've been able to work

8    with them when needed.

9           And one of the agreements that the parties reached

10   and the Court entered an order on was Document 98 which is

11   the second cash collateral order.  And Paragraph No. 14,

12   Your Honor, really codifies the agreement that the Court

13   blessed that the parties to do discovery as it relates to

14   the cash collateral order and what it says is it provides

15   that PQPR as well as FSS, but really we're focused on PQPR

16   today, PQPR was supposed to provide documents in response to

17   document -- to discovery requests and provide other

18   discovery responses by certain date.  Then after that date,

19   the parties were going to have a deposition of PQPR's

20   corporate representative.

21          Paragraph 14 of Document 98 also says that if

22   there's some sort of dispute relating to the discovery, then

23   that the parties can move on an emergency basis.  Now, that

24   being agreed to, the parties did issue discovery requests

25   and the Texas plaintiffs served discovery requests that were

1   focused on this targeted issue about the nature of the PQPR

2   debt and the amount of the PQPR debt.

3          And just so the Court understands, Exhibits 1, 2,

4   and 3 to the motion to compel, I've conferred with opposing

5   counsel and their finding that admitted.  That way Jarrod

6   can leave a little sooner without having to get those

7   documents in.

8          THE COURT:  Let's make him stay.  Just fine.

9   Thank you.

10         MR. MOSHENBERG:  But Documents 1, 2, and 3 in

11   support of that motion or exhibits, rather, it's the

12   discovery request, the responses, and then the attempt to

13   meet and confer.  Now, the cash collateral motion, you know,

14   of course the underlying notes, the cash collateral here

15   that PQPR has with Free Speech Systems, it's not an ordinary

16   note that you would find, for instance, when a bank is

17   giving out a secured loan for a promissory note.

18         What you have here is you've got promissory notes

19   that are basically memorializing 50-some million dollars,

20   $53 million in past obligations owed.  So it's not future

21   money being paid out under a security arrangement.  It's

22   supposedly some legal obligation to pay a debt that was

23   incurred in the past.

24         And so a lot of our discovery requests were

25   focused on figuring out what's the nature of that underlying

1    debt that preceded the promissory notes.  And that's why we

2    just served those discovery responses that are in Exhibit 1

3    and the responses that are in Exhibit 2.  The problem is --

4    and this is in Exhibit 2 -- is that the responses PQPR

5    provided list a bunch of boilerplate objections and then it

6    just states what documents PQPR has decided to produce.

7            What we have a problem with their responses is

8    first of all, there's really two issues.  The first one is,

9    we don't really know whether responsive documents are being

10   withheld on the basis of an objection.  They just provide

11   these boilerplate objections saying we object to this

12   request, here's what we'll produce.  It's unclear from the

13   responses, are there other responsive documents out there

14   that are responsive to that request that are being withheld.

15           THE COURT:  Have the parties conferred?

16           MR. MOSHENBERG:  We have tried to.  We did speak

17   this morning, Your Honor.  So we tried to confer for several

18   days, as Exhibit 3 shows to our motion.  We didn't hear

19   anything for a long time, Your Honor.  Finally, yesterday,

20   after they filed their response, there was a brief

21   communication where they sort of invited us to send another

22   email and explain what we want, and we did that.

23          We sent a long email detailing the documents we

24   want and why we want them, and they responded and they

25   basically said the effect of well, you don't need to have

1      these documents.  First, take the deposition and then see if

2      you need the documents.  Obviously, that's not what the

3      discovery rules contemplate.  If there's responsive

4      documents out there and they're discoverable, then we have a

5      right to receive them.

6            Of course, in practice, you need the documents in

7      order to take a meaningful deposition.  So legally, I don't

8      really understand why that's a reason to not turn over a

9      responsive document.  Doesn't make any sense in normal

10     practice of law, but especially doesn't make sense given

11     that the parties already agreed that they were going to turn

12     over responsive documents before the deposition, and that's

13     what Document 98, Paragraph 14 shows.  So I don't really

14     understand the basis for that.

15           The other issue that they mention is they sort of

16     indicate there might be some responsive documents.  There

17     may not be other ones.  They don't exist.  If -- and this

18     really is a big part of the issue.  We don't want responsive

19     documents being held on the basis of an objection.  If there

20     are no responsive documents, they're required under Rule 34

21     to say so.  We just want to know that there's no documents

22     out there that are being withheld.  And it seems like for

23     some of these discovery requests, that may be the case.

24           What they need to do is withdraw their improper

25     objections and just say, there's no responsive documents in

1    --

2                THE COURT:  Do you think some of these requests

3    are overly broad?

4                MR. MOSHENBERG:  I don't, Your Honor.  I'm happy

5    to handle any specific --

6                THE COURT:  Let's start.

7                MR. MOSHENBERG:  Sure.

8                THE COURT:  We're talking about cash collateral.

9                MR. MOSHENBERG:  Yes, Your Honor.

10               THE COURT:  Produce all agreements, contracts, and

11   -- all agreements between FSS and PQPR.  What purpose does

12   that serve with cash collateral --

13               MR. MOSHENBERG:  It's --

14               THE COURT:  -- unrelated to the debt?

15               MR. MOSHENBERG:  Well -- and so when we --

16               THE COURT:  I'll give you a few.  Produce all

17   documents evidencing any agreements between FSS and PQPR.

18   Right?  Regardless if it relates to the debt.  Say there's

19   an agreement -- what do you mean by agreements, right?

20   That's different from contracts and promissory notes.  All

21   of them.  Produce -- let's see.  Produce all employee lists

22   for PQPR from September 1st, 2013 to the present.  Why do

23   you need to know who works at PQPR in 2013 to determine

24   whether the debt is owed at that amount or not?  I'm just

25   asking.  It's the kind of -- all documents and

1    communications evidencing, so every communication evidencing

2    the ownership of PQPR from its inception.  You don't find

3    that to be a little overly broad?

4             MR. MOSHENBERG:  No, I --

5             THE COURT:  Documents just saying, we formed PQPR

6    in 2013, so I'm going to have to go back in 30 days' notice

7    and file -- and find every email that shows every time that

8    they say that they're the owner from 2013 in connection with

9    a cash collateral hearing that was schedule to occur today?

10            MR. MOSHENBERG:  Well, not necessarily, Your

11   Honor.  But to be clear, we detailed in an email yesterday,

12   we talked to them about what we were specifically looking --

13            THE COURT:  -- not what you said.  You said you

14   didn't think some of these were overly broad.

15            MR. MOSHENBERG:  Sure.  And let me be clear, and

16   we can always -- of course, the rules allow us to narrow it

17   to the extent it is discoverable and I want to be --

18            THE COURT:  Taking you up on your first statement.

19            MR. MOSHENBERG:  Sure, Your Honor.  I don't think

20   the way that you read the question, Your Honor, the request

21   --

22            THE COURT:  I read it the way you wrote it.

23            MR. MOSHENBERG:  Sure.  And I want to be clear.  I

24   didn't perceive it that way.  When we as a group circulated

25   these drafts, what we're referring to, the draft contracts,

1   agreements, however they want to call it, between Free

2   Speech Systems and PQPR.

3          THE COURT:  -- I'm going.

4          MR. MOSHENBERG:  Sure.

5          THE COURT:  I think some of these are really

6   broad, but it could be narrowed to address what you need and

7   then I think Mr. Lemmon is going to have to tell me if these

8   -- some of these requests were narrowly tailored towards

9   cash collateral and the debt that exists, I understand your

10   initial -- his initial response, but maybe he was jammed for

11   time.  But now we're a couple of weeks out now and we're

12   going to go further, even further out.  I don't understand.

13   I think some of these requests can be narrowly tailored in a

14   way to specifically address the issue and I would need to

15   understand from PQPR whether they would still have an

16   objection to that.

17          But I -- you're asking me whether I think an

18   organizational chart is appropriate.  I do.  If you're

19   asking me whether they need to identify all facilities and

20   offices used by them, I don't know.  You'll have to tell me

21   whether that's appropriate or not, but I do think that the

22   parties could talk and narrowly tailor this in a way that

23   really gets to the heart.  I do understand the issue.

24          There were -- there was a large amount of debt

25   that was -- this is different.  This is not just a loan

1    agreement where money was advanced, a loan agreement was

2    signed and then funds were advanced on a loan and there was

3    security taken on that.  This seems to be a little different

4    and you're -- I think you're entitled to get documents that

5    are based on that.

6          MR. MOSHENBERG:  Sure.

7          THE COURT:  I just want -- I just think things can

8    be narrowly tailored in a way that really addresses what

9    you're doing that relates to cash collateral, and I'm happy

10   to do that, but I think the parties could really sit down

11   and see if that could get done, with my guidance.

12          I think there's a difference between seeking

13   documents for other purposes, and I'm not saying that's what

14   you did.  I just -- if we're going to limit it to cash

15   collateral, which is what's going on, then I think you can

16   get the docs and I think there are.  And I agree with you,

17   if all you are receiving is the underlying loan documents

18   and some worksheets, I think Mr. Lemmon is going to have to

19   tell me if there's more or admit that there's more or not.

20          But I think some of these can be more narrowly

21   tailored to address the debt, but that's a simple thing.

22          MR. MOSHENBERG:  I totally agree, Your Honor, and

23   candidly, my normal practice, I usually am able to meet and

24   confer and reach some sort of deal.  The reason the motion

25   was filed is because we just heard nothing for about a week

1   and we tried our best and, you know, it turns out Mr. Lemmon

2   was busy meeting with Ms. Haselden and trying to promote his

3   motion to investigate instead of doing the discovery he

4   promised to do under our agreement.

5       THE COURT:  That's right.  The motion to

6   investigate is still out there as well.

7       MR. MOSHENBERG:  Yes, Your Honor.  And we totally

8   agree.  You know, if there's room to narrow it, absolutely.

9   We're not looking for every document under the sun, so I

10  agree with you and I think we'll be able to work it out.

11  But I do want to be clear and I would love some guidance

12  from the Court.  I mean, our wish list is essentially to

13  make sure that if there are no responsive documents that

14  they withdraw their objections and say there's no responsive

15  documents, assuming that it's been tailored as the Court has

16  discussed.

17      And then if there are responsive documents that

18  are tailored as was discussed, that absolutely produce them.

19  And I'm happy to work with Mr. Lemmon on that.  I think we

20  could probably do that, and if not, we can come back to the

21  Court soon if that works.

22      THE COURT:  Okay.  That's perfect.  Thank you.

23  Let me hear from Mr. Lemmon.

24      MR. LEMMON:  Judge, I'm chagrined to be here on a

25  discovery motion.  I don't think I've appeared on a

 1   contested discovery motion in federal court in 20 years, but

 2   part of this is on me, and that is that Mr. Martin reached

 3   out to me on Labor Day by email and I read his briefly.  It

 4   was to me and to Mr. Battaglia and I believe --

 5            AUTOMATED VOICE:  Conference muted.

 6            MR. LEMMON:  -- the first part of it dealt with a

 7   privilege log, right, which I didn't really find applicable

 8   and I did not give his email, when I read it on my iPhone

 9   when I got off the golf course, the -- in the way that I

10   should have.

11            The follow-up email again came to me and I read it

12   on my iPhone the day before the creditors meeting and it was

13   Mr. Martin's suggestion we visit after the creditors

14   meeting.  I completely zoned on those.  Just didn't see

15   them.  So I was surprised when I got the emergency motion.

16   I called Mr. Martin because the Court will recall I'm the

17   person that offered discovery informally at the time of the

18   August -- I think it was -- 3rd hearing.  And -- because I

19   was going on vacation.

20            I wanted everybody to be able to get what we had

21   and we have somebody who did the forensic accounting

22   relating to the underlying debt and was instrumental in the

23   -- knows about the execution of the notes and that's the

24   person I've offered and whose work papers I've sent.  And

25   we've offered him repeatedly for deposition.  That

1  deposition is currently set for October 4th and I suppose

2  that the plaintiffs will go forward taking it this time.

3          I had talked originally with Mr. Martin and I

4  thought we had an agreement that I was going to produce the

5  documents related to the existence of the debt which I

6  viewed as the key issue related to cash collateral.  And we

7  will.  We will absolutely produce everything related to the

8  existence of the debt or reasonably related to the existence

9  of the debt, Your Honor, and I don't have a problem with

10  that.

11          THE COURT:  You think that includes negotiations

12  surrounding the formulation of the debt?

13          MR. LEMMON:  I believe that there are no documents

14  regarding the negotiations regarding the formation of the

15  debt.  The way the debt occurred, Your Honor, was that PQPR

16  sold to FSS on open account and they kept a ledger, right.

17  And so those accounting issue -- entries are all, of course,

18  relevant, right.  My problem is that -- and when we got the

19  document requests while I was on vacation, it demanded a

20  response in eight days at that time.

21          We weren't able to do that.  My problem is that

22  that ledger has a lot of other things in it, right, such as

23  every purchase my client's ever made.  Right, it's my

24  client's general ledger and we don't find that to be germane

25  to any of the discussions.  So what we have is we have a

1    compilation done by the forensic accountant of all of those

2    and we can work with everybody to get them what they need

3    regarding the existence of the debt.  I don't have a problem

4    with that, Your Honor.

5          Just want to say one other thing, and that is

6    yesterday I called Mr. Martin and I said, what is it that

7    you guys really want.  And he said well, we need your

8    spreadsheets in native format and I agreed immediately.  I

9    said, they won't be Bates labeled that way, but we'll give

10   them to you.  And he said Mr. Moshenberg may want something

11   different.  I got an extensive email from him last night.  I

12   responded.  I called him.  Finally reached him this morning.

13         I said, what is it that you really want on an

14   emergency basis.  He said, I need you to withdraw every

15   single one of your objections and produce every single

16   document.  Judge, we will absolutely work with him.

17         Let me just mention one other thing, Your Honor,

18   that's a concern to us and that is we have asked for a

19   protective order in this case and we've circulated.  We

20   think we have agreement on the protective order, but there

21   are parties that are downloading our documents that we sent

22   to them and I don't know who those parties are exactly.

23         And so I've asked for them to tell us who has

24   signed off on the protective order but this illustrates one

25   of the problems in this case and that is, you know, this is

1    my client's proprietary information and we do not want it

2    traveling around the world.  So -- and so the protective

3    order that everybody has agreed to is just the standard

4    Southern District protective order with no changes

5    whatsoever.  But for that reason, we have concerns about

6    production in this case and we do need the signed signature

7    pages on the protective order before people are downloading

8    our documents.

9         So with all that said, Your Honor, we absolutely

10   will produce all of the documents relating to the debt.  You

11   know, we just need this tailored a little bit and we'll get

12   them all of that.

13        THE COURT:  Let me -- what I'm thinking about

14   doing, a couple of things and Mr. Lemmon, (indiscernible)

15   stand here, I want you to -- give the opportunity to react

16   to what I'm saying.  I'm going to deny your request for

17   emergency consideration to appoint the Subchapter V Trustee.

18   I'm going to -- expand the powers of the Subchapter V

19   Trustee.  I want to take everything up at one time.  I want

20   to take everything up on the 12th.  I want to think about

21   everything and I'm going to make a decision about

22   everybody's requests at that time.

23        That doesn't mean that the Subchapter V Trustee

24   can't, if she's doing whatever work she has, I'm not here to

25   impede whatever she's doing.  I'm just saying I want to take

1    up the consideration and sign whatever I'm going to sign

2    because what I don't want to do is, quite frankly, limit her

3    or limit myself in any way.  I want to have the full range

4    of options to -- based on evidence that I hear as to what I

5    think the Subchapter V may or may not be doing.  May want to

6    do more.  May want to do a little bit less.  Just -- I just

7    need to hear what the evidence is and I want to take it up

8    all at the same time.

9           I'm also going to say I don't think I need to rule

10   on anything today, but everybody reserves the right to come

11   back and tell me.  I am asking all of the professionals in

12   this case -- I understand the history here.  Understand that

13   there's a lot of tension between clients but I expect the

14   professionals to work together and to do it, so I think I'm

15   really reaching out to both sides, asking everyone to really

16   consider the rhetoric in the papers and the -- what gets

17   presented at the hearing.

18          I just am asking all the professionals to really

19   talk about what they want in connection with this hearing

20   and what you need in connection with cash collateral.  And

21   if the parties can't work it out, then come back to me but -

22   - I'll leave it there.

23          I think there's a way for you -- comes to

24   questions about protective orders, I think that's standard.

25   I think professionals should be able to work through that

1    really easy.  So I hope no one is downloading information

2    and taking advantage of information without protection, if

3    that's what folks are looking for.  At the same, Mr. Lemmon,

4    when it comes to PQPR, if there are additional documents

5    that are responsive, at some point someone's going to have

6    to say I do agree with Mr. Moshenberg; here's all I've got

7    and I've got nothing else, and I think that representation

8    is standard.

9         I don't think you need to remove your objection,

10   quite frankly, but I do think at some point people need to

11   know, you know, this is all you've got so that when they

12   show up to a hearing, they know that they've received all

13   responsive documents -- responsive nonprivileged documents.

14   So -- and I know the professionals here.  I'm talking very

15   basic standard things here, so I'll leave it there.

16        MR. LEMMON:  And Judge, just so I'm clear, and we

17   will produce everything related to the debt.  We would

18   produce an org chart.  I'm told there is not one.  But we

19   don't have a problem at all with that and we'll take all

20   these things up on the 12th, I suppose.

21        THE COURT:  That's when I want to take it up.  If

22   parties have different views on all this, they can certainly

23   take it up, but I don't want to take it up.  I don't know

24   what I'm going to hear on the 12th.

25        MR. LEMMON:  Sure.

1          THE COURT:  And regardless of how I rule on the

2     12th, I think the Subchapter V Trustee has to do her job and

3     do her job the way she sees fit, so that's not for me to --

4          MR. LEMMON:  May --

5          THE COURT:  -- up now.

6          MR. LEMMON:  May I say one thing, Your Honor?

7          THE COURT:  Sure.

8          MR. LEMMON:  And -- the meeting we had yesterday

9     with the Subchapter V Trustee and counsel was characterized

10    as some sort of sales job.  Would that I was such a great

11    advocate that I could put a sales job over on Ms. Freeman or

12    --

13         THE COURT:  I don't want to get into it.

14         MR. LEMMON:  -- you know, Ms. Haselden and it's --

15    it was informational.  We're happy to cooperate to the

16    fullest extent with the Sub V Trustee, so.

17         MR. MOSHENBERG:  (indiscernible).

18         THE COURT:  Yeah, absolutely.

19         MR. MOSHENBERG:  I am confident we're going to be

20    able to work together and figure out the scope of what is

21    discoverable, but I do want to make sure we're on the same

22    page about timing, Your Honor.  We have a deposition on the

23    4th.  His position has been that you can get the documents

24    after the deposition.  We think we're entitled to them

25    beforehand.  That was what was agreed to.

1            THE COURT:  I feel really confident that that's

2    probably not going to be the case after today.

3            MR. MOSHENBERG:  That -- I'm sorry.

4            THE COURT:  That you will receive the documents in

5    time to take a deposition.

6            MR. MOSHENBERG:  That we will?

7            THE COURT:  Yeah.

8            MR. MOSHENBERG:  Okay.

9            THE COURT:  I feel pretty confident about that,

10   without me having to get involved.

11           MR. MOSHENBERG:  I appreciate that, Your Honor,

12   and --

13           THE COURT:  I feel really confident that you're

14   not going to get them, like, October 1st, either.  You know,

15   that you'll get them in due course as quickly as possible on

16   a rolling basis.

17           MR. MOSHENBERG:  I appreciate that.

18           THE COURT:  That sounds right to me.

19           MR. MOSHENBERG:  I appreciate that, Your Honor.

20           THE COURT:  And look, I'm here on 24 hours'

21   notice, so if you get nervous, if things are getting tight

22   and you don't think things are going the way they are, I can

23   -- you know, it's just an email to my case manager, right,

24   and we can get on the phone in less than 24 hours we can

25   have a hearing, or the same day.  So this isn't saying I'm

1    continuing everything, right, and maybe the issue become

2    moot.  Maybe it doesn't.  But I'm here and I'm just hoping

3    that the professionals can -- I'm asking the professionals

4    to get in a room and have a serious meeting about what's

5    needed.  I think you're probably entitled to a lot of what

6    you've asked for but maybe it just needs to be narrowed in a

7    way that would make sense in light of the timing in terms of

8    where we are, and I think that can be accomplished in fairly

9    short order.  The documents either exist or they don't.  Mr.

10   Lemmon either can produce them or not and we'll see where it

11   goes.

12           MR. MOSHENBERG:  That's fair, Your Honor.

13           THE COURT:  And everybody's rights are reserved.

14   Everybody's rights are reserved, U.S. Trustee's rights, any

15   other creditors' rights, Subchapter V Trustee's rights,

16   Debtor's rights, everybody's rights are reserved on these

17   issues.  I think we've just got to get to the 12th and then

18   see where things go, right, and if this gets -- we'll see

19   where things are at that time.  But I'm really, really

20   asking the professionals to hear what I'm saying and I don't

21   think anyone has to agree on anything.

22           I do think it makes sense to be civil and work

23   through these issues as the professionals, take care and do

24   it.

25           Is there anything -- I'm going to sign that order,

1   cash collateral extension order today.  Let me ask the U.S.

2   Trustee, since I've got you here.  Is there anything -- I

3   saw that you filed objections to certain retention

4   applications.  Two of those individuals aren't here, so I

5   don't want to pick a date to take that up.  I don't want to

6   take it up on the 12th.  That seems like a lot --

7          MR. NGUYEN:  Understood, Your Honor.  Mr. Shannon

8   --

9          THE COURT:  -- in one day.  Mr. Shannon, I just --

10  but maybe you all can get together and we can pick a date

11  and just reach out to my case manager at that time.  I don't

12  need to comment.  I haven't read them -- haven't read

13  anything.

14         MR. NGUYEN:  Sure --

15         THE COURT:  I just say that it got filed, but

16  maybe we can pick a date.  There's a lot, I think, scheduled

17  for the 12th and I think there's -- has to be a day where we

18  can do retentions on a separate track.

19         MR. SHANNON:  Yeah.  Your Honor, one thing that --

20  there is a status hearing set in this case for September

21  20th.

22         THE COURT:  Yes, that's --

23         MR. SHANNON:  And I think that's probably about

24  the -- you know, it's quick, but still has some time for

25  gathering the required information.  So Your Honor, we would

1    request setting those applications to employ the CRO and

2    Shannon and Lee LLP on that date, if possible.

3            THE COURT:  You want to take it up at that hearing

4    on the 20th?

5            MR. SHANNON:  Yes, on September 20th.

6            MR. NGUYEN:  Your Honor, I have no problem with

7    that.  I understand Mr. Shannon doesn't want to put his

8    employment at risk.  He doesn't want to work longer than,

9    you know, Your Honor's --

10           THE COURT:  No, no, no.

11           MR. NGUYEN:  I'm certainly -- you know, we'll work

12   with the schedule.  I told Mr. Shannon this morning,

13   whenever he wants to do it, we'll be ready.  We'll raise our

14   objections and go forward with it.

15           THE COURT:  Let me just take a look at something.

16   Scheduled at one o'clock for the 20th?  Is that right?

17           MR. SHANNON:  I believe so, Your Honor.

18           THE COURT:  Okay.  Okay.  Yeah, let's take it up

19   at one.  Okay.  That works for me, September 20th at 1 p.m.

20           MR. NGUYEN:  And just for clarity, Your Honor, Mr.

21   Shannon and I spoke this morning.  He requested a little bit

22   more clarity on my objection.  I use an entity instead of an

23   individual.  I normally do that to tone down the rhetoric,

24   but Mr. Shannon asked me to be more clear in terms of when I

25   make the --

1           THE COURT:  I understand.

2           MR. NGUYEN:  I'm going to file a corrected motion.

3    If he wants me to be clear, I'm happy to do it and I'm not -

4    - I just want to make sure the record's clear.  That

5    corrected motion is going to be filed sometime this

6    afternoon or by the end of the day.

7           And then the second thing is, we talked about some

8    limited discovery.  It's very limited in terms of the scope

9    of the employment -- the scope of the engagement that

10   occurred between May 24th through May 31st, and Mr. Lee in

11   his declaration, there was about $21,000 of services.  I

12   asked Mr. Shannon to explain what those services are and we

13   just need some records of that to go forward with twenty --

14   other than that, I don't intend at the hearing on the 20th

15   it's going to go long.

16          THE COURT:  Okay.  No, no.  I'll give it as much

17   time as we need.  It's important, but I appreciate it so

18   that -- really appreciate you thinking about that.  So can

19   we -- do you think, Mr. Schwartz, we can take that up on the

20   20th as well?

21          MR. SHANNON:  I believe Mr. Schwartz will be here

22   anyway.

23          THE COURT:  For the status report?

24          MR. SHANNON:  For the status report.

25          THE COURT:  Okay.

1        MR. SHANNON:  And again, Your Honor, I do believe

2    that the U.S. Trustee's primary objection is about the

3    disclosures in the InfoW case.  That's really the crux of

4    the objection and what will need to be investigated, so it's

5    not -- I don't think it goes beyond that.

6        MR. NGUYEN:  That's correct.  There was a prior

7    nondisclosure that occurred before you.  There's going to be

8    some legal arguments on how you should address that, but

9    that's where we are with the objection.

10       THE COURT:  I can -- we'll take it up on the 20th

11   and if Mr. Schwartz, you can just -- I will assume Mr.

12   Schwartz will be here, but if anything changes just reach

13   out to Ms. Saldana and let her know, but I will -- we will

14   set Schwartz' application as CRO and Shannon and Lee and

15   take it up at -- on the 20th.

16       Ms. Haselden, anything we need to talk about?

17   Anything from your perspective before the 20th?

18       MS. HASELDEN:  (indiscernible).

19       THE COURT:  All right.  I do note -- and this is a

20   hyper technical point and I want to -- well, you're telling

21   me.  If there's anything you want to talk about, I'll take a

22   look at something.

23       MS. HASELDEN:  Your Honor knows this case is very

24   unusual and because of the motions that have been filed by

25   both the parties in the case, the Debtor and the plaintiffs,

1    seeking to expand my role, I mean, I've found it necessary

2    first to go ahead and engage counsel.  And then, you know,

3    Mr. Lemmon had requested that we meet with his client and

4    because of the nature and the posture of the case, we went

5    ahead and set the meeting.  I think, you know, at some point

6    we will need a little clarification on exactly what I need

7    to do.

8         Normally, some of this investigatory work, you

9    know, is not necessary, so I guess between now and the 12th,

10    I'll try to figure out --

11         THE COURT:  Yeah, look, I mean, I'm interested to

12    know your thoughts as well on -- you know.  That's why I

13    don't want to -- I don't want to take anything up on a rush.

14    I don't know what the evidence is.  I don't know what the

15    evidence is going to show.  May show something, may show

16    nothing.

17         I think I'd want to know if, you know, as I

18    consider expanding the role of the Subchapter V Trustee,

19    what you would see that role to be and what you think it

20    should be as well, if anything.  I don't want to put any

21    words or thoughts in your -- in you.  I just want to know

22    that I -- you're an important part of the Subchapter V

23    process and I want to know what you think.  Okay?

24         MS. HASELDEN:  Thank you, Your Honor.  Yes.  We're

25    learning and the parties are all at this point cooperating

1    and providing information.

2         THE COURT:  So Mr. Shannon, the only hyper

3    technical point is 1188(c) requires the report get filed on

4    the docket before the meeting, 14 days before.

5         MR. SHANNON:  Yes, Your Honor.  I believe you --

6         THE COURT:  The hearing.

7         MR. SHANNON:  I believe you filed an order that

8    set the date that the --

9         THE COURT:  I did.

10        MR. SHANNON:  -- status report needs to be filed.

11        THE COURT:  I did.

12        MR. SHANNON:  And I believe it's today, is what

13   that order says.

14        THE COURT:  No.  That's what I was trying to --

15        MR. SHANNON:  I'm sorry.  I don't remember the

16   docket number, unfortunately.

17        THE COURT:  Yeah.

18        MR. SHANNON:  Around 50 or so.

19        THE COURT:  That makes two of us.  Let's see.  If

20   today's the day, I just want to make sure something gets

21   filed so we comply with the code.  That's where I was going.

22   It wasn't to -- anything other than that.  I just want to

23   make sure that we're complying with -- that a status report

24   gets filed so that we're compliant with the Bankruptcy Code.

25        MR. SHANNON:  Yes, Your Honor.  And I just went,

1   what your order said rather than --

2          THE COURT:  No, no, no, you should.  You should.

3          MR. SHANNON:  Okay.

4          THE COURT:  No, no, no.  You absolutely should.

5   No, I -- we set them for a reason on that date and I

6   remember and I just want to make sure that we're all on the

7   same page.  Yeah, it's Docket 65, so --

8          MR. SHANNON:  Yes, Your Honor.  I believe

9   originally the status report, the idea was to actually have

10  it a week after that.  Mr. Schwartz will be out of the

11  country during that week, so I believe that the date for the

12  status conference got pushed back a week and the report did

13  move as well.

14         THE COURT:  No, no, no.  I think we're all on the

15  same page.  Think we're all on the same -- yeah.  Today's

16  your day.

17         MR. SHANNON:  All right.  Thank you, Your Honor.

18         THE COURT:  Sounds like you're having some fun

19  this afternoon.  All right, folks.  Anything else we need to

20  talk about?  All right.  Thank you, everyone.

21         CLERK:  All rise.

22

23      (Proceedings adjourned at 1:49 p.m.)

24

25

```
 1                        CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 20, 2022
```