**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor | § | |

# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

|  |  |
|---|---|
| In re: | ) |
|  | ) Case No. 22- 60043 |
| FREE SPEECH SYSTEMS, LLC, | ) |
|  | ) Chapter 11 (Subchapter V) |
| Debtor. | ) |
|  | ) |

**DEBTOR'S EMERGENCY MOTION FOR AN INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTIONS 105, 361, AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(B) AND (II) GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION SECURED LENDER**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 14 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED, IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 14 DAYS TO ANSWER, IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

RELIEF IS REQUESTED NOT LATER THAN AUGUST 3, 2022.

The above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS"), in the

above-referenced chapter 11 case, hereby files this emergency motion (the "Motion") seeking an

order from the Court (i) authorizing the use of cash collateral pursuant to Sections 105, 361, and 363

of the Bankruptcy Code and Bankruptcy Rule 4001(b); and (ii) granting adequate protection to the Debtor's pre-petition secured lenders. In support of the Motion, the Debtor submits and incorporates by reference the *Declaration of Marc Schwartz in Support of First Day Motions* (the "First Day Declaration"), filed concurrently herewith. In further support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1. On July 29, 2022 (the "Petition Date"), the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code §§ 101, *et seq.* (the "Bankruptcy Code").

2. The Debtor continues in the possession of its property and is operating and managing its businesses as debtor and debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code.

3. No request for a trustee or examiner has been made. No statutory committee of creditors has been appointed.

4. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion are proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory bases for the relief sought in this Motion are 11 U.S.C. §§ 105, 361, and 363 and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure.

## FSS' BACKGROUND[1]

6. Alex Jones began his career in the broadcasting industry fresh out of high school. Austin Public Access provided the forum for Alex's first broadcast. In 1996 he transitioned to talk

---

[1] Additional factual background and information regarding the Debtor and its operations is set forth in the *Declaration of W. Marc Schwartz in Support of Voluntary Petition and First Day Motions*

2

radio.  After leaving talk radio in 1999, he started broadcasting over the internet with a handful of employees.  Revenue was largely generated from advertising and the sale of books, T-shirts, and videos.

7.      What began as a family business continued to expand and in 2007 FSS was formed. The business continued to grow, adding a full blown studio, and employing over 60 people.  By 2013, FSS started selling dietary supplements to its growing listener base.

8.      Despite the rapid growth in the scale, diversity of operations and revenue, FSS remained a family run business and did not retain professional management or install professional management systems.

9.      FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

10.     On its Infowars.com[2] website today, FSS makes available to customers dietary supplements, ranging from Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts and other products Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of dietary supplements which have traditionally been supplied by PQPR Holdings Limited, LLC ("PQPR"), an affiliated entity.

11.     As of July 1, 2022, FSS employed a workforce of 58 individuals, the majority of whom had direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios.

---

[2] FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

This is the building where Jones produces his shows, including The Alex Jones Show. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a building where warehousing and product sales fulfillment takes place. All of the studios and offices are in leased space.

12.　　FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Approximately 80% of FSS' revenue is derived from product sales. Of the remainder, 11% is historically from advertising and the balance from a variety of sources.

13.　　Through its online sales channel, FSS currently sells (i) dietary supplements purchased by PQPR, (ii) dietary supplements purchased by FSS, and (i) books, DVD's, t-shirts, and other merchandise purchased by FSS.  The allocation of proceeds from the sale of products after credit card processing charges varies depending upon which of the above categories the product falls under, PQPR receives a fee for of ten percent of the net proceeds (the proceeds from the sale of the products less processing charges, as a royalty for introducing the supplement and vitamin market to FSS.

14.　　Due to the content of Alex Jones' shows, Jones and FSS have faced an all-out ban of Infowars from mainstream online spaces. Shunning from financial institutions and banning Jones and FSS from major tech companies began in 2018. Today, Facebook, Twitter, YouTube, Spotify, PayPal, and Apple have banned Infowars and Jones. Since being deplatformed by most mainstream commercial entities in 2018, FSS has had to operate in a harsh and unfriendly commercial environment.

15.　　FSS purchased to sell on its website two categories of products: (a) dietary supplements ("Supplements"), and (b) books, DVDs, t-shirts, and other merchandise ("Non-Supplements"). FSS relied on PQPR as no other vendor would supply the Supplements for Jones to

advertise on his shows. PQPR ordered and paid for Supplements, which it marked up, and then sold to FSS. Jones would publicize the Supplements on his show and FSS and/or PQPR fulfilled the orders to ship to its customers.

16.     As to Non-Supplements, FSS purchased the products, sold them, and fulfilled the sale through its own employees from its warehouse in Austin. Depending on whether a Supplement or Non-Supplement was sold, FSS and PQPR split the cost of the sale on an agreed to formula.

17.     Since 2018 FSS has had difficulty finding third parties willing and able to fulfill product sales.  In the past, both FSS and PQPR attempted to provide fulfillment services for product sales.  Recently, FSS employed a fulfillment company to take over this function. All former FSS employees responsible for fulfillment have been hired by this company.  The fulfillment company charges FSS a flat fee per order regardless of size.  Historically, fulfillment has cost an average of ten percent of sales, without considering payroll, the new agreement is estimated to cost sixteen percent of sales.

## PQPR INDEBTEDNESS

18.     As discussed above, PQPR ordered and paid for Supplements which it marked up and then sold to FSS. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

19.     The indebtedness to PQPR had accrued over a period of years from the sale of PQPR products through the Debtor's internet platform, generated by the Debtor and Alex Jones' sponsorship of those products.  The PQPR Note balance represents the unpaid share of the proceeds from product sales by PQPR to FSS over a four year period for which the Debtor did not fully remit the proceeds to PQPR.

20. On or about August 13, 2020, the Debtor executed that certain Promissory Note in favor of PQPR in the original principal amount of $29,588,000.00 (the "PQPR Note"). A security agreement of the same date granted PQPR a security interest in all of the Debtor's personal property assets, including but not limited to the Debtor's tangible and intangible property, accounts, and proceeds derived from those assets (the "PQPR Security Agreement"). PQPR filed a UCC-1 financing statement with the Texas Secretary of State that on November 18, 2020.

21. The PQPR Security Agreement secures the obligations under the PQPR Note and any future advances owing by the Debtor to PQPR. Specifically, "Obligations" is defined in the PQPR Security Agreement to include "any and all other obligations of Debtor to [PQPR] of any kind or character, now owed or hereafter arising."

22. Subsequent to the date of the PQPR Note, the Debtor accrued additional indebtedness to PQPR representing a portion of PQPR's share of the proceeds from product sales from the date of the PQPR Note through November 10, 2021, for which the Debtor did not fully remit the required proceeds to PQPR. The Debtor executed a second promissory note ("Second PQPR Note" and together with the PQPR Note, collectively the "PQPR Notes") in the amount of $25,300,000. The Second PQPR Note is also secured by the PQPR Security Agreement.

23. As of the Petition Date, $53,655,082.29 of principal and $11,794,19 of interest are due and owing under the PQPR Notes.

## RELIEF REQUESTED

24. Cash collateral is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of

rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." [6] 11 U.S.C. § 363(a).

  25.  11 U.S.C. § 363(c)(2) states as follows:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
> > (A)  each entity that has an interest in such cash collateral consents; or
> > (B)  the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

  26.  The Debtor is in possession of certain funds which are not proceeds of PQPR's collateral. Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR. Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR's cash collateral.

  27.  The Debtor requires the use of cash collateral to pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, inventory purchases, lease payments, marketing, taxes, and insurance. Those uses required in the next fourteen (14) days from the date of the emergency hearing are set forth on the budgets attached hereto as **Exhibit A** and incorporated herein by reference. The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, including the PQPR, and any other secured creditors purporting to hold an interest in the Debtor's cash collateral during the first fourteen (14) days of the Chapter 11 Cases (the "Interim Period"). The Debtor also requests that continued use of cash collateral is equally necessary to preserve the value of the Debtor's assets and rights of all of the constituencies with claims or interests in this Chapter 11 Case.

7

28.     Section 363 of the Bankruptcy Code authorizes a debtor to use cash collateral if those parties having an interest in such cash collateral consent or the court authorizes the use.  *See* 11 U.S.C. § 363(c)(2). The use of cash collateral, however, may be prohibited or conditioned, upon proper request, as necessary to adequately protect any interest in cash collateral. *See* 11 U.S.C. §363(e).

29.     A court may authorize the use of cash collateral upon showing that those with an interest in the cash collateral are adequately protected. *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, (Bankr. S.D. Tex. 2009) ("in order for this Court to authorize the use of cash collateral, the Lender must be adequately protected); *In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) (A debtor requesting court approval to use cash collateral has the burden of proof as to the issue of "adequate protection".) Adequate protection requires examination of the creditor(s)' aggregate collateral position, not simply protection of its lien on cash. Adequate protection may be provided by granting replacement or additional liens "to the extent [that the use of cash collateral] results in a decrease in the value of [an] entity's interest in property." *See* 11 U.S.C. § 361(2). Authorizing a debtor to use cash collateral on an interim basis is appropriate where, as here, continuing the business as a going concern will cause the generation of future revenues upon which the secured lender is granted replacement liens. *See, e.g., In re Neise, Inc.,* 16 B.R. 600 (Bankr. D. Fla. 1981); *In re Certified Corp.*, 51 B.R. 768 (Bankr. D. Haw. 1985); *In re Post- Tron Systems, Inc.*, 106 B.R. 345 (Bankr. D.R.I. 1989).

30.     By authorizing the Debtor to use cash collateral, the Court will place the Debtor in a position to fund its operating expenses and to operate as a going concern for the immediate future. The Debtor needs to use cash collateral in order to, *inter alia*, pay its employees, suppliers, and meet other on-going business obligations. Without the authority to use cash collateral, the Debtor will be unable to fund its business operations in a manner that will allow the Debtor to continue to operate, to the detriment of *all* of the Debtor's creditors, including the lenders referred to herein and the pool

of unsecured creditors. Furthermore, without the ability to fund continuing operations, the Debtor and its estate will suffer immediate and irreparable harm. For example, employees will not continue to provide services if they are not paid the wages for which they have already worked, and vendors will not continue to provide necessary services or supplies if they are not paid. Therefore, the Debtor seeks the emergency relief requested herein.

31.     Attached to this Motion is a proposed form of the Interim Cash Collateral Order (the "Interim Cash Collateral Order") that authorizes the Debtor's use of cash collateral.

32.     The proposed offer of adequate protection on an interim basis is set forth in the attached proposed Interim Cash Collateral Order and incorporated by reference herein for the purpose of setting forth the proposed offer of adequate protection for lenders. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent of the diminution of value of each lender's collateral, if any, and failure of other forms of adequate protection provided by the Debtor. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, and court-approved administrative expense claims of estate professionals.

33.     The Debtor believes that the terms of the proposed Interim Cash Collateral Order as set forth above are fair and reasonable under the circumstances. The Debtor asserts that the value of PQPR's cash collateral will not diminish as a result of the use of cash in this case. The value of PQPR's interest in cash may fluctuate, but such value should not diminish, other than minimally, over the next fourteen (14) days, the period of interim relief requested.

34.     The Debtor believes that PQPR is entitled to the protections set forth in the proposed Interim Cash Collateral Order. The adequate protection provisions have been drafted to provide

protection without taking undue or inappropriate value from the estate or its unsecured creditors. Given that the interests of the lenders will be adequately protected, it is in the best interest of the Debtor, its estate, and all of their creditors to be able to continue operations during the Interim Period and for the Debtor to be authorized to use cash collateral as requested herein.

35.     Therefore, the Debtor respectfully requests that it be authorized to use cash collateral as proposed herein for the purposes of paying necessary business expenses as allowed by Section 363 of the Bankruptcy Code, and that the Court grant PQPR a replacement lien on post-petition assets, as allowed by Sections 361, and/or 363 of the Bankruptcy Code, consistent with the terms and provisions contained in this Motion. The Debtor requests that this relief be granted on both an interim and final basis.

## RESERVATION OF RIGHTS

36.     The Debtor reserves any and all rights in connection with the Heslin\Lewis Suit. Nothing contained herein shall operate as a waiver of any of the Debtor's claims, rights or remedies.

## NO PRIOR REQUEST

37.     No previous request for the relief sought herein has been made to this Bankruptcy Court or any other court.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, PREMISES CONSIDERED, the Debtor respectfully requests the Court (i) authorize the use of cash collateral pursuant to Sections 105, 361, and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b); (ii) grant adequate protection to the pre-petition secured lenders; and (iii) grant such other and further relief as the Court may deem proper.

Respectfully submitted this 29th day of July, 2022.

**LAW OFFICES OF RAY BATTAGLIA, PLLC**

/s/*Raymond W. Battaglia*
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Proposed Counsel to the Debtor and Debtor-In-Possession*

-and-

**SHANNON & LEE LLP**

/s/*Kyung S. Lee*
Kyung S. Lee
State Bar No. 12128400
klee@shannonleellp.com
R. J. Shannon
State Bar No. 24108062
rshannon@shannonleellp.com
700 Milam Street, STE 1300
Houston, Texas 77002
Tel. (713) 714-5770

*Proposed Co-Counsel to the Debtor and Debtor in Possession*

## CERTIFICATE OF ACCURACY

I hereby certify that the forgoing statements are true and accurate to the best of my knowledge and belief. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ *Raymond W. Battaglia*

## CERTIFICATE OF SERVICE

I hereby certify that on the date of filing, a true and correct copy of the foregoing document was served by (a) the Court's CM/ECF system on all parties registered to receive such service, (b) by U.S.P.S. first class mail on all parties indicated in the attached service list, and (c) the following parties by email:

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
mark@fbtrial.com
bill@fbtrial.com

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com

Attn: F. Andino Reynal
Fertitta & Reynal LLP
917 Franklin St., Suite 600
Houston, TX 77002
areynal@frlaw.us

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
ehenzy@zeislaw.com

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401
sjordan@jhwclaw.com

Attn: Avi Moshenberg
McDowell Hetherington LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
avi.moshenberg@mhllp.com

Attn: Cordt Akers
The Akers Law Firm PLLC
Cordt Akers
3401 Allen Parkway, Suite 101
Houston, TX 77019
cca@akersfirm.com

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065
dan@copycatlegal.com

Ryan E. Chapple
Cain & Skarnulis PLLC
303 Colorado Street, Suite 2850
Austin, Texas 78701
rchapple@cstrial.com

Cliff Walson
Walsont Bowlin Callendar, PLLC
4199 San Filipe Street, STE 300
Houston, TX 77027
cliff@wbctrial.com

Jon Maxwell Beatty
The Beatty Law Firm PC
1127 Eldridge Pkwy, Suite 300, #383
Houston, TX 77077
max@beattypc.com

*/s/ Raymond W. Battaglia*

## USPS Service List

Twenty Largest Unsecured Creditors

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

eCommerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

## Parties Claiming Interest or Lien Affected

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

## Parties Filing Notice of Appearance

N/A

## Subchapter V Trustee

N/A (Not Yet Appointed)

## U.S. Trustee

Office of the U.S. Trustee
515 Rusk Ave STE 3516
Houston, TX 77002

## Additional Notice Parties

Attn: Mark Bankson, William Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008

Attn: Alinor C. Sterlin, Christopher Mattei,
Matthew Blumenthal
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 22- 60043 |
| | ) | |
| FREE SPEECH SYSTEMS, LLC, | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## INTERIM ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING PARTIAL ADEQUATE PROTECTION

On July 29, 2022, the above-captioned debtor and debtor-in-possession (the "Debtor" or "FSS") in the above-captioned chapter 11 case (the "Case"), filed its *Emergency Motion for an Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and (II) Granting Adequate Protection to the Pre-Petition Secured Lender* (the "Motion"). In the Motion, the Debtor requested, *inter alia*, entry of this interim order (this "Order") pursuant to Sections 105, 361, and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and in accordance with Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor's use of Cash Collateral (as hereinafter defined), as set forth herein. The Court, having considered the Motion, and having held an interim hearing on the Motion on August ___, 2022 (the "Interim Hearing"), and having considered the evidence presented or proffered and the statements and representations of the parties on the record at the Interim Hearing; and all objections, if any, to the entry of this Interim Order having been resolved or overruled; and after due deliberation and consideration and sufficient cause appearing therefor;

1.     The Chapter 11 Case. On July 29, 2022 (the "Petition Date") the Debtor commenced the above captioned case by filing a voluntary petition for relief under Subchapter V of Chapter 11

of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas (this "Court").

2.      Debtor-in-Possession. The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to Section 1182(2) of the Bankruptcy Code. To date, no trustee or examiner has been appointed in this Case. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

3.      Jurisdiction and Venue. This Court has jurisdiction over the Case, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion is a core proceeding under 28 U.S.C. § 157(b). Venue of the Case and the Motion in this Court is proper pursuant to 28 U.S. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 361, and 363 of the Bankruptcy Code, Bankruptcy Rule 4001, and the Local Rules of this Court (the "Local Rules").

4.      Committee Formation.      To date, no official committee (a "Committee") of unsecured creditors, equity interest holders, or other parties in interest has been appointed in the Case.

5.      Notice. On July 29, 2022, the Debtor served copies of the Motion and notice of the Interim Hearing to all creditors and parties in interest entitled to such notice in compliance with Bankruptcy Rules 2002, 4001, 9014, and the Local Rules, including: (i) the Office of the United States Trustee for this District, (ii) those creditors holding the twenty (20) largest unsecured claims against the Debtor's estate, (iii) PQPR Holdings Limited, LLC Trust ("PQPR"), and (vi) any other secured parties of record. Under the circumstances, such notice of the Interim Hearing and the emergency relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rule

4001 and the Local Rules, and no other or further notice of the Interim Hearing or the relief granted in this Interim Order is necessary or required.

6. <u>Immediate Need for Use of Cash Collateral</u>.  The Debtor asserts that an immediate and critical need exists for the Debtor to use Cash Collateral in order to continue the operation of its business. Without such use of Cash Collateral, the Debtor asserts that it will not be able to pay post-petition direct operating expenses and obtain goods and services needed to carry on its business in a manner that will avoid irreparable harm to the Debtor's estate. The Debtor further asserts that its ability to use Cash Collateral is necessary to preserve and maintain the going concern value of the Debtor's estate.

7. <u>Conditional Consent to Use of Cash Collateral</u>. The Debtor seeks authorization to use Cash Collateral to pay the Debtor's ordinary and necessary operating expenses set forth in the budget attached to the Motion as Exhibit A (the "<u>Budget</u>") for the period (the "<u>Interim Period</u>") from the Petition Date through and including August 15, 2022 (the "<u>Termination Date</u>").

8. <u>Good Cause/Fair and Reasonable Terms</u>. Good cause has been shown for the entry of this Order. Among other things, entry of this Order will minimize disruption of the business and operations of the Debtor and permit the Debtor to maintain the going concern value of its business. The use of Cash Collateral authorized hereunder is necessary, essential, and appropriate and is in the best interest of, and will benefit, the Debtor, its creditors, and the Debtor's bankruptcy estate as it will, among other things, provide the Debtor with the necessary liquidity to (i) avoid immediate and irreparable harm to the Debtor and its bankruptcy estate; and (ii) preserve and maximize the value of the Debtor's business and assets. The terms and conditions of the use of Cash Collateral and the

Case 22-50043 Document 884-1 Filed in TXSB on 01/28/23 Page 19 of 25

security interests, liens, rights, and priorities granted to the lenders hereunder are fair and appropriate under the circumstances.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      <u>Motion Granted</u>. The Motion is hereby granted on an interim basis as set forth herein. Any objections to the entry of this Order that have not been previously resolved or withdrawn are hereby overruled on their merits.

2.      <u>Interim Order</u>. This Order shall be considered an interim cash collateral order and shall be binding upon all parties and upon all subsequently appointed court officers, including any trustee appointed in the Case under Chapter 7 or Chapter 11 of the Bankruptcy Code.

3.      <u>DIP Account</u>. The Debtor shall maintain debtor in possession ("<u>DIP</u>") accounts at Axos Bank which accounts shall contain all operating revenues and any other source of cash constituting Cash Collateral, which is (or has been) generated by and is attributable to the Debtor's business (the "<u>DIP Account</u>").  All cash generated by the Debtor or from the Debtor's business or assets, including any cash held in any of the Debtor's pre-petition bank accounts, shall be immediately transferred by the Debtor to the DIP Account. The Debtor shall be prohibited from withdrawing or using funds from the DIP Account except as provided for in the Budget, this Order, or pursuant to further order of the Court.

4.      <u>Terms of Cash Collateral Use</u>. The Debtor is hereby authorized to use Cash Collateral to pay the items set forth in the Budget, and up to the respective aggregate amount of disbursements set forth in the Budget for any week during the Interim Period, subject to the Permitted Variance (as hereinafter defined). The Permitted Variance shall be defined as 10% per line item and 20% of the

4

overall Budget. The Debtor shall not use, sell, or expend, directly or indirectly, the Cash Collateral except pursuant to the Budget and upon the terms and conditions set forth in this Order.

5.      No Payments to Insiders. Other than as provided for in the Budget, the Debtor shall not make any payment to or for the benefit of any insider of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

6.      Further Authorization.  The Debtor is hereby authorized to enter into all agreements pursuant to the terms of this Order necessary to allow the Debtor to use Cash Collateral subject to the terms of this Order in the amounts and for the expenses set forth on the Budget. The Debtor is authorized to collect and receive all accounts receivable and other operating revenues and immediately deposit same in the DIP Account.

7.      Taxes.  Nothing in this Order shall be construed to grant PQPR (the "Pre-Petition Lender") liens which are senior to pre- and post-petition statutory ad valorem real property tax liens. The Debtor shall remain current in all post-petition tax payments and reporting obligations, including, but not limited to, all ad valorem real property taxes and federal trust fund taxes.

8.      Adequate Protection – Replacement Liens.        As adequate protection for any diminution in value of each of the Pre-Petition Lender's interest in the Debtor's collateral, if any, including Cash Collateral, resulting from the imposition of the automatic stay with respect to the Collateral and/or the Debtor's use, sale or lease of the Collateral during the Case (the "Diminution in Value"), the Pre-Petition Lender is hereby granted, effective as of the Petition Date, valid, binding, enforceable, and automatically perfected liens (the "Replacement Liens") in all currently owned or hereafter acquired property and assets of the Debtor, of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising (excluding

avoidance or other causes of action arising under chapter 5 of the Bankruptcy Code), and all proceeds and products of the foregoing (collectively, the "Adequate Protection Collateral"). The Replacement Liens granted pursuant to this Order shall have the same priority as each of the Pre-Petition Lender's properly perfected unavoidable pre-petition liens but shall be subject to the Carve Out.

9. Adequate Protection – Priority Administrative Claim. As additional partial adequate protection for the Debtor's use of Cash Collateral, to the extent of any Diminution in Value and a failure of the other adequate protection provided by this Order the pre-petition lenders shall have an allowed priority administrative expense claim in this Case and any successor case as provided in and to the fullest extent allowed by Sections 503(b) and 507(b) of the Bankruptcy Code and otherwise (the "Adequate Protection Priority Claim").

10. Carve Out. The Replacement Liens and Adequate Protection Priority Claim granted herein shall be subject to (a) unpaid fees payable to the Clerk of the Bankruptcy Court or the United States Trustee; (b) subject to the Budget, court-approved administrative expense claims of estate professionals, employed pursuant to order of this Court (collectively, "Estate Professionals"), for incurred but unpaid fees, expenses and other costs (all such carve-out amounts referenced above, collectively, the "Carve Out").

11. Subsequent Modification of Order. If any or all of the provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity of any obligation, indebtedness or liability incurred by the Debtor from the Petition Date through the effective date of such modification, vacation or stay, or the validity or enforceability of any security interest, lien or priority authorized or created by this Order.

6

12.    <u>Final Cash Collateral Hearing</u>: A final hearing on the Motion shall be held before this Court on August _____ 2022, at __:___.m. Central time.  Objections to the entry of a final order approving the Motion shall be filed and served on counsel for the Debtor and pre- petition lenders not later than 4:00 p.m. Central time on August _____ 2022.

Dated: August ___, 2022

_____
                        UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

**13-Week  Budget**

**Free Speech Systems LLC**

## Forecasted 13 Week Cash Flow Budget

Between July 30, 2022 and October 28, 2022

| | Period 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **Income** | | | | | | | | | | | | | | |
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 7,741,357.16 |
| Advertising | - | - | - | 480,166.46 | - | - | - | 480,166.46 | - | - | - | 480,166.46 | - | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | $ 40,836.21 |
| **Total Income** | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 9,222,692.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | - | (250,000.00) | - | (500,000.00) | - | - | - | - | - | - | - | - | - | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | - | - | - | (27,270.00) | - | - | - | (27,270.00) | - | - | - | - | (81,810.00) |
| Texas Sales Tax | (5,337.87) | - | - | - | (5,337.87) | - | - | - | (5,337.87) | - | - | - | - | (16,013.61) |
| **Total Cost of Goods Sold** | (262,569.67) | (479,961.80) | (229,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | - | - | - | (3,041.98) | - | - | - | (3,041.98) | - | - | - | - | (9,125.93) |
| Print Media | (3,000.00) | - | - | - | (3,000.00) | - | - | - | (3,000.00) | - | - | - | - | (9,000.00) |
| Radio Show Advertising | (11,500.00) | - | - | - | (11,500.00) | - | - | - | (11,500.00) | - | - | - | - | (34,500.00) |
| **Total Advertising & Promotion** | (17,541.98) | - | - | - | (17,541.98) | - | - | - | (17,541.98) | - | - | - | - | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | - | (1,608.39) | - | (2,082.90) | - | (1,608.39) | - | (2,082.90) | - | - | (1,608.39) | - | (11,073.89) |
| Software License Fees | (140.80) | - | - | - | (140.80) | - | - | - | (140.80) | - | - | - | - | (422.40) |
| Server Hosting Service | (28,595.13) | - | - | - | (28,595.13) | - | - | - | (28,595.13) | - | - | - | - | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | - | - | - | (55,728.00) | - | - | - | (55,728.00) | - | - | - | - | (167,184.00) |
| Satellite Service | (137,282.93) | - | - | - | (137,282.93) | - | - | - | (137,282.93) | - | - | - | - | (411,848.78) |
| Imaging License Fee | (9,201.25) | - | - | - | (9,201.25) | - | - | - | (9,201.25) | - | - | - | - | (27,603.75) |
| Software & Apps | (5,000.00) | - | - | - | (5,000.00) | - | - | - | (5,000.00) | - | - | - | - | (15,000.00) |
| Website Hosting | - | - | (266.50) | - | - | - | (266.50) | - | - | - | - | (266.50) | - | (799.50) |
| **Total Computer/IT/IP Expense** | (238,031.01) | - | (1,874.89) | - | (238,031.01) | - | (1,874.89) | - | (238,031.01) | - | - | (1,874.89) | - | (719,717.72) |
| Insurance | (2,166.50) | - | - | - | (2,166.50) | - | - | - | (2,166.50) | - | - | - | - | (6,499.50) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,989.90) | - | - | - | (1,989.90) | - | - | - | (1,989.90) | - | - | - | - | (5,969.69) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | (45,980.00) | - | - | - | (45,980.00) | - | - | - | (45,980.00) | - | - | - | - | (137,940.00) |
| Consulting Services | (22,670.00) | - | (12,000.00) | - | (22,670.00) | - | (12,000.00) | - | (22,670.00) | - | - | (12,000.00) | - | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | |
| Electricity | - | - | (5,107.63) | - | - | - | (5,107.63) | - | - | - | - | (5,107.63) | - | (15,322.89) |
| HVAC | (256.19) | - | - | - | (256.19) | - | - | - | (256.19) | - | - | - | - | (768.58) |
| CAM Charges | (20,364.16) | - | - | - | (20,364.16) | - | - | - | (20,364.16) | - | - | - | - | (61,092.48) |
| Water & Sewer | (1,708.55) | - | - | - | (1,708.55) | - | - | - | (1,708.55) | - | - | - | - | (5,125.66) |
| Gas Service | (132.09) | - | - | - | (132.09) | - | - | - | (132.09) | - | - | - | - | (396.28) |
| Pest Control | (244.65) | - | - | - | (244.65) | - | - | - | (244.65) | - | - | - | - | (733.95) |
| Waste Management | (351.81) | - | - | - | (351.81) | - | - | - | (351.81) | - | - | - | - | (1,055.43) |
| **Total Utilities** | (23,057.46) | - | (5,107.63) | - | (23,057.46) | - | (5,107.63) | - | (23,057.46) | - | - | (5,107.63) | - | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | - | - | - | (33,408.51) | - | - | - | (33,408.51) | - | - | - | - | (100,225.53) |
| Office Security | (31,111.90) | - | - | - | (31,111.90) | - | - | - | (31,111.90) | - | - | - | - | (93,335.69) |
| Repair & Maintenance - Building | (1,777.19) | - | - | - | (1,777.19) | - | - | - | (1,777.19) | - | - | - | - | (5,331.56) |
| Janitorial | (5,983.33) | - | - | - | (5,983.33) | - | - | - | (5,983.33) | - | - | - | - | (17,950.00) |
| **Total Occupancy** | (72,280.93) | - | - | - | (72,280.93) | - | - | - | (72,280.93) | - | - | - | - | (216,842.78) |
| Supplies | (1,258.02) | - | - | - | (1,258.02) | - | - | - | (1,258.02) | - | - | - | - | (3,774.07) |

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| | Period 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | (18,337.88) | - | - | - | (18,337.88) | - | - | - | (18,337.88) | - | - | - | - | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | |
| Salaries & Wages - Base | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | (1,179,272.08) |
| Payroll Tax | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | (97,797.65) |
| Alex Jones Salary | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | (379,166.67) |
| **Total Personnel Expenses** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **-** | **(236,605.20)** | **(1,656,236.39)** |
| **Travel** | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | - | (1,470.56) | - | - | (4,411.68) |
| **Total Travel Expenses** | **(99.69)** | **(1,570.25)** | **(99.69)** | **(99.69)** | **(99.69)** | **(1,570.25)** | **(99.69)** | **(99.69)** | **(99.69)** | **(99.69)** | **(1,570.25)** | **(99.69)** | **(99.69)** | **(5,707.66)** |
| **Total Operating Expenses** | **(680,347.03)** | **(1,898.71)** | **(256,015.88)** | **(428.15)** | **(680,347.03)** | **(1,898.71)** | **(256,015.88)** | **(428.15)** | **(680,347.03)** | **(428.15)** | **(238,503.91)** | **(19,410.68)** | **(237,033.35)** | **(3,053,102.68)** |
| **Non-Operating Expenses** | | | | | | | | | | | | | | |
| Payment on PQPR Note | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (523,000.00) |
| AMEX Payment | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | - | (1,034,341.69) |
| **Total Other Expenses** | **(184,890.28)** | **(15,500.00)** | **(199,890.28)** | **(27,500.00)** | **(199,890.28)** | **(27,500.00)** | **(227,390.28)** | **(55,000.00)** | **(227,390.28)** | **(55,000.00)** | **(227,390.28)** | **(55,000.00)** | **(55,000.00)** | **(1,557,341.69)** |
| **Professional Fees** | | | | | | | | | | | | | | |
| CRO Fees | - | - | - | - | - | - | (52,992.00) | - | (35,328.00) | - | - | - | - | (88,320.00) |
| Financial Advisor Fee | - | - | - | - | - | - | (57,876.00) | - | (40,352.00) | - | - | - | - | (98,228.00) |
| Shannon & Lee LLP | - | - | - | - | - | - | (40,000.00) | - | (60,000.00) | - | - | - | - | (100,000.00) |
| Ray Battaglia | - | - | - | - | - | - | (24,000.00) | - | (24,000.00) | - | - | - | - | (48,000.00) |
| **Total Professional Fees** | **-** | **-** | **-** | **-** | **-** | **-** | **(174,868.00)** | **-** | **(159,680.00)** | **-** | **-** | **-** | **-** | **(334,548.00)** |
| **Total Cash Flow** | **$ (529,176.72)** | **$ 101,269.75** | **$ (87,237.70)** | **$ 320,906.77** | **$ (544,176.72)** | **$ 339,269.75** | **$ (289,605.70)** | **$ 793,406.77** | **$ (731,356.72)** | **$ 313,240.31** | **$ (97,225.73)** | **$ 774,424.24** | **$ 76,635.11** | **440,373.41** |