# EXHIBIT 6

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3                                ) CASE NO: 22-60043-cml
                                  )
 4   FREE SPEECH SYSTEMS, LLC,    ) Houston, Texas
                                  )
 5            Debtor.             ) Tuesday, September 20, 2022
                                  )
 6   ------------------------------) 1:03 p.m. - 7:30 p.m.

 7

 8                                TRIAL

 9         BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
                 UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For Free Speech Systems: R.J. SHANNON
                              Shannon & Lee LLP
13                            700 Milam Street, Suite 1300
                              Houston, TX 77002
14
                              RAYMOND WILLIAM BATTAGLIA
15                            Law Offices of Ray Battaglia, PLLC
                              66 Granburg Circle
16                            San Antonio, TX 78218

17                            KYUNG SHIK LEE
                              Kyung S. Lee PLLC
18                            4723 Oakshire Drive, Apt. B
                              Houston, TX 77027
19
     For Veronique De La        JARROD B. MARTIN
20   Rosa, et al.:              Chamberlain, Hrdlicka, White,
                                Williams & Aughtry P.C.
21                              1200 Smith Street, Suite 1400
                                Houston, TX 77002
22
     For David Wheeler,         RYAN E. CHAPPLE
23   et al.:                    Cain & Skarnulis PLLC
                                303 Colorado Street, Suite 2850
24                              Austin, TX 78701

25
```

EXHIBIT

tabbies

```
 1    For the U.S. Trustee:     HA MINH NGUYEN
                                JAYSON B. RUFF
 2                              Office of the United States Trustee
                                515 Rusk Street, Suite 3516
 3                              Houston, TX 77002

 4    For PQPR:                 STEPHEN LEMMON
                                Streusand Landon Ozburn and Lemmon
 5                              1801 S Mopac Expressway, Suite 320
                                Austin, TX 78746
 6
      For the SubChapter V      MELISSA ANNE HASELDEN
 7    Trustee:                  Haselden Farrow, PLLC
                                Pennzoil Place
 8                              700 Milam, Suite 1300
                                Houston, TX 77002
 9
      Court Reporter:           ZILDE MARTINEZ
10
      Courtroom Deputy:         ZILDE MARTINEZ
11
      Transcribed by:           Veritext Legal Solutions
12                              330 Old Country Road, Suite 300
                                Mineola, NY 11501
13                              Tel: 800-727-6396

14

15
      Proceedings recorded by electronic sound recording;
16    Transcript produced by transcription service.

17

18

19

20

21

22

23

24

25
```

1                            INDEX

2   PLAINTIFFS' WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

3   KYUNG LEE

4   MARC SCHWARTZ

5

6   GOVERNMENT'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

7

8

9

10

11   PLAINTIFFS' EXHIBITS                              RECEIVED

12

13

14

15   GOVERNMENT'S EXHIBITS                             RECEIVED

16

17

18

19

20

21

22

23

24

25

1    HOUSTON, TEXAS; TUESDAY, SEPTEMBER 20, 2022; 1:03 PM

2                        (Call to Order)

3        THE COURT:  Okay.  Good afternoon, everyone.  This

4    is Judge Lopez.  Today is September 20th.  We are here in

5    Free Speech Systems here at the Subchapter V status

6    conference and also to take up a few retention applications,

7    one for Mark Schwartz and Schwartz & Associates as financial

8    advisors, Shannon & Lee as counsel to the Debtor, and also

9    Mr. Battaglia as counsel to you and the Debtors.

10        So let me go ahead and take appearances, first in

11    the courtroom and then we'll see where this goes.

12        Good morning.  I should say good afternoon.

13        MR. SHANNON:  Good afternoon, Your Honor.  R.J. of

14    Shannon & Lee LLP, on behalf of the Debtor.  Also in the

15    courtroom is Mr. Lee here and Mr. Battaglia is here also on

16    behalf of the Debtor.

17        One correction, Your Honor, at least there was no

18    objection to Mr. Battaglia.

19        THE COURT:  I still have an independent duty to

20    take it up.  Just because nobody objects doesn't mean we

21    don't take it up.

22        MR. SHANNON:  Yes, Your Honor.  I will say that

23    there are -- you know, the witness and exhibit list did not

24    contemplate this, but Mr. Battaglia is here.

25        THE COURT:  I'm not saying we're going to spend a

1    lot of time on it, but we have to take it up.

2              MR. SHANNON:  Got you.

3              THE COURT:  Okay.

4              MR. NGUYEN:  Good afternoon.  Ha Hguyen for the

5    U.S. Trustee.  Also from my office is Jayson Ruff and also

6    Christopher Roth Travis.

7              THE COURT:  Okay, good afternoon.

8              MR. MARTIN:  Good afternoon, Your Honor.  Jarrod

9    Martin for Texas plaintiffs.

10             THE COURT:  Okay, good afternoon.

11             MR. CHAPPLE:  Good afternoon, Your Honor.  Ryan

12   Chapple for the Connecticut plaintiffs.

13             THE COURT:  Good afternoon, sir.

14             MS. HASELDEN:  Good afternoon, Your Honor.

15   Elizabeth Haselden, Subchapter 5 Trustee, and I have with me

16   Elizabeth Freeman.

17             THE COURT:  Okay, good afternoon.  Anyone else in

18   the courtroom wish to make an appearance?  Okay.  I've muted

19   the line.  If you wish to make an appearance, you'll need to

20   hit 5 star.  There are a number of people on the line, and I

21   think it's just easier to go that route.  Anyone else wish

22   to make an appearance at this time, just hit 5 star.

23             Okay, going with a 512375.

24             MR. LEMMON:  Your Honor, Steve Lemmon for PQPR.

25             THE COURT:  Good afternoon, Mr. Lemmon.  Mr.

1    Lemmon, I'm going to leave your unmuted, okay?  Just please

2    keep your phone on mute.

3              MR. LEMMON:  Yes, sir.

4              THE COURT:  Okay, thank you.  Anyone else?  Seems

5    to be it on the line.  Why don't we, I guess, the status

6    conference that is required under the Bankruptcy Code.  I'd

7    like to start with that to satisfy the statutory duty of the

8    Debtor and make sure that we comply with the Bankruptcy Code

9    and get a status update as to where these cases are, and

10   then let's take up the retentions.

11             But before we do that, that's the order.  If

12   there's anything anyone wishes to tell me at a high level

13   picture for purposes of today and where things stand, now's

14   the time to tell me or we can take it up in due course.

15             Okay.  If we can start with the status conference,

16   that'd be great.  Thank you.

17             Good afternoon, Mr. Battaglia.  Good to see you.

18             MR. BATTAGLIA:  Good afternoon, Your Honor.  Ray

19   Battaglia for the Debtors.  The Debtor filed its status

20   report at the time dictated by the Court's prior order.

21   It's a relatively brief status report.  Obviously, things

22   have happened in front of this Court and the parties are

23   well aware of.

24             THE COURT:  Can you just get that mic just a

25   little bit closer to you or just curve it a little bit, make

1     sure the folks on the line can hear you.

2          MR. BATTAGLIA:  Is that better, Judge.

3          THE COURT:  Oh, much better.  Thank you.

4          MR. BATTAGLIA:  Thank you.  Many things have

5     happened in the Court that primarily relate to operating

6     issues, and I'll not belabor the record with a recitation of

7     those.  If the Court wants to ask regarding developments in

8     those, I'll be happy to discuss them.

9          Obviously, we have hearings set on a number of

10    matters on October 12th, and I don't think there's a need to

11    belabor where we are on those.  There is discovery, the

12    deposition of Mr. Schwartz that will happen Friday.  Mr.

13    Rowe's deposition is set for October 4th.

14         THE COURT:  Who's Mr. Rowe?

15         MR. BATTAGLIA:  Mr. Rowe was a consultant that was

16    retained to assist in evaluating the numbers that formed the

17    PQPR debt.

18         THE COURT:  Okay.

19         MR. BATTAGLIA:  So he was instrumental in that

20    effort and, therefore, he's someone with knowledge and

21    information that is requested.  And ultimately, currently

22    he's an employee or he's employed by, at least as a

23    consultant on a contract basis, by PQPR.

24         THE COURT:  Okay.

25         MR. BATTAGLIA:  With respect to really the

1   fundamental push of this case, the plan of reorganization,

2   we have a draft of a plan of reorganization that we're fine

3   tuning a little bit.  I've had conceptual conversations with

4   Mr. Lemmon on behalf of PQPR, Mr. Jordan on behalf of Alex

5   Jones, the Sub V Trustee and her counsel, we've had a more

6   thorough conversation.  And this morning, Mr. Martin and I

7   had a conversation.  I haven't had a time to circle back to

8   the Texas plaintiffs, but, hopefully, those discussions have

9   been shared.

10          Our goal, as opposed to filing it, just filing it

11  when we think we're ready, is to share it with the other

12  parties.  I have no allusions that we'll come to a

13  consensual plan, but I'm certainly willing to try.  The

14  conversations with Mr. Martin were fruitful.  I've had

15  conversations in the past that I've sort of equated it to

16  Lucy was holding the football today.  Whether that football

17  will be there when I kick, I don't know.  But in the past,

18  Lucy didn't even have the football, so that's progress in my

19  mind, and I hope we can do something.

20          Because at the end of the day, my charge and the

21  Debtors' charge in this case as I see it is to maximize the

22  asset value and pay creditors who are owed money with a lot

23  of claims, and that's all I'm here to do.  And if that's the

24  goal of the plaintiffs is to maximize the return on account

25  of their claims, then we have common ground to discuss.

1            And conceptually, of course, the timing of the

2       allowance of those claims of plaintiffs is going to be,

3       without settlement, will be a longer road because there will

4       be appeals and that process will take whatever time it

5       takes.  But the Debtor does generate, we anticipate will

6       continue to generate, net disposable income that can be

7       dedicated to a plan.  Obviously, proceeding under a Sub V

8       changes the confirmation dynamic tremendously for this Court

9       and the burden's on the Debtor to prove are certainly

10      smaller.

11            Mr. Martin and I discussed today possibilities.

12      I'm not saying anybody's agreed to any of this at this

13      point, but perhaps once the plan is shared, that it might be

14      fruitful to seek a mediation in front of perhaps Judge

15      Isgur.  I know he's got a docket now that's been a little

16      more burdened lately, but that's a possibility.

17            And whether it would be more fruitful to proceed

18      to negotiate the plan, as opposed to October 12th hearings.

19      Again, nobody's agreed, nobody's suggesting that's tenable

20      at all.  But ultimately, in my mind as Debtors' counsel, if

21      the plaintiffs were successful in removing the Debtor, the

22      Debtor is still the only party who can propose a plan of

23      reorganization.  And the plan as proposed and confirmed, the

24      Debtor's back in, what are we doing here, so I don't know.

25      We'll see where that goes.  I know Mr. Martin has to circle

1    back to a number of people to see whether anything that we

2    discuss this morning germinates and it may or may not, but

3    our goal is to file a plan of reorganization in the next

4    week to two weeks, and that's where we are, Judge.

5            THE COURT:  Okay.

6            MR. BATTAGLIA:  Happy to answer any questions the

7    Court may have.

8            THE COURT:  I had a couple of questions.  Mr.

9    Schwartz wasn't here last time.  They were kind of financial

10   questions.  And here as we kind of proceeded along, I had a

11   couple of real technical questions, and I can lay them out

12   and anyone can answer them.

13           One was, and I still was looking for a little bit

14   of clarity.  In connection with the last proposed cash

15   collateral order, there was an $80,000 or so request for --

16   I think it was labeled, like, Alex Jones trial travel or

17   something.

18           MR. BATTAGLIA:  Yes, sir.

19           THE COURT:  What did that relate to?

20           MR. BATTAGLIA:  Your Honor, I can answer that.

21   The lift stay order that we presented to you to allow the

22   Connecticut litigation to proceed, part of the agreement

23   that was encompassed in that order was that the Connecticut

24   plaintiffs would not object to the travel expenses for Mr.

25   Jones or for employees.

1          THE COURT:  I understand they didn't object.  I

2     just want to know what it related to.

3          MR. BATTAGLIA:  I understand.

4          THE COURT:  No one told me.

5          MR. BATTAGLIA:  So the budget item there, $34,000

6     of the $80,000 related to just security expenses.  Mr. Jones

7     does not travel freely without security in this world that

8     we're in today and particularly, I guess, being in the

9     backyard of the Sandy Hook disaster.

10          THE COURT:  Why is the estate paying for that?

11          MR. BATTAGLIA:  Well, he is an estate witness as

12     well.  His appearance is just as vital for us as it is for

13     Alex Jones.

14          THE COURT:  Was he paying for any of his travel?

15          MR. BATTAGLIA:  He was not, and you suggested that

16     we needed to come back to you with -- and my conversation

17     with Mr. Jones's counsel was he proceeds, and we'll go back

18     to the Court and ask what the Court thinks is appropriate to

19     pay.

20          THE COURT:  And I'm being honest, I don't know

21     what to do with every time there's a motion filed that we

22     start off with 100 percent we pay for the owner's personal

23     expenses.  And then, like, if the Court has to find it,

24     identify it, notify parties that he's noticed it, and then

25     people come back with their requests.

1           I don't -- who's negotiating this on behalf of the

2      estate?  Like, why am I finding issues that are 100 percent

3      in a case where there's two defendants.  I just want to

4      understand what's happening.

5           MR. BATTAGLIA:  Your Honor, the last item in the

6      budget that we were waiting on to be able to present to

7      parties was the cost of the travel related to the trial.

8           THE COURT:  The 34,000 was for?

9           MR. BATTAGLIA:  Was for security.

10          THE COURT:  And what was the remaining, I don't

11     know, 36,000 or 46,000?

12          MR. BATTAGLIA:  So there's obviously airline fees,

13     which we've priced based at a premium economy rate, not a

14     first class rate, for the security personnel and for Mr.

15     Jones.  There was lodging, there were food and other typical

16     expenses associated with travel, vehicles.  And, again, this

17     is for, you know, not just Mr. Jones, but the security

18     personnel who are attending.

19          THE COURT:  Okay.

20          MR. BATTAGLIA:  So we heard you.  We'll accumulate

21     receipts and come back to the Court with an appropriate...

22          THE COURT:  I thought folks heard me when I said I

23     had issues with Mr. Andino and other counsel when that was

24     100 to zero.  I just want to know exactly what's being on

25     the table.  It feels like I'm finding these things, because

1    I asked everyone at the last hearing is there anything I

2    should know about this cash collateral budget, and everyone

3    stayed quiet.

4         MR. BATTAGLIA:  It came together, again, at the

5    last minute.  I submitted the budget, along with the draft

6    revised order on the Sunday prior to that hearing, which was

7    on a Tuesday as I recall.

8         THE COURT:  Okay.

9         MR. BATTAGLIA:  You know, it --

10        THE COURT:  I got it.

11        MR. BATTAGLIA:  -- came together rather quickly,

12   Judge.

13        THE COURT:  I appreciate that.  And if that's the

14   answer, that's the answer.

15        I had another question that just related to the

16   schedules.  I saw in the schedules -- and normally, this is

17   what happens at a status conference.  The Debtors filed

18   schedules and the Court asks questions about things like

19   that.

20        There was a payment of about a million dollars to

21   American Express, and if I remember correctly, American

22   Express related to personal expenses.  I'll show it on my

23   screen.  I just want to make sure and maybe it related to

24   something different.  I just wanted to understand.  Let me

25   share my screen here.  Excuse me in the SOFAs, not in the

1    schedules, but in the SOFAs.

2          There were three payments totaling a million

3    dollars, like, leading up to this case to American Express,

4    but I'll let Mr. Schwartz in connection with the first day

5    hearings and cash collateral.  That related to personal

6    expenses.  Are those personal expenses that million dollars?

7          MR. BATTAGLIA:  No, sir.  I'm not going to suggest

8    to the Court that there are no personal expenses in and

9    amongst the million dollars.  But the Debtor had, under

10   prior operations, had a bad habit of using the AmEx card to

11   pay for everything.

12         THE COURT:  Okay, business expense.  Okay, that

13   makes sense to me.

14         MR. BATTAGLIA:  And consequently, a lot of vendors

15   didn't even show up on the accounts payable list because

16   they were paid through AmEx.

17         THE COURT:  Okay.

18         MR. BATTAGLIA:  I would venture to guess a

19   significant, substantial portion of that million related to

20   technical purchases or vendors or suppliers related to the

21   business itself.

22         THE COURT:  Okay.

23         MR. BATTAGLIA:  But I won't tell the Court

24   standing here today that all of it is.

25         MR. BATTAGLIA:  And the $3.1 million to PQPR, who

1    authorized that; was that Mr. Schwartz?

2              MR. BATTAGLIA:  That would have been payments to

3    insiders over a one-year period.  It was under an agreement

4    that --

5              THE COURT:  This looks like it was done over the

6    last 30 days before the case filed.  It's happened before,

7    don't get me wrong.  I'm just trying to understand who

8    authorized these payments.

9              MR. BATTAGLIA:  I'm not aware of the 3 million.

10   There was the prior deal that existed before Mr. Schwartz

11   came into place that paid $11,000 per business day in

12   service of the debt.  But it's not entirely impossible that

13   this also relates to inventory purchases.  PQPR was the

14   primary source of inventory.

15             THE COURT:  That's why I seen that it was in

16   combination of the --

17             MR. BATTAGLIA:  So it maybe a combination of the

18   two and it does say both.

19             THE COURT:  Okay.

20             MR. BATTAGLIA:  No payments in advances.

21             THE COURT:  Okay.  No one is seeing my screen,

22   right?  Somebody needs to talk to me.  No one's been seeing

23   anything I've been looking at.  All righty, that's helpful.

24   Let me share my screen right this time.  That's helpful, now

25   we're looking at stuff.  Miss Santos, you all stop me if you

1   think I'm doing something wrong.

2           That was the $3.1 million.  A million-dollar

3   payment was here on AmEx, $150,000.  Was Mr. Jones an

4   employee, Mr. David Jones an employee?

5           MR. BATTAGLIA:  At certain times, he had been, but

6   he is obviously the Debtors' principal's father.  He's Alex

7   Jones's father.

8           THE COURT:  Okay.  And I know this is October of

9   2021, so that was a while back.  I just want to make sure I

10  understand.

11          MR. SCHWARTZ:  He was not an employee --

12          THE COURT:  At the time?

13          MR. SCHWARTZ:  -- at that time.  That was an

14  advance.

15          THE COURT:  Okay.  Okay, payment on advance.  I

16  couldn't tell if it related to the PQPR.

17          MR. SCHWARTZ:  He just got $150,000.

18          THE COURT:  Okay.  Those were my questions and

19  some of that stuff we covered last time, so I think I have

20  what I need.  Does anyone have any statements or any

21  questions that anybody wants to talk about in connection

22  with the status conference?

23          Oh, I forgot to ask, is assuming the Connecticut

24  litigation has started --

25          MR. BATTAGLIA:  It has, Your Honor.

1        THE COURT:  -- or is ongoing.  Is there a time --

2        MR. BATTAGLIA:  I think Mr. Jones is on the stand.

3        THE COURT:  Does anyone know, like, when it's

4    supposed to end?

5        MR. LEE:  Your Honor, this is Kyung Lee for the

6    record.

7        THE COURT:  Yes, sir.

8        MR. CHAPPLE:  Your Honor, Ryan Chapple for the --

9        THE COURT:  I don't want any commentary or spin on

10   it.  I just want to know, like, if there's any timetable.

11       MR. CHAPPLE:  Absolutely.  I believe

12   conservatively, maybe a week and a half or two more weeks is

13   my general understanding, but that answer changes daily.

14       THE COURT:  No, no, no, I understand.

15       MR. CHAPPLE:  So that's the last I  heard.

16       THE COURT:  Okay, but it has started and it's

17   proceeding.  Is it still in the -- it sounds like it's

18   started started, not just jury selection.

19       MR. LEE:  That's correct, Your Honor.

20       MR. CHAPPLE:  There are witnesses.  They're taking

21   witnesses, live witnesses.

22       THE COURT:  Okay.

23       MR. CHAPPLE:  And I heard previously longer time

24   estimates, so I mean...

25       THE COURT:  Okay, yeah, and I got it.  I got it,

1    okay.  Does anyone have any statements they wish to make at

2    this time in connection with the status report?  Okay.  Then

3    the easiest thing to do maybe -- I know Mr. Battaglia's

4    retention is up as well.  I saw no objections.  I looked it,

5    I reviewed, and I'm comfortable with the representations

6    there.  Anyone object to the retention of Mr. Ray Battaglia?

7               May I ask the U.S. Trustee on this, so you're okay

8    with the proposed form of order that was filed?

9          MR. NGUYEN:  Yes, Your Honor.  I have no problem

10   with Mr. Battaglia's order.

11         THE COURT:  Okay.  Mr. Battaglia, I'm going to

12   note that for the record, there was an application to retain

13   you as counsel for FSS.  I'm going to find that there's been

14   proper notice of today's hearing on it and service of the

15   application.  It's also been proper.  The Court has reviewed

16   the standards under 327 and finds that they've been

17   satisfied.  I also note that there's been no objection and

18   the U.S. Trustee has also approved the proposed form of

19   order.

20             Miss Haselden, I will ask you as well, and you can

21   give me a thumbs up if you're there.  Are you okay with the

22   proposed form of order?  Okay, okay.

23             Then, Mr. Battaglia, I will approve that retention

24   application and I'll get it signed and on the docket this

25   afternoon.

1        MR. BATTAGLIA:  Thank you, Your Honor.  Your

2   Honor, I would note one thing is that I was retained as co-

3   counsel, and obviously what happens today will be a --

4        THE COURT:  No, no, no, no, I understand that, and

5   I didn't mean to imply anything.  I just -- you were

6   employed as co-counsel and I guess what I meant to say is

7   I'm approving your retention application.

8        MR. BATTAGLIA:  And I appreciate it, Your Honor.

9        THE COURT:  Maybe that's the easiest way of saying

10  it.  I got it.

11       Okay, let's see.  FSS filed the remaining

12  applications.  I'll let you take lead.

13       MR. SHANNON:  Thank you, Your Honor.  As the Court

14  has noted, we're here on two applications.  They are

15  applications by the Debtor, Free Speech Systems LLC, to

16  employ Marc Schwartz as its CRO, and Schwartz & Associates

17  LLC to help him with that; that is Docket No. 83.  We're

18  also here on an application by the Debtor to employ Shannon

19  & Lee LLP as bankruptcy co-counsel; that's Docket No. 85.

20       The U.S. Trustee has objected to both

21  applications; they're at Docket No. 145 and Docket No. 154.

22  The plaintiffs have joined those objections, filed by

23  joinders.

24       And, Your Honor, there's no dispute that Mr.

25  Schwartz and Shannon & Lee LLP meet the requirements for

1    employment under Section 327(a).  That's not what the

2    objection is about.  There's no dispute that the CRO,

3    proposed CRO and Shannon & Lee are disinterested in this

4    case.  There's no dispute that the retention of these

5    applicants is in the best interests of the Debtors'

6    bankruptcy estate.  That's not what the U.S. Trustee is

7    objecting about.

8              There's no dispute that administration of these

9    Chapter 11 cases will be furthered by the retention of the

10   applicants.  There's really no contention on anything about

11   this case -- that's Case No. 22-643 -- will be furthered by

12   denying the application of the Debtor to employ these

13   applicants.

14             The U.S. Trustee's contention is that the

15   applications to employ should be denied because Mr. Schwartz

16   and Mr. Lee did not amend and supplement their disclosures

17   in the InfoW bankruptcy cases, and that's the entire basis

18   for the objection.

19             And I believe that the U.S. Trustee's position is

20   that after Mr. Schwartz and Mr. Lee met with FSS on May

21   24th, that they should have done a supplemental disclosure

22   in the InfoW cases.

23             THE COURT:  What do you think?

24             MR. SHANNON:  Well, Judge --

25             THE COURT:  You were there.  What do you think?

1          MR. SHANNON:  Well, and actually on May 19th, I

2     was not there, but I was at the May 24th meeting.

3          THE COURT:  You were at the May 19th hearing.  You

4     understand, you were involved in the last cases.  What do

5     you think?

6          MR. SHANNON:  Well, Judge, I don't think that's

7     what Bankruptcy Rule 2014 requires.

8          THE COURT:  Okay.

9          MR. SHANNON:  It's not in the text of the rule.

10    The cases that have looked at it and said there is a

11    continuing duty to disclosure, they all say it's because of

12    Section 327(a).  In 327(a), you can only be employed as an

13    estate professional if you're a disinterested party.

14    Section 328 also says you can only be compensated if you're

15    a disinterested professional.

16          At that time, at the time of the May 24th meeting,

17    the InfoW debtors had already decided to dismiss their

18    cases.  They had -- that decision was made, you know, around

19    the May 19th hearing, sometime between then.  By May 23rd,

20    Mr. Lee had put together a motion to dismiss and he had

21    advised Mr. Schwartz that the cases should be dismissed;

22    that was his analysis.  On May 23rd, he had a draft motion

23    to dismiss prepared and they informed the U.S. Trustee of

24    that decision on May 25th.

25          At that point, Your Honor, neither Mr. Schwartz

1    nor Mr. Lee were seeking to be employed by the bankruptcy

2    estate.  They never were employed by the bankruptcy estate,

3    but they also at that point were not seeking to be employed

4    by the bankruptcy estate.

5         And when you look at the cases that talk about

6    this, that is what is important.  It's whether the

7    professional is seeking to be employed or has been employed

8    by an order of the Court.

9         Judge, I'll give you just a timeline of events,

10   just a little bit of a broader one.

11        THE COURT:  Okay.

12        MR. SHANNON:  The InfoW cases were filed on April

13   17th and April 18th.  April 29th, the Debtor files an

14   amended trust agreement and plan and support agreement.  And

15   that agreement was never signed by the parties and the

16   reason why was because that same day, the U.S. Trustee filed

17   a motion to dismiss.

18        And then on May 3rd, the plaintiffs came and said,

19   look, we just to release our claims against these InfoW

20   debtors.  We don't want to be involved in this bankruptcy

21   case; we don't want to deal with it.  And that took a little

22   while to effectuate.  So between May 3rd -- by May 13th, the

23   Connecticut plaintiffs had filed pleadings to dismiss the IW

24   debtors from their actions, again, because they didn't want

25   to be involved in the IW debtors' bankruptcy cases.

1          By May 18th, the Texas plaintiffs and the IW

2    debtors had reached a stipulation resolving their claims;

3    that was filed with the Court.  And then on May 19th at 2:00

4    p.m., the IW debtors or this Court entered that stipulation

5    resolving the claims of the Texas plaintiffs against the IW

6    debtors, not this debtor; there's no argument there.

7          Now that same day earlier, Mr. Lee files his

8    application to employ or filed the IW debtors application to

9    employ Kyung S. Lee PLLC.  Now at that time, there was

10   nothing to disclose.  Later that day, FSS contacted Mr. Lee

11   about a potential meeting in Austin the following Tuesday.

12   It was very clear to everyone that the PSA was dead, that

13   that wasn't going to be the way to go.  And Mr. Lee told

14   this Court that the IW debtors were considering to try to

15   get more funding from somewhere else, to try to go with a

16   plan without that, or to just dismiss the cases as the U.S.

17   Trustee demanded.

18         May 21st -- and this will be all in the evidence -

19   - on May 21st, Mr. Lee sent an email to Marc Schwartz, and I

20   believe May 21st was a Saturday.  In that email, Mr. Lee

21   outlined the reasons why the IW debtors should agree with

22   the U.S. Trustee and dismiss their cases, and in particular,

23   it was because it wasn't worth the expense of litigating

24   with the U.S. Trustee over those cases.  There were only, at

25   the time, I think they believed there were four creditors

1    remaining; turns out there were actually only three.  Mr.

2    Gilmore, one of the creditors that was remaining in the IW

3    cases actually had been paid, or at least I believe had been

4    paid at that time, definitely been paid by now.

5           On May 23rd, as I said, Mr. Lee had drafted a

6    motion to dismiss for the IW debtors and had circulated it

7    to Mr. Schwartz.  May 24th was the meeting in Austin where

8    they talked about the potential representation of FSS.  May

9    25th, Mr. Lee informed the U.S. Trustee of the IW debtors'

10   intent to dismiss their cases; that had been decided

11   previously.

12          As part of those communications, the U.S.

13   Trustee's attorney informed Mr. Lee, don't file a motion to

14   dismiss; just stipulate and agree to our motion to dismiss

15   that's already pending.

16          On May 26th, Mr. Lee attended the 341 meeting for

17   the IW debtors.  At that 341 meeting, Mr. Lee announced that

18   the IW debtors had decided to dismiss their cases.

19          THE COURT:  What date was that?  What date was

20   that?

21          MR. SHANNON:  That was May 26th.

22          THE COURT:  Thank you.

23          MR. SHANNON:  On June 1st, the stipulation of

24   dismissal agreed to between the IW debtors and the U.S.

25   Trustee was filed.  And it wasn't until June 5th that Mr.

1    Schwartz had finalized an application -- or finalized a

2    draft engagement letter.  They had sent it to Mr. Lee.  Mr.

3    Lee commented on it, sent it back to him with these

4    comments.  And that June 5th engagement letter is the

5    engagement letter that ultimately continues and that

6    ultimately that FSS seeks to retain Mr. Schwartz under the

7    debt.

8             On June 6th, both the engagement letter by Mr. Lee

9    and Mr. Schwartz were signed, and then on June 10th, the

10   Court entered the order dismissing the IW cases.

11            That's also the date that FSS is actually, you

12   know, paid retainers to Lee and Schwartz.  I believe in the

13   application, Shannon & Lee had said it was on or about June

14   7th.  There is an email saying it was going to be paid on

15   June 7th, and we actually looked at the bank and confirmed

16   that; it wasn't actually until June 10th.

17            THE COURT:  Okay.

18            MR. SHANNON:  And again, Your Honor, I just -- at

19   the May 24th meeting, which is the first time there was a

20   disclosable connection, a connection that meant something,

21   the IW debtors had decided to dismiss their case.

22            But I don't think that's even the whole argument

23   here, Your Honor, because even if Mr. Lee and Mr. Schwartz,

24   you know, should have disclosed that connection to the

25   Court, even though the case had been decided to be

1    dismissed, even though they were no longer seeking to be

2    employed, that's not really what we're here for.  What we're

3    here for is whether FSS should be allowed to retain these

4    two parties.

5              Judge, you could -- the U.S. Trustee could go

6    back, could reopen the IW cases and seek sanctions, and

7    that's what the Courts call the proper solution to a, you

8    know, failure to disclose under Rule 2014; they call it

9    sanctions.  And I don't think that those sanctions are

10   appropriate to be imposed on the Debtor FSS, and that's

11   really what the U.S. Trustee is asking you to do.  There are

12   no cases that say that's an appropriate sanction, none, none

13   that I could find.

14             THE COURT:  I'm not sure there's many cases where

15   a debtor's professional started working for another plan

16   support party either, so I don't know if you're going to

17   find facts like that either.  So I understand what you mean,

18   but I read that argument and you got to -- it's not just

19   that easy.  There aren't many cases where two parties to a

20   plan, a debtor was working for one plan support party under

21   a trust taking direction from a trust and then starts

22   working for another plan support party and never discloses

23   it to the Court.  I'm not sure you're going to find many

24   cases like that.

25             MR. SHANNON:  That's true, Your Honor, but there's

1    also --

2            THE COURT:  I can promise you every case is

3    distinguishable, right?

4            MR. SHANNON:  But, you know --

5            THE COURT:  The question is what's the legal

6    principle that apples.

7            MR. SHANNON:  Sure.  The legal principle that

8    applies is about who is getting punished here, and they're

9    trying to see get punished essentially FSS.  I mean, what

10   this is and what the effect would be, would be to decapitate

11   this debtor.

12           THE COURT:  And I'm going to tell you something

13   because I want you to engage in a dialogue with me.  The

14   concern, when you really boil it down, I think you're

15   looking at this too -- you know, looking at this kind of

16   through a check the box perspective, right?  If the

17   behavior, the non-disclosures began in one case and it there

18   are potential conflicts through acts that Mr. Schwartz and

19   Mr. Lee have taken that continue into this case, then the

20   history is important.

21           For example, if, for example, you know, Mr. Lee or

22   Mr. Schwartz's relationship with Mr. Jones or PQPR is

23   concerning, it raises an issue as to whether either one of

24   them can provide sound legal advice to the estate or sound

25   financial advice to the estate, then the history is

1    important, right?

2         So you can't just -- I understand your point that

3    if there's a lack of disclosure in one case, you should look

4    at it as that case and it shouldn't essentially carry

5    forward as a penalty into the new case.  The question is, is

6    there a throughline essentially; that's the question that

7    you've got to answer today, at least that's where I'm

8    focused on.

9         If you're asking me, you know, how I --

10        MR. SHANNON:  Yes, Your Honor.  I'll just state --

11        THE COURT:  -- think about it, that's the way I

12   think about it.  So, for example, so when Mr. Lee is working

13   -- I think you described in May, and Mr. Schwartz are

14   working in late May and have decided that there's no hope

15   for InfoW, what do I do with the fact that there's a

16   pleading filed with me in this case that says on June 2nd,

17   the Debtor is still considering all options, right?

18        How then do I view that, right?  That's the real

19   question, right, and whether that, the changing of the

20   jersey in essence, you know, whether that had already

21   occurred, but no one told me, right.  And so, that's the,

22   hey, we're still considering all options, hey, as a

23   fiduciary, we're thinking about everything, and five days

24   later, you're in a meeting in Austin, you know, with the two

25   plan funding sources in the current case.

1          MR. SHANNON:  And Judge --

2          THE COURT:  The question is does that carry,

3    right, into FSS and into this case and it should be judged

4    into FSS.  And I know that that's where the evidence is; I'm

5    just telling you the way I'm thinking about this now.  So as

6    arguments get made, that's the way I -- that's what I'm

7    thinking about.

8          MR. SHANNON:  Sorry, Judge.  And I'll just say

9    that there is no allegation in the objection of anything

10   that you just said, and I agree that that would be something

11   to consider.

12         THE COURT:  I have an independent duty, though.

13   That's my concern, so you're going to have to address that.

14         MR. SHANNON:  I understand.  I understand, Your

15   Honor.

16         THE COURT:  They do mention the June 2nd pleading,

17   though, right?

18         MR. SHANNON:  I believe in the June 2nd pleading,

19   there had already been this stipulation.

20         THE COURT:  Not being disclosed to me, that's what

21   I'm saying.  Everybody may have known.  It's what was

22   represented to me and whether that continues into this case

23   is that's the question I've got to figure out.

24         So let me ask you, Mr. Shannon, did you work on

25   the responses to the objections?

```
 1              MR. SHANNON:  I did, Your Honor.

 2              THE COURT:  Okay.  I'm going to hand you a copy.

 3    I want to take this up now before we take up the evidence.

 4    That's a copy of what was filed, and there are serious

 5    allegations in here.  And I can't avoid not paying attention

 6    to them because if they're true, then we're going to have to

 7    deal with them, okay.

 8              I'm going to turn you to Paragraph 2.

 9              MR. LEE:  Your Honor, can I interject?  This is

10    the Schwartz response?

11              THE COURT:  Yeah, yeah.  It's what was filed.

12              MR. LEE:  This is my work, Your Honor.

13              THE COURT:  Anyone can answer.  I asked if you

14    worked on them.

15              MR. LEE:  I'll take care of these, Your Honor.

16              THE COURT:  Okay.  So on Page 2, Paragraph 2.

17              MR. LEE:  Yes, Your Honor.

18              THE COURT:  You say that the U.S. Trustee

19    sprinkled, right, tabloid headlines, fabrications, and

20    misrepresentations.

21              MR. LEE:  Yes, Your Honor.

22              THE COURT:  And that their fabrications are

23    unethical.

24              MR. LEE:  Yes, Your Honor.

25              THE COURT:  I want you to point me to the language
```

1    in the -- I'm going to want you to -- and I'm going to print

2    you a copy of the objection.  I want you to tell me what

3    they are.

4              MR. LEE:  And, in fact, I do that in the pleading

5    in my view.

6              THE COURT:  I don't think you do.  This is real

7    serious.  I want to know what's unethical.

8              MR. LEE:  First of all, on Paragraph 4 --

9              THE COURT:  Okay.

10             MR. LEE:  -- where the U.S. Trustee argues that

11   Schwartz did not disclose -- on objection Paragraph 49 that

12   Schwartz did not disclose his connections to FSS or Jones

13   during the InfoW cases; that is a statement in the

14   objection.  And previously in Paragraphs 14 and 15 of the

15   objection, the U.S. Trustee says Schwartz made these

16   declarations in the beginning.

17             THE COURT:  Did he make them to me?

18             MR. LEE:  They were in the pleading filed with the

19   Bankruptcy Court, Your Honor.  That's what I'm saying.  They

20   made the representations in a pleading filed with the Court,

21   and then he changes them --

22             THE COURT:  Schwartz disclosed his connections to

23   me during the InfoWar cases?

24             MR. LEE:  Yes, Your Honor.

25             THE COURT:  When?

1          MR. LEE:  In the application that he filed with

2    the Court.

3          THE COURT:  In the InfoW cases?

4          MR. LEE:  Yes, Your Honor, absolutely.

5          THE COURT:  What did he disclose?

6          MR. LEE:  He disclosed that he -- if I may, Your

7    Honor, may I turn to the exhibits?

8          THE COURT:  Mm hmm.  What did he disclose?  Did he

9    tell me he was working for them?

10          MR. LEE:  No.  He filed an application at the very

11    beginning of the case which was Exhibit No. -- I believe one

12    of the early exhibits that got postponed.

13          THE COURT:  Their argument is that nothing was

14    supplemented.  Was there ever a disclosure to the Court that

15    Mr. Schwartz started working for FSS during the InfoWars

16    cases?

17          MR. LEE:  The answer is no, you're not.

18          THE COURT:  So that's not a lie.  Can you tell me

19    what's unethical here?

20          MR. LEE:  But, Your Honor, if I may --

21          THE COURT:  Point me out to what's unethical.  No,

22    because that's serious allegations, right.  You're saying

23    that a branch of the Department of Justice is conducting

24    unethical behavior; that's real serious.  So point me to the

25    unethical behavior that you're describing in this objection.

1           MR. LEE:  Well, that's number one in my view, Your

2    Honor.

3           THE COURT:  You think that's unethical?

4           MR. LEE:  Well, I think that if you say something

5    that's untrue on one page and then you say something else

6    different on another page, then I think that --

7           THE COURT:  Just established that it wasn't --

8    that what you're saying, Schwartz did not disclose his

9    connections to FSS or Jones during the InfoWars.  I never

10   knew about that, so that's a true statement to me.  It's

11   true to me.  It's absolutely true to me, and you just

12   confirmed that I never knew about that, no one never told

13   me, so how is that unethical?

14          I think their whole argument is that no one ever

15   described anything to the Court.

16          MR. LEE:  Your Honor, my statement in Paragraph 4

17   was pointing that in the earlier paragraphs, he pointed out

18   that he made the disclosures at the beginning of the

19   bankruptcy case, which he did in the application.

20          THE COURT:  And he never updated them.

21          MR. LEE:  And, Your Honor, there's no dispute that

22   from May 19th on, neither Lee nor Schwartz made a

23   supplemental disclosure.

24          THE COURT:  That's what they're arguing, though.

25   That's what I read the objection to say is that, Judge, that

1    should have weight.  Tell me where the fact -- where the

2    unethical behavior is.

3            MR. LEE:  Well --

4            THE COURT:  I can print you a copy of their

5    objection because I want you to point me out.

6            MR. LEE:  No, Your Honor.  I apologize if you took

7    it that way, but my percept- --

8            THE COURT:  I'm just going to interrupt you.  So

9    let's go to Page 5.

10           MR. LEE:  Yes, Your Honor.

11           THE COURT:  Last paragraph, last in Paragraph 8,

12   okay, "The myth has been perpetuated by the United States

13   Trustee by pointing to the lynching mob at the May 19th," --

14   who is the, what is this mob that you're describing?

15           MR. LEE:  The mob that I'm describing is the fact

16   that everyone knew this --

17           THE COURT:  That's how dangerous that language is?

18           MR. LEE:  Well, Your Honor, one of the reasons why

19   is because, in fact, every time an event takes place in this

20   case, every conduct that we're subject to is somehow

21   misconstrued, misinterpreted.  And no one comes to this

22   Court and tells you the context in which certain things

23   occur.

24           THE COURT:  Well, I'm asking you.  We're going to

25   put you on the stand.

1              MR. LEE:  Yes, Your Honor.

2              THE COURT:  But tell me what's the -- who are

3    these people that constitute this mob?

4              MR. LEE:  Well, in the case of --

5              THE COURT:  No, in accordance with your statement;

6    who are you describing in this?

7              MR. LEE:  I think in this instance, I'm describing

8    the U.S. Trustee's office.

9              THE COURT:  That's the mob?

10             MR. LEE:  Yes, Your Honor.

11             THE COURT:  I understand, okay.  Let's go then to

12   Page 7, Paragraph 12.  I'm assuming that there are -- you're

13   saying you're being besmirched with lies.

14             MR. LEE:  Yes, Your Honor.

15             THE COURT:  And that the U.S. Trustee decided to

16   pour gasoline on an ember.

17             MR. LEE:  Yes, Your Honor.

18             THE COURT:  And quoting my concerns.

19             MR. LEE:  Yes, Your Honor.

20             THE COURT:  Has anyone addressed my concerns in

21   any of these pleadings?  Has anybody told me about -- has

22   anyone addressed in any of the pleadings in here why the

23   Court was never informed?  Is there a sentence in your

24   response or the response to Mr. Schwartz that addresses the

25   concern that I raised at the beginning of the case; that no

1    one informed me about anything that happened in the InfoW

2    cases.

3              MR. LEE:  The point is precisely that, you know.

4              THE COURT:  Can you tell me a sentence where my

5    concern was addressed?

6              MR. LEE:  Your Honor --

7              THE COURT:  In your response, can you tell me --

8    can you point me to a sentence anywhere in this here that

9    you describe where the gasoline is being drawn on because of

10   the comments that I made.

11             MR. LEE:  No, Your Honor.  It's not the fact that

12   your comments were creating the fire.  It's the fact --

13             THE COURT:  No, no, no.  They poured gasoline on

14   my comment.

15             MR. LEE:  Your comments --

16             THE COURT:  Tell me where the gasoline is.

17             MR. LEE:  The gasoline is the suggestion that

18   there was some type of unethical conduct when, if they had

19   asked about the sequence and they should have investigated

20   it after you made those comments to us, we could have told

21   them the sequence of events that took place here.

22             THE COURT:  I'm going to tell you, the question

23   I'm going to ask is why didn't you tell me.  Why did you

24   stand up and tell me that -- why did you stand up on May

25   19th --

```
 1          MR. LEE:  Yes, Your Honor.

 2          THE COURT:  -- and tell me that you all were

 3    pursuing other options, and then five days later, you're in

 4    a meeting and you're drafting first day declarations a week

 5    later; that's what's going to come out.  And I'm just

 6    telling you those are the questions that I'm going to ask

 7    you, but I want it under oath.

 8          MR. LEE:  Your Honor, I'm happy to go under oath

 9    and tell you that.

10          THE COURT:  No, no.  I think you're going to have

11    to because I think there's been an objection.  So why don't

12    we just -- I'm just telling you where this is going.

13          MR. LEE:  Your Honor, I'm --

14          THE COURT:  I'm just concerned about the inflamm-

15    -- I asked, and Mr. Shannon was here.  I asked all parties

16    to really -- this is an emotional case and I get it.  And

17    I'm not one to -- I think people should defend themselves

18    vigorously, especially with what's at stake, and I think

19    there's strong emotions on both sides.  I asked everyone to

20    really consider the rhetoric that was here.  In one matter,

21    I had to seal something because of inflammatory language.

22    I've even stopped exhibits from being shown.

23          So when I start hearing that the U.S. Trustee has

24    engaged in unethical behavior, I take those things really

25    seriously.  I'm going to tell you, maybe you can point me
```

 1    out to something, but as of right now, I would have an

 2    ethical duty to report any such behavior, and I find none.

 3    So I'm satisfied that I've taken care of my duties to

 4    investigate whether there was anything in this -- anywhere

 5    in this response that really displayed unethical behavior or

 6    whether there were flat out lies in these statements, and I

 7    find none.

 8         That doesn't mean, and I want the U.S. Trustee to

 9    understand, I don't mean I don't approve the application.

10    It just means that the reporting obligation that I would

11    have if I found some unproper behavior on behalf of the

12    United States Trustee, I believe has been satisfied.

13         So, Mr. Shannon, how do you want to proceed?

14         MR. SHANNON:  Thank you, Your Honor.

15         THE COURT:  You can take them up at the same time,

16    however you want.  How do you feel comfortable proceeding

17    with Mr. Schwartz and Mr. Lee.  I want you to put on your

18    presentation.  I had to take care of that first because I

19    can't deal with that in the middle of a hearing where there

20    are allegations that go beyond the scope of what we're

21    talking about today.  I had to address that.

22         MR. SHANNON:  Understood, Your Honor.  Your Honor,

23    you basically heard my argument.  But to respond to what you

24    were raising before, there are --

25         THE COURT:  Which portion of it?

1            MR. SHANNON:  I'm sorry.

2            THE COURT:  I apologize.

3            MR. SHANNON:  The Court had raised the issue that,

4    well, if there was something that affected this case, if

5    there was a connection or some kind of conflict in this

6    case.  The evidence will show that there is none.

7            THE COURT:  Okay.

8            MR. SHANNON:  And ready to have evidence unless

9    you have any questions for me.

10           THE COURT:  No, no.  I want to give the United

11   States Trustee an opportunity to just kind of make a brief

12   opening if that's what they choose to do.

13           And, Mr. Hguyen, I see it.  I just want to make

14   sure -- got a lot of people listening in.  I want to make

15   sure everybody has an opportunity to hear everything.

16           MR. NGUYEN:  Understood, Your Honor.

17           THE COURT:  Just get close to a mic whenever you

18   do speak.

19           MR. NGUYEN:  Your Honor, we filed two objections

20   in this case, and we don't take these objections lightly.

21   You know, the matter before the Court is primarily focused

22   on disclosure.  Disclosure is looked at most important.  And

23   I remember the first day we were in here and I told the

24   Court, you know, we're going to look at this case with fresh

25   eyes, but as long as everyone operated with complete

1    transparency and if there is any lack of transparency, we

2    would be bringing it before the Court.

3          And, Your Honor, during Mr. Shannon's

4    presentation, I don't -- he didn't say, but he seems to

5    suggest that somehow we knew about the connections in the

6    InfoW cases.  I can tell the Court that none of that was

7    told to us.  We found out the same time you found out.

8          So, Your Honor, since transparency in bankruptcy

9    cases in general, you know, plays a very important role.

10   The Debtor has to be transparent, creditors have to be

11   transparent when they file proof of claim, and there's a

12   high standard of transparency that's imposed to almost all

13   the professionals that appear in front of you.

14         The professionals need to come out and lay bare

15   all of their connections.  There's discussions of

16   disclosable connections, material connections, or

17   disqualifying connections.  That's not the standard under

18   Rule 2014.  You disclose all your connections.  You don't

19   pick and choose which connections to disclose and not

20   disclose and, quite frankly, that's what happened in the

21   InfoW case.

22         They decided on May 24th in a room up in Austin to

23   not proceed with the bankruptcy case.  You know, the Court

24   wasn't in that room and understanding (sound glitch)

25   plaintiffs were in that room.  So based on that decision,

1    they made the determination not to disclose to Your Honor

2    their connection with FSS beginning May 24th.

3         And, Your Honor, I think the connection actually

4    began on May 19th when Mr. Lee picked up that phone call and

5    he acted as the recruiter for FSS and asked Mr. Schwartz,

6    who was the CRO, the guy who is in the driver's seat for

7    InfoW cases, to pretty much change his jersey and then work

8    for FSS. You know that day, May 19th, was when the

9    connection occurred. And that's under the rule, under Rule

10   2014, that is when they needed to disclose that connection.

11        I know there's discussion about, well, you know,

12   it was May 24th, maybe it was June 6th when we executed

13   agreement. The date seems to fluctuate, but it all comes

14   down to that May 19th, as far as we know, because the

15   conversation could have occurred before, but we know there

16   was a phone call on May 19th.

17        And remember on May 19th, we were all in this

18   courtroom and there were discussions about Mr. Schwartz

19   needed to -- he needed a month, I think that's what the

20   original request was, to handle the remaining creditors.

21   But all of a sudden within that afternoon, Mr. Schwartz was

22   ready to send that engagement letter to FSS to change his

23   role.

24        And FSS, no matter we're not -- you know, under

25   the rules, all connection, but the connection to FSS was so

1    central to the InfoW case.  This is not talking about your

2    neighbor's mailman's sister.  This is the counterparty that

3    was sitting at a negotiation table in the FSS case.

4            THE COURT:  Mr. Nguyen, let me ask you.  The

5    argument raised by Mr. Shannon is, look, that's we're

6    rehashing InfoW issues, and you have your rights as to

7    whatever it is in the InfoW case.  But when we look at the

8    FSS case, it's different and you should look at FSS.  And

9    what you're seeking to do is inject, you know, potential

10   non-disclosure issues in the InfoW case and infect them into

11   this case.  What's your response to that?

12           MR. NGUYEN:  Your Honor, we're obligated, we are

13   obligated to bring this objection in this case.  Remember,

14   FSS was the connection that they did not tell you in the

15   InfoW case.

16           Now, they're coming into this case asking you to

17   approve -- you're actually -- if you approve these

18   applications, you're actually compounding the disclosure

19   failures in the other case, because FSS is the connection

20   that was not disclosed to you from May 19th all the way to

21   June 10th.  It wasn't disclosed to the Sandy Hook family, it

22   wasn't disclosed to the U.S. Trustee.  I don't believe the

23   Subchapter V Trustee knew about it.

24           The reason why we're objecting is this is the very

25   connection.  The Court is a witness to this.  The Court was

1    not told about any of this.  And you say, oh, now it's

2    improper for us to raise this objection while you're asking

3    the Court to bless a connection that wasn't disclosed?  It's

4    relevant here, Your Honor.  They didn't disclose the

5    connection to FSS.  This is the client, the same -- I mean,

6    there are some -- I call them distractions.  There are some

7    distractions saying, oh well, it was a different law firm.

8           Well, you know, when we were talking about 327,

9    we're talking about professionals.  Change your letterhead,

10   doesn't matter, we're talking about professionals.  We're

11   talking about the same people, we're talking about the same

12   connection that was not disclosed to you.

13          And it's, in many ways, a continuation of the

14   previous case because this is the connection that -- I don't

15   want to -- I'm trying to use my words carefully.  There was

16   an non-disclosure of this connection and they're asking you

17   to bless this connection, so that's my response to that.

18          And I'm not obligated to object to this.  I'm

19   obligated to bring this before the Court and I'm not doing

20   this for any unethical reasons.

21          And, you know, I'm glad Your Honor went through

22   that reply.  I wasn't going to do it, but that -- I wasn't

23   going to address it, but I think it's important that there

24   were a serious attacks on my character and also Mr. Ruff's

25   character.  And all I got to say about that is, you know,

1    Mr. Ruff and myself appear in front of Your Honor all the

2    time.  You know what type of lawyers we are, and I will just

3    leave it at that, Your Honor.  I won't address the language

4    that was in the reply.

5          But, Your Honor, all we're saying here is there

6    was a serious non-disclosure that occurred with this very

7    connection.  I think under Rule 2014, there is a proverbial

8    fox that guards the henhouse.  What we're asking is harsh,

9    but, you know, disclosure violations when they occur, you

10   know, sometimes the consequences are harsh.  A lot of cases,

11   you might get disqualified.  A lot of cases, you lose all

12   your fees.  But sometimes, that's what it takes to uphold

13   the integrity of the bankruptcy system and that's why we're

14   asking for Your Honor to deny the two applications that are

15   before you.

16         THE COURT:  Thank you.  Is there anyone else who

17   wishes to make any form of an opening if you will.  Mr.

18   Battaglia.

19         MR. BATTAGLIA:  Yes, Your Honor.  Ray Battaglia

20   for Free Speech Systems.  I was Free Speech Systems' counsel

21   in the IW bankruptcy cases.  I guess ultimately my

22   perspective on this, since I've been --

23         THE COURT:  Can you just get closer to the mic?  I

24   want to make sure folks can hear you.

25         MR. BATTAGLIA:  All right.  The continuity I have

1    with this is I am the representative, legal representative

2    of FSS in both cases.  And obviously, there was a certain

3    logic to retaining counsel that had some familiarity with

4    the players and the baseline issues existing here with

5    litigation and the like.

6              So it can't be extraordinary to anybody that prior

7    counsel and prior CRO would be logical selections, not the

8    least of which is the number of people who are willing to

9    take representation of an Alex Jones-related entity is

10   small.  It's a very small universe of professionals.

11             But my perspective on this is did they meet the

12   standard of disinterestedness.  I can't comment on the

13   disclosure issues in the IW case, but my perspective on it

14   is were they disinterested at the time that communication

15   was established about them coming to provide services to

16   FSS.

17             By, I believe it was May 19th, if not before, the

18   litigation claims against the IW debtors had been dismissed

19   with prejudice, and, therefore, as of that date or slightly

20   before then, IW and FSS were ships passing in the night.

21   They did not have common ownership; they did not have common

22   creditors.  There just was no connection at that point in

23   that they'd been disconnected by the dismissals with

24   prejudice, a decision that the plaintiffs themselves decided

25   to make.  Texas plaintiffs actually made that decision the

1    day of or just prior to the filing of the IW cases.

2    Connecticut plaintiffs took a little bit longer and filed

3    their dismissal pleadings in the Connecticut cases.

4           So as far as I could tell from my perspective,

5    they were disinterested; they met the standard.  They didn't

6    represent common shareholders, they didn't represent parties

7    who had common claims against themselves.  And the PSA,

8    which I know is important to you -- and you raised this

9    before when we talked about how it terminated in its own

10   terms and you had asked would there be an extension, and I

11   told you we would agree to extend it and we submitted the

12   draft that was negotiated with the litigation trustees with

13   a new date.

14          It was never executed because by the time it came

15   up, there was no purpose to be served anymore by a PSA.  The

16   PSA was exclusively designed to pay the Connecticut and

17   Texas plaintiffs' claims.  They didn't exist against IW, so

18   there was no purpose served by the PSA at that point.  It

19   was a dead document.  The relationships between the

20   entities, the IW and the FSS entities had ceased to exist by

21   the dismissals.

22          And so, from the Debtors' perspective in selecting

23   counsel and selecting a CRO, we found someone who we believe

24   to be completely disinterested at the time that we engaged

25   them.

```
 1              THE COURT:  Thank you.  Anyone else?  Mr. Chapple.
 2              MR. CHAPPLE:  Thank you, Your Honor.  Ryan Chapple
 3    again on behalf of the Connecticut plaintiffs.
 4              Your Honor, we did, along with the Texas
 5    plaintiffs, filed a joinder to the objections to the
 6    employment objections.  The only note that I would make here
 7    is that candor and disclosure are important with the
 8    parties.  It's always of the utmost importance, especially
 9    in this context, especially when we have these two cases
10    abutting back to back.
11              And when the latter case was filed under
12    Subchapter V, which by statute does not have all of the
13    components relating to oversight and there's typically no
14    committee.  There's typically the creditors who do
15    participate are not as sophisticated as the creditors you
16    see in a typical large Chapter 11.
17              So I believe the only point that the Connecticut
18    plaintiffs, and I believe the Texas plaintiffs as well,
19    would make is that candor and disclosure is absolutely of
20    the utmost importance here, and that's why we filed our
21    joinder to the Trustee's objections.
22              That's all I have right now, Your Honor.
23              THE COURT:  Thank you.  Okay, Mr. Shannon.  The
24    only request I'm going to make is anytime anyone speaks, I
25    just want to make sure -- just get as close as you can to
```

1    one of the mics.  If you've got a booming voice, you're

2    good; if you have a soft voice, I just ask that you get a

3    little closer.  I want to make sure that we have a good

4    record.  And obviously, the hearing's being recorded, so I

5    want to make sure that we have a good record for today.

6              Mr. Shannon, I apologize.

7              MR. SHANNON:  Yes, thank you, Your Honor.  I guess

8    first before the hearing --

9              THE COURT:  Actually, I want to talk -- before you

10   get into any argument, exhibits.  Was there any agreement on

11   exhibits as to what the parties could agree to up front?

12             MR. SHANNON:  Yes, Your Honor.  I believe that all

13   of the exhibits are agreed, and those would be --

14             THE COURT:  Hold on.  Let me just make sure we

15   have a good record.  I just want to pull docket numbers and

16   make sure that we're all good on that.  So I see one at 163,

17   Mr. Shannon, where you have exhibits --

18             MR. SHANNON:  One through 34.

19             THE COURT:  -- 1 through 34.  Any objection to

20   that?

21             MR. NGUYEN:  No objection, Your Honor.  We've

22   agreed for all the exhibits.

23             THE COURT:  Okay, let me just go one by one then.

24   So what about 165; that's the U.S. Trustee's, I believe.

25             MR. SHANNON:  No objection, Your Honor, from the

1    debtor.

2              THE COURT:  Okay, so that is Exhibits 1 through

3    16?

4              MR. SHANNON:  Yes, Your Honor.  I do believe that

5    on Exhibit 16 is a --

6              THE COURT:  Demonstrative?

7              MR. SHANNON:  -- demonstrative.

8              MR. NGUYEN:  One through 15, Your Honor, so 16

9    doesn't need to go in.

10             THE COURT:  Okay, 1 through 15 at Docket No. 165.

11   You filed one, an additional one today, Mr. Shannon.  Is

12   there any objection to that?

13             MR. NGUYEN:  No, Your Honor.  We discussed it, no

14   objection.

15             THE COURT:  Okay, so then that would be at 178,

16   Exhibits 35 through 37?

17             MR. NGUYEN:  That's correct, Your Honor.

18             THE COURT:  Okay.  So then we have essentially 1

19   through 37 on behalf of Free Speech and U.S. Trustee

20   Exhibits 1 through 15.  Did I get that right?

21             MR. NGUYEN:  Yes, Your Honor.

22             THE COURT:  Okay.  All right, that was the last

23   housekeeping piece.

24             Mr. Shannon, I'm really going to stay quiet this

25   time.  I apologize.

```
 1                 MR. SHANNON:  Yes, Your Honor.  I mean, I don't
 2      know if you would like to hear a response from me or we
 3      could just start evidence.
 4                 THE COURT:  I want you to proceed.
 5                 MR. SHANNON:  Great.  You know, Your Honor, my
 6      understanding from what I hear is that what this Court is
 7      interested in hearing is whether there is anything that
 8      creates a conflict that does not allow Shannon & Lee LLP or
 9      Mr. Schwartz to exercise their fiduciary duties.
10                 THE COURT:  I think it's a factor for sure.  I
11      mean, it's the test, right.
12                 MR. SHANNON:  So, Your Honor, with that, I would
13      just --
14                 THE COURT:  But I want you to put on whatever
15      presentation you want.  I put out that thought because, you
16      know, obviously, I think there could be a connection between
17      the two cases, but you're free to tell me there is none,
18      one, but I just inquire as to that.  But I want you to put
19      on your full presentation.
20                 MR. SHANNON:  Your Honor, I would just like to go
21      to evidence and call Mr. Lee.
22                 THE COURT:  Okay.  Mr. Lee, please take the stand.
23      I'll get you close to a mic.  There is a binder on the
24      stand.  Who's binder?
25                 MR. SHANNON:  Both of those are the Debtors, Your
```

```
1    Honor.  The large binder would be Exhibits 1 through 35, and
2    the small binder is Exhibits -- or 1 through 34, I'm sorry.
3              THE COURT:  And then 35 through 37?
4              MR. SHANNON:  That's correct.
5              THE COURT:  Okay.
6              MR. LEE:  Your Honor, I have in my possession a
7    blank calendar for 2022.
8              THE COURT:  Okay.
9              MR. LEE:  Because the dates are -- I'm just...
10             THE COURT:  Understood.  Raise your right hand.
11   Do you swear to tell the truth, the whole truth, and nothing
12   but the truth.
13             MR. LEE:  I do.
14             THE COURT:  Okay.  You may be seated, sir.
15                  DIRECT EXAMINATION OF KYUNG LEE
16   BY MR. SHANNON:
17   Q    Good afternoon, Mr. Lee.  Can you state your full name
18   for the record.
19   A    Kyung, K-Y-U-N-G, middle name Shik, S-H-I-K, last name
20   Lee, L-E-E.
21   Q    And do you understand that you're here for the
22   consideration of the application for the CRO and Shannon &
23   Lee LLP by the Debtor, Free Speech Systems?
24   A    I am.
25   Q    What is your role in this bankruptcy cases?
```

1    A    In the FSS bankruptcy case, I am a partner with Shannon

2    & Lee, and I'm being put up as a co-counsel for the Debtor,

3    FSS.

4    Q    And, Mr. Lee, when was Shannon & Lee LLP founded?

5    A    In June 1, 2022.

6    Q    Mr. Lee, are you a licensed attorney?

7    A    I am.

8    Q    How long have you been a licensed attorney?

9    A    Since September of 1984.

10   Q    And can you describe your practice for the Court?

11   A    My focus is on corporate bankruptcy work, either for

12   the debtor, committees, or creditors, and I've been doing it

13   since 1984.  Practiced with Sheinfeld Maley & Kay for a

14   number of years and went off for the group in 1993 with

15   Verner Kiipfert and practiced with them as their bankruptcy

16   group for 10 years, and then went off with a small group to

17   join a boutique called Diamond McCarthy, was their

18   bankruptcy group for a number of years until 2018.

19          And then I left to work for Kasowitz Benson for

20   one year, and then formed my own firm as of 2019 and

21   practiced for about six months by myself and then partnered

22   up with my former partner, Mr. Leonard Parkins and Charles

23   Rubio, as of August 1, 2020, and practiced with them two

24   years until May 15th, 2022, when I departed and practiced

25   law with myself for 15 days, from May 15, 2022 to June 1,

1    2022, and then I formed a partnership with you to form

2    Shannon & Lee LLP as of June 1, 2022.

3    Q    Thank you, Mr. Lee.  Are you involved in any

4    professional groups related to your practice?

5    A    I am.  I'm a member of the American Bar Association.

6    I'm a member of the American Bankruptcy Institute.  I belong

7    to the TMA organization here in Houston.  I'm an active

8    member of the American Bar Association Business Bankruptcy

9    Committee, serve on the subcommittee on government powers.

10   I also have acted in the past with the Texas Disciplinary

11   Committee in sanctioning and disciplining attorneys who are

12   in violation of ethical obligations and served on that

13   committee for about five years in the last 1980s, and also

14   serve on several other committees in connection with

15   minority attorneys.

16   Q    Thank you.  If you could turn in the large exhibit book

17   there to Tab No. 1.

18   A    Yes, sir.

19   Q    Take a look at that exhibit and let me know if you're

20   familiar with this document.

21   A    I am.

22   Q    Can you explain what this document is?

23   A    Exhibit No. 1 is an application of Shannon & Lee to be

24   retained as bankruptcy co-counsel in the FSS bankruptcy

25   case.

1    Q    Mr. Lee, when you say co-counsel, what is your

2    understanding of what Shannon & Lee LLPs role would be if

3    the application to employ is granted?

4    A    Shannon & Lee will work together with the Law Offices

5    of Ray Battaglia to represent Debtor FSS in the bankruptcy

6    case.  The division of responsibility will be like in a

7    large law firm where Mr. Battaglia would have certain

8    responsibilities because he's technically the lead counsel

9    and have overall strategy, global kind of responsibility

10   about the case.

11         And it's contemplated that Shannon & Lee will take

12   over a lot of the issues relating to the daily operations of

13   the business and assist Mr. Schwartz in implementing many of

14   the operational issues, as well as assisting Mr. Battaglia

15   in all the work that has to be done in the case.

16   Q    And to date, what kind of things have you been involved

17   in with the Debtor, what matters?

18   A    Since the filing of the bankruptcy case, I've been

19   involved in most of the daily operational issues that have

20   confronted the company, in drafting pleadings with you.  I

21   guess primarily my work has been investigating sort of the

22   capital structure of the company, understanding its business

23   background so as to be able to draft the declaration for Mr.

24   Schwartz in connection with the filing of the bankruptcy

25   case.

1          Number two, understanding the finances of the

2     company so as to be able to determine what would be an

3     acceptable disposable net income for the next three years

4     for a plan of reorganization, as well as understanding the

5     company's capital structure in order to be able to complete

6     the financials and also the schedules and the monthly

7     operating reports, and strategize with respect to the plan

8     of reorganization.

9     Q    Mr. Lee, do you have familiarity with the Debtors'

10    corporate structure?

11    A    I do.

12    Q    How did you get that familiarity?

13    A    It started on May 24th, 2022, when we were invited to

14    come to a meeting in Austin, Texas, and we started the data

15    gathering process at that point in time with Mr. Schwartz

16    and with the company people that were available at that

17    time.  It was an arduous task because the company's books

18    and records were not in the best shape.  And so, by the time

19    we got through June 5th or June 6th at that time, we

20    gathered very few documents and were still looking for

21    documents regarding what the company's capital structure

22    looked like, and we're still gathering those document.

23          To this day, we have some of the documents.  But

24    for example, as a major secured creditor, Security Bank of

25    Crawford, we have a proof of claim that still doesn't make

1    sense and we still don't have their corporate documents as

2    to their secured claim, so we're still missing documents.

3    Q    Mr. Lee, do you have familiarity with the litigation

4    against the Debtors?

5    A    I do.

6    Q    How did you get that familiarity?

7    A    I got the familiarity by studying the state court

8    lawsuits that have been filed.  The state court litigators

9    in Texas made available to me their state court discovery,

10   and so, I studied the thousands of pages of documents that

11   were produced and went through those files to understand

12   what the issues were, as well as what had been produced in

13   the last four years of litigation, in order to determine

14   what documents had been produced relating to the financial

15   aspects of the company, so as to understand what had been

16   represented to the state court litigators so as to

17   understand what will be presented against us in a bankruptcy

18   case.

19   Q    And, Mr. Lee, to date, have you been involved at all in

20   preparing the proposed plan of reorganization that will come

21   in this case?

22   A    I have.

23   Q    And about how much time would you say you've spent on

24   that?

25   A    I've spent, I would say, I can't give you quite a

1    number, but I can tell you that I've been involving staying

2    up quite late in drafting a plan of reorganization

3    internally.  I've had strategy sessions with the company

4    internally with you, as well as Mr. Schwartz and Mr.

5    Battaglia, over the classification of various claims, as

6    well as the treatment of various creditors and the concepts

7    of how to put disposable net income and calculate those and

8    had discussions with how to proceed to confirmation on such

9    a plan, and also how to dedicate the avoidance actions and

10   to whom they should be dedicated.

11   Q    Thank you, Mr. Lee.  When was Shannon & Lee LLP first

12   retained by the Debtor, Free Speech Systems LLC?

13   A    My recollection is that the engagement letter was

14   executed on June 6, 2022, when Mr. Alex Jones signed the

15   engagement letter when we were in Austin, Texas.

16   Q    Did Shannon & Lee LLP receive a retainer?

17   A    We did.

18   Q    And when was that retainer received?

19   A    To my knowledge, the retainer was received on June 10,

20   2022, and was sent to us by FSS.

21   Q    Thank you.  If you could look at this Exhibit 1 and

22   turn to Paragraph 15.

23   A    I'm there.

24   Q    You beat me there.  If you could just review Paragraph

25   15.

1    A    I have.

2    Q    And let me know if anything in that needs to be

3    changed.

4    A    It does.  The last sentence where it says that the

5    retainer was received on or about June 7, 2022 was

6    incorrect.  We received an email saying that it was sent on

7    June 7th, but it turns out that our bank records show that

8    the receipt was on June 10, 2022.

9    Q    Thank you, Mr. Lee.  If you could turn in your exhibit

10   book to Exhibit 3.

11   A    Yes, sir.  I'm there.

12   Q    Could you tell me what this -- or are you familiar with

13   this document?

14   A    I am.

15   Q    Can you tell me what this document is?

16   A    It's the engagement letter we prepared for FSS that was

17   prepared on or about June 5, 2022, and executed by Mr. Jones

18   on June 6, 2022, retaining Shannon & Lee for the company

19   FSS.

20        THE COURT:  Mr. Shannon, is there any objection to

21   me showing this on the screen, just so --

22        MR. SHANNON:  No, Your Honor.

23        THE COURT:  I want to make sure because normally,

24   our local rules require that exhibits get filed on the

25   docket.  I don't mind waiving it today, but I just want to

1    make sure we can all follow along.

2              MR. SHANNON:  Yes.  And, Your Honor, the exhibits

3    were filed on the docket.

4              THE COURT:  Oh, I know, and just no one's -- we're

5    not putting them up.  I just want to make sure that

6    everybody who may be watching or in the courtroom can follow

7    along, if it's okay, but I'm only going to go to the pages

8    that you point to.

9              MR. SHANNON:  Okay.  Thank you, Your Honor.

10             THE COURT:  Okay, thank you.

11   BY MR. SHANNON:

12   Q    Okay, Mr. Lee, if you could turn to Exhibit 4 in that

13   book.

14   A    Yes.

15   Q    Are you familiar with this document?

16   A    I am.

17   Q    Can you describe what this document is?

18   A    This is the declaration that I prepared in connection

19   with the filing of our application in the FSS bankruptcy

20   case, and it recites the declaration of disinterestedness

21   that we're required to file in connection with our

22   application.

23   Q    And did you review this document before coming to court

24   today?

25   A    I did.  And, in fact, I'm responsible for having

1    drafted this document in the first place.

2    Q    And are there any corrections that need to be made to

3    this document?

4    A    I don't believe so.

5    Q    Thank you.  Could you turn to Tab No. 5 and take a look

6    through that.  Are you familiar with this document?

7    A    I'm generally familiar with this document.  It's a

8    conflicts check.  Yes, I'm generally familiar with it.

9    Q    What is this document?

10   A    The document is a conflicts check that you ran in

11   connection with our Clio software program showing the

12   conflicts check that you performed in connection with the

13   potential representation of FSS in this bankruptcy case,

14   which is also Document Nos. 5 and 6.  It shows the hits that

15   we received, if any, in doing the conflicts check before we

16   undertook the representation.

17   Q    And can you tell based on this document on or about

18   what date it was created?

19   A    Performed, it looks like one was performed on August

20   16, 2022, and the other one, Exhibit No. 6, was performed on

21   or about September 16, 2022 if that's correct.

22   Q    Well, okay, let's turn to Exhibit 6 then.  You kind of

23   jumped ahead of me there.

24   A    Sure, sorry about that.

25   Q    Are you familiar with this document and, if so, what is

```
 1   it?

 2   A    It's another conflicts check performed by you.

 3   Q    Okay.  And you had just said that this one was

 4   performed on 9/16.

 5   A    That's correct.

 6   Q    Okay.  If there were any conflicts -- let me retract

 7   that.  What does this document show; what does it determine?

 8   A    It determines that there are no conflicts that we're

 9   aware of within our firm system that are creditors of the

10   FSS corporation that would create any kind of issue for the

11   firm being able to undertake the representation or that

12   would create a problem of disinterestedness for us.

13   Q    And do you know how this document is -- how it runs,

14   how it's created?

15   A    I have a general idea of it, but it looks like it does

16   kind of a computer search and then it hits on these words

17   that are within our computer system, and if there's a hit,

18   it hits it.  But that's about the best way I know -- I'm not

19   a -- even though I'm not a science major.

20   Q    That's fine.  Let me just ask you, and I'm not asking

21   whether it's in these documents.

22   A    Right.

23   Q    Does Shannon & Lee LLP have any connection to PQPR?

24   A    No.

25   Q    Did it ever represent PQPR?
```

1   A     We have never represented PQPR.  And again...

2   Q     What connections does Shannon & Lee have to Alex Jones.

3   A     Well, before you -- I want to answer the question about

4   PQPR.  Counsel to PQPR, Mr. Steve Lemmon, was a former

5   partner of mine at Sheinfeld Maley & Kay between 1984 and

6   1993.  Again, I haven't disclosed that, but that's one

7   connection that is there.  Another connection is that Millie

8   Saul was an associate that I trained for four years between

9   1998 and 1992, which I also did not disclose.  But those are

10  as a result of practicing in the bankruptcy area, you tend

11  to have a lot of connections.  And those are the two that I

12  guess, depending upon the day, maybe I should have

13  disclosed; I didn't.  But I didn't disclose them because I

14  don't think they have any impact on my ability to be fair

15  and unbiased in this estate.

16  Q     Thank you, Mr. Lee.  So now a question about Alex

17  Jones.

18  A     Yes, sir.

19  Q     Does Shannon & Lee LLP represent Alex Jones?

20  A     We do not.

21  Q     Has -- strike that question.  Has the Debtor, Free

22  Speech Systems LLC, in this bankruptcy case ever taken any

23  position contrary to Alex Jones?

24  A     Yes.

25  Q     And could you describe one of them?

1    A    In this bankruptcy case, as an example?

2    Q    Yes.

3    A    We've taken lots of adverse positions to Alex Jones.

4    One, there's been a request by Mr. Jones to extend the

5    automatic stay to him; we've told him we can't do that.

6    Number two, he's asked us to bear 100 percent of the costs

7    of all these things, including legal, in connection with

8    these lawsuits; we've told him we're not going to do that,

9    and we've had to fight him on that.

10           THE COURT:  Mr. Lee.

11           THE WITNESS:  Yes, Your Honor.

12           THE COURT:  On the state court litigation, isn't

13   that what FSS filed originally was a request to pay for 100

14   percent of the legal expenses for Mr. -- the two counsels

15   that are in the litigation in Connecticut?

16           THE WITNESS:  We did, Your Honor.  And then once

17   you told us that we couldn't do that, when we filed the

18   retention pleadings for Mr. Martin, the appellate lawyer, we

19   already told them that we could only bear either 50 to 60

20   percent of those costs.

21           THE COURT:  But I'm saying that you said that you

22   went against Mr. Jones on that.  That was at the request of

23   the United States Trustee and the Court that said that they

24   weren't going to approve without paying their fair share.

25   How did Shannon & Lee take a contrary position?  The

1  application was filed requesting 100 percent of the fees on

2  an emergency basis.

3           THE WITNESS:  Your Honor, that is correct.  We did

4  file an emergency basis saying -- to bear the 100 percent

5  and then negotiations subsequently took place.  And, you're

6  right, I need to correct my testimony.

7           THE COURT:  You're talking about after?

8           THE WITNESS:  Yes, Your Honor.

9           THE COURT:  Okay.

10           THE WITNESS:  Yes, Your Honor, absolutely.

11           THE COURT:  Thank you.  Thank you.

12           THE WITNESS:  We did file it as 100 percent, and

13  then subsequently, there were negotiations that resulted in

14  the reduction to 50 and 40 percent, I believe -- 60 percent.

15  Yes, Your Honor, absolutely.

16  BY MR. SHANNON:

17  Q    And, Mr. Lee, just to clarify.  So in the most recent

18  application to employ litigation counsel, the appellate

19  counsel.

20  A    Yes.

21  Q    In that one, there was not a request to pay the full

22  amount.

23  A    That's correct.  We already made -- we already told Mr.

24  Jones's counsel that Mr. Jones would have to bear a

25  proportionate share and they've agreed to bear 40 percent

1  and we agreed to bear 60 percent.  And the arguments were

2  that Mr. Jones has already been cut back on some of his

3  regular salary and we had an arm's length negotiations over

4  that issue and came down to a 40/60 split.

5  Q    And what about PQPR; were there any, you know, contrary

6  positions taken?

7  A    To be blunt about it, there were almost fistfights over

8  the negotiations between PQPR and FSS and Mr. Jones, so to

9  suggest that we're all in bed together is just nonsense.

10  We've had many disputes over all the terms of the

11  relationship among us, and there's not been one group of

12  people getting into bed together and arranging something

13  secret.  It has been very hardily fought.  It's been very

14  hardily -- it's been negotiated very hard and there have

15  been terms that had to require lots of negotiations to get

16  to a final resolution.

17  Q    Thank you, Mr. Lee.  If you could turn in the exhibit

18  book to Exhibit 7.

19  A    I'm there.

20  Q    Are you familiar with this document?

21  A    I am.

22  Q    And if so, what is it?

23  A    It's the invoice for Shannon & Lee for the month of

24  June 2022 for FSS and the time records for what we did for

25  them during the month of June 2022.

 1    Q    If you could look through this document and see if you

 2    can determine how many hours Shannon & Lee LLP professionals

 3    worked on this matter in that month.

 4    A    On Page 6 of 7 on Exhibit No. 7, it says that the total

 5    was 127 hours and 95 minutes for the month of June 2022.

 6    Q    It's .95 hours.

 7    A    I'm sorry, .95.  127 hours and .95 whatever hours.

 8    Q    Could you turn to Exhibit 8.  Are you familiar with

 9    this document and what is it?

10    A    I am.  This is the July invoice that Shannon & Lee

11    supplied to the client, FSS, for the work we did in the

12    month of July 2022.

13    Q    And same question, how many hours does this reflect

14    spent on the matter?

15    A    On Page 5 of 7, it reflects it looks like 140 -- I'm

16    sorry -- I think it's 140.85 hours.

17    Q    Thank you, Mr. Lee.

18         THE COURT:  I have a question on this page and I'm

19    going to ask you anyway.  So on Page 1, you attended a focus

20    group hosted by someone and participated on a jury

21    perception of Alex Jones.  That was work for FSS?

22         THE WITNESS:  Yes, Your Honor.  We're co-

23    defendant.

24         THE COURT:  Okay.

25         THE WITNESS:  We're co-defendant.

1          THE COURT:  I understand.  Thank you.

2     BY MR. SHANNON:

3     Q    And, Mr. Lee, let's actually talk about that particular

4     time.  What was that time entry the Judge just brought up

5     about the focus group?  Can you describe what you did during

6     that time?

7     A    Yes.  I was asked by Andino Reynal, and I spelled this

8     wrong here, who was our state court litigator who was

9     conducting focus groups to come in at 10:00 and listen to

10    what the group was saying and how they reacted, and I ended

11    up participating and listening and watching it to determine

12    how the group was reacting to some of the questions and

13    issues that were being brought up about the soon-to-be tried

14    case and getting a sense of the various ranges of jury

15    verdicts that they would give for certain claims.

16          And I was asked to listen to those and get a sense

17    of this so that I could have an idea of the kind of range of

18    estimation of claims that we could kind of get an idea of.

19    Again, just a way of approximating a range of claims for

20    purposes of getting ready for the bankruptcy.

21    Q    And you said the case that was soon to be tried.  Do

22    you know what case that you were talking about?

23    A    I believe it was the Texas case called the Heslin/Lewis

24    suits that went to trial in Texas.

25    Q    And did that case play -- that state court litigation

1    have anything that was filed in the bankruptcy case about

2    that?  Was anything filed in the bankruptcy case about it?

3    A    In this case or in the last --

4    Q    In this case.

5    A    The Heslin/Lewis suit, yes.  In fact, that was the

6    motion that was filed on the first day of the FSS bankruptcy

7    case in which the Debtor, FSS, agreed to lift the automatic

8    stay so that that lawsuit could proceed to trial to

9    judgment.  And we filed the motion to lift stay on the very

10   first day and we went and came before Judge Lopez to get

11   relief so that that lawsuit could proceed to judgment before

12   Judge Gamble.

13   Q    And, Mr. Lee, do you remember who argued that motion on

14   behalf of the Debtor?

15   A    It was either you or Mr. Battaglia, I believe; that's

16   my best recollection.  I apologize, but I just don't -- I

17   don't have a good recollection of that day.

18   Q    That's fine, Mr. Lee.  If you could turn in the exhibit

19   book to Tab 9.

20   A    I'm there.

21   Q    What is this document?

22   A    This is an invoice that I submitted to Mr. Schwartz for

23   work that I did on behalf of Free Speech between the period

24   of 5/24 and June 1, when I was practicing alone as Kyung S.

25   Lee PLLC, and that was the invoice I sent to Mr. Schwartz

1    for the work I was doing during that period of time.

2    Q    Okay.  And now why is this for -- you know, why does it

3    say Kyung S. Lee PLLC and not Shannon & Lee LLP?

4    A    Because I was asked to depart at Parkins Lee & Rubio

5    because of a positional conflict that my partners, Parkins &

6    Rubio, discovered on a case that we had brought together in

7    the LTL bankruptcy case.  So when I left the firm on May

8    15th, I did not have another shop to go to, so I went back

9    to my own and practiced by myself for 15 days.

10          And then you and I ended up practicing law

11   together starting on June 1, so I practiced law by myself

12   under Kyung S. Lee PLLC.  And at that point in time, InfoW

13   debtors did not have counsel and so, I thought it was

14   important for me to get myself situation so that I could

15   help Mr. Schwartz finish up the InfoW case, and I did it

16   under the rubric of Kyung S. Lee PLLC, which is a PLLC which

17   I had set up after I left Kasowitz Benson in 2018.

18   Q    Mr. Lee, if you could just summarize the work you did,

19   how would you do that?

20   A    I think the best way to say it is what I've already

21   said before.  These were organizational and informational

22   gathering meetings that we were invited to come to Austin to

23   discuss FSS.  And as you can see by my time entries there

24   starting on May 24th, we were gathering documents and data

25   to understand the company, what it did, what its capital

1    structure was, what its history was, and to gather documents

2    to understand and verify what its corporate and capital

3    structure was and to understand, moreover, what had been

4    produced in the state court system because there had been

5    four years of litigation and my concern was to make sure

6    that I understood what had been produced there so as to be

7    able to manage what we would be -- what would be used

8    against us in the bankruptcy court once...

9         If the company had to go into bankruptcy, I wanted

10   to find out what financial data had been produced so that we

11   wouldn't be contradicting what we'd be saying in the

12   bankruptcy court versus what had been produced previously.

13   Q    And was there ever an engagement letter with Kyung S.

14   Lee PLLC and FSS?

15   A    I think there must have been one.  I just don't

16   remember right now off the top of my head whether there was

17   one or not, but...

18   Q    You don't remember whether --

19   A    I just don't remember it because I remember there was

20   so many things going on and it was for a 15-day period, and

21   I just don't remember.  Most likely, there would have been

22   one, but I just don't know.  I can't answer you accurately

23   right now off the top of my head, but I'm happy to go look

24   in my records and see if there was one.

25   Q    Well, I don't think we need to do that.  Could you turn

1    back to Exhibit 3 for me.

2    A    Sure.

3    Q    And if you could go to the second page of that

4    document.

5    A    I'm there.

6    Q    And if you could read that Footnote 1 and let me know

7    if that refreshes your recollection.

8    A    Footnote 1 says, "As S&L was formed on June --

9    Q    I don't need you to read it.

10   A    Okay.

11   Q    Does it refresh your recollection?

12   A    It does not refresh my recollection as to whether there

13   was a written engagement letter.  But I put the client on

14   notice that I have been practicing by myself May 15th and

15   June 1 and that to the extent the fees were paid, that they

16   would be allocated to my PLLC for that period of time to

17   make sure the client knew that there was a separation of

18   entities.

19   Q    Okay.  All right, and so, Mr. Lee, what is your

20   understanding of what the U.S. Trustee's objection is in

21   this case?

22   A    The U.S. Trustee's objection, as I understand it, is

23   that Kyung S. Lee, Mr. Lee I guess, that I failed to make

24   the appropriate disclosures when I was getting involved with

25   FSS as of May 24, 2022.  And more accurately, that I failed

1    to disclose to them and to the Court and to the creditors my

2    involvement starting as of May 19, 2022 with FSS and going

3    through the June 10th period of time.

4    Q    Okay, thank you.  I'm going to skip quite a number of

5    these exhibits, but if you could just tell me briefly what

6    your involvement in the InfoW cases was.

7    A    My involvement in the InfoW case was I was the primary

8    partner in charge of representing the three debtors, along

9    with you as my primary associate at Parkins Lee & Rubio, and

10   we were the primary bankruptcy counsel for the three

11   debtors.

12   Q    And what was the -- what was trying to be accomplished

13   in those InfoW cases?

14   A    Prior to the filing of the bankruptcy case, Alex Jones

15   and FSS and the debtors had agreed to a plan structure in

16   which, number one, Mr. Jones dedicated the equity interest

17   in the three debtors into a trust agreement so that he would

18   have no interest in the three companies, first of all, so

19   that he would lose all interest in that.

20        Number two, the trust would be manned by two

21   former bankruptcy judges, Judges Nelms and Schmidt, who

22   would basically be the trustees over the three entities

23   during the bankruptcy case, as well as on a post-

24   confirmation basis.

25        Number three, the plan contemplated that the trust

1  would oversee a plan of reorganization whereby the plan

2  contributors -- that would be FSS and Alex Jones -- would

3  contribute the following things upon confirmation of the

4  plan: (a) $2 million on the effective date of the plan; (b)

5  approximately, I believe, some amount of money each quarter

6  -- I think it was either $200,000 or $500,000 a quarter,

7  such that for the next X number of years, the total

8  consideration was going to be $10 million to the total group

9  of tort and contingent unsecured claimants at that time.

10      And then number three, the trust had been funded

11  with approximately $725,000 of cash, which would be enough

12  funds to fund the Chapter 11 administrative process so that

13  the InfoW debtors could get the plan confirmed with these

14  elements in it: the LST trust, the plan support agreement,

15  as well as funding during the Chapter 11 case, which all was

16  predicated on the idea of getting the Connecticut plaintiffs

17  and the Texas plaintiffs under one roof so they could all be

18  adjudicated and handled in one roof under the bankruptcy

19  Court.

20  Q    Okay.

21  A    Was that clear?  I just want to make sure.

22  Q    It was clear.  It was clear.  If you could turn to Tab

23  No. 12.

24  A    I'm there.

25  Q    Are you familiar with this document and, if so, what is

1    it?

2    A    This is the emergency application that the debtor

3    drafted in order to --

4    Q    You said the debtor.  Who do you mean?

5    A    Oh, I apologize.  This is the application or emergency

6    application submitted by the InfoW debtors to put in place

7    the two liquidation trustees, former Judge Nelms and former

8    Judge Schmidt, so they could oversee the trust that would

9    essentially be supervising the plan of reorganization, as

10    well as the Chapter 11 process when they were in place to

11    further negotiate the plan support agreement.

12    Q    And just from your memory without looking at the

13    exhibit, do you remember if the plan support agreement you

14    just talked about had a termination date?

15    A    Yes.

16    Q    Do you remember what that date was?

17    A    There were several: April 30, 2022, I believe was one.

18    Number two, there were other conditions, including I believe

19    Paragraph 8 of the plan support agreement contains several

20    termination provisions, including the necessity for filing a

21    plan of reorganization by April 30th.  There was also a

22    provision requiring that the LST trustees be appointed by

23    the bankruptcy court by April 30th.  And those are the two

24    ones that I remember specifically which were contained in

25    Paragraph 8 of the plan support agreement that I remember

1    reading.

2    Q    Okay.  And what was -- under the plan support

3    agreement, there were other parties that were funding this,

4    not the IW debtors, correct?

5    A    That is correct.

6    Q    And why were they doing that?

7    A    The whole idea was that Mr. Jones and FSS would be

8    funding the trust in order to get what they called a full

9    release.  In other words, there would never be a release

10   like in the Purdue or these Boy Scouts cases.  The idea was

11   that they would get a full release only and only -- if and

12   only when the creditors in the trust got paid in full.  And

13   the idea was that they would dedicate the amount of monies

14   into the plan over the period of the plan so that only when

15   those creditors in the plan got paid in full would they get

16   a release.

17   Q    And was that agreement you just talked about ever

18   renegotiated in the IW cases?

19   A    It was.

20   Q    Can you describe that renegotiation?

21   A    I can give you only just general terms because I myself

22   and Mr. Schwartz, we were not involved in it intimately

23   because we were on the operational side.  The major

24   negotiations took place between the potential trustee's

25   counsel, which was Mr. Okin for Mr. Nelms and Mr. Schmidt,

 1    and I believe the counsel for Mr. Jones, which was Shelby

 2    Jordan, and counsel for FSS, which was Mr. Battaglia, and I

 3    believe you were involved in looking at the documents.

 4            They all got renegotiated so as to take in the

 5    concerns of this Court and the creditors and they got filed

 6    on the Court as Document ECF No. 48 on April 29, 2022, and

 7    they were redlined to reflect all the changes that were made

 8    by the parties and also a clean copy was filed at ECF No.

 9    48.

10    Q    If you could turn in the exhibit binder to Tab 14.

11    A    Yes, sir.

12    Q    Take a look at this exhibit and, I guess, first, are

13    you familiar with it?

14    A    I am.

15    Q    And what is this document?

16    A    This is ECF 48 on InfoW case.  This is a document

17    that's the notice that was filed attaching both the clean

18    and the redline copies of the trust, as well as the PSA, the

19    plan support agreement, that was renegotiated between April

20    17th, the petition date, and April 29, 2022, among the

21    parties and filed with the Court to reflect the changes that

22    the parties were making as the case progressed.

23    Q    Okay.  Who negotiated this agreement on behalf of Free

24    Speech Systems?

25    A    Ray Battaglia as I remember.

1    Q    Okay.  Who did you represent in the limited

2    negotiations you just testified?

3    A    The three debtors, InfoW debtors.

4    Q    And what about Mr. Schwartz.

5    A    InfoW debtors.

6    Q    Okay.  And I guess just to ask, who did I represent in

7    that?

8    A    InfoW debtors.

9    Q    Were the amended PSA reflected in here ever executed?

10   A    No.

11   Q    And why not?

12   A    Number one, the emergency motion to appoint the

13   trustees, Exhibit No. 5 or the one that we just talked

14   about.  I'm going to go back to it, just a minute, one

15   second to be clear.  Exhibit No. 12, which was the emergency

16   motion to appoint the trustees; that was never approved by

17   the Court, and it kept on being passed and continued, so

18   that was never done.

19         Number two, the documents that were renegotiated

20   that the people worked on day in and day out that got filed

21   on April 29th.  The role changed completely on May 3rd when

22   the Connecticut plaintiffs and the Texas plaintiffs filed a

23   notice with this Court saying, Your Honor, we need a status

24   conference with you because we have some news that we want

25   to tell you about certain things we have done in our

1    respective state court, which was specifically we're going

2    to dismiss InfoW debtors from our respective state court

3    litigation, and that's the notice they sent.

4            So the Court set a hearing, I believe, on or about

5    May 6, 2022, in which they came to Court and said, Your

6    Honor, we think this case -- we don't want to be part of

7    this case anymore and here are the pleadings we're filing in

8    the respective state courts to show that we're dismissing

9    the three InfoW debtors from both the Connecticut and the

10   Texas state courts in the Sandy Hook lawsuits.

11   Q    Well, when you say state courts, were those litigations

12   removed through the Federal Bankruptcy Court at that time?

13   A    I apologize for not clarifying that.  On the day that

14   we had filed bankruptcy for the three debtors, InfoW debtors

15   on April 17 and 18, 2022.

16   Q    Is that a yes?

17   A    Yes, I'm sorry.  Yes, I apologize.

18   Q    And so, is that what you meant when you said state

19   court litigation, the removed state court litigation?

20   A    I did.  I'm getting ahead of myself.

21   Q    If you could turn to Tab 16.

22   A    Yes.

23   Q    Are you familiar with this document and, if so, what is

24   it?

25   A    This is the -- let me just look at the date.  This is

1    the filing made by the, I believe the Connecticut plaintiffs

2    on May 2nd in which they're requesting an expedited status

3    conference with Judge Lopez in which they want to announce

4    to the Court that they had basically filed motions to

5    dismiss their claims against the InfoW debtors in

6    Connecticut state court litigation.

7    Q    Okay.  And so, when you referenced May 3rd, is this one

8    of the documents you were --

9    A    I am, that's correct.  I apologize for the mistaken

10   date.

11   Q    No need to apologize.  If you could turn to Tab 17.

12   A    Yes.

13   Q    Same questions.  Are you familiar with this and, if so,

14   what is it?

15   A    This is the same document.  This is a document that was

16   filed by the Texas plaintiffs stating that on May 6, 2022,

17   they want to join in the request by the Connecticut

18   plaintiffs for a status conference with Judge Lopez, also

19   wanting to say we're dismissing the InfoW debtors from their

20   respective lawsuits in Texas.

21   Q    And this is the other one that you had just talked

22   about as affecting the PSA.

23   A    Correct.

24   Q    Okay.  If you could turn to Tab 18.

25   A    Yes, I'm there.

1    Q    What is this -- are you familiar with this document

2    and, if so, what is it?

3    A    The document is an email from Mr. Ruff from the U.S.

4    Trustee's office on May 17th in which memorializes our

5    discussion that we've had regarding the direction of the

6    case.  It's a memorialization of our conversation he and I

7    have had, which we've had many of during the case regarding

8    the direction of the case, and he's setting forth his

9    arguments of why, at least from his perspective, he believes

10   that the cases should be dismissed as soon as possible.

11   Q    And if you could look down that and read that last

12   bullet point there out loud.

13   A    The last bullet points says from Mr. Ruff, "Dismissal

14   is the more efficient and cheaper option for these debtors

15   as it will save from administrative and litigation costs and

16   will still allow debtors options to resolve their claims."

17   Q    And, Mr. Lee, did you -- you received this email,

18   correct?

19   A    I did.

20   Q    Did you evaluate it?

21   A    I did, and I also evaluated it with Mr. Schwartz.

22   Every time one of these came, Mr. Schwartz and I discussed

23   it, we evaluated all the things that Mr. Ruff was saying and

24   considered it with all the other factors that we had to deal

25   with in the bankruptcy case, in the InfoW bankruptcy case.

1    Q     Okay.  If you could turn to Tab No. 19.

2    A     Yes, I'm there.

3    Q     Are you familiar with this document and, if so, what is

4    it?

5    A     It is, 19 is a copy of my application for Kyung S. Lee

6    PLLC.  It's the application to be retained in the bankruptcy

7    case of InfoW, which I filed on May 19, 2022.  And my

8    recollection is that I filed this application probably first

9    thing or early in the morning on May 19th because we had the

10   status conference with Judge Lopez at 2:00 p.m. that day in

11   which we were going to the Court and tell the Judge that we

12   had reached final agreement with the Texas plaintiffs about

13   the stipulation regarding their dismissal of their claims

14   against the debtors with prejudice.

15   Q     And, Mr. Lee, did you have any connection with FSS when

16   this was filed?

17   A     Absolutely none, other than the fact that they were

18   counterparties to the PSA when we first started the

19   bankruptcy case.  And, in fact, that's a point that I want

20   to clarify for this Court, and that is not until after I

21   finished the status conference with Judge Lopez on that

22   date, May 19th, that I received a call from Mr. Battaglia to

23   come to Austin and that's the point that I've been trying to

24   tell everyone since.  And that's the reason why, even if I

25   were able to make that disclosure, I couldn't make the

1    disclosure to Judge Lopez at 2:00 p.m. because I didn't

2    receive the call from FSS about coming to a meeting before

3    2:00 p.m.

4    Q    Okay, thank you.  If you could turn to Tab 20.

5    A    Yes.

6    Q    Are you familiar with this document and, if so, what is

7    it?

8    A    This is the document, as I recall, that the Connecticut

9    plaintiffs filed on or about May 19th before the hearing in

10   which they gave notice that in Connecticut that they had

11   filed their motions to dismiss with prejudice their claims

12   against the debtors, InfoW debtors, by motion.  There had

13   been a mistrust by the Connecticut plaintiffs to do any kind

14   of stipulations with the debtors because they thought that

15   it would be used later against them by one of the co-

16   defendants to say something that it didn't say, so they

17   proceeded by motion, while the Texas plaintiffs did

18   stipulations with the InfoW debtors that Mr. Battaglia and I

19   worked on that we presented to Judge Lopez on May 19th at

20   2:00 p.m.

21   Q    If you can talk about that stipulation, if you could

22   turn to Tab 21.

23   A    Yes.

24   Q    Are you familiar with this document and, if so, what is

25   it?

1   A    I am.  Exhibit No. 21 is the stipulation that the Texas

2   plaintiffs and I worked on behalf of the debtor InfoW, Mr.

3   Battaglia and I negotiated this during the week before May

4   19th and we filed this either the day before on the Court's

5   docket and then we came to Court on May 19th and asked Judge

6   Lopez to approve it.  And then Mr. Battaglia, I believe,

7   took it and he filed it in the Western District of Texas so

8   that Judge Mott and others could rule on their motions to

9   remand.

10  Q    Mr. Lee, I have a question.  How did this benefit FSS,

11  this stipulation and order?

12  A    This stipulation had nothing to do with FSS.  I was not

13  thinking about FSS.  This was for the benefit of the debtor.

14  It was for the fact that they were dismissing the claims.

15  And my charge from Mr. Schwartz, ever since we were told

16  that the plaintiffs in both Connecticut and Texas were

17  dismissing us, my charge from Mr. Schwartz to me was make

18  sure that they dismiss us with prejudice, that there are no

19  longer creditors, and make sure that those dismissals are

20  absolutely clean and that they are gone forever from these

21  estates.

22       That was my duty and he told me to go implement

23  that and that's what I was told to do from May 19th until

24  these things got done -- from May 3rd until May 19th; that

25  was my charge, that's what I worked on.

1    Q    And you said the debtor and you said the estates.  You

2    mean the InfoW debtors?

3    A    InfoW debtors, yes.

4    Q    I want you to turn to Tab 26.

5    A    I'm there.

6    Q    I want you to read through it and it goes on for a

7    couple of pages and tell me what this document or if you're

8    familiar with this document and, if so, what it is.

9    A    I'm familiar with the document.  This is an email which

10   starts the string on May 25, 2022, if you go back to Page 5

11   of 5 on Exhibit No. 26.  This is a document in which after I

12   had evaluated -- let me just start.  May 19th is when we go

13   to Court and tell Judge Lopez that the Texas plaintiffs have

14   stipulated to dismissal with prejudice.  Judge Lopez signs

15   the stipulation and we file it.

16         Thereafter, we start working.  Mr. Schwartz and I

17   start evaluating whether or not the company should proceed

18   to Chapter 11 or dismiss.  We make an evaluation, which

19   we'll talk about in some of these other emails.  But Mr.

20   Schwartz tells me, we've concluded, that we're going to

21   dismiss the case, and we make the announcement to the U.S.

22   Trustee on May 25th -- that's the first email that you see

23   at the very beginning on Page 5 of 5 -- at which point in

24   time, Mr. Ruff and I begin discussions on how to get the

25   dismissals done.

1          I'm telling Mr. Ruff I need some more time because

2     I want to do it right because I may take more time to get

3     some of these things done because I've been pressured to do

4     it so quickly, I don't want to make any mistakes.  He says,

5     Kyung, get it done quickly.  You can do it through a

6     stipulation of dismissal of our motion to dismiss.  So we

7     look at that idea and we start drafting a stipulation of

8     dismissal.  We go back and forth and --

9          MR. NGUYEN:  Objection, Your Honor.  I don't think

10    hearsay testimony.

11          THE WITNESS:  He's a party.

12          MR. NGUYEN:  He's explaining what Mr. Russ was

13    saying.  Mr. Ruff (indiscernible)

14          THE COURT:  There's an objection, a hearsay

15    objection.  What's your response?

16          MR. SHANNON:  Your Honor, he's talking about the

17    status of negotiations that are really the crux of the U.S.

18    Trustee's objection to the applications to employ.

19          THE COURT:  Overruled.  He can answer.

20          THE WITNESS:  So basically, this chain of emails

21    starts on May 25th, and then the next thing you see is Mr.

22    Ruff send us on May 27th a proposed stipulated dismissal on

23    May 27th.  The problem I had with the May 27th draft that he

24    sent me was it starts off by saying, "The motion to dismiss

25    by the U.S. Trustee is granted," and that wasn't our deal.

1     That wasn't what the agreement was.  The agreement was we're

2     going to dismiss the case because we had no further need for

3     the case.  And so, I had to then go and redraft the entire

4     thing and work with Mr. Schwartz and go get that process

5     too, so that's what I worked on so that took another day.

6              And then as you can see, we marked that, and by

7     June 1, we've gotten it back to Mr. Ruff and he's going

8     through it and he's eliminated a lot of things that I've

9     asked for, but we've now come to an agreement by June 1 on

10    that dismissal order or stipulation.

11             So this is what it reflects, but from May 25th to

12    June 1, only thing we're working on between me and him was

13    getting that document correct.

14    BY MR. SHANNON:

15    Q    Thank you, Mr. Lee.  And I actually got a little bit

16    out of order.  I jumped ahead of myself there.

17    A    Sorry about that.

18    Q    If you could go back to Tab 23.

19    A    Sure.

20    Q    Are you familiar with this document and, if so, what is

21    it?

22    A    It is.  This is an email I sent to Mr. Schwartz on May

23    24th -- or on May 19th at 5:24 p.m.  Recall we came to Court

24    on May 19th at 2:00 p.m. and the hearing before Judge Lopez

25    lasted from 2:00 to 2:28 p.m., in which we announced the

1   stipulation of dismissal and Judge Lopez signed the

2   stipulation.  I got the call from Mr. Battaglia afterwards

3   and he said, please come to Austin next Tuesday.  I had not

4   mentioned any of this to Mr. Schwartz because of all this

5   other work we were still doing.  And it was only at 5:24

6   that I sent him this email saying, hey, we've been invited

7   to come to Austin to talk about FSS, so let's -- I just want

8   you to know that's when the meeting is going to be.

9         And I didn't mention any of this stuff to him

10  until the hearing was over, until we had dismissed all the

11  claims and, at least in my mind, knew there was no

12  relationship between FSS and InfoW debtors at that point in

13  time because there were no claims that existed between the

14  litigation claimants and FSS, at least at one datapoint that

15  I had.

16  Q    Okay.  And if you could go to Tab 24.

17  A    Yes.

18  Q    Same questions.  Are you familiar with this document

19  and, if so, what is it?

20  A    I am.  This is a document that I prepared after I sent

21  the email on Thursday, May 19th.  I took time on Friday, May

22  20th, Saturday, May 21 to evaluate my InfoW file.  Because

23  one of the things I did not want to do is create this very

24  same problem that we're having right now, which is I did not

25  want the Court, the creditors, or anyone to think that we

1    were running from one project to go into another one

2    thinking that we had all these little issues.

3         So I took it upon myself to study the problem and

4    say, Marc, do we have a problem here, do we need to analyze

5    this, and I took it upon myself for two days to study this

6    and this was the conclusion that I reached, and it was sent

7    to him on Saturday, May 21 at 10:52 in the morning.  And I

8    said I've been evaluating these things and I said, here, I

9    started the evaluation ever since we saw Judge Lopez on

10   Thursday about the dismissals and whether we need to

11   evaluate any of these other things.

12        I said, I've continued to evaluate those issues

13   and reaching the conclusion that the cost to prosecute the

14   Subchapter V bankruptcies for the three debtors to

15   confirmation, especially with opposition from the U.S.

16   Trustee, the fact that the remaining claims or obligations

17   also jointly (indiscernible) by Free Speech Systems; (c) the

18   debtor should have sufficient funds; (d) debtor's reserve

19   and that there should be enough money for the Subchapter V

20   Trustee and that the most efficient way to administer the

21   debtors is to file as soon as possible a motion to dismiss

22   the bankruptcy case.  The motion to dismiss the bankruptcy

23   will be on 21 days' notice to all creditors.

24        I think it would behoove all of us to all agree

25   that this is the right conclusion, that we're moving to

1    implementation of dismissal as the goal.

2    Q    Okay.  So I just want to know, you testified earlier

3    about an email from Mr. Ruff.  Did what Mr. Ruff tell you

4    have any, you know, bearing on your decision here; did you

5    consider what he said in that?

6    A    Absolutely.  As of May 17th, Mr. Ruff had taken the

7    position that no applications for employment of

8    professionals would ever come before a hearing on a motion

9    to dismiss.  He had said that in his email on May 17th and

10   he had continued to take that position throughout any

11   discussions that we've had.

12        So in order for us to get our applications

13   approved in the InfoW case, the estate would have had to

14   spend monies to beat the U.S. Trustee on his motion to

15   dismiss to have the case approved as a Subchapter 11(sic)

16   only to feather our own nests at that point in time to get

17   our applications approved so that we could have final fee

18   applications.

19   Q    Okay.  Let's see, and if we could just go to Tab 25

20   now.

21        THE COURT:  Mr. Lee, hold on.  I'm going to ask

22   you a question about that.

23        THE WITNESS:  Yes, sir.

24        THE COURT:  Are you saying that if you would have

25   requested a hearing date in front of me about an application

1    that I wouldn't have considered it because of what the

2    United States Trustee was arguing?

3            THE WITNESS:  No, Your Honor.  I'm not suggesting

4    that at all.  What I'm suggesting is that the way that the

5    case had already been set, it was clear to me that the U.S.

6    Trustee had already set the motion to dismiss in front of

7    all the applications first.

8            And, number two, that in order to get the

9    applications heard, at least it was my perception, that the

10   U.S. Trustee would oppose that because he was saying that

11   the bankruptcy case was an improper bankruptcy case, and he

12   was saying that it would be improper to have professionals

13   employed in an improper bankruptcy case and, therefore, he

14   wasn't going to let that happen.

15           He wanted the case dismissed without the stamp of

16   a bankruptcy court allowing a professional to be employed.

17   That's the position I think took.  And so, I have to

18   evaluate those facts with Mr. Schwartz and say, was it worth

19   it for us to have that fight to get the fee apps approved.

20   Because as you will see, I again on May 30th, Mr. Schwartz,

21   should we have that fight just to get the protections for

22   us, the professionals, and Mr. Schwartz said to me again,

23   no, Kyung, that's stupid.  Why would you spend more estate

24   monies just to feather our own nest to get bulletproof

25   protection for our fee applications?

 1              THE COURT:  Okay.

 2              THE WITNESS:  That's just not worth it.  That's

 3    the dialogue we were having internally.

 4              THE COURT:  Thank you.

 5              THE WITNESS:  Okay.

 6    BY MR. SHANNON:

 7    Q    Okay.  So, Mr. Lee, then let's go to Tab 25.

 8    A    Yes, sir.

 9    Q    Are you familiar with this document and, if so, what is

10    it?

11    A    This document is the email I sent to Marc Schwartz,

12    Chris Schwartz, and Harold on Monday, May 23rd.  Recall, May

13    19th, we have the hearing with the Court.  May 21, I give

14    the analysis.  And to make sure the estate is run lean, I've

15    drafted a motion to dismiss by May 23rd.

16    Q    Okay.  And so, it's after that that then the

17    conversation with the U.S. Trustee you talked about before

18    happened.

19    A    Takes place starting on May 25.

20    Q    Okay.  And on May 24 was the meeting with FSS --

21    A    Correct.

22    Q    -- that is at issue.

23    A    That's correct.

24    Q    Go to Exhibit 27.

25    A    Yes, sir.

1    Q    Same questions.  Are you familiar and, if so, what is

2    it briefly?

3    A    This is the stipulation that Mr. Ruff and I worked on

4    from May 25th until June 1, and then we filed it with the

5    Court.  And then it was on, I believe, 10 days' notice and

6    Judge Lopez signed it on June 10th.

7    Q    Okay.  Let me just ask you, was -- well, I guess it's

8    already clear.  Is it correct that KSL PLLC, Kyung S. Lee

9    PLLC, it was never employed in the IW bankruptcy case.

10   A    We were not.

11   Q    At what point did you believe that the IW debtors had

12   determined they were not going forward with that employment?

13   A    May 21.

14   Q    Okay.  And why did you believe that?

15   A    Because I had recommended to Mr. Schwartz that the case

16   be dismissed, and Mr. Schwartz had agreed with me.  And by

17   the time we were going to dismiss the case, there wasn't

18   going to be further need for retaining professionals.  And

19   then that was supplemented by my continuing dialogue with

20   Mr. Ruff from the U.S. Trustee's office, who said let's be

21   efficient in how we administer this Chapter 11 case.  You

22   can pay your professionals outside of bankruptcy and let's

23   dismiss the case and be done with it so that the only thing

24   we should be worrying about is Miss Haselden, Melissa

25   Haselden, the Subchapter V Trustee, and make sure that she

1   has enough -- that the estate has enough money to pay her

2   fees and let's get the case dismissed.

3   Q    And do you remember when you might have heard that from

4   Mr. Ruff?

5   A    It started with the email on May 17th, which we've

6   talked about already, and was repeated throughout the entire

7   negotiations process.  When I was asking for more time, he

8   was asking for dismissal and handle all your administrative

9   fees outside of the bankruptcy.

10  Q    Okay.  I'm just going to ask you straight up, Mr. Lee,

11  why was there never a supplemental Rule 2014 disclosure for

12  Kyung S. Lee PLLC?

13  A    Number one, as we've talked about in our papers, we

14  didn't move -- the idea of seeking employment disappeared as

15  far as the applicant was concerned when the case was going

16  to be dismissed shortly, number one.

17        Number two, if I didn't disclose this to the

18  Court, I apologize, but I think the only time I saw the

19  Court was on May 19th and then June 10th, I believe.  I

20  don't think there was a time between those two periods that

21  I saw the Court.  And as I indicated, I did not know about

22  the FSS meeting until after the May 19th hearing.

23        Number three, I just need to let people know there

24  was not a certainty when we went to this meeting on May 24

25  that Kyung Lee or Marc Schwartz was going to be retained.

1    The idea that there was a letter that Mr. Schwartz sent to

2    me on May 19th, got signed on May 19th, and he got engaged,

3    it's just not true; that's not what happened.  He sent the

4    letter, and it got lost in the ether and neither of our

5    engagement letters got signed until June 6, and we were just

6    there to see if we were going to be retained.

7         And again, I did my best to, on May 21, to

8    evaluate the situation internally with the client and the

9    client said, look, we're done with this case, there's

10   nothing more to do here, and there's no adversary between

11   FSS and InfoW debtors because there's no conflict, and we

12   didn't deal with any of these issues between the two

13   companies between that period of time.

14        And there was a lot of uncertainty because on the

15   other hand, especially for a professional like me, I have

16   client confidences I have to keep.  And so, there were a lot

17   of factors that were going in my mind, and I felt very

18   confident that, from my perspective, there was nothing

19   impinging on the estate because we weren't dealing with any

20   FSS issues at that point in time and had nothing to do with

21   them.

22        And again, if I erred, it's my fault.

23   Q    Okay.  I want you now to go to the small book.

24   A    Sure.

25   Q    And turn to Tab 1.  We're going to switch gears a

1    little bit and now we're going to talk about Mr. Schwartz

2    very briefly.

3    A    Sure.

4    Q    Same questions as always.  Are you familiar with this

5    document behind Tab 1?

6    A    I am.

7    Q    And, if so, what is it?

8    A    This is an email that I located last night at midnight

9    in searching through my outbox and it is an email that I

10   sent to Mr. Schwartz on June 5.

11          THE COURT:  Is this Docket 178?

12          MR. SHANNON:  Yes.

13          THE COURT:  Okay.  I just want to make sure.

14          THE WITNESS:  178-1.  It's an email that I found

15   last night at around midnight.  And what it is it's an email

16   that I sent to Mr. Schwartz on June 5, okay, and if you look

17   on your calendar, June 5 is a Sunday.  And it's an email I

18   sent to him saying, hey, I've made some revisions to your

19   engagement agreement, and I've done it based upon looking at

20   the company agreement of FSS.

21          And the reason why I was doing that was because

22   all the creditors were complaining mightily about, oh, Mr.

23   Schwartz is just the lackey in InfoW; he doesn't have any

24   authority.  So I took the company agreement of FSS, and I

25   tightened up the provisions about his authority, and I

Page 96

1    redlined it, and I sent it to him on June 5th.

2            And when I looked at last night, I said, you know

3    what, this looks kind of funny, it looks very familiar.  So

4    when I looked at the redline which is attached and I took

5    the engagement letter that everyone's been saying was dated

6    May 19th and it's attached to his application, I took that,

7    and I looked at it and I compared it word for word, and I

8    realized that my redline is the engagement letter.

9    BY MR. SHANNON:

10   Q    Well, let's talk about the redline.  Let's go to Tab 2.

11   A    Sure.

12   Q    Is this the redline that you're talking about?

13   A    It is the redline I'm talking about.  And as you can

14   see, it's a redline that I did for Mr. Schwartz on June 5,

15   2022, in which I tightened up all these things and give him

16   really good powers I think.  And so, all these changes are

17   made, and if you look at the application letter that is

18   attached to his letter, the engagement letter, you will see

19   that every one of these changes are incorporated into it.

20           And so, it was impossible for Mr. Schwartz to have

21   given this letter, the one that he got signed to the company

22   FSS on May 19th.  It's impossible because I hadn't given him

23   these comments until June 5.  And you could see it because

24   at the top of this letter, you see the comma 2022; there's

25   no space between the two letters.  When you see the final

1    engagement letter, it still has that same mistake on it.

2    And I don't know why somebody put May 19th on the top as the

3    final one, but it's got the same error.

4         THE COURT:  Can I ask you a question, Mr. Lee.  I

5    want you to take a look at the screen.  Take a look at the

6    screen there.  It's a supplemental declaration filed by Mr.

7    Reynal.  I'll stipulate that he filed this -- we'll get the

8    date on it -- and that's special counsel.

9         Here's what he said.  Do you consider this to be a

10   true and accurate statement -- I've got to deal with that

11   too -- to your knowledge?  He's saying that FSS retained

12   Schwartz on May 19th and that Schwartz asked him, who's a

13   criminal defense lawyer, whether Mr. Schwartz knew of any

14   financial executive.

15        So I understand what you're saying.  I'm also

16   looking at this and here's another statement filed by

17   someone under -- this was filed on September 12th --

18        THE WITNESS:  Yes.

19        THE COURT:  -- under penalty of perjury.

20        THE WITNESS:  Right.

21        THE COURT:  And it's speaking of an additional

22   relationship on May 19th.  And I will stipulate to you --

23   I'm just trying to see if I can put all the pieces together.

24        THE WITNESS:  Your Honor, I have an answer for

25   you.

```
 1            THE COURT:  If you don't know it and you filed it.

 2            THE WITNESS:  I drafted it.

 3            THE COURT:  Oh, okay.

 4            THE WITNESS:  I drafted it.  So until I discovered

 5    this issue last night, I was also under the mistaken

 6    impression that the letter was dated May 19th is what I'm

 7    trying to tell you.

 8            THE COURT:  So do you think Mr. Reynal is -- do

 9    you think the statement that he's making here under penalty

10    of perjury is untrue?

11            THE WITNESS:  It is untrue because I wrote it for

12    him, and so it was my mistake too.

13            MR. SHANNON:  Judge, if I could --

14            THE COURT:  No, no, no.  We take witnesses.  You

15    get to ask questions and so do I.  I'm just trying to put

16    all the pieces together.

17            THE WITNESS:  Yes, Your Honor.

18            THE COURT:  Thank you.

19            THE WITNESS:  It's my fault.

20            THE COURT:  No, no, no.

21            THE WITNESS:  It's my fault.

22    BY MR. SHANNON:

23    Q    All right.  Let's go to Tab -- actually, let's answer

24    that real quick.  If you go back to the big book.

25    A    Sure.
```

1    Q    And we'll go to towards the end here.

2         THE COURT:  Mr. Lee, I've got more questions.  So

3    in the previous exhibits that were shown, Mr. Schwartz is

4    attending meetings on May 24th.  So even if I accept that

5    the work was not -- maybe that the retention letter that Mr.

6    Schwartz is indicating, you know, was filed later, he's

7    certainly attending meetings in May in connection with a

8    potential FSS restructuring, right, because he was at the

9    May 25th meeting.

10        THE WITNESS:  May 24th.  Yes, Your Honor, he was.

11        THE COURT:  Okay.

12        THE WITNESS:  Yes.

13        THE COURT:  Okay.

14        THE WITNESS:  No disagreement on that point.

15        THE COURT:  Okay.  I just wanted to understand.

16        THE WITNESS:  Yes, Your Honor.

17        THE COURT:  I understand your point though.

18        THE WITNESS:  Yes, Your Honor.

19        THE COURT:  Thank you.

20        MR. SHANNON:  Sorry, I'm going to take one second.

21        THE WITNESS:  Sure.

22        THE COURT:  Take your time.  So let me ask you

23   this as well, and I'm just trying to put all the pieces

24   together.  Here is Mr. Schwartz's declaration that he filed

25   in connection with the first day case, and he says May 19th

1    as well.  Are you telling me that Mr. Schwartz got it wrong

2    too?

3            THE WITNESS:  Your Honor, the reason why everyone

4    got it wrong is because I'm the person drafting all of

5    these, and I got --

6            THE COURT:  I'm assuming somebody's reading it

7    before they sign it.

8            THE WITNESS:  Your Honor, that's correct.  I can't

9    deny your sentence, what you just said.  But I'm the one

10   who's drafting these, and I did not know -- I did not

11   remember this until last night is what I'm trying to tell

12   Your Honor.

13           THE COURT:  I know, I understand.  It sounds like

14   Mr. Schwartz didn't either.

15           THE WITNESS:  No, no one did.  I apologize.  I

16   apologize.

17           THE COURT:  Okay.  I don't think you remembered it

18   when we first talked about it at the first hearing.

19           THE WITNESS:  That's correct.

20           THE COURT:  Okay.

21           THE WITNESS:  No one did, and I didn't remember it

22   until last night when I came across the email.

23           THE COURT:  Okay.

24   BY MR. SHANNON:

25   Q    Okay.  Well, Mr. Lee, can you go back to that big book

1   and go to Tab 30.

2   A    Sure.

3   Q    If you could go back to the big book and go to Tab 30.

4   A    Sure.

5   Q    Are you familiar with that document?

6   A    Yes, I am.

7   Q    Can you tell me what it is?

8   A    That is the attachment to Mr. Schwartz's application in

9   the FSS bankruptcy case.  It is a copy of his engagement

10  letter to FSS signed on or about June 6, 2022 by Mr. Jones.

11  Q    And what was this letter dated?

12  A    It's dated at the top as May 19, 2022.

13  Q    Okay, no further questions about that.  Okay, now back

14  to the small binder.  I'm sorry, wanted to clarify that.

15  All right, now if you could just go to Tab 3 in that small

16  binder.  Are you familiar with this document?

17  A    It is -- I am.  I am.

18  Q    Please describe to me what this is in relation to the

19  other (sound drops).

20  A    If you look from the bottom up, you will see that this

21  is the email that I sent to Mr. Schwartz on Sunday, where I

22  ask him for his Word document of the engagement letter so

23  that I could make the changes based upon my review of the

24  company engagement letter -- company agreement of FSS.  And

25  then I sent him at 3:05 p.m. certain revisions that we

 1    looked at are behind Exhibit No. 2.

 2            And then at 4:20, he says to me, I'm fine with

 3    these changes, and he says you want me to make them, and

 4    then he says, I need to read Paragraph 8.01 of the company

 5    agreement.  And I tell him I want you to make -- he tells me

 6    I want -- I tell him, please make the changes and bring both

 7    the redline and the clean to Austin so we can show it to

 8    Ray, meaning Ray Battaglia, and client and have it signed.

 9    It is too difficult and confusing to do it otherwise.  Do

10    you see what I'm saying?

11            And so, it's concluding our discussion about the

12    changes that need to be made to his engagement letter that

13    he needs to bring to Austin on June 6, the Monday, the next

14    day.

15    Q   So that's when the Schwartz engagement letter was

16    actually signed, irrespective of when the letter was dated.

17    A   That's correct.

18    Q   Okay.

19            MR. SHANNON:  Well, no further questions from me,

20    Your Honor.

21            THE COURT:  I just have one question.

22            THE WITNESS:  Yes, Your Honor.

23            THE COURT:  So here is the Schwartz declaration

24    submitted in connection with his application.

25            THE WITNESS:  Yes, Your Honor.

1          THE COURT:  Paragraph 19 and 20, he's referring to

2     May 19th again.  Is it your understanding that Mr. Schwartz

3     got that wrong too?

4          THE WITNESS:  Yes, Your Honor, because again --

5     (reads to himself) -- on this sentence, it's correct because

6     I called him after our hearing with you to come to Austin,

7     and that's what he's referring to there.

8          THE COURT:  Okay.  But is it possible that your

9     draft -- there was a draft on May 19th that was submitted,

10    and Mr. Schwartz started working for FSS around May 19th.

11    It's just the final draft of the document was dated -- with

12    the additional language and it was still dated May 19th

13    because that's when the work was done.  Happens all the time

14    in Chapter 11 cases.

15         THE WITNESS:  No, I understand what you're saying.

16    The answer is that Mr. Schwartz probably submitted something

17    to me, and I submitted something to Mr. Battaglia, but it

18    got lost in the paperwork and neither Shannon & Lee nor

19    Schwartz Associates or the CRO had an engagement letter

20    signed until June 6th.

21         THE COURT:  Okay.

22         THE WITNESS:  That's what happened.

23         THE COURT:  Completely understand.

24         THE WITNESS:  So whatever recitations I made about

25    May 19th, it was based upon an erroneous statement or

1    assumption that I made and all those were written by me with

2    that erroneous statement until I found this last night.

3              THE COURT:  Okay.

4              THE WITNESS:  That's my error.

5              MR. SHANNON:  I don't know if this would be a

6    redirect because I did say I pass the witness, Your Honor.

7              THE COURT:  You did.  You did.

8              MR. SHANNON:  I can wait.

9              THE COURT:  Okay.  So why don't we take five

10   minutes and let everybody just take a moment, let everyone

11   stretch their legs out.  Why don't we -- it's 3:17, why

12   don't we come back at 3:25.

13             THE WITNESS:  Okay.

14             THE COURT:  Okay, thank you.

15             CLERK:  All rise.

16             (Recess)

17             CLERK:  All rise.

18             THE COURT:  Okay, we are back on the record in

19   Free Speech.  Mr. Lee, I'll remind you that you're still

20   under oath.

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  Okay.  Mr. Nguyen, you may proceed

23   with cross examination and just get close to a mic.  I want

24   to make sure we can hear you.

25             MR. NGUYEN:  I will do my best, Your Honor.

```
 1                THE COURT:  Thank you.

 2                MR. NGUYEN:  Sometimes I forget.  Your Honor, I

 3    got some assistance from Mr. Travis who will be --

 4                THE COURT:  Okay.

 5                MR. NGUYEN:  -- if I can ask Your Honor to give

 6    him control, he's going to be -- I didn't, I was trying to

 7    save paper.

 8                THE COURT:  Okay.

 9                MR. NGUYEN:  So he's going to be showing the

10    exhibits on the screen.  I can't see Mr. Lee's computer, but

11    is the screen --

12                THE COURT:  I think once I -- I think mister --

13    okay, you're good.  You should be --

14                MR. NGUYEN:  Okay.

15                THE COURT:  Okay.

16                MR. NGUYEN:  Great, and Mr. Travis, if you can

17    just go to 163-18 and we'll just start out with that email.

18    Maybe you can just make it a little bit bigger.

19                      CROSS EXAMINATION OF KYUNG LEE

20    BY MR. NGUYEN:

21    Q    Mr. Lee -- nice to see you, Mr. Lee.

22    A    How are you, Mr. Nguyen?

23    Q    I'm doing well.  Thank you for asking.

24    A    Thank you.

25    Q    I just want to jump to this one before I forget.  This
```

1   was an email that you were discussing with Mr. Shannon about

2   -- I think the way you described it was this email was a

3   memorialization of a discussion between yourself and Mr.

4   Ruff.  Was that the testimony?

5   A    Based upon the first sentence.  "Following on our

6   conversation yesterday, please let me know when you've had a

7   chance to discuss these matters with Marc."

8   Q    Okay.  And did you respond to this email?

9   A    I don't know.

10  Q    You've attached Mr. Ruff's email, but -- and I think

11  you said he made some good points about the administrative

12  cost and the dismissal, but were you on board with

13  dismissing the InfoW cases on May 17th, when this email was

14  sent to you?

15  A    The answer is I don't think I made any kind of

16  decisions because I hadn't discussed it with Mr. Schwartz on

17  May 17th yet.

18  Q    So you think the Court should have the benefit of

19  seeing your response to this email just to determine your

20  mental state as of May 17th?

21          THE COURT:  (indiscernible).  Just curl the mic

22  down.  I want to make sure we can hear you.

23  BY MR. NGUYEN:

24  Q    You didn't attach your responses to the exhibit, right?

25  A    I didn't know what exhibits you're going to attach, so

1    no, I don't -- I didn't attach anything if that's what --

2    that's your question.

3            MR. NGUYEN:  Your Honor, I have a rebuttal

4    exhibit, if I can just hand it up to the party.

5            THE COURT:  Sure.

6            MR. NGUYEN:  And Your Honor, may I approach?

7            THE COURT:  Okay.

8            MR. NGUYEN:  I'm going to ask Mr. Shannon

9    (indiscernible).

10           MR. SHANNON:  Yeah, I'm not sure what this is in

11   rebuttal to that --

12           MR. NGUYEN:  Your Honor, the testimony was on May

13   17th.  There was a decision to dismiss the case based on --

14           MR. SHANNON:  I don't believe that was the

15   testimony, Your Honor.

16           THE COURT:  What's the --

17           MR. NGUYEN:  Your Honor, the use of this exhibit

18   without the response, they were making arguments that all

19   these were good points.  I'm just rebutting the fact that

20   they weren't on board at this time.

21           THE COURT:  If you want to impeach the testimony,

22   then --

23           MR. NGUYEN:  Sure.

24           THE COURT:  Then do that.

25           MR. NGUYEN:  Thank you, Your Honor.

1  BY MR. NGUYEN:

2  Q    Mr. Lee, did you respond to this email?

3  A    Looks like I responded to, based upon what you showed

4  me, looks like I did on 4:45 p.m.

5  Q    And did you describe the email that I believe is on

6  165-18 as a diatribe?

7  A    Yes.

8  Q    And you also told Mr. Ruff to send notice of

9  depositions for Mr. Schwartz?

10  A    Right.

11  Q    And at this time, you hadn't made the decision to

12  dismiss the case, right?

13  A    That's correct.

14  Q    And --

15  A    We're fighting with the U.S. Trustee on May 17th.  That

16  is correct.

17  Q    Yeah, and you also sent the DOJ legal manual to Mr.

18  Ruff and you told Mr. Ruff to read the DOJ manual, is --

19  A    That's correct.  I was very upset with him.

20  Q    Did Mr. Ruff ever tell you not to amend your

21  declaration in the InfoW case?

22  A    We never discussed my declaration in InfoW case.  No.

23  Q    Okay. And earlier, you mentioned that you've been

24  practicing bankruptcy law since September of 1984, right?

25  A    That's correct.

1    Q    Thank you.  And you file a lot of bankruptcy cases?

2    A    I filed cases.

3    Q    Okay.  And you're familiar with Rule 2014, correct?

4    A    Generally, I am.

5    Q    Okay.  And earlier, we went through the little history

6    with the law firms that you were with and just so I can get

7    it clear as it relates to the InfoW case, at this time,

8    you're currently with Shannon & Lee LLP, correct?

9    A    I am.

10   Q    And that started on June 1st, 2022, correct?

11   A    That is correct.

12   Q    And prior to Shannon & Lee LLP, you were with Kyung S.

13   Lee PLLC; is that correct?

14   A    That is correct, for 15 days.

15   Q    And that started May 15 to May 31st, 2022?

16   A    May 16th, 2022 through May 31.  I think May has 31

17   days.

18   Q    Okay.  And prior to -- I'm going to call it KSL PLLC --

19   you were with Perkins, Lee, and Rubio LLC, correct?

20   A    From August 1, 2022 through May 15th, 2022.

21   Q    Okay, so when the InfoW cases were filed on April 17th

22   and -- it was a midnight filling, so there's some cases in

23   April 17th and there was some cases on April -- one case on

24   April 18th, you filed with the firm Perkins, Lee, and Rubio.

25   A    That is correct.

1    Q    Okay.  And prior to the filing -- prior to the filing

2    of the InfoW cases -- and when I talk about InfoW case, I'm

3    talking about InfoW, IWHealth, and Prison Planet, those

4    cases --

5    A    Yes, sir.

6    Q    You were involved in the negotiation of the plan

7    support agreement?

8    A    Yes.

9    Q    Okay.  And you were representing these three entities

10   in the negotiation of those plan -- in the negotiation of

11   the plan support agreement, correct?

12   A    Yes.

13   Q    Okay.  And when you were negotiating on behalf of the

14   InfoW Debtors, you were -- well, who were you negotiating

15   with on the plan support --

16   A    Against or with?

17   Q    Who were the parties to the plan support agreement?

18   A    There was -- Ray Battaglia was representing Free Speech

19   Systems and Mr. Jordan was representing Alex Jones.

20   Q    So it was Alex Jones, Free Speech Systems, and the

21   InfoW Debtor.

22   A    That's right.  We were the party that was going to be

23   the recipient of the funds from Free Speech Systems as well

24   as Alex Jones under the plan support agreement.

25   Q    So there was Alex Jones, Free Speech Systems, and InfoW

1    Debtors, correct?

2    A    That's correct.

3    Q    Okay, thank you.  And then after the bankruptcy case

4    was filed, there was, I believe -- it's a restated and

5    amended plan support agreement that was filed with the Court

6    on April 29th --

7    A    Incorrect.  There was a restated and amended trust

8    agreement, but only an amended plan support agreement.

9    Q    Got it.  So there was an amended plan support agreement

10   filed with the Court on April 29 --

11   A    Correct.

12        THE COURT:  And Nguyen, I want you to take the

13   microphone and just take it -- just turn it down a little a

14   bit.  (indiscernible).

15        MR. NGUYEN:  I'm going to leave it right here.

16        THE COURT:  Well -- that's perfect.  Thank you.

17   And I apologize.

18        MR. NGUYEN:  I apologize, Your Honor.  Sometimes I

19   -- zoned in and I forget.  I'll be more mindful.

20   BY MR. NGUYEN:

21   Q    And Mr. Lee, the parties -- I'm stepping away.  The

22   parties to the negotiation under the amended plan support

23   agreement were the InfoW Debtors, Alex Jones, and Free

24   Speech Systems.  Correct?

25   A    Incorrect.

1   Q    Who else?

2   A    The trust lawyers.  LST.

3   Q    Mr. Okin

4   A    Mr. Okin and he represented the trust Trustees which

5   were former Judge Nelms and former Judge Schmidt.  They were

6   the primary ones involved in the negotiations because they

7   were the ones who were going to take over direction of the

8   case insofar as negotiations with the parties.

9   Q    Mr. Lee, are you familiar with the U.S. Trustee's

10  motion to dismiss in the InfoW cases?

11  A    I am.

12  Q    Thank you.  And we'll get back to that in a little bit.

13  And before the U.S. Trustee filed a motion to dismiss, the

14  Connecticut plaintiff and Texas plaintiff also filed motion

15  to dismiss -- motions to dismiss in the InfoW cases,

16  correct?

17  A    That is correct.

18  Q    Yeah.  And if I remember correctly, the Court set a May

19  27th hearing date for all three motions; is that correct?

20  A    That is correct.

21  Q    Okay.  And then there were deadlines for yourself in

22  representing the InfoWars Debtors (indiscernible) to respond

23  to three motions by May 230th, 2022?

24  A    I can't remember the exact day, but there were certain

25  deadlines set for us to respond to.

1    Q    All right.  You had to respond to all three motions,

2    correct?

3    A    That is correct.

4    Q    And earlier, you mentioned -- on May 3rd, you described

5    it as the world changed on May 3rd, right?

6    A    I think that's correct.

7    Q    Okay.  So as we got closer to the May -- I'll just say

8    May 20th deadline for you to respond, your objective at the

9    time was not to take care of the motion to dismiss but to

10   dismiss the plaintiff's claims with prejudice; is that a

11   correct statement?

12   A    I don't understand your question.

13   Q    Okay.  So there's two competing tasks that you have to

14   do, right?  One is to respond to our motion to dismiss and

15   the other task is to make sure that the claims against the

16   InfoW Debtors were dismissed with prejudice and you were

17   more focused on the second task as opposed to responding to

18   our motion to dismiss --

19   A    That's a fair statement.

20   Q    Okay, thank you.  So on May 18th, 2022, you filed a

21   document with the Court and in that document you were

22   requesting additional time to -- you were requesting

23   additional time to -- especially kicking out the deadlines,

24   right, the May 27th deadline to June and then extending your

25   deadline to respond to the U.S. Trustee's motions; is that

1    correct?

2    A    That motion asked for several things and it was subject

3    of negotiation between Mr. Ruff and me to kick out the

4    deadlines, discovery deadlines and everything else until I

5    had sufficient time to finish up the negotiations and the

6    stipulations with the dismissing creditors.

7            MR. NGUYEN:  Okay.  And Mr. Travis, can you pull

8    up Exhibit 165-6?

9    BY MR. NGUYEN:

10   Q    And Mr. Lee, are you familiar with this document?

11   A    Can I see the whole thing?

12   Q    Sure.

13           MR. NGUYEN:  Can you please scroll down to Mr. Lee

14   can see the whole thing?

15   BY MR. NGUYEN:

16   A    Yes, generally I'm familiar with this.  This is the one

17   that we sought some more time.  Yes.

18   Q    And is this a document that you drafted?

19   A    Yes, it is.

20   Q    Okay.  And in this motion, you were asking the Court to

21   continue the May 27th date to June 24th, 2022; is that

22   correct?

23   A    I can't read it right now, but --

24   Q    Okay.

25   A    If you say, if you represent that to be the case --

1    Q    Well --

2    A    -- then that's true.

3    Q    Well, let's let you see it.

4         MR. NGUYEN:  Can you scroll to Paragraph 18, Mr.

5    Travis?  And then if you just go to Page 6 a little bit, Mr.

6    Travis.

7    BY MR. NGUYEN:

8    Q    June 24th, 2022.  You see that?

9    A    Yes.

10   Q    So in your motion, the basis for that is restated in

11   Paragraph 21.

12        MR. NGUYEN:  Can you scroll down to Paragraph 21?

13   BY MR. NGUYEN:

14   Q    Mr. Lee, can you read Paragraph 21?

15   A    Sure.  "Continuing the original hearing date until June

16   will also permit a CRO who has been engulfed in evaluating

17   dismissals with prejudice issues to now focus on the

18   remaining creditors of the Debtors.  The CRO will be able to

19   evaluate either before or by the June hearing date whether

20   he should proceed with trying to confirm a subchapter plan

21   of reorganization or handle these claims outside of

22   bankruptcy.  Again, such efforts would be wise use of the

23   limited financial resources.  Such an approach will also

24   save valuable judicial resources."

25   Q    Okay.  And the question is, on May 18th, why do you

1    need an entire month for the CRO to accomplish this?

2    A    Because one, I had not known what else needed to be

3    done with respect to the rest of the dismissals.   For

4    example, we had a Connecticut hearing to dismiss the actual

5    cases up in Connecticut.   That was number one.   That was

6    supposed to take place the week after May 17th.

7         And number two, I needed time to evaluate all the

8    things that Mr. Schwartz hadn't been focusing in on and I

9    was just asking for time in order to be able to do that and

10   that was just my best guess as to what we needed to be able

11   to calmly evaluate because we hadn't had one second of time

12   since April 17th because we had filed the bankruptcy on

13   April 17th and we'd been working around the clock to figure

14   out everything and things had changed very quickly.   And so

15   I was trying to get as much time as possible for the Trustee

16   and for the law firm -- for the lawyers on our side to

17   evaluate which way we should go.

18   Q    Thank you, Mr. Lee.   Did any of the InfoW Debtors have

19   any claims against Alex Jones or Free Speech Systems?

20   A    Not to my knowledge.

21   Q    Did you check?

22   A    Well, sure.   We --

23   Q    Okay.

24   A    -- checked in our schedules, et cetera.

25   Q    Right.   That's good.   So IWHealth LLC had royalty

1    payments, correct?

2    A    That is correct.

3    Q    Was it Longevity or Yongevity?  I always mess it up?

4    A    It starts with a Y.  Yongevity.

5    Q    Okay.  And at a certain point, the royalty payments

6    were deposited into the InfoW Debtors' accounts, correct?

7    A    IWHealth's account.

8    Q    IWHealth account.  But --

9    A    That's correct.

10   Q    But prior to that, where were the funds for the royalty

11   payments --

12   A    They may have been diverted prior to the time -- some

13   of them may have been gone to somebody else rather than to

14   IWHealth.

15   Q    When you say somebody else, could've gone to Alex

16   Jones.

17   A    That is correct.  It could've gone to Alex Jones.

18   Q    Okay.  And how many of those payments went to Alex

19   Jones?

20   A    We don't know.

21   Q    Did you check?

22   A    No, we did not.  Not to my -- I did not check.

23   Q    So if payments that are supposed to go to IWHealth is

24   going to Alex Jones, you think IWHealth has a claim against

25   Alex Jones for those payments?

1   A      Sure.

2   Q      Okay, thank you.  Let's get back to that motion.  So

3   you filed on the 18th.  It was an emergency motion and the

4   Court, as always, gave you a hearing the very next day, May

5   19th.  Correct?

6   A      If you say so.

7   Q      Okay.  Well, May 19th is an important date, right?  We

8   were in Court on May 19th?

9   A      It was an important date, because that's when we went

10   to go get the stipulations approved.  That's when all the

11   parties wanted to get the Texas stipulations approved.

12   Q      Were we in Court on May 19th?

13   A      Yes.

14   Q      Okay, thank you.  And May 19th was also important

15   because that morning you file your application to be

16   employed for the InfoW Debtors with your new law firm, Kyung

17   S. Lee PLLC, correct?

18   A      That is the day I filed my application.  That is

19   correct.

20   Q      And the application requested retention as effective of

21   May 16th?

22   A      That is correct.

23   Q      Great.  And since 1984, I'm assuming you've encountered

24   the word connections far as it relates to a bankruptcy case;

25   is that correct?

1    A    I have.

2    Q    Great.  So let's talk about your application on -- that

3    was filed on -- I believe it was filed on May 19th.

4         MR. NGUYEN:  And Mr. Travis, can you go to Docket

5    No. 165-3 which is, I believe, Mr. Lee's application in the

6    InfoW case.  And if you can just scroll down to Paragraph

7    22.

8    BY MR. NGUYEN:

9    Q    Do you see Paragraph 22, Subparagraph C on the screen,

10   Mr. Lee?

11   A    Yes.

12   Q    And Paragraph C is actually just a restatement of

13   Bankruptcy Rule 2014, correct?

14   A    Yes.

15   Q    And do you see the word person's connections there on

16   Subparagraph C on the second line?

17   A    I do.

18   Q    Is there any qualifier in front of the word connections

19   besides the person's connection?  Does it say material

20   connection?

21   A    No.

22   Q    Okay.  It's just connection, right?

23   A    That's correct way to read that sentence.  Yes.

24   Q    Okay.  And let's flip over to your declaration which is

25   on same exhibit.  If you can just go to 13 of 30.  Scroll

 1   down to Paragraph 10.  Do you see Paragraph 10 right there

 2   on the screen, Mr. Lee?

 3   A    I do.  I've got it also on paper here.

 4   Q    Okay, great.  So the second line in Paragraph 10 talks

 5   about disclosable connections.

 6   A    That's correct.

 7   Q    What is the difference between a disclosable connection

 8   and just a regular connection?

 9   A    From my perspective if it's, for example, if you have a

10   conflict that should be a disclosable connection.  If you

11   have a connection that could mean something like, you know,

12   somewhat remote like come connection -- like you work with

13   somebody in the U.S. Trustee's office or you know somebody

14   in the Court system.  Again, you know, as I said on the

15   direct testimony, I look at it as whether or not such a

16   connection could bias you in a case or create some kind of a

17   adverse problem for you as a lawyer in a case.  That's how I

18   look at it.  So it's my own version of what I think should

19   be disclosed as -- if it adversely impacts you is the way I

20   think about it.

21   Q    Well, let's look at Paragraph 11 down there.

22   A    Sure.

23   Q    It talks about disqualifying connections.

24   A    Right.

25   Q    What is the difference between a disclosable

1    connection, a disqualifying connection?  What's the

2    difference between the two?

3    A    I think the --

4         MR. BATTAGLIA:  Your Honor, I'm going to object.

5    He's asking legal conclusions.  Mr. Lee is a lawyer, but

6    he's here right now as a witness.

7         THE COURT:  We're just asking what he meant, I

8    think.  I'm going to overrule that.  I think the question is

9    just trying to clarify what he meant in his declaration, not

10   whether it's a legal conclusion or not, just trying to make

11   an understanding as to what he meant.

12   BY MR. NGUYEN:

13   A    I think what I meant in the (indiscernible)

14   disqualifying connections is it's not a connection such that

15   it disqualified me from being counsel by virtue of having

16   that connection under Rule 2014.  It's not a conflict, as an

17   example.  I don't have any -- I didn't have a conflict in

18   being able to represent this Debtor, is my statement there.

19   Q    Is it your understanding that Rule 2014 requires you to

20   disclose all connection, not just only disclosable

21   connection or disqualifying connection?

22   A    Well, from my perspective?

23   Q    Yeah, I'm asking for your understanding.

24   A    My understanding is is that there has to be some limit

25   as to what connections you should disclose because if you

1    took the word literally, connections literally, you'd have

2    to disclose everything under the world, especially if you've

3    been a bankruptcy lawyer or professional forever.  That's

4    why you have language in it that says, you know, I've been

5    practicing the law for many years and so you may have come

6    across certain parties, et cetera.

7         That's why you have all those caveats, so the purpose

8    of, in my view, of a 2014 disclosure is to let Courts know,

9    for example, you have a connection that could adversely

10   affect you in doing your job.  That's how I looked at it.

11   That's how I look at it when I do my 2014 disclosures.

12   That's the way I think about it, like I did on my May 21

13   email to my client saying, do we have an issue here that we

14   need to think about.

15   Q    Okay.  Thank you.

16        MR. NGUYEN:  And Mr. Travis, can you turn to Page

17   18 of 30?  And when I say 18 of 30, I'm talking about the

18   Bates stamp on top.

19   BY MR. NGUYEN:

20   Q    You see the third paragraph down there, Mr. Lee?  It

21   says retainer.

22   A    Yes.

23   Q    The firm there is capitalized and when it says the

24   firm, right, that's KSL PLLC; is that correct?

25   A    Yes.  If that engagement letter is with KSL PLLC.

1    Q    Yeah, we're in the same document.

2    A    Okay.

3    Q    So, and then client is capitalized there.  You see down

4    there, the firm has not requested a retainer from the

5    client?

6    A    Right.

7    Q    Client is the InfoW Debtors, correct?

8    A    Can you scroll up?  I just want to make sure if that's

9    the same letter.  If the client is defined as the InfoW

10   Debtors, yes.

11   Q    Okay, great.

12   A    That's correct.

13   Q    So from reading this paragraph on the retainer, is it

14   fair to say that KSL PLLC did not request a retainer from

15   the InfoW Debtors; is that correct?

16   A    That is correct.

17   Q    Okay.  And if we can just turn back to the declaration

18   at Page 13 of 30.  You see Paragraph 9 there, Mr. Lee?  It

19   says, KSL PLLC has requested a retainer.  I'm just going to

20   stop it there.

21   A    Yes.

22   Q    Who -- if you didn't request a retainer from Mr.

23   Schwartz who was representing InfoW Debtors, who did you

24   request a retainer from?

25   A    It's again -- the fault is mine.  It's -- number one, I

1    never requested a retainer.  The language in Paragraph 9 is

2    incorrect.

3    Q    Did you read the declaration before you filed --

4    A    I did and the language there saying as requested

5    retainer is incorrect.  What the -- statement in the

6    engagement letter is the correct one, that I never got one

7    and I never requested one.

8    Q    Okay.  So next time, I should rely on the engagement

9    letter, but not the declaration?

10   A    Mr. Nguyen, I told you, I made mistakes and I'm telling

11   you this is a mistake and I'm owning up to it, so you know,

12   that's my mistake.

13   Q    That's fine.  So you didn't request a retainer from

14   anyone else?  You didn't ask any of the third party funders

15   to pay your retainer?

16   A    No.  First of all, it was a post-petition matter and I

17   thought it was going to very hard to get a retainer and so I

18   didn't ask one for InfoW.

19   Q    That's --

20   A    That's the major reason.

21   Q    So just to recap, so May 18th, the motion to extend a

22   bunch deadlines was filed.  On May 19th, the morning of, you

23   file the KSL PLLC application and then there was a hearing

24   scheduled for the afternoon on May 19th; is that correct?

25   A    That is correct.

1   Q    And on the afternoon of May 19th, you were requesting

2   additional time.  I think you were asking for a month, but

3   Mr. Ruff had an issue with a month.  He thought it was too

4   long; is that correct?

5   A    Yes, I believe that's correct.

6   Q    Okay.  And one of the reasons -- and we can pull the

7   transcript if need be -- you told the Court that you needed

8   this additional time because if the InfoW Debtors were going

9   to remain in Subchapter V, you might have to renegotiate the

10  plan support agreement, correct?

11  A    Well, I may have said that, but --

12  Q    Thank you.

13  A    Wait, wait, wait --

14  Q    He -- Mr. Shannon can bring you on redirect.  That's

15  all I needed.

16  A    But that's not what I said.

17  Q    So -- and then also before the hearing adjourned on May

18  19th, you also told the Court Mr. Schwartz in his fiduciary

19  capacity is evaluating alternative.  Do you recall telling

20  the Court that?

21  A    I did.

22  Q    Okay.  And when you say fiduciary capacity, fiduciary

23  capacity to who?

24  A    To InfoW Debtors.

25  Q    Okay.  Was one of the alternatives that you were

1    thinking at the time that Mr. Schwartz would be the chief

2    restructuring officer for Free Speech Systems?

3    A    When I made that statement, I was addressing a

4    different issue raised by the Court.

5    Q    Great.  The consideration of whether Mr. Schwartz

6    should be the CRO for Free Speech Systems actually occurred

7    on May 19th, correct?

8    A    No.

9    Q    There was no consideration on May 19th?

10   A    No.

11   Q    Okay.  After the hearing on May 19th, did you receive a

12   phone call from someone at Free Speech Systems?

13   A    From Ray Battaglia.

14   Q    Okay.  And Mr. Battaglia was representing Free Speech

15   Systems at the time, correct?

16   A    That is correct.

17   Q    Were you still in the courthouse when you received this

18   phone call?

19   A    No.

20   Q    How long was the conversation?

21   A    Very short, I believe.

22   Q    During the call, were there any discussions regarding

23   your potential engagement with FSS?

24   A    No.  It was a call basically saying please come to

25   Austin.

1    Q    Okay.  Was there any discussion of Mr. Schwartz'

2    potential engagement with FSS on May 19th?

3    A    No.  In fact, the discussion really revolved around the

4    need for somebody with a contact with a commercial bank,

5    Axos Bank, that needed a commercial banking relationship.

6    Q    After the phone call on May 19th with Mr. Battaglia,

7    you contact Mr. Schwartz and you said that on May 24th, you

8    were going to meet with -- I'm not sure who -- well, let's

9    step back.  There is an email from you on May 19th to Mr.

10   Schwartz telling Mr. Schwartz that you were going to make it

11   up to Austin on May 24th, correct?

12   A    Well, let's be real clear.  The email that I sent him

13   was what I sent him, at 5:24 p.m.  It's --

14   Q    Well --

15   A    -- three-line sentence email that says, "We are asked

16   to come to a meeting in Austin on May 24th."

17   Q    So the meeting on May 24th was scheduled on May 19th;

18   is that a fair statement?

19   A    It says, "I told Ray we can be there by 11:30 and see

20   if he can set up a meeting to start then.  We can do

21   Connecticut status hearing at 1 p.m. and continue with FSS

22   meeting thereafter in Austin."

23   Q    So --

24   A    That was at 5:24 p.m.

25   Q    So is it fair to say that on May 19th, there was a

1    meeting scheduled for May 24th in Austin?

2    A    Yes.

3    Q    Okay.

4    A    Yes.

5    Q    And excuse my ignorance.  I'm a northerner from Chicago

6    and I moved down here it's very cold in Chicago and I'm not

7    familiar with distances.  How long does it take to get from

8    Houston to Austin?

9    A    Three hours.  Or two-and-a-half hours, depending how

10   fast you drive.

11   Q    And does Mr. Battaglia live in Austin?

12   A    San Antonio.

13   Q    So how long does it take to drive from San Antonio to

14   Austin?

15   A    One-and-a-half hours or one hour, depending on how Ray

16   drives.

17   Q    Fair enough.

18          THE COURT:  Sorry.

19   BY MR. NGUYEN:

20   Q    The meeting on May twenty -- well, let me ask --

21          MR. BATTAGLIA:  To be fair, it's more traffic.

22   BY MR. NGUYEN:

23   Q    So the meeting that was scheduled on May 24, that

24   wasn't a meeting to renegotiate a plan support agreement,

25   was it?

1    A    Absolutely not.

2    Q    Okay.  Fair enough.  It was a meeting to discuss

3    potential restructuring for FSS; is that correct?

4    A    It was a meeting to discuss FSS generally and it was

5    just walking about the state of FSS condition and for people

6    to get background documentation on FSS.

7    Q    Where did you meet on May 24th?

8    A    At the offices of FSS.

9    Q    In Alvin Devane?  Is that how you --

10   A    That's correct, it's on Alvin Devane with all the

11   shaded windows and studios.  That's correct.

12   Q    And earlier we -- when we were going through the KSL

13   PLLC and we were going through connections and disqualifying

14   connection and disclosable connection, you think this was a

15   connection that needed to be disclosed?

16   A    The answer is, from my perspective, I didn't know yet

17   what it was because I didn't know what they wanted.  I

18   didn't know if they were going to retain me.  I didn't know

19   what was going on.  I just had an idea that we had -- we

20   were asked to come to a meeting.  We were going to discuss

21   things and I knew that insofar as it could involve that

22   representation, but nobody had promised me anything except

23   come to a meeting.

24   Q    And normally, do you drive three hours just to get

25   information from a potential client?

1   A      As a debtor counsel, I fly on airplanes to go to

2   meetings.  Yes.  Prospective clients.  Yes, I do.

3   Q      So let me understand.  So you don't think the

4   connection should've been disclosed on May 19th?

5   A      Well, here's the reason why.

6   Q      Well --

7   A      There was nothing I could disclose when I was here in

8   Court at 2 p.m., is what I'm trying to tell you, because I

9   didn't get the call until after I left the Court.

10  Q      So after you got the phone call after Court from Mr.

11  Battaglia and after you sent the email to Mr. Schwartz, you

12  -- at that point, there was a connection that was required

13  to be disclosed?

14  A      The answer is, I had -- I don't think I had a

15  connection that I could disclose because I didn't know what

16  that connection was.

17  Q      Who was at the meeting on May 24th?

18  A      Mr. Battaglia, Mr. Schwartz, I think Mr. Jordan showed

19  up for -- on behalf of -- and Mr. Jones.  I believe Mr.

20  Shannon showed up for the meeting.  And then at some point

21  in time, I believe Mr. Jones attended the meeting to give us

22  his views on things and also sign some of the agreements.

23  And I believe there may have been some other participants,

24  but those are the ones that I remember primarily.  Mr.

25  Schwartz was there and Mr. Battaglia and -- yeah, those are

1    the primary people.

2             MR. NGUYEN:  And Mr. Travis, can you go to 165-10?

3    BY MR. NGUYEN:

4    Q    So prior to coming to the meeting, you did some

5    research on FSS and then you emailed background research to

6    Mr. Shannon; is that correct?

7    A    Yes.

8    Q    Okay.  Thank you. And you see on the bottom there, it

9    says "Extended conference with client, Schwartz Associates,

10   B. Rowe, S. Jordan, and RJ Shannon to discuss options and

11   issues with FSS restructuring."  You see that?

12   A    Yes, I do.

13   Q    You see it says five hours there?

14   A    Yes.

15   Q    It says client there.  Who's the client?

16   A    I guess I was referring to FSS at that point in time.

17   Q    Was it Mr. Jones?

18   A    No.

19   Q    Mr. Jones, the owner of the company wasn't the client

20   at the time?

21   A    Mr. Nguyen, we've never represented Mr. Jones.  I've

22   never represented Mr. Jones.

23   Q    So who are you referring to client?  Because you list

24   everyone else.

25   A    Well, the memo, the invoice is being sent to FSS and

1    therefore I'm making it to FSS.  If I'd represented Mr.

2    Jones, I wouldn't be sitting here representing FSS today.

3    Q    Let me ask you.  Mr. Jordan.  Mr. Jordan was at that

4    meeting.  Who does Mr. Jordan represent?

5    A    Represents Mr. Jones.

6    Q    And on May 25th, you spent about three hours driving,

7    depending how fast you drive, and about five hours actually

8    meeting people at the facilities at FSS; is that correct?

9    A    You mean on May 24th, not 25th?

10   Q    I'm sorry, May 24th.

11   A    Yes.

12   Q    And --

13   A    That's right.

14   Q    And at that point -- and earlier, we talked about

15   connections and I won't go to -- you think there was a

16   connection on May 24th that needed to be disclosed?

17   A    No.

18   Q    No connection that needed to be disclosed to the Court?

19   A    No.

20   Q    You start billing for FSS on May 24th and you don't

21   think there's a connection that needed to be disclosed to

22   the Court?

23   A    I did not.

24   Q    Okay.  You think it's a problem that in your

25   declaration on -- in the KSL PLLC that there's a pending

1    declaration with the Court that says that you had no

2    connections to FSS and Alex Jones, you think that's an

3    issue?

4    A    Well, to me it was not, because the case was going to

5    be dismissed and we were not seeking employment anymore.

6    Q    And Mr. Schwartz was at this meeting, correct?

7    A    That's correct.

8    Q    Did Mr. Schwartz billed for this meeting?

9    A    I don't know.

10   Q    Does Mr. Schwartz generally do stuff without billing?

11   A    Lots of times he does.

12   Q    Good.  And the meeting as you notate on the entry, it

13   was to discuss options and issues with FSS restructuring,

14   correct?

15   A    Correct.

16   Q    Okay.  And I'm sure there's going to be an attorney-

17   client privilege.  I won't ask about the conversation, so

18   we'll just move on.  Prior to June 10th, did you tell any of

19   the Sandy Hook plaintiff or their attorneys that you were

20   doing work for FSS on May 24th?

21   A    No.

22   Q    Prior to June 10th, you didn't tell anyone at the U.S.

23   Trustee's office that you were working for FSS on May 24th;

24   is that correct?

25   A    That is correct.

1    Q    Prior to June 10th, you didn't tell the Court that you

2    were working for FSS on May 24th; is that correct?

3    A    That is correct.

4    Q    As a matter of fact, your trip to Austin on May 24th

5    was not disclosed to the Court until August 20th when you

6    filed your declaration in the Shannon & Lee application; is

7    that correct?

8    A    That's accurate.

9    Q    That's the first time you ever told any -- either the

10   Court, the U.S. Trustee, or the creditors that you made the

11   trip up to Austin on May 24th; is that correct?

12   A    That is accurate.

13   Q    And on May 24th, just to be clear, you were still

14   representing the InfoW Debtors, correct?

15   A    That is correct.

16   Q    So I just want to go back to -- if you go back to 165-

17   3.  So on May -- I believe May 19th, in your declaration at

18   Paragraph 19, if you can just go there.

19         MR. NGUYEN:  Paragraph 19, Mr. Travis.  Give me

20   one second.  I apologize.  Paragraph 19 on the motion.

21   BY MR. NGUYEN:

22   Q    Mr. Lee, can you read Paragraph 19 to me?

23   A    "The Debtors believe that KSL PLLC neither holds nor

24   represents a disqualifying interest that is adverse to the

25   estate and is a disinterested person.  If any new relevant

1    facts or relationships are discovered, KSL PLLC will

2    supplement its disclosure to the Court."

3    Q    But you told the Court this statement on May 19th,

4    correct?

5    A    That is correct.

6    Q    But you didn't supplement it, correct?

7    A    That's correct.

8         MR. NGUYEN:   Okay.  And let's go back to 165-10.

9    I apologize, Mr. Travis.  I'm jumping around a little bit.

10   BY MR. NGUYEN:

11   Q    Let's go through some of these time entries and just

12   make sure I understand what you were doing for FSS during

13   this time.  So on May 26, you were still representing the

14   InfoW Debtors, but you were looking at valuation reports for

15   PQPR on behalf of FSS; is that correct?

16   A    I was reviewing two reports that I found out about that

17   were historical regarding PQPR and FSS that had been

18   discovered that were like basically 2012, 2013 reports.

19   Q    So is that a yes to my question, sir?

20   A    Yes, it is.

21   Q    Okay, thank you.  And on May 28th and May 29th, you

22   were analyzing data from the state court counsel; you see

23   that?

24   A    Yes.

25   Q    Is that what you did on May 28th and May 29th?

1   A    Yes.

2   Q    Okay.  And when we think about state court litigation,

3   we're really thinking about the Texas litigation and the

4   Connecticut litigation, correct?

5   A    Well, what I'm referring to there is just merely the

6   Texas state court litigation, because I didn't have access

7   to the discovery in the Connecticut litigation.

8   Q    Who gave you the state court litigation production that

9   you were analyzing on May 28th?

10  A    I'm trying to think.  It must've been the Reynal firm.

11  Q    And it wasn't any documents from Connecticut, correct?

12  A    No.  It was not.

13  Q    Okay.  And towards the end of this, so from May -- I

14  believe May 24th to May 31st, you billed for a total amount

15  of $24,409.09; is that correct?

16  A    That is correct.

17  Q    Were you paid this amount?

18  A    Yes, I was.

19       MR. NGUYEN:  Okay.  If we can just go back to

20  Exhibit 165-9.  And if you go to Page 5 on the motion, Mr.

21  Travis.

22  BY MR. NGUYEN:

23  Q    Mr. Lee, do you see the footnote there on Page 5?  And

24  I'm going to read it to you.  "KSL PLLC received payment

25  from the Debtor of $21,986.59 for services provided to FSS

1  from May 24th, 2022 through May 31st, 2022."  And the

2  question is, did I read that correctly?

3  A   You did read that correctly.

4  Q   Okay.  Thank you.  And when were you paid for the legal

5  services for KSL PLLC?

6  A   I don't know it off the top of my head, but it's

7  something I could give you -- to you if you need that.  I

8  just don't know, but I think it was sometime in June or

9  July.  June.

10  Q   Okay.

11  A   I just don't know the answer off the top of my head.

12  Q   And you assisted Mr. Schwartz in the preparation of the

13  schedules and Statement of Financial Affairs in the FSS

14  case?

15  A   Yes.

16  Q   And you've been doing this for a while.  You know in

17  the Statement of Financial Affairs, there's a section that

18  requires disclosure of payments related to bankruptcy

19  services.  Are you familiar with that section?

20  A   I am.

21  Q   Okay.

22      MR. NGUYEN:  Let's -- if you can go to 165-2, Mr.

23  Travis.  And if you can turn to Page 9 of 28, right.

24  BY MR. NGUYEN:

25  Q   Do you see any payments disclosed to KSL PLLC on Line

1    11?

2    A    I think that we addressed that in the global head

3    notes, in the global notes with respect to the fact that

4    there were certain payments made and they were distributed

5    to the -- Schwartz Associates.  I think we were going to

6    supplement that also with the Ray Battaglia PLLC.

7    Q    You see how the payment to Shannon & Lee was disclosed

8    --

9    A    Yes.

10   Q    -- through the SA LLC Trust?

11   A    Yes.

12   Q    But the question is, do you see the KSL PLLC payments

13   here?

14   A    I do not.

15   Q    Okay, thank you.

16   A    I do not.

17   Q    And the Statement of Financial Affairs is signed under

18   penalty of perjury by Mr. Schwartz, correct?

19   A    That is correct.

20   Q    Okay.  And --

21   A    That is correct.

22   Q    And did you know, did Mr. Schwartz, do you know if he

23   looked over the Statement of Financial Affairs before it was

24   filed with the bankruptcy court?

25   A    He did, because --

1    Q    Okay.

2    A    He did.

3    Q    Would you agree with me that the payment to KSL PLLC

4    should be listed on the Statement of Financial Affairs?

5    A    Most likely.

6    Q    Is that a yes?

7    A    It is a yes.

8    Q    Thank you.

9    A    Yeah.

10   Q    So let's just talk about the InfoW cases and the

11   stipulations.  Beginning May 27th, you and -- and tell me if

12   it's before May 27 -- you and Mr. Ruff, you actually began

13   exchanging draft of a stipulated dismissal on May 27.

14   That's when the actual change of language happened, correct?

15   A    If you tell me that's what happened.  All I know is I

16   told him it was May 25th.  He sent me something based upon

17   the emails that I have, was -- I believe the first one he

18   sent me was probably on May 27th.

19   Q    Yeah. Don't look at the document --

20   A    Okay.

21   Q    -- ask you.  If you don't know the answer --

22   A    I don't know the answer to -- off the top of my head.

23   I have to look at a document.

24   Q    Fair enough.

25        MR. NGUYEN:  Mr. Travis, can you go to 163-26?  If

1    you scroll to -- can you scroll up a little bit, Mr. Travis,

2    please?  See the dates here.  Scroll all the way to the

3    bottom of this email chain.  If you scroll up one more to

4    the next email by Mr. Ruff.  If you can go to --

5    BY MR. NGUYEN:

6    Q    On May 27th, at about 3:16 p.m., Mr. Ruff sent you a

7    draft of the proposed stipulated dismissal, correct?

8    A    This email says that.  That's correct.

9    Q    Okay.  And on May 31st, if we scroll up, you circulated

10   some comments to the draft.

11   A    It's a rewrite.

12   Q    Right, and one of the issue you took with the

13   stipulated dismissal order that Mr. Ruff draft was, it says,

14   the motion to dismiss is granted.

15   A    That's correct.

16   Q    Okay.  And so we were exchanging language as of May

17   31st, but there wasn't no agreement to dismiss the case,

18   correct?

19   A    Mr. Nguyen --

20   Q    Was there signatures on --

21   A    The answer to your question about the signatures is

22   there was no --

23   Q    Okay.

24   A    -- the concept of this agreement --

25   Q    And --

1    A    -- authority in place.

2    Q    And then on June 1st, there's an email from Mr. Ruff.

3    Do you see that?  It's a long email in response to your

4    draft of the stipulated dismissal.  Mr. Ruff had some issues

5    with how your draft was drafted, correct?

6    A    Yes, sir.

7    Q    And one of the issues he took was there were

8    exculpations on your draft of the stipulated dismissal,

9    correct?

10    A    That is correct.

11    Q    Okay.  Why did you feel the need to include an

12    exculpation clause?

13    A    Well, in light of the fact that the Trustee was

14    opposing the professionals from getting retained and that if

15    we would -- gotten retained and gotten final fee

16    applications approved, we would've had the protections of

17    the bankruptcy court, so since the Trustee was saying they

18    wanted the cases dismissed and did not want the

19    professionals to be retained, we thought at least that we

20    should ask for exculpation in light of the fact that the

21    Trustee was standing in the way of us getting retained.  I

22    thought that was a reasonable ask.

23    Q    And so after this email, we cleaned up the stipulated

24    dismissal order and the stipulation was actually filed with

25    the Court on June 1st, correct?

1    A    That is correct.

2    Q    Okay.  And prior -- well, let me strike that.  And you

3    understand on June 1st, even though my office and yourself

4    agreed to dismissal via our stipulation, the cases weren't

5    dismissed until Judge Lopez put his signature on that

6    stipulation, correct?

7    A    I do agree with that.

8    Q    Okay.  So on June 1st, the representations of the InfoW

9    Debtors was not over.

10   A    That is correct.

11   Q    And so the stipulation was filed on June 1st and then

12   on June 2nd, you file on behalf of InfoW, Debtors' omnibus

13   response to motion to dismiss.  Is that correct?

14   A    That's correct.

15   Q    Okay.  You drafted this response?

16   A    Mr. Shannon and I both worked on it.

17   Q    Okay.  What was the point of filing a response to the

18   motion to dismiss if the parties already stipulated?

19   A    There were several reasons for it.  Number one, there

20   were allegations that were outstanding that people were

21   going to use against the InfoW Debtors in a negative way and

22   so we felt as a fiduciary it was it was incumbent upon us to

23   set the record straight as to what happened in the case.

24   That was number one.  Number two, everybody thought that the

25   case had been filed in bad faith and made those allegations

1    as the central core of any pleading they filed, and I

2    thought it was important for the Debtor to set the record

3    straight before the case was dismissed so that things like

4    this wouldn't happen again.

5    Q    Okay.

6    A    So it was incumbent upon us to file that as a fiduciary

7    to set the record straight.  And number three, we didn't

8    want pleadings that were filed that didn't go unchallenged

9    in that case because of the publicity and all the issues

10   that surrounded it.  So we thought it was incumbent upon the

11   Debtors to set the record straight before the cases got

12   dismissed completely.

13   Q    And it was setting the record straight as to

14   allegations against the InfoW Debtors.  The purpose of the

15   response was not to defend Alex Jones and Free Speech

16   Systems, the client you were representing on the day that

17   you filed the response, correct?

18   A    Mr. Nguyen, we were representing the InfoW Debtors.  As

19   you will read in the response, it was a response by the

20   three Debtors.

21   Q    Okay.  Let me ask -- so the purpose of the response was

22   not to defend Alex Jones and Free Speech Systems, correct?

23   A    There is not one word in that response, docket number

24   whatever it is, that defends FSS or Alex Jones.  It defends

25   the rationale for filing the InfoW Debtors' bankruptcy cases

1    and it defends the allegations that made by the U.S. Trustee

2    and the plaintiff saying it was a bad faith filing.

3    Q    And in your response on June 2nd, you used the word

4    independent to describe the CRO.  Isn't it a little bit

5    misleading to describe the CRO as independent when the CRO

6    is working for Free Speech Systems?  It's a yes or no

7    question.  Is it misleading to --

8    A    It is not misleading, Mr. Nguyen.

9    Q    Thank you.  And earlier you testified I think around

10   May 24, you were no longer seeking to be employed by the

11   InfoW Debtors, correct?

12   A    That is an incorrect statement of what I testified to.

13   I testified that as of May 21, I'd already decided based

14   upon the position you had -- your office had taken and the

15   analysis that I'd done that we were no longer seeking to be

16   retained as of Saturday, May 21 when I finished my memo and

17   analysis.

18   Q    Okay.

19        MR. NGUYEN:  (indiscernible) just pull up -- if

20   you can pull up 165-7.

21   BY MR. NGUYEN:

22   Q    Let me ask you this.  On June 2nd, did you still have

23   fiduciary duties to the InfoW Debtors?

24   A    I did.

25   Q    Even though you were not seeking employment?

1   A     I did.

2   Q     Okay.  And isn't it a little bit misleading to say that

3   the fiduciary duties were clear and unwavering when you were

4   employed by FSS at that time?

5   A     No.  The duties that I had to InfoW Debtors were

6   unwavering and they were fulfilled to 1,000 percent on June

7   2nd through June 10th.

8   Q     Okay, so -- but on June 2nd, you were drafting the

9   first day declaration for FSS, correct?

10   A     What has that got to do with the fiduciary duty

11   obligations that I had to InfoW Debtors?  I fulfilled every

12   one of them.

13   Q     Again, on June 2nd, you were drafting the first day

14   declaration for Mr. Schwartz for the FSS --

15   A     The answer is, Mr. Nguyen, I was putting together a

16   draft declaration for Mr. Schwartz as CRO for FSS, which had

17   nothing to do with InfoW Debtors.  The three Debtors had

18   been dismissed by the plaintiffs.  They had no relationship

19   with FSS at that time except for one relationship which was

20   stable and no dispute between them.

21   Q     So in that June 2nd filing, nowhere in that filing did

22   you mention you started working for FSS; is that correct?

23   A     That is accurate.  That's correct.

24   Q     Nowhere in that filing did you mention that Mr.

25   Schwartz was at this time working for FSS; is that correct?

1    A    That is also accurate.

2    Q    And earlier, you mentioned that by the time you filed

3    this, I guess it's a response on June 2nd, you were no

4    longer seeking employment from the InfoW Debtors.

5         MR. NGUYEN:  Mr. Travis, can you scroll down to

6    the signature line?  Go up one, to the motion, the signature

7    line on the motion.  All the way at the bottom.  At the

8    bottom of the motion.

9    BY MR. NGUYEN:

10   Q    You see where it says proposed counsel for the Debtor?

11   Who were you proposing to be counsel to the Debtor when you

12   signed that signature?

13   A    The Debtors, the InfoW Debtors.

14   Q    And you were proposing to the Court to be the Debtor,

15   right, when you signed that signature?

16   A    That's how I called myself.  That is correct.

17   Q    Okay.

18   A    And so I call myself that the entire time between May

19   19th through June 10th.

20   Q    And until the end of June 10th, you didn't resolve the

21   KSL PLLC application, correct?

22   A    That is also correct, Mr. Nguyen.

23   Q    Mr. Schwartz didn't withdraw his application as of June

24   10th, correct?

25   A    That is also correct.

1    Q    And there was no amendment, no supplements to any of --

2    to either of the applications in the InfoW case, correct?

3    A    That is correct.

4    Q    And on June 10th, the Court conducted a hearing on the

5    stipulated dismissal, correct?

6    A    I think the Court really conduct -- took up the

7    stipulation.  I don't know if it conducted a hearing, but

8    basically took up the stipulation.

9    Q    Fair enough.  And you appeared at the June 10th hearing

10   but you were on video.  I believe at the time, you were with

11   your mother in California?

12   A    I was at my niece's high school graduation.

13   Q    Right.

14   A    So Mr. Shannon was here in person and I appeared via

15   video.

16   Q    Okay.  So Mr. Shannon was here and was -- Mr. Schwartz

17   was here as well?

18   A    I don't recall whether he attended or not.

19   Q    And do you recall Mr. Shannon making the announcement

20   that there was a new firm, Shannon & Lee LLP at the time?

21   A    I believe so.

22   Q    Okay.  But there was no announcement of any connections

23   to FSS on June 10th; is that correct?

24   A    That is -- I don't recall any.

25   Q    Okay.  And let me ask you this.  Like, when did the

1    representation of the InfoW Debtors end?  Did it end with

2    the stipulated dismissal?

3    A    In my view, it ended -- it terminated really all for

4    practical purposes when the case was dismissed, because

5    there was no longer need for counsel to aid them in their

6    restructuring which was the scope of our engagement.

7    Q    Okay.

8    A    And so that's how I viewed it, because the scope of our

9    engagement was, the matter was to help them in their

10   restructuring.  When the case got dismissed as of June 10th,

11   the purpose of our engagement and the scope of our matter

12   disappeared.

13   Q    Okay.   Give me one second --

14   A    Sure.

15          THE COURT:  I think he meant me, Mr. Lee.

16          THE WITNESS:  I'm sorry.  I apologize.  I'm sorry,

17   Your Honor.  You know, when you get sitting up here, you

18   kind of fade away.  I apologize.

19   BY MR. NGUYEN:

20   Q    Mr. Lee, when the Texas plaintiff and the Connecticut

21   plaintiff dismissed their claims against the InfoW Debtors,

22   were there remaining claims?

23   A    Yes.

24   Q    About $140,000 in claims?  Is that --

25   A    I think there were closed to $190,000 of claims and

1    then there were still unknown facts, but there were about

2    four claimants and it turns out that maybe one of them had

3    been paid and -- so, but there was uncertainty about them,

4    but there was about four claims remaining.

5    Q    And was FSS a joint Debtor to those claims?

6    A    Yes, they were.

7    Q    Thank you.

8         MR. NGUYEN:  No further questions, Your Honor.

9    Thank you for --

10        THE COURT:  Okay.

11        MR. NGUYEN:  -- opportunity.

12        THE COURT:  Mr. Shannon -- well, let me, before

13   you go there, let me ask, does any other party who opposes

14   the retention of either Mr. Lee or Ms. Schwartz have any

15   questions?  Okay.  Mr. Shannon, any redirect?

16        MR. SHANNON:  Yes, Your Honor, just a couple

17   questions.

18        THE COURT:  Okay.  Before you begin, I'm going to

19   take back the power of the screen, just so -- yep.  Perfect.

20   Thank you.  Mr. Shannon, please proceed.

21             REDIRECT EXAMINATION OF KYUNG LEE

22   BY MR. SHANNON:

23   Q   Mr. Lee, I just want to clarify something.  Who does

24   Shannon & Lee LLP propose to represent in this case?

25   A   Free Speech Systems LLC, the Debtor.

1  Q    Has Shannon & Lee LLP ever represented Alex Jones?

2  A    We have never represented Alex Jones.

3  Q    Have you ever represented Alex Jones?

4  A    I have never represented Alex Jones.

5  Q    Mr. Lee, did you sign the Debtor's schedules and

6  Statement of Financial Affairs?

7  A    I did not.

8  Q    I want to talk a little bit about the request for

9  exculpation and the reason for the response.  Has there

10  been, in these cases or -- rewind that.  In the InfoW cases

11  and the surrounding litigation, has there been a history of

12  sanctions sought?

13  A    Yes.

14  Q    Has there been sanctions that were sought against the

15  attorney who removed those cases?

16  A    Absolutely.

17  Q    And the bankruptcy court -- I'm actually talking about

18  particularly the cases, the Texas cases that were removed

19  from Austin State District Court to the Texas Bankruptcy

20  Court -- Western District of Texas Bankruptcy Court.  Were

21  there requests for sanctions against the attorneys who

22  provided services to the InfoW Debtors in that?

23  A    Yes.

24  Q    Now, where those sanctions against Shannon & Lee LLP?

25  A    Not necessarily.  Some of them could be, but they were

1    asserted against state court counsel and we didn't know how

2    far they could reach.

3    Q    And those are attorneys who provided services to the

4    InfoW Debtors, correct?

5    A    That's correct.

6    Q    Okay.

7            MR. SHANNON:  No further questions, Your Honor.

8            THE COURT:  Okay.  Any further redirect?  Okay.

9    Mr. Lee, thank you for your time.

10           THE WITNESS:  Thank you, Your Honor.

11           THE COURT:  Mr. Shannon, do you have any other

12   witnesses or any other evidence?

13           MR. SHANNON:  Yes, Your Honor.  If it's okay with

14   the Court, Mr. Lee was going to now handle questions of Mr.

15   Schwartz.

16           THE COURT:  Okay.

17           MR. LEE:  Call Mr. Schwartz.

18           THE COURT:  Okay.

19           MR. NGUYEN:  Your Honor (indiscernible).

20           THE COURT:  All right.  Good to see you, again.

21   Do you swear to tell the truth, the whole truth, and nothing

22   but the truth?

23           THE WITNESS:  I do.

24           THE COURT:  Okay.  Please have a seat.  And if you

25   can pull that microphone close to you.  Just want to make

1    sure that we can all hear each other.  Mr. Lee, just from --

2    I want you to take as much time as you want.  I'm just

3    thinking from a timing standpoint, we can -- we're going to

4    go until we're done today.

5              MR. LEE:  Thirty minutes?

6              THE COURT:  Okay.  No, no, no, I just -- so why

7    don't we then do a direct, take a short break, and then

8    we'll come back and do cross like we did before.  Okay?

9              MR. LEE:  Okay.

10             THE COURT:  Okay.  Thank you.

11                  DIRECT EXAMINATION OF MARC SCHWARTZ

12   BY MR. LEE:

13   Q    State your name for the record.

14   A    Marc Schwartz.

15   Q    And how many years have you been in the financial

16   restructuring business?

17   A    Since around 1984.

18   Q    And during that period of time, have you generally been

19   keeping up with your ethical requirements of practicing in

20   the bankruptcy court?

21   A    Trying to.

22   Q    What does that mean?

23   A    Well, I have to meet ethical requirements.  I'm a CPA.

24   Specific requirements are laid out every two years.  In the

25   bankruptcy arena, I don't have that formality, but I am

1    trying to stay aware of the issues as -- what's come up.  I

2    do (indiscernible) the AICPA's code of ethics usually works

3    pretty well.

4    Q    Now, you've testified before this Court in this case,

5    correct?

6    A    Yes.

7    Q    And you've also appeared before this Court in the InfoW

8    bankruptcy case, correct?

9    A    Yes.

10   Q    So could you tell the Court generally just your

11   educational background and we'll talk about your other

12   background after that, but tell the Court where you went to

13   school -- college.

14   A    College.  I had bachelor of economics from Princeton

15   University, master in accounting and finance from University

16   of Chicago's Booth School of Business.

17   Q    And you finished your MBA in how many years?

18   A    One-and-a-half.

19   Q    All right.  And how were you able to do that?

20   A    Well, I went summer school and I (indiscernible)

21   economics (indiscernible) Princeton.  I placed out of a lot

22   of courses, so I was able to (indiscernible) prior hours

23   with -- you know, (indiscernible) classes.

24   Q    So after you graduated from University of Chicago, what

25   did you do in your career?

1    A    I went to work as a junior accountant for firm of --

2    became PriceWaterhouseCoopers in its Chicago office.

3    Q    And how long did you stay there?

4    A    I was with (indiscernible) Coopers and Lybrand for 20

5    years.

6    Q    And were you working in the restructuring financial

7    advisory space at that point in time?

8    A    Yeah.  I was technically still in the audit practice

9    and I had significant audit clients, but I was in charge of

10   the forensic evaluation services practice in Houston, which

11   included -- I started doing my bankruptcy work with them in

12   '84 and continued that, doing that bankruptcy work here.

13   Q    Have you been working in the bankruptcy field since

14   '84?

15   A    Yes.

16   Q    And in that time period, what type of work have you

17   been doing in the bankruptcy field?

18   A    Well, '84 we started doing work for Chapter 7 Trustees

19   in the area of compliance work, i.e., tax compliance.  In

20   addition in connection with litigation, we got involved

21   working with -- for the Trustees on some of the larger

22   litigation projects.  I mean, (indiscernible) I had 1,100

23   Chapter 7 cases open.

24   Q    How about your experience in the Chapter 11 arena?

25   A    I worked in Chapter 11, really, that in 1993, for me.

1    I did some Chapter 11 work prior to that, doing some

2    committee work in the '80s, '90s, doing some debtor --

3    assistant counsel for debtors, preparing companies' filing

4    and then serving during the bankruptcy itself.  And in '93,

5    when I left Coopers and U.S. Trustee's office called me and

6    asked me to get involved in a Chapter 11 as Trustee and

7    that's when I started doing trustee work which expanded to

8    trusteeships, examiners, examiners with expanded powers.  I

9    still do get some debtor-creditor work as well.

10   Q    Now, do you also do receiver work?

11   A    Yes.

12   Q    Now, do you understand the concept of being a

13   fiduciary?

14   A    I believe I do, yes.

15   Q    Can you tell the Court and the parties here what your

16   understanding of what a fiduciary means?

17   A    Being a fiduciary means that (indiscernible) a

18   fiduciary, you owe a duty to the party whose assets, whose

19   business, whose -- you've been placed in responsibility

20   over.  And that means that that duty is their interest

21   supersedes your interest.

22   Q    Since you've been involved in this area of

23   restructuring and financial advisory, have you ever been

24   reported for violations of any of your ethical obligations

25   to a client or to a party?

```
1    A    No.

2    Q    Mr. Schwartz, I want to first turn your attention to

3    the topic of your May 19th letter and if you'll take a look

4    at the small binder that's in front of you.  First of all,

5    before you go into this binder and look at these two

6    exhibits or three exhibits, can you explain to the Court the

7    controversy that you're aware of regarding the -- your

8    engagement letter of May 19th, 2022?  Are you familiar with

9    the various allegations and challenges to that letter?

10   A    Well, I'm (indiscernible) the fact there's -- that the

11   (indiscernible) of the letter has brought a lot of attention

12   and I will right now tell you (indiscernible) what you said,

13   I'm the one who put the May 19 on there.

14   Q    Let's talk about -- let's give the judge and the

15   parties exactly the reasons why the confusion was first

16   created.  Because as I read the objection, you were asked

17   certain questions at a previous court hearing and you seemed

18   to indicate that you sent this letter on or about May 19th.

19   A    I did.  I sent the letter to you.  (indiscernible)

20   asked me to get a draft of an engagement letter.

21   Q    All right.

22   A    I sent you all a draft.  I (indiscernible) had

23   everything.

24   Q    Now, did that letter that you sent to me as you now

25   discover turn out to be the letter that was signed by the
```

1    client FSS on June 6, 2022?

2    A    No.  It was not my draft.

3    Q    Okay.  Now let's turn to Exhibit No. 178-1, 178-2, 178-

4    3.  That's in front of you, that little binder.

5    A    Okay.  I'm sorry.

6    Q    Okay?  Mr. Schwartz, take a look at it and I don't know

7    if --

8              MR. LEE:  Have these been admitted, Mr. Nguyen?

9              THE COURT:  Yes, they have.

10   BY MR. LEE:

11   Q    Can you tell the Court, first of all, when I showed you

12   these emails regarding these letters, this exchange?

13   A    Well, recently, like yesterday, yeah.  I mean, because

14   I'd forgotten about this exchange.

15   Q    And so tell the Court what happened here that -- and

16   summarize it for the Court on Exhibits 1, 2, and 3 and how

17   the engagement letter that was ultimately signed and

18   attached to your application came about.

19   A    Well, May 19th, as I said, I believe I sent it to you.

20   You asked me to re-send it to you on Sunday, June 5th which

21   fits with (indiscernible) kind of got lost somewhere.

22   (indiscernible) modifications to it and sent me back those

23   revisions on Sunday, June 5th at 3:40 in the afternoon.  I

24   accepted those revisions and had -- where it is -- yeah.

25   Yeah, I accepted those revisions at 4:20 that day

1    (indiscernible) asked me to go ahead and print out.  When I

2    did that, I went ahead and put the date of May 19th on it

3    because that's when I originally drafted it.  May 24th, a

4    few business days later is when we -- I visited Austin with

5    you.

6    Q    Okay.

7    A    (indiscernible).  I think, Judge, you mentioned it

8    happens in bankruptcy.  I sit there and with all this is

9    because I did not put in front of this, as of May 19th, this

10   letter.  That was what my thinking was.

11   Q    so the engagement letter that you sent on May 19th was

12   never executed, correct?

13   A    Correct.

14            MR. CHAPPLE:  (indiscernible).

15            THE COURT:  Sustained.

16   BY MR. LEE:

17   Q    Which engagement letter was executed by the client on

18   June 6, 2022?

19   A    The one that (indiscernible) took to Austin on

20   (indiscernible) on June 5th is my -- yeah, I would've

21   prepared it on June 5th.

22            THE COURT:  Overruled.

23   BY MR. LEE:

24   Q    Mr. Schwartz, I want you to turn to Exhibit 23 in your

25   big binder, please.

1    A    I have it.

2    Q    Do you recognize the Exhibit No. 23?

3    A    (indiscernible) be related to the Austin visit starting

4    at 11:30.

5    Q    To the best of your recollection, do you recall whether

6    or not I or anyone else from any other party mentioned to

7    you to come to a meeting regarding FSS prior to my sending

8    you this email on May 19th, 2022 -- 5:24?

9         MR. CHAPPLE:  Objection (indiscernible).

10        THE COURT:  Sustained.

11   BY MR. LEE:

12   Q    Mr. Schwartz, do you recall reading this email at 5:24

13   on that date?

14   A    Yes.

15   Q    Was this the first time you read this email?

16   A    Yeah, five -- yes.  That date at 5/24 was the first

17   time I read it.

18   Q    And was this the first time the subject matter came up

19   that's contained in this email?

20   A    Yes.

21   Q    Had you ever had this subject come up before this time?

22   A    No.

23   Q    And what did you do in response to this email?

24   A    What did I do in response?

25   Q    Yes, sir.  If anything.

1   A    Okay, I looked at my calendar to see if I could be in

2   Austin with you on the 24th.

3   Q    Now turn to -- looking to Exhibit No. 24.

4         THE COURT:  Before you go there.  So the email

5   says, "I told Ray we can be there by 11:30."  What did you

6   understand that, if the topic had never come up?

7         THE WITNESS:  The 11:30?

8         THE COURT:  It said --

9         THE WITNESS:  (indiscernible).

10        THE COURT:  It said, "I told Ray we can be there

11  by 11:30."  The question before you was that before this

12  email the topic had never come up and I'm just trying to

13  understand then what did you understand that you were going

14  -- be there by 11:30.  What did you understand at that time?

15        THE WITNESS:  My typical experience is when

16  someone asks, like a lawyer or someone asks me to a meeting,

17  they have a project in mind.

18        THE COURT:  So you knew at some point before this

19  email that you were going to be asked to go to a meeting?

20        THE WITNESS:  No.  I didn't know until I -- that I

21  was going to be asked.

22        THE COURT:  That's what confusing.  The email

23  starts and says, "I told Ray we can be there by 11:30."  So

24  --

25        THE WITNESS:  (indiscernible), Mr. Lee told me

1    that Ray had said can you come to Austin for a meeting.

2              THE COURT:  That's what I was trying to --

3              THE WITNESS:  -- on the 24th.

4              THE COURT:  -- understand.  And that was -- was

5    that before this email?

6              THE WITNESS:  Yeah, because then this is the

7    confirming the time.

8              THE COURT:  Do you recall when that --

9              THE WITNESS:  That would've been -- this is --

10   well, it had to have been after the hearing because we

11   didn't know about it before the hearing.  So (indiscernible)

12   --

13             THE COURT:  Okay.

14             THE WITNESS:  -- five or 4:30.

15             THE COURT:  Thank you.

16   BY MR. LEE:

17   Q    All right.  Mr. Schwartz, I asked you to take a look at

18   Exhibit No. 24 and see if you recognize that document.

19   A    Yes.

20   Q    Can you describe that document to the Court?

21   A    (indiscernible) a summary I prepared and sent of

22   (indiscernible) evaluation of the situation we were in with

23   the three debtors and possible approaches and, quite

24   frankly, look at the economics of various alternatives we

25   had.

1  Q    Okay.  Mr. Schwartz, had you been thinking about how to

2  proceed with the InfoW cases before I wrote you this email

3  on May 21?

4  A    I'd been thinking about it since we got the first word

5  that they wanted to dismiss us at the time without

6  prejudice.  So I knew, okay, if they're smart they're going

7  to (indiscernible) dismiss us with prejudice and we need to

8  think about what happens then.

9  Q    So tell the Court what you did in response to the --

10  once you read this email from me on Saturday, May 21.  What

11  type of actions or response, if any, you did in reaction to

12  my email that I sent you.

13  A    I told you we have to stop this through -- get this

14  case dismissed.  We can't afford to keep us working on this

15  when there's (indiscernible) benefit to the estate of us

16  doing that, nor economic benefit.

17  Q    And what kind of analysis did you do in order to come

18  to that conclusion?

19  A    My analysis (indiscernible) whole lot.  I -- you know,

20  what's, you know, we don't have any assets to recover.  We

21  can incur fees.  We had seventy-something thousand dollars

22  in the bank (indiscernible) I'm going to blow this $70,000

23  and what do we have to show for it.  Nothing.  And if we get

24  out of here there's still $50,000 in the estate.

25  Q    Now, was there at some point in time -- look at Exhibit

1   No. 25.   Do you recognize Exhibit No. 25?

2   A    Yes.

3   Q    And what is that document?

4   A    This is an email you sent me attaching a draft of the

5   motion to dismiss, the 5/23/22 draft telling me about that

6   and also telling me we're going to skip the 341 meeting.

7   Q    And was the -- what was the rationale for us moving as

8   quickly as we did to try to get these cases dismissed at

9   that point in time?

10   A    Because it's just costing money.   You know, it's

11   costing expensive professional time.

12   Q    So do you recall also that I had attended a hearing on

13   May 19th with the bankruptcy court?

14   A    Yes.

15   Q    And that I explained to the Court that we had to

16   evaluate alternatives; do you recall that?

17            MR. CHAPPLE:   (indiscernible).

18            THE COURT:   Sustained.

19   BY MR. LEE:

20   Q    Do you recall what I told the Court on May 19th

21   regarding the future of the bankruptcy case?

22   A    Yes.

23   Q    And what -- do you recall what I had told the Court?

24   A    You just said, we're looking at alternatives.   I went,

25   okay, fine.   He (indiscernible) lawyer.   I said, dismiss it.

1    Q    All right.  Now, one of the things that's been asked of

2    you or alleged against you is that you had apparently been

3    on both sides of the transaction.  Are you aware of that

4    allegation?

5    A    I'm aware of the allegation.

6    Q    Mr. Schwartz, in your job over the last 40 years in the

7    bankruptcy arena as a financial advisor, do you understand

8    the term being on both sides of a transaction?

9    A    Yes.

10   Q    Tell everyone here what that means to you.

11   A    What it means to me is quite literally wearing two

12   hats, your hats are negotiating with each other and you're -

13   - so you're really negotiating with yourself.  Or some

14   portion of it's yourself.

15   Q    So let's talk about the plan support agreement.  Before

16   the bankruptcy was filed, tell the Court what role you

17   played on behalf of InfoWar debtors with respect to the

18   negotiation of the plan support agreement, if any.  And I

19   remember you came on the scene, so tell the Court what role

20   you played in formulating that document before the petition

21   date of April 17th.

22   A    In formulating, I'm almost none -- none other than, I

23   mean, the last (indiscernible) I had to review, but the

24   substantive economics were established before I came along.

25   The concept of the trust, the concept of the trustees, the

1    concept of the (indiscernible) judges preexisted

2    (indiscernible).  I always (indiscernible) to look for

3    implications that I could (indiscernible) for the Debtors

4    that (indiscernible) may not like but -- and just generally

5    doesn't make sense to me or is there anything confusing in

6    it, but it --

7    Q    And then do you recall so far the testimony that those

8    agreements, the declaration of trust as well as the plan

9    support agreement went -- underwent revision from April 17th

10   to April 29th?  Do you recall that testimony?

11             MR. CHAPPLE:  Objection.

12             THE COURT:  Overruled.

13   BY MR. LEE:

14   A    (indiscernible) those revisions.

15   Q    What role did you play in those discussions and

16   negotiations?

17   A    None.

18   Q    And why was that?

19   A    That was because the judges had their counsel looking

20   at it and they basically went away and looked at it and

21   worked on it and worked on it and worked on it, and then all

22   of a sudden, there was the product.

23   Q    And do you recall that it was on, what, April 29th,

24   2022 as ECF 48 which got filed on the record?

25   A    Yes.

1    Q     Would it still be -- would it be fair to say that the

2    world changed for InfoW Debtors on June 3rd or 6th when the

3    plaintiffs decided to dismiss the claims against the Debtor?

4    A     June 3rd --

5    Q     Third.

6    A     (indiscernible).

7    Q     I'm sorry, May 3rd.

8    A     Yeah.  Yes.

9    Q     And tell the Court why that was.

10   A     Well, the PSA, plan support agreement, and the trust

11   were structured in order to bring the Texas and the

12   Connecticut plaintiffs into the Court for the process of

13   hopefully efficiently and fairly getting their claims

14   liquidated for an amount that they would be paid by the

15   trust.  With the plaintiffs moving to dismiss us from the

16   cases, we -- there would be no standing for us that the

17   trust, the Debtors and the trust -- the Debtors wouldn't be

18   there, so there would be no standing to (indiscernible)

19   plaintiffs' claims into the (indiscernible) offices of the

20   bankruptcy court.

21   Q     Now, before we reach the May 19th hearing date, do you

22   recall the direction that you gave me with respect to what I

23   needed to do for the InfoW Debtors' bankruptcy case as to

24   those stipulations?

25   A     Stipulations of the Texas (indiscernible), I said

1    absolutely (indiscernible).  Can't dismiss it

2    (indiscernible) out of there, (indiscernible) unless we get

3    (indiscernible) with prejudice.  I was (indiscernible) that.

4    Q    So your focus to me was to make sure those got done

5    correctly; is that accurate?

6    A    yes.

7    Q    And do you also recall that with respect to the

8    Connecticut plaintiffs, they decided to proceed by way of

9    motion, not by stipulation, correct?

10   A    Right --

11            MR. RUFF:  There was an objection, Your Honor.

12            THE COURT:  Overruled.

13            MR. RUFF:  Thank you.

14   BY MR. LEE:

15   Q    You also recall whether or not there was tension

16   between the Debtor, especially counsel for the Debtor, Mr.

17   Lee -- me -- and Mr. Ruff before May 19th with respect to

18   the speed at which we wanted to get -- both parties wanted

19   to get the --

20            MR. RUFF:  Objection, Your Honor.  Calls for

21   speculation.

22            THE COURT:  Sustained.

23            MR. LEE:  I haven't even finished my question,

24   Your Honor.

25            THE COURT:  Really obvious.

1          MR. LEE:  I apologize.

2          THE COURT:  No worries.

3   BY MR. LEE:

4   Q    Do you know whether or not there were -- based on

5   reviewing the emails between me and Mr. Ruff where there was

6   tension between the Debtors' counsel and the U.S. Trustee's

7   counsel before May 19th as to the disposition of this case?

8   A    Yes.

9   Q    What was that dispute?

10  A    That -- I recall it was whether or not dismiss -- our

11  filing was legitimate should've been allowed.  I mean

12  (indiscernible) from the very beginning.

13  Q    Okay.  And do you recall where your application to

14  retain was placed insofar as being heard by the Court?

15  A    I don't think it had a date.

16  Q    Do you recall my reporting to you as to the results of

17  the hearing on May 19th, 2022 after the dismissal of the

18  Texas and the Connecticut plaintiffs?

19  A    Yes.

20  Q    And do you recall my telling you the conversations I

21  had with respect to the dismissal of the cases by the U.S.

22  Trustee and their position about the case?

23  A    I remember you discussing with me their position.  I

24  don't think at that time it had significantly changed in

25  terms of our view (indiscernible) accomplished.

1    Q     So going back to Exhibit No. 24 in front of you, as of

2    May 21, 2022, had you made a decision or -- had you made a

3    decision as to whether or not the InfoW Debtors' cases would

4    continue in Chapter 11 or be dismissed?

5    A     By this date, I was convinced it was not -- they were

6    not going to continue.

7    Q     And by May 23rd, 2022, when I had forwarded to you a

8    draft of the motion to dismiss Chapter 11 cases, had your

9    views in any way changed about dismissing the cases?

10   A     No.

11   Q     And so did you direct me then on May 25, 2022 to advise

12   the U.S. Trustee that the Debtors were dismissing their

13   cases?

14   A     Yeah, we talked about that, somewhere (indiscernible)

15   May 25 that I told do it.

16   Q     So as of at least May 25, was there any expectation

17   that you as a CRO or Schwartz & Associates would be retained

18   as an estate professional in the InfoW Debtors bankruptcy

19   cases?

20   A     No expectation, no.  I figured at that point, it wasn't

21   going to happen.

22   Q     And in fact, did you learn from me through the emails I

23   forwarded to you that the U.S. Trustee did not want you to

24   be retained as an estate professional?

25   A     Yes, I did.

1  Q    And that included any other professionals including

2  lawyers; is that correct?

3  A    Right.  That's what I understood.

4  Q    Would it have made business sense for you as a chief

5  restructuring officer to have spent the monies and the

6  administrative claim to fight the U.S. Trustee and get the

7  case in place in order to have our applications heard and

8  our fee applications then blessed by this Bankruptcy Court

9  in the InfoW bankruptcy case?

10  A    In my opinion, if I had done that, then I would've been

11  guilty of violating my fiduciary responsibilities.

12  Q    Mr. Schwartz, in your work since -- prior to April

13  17th, the petition date of InfoW Debtors to now, have you

14  ever worked directly for Mr. Alex Jones?

15  A    No.

16  Q    All right.  And insofar as your present duties today as

17  the chief restructuring officer or proposed chief

18  restructuring officer of FSS, tell the Court the kind of

19  interaction you had with Mr. Jones in your capacity as the

20  CRO.  How does -- how do you interact with him?

21  A    Well, it's pleasant.  We speak frequently.  He

22  sometimes will call me two or three times a day, sometimes

23  in 30 minutes.  Usually, he has problems.  He needs my

24  (indiscernible) help him resolve or he's asking permission

25  to do something.  They're cordial.  And that or I call him

1    to (indiscernible) focus on something.

2    Q    Does he get to direct what you do and how you operate

3    your business at FSS as a CRO?

4    A    No.  I operate the business and I direct the business.

5    I -- no.

6    Q    So what role, if any, does he -- is he involved in your

7    business decision making at FSS?

8    A    Well, first off, he is the leading key sales guy.

9    Nothing really gets sold of any substance but by him, so he

10   is (indiscernible) component to the business.  He also has -

11   - because of that and his tremendous understanding and

12   knowledge of the products that we sell, particularly in the

13   supplements and compounds or -- (indiscernible) say

14   compounds, the chemical products that we sell and the market

15   demand for them.  He's (indiscernible) very well and

16   (indiscernible) the suppliers to a great extent, so he's an

17   important from the standpoint of (indiscernible) important

18   as a source of information and to help me (indiscernible) we

19   should be doing on the product side.

20   Q    Now, because of these things he does, have you given

21   him any preferential treatment insofar as paying his claims

22   or treating him differently because of his role in this

23   bankruptcy case in any way?

24   A    I don't think so.

25   Q    Insofar as wages are concerned that he's entitled to,

1   has he been afforded his full wages under the cash

2   collateral order to date?

3   A    The amount has been allowed.  He's been paid.

4   Q    Is that the full amount that he's entitled to under his

5   employment contract that he was with FSS today?

6   A    It is not the amount.

7   Q    How much is it lower by?

8   A    (indiscernible) a million-three annual salary, if you

9   will, the employment agreement.  We're currently paying him

10  $20,000 a pay period so that's about $480,000 at that rate.

11  And prior to this, we paid him $10,000 or $20,000 a pay -- a

12  month -- $40,000 a month, $20,000 a month.  So he's getting

13  less than half of his -- what his agreement calls for.

14  Q    Mr. Schwartz, you've also highlighted in your

15  declaration and previous testimony some of the issues that

16  you discovered at FSS when you came on the scene.  Do you

17  remember that?

18  A    Yes.

19  Q    And can you tell the Court in a brief summary some of

20  the, I guess, problems you encountered and found and what

21  you've done about them to date?

22  A    Well, we -- the time the declaration we had

23  substantially brought the books current (indiscernible) on

24  the bookkeeping (indiscernible).  The inventory has been a

25  continuing problem, having the right inventory.  We don't

1    have a good system yet for inventory management in the sense

2    of information flow. (indiscernible) working on that. We -

3    - our cost of processing of credit cards was extremely high,

4    about 14, 15 percent, extremely high. I got it down to 4

5    percent. Negotiated that and we're currently

6    (indiscernible) to try to reduce that cost.

7        We're looking at alternative sources of inventory

8    financing which will get us more inventory (indiscernible)

9    for the Christmas holiday sales and sustain our company

10   going forward. What have I missed? I've hired a CRO --

11   excuse me, an operating manager and I've hired

12   (indiscernible) bookkeeper, keeping operations

13   (indiscernible) bringing someone on board in the offices at

14   FSS as an employee of FSS and in contracting with the

15   bookkeeping services. Matter of fact, I have meetings with

16   them tomorrow. So it's a few of the things we -- you know,

17   we're facing. You know (indiscernible) a chapter in the

18   book but we're (indiscernible) that under control and we are

19   close to getting prepaid credit cards. We've been in -- we

20   had a couple of (indiscernible), but I think we've got a

21   vendor now who's not afraid.

22   Q    Let's talk about the schedules that Mr. --

23   A    Yeah.

24   Q    -- asked me about and some of the omissions he alluded

25   to. Tell the Court what is the stage of amending the

1    schedules after the Debtor submitted them last week.  Can

2    you talk -- tell the Court what is going on there?

3    A    The specific (indiscernible) and I discussed that at

4    the 341 meeting that if you noticed where there's no mention

5    of Shannon & Lee, there's Schwartz & Associates.  That's

6    like a $380,000 payment.  What happened is (indiscernible)

7    was wired to me to my trust account and then we distributed

8    it to Shannon & Lee and Kyung S. Lee PLLC and I think even

9    some to Mr. Battaglia, so I (indiscernible) that schedule

10   was -- I've got it on (indiscernible) for that page where I

11   have the tale.  (indiscernible) got what laid out there so

12   it -- but it was for prepetition fees or retainers and so

13   we're working on that.

14       I just learned Friday of a transaction that was booked

15   as other income which was actually a contribution of capital

16   by (indiscernible).  That will change the schedules with

17   that booked right.  That was done in July prepetition.

18   There are the -- there's a question of why on the payments

19   to creditors there was no (indiscernible).  That was asked

20   and that has been -- actually what happened is the

21   (indiscernible) report to July 22nd, not July 29th so we've

22   added seven more days of payments on there.

23       So it's come forward.  I'm going to go back through and

24   see, okay, what else have we got in here.  We've got at

25   least one unsecured creditor who's told me, I'm not owed

1    anything.  I owe you people money.  So --

2    Q    So would it be fair to say that you're still drinking

3    from a fire hose?

4    A    It's a smaller fire hose, but it's still a fire hose.

5    Q    And would it still be accurate to say that you are

6    constantly correcting, amending, updating data in order to

7    make them as accurate as possible and not hiding things from

8    creditors or the Court?

9    A    Yeah, we're not trying to hide anything.

10   Q    So let's go back to talking about the issue of being on

11   both sides of the transaction.  Do you recall us talking

12   about that.  Did you ever end up being on both sides of the

13   transaction after May 19th, 2022 when I left this Court and

14   told the Court we would either evaluate dismissing the case

15   or having to go back and negotiate either an amendment to

16   the PSA or a new funding agreement, did you, while you were

17   going up and sitting at FSS' office end up negotiating for

18   InfoW for more money or trying to do that?

19   A    No.

20   Q    And tell the Court why not.

21   A    Well, again, I mean, let me put it this way.  The

22   description of the situation we were in after that date, we

23   were trying to decide do we continue or do we dismiss.  At

24   that point in time, we -- I think all the professionals

25   involved -- were in that position where it would've been

1    more beneficial for us financially to keep going.

2    Q    For the professionals?

3    A    For the professionals.  So we were in that -- that

4    happens. Regularly in bankruptcy and receiverships.  You get

5    to a point where, hey, keep going or stop?  And I can make

6    more money if I keep going.  That was -- that's exactly that

7    situation.  I did not go out of turn to negotiate more money

8    for the plan sponsors.  First off, I couldn't give a -- I

9    can't come up with a reason why they should give us money.

10   And two, there is no benefit to doing it.

11   Q    Now, another criticism that's been leveled against you

12   and me is that we came here and we told the Court that we're

13   going to do our fiduciary duty.  Do you recall that

14   criticism?

15   A    I remember very strongly the judge's words on that.

16   Q    Do you recall that one of the issues that came up when

17   the plaintiffs dismissed their claims, that one of the

18   concerns that the parties had is that the Debtor, InfoW

19   Debtors, would not accept their dismissal and would try to

20   perpetuate the bankruptcy cases?  Do you recall that, sir?

21             MR. CHAPPLE:  Objection.

22             THE COURT:  Sustained.

23   BY MR. LEE:

24   Q    Do you recall one of the objectives that the plaintiffs

25   were saying that the InfoW Debtors would be trying to do

1   after the plaintiffs trying to dismiss their cases?

2   A    I recall that they didn't trust us and were trying to

3   figure out what were we up to.  That's what made it so hard

4   to get -- and actually, I thought it would be, you know,

5   what's so hard about with prejudice in a dismissal and it

6   actually became an issue.  But it was because of the

7   distrust out there.

8            MR. CHAPPLE:  Objection.

9            THE COURT:  I'll overrule.  He can --

10   BY MR. LEE:

11   Q    And so Mr. Schwartz, at the end of the day, did you

12   conclude that dismissal of the bankruptcy cases as of May

13   21, '22, when I sent you the email was in the best interest

14   of this estate?

15   A    Yes.

16            THE COURT:  Okay.  Overruled.

17   BY MR. LEE:

18   Q    During the time between May 19th through June 10th,

19   were you ever involved in discussions with any party, any

20   part, in which you took an adverse position to InfoW Debtors

21   on any topic?

22            MR. LEE:  Pass the witness, Your Honor.

23            THE COURT:  Okay.  Before we take a break, there

24   are two questions I've been -- forgot to ask you earlier

25   (indiscernible) relevant now.  What is (indiscernible)

1    prepared like a budget to actual, just comparing essentially

2    the cash collateral budgets to what has been actually spent?

3    I've only seen estimated budgets in the cash collateral.

4    I'd love to see kind of a reconciliation of budget to

5    actual.  What I mean for that -- by that, I'm just

6    (indiscernible) explaining in general if cash collateral

7    budget would budget a million dollars in potential gross

8    receipts over a period of time.  Maybe you took in a

9    million.  Maybe you took in a million-five.  Maybe you took

10   in a half a million.  Has there been any reconciliation of

11   budget to actual?

12          THE WITNESS:  What we did is every -- except for

13   today because today is Tuesday, the day it's due, we do a

14   budget to actual.  What I actually do now is -- and we've

15   done this every week -- is budget this is week seven, I

16   think.  Last week is week seven.  So we budget -- the budget

17   we had for cash collateral, the actuals, the variance, and

18   then the bankruptcy to date where you can see the whole

19   picture.

20          THE COURT:  Okay.

21          THE WITNESS:  That's done every week.

22          THE COURT:  Okay.  I was just curious.  Just -- I

23   hadn't seen it, but I know that sometimes it gets filed with

24   an MOR or --

25          THE WITNESS:  I didn't even --

1           THE COURT:  Just a question.

2           THE WITNESS:  I don't think it's getting filed.

3           THE COURT:  It may not.  Just something I, at some

4      point, I'd mention.  I'd like to see just to understand the

5      true financials.  There's something else and -- apologize.

6      And if you look at your screen, whenever it decides to load.

7      The dot, dot, dots make it look like it's -- it's your first

8      day declaration with the exhibits.  See if I can get this to

9      load up in a faster way, what I'm looking for.  Always meant

10     to ask you this question.

11          It's always when you want something to load

12     quickly.  All right.  So you recall there were the -- those

13     exhibits you filed, the comparative profit -- P&L

14     statements.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  So here's something I've always meant

17     to ask you.  So in 2021, InfoWars Health and Prison Planet

18     paid -- looks like FSS book income from InfoWars Health and

19     Prison Planet in 2021, but in -- they didn't in 2022.  Do

20     you know what the income was attributed to in 2021 for

21     InfoWars Health or Prison Planet?

22          THE WITNESS:  I may have to go back and look, Your

23     Honor.  I mean, I -- InfoWars Health is tone one who owns --

24     that monthly royalty is about $38,000 and so, and Prison

25     Planet, I --

1              THE COURT:  But InfoWars Health had paid FSS, is

2    that -- was that the correct way to book it?

3              THE WITNESS:  It'd all depend on what the -- that

4    relationship is actually controlled by Dr. David Jones and

5    sometimes they move these around.

6              THE COURT:  So in 2022, would InfoWars Health have

7    owed FSS any funds?

8              THE WITNESS:  No.  No, that funds -- my

9    understanding, those -- 2022, those funds, we were told,

10   that royalty relation actually belongs to Health, to Health.

11             THE COURT:  Got it.

12             THE WITNESS:  And that that's when I said --

13   actually the one who said no, I need that money --

14             THE COURT:  You need that money.

15             THE WITNESS:  -- right now.

16             THE COURT:  I remember.  That's why I was

17   wondering.  I know at some point, it turned and you turned

18   it around to start receiving it.

19             THE WITNESS:  Once it -- I actually don't know

20   where it is now because --

21             THE COURT:  Okay.

22             THE WITNESS:  I hadn't (indiscernible) signer on

23   the bank account for IWHealth.  Haven't found a way to

24   unravel that mess.

25             THE COURT:  Okay.

1          THE WITNESS:  And haven't seen any more money come

2     in.

3          THE COURT:  And for Prison Planet, do you know

4     what that 5,000 --

5          THE WITNESS:  No.

6          THE COURT:  Okay.  Okay.  Those are my only

7     questions.  I just been meaning to ask you.  I needed to

8     understand just the relationship.  Why don't we -- who's

9     going to ask questions on cross?  Mr. Ruff?  Mr. Chapple,

10     are you going to have any examination?  Okay.  So why don't

11     we -- it's 5:15.  Why don't we come back on in five minutes,

12     let everyone take a break and then we'll come back in five

13     minutes and we'll continue with cross.

14          CLERK:  All rise.

15          (Recess)

16          THE COURT:  We are back on the record in Free

17     Speech.  Mr. Schwartz, I remind you are still under oath and

18     Mr. Ruff, I have one more question and I'm going to take the

19     liberty.

20          MR. RUFF:  Go ahead, Your Honor.

21          THE COURT:  And it was a question that I asked Mr.

22     Lee and I wanted to -- you're the better person to ask just

23     to understand it.  I'm trying to -- again, just trying to

24     put the timing together and I put it up on the screen

25     earlier and I'm going to see if I can find it again.  Just

1    give me a second.  This is just the docket entry.  This is

2    what I meant to ask you.  Well, I'll take the drama out.

3    The question had to do with the declaration that was filed

4    by Mr. Andino Reynal saying in that -- here we go.

5            That statement -- I just want you to look at

6    paragraphs 5 and 6.  It says that in May of -- May 19th, FSS

7    retained you as a CRO and that you contacted Mr. Reynal if

8    you knew of any financial executive that was able to come

9    and work at FSS, and that criminal defense lawyer

10   recommended Mr. Jeffrey Schultz and -- with essentially the

11   -- with his recommendation that FSS hire Mr. Schultz.  Can

12   you confirm the accuracy of statements in paragraph 5 or 6

13   is there anything that you would clarify?

14           THE WITNESS:  Well, the only thing I want --

15           THE COURT:  You didn't sign this so I'm just -- so

16   I want to be very clear about that.   You didn't sign this.

17   This is saying something about what happened in May

18   regarding -- including, as it pertains to you and I'm just

19   trying to understand what your understanding was.

20           THE WITNESS:  Well, in terms of the hiring of Jeff

21   Schultz --

22           THE COURT:  Maybe I can ask it this --

23           THE WITNESS:  There's more to the process than

24   just me recommending Schultz.

25           THE COURT:  But was it in May of 2022 that you --

1          THE WITNESS:  Oh, yeah.  I think so.  I'd have to

2    go back and look at my calendar.

3          THE COURT:  But did you -- this --

4          THE WITNESS:  No, wait a minute.  May?  I'm sorry.

5    I don't know if that's right.

6          THE COURT:  Okay.  This also -- you think it was

7    May or sometime after May?

8          THE WITNESS:  I know it was after May because I've

9    been -- my engagement letter wasn't signed until June 7th

10   (indiscernible) as of May 19th and that's where he got a

11   date, but he's wrong on the month of May because I can tell

12   you right off the bat -- I mean, we didn't do much of

13   anything until the retainer came in because under my

14   agreement, I had to get the retainer too for the engagement

15   to be effective.  So June 10th, we're working.  Now June

16   10th I'm screaming, I need somebody.  So it would have been

17   in June.

18         THE COURT:  Did you contact Mr. Reynal and ask if

19   he knew of --

20         THE WITNESS:  Yes, I asked all -- everybody.  So

21   it was kind of a blanket request.  Nobody -- and he --

22   Andino called me up and said, I got somebody but let me tell

23   you the situation.

24         THE COURT:  May I just ask a silly question.

25   You're a professional with over 40 years of experience.  Why

 1    did you contact a criminal defense lawyer about someone to

 2    hire as a potential accountant in a business?

 3              THE WITNESS:  I actually -- just let all the

 4    lawyers know -- I mean, he was, you know, just in the room

 5    because he defends -- he's defending the Texas cases.

 6              THE COURT:  Right.

 7              THE WITNESS:  So he was there and I said, you

 8    know, I'm looking for somebody.

 9              THE COURT:  Oh, I understand.  Thank you for the

10    clarification, sir.  Thank you.

11                              EXAMINATION

12    BY MR. RUFF:

13    Q    Good afternoon, Mr. Schwartz.

14    A    Mr. Ruff, you have a halo around you now.

15    Q    Do I?  Don't be deceived.

16    A    Believe me, I'm not.

17    Q    Now Mr. Schwartz, you have more than 40 years of

18    experience in the restructuring business.  Correct?

19              THE COURT:  That's my line.

20              MR. RUFF:  Oh.

21              THE WITNESS:  So it must be right.

22              THE COURT:  I'm sorry.  Go ahead.

23    BY MR. RUFF:

24    Q    And during these 40-plus years, you have frequently

25    served as a chief restructuring officer or CRO.  Is that

1    correct?

2    A    Not that frequently.  That's a relatively new concept

3    to me anyway.  I mean, back then, the owner in charge --

4    Chapter 11 trustee -- only in (indiscernible) years have we

5    -- have I been doing CROs.  But I distinguish between the

6    trustee and the CRO, though -- the concept of the -- you

7    know, the trustee, I get paid less but I also have more

8    protection from the court.  CRO, I get paid more.  I still

9    have to do the same work.

10              MR. RUFF:  Can you -- Mr. Ross is going to be --

11              THE COURT:  All right.

12              MR. RUFF:  Then if you could go to Page 9.  It

13   will be Paragraph 26 (indiscernible).

14   BY MR. RUFF:

15   Q    Mr. Schwartz, would you mind reading the second

16   sentence in Paragraph 26 for me?

17   A    Yes.  He frequently serves as a chief restructuring

18   officer, as a federal and state court appointed receiver in

19   bankruptcy and non-bankruptcy and -- what happened --

20   proceedings, and that he's -- do you want me to read the

21   rest?

22   Q    No, that's all I needed you to read.  So this was your

23   application for employment and it -- in there, it

24   represented that you frequently served as a chief

25   restructuring officer.

1   A    Wait a minute.  I think -- I says -- could you go back

2   to that page?  Frequently serves as a chief restructuring

3   officer, as a federal and state court appointed receiver, in

4   bankruptcy.  So I frequently serve in those capacities, as a

5   receiver and as a CRO and probably what I should say is --

6   well, as an examiner also, but that's kind of gone passe.

7   Q    Would it be accurate to say that you frequently have

8   served as a professional in bankruptcy?

9   A    That's accurate.

10  Q    Okay.  Very good.  And so you are familiar with the

11  need to disclose connections when seeking employment in a

12  bankruptcy case.  Is that correct?

13  A    Yes.

14  Q    Okay.  And, Mr. Schwartz, you were the chief

15  restructuring officer in the -- what I will refer to as the

16  Info W cases.  Is that correct?

17  A    Yes.

18  Q    All right.  Now in the Info W cases, there was a plan

19  support agreement and a litigation settlement trust.  Is

20  that correct?

21  A    Correct.

22  Q    All right.  Now those agreements were negotiated prior

23  to your being retained as the chief restructuring officer or

24  after?

25  A    Substantively, prior.  Like I said, the -- do you have

1   -- well -- the structure of what was being planned, i.e.,

2   the structure of the trust and the proposed trustees, the

3   litigation of the PSA, extensively had been developed.  The

4   financing had all been negotiated prior to my arrival.  That

5   was pretty well known.  I mean, if there was any question,

6   that was minor on that so there was -- the agreements

7   themselves were still being -- going through the editing

8   stages, but the -- substantially, you know, the car was

9   designed and chassis built and they were just finishing off

10  the waxing.

11  Q    Now -- and again, in the Info W cases under those

12  agreements, Alex Jones and Free Speech Systems -- FSS --

13  were the third-party funders who were going to contribute

14  funds under the litigation settlement trust to pay the

15  creditors in the Info W cases.  Is that correct?

16  A    Well, they were contributing funds to the trust and

17  they were setting aside funds for the professional costs.

18  Q    So there was no -- under those agreements, there was no

19  consideration or funds being given for the creditors of the

20  Info W debtors?

21  A    Well, I said there's funds -- there are funds being set

22  aside in the trust for the benefit of the creditors and

23  there were funds being set aside -- I think they were

24  actually held in an (indiscernible) account to pay the

25  professionals.  That money all came from -- was coming from

1  Mr. Jones and FSS.

2  Q    Is it your recollection that there was approximately or

3  maybe $10 million to be funded under those agreements?

4  A    Well, the estimation of the amount that would

5  ultimately be funded is 10 million.  There was $2 million,

6  as I recall, of cash up front.  There was another amount --

7  $40,000 -- 500,000 -- $480,000 a year for five years.  That

8  was coming from another source, and then FSS itself would

9  devote its net income to the trust as well.  (indiscernible)

10  But some of that depending on which estimate you use for

11  FSS, is 10, 12, $15 million.

12  Q    And you were the -- as the chief restructuring officer,

13  you were the party designated to represent the interest of

14  the Info W Debtors under those agreements.  Correct?

15  A    Yes.

16  Q    And that's in the negotiation of those agreements?

17  Correct?

18  A    Well, yes, once I came on board.

19  Q    Okay.  And there was testimony earlier about an amended

20  plan support agreement and a litigation settlement trust

21  being filed with the court on April 19th.  Do you recall

22  that?

23  A    Yes.

24  Q    Okay.  So the parties were in negotiation again,

25  yourself on behalf on the Info W Debtors, Alex Jones for

1    himself, FSS for itself, and the proposed trustees under the

2    litigation settlement trust.  Is that correct?

3    A    (No audible response)

4    Q    So those were -- let me rephrase.  Yeah.  So the

5    parties that were negotiating at the time were the Info W

6    Debtors, Alex Jones, Free Speech Systems, and the litigation

7    -- proposed litigation -- settlement trustees.  Is that

8    correct?

9    A    Yes.

10   Q    All right.  And more negotiations were required because

11   the trustees or the proposed trustees of the litigation

12   settlement trust had not agreed to that document yet.  Is

13   that correct?

14   A    Correct.  They had not signed off on it.

15   Q    So as of April 29th when that was filed, you were on

16   opposite sides of the table from FSS.  Is that correct?

17   A    Well, I guess that's one way to look at it.  Yeah, we

18   were -- they were negotiating -- well --

19   Q    I'll take your answer.  If yes is the answer -- yes or

20   no and you said yes.  I'll take it.

21   A    Well, I (indiscernible) opposite sides because we're

22   not fighting.  But, yes, we're not -- we're each looking for

23   our own interest or our own constituents' interest.

24   Q    Very well.  I'll take that as well too.  So you were

25   there for the interest of the Info W Debtors.  Correct?  You

1    were not there for the interest of FSS at that time.

2    A    Correct.  And then -- you say Debtors and the primary

3    responsibility is to the Debtor's creditors, obviously.  So

4    that's what I'm mostly concerned about.

5    Q    Now moving on, on April 18th, 2022, the Info W Debtors

6    filed an application to request authority to employ you as

7    their chief restructuring officer in the Info W cases.

8    Correct?

9    A    Okay.  Sorry.  I don't recall the date but --

10   Q    Does that sound correct to you?

11   A    Yes, that sounds correct.

12   Q    Now prior to the application being filed on April 18th,

13   you reviewed the application.  Correct?

14   A    Yes.

15   Q    Okay.  And you also reviewed your declaration before it

16   was filed.  Correct?

17   A    Yes.

18   Q    Okay.  Who drafted your declaration?

19   A    (indiscernible), I believe.

20   Q    Okay.  But ultimately, since the declaration was signed

21   by you -- correct -- the declaration was signed by you.

22   Correct?

23   A    Yes.

24   Q    Okay.  And do you understand that you're responsible

25   for the content within the declaration?

1    A    Yes.

2    Q    Okay.  And the declaration was signed under penalty of

3    perjury.  Correct?

4    A    That's what I remember.

5    Q    Okay.  And when you sign a document under penalty of

6    perjury, you're signed attesting to the fact that it's true

7    and accurate.  Correct?

8              MR. LEE:  Objection.  He's asking the witness for

9    a legal conclusion.

10             THE COURT:  I think he's just testifying to what

11   the words say at the bottom of the declaration.

12             MR. LEE:  As long as that's the case.

13             THE COURT:  Yeah.  I'll overrule.  To your

14   knowledge.

15             THE WITNESS:  To my -- okay.  That it's true and

16   correct?  Yes, to the best of my knowledge -- the best of my

17   knowledge, it's true and correct.

18             MR. RUFF:  Okay.

19   BY MR. RUFF:

20   Q    Do you recall who filed the employment application in

21   the Info W cases?  Which attorney?

22   A    The employment applications?

23   Q    For yourself.  Yeah, who filed that?

24   A    I believe Mr. Lee did as counsel for the Debtor --

25   Debtors.

1    Q    All right.  Prior to them filing it, they got your

2    authorization to file that application.  Is that correct?

3    A    Yes.

4    Q    Okay.  Now attached to the application, was an

5    engagement letter.  Do you recall who signed the engagement

6    on behalf on the Info W Debtors?

7    A    No, I do not.

8    Q    All right.  I think you're on the same exhibit.  It

9    will be I think Page 32.  Scroll down.  There you go.  No,

10   back down where the signatures are.  All right.  Do you

11   recall this document, Mr. Schwartz?

12   A    Yes.

13   Q    All right.  What is this document to your recollection?

14   A    This appears to be our engagement letter.

15   Q    With the Info W Debtors?  Is that correct?

16   A    Yes.

17   Q    Okay.  And do you see who signed on behalf of --

18   A    Yes.

19   Q    Who signed that?

20   A    Alex Jones.

21   Q    Okay.  Thank you.  Now on the declaration filed on the

22   Info W cases, you affirmatively stated that there was no

23   connection to Free Speech Systems, LLC.  Is that correct?

24   A    Correct.

25   Q    And on the declaration filed in the Info W cases, you

1    also affirmatively stated that there was connection to Alex

2    Jones.  Is that correct?

3    A    That's correct.

4    Q    All right.  So from April 18th, 2022, to the dismissal

5    of the Info W cases which happened on June 10th, 2022, you

6    did not provide any subsequent amendments to the

7    declaration.  Is that correct?

8    A    I don't recall doing any.  I don't think so.

9    Q    Now let's if anything changes in your declaration and a

10   new connection developed.  Do you understand that you were

11   required to supplement your declaration?

12   A    Yes.

13   Q    Okay.  But you didn't supplement it at any time, did

14   you?

15   A    I did not.

16   Q    Okay.  Now fast forwarding a little bit to May 19th,

17   2022, you sent an engagement letter to FSS outlining the

18   terms upon which you would serve as its CRO.  Is that

19   correct?

20   A    That's incorrect.

21   Q    Okay.  Can you clear that up for me?  Did you -- let me

22   back then.  Restate the question.  Did you draft an

23   engagement letter for FSS on -- for your -- excuse me --

24   strike.

25        Did you draft an engagement letter to serve as CRO of

1    FSS on May 19th, 2022?

2    A    Yes.

3    Q    Okay.  Did you send that engagement letter to anyone on

4    May 19th, 2022?

5    A    Yes.

6    Q    Who did you send it to?

7    A    Mr. Lee.

8    Q    Okay.  So you were actively seeking an engagement to

9    serve as the CRO of FSS as early as May 19th, 2022?

10   A    I wouldn't -- you know, I was -- Mr. Lee asked me to

11   put together an engagement letter but we'd not had any

12   discussions with FSS or any of its principals or any of its

13   counsel -- I had not -- about employment.  So I did

14   (indiscernible) gave him a draft of the engagement letter so

15   he could see the terms under which I would take the job on,

16   but we had not sat down with anybody and even gotten

17   background information at that point.  I can't say I'm

18   actively seeking.  I'm actively seeking information.

19   Q    So it's your testimony today that when you send out an

20   engagement letter, you're not seeking to be engaged?

21   A    Most of the time when I get asked to send an engagement

22   letter, they're asked -- they want to look at the -- look at

23   the terms of my engagement.  That's typically what happens

24   and they will call back and if you're got a problem or not.

25   So (indiscernible) anticipating an engagement but it doesn't

1    always happen.  You know, some people just like certain

2    clauses that we don't give on.  It's whatever.  And we

3    (indiscernible) ask for a draft and I sent a draft

4    engagement letter.  Yeah, I think it was draft.  And -- but

5    we had not sat down and talked with anybody about it at that

6    point in time.

7    Q    So is it your testimony then that as of May 19th, you

8    were desiring in an engagement with FSS as its chief

9    restructuring officer?

10    A    I'd say I was interested in it for certain.

11    Q    Okay.  Very good.  Now serving as the chief

12    restructuring officer of FSS, that an important role.

13    Correct?

14    A    Well, some people think so.  Some people don't.

15    Q    I'm asking you if you think it's an important role.

16    A    Well, I mean, it's a responsible role.  I mean, you

17    have to take it seriously.

18    Q    Okay.  In that role now you actually run FSS.  Correct?

19    A    Well, as much as any one person could run 50 people.

20    Q    Okay.

21    A    They still have their own -- I mean, I am the chief --

22    I (indiscernible) call it CRO because (indiscernible) chief

23    executive officers at this level so I have the

24    responsibility for everything going on but I don't do

25    everything.

1   Q    So it wasn't your testimony earlier that -- let me back

2   up.  Strike that.

3        You testified earlier that Alex Jones doesn't control

4   FSS now.  Correct?

5   A    That is -- Alex -- that is correct but Alex Jones has a

6   lot of influence over the employees there still.

7   Q    Okay.  But it also was your testimony that you make all

8   management decisions.  Is that correct?

9   A    That is correct.  He comes to me.

10  Q    Okay.  So that's a pretty significant role then at FSS.

11  Is it not?

12  A    It's a lot of responsibility so, yeah, I mean --

13  Q    Okay.  And it was certainly a connection, wasn't it?

14  A    It was -- (indiscernible) it's --

15  Q    In the --

16  A    (indiscernible) it's a connection today.

17  Q    Okay.

18  A    But InfoWars is not a connection today.

19  Q    When you're -- but when you were seeking employment as

20  the chief restructuring officer and drafting any engagement

21  letter, you didn't see that as a connection at that time?

22  A    No.

23  Q    Okay.  When did you believe that there was connection?

24  A    Well, I believe we were still negotiating working with

25  the PSA and that was in force, definitely there was a

1   connection because they were the funding source for the --

2   one of the funding sources for the PSA, but once that PSA

3   was voided -- I mean, they've had -- (indiscernible) they

4   were an independent -- they were no longer involved.  They

5   were no longer an influential entity and (indiscernible)

6   they had no part -- no place at the table.

7   Q    Now you had a meeting in Austin on May 24th.  Is that

8   correct?

9   A    Correct.

10   Q    Okay.  And that was to discuss the FSS restructuring.

11   Is that correct?

12   A    That was to get introduced to it and they explained

13   that -- you know, they -- (indiscernible) doing

14   (indiscernible) saw a lot of them going over the proposed

15   structure of the (indiscernible) trust and the PSA and the

16   funding sources and we had some quite discussions about the

17   funding sources.

18   Q    So on May 24th, you were talking about the PSA for the

19   Info W Debtors?

20   A    I'm sorry.  May -- I apologize.  You're right.  My

21   brain just jumped back two months because I remember that

22   vividly.  Yeah, May 24th, we discussed the FSS bankruptcy

23   and some of the issues involved.

24   Q    Okay.  So as of May 24th, there was already a planned

25   FSS bankruptcy being talked about?

1    A    I wouldn't say it was a plan.  There was a -- the

2    possibility of a bankruptcy was being talked about.

3    Q    Okay.  And you were seeking to serve as or being

4    considered as the chief restructuring officer of FSS in that

5    plan.  Is that correct?

6    A    I believe I was being interviewed for it, yes.

7    Q    Okay.  And you didn't think that that was an important

8    connection?

9    A    As it goes to InfoWars, no, I did not, again, because

10   FSS was no longer in the InfoWars bankruptcy.  They were

11   gone.

12   Q    Was FSS jointly liable for all of the Info W Debtor's

13   debts?

14   A    No.  They'd all been dismissed from our standpoint.

15   Q    What about the remaining debts?

16   A    Oh, the other three?  I was actually -- yes, that's one

17   of the considerations we had was why should we spend money

18   here.  I mean, they got all the money and they're the ones -

19   - they are jointly liable for that.

20   Q    Now the U.S. Trustee filed a motion to dismiss the Info

21   W cases on April 29th.  Correct?

22   A    I believe that's correct.

23   Q    All right.  And the motion was set to be heard on May

24   27th.  Correct?

25   A    Correct.

1    Q    All right.  And on May 18th, the Info W Debtors filed a

2    motion seeking to continue the hearing to June 24th.  Is

3    that correct?

4    A    Correct.

5    Q    Did you authorize the filing of that motion to continue

6    the hearings?

7    A    Yeah.  I'm -- I never actually said I authorize you to

8    do this (indiscernible) but I was aware of it.  You know, we

9    were talking about it.

10   Q    He made you aware that he wanted to file the motion and

11   you didn't object to it.  Is that accurate?

12   A    Correct.  That's fine.

13   Q    All right.

14   A    (indiscernible) but I understand that.

15   Q    I'm sorry.  You wanted --

16   A    I wanted it sooner but I could understand the need to

17   (indiscernible) more time than June 10th.

18   Q    What did you think might need more be happen sooner?

19   A    Well, my hope you could do is get an agreement on

20   getting the bankruptcy dismissed.

21   Q    All right.  And then the hearing on the motion to

22   continue the dates was on May 19th, 2022.  Correct?

23   A    That was busy day so I'm going to have to accept your

24   word for the 19th.  I just --

25   Q    Well, the motion was filed on the 18th.  Correct?

```
 1    A     The motion for the continuance?

 2    Q     Yes.

 3    A     I'm sorry.  Yes.

 4    Q     And then the hearing for the continuance was on the

 5    19th.  Correct?

 6    A     Right.

 7    Q     Okay.  And the motion was never withdrawn at any point.

 8    Correct?

 9    A     The motion to --

10    Q     Continue.

11    A     -- continue?  I don't recall one way or the other.

12    Q     So there was not any sort of final decision to dismiss

13    the Info W cases as of May 19th then.  Correct?

14    A     Well, it was dependent on being able to work out with

15    you a mutual -- mutually agreed way of doing it.  So the --

16    Q     All right.

17               MR. RUFF:  I'm going to object as nonresponsive,

18    Your Honor.  I asked him if there was a decision to --

19               THE COURT:  I'm going to overrule.  He can answer

20    the question.

21               THE WITNESS:  Oh, (indiscernible) I definitely

22    knew in my mind I wanted to withdraw.  But (indiscernible) I

23    think I said earlier, once the Texas and Connecticut

24    Defendants released us with -- dismissed us with prejudice,

25    I mean, I knew at that moment, we're going to have to
```

1    terminate this bankruptcy and that's what we ended up with.

2    BY MR. RUFF:

3    Q    So if you knew you wanted to terminate the bankruptcy

4    right away, why were the Info W Debtors seeking to continue

5    to push it out until June 24th?

6    A    Because Mr. Lee was working on how he was going to get

7    this accomplished.  Plus we had to make sure everything was

8    finalized with the Texas and Connecticut matters in terms of

9    the state courts and, you know, what they had to do on the

10   dismissals.  I believe that was -- we were having to wait

11   for some of that time and then we had to allow time to work

12   -- negotiate with the U.S. Trustee's Office.

13   Q    And now Mr. Lee had sent an email to you on May 21st

14   that he was going over with you earlier recommending the

15   dismissal of the bankruptcy cases.  Correct?

16   A    Right.

17   Q    Okay.  Had he made a recommendation to dismiss the

18   bankruptcy cases before that?

19   A    I can't he made a recommendation.  We had discussed it.

20   I think he wanted to, you know, sit down and go logically

21   through it and make sure he wasn't -- we were covering all

22   the bases.

23   Q    And you let him know on May 23rd, yes, go forward.

24   Let's get these things dismissed.  Is that correct?

25   A    Yes.

1    Q    All right.  But that was all after May 19th.  Correct?

2    Nothing before that?

3    A    I mean, I can't say we didn't have discussions before

4    that.  I don't think he was yet committed to the -- you

5    know, to do it.  He hadn't gone through his legal analysis

6    and I looked at it from a practical business standpoint and

7    says, you know, there's no point in us being here.

8    Q    Okay.

9    A    But I -- you know, he represents the Debtors and he's

10   got to go through the legal process and tell me how we're

11   going to get it done and make sure we can -- everything is

12   taken care of.  So the final decision to pull the trigger

13   was May 23rd but that -- I had no doubt where we were going.

14   Q    Do you recall having a phone call with Mr. Battaglia on

15   May 17th?

16   A    On May 17th?  You going to have to help me out.  I

17   don't remember it.

18        MR. RUFF:  Pull up 155-13.  Can you go to Page 8,

19        please?  All right.  Can you blow up to 33

20        (indiscernible)?

21   BY MR. RUFF:

22   Q    Do you recognize this document, Mr. Schwartz?

23   A    It looks a copy of our time records.

24   Q    Okay.  Do you see that time entry there right where the

25   cursor is blinking?

1    A    I do.

2    Q    Can you read that for me?

3    A    It says call with R. Battaglia.

4    Q    Who is the R. Battaglia that's being referred to in

5    that time entry?

6    A    That's Ray Battaglia.

7    Q    Okay.  Do you recall what that call was about?

8    A    No, I do not and that's -- what's the date on that one?

9    May 17th?  No, I don't recall.

10   Q    Okay.  But Mr. Battaglia was representing Free Speech

11   Systems at that time.  Correct?

12   A    Right.

13   Q    Was that your understanding?

14   A    Yes.  He did represent Free Speech Systems.

15   Q    Okay.  But you have no recollection of what that call

16   is?

17   A    No.  I mean, access document -- (indiscernible) wait a

18   minute.  It may have been about access.  I don't know but

19   that's just because the entry above it's about access --

20   (indiscernible).  Working on the bank accounts.  No, I don't

21   know.

22   Q    So moving on, on May 25th, you had directed Mr. Lee is

23   prepare a motion to dismiss the Info W cases.  Is that

24   correct?

25   A    I directed him to get them dismissed so I guess that

1    means I directed him to get a motion or to work out with you

2    a motion.

3    Q    Okay.  But before that time, you -- there had been

4    discussions about a possible dismissal but no direction from

5    you to get the cases dismissed.  Is that correct?

6    A    Right.

7    Q    Okay.  Now ultimately, the United Stated Trustee and

8    the Info W Debtors stipulated to a dismissal of the Info W

9    cases on June 1st.  Correct?

10   A    Correct.

11   Q    All right.  But the cases were not dismissed until June

12   10th after the court held a hearing.  Correct?

13   A    Correct.

14   Q    All right.  At no time prior to the cases being

15   dismissed did you file a supplemental declaration.  Correct?

16   A    Correct.

17   Q    And at no time prior to the dismissal did you have your

18   employment application withdrawn.  Correct?

19   A    Correct.

20   Q    So you were still serving as the chief restructuring

21   officer of the Info W Debtors when their cases were

22   dismissed.  Correct?

23   A    Correct.

24   Q    But at no time prior to the Info W cases being

25   dismissed did you disclose to the Court or to the United

1    States Trustee your connection with Free Speech Systems as

2    its chief restructuring officer.   Correct?

3    A    That's is correct.  I didn't consider them an

4    interested party.

5    Q    So you didn't think that a co-liable debtor was a party

6    and interest to the Info W Debtors?

7    A    Co-viable?

8    Q    Co-liable.

9    A    Co-liable.  Okay.  I'm sorry.  It sounded like co-

10   viable.  No, I didn't.

11   Q    Is that usually your judgment that parties who are

12   jointly liable for a debt are not parties and interest?

13   A    I can't see -- I'd have to think about that.  I'm not

14   sure I agree with that.  I think it depends on a lot of

15   things but FSS was out of the picture as far as I was

16   concerned and they had no interest in InfoWars.   InfoWars

17   didn't have any interest in them.  I'm not sure if it's

18   called liable in this makes it necessarily an interested

19   party or not.

20        MR. RUFF:  I have no further questions

21   (indiscernible).

22        THE COURT:  Okay.  Mr. Lee, do you have any

23   redirect?

24        MR. LEE:  Two questions.

25        THE COURT:  Okay.

```
 1                      REDIRECT EXAMINATION
 2   BY MR. LEE:
 3   Q    Mr. Schwartz, between the period of May 19th through
 4   June 10th, '22, was there ever a matter of where you acted
 5   adversely to the interest of Info W Debtor?
 6   A    No.
 7   Q    Between the period of May 19th through June 10th, '22,
 8   was there ever a matter that involved a dispute between FSS
 9   and Info W Debtors on which you had to act?
10   A    No.
11   Q    Let's talk about the remaining creditors that we talked
12   about and the joint liability.  Do you recall whether or not
13   we discussed the remaining claimants before we went on
14   embarking on a new project?  Do you recall --
15   A    Yes.
16   Q    Okay.
17   A    We talked about that in the process of deciding whether
18   or not to terminate the bankruptcy.
19   Q    And tell the Court what you -- what we discussed.
20   A    Well, I remember that we discussed, one, it could be
21   better handled outside; two, because FSS is the -- and Mr.
22   Jones are the -- essentially, they're the big pocketbooks.
23   We had -- at that time, we had $70,000 for three companies.
24   That was it -- all the money.  So, you know, there was not
25   much -- you know, it was going to get resolved but it had to
```

1    -- let them resolve when they resolve -- let them -- handled

2    it and then in that process, resolve those claims on

3    InfoWars -- the InfoWar Debtors.

4    Q    And tell the Court and the creditors here whether any

5    of the actions you took in the Info W Debtors cases while

6    you were acting and consulting with FSS starting on May 24th

7    -- did it adversely affect anything you did in the Info W

8    Debtors' bankruptcy cases?

9    A    No.

10            MR. LEE:  Pass the witness, Your Honor.

11            THE COURT:  Okay.  Any re-cross?  Okay.  Thank you

12   very much, sir.

13            THE WITNESS:  Thank you.

14            THE COURT:  Okay.  Mr. Shannon, any other

15   witnesses?

16            MR. SHANNON:  No other witnesses for us, Your

17   Honor.

18            THE COURT:  Okay.  Can I consider, I should say,

19   the evidence on your side completed?

20            MR. SHANNON:  Yes.

21            THE COURT:  Okay.  Turning now to the other side,

22   does anyone present any witness or any --

23            MR. RUFF:  No, Your Honor.

24            THE COURT:  Okay.  Mr. (indiscernible)?  Okay.

25   Okay.  What do you wish to tell me, sir?  Why don't we give

1   you -- everyone a brief opportunity to present any closing

2   statements and then give me a few minutes and I'll rule.

3          MR. SHANNON:  And I will keep it very brief, Your

4   Honor.

5          THE COURT:  I want you to take your time.  Don't -

6   - we'll go until we're done.

7          MR. SHANNON:  Your Honor, as we said in the

8   beginning, there is no dispute about these bankruptcy cases

9   -- this bankruptcy case -- the FSS bankruptcy case.  There's

10  no dispute that the applicants that this Debtor wants to

11  employ are disinterested, that they do not hold or represent

12  any interest adverse to this Debtors' bankruptcy estate.

13  There's no dispute there.

14         Again, the issue that the U.S. Trustee has brought

15  up and the only issue that the evidence has brought up is

16  this potential failure to supplement 2014 disclosures in the

17  Info W bankruptcy case.  And maybe the U.S. Trustee's

18  (indiscernible) agrees then it's not something that I knew

19  before.  Maybe it's -- maybe the U.S. Trustee is right, that

20  even though the agreement to dismiss the case has been

21  reached, you know what, Mr. Lee and Mr. Schwartz should have

22  supplemented their disclosures.

23         And if that's the case, though, Your Honor, it's

24  still not a good reason to decapitate this Debtor in this

25  case and basically shut FSS down, and there's been no

1  argument that denial of these applications to employ will

2  benefit the estate, and the case law says that's what

3  important.  There's been no argument or no evidence that

4  denial of these applications to employ will further

5  administration of these bankruptcies -- of this bankruptcy.

6  It simply wouldn't -- removing, you know, more than half of

7  the Debtors' attorneys -- it wouldn't help.

8          Now again, Your Honor, if there was a failure to

9  supplement the disclosures, I believe the Debtor has

10  submitted a reasonable alternative to what the sanctions

11  should be and that sanction should not be to deny the

12  application to employ.  You know what, if Mr. Lee made a

13  mistake, it's that he should have waited to dismiss the case

14  -- dismiss the Info W Debtors' cases before representing

15  FSS.  I'm sure if he went back that's what he would do.  And

16  the alternative that the Debtors suggest is disallow Shannon

17  & Lee, LLP's fees in that amount -- $24,409, and that would

18  basically put everybody in the situation that the U.S.

19  Trustee says people should have been in.  That actually puts

20  the Debtor in a better position, right, because they got --

21  they would have gotten free legal services.  That is -- the

22  Debtor's fine with that.  I believe that Shannon & Lee, LLP,

23  will continue to represent the Debtor if that's the Court's

24  ruling.

25          But there is no case law that mandates that

1    outcome.  It's not supported by the evidence which all the

2    evidence has -- all the evidence you've heard is that Mr.

3    Lee and Mr. Schwartz tried to do their fiduciary duties to

4    the Info W Debtors.  They've been trying to do their

5    fiduciary duties to this Debtor.  They've stood up to some

6    pressure from these parties that are supposedly or

7    potentially -- you know, that there potentially could be,

8    you know, insiders that I guess is what the U.S. Trustee is

9    worried about.  That's all the evidence that's been in front

10   of this Court.

11         So with that, Your Honor, unless you have any

12   questions from me, that's my presentation.

13         THE COURT:  I just have one.  So nobody's actually

14   talked about the fifth circuit standards for retention.

15   There's been responses to -- (indiscernible) gone back and

16   forth which was the problem with the pleadings and no one

17   ever talked about, right, what it means to hold an adverse

18   interest to the debtor or to the estate.

19         When you look at West Delta Oil, right, fifth

20   circuit said -- you look -- a professional possesses or

21   asserts any economic interest that would tend to lessen the

22   value of the estate or that would create an actual potential

23   dispute in which the estate in a rival claim (indiscernible)

24   to possess a predisposition under circumstances that render

25   such a bias against the estate.  That was a Utah case that

1    the fifth circuit was looking on and said, look, that's a

2    good definition.  You got to look at it with the eyes and

3    attention to circumstances which may impair a professional's

4    ability to offer impartial disinterested advice to his or

5    her client, right.  That's what it means to have an adverse

6    interest.

7         And you look at cases like West Delta Oil and

8    Waldron versus Adams and Reese case and that case says --

9    I'm going to ask the United States Trustee the same

10   question.  It says attorneys engaged in the conduct of a

11   bankruptcy case should be free of the slightest personal

12   interest which might be reflected in their decisions

13   concerning the matters of the debtors (indiscernible) which

14   might impair the high degree of impartiality or detached

15   judgment expected of them.

16        I got it that you're saying no one should look to

17   the last case.  What's your answer to what the fifth circuit

18   requires me to look at?

19        MR. SHANNON:  Well, I would say, look, the

20   question is about Mr. Schwartz and Shannon & Lee, LLP, and

21   whether they have either an economic interest or some

22   interest that is adverse to this bankruptcy.  That's not the

23   case, Your Honor, and I believe that everything -- all the

24   evidence is support of that.  I believe that was clear based

25   on the application and there has -- none of the parties have

1    disputed that.

2           THE COURT:  Do you think Shannon & Lee, Mr.

3    Schwartz -- let's just get the real question, right.  Do you

4    think Shannon & Lee or Mr. Schwartz can render solid advice

5    or impartial advice to FSS if it meant taking an action

6    against an insider?

7           MR. SHANNON:  Your Honor, absolutely and I can

8    tell you that both Mr. Lee and I have taken that position.

9           THE COURT:  I didn't hear one today.  Which one

10   did you take?  The one that Mr. -- when he testified to that

11   was me.  Which one did you take?

12          MR. SHANNON:  Oh, that Mr. -- Mr. Jones -- Alex

13   Jones --

14          THE COURT:  Again, I -- this case is -- what

15   complicates this case is that there are well known people

16   involved in it.  I just want you to take all that out.  Just

17   --

18          MR. SHANNON:  No, I understand --

19          THE COURT:  -- and the facts that you have today -

20   - can a professional who is engaged in the -- all the

21   evidence that the United States Trustee has (indiscernible)

22   setting aside and let's just call it company A, owner A --

23   could Shannon & Lee provide -- give the Court comfort that

24   Shannon & Lee or Mr. Schwartz can provide impartial advice

25   to the estate based on what we've heard today, right?  And I

1    know -- just let me finish -- I know that you're saying that

2    I should just look at the last case as nothing, but, right,

3    I was here.  So what do I -- in considering the cases that

4    I'm thinking about, how do you then -- what weight or what

5    consideration should I give to what happened in the last

6    case as I consider whether you can render impartial -- fair

7    and impartial advice to the estate in this case?

8                MR. SHANNON:  Your Honor, I would actually point

9    out the track record, right.  I mean, it did not benefit

10   Alex Jones or FSS to not fight the Texas Plaintiffs or the

11   Connecticut Plaintiffs getting rid of their claims in the

12   Info W cases.  That was -- did not help those parties.  The

13   Info W Debtors said, that's not what -- and Mr. Schwartz

14   obviously was the one making this decision ultimately -- you

15   know, the decision that was made was how does it benefit

16   this estate and these Debtors.  That was the focus in those

17   cases.  It was not what benefits the owner.  It's not what

18   benefits the related parties.

19                I believe in this case, there was, you know, some

20   requests to do things that the Debtor didn't believe were

21   the best interest of the Debtor's estate.  Mr. Schwartz as

22   the CRO, you know, Shannon & Lee, LLP representing the

23   Debtor, obviously Mr. Battaglia as well, said those things

24   do not benefit the estate and that's what Mr. Lee testified

25   to about extending the automatic stay to Alex Jones.  He

1    said, no, we're not going to do that.  So I would actually

2    look at the track record in this case and the last case to

3    give the Court that comfort.

4         THE COURT:  What evidence can you point me to in

5    the record?  That's what today's about, right?

6         MR. SHANNON:  Well, Mr. Lee's testimony that he --

7    you know, that the Debtor here, FSS, denied or pushed back

8    on that request from Alex Jones.

9         THE COURT:  Thank you.

10        MR. SHANNON:  So that's in the record.  I also

11   believe that Mr. Lee's email on May 21st, right -- it really

12   points out what was considered in that decision.  It was not

13   any pressure from FSS, and again, frankly, I believe that

14   the -- you know, the dismissal or the not putting up any

15   opposition to the dismissal by the Texas Plaintiffs and the

16   Connecticut Plaintiffs in the Info W cases -- that was not

17   for the benefit of anyone else other than those Debtors.

18   And so that's the evidence I think the Court should consider

19   on that issue.

20        THE COURT:  What about Mr. Schwartz?  What about -

21   - I think -- I understand your position with Shannon & Lee.

22   What about Mr. Schwartz?

23        MR. SHANNON:  Well, Mr. Schwartz was the ultimate

24   decision maker.

25        THE COURT:  Well, I thought he was taking

1    direction from the initial trustee.

2         MR. SHANNON:  The initial trustee gave no

3    direction at all in that first case.  If you remember, that

4    was the emergency behind getting the former judges appointed

5    because the initial trustee had no role in that case.  The

6    initial trustee, frankly, is someone who is very close to

7    Mr. Jones.

8         THE COURT:  The conflict that I'm having in my

9    mind -- and again, I don't like it when judges don't share

10   their thoughts -- so Mr. Schwartz testified that, you know,

11   the owner has no authority on decisions as it related to the

12   bankruptcy case.  It certainly has influence and there's no

13   denying that, right, and it's an important consideration.

14   Who's putting in the cash collateral budget to pay for an

15   $80,000 travel expense where the (indiscernible) pays for

16   everything, right?  Like who's putting that in?  That's Mr.

17   Schwartz making that decision?  Is that -- that's Mr.

18   Schwartz saying, pay 100 percent of the legal expenses in

19   the Connecticut litigation?  That's Mr. Schwartz saying,

20   let's go 40/60 on an appeal on a case in which you're going

21   to get ready to file plan?  That's Mr. Schwartz saying, pay

22   PQPR, you know, $750,000 in the first -- that's Mr.

23   Schwartz?

24        MR. SHANNON:  It is ultimately Mr. Schwartz,

25   Judge, but I will say this.

1          THE COURT:  Maybe it is.

2          MR. SHANNON:  There are arms length negotiations

3     in that --

4          THE COURT:  That's what I'm saying, but who's the

5     (indiscernible) let's put in an $80,000 travel expense or

6     let's go 60 -- let's go 100 -- we'll pay 100 percent of the

7     state court litigation that's already started in

8     Connecticut?  Who's making that decision?  That's what --

9     where's the arms length there?

10          MR. SHANNON:  The demand would be by Mr. Jones and

11     really through Mr. Jones's counsel, saying, this is what we

12     need to do.  Otherwise, it's not worth Mr. Jones, you know,

13     continuing on in this company.

14          THE COURT:  Do you see the tension with this case

15     and as it relates to -- this case is interesting because

16     there's active litigation --

17          THE COURT:  And, Your Honor, the one thing I will

18     say --

19          THE COURT:  -- right, the Debtor and owners are

20     co-Defendants in litigation and so that's what makes this

21     tricky aside from the issue and it involves tortes.

22          MR. SHANNON:  The one thing I'll say, Your Honor,

23     is that if the CRO -- the application employed the CRO is

24     not done then who is making the entire decision.  There is

25     no other party to --

1          THE COURT:  I'm asking, who's making the decision

2    now?

3          MR. SHANNON:  It's Mr. Schwartz.

4          THE COURT:  Okay.

5          MR. SHANNON:  And that's why you have the first

6    day of this hearing Mr. Lee did not remember.  I can ask the

7    Court to take judicial notice.  I was the one there.

8          THE COURT:  Oh, I know why you asked the question.

9          MR. SHANNON:  That's why we agreed ultimately to

10   extend or to allow a relief from the automatic stay for the

11   Connecticut Plaintiffs to go forward.  That's no something

12   Mr. Jones wanted.  That's something that the Debtor believed

13   was in the best interest of this estate and that Mr.

14   Schwartz believed was in the best interest of this estate.

15         THE COURT:  Okay.

16         MR. SHANNON:  And so I think that's the evidence,

17   Your Honor, that it -- if Mr. Jones or if this Debtor was

18   acting strictly for the benefit of Mr. Jones, those things

19   wouldn't have happened, right.  And sure, there are -- there

20   is some give and take there, right, and he is the most

21   important person (indiscernible).

22         THE COURT:  No question.

23         MR. SHANNON:  But there is --

24         THE COURT:  That's not surprising in companies,

25   right.  That's not surprising especially in the nature of

1    the business in which the Debtor's involved in.  That's not

2    surprising.  So I don't want anyone to think that it's rare.

3            MR. SHANNON:  So, Your Honor, that's the answer I

4    have to your question.

5            THE COURT:  Thank you very much.

6            MR. SHANNON:  Thank you, Your Honor.

7            THE COURT:  Okay.  Mr. Battaglia.  Yes, sir.

8            MR. BATTAGLIA:  Thank you, Your Honor.  Ray

9    Battaglia for Free Speech Systems.

10           A lot of what I heard today relates to what the

11   standard I know the Court holds attorneys to in terms of

12   their disclosures, in terms of the accuracy of what they put

13   in front of this Court, and I wish Mr. Lee had done a little

14   better on some of the dates and some of the other things.  I

15   understand the ambiguity over whether or not there was a

16   conflict based on the context of what was going on in the IW

17   case at that particular time.

18           It was clear well before you signed the

19   stipulation dismissing the case or the order dismissing the

20   case that this case was going to be dismissed.  There was

21   nobody propping up the case, not the Debtor, not my client

22   FSS, not Mr. Jones, not the Connecticut Plaintiffs, not the

23   U.S. Trustee's Office.  Everybody wanted the case dismissed

24   and well before you signed that order and well before May

25   19th if that's the key date, it was pretty clear that this

1    case was going to be dismissed.  The structure of how it was

2    be accomplished, what the literal language of an order or

3    stipulation would say, had some things to be worked out, but

4    there really wasn't any question that this case was -- that

5    that case -- the IW case -- was filed for the purpose of

6    trying to create a vehicle to settle litigation claims.

7         Once those litigants dismissed their claims with

8    prejudice -- claim that by the way they had held dearly,

9    steadfastly for four years against those Debtors -- they

10   just dismissed them literally overnight.  And so the purpose

11   of that case was gone, the purpose of the PSA, the purpose

12   of the litigation and trust -- all of those things were

13   gone, and so can someone hold up a candle and say, well,

14   there should have been a disclosure the first time you had a

15   conversation with me or a meeting in Austin on the 24th of

16   May.  Perhaps.  But at that point, FSS had gone from an

17   active participant to almost a stranger to the case, and so

18   -- I'm a firm believer that better to ask permission than

19   beg forgiveness and I think what you're hearing is some

20   begging of forgiveness today that it could have been done

21   better and cleaner, and I guess I could lay claim to

22   perfection.

23        I can't.  I screw up.  It happens.  I've been

24   doing this for 39 years.  I guarantee you I see pleadings

25   that I use as a template for the next case and go, oh, my

1    God, I can't believe I didn't catch that.  It happens every

2    day.  We're human.  But I think the real issue for the Court

3    is, what does that mean in terms of these parties' ability

4    to act on behalf of FSS and its creditors, and I don't think

5    it affects their abilities at all.  And as Mr. Lee

6    testified, there have been occasions where I assure you the

7    principles of the Debtor are not in league with FSS --

8    filing the immediate motion to lift the stay to allow Texas

9    case to go forward.  You could probably assume Mr. Jones

10   didn't like the idea of having to continue in that trial.

11   Filing the motion to lift the stay to allow the Connecticut

12   litigation to go forward and not proceed with other remedies

13   that are recognized by this Court and other courts about

14   injunctive relief and extension of the automatic stay.  Even

15   the removal that was done of the Connecticut litigation was

16   done with great hesitance and reluctance on our part but

17   only because it was unclear what the Connecticut court had

18   done, vis-à-vis FSS.  Not Alex Jones -- FSS.

19          So there have been numerous occasions where I

20   assure the Court that Mr. Jones and Mr. Jordan have had some

21   very terse conversations with us about what he thinks we

22   ought to be doing and we haven't done it.  And Mr. Lee and -

23   - I'll tell you, Mr. Shannon has had some terse

24   conversations with me on those topics as well.  So there's

25   no pushovers here.  There's nobody's doing Mr. Jones's

1  bidding other than his lawyers who represent him, and I

2  appreciate that the Court is concerned about the fee issues

3  on the litigation and I accept that.  I understand it.

4       I think that the thing that the Court doesn't get

5  to hear is what's Mr. Jones's ability to pay.  What happens

6  if he can't pay?  What happens if his state court lawyer

7  who's set for trial and we want to negotiate to lift the

8  automatic stay say, I won't go forward.  How do we deal with

9  that?  We're liable for that claim.  FSS is liable for that

10  claim.  We've agreed to produce Mr. Jones and through

11  negotiations that were extensive about who would show up at

12  trial.  The idea of making sure he shows up and -- you know,

13  that's a cost.  I told you it came in late in the day.  With

14  more time would we have rethought it and done better?

15  Perhaps.  Perhaps not.  It's just -- it's important that he

16  be there.  I'm important to me that he be there.  It's

17  important to him as well, but it's important to me and on

18  behalf of FSS.

19       So I hear the issues and I don't want to say

20  they're gotchas because they're not.  I mean, things should

21  have been done better in the IW cases.  There should have

22  been perhaps some more disclosure.  There should have been

23  some dates that were fixed.  I assure you I wouldn't have

24  contacted anybody had I thought there was a conflict of

25  interest coming into this case.  But the idea that I would

1    contact people who had familiarity with the issues involved

2    in the case, it can't be foreign to the Court.  I mean, it

3    makes complete sense and as I said, if you were to decide

4    that these parties can't be retained, I don't know where to

5    go.

6         I came into this as co-counsel.  I've been a solo

7    practitioner now for seven years.  I'm not with a big firm

8    anymore.  I can't -- and I'm hitting my later years of

9    hopefully practicing law, I can't run this hard anymore.  I

10   can't -- I couldn't possibly handle this case without co-

11   counsel and I don't know who out there would even consider

12   for a moment jumping in if it wasn't Shannon & Lee.  So when

13   Mr. Shannon says decapitate the Debtor, that's exactly what

14   would happen here and that clearly wouldn't be in anybody's

15   best interest, particularly as we're negotiating hopefully a

16   plan to proceed.

17        You know, we've made significant advances in

18   fixing this Debtor to the point where it can contribute net

19   cash (indiscernible).  The goal here is, as I said in the

20   very first hearing in front of you, I understand what this

21   bankruptcy code is about is paying creditors and that's all

22   I'm about.  It's my job to maximize the value of this estate

23   to pay creditors who are owed legitimate claims and that's

24   what I intend to do, but it isn't going to happen without

25   the help of a CRO and one who knows the business and without

1    assistance of effective co-counsel.

2         I can't do it myself.  I'm not -- when I told you

3    earlier that I had applied to be co-counsel, the point I was

4    driving home is, I don't know what --

5         THE COURT:  Right.

6         MR. BATTAGLIA:  -- your ruling to day will do to

7    me because I couldn't conceivably professionally stay in

8    this case and say, I can deliver the results that I'm

9    required to deliver to a client in zealous representation.

10   So that's really what I meant and I'll be happy to answer

11   any questions.

12        THE COURT:  Thank you for your time.

13        MR. NGUYEN:  Thank you, Your Honor.  Ha Nguyen for

14   the U.S. Trustee.  I just want to make some comments to Mr.

15   Battaglia's statement.  He has a very grasp on disclosure.

16   He understands what needs to be disclosed and I think

17   partially that's why one of the reasons his application is

18   not being objected to, but what you heard on evidence today

19   -- you heard both Mr. Schwartz and you heard Mr. Lee -- they

20   sat up there and they said, you know, as of May 24th, they

21   didn't think there was a need for disclosure on May 24th.

22        Your Honor, that -- the case law in rule 2014,

23   that is not a decision for them to make.  2014 is about

24   laying all of your connections out on the table for the

25   Court and the parties to examine.

1          THE COURT:  Why should it carry -- why should that

2     carry into this case?

3          MR. NGUYEN:  Your Honor, because this is the very

4     connection that was concealed from you.  Your Honor, it's so

5     important.  I mean, we have the technical requirements of

6     327.  I agree with you.  The fifth circuit in Delta Oil

7     explains it well.  But then there's another piece to this,

8     and that piece is the disclosure piece.  And disclosure in

9     the bankruptcy system is -- it's self-policed.  It's self-

10    policed by these professionals.

11         Like I said earlier, it's about the fox guarding

12    the henhouse, right.  So when you have a disclosure

13    violation, the Court should respond strongly because, you

14    know, that is what motivates other professionals to fully

15    disclose all of their connections.  Consequences for non-

16    disclosures are often harsh.  Sometimes people get

17    disqualified.  Sometimes people get full disgorgement of

18    their fees.  These are harsh remedies.  I understand.  But

19    they are required remedies to protect the integrity of the

20    bankruptcy system.

21         And, Your Honor, there was -- there is always --

22    since the beginning of this case, there was always a cloud

23    and I think Mr. Schwartz recognized it when he put in his

24    declaration.  There was always a question of loyalty here --

25    loyalty to Alex Jones or FSS.  That question has always been

1    a big issue in this case, and, you know, I go back to the --

2    I guess the August 3rd hearing when we found out that there

3    was American Express payment on the cash collateral budget

4    that was going to pay Alex Jones's housekeeper.  I think

5    that was the testimony at the time.

6            Who made that decision?  But Mr. Schwartz was the

7    one sitting up there testifying about the American Express.

8    Your Honor brings a good point about the 50/50 split for Mr.

9    Reynal and Mr. Pattis.  You know, I had many conversations

10   with Mr. Lee over that weekend and it's like, I don't -- Mr.

11   Lee was fighting for 40/60 for both of the applications.

12   And I said, Mr. Lee, like why are we giving Mr. Jones a

13   discount because one was 40/60 the other was 50/50.  It was

14   an argument of, hey, you should do 40/60 for this -- you

15   know, for this one as well.

16           And I was asking Mr. Lee, why are we shooting

17   ourselves in the foot.  I want the state to have a fair deal,

18   but why are you arguing for 40/60 to give Mr. Jones an extra

19   10 percent discount.  So we ultimately ended up on the

20   50/50.  And then there was another counsel that was filed --

21   I think the appellate counsel in the Texas litigation -- and

22   I had the same objections there.  They did 40/60.  I don't

23   understand why 40/60.  They should be 50/50.

24           THE COURT:  That will get reconsidered after

25   today, after reading (indiscernible) but --

1          MR. NGUYEN:  It needs to be 50/50, Your Honor.  So

2     on top of all of these concerns about potential bias, you

3     have the non-disclosure that happened in the prior case.

4     Remember, all of these parties were hired by Alex Jones.

5     Look at the engagement letter.  Alex Jones drew out --

6          THE COURT:  But that's typical in a small case,

7     all right.  I mean, it's not small in number but in terms of

8     small business where, you know, the owner hires everybody.

9     That's not surprising in a sub-Chapter 5 case.  So I'm --

10          MR. NGUYEN:  I agree, Your Honor, but think about

11     -- and like I said at the beginning of the opening, the

12     Court is a witness to everything that's gone on here.  We're

13     not talking about something that happened before a different

14     judge in a different case.  You were here throughout the

15     entire thing.  Statements were made to you, declarations

16     were filed.  Candor was important in the prior case.  Candor

17     is important in the case, and as Your Honor was going

18     through some of the exhibits, you know, there's an issue --

19     there's -- there are statements in Mr. Schwartz's

20     declaration that says May 19th and it turns out that that's

21     incorrect.  Mr. Schwartz testified he read his declaration,

22     but there's mistakes all over the place.

23          So that big issue -- that non-disclosure issue --

24     I just don't think you can get away from it.  And I think

25     it's important to remember what happened in the prior cases

1    because of May 19th, Mr. Battaglia said he would have

2    amended and disclosed, but the professional that sat up

3    here, they -- we asked them, you know, was this a connection

4    that should have been disclosed.  They all said no.  They

5    are still defiant about their duty to disclose.  Most

6    professionals would just come and file a supplement but

7    these professionals were --

8            THE COURT:  Well, I'm sure they're do it now if

9    you'll give them a chance.  You know, the question should

10   the -- you know --

11           MR. NGUYEN:  Your Honor, I --

12           THE COURT:  Go ahead.

13           MR. NGUYEN:  There was a connection that was not

14   disclosed.  Declarations were filed.  They were incorrect.

15   Statements were made to you to the contrary, that

16   (indiscernible) indicated that they were independent.  There

17   were multiple opportunities to disclose Free Speech System

18   as a connection.

19           Now they're coming in.  They're asking you to

20   approve this connection that they didn't disclose.  We can't

21   just -- we can't do that in terms of -- that just can't be

22   the case when there is an utter failure of disclosure, a

23   lack of acknowledgment from the professional, and now

24   they're asking you to bless it.  By blessing the application

25   now, you're actually compounding the non-disclosure in the

1    prior case because you're essentially approving it, and

2    that's the problem we have.

3          So there is a sense of bias here.  There are

4    questions and then you compound it by having this non-

5    disclosure that they refused to acknowledge.  I think it's a

6    huge problem, Your Honor, and I would ask the Court to

7    consider just integrity of the process -- integrity for

8    these creditors who are here, who are demanding candor.

9    Candor is important.  So I would ask the Court to deny these

10   two applications.  The system demands it -- of it.  I just

11   don't know how else to put it.

12         There will be harsh consequences to it, but, you

13   know, that's -- sometimes that happens when you're not

14   upfront about your connections with the Court.  And so, Your

15   Honor, that's all I have.  I won't belabor the point.  We've

16   been here for a while.  We take a strong position on it

17   because the system demands a strong response to a non-

18   disclosure of this sort.

19         THE COURT:  Thank you.

20         MR. SHANNON:  If I could just make one correction

21   --

22         THE COURT:  Sure.

23         MR. SHANNON:  There was no misrepresentation in

24   either Mr. Lee or Mr. Schwartz' declarations in the Info W

25   cases.  They weren't (indiscernible).  And I just want to

1    correct it and this is I think why Mr. Lee got so upset and

2    obviously filed a reply that he should not have.  There was

3    --

4           THE COURT:  Well, I think he can file what he

5    wants.  I just think I get questions based upon what gets

6    filed.

7           MR. SHANNON:  Exactly.  So I just -- I want to

8    make that one clarification, that it was not a declaration

9    that was mistakenly (indiscernible).  It was just not

10   supplemented maybe as it should be.

11          THE COURT:  Okay.  Thank you.  Folks, it's 6:32.

12   I'm going to take a look at something.  I'm going to come

13   out at 6:40.  I'm going to rule on it.  Thank you.

14          CLERK:  All rise.

15          (Recess)

16          THE COURT:  Okay, so we are back on the record in

17   Free Speech.  I'll just note for the record, Mr. Battaglia,

18   I did get a chance to look, and your order is on the docket,

19   so I just -- okay.

20          So what is remaining, two retention applications,

21   and they are filed at Docket Numbers 83 and 85.  They were

22   filed on August 12th.  The application to employ Shannon and

23   Lee as bankruptcy co-counsel to the Debtor and the

24   application to employ W. Marc Schwartz and Schwartz

25   Associates LLC (indiscernible) essentially as financial

1    advisors as well.  This is a court proceeding under 28

2    U.S.C. 157(b)(2)(A).

3         Court finds that there's been proper service of

4    the application and then proper notice of today's hearing.

5    The Court has considered the evidence, and here's my ruling

6    on the applications.  I do note, before I begin that -- here

7    is just the -- or -- or Free Speech -- well, we'll disagree,

8    but what the Court has done, that's just the nature of what

9    the Court has to do.  The Court is required to weigh the

10   evidence and apply the law as faithfully as I can and that's

11   what I believe that I'm doing now.

12        So the Debtor FSS seeks to employ Mr. Schwartz as

13   chief restructuring officer and his firm Schwartz Associates

14   LLC as advisors on Section 327(a) of the Bankruptcy Code.

15   FSS also seeks to employ Shannon and Lee as bankruptcy co-

16   counsel.  US Trustee objects to both employment

17   applications.  The Trustee argues that these professionals

18   failed to disclose important connections required under

19   Bankruptcy Rule 2014 and recently dismissed bankruptcy

20   cases.  The Sandy Hook plaintiffs filed a statement joining

21   in and supporting the US Trustee's objection.

22        In response, FSS argues (indiscernible) motion by

23   Schwartz and Lee that previously dismissed bankruptcy cases

24   are not a valid basis to deny retention of these

25   professionals in these cases.  FSS argues that these

1    professionals satisfy the requirements for employment under

2    Section 327(a) of the Bankruptcy Code in this case.  Based

3    on our evidence and applicable law, the Court is going to

4    deny the applications to retain Schwartz as CRO and

5    Schwartz's LLC Associates as financial advisors and Shannon

6    and Lee as co-counsel to FSS.

7         On July 29, FSS started this --

8         Yes.  That's fine.  I'm still writing.  Do you

9    want to get him back on the line?

10        RECORDED VOICE:  -- are ten attendees in this

11   conference.  Your host has joined.

12        Conference muted.

13        THE COURT:  Okay.  As I said, based on the

14   evidence and applicable law, I'm going to deny both

15   retention applications.  On July 29, FSS started this case.

16   About three weeks later, FSS filed applications to employ

17   Schwartz as CRO along with his firm as financial advisors,

18   and Shannon and Lee as co-counsel.  Mr. Ray Battaglia has

19   always represented FSS as the (indiscernible) other proposed

20   counsel and has been approved today.  No party objected to

21   his retention, so he is retained as bankruptcy counsel to

22   FSS at this point.

23        Schwartz submitted a declaration in support of his

24   retention, stating that neither him nor Schwartz Associates

25   was contacted about serving as CRO for Free Speech until

 1    July 19th, 2022, when (indiscernible) in the Debtor's

 2    bankruptcy cases has reached a favorable outcome for those

 3    debtors.  He says that for all practical purposes,

 4    (indiscernible) to reorganize the InfoW debtors had

 5    concluded because the bankruptcy cases no longer had the

 6    necessary participants to implement the global settlement.

 7    He had (indiscernible) to restructure and reorganize InfoW

 8    debtors at that point and that also the work he was

 9    performing was ministerial.

10         The Shannon and Lee retention application included

11    a declaration by Mr. Lee.  It states, and I quote, "The

12    first services of our attorneys, Shannon and Lee, provided

13    to FSS, occurred on July 24th, 2022.  They were provided by

14    Lee through Kyung S. Lee PLLC."

15         The application also disclosed that Mr. Lee

16    received payment for services rendered between May 24th and

17    May 31st, 2022.  Section 327(a) of the Bankruptcy Code

18    authorizes a Chapter 11 Debtor with the Court's approval to

19    employ one or another attorneys, accountants, or other

20    professional persons do not hold or represent the interests

21    adverse to the estate and other disinterested persons to

22    represent or help the Debtor carry out its duties under

23    Chapter 11.

24         I want to be really clear.  Debtors have the right

25    the choose their lawyers.  The Bankruptcy Court has the duty

1   to ensure Section 327 is satisfied.  The text of 327(a)

2   states that retention is subject to court approval.

3   Assuming that the technical requirements of Section 327 are

4   satisfied, the Bankruptcy Code gives a bankruptcy court  .

5   discretion to deny an application.  That should be used, in

6   my opinion, very sparingly.  But this Court must consider

7   the facts of each case.

8          The text of Section 327(a) also requires

9   application for two-prong tests for employment of

10   professionals.  In order to (indiscernible) employ a

11   professional that one, does not hold or represent an

12   interest adverse to the estate and is a disinterested

13   person.  The term "disinterested person" is defined under

14   Section 101(14) of the Bankruptcy Code.  Neither one of

15   these two prongs overlap because the definition -- Part C of

16   the definition of "disinterested person" includes a person

17   who does not have an interest materially adverse to the

18   estate.

19          The application to employ a professional requires

20   an accompanied verified statement of the proposed retention

21   requirement of Bankruptcy Rule 2014.  Under that, a

22   professional must disclose all known connections the

23   professional has with the debtor, including insiders with

24   the debtor, creditors and other parties in interest in the

25   case, other proposed professionals the debtor seeks to

1    retain, and the Office of the United States Trustee.

2          Such public disclosure provides important

3    transparency to the Bankruptcy process and helps bankruptcy

4    courts evaluate if a professional is disinterested and

5    doesn't hold an adverse interest to the estate.  We

6    emphasize the professional has to be disinterested and not

7    hold an adverse interest to the estate.  Professionals

8    retained under the Section 327 represent the estate.  Thus,

9    in some cases, a professional representation of the estate

10   may conflict with the interest of shareholders and secured

11   and unsecured creditors.

12         So what does it mean to represent or hold any

13   interest adverse to the estate and to be disinterested?

14   Bankruptcy Code does not define the phrase "represent or

15   hold any interest adverse to the debtor to the estate."  The

16   Fifth Circuit (Indiscernible) that the oil company 432 F.3rd

17   347, Fifth Circuit 2005 reviewed and adopted -- or reviewed

18   a definition used by other circuits.  And that was to

19   possess or assert any economic interest that would tend to

20   lessen the value of the bankruptcy estate that would either

21   create either an actual or potential dispute in which the

22   estate is a rival claimant or to possess a predisposition

23   under circumstances that render such bias against the

24   estate.

25         The Fifth Circuit held that while the definition

1   was helpful, had to be employed with an eye to the specific

2   facts of each case and with attention to circumstances that

3   may impair a professional's ability to offer impartial,

4   disinterested advice to the client.  The Fifth Circuit has

5   also held that the standards for (indiscernible) conflict

6   are strict and professionals engaged in the conduct of a

7   bankruptcy case "should be free of the slightest personal

8   interest which might be reflected in their decisions

9   concerning matters of the debtors' estates or which impair -

10  - might impair" -- excuse me -- "a high degree of

11  impartiality and detached judgment expected by them during

12  the course of administration."

13          I want to start with the oil, 432 F.3d at 355.

14  I'll also cite to Waldron v. Adams & Reese in re, right,

15  American International Refinery, Inc. 676 F.3d 455, pincite

16  462 Fifth Circuit 2012.  Under Section 101(14), the term

17  "disinterested person" means a person that's not a creditor,

18  an equity security holder, or an insider.  That's A; B, is

19  or was not within two years before the date of the filing of

20  the petitioner, a director, officer, or an employee of the

21  debtor; and C, does not have an interest materially adverse

22  to the interest of the estate or any class of creditors or

23  equity security holders by reason, any direct or indirect

24  relationship to or in connection with or interest in the

25  debtor, or for any other reason.

1          I'd say Lee and Schwartz satisfy parts A and B of

2     the definition of disinterested.  And I acknowledge that

3     Schwartz was retained as CRO pre-petition, but the actual

4     entity retained by FSS is Schwartz Associates LLC.  Right,

5     and so Schwartz Associates is not a creditor, equity

6     security holder, an insider and was not within two years of

7     the filing of the petition date a director, officer, or an

8     employee of the Debtor.  It's a fine distinction.  That's

9     why individuals who work for Schwartz LLC, as in Mr.

10    Schwartz, can be retained pre-petition and still not be held

11    to be an officer.  It's the entity that got retained, not

12    him individually.

13         The question for any other reason, what does that

14    mean?  It's also known as the catch-all clause.  It's

15    sufficiently broad to include any professional with an

16    interest or relationship that would even faintly counter the

17    independence or impartial attitude required by the Code.

18         I'll cite to Judge Iscara's decision on -- it's

19    either LTHM Houston Operations LLC 2014 WL 5449737

20    Bankruptcy Seventh District of Texas 2014.  In this the Code

21    requires that there may be additional instances based on the

22    facts where a professional may have an interest material

23    adverse to the estate.  The US Trustee objects to the

24    retentions mainly based on actions and failures to disclose

25    in three recently dismissed bankruptcy cases.  FSS really

1    wants the Court to overlook the history of the past as not

2    really relevant, but this case cannot be divorced from the

3    history of the prior cases.

4         Before FSS started this case, Schwartz served as

5    proposed CRO and Lee served as proposed counsel in

6    Subchapter 5 bankruptcy cases of InfoW LLC, IW Health LLC,

7    and Prison Planet TV LLC.  These entities were original

8    affiliates of FSS.  Mr. Jones owned 100 percent of the

9    equity in FSS.  He also owned 100 percent of the equity in

10   the InfoW entities.  FSS, Mr. Jones, and the InfoW entities

11   were also defendants in what I would call Sandy Hook-related

12   litigation, defamation lawsuits pending in Texas and

13   Connecticut State courts.

14        InfoW, IW Health, and Prison Planet filed

15   bankruptcy cases in the Southern District of Texas in April

16   of 2022.  Shortly before the filing, Mr. Jones assigned his

17   equity and his interest in these entities to a 2022

18   litigation settlement trust.  This Court was informed in

19   that case that the litigation settlement trust removed

20   control of the InfoW debtors from Mr. Jones.  The trust was

21   managed by an actual trustee and was supposed to be

22   eventually managed by two new trustees.  The trustees would

23   then have full governance authority over the Debtors.  The

24   litigation trust was first funded by Jones and FSS.

25        FSS, Mr. Jones, and the InfoW debtors also signed

1    a plan support agreement.  Part of the stated goal of the

2    InfoW cases was to negotiate a financial settlement between

3    the InfoW debtors and the Sandy Hook plaintiffs to resolve

4    defamation lawsuits pending in Texas and Connecticut.  Such

5    a settlement would have also resolved litigation against the

6    third-party contributors to the litigation trust, which

7    included FSS.

8            On April 29th -- well, I'll note, at least at the

9    beginning of the case, Mr. Schwartz was proposed CRO was

10   subject to the oversight and the direction of the initial

11   trustee, at least according to the court filings of the

12   litigation trust.  Mr. Lee was also proposed counsel for the

13   InfoW debtors and was taking direction from Mr. Schwartz as

14   CRO.  On April 29th, the US Trustee moved to dismiss the

15   InfoW cases, alleging, among other things, that the cases

16   were filed in bad faith and engineered to shield Mr. Jones

17   and FSS from liability.  An evidentiary hearing was

18   originally scheduled for May 27th.

19           The Court held a hearing on May 19th.  You've

20   heard a lot about that hearing today.  It's an important

21   hearing both for what was stated to the Court and what

22   wasn't disclosed.  Texas plaintiffs announced that they were

23   dismissing their claims against the InfoW debtors with

24   prejudice in the Texas defamation lawsuits, thus leaving Mr.

25   Jones and FSS as defendants in the Texas litigation.  The

1    Court also signed a stipulation on that day to that effect,

2    authorizing the parties to proceed in the Texas litigation.

3           Around that same time, the plaintiffs in the

4    Connecticut State litigation had filed a notice of dismissal

5    to claimants against the InfoW Debtors in the Connecticut

6    State court, which again, would have also left Mr. Jones and

7    FSS as defendants.  To allow the parties time to finalize

8    these state court dismissals with prejudice, which was the

9    issue at the time, Mr. Lee requested more time to respond to

10   the US Trustee's motion to dismiss the InfoW cases.  Among

11   the basis stated for the continuance was that Mr. Schwartz

12   needed more time to fulfill his fiduciary duties to other

13   creditors.

14          Mr. Lee also stated on the record at that hearing

15   that the other part that I have to do is renegotiate the

16   plan support agreement.  The debtors intended to

17   (indiscernible) with respect to a small Subchapter 5 plan.

18   Mr. Lee, with Mr. Schwartz right next to him, also told the

19   Court that they want me to know that Mr. Schwartz in his

20   fiduciary capacity is evaluating all alternatives.  Based on

21   his representations and agreements between the parties, the

22   Court reset an evidentiary hearing on the motion to dismiss

23   for some time in June.

24          What was unknown to the Court at this time, it

25   sounds like there was a meeting shortly after that hearing,

1    was that Schwartz and Lee would soon plan to start working

2    for FSS.  On May 25th, Mr. Lee starts working on a first-day

3    declaration for FSS, according to the time records admitted

4    into evidence, which means that around that time, Mr.

5    Schwartz was also part of the FSS team.  This continued into

6    early June, which means that Mr. Lee's statement about

7    exploring all options, if truthful -- and I don't doubt his

8    sincerity at the time -- but if it would have been played

9    out, then Mr. Schwartz would have then potentially found

10   himself negotiating as the CRO for the InfoW debtors on one

11   side and CRO for FSS on the other side.

12          Considering the history of the prior cases is

13   important, and that's why it's important, because what was

14   told to me on May 19th is that Mr. Schwartz was exploring

15   all options.  When you look at the statements filed in the

16   declarations in support of retentions, it's impossible to

17   recognize -- to reconcile, excuse me, that statement with

18   Mr. Schwartz's declaration that his duties are

19   (indiscernible) and that he had nothing to restructure or

20   reorganize.

21          Based on all (indiscernible) submitted by Mr. Lee

22   to Mr. Schwartz on -- Mr. Lee submitted an invoice to Mr.

23   Schwartz on behalf of FSS, stating that Lee and his comrade,

24   Mr. Shannon, met with Mr. Schwartz and counsel to Mr. Jones

25   to discuss issues about an FSS restructuring on May 24th for

1   five hours.  And that's -- right, that's five days after the

2   hearing.  On May 25th, Mr. Lee researched the information to

3   prepare first a declaration for Mr. Schwartz in connection

4   with an FSS bankruptcy.  On May 26th, he was organizing PQPR

5   valuation reports.  On May 27th, he coordinated with state

6   court counsel on state court sanction (indiscernible), and

7   "located critical documents for counsel to PQPR."  PQPR is

8   managed by Mr. Jones's father.

9        The next few days, Mr. Lee spent time analyzing

10  the data produced to state court counsel even though what

11  was represented -- even though, at that time, the InfoW

12  debtors were in the process of being dismissed with

13  prejudice.  On May 31st, they kept looking at a declaration

14  for Schwartz as CRO for FSS.  During this time, Mr. Schwartz

15  spent a lot of time working for FSS, hiring staff in order

16  with PQPR, its owners, and Mr. Jones.

17       Thus, at the time the bankruptcy strategy to

18  implement -- to be implemented in the InfoW cases

19  essentially failed and a group of parties went in order to

20  proceed with a new strategy for FSS.  Lee and Schwartz took

21  part in this strategy even though they were technically

22  supposed to work as fiduciaries for the InfoW Debtors.

23       I need to stress here, too, weren't they per se

24  (indiscernible) with secure letters and its counsel pre-

25  petition?  It happens all the time in large Chapter 11

1     bankruptcy cases.  Right?  It happens very often before

2     Chapter 11 cases are filed, either in an effort to avoid

3     bankruptcy or offer to negotiate in connection with the

4     Chapter 11 case.  Right?  Including the use of cash

5     collateral.  Right?  Debtors often want to have a consensual

6     use of cash collateral on the first day, try to enter

7     sometimes -- debtors may around the country enter into

8     restructuring support agreements and plan support agreements

9     or entering into pre-packaged Chapter 11 plans or --

10    various, many reasons to enter into negotiations with a

11    secured creditor.  Right?

12          What makes this case different is that Schwartz

13    and Lee were working for FSS.  They were also technically

14    working for the InfoW debtors.  Right?  And at some point,

15    the litigation trust and (indiscernible) broke down and who

16    was represented to the Court that Mr. Schwartz was taking

17    direction from?  Apparently that all had broke down.  So

18    there was a (indiscernible) separation between his affiliate

19    entities and the (indiscernible).  And there are other -- a

20    breach of corporate formalities disclosed in public

21    documents or things just went away.  And they could have

22    expired on their own.  Not to say that any of those things

23    were wrong.

24          It's just that, again, on June 2nd -- right, and

25    this is why things get tricky, but just leave it there.

1    Maybe there's nothing wrong, but on June 2nd, the InfoW's

2    response to the US Trustee's motion to dismiss.  Response

3    was filed by counsel for the debtors.  And despite their

4    representations and the declarations of that ministerial

5    work happening in May in this case, in the adjoined

6    pleading, professionals represented to the Court and to the

7    public that the InfoW cases still served our bankruptcy

8    purposes -- would they say -- nonetheless, the debtor's own

9    acknowledgment of their independent CRO.  How are you

10   independent if you're working for and hiring for FSS at that

11   time?  I don't really -- how are you -- what does

12   independence mean at that time?  I recognize that this also

13   was in the best interest of the debtors and their estates.

14   Right?

15        The InfoW cases are dismissed on June 10th, based

16   on internal records.  In July of 2022, Mr. Lee is assistant

17   counsel to Mr. Jones on the data issues between Mr. Jones

18   and FSS.  (Indiscernible) FSS for attending a focus group

19   and participated in a jury perception of Mr. Jones.  It was

20   a separate defendant in the Connecticut and Texas cases.

21   You're paid to do no effort, no evidence, of no effort to

22   separate your performance for the debtor and work performed

23   for FSS or potential claims that folks may have against each

24   other at that time.  The issue is that that's continued

25   post-petition and FSS's responses failed to appreciate this

1    point.

2         FSS's response focuses primarily on trying to cast

3    the US Trustee's Office in a negative light, rather than

4    proving that these professionals don't hold an adverse

5    interest to the estate and are disinterested.  During the

6    case, for example, FSS sought approval of a cash collateral

7    lawyer providing for approximately $80,000 in travel

8    expenses for the lawyer of FSS.  All of the travel expenses

9    for him and others were to be paid 100 percent by the FSS

10   estate.  I will tell you that no one called that out to me.

11   It was the Court who highlighted that issue.  And maybe

12   $80,000 is what's required for people to travel.  Of course,

13   that's not really the question.

14        The question is, who was negotiating on behalf of

15   the estate as to this 100 percent of all travel expenses to

16   go participate in a defamation trial on damages as a co-

17   defendant, 100 percent to be paid for by an entity in

18   bankruptcy?

19        In August of '22, FSS filed application to retain

20   two special counsels to represent it in the Connecticut

21   State court trial.  FSS's initial request was to, again, pay

22   for full legal fees on behalf of itself and the co-

23   defendant.  In a tort trial on damages, the estate proposed

24   to pay 100 percent for the legal fees for itself and its

25   owner as a separate defendant in the case.  Again, the Court

1    highlights that issue.  I must say I do believe that -- I

2    pre-empted the United States Trustee who has also stood up

3    right away and said this was an issue that we had, if I

4    remember that hearing correctly.

5           In September '22, in (indiscernible), special

6    counselor to FSS, who's one of the aforementioned special

7    counsel, filed a supplemental declaration which was drafted

8    by Mr. Lee.  And he states that since May 19th, FSS retained

9    Schwartz as its CRO and that Schwartz, as counsel for FSS, a

10   (indiscernible) defense lawyer (indiscernible) financial

11   executive was able to come and work at FSS in their

12   accounting department.  According to the declaration, he

13   recommends Jeffrey Schwartz as CRO.

14          I would note that Mr. Schwartz could not remember

15   if the retention occurred in May or later.  And there was

16   great confusion, although May 19th was cited in multiple

17   declarations filed in this case, FSS, Mr. Schwartz, Mr. Lee

18   essentially argue that maybe that was closer to June when it

19   was -- when those retention application, excuse me, when

20   those engagement letters were sent in by Mr. Jones in June.

21   But certainly the work, regardless of when the applications

22   were dated, certainly there was a meeting on the 24th when

23   the work started.

24          Mr. Schwartz also disclosed that FSS's books and

25   records were in disarray when he started working

1    (indiscernible), that the 2021 ledger had not been

2    completed, and the books had not been closed.  There was no

3    transaction that had been recorded in the 2022 ledger.  As a

4    result, both financial statements were produced for FSS for

5    the 18 years before his engagement.  Schwartz and Associates

6    also found out that reconciliations for 2021 are in 2022 and

7    were inadequate, out of their control -- actually, they

8    (indiscernible) controls, including lack of segregation of

9    duties, lack of supervision, reveal of accounting functions

10   -- this is all in Mr. Schwartz's declarations earlier in

11   this case -- more billings to PQPR.

12         I have issues about the relationship with FSS and

13   PQR, with their professionals certainly engaged extensively

14   with pre-petition.  The Court really -- I didn't hear any

15   evidence that they've analyzed it seriously post-petition.

16   And the estate made no claims against PQPR.  And recall that

17   PQPR is managed by an outsider.  They're approximately --

18   according to what was noted, right, in August of 2020 and

19   November 2021, there were security agreements signed on and

20   proto-signed on to the total of approximately $54 million.

21   That is subject to a fraudulent transfer litigation pending

22   outside of this district.  That may be 100 percent

23   legitimate and properly secured.  I don't know.  Someone

24   needs to do this work.

25         In this case, the professionals prior to post-

1    petition actions and this Court's assessment based on the

2    evidence colors the independence and the impartiality

3    required by the Bankruptcy Code.  Not just an appearance of

4    conflict of interest.  There are adverse interests to the

5    estate based on the evidence related to Mr. Jones and PQPR.

6    The lack of transparency and the lack of disclosures

7    required under Bankruptcy Rule 2014, which says any

8    connections, give this Court a lot of concern about whether

9    these professionals can impartially represent FSS, which may

10   include making difficult decisions about other parties, if

11   necessary.

12        The estate may -- I have no idea -- hold claims,

13   defenses to claims, and costs of actions against third

14   parties.  For instance, based on the time records entered

15   into evidence, Mr. Jones may allege a right to an indemnity

16   from FSS.  I know that he's been seeking personal expenses

17   paid.  Right?

18        And I know that Exhibit 163-8, there's a July 11th

19   time entry where counsel assisted Mr. Jones as counsel on

20   indemnity issues between FSS and Mr. Jones.  Right?  He had

21   first a cash collateral motion.  It was the Court who

22   questioned the material (indiscernible) for about $172,000

23   that consisted primarily of personal charges not related to

24   the business.

25        FSS's schedules also list pre-petition payments to

1   the same vendor for about a million dollars.

2   (Indiscernible) attorney at this time how much relates to

3   purely FSS's business expenses, but that work needs to get

4   done.  So consider I'm the Fifth Circuit guidance and an eye

5   to the specific facts here and with attention to

6   circumstances, there is evidence showing circumstances and

7   instances that have and may in fact impact future ability to

8   offer impartial and disinterested advice to FSS.

9        And I understand that that has consequences, and I

10  hope everyone hears it in my voice.  This is not easy for me

11  to do, but I'm required to make these decisions under law

12  and Bankruptcy Code affords me the discretion to do so.  And

13  I'm not even sure this is a discretion issue.  I think

14  there's a material adverse interest to the estate.

15       And I stress that this decision is based on the

16  facts presented in this case.  I really want to stress this

17  because I know a lot of people are listening.  No one should

18  read this decision as a critique of using local counsel or

19  using co-counsel in a case.  I understand that debtors needs

20  sometimes not to retain multiple law firms when appropriate.

21       Again, I stress debtors have an absolute right to

22  seek to retain professionals that will assist in their

23  Chapter 11 case.  I'm a firm believer in that.  This

24  decision has no application in those instances.  None.  This

25  decision also has no application whenever professionals

1    (indiscernible) by a group of affiliated debtors.  It

2    happens all the time in Chapter 11.  A debtor, sometimes a

3    financial advisor, sometimes an investment banker gets

4    retained by Company A and all of its related entities.

5            And sometimes that means a debtor, right, a group

6    of debtors file at the beginning because you're trying to

7    keep a group of entities out of bankruptcy as you negotiate.

8    And sometimes, right, debtors counsel has to advise clients

9    that, well, another subset has to go in at a later time.

10   And it often happens in restructurings.  Those often --

11   those instances are much different in the -- in this case.

12   In this case, you know, a proposed CRO and counsel were

13   actively representing the InfoW debtors.   Right?

14           Let's not forget whose interests are held by a

15   litigation trust and are solely represented, (indiscernible)

16   affiliated entities.  I also note that FSS is not without

17   counsel to continue this case.  I take what Mr. Battaglia

18   really said -- I really take it to heart.  I don't -- I

19   don't like where we are today.  I think I'm making the right

20   decision under the law.  I think I'm commanded by the law,

21   the Fifth Circuit case law, to make this decision.

22           I also know that what occurred today is limited to

23   today.  I think Shannon and Lee and Mr. Schwartz and

24   Schwartz and Associates can appear in another case in front

25   of me with no issues.  I mean zero.  I really mean that.  I

1   hope they can take comfort in that.  And any future case is

2   going to be just judged on those facts and nothing today or

3   in this case changes that for me or any professional.  I

4   hope to never make a similar decision as long as I'm on the

5   bench.  But judges are required to make difficult decisions

6   sometimes and this is one of those today.

7          I noted earlier, and I'll note it again, I find

8   there was some strong language used in the response to the

9   US Trustee's objection.  And I find nothing improper about

10  the arguments raised in those objections, not because I

11  ruled in the way that I did, but also just looking at it

12  independently, I take statements very seriously in the court

13  and filed with the Court, sometimes better to ask than to

14  make assumptions.  So something else I need to do today

15  based on what I've heard.  So Chapter 5 is the new addition,

16  relatively new addition, to the Bankruptcy Code.  And it

17  provides a streamlined process for small businesses to

18  reorganize.

19         So Chapter 5 involves the appointment of a

20  Subchapter 5 trustee to provide oversight of the debtor in

21  possession and helps facilitate negotiation of what will be

22  hopefully or consensually reorganized, reorganization plan.

23  As with any case, a Subchapter 5 bankruptcy requires a

24  debtor to be forthcoming about its affairs.  The Subchapter

25  5 trustee, the court, and its creditors are all

1    stakeholders.  Interestingly, the debtor in Subchapter 5 is

2    not mandated to investigate its own acts, conduct, and

3    liabilities in financial condition.

4         But 11 U.S.C. 1183(b)(2), a court for cost and on

5    the request of a party of interest, the trustee or the

6    United States Trustee may order an expansion of the

7    Subchapter 5 trustee's power to include the power specified

8    in Sections 1106(a)(3) and (a)(4) of the Bankruptcy Code.

9    1106(a)(3) says, "Except to the extent the Court orders

10   otherwise, the trustee shall investigate the acts, conducts,

11   assets, liabilities, and the financial condition of the

12   debtor, the operation of the debtor's business, and the

13   design or ability of the continuance of such business, and

14   any other matter relevant to the case or to formulation of

15   the plan, and as soon as practical, upon a statement of an

16   investigation conducted, including any fact ascertained

17   pertaining to fraud, dishonesty, incompetent, misconduct,

18   mismanagement, or irregularity in the mismanagement of the

19   affairs of the debtor or to a cause of action available to

20   the estate."

21        It's not on a cause.  A cause is not defined in

22   the Bankruptcy Code.  When you look at cases, trying to

23   define a cause in the Fifth Circuit, or how a cause is

24   viewed, according to the Fifth Circuit apply a flexible

25   standard, giving the bankruptcy courts flexibility to

1    determine whether a cause exists.  And it's a fact in

2    (indiscernible) inquiry that must be determined on a case-

3    by-case basis.

4         The leading treatise (indiscernible) on bankruptcy

5    law provides that the standard for cause under 1183(b)(2)

6    should not be higher than the standard for cause, say, for

7    example, removing a Subchapter 5 trustee.  I agree with

8    that.  There always ought to be cause.  Weigh the facts and

9    the evidence and make a determination as to whether there's

10   cause based on the facts.

11        I don't like the factors because not all the

12   factors apply in every case, and this case is not different

13   -- it's far different than a Subchapter 5 case where someone

14   is trying to keep a pizza shop going.  Section 105(a) of the

15   Bankruptcy Code authorizes a court to sua sponte expand the

16   Subchapter 5 trustee's duties under 1183(b)(2) even though

17   the subsection requires -- uses the phrase "on request of a

18   party in interest" when you look at 105(a).  I do note that

19   a party has already requested that.  That hearing was set

20   for another date and under certain circumstances.  I believe

21   it was PQPR.  And I'm going to expand that today sua sponte.

22        There's a clear and pressing need to expand the

23   role of the Subchapter 5 trustee and to direct her to

24   investigate.  That doesn't mean that there's anything wrong.

25   It just means that in this particular case, there has to be

1    work done for the debtor to really understand the scope of

2    its assets and potential claims and liabilities.  I do note,

3    there's been a lot of talk about candor and how the Court

4    feels about it.  I'm would note and I do think there was a

5    lack of candor under Rule -- Bankruptcy Rule 2014 in the

6    last case.  And I do think there was some lack of candor in

7    this case.

8              I've expressed concern since the first hearing

9    about what happened.  And as this case has progressed and

10   based on what I've heard today and the evidence that I was

11   able to review, those concerns continue to exist.  And I

12   think if someone's going to investigate the Debtor in this

13   case, it really has to be someone impartial, someone with no

14   connection from the InfoW cases, who represented a party in

15   interest.  And I believe that's the Subchapter 5 trustee who

16   is independent and remains independent.

17             Someone has to do the work, and the Bankruptcy

18   Code gives the answer.  It's the Subchapter 5 trustee.  I

19   won't rehash the concerns that I have.  You heard them

20   earlier.  For other reasons I stated earlier about the

21   concerns that I've had with disclosure, lack of candor

22   leading into this case, there is cause to expand the

23   Subchapter 5 trustee's duties under Section 1183(b)(2), to

24   include exactly what the code says, investigate the acts,

25   conduct, assets, liabilities, and financial condition of the

1    Debtor, the operation of the Debtor's business, and the

2    desirability of the continuation of the business.

3         I want to give the Subchapter 5 trustee some

4    guiding.  I think that includes investigating the

5    approximately $54 million security claim listed in favor of

6    PQPR Holdings Limited LLC described in Schedule D at Docket

7    Number 121, investigating Free Speech Systems credit card

8    processor, solely for any insider relationship.  That's what

9    I'm focused on, the inside, if there's any potential insider

10   relationship that I should be aware of or anything that

11   gives the Subchapter 5 trustee any concern.  Right?

12        There maybe -- I don't think at this stage, I

13   don't think there's a need to disclose who it is.  And if

14   there is, I want there to be real caution before that's

15   done.  But if there's an insider, that needs to be

16   disclosed.  I think there also -- there has also been much

17   discussion about the $61 million, maybe $62 million member

18   draw 2021 and $254,000 member draw 2022 listed in the Free

19   Speech Systems comparative balance sheet as of December 31,

20   2021 and May 31, 2022 attached to Mr. Schwartz's declaration

21   filed at Docket Number 10.

22        Under 1106(a)(4), the trustee is to get to work

23   and file a statement detailing her findings as soon as

24   practicable, as described under 1106(a)(4).  Look, I realize

25   that there are other pending motions filed by the Sandy Hook

1    families to appoint a tort claimants' committee and to

2    remove Free Speech as a debtor in possession.

3         I'm not ruling on any of those issues and I'm not

4    describing any of them now.  I may need to take up one of

5    them soon.  I also note, and I state for the record, it is

6    rare, I think, in Subchapter 5 cases for -- the need for a

7    Subchapter 5 trustee to hire counsel or professionals to

8    assist in the duties.  And I think this is the case where

9    it's required.  So Ms. Hazleton, I think you need to find --

10   you need to get a team.  And I'm telling you, I want folks

11   with no connection to any of these cases to assist you in

12   your work.  It looks like you've already found one person.

13        Let's start the process of retaining what you

14   need.  I've charged you to do work and I need you to do it

15   as quickly as possible, but you can't do it on your own.  So

16   no one should read this as a Subchapter 5 trustee and think

17   that you know, I should -- don't cite this case as the

18   reason that you need to hire counsel.  There may be other

19   reasons.  I just think this case is different for all the

20   above reasons.  And again, I'm not saying anything is wrong.

21   You may find all the investigations are proper and that you

22   don't find anything.  Fine with me.  File that and say that.

23        But there has to be greater transparency in this

24   case.  I understand that PQPR may want to have discussions

25   about what that means, but it's going to cost what it costs.

1    I'm just telling you now.  Right?  You can work on a budget,

2    but I'm charging the trustee to do the work, and it'll cost

3    what it costs.  And I understand that that may require

4    negotiations with a secured lender as to what that means and

5    we already have a hearing teed up where we can take all that

6    up.

7         I don't know -- and really -- what you see in my

8    face is really listening to what Mr. Battaglia said and

9    weighing on me.  I don't want to rule anymore.  That's

10   enough for me today.  I think people have a right to listen

11   to what I said.  I'll enter some orders today, and I'll say

12   for the reasons stated on the record.  I will say this and I

13   don't want -- yeah, I'll say this.

14        I understand that that's going to require some

15   questions as to where that leaves Shannon and Lee and Mr.

16   Schwartz in terms of you know, retention and the work that

17   they've done.  And I'll be looking to the Subchapter 5

18   trustee for guidance here, but there was good work done

19   here.  And I think Schwartz and Associates, right, helped

20   the process.  We've got cash collateral budgets in place and

21   there was folks who would answer phone calls.  From what I

22   hear, what Mr. Schwartz encountered -- and I don't want

23   anyone to leave thinking that I don't think they should be

24   compensated for -- for good work in this case.

25        The US Trustee is free to disagree with me on

 1    that.  And I'll be looking to guidance from the Subchapter 5

 2    trustee as to what I heard in my gut is right or if I should

 3    be concerned about something.  Everybody's rights are

 4    reserved on this.  I don't want anyone to think anything

 5    about these professionals.  I've ruled.  I didn't say

 6    anything about them.  It just talks about the ruling, the

 7    very difficult decision I had to make in this case.  That's

 8    it.  That's what it means to me.

 9          If it means something to anyone else, then you're

10    not paying attention to what I really said.  I have a great

11    amount of respect for people and the work that professionals

12    do in bankruptcy cases is not easy.  And I know that the

13    work that gets done when people aren't here across the

14    United States is difficult work.  It requires bankruptcy

15    lawyers.  Bankruptcy professionals have to balance a great

16    number of things.  The process is incredibly important as

17    well along the way.  Without process and without

18    transparency, people lose faith in the process.

19          And so standards must be satisfied to ensure that

20    the process can continue and people can have faith in the

21    process.  But also, right, Congress writes laws.  Judges

22    apply them as faithfully as possible.  And that's what I've

23    done today.  I wish everyone the best.  That's -- that's

24    enough for me today, folks.  You all have a good day.

25          Yes, sir.  Mr. Battaglia.

1          MR. BATTAGLIA:  Mr. Schwartz's deposition was set

2     pursuant to the cash collateral hearing for Friday.

3     Obviously, he won't be appearing.  There was a 30(b)(6)

4     deposition notice that we had other opposition to, but I

5     honestly have no idea who I can even present, so I have no -

6     -

7          THE COURT:  Yeah, I understand that.  And I

8     understand that.

9          MR. BATTAGLIA:  (Indiscernible).

10          THE COURT:  I understand that there are decisions

11     that I've made that may have consequences.  And everybody's

12     going to have to think about what I did today.

13          MR. BATTAGLIA:  I understand, Your Honor.  I just

14     (indiscernible) parties should know --

15

16          THE COURT:  No, no, I understand.  That's what --

17     I'm looking at them, so I -- you all need to think --

18     everybody needs to think about that.  So I agree.

19          MR. BATTAGLIA:  And there's a lot for me to sort

20     out in my own mind in terms of who I pick up the phone and

21     call about a business issue tomorrow.

22          THE COURT:  Yeah.

23          MR. BATTAGLIA:  I'm not sure who that'll be.  We

24     were already cooperating with the Sub-B trustee on

25     investigation issues, so that's fine.  We'll keep doing

 1    that.  I don't know what it means for me.  I will not

 2    continue to represent a -- I don't -- never run away from a

 3    representation --

 4           THE COURT:  I understand.

 5           MR. BATTAGLIA:  -- in my life.  But if I can't

 6    meet my obligations as counsel --

 7           THE COURT:  I understand.

 8           MR. BATTAGLIA:  -- (indiscernible) what it means.

 9    And I'll file appropriate pleadings if -- once I have some

10    time to digest this and figure out how we might be able to

11    move.

12           THE COURT:  I understand.

13           MR. BATTAGLIA:  Thank you.

14           THE COURT:  Have a good day, everyone.

15           CLERK:  All rise.

16           (Whereupon these proceedings were concluded at

17    6:32 PM)

18

19

20

21

22

23

24

25

```
1                         I N D E X

2

3                          RULINGS

4                                          Page      Line

5    Applications for Retention of Co-Counsel

6    and CRO DENIED                        228        9

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7    

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 23, 2022
```