| | |
|---|---|
| NO. X06-UWY-CV-18-6046436-S | ) SUPERIOR COURT |
| | ) COMPLEX LITIGATION |
| ERICA LAFFERTY, ET AL. | ) AT WATERBURY |
| | ) |
| v. | ) |
| | ) |
| ALEX EMRIC JONES, ET AL. | ) |
| | ) |
| NO. X06-UWY-CV-18-6046437-S | ) SUPERIOR COURT |
| | ) COMPLEX LITIGATION |
| WILLIAM SHERLACH | ) AT WATERBURY |
| | ) |
| v. | ) |
| | ) |
| ALEX EMRIC JONES, ET AL. | ) |
| | ) |
| NO. X06-UWY-CV-18-6046438-S | ) SUPERIOR COURT |
| | ) COMPLEX LITIGATION |
| WILLIAM SHERLAC, ET AL. | ) AT WATERBURY |
| | ) |
| v. | ) |
| | ) |
| ALEX EMRIC JONES, ET AL. | ) |
| | ) |

## AFFADAVIT OF W. MARC SCHWARTZ

I, W. Marc Schwartz, the Chief Restructuring Officer of Free Speech Systems, LLC ("FSS"), aver the following statements under penalty of perjury:

1.      I am the Chief Restructuring Officer for Free Speech Systems, LLC. Attached as Exhibit A hereto is my engagement agreement with FSS (the "Engagement Agreement").

2.      As set out in the Engagement Agreement, I have full managerial authority over FSS as set out in paragraph 8.01 of the Company Agreement of FSS (the "Company Agreement"). A copy of the Company Agreement referred to in the Engagement Agreement is attached hereto as Exhibit B.

3.      I am also a founder and the chairman of Schwartz Associates, LLC ("SALLC"). SALLC has been retained by FSS as its financial advisor to assist me in my duties as the Chief Restructuring Officer. I have control and supervisory authority over all employees of SALLC.

4.      In my role as Chief Restructuring Officer, I have access to all corporate records of FSS and control over all employees, contractors, and professionals of FSS. I have reviewed and analyzed these records in connection with, among other things, preparing the voluntary petition, schedules of assets and liabilities, and statement of financial affairs in FSS's chapter 11 bankruptcy case pending as case no. 22-60043 (the "Bankruptcy Case") before the United States Bankruptcy Court for the Southern District of Texas.

5.      Employees of SALLC have also reviewed and analyzed the records of FSS in connection with, among other things, preparing the voluntary petition, schedules of assets and liabilities, and statement of financial affairs in the Bankruptcy Case.

6.      In connection with the litigation pending before the Connecticut Superior Court against FSS (the "Connecticut Litigation"), I have searched the records of FSS for any management agreements between PQPR Holdings Limited, LLC ("PQPR") and FSS. My understanding of the term "management agreement" is a contract between the owner of a company and one or more persons responsible for managing the company. I have not found any such records and I am not otherwise aware of any management agreements between PQPR and FSS.

7.      I have also directed employees of FSS, attorneys representing FSS, and employees of SALLC involved in assisting me in my role as Chief Restructuring Officer of FSS to search for records of any management agreements between PQPR and FSS. These parties have informed me that they have not uncovered any such records and that they are not otherwise aware of any management agreements between PQPR and FSS.

8. I have been informed by FSS's counsel in the Connecticut Litigation that Alex Jones and Lydia Hernandez testified to seeing a management agreement between PQPR and FSS at some point in the past.

9. Notwithstanding the testimony of Mr. Jones and Ms. Hernandez, I do not believe that there is any such management agreement between PQPR and FSS. As the result of the search and my work with FSS, the only document that I am aware of that that Mr. Jones and Ms. Hernandez may have been referring to is the memorandum of understanding document attached in redacted form as Exhibit C (the "Payment MOA").

10. I do not consider the Payment MOA to be a "management agreement" based on my understanding of that term. Although FSS and PQPR are parties to the Payment MOA and the term "manager" and "management" is used therein, the Payment MOA does not concern management of either FSS or PQPR but rather payment of the proceeds of product sales.

Executed on: 9/8/22

W. Marc Schwartz

THE STATE OF TEXAS

COUNTY OF HARRIS

BEFORE ME, the affiant authority, this day appeared W. Marc Schwartz, who after being duly sworn, stated upon oath that the foregoing was true and correct. Sworn to before me this 8ᵗʰ day of September, 2022.



TRENA N. HOGGE
My Notary ID # 133264331
Expires August 12, 2025

NOTARY PUBLIC STATE OF TEXAS

## EXHIBIT A TO SCHWARTZ AFFIDAVIT

Engagement Agreement



**Schwartz** Associates

May 19, 2022

<u>**VIA EMAIL**</u>

Free Speech Systems, LLC
VIA EMAIL: rbattaglialaw@outlook.com

**Re: Engagement of Chief Restructuring Officer**

Gentlemen:

  This letter confirms that Alex E. Jones has delegated to W. Marc Schwartz of Schwartz Associates, LLC ("SALLC") those managerial duties under ¶ 8.01 of the Free Speech System, LLC's ("FSS") Company Agreement to act as its Chief Restructuring Officer (the "CRO"), as defined in this letter to advise and lead its restructuring efforts involving the scope described herein, potentially including a filing under the United States Bankruptcy Code (the "Bankruptcy Code"). This letter also confirms that FSS shall retain SALLC as its financial advisor ("FA") in connection with the restructuring efforts.

  SALLC understands that the purpose of the engagement is to continue stable operations while maximizing the values of FSS' assets, including negotiations with creditors of FSS and affiliates of FSS to assure that creditors of FSS have the best chance of recoveries on their claims. CRO will work to maximize returns and to assure a fair pro rata distribution to all unsecured creditors.

**I. Scope of Engagement**

  CRO will lead FSS' management and personnel through the restructuring process. It is agreed that CRO's authority may include, but not be limited to, the following:

1. Provide business and debt restructuring advice, including as it relates to business strategy and other key elements of the business;
2. Assist FSS with managing due diligence requests and other items that may be requested by its various constituents as part of the restructuring process;
3. Prepare cash flow forecasts and related financial and business models;
4. Identify and implement short and long-term liquidity initiatives;
5. Prepare Statements of Financial Affairs and Schedules, Monthly Operating Reports, and other similar regular Chapter 11 administrative, financial, and accounting reports required by the United States Bankruptcy Court ("Bankruptcy Court") as well as providing necessary testimony before the Bankruptcy Court on matters within CRO's areas of expertise;
6. Review inventory marketability and provide monetization alternatives as deemed appropriate;

1

**EXHIBIT**
**4**
tabbies®



**Schwartz**Associates

7. Make operational decisions, with advice of current ownership, directed to maximizing the value of FSS;

8. Implement cost containment measures;

9. Negotiate with creditors, prospective purchasers, equity holders, equity committees, official committee of unsecured creditors, and all other parties-in-interest;

10. Be in charge of all business decisions on behalf of FSS as necessary or required, utilizing CRO's business judgment in aid of the restructuring.

11. Execute all documents and take all other actions necessary to effectuate restructuring of FSS, including in any case before the Bankruptcy Court, subject to review and oversight by current ownership.

## II.    Indemnification

FSS agrees to indemnify, defend, and hold harmless CRO, individually, and SALLC, its subsidiaries or affiliates, the respective partners, directors, officers, agents, contractors, and employees of SALLC and each other person, if any, controlling SALLC or its affiliates (individually or collectively) from and against any and all losses, claims, damages, liabilities, or costs, as and when incurred, to which such party may become subject to or which are asserted against any party, directly or indirectly, in any way related to party while acting for FSS under this agreement including, without limitation, in connection with i) any act or omission by party related to engagement as FA or CRO under the Agreement or ii) Party's acceptance, performance or non-performance of obligations under said Agreement.

FSS will advance to the party amounts paid by the party for reasonable and documented legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages, or liabilities or any action in respect thereof, whether or not in connection with existing, pending or threatened litigation against the party; provided, however, that FSS shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found to have resulted from party's gross negligence, bad faith, willful misconduct, or a breach of this agreement and party shall no later than ten days after a determination of gross negligence, bad faith, willful misconduct, or breach of this agreement refund such amounts previously advanced by FSS. If, in the opinion of counsel, representing both parties in this matter covered by this indemnification creates a potential conflict of interest, the party may engage separate counsel to represent them at FSS' expense.



**Schwartz** Associates

### III.    Materials Provided

FSS agrees to provide SALLC with such financial and other available information as is reasonably required for SALLC to render the services performed or to be performed hereunder. SALLC agrees to review the information and identify any inaccuracies or omissions that are reasonably apparent on the face of the information provided.

### IV.    Work Product

SALLC shall not disclose any confidential or privileged information to any third party, subject to the following exceptions: (a) to SALLC's affiliates, vendors, or agents who provide services in connection with this engagement; (b) with Client's written consent; (c) when legally required to do so; or (d) if such information is available from public sources.

Any and all records of FSS obtained by SALLC will be promptly returned to FSS at the end of this Engagement.

### V.    Disclosures

FSS shall not disclose any work or analyses of SALLC or CRO to any third party (other than any direct or indirect equity holder of FSS) without prior written consent of CRO, which shall not be unreasonably withheld. Neither SALLC nor CRO shall disclose any information respecting the business, properties, books, and records of FSS except to professionals hired by FSS for purposes of this Engagement, unless subpoenaed by a court of competent jurisdiction.

SALLC cannot assure that, following the completion of our internal conflict search, an engagement for or involving your creditors or other parties-in-interest or their respective attorneys and accountants will not be accepted by SALLS, its subsidiaries or affiliates. Should any potential conflict come to the attention of SALLC, we will endeavor to resolve such potential conflict and will determine what action needs to be taken. You agree that you will comprehensively inform us of the parties-in-interest to this matter of or additions to, or name changes for, those parties-in-interest whose names you provided.

SALLC may have provided, currently provide, or provided in the future, services to FSS' creditors, other parties-in-interest, and their respective attorneys and accountants in matters or engagements unrelated to this Engagement. You agree that party shall not have responsibility to FSS relating to such professional services, nor any responsibility to use or disclose information SALLC possess by reason of such services, whether such information might, by itself or others, be considered material to FSS.

SALLC has performed an internal search for any such conflict of interest with respect to FSS, its officers, directors, creditors, and other parties and has found no conflicts of interest.

3



**Schwartz** Associates

## VI.    Term & Termination

This agreement shall remain in effect until the earlier of i. The completion of the winddown of FSS, ii. Execution of a comprehensive debt restructuring agreement, iii. Confirmation and completion of a liquidating Chapter 11 plan of reorganization, iv. SALLC or CRO's resignation, or vi. Termination of the agreement by either party upon seven (7) calendar days' written notice.

SALLC may terminate this agreement without notice if FSS fails to make payments when due hereunder.

## VII.   Compensation

For services provided described herein, SALLC shall be compensated for the services of CRO on an hourly fee basis of $690.00 per hour.

If, in CRO's sole judgment, it is determined that additional services are required to assist with the scope of this engagements as outlined by this Agreement, CRO may employ SALLC, which shall be compensated at the following hourly rates

| | |
|---|---|
| M. Christian Schwartz: | $470 per hour |
| Managers: | $350 per hour |
| Associates: | $280 per hour |
| Analysts: | $210 per hour |
| Administrative Staff | $95 per hour |

FSS shall be responsible for CRO's and SALLC's reasonable and necessary documented out-of-pocket costs and expenses incurred in connection with this engagement. SALLC will provide to FSS detailed documentation of all expenses incurred.

SALLC acknowledges that, should FSS seek relief under the Bankruptcy Code, and FSS apply for authorization to retain and employ CRO and SALLC, FSS' payment of CRO's and SALLC's fees and expenses shall be subject to Bankruptcy Court approval. The provisions of this paragraph shall not limit nor restrict the indemnification and contribution provisions set forth in this Agreement.

### A. Retainer

In order to commence the engagement, SALLC requires a retainer payment in the amount of $75,000.00 for the representation of FSS. SALLC must receive the retainer payment as well as the signed copy of this letter before the firm will take any action or be deemed to represent you. In the event that this agreement is terminated prior to incurring fees and expenses in excess of retainer amount, the balance shall be refunded to FSS within thirty days.



# **Schwartz** Associates

### B. Invoicing

Prior to filing bankruptcy, invoices reflecting the services of SALLC, including the services of CRO, shall be prepared and submitted monthly and paid no later than seven (7) business days thereafter. In the event that any portion of the retainer is used prior to the filing of bankruptcy, FSS shall replenish the retainer prior to filing bankruptcy. In case of a disputed invoice, Client agrees to pay undisputed portion of fees. Expense charges shall be submitted to FSS no later than 30 days after expense was incurred or immediately upon approval of Bankruptcy Court. For any recurring monthly charges, payment is to be made on the first day of each month. Upon filing bankruptcy, invoices shall be submitted and paid in accordance with the orders of the Bankruptcy Court.

### VIII. CRO's Counsel

Prior to commencing this engagement, FSS will fund a $20,000 retainer to be paid to SALLC so that SALLC can engage Michael Ridulfo of Kane, Russell Coleman Logan PC to serve as legal counsel to the CRO.

### IX. Authorization

FSS represents that this Agreement outlines the engagement and has been approved by its Board of Directors or managers (as appropriate) and that the individual that signs this Agreement on behalf of FSS has been duly authorized to do so, including express consent of the Board of Directors or Managers.

Further, it is acknowledged that future economic, operational performance or the confirmation success of a Chapter 11 plan of reorganization or Chapter 7 liquidation plan cannot be guaranteed. The monthly fees and related expenses to be paid by FSS to CRO and SALLC are not contingent upon the results of this engagement and neither CRO nor SALLC warrant or predict results or developments during the term of this engagement.

SALLC's maximum liability relating to services rendered under this letter (regardless of form of action, whether in contract, negligence, or otherwise) will be limited to the charges paid to SALLC for the portion of its services or work products giving rise to liability. In no event shall SALLC be liable for consequential, special, incidental, or punitive loss, damage or expense (including, without limitation, lost profits, opportunity costs, etc.) even if it has been advised of their possible existence.

Please acknowledge your agreement with the terms of this engagement letter and by signing and dating below. Once executed and the retainer is funded, a copy will be delivered to you via email. If you have any questions regarding this engagements letter, please call me at (832) 583-7021.

5



**Schwartz** Associates

Very truly yours,

W. Marc Schwartz

**CONFIRMED AND AGREED**

Free Speech Systems, LLC

By: _____

Date: _____

Invoices should be sent to:

Name: _____

Email: _____

6

## EXHIBIT B TO SCHWARTZ AFFIDAVIT

FSS Company Agreement

## COMPANY AGREEMENT OF
## FREE SPEECH SYSTEMS, LLC

THIS COMPANY AGREEMENT OF FREE SPEECH SYSTEMS, LLC, a Texas limited liability company (this "Agreement"), is dated effective November 16, 2007 (the "Effective Date"), by the undersigned initial Members (defined herein) and Managers (defined herein) of the Company.

1.     **Formation of the Company.**

  **1.01     Filing of Certificate of Formation.** The Certificate of Formation for the Company was filed with, and a certificate evidencing filing was issued by, the Secretary of State of the State of Texas on the Effective Date.

  **1.02     Initial and Additional Members.** The names and addresses of the initial Members of the Company are as set forth on Schedule A of this Agreement.  At the date hereof, there are no other Members of the Company and no other Person has any right to take part in the ownership or management of the Company. Additional Members of the Company shall be admitted only upon the approval of a Required Interest.

  **1.03     Term of the Company.** The Company shall exist for the duration specified in the Certificate of Formation (which may be perpetual), unless sooner terminated in accordance with this Agreement.  No provision of this Agreement (including, without limitation, the provisions of Section 10) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of any other member or Manager, for any purposes other than federal and state tax purposes.

2.     **Organization of the Company.**

  **2.01     Name of the Company.** The name of the Company is "Free Speech Systems, LLC."  The Managers may cause the Company to do business under one or more assumed names.

  **2.02     Registered Office.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.

  **2.03     Principal Office.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 101.501 of the TBOC.  The Company may have such other offices as the Managers may designate from time to time.

   **2.04** **Purpose.** The sole purpose of the Company shall be to operate such businesses as the Members choose from time to time and shall have all the specified rights, powers, and duties set forth in the TBOC.

   3.  **Definitions.**

   **3.01** **Certain Defined Terms.** The capitalized terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Section 3.01.

   **"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

   **"Agreement"** means this Agreement, including Schedule A, as originally executed and as subsequently amended from time to time.

   **"Capital Account"** means the Capital Account maintained for each Member pursuant to Section 4.04 of this Agreement.

   **"Capital Contribution"** means, as to any Member, the sum of the following: (i) the Member's Initial Capital Contribution; plus (ii) the Member's Additional Capital Contributions, if any. "Initial Capital Contributions" means, as to any Member, the contributions described in Section 4.01. "Additional Capital Contributions" means, as to any Member, the contributions described in Section 4.02.

   **"Certificate of Formation"** means the Certificate of Formation of the Company described in Section 1 of this Agreement, as may be amended from time to time by appropriate filing with the Secretary of State of Texas.

   **"Code"** means to the Internal Revenue Code of 1986, as it has been and may be amended.

   **"Company"** means Free Speech Systems, LLC, a Texas limited liability company, as such limited liability company may from time to time be constituted.

   **"Company Minimum Gain"** shall have the meaning of "partnership minimum gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

   **"Company Property"** or **"Company Properties"** means all interests, properties and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

"**Default Interest Rate**" means the rate per annum equal to the lesser of (i) the most recent prime rate as quoted in the Wall Street Journal, and (ii) the maximum rate permitted by applicable law.

"**Managers**" means, as of any date, the Person or Persons who are then managing the business of the Company in accordance with Section 8 of this Agreement.

"**Member Nonrecourse Debt**" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"**Member Nonrecourse Deductions**" has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"**Members**" means, as of any date, to the Persons who then own Percentage Interests in the Company.  The current Members are listed on Schedule A.

"**Membership Interest**" means, as of any date, a Member's share of the Company's income, gain, loss, deduction and credits and the right to receive distributions from the Company expressed by such Member's Percentage Interest, but does not include (i) the right of the holder thereof to participate in the management of the business or affairs of the Company, (ii) the right of the holder thereof to consent, approve, reject or disapprove any act of the Company, or (iii) the right of the holder thereof to be a Member.

"**Net Cash From Operations**" means the gross cash proceeds from the operations of the Company less the portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers. "Net Cash From Operations" shall not be reduced by depreciation, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition and the definition of "Net Cash from Sales or Refinancings."

"**Net Cash from Sales or Refinancings**" means the net cash proceeds of the Company from all sales and other dispositions of Company Property other than in the ordinary course of business (such as the sale or condemnation of all or a portion of the Property, a refinancing of all or a portion of the Property pursuant to a refinancing transaction or the receipt of casualty, litigation proceeds, or accelerated lease payments), less any portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers, and shall include all principal and interest payments with respect to any note or other obligation received by the Company in connection with such a capital transaction.

"**Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

**"Nonrecourse Liability"** has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

**"Percentage Interest"** means the interest of each Member in the Company as set forth opposite the Member's name on the attached Schedule A, as may be adjusted from time to time in accordance with the provisions of this Agreement.

"**Permitted Transferee**" means any of the following:

(1)     Alex Jones, Kelly Jones, and any of their descendants;

(2)     Any corporation, partnership, limited liability company, or other entity 100% of the beneficial ownership of which is owned by Permitted Transferees;

(3)     Any charitable foundation established by an individual referenced in (1) above; or

(4)     Any trust set up for the primary benefit of one or more of the individuals referenced in (1) above or for the benefit of a charitable foundation referenced in (3) above.

**"Person"** means any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, business trust, real estate investment trust, cooperative, association, trust, estate or other entity or organization.

**"Profits"** and **"Losses"** means the net book income or net book loss, as the case may be, of the Company determined in accordance with the principles for computing "book" income and "book" loss under Section 1.704-1(b)(2)(iv) of the Treasury Regulations; provided, however, that items of income, gain, loss, deduction and credit specially allocated pursuant to the provisions of Section 5.03 shall be excluded from the computation of Profits and Losses.

**"Required Interest"** means Members holding in aggregate fifty-one percent (51.00%) or more of the Percentage Interests then held by all Members.

**"Standard Rate"** means a per annum rate of interest equal to ten percent (10%), compounded annually.

**"Tax Distribution"** with respect to any Member for any taxable year of the Company, means an amount of cash equal to the product of (i) the Profit and items of income and gain (reduced by Losses plus any items of loss and deduction) allocated to such Member for such taxable year pursuant to Section 5 and (ii) the highest marginal effective federal income tax rate applicable to an individual in effect from time to time during such taxable year.

**"TBOC"** means the Texas Business Organizations Code, as it may be amended from time to time.

- 4 -

"**Treasury Regulations**" means those regulations promulgated under the Code.

"**Unrecovered Capital Contribution**" means, as of any day, a Member's Capital Contribution adjusted as follows: (i) increased by the amount of any Company liabilities which, in connection with distributions pursuant to Sections 6.02(b) and 10.04(b), are assumed by such Member or are secured by any Company Property distributed to such Member; and (ii) reduced by the amount of cash and the fair market value (as determined by the Managers) of any Company Property distributed to such Member pursuant to Sections 6.02(b) and 10.04(b) and the amount of any liabilities of such Member assumed by the Company or which are secured by any Company Property contributed by such Member to the Company. In the event any Person transfers all or any portion of his Membership Interest, the transferee shall succeed to the Unrecovered Capital Contribution of the transferor to the extent it relates to the transferred Membership Interest.

**3.02   Other Defined Terms.**  Other capitalized terms not defined in Section 3.01 shall have the meanings specified in the other sections of this Agreement.

4.      **Capital of the Company.**

**4.01   Initial Capital Contributions.** Each Member shall contribute to the capital of the Company the amount set forth as such Member's "Initial Capital Contribution" on Schedule A.

**4.02   Additional Capital Contributions.** The Managers may from time to time call upon the Members to make additional contributions to the capital of the Company pursuant to such terms and conditions as are specified by the Managers. The Members may (but shall not be required to) make Additional Capital Contributions to the Company. All Additional Capital Contributions shall be made within thirty (30) days after the Members have received notice thereof from the Managers. For purposes of this Agreement, "Additional Capital Contribution" means, as to any Member, such Member's pro rata share, based upon such Member's Percentage Interest, of the additional sums determined by the Managers to be required for the operation of the Company.

**4.03   Failure to Make Additional Capital Contributions.** If any Member fails to pay all or any portion of an additional assessment after due notice, then the Managers may recoup any deficiency by arranging for additional advances to be made by those Members that are willing to fund some portion of the deficiency, in such proportions as the Managers and the participating Members agree. In any event, if any funds are advanced hereunder on other than a pro rata basis, all such advances made by any Member hereunder (including each Member's pro rata advance) shall be considered loans to the Company and shall accrue interest at a per annum rate equal to the Standard Rate.

**4.04   Capital Accounts.** A Capital Account shall be established and maintained for each Member. It is the intention of the Members that the Capital Accounts be maintained in accordance with Section 1.704-1(b) of the Regulations. In that regard, each Member's Capital Account shall be:

(a)     Increased by:

(i)     The amount of money contributed by that Member to the Company;

(ii)     The fair market value of property or services contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to within the meaning of Section 752 of the Code); and

(iii)     Allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax, and

(b)   Decreased by:

(i)     The amount of money distributed to that Member by the Company;

(ii)     The fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to within the meaning of Section 752 of the Code);

(iii)     Allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code; and

(iv)     Allocations of Company loss and deduction (or items thereof).

A Member's Capital Account also shall be adjusted as provided in Treas. Reg. § 1.704-1(b)(2)(iv)(e) to reflect the distribution of property to a Member, and otherwise adjusted as required by Treas. Reg. § 1.704-1(b)(2)(iv) or 1.704-1(b)(4). On the transfer of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(l).

**4.05   Return of Capital Contributions; Company Property.** Except as otherwise provided herein or in the TBOC, no Member shall have the right to withdraw, or receive any return of, his Capital Contribution. No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts. Company Property shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Managers may determine. All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

5.    **Allocations.**

**5.01   Allocation of Profits.** After giving effect to the special allocations set forth in Section 5.03, Profits for each taxable year shall be allocated in the following order and priority:

- 6 -

(a)      First, to the Members in an amount equal to the excess, if any, of (i) the cumulative Losses allocated pursuant to Section 5.02(a)(ii) for all prior taxable years, over (ii) the cumulative Profits allocated pursuant to this Section 5.01(a) for all prior taxable years; and

(b)      Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

5.02    **Allocation of Losses.** After giving effect to the special allocations set forth in Section 5.03, Losses for any taxable year shall be allocated as set forth in Section 5.02(a), subject to the limitations in Section 5.02(b).

(a)      Losses for any taxable year shall be allocated in the following order and priority;

(i)      First, to the Members in accordance with their respective Percentage Interests in an amount equal to the excess, if any, of (A) the cumulative Profits allocated pursuant to Section 5.01(b) for all prior taxable years, over (B) the cumulative Losses allocated pursuant to this Section 5.02(a)(i) for all prior taxable years; and

(ii)      Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

(b)      The Losses allocated pursuant to Section 5.02(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 5.02(a), the limitation set forth in this Section 5.02(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

5.03    **Special Allocations.** The following special allocations shall be made in the following order:

(a)      Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Company Minimum Gain during any taxable year, each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.03(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)      Member Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company taxable year, each

Person who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Person's share of the net decrease in Company Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.03(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)      Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided that an allocation pursuant to this Section 5.03(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 5 have been tentatively made as if this Section 5.03(c) were not in this Agreement.

(d)      Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any taxable year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 5.03(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 5 have been tentatively made as if Section 5.03(c) and this Section 5.03(d) were not in this Agreement.

(e)      Nonrecourse Deductions. All Nonrecourse Deductions for any taxable year shall be specially allocated among the Members in proportion to their Percentage Interests.

(f)      Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

(g)      Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations, to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his Membership Interest, the

amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their respective Percentage Interests in the event that Section 1.704-1(b)(2)(iv)(m)(2) of the Treasury Regulations applies, or to the Member to whom such distribution was made in the event that Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations applies.

**5.04    Curative Allocations.** The allocations required by Section 5.03 and this Section 5.04 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations.   It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income gain, loss, or deduction pursuant to this Section 5.04.   Therefore, notwithstanding any other provision of this Section 5 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 5.01.

**5.05    Section 704(c) Allocations.** In accordance with Section 704(c) of the Code, income, gain, loss and deduction concerning any property contributed to the Company shall, solely for tax purposes, be allocated among the Members to take account of any variation between the adjusted tax basis of such property and the agreed fair market value of such property upon contribution. If the agreed fair market value of any Company asset is adjusted pursuant to this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset for federal income tax purposes and its adjusted fair market value in the same manner as under Section 704(c) of the Code. Allocations under this Section 5.05 are solely for purposes of federal income taxes and shall not affect or be taken into account in computing any Member's Capital Account.

**5.06    Other Allocation Rules.** In the event Members are admitted to the Company on different dates, the Profits or Losses allocated to the Members for each such taxable year during which Members are so admitted shall be allocated among the Members in proportion to the number and class of Interests each holds from time to time during such taxable year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Managers. Solely for purposes of determining a Member's proportionate share of the Company's "excess nonrecourse liabilities" within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, and solely for such purpose, the Member's Percentage Interest is specified to be his applicable Interest. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

**5.07    Allocations on Transfer.** Income, gain, loss, deduction or credit attributable to any Company interest which has been transferred shall be allocated between the assignor and the assignee as follows:

(a)    For the months prior to the transfer, to the assignor;

(b)    For the months subsequent to the transfer, to the assignee; and

(c)      For the month of the transfer, to the assignee if the transfer occurs on or before the 15th day of such month and to the assignor if occurring thereafter.

For purposes of the above allocation, income, gains, losses, deductions and credits shall be allocated equally among the months of the taxable year without regard to Company operations during such months.

6.      **Distributions.**

6.01    **Distributions of Net Cash from Operations.** Except as otherwise provided in Section 10, Net Cash from Operations, if any, shall be distributed to the Members within thirty (30) days after the end of each taxable year, in the following order and priority:

(a)      First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Operations distributed to a Member under this Section 6.01(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c) of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.01(a), and (ii) no such distribution of Net Cash from Operations shall be made pursuant to this Section 6.01(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business; and

(b)      Then, the balance, to the Members in accordance with their respective Percentage Interests.

6.02    **Distributions of Net Cash from Sales or Refinancings.** Except as otherwise provided in Section 10, Net Cash from Sales or Refinancings shall be distributed, within thirty (30) days following the receipt thereof, in the following order and priority:

(a)      First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Sales or Refinancings distributed to a Member under this Section 6.02(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c)of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.02(a), and (ii) no such distribution of Net Cash from Sales or Refinancings shall be made pursuant to this Section 6.02(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business;

(b)      Then, to the Members in an amount equal to their Unrecovered Capital Contributions, payable in proportion to the unpaid amounts thereof; and

(c)      Then, the balance, to the Members in accordance with their respective Percentage Interests.

6.03    **Amounts Withheld.** All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company, the Members and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in

respect of any Member or any Person owning an interest, directly or indirectly, in such Member shall be treated as amounts distributed to the Member with respect to which such amount was withheld pursuant to this Section 6.03 for all purposes under this Agreement. The Managers are authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law and shall allocate any such amounts to the Members with respect to which such amount was withheld.

7.    **Fiscal Matters; Books and Records.**

7.01    **Bank Accounts; Investments.**  Capital Contributions, revenues and any other Company funds shall be deposited by the Managers in a bank account established in the name of the Company, or shall be invested by the Managers in furtherance of the purpose of the Company.  No other funds shall be deposited into Company bank accounts or commingled with Company investments.  Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company purpose, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

7.02    **Records Required by TBOC; Right of Inspection.** During the term of the Company and for a period of four (4) years thereafter, the Managers, at the expense of the Company, shall maintain in the Company's principal office in the United States specified in Section 2 all records required to be kept pursuant to the TBOC. On written request stating the purpose, a Member or an assignee of a Member's Percentage Interest may examine and copy in person or by such Person's representative, at any reasonable time, for any proper purpose, and at such Person's expense, records required to be maintained under the TBOC.

7.03    **Books and Records of Account.**  The Managers, at the expense of the Company, shall maintain for the Company adequate books and records of account that shall be maintained on the method of accounting selected by the Managers and on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

7.04    **Tax Returns and Information.**  The Members intend for the Company to be treated as a partnership for tax purposes.  The Managers shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file.  Within the shorter of:  (a) such period as may be required by applicable law or regulation; or (b) seventy-five (75) days after the end of each calendar year, the Managers shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

7.05    **Tax Elections.**  The Company shall be treated as a partnership for federal income tax purposes and neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law.

7.06    **"Tax Matters Member."** The Managers designate Alex Jones as the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. The tax matters partner shall inform each other Member of all significant matters that may come to his attention in his capacity as "tax matters partner" by giving notice thereof on or before the fifth day after

becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.

8.    **Management of the Company.**

8.01    **Management.**   The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managers. The Managers shall have authority to cause the Company to do business in jurisdictions other than the State of Texas. Pursuant to the TBOC, the existence of the Company began upon the effective date of the Certificate of Formation.  The initial Manager of the Company shall be Alex Jones, and he shall serve in such capacity until such time as his successor or successors have been duly elected by the approval of a Required Interest.

8.02    **Powers of Managers/Delegation of Authority.**   The Managers shall have no power to cause the Company to do any act outside the purpose of the Company as set forth in Section 2.04.  Subject to the foregoing limitation and all other limitations in this Agreement, the Managers, shall have full, complete and exclusive power to manage and control the Company, and shall have the authority to take any action they deem to be necessary, convenient or advisable in connection with the management of the Company.

8.03    **Action by Managers.**   Unless otherwise expressly provided in this Agreement, at any meeting of the Managers, a majority (by number) of the Managers shall constitute a quorum for the transaction of business, and an act of a majority (by number) of the Managers who are present at such a meeting at which a quorum is present shall be the act of the Managers. A meeting of the Managers shall be held at the principal office of the Company upon five (5) days' notice. Any action that may be taken at a meeting of the Managers or any committee of the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all of those Persons entitled to vote at that meeting on the particular action, and such consent shall have the same force and effect as a unanimous vote of the Managers or such committee or designated group of Managers at a meeting duly called and held.  No notice shall be required in connection with the use of a written consent pursuant to this Section 8.

9.    **Membership in the Company.**

9.01    **Rights, Powers and Obligations of Members.** No Member (other than a Manager or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.  No Member (including any Member who is a Manager or officer) shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

9.02    **Action by Members.** Commencing with the calendar year next following the calendar year in which the Company was organized, annual meetings of the Members shall be held on the first Thursday of January at 10:00 a.m., local time. Special meetings of the Members may be called by resolution of a Required Interest upon five (5) days' notice, for the purpose of addressing any matter upon which the Members may vote under this Agreement. A Required Interest shall constitute (i) a quorum for the transaction of business, and (ii) the act of the Members. All meetings of Members shall be held at the principal office of the Company as provided in Section 2. Any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by

a Required Interest or Members holding in aggregate the Percentage Interests required to approve such action under the TBOC, the Certificate of Formation or this Agreement.

10.    **Restrictions Upon Membership Interests.**

   **10.01  Generally.**    The ownership and transferability of Interests in the Company are substantially restricted.  Neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred or encumbered except as otherwise set forth in this Agreement.  Capital is material to the business and investment objectives of the Company and its federal tax status.  An unauthorized transfer of a Member's Membership Interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure.  These restrictions upon ownership and transfer are not intended as a penalty, but as a method to protect and preserve existing relationships based upon trust and the Company's capital and its financial ability to continue its business.  Except as provided in this Agreement, neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred without the prior written approval of a Required Interest.

   **10.02  Authorized Transfers at Death.**  An individual Member may transfer all or any part of his Membership Interest at his death to a Permitted Transferee without obtaining the approval of a Required Interest.  In addition, a trust with an individual beneficiary who has a limited or unlimited testamentary power of appointment may transfer all or any part of its Membership Interest at the death of such individual to a Permitted Transferee without obtaining the approval of a Required Interest.  A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.02, shall become a Substituted Member without the approval of a Required Interest.

   The transfer may be accomplished pursuant to (1) the terms of the properly probated last will and testament of a Member; (2) the exercise of a limited or unlimited testamentary power of appointment; (3) the terms of any trust set up for the primary benefit of one or more Permitted Transferees; or (4) pursuant to an acknowledged assignment instrument, effective as of the date of the Member's death, delivered to and signed by the Manager prior to the death of the Member.

   If there has been no pre-arranged transfer as provided above, the executor, administrator, guardian, conservator, or legal representative of a deceased or incompetent Member may exercise all the deceased or incompetent Member's rights and powers necessary to settle the Member's estate or administer the Member's property.  However, the estate of a deceased or incompetent Member shall not have the right to become a Substituted Member without the approval of a Required Interest.

   **10.03  Authorized Estate Planning Transfers.**  An individual Member may make transfers of all or any part of his Membership Interest, with or without consideration, to a Permitted Transferee without obtaining the approval of a Required Interest.  In addition, a trust with an individual beneficiary who has a limited or unlimited right to make a disposition of all or any part of his interest in the trust during his lifetime may transfer all or any part of its Membership Interest to a Permitted Transferee with or without consideration, without obtaining the approval of a Required Interest.  A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.03, shall become a Substituted Member without the approval of a Required Interest.

**10.04  Nonrecognition of an Unauthorized Transfer.**  The Company will not be required to recognize the interest of any transferee or assignee who has obtained a purported Membership Interest as the result of a transfer or assignment that is not authorized by this Agreement (an "Unauthorized Transfer").  If there is doubt as to who owns a Membership Interest or who is entitled to distributions or to the proceeds upon liquidation of the Company, the Manager may accumulate such distributions or liquidation proceeds until the issue is resolved.

**10.05  Effect of Unauthorized Transfers.**  If a Member makes an Unauthorized Transfer of all or any part of a Membership Interest, the Company will have the unilateral option to acquire the interest of the transferee or assignee, or any fraction or part thereof (referred to in this Section 10.05 as the "Unauthorized Interest"), upon the following terms and conditions.

(a)     The Company will have the option to acquire the Unauthorized Interest by giving written notice to the transferee or assignee of its intent to purchase the Unauthorized Interest within ninety (90) days from the date it is finally determined that the Company is required to recognize the transfer or assignment of the Unauthorized Interest.

(b)     The valuation date for the determination of the purchase price of the Unauthorized Interest will be the first day of the month following the month in which such written notice is delivered.

(c)     Unless the Company and the transferee or assignee agree otherwise, the purchase price for the Unauthorized Interest shall be its fair market value as determined in the manner provided in Schedule B.

(d)     Closing of the sale will occur at the principal office of the Company at 10 o'clock a.m. on the first Tuesday of the month following the month in which the fair market value was finally determined in accordance with the provisions of Schedule B.

(e)     In order to reduce the burden upon the resources of the Company, the Company will have the option, to be exercised in writing delivered at closing, to pay its purchase money obligation in fifteen (15) equal annual installments (or in annual installments for the remaining term of the Company if less than fifteen (15) years) with interest at the Default Interest Rate.  The first installment of principal, with interest, will be due and payable on the first day of the calendar year following closing, and subsequent annual installments, with accrued interest, will be due and payable on the first day of each succeeding calendar year until the entire amount of the obligation is paid.  The Company will have the right to prepay all or any part of the purchase money obligation at any time without penalty.

(f)     Upon the approval of a Required Interest, other than the Member whose interest is to be acquired, the Manager may assign the Company's option to purchase to one or more of the remaining Members and when done, any rights or obligations imposed upon the Company will instead become, by substitution, the rights and obligations of such Members.

(g)     Neither the transferee or assignee of an Unauthorized Interest or the Member causing the transfer or assignment, will have the right to vote on Company matters during the prescribed option period.

**10.06  Deemed Unauthorized Transfers.**  In the event that any of the following events occur with respect to a Member, such Member will be deemed to have made an

Unauthorized Transfer of his Membership Interest, and the provisions of Section 10.05 will apply:

(a)     the assignment of all or any part of a Member's Membership Interest for the benefit of creditors;

(b)     the Bankruptcy of a Member;

(c)     the appointment of a receiver for all or substantially all of the assets of a Member;

(d)     the levy of an attachment, sequestration, garnishment, or charging order against all or any part of a Member's Membership Interest; or

(e)     a purported transfer or encumbrance by operation of law or otherwise of all or any part of a Member's Membership Interest, except as expressly permitted under this Agreement.

### 10.07   Admission of Substituted Members.

(a)     Except as otherwise provided in Sections 10.02 and 10.03 of this Agreement, no assignee of all or any part of a Membership Interest shall have the right to become a Substituted Member except with the approval of a Required Interest, the granting or denying of which consent shall be in the sole discretion of those constituting the approval of a Required Interest, and, if granted, may be granted subject to whatever conditions, if any, those constituting the approval of a Required Interest may require.   Notwithstanding any other provision of this Agreement, in no event may an assignor of all or any part of a Membership Interest make or enter into an agreement, oral or written, with an assignee or potential assignee of such interest under which the assignor agrees to exercise its residual rights in the Company at the discretion or instruction of any assignee of such interest, and any such purported agreement shall be null and void.

(b)     Notwithstanding any granting of the approval of a Required Interest under paragraph (a) of this Section 10.07, and notwithstanding the provisions of Sections 10.02 and 10.03, the admission of an assignee as a Substituted Member shall be further conditioned as follows:

(i)     the assignment instrument and such other instruments as the Managers may deem necessary or desirable to effect the admission of the assignee as a Substituted Member being in form and substance satisfactory to the Managers;

(ii)     the assignor and assignee executing such other instrument or instruments as the Managers may deem necessary or desirable to effectuate such admission;

(iii)     the assignee and the assignee's spouse (if any) accepting and adopting in writing all the terms and provisions of this Agreement, as the same may have been amended;

(iv) the assignee and/or the assignor paying or obligating themselves to pay all reasonable expenses connected with such admission (as determined by the Managers, but which the Managers shall have the right to waive), including, but not limited to, the cost of the preparation, filing, and publishing of any appropriate documents; and

(v) such other conditions as the Managers may reasonably impose.

(c) In the event that an assignee seeking to become a Substituted Member under this Section 10.07 is an assignee of all or any part of a Membership Interest of a Manager, then all decisions in this Section 10.07 are to be made by the other Manager(s), if any, or if there is no other Manager, then by a Unanimity of Interest of the Members.

**10.08 Status of a Substituted Member.** A "Substituted Member" is an assignee of all or any part of a Membership Interest admitted to all the rights and subject to all of the obligations of a Member in the Company. Any such Substituted Member shall be treated as a Member. In the event an assignee becomes a Substituted Member, such Substituted Member shall be deemed to have received its interest in the Company from the Member who assigned such interest, and will have the same rights to receive distributions and to be allocated tax items as the Member with respect to which such assignee is becoming a Substituted Member.

**10.09 Assignee of a Membership Interest.** Any person or entity who acquires all or any part of a Membership Interest and who has not been admitted as a Substituted Member shall be entitled to receive Company distributions attributable to such Interest, but shall have no voting or managerial rights.

**10.10 Membership Interest Pledge or Encumbrance.** No Member may grant a security interest in or otherwise pledge, hypothecate, or encumber all or any part of his Membership Interest or such Member's distributions without obtaining the approval of a Required Interest. It is understood that the Members are under no obligation to give consent nor are they subject to liability for withholding consent.

11. **Dissolution and Winding Up.**

**11.01 Events Causing Dissolution.** The Company shall be dissolved upon the first of the following events to occur: (a) the expiration of the term of duration of the Company, if any, set forth in the Certificate of Formation; (b) the written consent of a Required Interest at any time to dissolve and wind up the affairs of the Company; or (c) the occurrence of any other event that causes the dissolution of a limited liability company under the TBOC.

**11.02 Winding Up.** If the Company is dissolved pursuant to Section 11.01, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a) Appointment of Liquidator. The winding up of the Company's affairs shall be supervised by a Liquidator. The Liquidator shall be the Managers or, if the Members prefer, a liquidator or liquidating committee selected by a Required Interest.

(b) Powers of Liquidator. In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, for and on behalf of the Company: (i)

to prosecute and defend civil, criminal or administrative suits; (ii) to collect Company assets, including obligations owed to the Company; (iii) to settle and close the Company's business; (iv) to dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions; (v) to pay all reasonable selling costs and other expenses incurred in connection with the winding up out of the proceeds of the disposition of Company Property; (vi) to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; (vii) to distribute any remaining proceeds from the sale of Company Property to the Members; (viii) to prepare, execute, acknowledge and file articles of dissolution under the TBOC and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and (ix) to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Managers under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions. The Liquidator (if not the Managers) shall not be liable as a Manager to the Members and shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in the Certificate of Formation.

**11.03  Compensation of Liquidator.** The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and a Required Interest.

**11.04  Liquidation.** Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

(a)  First, to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company distributions), of the Company, whether by payment or establishment of reserves; and

(b)  Then, to the Members, in accordance with, and in the ratio of, the positive balances in their respective Capital Accounts.

The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group.  If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Percentage Interests of each Member in such group.

**11.05  Final Report.** Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to Section 11.04.

**11.06  Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, and notwithstanding that the deficit, if any, in the Capital Account of any Member results from or is

- 17 -

attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## 12. Miscellaneous.

**12.01 Notices.** All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, registered or certified with return receipt requested, or (ii) hand delivered to the intended addressee. Notice so mailed shall be effective upon the expiration of three (3) days after its deposit and notice given by hand delivery shall be effective upon actual receipt by the addressee. For purposes of notice, the addresses of the Members shall be as set forth under their respective names on the attached Schedule A; provided, however, that each Member shall have the right to change his address for purposes of notice hereunder to any other physical address by the giving of thirty (30) days' notice to the other Members in the manner set forth above.

**12.02 Governing Law.** This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Texas. In particular, this Agreement is intended to comply with the requirements of the TBOC and the Certificate of Formation. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the TBOC or any provision of the Certificate of Formation, the TBOC and the Certificate of Formation, in that order of priority, will control.

**12.03 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

**12.04 Amendment.** Except as expressly provided herein, this Agreement may be amended only by action of a Required Interest.

**12.05 Construction; Headings.** The Article and Section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section. Whenever required by the context, as used in this Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

**12.06 Creditors Not Benefited.** Nothing in this Agreement is intended to benefit any creditor of the Company or a Member. No creditor of the Company or a Member will be entitled to require the Managers to solicit or accept any loan or additional capital contribution for the Company or to enforce any right which the Company or any Member may have against a Member, whether arising under this Agreement or otherwise.

**12.07 Arbitration.** Any controversy, claim or dispute arising out of or relating to this Agreement or any other agreements referred to herein, shall be settled by binding arbitration in Austin, Travis County, Texas. Such arbitration shall be conducted in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association

("AAA"), with the following exceptions if in conflict: (a) one arbitrator shall be chosen by AAA; (b) each party to the arbitration will pay its pro rata share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any party if written notice (pursuant to the AAA's rules and regulations) of the proceedings has been given to such party. The parties agree to abide by all decisions and awards rendered in such proceedings.  Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief or other equitable relief.  The arbitrator shall not have the right to award punitive damages or speculative damages to either party and shall not have the power to amend this Agreement.  The arbitrator shall be required to follow applicable law. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO.

**12.08  Entire Agreement.** This Agreement (including the heading on the first page hereof), the schedules and exhibits attached hereto and specifically referenced herein, collectively contain the entire agreement among the Members relating to the subject matter hereof and all prior agreements relative hereto which are not contained herein are terminated.

This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document.

**[Signature Page Follows]**

EXECUTED to be effective as of the Effective Date.

**Members:**

_____
Kelly Jones

_____
Alex Jones

**Managers:**

_____
Alex Jones

## SCHEDULE A

### Names, Addresses, Initial Capital Contributions and Percentage Interests

| Members: | Initial Capital Contributions: | Percentage Interest: |
|---|---|---|
| Kelly Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas 78746 | $51.00 | 51% |
| Alex Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas 78746 | $49.00 | 49% |
| Totals: | $100.00 | 100.00% |

## SCHEDULE B

## DETERMINATION OF FAIR MARKET VALUE
## OF MEMBERSHIP INTEREST

In the event a determination of the fair market value of all or any part of a Membership Interest is required pursuant to the terms of this Agreement, the following provisions shall apply.

A. The fair market value of all or any part of a Membership Interest shall be the price at which the interest would change hands between a willing seller and a willing buyer, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts, including, but not limited to, all facts relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held entity interests which may not be withdrawn before the end of the term of the Company.

B. Purchaser and Seller shall first attempt to determine the fair market value of the affected Membership Interest or any part thereof (the "Affected Interest") by agreement. If Seller and Membership are unable to agree on the fair market value of the Affected Interest within fifteen (15) days after Purchaser has notified Seller of its intent to purchase the Affected Interest, each of Seller and Purchaser shall, within the period of an additional fifteen (15) days, name a qualified appraiser and supply the name of such appraiser to the other party. If either Seller or Purchaser fails to appoint an appraiser, the determination of the fair market value of the Affected Interest shall be made by the sole appraiser appointed. Within the period of thirty (30) days after the appointment of the second appraiser, the two appraisers shall separately determine the fair market value of the Affected Interest and shall provide copies of their written reports to each of Seller and Purchaser. If the difference between the two appraisal reports is ten percent (10%) or less (the higher report being less than the lower report multiplied by 1.01) the average of the appraisals shall conclusively determine the fair market value of the Affected Interest. If the difference between the two appraisal reports is greater than ten percent (10%), the two appraisers shall appoint a third appraiser who shall select between the two appraisal reports as to the fair market value of the Affected Interest, and the opinion of the third appraiser shall be conclusive of the fair market value of the Affected Interest.

C. For purposes hereof, an appraiser shall be "qualified" if he would be considered an expert for purposes of giving testimony as to the fair market value per Interest in the Company in a judicial or similar proceeding. The costs and expenses of the appraiser selected by Seller or Purchaser shall be borne by the party selecting the appraiser. The costs and expenses of a common appraiser shall be borne equally by the Seller and Purchaser.

D. During the period of time that a determination of the fair market value of the Affected Interest is being conducted pursuant to the procedures set forth in this Schedule B, all time periods for notice or exercise of any rights related to the purchase shall be suspended. Upon the final determination of fair market value, all time limits shall automatically commence.

**EXHIBIT C TO SCHWARTZ AFFIDAVIT**

Payment MOA

# Memorandum of Understanding

This Memorandum of Understanding is between ███████████ as Manager, and Free Speech Systems LLC (FSS) and PQPR Holdings LLC (PQPR).

It is agreed that ███████████ will manage all credit card transactions on behalf of FSS and PQPR. ███████████ will perform daily settlements as follows:

    A. ███████████ will first pay the Merchant Account fees as charged by credit card processors.

    B. After deducting credit card processing, remaining funds will be allocated as follows:

    C. funds will be allocated firstly 10 percent to ███████████ for its Services.

    D. Next, 80 percent of the sales of PQPR products will be allocated to PQPR.

    E. ███████████ will pay the sum of $11,000 per calendar day and remit to PQPR Holdings LLC as payment on its prior outstanding balances.

    F. Any remaining funds will be paid to FSS.

This agreement is effective October 6, 2021

Signed:

_____

Free Speech Systems LLC

_____

PQPR Holdings LLC

_____

████████████████