**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22--60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

**DEBTOR'S PLAN OF REORGANIZATION UNDER**
**SUBCHAPTER V OF THE BANKRUPTCY CODE**

## <u>INTRODUCTION</u>

Free Speech Systems, LLC**,** the Debtor and Debtor-in-Possession, in the above-captioned Chapter 11 Case, proposes the following Plan of Reorganization. As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority of payments as provided in the Bankruptcy Code, states whether each Class of Claims or interests is impaired or unimpaired and provides the treatment each Class will receive under the Plan.

## <u>SUMMARY OF THE PLAN</u>

The following is a brief description and summary of this Plan.

Under this Plan, the Debtor anticipates paying holders of Allowed Claims 100% of their Allowed Claims. With the exception of the certain holders of Contingent and Unliquidated Unsecured Claims and the Unsecured Deficiency Claim of PQPR, the Plan proposes to pay the holders of all other Allowed Classes of creditors, including Class 3-A "Unsecured Claims" of Trade Creditors 100% of their Allowed Claims. The Debtor also anticipates resolving its Claims against all the Disputed Claimants through the Plan, or, to the extent such parties vote against or object to the Plan, reserving and pursuing its objections and Causes of Action against those parties.

Allowed Claims will be paid in the order of priority established by the Bankruptcy Code from Distributable Funds, plus any additional proceeds from the recoveries by the Reorganized Debtor, net of fees and expenses, from Retained Causes of Action and recoveries by the Disbursing Agent, net of her fees and expenses, and the Retained Causes of Action Costs.

Provided that all other applicable requirements of subchapter V of chapter 11 the Bankruptcy Code are met, the Plan may be confirmed even if every class of impaired claims does not accept the Plan. <u>See</u> Bankruptcy Code § 1191(b). However, the Debtor hopes to achieve consensual confirmation under § 1191(a) of the Code.

The Debtor submits that a consensual plan is preferable for at least the following reasons: (a) it will reduce Administrative Expenses, including the fees of the Subchapter V Trustee and the Debtor's Professionals, which should result in an increase in the amounts paid to holders of

Allowed Claims; and (b) it should reduce the amount of time required to achieve confirmation of the Plan, thus expediting the date on which distributions under the Plan will commence.

> ALL INTERESTED PARTIES SHOULD READ THIS DOCUMENT CAREFULLY AND DISCUSS IT WITH THEIR LEGAL AND FINANCIAL ADVISORS.

> THE PLAN MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE PLAN, YOU SHOULD IMMEDIATELY CONTACT THE DEBTOR TO RESOLVE THE DISPUTE. IF YOU AND THE DEBTOR CANNOT AGREE, YOU MUST FILE AND SERVE ANY OBJECTION ON OR BEFORE THE DEADLINE SET BY THE COURT AND INDICATED IN THE NOTICE OR ORDER ACCOMPANYING THIS PLAN. IF YOU DO NOT FILE A TIMELY RESPONSE, THE PLAN MAY BE APPROVED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE PLAN AND HAVE NOT REACHED AN AGREEMENT WITH THE DEBTOR, YOU MUST ATTEND THE CONFIRMATION HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE BANKRUPTCY COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY CONFIRM THE PLAN AT THE HEARING.

> REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.

## ARTICLE 1
## DEFINITIONS AND RULES OF CONSTRUCTION

1.1.    **Definitions.** Applicable definitions contained in the Bankruptcy Code are incorporated into the Plan except as modified in this Article 1. The following definitions shall have the meanings as specified herein, and shall be designated, when such special definitions are applicable, with capital letters, and these definitions shall be enforceable as terms of the Plan in conjunction with the respective matters to which they reference or define:

1.1.1.    "Administrative Expense Claim" or "Administrative Claim" means any right to payment constituting a cost or expense of administration of the Chapter 11 Case pursuant to Bankruptcy Code §§ 503(b) or 507, including, without limitation (a) any fees or charges assessed against the Debtor's Estate under 28 U.S.C. § 1930, and (b) other Administrative Expense Claims as may be ordered and Allowed by the Bankruptcy Court.

1.1.2.    "AEJ" or "Jones" means Alex E. Jones, an individual residing in the State of Texas.

1.1.3.    "Allowed" or "Allowed Claim" means: (a) a Claim that: (i) has been listed by the Debtor in its Schedules as other than disputed, contingent or unliquidated; and (ii) is not otherwise a Disputed Claim; (b) a Claim (i) for which a Proof of Claim or request for payment of Administrative Expense Claim has been filed by the applicable Bar Date, or otherwise has been deemed timely filed under applicable law; and (ii) that is not otherwise a Disputed Claim; or (c) a Claim that is allowed: (i) in any stipulation executed by the Claim Holder and the Debtor, Reorganized Debtor, or Subchapter V Trustee as applicable; (ii) in a Final Order; or (iii) pursuant

to the terms of the Plan.  Except as otherwise specified in the Plan or any Final Order of the Bankruptcy Court, and except for any Claim that is Secured by property of a value more than the principal amount of such claims, the amount of an Allowed Claim shall not include any attorneys' fees, costs, penalties, or interest on such Claim occurring or incurred from and after the Petition Date.

1.1.4.  "Avoidance Actions" means causes of action arising under chapter 5 of the Bankruptcy Code or under related state or federal statutes or common law, including fraudulent conveyance laws, whether litigation has been commenced to prosecute such causes of action which are expressly preserved for the Estate hereunder.

1.1.5.  "Ballot" means the form or forms distributed to each holder of an impaired Claim entitled to vote on the Plan on which the holder indicates acceptance or rejection of the Plan.

1.1.6.  "Bankruptcy Estate" means the estate created pursuant to 11 U.S.C. § 541 with respect to the Debtor.

1.1.7.  "Bankruptcy Code" or "Code" means Title 11, United States Code, Section 101 *et. seq.*, in effect on the Filing Date, and all amendments thereto and in effect on or before the Confirmation Date, or thereafter to the extent such amendments are retroactive.

1.1.8.  "Bankruptcy Rules" and "Rule" mean collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, in effect on the Filing Date, and all amendments thereto and in effect on or before the Confirmation Date, or thereafter to the extent such amendments are retroactive.

1.1.9.  "Bar Date" means the applicable bar date by which a Proof of Claim or request for payment of an Administrative Expense Claim must be or must have been filed, as established by the Notice of Chapter 11 Bankruptcy Case [ECF No. 53] or the Confirmation Order.

1.1.10.  "Business Day" means a day other than a Saturday, Sunday, or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

1.1.11.  "Cash" means legal tender of the United States of America or its equivalent in immediately available funds.

1.1.12.  "Causes of Action" shall mean, without limitation, all actions, causes of action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown, in law, equity or otherwise, including, without limitation, Avoidance Actions.

1.1.13.  "Chapter 11 Case," "Case," or "Bankruptcy Case" means the case under chapter 11 of title 11 of the United States Code pending as *in re Free Speech Systems LLC.*, Case No. 22-60043, commenced on July 29, 2022, in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division, and later transferred to the Houston Division.

1.1.14.  "Claim(s)" means a "claim" against the Debtor, as defined in Bankruptcy Code § 101(5).

1.1.15. "Claim Objection Deadline" means the later of (a) sixty (60) days after the Effective Date, (b) sixty (60) days after the Bar Date, and (c) such later date as may be ordered by the Bankruptcy Court pursuant to a motion filed prior to the expiration of such sixty (60) day period.

1.1.16. "Class" or "Classification" means the class designated in the Plan, pursuant to Bankruptcy Code §§ 1122 and 1129, into which the Claims of all Creditors or Equity Interests have been segregated for purposes of voting and distributions.

1.1.17. "Class __ Claim(s)" or "Class __ Interest(s)" means the Class of Claims or Interests described in Section 3.3 of the Plan.

1.1.18. "Collateral" means any Property or interest in Property of the Estate which is subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code, disallowance under Bankruptcy Code § 506, or is otherwise invalid under the Bankruptcy Code or applicable state law.

1.1.19. "Confirmation" or "Confirmation of the Plan" means the approval of this Plan by the Bankruptcy Court at the Confirmation Hearing.

1.1.20. "Confirmation Date" means the date on which the clerk dockets a Confirmation Order determining that the Plan meets the requirements of subchapter v of the Bankruptcy Code, which order has been previously entered by the Court.

1.1.21. "Confirmation Hearing" means the hearing(s) which will be held before the Bankruptcy Court in which the Debtor will seek Confirmation of this Plan.

1.1.22. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

1.1.23. "Contingent or Unliquidated Claim" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court on or before the applicable Bar Date, but which:(a) was not filed in a sum certain; or (b) is contingent upon any event or condition which has not occurred and/or is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed by a Final Order.

1.1.24. "Court" or "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, presiding over the Chapter 11 Case, or, if necessary, the United States District Court for the District and Division having original jurisdiction over the Chapter 11 Case.

1.1.25. "Creditor(s)" means all creditors of the Debtor holding Claims for debts, liabilities, demands or Claims of any character whatsoever, as defined in Bankruptcy Code § 101(5).

1.1.26. "Cure Claim" means any Claim based upon the Debtor's default under any Executory Contract to which the Debtor was a party on the Filing Date that has been or will be assumed under Bankruptcy Code § 365 or pursuant to the Plan.

1.1.27. "Debtor" or "Debtor in Possession" means Free Speech Systems, LLC prior to the Effective Date.

1.1.28. "Deficiency Claim" means, with respect to a Secured Claim, the amount by which the Allowed Claim exceeds the sum of (i) any set off rights of the holder of such Claim against the Debtor under Bankruptcy Code §§ 506 and 553 and (ii) the net proceeds realized from the disposition of the Collateral securing such Claim or, if such Collateral is not liquidated, the value of the interests of the holder of the Claim in the Debtor's interest in the Collateral securing such Claim, as determined by the Bankruptcy Court in accordance with Bankruptcy Code § 506;

provided, however, that if the holder of such Claim makes the election provided for in Bankruptcy Code § 1111(b)(2), there shall be no Deficiency Claim in respect of such Claim.

1.1.29.    "Disallowed" means, with respect to a Claim, Interest, Administrative Expense Claim, or portion thereof, that it is determined by a Final Order that the Claim, Interest, Administrative Expense, or portion thereof is not allowed under Bankruptcy Code §§ 502 or 503.

1.1.30.    "Disbursing Agent" means the Subchapter V Trustee.

1.1.31.    "Disbursing Agent Costs" means the Post-Effective Date Subchapter V Trustee Compensation and the post Effective Date fees and expenses incurred by the Subchapter V Trustee arising out of or relating to performance of obligations under this Plan together with Retained Causes of Action Costs.

1.1.32.    "Disposable Income" shall mean the average quarterly "disposable income" of the Debtor as defined in and calculated pursuant to the requirements of section 1191(d)(2) of the Bankruptcy Code, which is and shall be for the purpose of this Plan and the duration of the Plan Period, the amount shown on the attached "Exhibit A".

1.1.33.    "Disputed Claim" means (a) a Claim, Interest or Administrative Expense that is subject to a pending objection; or (b) until the Objection Deadline:

- a Claim for which a corresponding Claim has not been listed in the Debtor's Schedules or for which the corresponding Claim is listed in the Debtor's Schedules with a differing amount, with a differing classification, or as a disputed, contingent, or unliquidated Claim;

- a Claim which a Debtor in good faith believes is held by a holder either (i) from which property is recoverable by the applicable Debtor under any of Bankruptcy Code §§ 542, 543, 550 or 553 or (ii) that is a transferee of a transfer avoidable under Bankruptcy Code §§ 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) unless the holder has paid the amount, or turned over any such property for which such holder is liable under the terms of Bankruptcy Code §§ 522(i), 542, 543, 550, or 553; and/or

- an Interest for which a corresponding Interest has not been listed in the Debtor's List of Equity Interests or has been listed in a different number (to the extent of such difference).

1.1.34.    "Disputed Claim Reserve Account" means the Cash bank accounts to be established pursuant to Section 9.4 of the Plan, into which the Reorganized Debtor or the Disbursing Agent, as the case may be, shall deposit the payments attributable to that Class Claimant under the Plan pending allowance of the Claim.

1.1.35.    "Disputed Lien" shall mean a Lien which is the subject of a pending Avoidance Action or any other type of judicial challenge to the validity, priority or enforceability of the Lien, whether prosecuted by the Debtor or another party-in-interest and whether filed in the Bankruptcy Court or another court of competent jurisdiction.  Independent of and in addition to the foregoing, if the Claim secured by a Lien is a Disputed Claim, the Lien shall be considered a "Disputed Lien" unless and until the Claim is Allowed.

1.1.36. "Distribution Date" shall mean fourteen (14) days after the last day of each full Quarter following the Effective Date, up to and including the Final Distribution Date, or if the fourteenth day following the last day of any Quarter is not a Business Day, the first Business Day immediately thereafter.

1.1.37. "Distributable Funds" shall mean the aggregate total of; (i) the Debtor's projected Disposable Income, determined as of the date of this Plan, for the period beginning on the Initial Distribution Date and ending on the twentieth Quarterly Distribution Date, (ii) any recoveries from Retained Causes of Action, net of Disbursing Agent Costs.

1.1.38. "Effective Date" means the first Business Day following fourteen (14) days after the Confirmation Date on which all conditions to the effectiveness of this Plan specified in Article 8 have been met or waived.

1.1.39. "Equity Interest(s)" or "Interest(s)" means all the membership interest in the Debtor.

1.1.40. "Estate" means the estate created pursuant to Bankruptcy Code §§ 541 and 1186 by the commencement of the Chapter 11 Case.

1.1.41. "Executory Contract" shall have the meaning assigned in Bankruptcy Code § 365.

1.1.42. "Filing Date" or "Petition Date" means July 29, 2022, the date upon which the Chapter 11 Case was commenced as a voluntary case under chapter 11 of the Bankruptcy Code.

1.1.43. "Final Decree" means the order of the Court entered after the Plan is substantially consummated which closes the Chapter 11 Case.

1.1.44. "Final Distribution Date" shall mean the earlier of (A) the Distribution Date immediately prior to, or substantially contemporaneous with, the filing of notice of substantial consummation pursuant to section 1183(c)(2) of the Bankruptcy Code, or (B) the twentieth Quarterly Distribution Date.

1.1.45. "Final Order" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a stay, new trial, reargument or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to Bankruptcy Code §§ 502(j) or 1144, Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.1.46. "FSS" means Free Speech Systems, LLC, a Texas limited liability company.

1.1.47. "General Unsecured Claim" means an Unsecured Claim that is not an Administrative Expense Claim, Priority Tax Claim, or Priority Claim.

1.1.48.    "Impaired Class" and "Unimpaired Class" shall have the meaning described in Bankruptcy Code § 1124.

1.1.49.    "Initial Distribution Date" shall mean and refer to the Distribution Date first occurring after the Effective Date.

1.1.50.    "Interim Distribution Date" shall mean each Distribution Date other than the Final Distribution Date.

1.1.51.    "Lien" has the meaning set forth in Bankruptcy Code § 101(37)*, except that* a Lien that has been avoided in accordance with sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien.

1.1.52.    "Non-Ordinary Course Administrative Expense Claim" means Administrative Expense Claims that are (a) Professional Fee Claims; (b) held by the Subchapter V Trustee; and (c) any liability of the Debtor arising for any breach of contract, breach of duty of care, commission of tort, or violation of law or regulation as the by the Debtor, its agents, or any other party for which the Debtor is directly or vicariously liable occurring after the Filing Date and before the Effective Date.

1.1.53.    "Objection Deadline" means the deadline for Reorganized Debtor or the Subchapter V Trustee to file objections to Claims with the Bankruptcy Court established in Article 9 of this Plan.

1.1.54.    "Ordinary Course Administrative Expense Claims" means Administrative Expense Claims that are not Non-Ordinary Course Administrative Expense Claims.

1.1.55.    "Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, or entity of whatever nature.

1.1.56.    "Petition Date" shall mean July 29, 2022.

1.1.57.    "Plaintiffs' TUFTA Suit" means *Neil Heslin, Scarlet Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine vs. AEJ, Infowars LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-22-001610 in the 200th District Court of Travis County, Texas, removed to the Bankruptcy Court and pending as Adversary Proceeding #: 22-03331;

1.1.58.    "Plan" means the Debtor's Plan of Reorganization in its present form or as it may be amended, modified, or supplemented from time to time, together with all exhibits thereto.

1.1.59.    The "Plan Filing Date" is the date on which this Plan was filed with the Court, *i.e.*, [**].

1.1.60.    The "Plan Lien Rate" means a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the Plan Filing Date, or (b) the non-default interest rate expressly provided for under the loan agreement or contract between the Debtor and the applicable holder of the Claim or Lien

1.1.61.    "Plan Period" shall mean the period commencing on the Effective Date and ending on the Final Distribution Date. If the treatment of a particular Claim or creditor relates to periods of time preceding the Effective Date (including payments made or received between the

Petition Date and the Effective Date), then the Plan Period shall commence on the applicable date with respect to that Claim or creditor.

1.1.62. "Plan Supplement" means, including without limitation, the forms of the material documents to implement the provisions of the Plan that are to be filed with the Bankruptcy Court as early as is practicable, but in no event later than five (5) Business Days before the Confirmation Hearing, or on such other date as the Bankruptcy Court may determine. The Plan Supplement is incorporated into the Plan as if fully set forth in the Plan and all references to the Plan refer also to the Plan Supplement.

1.1.63. "Post-Effective Date Subchapter V Trustee Compensation" means the Subchapter V Trustee's ordinary and typical compensation, plus reimbursement of actual and necessary expenses, arising from the Subchapter V Trustee fulfilling his post-effective date obligations under this Plan.

1.1.64. "Priority Claim" means any Claim (or portion of such Claim) entitled to priority under Bankruptcy Code § 507 and that is not an Administrative Expense Claim, a Priority Tax Claim, or a Secured Claim.

1.1.65. "Priority Tax Claim" means a Claim that is entitled to priority pursuant to Bankruptcy Code §§ 502(i) or 507(a)(8) that is not a Secured Claim.

1.1.66. "Professional" means any professional employed in the Chapter 11 Case pursuant to Bankruptcy Code §§ 327, 328 or 1103 or otherwise, and any professional seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Bankruptcy Code § 503(b).

1.1.67. "Professional Fee Claim" means a Claim of a Professional for compensation for services rendered, and/or reimbursement of costs and expenses incurred, after the Filing Date and prior to and including the Effective Date.

1.1.68. "Proof of Claim" means any proof of claim filed with the Bankruptcy Court with respect to the Debtor pursuant to Bankruptcy Rules 3001 or 3002.

1.1.69. "Property" or "Property of the Estate" means all assets of the Debtor which are property of the Estate pursuant to Bankruptcy Code § 541.

1.1.70. "Pro Rata Share" means with respect to Claims, the proportion that the amount of an Allowed Claim in a particular Class bear to the aggregate amount of all Claims in such Class, exclusive of Disallowed Claims, but including Disputed Claims.

1.1.71. "PQPR" means PQPR Holdings Limited LLC.

1.1.72. "PQPR Secured Note" means 2 promissory notes held by PQPR, the first promissory note in the principal amount of $29,588,000, dated as of August 13, 2020, a second promissory note in the principal amount of $25,300,000.00 made payable to PQPR, dated as of November 10, 2021, the repayment of which is secured by substantially all assets of FSS.

1.1.73. "Quarter" means and refers to the calendar quarters ending, respectively, on March 31, June 30, September 30 and December 31.

1.1.74. "Quarterly" means based on a Quarter.

1.1.75.    "Reorganized Debtor" means the Debtor on and after the Effective Date, surviving after confirmation of the Plan.

1.1.76.    "Retained Causes of Action" means all causes of action that Debtor, its Estate, or the Reorganized Debtor would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or interest in, a Debtor or other entity, including, but not limited to Avoidance Actions, provided that such term does not include any cause of action or Claim against any of the Released Parties.

1.1.77.    "Retained Causes of Action Costs" means all costs and expenses incurred by the Subchapter V Trustee incurred after the Effective Date arising out of or related to the prosecution of the Retained Causes of Action, including, but not limited to the fees and expenses of any profession retained by the Subchapter V Trustee.

1.1.78.    "Sandy Hook Litigation" means all pending civil lawsuits against the Debtor, including, but not limited to, the following:

- *Marcel Fontaine vs. Alex E., Jones, Infowars, LLC, Free Speech Systems, LLC and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th Judicial District Court of Travis County, Texas;

- *Neil Heslin vs. Alex E. Jones, Infowars, LLC, and Free Speech Systems, LLC*, Cause No. D-1-GN-18-001835 in the 261st Judicial District Court of Travis County, Texas;

- *Veronique de la Rosa and Leonard Pozner vs. Alex E. Jones, InfoWars, LLC, and Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842 in the 345th Judicial District Court of Travis County, Texas;

- *Scarlett Lewis vs. Alex E. Jones, InfoWars, LLC, Free Speech Systems, LLC and Owen Shroyer*, Cause No. D-1-GN-18-006623 in the 98th Judicial District Court of Travis County, Texas;

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division;

1.1.79.    "SBC" means Security Bank of Crawford.

1.1.80.    "Schedules" and "Statements" means the Schedules, Statements and Lists filed by the Debtor with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been and may be amended or supplemented from time to time.

1.1.81.    "Secured Claim" means the Claim of any Creditor which is secured by a Lien (whether voluntary or involuntary) on or a security interest in Collateral, or in the event such Claim is a claim of setoff under Bankruptcy Code § 553, to the extent of such setoff.

1.1.82.    "Subchapter V Trustee" means the subchapter v trustee Melissa Haselden appointed in the Bankruptcy Case, or such trustee's successor appointed to serve as trustee pursuant to Bankruptcy Code § 1183.

1.1.83.    "Subordinated Claim" shall mean any Claim that is subordinated in right of payment to Unsecured Claims by reason of either (a) voluntary agreement or consent by the holder of the Claim, or (b) a Final Order of the Court.

1.1.84.    "Timely Filed" with respect to a Claim, Interest or Administrative Expense, means, that a proof of such Claim or Interest or request for payment of such Administrative Expense was filed with the Bankruptcy Court within such applicable period fixed by the Plan, statute, or pursuant to both Bankruptcy rule 3003(c)(3) and a Final Order (e.g., the Bar Date).

1.1.85.    "Trade Creditor" means a supplier that provides goods and services to FSS on credit terms. The amounts owed are stated on the balance sheet of a customer as a current liability, and on the balance sheet of the trade creditor as a current asset.

1.1.86.    "Unclaimed Distribution Reserve" has the meaning ascribed to such term in Section 10.2.2. of the Plan.

1.1.87.    "Unimpaired Class" has the meaning described in Bankruptcy Code § 1124.

1.1.88.    "United States Trustee" or "U.S. Trustee" means the United States Trustee for the Southern District of Texas.

1.1.89.    "Unsecured Claim" means any Claim (regardless of whether such Claim is covered by insurance) that is neither secured nor entitled to priority under the Bankruptcy Code, or by a Final Order of the Bankruptcy Court, including, but not limited to: (a) any claim arising from the rejection of an Executory Contract or unexpired lease under Bankruptcy Code § 365, and (b) any portion of a Claim to the extent the value of the holder's interest in the applicable Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to Bankruptcy Code § 506(a), and (c) any Deficiency Claim.

1.1.90.    "Unsecured Trade Creditor" means a Trade Creditor who holds an Unsecured Claim.

1.1.91.    "Unsecured Creditors" means all holders of Unsecured Claims.

1.2.    **Rules of Construction.**

1.2.1.    <u>Interpretation</u>. Unless otherwise specified herein, all section, article and exhibit references in the Plan are to the respective section in, article of, and exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. All headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

1.2.2.    <u>Capitalized Terms</u>. Unless otherwise provided, any capitalized terms used in the Plan shall have the meaning set forth in Article 1.

1.2.3.   <u>References to Documents, Headings or Exhibits</u>.  Any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions.  Any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented.  Unless otherwise specified in a particular reference, all references in the Plan to articles, sections, subsections and exhibits are references to articles, sections, subsections and exhibits of or to the Plan.

1.2.4.   <u>Construction and Application of Bankruptcy Code Definitions</u>. Unless otherwise defined herein, words and terms defined in Bankruptcy Code § 101 shall have the same meanings when used in the Plan. Words or terms used but not defined herein shall have the meanings ascribed to such terms or words, if any, in the Bankruptcy Code. The rules of construction contained in Bankruptcy Code § 102 shall apply to the construction of the Plan.

1.2.5.   <u>Other Terms</u>. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any article, section, subsection, or clause contained in the Plan.

1.2.6.   <u>Time</u>. In computing any period prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE 2

## INFORMATION REGARDING THE DEBTOR,
## THE CHAPTER 11 CASE, AND THE PLAN

THIS ARTICLE 2 PRESENTS ONLY AN OVERVIEW OF CERTAIN KEY INFORMATION RELEVANT TO THE PLAN AND OMITS OTHER DETAILS OF THE PLAN THAT MAY BE IMPORTANT TO YOUR RIGHTS. YOU SHOULD CAREFULLY READ THE ENTIRE PLAN AND SEEK THE ADVICE OF AN ATTORNEY IF YOU ARE UNSURE ABOUT ANY PROVISIONS OF THIS PLAN.

TO THE EXTENT THAT THERE IS ANY INCONSISTENCY BETWEEN A PROVISION IN THIS ARTICLE 2 AND A PROVISION CONTAINED ELSEWHERE IN THE PLAN, THE PROVISION ELSEWHERE IN THE PLAN SHALL CONTROL IN ALL RESPECTS.

2.1.   **Background on the Debtor**.

A.   **Business of Free Speech Systems, LLC**

FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, airs via GCN on over 100 radio stations across the United States and via the internet

through the website Infowars.com.

On its Infowars.com website today, FSS makes available to customers dietary supplements ("Supplements"), such as Bodease, Krill Oil, Ultimate Fish Oil, DNA Force Plus, Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products. FSS periodically adjusts and updates the menu of products available to its listeners and viewers. The website also has available books, t-shirts, and other products ("Non-Supplements") Jones advertises during his radio talk show.

The vast majority of FSS revenues comes from the sale of Supplements, which have prior to the Petition Date have been supplied by or contracted for by PQPR, an affiliated entity, described below.

FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Historically, approximately 80% of FSS' revenue is derived from product sales, of the remainder, 11% is historically from advertising and the balance from a variety of sources.

As of December 31, 2022, FSS employed a workforce of 45 individuals, down from 58 employees on the Petition Date.  The majority of whom are involved in production of the Alex Jones Show and other shows produced by FSS and have a direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios where online and traditional broadcast production is provided.  The Alex Jones Show and other shows are produced in these studios. An adjacent building contains administrative offices and customer support. On the Petition Date, FSS had a warehouse in a separate location in Austin, Texas where warehousing and product sales fulfillment took place. All of the Debtor's buildings and offices are leased.

B.      **The Relationship Between Alex Jones and FSS**

At its formation, Alex Jones and Kelly Jones owned 49% and 51% of the membership interests in FSS.  Alex and Kelly Jones divorced in 2015. Upon their divorce, Jones became the sole owner of FSS.  Since then, Alex Jones has been the Managing Member of FSS.

Alex Jones is also employed by FSS pursuant to an Employment Agreement and Accompanying Employee Annuity and Life Insurance Plan, dated April 14, 2022 (the "Jones Employment Agreement").  Under the Jones Employment Agreement, Jones agreed to promote products and services agreed to by the FSS.

Since inception, Alex Jones has been a "single talent business," *to wit*, without him and his show, there would neither be any InfoWars nor internet sales. Unfortunately, Jones failed to bring on board the necessary management skills to manage what was once a small family business but had become a $60 to $70 million a year enterprise[1]. Jones and his employees continued to run the business with an inverted T structure, where essentially everyone reported

---

[1] Gross sales, including sale of PQPR's consigned goods.

to Alex, as though it was still a family business.

Entry into a durable contract for Jones to continue to provide his services to the Reorganized Debtor is essential to the feasibility of the Plan. FSS (through its Chief Restructuring Officer) and Jones intend to begin negotiations in earnest. Success of the Plan depends on Alex Jones being on the air.

### C.     The Relationship of FSS and PQPR

*Background Information About PQPR*

PQPR was founded in 2013 and began operations in September 2013. PQPR is engaged in the online sale and marketing of primarily nutritional supplements which it sells under its own label as well as acquiring nutritional supplements for FSS which it markets under its InfoWars label. Historically, PQPR advertised its products exclusively through FSS/The Alex Jones Show for which it received a bulk discount. PQPR also sells product outside the FSS/Alex Jones show channels.

PQPR is managed by Dr. David Jones, Alex Jones' father. Alex Jones is not a manager of PQPR but is an indirect owner of PQPR equity. The current owners and their ownership interests in PQPR are as follows:

|  | % Owned |
|---|---|
| PLJR Holdings | 80.00% |
| JLJR Holdings, LLC | 20.00% |
| Total | 100.00% |

Through AEJ Austin Holdings, LLC, Jones has an effective 72% membership interest in PLJR Holdings, LLC ("PLJR").  Mrs. Carol Jones (Alex Jones' Mother) owns an 80.00% interest in JLJR Holdings, LLC ("JLJR") and Dr. David Jones holds the remaining 20.00% membership interest.

Alex Jones is not a manager of either PLJR or JLJR.

*Commercial Relationship Between FSS and PQPR*

FSS' Pre-Petition As discussed previously, FSS sells two groups of products on its Infowarsstore.com website: Supplements and Non-Supplements. The nature of the relationship between FSS and PQPR has changed over time.  In the past, PQPR ordered and paid for Supplements which it marked up and then sold to FSS for distribution. FSS charged PQPR an administrative fee and an advertising fee based on sales volume together with miscellaneous out of pocket expenses. The selection of nutritional supplements to be sold was determined by Alex Jones, David Jones, and staff of FSS.

In 2021, the relationship with PQPR began to change as FSS wanted to increase its revenue by purchasing products and reaping higher margins. While FSS continued to sell PQPR

inventory, FSS began placing orders for Supplements with PQPR which then placed the order with the manufacturer. FSS paid PQPR, as its agent, funds required to purchase product, which then paid the manufacturer and managed the delivery and certification of the products. Pricing of the Supplements was done by FSS.

Non-Supplements consist of "Infowars" merchandise, ranging from T-shirts to silver coins. This group of merchandise was handled solely by FSS employees, starting from the selection of the merchandise, placing of the merchandise on the Infowars website, ordering of and paying for the product.

Over time, FSS failed to fully pay sums due to PQPR derived from the sale of Supplements owned by PQPR. In turn, FSS continued to charge administrative and advertising fees which were not paid. In April 2021, FSS employed Bob Roe, a CPA and Certified Forensic Accountant to reconcile the PQPR accounts. As a result of Roe's work, it was determined that FSS owed significant unpaid accounts to PQPR totaling $29,588,000.00. FSS and PQPR executed a Promissory Note in the principal amount of $29,588,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR through December 31, 2018 (the "2020 Secured Note"). The 2020 Secured Note matures on August 1, 2050, interest is due and payable annually. The 2020 Secured Note bears interest at 1.75%.

The 2020 Secured Note is secured by a Security Agreement entered as of August 13, 2020, between FSS and PQPR (the "2020 Security Agreement"). The 2020 Security Agreement provides in paragraph II that the "Collateral" securing the repayment of the 2020 Secured Note consists of all personal property owned by FSS. On November 18, 2020, PQPR filed a UCC-1 Financing Statement with the Texas Secretary of State ("November 18 UCC Financing Statement").

Following the execution of the 2020 Secured Note, FSS payment performance on its PQPR accounts did not change. On or about November 10, 2021, FSS and PQPR entered into a second Promissory Note in the principal amount of $25,300,000.00 made payable to PQPR, which memorialized additional accrued obligations of FSS to PQPR from January 1, 2019 to December 31, 2020 (the "2021 Secured Note"). Principal and interest of $1,939,644.81 is due on each anniversary of the 2021 Secured Note. The 2021 Secured Note bears interest at 1.8% and matures on November 10, 2036. The 2021 Secured Note is secured by the 2020 Security Agreement and the November 18 UCC Financing Statement.

PQPR's claims and security interests are under examination by the Subchapter V Trustee and her professionals pursuant to expanded powers granted by the Bankruptcy Court. Other creditor constituencies dispute the debt and liens alleged by PQPR.

## 2.2   Events Leading Up to Bankruptcy

The Debtor' financial distress stems from statements made by Alex Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Certain parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these

statements were defamatory and inflicted emotional distress.

The crux of the allegations in these lawsuits are that Alex Jones and FSS employees said or implied that the Sandy Hook massacre did not happen and that the parents were participants in a conspiracy against the public.

In 2018, certain aggrieved parties (the "Texas Plaintiffs") commenced state-court actions against one or more of the Debtor styled as: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; ***(c)*** *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; ***(d)*** *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County, Texas ( (collectively, as may have been consolidated, the "Texas State Court Litigation").

The Texas Plaintiffs then commenced in 2022 a fraudulent conveyance lawsuit under TUFTA styled *Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, in the 200th District Court for Travis County (the "Plaintiffs' TUFTA Suit").

Two actions: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas (the "Heslin/Lewis Suit") have been consolidated. Judge Maya Gamble.

Immediately after the Petition Date, the Debtor sought an order from the Bankruptcy Court to lift the automatic stay to permit the Heslin/Lewis Suit to continue to judgment. The Bankruptcy Court lifted the automatic stay and permitted the suit to trail.

In 2018, certain other parties (the "Connecticut Plaintiffs") brought actions in Connecticut styled:

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046438-S in the Superior Court of Connecticut, Waterbury Division (collectively, the "Connecticut State Court Litigation" together with the Texas State Court Litigation are hereinafter referred to as the "Sandy Hook Lawsuits").

Trials on the Sandy Hook Lawsuits were set to commence consecutively with significant possibility that they would overlap each other. The Debtor lacked the ability to proceed to trial on that basis. The cost of two trials at the same time, compounded by the scheduling issues threatened FSS ability to continue as a going concern. Proceeding to trial as scheduled would have required Jones to be absent from his shows, resulting in dramatic drop in revenue at a time when trial costs would skyrocket.

FSS filed its voluntary petition initiating this Chapter 11 Case on July 29, 2022.

2.3   **Significant Actions in the Chapter 11 Case**

During the course of this Case, various pleadings have been filed with the Bankruptcy Court. The following is a description of the more significant pleadings filed during the pendency of this Case affecting operations and the FSS ability to generate Disposable Income. This is not intended as a description of all events which have transpired following the Petition Date. For a comprehensive listing of the pleadings that have been filed in this Chapter 11 Case, the docket should be reviewed, and relevant pleadings may be obtained from the Clerk's Office of the Bankruptcy Court or via the online PACER system at: https://pacer.login.uscourts.gov/csologin/login.jsf

*Employment of Chief Restructuring Officer*

Initially FSS sought to retain Mark Schwartz as its Chief Restructuring Officer ("CRO"). The Court determined that Mr. Schwartz was not disinterested and denied his application for retention. The Debtor sought a replacement for Mr. Schwartz and determined to hire Patrick Magill. On October 13, 2022, the Court approved Mr. Magill's employment as Chief Restructuring Officer ("CRO").

*Operational Changes*

The CRO has made significant changes to FSS's operations since his employment. The following is a summary of the significant changes which have improved the Debtor's operations

and margins.

Changing Credit Card Processors – After 2018, FSS experienced deplatforming from internet access, television and radio and also financial deplatforming. FSS longstanding banking relationship was terminated, and more importantly, FSS was denied access to credit card processing. Without the ability to process credit card transactions, FSS's business could not operate. Customers utilize credit or debit cards to purchase merchandise on the Infowarsstore.com website. FSS had to locate a credit card processor and a bank that would do business with it, after FSS was shunned by financial institutions in 2018.

Initially FSS contracted with Auriam Services, LLC as an intermediary to a credit card processor. FSS credit card processing cost was in excess of 14.5% of each transaction. While the rate was subsequently renegotiated and reduced to approximately 9%, the CRO sought less expensive options. On November 21, 2022, the Court granted FSS' motion to enter into a new financial services agreement. Under the new agreement, FSS credit card processing cost declined to approximately 6%.[2]

As of the Petition Date, FSS had started to transition from selling PQPR supplements, which generated only 20% profit margins to purchasing inventory directly, generating substantially greater profit margins for the Debtor's estate. At the same time, FSS transitioned out of its fulfillment operations and entered into an agreement to process and fulfill product sales on behalf of FSS. While elimination of fulfillment was only marginally accretive to earnings, the Debtor reduced employee headcount and allowed it to focus on its core operations.

Notwithstanding the transition to Blue Ascension, the fulfillment costs were still a significant cost and impaired FSS operating profits. At the same time, the CRO negotiated a replacement financial services agreement, the CRO completed the operational changes by entering into a new fulfillment agreement. The counterparty to that fulfillment agreement ("Fulfillment Contractor") provides product sourcing of a menu of supplements which FSS pays for only after the customer orders and pays for the product. In addition, the Fulfillment Contractor picks, packs and ships each order at a cost to FSS less than half what FSS paid Blue Ascension. FSS relocated all of its remaining inventory to the Fulfillment Contractor's warehouse.

As a result of the changes in operations, FSS (i) reduced its credit card processing by 50%, (ii) reduced its reliance on PQPR as a source of product thereby increasing margins, (iii) reduced its cost of fulfillment by more than 50%, and (iv) reduced overhead by rejecting its lease on warehouse space in Austin, Texas. Most importantly, FSS was able to increase inventory availability without additional capital or financing. Since FSS is unable to obtain financing and has limited capital, the ability to source products from the Fulfillment Contractor without the requirement to prepay for the product removes financial limitations on access to certain inventory.

---

[2] The original credit card processor backed out from the arrangement when its identity was discovered, and they were exposed to the threat of doxing. As a result credit card processing costs have increased 7% with a new credit card processor.

*Mediation*

On October 12, 2022, the Court entered a Stipulation and Agreed Order submitting the disputes between FSS and the Sandy Hook Plaintiff's to mediation before the Honorable Marvin Isgur.  That mediation remains ongoing.  In the event the parties are able to reach a mediated settlement, the terms of this Plan will be modified to incorporate those terms.

## 2.4    **Description Of Assets**

The Debtor filed schedules of all of its assets and liabilities on August 29, 2022. Complete copies of the schedules are available from the Clerk of the Court. The primary assets of the bankruptcy estate, their book values, are shown on the balance sheet attached hereto as Exhibit B.


## 2.5    **Liquidation Analysis**

Under sections 1191 and 1129(a)(7) a plan can be confirmed without the accepting votes of impaired classes of claims as long as each such class would receive under the plan "not less than" they would receive "if the debtor were liquidated under chapter 7."

If this case were converted to chapter 7 and the assets of the Debtor liquidated, such a liquidation would destroy the going-concern value of this business because it would require the cessation of business operations. Creditors would be forced to look to the liquidation value of the debtor's remaining tangible assets.  FSS believes that on a liquidation basis the return to unsecured creditors would be negligible if the Sandy Hook Plaintiffs claims are Allowed.  If PQPR's Secured Claim is Allowed Unsecured Creditors will receive nothing on account of their Allowed Claims.  If those the Claims of PQPR and the Sandy Hook Plaintiffs Claims are disallowed, liquidation of the Debtor's assets might generate a significant return to the Debtor's Trade Creditors. A liquidation analysis is attached hereto as Exhibit C.

## 2.6    **Projection of Disposable Income**

The Debtor's ability to continue in operation and generate revenue is entirely dependent upon Jones' commitment to continue to broadcast for the five year term of the Plan.  Based on the assumption that Jones will enter into an employment contract with FSS covering that period of time, the Debtor projects that it will generate a continuing stream of revenue in excess of its expenses and capital requirements which will be available to pay its creditors Allowed Claims. The Debtor's Disposable Income projections for the term of the Plan are attached hereto as Exhibit A.

The Debtor's business is subject to seasonality common to any retail operation and is similarly exposed to the vagaries of the global and national economy.  Moreover, FSS and its suppliers and contract counterparties are continuously exposed to doxing and deplatforming which adds further unpredictability to the Debtor's operations.  Finally, the product mix which the Debtor makes available turns over with regularity.  Although the Debtor maintains a stable of products which have a consistent history of sales, some supplements have relatively short sales cycles and sundries such as t-shirts, hats, and bumper stickers change with great

regularity.

# ARTICLE 3

## CLASSIFICATION OF CLAIMS AND INTERESTS

### 3.1.   **Claims and Equity Interests Classified.**

To make the Plan easier to understand, to aid in the Plan balloting process and for all confirmation matters, all Claims (except Administrative Expense Claims and Priority Tax Claims) and Equity Interests shall be classified as set forth in this Article 3 of the Plan. The treatment of unclassified and classified Claims is set out in Articles 4 and 5 of the Plan.

### 3.2.   **Administrative Claims and Priority Tax Claims.**

Bankruptcy Code § 1123(a)(1) provides that Administrative Claims and Priority Tax Claims shall not be classified for purposes of voting or receiving distributions under the Plan. All such Claims are to be treated separately as unclassified Claims on the terms set forth in Article 4 of the Plan.

### 3.3.   **Summary of Plan**.

This is a stand-alone Plan wherein the Debtor will be professionally managed and operated post-confirmation for the benefit of its creditors. The Plan contemplates the Debtor having adequate cash on the Effective Date to make (a) the necessary payments to pay Administrative Expense Claims in full or make appropriate reserve for same by depositing cash into a separate Administrative Expense Claim Account at a financial institution, approved by the Disbursing Agent (the "Approved Bank") and (b) when due, the Plan payments called for holders of Allowed Priority and Allowed Priority Tax Claimants, and, if any are disputed, then they will be paid upon entry of a Final Order determining said claim to be an Allowed Claim. Administrative Expenses will be paid by the Reorganized Debtor in the ordinary course of its business, subject to procedures for resolving disputes.

The Plan contemplates (a) satisfying the Allowed SBCs in accordance the treatment proposed herein; and (b) dedicating to the Disbursing Agent the Reorganized Debtor's projected Disposable Income for 5 years from the Effective Date in accordance with Bankruptcy Code § 1191.  All Retained Causes of Action will be vested with the Disbursing Agent and any recoveries from Retained Causes of Action will be received and delivered by the Disbursing Agent for distribution as Distributable Funds.[3]

The following chart summarizes the treatment of the various classes of Claims and Interests under the Plan:

| Class | Description | Treatment of Allowed Claims |
|-------|-------------|------------------------------|
| N/A | Administrative Expense Claims | Ordinary Course Administrative Expense Claims—Receive, in full satisfaction of such Claim, Cash payment from the Reorganized Debtor in the amount of the Allowed Ordinary Administrative Expense Claim (a) under the existing agreements |

---

[3] The Plan provides that the Subchapter V Trustee will have standing to assert Retained Causes of Action.

| | | between the Debtor and the holder of an Ordinary Course Administrative Expense Claim or (b) on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such claim becomes an Allowed Claim. |
|---|---|---|
| | | Non-Ordinary Administrative Expense Claims—Receive, in full satisfaction of such Claim, Cash payment from the Distributable Funds in the amount of the Allowed Ordinary Administrative Expense Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such claim becomes an Allowed Claim. |
| N/A | Priority Tax Claims | Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor agree to a different treatment, each holder of an Allowed Priority Tax Claim will receive in full satisfaction of such Claim, Cash payments from Reorganized Debtor over a period not exceeding five (5) years from the Petition Date. Payments by Reorganized Debtor provided for herein shall be made in equal monthly installments with the first payment due on the tenth Business Day of the first month following the Effective Date. Interest shall accrue on the Priority Tax Claim in accordance with section 511 of the Bankruptcy Code. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. To the extent the holder of an Allowed Priority Tax Claim has a Lien on the Debtor's property, such Lien shall remain in place until such Allowed Priority Tax Claim has been paid in full. |
| Class1-A | Secured Claim of SBC | Receive, in full satisfaction of such Claim, Cash payments from Distributable Funds in the Allowed amount of such Claim in accordance with the requirements of Bankruptcy Code § 1129(b)(2)(A). |
| Class 1-B | Secured Claim of PQPR | Whether PQPR holds a claim against FSS, and whether FSS holds a Lien on any Collateral to secure the repayment of such debt is subject of significant dispute. Under the Plan, the Debtor plans to treat PQPR's secured and unsecured claim as disputed, unless the challenge to PQPR's debt and Lien is resolved by agreement or a Final Order prior to the Confirmation Hearing. Under the Plan, the Debtor intends to determine under Bankruptcy Code § 506(a) the secured and unsecured portions of its claim, and, once such amount is determined, intends to treat the secured claim in accordance with Bankruptcy Code § 1129(b)(2)(A)(i)(1) or (iii), and treat the unsecured claim in Class 3-C. Pending allowance of PQPR's claim, the Disbursing Agent shall deposit the Distributions on account of their claims into the Disputed Claim Reserve Account. |
| Class 2 | Priority Claims | Receive, in full satisfaction of such Claim, Cash payments from Distributable Funds in the Allowed amount of such Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such Claim becomes an Allowed Claim. |

| Class 3-A | Unsecured Claims of Trade Creditors | Receive, in full satisfaction of such Claim, Cash payments in the amount of the Pro Rata Share of the Distributable Funds remaining after (a) the satisfaction of all Allowed Non-Ordinary Course Administrative Expense Claims, Priority Tax Claims, and Class 1 and 2 Claims, and (b) the Subchapter V Trustee Post-Effective Date Compensation. Receive Pro Rata Class 3 Distributions until Paid in Full first. |
| Class 3-B | Unsecured Claims of Contingent and Unliquidated Claims | Receive Pro Rata Class 3 Distributions after Class 3-A from Distributable Funds until Paid in Full. |
| Class 3-C | Unsecured Claims of Insiders and Unsecured Deficiency Claim of PQPR | Receive Pro Rata Class Distribution after Class 3-B from Distributable Funds until Paid in Full |
| Class 4 | Interests | Interest Holders shall retain their Interests in the Debtor. |

3.4.     **Impairment Controversies**.

All controversies as to whether a Class of Claims or Equity Interests are impaired under the Plan and whether they are entitled to vote for or against the Plan shall be resolved by the Bankruptcy Court after notice and hearing.

## ARTICLE 4
## TREATMENT OF UNCLASSIFIED CLAIMS

4.1.     **Administrative Expense Claims**.

4.1.1.     <u>Ordinary Course Administrative Expense Claims</u>. Ordinary Course Administrative Expense Claims shall receive the following treatment:

4.1.1.1.     <u>*No Requirement to File Request; Procedure for Disputes*</u>. Holders of Ordinary Course Administrative Expense Claim shall not be required but may file a request for the payment of any Ordinary Course Administrative Expense Claim with the Court. Holders of Ordinary Course Administrative Expense Claims electing not to file requests for payment of Ordinary Course Administrative Expense Claims shall submit invoices or other documents reflecting an asserted Ordinary Course Administrative Expense Claim to the Debtor or Reorganized Debtor, as applicable, in the ordinary course pursuant to any agreement, practices of the parties, and/or applicable law. To the extent the Debtor or Reorganized Debtor disputes an asserted Ordinary Course Administrative Expense Claim submitted to the Debtor prior to the filing of a motion or application for entry of a Final Decree or within (60) days before entry of a Final Decree, the Debtor or Reorganized Debtor shall file a motion with the Bankruptcy Court seeking determination of the disputed Ordinary Course Administrative Expense Request that be (a) governed by Rule 9013 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules 9013-1 and 9013-2, and (b) served on the holder of the disputed Ordinary Course Administrative Expense and the Subchapter V Trustee with no further service required. To the extent that an Ordinary Course Administrative Expense Claim is submitted to the Debtor after the filing of a

motion or application for entry of a Final Decree or within sixty (60) days before entry of a Final Decree, the Reorganized Debtor may, in its sole discretion, (a) seek to delay entry of a Final Decree to seek determination by the Bankruptcy Court of the disputed Ordinary Course Administrative Expense Claim, (b) seek to have the case reopened for such determination, or (c) seek determination of its obligation to the holder of the asserted Ordinary Course Administrative Course Administrative Expense Claim before any tribunal with competent jurisdiction or as otherwise provided by applicable non-bankruptcy law.

4.1.1.2.    *Time for Seeking Determination by Debtor*. The Debtor or Reorganized Debtor shall file any request for determination by the Bankruptcy Court of a disputed Ordinary Course Administrative Expense Claim asserted prior to the filing of a motion or application for entry of a Final Decree or entry of a Final Decree within sixty (60) days of receipt of an invoice or other document reflecting an asserted Ordinary Course Administrative Expense Claim.

4.1.1.3.    *Time for Optional Request by Holders of Ordinary Course Administrative Expense Claims*. Any holder of Ordinary Course Administrative Expense Claim electing to file with the Bankruptcy Court a request for payment of such Claims shall file such request within thirty (30) days after the Effective Date. Any such request must be served on the Debtor, its counsel, and the Subchapter V Trustee with no further service required, and must, at a minimum, set forth (i) the name of the holder of the Ordinary Course Administrative Expense Claim; (ii) the amount of the Ordinary Course Administrative Expense Claim; and (iii) the basis for the Ordinary Course Administrative Expense Claim. A failure to file any such request in a timely fashion will not prejudice any holder of an Ordinary Course Administrative Expense Claim from submitting invoices or other documents reflecting an asserted Ordinary Course Administrative Expense Claim to the Debtor to be determined under the procedures set forth in Sections 4.1.1.1 and 4.1.1.2 of the Plan.

4.1.1.4.    *Allowance of Ordinary Course Administrative Expense Claims*. An Ordinary Course Administrative Expense Claim submitted to the Debtor under the procedure set forth in Section 4.1.1.1 of the Plan prior to the filing of a motion or application for entry of a Final Decree or within (60) days before entry of a Final Decree shall be become an Allowed Ordinary Course Administrative Expense Claim unless the Debtor or Reorganized Debtor files a motion seeking determination of the asserted Ordinary Course Administrative Expense Claim within the time period provided by Section 4.1.1.2 of the Plan. An Ordinary Course Administrative Expense Claim submitted to the Debtor under the procedure set forth in Section 4.1.1.1 of the Plan after the filing of a motion or application for entry of a Final Decree or within (60) days before entry of a Final Decree shall be become an Allowed Ordinary Course Administrative Expense Claim upon agreement of the Reorganized Debtor or a Final Order determining the Reorganized Debtor's obligation. An Ordinary Course Administrative Expense Claim for which a request for payment has been properly filed under the procedure in Section 4.1.1.3 shall become an Allowed Administrative Expense Claim unless an objection is filed by the date that is twenty-one (21) days after a request for payment of such Ordinary Course Administrative Expense Claim is filed. If an objection is timely filed to a request for payment of an Ordinary Course Administrative Expense Claim under the procedure in Section 4.1.1.3, the Ordinary Course Administrative Expense Claim in question shall become an Allowed Administrative Expense Claim only to the extent so Allowed by Final Order of the Bankruptcy Court.

4.1.1.5.    *Payment of Ordinary Course Administrative Expense Claims*. Except to the extent that (i) a holder of an Ordinary Course Administrative Expense Claim and the Debtor agree

to a different treatment, (ii) such Claim was satisfied while the Chapter 11 Case was pending, or (iii) existing agreements between the Debtor and the holder of an Ordinary Course Administrative Expense Claim provide for payment of such Ordinary Course Administrative Expense Claims on different terms, in which case such Claim shall be satisfied in accordance with those pre-existing agreements or policies, each holder of an Allowed Ordinary Course Administrative Expense Claim shall receive, in full satisfaction of such Claim, Cash payment from the Reorganized Debtor in the amount of the Allowed Ordinary Administrative Expense Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such claim becomes an Allowed Claim. For the avoidance of doubt, Allowed Ordinary Course Administrative Expenses shall *not* be paid from Distributable Funds.

4.1.2.   Non-Ordinary Course Administrative Expense Claims. Non-Ordinary Course Administrative Expense Claims shall receive the following treatment:

4.1.2.1.   *Time for Filing Request by Holders of Non-Ordinary Course Administrative Expense Claims*. All holders of Non-Ordinary Course Administrative Expense Claims, other than Professional Persons holding Professional Fee Claims, shall file with the Bankruptcy Court a request for payment of such Claims within thirty (30) days after the Effective Date. Any such request must be served on the Debtor, its counsel, and the Subchapter V Trustee with no further service required, and must, at a minimum, set forth (i) the name of the holder of the Non-Ordinary Course Administrative Expense Claim; (ii) the amount of the Non-Ordinary Course Administrative Expense Claim; and (iii) the basis for the Non-Ordinary Course Administrative Expense Claim. Failure to file any such request in a timely fashion will result in the Administrative Expense Claim in question being discharged and its holder forever barred from asserting such Administrative Expense Claim against the Debtor, its Estate, the Reorganized Debtor, the Subchapter V Trustee, or the Distributable Funds.

4.1.2.2.   *Allowance of Non-Ordinary Course Administrative Expense Claims*. A Non-Ordinary Course Administrative Expense Claim for which a request for payment has been properly filed shall become an Allowed Administrative Expense Claim unless an objection is filed by the date that is twenty-one (21) days after a request for payment of such Non-Ordinary Course Administrative Expense Claim is filed. If an objection is timely filed, the Non-Ordinary Course Administrative Expense Claim in question shall become an Allowed Administrative Expense Claim only to the extent so Allowed by Final Order of the Bankruptcy Court.

4.1.2.3.   *Payment of Non-Ordinary Course Administrative Expense Claims*. Except to the extent that a holder of a Non-Ordinary Course Administrative Expense Claim and the Debtor agree to a different treatment or such Claim was satisfied while the Chapter 11 Case was pending, each holder of an Allowed Ordinary Course Administrative Expense Claim shall receive, in full satisfaction of such Claim, Cash payment from Distributable Funds in the amount of the Allowed Ordinary Administrative Expense Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such claim becomes an Allowed Claim. For the avoidance of doubt Non-Ordinary Course Administrative Expense Claim shall not be paid from the Reorganized Debtor.

4.1.3.   Special Provisions for Professional Fee Claims. Notwithstanding anything to the contrary in this Article 4, every Professional Person holding a Professional Fee Claim that has not previously been the subject of a final fee application and accompanying Bankruptcy Court order shall file a final application for payment of fees and reimbursement of expenses no later than the

date that is thirty (30) days after the Effective Date; *provided*, *however*, that a Professional Person may supplement its request up to and including the date of the  hearing on such request to account for fees and expenses incurred following the Effective Date in connection with, among other things, preparation of the request for allowance of such Professional Fee Claim, attendance at the hearing thereon and any other allowable fees or expenses not previously requested. Any such final fee application shall conform to and comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. The last date to object to any final fee application shall be the twenty-first (21st) day after such fee application has been filed with the Bankruptcy Court. Allowed Professional Fee Claims, not otherwise paid pursuant to any applicable interim compensation procedures, shall be paid in full in Cash by the Reorganized Debtor on the later of the fifteenth (15th) day after the Effective Date or fifteen (15) days after such Claim becomes an Allowed Claim.

4.2.    **Priority Tax Claims**.

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor agree to a different treatment, each holder of an Allowed Priority Tax Claim will receive in full satisfaction of such Claim, Cash payments from Reorganized Debtor over a period not exceeding five (5) years from the Petition Date. Payments by Reorganized Debtor provided for herein shall be made in equal monthly installments with the first payment due on the tenth Business Day of the first month following the Effective Date. Interest shall accrue on the Priority Tax Claim in accordance with section 511 of the Bankruptcy Code. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. To the extent the holder of an Allowed Priority Tax Claim has a Lien on the Debtor's property, such Lien shall remain in place until such Allowed Priority Tax Claim has been paid in full.


# ARTICLE 5

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS UNDER THE PLAN


5.1.    **Class 1-A – Secured Claim of SBC**.

5.1.1    Impairment and Voting.  This Class is impaired under the Plan. The holder of the Allowed Claim in  Class 1-A shall be entitled to vote to accept or reject the Plan.

5.1.2    Treatment of SBC's Secured Claim

5.2.2.1    *Claim Not Allowed*:  The Class 1-A Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

5.2.2.1    *Treatment of Secured Claim*:  To the extent it is Allowed and Secured, the Class 1 Secured Claim shall be treated and paid as provided below, and the balance of the Class 1-A Claim that is not Secured shall be treated as a General Unsecured Claim in Class 3-A:

*Potential Bifurcation of Claim.*  If Class 1-A Claim as of the Petition Date exceeds

the forced liquidation value of the Collateral as of the Petition Date (considering all Liens that were senior to the Lien securing the Class 1-A Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

*Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties in interest regarding the claim and amount) shall have the right to object to the Class 1-A Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

*Interest:* Interest shall accrue on the portion of the Class 1-A Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

*Payment:* Beginning on the fifteenth day of the month first occurring after the earlier of (a) the Effective Date or (b) the date the Claim becomes Allowed, the Debtor shall pay the Allowed Secured Class 1-A Claim in equal monthly installments calculated on a five-year amortization.

*Retention of Lien up to Amount of Allowed Class 1-A Claim:* Except as otherwise provided in this Section, to the extent that it has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 1-A Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 1-A Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral.

5.2.    **Class 1-B – Secured Claim of PQPR.**

5.2.1    Impairment and Voting. This Class is impaired under the Plan. The holder of the Allowed Claim in Class 1-B shall be entitled to vote to accept or reject the Plan.

5.2.2    Treatment of PQPR's Secured Claim

5.2.2.1    *Claim Not Allowed*: The Class 1-B Claim shall not be Allowed, unless and until the Court enters a Final Order allowing such Claim.

5.2.2.1    *Treatment of Secured Claim*: To the extent it is Allowed and Secured, the Class 1 Secured Claim shall be treated and paid as provided below, and the balance of the Class 1-B Claim that is not Secured shall be treated as a General Unsecured Claim in Class 3-C:

*Potential Bifurcation of Claim.* If Class 1-B Claim as of the Petition Date exceeds the forced liquidation value of the Collateral as of the Petition Date (considering all Liens that were senior to the Lien securing the Class 1-B Claim as of the Petition Date), the Claim shall be treated as a Secured Claim only to the extent of such value.

*Reservation of All Objections to Claim and Lien.* The Reorganized Debtor (and other parties in interest regarding the claim and amount) shall have the right to object to

the Class 1-B Claim or ostensible Lien on any grounds, including amount, validity, perfection, priority and in all other respects.

*Interest:* Interest shall accrue on the portion of the Class 1-B Claim that is a Secured Claim and is an Allowed Claim at the Plan Lien Rate.

*Payment:* Beginning on the fifteenth day of the month first occurring after the earlier of (a) the Effective Date or (b) the date the Claim becomes Allowed, the Disbursing Agent shall pay the Allowed Secured Class 1-B Claim in equal monthly installments calculated on a five-year amortization into the Class 1-B Disputed Claims Reserve Account from the Distributable Funds.

*Retention of Lien up to Amount of Allowed Class 1-B Claim:* If the holder of the Class 1-B Claim has a properly perfected Lien and to the extent it is not avoided, the holder of an Allowed Secured Class 1-B Claim shall retain its Lien upon its Collateral until its Allowed Secured Claim is paid in full as provided herein. When its Allowed Secured Claim is paid in full, the holder of the Allowed Class 1-B Claim shall be deemed to have released its Lien and security interest in its Collateral and shall take such steps as are necessary to indicate the release of its Lien in such Collateral, including without limitation filing a UCC-3 Financing Statement Amendment Form with the State of Texas, indicating that its Lien has been terminated and released.

5.3.  **Class 2 – Priority Claims**.

Except to the extent that a holder of an Allowed Class 2 Claim and the Debtor or Reorganized Debtor agree to a different treatment or such Claim was satisfied while the Chapter 11 Case was pending pursuant to an order of the Bankruptcy Court, each holder of an Allowed Class 2 Claim shall receive, in full satisfaction of such Claim, Cash payments from Distributable Funds in the Allowed amount of such Claim on the later of the thirtieth (30th) day after the Effective Date or thirty (30) days after such Claim becomes an Allowed Claim.

5.4.  **Class 3 – General Unsecured Claims**.

Except to the extent that a holder of an Allowed Class 3-A Claim and the Debtor or Reorganized Debtor agree to a less favorable treatment or such Claim was satisfied while the Chapter 11 Case was pending pursuant to an order of the Bankruptcy Court, and subject to the Disputed Claim Reserve, each holder of an Allowed Class 3-A Claim shall receive, in full satisfaction of such Claim, Cash payments in the amount of the Pro Rata Share of the Distributable Funds remaining after (a) the satisfaction of all Allowed Non-Ordinary Course Administrative Expense Claims, Priority Tax Claims, and Class 1 and 2 Claims, and (b) the Subchapter V Trustee Post-Effective Date Compensation and in accordance with the waterfall such that holders of Allowed Claims in Class 3-A shall be paid in full before any payments are made to Class 3-B and the same condition shall apply as to payment as to Class 3-C.

Except to the extent that a holder of an Allowed Class 3-B Claim and the Debtor or Reorganized Debtor agree to a less favorable treatment or such Claim was satisfied while the Chapter 11 Case was pending pursuant to an order of the Bankruptcy Court, and subject to the Disputed Claim Reserve, each holder of an Allowed Class 3-B Claim shall receive, in full satisfaction of such Claim, Cash payments in the amount of the Pro Rata Share of the Distributable

Funds remaining after (a) the satisfaction of all Allowed Non-Ordinary Course Administrative Expense Claims, Priority Tax Claims, and Class 1 and 2 Claims, and (b) the Subchapter V Trustee Post-Effective Date Compensation and in accordance with the waterfall such that holders of Allowed Claims in Class 3-A shall be paid in full before any payments are made to Class 3-B and the same condition shall apply as to payment as to Class 3-C.

Except to the extent that a holder of an Allowed Class 3-C Claim and the Debtor or Reorganized Debtor agree to a less favorable treatment or such Claim was satisfied while the Chapter 11 Case was pending pursuant to an order of the Bankruptcy Court, and subject to the Disputed Claim Reserve, each holder of an Allowed Class 3-C Claim shall receive, in full satisfaction of such Claim, Cash payments in the amount of the Pro Rata Share of the Distributable Funds remaining after (a) the satisfaction of all Allowed Non-Ordinary Course Administrative Expense Claims, Priority Tax Claims, and Class 1 and 2 Claims, and (b) the Subchapter V Trustee Post-Effective Date Compensation and in accordance with the waterfall such that holders of Allowed Claims in Class 3-A and 3-B shall be paid in full before any payments are made to Class 3-C.

5.5. **Class 4 – Interests**.

Allowed Class 4 Interest shall retain their Interests in the Reorganized Debtor.


## ARTICLE 6
## ACCEPTANCE OR REJECTION OF THE PLAN

6.1. **Presumed Acceptance of Plan**.

Any Unimpaired Class under this Plan is conclusively presumed to accept this Plan. Any Class that voted to accept the Plan is presumed to accept this Plan.

6.2. **Presumed Rejection of Plan**.

Any Class that voted to reject the Plan or who will receive or retain no property under the Plan is presumed to reject this Plan.


## ARTICLE 7
## IMPLEMENTATION AND EXECUTION OF THE PLAN

7.1. **Reorganized Debtor**.

7.1.1. Continued Existence. The Debtor shall continue to exist and operate its business as the Reorganized Debtor after the Effective Date. The Reorganized Debtor shall continue in business and shall carry on its business affairs without consultation or approval from the Bankruptcy Court. The Reorganized Debtor shall be free to use or sell its assets, hire, and compensate professionals and otherwise operate free of the restrictions, limitations and constraints existing under the Bankruptcy Code. The Reorganized Debtor shall operate in conformity with the Plan and shall make any required distributions and payments timely and in accordance with the Plan.

7.1.2. Disbursing Agent. The Reorganized Debtor shall be the Disbursing Agent under the Plan for Ordinary Course Administrative Expenses, Professional Fee Claims and Priority Tax

Claims. The Subchapter V Trustee shall be the Disbursing Agent for all other purposes.

7.1.3. <u>Delivery of Distributable Funds to the Subchapter V Trustee</u>. On the Effective Date, the Reorganized Debtor shall deliver to the Subchapter V Trustee cash in the amount of US$[_____] to be used to fund distributions under this Plan.

7.1.4. <u>Additional Distributions by the Reorganized Debtor</u>. Commencing on the first day November 2023 and continuing each calendar quarter for the following 19 calendar quarters, the Reorganized Debtor shall deliver to the Subchapter V Trustee its Disposable Income for the preceding calendar quarter (for avoidance of doubt, on the first business day of November, the Reorganized Debtor shall deliver the Disposable Income for the calendar quarter ended September 30, on the first business day of February the Reorganized Debtor shall deliver the Disposable Income for the calendar quarter ended December 31, *etc.*). The Subchapter V Trustee shall make distributions from the funds received in accordance with the terms of the Plan. The Subchapter V Trustee shall exercise her discretion in establishing reserves for Disbursing Agent Costs and the timing of distributions to creditors, unless specifically set forth in the Plan.

7.1.5. <u>Retention of Interests</u>**.** On the Effective Date, the Interests in the Reorganized Debtor shall vest in the Equity Interest as indicated below:

| Member | Number of Units | Percent Ownership |
|---|---|---|
| Alex E. Jones | 1 | 100% |

7.1.6. <u>Directors and Officers of the Reorganized Debtor</u>. As of the Effective Date, the term of the current managers shall continue in effect as follows until the termination of the Plan payments:

| Officer Name | Title |
|---|---|
|  |  |
|  |  |

7.1.7. <u>Corporate Action</u>. Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Debtor, and any corporate action required by the Debtor or Reorganized Debtor in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtor or Reorganized Debtor, as applicable.

7.2. **Subchapter V Trustee**.

7.2.1. <u>Disbursing Agent</u>. The Subchapter V Trustee shall be the Disbursing Agent under the Plan for Non-Ordinary Course Administrative Expenses, and Class 1, 2, 3, and 4 Claims and Interests.

7.2.2. <u>Receipt of Distributable Funds</u>. The Subchapter V Trustee shall hold the Distributable Funds in trust pending distribution pursuant to the terms of this Plan.

7.2.3. <u>Standing with Respect to Retained Causes of Action</u>. The Subchapter V Trustee shall have standing to assert or intervene with respect to any Retained Causes of Action which the Debtor may have, or which may be enforceable under any statute; *provided*, *however*, that any expenses incurred by the Reorganized Debtor with respect to such causes of action shall be

accounted for in determining the net proceeds from such action constituting Distributable Funds, notwithstanding the Subchapter V Trustee's assertion or intervention. The Subchapter V Trustee shall have no obligation to assert or intervene with respect to any Retained Cause of Action. Nothing in the Plan affect the Reorganized Debtor's standing to prosecute any appeal Sandy Hook Litigation or object to the Claims of Class 3-B Claims.

7.2.4.   <u>Compensation and Reimbursement</u>. The Subchapter V Trustee shall be entitled to the Post-Effective Date Subchapter V Trustee Compensation, subject to the approval by the Bankruptcy Court under Bankruptcy Code §§ 330, 331, and/or 503; *provided, however*, that actual expenses incurred by the Subchapter V Trustee arising directly from effectuating distributions according to this Plan (including, but not limited to printing, postage, bank fees, and similar costs) may be paid or reimbursed from Distributable Funds without an order of the Court, subject to final allowance pursuant to Bankruptcy Code § 330.

7.2.5.   <u>Limitation of Liability</u>. Notwithstanding anything to the contrary in this Plan, the Subchapter V Trustee shall have no liability to any Creditor, Claimant, the Debtor, the Reorganized Debtor, or any other party-in-interest for except upon a finding of the Bankruptcy Court in a Final Order that the Subchapter V Trustee engaged in fraud, intentional misconduct, or gross negligence.

## 7.3.   **Vesting of Assets**.

On the Effective Date, all Property of the Estate, excluding Retained Causes of Action, shall vest in Reorganized Debtor.

## 7.4.   **Preservation of the Debtor's Claims**.

All Retained Causes of Action shall be preserved and shall constitute Property of the Estate and shall be conveyed to Subchapter V Trustee on the Effective Date. The Court shall retain jurisdiction to determine all such Retained Causes of Action until the entry of a Final Decree.

## 7.5.   **Preservation of Insurance**.

Nothing in this Plan, including the discharge or release of the Debtor provided in this Plan, shall diminish, or impair the enforceability of any insurance policies that may cover any Claims against the Debtor, the Reorganized Debtor, or any shareholder, officer, director, agent, professional, financial advisor or other Person covered by any insurance policy maintained by the Debtor.

## 7.6.   **Release of Liens**.

Except as otherwise provided in the Plan, the Confirmation Order, or in any document, instrument, or other agreement created in connection with the Plan, all mortgages, deeds of trust, Liens or other security interests against the Property of the Estate shall be released on the Effective Date.

## 7.7.   **Exemption from Stamp or Similar Taxes**.

In accordance with Bankruptcy Code § 1146(c): (a) the issuance, distribution, transfer or exchange of Reorganized Debtor's equity interests or other property of the Debtor's Estate; (b) the creation, modification, consolidation or recording of any deed of trust or other security interest, the securing of additional indebtedness by such means or by other means in furtherance of, on in connection with, this Plan or the Confirmation Order; (c) the making, assignment, modification or recording of any lease or sublease; or (d) the making, delivery, or recording of a deed or other

instrument of transfer under, in furtherance of, or in connection with, this Plan, the Confirmation Order, or any transaction contemplated by any of the foregoing shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax or stamp act or real estate transfer or mortgage recording tax, or any governmental assessment. The appropriate state or local government officials or agents shall be directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

7.8.   **Recordable Order.**

Upon Confirmation of the Plan, the Confirmation Order shall be deemed to be in recordable form and shall be accepted by any recording officer for filing and recording purposes without further or additional orders when certified by the Clerk of the Bankruptcy Court.

7.9.   **Effectuating Documents and Further Transactions.**

The Reorganized Debtor shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.


# ARTICLE 8
# CONDITIONS PRECEDENT

8.1.   **Conditions to the Effective Date**.

Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless, and until, each of the following conditions have been satisfied by the Debtor or, if applicable, waived, in writing by the Debtor and the New Equity:

a.   The Confirmation Order, in a form acceptable to the Debtor, shall have become a Final Order; *provided, however*, that the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order at the option of the Debtor, unless the effectiveness of the Confirmation Order has been stayed or vacated, in which case the Effective Date may be, again at the option of the Debtor, the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order;

b.   No request for revocation of the Confirmation Order under Bankruptcy Code § 1144 has been made, or, if made, remains pending.

c.   Entry into an employment and non-compete agreement with Jones acceptable to the Debtor and the Subchapter V Trustee

d.   Sufficient Distributable Funds are available on the Effective Date to pay in full the Allowed Non-Ordinary Administrative Expenses.

e.   The Reorganized Debtor will have professional management to operate its business during the Plan Period.

8.2.   **Notice to Bankruptcy Court.**

Promptly after the Effective Date, Reorganized Debtor shall file with the clerk of the Bankruptcy Court a notice that the Plan has become effective; *provided, however*, that failure to

file such notice shall not affect the effectiveness of the Plan or the rights and substantive obligations of any entity hereunder.

# ARTICLE 9
## PROCEDURES FOR DISPUTED CLAIMS

9.1.      **Generally**.

Except as otherwise provided in the Plan, all Claims against the Debtor that are disputed as of the Effective Date shall be subject to the following procedures in this Article 9:

9.2.      **Objections to Claim**.

Except as is otherwise provided for with respect to Administrative Expense Claims, or as otherwise ordered by the Bankruptcy Court, objections to Claims and Equity Interests shall be prosecuted as follows:

9.2.1.    Pre-Effective Date Objections. Prior to the Effective Date, any party entitled to do so under the Bankruptcy Code or order of the Court may file and prosecute objections to Claims. The failure of the Debtor prior to Confirmation to object to a Claim for purposes of voting on the Plan shall in no way be deemed to be a waiver of the right of Reorganized Debtor or Subchapter V Trustee to object to such Claim in whole or in part.

9.2.2.    Post Effective Date Objections. After the Effective Date, objections to Claims may be made exclusively by the Reorganized Debtor and/or the Subchapter V Trustee. Either the Reorganized Debtor or the Subchapter V Trustee may bring an objection to any Claim and may join in any objection to Claim asserted by the other.

9.3.      **Time to File Objections to Claim**.

The Reorganized Debtor or Subchapter V Trustee shall file any Objection to Claim as soon as practicable, but in no event later than the later of (a) sixty (60) days after the later of the Effective Date or the Bar Date or (b) other date set by the Court. The filing, prosecution, settlement, or withdrawal of all objections to Claims after the Effective Date are reserved to the sound discretion of Reorganized Debtor and Subchapter V Trustee; *provided that* (x) any settlement of an objection to Claim shall require the consent of the party that brought the objection, (y) any settlement of an objection to Claim of a Class 1, Class 2, Class 3, or Class 4 Claim or Interest by the Debtor (other than through this Plan) shall require the consent of the Subchapter V Trustee, and (z) any settlement an Ordinary Course Administrative Expense Claim shall require the consent of the Debtor or Reorganized Debtor.

9.4.      **Disputed Claim Reserve**.

From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by a Final Order of the Bankruptcy Court, the Subchapter V Trustee shall, consistent with and subject to Bankruptcy Code § 1123(a)(4), with respect to each applicable class of Claims against the Debtor, retain in the applicable Disputed Claims Reserve for such Class in an aggregate amount equal to the distributions that would have been made to holders of Disputed Claims of such Class as if such Disputed Claims were Allowed Claims against the Debtor, in each case in an amount equal to the least of (i) the filed amount of such Disputed Claims, (ii) the amount determined, to the extent permitted by the Bankruptcy Code and

Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Claims, and (iii) such other amounts as may be agreed upon by the holders of such Disputed Claims and the Subchapter V Trustee.

9.5.    **Interest on Claims**.

Unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

## ARTICLE 10
## PROVISIONS GOVERNING DISTRIBUTIONS

10.1.    **Distributions for Claims Allowed**.

No distributions shall be made upon any Claim or Equity Interest except to Allowed Claims and Equity Interests, whether allowance results from: (i) the provisions of the Code; (ii) the entry of a Final Order on an objection to a Claim or Equity Interest; (iii) the determination of an objection to Claim or Equity Interest contained in an adversary proceeding or other pending litigation which the Court has directed to liquidate the Claim of a Creditor or Equity Interest holder; (iv) through stipulation entered into between Reorganized Debtor or the Subchapter V Trustee and a Creditor or holder of an Equity Interest; (v) through estimation pursuant to Bankruptcy Code § 502(c), or (vi) under the express terms of the Plan. Nothing herein shall preclude the payment of the Debtor's operating expenses without Court order.

10.2.    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**.

10.2.1.    Delivery of Distributions in General. Distributions to holders of Allowed Claims shall be made at the addresses set forth in the Proofs of Claim; (ii) the Debtor's Schedules; or (iii) other records of Reorganized Debtor at the time of the distribution.

10.2.2.    Undeliverable and Unclaimed Distributions.

10.2.2.1.    *Holding and Investment of Undeliverable and Unclaimed Distributions*. If the distribution to any holder of an Allowed Claim is returned to Reorganized Debtor or Subchapter V Trustee as undeliverable or is otherwise unclaimed, no further distributions shall be made to such holder unless and until the Reorganized Debtor or Subchapter V Trustee is notified in writing of such holder's then-current address. Undeliverable and unclaimed distributions shall be held by the Subchapter V Trustee as an "Unclaimed Distribution Reserve."

10.2.2.2.    *After Distributions Become Deliverable*. The Subchapter V Trustee shall make all distributions that have become deliverable or have been claimed after a distribution without interest.

10.2.2.3.    *Failure to Claim Undeliverable Distributions*. Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed distribution within one (1) year after the Effective Date shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed distribution against the Debtor, the Estate, the Reorganized Debtor, the Subchapter V Trustee, or the Distributable Funds. In such

cases, the Pro Rata Share of any Cash or other property held in the Unclaimed Distribution Reserve for distribution on account of such Claims shall be distributed to Class 3 Claims or Class 4 Interests as applicable notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require anyone to attempt to locate any holder of an Allowed Claim.

10.3.   **Withholding and Reporting Requirements**.

In connection with the Plan and all distributions thereunder, Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Subchapter V Trustee shall provide the Reorganized Debtor with a list of all distributions made from Distributable Funds to allow the Reorganized Debtor to comply with such withholding and reporting requirements.

10.4.   **IRS Form W-9**.

Within 3 business days of the Effective Date, the Reorganized Debtor will mail Internal Revenue Service Form W-9 to each Creditor to whom a Cash distribution is to be made. Notwithstanding anything to the contrary in this Plan, the Subchapter V Trustee shall withhold any distribution required to be made to a non-governmental Creditor, until that Creditor prepares, executes, and returns to the Subchapter V Trustee the Internal Revenue Service Form W-9, unless the Reorganized Debtor informs the Subchapter V Trustee in writing that the Reorganized Debtor has an Internal Revenue Service Form W-9 for the Creditor on file.

10.5.   **Setoffs**.

The Reorganized Debtor and/or Subchapter V Trustee may, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtor may have against the holder of such Claim; *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Reorganized Debtor of any such Claim that the Debtor may have against such holder.

10.6.   **Payments and Distributions with Respect to Disputed Claims**.

No payment or distribution under the Plan shall be made on account of any Claim unless and until such Claim becomes an Allowed Claim by Final Order of the Court.


## ARTICLE 11
## EXECUTORY CONTRACTS


11.1.   **Executory Contracts Rejected**.

Except all Executory Contracts and unexpired leases assumed by the Confirmation Order or by a separate order of the Bankruptcy Court order, all other Executory Contracts and unexpired leases shall be rejected upon confirmation of this Plan

11.2.   **Filing Proofs of Claim for Rejection Damages**. Any Claims arising from the rejection of an Executory Contract or unexpired lease by this Plan shall be evidenced by a Proof of Claim filed on or before the date that is thirty (30) days after the Effective Date. A failure to file a Proof of Claim for Claims arising from the rejection of an Executory Contract or unexpired lease within

such period will result in the Claim in question being discharged and its holder forever barred from asserting such Claim against the Debtor, its Estate, the Reorganized Debtor, or the Distributable Funds.

## ARTICLE 12
## EFFECT OF CONFIRMATION

12.1.  **Binding Effect**.

Except as otherwise provided in Bankruptcy Code § 1141(d)(3), and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest the Debtor and inure to the benefit of, and be binding on, any such holder's respective successors and assigns, regardless of whether any Claim or Interest of such holder is impaired under this Plan or whether such Holder has accepted this Plan.

12.2.  **Discharge of Claims against and Interests in the Debtor**.

If the Debtor's Plan is confirmed under § 1191(a), upon the Effective Date and in consideration of the distributions to be made under this Plan, except as otherwise provided in the Plan or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest and any successor, assign and affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtor, to the fullest extent permitted by Bankruptcy Code § 1141, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.

If the Debtor's Plan is confirmed under § 1191(b), the Debtor will be discharged as soon as practicable after completion by the Debtor of all payments due within 5 years after the Effective Date.  The Court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of this title, and all other debts allowed under section 503 of the Code and provided for in the Plan.

Except as otherwise provided in this Plan, upon discharge, all such holders of Claims against or Interests in the Debtor, and their successors, assigns and affiliates, shall be forever precluded and enjoined, pursuant to Bankruptcy Code § 105, 524 and 1141, from prosecuting or asserting any such discharged Claim against, or terminated Interest in, the Reorganized Debtor.

12.3.  **Pre-Confirmation Injunctions, Stays, Stipulations, and Discovery Orders**.

Unless otherwise provided in this Plan, all injunctions and stays arising under or entered during the Chapter 11 Case, whether under Bankruptcy Code §§ 105 or 362 or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

12.4.  **Injunction against Interference with Plan**.

SUBJECT TO SECTION 15.2 OF THE PLAN REGARDING WITHDRAWAL AND REVOCATION OF THE PLAN, UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR, AND OTHER PARTIES IN INTEREST WHO RECEIVED ACTUAL OR CONSTRUCTIVE NOTICE OF THIS PLAN PRIOR TO THE CONFIRMATION HEARING, SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.

12.5.  **Plan Injunction**.

EXCEPT AS OTHERWISE PROVIDED IN THIS PLAN OR IN THE CONFIRMATION ORDER, AS OF THE ENTRY OF THE CONFIRMATION ORDER BUT SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTOR ARE, WITH RESPECT TO ANY SUCH CLAIM OR INTEREST, PERMANENTLY ENJOINED AFTER THE ENTRY OF THE CONFIRMATION ORDER FROM: (I) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND (INCLUDING ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING, DIRECTLY OR INDIRECTLY, THE DEBTOR, ITS ESTATE, THE REORGANIZED DEBTOR, OR THE PROPERTY OF ANY OF THE FOREGOING, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS MENTIONED IN THIS CLAUSE (I) OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (II) ENFORCING, LEVYING, ATTACHING (INCLUDING ANY PREJUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING IN ANY MANNER OR BY ANY MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR, ITS ESTATE, THE REORGANIZED DEBTOR, OR THEIR PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS MENTIONED IN THIS CLAUSE (II) OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (III) CREATING, PERFECTING OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR, ITS ESTATE, THE REORGANIZED DEBTOR, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS MENTIONED IN THIS CLAUSE (III) OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (IV) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THIS PLAN; AND (V) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY, OR IS INCONSISTENT, WITH THE PROVISIONS OF THIS PLAN; *PROVIDED*, *HOWEVER*, THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE SUCH PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTERESTS THE DEBTOR OR ITS ESTATE FROM EXERCISING THEIR RIGHTS, OR OBTAINING BENEFITS, PURSUANT TO, AND CONSISTENT WITH, THE TERMS OF THIS PLAN.

12.6.  **Exculpation**.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER THE DEBTOR, REORGANIZED DEBTOR, NOR ANY OF THEIR RESPECTIVE PARTNERS, GENERAL PARTNERS, MEMBERS, SHAREHOLDERS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR PROFESSIONALS HAVE OR MAY INCUR ANY LIABILITY TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST, OR ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RESPECTIVE MEMBERS OR

FORMER MEMBERS, AGENTS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, ATTORNEYS OR AFFILIATES, OR ANY OF THEIR SUCCESSORS OR ASSIGNS, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO OR ARISING OUT OF THE CHAPTER 11 CASE, THE NEGOTIATION AND PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN OR THE ADMINISTRATION OF THE PLAN (THE "CHAPTER 11 ACTIVITIES"), EXCEPT FOR THEIR ACTS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION, AND IN ALL RESPECTS ARE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES IN CONNECTION WITH THE CHAPTER 11 ACTIVITIES. NO HOLDER OF A CLAIM OR EQUITY INTEREST, OR ANY OTHER PARTY IN INTEREST, INCLUDING THEIR RESPECTIVE AGENTS, EMPLOYEES, REPRESENTATIVES, FINANCIAL ADVISORS, ATTORNEYS OR AFFILIATES, HAVE ANY RIGHT OF ACTION AGAINST THE DEBTOR, REORGANIZED DEBTOR, OR ANY OF THEIR RESPECTIVE PARTNERS, GENERAL PARTNERS, OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES, AGENTS, ADVISORS OR PROFESSIONALS FOR ANY ACT OR OMISSION IN CONNECTION WITH THE CHAPTER 11 ACTIVITIES, EXCEPT FOR THEIR ACTS OR OMISSIONS CONSTITUTING WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION.

12.7.    **Injunction Related to Exculpation**.

TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, THE CONFIRMATION ORDER SHALL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CAUSES OF ACTION EXCULPATED PURSUANT TO THIS PLAN.

# ARTICLE 13
# JURISDICTION

13.1    **Retention of Jurisdiction**.

The Bankruptcy Court shall retain and have all the jurisdiction conferred upon it by Bankruptcy Code, including all amendments thereof now existing or hereafter arising, and all amendments made to Title 28 of the United States Code after October 1, 1979. Without limiting the foregoing in any way, the Bankruptcy Court shall retain jurisdiction of this Chapter 11 Case after the Confirmation Date in respect to the following matters to the fullest extent under applicable law:

a. To enable any party in interest (including the Reorganized Debtor) to consummate all proceedings that it may bring prior to the Confirmation Date to set aside Liens, or to recover any preferences, transfers, assets, Claims or damages to which said party may be entitled, or to reject any contracts and recover any property under the provisions of the Bankruptcy Code or other federal or state law;

b. To hear and determine all Claims, estimation of claims, and objections to Claims, including Claims arising from the rejection of any Executory Contract and any objections which may be made thereto;

c.   To liquidate or estimate damages or determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim;

d.   To adjudicate all Claims to any Lien on any Property of the Estate or any proceeds thereof;

e.   To recover all assets and Property of the Estate, wherever located, to the extent necessary for the consummation of the Plan;

f.   To Allow, Disallow, or otherwise adjudicate any Claim;

g.   To resolve any disputes pertaining to the terms and conditions of the sale of any Property of the Estate;

h.   To resolve any disputes pertaining to the business operations of the Debtor during the pendency of the Chapter 11 Case;

i.   To enter any orders which may be necessary or appropriate to modify, carry out or enforce the provisions of the Plan, including the injunctions provided for in the Plan;

j.   To determine any defaults under the Plan, and the consequences of such default;

k.   To resolve any disputes over the meaning of any provision of the Plan;

l.   To make such determinations as are specifically provided in the Plan;

m.   To hear and determine all requests for compensation and/or reimbursement of expenses which may be required under the Code, and not otherwise dispensed with under the Plan;

n.   To grant the Debtor a discharge pursuant to § 1192 of the Bankruptcy Code; and

o.   To enter a final decree pursuant to Bankruptcy Code § 350 and Bankruptcy Rule 3022.

13.2   **Failure of Bankruptcy Court to Exercise Jurisdiction**.

If the Bankruptcy Court abstains or exercises discretion not to hear any matter within the scope of its jurisdiction, nothing herein shall prohibit or limit the exercise of jurisdiction by any other tribunal having competent jurisdiction over such matter.


# ARTICLE 14
## MODIFICATION OF PLAN

14.1   **Pre-Confirmation Modifications**.

The Debtor may propose amendments or modifications to the Plan at any time prior to the Confirmation Date, with leave of the Court and upon notice pursuant to Bankruptcy Code § 1193(a) and Bankruptcy Rule 3019.

14.2   **Post-Confirmation Modifications**.

After the Confirmation Date, Modification of the Plan is permitted only upon Court order and only as authorized under Bankruptcy Code § 1193.

## ARTICLE 15
## GENERAL PROVISIONS

15.1 **The Subchapter V Trustee**.

The trustee appointed under Bankruptcy Code § 1183(a) will have appropriate access to the management, books and records and professionals of the Debtor to evaluate the Plan. The Trustee's term is anticipated to continue until all Distributions from Distributable Funds are made under the Plan.

15.2 **Revocation, Withdrawal or Non-Consummation**.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtor revokes or withdraws the Plan, or if confirmation or consummation does not occur, then: (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor or any other Person, or (iii) constitute an admission of any sort by the Debtor or any other Person.

15.3 **Severability of Plan Provisions**.

If, prior to confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

15.4 **Successors and Assigns**.

The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

15.5 **Final Decree**.

The Reorganized Debtor or the Subchapter V Trustee shall file an application for entry of a final decree upon the distribution of all Distributable Funds.

15.6 **Notices**.

Unless otherwise provided herein, all notices or demands required or permitted hereunder shall be deemed to have been duly given and served when made in writing and (a) deposited in the United States Mail in an envelope addressed to the last known address of the noticed party, with

postage prepaid or (b) sent by electronic mail to an address indicated on a Proof of Claim or other document filed in the Bankruptcy Case. Any notices to be provided to the Reorganized Debtor shall be addressed as follows:

> To the Reorganized Debtor:

>> Attn: Patrick Magill
>> Chief Restructuring Officer
>> 3019 Alvin DeVane Blvd.
>> Austin, Texas 78741

> With a copy to the attorneys for the Reorganized Debtor:

>> Attn: Raymond W. Battaglia
>> Law Offices of Raymond W. Battaglia
>> 66 Granburg Circle
>> San Antonio, Texas 78218
>> rbattaglialaw@outlook.com

### 15.7 **Governing Laws**.

The Plan shall be governed by the laws of the State of Texas and the laws of the United States, as may be applicable.

### 15.8 **Cramdown**.

15.8.1  The Debtor may request Confirmation of the Plan, under Bankruptcy Code § 1129(b).

15.8.2  Subchapter V modifies the rules under which classes of claims can be crammed down. Subchapter V permits a court to disregard Bankruptcy Code § 1129(a)(10) and cram down a plan even if no impaired class of claims accepts the plan. Specifically, Bankruptcy Code § 1191(b) provides that if all the applicable requirements of Bankruptcy Code § 1129(a) are met other than subsections (a)(8), (a)(10), and (a)(15), the Bankruptcy Court can confirm the plan if:

> a.  The plan does not discriminate unfairly against any impaired, non-consenting class.

> b.  Is fair and equitable regarding each class of impaired claims or interests that has rejected the plan.

15.8.3  The Debtor reserves the right to modify the Plan to the extent, if any, required for confirmation pursuant to Bankruptcy Code § 1129(b), as modified by Bankruptcy Code § 1191.

*[Signature Page Follows]*

**DATED:**        March __, 2023.

Respectfully submitted,

**FREE SPEECH SYSTEMS LLC.**

_____

By: Patrick Magill
Its: Chief Restructuring Officer

Through its counsel:

LAW OFFICES OF RAY BATTAGLIA, PLLC

/S/ RAYMOND W. BATTAGLIA
Raymond W. Battaglia
State Bar No. 01918055
rbattaglialaw@outlook.com
66 Granburg Circle
San Antonio, Texas 78218
Tel. (210) 601-9405

*Counsel to the Debtor and Debtor-In-Possession*

# Exhibit A

# Projections of Net Disposable Income

# 2023 Profit and Loss Summary



| | 2023 | 2024 | | 2025 | | 2026 | | 2027 | |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Supplement Sales | 30,767,471 | 30,851,924 | | 32,394,520 | | 34,014,246 | | 35,714,959 | |
| Merchandise | 179,565 | 224,565 | | 235,793 | | 247,583 | | 259,962 | |
| Non-Supplement Initiatives | 12,000 | 12,000 | | 60,000 | | 90,000 | | 120,000 | |
| Advertising / Endorsements | 540,000 | 1,120,000 | | 1,288,000 | | 1,432,038 | | 1,646,843 | |
| Donations | 325,000 | 375,000 | | 375,000 | | 375,000 | | 375,000 | |
| **Total Income** | **31,824,036** | **32,583,489** | 2.4% | **34,353,313** | 5.4% | **36,158,867** | 5.3% | **38,116,764** | 5.4% |
| **Cost of Goods Sold** | | | | | | | | | |
| FSS Supplement Costs | 11,829,348 | 10,273,691 | | 10,633,270 | | 11,005,434 | | 11,390,625 | |
| Online Merchandise | 107,739 | 134,739 | | 139,455 | | 144,336 | | 149,388 | |
| Non-Supplement Sales Costs | 8,400 | 8,400 | | 42,000 | | 63,000 | | 84,000 | |
| **Total Cost of Goods Sold** | **11,945,487** | **10,416,830** | | **10,814,725** | | **11,212,770** | | **11,624,012** | |
| **Gross Margin** | **19,878,549** | **22,166,659** | 11.5% | **23,538,589** | 6.2% | **24,946,097** | 6.0% | **26,492,752** | 6.2% |
| | *62.5%* | *68.0%* | | *68.5%* | | *69.0%* | | *69.5%* | |
| **Personnel Expenses** | | | | | | | | | |
| Salaries | 2,930,779 | 3,077,318 | | 3,231,184 | | 3,392,743 | | 3,562,380 | |
| Alex Jones Salary | 520,000 | 520,000 | | 520,000 | | 520,000 | | 520,000 | |
| New COO Candidate | 360,000 | 520,000 | | 520,000 | | 520,000 | | 520,000 | |
| Hourly Wages & Overtime | 780,232 | 819,244 | | 860,206 | | 903,216 | | 948,377 | |
| Payroll Taxes | 351,212 | 377,647 | | 392,551 | | 408,201 | | 424,633 | |
| Benefits | 275,461 | 296,194 | | 307,883 | | 159,625 | | 333,045 | |
| Executive Incentive Comp | 560,000 | 900,000 | | 1,020,000 | | 1,140,000 | | 1,260,000 | |
| Employee Bonuses | 352,000 | 584,484 | | 613,708 | | 644,394 | | 676,614 | |
| Payroll Tax on Bonus Comp | 21,432 | 34,885 | | 38,392 | | 41,933 | | 45,510 | |
| Contract Employees | 839,400 | 881,370 | | 925,439 | | 971,710 | | 1,020,296 | |
| Consulting Services | 42,000 | 45,000 | | 48,000 | | 60,000 | | 72,000 | |
| **Total Personnel Costs** | **7,032,516** | **8,056,142** | 14.6% | **8,477,364** | 5.2% | **8,761,822** | 3.4% | **9,382,856** | 7.1% |
| | *22.1%* | *24.7%* | | *24.7%* | | *24.2%* | | *24.6%* | |
| **Operations Expense** | | | | | | | | | |
| IT Expenses - Production | 2,432,100 | 2,553,705 | | 2,681,390 | | 2,815,460 | | 2,956,233 | |
| IT Expesnes - Online Store | 1,065,500 | 1,048,000 | | 1,100,400 | | 1,155,420 | | 1,213,191 | |
| Advertising & Promotion | 500,500 | 525,525 | | 551,801 | | 579,391 | | 608,361 | |
| Facilities | 1,457,805 | 1,529,895 | | 1,606,390 | | 1,686,709 | | 1,771,045 | |
| Travel | 173,800 | 182,490 | | 191,615 | | 201,195 | | 211,255 | |
| Administrative | 114,600 | 120,330 | | 126,347 | | 132,664 | | 139,297 | |
| **Total Operations Expense** | **5,744,305** | **5,959,945** | 3.8% | **6,257,942** | 5.0% | **6,570,839** | 5.0% | **6,899,381** | 5.0% |
| | *18.1%* | *18.3%* | | *18.2%* | | *18.2%* | | *18.1%* | |
| **Capital Expenditures** | 60,000 | 80,000 | | 100,000 | | 120,000 | | 140,000 | |
| **Total Expenses** | **12,836,821** | **14,096,087** | 9.8% | **14,835,306** | 5.2% | **15,452,662** | 4.2% | **16,422,237** | 6.3% |
| | *40.3%* | *43.3%* | | *43.2%* | | *42.7%* | | *43.1%* | |
| **Income** | **7,041,728** | **8,070,572** | 14.6% | **8,703,283** | 7.8% | **9,493,435** | 9.1% | **10,070,515** | 6.1% |
| | *22.1%* | *24.8%* | | *25.3%* | | *26.3%* | | *26.4%* | |

43,379,532

**Priority Claims**
**Class 3-A**
**Administrative Claims - Pendency**

       **CRO Fees**
       **Trustee Fees**
    **Sandy Hook Legal Fees**
       **Ray Battaglia**

**Post Effective Date Professional Fees**
       **Trustee Fees**
    **Sandy Hook Legal Fees**

**2023 Profit and Loss Summary**


FREE SPEECH SYSTEMS

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2023 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Supplement Sales | 2,658,375 | 2,552,885 | 2,599,132 | 2,561,571 | 2,593,538 | 2,558,375 | 2,537,596 | 2,488,743 | 2,394,361 | 2,448,333 | 2,617,807 | 2,756,755 | 30,767,471 |
| Merchandise | 14,475 | 13,410 | 14,580 | 14,655 | 14,850 | 14,250 | 14,295 | 14,760 | 13,860 | 14,910 | 16,950 | 18,570 | 179,565 |
| Non-Supplement Initiatives | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Advertising / Endorsements | 5,000 | 5,000 | 5,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 75,000 | 75,000 | 75,000 | 540,000 |
| Donations | 7,500 | 7,500 | 7,500 | 125,000 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 125,000 | 7,500 | 7,500 | 325,000 |
| **Total Income** | 2,686,350 | 2,579,795 | 2,627,212 | 2,752,226 | 2,666,888 | 2,631,125 | 2,610,391 | 2,562,003 | 2,466,721 | 2,664,243 | 2,718,257 | 2,858,825 | 31,824,036 |
| **Cost of Goods Sold** | | | | | | | | | | | | | |
| FSS Supplement Costs | 1,169,160 | 1,118,380 | 1,102,780 | 1,084,699 | 1,047,387 | 1,030,460 | 967,758 | 906,379 | 797,322 | 815,295 | 871,730 | 917,999 | 11,829,348 |
| Online Merchandise | 8,685 | 8,046 | 8,748 | 8,793 | 8,910 | 8,550 | 8,577 | 8,856 | 8,316 | 8,946 | 10,170 | 11,142 | 107,739 |
| Non-Supplement Sales Costs | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 8,400 |
| **Total Cost of Goods Sold** | 1,178,545 | 1,127,126 | 1,112,228 | 1,094,192 | 1,056,997 | 1,039,710 | 977,035 | 915,935 | 806,338 | 824,941 | 882,600 | 929,841 | 11,945,487 |
| **Gross Margin** | 1,507,805 | 1,452,669 | 1,514,984 | 1,658,034 | 1,609,891 | 1,591,415 | 1,633,356 | 1,646,068 | 1,660,383 | 1,839,302 | 1,835,657 | 1,928,984 | 19,878,549 |
| | *56.1%* | *56.3%* | *57.7%* | *60.2%* | *60.4%* | *60.5%* | *62.6%* | *64.2%* | *67.3%* | *69.0%* | *67.5%* | *67.5%* | *62.5%* |
| **Personnel Expenses** | | | | | | | | | | | | | |
| Salaries | 218,445 | 218,445 | 218,445 | 218,445 | 218,445 | 347,667 | 229,367 | 229,367 | 229,367 | 229,367 | 229,367 | 344,051 | 2,930,779 |
| Alex Jones Salary | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 520,000 |
| New COO Candidate | - | - | - | - | 40,000 | 60,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 360,000 |
| Hourly Wages & Overtime | 58,554 | 58,554 | 58,554 | 58,554 | 58,554 | 87,831 | 61,482 | 61,482 | 61,482 | 61,482 | 61,482 | 92,223 | 780,232 |
| Payroll Taxes | 24,250 | 24,250 | 24,250 | 24,250 | 27,310 | 42,496 | 28,370 | 28,370 | 28,370 | 28,370 | 28,370 | 42,555 | 351,212 |
| Benefits | 19,020 | 19,020 | 19,020 | 19,020 | 21,420 | 33,330 | 22,251 | 22,251 | 22,251 | 22,251 | 22,251 | 33,376 | 275,461 |
| Executive Incentive Comp | - | - | - | - | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 560,000 |
| Employee Bonuses | - | - | - | - | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 352,000 |
| Payroll Tax on Bonus Comp | - | - | - | - | 2,679 | 2,679 | 2,679 | 2,679 | 2,679 | 2,679 | 2,679 | 2,679 | 21,432 |
| Contract Employees | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 839,400 |
| Consulting Services | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 42,000 |
| **Total Personnel Costs** | 433,719 | 433,719 | 433,719 | 433,719 | 595,858 | 821,452 | 611,599 | 611,599 | 611,599 | 611,599 | 611,599 | 822,334 | 7,032,516 |
| | *16.1%* | *16.8%* | *16.5%* | *15.8%* | *22.3%* | *31.2%* | *23.4%* | *23.9%* | *24.8%* | *23.0%* | *22.5%* | *28.8%* | *22.1%* |
| **Operations Expense** | | | | | | | | | | | | | |
| IT Expenses - Production | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 202,675 | 2,432,100 |
| IT Expsenes - Online Store | 101,500 | 101,500 | 101,500 | 97,000 | 82,000 | 82,000 | 83,000 | 83,000 | 83,000 | 83,000 | 84,000 | 84,000 | 1,065,500 |
| Advertising & Promotion | 38,750 | 38,750 | 38,750 | 41,250 | 41,250 | 41,250 | 43,250 | 43,250 | 43,250 | 46,250 | 43,250 | 41,250 | 500,500 |
| Facilities | 119,335 | 119,335 | 119,335 | 121,700 | 122,200 | 122,200 | 122,700 | 122,700 | 122,700 | 122,200 | 121,700 | 121,700 | 1,457,805 |
| Travel | 2,550 | 2,550 | 38,350 | 2,550 | 2,550 | 38,350 | 2,550 | 2,550 | 38,350 | 2,550 | 2,550 | 38,350 | 173,800 |
| Administrative | 7,700 | 7,700 | 12,700 | 12,700 | 7,700 | 9,700 | 7,700 | 7,700 | 10,500 | 8,500 | 8,500 | 13,500 | 114,600 |
| **Total Operations Expense** | 472,510 | 472,510 | 513,310 | 477,875 | 458,375 | 496,175 | 461,875 | 461,875 | 500,475 | 465,175 | 462,675 | 501,475 | 5,744,305 |
| | *17.6%* | *18.3%* | *19.5%* | *17.4%* | *17.2%* | *18.9%* | *17.7%* | *18.0%* | *20.3%* | *17.5%* | *17.0%* | *17.5%* | *18.1%* |
| **Capital Expenditures** | - | - | 15,000 | - | - | 15,000 | - | - | 15,000 | - | - | 15,000 | 60,000 |
| **Total Expenses** | 906,229 | 906,229 | 962,029 | 911,594 | 1,054,233 | 1,332,627 | 1,073,474 | 1,073,474 | 1,127,074 | 1,076,774 | 1,074,274 | 1,338,809 | 12,836,821 |
| | *33.7%* | *35.1%* | *36.6%* | *33.1%* | *39.5%* | *50.6%* | *41.1%* | *41.9%* | *45.7%* | *40.4%* | *39.5%* | *46.8%* | *40.3%* |
| **Income** | 601,576 | 546,440 | 552,955 | 746,440 | 555,658 | 258,787 | 559,882 | 572,595 | 533,309 | 762,528 | 761,383 | 590,175 | 7,041,728 |
| | *22.4%* | *21.2%* | *21.0%* | *27.1%* | *20.8%* | *9.8%* | *21.4%* | *22.3%* | *21.6%* | *28.6%* | *28.0%* | *20.6%* | *22.1%* |

**CRO Fees**
**Trustee Fees**
**Sandy Hook Legal Fees**
**Ray Bataglia**

**2023 Profit and Loss Summary**


FREE SPEECH SYSTEMS

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2024 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Supplement Sales | 2,493,809 | 2,394,638 | 2,494,573 | 2,552,261 | 2,572,250 | 2,495,745 | 2,495,358 | 2,573,024 | 2,460,767 | 2,578,400 | 2,787,518 | 2,953,581 | 30,851,924 |
| Merchandise | 14,475 | 13,410 | 14,580 | 14,655 | 14,850 | 14,250 | 24,295 | 24,760 | 23,860 | 29,910 | 16,950 | 18,570 | 224,565 |
| Non-Supplement Initiatives | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Advertising / Endorsements | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 85,000 | 85,000 | 100,000 | 100,000 | 125,000 | 150,000 | 100,000 | 1,120,000 |
| Donations | 7,500 | 7,500 | 7,500 | 150,000 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 150,000 | 7,500 | 7,500 | 375,000 |
| **Total Income** | **2,591,784** | **2,491,548** | **2,592,653** | **2,792,916** | **2,670,600** | **2,603,495** | **2,613,153** | **2,706,284** | **2,593,127** | **2,884,310** | **2,962,968** | **3,080,651** | **32,583,489** |
| **Cost of Goods Sold** | | | | | | | | | | | | | |
| FSS Supplement Costs | 830,438 | 797,414 | 830,693 | 849,903 | 856,559 | 831,083 | 830,954 | 856,817 | 819,435 | 858,607 | 928,243 | 983,542 | 10,273,691 |
| Online Merchandise | 8,685 | 8,046 | 8,748 | 8,793 | 8,910 | 8,550 | 14,577 | 14,856 | 14,316 | 17,946 | 10,170 | 11,142 | 134,739 |
| Non-Supplement Sales Costs | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 8,400 |
| **Total Cost of Goods Sold** | **839,823** | **806,160** | **840,141** | **859,396** | **866,169** | **840,333** | **846,231** | **872,373** | **834,451** | **877,253** | **939,113** | **995,384** | **10,416,830** |
| **Gross Margin** | **1,751,961** | **1,685,388** | **1,752,512** | **1,933,520** | **1,804,431** | **1,763,162** | **1,766,922** | **1,833,911** | **1,758,676** | **2,007,057** | **2,023,855** | **2,085,267** | **22,166,659** |
| | *67.6%* | *67.6%* | *67.6%* | *69.2%* | *67.6%* | *67.7%* | *67.6%* | *67.8%* | *67.8%* | *69.6%* | *68.3%* | *67.7%* | *68.0%* |
| **Personnel Expenses** | | | | | | | | | | | | | |
| Salaries | 229,367 | 229,367 | 229,367 | 229,367 | 229,367 | 365,050 | 240,836 | 240,836 | 240,836 | 240,836 | 240,836 | 361,253 | 3,077,318 |
| Alex Jones Salary | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 520,000 |
| New COO Candidate | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 520,000 |
| Hourly Wages & Overtime | 61,482 | 61,482 | 61,482 | 61,482 | 61,482 | 92,223 | 64,556 | 64,556 | 64,556 | 64,556 | 64,556 | 96,834 | 819,244 |
| Payroll Taxes | 28,370 | 28,370 | 28,370 | 28,370 | 28,370 | 44,161 | 29,482 | 29,482 | 29,482 | 29,482 | 29,482 | 44,224 | 377,647 |
| Benefits | 22,251 | 22,251 | 22,251 | 22,251 | 22,251 | 34,636 | 23,123 | 23,123 | 23,123 | 23,123 | 23,123 | 34,685 | 296,194 |
| Executive Incentive Comp | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 900,000 |
| Employee Bonuses | 43,627 | 43,627 | 43,627 | 43,627 | 43,627 | 68,591 | 45,809 | 45,809 | 45,809 | 45,809 | 45,809 | 68,713 | 584,484 |
| Payroll Tax on Bonus Comp | 2,788 | 2,788 | 2,788 | 2,788 | 2,788 | 3,374 | 2,839 | 2,839 | 2,839 | 2,839 | 2,839 | 3,377 | 34,885 |
| Contract Employees | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 881,370 |
| Consulting Services | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 45,000 |
| **Total Personnel Costs** | **620,082** | **620,082** | **620,082** | **620,082** | **620,082** | **880,233** | **638,843** | **638,843** | **638,843** | **638,843** | **638,843** | **881,284** | **8,056,142** |
| | *23.9%* | *23.9%* | *23.9%* | *22.2%* | *23.2%* | *33.8%* | *24.4%* | *23.6%* | *24.6%* | *22.1%* | *21.6%* | *28.6%* | *24.7%* |
| **Operations Expense** | | | | | | | | | | | | | |
| IT Expenses - Production | 212,809 | 212,809 | 212,809 | 212,809 | 212,809 | 212,809 | 212,809 | 212,809 | 212,809 | 212,809 | 212,809 | 212,809 | 2,553,705 |
| IT Expsenes - Online Store | 84,625 | 84,625 | 84,625 | 85,825 | 87,975 | 87,975 | 88,475 | 88,475 | 88,475 | 88,975 | 88,975 | 88,975 | 1,048,000 |
| Advertising & Promotion | 40,688 | 40,688 | 40,688 | 43,313 | 43,313 | 43,313 | 45,413 | 45,413 | 45,413 | 48,563 | 45,413 | 43,313 | 525,525 |
| Facilities | 125,035 | 125,035 | 125,035 | 127,785 | 128,310 | 128,310 | 128,835 | 128,835 | 128,835 | 128,310 | 127,785 | 127,785 | 1,529,895 |
| Travel | 2,678 | 2,678 | 40,268 | 2,678 | 2,678 | 40,268 | 2,678 | 2,678 | 40,268 | 2,678 | 2,678 | 40,268 | 182,490 |
| Administrative | 8,085 | 8,085 | 13,335 | 13,335 | 8,085 | 10,185 | 8,085 | 8,085 | 11,025 | 8,925 | 8,925 | 14,175 | 120,330 |
| **Total Operations Expense** | **473,919** | **473,919** | **516,759** | **485,744** | **483,169** | **522,859** | **486,294** | **486,294** | **526,824** | **490,259** | **486,584** | **527,324** | **5,959,945** |
| | *18.3%* | *19.0%* | *19.9%* | *17.4%* | *18.1%* | *20.1%* | *18.6%* | *18.0%* | *20.3%* | *17.0%* | *16.4%* | *17.1%* | *18.3%* |
| **Capital Expenditures** | - | - | 20,000 | - | - | 20,000 | - | - | 20,000 | - | - | 20,000 | 80,000 |
| **Total Expenses** | **1,094,001** | **1,094,001** | **1,156,841** | **1,105,826** | **1,103,251** | **1,423,092** | **1,125,136** | **1,125,136** | **1,185,666** | **1,129,101** | **1,125,426** | **1,428,608** | **14,096,087** |
| | *42.2%* | *43.9%* | *44.6%* | *39.6%* | *41.3%* | *54.7%* | *43.1%* | *41.6%* | *45.7%* | *39.1%* | *38.0%* | *46.4%* | *43.3%* |
| **Income** | **657,959** | **591,386** | **595,671** | **827,694** | **701,180** | **340,070** | **641,785** | **708,775** | **573,009** | **877,956** | **898,428** | **656,659** | **8,070,572** |
| | *25.4%* | *23.7%* | *23.0%* | *29.6%* | *26.3%* | *13.1%* | *24.6%* | *26.2%* | *22.1%* | *30.4%* | *30.3%* | *21.3%* | *24.8%* |

CRO Fees
Trustee Fees
Sandy Hook Legal Fees
Ray Bataglia

**2023 Profit and Loss Summary**



| | Q1 | Q2 | Q3 | Q4 | Total 2025 | Q1 | Q2 | Q3 | Q4 | Total 2026 | Q1 | Q2 | Q3 | Q4 | Total 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | | |
| Supplement Sales | 7,752,171 | 8,001,269 | 7,905,606 | 8,735,474 | **32,394,520** | 8,139,780 | 8,401,332 | 8,300,887 | 9,172,248 | **34,014,246** | 8,546,769 | 8,821,399 | 8,715,931 | 9,630,860 | **35,714,959** |
| Merchandise | 44,588 | 45,943 | 76,561 | 68,702 | **235,793** | 46,818 | 48,240 | 80,389 | 72,137 | **247,583** | 49,159 | 50,652 | 84,408 | 75,743 | **259,962** |
| Non-Supplement Initiatives | 15,000 | 15,000 | 15,000 | 15,000 | **60,000** | 22,500 | 22,500 | 22,500 | 22,500 | **90,000** | 30,000 | 30,000 | 30,000 | 30,000 | **120,000** |
| Advertising / Endorsements | 258,750 | 270,250 | 327,750 | 431,250 | **1,288,000** | 297,563 | 310,788 | 327,750 | 495,938 | **1,432,038** | 342,197 | 357,406 | 376,913 | 570,328 | **1,646,843** |
| Donations | 22,500 | 165,000 | 22,500 | 165,000 | **375,000** | 22,500 | 165,000 | 22,500 | 165,000 | **375,000** | 22,500 | 165,000 | 22,500 | 165,000 | **375,000** |
| **Total Income** | **8,093,009** | **8,497,462** | **8,347,417** | **9,415,425** | **34,353,313** | **8,529,160** | **8,947,860** | **8,754,026** | **9,927,822** | **36,158,867** | **8,990,624** | **9,424,456** | **9,229,752** | **10,471,932** | **38,116,764** |
| **Cost of Goods Sold** | | | | | | | | | | | | | | | |
| FSS Supplement Costs | 2,544,595 | 2,626,359 | 2,594,959 | 2,867,357 | **10,633,270** | 2,633,656 | 2,718,282 | 2,685,782 | 2,967,714 | **11,005,434** | 2,725,834 | 2,813,422 | 2,779,785 | 3,071,584 | **11,390,625** |
| Online Merchandise | 26,371 | 27,172 | 45,280 | 40,632 | **139,455** | 27,294 | 28,123 | 46,859 | 42,054 | **144,336** | 28,249 | 29,107 | 48,505 | 43,526 | **149,388** |
| Non-Supplement Sales Costs | 10,500 | 10,500 | 10,500 | 10,500 | **42,000** | 15,750 | 15,750 | 15,750 | 15,750 | **63,000** | 21,000 | 21,000 | 21,000 | 21,000 | **84,000** |
| **Total Cost of Goods Sold** | **2,581,466** | **2,664,031** | **2,650,739** | **2,918,489** | **10,814,725** | **2,676,699** | **2,762,155** | **2,748,397** | **3,025,519** | **11,212,770** | **2,775,083** | **2,863,529** | **2,849,290** | **3,136,110** | **11,624,012** |
| **Gross Margin** | **5,511,544** | **5,833,430** | **5,696,678** | **6,496,936** | **23,538,589** | **5,852,460** | **6,185,705** | **6,005,628** | **6,902,303** | **24,946,097** | **6,215,541** | **6,560,927** | **6,380,462** | **7,335,821** | **26,492,752** |
| | *68.1%* | *68.6%* | *68.2%* | *69.0%* | *68.5%* | *68.6%* | *69.1%* | *68.6%* | *69.5%* | *69.0%* | *69.1%* | *69.6%* | *69.1%* | *70.1%* | *69.5%* |
| **Personnel Expenses** | | | | | | | | | | | | | | | |
| Salaries | 722,507 | 864,974 | 758,632 | 885,071 | **3,231,184** | 758,632 | 908,223 | 796,564 | 929,324 | **3,392,743** | 796,564 | 953,634 | 836,392 | 975,791 | **3,562,380** |
| Alex Jones Salary | 120,000 | 140,000 | 120,000 | 140,000 | **520,000** | 120,000 | 140,000 | 120,000 | 140,000 | **520,000** | 120,000 | 140,000 | 120,000 | 140,000 | **520,000** |
| New COO Candidate | 120,000 | 140,000 | 120,000 | 140,000 | **520,000** | 120,000 | 140,000 | 120,000 | 140,000 | **520,000** | 120,000 | 140,000 | 120,000 | 140,000 | **520,000** |
| Hourly Wages & Overtime | 193,667 | 225,945 | 203,351 | 237,243 | **860,206** | 203,351 | 237,243 | 213,518 | 249,105 | **903,216** | 213,518 | 249,105 | 224,194 | 261,560 | **948,377** |
| Payroll Taxes | 88,447 | 104,875 | 91,952 | 107,277 | **392,551** | 91,952 | 109,048 | 95,631 | 111,570 | **408,201** | 95,631 | 113,430 | 99,495 | 116,077 | **424,633** |
| Benefits | 69,370 | 82,255 | 72,119 | 84,139 | **307,883** | 72,119 | - | - | 87,506 | **159,625** | 75,005 | 88,964 | 78,035 | 91,041 | **333,045** |
| Executive Incentive Comp | 255,000 | 255,000 | 255,000 | 255,000 | **1,020,000** | 285,000 | 285,000 | 285,000 | 285,000 | **1,140,000** | 315,000 | 315,000 | 315,000 | 315,000 | **1,260,000** |
| Employee Bonuses | 137,426 | 163,638 | 144,297 | 168,347 | **613,708** | 144,297 | 171,820 | 151,512 | 176,764 | **644,394** | 151,512 | 180,411 | 159,088 | 185,603 | **676,614** |
| Payroll Tax on Bonus Comp | 9,222 | 9,838 | 9,383 | 9,949 | **38,392** | 10,088 | 10,735 | 10,258 | 10,851 | **41,933** | 10,963 | 11,642 | 11,141 | 11,764 | **45,510** |
| Contract Employees | 231,360 | 231,360 | 231,360 | 231,360 | **925,439** | 242,928 | 242,928 | 242,928 | 242,928 | **971,710** | 255,074 | 255,074 | 255,074 | 255,074 | **1,020,296** |
| Consulting Services | 12,000 | 12,000 | 12,000 | 12,000 | **48,000** | 15,000 | 15,000 | 15,000 | 15,000 | **60,000** | 18,000 | 18,000 | 18,000 | 18,000 | **72,000** |
| **Total Personnel Costs** | **1,959,000** | **2,229,885** | **2,018,094** | **2,270,384** | **8,477,364** | **2,063,367** | **2,259,996** | **2,050,411** | **2,388,048** | **8,761,822** | **2,171,268** | **2,465,259** | **2,236,419** | **2,509,910** | **9,382,856** |
| | *24.2%* | *26.2%* | *24.2%* | *24.1%* | *24.7%* | *24.2%* | *25.3%* | *23.4%* | *24.1%* | *24.2%* | *24.2%* | *26.2%* | *24.2%* | *24.0%* | *24.6%* |
| **Operations Expense** | | | | | | | | | | | | | | | |
| IT Expenses - Production | 670,348 | 670,348 | 670,348 | 670,348 | **2,681,390** | 703,865 | 703,865 | 703,865 | 703,865 | **2,815,460** | 739,058 | 739,058 | 739,058 | 739,058 | **2,956,233** |
| IT Expenses - Online Store | 266,569 | 274,864 | 278,696 | 280,271 | **1,100,400** | 279,897 | 288,607 | 292,631 | 294,285 | **1,155,420** | 293,892 | 303,037 | 307,263 | 308,999 | **1,213,191** |
| Advertising & Promotion | 128,166 | 136,434 | 143,049 | 144,152 | **551,801** | 134,574 | 143,256 | 150,202 | 151,359 | **579,391** | 141,303 | 150,419 | 157,712 | 158,927 | **608,361** |
| Facilities | 393,860 | 403,625 | 405,830 | 403,074 | **1,606,390** | 413,553 | 423,807 | 426,122 | 423,228 | **1,686,709** | 434,231 | 444,997 | 447,428 | 444,389 | **1,771,045** |
| Travel | 47,904 | 47,904 | 47,904 | 47,904 | **191,615** | 50,299 | 50,299 | 50,299 | 50,299 | **201,195** | 52,814 | 52,814 | 52,814 | 52,814 | **211,255** |
| Administrative | 30,980 | 33,185 | 28,555 | 33,626 | **126,347** | 32,529 | 34,845 | 29,982 | 35,308 | **132,664** | 34,156 | 36,587 | 31,482 | 37,073 | **139,297** |
| **Total Operations Expense** | **1,537,826** | **1,566,360** | **1,574,382** | **1,579,375** | **6,257,942** | **1,614,717** | **1,644,678** | **1,653,101** | **1,658,343** | **6,570,839** | **1,695,453** | **1,726,912** | **1,735,756** | **1,741,260** | **6,899,381** |
| | *19.0%* | *18.4%* | *18.9%* | *16.8%* | *18.2%* | *18.9%* | *18.4%* | *18.9%* | *16.7%* | *18.2%* | *18.9%* | *18.3%* | *18.8%* | *16.6%* | *18.1%* |
| **Capital Expenditures** | 25,000 | 25,000 | 25,000 | 25,000 | **100,000** | 30,000 | 30,000 | 30,000 | 30,000 | **120,000** | 35,000 | 35,000 | 35,000 | 35,000 | **140,000** |
| **Total Expenses** | **3,521,826** | **3,821,245** | **3,617,476** | **3,874,759** | **14,835,306** | **3,708,084** | **3,934,674** | **3,733,512** | **4,076,391** | **15,452,662** | **3,901,721** | **4,227,171** | **4,007,175** | **4,286,170** | **16,422,237** |
| | *43.5%* | *45.0%* | *43.3%* | *41.2%* | *43.2%* | *43.5%* | *44.0%* | *42.6%* | *41.1%* | *42.7%* | *43.4%* | *44.9%* | *43.4%* | *40.9%* | *43.1%* |
| **Income** | **1,989,718** | **2,012,185** | **2,079,202** | **2,622,177** | **8,703,283** | **2,144,376** | **2,251,031** | **2,272,116** | **2,825,912** | **9,493,435** | **2,313,821** | **2,333,756** | **2,373,287** | **3,049,651** | **10,070,515** |
| | *24.6%* | *23.7%* | *24.9%* | *27.8%* | *25.3%* | *25.1%* | *25.2%* | *26.0%* | *28.5%* | *26.3%* | *25.7%* | *24.8%* | *25.7%* | *29.1%* | *26.4%* |

CRO Fees
Trustee Fees
Sandy Hook Legal Fees
Ray Bataglia



**2023 Revenue Budget**
v1.1 as of 1/4/2023

| | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2023 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Online Supplement Sales - FSS | (a) | 2,119,625 | 2,043,835 | 2,148,907 | 2,121,921 | 2,244,888 | 2,219,625 | 2,304,696 | 2,341,443 | 2,394,361 | 2,448,333 | 2,617,807 | 2,756,755 | 27,762,196 |
| Online Supplement Sales - OTHER | (b) | 538,750 | 509,050 | 450,225 | 439,650 | 348,650 | 338,750 | 232,900 | 147,300 | - | - | - | - | 3,005,275 |
| | | 2,658,375 | 2,552,885 | 2,599,132 | 2,561,571 | 2,593,538 | 2,558,375 | 2,537,596 | 2,488,743 | 2,394,361 | 2,448,333 | 2,617,807 | 2,756,755 | 30,767,471 |
| Online Merchandise | | 14,475 | 13,410 | 14,580 | 14,655 | 14,850 | 14,250 | 14,295 | 14,760 | 13,860 | 14,910 | 16,950 | 18,570 | 179,565 |
| Non-Supplement Sales Initiatives | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Advertising / Endorsements | (c) | 5,000 | 5,000 | 5,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 75,000 | 75,000 | 75,000 | 540,000 |
| Donations | (d) | 7,500 | 7,500 | 7,500 | 125,000 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 125,000 | 7,500 | 7,500 | 325,000 |
| **Total Income** | | **2,686,350** | **2,579,795** | **2,627,212** | **2,752,226** | **2,666,888** | **2,631,125** | **2,610,391** | **2,562,003** | **2,466,721** | **2,664,243** | **2,718,257** | **2,858,825** | **31,824,036** |
| | | | | | | | | | | | | | | |
| **Cost of Goods Sold** | | | | | | | | | | | | | | |
| FSS Supplement Costs | (e) | 705,835 | 680,597 | 715,586 | 706,600 | 747,548 | 739,135 | 767,464 | 779,701 | 797,322 | 815,295 | 871,730 | 917,999 | 9,244,811 |
| Other Supplement Pmts | (f) | 463,325 | 437,783 | 387,194 | 378,099 | 299,839 | 291,325 | 200,294 | 126,678 | - | - | - | - | 2,584,537 |
| Online Merchandise | | 8,685 | 8,046 | 8,748 | 8,793 | 8,910 | 8,550 | 8,577 | 8,856 | 8,316 | 8,946 | 10,170 | 11,142 | 107,739 |
| Non-Supplement Sales Costs | | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 8,400 |
| | | 1,178,545 | 1,127,126 | 1,112,228 | 1,094,192 | 1,056,997 | 1,039,710 | 977,035 | 915,935 | 806,338 | 824,941 | 882,600 | 929,841 | 11,945,487 |
| | | | | | | | | | | | | | | |
| **Gross Margin** | | **1,507,805** | **1,452,669** | **1,514,984** | **1,658,034** | **1,609,891** | **1,591,415** | **1,633,356** | **1,646,068** | **1,660,383** | **1,839,302** | **1,835,657** | **1,928,984** | **19,878,549** |
| | | *56.1%* | *56.3%* | *57.7%* | *60.2%* | *60.4%* | *60.5%* | *62.6%* | *64.2%* | *67.3%* | *69.0%* | *67.5%* | *67.5%* | *62.5%* |

*(a)*  FSS Sales include product inventory purcahsed by FSS or through our third party fullfillment service
*(b)*  Includes sales from PQPR and ESG.  Sales are at a reduced margin and expected to be phased out in 2023
*(c)*  Working with third party firm to actively market advertising / endorsement time on the Alex Jones Show. Amounts are net of commissions
*(d)*  Assume two donation drives per year
*(e)*  Supplement margins on FSS inventory are averaging 67% with some individual products higher and some lower
*(f)*  Current arrangement with ESG is that Platinum inventory is 20% commission after fees and inventory costs



**2024 Revenue Budget**
v1.2 as of 1/19/2023

| | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2024 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Online Supplement Sales - FSS | (a) | 2,493,809 | 2,394,638 | 2,494,573 | 2,552,261 | 2,572,250 | 2,495,745 | 2,495,358 | 2,573,024 | 2,460,767 | 2,578,400 | 2,787,518 | 2,953,581 | 30,851,924 |
| Online Merchandise | (b) | 14,475 | 13,410 | 14,580 | 14,655 | 14,850 | 14,250 | 24,295 | 24,760 | 23,860 | 29,910 | 16,950 | 18,570 | 224,565 |
| Non-Supplement Sales Initiatives | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Advertising / Endorsements | (c) | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 85,000 | 85,000 | 100,000 | 100,000 | 125,000 | 150,000 | 100,000 | 1,120,000 |
| Donations | (d) | 7,500 | 7,500 | 7,500 | 150,000 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 150,000 | 7,500 | 7,500 | 375,000 |
| **Total Income** | | **2,591,784** | **2,491,548** | **2,592,653** | **2,792,916** | **2,670,600** | **2,603,495** | **2,613,153** | **2,706,284** | **2,593,127** | **2,884,310** | **2,962,968** | **3,080,651** | **32,583,489** |
| | | | | | | | | | | | | | | |
| **Cost of Goods Sold** | | | | | | | | | | | | | | |
| FSS Supplement Costs | (e) | 830,438 | 797,414 | 830,693 | 849,903 | 856,559 | 831,083 | 830,954 | 856,817 | 819,435 | 858,607 | 928,243 | 983,542 | 10,273,691 |
| Online Merchandise | | 8,685 | 8,046 | 8,748 | 8,793 | 8,910 | 8,550 | 14,577 | 14,856 | 14,316 | 17,946 | 10,170 | 11,142 | 134,739 |
| Non-Supplement Sales Costs | | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 8,400 |
| **Total Cost of Goods Sold** | | **839,823** | **806,160** | **840,141** | **859,396** | **866,169** | **840,333** | **846,231** | **872,373** | **834,451** | **877,253** | **939,113** | **995,384** | **10,416,830** |
| | | | | | | | | | | | | | | |
| **Gross Margin** | | **1,751,961** | **1,685,388** | **1,752,512** | **1,933,520** | **1,804,431** | **1,763,162** | **1,766,922** | **1,833,911** | **1,758,676** | **2,007,057** | **2,023,855** | **2,085,267** | **22,166,659** |
| | | *67.6%* | *67.6%* | *67.6%* | *69.2%* | *67.6%* | *67.7%* | *67.6%* | *67.8%* | *67.8%* | *69.6%* | *68.3%* | *67.7%* | *68.0%* |

(a)   FSS Sales include product inventory purcahsed by FSS or through our third party fullfillment service
(b)   Assumes that other merchandise sales increase ahead of the 2024 election cycle.
(c)   Assumes that advertising and endorsements is a growing product line in 2024 and that AJ is able to secure higher rates
(d)   Assume two donation drives per year
(e)   Supplement margins on FSS inventory are averaging 67% with some individual products higher and some lower



**2024 Revenue Budget**
v1.1 as of 1/4/2023

| | | 2025 | | | | | 2026 | | | | | 2027 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | 2025 TOTAL | Q1 | Q2 | Q3 | Q4 | 2026 TOTAL | Q1 | Q2 | Q3 | Q4 | 2027 TOTAL |
| **Income** | | | | | | | | | | | | | | | | |
| Online Supplement Sales - FSS | (a) | 7,752,171 | 8,001,269 | 7,905,606 | 8,735,474 | 32,394,520 | 8,139,780 | 8,401,332 | 8,300,887 | 9,172,248 | 34,014,246 | 8,546,769 | 8,821,399 | 8,715,931 | 9,630,860 | 35,714,959 |
| Online Merchandise | (b) | 44,588 | 45,943 | 76,561 | 68,702 | 235,793 | 46,818 | 48,240 | 80,389 | 72,137 | 247,583 | 49,159 | 50,652 | 84,408 | 75,743 | 259,962 |
| Non-Supplement Sales Initiatives | | 15,000 | 15,000 | 15,000 | 15,000 | 60,000 | 22,500 | 22,500 | 22,500 | 22,500 | 90,000 | 30,000 | 30,000 | 30,000 | 30,000 | 120,000 |
| Advertising / Endorsements | (c) | 258,750 | 270,250 | 327,750 | 431,250 | 1,288,000 | 297,563 | 310,788 | 327,750 | 495,938 | 1,432,038 | 342,197 | 357,406 | 376,913 | 570,328 | 1,646,843 |
| Donations | (d) | 22,500 | 165,000 | 22,500 | 165,000 | 375,000 | 22,500 | 165,000 | 22,500 | 165,000 | 375,000 | 22,500 | 165,000 | 22,500 | 165,000 | 375,000 |
| **Total Income** | | **8,093,009** | **8,497,462** | **8,347,417** | **9,415,425** | **34,353,313** | **8,529,160** | **8,947,860** | **8,754,026** | **9,927,822** | **36,158,867** | **8,990,624** | **9,424,456** | **9,229,752** | **10,471,932** | **38,116,764** |
| **Cost of Goods Sold** | | | | | | | | | | | | | | | | |
| FSS Supplement Costs | (e) | 2,544,595 | 2,626,359 | 2,594,959 | 2,867,357 | 10,633,270 | 2,633,656 | 2,718,282 | 2,685,782 | 2,967,714 | 11,005,434 | 2,725,834 | 2,813,422 | 2,779,785 | 3,071,584 | 11,390,625 |
| Online Merchandise | | 26,371 | 27,172 | 45,280 | 40,632 | 139,455 | 27,294 | 28,123 | 46,865 | 42,054 | 144,336 | 28,249 | 29,107 | 48,505 | 43,526 | 149,388 |
| Non-Supplement Sales Costs | | 10,500 | 10,500 | 10,500 | 10,500 | 42,000 | 15,750 | 15,750 | 15,750 | 15,750 | 63,000 | 21,000 | 21,000 | 21,000 | 21,000 | 84,000 |
| **Total Cost of Goods Sold** | | **2,581,466** | **2,664,031** | **2,650,739** | **2,918,489** | **10,814,725** | **2,676,699** | **2,762,155** | **2,748,397** | **3,025,519** | **11,212,770** | **2,775,083** | **2,863,529** | **2,849,290** | **3,136,110** | **11,624,012** |
| **Gross Margin** | | **5,511,544** | **5,833,430** | **5,696,678** | **6,496,936** | **23,538,589** | **5,852,460** | **6,185,705** | **6,005,628** | **6,902,303** | **24,946,097** | **6,215,541** | **6,560,927** | **6,380,462** | **7,335,821** | **26,492,752** |
| | | *68.1%* | *68.6%* | *68.2%* | *69.0%* | *68.5%* | *68.6%* | *69.1%* | *68.6%* | *69.5%* | *69.0%* | *69.1%* | *69.6%* | *69.1%* | *70.1%* | *69.5%* |

| | 2025 | 2026 | 2027 |
|---|---|---|---|
| *Supplements Revenue Growth Rate* | *5.0%* | *5.0%* | *5.0%* |
| *Advertising Revenue Growth Rate* | *15.0%* | *15.0%* | *15.0%* |
| *Expense Growth Rate* | *3.5%* | *3.5%* | *3.5%* |

(a)  FSS Sales include product inventory purcahsed by FSS or through our third party fulfillment service
(b)  Assumes that other merchandise sales mirror previous years activity
(c)  Assumes that advertising and endorsements is a growing product line and that AJ is able to secure higher rates
(d)  Assume two donation drives per year
(e)  Supplement margins on FSS inventory are averaging 67% with some individual products higher and some lower



**2023 Operations Expenses**
*v 1.1 as of 1/24/23*

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2023 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IT Expenses - Production** | | | | | | | | | | | | | |
| Internet / Streaming / Bandwidth | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 62,000 | 744,000 |
| Satellite Service | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 20,675 | 248,100 |
| Cloud Services | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 1,320,000 |
| Images / Software / Licenses | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **202,675** | **2,432,100** |
| **IT Expenses - Online Store** | | | | | | | | | | | | | |
| Hosting / Cloud Services | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Store Infrastructure / Safety | 58,000 | 58,000 | 58,000 | 58,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 576,000 |
| Store Maintenance / Compliance | 20,000 | 20,000 | 20,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 186,000 |
| Software Licenses | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Customer Service Contract | 11,000 | 11,000 | 11,000 | 12,500 | 12,500 | 12,500 | 13,500 | 13,500 | 13,500 | 13,500 | 14,500 | 14,500 | 153,500 |
| | **101,500** | **101,500** | **101,500** | **97,000** | **82,000** | **82,000** | **83,000** | **83,000** | **83,000** | **83,000** | **84,000** | **84,000** | **1,065,000** |
| **Advertising & Promotion** | | | | | | | | | | | | | |
| Print Media | 1,750 | 1,750 | 1,750 | 1,750 | 1,750 | 1,750 | 1,750 | 1,750 | 1,750 | 1,750 | 1,750 | 1,750 | 21,000 |
| Radio Media | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 34,500 | 414,000 |
| Television / Online Media | 2,500 | 2,500 | 2,500 | 5,000 | 5,000 | 5,000 | 7,000 | 7,000 | 7,000 | 10,000 | 7,000 | 5,000 | 65,500 |
| | **38,750** | **38,750** | **38,750** | **41,250** | **41,250** | **41,250** | **43,250** | **43,250** | **43,250** | **46,250** | **43,250** | **41,250** | **500,500** |
| **Facilities** | | | | | | | | | | | | | |
| Rent | 52,635 | 52,635 | 52,635 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 652,905 |
| Utilities | 4,500 | 4,500 | 4,500 | 4,500 | 5,000 | 5,000 | 5,500 | 5,500 | 5,500 | 5,000 | 4,500 | 4,500 | 58,500 |
| Security | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 29,500 | 354,000 |
| Telecommunication | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 276,000 |
| Janitorial | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 42,000 |
| Repair and Maintenance | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Supplies / Printing / Copy | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 38,400 |
| Business Meals | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| | **119,335** | **119,335** | **119,335** | **121,700** | **122,200** | **122,200** | **122,700** | **122,700** | **122,700** | **122,200** | **121,700** | **121,700** | **1,457,805** |
| **Travel** | | | | | | | | | | | | | |
| Vehicle Leases | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 850 | 10,200 |
| Fuel / Tolls / Repairs | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,000 |
| Airfare / Lodging / Rental Car | 1,000 | 1,000 | 25,000 | 1,000 | 1,000 | 25,000 | 1,000 | 1,000 | 25,000 | 1,000 | 1,000 | 25,000 | 108,000 |
| Security | - | - | 10,000 | - | - | 10,000 | - | - | 10,000 | - | - | 10,000 | 40,000 |
| Meals | 200 | 200 | 2,000 | 200 | 200 | 2,000 | 200 | 200 | 2,000 | 200 | 200 | 2,000 | 9,600 |
| | **2,550** | **2,550** | **38,350** | **2,550** | **2,550** | **38,350** | **2,550** | **2,550** | **38,350** | **2,550** | **2,550** | **38,350** | **173,800** |
| **Administrative** | | | | | | | | | | | | | |
| Liability / Property Insurance | 7,600 | 7,600 | 7,600 | 7,600 | 7,600 | 7,600 | 7,600 | 7,600 | 8,400 | 8,400 | 8,400 | 8,400 | 94,400 |
| Banking Fees | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,200 |
| Accounting | - | - | 5,000 | 5,000 | - | 2,000 | - | - | 2,000 | - | - | 5,000 | 19,000 |
| Legal | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **7,700** | **7,700** | **12,700** | **12,700** | **7,700** | **9,700** | **7,700** | **7,700** | **10,500** | **8,500** | **8,500** | **13,500** | **114,600** |
| **TOTAL OPERATING EXP** | **472,510** | **472,510** | **513,310** | **477,875** | **458,375** | **496,175** | **461,875** | **461,875** | **500,475** | **465,175** | **462,675** | **501,475** | **5,744,305** |



**2024 Operations Expenses**
*v 1.1 as of 1/24/23*

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2023 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IT Expenses - Production** | | | | | | | | | | | | | |
| Internet / Streaming / Bandwidth | 65,100 | 65,100 | 65,100 | 65,100 | 65,100 | 65,100 | 65,100 | 65,100 | 65,100 | 65,100 | 65,100 | 65,100 | 781,200 |
| Satellite Service | 21,709 | 21,709 | 21,709 | 21,709 | 21,709 | 21,709 | 21,709 | 21,709 | 21,709 | 21,709 | 21,709 | 21,709 | 260,505 |
| Cloud Services | 115,500 | 115,500 | 115,500 | 115,500 | 115,500 | 115,500 | 115,500 | 115,500 | 115,500 | 115,500 | 115,500 | 115,500 | 1,386,000 |
| Images / Software / Licenses | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 126,000 |
| | **212,809** | **212,809** | **212,809** | **212,809** | **212,809** | **212,809** | **212,809** | **212,809** | **212,809** | **212,809** | **212,809** | **212,809** | **2,553,705** |
| | | | | | | | | | | | | | |
| **IT Expsnes - Online Store** | | | | | | | | | | | | | |
| Hosting / Cloud Services | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 126,000 |
| Store Infrastructure / Safety | 43,000 | 43,000 | 43,000 | 43,000 | 45,150 | 45,150 | 45,150 | 45,150 | 45,150 | 45,150 | 45,150 | 45,150 | 533,200 |
| Store Maintenance / Compliance | 14,000 | 14,000 | 14,000 | 14,700 | 14,700 | 14,700 | 14,700 | 14,700 | 14,700 | 14,700 | 14,700 | 14,700 | 174,300 |
| Software Licenses | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 31,500 |
| Customer Service Contract | 14,500 | 14,500 | 14,500 | 15,000 | 15,000 | 15,000 | 15,500 | 15,500 | 15,500 | 16,000 | 16,000 | 16,000 | 183,000 |
| | **84,625** | **84,625** | **84,625** | **85,825** | **87,975** | **87,975** | **88,475** | **88,475** | **88,475** | **88,975** | **88,975** | **88,975** | **1,048,000** |
| | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | |
| Print Media | 1,838 | 1,838 | 1,838 | 1,838 | 1,838 | 1,838 | 1,838 | 1,838 | 1,838 | 1,838 | 1,838 | 1,838 | 22,050 |
| Radio Media | 36,225 | 36,225 | 36,225 | 36,225 | 36,225 | 36,225 | 36,225 | 36,225 | 36,225 | 36,225 | 36,225 | 36,225 | 434,700 |
| Television / Online Media | 2,625 | 2,625 | 2,625 | 5,250 | 5,250 | 5,250 | 7,350 | 7,350 | 7,350 | 10,500 | 7,350 | 5,250 | 68,775 |
| | **40,688** | **40,688** | **40,688** | **43,313** | **43,313** | **43,313** | **45,413** | **45,413** | **45,413** | **48,563** | **45,413** | **43,313** | **525,525** |
| | | | | | | | | | | | | | |
| **Facilities** | | | | | | | | | | | | | |
| Rent | 55,000 | 55,000 | 55,000 | 57,750 | 57,750 | 57,750 | 57,750 | 57,750 | 57,750 | 57,750 | 57,750 | 57,750 | 684,750 |
| Utilities | 4,725 | 4,725 | 4,725 | 4,725 | 5,250 | 5,250 | 5,775 | 5,775 | 5,775 | 5,250 | 4,725 | 4,725 | 61,425 |
| Security | 30,975 | 30,975 | 30,975 | 30,975 | 30,975 | 30,975 | 30,975 | 30,975 | 30,975 | 30,975 | 30,975 | 30,975 | 371,700 |
| Telecommunication | 24,150 | 24,150 | 24,150 | 24,150 | 24,150 | 24,150 | 24,150 | 24,150 | 24,150 | 24,150 | 24,150 | 24,150 | 289,800 |
| Janitorial | 3,675 | 3,675 | 3,675 | 3,675 | 3,675 | 3,675 | 3,675 | 3,675 | 3,675 | 3,675 | 3,675 | 3,675 | 44,100 |
| Repair and Maintenance | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 2,625 | 31,500 |
| Supplies / Printing / Copy | 3,360 | 3,360 | 3,360 | 3,360 | 3,360 | 3,360 | 3,360 | 3,360 | 3,360 | 3,360 | 3,360 | 3,360 | 40,320 |
| Business Meals | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 6,300 |
| | **125,035** | **125,035** | **125,035** | **127,785** | **128,310** | **128,310** | **128,835** | **128,835** | **128,835** | **128,310** | **127,785** | **127,785** | **1,529,895** |
| | | | | | | | | | | | | | |
| **Travel** | | | | | | | | | | | | | |
| Vehicle Leases | 893 | 893 | 893 | 893 | 893 | 893 | 893 | 893 | 893 | 893 | 893 | 893 | 10,710 |
| Fuel / Tolls / Repairs | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 6,300 |
| Airfare / Lodging / Rental Car | 1,050 | 1,050 | 26,250 | 1,050 | 1,050 | 26,250 | 1,050 | 1,050 | 26,250 | 1,050 | 1,050 | 26,250 | 113,400 |
| Security | - | - | 10,500 | - | - | 10,500 | - | - | 10,500 | - | - | 10,500 | 42,000 |
| Meals | 210 | 210 | 2,100 | 210 | 210 | 2,100 | 210 | 210 | 2,100 | 210 | 210 | 2,100 | 10,080 |
| | **2,678** | **2,678** | **40,268** | **2,678** | **2,678** | **40,268** | **2,678** | **2,678** | **40,268** | **2,678** | **2,678** | **40,268** | **182,490** |
| | | | | | | | | | | | | | |
| **Administrative** | | | | | | | | | | | | | |
| Liability / Property Insurance | 7,980 | 7,980 | 7,980 | 7,980 | 7,980 | 7,980 | 7,980 | 7,980 | 8,820 | 8,820 | 8,820 | 8,820 | 99,120 |
| Banking Fees | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 1,260 |
| Accounting | - | - | 5,250 | 5,250 | - | 2,100 | - | - | 2,100 | - | - | 5,250 | 19,950 |
| Legal | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **8,085** | **8,085** | **13,335** | **13,335** | **8,085** | **10,185** | **8,085** | **8,085** | **11,025** | **8,925** | **8,925** | **14,175** | **120,330** |
| | | | | | | | | | | | | | |
| **TOTAL OPERATING EXP** | **473,919** | **473,919** | **516,759** | **485,744** | **483,169** | **522,859** | **486,294** | **486,294** | **526,824** | **490,259** | **486,584** | **527,324** | **5,959,945** |

*** *Year over Year Expenses increase 5%* ***

1.05



**FREE SPEECH SYSTEMS**

| | Q1 | Q2 | Q3 | Q4 | 2025 Total | Q1 | Q2 | Q3 | Q4 | 2026 Total | Q1 | Q2 | Q3 | Q4 | 2027 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IT Expenses - Production** | | | | | | | | | | | | | | | |
| Internet / Streaming / Bandwidth | 205,065 | 205,065 | 205,065 | 205,065 | 820,260 | 215,318 | 215,318 | 215,318 | 215,318 | 861,273 | 226,084 | 226,084 | 226,084 | 226,084 | 904,337 |
| Satellite Service | 68,383 | 68,383 | 68,383 | 68,383 | 273,530 | 71,802 | 71,802 | 71,802 | 71,802 | 287,207 | 75,392 | 75,392 | 75,392 | 75,392 | 301,567 |
| Cloud Services | 363,825 | 363,825 | 363,825 | 363,825 | 1,455,300 | 382,016 | 382,016 | 382,016 | 382,016 | 1,528,065 | 401,117 | 401,117 | 401,117 | 401,117 | 1,604,468 |
| Images / Software / Licenses | 33,075 | 33,075 | 33,075 | 33,075 | 132,300 | 34,729 | 34,729 | 34,729 | 34,729 | 138,915 | 36,465 | 36,465 | 36,465 | 36,465 | 145,861 |
| | **670,348** | **670,348** | **670,348** | **670,348** | **2,681,390** | **703,865** | **703,865** | **703,865** | **703,865** | **2,815,460** | **739,058** | **739,058** | **739,058** | **739,058** | **2,956,233** |
| | | | | | | | | | | | | | | | |
| **IT Expenses - Online Store** | | | | | | | | | | | | | | | |
| Hosting / Cloud Services | 33,075 | 33,075 | 33,075 | 33,075 | 132,300 | 34,729 | 34,729 | 34,729 | 34,729 | 138,915 | 36,465 | 36,465 | 36,465 | 36,465 | 145,861 |
| Store Infrastructure / Safety | 135,450 | 139,965 | 142,223 | 142,223 | 559,860 | 142,223 | 146,963 | 149,334 | 149,334 | 587,853 | 149,334 | 154,311 | 156,800 | 156,800 | 617,246 |
| Store Maintenance / Compliance | 44,100 | 46,305 | 46,305 | 46,305 | 183,015 | 46,305 | 48,620 | 48,620 | 48,620 | 192,166 | 48,620 | 51,051 | 51,051 | 51,051 | 201,774 |
| Software Licenses | 8,269 | 8,269 | 8,269 | 8,269 | 33,075 | 8,682 | 8,682 | 8,682 | 8,682 | 34,729 | 9,116 | 9,116 | 9,116 | 9,116 | 36,465 |
| Customer Service Contract | 45,675 | 47,250 | 48,825 | 50,400 | 192,150 | 47,959 | 49,613 | 51,266 | 52,920 | 201,758 | 50,357 | 52,093 | 53,830 | 55,566 | 211,845 |
| | **266,569** | **274,864** | **278,696** | **280,271** | **1,100,400** | **279,897** | **288,607** | **292,631** | **294,285** | **1,155,420** | **293,892** | **303,037** | **307,263** | **308,999** | **1,213,191** |
| | | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | | |
| Print Media | 5,788 | 5,788 | 5,788 | 5,788 | 23,153 | 6,078 | 6,078 | 6,078 | 6,078 | 24,310 | 6,381 | 6,381 | 6,381 | 6,381 | 25,526 |
| Radio Media | 114,109 | 114,109 | 114,109 | 114,109 | 456,435 | 119,814 | 119,814 | 119,814 | 119,814 | 479,257 | 125,805 | 125,805 | 125,805 | 125,805 | 503,220 |
| Television / Online Media | 8,269 | 16,538 | 23,153 | 24,255 | 72,214 | 8,682 | 17,364 | 24,310 | 25,468 | 75,824 | 9,116 | 18,233 | 25,526 | 26,741 | 79,616 |
| | **128,166** | **136,434** | **143,049** | **144,152** | **551,801** | **134,574** | **143,256** | **150,202** | **151,359** | **579,391** | **141,303** | **150,419** | **157,712** | **158,927** | **608,361** |
| | | | | | | | | | | | | | | | |
| **Facilities** | | | | | | | | | | | | | | | |
| Rent | 173,250 | 181,913 | 181,913 | 181,913 | 718,988 | 181,913 | 191,008 | 191,008 | 191,008 | 754,937 | 191,008 | 200,559 | 200,559 | 200,559 | 792,684 |
| Utilities | 14,884 | 15,986 | 18,191 | 15,435 | 64,496 | 15,628 | 16,786 | 19,101 | 16,207 | 67,721 | 16,409 | 17,625 | 20,056 | 17,017 | 71,107 |
| Security | 97,571 | 97,571 | 97,571 | 97,571 | 390,285 | 102,450 | 102,450 | 102,450 | 102,450 | 409,799 | 107,572 | 107,572 | 107,572 | 107,572 | 430,289 |
| Telecommunication | 76,073 | 76,073 | 76,073 | 76,073 | 304,290 | 79,876 | 79,876 | 79,876 | 79,876 | 319,505 | 83,870 | 83,870 | 83,870 | 83,870 | 335,480 |
| Janitorial | 11,576 | 11,576 | 11,576 | 11,576 | 46,305 | 12,155 | 12,155 | 12,155 | 12,155 | 48,620 | 12,763 | 12,763 | 12,763 | 12,763 | 51,051 |
| Repair and Maintenance | 8,269 | 8,269 | 8,269 | 8,269 | 33,075 | 8,682 | 8,682 | 8,682 | 8,682 | 34,729 | 9,116 | 9,116 | 9,116 | 9,116 | 36,465 |
| Supplies / Printing / Copy | 10,584 | 10,584 | 10,584 | 10,584 | 42,336 | 11,113 | 11,113 | 11,113 | 11,113 | 44,453 | 11,669 | 11,669 | 11,669 | 11,669 | 46,675 |
| Business Meals | 1,654 | 1,654 | 1,654 | 1,654 | 6,615 | 1,736 | 1,736 | 1,736 | 1,736 | 6,946 | 1,823 | 1,823 | 1,823 | 1,823 | 7,293 |
| | **393,860** | **403,625** | **405,830** | **403,074** | **1,606,390** | **413,553** | **423,807** | **426,122** | **423,228** | **1,686,709** | **434,231** | **444,997** | **447,428** | **444,389** | **1,771,045** |
| | | | | | | | | | | | | | | | |
| **Travel** | | | | | | | | | | | | | | | |
| Vehicle Leases | 2,811 | 2,811 | 2,811 | 2,811 | 11,246 | 2,952 | 2,952 | 2,952 | 2,952 | 11,808 | 3,100 | 3,100 | 3,100 | 3,100 | 12,398 |
| Fuel / Tolls / Repairs | 1,654 | 1,654 | 1,654 | 1,654 | 6,615 | 1,736 | 1,736 | 1,736 | 1,736 | 6,946 | 1,823 | 1,823 | 1,823 | 1,823 | 7,293 |
| Airfare / Lodging / Rental Car | 29,768 | 29,768 | 29,768 | 29,768 | 119,070 | 31,256 | 31,256 | 31,256 | 31,256 | 125,024 | 32,819 | 32,819 | 32,819 | 32,819 | 131,275 |
| Security | 11,025 | 11,025 | 11,025 | 11,025 | 44,100 | 11,576 | 11,576 | 11,576 | 11,576 | 46,305 | 12,155 | 12,155 | 12,155 | 12,155 | 48,620 |
| Meals | 2,646 | 2,646 | 2,646 | 2,646 | 10,584 | 2,778 | 2,778 | 2,778 | 2,778 | 11,113 | 2,917 | 2,917 | 2,917 | 2,917 | 11,669 |
| | **47,904** | **47,904** | **47,904** | **47,904** | **191,615** | **50,299** | **50,299** | **50,299** | **50,299** | **201,195** | **52,814** | **52,814** | **52,814** | **52,814** | **211,255** |
| | | | | | | | | | | | | | | | |
| **Administrative** | | | | | | | | | | | | | | | |
| Liability / Property Insurance | 25,137 | 25,137 | 26,019 | 27,783 | 104,076 | 26,394 | 26,394 | 27,320 | 29,172 | 109,280 | 27,714 | 27,714 | 28,686 | 30,631 | 114,744 |
| Banking Fees | 331 | 331 | 331 | 331 | 1,323 | 347 | 347 | 347 | 347 | 1,389 | 365 | 365 | 365 | 365 | 1,459 |
| Accounting | 5,513 | 7,718 | 2,205 | 5,513 | 20,948 | 5,788 | 8,103 | 2,315 | 5,788 | 21,995 | 6,078 | 8,509 | 2,431 | 6,078 | 23,095 |
| Legal | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **30,980** | **33,185** | **28,555** | **33,626** | **126,347** | **32,529** | **34,845** | **29,982** | **35,308** | **132,664** | **34,156** | **36,587** | **31,482** | **37,073** | **139,297** |
| | | | | | | | | | | | | | | | |
| **TOTAL OPERATING EXP** | **1,537,826** | **1,566,360** | **1,574,382** | **1,579,375** | **6,257,942** | **1,614,717** | **1,644,678** | **1,653,101** | **1,658,343** | **6,570,839** | **1,695,453** | **1,726,912** | **1,735,756** | **1,741,260** | **6,899,381** |

***     *Year over Year Expenses increase 5%*     ***

*1.05*



**2023 Personnel Expenses**
*v 1.1 as of 1/24/23*

## Personnel Expenses

| | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2023 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salaries | | 218,445 | 218,445 | 218,445 | 218,445 | 218,445 | 347,667 | 229,367 | 229,367 | 229,367 | 229,367 | 229,367 | 344,051 | 2,930,779 |
| Alex Jones Salary | (a) | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 520,000 |
| New COO Candidate | | - | - | - | - | 40,000 | 60,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 360,000 |
| Hourly Wages & Overtime | | 58,554 | 58,554 | 58,554 | 58,554 | 58,554 | 87,831 | 61,482 | 61,482 | 61,482 | 61,482 | 61,482 | 92,223 | 780,232 |
| Payroll Taxes | | 24,250 | 24,250 | 24,250 | 24,250 | 27,310 | 42,496 | 28,370 | 28,370 | 28,370 | 28,370 | 28,370 | 42,555 | 351,212 |
| Benefits | | 19,020 | 19,020 | 19,020 | 19,020 | 21,420 | 33,330 | 22,251 | 22,251 | 22,251 | 22,251 | 22,251 | 33,376 | 275,461 |
| | | 360,269 | 360,269 | 360,269 | 360,269 | 405,729 | 631,323 | 421,470 | 421,470 | 421,470 | 421,470 | 421,470 | 632,205 | 5,217,684 |
| Executive Incentive Comp | (a) (b) | - | - | - | - | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 560,000 |
| Employee Bonuses | (c) | - | - | - | - | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 352,000 |
| Payroll Tax on Bonus Comp | | - | - | - | - | 2,679 | 2,679 | 2,679 | 2,679 | 2,679 | 2,679 | 2,679 | 2,679 | 21,432 |
| Contract Employees | (d) | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 69,950 | 839,400 |
| Consulting Services | (e) | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 42,000 |
| **Total Personnel Expenses** | | **433,719** | **433,719** | **433,719** | **433,719** | **595,858** | **821,452** | **611,599** | **611,599** | **611,599** | **611,599** | **611,599** | **822,334** | **7,032,516** |

(a) Per 5-year Employment contract dated _____, 2023
(b) Includes Alex Jones and TBD COO
(c) Assumes bonuses of approximately 15% of Salaries to retain key employees
(d) Contract / 1099 production employees
(e) Accounting service

**2024 Personnel Expenses**
*v 1.1 as of 1/24/23*

## Personnel Expenses

| | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2024 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salaries | (a) | 229,367 | 229,367 | 229,367 | 229,367 | 229,367 | 365,050 | 240,836 | 240,836 | 240,836 | 240,836 | 240,836 | 361,253 | 3,077,318 |
| Alex Jones Salary | (b) | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 520,000 |
| New COO Candidate | | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 60,000 | 520,000 |
| Hourly Wages & Overtime | (a) | 61,482 | 61,482 | 61,482 | 61,482 | 61,482 | 92,223 | 64,556 | 64,556 | 64,556 | 64,556 | 64,556 | 96,834 | 819,244 |
| Payroll Taxes | | 28,370 | 28,370 | 28,370 | 28,370 | 28,370 | 44,161 | 29,482 | 29,482 | 29,482 | 29,482 | 29,482 | 44,224 | 377,647 |
| Benefits | | 22,251 | 22,251 | 22,251 | 22,251 | 22,251 | 34,636 | 23,123 | 23,123 | 23,123 | 23,123 | 23,123 | 34,685 | 296,194 |
| | | 421,470 | 421,470 | 421,470 | 421,470 | 421,470 | 656,071 | 437,997 | 437,997 | 437,997 | 437,997 | 437,997 | 656,996 | 5,610,402 |
| Executive Incentive Comp | (b) (c) | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 900,000 |
| Employee Bonuses | (d) | 43,627 | 43,627 | 43,627 | 43,627 | 43,627 | 68,591 | 45,809 | 45,809 | 45,809 | 45,809 | 45,809 | 68,713 | 584,484 |
| Payroll Tax on Bonus Comp | | 2,788 | 2,788 | 2,788 | 2,788 | 2,788 | 3,374 | 2,839 | 2,839 | 2,839 | 2,839 | 2,839 | 3,377 | 34,885 |
| Contract Employees | (a) (e) | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 73,448 | 881,370 |
| Consulting Services | (f) | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 45,000 |
| **Total Personnel Expenses** | | **620,082** | **620,082** | **620,082** | **620,082** | **620,082** | **880,233** | **638,843** | **638,843** | **638,843** | **638,843** | **638,843** | **881,284** | **8,056,142** |

(a) Assumes salaries increase 5% per year    *1.05*
(b) Per 5-year Employment contract dated _____, 2023
(c) Includes Alex Jones and TBD COO
(d) Assumes bonuses of 15% of Salaries to retain key employees
(e) Contract / 1099 production employees
(f) Accounting service



**2025 - 2027 Personnel Expenses**
*v 1.1 as of 1/24/23*

| Personnel Expenses | | Q1 | Q2 | Q3 | Q4 | 2025 Total | Q1 | Q2 | Q3 | Q4 | 2026 Total | Q1 | Q2 | Q3 | Q4 | 2027 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salaries | (a) | 722,507 | 864,974 | 758,632 | 885,071 | **3,231,184** | 758,632 | 908,223 | 796,564 | 929,324 | **3,392,743** | 796,564 | 953,634 | 836,392 | 975,791 | **3,562,380** |
| Alex Jones Salary | (b) | 120,000 | 140,000 | 120,000 | 140,000 | **520,000** | 120,000 | 140,000 | 120,000 | 140,000 | **520,000** | 120,000 | 140,000 | 120,000 | 140,000 | **520,000** |
| New COO Candidate | | 120,000 | 140,000 | 120,000 | 140,000 | **520,000** | 120,000 | 140,000 | 120,000 | 140,000 | **520,000** | 120,000 | 140,000 | 120,000 | 140,000 | **520,000** |
| Hourly Wages & Overtime | (a) | 193,667 | 225,945 | 203,351 | 237,243 | **860,206** | 203,351 | 237,243 | 213,518 | 249,105 | **903,216** | 213,518 | 249,105 | 224,194 | 261,560 | **948,377** |
| Payroll Taxes | | 88,447 | 104,875 | 91,952 | 107,277 | **392,551** | 91,952 | 109,048 | 95,631 | 111,570 | **408,201** | 95,631 | 113,430 | 99,495 | 116,077 | **424,633** |
| Benefits | | 69,370 | 82,255 | 72,119 | 84,139 | **307,883** | 72,119 | - | - | 87,506 | **159,625** | 75,005 | 88,964 | 78,035 | 91,041 | **333,045** |
| | | 1,313,992 | 1,558,050 | 1,366,054 | 1,593,729 | **5,831,825** | 1,366,054 | 1,534,513 | 1,345,713 | 1,657,505 | **5,903,785** | 1,420,718 | 1,685,132 | 1,478,116 | 1,724,469 | **6,308,436** |
| Executive Incentive Comp | (b) (c) | 255,000 | 255,000 | 255,000 | 255,000 | **1,020,000** | 285,000 | 285,000 | 285,000 | 285,000 | **1,140,000** | 315,000 | 315,000 | 315,000 | 315,000 | **1,260,000** |
| Employee Bonuses | (d) | 137,426 | 163,638 | 144,297 | 168,347 | **613,708** | 144,297 | 171,820 | 151,512 | 176,764 | **644,394** | 151,512 | 180,411 | 159,088 | 185,603 | **676,614** |
| Payroll Tax on Bonus Comp | | 9,222 | 9,838 | 9,383 | 9,949 | **38,392** | 10,088 | 10,735 | 10,258 | 10,851 | **41,933** | 10,963 | 11,642 | 11,141 | 11,764 | **45,510** |
| Contract Employees | (e) | 231,360 | 231,360 | 231,360 | 231,360 | **925,439** | 242,928 | 242,928 | 242,928 | 242,928 | **971,710** | 255,074 | 255,074 | 255,074 | 255,074 | **1,020,296** |
| Consulting Services | (f) | 12,000 | 12,000 | 12,000 | 12,000 | **48,000** | 15,000 | 15,000 | 15,000 | 15,000 | **60,000** | 18,000 | 18,000 | 18,000 | 18,000 | **72,000** |
| **Total Personnel Expenses** | | **1,959,000** | **2,229,885** | **2,018,094** | **2,270,384** | **8,477,364** | **2,063,367** | **2,259,996** | **2,050,411** | **2,388,048** | **8,761,822** | **2,171,268** | **2,465,259** | **2,236,419** | **2,509,910** | **9,382,856** |

(a)   Assumes salaries increase 5% per year        1.05
(b)   Per 5-year Employment contract dated _____, 2023
(c)   Includes Alex Jones and TBD COO
(d)   Assumes bonuses of approximately 15% of Salaries to retain key employees
(e)   Contract / 1099 production employees
(f)   Accounting service

# Exhibit B

# Balance Sheet



**FREE SPEECH SYSTEMS, LLC**
**Balance Sheet**
*As of December 31, 2022 and January 31, 2023*

| | 12/31/2022 | 1/31/2023 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets** | | |
| Bank Accounts | | |
| Checking Axos Deposit Acct 8877 | 70,625.79 | 452,490.96 |
| Checking Axos Donations Acct 8885 | 129,398.59 | 134,441.10 |
| Checking Axos Infowars Acct 8893 | 6,125.44 | 6,125.44 |
| Checking Axos Legal Acct 8901 | - | 100,000.00 |
| Checking Axos Operations Acct 8919 | 120,321.47 | 164,321.51 |
| Checking Axos Payroll Acct 8927 | 20,397.80 | 15,318.25 |
| **Total Bank Accounts** | **346,869.09** | **872,697.26** |
| | | |
| **Other Current Assets** | | |
| CC Merchant Reserves Account | 500,000.00 | 500,000.00 |
| Receivable from PQPR | - | 50,000.00 *(c)* |
| Inventory | 1,656,736.78 | 2,092,724.21 |
| Prepaid Expenses | - | 57,440.44 |
| Professional Retainers | 252,235.00 | 252,235.00 |
| **Total Other Current Assets** | **2,408,971.78** | **2,952,399.65** |
| | | |
| **Total Current Assets** | **2,755,840.87** | **3,825,096.91** |
| | | |
| **Fixed Assets** | | |
| Intangibles / Intellectual Property | 2,520.81 *(a)* | 2,520.81 |
| Leasehold Improvements | 1,335,971.23 *(a)* | 1,335,971.23 |
| Machinery, Equipment and Vehicles | 309,153.00 *(a)* | 309,153.00 |
| Office Furniture and Fixtures | 47,539.41 *(a)* | 47,539.41 |
| **Total Fixed Assets** | **1,695,184.45** | **1,695,184.45** |
| | | |
| **Due From - PQPR** | **129,500.00** *(b)* | **-** |
| | | |
| **TOTAL ASSETS** | **4,580,525.32** | **5,520,281.36** |
| | | |
| **LIABILITIES AND EQUITY** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts Payable (A/P) | 155,937.91 | 650,452.45 |
| Accrued Expenses | 57,772.94 | 57,772.94 |
| Note Payable - Allowance | 50,000.00 *(c)* | - *(c)* |
| Payroll Liabilities | 251,968.15 *(d)* | 251,968.15 *(d)* |
| SEC Bank - RV Note | 73,000.00 | 73,000.00 |
| Sales Tax Payable | 990.58 | - |
| **Total Current Liabilities** | **589,669.58** | **1,033,193.54** |
| | | |
| **Total Liabilities** | **589,669.58** *(e)* | **1,033,193.54** |
| | | |
| **Equity** | | |
| Opening balance equity | 5,068,000.49 | 5,068,000.49 |
| Retained Earnings | - | (1,077,144.75) |
| Prior Period Adjustment | - | (37,844.42) *(f)* |
| Net Income | (1,077,144.75) | 534,076.50 |
| **Total Equity** | **3,990,855.74** | **4,487,087.82** |
| | | |
| **TOTAL LIABILITIES AND EQUITY** | **4,580,525.32** | **5,520,281.36** |

*(a) Amounts are from the Statement of Financial Affairs and are subject to review*
*(b) over payment of adequate protection payments to PQPR, settled in January of 2023*
*(c) 12/31 Balance due to PQPR for inventory purchases, account was reconciled resulting in overpayment*
*(d) Includes $228,818.31 in payroll tax witholding due from Q4 transition with new payroll vendor,*
*    amount was paid with the 4th Qtr 941*
*(e) Total Liabilities excludes contingent and unliquidated claims of PQPR and Sandy Hook Plaintiffs*
*    in Texas and Connecticut*
*(f) Expenses related to 2022 were discovered in the January financial review.  Amounts were not material*
*    enough to merit restating 2022 so they are presented as prior period adjustment*


**We believe this Balance Sheet materially presents the financial condition of Free Speech**
**Systems, LLC as of 12/31/2022 and 1/31/2023, but management does not represent that**
**it is in compliance with all requirements of Generally Accepted Accounting Principles (GAAP)**
**UNAUDITED**

**Exhibit C**

**Liquidation Analysis**