# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re<br><br>Alexander E. Jones,<br><br>      Debtor | Case No. 22-33553 (CML)<br><br>Chapter 11 |
| In re<br><br>Free Speech Systems, LLC,<br><br>      Debtor | Case No. 22-60043 (CML)<br><br>Chapter 11 |
| David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto Marino, William Aldenberg, William Sherlach, Robert Parker, and Richard M. Coan, as chapter 7 trustee for the estate of Erica Lafferty,<br><br>      Plaintiffs<br><br>    v.<br><br>Alexander E. Jones and Free Speech Systems, LLC,<br><br>      Defendants | Adv. Pro. No.: ___ |

## ADVERSARY COMPLAINT SEEKING JUDGMENT THAT SANDY HOOK JUDGMENT IS NON-DISCHARGEABLE UNDER BANKRUPTCY CODE § 523(a)

David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto Marino, William Aldenberg, William Sherlach, Robert Parker, and Richard M. Coan, as chapter 7 trustee for the estate of Erica Lafferty (collectively, the "Sandy Hook Families" or "Plaintiffs") allege as follows:

## INTRODUCTION

1.      Bankruptcy law holds a debtor who has caused willful and malicious injury—as Alex Jones[1] has done—accountable, no matter how many bankruptcies the debtor files.  For years, Alex Jones and his Infowars "contributors" told his audience of millions that the Sandy Hook shooting was "completely fake with actors," a "hologram," an "illusion," "the fakest thing since the three-dollar bill," "staged" to take away their guns, and that the Sandy Hook Families were "paid . . . totally disingenuous" "crisis actors" who faked their loved ones' deaths.  He urged his audience to "investigate," knowing they would respond by cyberstalking, harassing, and threatening the Sandy Hook Families.  After nearly five years of litigation, a disciplinary default for Jones's extreme discovery misconduct, and a trial on damages, the respected trial judge who issued the judgment that forms the debt in this case held that Jones's conduct was "intentional and malicious, and certain to cause harm"; demonstrated "depravity," "cruel[ty]," and "persisten[ce]"; and ultimately reflected "the highest degree of reprehensibility and blameworthiness."  The law cannot repair the harm that Jones has done to the Sandy Hook Families, but it can and must hold Jones fully accountable for the injury he has caused and the resulting judgment against him.

2.      Plaintiffs seek a judgment that the approximately $1.4 billion debt they are owed by defendants Alex Jones and Free Speech Systems, LLC ("FSS") is not dischargeable under section 523(a)(6) of the Bankruptcy Code because it is the result of a willful and malicious injury.  Plaintiffs are immediate family members of the victims of, and an emergency responder to, the mass shooting at Sandy Hook Elementary School in Newtown, Connecticut, on December 14, 2012.  The debt comprises compensatory and punitive damages awarded to Plaintiffs in a Connecticut state court action in which Alex Jones and FSS were held liable for defamation,

---

[1]     For purposes of this complaint, all references to Alex Jones shall refer to both Alex Jones in his personal capacity and Free Speech Systems, LLC.

intentional infliction of emotional distress, and other torts arising from their broadcast of lies about Plaintiffs for profit.

3.　　There are no issues of fact to be decided here, as all relevant facts were already decided in the Connecticut action.  This case poses the narrow question of whether the closed record from the Connecticut action, which is incorporated by reference, demonstrates that Alex Jones's debt to Plaintiffs is from a willful and malicious injury.  The answer to that question is yes.

4.　　Starting the same day as the mass shooting that killed twenty first-grade children and six adults at Sandy Hook Elementary School in 2012, Jones and his wholly-owned companies, including FSS, began broadcasting a campaign of lies to online and radio audiences.  Jones claimed that the Sandy Hook shooting was a government-sponsored hoax in which the grieving Sandy Hook Families participated as actors pretending their loves ones had died.  Alex Jones never actually believed these lies.  Yet for years, he spread and amplified these lies through videos, articles, and radio segments that he published and distributed over numerous internet and social media platforms—during which he repeatedly urged millions of listeners to "investigate" the Sandy Hook Families.

5.　　Alex Jones's business is the sale of supplements and other products.  In order to sell these items, he has cultivated customers by holding himself out as a warrior for the truth and a trusted newsman.  The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was a prime narrative for attracting, augmenting, and agitating Jones's audience, and it was a central part of a marketing scheme that has earned Jones and FSS tens of millions of dollars per year.

6.　　Alex Jones's lies were certain to—and did—cause catastrophic injuries to the Sandy Hook Families.  Jones's course of conduct traumatized them during a time of devastating

grief.  They were harassed, stalked, physically confronted, and threatened, including receiving regular death and rape threats.  Some moved houses for their safety and to protect their families, and all suffered a sustained barrage of harassment on social media—including on the memorial and foundation websites they had set up in memory of their loved ones.

7.     Alex Jones's willful and malicious targeting of the Sandy Hook Families has been the subject of nearly five years of court proceedings in Connecticut.  When the Sandy Hook Families brought suit in 2018, Alex Jones appeared and defended the case.  Rather than follow the rules applicable to all litigants, however, he mocked Plaintiffs' efforts to hold him accountable and transformed the litigation into a new profit center by targeting them and their attorneys.  He repeatedly flouted court orders, obstructed the discovery process by denying Plaintiffs the materials necessary to litigate their case, and even broadcast to his listeners that Plaintiffs' counsel were part of a conspiracy of "goddamn rapists" and "fucking child molesters," and he promised a bounty of "one million dollars to put [their] head on a pike."  The trial court issued sanctions.  The Connecticut Supreme Court granted a rare interlocutory appeal and affirmed.

8.     Neither the sanctions nor subsequent additional warnings from the trial court had any effect, however, as Alex Jones continued his threatening tactics and discovery abuses.  This pattern of misconduct ultimately resulted in the entry of a default judgment against Jones, which caused Plaintiffs' allegations to be admitted as a matter of Connecticut law and divested Jones of affirmative defenses.

9.     A trial on compensatory and punitive damages followed.  Alex Jones was subpoenaed and testified.  Each Plaintiff also testified regarding the nature and severity of their injuries.  The jury awarded $965 million in compensatory damages and approved common law punitive damages.  In a lengthy decision evaluating the degree of Alex Jones's reprehensible

conduct, the Connecticut trial court expressly found that Jones's conduct was willful and malicious:

> The record clearly supports the plaintiffs' argument that the defendants' conduct was *intentional and malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience including the "infowarriors."* The record also establishes that the *defendants repeated the conduct and attacks on the plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the plaintiffs. This depravity, and cruel, persistent course of conduct by the defendants establishes the highest degree of reprehensibility and blameworthiness.*

The trial court awarded over $470 million in common law and statutory punitive damages, bringing the total amount of damages awarded to Plaintiffs and against Jones and FSS to $1,438,139,555.94 ("the Connecticut Judgment")[2].

10.     Under 11 U.S.C. § 523(a)(6), debts for "willful and malicious injury" may not be discharged in a bankruptcy—this prohibition reflects an express recognition by Congress that certain actions are so inexcusable that a debtor cannot escape liability through the bankruptcy process, but rather must remain accountable for debts arising from such malicious harm for life.

11.     The closed record from the Connecticut action—which includes a default judgment and admitted complaint allegations,[3] extensive trial evidence, a jury award, and numerous court orders (including one assessing substantial punitive damages)—conclusively establishes that Alex Jones caused the Sandy Hook Families willful and malicious injury that will continue to traumatize them for the rest of their lives, such that the resulting $1.4 billion debt cannot be discharged under the Bankruptcy Code.  In fact, Jones is *precluded* from relitigating the issue of whether his conduct caused "willful and malicious injury" because that issue was already decided against him by the

---

[2]     The judgment consists of the jury verdict (Exhibit A) and the trial court's ruling on punitive damages (Exhibit B). Judgment became effective on December 22, 2022, the date the trial court denied the motions by Alex Jones and FSS for a new trial and for remittitur (see Exhibit C).

[3]     Under Connecticut law, an entry of default conclusively establishes the facts alleged in a complaint.

Connecticut trial court.  Accordingly, there are no outstanding factual issues to be resolved in this action, and a judgment of nondischargeability should be issued in short order.

12.     Even if there were a question as to the preclusive effect of the proceedings in the Connecticut court, which there is not, the Connecticut record confirms that the debt arose from Jones's willful and malicious injury to the Sandy Hook Families.  Accordingly, the Sandy Hook Families respectfully request that this Court find that the Connecticut Judgment is nondischargeable under 11 U.S.C. § 523(a)(6).

## JURISDICTION AND VENUE

13.     Plaintiffs commence this adversary proceeding pursuant to Rules 4007, 7001(6), and 7001(9) of the Federal Rules of Bankruptcy Procedure.  This Court has jurisdiction to determine nondischargeability under Section 523 of Title 11 of the United States Code (the "Bankruptcy Code") and Sections 157 and 1334 of Title 28 of the United States Code. Determination of nondischargeability under Section 523 of the Bankruptcy Code is a "core proceeding" pursuant to Section 157(b)(2)(1) of Title 28 of the United States Code.  Pursuant to Rule 7008 of the Federal Rules of Civil Procedure, Plaintiffs consent to entry of final order(s) or judgment by this Court.

14.     Venue is proper in this district pursuant to Sections 1408 and 1409 of Title 28 of the United States Code.

## PARTIES

15.     Plaintiffs are immediate family members of the victims of, and a first responder to, the December 14, 2012 shootings at Sandy Hook Elementary School in Newtown, Connecticut, and the holders of the Connecticut Judgment.

16.     Plaintiffs David Wheeler and Francine Wheeler are the parents of first-grader Benjamin Wheeler, who was killed in the Sandy Hook Elementary School shooting on December

14, 2012.

17.     Plaintiffs Mark and Jacqueline Barden are the parents of first-grader Daniel Barden, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012.

18.     Plaintiffs Nicole Hockley and Ian Hockley are the parents of first-grader Dylan Hockley, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012.

19.     Plaintiff Jennifer Hensel is the mother of first-grader Avielle Richman, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012.

20.     Plaintiff Donna Soto is the mother, and Plaintiffs Carlee Soto-Parisi, Carlos M. Soto, and Jillian Soto Marino are the siblings, of first-grade teacher Victoria Leigh Soto, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012, at the age of 27. She died shielding her students.

21.     Plaintiff William Aldenberg was a first responder to the Sandy Hook Elementary School shooting on the morning of the December 14, 2012 and is depicted in iconic photographs and video footage from those events.

22.     Plaintiff William Sherlach was the spouse of school psychologist Mary Sherlach, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012.

23.     Plaintiff Robert Parker is the father of first-grader Emilie Parker, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012.

24.     Erica Lafferty is the daughter of elementary school principal Dawn Lafferty Hochsprung, who was killed in the Sandy Hook Elementary School shooting on December 14, 2012.  Dawn died trying to save her students.  Due to Erica Lafferty's chapter 7 bankruptcy, Plaintiff Richard M. Coan, chapter 7 trustee for the estate of Erica Lafferty, is substituted for Ms. Lafferty as party-plaintiff in the Connecticut action.

25.      Defendant Alexander E. Jones ("<u>Alex Jones</u>" or "<u>Jones</u>") is the debtor in Case No. 22-33553 (CML) before this Court and a defendant in the three consolidated cases in Connecticut (the "<u>Connecticut Action</u>").[4]  He resides in Austin, Texas and is indebted to Plaintiffs pursuant to the Connecticut Judgment.

26.      Defendant FSS (together with Alex Jones, "<u>Defendants</u>") is a Texas limited liability company wholly-owned by Alex Jones.  FSS is the debtor in Case No. 22-60043 (CML) before this Court, and a defendant in the Connecticut Action.  Its principal offices are located at 3005 South Lamar Boulevard, Austin, Texas.  Jones and FSS control Infowars.com, the primary FSS website, and Infowars LLC (together with Infowars.com, "<u>Infowars</u>") as well as the other associated websites through which Jones and FSS do business.

## <u>RELEVANT CONTENTS OF THE CONNECTICUT RECORD</u>

27.      After Alex Jones engaged in substantial discovery misconduct and bad faith litigation in defiance of repeated court orders, the Connecticut trial court issued sanctions—subsequently affirmed by the Connecticut Supreme Court—and ultimately entered a default judgment against him.  The operative effect of this default judgment under Connecticut law is to conclusively admit and establish the Connecticut Complaint's allegations.  Following the default, the Connecticut Action proceeded to a trial on damages.  The evidence at trial, along with the now-established allegations, plainly proved that Alex Jones willfully and maliciously injured the Sandy Hook Families.  The record leading to the Connecticut Judgment also includes filings by Plaintiffs and Alex Jones, rulings by the Connecticut trial court and Connecticut Supreme Court,

---

[4]      The three consolidated cases are *Lafferty, et al. v. Jones, et al.*, Case No. X06- UWY-CV-18-6046436-S, in the Superior Court of Connecticut, Judicial District of Waterbury; *Sherlach v. Jones, et al.*, Case No. X06-UWY-CV-18-6046437-S, in the Superior Court of Connecticut, Judicial District of Waterbury; and *Sherlach, et al. v. Jones, et al.*, Case No. X06-UWY-CV-18-60464386-S, in the Superior Court of Connecticut, Judicial District of Waterbury. The complaints are substantively similar. References to "Conn. Compl." or "Connecticut Complaint" hereafter are to the *Lafferty v. Jones* complaint, the lead complaint on which default was granted. This complaint is attached at Exhibit D.

and a jury verdict following the damages trial.

28.     The Connecticut record, which is incorporated by reference here, provides a closed record of conclusively established facts that are binding in this case.  The following sections of this Complaint draw exclusively from facts established in the Connecticut Action.

### A.     Infowars's Infrastructure at the Time of the Shooting

29.     Alex Jones is a supplement salesman and internet "newsman" who resides in Austin, Texas.[5]  He uses all the paraphernalia and symbology of television and radio journalism to confirm his "newsman" image.[6]  Once he has their attention and trust, Jones exploits his audience by selling them products in line with the paranoid worldview he promotes.[7]

30.     Alex Jones owns, operates, and controls the websites Infowars.com and PrisonPlanetTV.com, and other websites.  He is the star of "The Alex Jones Show."  At the time of the Sandy Hook shooting, Alex Jones had built a corporate infrastructure designed to spread his content as far as possible and to activate his audience members to act on it.  Jones was broadcasting via Infowars.com to an audience of "tens of millions of listeners and viewers each month," on 150 nationally syndicated radio stations,[8] and systematically re-posting content to YouTube, Twitter, and Facebook through multiple accounts.[9]

31.     Jones groomed his audience to believe that he and only he would tell them the truth.

---

[5]    *See* Conn. Compl. ¶ 30.

[6]    Among other things, Alex Jones adopts the consciously deepened voice; the news anchor's huge, Lucite desk; the shuffling of papers; the clipped news-anchor's diction and regular tone modulation; the title-and-picture callouts by story; the breaking-news broadcast opening and transition graphics using Infowars logos; and the regular references to Infowars "reporters" and "investigations."  Conn. Compl. ¶ 93.

[7]    For example, Alex Jones promotes to his audience "open currency" precious metals, pre-packaged food and dietary supplements, "male enhancement" elixirs, radiation-defeating iodine tablets, gas masks and body armor, and various customized AR-15 "lower receivers" (the extruded metal frame that encloses the breach, ammunition feed, and firing mechanism of the AR-15 rifle).  Conn. Compl. ¶ 94.

[8]    Pl. Trial Ex. 217 (2016 Media Kit).

[9]    *See, e.g.*, 9/14/22 Trial Tr. (Vol. I) at 55:21–56:6 (Brittney Paz testifying that it was the defendants' practice to upload every clip produced from the Alex Jones show to every online platform they controlled, including Facebook, Twitter, and YouTube); 9/16/22 Trial Tr. (Vol. I) at 76:15–19.  *See also* Conn. Complaint ¶ 40.

Jones's tagline on Infowars was "the frontline of truth journalism," and Infowars was marketed as "the House that Truth Built."[10]  FSS's corporate designee confirmed this at trial.[11]

32.    Jones knows that his customers will act on what he tells them:  "our customers are so loyal to us that they believe in what we're doing to such a degree that if we say something is good for you and is a good value they're going to buy it and buy a lot of it."[12]  His business model is not just to activate customers to buy supplements but to activate them as "infowarriors."  When Jones attacks someone or something, he intends his audience to attack too:  "I am a precision guided heavy munition, coming in on top of you.  I'm here to stand up for the innocents.  I don't like you. I don't like you getting away with what you do.  You make me sick.  So, I hit the barbed wire, and everybody else comes in over me."[13]

## B.    Alex Jones's Campaign of Defamation and Lies about the Sandy Hook Shooting

33.    On December 14, 2012, a young man shot his way into Sandy Hook Elementary School with a semi-automatic Bushmaster XM15-E2S rifle, and in less than five minutes, he killed twenty first-grade children and six adults while wounding two others.  That terrible day left behind 26 families struggling with grief and senseless loss.

34.    When the shooting occurred, Jones hurried to claim it was a hoax in which the Sandy Hook Families were participating as "actors."[14]  His campaign of lies began the day of the

---

[10]    Pl. Trial Ex. 216 (2014 Media Kit); Pl. Trial Ex. 212 (2013 Web Media Kit).

[11]    9/14/22 Trial Tr. (Vol. II) at 49:11–50:18.

[12]    Pl. Trial Ex. 336a,5/16/19 David Jones Dep. Tr. at 30:21–30:24 (played to the jury on 9/29/22). *See also* Conn. Complaint ¶¶ 93–94.

[13]    Pl. Trial Ex. 37a (video titled  "Alex Jones Warns Megyn Kelly, Exposes Psychological Warfare Operation," dated June 12, 2017); *see also* Pl. Trial Ex. 508 (video dated Sept. 18, 2022); Pl. Trial Ex. 13d (video titled "Super Bowl Police State - Matthew Mills makes a mockery of the Global Mafia," dated Feb. 3, 2014); Pl. Trial Ex. 27 (video titled "Infowars Footage of FOIA Hearing," dated June 3, 2015); Conn. Complaint ¶¶ 41–57.

[14]    *See, e.g.*, Pl. Trial Ex. 105; *see also* Conn. Compl. at ¶ 9 ("Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax – and he never has.").  Of course, he made no attempt to investigate the shooting before publishing his lies to millions.  *See* 9/15/22 Trial Tr. (Vol. III) at 5:19–26.

shooting. Just hours after the shooting, Jones published headlines stating that, according to "witnesses," the shooting was a false flag.[15] FSS admitted that this click-bait headline was false— there were no witnesses who said such a thing.[16]

35.     Alex Jones knew at that time and has known since that his statements about the Sandy Hook shooting being a hoax were lies.[17] Indeed, as Infowars Chief Editor Paul Watson wrote in a December 17, 2015 email, "This Sandy Hook stuff is killing us. It's promoted by the most batshit crazy people like Rense and Fetzer who all hate us anyway. Plus it makes us look really bad to align with people who harass the parents of dead kids."[18]

36.     The day after the shooting, Plaintiff Robert Parker made a press statement to thank all those who had reached out to his family, to remember six-year old Emilie, and to express his forgiveness to the shooter's family. Jones attacked Mr. Parker "pretty immediately" after Mr. Parker issued this statement.[19] He targeted Mr. Parker again on December 19, 2012, in an article titled "Father of Sandy Hook Victim Asks 'Read the Card?' Seconds Before Tear-Jerking Press Conference," which falsely claimed that Mr. Parker read off a card at a press conference the day after his daughter was killed. The article embedded a video titled "Sandy Hook Shooting Exposed as a Fraud," and included a "Statement from Alex Jones" stating that, "It appears that members of the media or government have given him a card and are telling him what to say as they steer reaction to this event, so this needs to be looked into."[20]

---

[15]   *See* Pl. Trial Ex. 1 (video titled "Connecticut School Massacre Looks Like False Flag Says Witnesses," dated Dec. 14, 2012).

[16]   9/14/22 Trial Tr. (Vol. II) at 59:3–11.

[17]   Conn. Compl. at ¶ 9 ("Alex Jones does not in fact believe that the Sandy Hook Shooting was a hoax – and he never has."). Of course, he made no attempt to investigate the shooting before publishing his lies to millions. *See* 9/15/22 Trial Tr. (Vol. III) at 5:19–26.

[18]   Pl. Trial Ex. 160.

[19]   *See* Pl. Trial Ex. 550 (video titled "Sandy Hook Film Censorship Efforts Backfire," dated Dec. 12, 2014*).*

[20]   Pl. Trial Ex. 61 (Infowars.com Article, *Father of Sandy Hook Victim Asks 'Read the Card'*, dated Dec. 19, 2012*)*; *see also* Conn. Compl. ¶¶ 102–105.

37.     On January 27, 2013, Alex Jones posted a video on his YouTube channel titled "Why People Think Sandy Hook is A Hoax."   In the video, Jones claimed that "evidence is beginning to come out more and more in the direction" that the shooting "was a staged event" due in part to "what appears to be people who've been coached, people who have been given cue cards, people who are behaving like actors."[21]   Jones then scapegoated Mr. Parker again, playing a video of Mr. Parker's statement the day after the shooting.   The video was accompanied by a scrolling chyron stating, "Odd Parent Reaction from SandyHook [sic]."   As the video of Mr. Parker played, Alex Jones commented that "I haven't touched this," and that "all I know is they're seizing on it. They staged fast and furious. . . .   Our government, to blame the Second Amendment, they'd stage anything."   Later in the broadcast, Alex Jones continued: "This needs to be investigated.   They're clearly using this to go after our guns. . . . Something though, really, is starting to get suspicious here. . . ."[22]

38.     On January 29, 2013, Leonard Pozner—the father of a Sandy Hook shooting victim and a plaintiff in cases brought in Texas—notified Jones about the injuries he was causing and asked him to change his behavior:

> Alex,
> I am very disappointed to see how many people are directing more anger at families that lost their children in Newtown.   Accusing us of being actors . . . .   Haven't we had our share of pain and suffering?   All these accusations of government involvement, false flag terror, new world order etc.   I used to enjoy listening to your shows prior to 12-14-12.   Now I feel that your type of show created these hateful people and they need to be reeled in![23]

39.     Rather than change his behavior or retract his lies, Jones continued to promote the

---

[21]   Pl. Trial Ex. 6 (video titled "Why People Think Sandy Hook is A Hox," dated Jan. 27, 2013); *see also* Conn. Compl. ¶¶ 111–112.

[22]   Pl. Trial Ex. 6 (video titled "Why People Think Sandy Hook is A Hox," dated Jan. 27, 2013); *see also* Conn. Compl. ¶¶ 113–117.

[23]   Pl. Trial Ex. 109.

false narrative that the families were actors.  To create more content to continue that narrative, he elevated and amplified prominent Sandy Hook deniers like Steve Pieczenik and Wolfgang Halbig.[24]

40.     On April 1, 2013, Jones invited Pieczenik onto his show as a guest caller.  During this broadcast, Jones asked him "What is your take on, on Sandy Hook?  Is it just all the clear scripting, and how they were ready minute one, and now it's come out that Bloomberg was ready months before, and, and all the people that look and act like actors?  What's your take as an expert on this?"  Pieczenik responded, "Well, this is a total script," and then continued to discuss Sandy Hook being faked by actors.[25]  A few days later, Alex Jones again told his audience that Sandy Hook was staged, stating, "and I'll tell you right now, there's—it's open and shut.  It's a government operation at the movie theater.  No doubt. . . . Sandy Hook, it's got inside job written all over it."[26]

41.     On May 13, 2014, Alex Jones broadcast a video on YouTube titled "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert."  In the video, Alex Jones interviewed Halbig, who claimed that, "I think the reason they're not answering those questions 'cause I think it's going to expose their whole scam."  Jones asked Halbig, "What are the big smoking guns? . . . What are the big red flags?"  Halbig answered: the "red flags is [sic] that you're

---

[24]   *See e.g.,* Pl. Trial Ex. 17 (video titled "Bombshell: Sandy Hook Massacre Was a DHS Illusion Says School Safety Expert," dated May 13, 2014); Pl. Trial Ex. 19 (video titled "FBI Says Nobody Killed at Sandy Hook Massacre ft. Wolfgang Halbig," dated Sept. 25, 2014); Pl. Trial Ex. 25 (video titled "New Bombshell Sandy Hook Information In-Bound," dated Mar. 4, 2015); Pl. Trial Ex. 26 (video titled "Sandy Hook The Lies Keep Growing (Infowars Nightly News)," dated May 29, 2015); Pl. Trial Ex. 27 (video titled "Infowars Footage of FOIA Hearing," dated June 3, 2015); Pl. Trial Ex. 28 (video titled "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP," dated July 7, 2015); Pl. Trial Ex. 68 (Infowars.com Article, *Sandy Hook Investigator: Connecticut PD Had FBI Falsify Crime Statistics*, dated Sept. 26, 2014); Conn. Compl. ¶¶ 129–202.  As he did with Pieczenik, Jones brought Halbig on his shows for the purpose of eliciting and publishing false statements claiming that Sandy Hook was a hoax, the Sandy Hook Families were actors and fraudsters, and that children and teachers did not die at Sandy Hook.  *See* Conn. Compl. ¶¶ 71–73.

[25]   Pl. Trial Ex. 8a (video titled "Crisis Actors Used at Sandy Hook: Special Report," dated Apr. 1, 2013).

[26]   Pl. Trial Ex. 9a (video titled "Obama Gun Grab Psyop," dated Apr. 9, 2013).

looking at $29 million . . . and there are other community nonprofit organizations within Newtown

that received a lot of funds."  Jones interjected, "You're saying a motive for the locals to go along

with the fraud is money."  Halbig said, "Children did not die, teachers did not die, on December

14, 2012."  Jones said, "it's fake . . . it's fake . . . you've got parents acting . . . it is just the fakest

thing since the three-dollar bill."[27]

42.     In this same "interview" with Halbig, Alex Jones played a video of Plaintiff Robert

Parker at the December 15, 2012 press conference, using it to target all the Sandy Hook Families,

and others, as actors:

> I mean, it's fake!  Blue screens, it's fake! . . .  You got parents laughing [mocking
> laughing], 'Watch this,' and then [mocking crying] method acting [mocking crying
> and wailing], 'Oh, my child!'  I mean, it's just ridiculous!  You've got coroners that
> start laughing—and I don't mean uncomfortably, I mean like laughing—with the
> State Police when they're giving press conferences.  I mean, it just is the fakest
> thing since the three-dollar bill![28]

43.     Pieczenik appeared on Alex Jones's show again on May 27, 2013.  During this

broadcast, Pieczenik stated that "Sandy Hook was a total false flag."  Later in that segment, Jones

told Pieczenik, "You coming on and saying 'it's a false flag' is big.  When can you come back on

this week or next week for a full hour?"[29]

44.     A September 24, 2014 article titled "FBI Says No One Killed at Sandy Hook,"

which described the shooting as a "carefully-scripted false flag event," drove new social media

traffic, resulting in massive spikes in visits and pageviews to Infowars.com.[30]  FSS was monitoring

---

[27]  *See, e.g.*, Pl. Trial Ex. 17e (video titled "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert," dated May 13, 2014).  *See also* Conn. Compl. ¶¶ 129–141.

[28]  Pl. Trial Ex. 17 (video titled "Bombshell: Sandy Hook Massacre Was a DHS Illusion Says School Safety Expert," dated May 13, 2014).  *See also* Conn. Compl. ¶¶ 129–141.

[29]  Pl. Trial Ex. 7a (video titled "Dr. Steve Pieczenik: Sandy Hook was A Total False Flag," dated Mar. 27, 2013). *See also* Conn. Compl. ¶¶ 123–124.

[30]  *See* Pl. Trial Ex. 67; Pl. Trial Ex. 134 (analytics showing spikes in visits and pageviews to Infowars.com due to this article); Pl. Trial Ex. 135; 9/15/22 Trial Tr. (Vol. II) at 26:24–49:14; Pl. Trial Ex. 278a.

audience engagement with this article—as Jones generally did—and identified the massive spikes caused by the article.  FSS circulated screenshots of analytics data for Infowars.com in the days after the defendants published "FBI Says No One Killed at Sandy Hook."[31]

45.     Jones continued to target the shooting as a hoax and encourage "investigation," [32] including by listeners he knew lived nearby to the Sandy Hook Families.  On December 28, 2014, during his radio show, Alex Jones took a call from a listener name Kevin who claimed to live close to Newtown, Connecticut and wanted to talk about the shooting.  Jones told Kevin, "I've had the investigators on, the state police have gone public, you name it," he said.  "The whole thing is a giant hoax."  He continued:  "The general public doesn't know the school was actually closed the year before . . . They don't know they've sealed it all, demolished the building.  They don't know that they had the kids going in circles in and out of the building as a photo-op.  Blue screen, green screens, they got caught using."  He concluded, "I did deep research—and my gosh, it just pretty much didn't happen."[33]

46.     On January 13, 2015, during a broadcast of The Alex Jones Radio Show, Alex Jones proclaimed:

> Yeah, so, Sandy Hook is a synthetic completely fake with actors, in my view, manufactured.  I couldn't believe it at first.  I knew they had actors there, clearly; but I thought they killed some real kids.  And it just shows how bold they are, that they clearly used actors.  I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey-so yeah, or Pakistan.  The

---

[31]  Pl. Trial Ex. 134.  *See also* Conn. Compl. ¶¶ 11, 90, 92–94.

[32]  *See e.g.*, Pl. Trial Ex. 19g, (video titled "FBI Says Nobody Killed at Sandy Hook Massacre ft. Wolfgang Halbig," dated Sept. 25, 2014) (Jones: "I do want to send some reporters up there with you as part of an investigation soon. Wolfgang is our guest. Sandyhookjustice.com. Support him. He has a lot of courage and a sterling record, and he's putting it all on the line to expose what we all know is pure bull."); Pl. Trial Ex. 19j (video titled "FBI Says Nobody Killed at Sandy Hook Massacre ft. Wolfgang Halbig," dated Sept. 25, 2014); Pl. Trial Ex. 26b (video titled "Sandy Hook The Lies Keep Growing (Infowars Nightly News)," dated May 29, 2015); Pl. Trial Ex. 28c (video titled "Retired FBI Agent Investigates Sandy Hook MEGA MASSIVE COVER UP," dated Jul. 7, 2015).

[33]  Pl. Trial Ex. 22 (video titled "America The False Democracy," dated Dec. 28, 2014); *see also* Conn. Compl. ¶¶ 171–176.

sky is now the limit.[34]

47.     On July 7, 2015, the Alex Jones Radio Show broadcast a video posted on YouTube with the title "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP."[35] "[T]he more we look at Sandy Hook," Alex Jones said, "I don't want to believe it's a false flag. I don't know if kids really got killed, but you've got green screen with Anderson Cooper . . . and then his nose disappears. It's fake! The whole thing, it's—I don't know what happened." He continued, "It's kind of, you see a hologram at Disney World in the haunted house, I don't know how they do it, it's not real. When you take your kids to the haunted house and there are ghosts flying around, it's not real, it's staged. . . . I don't know what the trick is here, I got a good suspicion. But when you've got Wolfgang Halbig . . . he went and investigated, no paperwork, no nothing, it's bull." Later, Jones continued, "But what about how for a mass shooting in Pakistan, they got photos of Sandy Hook kids," and referring to an Infowars article, stated, "it's like the same P.R. company is running this . . . and then they try to hit us with fake copyright deals whenever we show this."[36] Defendants' attacks continued unabated.[37]

48.     Jones has repeatedly claimed that Plaintiffs' grief is evidence of their "acting."[38]

---

[34] Pl. Trial Ex. 23a (video titled "Ron Paul – Kurt Haskell," dated Jan. 13, 2016); *see also* Conn. Compl. ¶¶ 185–186.

[35] *See* Pl. Trial Ex. 28 (video titled "Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP," dated July 7, 2015). *See also* Conn. Compl. ¶ 36.

[36] *See id. See also* Conn. Compl. ¶¶ 220–224.

[37] *See, e.g.*, Pl. Trial Ex. 35b (video dated Nov. 18, 2016) (Jones: "All I know is, the official story of Sandy Hook has more holes in it than Swiss cheese"); Pl. Trial Ex. 43a (video titled "JFK Assassination Documents to DROP Tonight," dated Oct. 26, 2017) (Jones: "[Sandy Hook is] as phony as the three dollar bill."); *see also* Pl. Trial Ex. 35d (video dated Nov. 18, 2016); Pl. Trial Ex. 35e (video dated Nov. 18, 2016); Pl. Trial Ex. 46 (video titled "SOROS LAWFARE EXPOSED: Phony Sandy Hook Lawsuits Filed By FBI Agent And Families," dated May 23, 2018).

[38] *See, e.g.*, Pl. Trial Ex. 6b (video titled "Why People Think Sandy Hook is A Hoax," dated Jan. 27, 2013) (Jones mocking Robert Parker: "And when you watch the footage, I know grieving parents do strange things but he – it looks like he's saying 'okay do I read off the card' he's laughing, and then he goes over and starts um basically breaking down and crying. So let's show that clip."); Pl. Trial Ex. 17f (video titled "Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert," dated May 13, 2014) (Jones: "you got parents laughing going 'ha ha ha watch this' and then they're going [imitating fake crying] method acting [imitating fake crying] I mean it's just ridiculous"); Pl. Trial Ex. 19i video titled "FBI Says Nobody Killed at Sandy Hook

49.     Plaintiffs' expert on the internet, social media, and the spread of the defendants' online content, Clint Watts, explained that Jones's infrastructure at the time of the Sandy Hook shooting allowed him to engage a "massive audience" of 49 million users on his website alone.[39]

50.     Alex Jones's conduct was certain to cause Plaintiffs catastrophic harm.  Looking only at the time period 2012–2018, Alex Jones's Sandy Hook lies secured *an absolute minimum of 550 million impressions on social media alone* – that is *not even counting* the massive reach of Infowars.com.[40]  Moreover, the full reach of the Defendants' lies could not be determined because of information that Jones failed to produce.[41]

51.     The record in the Connecticut Action contains numerous additional examples, beyond those recounted here, of Alex Jones's lies that were intentionally broadcast to his massive audience.  Additionally, FSS's corporate designee testified that Jones and FSS failed to produce videos for over 100 more broadcasts of the Alex Jones Show in which Sandy Hook was discussed.[42]

52.     Jones continued to attack Plaintiffs immediately before and during the Connecticut trial.[43]  He did this precisely because those attacks would drive profits and sales.[44]  As recently as September 29, 2022, he told his audience, "now that I've seen the trial's rigged, and how it all looks, I mean—it's definitely—the whole thing's deep state, that's all I can say.  So, I think the

---

Massacre ft. Wolfgang Halbig," dated Sept. 25, 2014); Pl. Trial Ex. 20a (video titled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," dated Dec. 27, 2014); Pl. Trial Ex. 35c (video dated Nov. 18, 2016).

[39]   9/20/22 Trial Tr. (Vol. I) at 100:13–100:24.

[40]   *See* 9/20/22 Trial Tr. (Vol. III) at 16:20–17:2.

[41]   9/20/22 Trial Tr. (Vol. III) at 2:5–8:25 (Clint Watts describing categories of missing data); *see also* DN 1006.

[42]   Pl. Trial Ex. 50 (list of broadcasts in which Jones discussed Sandy Hook, but for which defendants did not produce videos); 9/16/22 Trial. Tr. (Vol. I) at 42:8–43:21.

[43]   *See* Pl. Trial Ex. 552b (video from the Greg Reese Show on Infowars, dated Sept. 23, 2022, showing Plaintiff Robert Parker in footage from livestream of trial and mocking him for "shaking with emotion by the mere presence of Alex Jones"); Pl. Trial Ex. 594.

[44]   *See, e.g.*, Pl. Trial Ex. 513; Pl. Trial Ex. 504; Pl. Trial Ex. 512; Pl. Trial Ex. 552a.

public's original instinct about it was right.  I don't know what really happened there, but it is, it is synthetic as hell."[45]

### C.   Alex Jones's Willful and Malicious Conduct Caused Significant, Irrevocable Harm to the Sandy Hook Families

53.   Jones began attacking Plaintiffs at the lowest and most vulnerable moment of their lives.  Plaintiff David Wheeler—who lost his son Ben—testified that "after the shock of . . . Ben's murder . . . I felt like I was under water and I didn't know—I didn't know which way was up."[46] Plaintiff Mark Barden—whose son Daniel was killed in the shooting—testified that the "lie going on around [him] about [] being an actor[,] about Sandy Hook being a staged event, about Daniel being a fraud and never existed" was "harder beyond what we could ever imagine trying to deal with, trying to deal with the fact that our little boy had just been shot to death in his first grade classroom and how to literally manage one minute to the next, like literally manage from one minute to the next and then also still be parents to [his surviving children] and still be strong for them and still give them some sense of normalcy in what we didn't understand."[47]   Plaintiff Jennifer Hensel described the devastation of losing a child and then being attacked as having faked it:

> I don't think you heal from something like this.  I think you forever hold grief and you rebuild some joy back into your life, and it balances.  And some days, on other days, one takes over the other and the other days the grief is just so awful.  Then you add on the idea that people think that you made all this up for money, or that your child didn't exist—that compounds everything on top of anything you do, and you can't—I couldn't work.  I write for a living, and I couldn't form sentences.[48]

The testimony of Plaintiff William Aldenberg—an FBI agent and first responder on the scene—

---

[45]   Pl. Trial Ex. 594 (video from the Alex Jones Show, dated Sept. 29, 2022).

[46]   9/21/22 Trial Tr. (Vol. I) at 28:22–29:8.

[47]   10/4/22 Trial Tr. (Vol. II) at 21:12–23:7.

[48]   9/21/22 Trial Tr. (Vol. IV) at 30:27–31:10.

epitomized the direct trauma he experienced and provided insight into what the Sandy Hook Families had to bear about their loved ones' last minutes:  "Our senses were—and that is like—it overwhelms your senses.  I don't know.  I don't know what I heard, I just know that what I saw.  It overwhelms your senses.  It's freaking horrible."[49]

54.    As a result of Jones's intentional conduct, the Sandy Hook Families endured, on a regular basis, physical confrontation and harassment, death threats, and a sustained barrage of verbal assault on social media.  Plaintiff Robert Parker described how the harassment he and his family suffered "would come in these waves, and it was almost like I knew when Alex Jones had said something, because we would get a huge wave of stuff."[50]  Plaintiff William Aldenberg was also targeted, as people said he was "not a real FBI agent" and "an actor."[51]

55.    The harassment of the Sandy Hook Families often threatened violence, including death and rape threats.  Erica Lafferty received a letter stating that she "should die, and then be buried next to [her] fake, dead mother," and she received rape threats.[52]  Francine and David Wheeler received death threats at their child's funeral[53] and intruders invaded their home, "opened the door" and "demanded to see" their son Ben, saying, "I know he's here.  I know he's alive."[54]  Plaintiff Mark Barden testified that he was "getting letters in our mailbox and started seeing things on line that were clearly death threats . . . [W]e were sharing things with the FBI.  We were sharing things with Newtown Police Department like what is this and it looked scary and dangerous."[55]

---

[49]    9/13/22 Trial Tr. (Vol. II) at 31:11–19.

[50]    9/29/22 Trial Tr. (Vol. I) at 24:14–25:4.

[51]    9/13/22 Trial Tr. (Vol. II) at 47:21–48:4.

[52]    9/21/22 Trial Tr. (Vol. III) at 17:25–18:15, 21:13–18.

[53]    10/4/22 Trial Tr. (Vol. I) at 26:10–28:17

[54]    9/21/22 Trial Tr. (Vol. III) at 32:11–33:1; *see also* 10/4/22 Trial Tr. (Vol. I) at 24:24–25:4.

[55]    10/4/22 Trial Tr. (Vol. II) at 23:11–24:3.

FBI agent William Aldenberg testified to receiving "violent, threatening messages."[56]  Plaintiff Ian Hockley—father of six-year-old Dylan—testified that someone left on his windshield a card showing Plaintiff Robert Parker purportedly laughing.[57]

56.    Plaintiff Carlee Soto-Parisi—whose sister Victoria, a teacher, was killed in the Sandy Hook shooting trying to protect her students from the shooter—testified about how the hoax penetrated her own community:  "I was hanging out with some friends and one of the girls I was hanging out with said, you know, this girl that we went to school with, she thinks that it was all a hoax, she doesn't believe you—and I went to school with this girl, we went to school from middle school on, together.  And she didn't believe that I had a sister that died.  She thought I was an actress.  And I just couldn't wrap my head around that."[58]

57.    The Sandy Hook Families also experienced massive, constant online harassment. For example, Plaintiff Mark Barden, father of Daniel, described attacks on his music website:

> I started getting this stuff on there . . . like . . . you're a liar, you're a fraud, . . . and I'm like what? It was just completely foreign.  I didn't understand where it was coming from, why it was coming and it was really hurtful because my little music website I've never had a Facebook page in my life.  I had a little YouTube thing, again, to share music and family stuff but not really a social media person . . . and we finally had to let the website go because this hateful stuff threatening stuff, dangerous stuff was coming in so just shut it off.[59]

Plaintiff Francine Wheeler—mother of Ben—explained:

> [T]hey took my videos, and my work of 20 years, and they doctored them, and they made fun of them, and they said, look, see, she's an actor.  And they took—they took my identity.  They took my identity, and then they took my husband's identity, they took my surviving child's identity who was hiding in the gym.  They took it.[60]

---

[56]   9/13/22 Trial Tr. (Vol. II) at 52:7–53:21.

[57]   9/27/22 Trial Tr. (Vol. II) at 6:23–9:3.

[58]   9/13/22 Trial Tr. (Vol III) at 25:15–26.

[59]   10/4/22 Trial Tr. (Vol. II) at 21:12–23:7.

[60]   10/4/22 Trial Tr. (Vol. I) at 37:9–17.

Plaintiff Carlos M. Soto—Victoria Soto's brother—described online comments "saying that I wasn't real.  Saying that [Victoria] wasn't real.  And that my family wasn't real."  He stated that "[a]nytime there's another shooting, or anytime someone says something, our social medias are flooded with another batch of comments."[61]

58.    The harassment poured into online memorials and foundation websites.   For example, in connection with his daughter Emilie's memorial page, Plaintiff Robert Parker explained:

> [W]e had eight people that we had allowed to be administrators on the [Emilie memorial] page, who just spent as much free time as they could report-ban-delete, report ban-delete, report-ban-delete—trying to get rid of the stuff, just trying to get it far enough down on the page so that if anybody came to the page, the first thing they would see was something about Emilie and not all of this filth.  Then by the middle of January, I finally just turned the page off.  I couldn't—I couldn't—I felt like I couldn't protect Emilie's name or her memory anymore.  So, I had to get rid of it.[62]

Plaintiff Ian Hockley did the same with memorial videos for his son:

> We put some of the memorials filmed and we put some of those videos on YouTube.  Some of just the video of Dylan that had been created but what others were who spoke or sang and Nicole and mine eulogy we also posted that.  And that started attracting comments about my behavior because I was called out for smiling . . .  I can't remember all the comments that that is what that video started to attract is people saying this must be fake.  He's an actor.  He's smiling . . . All those things started to appear until we took our video down.[63]

Plaintiff Jennifer Hensel—whose daughter Avielle was killed in the Sandy Hook shooting—described the attack on her family through the Avielle Foundation:  "[F]iltering in were people who were attacking our idea and attacking us as actors, and telling us that Avielle didn't exist and that we [were] just trying to get money from the public—and how dare we do something like

---

[61]   9/29/22 Trial Tr. (Vol. II) at 14:8–16:12.

[62]   9/29/22 Trial Tr. (Vol. I) at 12:11–13:25.

[63]   9/27/22 Trial Tr. (Vol. I) at 33:17–34:6.

that."[64]

59.     Jones's campaign of lies has forced the Sandy Hook Families to live in fear for their own safety and for the safety of their surviving loved ones.  For example, Plaintiff Nicole Hockley—whose son Dylan was killed in the Sandy Hook shooting—"took out a really large life insurance policy . . . so that if they got to me [her] surviving son will be okay—financially okay," and bought a house "that is purposefully exposed, so you can't get near my house without someone else in the neighborhood seeing you from any angle.  I have security lights throughout the whole exterior of the house."[65]  Plaintiff Mark Barden explained, "I have developed a layer of constant hypervigilance, and it's exhausting.  It interferes with your sleep, it interferes with your conscious, it interferes with your thinking, your ability to process."[66]  Plaintiff Robert Parker moved away from Newtown, but the move did not protect his family:  "[W]e weren't even halfway through the remodel on this new house, and I see this video on YouTube of all of the county documents about the sale of our house—how much it cost, the address, and the person going through all of that and following—basically, following our steps and the steps of this house and everything.  So, immediately, that sense of security that I thought that we had was totally shattered."[67]

**D.     The Filing of the Connecticut Action**

60.     On May 23, 2018, some of the Sandy Hook Families filed the Connecticut Action in the Judicial District of Fairfield at Bridgeport in Connecticut Superior Court, titled *Lafferty, et al.* v. *Jones, et al.*, UWY-CV-18-6046436-S, before Judge Barbara N. Bellis.  In December 2018 and January 2019 two substantively identical complaints—titled *Sherlach, et al.* v. *Jones, et al.*,

---

[64]   9/21/22 Trial Tr. (Vol. IV) at 28:2–6.

[65]   9/27/22 Trial Tr. (Vol. III) at 23:15–27:15.

[66]   10/4/22 Trial Tr. (Vol. III) at 19:19–20:24.

[67]   9/29/22 Trial Tr. (Vol. I) at 18:20–20:4.

UWY-CV-18-6046437-S and *Sherlach, et al.* v. *Jones, et al.*, UWY-CV-18-6046438-S—were consolidated with the first complaint in the Connecticut Action.[68]

61.    The Connecticut Action was brought against (i) Alex Jones, (ii) FSS; (iii) various additional entities wholly owned and operated by Jones (Infowars, LLC; Infowars Health, LLC; and Prison Planet TV, LLC); and (iv) some additional defendants not relevant here and who were not a party to the case at the time the judgment was entered.

62.    Plaintiffs asserted five causes of action: (i) invasion of privacy by false light, (ii) defamation and defamation *per se*, (iii) intentional infliction of emotional distress, (iv) negligent infliction of emotional distress, and (v) violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), codified at Conn. Gen. Stat. § 42-110a *et seq.*[69]

**E.    Alex Jones's Repeated Discovery Violations and Continuing Harassment While Defending the Connecticut Action**

63.    From the filing of the Connecticut Complaint in May 2018 through the end of the damages trial and entry of judgment in late 2022, Alex Jones actively defended the Connecticut Action.

64.    On July 13, 2018, Alex Jones removed the case to the U.S. District Court for the District of Connecticut.  DN 106.[70]  On November 21, 2018—the day after the case was remanded back to the Connecticut Superior Court—Jones filed a special motion to dismiss the case under

---

[68]    The three complaints make substantively similar allegations and advance similar causes of action, and are referred to interchangeably in subsequent briefing by the parties.  As a result, this complaint does not distinguish between them except when citing specific allegations in particular complaints.

[69]    On September 19, 2022, after entry of the default judgment but before the start of trial on damages described below, the Sandy Hook Families filed an amended complaint removing all but Alex Jones and FSS as defendants, and withdrawing the claim for negligent infliction of emotional distress.

[70]    Citations in the form of "DN" refer to the docket number of the *Lafferty.* v. *Jones* docket, which is publicly available at https://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=UWYCV186046436S.

Connecticut's anti-SLAPP statute,[71] arguing that the "claims are based on speech on an issue of public concern." DN 112, 113. A month later, the Connecticut court granted limited discovery to respond to the motion as provided by the anti-SLAPP statute. DN 123.10.

65. Jones resisted discovery, refusing in particular to produce basic analytics data, which would have given Plaintiffs insight into daily traffic flows on Infowars.com and its mirror websites and other significant information.[72] When Alex Jones finally did produce some documents, Plaintiffs discovered that Jones had produced documents that included child pornography. Jones used this as a pretext to target Plaintiffs' counsel by name, and to urge his audience to do the same. On June 14, 2019, he claimed that Plaintiffs' counsel, whose photograph he prominently displayed to his audience, framed him by planting the child pornography in his email so that he would produce it and offered a bounty to his audience for retribution:

> 'Now, I wonder who during discovery would send e-mails out of millions and then know what to search and look at . . . . One million dollars on conviction for who sent the child porn. . . . . We're going to turn you loose, the [internet service providers], the law enforcement. You know who did it. . . . 'You think when you call up on, oh, we'll protect you. We found the child porn. I like women with big giant tits and big asses. ***I don't like kids like you goddamn[ed] rapists, f-heads. In fact, you fucks are going to get it, you fucking child molesters. I'll fucking get you in the end, you fucks.*** . . . ***You're trying to set me up with child porn. I'm going to get your ass.*** One million dollars. One million dollars, you little gang members. One million dollars to put your head on a pike. One million dollars, bitch. I'm going to get your ass.
> . . .
> That's why I said, one million. I'm not BSing. One million dollars when they are convicted. The bounty is out, bitches, and you know, you feds, they're going to know you did it. ***They're going to get your ass, you little dirt bag. One million, bitch. It's out on your ass***. . . .
> . . .

---

[71]   Connecticut's anti-SLAPP ("Strategic Lawsuit Against Public Participation") statute—Conn. Gen. Stat. § 52-196a, effective January 1, 2018—was enacted to protect parties from frivolous lawsuits aimed at curtailing the exercise of certain federal and state constitutional protected rights, and it authorizes a plaintiff to file a special motion to dismiss when a complaint is "based on the opposing party's exercise of its right of free speech, right to petition the government, or right of association" under the U.S. or Connecticut constitutions. *See, e.g.*, *Elder* v. *Kauffman*, 254 A3d 1001, 1003–04, 1004 n.2 (Conn. App. Ct. 2021).

[72]   *See* DN 450 at 2–3.

> *And so, if they want war—you know, it's not a threat.  It's like an AC/DC song.*
> *If you want blood, you've got it.  Blood on the streets, man*. . . .  And I'm just
> asking the Pentagon and the patriots that are left, and 4chan and 8chan, and
> Anonymous, anybody [who's] a patriot, I am under attack, and if they bring me
> down, they'll bring you down.  I just have faith in you.  I'm under attack.  And I
> summon the mean war.  I summon all of it against the enemy.

(Emphases added).

66.    On June 18, 2019, the Connecticut trial court entered sanctions based on Jones's

discovery misconduct and on his threatening conduct toward counsel, finding that:

> Putting aside the fact that the documents the Jones defendants did produce
> contained child pornography, putting aside the fact that the Jones defendants filed
> with the Court a purported affidavit from Alex Jones that was not in fact signed by
> Alex Jones, the discovery in this case has been marked with obfuscation and delay
> on the part of the defendants, who, despite several Court-ordered deadlines as
> recently as yesterday, they continue in their filings to object to having to, what they
> call affirmatively gather and produce documents which might help the plaintiffs
> make their case.  Despite over approximately a dozen discovery status conferences
> and several Court-ordered discovery deadlines, the Jones defendants have still not
> fully and fairly complied with their discovery obligations.[73]

67.    Regarding Jones's threatening conduct, the Connecticut trial court wrote: "Again,

these are just a few examples where Jones either directly harasses or intimidates Attorney Mattei

[counsel for the Sandy Hook Families], repeatedly accuses Plaintiffs' Counsel of requesting the

metadata so they could plant the child pornography, continues to call him a bitch, a sweet little

cupcake, a sack of filth, tells him to go to hell, and the rant or tirade continues with frequent

declarations of war against Plaintiffs' Counsel."[74]  The court recognized its "authority to address

out-of-court bad-faith litigation misconduct where there is a claim that a party harassed or

threatened or sought to intimidate counsel on the other side," and, as a sanction for Alex Jones's

discovery misconduct, denied Jones the opportunity to pursue the special motion under

---

[73]    DN 269 at 1.

[74]    *Id.* at 7.

Connecticut's anti-SLAPP statute.[75]  The court further cautioned that:

> At this point, I decline to default the Alex Jones defendants, but I will—I don't know how clearly I can say this.  As this case progresses, and we will get today before you leave a trial date in the case now and a scheduling order.  As the discovery in this case progresses, if there is continued obfuscation and delay and tactics like I've seen up to this point, I will not hesitate after a hearing and an opportunity to be heard to default the Alex Jones defendants if they from this point forward continue with their behavior with respect to discovery.[76]

68.     Alex Jones then appealed the sanction to the Connecticut Supreme Court, which heard oral argument in August 2019.  On July 23, 2020, the Connecticut Supreme Court issued a decision affirming the lower court's dismissal of the anti-SLAPP motion as a sanction for Alex Jones's repeated discovery violations.[77]  After looking to guidance from the U.S. Supreme Court and sister state appellate courts on the constitutionality of contempt as a sanction for out-of-court statements commenting on judicial proceedings, the Connecticut Supreme Court affirmed the sanctions, finding that Alex Jones's behavior "posed ***an imminent and likely threat*** to the administration of justice" and was "***calculated to interfere with the fairness of the proceedings*** as it directly targeted opposing counsel, accusing him of felonious behavior and threatening him, and reasonably can be expected to influence how the plaintiffs litigate their case."[78]  The Connecticut Supreme Court further noted that, "Because Jones's statements were ***one part of a whole picture of bad faith litigation misconduct***, we conclude that the trial court's reliance on Jones's speech as part of the rationale for the sanctions orders was appropriate in this context."[79]

69.     The case returned to the Connecticut trial court in September 2020.  Over the next

---

[75]   *Id.* at 3.

[76]   *Id.* at 8.

[77]   *See Lafferty* v. *Jones*, 246 A.3d 429 (Conn. July 23, 2020)*, available at* https://jud.ct.gov/external/supapp/Cases/AROcr/CR335/335CR35.pdf.

[78]   *Id.* at 365, 370.

[79]   *Id.* at 370 (emphases added).

two years, Alex Jones continued actively defending the case, and he continued his active discovery misconduct.

70.     For example, in the very first deposition of a plaintiff—and even while that deposition was ongoing—Alex Jones violated the protective order by using testimony designated as "Confidential-Attorneys Eyes Only" as the basis for a frivolous motion to depose former presidential candidate Hillary Clinton.  In forcefully rebuking this violation of the protective order over Jones's objection, the Connecticut court stated in its August 5, 2021 order that Alex Jones:

> [T]ake[s] the absurd position that the court ordered protective order  .  .  .  did not need to be complied with, and should not be enforced by the court.  This argument is frightening.  Given the cavalier actions and willful misconduct of Infowars in filing protected deposition information during the actual deposition, this court has grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public.  The court will address sanctions at a future hearing.

71.     At the ensuing October 20, 2021 hearing, the Connecticut court imposed sanctions for Alex Jones's violations of the protective order, holding that the arguments by Alex Jones "were baseless, and I think the behavior really is unconscionable.  There is no confusion.  There can be no confusion about a very straight forward protective order that counsel themselves filed and asked the Court to approve.  And I am concerned about a chilling effect on the testimony of other witnesses."  DN 525 at 78.

72.     Similarly, after the court ordered Alex Jones and FSS to produce trial balances for FSS, including subsidiary ledgers, they failed to produce the required discovery.  After the Sandy Hook Families moved for sanctions, the court once more called out the defendants' misconduct in an order dated August 6, 2021:

> There is no excuse for the defendants' disregard of not only their discovery obligations, but the two court orders.  The court finds that the failure to comply with the production request has prejudiced the plaintiffs [and] their ability to both

prosecute their claims and conduct further depositions in a meaningful manner. The Connecticut court further noted that, "Sanctions will be addressed at a future hearing."

73.     In a similar obstructionist vein, Alex Jones and FSS failed to produce Google Analytics data in violation of multiple court orders.  Once more, the Connecticut court found the misconduct sanctionable:

> The Jones defendants, however, seem to take the position that the rules of practice do not apply to them. . . . There is no dispute here that the Jones defendants failed to follow the rules as they relate to discovery.  The actions they took, as they themselves outlined in their objection and surreply, fall far short of meeting their obligations under our rules. . . . In light of this continued failure to meet their discovery obligations in violation of the court's order, to the prejudice of the plaintiffs, the court will address the appropriate sanctions at the next status conference.[80]

74.     While Alex Jones's misconduct in the litigation continued, the court continued to issue a series of warnings that repeated violations might lead to sanctions, including a potential default judgement.  *See, e.g.*, DN 326.10 (May 5, 2021 order noting that noncompliance with a discovery order "may result in sanctions."); DN 336, May 6, 2021 Tr. at 13–16 (noting that "invok[ing] the Rules of Professional Conduct as a procedural weapon" was inappropriate and sanctionable); DN 348.10 (June 2, 2021 order noting that failure to comply with longstanding discovery orders "may result in sanctions including but not limited to a default").

### F.      The Default Judgment Against Alex Jones

75.     Unable to prosecute meaningful discovery, Plaintiffs filed a motion for default judgment on October 6, 2021, which Alex Jones and FSS actively opposed.  At the time that Plaintiffs filed their motion, there were other discovery disputes pending about Alex Jones's misconduct, including regarding the manipulation of financial documents produced in discovery and the improper handling of confidential settlement information in violation of a court order.

---

[80]    DN 450.20, Sept. 30, 2021 order.

76.     In a ruling on November 15, 2021, on the record, which is attached hereto as Exhibit E, the court noted Alex Jones's extensive participation and willful misconduct to date in the litigation.  As to the violations of the protective order, for example, the court noted that Alex Jones and the other defendants "argued unconvincingly that they didn't understand the very protective order that they themselves drafted and asked the Court to approve as a Court order, which the Court did."  DN 574 at 3–4.  The court underscored Alex Jones's long history of extensive appearances in the action—*e.g.*, on June 28, 2018; March 1, 2019; February 24, 2020; July 7, 2020; November 6, 2020; May 14, 2021; and October 20, 2021—and emphasized his history of openly defying repeated court orders and making false representations to the court.

77.     As a result of these violations, the court entered default judgment on all claims against defendants Alex Jones; Infowars, LLC; Free Speech Systems, LLC; Infowars Health, LLC; and Prison Planet TV, LLC.  In concluding that default judgment was appropriate, the court explained:

> Here the Jones defendants were not just careless.  Their failure to produce critical documents, their disregard for the discovery process and procedure and for Court orders is a ***pattern of obstructive conduct*** that interferes with the ability of the plaintiffs to conduct meaningful discovery and prevents the plaintiffs from properly prosecuting their claims.
> . . .
> The prejudice suffered by the plaintiffs, who had the right to conduct appropriate, meaningful discovery so they could prosecute their claims again, was ***caused by the Jones defendants willful noncompliance***, that is, the Jones defendants failure to produce critical material information that the plaintiff needed to prove their claims.  For these reasons, the Court is entering a default against the defendants Alex Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC.  The case will proceed as a hearing in damages as to the defendants.  The Court notes ***Mr.  Jones is sole controlling authority of all the defendants, and that the defendants filed motions and signed off on their discovery issues jointly.  And all the defendants have failed to fully and fairly comply*** with their discovery obligations.[81]

---

[81]     DN 579 at 56–57 (emphases added).

78.    Following the entry of default judgment, Alex Jones and the other defendants filed a notice of defenses.  *See* DN 594.  In a December 24, 2021 order, the court struck those defenses, finding that "the Alex Jones defendants are prohibited from contesting liability or raising affirmative defenses in light of the disciplinary default entered against them.  Therefore, the notice of defenses is stricken, and the case will proceed as a hearing in damages as to these defendants."  *See* DN 620.20 at 1.

79.    Under Connecticut law, an entry of default "conclusively establishe[s] the facts alleged in the plaintiffs' complaint."  *Smith* v. *Snyder*, 839 A.2d 589, 598 (Conn. 2004); *DeBlasio* v. *Aetna Life & Cas. Co.*, 441 A.2d 838, 839 (Conn. 1982).  Thus, as a matter of Connecticut law, Alex Jones has legally admitted to allegations referenced previously, as well as to the following allegations, among others:

- "Jones . . . has persisted in the perpetuation and propagation of this outrageous, deeply painful, and defamatory lie in the face of a mountain of evidence to the contrary and with no supporting evidence."  (Conn. Complaint ¶ 8);
- "Alex Jones does in fact believe that the Sandy Hook Shooting was a hoax—and he never has."  (*Id.* ¶ 9);
- "Jones has deliberately employed these false narratives about the Sandy Hook shooting, the victims, and their families as part of a marketing scheme that has brought him and his business entities tens of millions of dollars per year."  (*Id.* ¶ 11);
- "As a result of Jones's campaign, the families and survivors of the Sandy Hook shooting have been forced to endure malicious and cruel abuse at the hands of ruthless and unscrupulous people," including "physical confrontation and harassment, death threats, and a sustained barrage of harassment and verbal assault on social media."  (*Id.* ¶¶ 13–14);
- "Jones has repeatedly expressly stated that he aspires to spur his followers to action, and has acknowledged that his exhortations have that effect.  This is especially true with regard to the Sandy Hook shooting."  (*Id.* ¶ 41);
- "The false claim that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control was . . . a prime narrative for attracting, augmenting, and agitating Jones's audience."  (*Id.* ¶ 92);
- "In light of [his] prior experience with similar sorts of reckless and false statements, [Jones] knew that [his] publications could cause the plaintiffs to suffer harassment and potential violence."  (*Id.* ¶ 341);

- Jones's acts "resulted in damage to the plaintiffs." (*Id.* ¶ 346);

- "In broadcasting [his] campaign of outrageous and false statements about the plaintiffs, [Jones] intended to inflict emotional distress or knew, or should have known, that emotional distress was the likely result of [his] conduct." (*Id.* ¶ 361);

- Jones's "conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (*Id.* ¶ 365);

- "Jones's outrageous, cruel and malicious conduct was the cause of the plaintiff's distress." (*Id.* ¶ 377); and

- Jones "unethically, oppressively, immorally, and unscrupulously developed, propagated, and disseminated outrageous and malicious lies about the plaintiffs and their family members, and . . . did so for profit." (*Id.* ¶ 386).

### G.    The Damages Trial Against Alex Jones

80.    On September 13, 2022, following the default judgment, the Connecticut Action proceeded to a trial on damages, in which Alex Jones and his counsel once again fully participated. *See* DN 1026 at 7.

81.    Although he went to Connecticut for much of the trial, Alex Jones spent almost all of the trial outside the courthouse.[82]  On September 22, 2022, the seventh day of trial, Plaintiffs called Alex Jones to the stand.  During his testimony, Jones drew a contempt threat from the court and repeatedly spoke over his own lawyer's objections.[83]  While on the stand, Jones was asked: "[I]f someone were to falsely claim that a group of families who have lost loved ones were actors and had faked the deaths of their loved ones, that would be a horrible thing to say, correct?"  He responded, "In the context, it could be, yes."[84]

82.    As previously described, Plaintiffs testified at the trial regarding their injuries.  Alex

---

[82]    *See* DN 996 (recounting 9/23/22 press conference Jones gave on courthouse steps in which he called for the jury to "go . . . research" the case on their own, in direct contradiction to court's instruction to jury to decide case on evidence presented); 9/27/22 Trial Tr. (Vol. I) at 3; 9/23/22 Trial Tr. (Vol. I) at 1–2; 10/5/22 Trial Tr. (Vol. I) at 5–6.

[83]    *See* 9/22/22 Trial Tr. (Vol. IV) at 22.

[84]    *See* 9/22/22 Trial Tr. (Vol. II) at 38.

Jones's trial counsel was present throughout the trial and had the opportunity to cross-examine each Plaintiff, to cross-examine all other witnesses, and to call witnesses himself.

83. Following the three-week trial, the court instructed the jury on October 7, 2022 that it was their "duty as jurors to determine the extent of damages," and that they should "award those damages [they] find to have been proven by a preponderance of the evidence[.]"[85]   The court further instructed the jury that, in addition to compensatory damages, common law "[p]unitive damages may be awarded if you find that the defendants' actions in this case were willful[,] wanton or malicious." *Id.*  Punitive damages under CUTPA would be determined by the court.

84. On October 12, 2022, the jury rendered a verdict assessing damages against Alex Jones and FSS.  This verdict is attached hereto as Exhibit A.  The damages assessment was based on the already-established liability against Jones and FSS for invasion of privacy by false light, defamation, intentional infliction of emotional distress, and violation of CUTPA.  The jury awarded Plaintiffs $965 million in compensatory damages.  The jury also found that Plaintiffs were entitled to common law punitive damages, which in Connecticut consist of attorney's fees and costs.  *See* DN 1010.

85. On October 21, 2022, Alex Jones and FSS moved to set aside the verdict and for remittitur to reduce the jury's assessment of damages.  That same day, the parties began briefing the issue of CUTPA punitive damages, which are determined by the court under the statute.  On October 21, 2022, Plaintiffs submitted their opening brief, in which they argued that the misconduct by Alex Jones and FSS evidenced the highest possible degree of reprehensibility.  DN 1018.  Under CUTPA, punitive damages are only available where the evidence reveals a "reckless indifference to the rights of others or an intentional and wanton violation of those

---

[85]   Jury Charge, *Lafferty* v. *Jones* Court Ex. II at 12.

rights,"[86] and the "basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive, and violence."[87]  Plaintiffs argued that the evidence before the court established that "it was objectively certain that defendants' conduct would harm the plaintiffs and that the defendants 'actually entertained' the intent to harm the plaintiffs," and "[k]nowing the harm they were causing, the defendants chose to continue inflicting harm on the plaintiffs for ten years, including during this trial." *Id.* at 5.  Plaintiffs advanced several arguments for awarding substantial punitive damages under CUTPA.

86.     *First*, Plaintiffs pointed to evidence that Alex Jones and FSS knew that their actions were certain to cause harm, including because (i) the defendants' infrastructure at the time of the Sandy Hook shooting allowed them to engage a "massive audience" of 49 million users on their website alone, as established by Plaintiffs' trial expert and by FSS's own documents concerning the reach of Infowars content; (ii) Jones groomed his audience to believe that he—and only he— would tell them the truth, as extensively established by the evidence at trial (and the admitted allegations of the Connecticut Complaint); and (iii) Jones's business plan is to activate his audience, and he knows that plan works.  *Id.* at 7–9.

87.     *Second*, Plaintiffs pointed to evidence that from shortly after the shooting until recently, Alex Jones and FSS knew they were actually harming Plaintiffs but nevertheless continued attacking them repeatedly.  Plaintiffs noted (i) Alex Jones's repeated attacks on the plaintiffs over a period of years; (ii) that Jones knew his lies were false from the beginning; (iii) that if there were any question whether Jones knew his lies were harming the plaintiffs, that question was completely resolved by the warning from Leonard Pozner barely six weeks after the shooting

---

[86]   *Bridgeport Harbour Place I, LLC* v. *Ganim*, 30 A.3d 703, 732 (Conn. App. Ct. 2011).

[87]   *Id.*

about the "pain and suffering" that Jones was causing and how Jones's show "created these hateful people and they need to be reeled in;" (iv) that Jones chose to keep targeting Plaintiffs after Pozner's warning; (v) that the November 2013 report by the Connecticut State's Attorney regarding the shooting again gave the lie to any notion that the shooting was a hoax, but rather than back off his lies, Jones chose to capitalize on the engaged audience he had developed around the Sandy Hook hoax narrative; (vi) that record evidence showed Jones's focus on the way that the Sandy Hook lies were increasing his website traffic; (vii) that Jones continued his attacks year after year; and (viii) that the trial evidence established Jones's Sandy Hook lies received a minimum of 550,000,000 impressions on social media alone between 2012 and 2018 (this does *not* count radio or impressions from Jones's massive following on Infowars.com and other Jones websites). *Id.* at 9–18.

88.     *Third*, Plaintiffs pointed out the evidence that Jones had continued to attack the Sandy Hook Families during trial in order to push product sales. *Id.* at 18–19.

89.     On October 28, 2022, Alex Jones and FSS opposed the award of punitive damages under CUTPA. DN 1021. They acknowledged that "punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.* at 3. They argued, among other things, that (i) the compensatory damages award achieved the purpose of punitive damages, (ii) punitive damages, if imposed, should be limited to common law punitive damages, and (iii) common law damages should be limited to what due process requires. *Id.*

90.     On November 10, 2022, the court issued a 45-page opinion—attached hereto as Exhibit B—regarding common law and CUTPA punitive damages. DN 1026. The court imposed approximately $322 million in common law punitive damages, rejecting Alex Jones's arguments

that full common law punitive damages should not be awarded, and fully compensated Plaintiffs'

attorney's fees and costs (attorney's fees and costs are the measure of common law punitive

damages under Connecticut law).  *Id.* at 20.

91.     As to CUTPA punitive damages—determined by the court under Connecticut

law—the Connecticut court stated that it had assessed a number of factors, including (i) the degree

of relative blameworthiness, i.e., whether the defendant's conduct was reckless, intentional, or

malicious; (ii) whether the defendant's action was taken or omitted to augment profit; (iii) whether

the wrongdoing was hard to detect; (iv) whether the injury and compensatory damages was small,

providing a low incentive to bring the action; and (v) whether the award will deter the defendant

and others from similar conduct.  *Id.* at 29–30.

92.     In considering the first factor regarding the degree of relative blameworthiness—

which the court found was "the most important consideration"—the court held:

> ***The record clearly supports the plaintiffs' argument that the defendants' conduct
> was intentional and malicious, and certain to cause harm by virtue of their
> infrastructure, ability to spread content, and massive audience including the
> "infowarriors."***  The record also establishes that the defendants repeated the
> conduct and attacks on the plaintiffs for nearly a decade, including during the trial,
> wanton, malicious, and heinous conduct that caused harm to the plaintiffs.  This
> depravity, and cruel, persistent course of conduct by the defendants establishes the
> highest degree of reprehensibility and blameworthiness.[88]

93.     In considering the second factor regarding whether Jones's actions were taken in

order to augment profits, the court held:

> [D]espite the defendants' abject failure to meet their obligations to fully and fairly
> comply with discovery—and despite the defendants' failure to produce a
> knowledgeable corporate representative armed with sufficient information—the
> plaintiffs clearly established that the defendants' conduct was motivated by profit,
> by virtue of the convincing evidence including the text messages between Alex
> Jones and Tim Fruge regarding daily sales figures, the business model used by the
> defendants whereby they emulated content including Sandy Hook content to reap
> more profits, the expert testimony of Clint Watts that Jones' use of Sandy Hook

---

[88]  *Id.* at 43–44 (emphasis added).

engaged the audience and drove up sales and profit, the spikes in sales revenue following the article "FBI Says No One Killed at Sandy Hook," and their use of the plaintiffs even during the trial to make money.[89]

94.     In considering the third factor regarding the difficulty to detect the wrongdoing, the

court held:

> [T]he defendants' concealment of their conduct and wrongdoing, by virtue of their stunningly cavalier attitude toward both their discovery obligations and court orders regarding discovery throughout the entire pendency of the case, their unprepared corporate representative, and intentional discovery abuses, militates in favor of a substantial award of punitive damages.[90]

95.     In considering the fourth factor regarding the size of the injuries and compensatory

damages awards and the low incentive to bring the action, the court held:

> [D]espite the magnitude of the injuries and ultimate outcome, there was a low incentive to bring and maintain an action like this.  The road to reach a verdict here was a tortuous one, involving an unusual number of appeals, an extraordinary number of court filings, and numerous forays into federal court including bankruptcy court.  Moreover, the trial record establishes that the defendants remain in the unique position of having-and continuing to utilize-an immense media platform and audience to continue to target the plaintiffs, as well as mocking the plaintiffs' attorneys, the court, and the very jury that they selected.  ***It is, quite simply, unprecedented in American jurisprudence***, and the court reaches the inescapable conclusion that despite the magnitude of the harms caused to the plaintiffs, there is little incentive to bring an action like this against defendants such as these defendants, who have continued to use their platform to attack.[91]

96.     In considering the fifth factor regarding the deterrent effect of punitive damages,

the court held:

> [T]he court bases its decision on the record before it, including its findings of concealed financial records and analytics, sanitized trial balances, sales following the FBI article, and the defendants' intentional choice to produce an unprepared corporate designee, who, when asked how much money the defendants earned since 2012, could only provide an estimate between over $100 million and up to $1 billion.[92]

---

[89]  *Id.* at 40–41.

[90]  *Id.* at 41.

[91]  *Id.* at 41–42 (emphasis added).

[92]  *Id.* at 42–43.

97.     Based on its analysis of these factors, the court awarded $10 million in CUTPA punitive damages to each of the 15 plaintiffs in the Connecticut Action, for a total of $150 million.[93]

98.     On December 22, 2022, the court denied the motion by Alex Jones and the other defendants for a new trial and remittitur.  DN 1042.  This decision is attached hereto as Exhibit C. The court found:

> Here, the overwhelming evidence of the plaintiffs' injuries and damages, in conjunction with the court's instructions on the law, which the jury is presumed to have followed, clearly support the verdicts rendered by the jury. . . . In reviewing the evidence in a light most favorable to sustaining the verdicts, . . . ***the evidence of the devastating harm caused to the plaintiffs through the defendants' continued use of their business platform to spread lies to a massive audience*** clearly supports the verdicts, and that the verdicts are within the limits of a fair and just award of damages.[94]

99.     On December 29, 2022, Alex Jones and other defendants filed an appeal from the judgment.  DN 1050.  That appeal is currently pending.

100.    As a result of the jury's damages verdict, Alex Jones owes debts to the Sandy Hook Families for damages, including common law and statutory punitive damages, in the total amount of $1,438,139,555.94. The Connecticut Judgment comprises 15 separate debts owed to the 15 different Plaintiff creditors, as reflected in the table below.

| Plaintiffs | Compensatory Damages | Common Law Punitive Damages | CUTPA Punitive Damages | Total |
|---|---|---|---|---|
| Robert Parker | $120,000,000 | $40,099,304 | $10,000,000 | $170,099,304 |
| David Wheeler | $55,000,000 | $18,429,304 | $10,000,000 | $83,429,304 |
| Francine Wheeler | $54,000,000 | $18,099,304 | $10,000,000 | $82,099,304 |
| Jacqueline Barden | $28,800,000 | $9,699,304 | $10,000,000 | $48,499,304 |
| Mark Barden | $57,600,000 | $19,299,304 | $10,000,000 | $86,899,304 |
| Nicole Hockley | $73,600,000 | $24,629,304 | $10,000,000 | $108,229,304 |
| Ian Hockley | $81,600,000 | $27,299,304 | $10,000,000 | $118,899,304 |

---

[93]   *Id.* at 44.

[94]   *Id.* at 4–5 (emphasis added).

| | | | |
|---|---|---|---|
| Jennifer Hensel | $52,000,000 | $17,429,304 | $10,000,000 | $79,429,304 |
| Donna Soto | $48,000,000 | $16,099,304 | $10,000,000 | $74,099,304 |
| Carlee Soto-Parisi | $66,000,000 | $22,099,304 | $10,000,000 | $98,099,304 |
| Carlos M. Soto | $57,600,000 | $19,299,304 | $10,000,000 | $86,899,304 |
| Jillian Soto Marino | $68,800,000 | $23,029,304 | $10,000,000 | $101,829,304 |
| William Aldenberg | $90,000,000 | $30,099,304 | $10,000,000 | $130,099,304 |
| Richard M. Coan, chapter 7 trustee for the estate of Erica Lafferty | $76,000,000 | $25,429,304 | $10,000,000 | $111,429,304 |
| William Sherlach | $36,000,000 | $12,099,304 | $10,000,000 | $58,099,304 |
| **TOTAL** | $965,000,000 | $323,139,556 | $150,000,000 | **$1,438,139,556** |

101.     In addition to the litigation proceeding against Alex Jones and other defendants in Connecticut state court, other parents of children killed in the Sandy Hook shooting filed three defamation lawsuits in Texas in 2018 against Alex Jones and FSS based on the same underlying campaign of lies and harassment by Alex Jones. [95]  The cases brought by Sandy Hook parents Neil Heslin and Scarlett Lewis were consolidated, and on August 5, 2022, a jury ordered Alex Jones to pay $45.1 million in punitive damages—in addition to $4.1 million in compensatory damages already awarded.   The third action—brought by Sandy Hook parents Leonard Pozner and Veronique De La Rosa—may proceed to trial this year.

## <u>COUNT ONE</u>

### **(Declaratory Judgment That the Connecticut Judgment is Nondischargeable Under Section 523(a)(6))**

102.     Plaintiffs repeat, incorporate, and reallege each and every allegation contained above as if fully set forth herein.

103.     Section 523(a)(6) of the Bankruptcy Code provides that a "discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity."

---

[95]     *See Heslin* v. *Jones*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; *Lewis* v. *Jones*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; *Pozner* v. *Jones*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; *Fontaine* v. *Jones*, Cause No. D-1-GN-18-001605, in the 459th District Court for Travis County, Texas.

104.    "Willful and malicious injury" under Section 523(a)(6) "requires a showing of either: (1) an objective substantial certainty of injury or (2) a subjective motive to cause harm on the part of the debtor."[96]

105.    The Connecticut trial court has already determined that this debt arises from willful and malicious injury to Plaintiffs by Jones under both the objective and subjective standards.

106.    These determinations were fully litigated and resolved in the Connecticut Action over Jones's active defense and have preclusive effect here.

107.    The closed record of admitted facts, evidence, court orders and jury verdict from the Connecticut Action also confirms that the Connecticut Judgment reflects Jones's willful and malicious injury to Plaintiffs.

108.    The Sandy Hook Families accordingly request a judicial determination by this Court that the approximately $1.4 billion debt owed them is not dischargeable pursuant to section 523(a)(6) of the Bankruptcy Code.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment as follows:

A.    That Debtors, Alex Jones and FSS, are indebted to Plaintiffs in the amount of the Connecticut Judgment;

B.    That  Debtors, Alex Jones and FSS, are indebted to Plaintiffs for attorney's fees, expenses, interest, other costs, and charges from the Connecticut Judgment until paid in full;

C.    That the Connecticut Judgment and other obligations, including any and all other claims, debts, and damages owed by Debtors Alex Jones and FSS to Plaintiffs arising from or relating to the allegations herein are nondischargeable pursuant to section 523(a)(6) of the Bankruptcy Code; and

D.    For such other and further relief as the Court may deem proper.

---

[96]    *Miller* v. *J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998).

Respectfully submitted on this 10th day of March, 2023.

**CAIN & SKARNULIS PLLC**
By: */s/ Ryan E. Chapple*
Ryan E. Chapple
State Bar No. 24036354
303 Colorado Street, Suite 2850
Austin, Texas  78701
Telephone:  (512) 477-5000
Fax:  (512) 477-5011

*Counsel to the Sandy Hook Families*

**KOSKOFF KOSKOFF & BIEDER PC**
Alinor C. Sterling (admitted *pro hac vice*)
350 Fairfield Avenue
Bridgeport, Connecticut  06604
Telephone:  (203) 336-4421

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Kyle J. Kimpler (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Daniel S. Sinnreich (admitted *pro hac vice*)
Daniel A. Negless (admitted *pro hac vice*)
Briana P. Sheridan (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Fax:  (212) 757-3990

*Counsel to the Sandy Hook Families other than*
*Richard M. Coan, as chapter 7 trustee for the estate*
*of Erica Lafferty*

**ZEISLER & ZEISLER, PC**
Eric Henzy (*pro hac vice* pending)
10 Middle Street, 15th Floor
Bridgeport, Connecticut  06604
Telephone:  (203) 368-5495

*Counsel to Richard M. Coan, as chapter 7 trustee*
*for the estate of Erica Lafferty*