```
                  UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                      .
IN RE:                                .  Case No. 22-60043
                                      .  Chapter 11
FREE SPEECH SYSTEMS, LLC,             .
                                      .
                                      .
                Debtor.               .
                                      .
. . . . . . . . . . . . . . . . . .   .
                                      .
IN RE:                                .  Case No. 22-33553
                                      .  Chapter 11
ALEXANDER E. JONES,                   .
                                      .  515 Rusk Street
                                      .  Houston, TX 77002
                Debtor.               .
                                      .  Monday, March 27, 2023
. . . . . . . . . . . . . . . . .     .  1:00 p.m.


    TRANSCRIPT OF EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
  (I) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION
   105, 361, AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF
     BANKRUPTCY PROCEDURE 4001(B) AND (II) GRANTING ADEQUATE
        PROTECTION TO THE PRE-PETITION SECURED LENDER [6];
          AMENDED MOTION FOR RELIEF FROM STAY [406];
              JOINT MOTION TO REVOKE THE DEBTOR'S
                 SUBCHAPTER V ELECTION [468];
         MOTION FOR RELIEF FROM STAY, FEE AMOUNT $188 [113]
           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
              UNITED STATES BANKRUPTCY COURT JUDGE



APPEARANCES CONTINUED.

Audio Operator:            Zilde Martinez, ECR

Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46048
                           (855) 873-2223
                           www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

APPEARANCES (Continued):

| | |
|---|---|
| For Free Speech Systems, LLC: | Law Offices of Ray Battaglia, PLLC<br>By:  RAYMOND WILLIAM BATTAGLIA, ESQ.<br>66 Granburg Circle<br>San Antonio, TX 78218<br>(210) 601-9405 |
| For Alex E. Jones: | Crowe & Dunlevy, P.C.<br>By:  VICKIE L. DRIVER, ESQ.<br>    CHRISTINA W. STEPHENSON, ESQ.<br>2525 McKinnon Street, Suite 425<br>Dallas, TX 75201<br>(214) 420-2142<br><br>Jordan & Ortiz, P.C.<br>By:  SHELBY A. JORDAN, ESQ.<br>500 North Shoreline, Suite 900 N<br>Corpus Christi, TX 78401<br>(361) 884-5678 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By:  HA MINH NGUYEN, ESQ.<br>    JAYSON B. RUFF, ESQ.<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>(713) 718-4650 |
| For the Official Committee of Unsecured Creditors: | Akin Gump Strauss Hauer & Feld LLP<br>By:  KATHERINE PORTER, ESQ.<br>    SARA L. BRAUNER, ESQ.<br>One Bryant Park<br>Bank of America Tower<br>New York, NY 10036-6745<br>(212) 872-8027 |
| For the Subchapter V Trustee: | The Law Office of Liz Freeman<br>By:  ELIZABETH CAROL FREEMAN, ESQ.<br>P.O. Box 61209<br>Houston, TX 77208-1209<br>(832) 779-3580 |
| Subchapter V Trustee: | Haselden Farrow PLLC<br>By:  MELISSA A. HASELDEN, ESQ.<br>Pennzoil Place<br>700 Milam, Suite 1300<br>Houston, TX 77002<br>(832) 819-1149 |

```
APPEARANCES (Continued):

For PQPR Holdings
Limited, LLC:              Streusand Landon Ozburn Lemmon LLP
                          By:  STEPHEN WAYNE LEMMON, ESQ.
                          1801 S. Mopac Expressway, Suite 320
                          Austin, TX 78746
                          (512) 220-2688

For the Texas
Plaintiffs:               Willkie Farr & Gallagher LLP
                          By:  JENNIFER JAYE HARDY, ESQ.
                          600 Travis Street, Suite 2310
                          Houston, TX 77002
                          (713) 510-1766

                          McDowell Hetherington
                          By:  AVI MOSHENBERG, ESQ.
                          1001 Fannin Street, Suite 2400
                          Houston, TX 77002
                          (713) 221-3795

                          Chamberlain Hrdlicka White Williams
                          & Aughtry P.C.
                          By:  JARROD B. MARTIN, ESQ.
                          1200 Smith Street, Suite 1400
                          Houston, TX 77002
                          (713) 356-1280

For the Connecticut
Plaintiffs:               Cain & Skarnulis PLLC
                          By:  RYAN E. CHAPPLE, ESQ.
                          303 Colorado Street, Suite 2850
                          Austin, TX 78701
                          (512) 477-5000

                          Paul Weiss Rifkind Wharton &
                          Garrison LLP
                          By:  KYLE KIMPLER, ESQ.
                          1285 Avenue of the Americas
                          New York, NY 10019-6064
                          (212) 373-3253

                          Koskoff Koskoff & Bieder P.C.
                          By:  ALINOR STERLING, ESQ.
                          350 Fairfield Avenue, Suite 501
                          Bridgeport, CT 06604
                          (203) 587-4408

Also Present:             PATRICK MAGILL
```

1          (Proceedings commence at 1:00 p.m.)

2          THE COURT:  Good afternoon, everyone.  This is Judge

3  Lopez.  I'm going to call the 1 p.m. case.  Today's March 27th.

4  I'm going to call the combined cases of the Alex Jones and Free

5  Speech.  I'm going to turn my camera on in just a moment.

6  (Indiscernible)  Take a look at an interesting set up here.

7          I'm going to mute the line.  If you wish to make an

8  appearance, I'm going to ask that you please hit "five star."

9          Why don't I take appearances and I'll start in the

10  courtroom.  Mr. Battaglia, good to see you.

11          MR. BATTAGLIA:  Good morning, Your Honor.  Ray

12  Battaglia for Free Speech Systems.

13          THE COURT:  All right, good afternoon.

14          MR. BATTAGLIA:  Mr. Magill, the chief restructuring

15  officer, is in the court as well.

16          THE COURT:  Okay.  I see you there.  Good afternoon.

17          MS. FREEMAN:  Good afternoon, Your Honor.  Elizabeth

18  Freeman on behalf of Melissa Haselden, the Subchapter V

19  Trustee, and Ms. Haselden is in attendance today.

20          THE COURT:  Okay.  Good afternoon.

21          MR. LEMMON:  Your Honor, Steve Lemmon on behalf of

22  PQPR.

23          THE COURT:   Okay.  Good afternoon, Mr. Lemmon.

24          MR. RUFF:  Good afternoon, Your Honor.  Jayson Ruff

25  and Ha Nguyen for the U.S. Trustee's Office.

```
 1              THE COURT:  Okay.  Good afternoon.  Good to see both
 2  of you.
 3              MR. KIMPLER:  Good afternoon, Your Honor.  Kyle
 4  Kimpler on behalf of the Connecticut plaintiffs.  My co-
 5  counsel, Alinor Sterling, is here as well.  And we're joined
 6  online by Mr. Ryan Chapple.
 7              THE COURT:  Okay, good afternoon.  Good to see all of
 8  you.
 9              MS. STERLING:  Good afternoon, Your Honor.
10              THE COURT:  Good afternoon.
11              MS. HARDY:  Good afternoon, Your Honor.  Jennifer
12  Hardy of Willkie Farr on behalf of the Texas plaintiffs.  In
13  the courtroom, I also have Mr. Avi Moshenberg and Mr. Jarrod
14  Martin.
15              THE COURT:  Okay.  Good afternoon.
16              MS. HARDY:  Thank you, Your Honor.
17              THE COURT:  Good afternoon.  Good to see everyone.
18  Okay.  And I'm going to call to make appearances in both cases,
19  so anyone wishes to make an appearance and any -- everyone's
20  appearance will serve for both cases.
21              Anyone from the Committee in the Alex Jones case,
22  wish to make an appearance, I'd ask that you please hit "five
23  star" now.
24              MS. BRAUNER:  Good afternoon, Your Honor.  Sara
25  Brauner, Akin Gump, on behalf of the Committee.
```

```
 1              THE COURT:  Okay, good afternoon.  I should have
 2   started by asking if there was anyone from the debtors, from
 3   Mr. -- representing Mr. Jones that maybe wish to make an
 4   appearance today.  I'd ask that you hit "five star."
 5              MS. STEPHENSON:  Good afternoon, Your Honor.
 6   Christina Stephenson for the debtor, Alex Jones.
 7              THE COURT:  Good afternoon.  Good to see you,
 8   Ms. Stephenson.  And I will say at the outlet if you hear me
 9   sniffling, it's allergy season in Houston and I won't be alone.
10   I apologize in advance.
11              Okay.  Anyone else wish to make an appearance?
12   Please hit "five star" at this time.
13              MR. JORDAN:  Your Honor, Shelby Jordan, co-counsel
14   for Alex Jones.
15              THE COURT:  Good afternoon, Mr. Jordan.
16              MR. JORDAN:  Good afternoon.
17              THE COURT:  Okay.  Anyone else?
18              Okay.  Mr. Battaglia?
19              MR. BATTAGLIA:  Your Honor, Ray Battaglia for Free
20   Speech Systems.  I filed an agenda last night.  There are three
21   items on today's docket on the Free Speech Systems case.
22   There's one on the Alex Jones docket.  There's another matter
23   that was filed Friday night that I suspect is going to require
24   some attention today.
25              So obviously the debtor filed a disclosure late
```

1    Friday evening.

2              THE COURT:  Uh-huh.

3              MR. BATTAGLIA:  And I think it's fairly complete, but

4    I'd just as soon be available and Mr. Magill  available, to

5    answer any questions the Court might have about that

6    disclosure.

7              THE COURT:  Okay.  Thank you.

8              MR. BATTAGLIA:  And then I'm happy to address the

9    other matters.  I don't know whether we want to take that up

10   first or --

11             THE COURT:  Why don't we just confirm what matters

12   that everyone's going forward on today and then we can kind of

13   take them up one by one.

14             MR. BATTAGLIA:  We have the cash collateral motion,

15   Docket Number 6.  The proposed order was filed, I think Friday

16   night as well, Docket Number 535.  I've had no comments.

17   Mr. Nguyen told me today the U.S. Trustee has no comments.

18             THE COURT:  Okay.

19             MR. BATTAGLIA:  Usually I get most from him.  And the

20   secured creditor, PQPR, has approved the budget as well.  So

21   I'm unaware of any comments or outstanding comments or

22   opposition to the proposed form of order.  The order is

23   substantially the same as the 9th, with the exception now it's

24   the 10th.

25             THE COURT:  Got it.  Okay.  And so that's cash

1    collateral.  And then now we have the motion to revoke what I

2    would call.

3             MR. BATTAGLIA:  Yeah.  And I unfortunately my -- I

4    didn't fix the title.  It is the joint motion to revoke.  That

5    is opposed, and I assume we'll need some time on the docket.

6             And lastly is the motions for relief from stay,

7    Docket Number 406 in the Free Speech Systems case.  There are

8    eight exhibits filed in response to that as well.  I've not

9    been directly involved in discussions between Ms. Driver and

10   Texas plaintiff's counsel, but I -- Mr. Martin and I have had a

11   conversation that there's an effort afoot to reach an

12   accommodation agreement on the termination of the stay at an

13   appropriate time.  And that, I think, still isn't fully baked,

14   is my impression, and that I think the parties want to pass the

15   hearing to a later date.  Ms. Hardy can address it more

16   completely --

17            THE COURT:  Yeah, that's --

18            Mr. BATTAGLIA:  -- than I do.  I know we're not going

19   forward today.

20            THE COURT:  Yeah.  Okay.  Ms. Hardy, can you just

21   confirm that the parties choose not to go forward today?  I'm

22   completely fine with it.  I just want to -- maybe we can

23   just --

24            MS. HARDY:  Yes, sir.

25            THE COURT:  -- talk about that in rescheduling dates.

1           MS. HARDY:  That's right.  We hope to have a 9019

2    motion in front of Your Honor, with respect to that matter, but

3    if not, we will reach out to reschedule the contested lift

4    stay.

5           THE COURT:  Okay.  Can -- and just so you know --

6    kind of just have it in the back of your mind.  You know, if

7    something's up in the next two weeks, I don't need know about

8    it.  But if it goes beyond two weeks and we're kind of sitting

9    in mid-April and nothing has been done, someone just reach out

10   to my case manager.  If not, we'll just get something on the

11   docket and we'll see how dates go.

12          MS. HARDY:  Okay.  Thank you.  Your Honor, I do

13   believe we probably need at least two weeks because we have put

14   discovery in abeyance on the fact issues with respect to the

15   lift stay pending settlement.

16          THE COURT:  Okay.  Okay.  And it would be a 9019 to

17   resolve the lift stay?

18          MS. HARDY:  That's right, Your Honor.

19          THE COURT:  Okay.  And at some point, I suspect we're

20   going to need a status conference on -- or some kind of either

21   status or scheduling conference in connection with the

22   adversaries, right?

23          MS. HARDY:  Yes, Your Honor.  We on -- I believe it

24   was Friday, we filed scheduling motions on an emergency basis,

25   and the Connecticut plaintiffs as well, seeking a scheduling

1  order with respect to the adversary proceedings.

2          THE COURT:  Okay.  Why don't we -- one way or the

3  other, we'll schedule something in the next two weeks on that.

4          MS. HARDY:  We did request an emergency hearing date

5  on the scheduling motion for Friday.  I'm not sure if Your

6  Honor has availability that day.

7          THE COURT:  I unfortunately am flying back from

8  somewhere on Friday, so that's going to be tricky, but maybe

9  next Monday would work.

10          MR. BATTAGLIA:  Your Honor, I've not seen the

11  motions, I've -- probably because I've not made an appearance

12  in the adversaries yet, but I didn't get an email notification.

13          THE COURT:  Yeah, you would need to have made an

14  appearance in the adversary.  And I wanted to let everyone

15  know, if you filed a pro hac in the main case, we're going to

16  treat it as a -- you're admitted for all purposes, so no need

17  to refile.

18          I think next Monday or Tuesday would be the date that

19  I could -- I know I could do, on that.  Why don't we --

20          MS. HARDY:  And I'm happy to send Mr. Battaglia the

21  motion as well.

22          MR. BATTAGLIA:  I don't mean that as an accusation.

23  I just hadn't seen it.

24          THE COURT:  No, no, no, I know.  You're -- why don't

25  we -- yeah.  I would tell you realistically probably -- ooh,

1    next Monday -- there's a lot going on next Monday.  So I'm

2    thinking, realistically, April 4, but I'll check with my case

3    manager, next Tuesday.  Okay?

4            MS. HARDY:  Okay.  Thank you, Your Honor.

5            THE COURT:  Alrighty.  Thank you.

6            Okay, so I think we'll just note then for the -- just

7    a docket entry on the motion to lift stay is deemed passed to a

8    date to be determined.  I'll just keep it simple there.

9            Why don't we, before we talk about cash collateral,

10   talk about the disclosures that were made?

11           MR. BATTAGLIA:  Yes, sir.

12           THE COURT:  Talk about that.

13           MR. BATTAGLIA:  Your Honor, I think we've made --

14           THE COURT:  If you could just make sure the mic gets

15   a little closer.

16           MR. BATTAGLIA:  Sure.

17           THE COURT:  I just want to make sure we have a good

18   record.

19           MR. BATTAGLIA:  We -- we've tried to make a pretty

20   fulsome disclosure.  Mr. Magill, I think as a result of seeing

21   the Jones schedules with an entity called Mountain Way and

22   receivables reflected, was curious as to what it was;

23   investigated it; and discovered that it was an entity that was

24   formed in August and started -- apparently started to do

25   business in September of 2022.

1          THE COURT:  You know when it was formed in August?

2          MR. BATTAGLIA:  Late -- mid to late August, the last

3    half of the month.  I -- I'm --

4          THE COURT:  Okay.  Okay.

5          MR. BATTAGLIA:  I'd tell you precisely, but I don't

6    have it in front of me.

7          THE COURT:  Okay.  No, no, that's all I needed for

8    now.

9          MR. BATTAGLIA:  It was formed by an employee of Free

10   Speech Systems.  His name's knowable, but I'd just as soon not

11   put it on the record.  I've met this gentleman once or twice.

12   He's a pretty unsophisticated person involved in the production

13   side of the business and apparently had an arrangement to share

14   90/10 with monies that Mountain Ways [sic] derived.  Mountain

15   Way was in turn selling advertising on the FSS channel, whether

16   that was banners, whether that was live participation of

17   advertisers, or just a live read.  That's generally what it

18   was, without sharing a -- any portion of revenues with Free

19   Speech Systems.

20          When Mr. Magill discovered this, he immediately

21   reached out to me and to the Sub V Trustee to disclose what it

22   was or what we thought it was.  And it actually morphed while

23   we were evaluating it.  Approached the employee and said, what

24   is this?  And the employee was completely forthcoming.

25   Mr. Jones was completely forthcoming that approximately, I

1  believe the disclosure says, $257,000 in ad revenue went to

2  Mountain Way with -- without any of it being shared.

3          Whether or not anybody else is entitled to a fee off

4  of that is not particularly relevant at this point in time.  We

5  simply instructed them that that can't be, that that money

6  belongs to Free Speech Systems.  And we approached Ms. Driver

7  and told her that that money belonged to the debtor and the

8  Jones estate was cooperative.  And they have -- I think as of

9  Friday, we have 111,000.  The 86,000 that was still on deposit

10 with Mountain Way has been wired to the debtor, Free Speech

11 Systems.  And 25 of the Alex Jones has been wired to Free

12 Speech Systems.

13          THE COURT:  26 out of the 100 and --

14          MR. BATTAGLIA:  25 out of the remainder, so it's

15 another 146,000 or so.  Apparently that they had intentions to

16 wire the balance, the entire balance, the money is disclosed in

17 the Jones schedules.  It's still sitting in the DIP account.

18 They have a limitation on how much they can wire.

19          So my impression, and Ms. Stephenson can confirm

20 this, is that they're going to get us a cashier's check this

21 week for the remaining balance of the funds that Mountain Way

22 has.  And in addition, as it's noted in the disclosure, any

23 future revenues that are accounts receivable to Mountain Way

24 will be turned over, either redirected to Free Speech Systems,

25 or turned over upon receipt to Free Speech Systems.

1          THE COURT:  You know what this -- the period of time

2  in which Mountain Way sold --

3          MR. BATTAGLIA:  Yeah.  September, mostly the fourth

4  quarter of last year --

5          THE COURT:  Like September through December?

6          MR. BATTAGLIA:  --  the first quarter.  There are --

7  I think there were six advertisers, that -- is that right?

8          MR. MAGILL:  Three individual advertisers.

9          MR. BATTAGLIA:  Three individual advertisers who were

10  contracted through Mountain Way.  And they were -- I've seen

11  the invoices or you know, a couple of them were $50,000

12  invoices and a couple of them were smaller.

13          THE COURT:  Was it like around January time period,

14  September?

15          MR. BATTAGLIA:  No, it -- the first invoices I recall

16  seeing are September or October.

17          THE COURT:  I mean, just when it ended.

18          MR. BATTAGLIA:  When it ended?

19          THE COURT:  Do you recall?

20          MR. BATTAGLIA:  Let me ask Mr. Magill.

21       (Counsel confers with client)

22          MR. BATTAGLIA:  1st of March, Your Honor.

23          THE COURT:  1st of March?

24          MR. BATTAGLIA:  Yes, sir.

25          THE COURT:  Okay.  So it started about two weeks

1  after I entered the first cash collateral order, reducing

2  Mr. Jones's amount to about $10,000.  And then here you're

3  telling me that -- I entered a cash collateral order around

4  August the 5th that reduced Mr. Jones' salary to about $10,000.

5  And that was for the reasons stated on that at that time.  And

6  then, so what you're telling me is that someone had formed an

7  organization about a couple of weeks later and then started

8  selling advertisements on the side.  That's --

9          MR. BATTAGLIA:  That's what it appears to be, yes.

10          THE COURT:  Okay.  Okay.

11          MR. BATTAGLIA:  So -- and I'm happy to address any

12  other questions.

13          THE COURT:  No, I think you did what you're supposed

14  to do, which is disclose it to the Court, and I very much

15  appreciate it.

16          MR. BATTAGLIA:  It's obviously sensitive and it does

17  affect individual employees who I don't think had any mal

18  intent.

19          THE COURT:  No.

20          MR. BATTAGLIA:  But --

21          THE COURT:  No, no, no.  I just think --

22          MR. BATTAGLIA:  -- be that as it may, we didn't file

23  it under seal.

24          THE COURT:  I do appreciate it.  And what I would say

25  is, look, this is -- I think disclosure is incredibly

1    important.  I appreciate it and so is transparency.  All right.

2            And I can't forget that this is the third case,

3    right?  So they were -- so it -- this troubles me in the sense

4    that the InfoW cases -- and so everybody had to learn a little

5    bit about, you know, now the fourth case, I see today, with

6    three debtors back then.  But everybody learned a little bit

7    about what you can and can't do in bankruptcy and disclosures

8    and property of the estate.

9            And so this is troubling.  I appreciate the

10   disclosure.  I'm glad the money is coming back.  I understand

11   that the Committee is -- I read what the Committee wrote and I

12   understand the Committee's position that there's money

13   theoretically being transferred from the Jones account that

14   constitutes property of the Jones estate.  I assure you that

15   money was coming back one way or the other if the facts held up

16   the way I thought they were, just would have required an order

17   from me.  But if this is going to work itself out, let's just

18   proceed.

19           I look forward to -- I need to make sure that the

20   funds come back and once they are, I want somebody to let me

21   know.  I think we've been learning a lot more.  I think -- I

22   appreciate the work of the Subchapter V Trustee.  I look

23   forward to reading the final report that gets completed,

24   whenever that's done.  I know that's coming soon and I look

25   forward to the amended schedules.

1         And I think in the Jones case, I'll just take a hard

2    look at where things are and maybe I call a hearing on about

3    where we are, maybe I don't.  But I think -- at a minimum, I

4    think, depending on what I see in the next week or so -- I'm

5    troubled by what I see now, hope it's not a pattern.  I hope it

6    was a one-off.  If it turns out to feel more like a pattern,

7    then maybe we just need to hold an evidentiary hearing here and

8    see where things go.  But I want to make sure that I don't want

9    to make any assumptions.

10        I think we should all be a little bit smarter in the

11   next couple of weeks.  We'll read, give Mr. Jones an

12   opportunity to answer any questions if there are any.  Well,

13   let's just see where things go.

14        MR. BATTAGLIA:  And Your Honor, if I can just add a

15   little, small amount of assurance, because it's hard to know a

16   negative here.  But that -- that's the circumstance that

17   Mr. Magill found himself in.

18        THE COURT:  Yep.

19        MR. BATTAGLIA:  But we have investigated whether

20   individual employees or contract parties that are close to us,

21   to Free Speech Systems, have any business entities that they've

22   formed.  And Mr. Magill has talked to those employees and asked

23   them whether they have relationships with Free Speech Systems

24   or Mr. Jones, and they appear to be unrelated entities.  He has

25   disclosed and discussed to all employees that they are not to

1   use Free Speech Systems' assets other than for Free Speech

2   Systems business.  That includes, obviously, advertising space

3   and, and basically the channels.  And so I think that

4   Mr. Magill is certainly aware of the responsibilities of the

5   debtor --

6           THE COURT:  Mm-hmm.

7           MR. BATTAGLIA :  -- and of the CRO and is doing his

8   level best to try to keep this from happening.  This is just

9   one that was unknowable until Mr. Jones filed his schedule.

10          THE COURT:  I understand.  And Ms. Stephenson, what I

11  would ask, and Mr. Jordan, is if there are any more Mountain

12  Ways out there, I'd like to know about them.  I'd rather them

13  not get -- be discovered by some other party.  If they're out

14  there, I'd like to know about them.  And if there are, let's

15  just -- transparency's important.  And I appreciate that

16  they're in the schedules, but if there's something else that

17  needs to happen, then I think we all need to know.  And I'd

18  appreciate if the Committee was made aware of any others and as

19  well as Free Speech.  So -- that -- that's where I am on that,

20  unless anyone else has anything else to tell me, I should say

21  with respect to the disclosure.

22          MR. BATTAGLIA:  Yes, sir.

23          THE COURT:  And if -- I've unmuted the line.  Let me

24  just check because I -- there is --

25          MS. DRIVER:  Okay.

```
 1              THE COURT:  Okay.  I've unmuted a 254 line.

 2              MS. DRIVER:  And Judge Lopez, this is Vickie Driver.

 3              THE COURT:  Yes, Ms. Driver?

 4              MS. DRIVER:  I wasn't going to make an appearance

 5    because Ms. Stephenson was handling the hearing, but I have

 6    been the one handling this disclosure.

 7              Your Honor, we  -- I did believe that I disclosed

 8    this to the Committee.  I think the Committee remembers me

 9    talking about it, but doesn't remember specifics.  But I did

10    attempt to disclose this to them in our weekly call that we

11    have on Friday.  So it certainly wasn't meant to be not

12    something that they could not and would not know.

13              And because -- the only reason all the money hasn't

14    been returned is that our bank that has the DIP account has a

15    $25,000 daily wire limit and a $50,000 monthly limit that I've

16    verified with the bank.  And so we are simply going to deliver

17    a check when we are down in Austin to Mr. Magill when we're

18    down there for the 341 meeting.

19              So by Friday you should have a notice filed on the

20    docket that says it's all been done.  And this notice is being

21    filed in Mr. Jones's case.  There was just a slip up from me

22    that it didn't make it to the person to file it when we were

23    working on schedules last week.

24              THE COURT:  No worries.

25              MS. DRIVER:  So I am getting that filed in our case.
```

```
 1   It will reflect that the 25,000 went and that the remainder

 2   will be delivered on Thursday.

 3            And you know, we absolutely 100 percent want full

 4   disclosure on this.  I do think we were able to discover it and

 5   make it to Mr. Magill before we were told by the Subchapter V

 6   Trustee that it was a problem.  So I just want you to know that

 7   as professionals, when we discovered it, we got it to -- we

 8   went to Mr. Magill as quickly as we could to say, hey, let's

 9   try to figure out what to do with this because we're learning

10   things about this, and we want to make it right.

11            THE COURT:  Okay.

12            MS. DRIVER:  And Mr. Magill was very -- you know,

13   we've just been trying to work with him.  Basically, Mr. Jones,

14   as you pointed out at a hearing, is not making enough money.

15   And so, I think --

16            THE COURT:  I don't know if I pointed that part out.

17   I don't know if I pointed that part out.

18            MS. DRIVER:  And so he needs -- he -- I will tell

19   you -- he can't cover my fees and BlackBriar's fees if he

20   doesn't have more monthly income.

21            THE COURT:  I'm just -- I'm not saying -- I'm just

22   saying, I didn't say that.  I just want the record to be clear.

23   I didn't say that.  It may well be true.  I'm just saying I

24   didn't say that.  I -- but I understand the point.

25            MS. DRIVER:  Sorry, my apologies.
```

1           THE COURT:  I understand the point.

2           MS. DRIVER:  But we're -- we are -- but we -- he

3  understands that he's not allowed to do anything of this sort,

4  and that, you know, we're going to work with Mr. Magill to

5  figure out the best way to either augment his employment with

6  truly, truly third-party deals, or whether we can get his

7  salary increased in the case.

8           Fortunately, I think some of the performance has been

9  up, so they may be able to afford it a little bit better now.

10 But again, we did disclose it and we wanted to make it right

11 and it's going to be made right.

12          THE COURT:  Okay.  Thank you.  Then --

13          MR. BATTAGLIA:  And Your Honor --

14          THE COURT:  Just so the record's clear, I believe

15 what I said was, that I was open to any motions if anyone

16 had -- just, does anyone else -- anybody seeks a motion to

17 request it for additional -- an adjustment?  Ms. Rosario is

18 free to file it and we can take it up and deal with it.  That

19 was, I believe, what I said.

20          MR. BATTAGLIA:  Mr. Magill is insistent that I make

21 sure it's clear on the record that, other than the schedules in

22 the Jones case, which disclosed Mountain Way, he discovered all

23 of this on his own and then went to Ms. Driver and the Jones

24 counsel and the Sub V Trustee.

25          THE COURT:  Yeah.

1          MR. BATTAGLIA:  But I just want to --

2          THE COURT:  That's what I mean.  So for everyone, I

3   think you're hearing me loud and clear, and I think we're all

4   on the same page.  I -- just no more discoveries from anyone is

5   really what I'm looking for.  Transparency is what we're after

6   and I know all the professionals are working hard on this, and

7   it's not to make a statement about any of the professionals.

8   I'm just saying it so that it's said out loud.

9          Mr. Ruff?

10         MR. RUFF:  Your Honor, I just -- I'll try to be

11  brief.  But I do think it's important just to note that, while

12  the professionals are doing what professionals should do when

13  they discover stuff like this, is try to advise their client to

14  do, you know, what's the best thing in light of the facts.

15  These are not good facts that have come to light.  And you

16  know, last Friday's disclosure essentially was a disclosure of

17  a scheme that was put in place intentionally to divert assets

18  away from an estate; income, specifically, from a bankruptcy

19  estate to the insider and to the owner.  And we believe it's

20  important to find out who was involved in this scheme, who

21  devised it, not only -- who all received from it, and who was

22  aware of it and when.

23         It's also another important data point, Your Honor,

24  to take into consideration.  Nothing happens in a vacuum here.

25  This is the third -- we're in our third case, round of cases

1    here.  And there were disclosure issues in the first case.  And

2    we've heard repeatedly, from the very first set of cases that

3    were filed, continuing into FSS, and then also with Mr. Jones

4    as to one of the goals was to have open disclosure of things,

5    and -- so that the parties could negotiate in good faith.

6              And again, here's another data point where we're just

7    discovering stuff.  But it wasn't disclosed.  It was

8    discovered, which was just reiterated by Mr. Battaglia.  The

9    CRO discovered this.  It was not disclosed.

10             And so anyways, Your Honor, we reserve all of our

11   rights to take whatever actions are appropriate and necessary.

12   You know, but I guess I'll just leave it at that, Your Honor.

13             THE COURT:  No, I appreciate it.

14             MR. RUFF:  It's very disturbing -- it's distressing

15   to see this.

16             THE COURT:  Yeah.  I -- and I will call it

17   concerning.  I don't want to necessarily -- and I understand

18   the Trustee's position.  I won't call it a scheme.  I will call

19   it troubling in light of the dates from where we are.

20             I -- let's just see where this goes.  But I

21   appreciate the comments and I understand the reservation of

22   rights.  And I think you're hearing me stress how important

23   disclosure and transparency are.  The process doesn't -- the

24   bankruptcy process just doesn't work without it.

25             Yes, Counsel?

1          MR. KIMPLER:  Your Honor, Kyle Kimpler from Paul

2     Weiss on behalf of the Connecticut plaintiffs.  I appreciate

3     what the U.S. Trustee said about this.  And just for the

4     record, obviously this is extremely concerning to my clients.

5          I do not abide by the three-strike rule on fiduciary

6     duty violations.  I'm a little bit concerned about the idea

7     that there is no harm, no foul here.  The money's been

8     returned.  We've promised not to do it again.

9          Once a fiduciary has manifested an intent to violate

10    their fiduciary duties, my client's view is that fiduciary

11    cannot be trusted.  I think that's all I would say for now

12    other than to reserve our rights, just to emphasize, again, how

13    seriously we are taking this.

14          THE COURT:  Thank you.

15          MR. BATTAGLIA:  Your Honor, I want to be clear that I

16    feel I bear some fiduciary responsibility to this Court, and

17    Mr. Magill does as well.  And we feel like we've lived up to

18    our fiduciary responsibilities in full here.  And I'm -- I

19    really don't take kindly to sort of a broad aspersion of

20    breaches of fiduciary duties.  We discovered this.  We did what

21    we were supposed to do, and we've done the best we can for the

22    creditors and for this Court.

23          THE COURT:  Yeah.  I've got no issue with any of the

24    professionals from what I can tell.  I understand,

25    Mr. Battaglia.

```
 1              MR. KIMPLER:  I was not accusing the professionals,
 2  Your Honor.
 3              THE COURT:  No, I know.  I know you aren't.  I know
 4  you aren't.  Okay.  Let's take up --
 5              MR. BATTAGLIA:  Cash collateral.
 6              THE COURT:  -- cash collateral.  Well, it makes cash
 7  collateral a little easier for me now, hearing that the money's
 8  coming back.
 9              MR. BATTAGLIA:  Your Honor, the proposed order with
10  the budget was uploaded.  It is at Docket Number 535.  As I
11  said, I've received no comments.  I'm happy to address any
12  questions the Court might have, I assume primarily related to
13  the budget itself, if any.
14              THE COURT:  Yeah.  I'm approving this subject to
15  the -- with the understanding that the funds are coming back
16  into the estate.  If the funds hadn't, we would have a
17  different conversation about cash collateral, but I do take Ms.
18  Driver at her word, and so we'll proceed.
19              MR. BATTAGLIA:  The budget does not disclose the
20  returned funds, obviously.  And I --
21              THE COURT:  No, I understand.  But it --
22              MR. BATTAGLIA:  And it's not --
23              THE COURT:  -- contemplates payments going out?
24              MR. BATTAGLIA:  Clearly, we -- yes.  Exactly.
25              THE COURT:  I got it.
```

1              MR. BATTAGLIA:  This is more an expense side budget

2    than the revenues or estimates.  And I, frankly, do expect an

3    additional as much as $400,000 from Orion that's been holding

4    an offset for a chargeback deposit account, and perhaps more

5    after that.  But that may occur during this month, and it's not

6    reflected in the budget either because it's -- neither one of

7    them were known or certain at the time the budget was produced.

8              THE COURT:  Okay.

9              MR. BATTAGLIA:  At least the --

10             THE COURT:  I would say if things change in terms of

11   the return of the funds, I may revisit the 10th interim.

12             MR. BATTAGLIA:  You'll hear from me, Judge, if it

13   doesn't happen by Friday.

14             THE COURT:  Okay.  Okay.

15             MR. BATTAGLIA:  And that leaves the --

16             THE COURT:  Oh, wait, we -- I have to set another

17   hearing on this.  That's the --

18             MR. BATTAGLIA:  I'm sorry.  Yes, you do.

19             THE COURT:  Yeah.  Yeah.

20             MR. BATTAGLIA:  Budget's on a month-to-month basis,

21   so -- right.

22             THE COURT:  It's important fill in the blank.  Yeah.

23   On this -- when does the budget expire?

24             MR. BATTAGLIA:  It's month-to-month, Judge, so it's

25   the end of April.

```
 1                 THE COURT:  Okay.  Now, let's see.
 2                 MR. BATTAGLIA:  So sometime in the week of the 24th
 3    of April.
 4                 THE COURT:  Let's do Friday the 28th.  I know for
 5    sure I'll be here.
 6                 MR. BATTAGLIA:  At what time, Judge?
 7                 THE COURT:  One o'clock.  One o'clock on Friday the
 8    28th.
 9                 MR. BATTAGLIA:  Very good.
10                 THE COURT:  Okay.
11                 MR. BATTAGLIA:  And I know the Court's a
12    sophisticated Adobe user.  You don't need me to mark the order
13    up.  I'm happy to do it.
14                 THE COURT:  I wouldn't call myself sophisticated, but
15    I can get this one done.
16                 MR. BATTAGLIA:  Okay.  That leaves us with the motion
17    to revoke election.
18                 THE COURT:  Okay.
19                 MR. BATTAGLIA:  That is the plaintiffs' joint motion.
20                 THE COURT:  I will turn it over to plaintiffs.
21                 Counsel, can you just give me a second?  I want to
22    just sign this and send it off the docketing now so that I --
23    you have my full attention.  Okay, it is off to docketing.
24                 MR. KIMPLER:  Your Honor, Kyle Kimpler from Paul
25    Weiss on behalf of the Connecticut plaintiffs.  I'll be
```

1  handling the motion to revoke the Subchapter V election.

2          Your Honor, I'm sure you've read the papers.  I have

3  prepared remarks that I'd be happy to start with.  If you want

4  to start with questions, I'm happy to take your lead.

5          THE COURT:  No, no, no.  I've -- I just -- I've read

6  everything, and I've been thinking about it quite a bit, so I'm

7  well prepared for today.  I'll be --

8          MR. KIMPLER:  Great.

9          THE COURT:  You can -- I'll just turn it over to you.

10          MR. KIMPLER:  Your Honor, the issue that you have

11  before you today, I will concede is an issue of first

12  impression.  I don't believe anybody in this courtroom has

13  identified a case where this issue has come up.  But not

14  withstanding that, it's our view that the issue is rather

15  straightforward and based on a plain read of the statute.

16          Section 1182 of the Bankruptcy Code defines the

17  eligibility requirements to be a Subchapter V debtor and

18  Section 1182 imposes a two-part test to be eligible.  In

19  Subsection 1(A), Congress defines the positive attributes that

20  a debtor must have to be eligible, and those include many

21  things.  Has to be a person as defined by the Bankruptcy Code.

22  That person has to be engaged in commercial activities.  That

23  person has to have non-contingent liquidated debts, less than

24  $7 and a half million dollars as of the petition date, and at

25  least 50 percent of those debts must arise from the business

1    activities.

2          Now, before I go on, I would note that the temporal

3    limitation that we're going to spend most of our time talking

4    about today, is not the first words you see in Subsection (A).

5    It's buried in the middle.  It's limited solely to the question

6    of the debts.

7          So if we were here saying that a debtor had

8    liquidated, for example, and was no longer engaged in

9    commercial activities, I think there'd be a question whether it

10   was eligible.  The -- at the "as of the petition date" language

11   is in the middle of (A), and it applies solely to the question

12   of the debtor's debts.

13         Now, of course, Subparagraph (A) is expressly subject

14   to Subparagraph (B).  Subparagraph (B) applies the second of

15   our two-part test.  And it says that even if you satisfy all of

16   the requirements of (A), you have to do something else, you

17   have to satisfy the requirements of (B).  And there you are not

18   eligible if you are a member of a group of affiliated debtors

19   that together, in the aggregate, hold more than $7.5 million in

20   debts.  Again, no reference there to a petition date.  You're

21   also ineligible if you're a public filer under the securities

22   laws or you're an affiliate of the public filer.

23         So as we think about this two-part test that comes

24   out of 1182(1), and we apply it to this case, there are several

25   facts that are not in dispute today.  No question that Free

1   Speech Systems and Alex Jones are affiliated debtors under

2   Title 11.  No question that as of today, and frankly, as of

3   December of 2022, that they held non-contingent liquidated

4   debts exceeding $7.5 million.  And there's no question that

5   Subparagraph (B) does not use the words "as of the petition

6   date."   On that basis, Your Honor, my clients believe that

7   Free Speech is not an eligible Subchapter V debtor.

8         Now, the only argument, at least raised in the

9   papers, is that the reference to the petition date in

10  Subparagraph (A) applies by implication, not expressly, to

11  Subparagraph (B); that you can take those words that you find

12  in the middle of Paragraph (A), and you apply that to every one

13  of the requirements in Paragraph (B).  And that interpretation

14  is wrong for at least three reasons.  First, the statute

15  doesn't say that.  Nothing in the plain language of the statute

16  says that (B) -- Subparagraph (B) is qualified by Subparagraph

17  (A).  It's actually precisely the opposite.  (A) says that even

18  if you meet the requirements of (A), you're subject to (B).

19  That means that (A) is qualified by (B).

20        The argument you have -- you will hear, or in the

21  papers anyways from the debtors, is that in fact, (B) is

22  qualified by (A), but that is not the way the statute works.

23  The statute says that (B) overrides (A), that you can meet all

24  of the requirements in (A) and still be ineligible.  There is

25  no case and no canon of statutory interpretation that I'm aware

1    of that says the words "subject to" in one paragraph means that

2    you take certain provisions of that and graft it onto another

3    one.  I think the more obvious interpretation is that (B)

4    overrides (A).

5            The second problem with the argument advanced by the

6    debtor is that the basic principles of statutory construction

7    point the opposite direction.  Your Honor, I'm only going to

8    say to you today, I think hopefully, two cases.  But one of the

9    cases that I think is actually very instructive here is the

10   Supreme Court's very recent ruling in Bartenwerfer v. Buckley,

11   the recent decision on dischargeability of debts obtained by

12   fraud.

13           And let me just take a quick detour and lay out what

14   was going on there.  You had a debtor who was co-obligor on a

15   debt, and everybody agreed that that debt was obtained by

16   fraud.  But the debtor was an honest debtor and said, my co-

17   obligor committed the fraud, not me, and the debt is only non-

18   dischargeable if I am culpable.

19           Now, Section 523(a)(2)(A) of the Bankruptcy Code was

20   written in the passive voice.  It doesn't say who committed the

21   fraud.  It said if a fraud -- if a debt was obtained by fraud.

22   But the debtor there said, well, don't just look at

23   523(a)(2)(A), Look at 523(a)(2)(B).  Look at 523(a)(2)(C).

24   These are similar provisions governing the nondischargeability

25   of debts.  And there in (B) and (C) it says it has to be

1   actions by the debtor.  And so the debtor here said that

2   implies the same thing in Subparagraph (A).

3           The Supreme Court disagreed.  It says that this

4   argument, and I'm quoting, "flips the rule that when Congress

5   includes particular language in one section of a statute, but

6   omits it in another, we generally take the choice to be

7   deliberate."  And the Supreme Court went on to say that, "the

8   more likely inference is that (A) excludes debtor culpability

9   from consideration, given that (B) and (C) expressly hinge on

10  it."

11          And I think that analysis applies with full force to

12  Section 1182.  1182(a)(1) expressly hinges on debts as of the

13  petition date.  But subsection -- I'm sorry -- Subparagraph (B)

14  does not.  And if we know anything about interpreting statutes,

15  what the Supreme Court has told us is that that is intentional.

16          And I want to make one other point about the debtor's

17  argument, a practical point.  If it were true that you had to

18  measure aggregate debts as of the petition date, that would

19  make it very easy for debtors to avoid the application of (B).

20          And so let's just take an example here.  Let's say

21  that Free Speech and Alex Jones wanted to file on the same day,

22  but they knew -- and let's say the judgments were liquidated at

23  this point.  But they knew they couldn't do that because that

24  would run afoul.  Under the debtor's interpretation, what you

25  can do is have Free Speech file today, have Alex Jones file

 1  tomorrow.  And you can say, well, now Alex Jones couldn't be a

 2  Subchapter V in that example, but Free Speech could because you

 3  would say, no, no, no, you only look at the petition date; and

 4  on the petition date, I didn't have an affiliated debtor.

 5          THE COURT:  You agree the opposite is also true,

 6  right?  That a corporation with its own board could file for

 7  bankruptcy and elect for Subchapter V and the parent, with a

 8  completely separate board, could also elect to file a

 9  bankruptcy case and that would render the first filer

10  ineligible, unless you say they were completely -- for two

11  completely different reasons.  So the opposite is true.  So how

12  does that help?

13          MR. KIMPLER:  I -- I'm not sure I follow, Your Honor.

14          THE COURT:  If -- let's just say a sub files.  Right?

15  Sub has its own board.

16          MR. KIMPLER:  Yep.

17          THE COURT:  Files for its own reason.  Parent runs

18  into trouble.  The parent files later.  Right?

19          MR. KIMPLER:  Yes.

20          THE COURT:  Let's just say Joe's filed for a

21  completely different reason, completely different liquidated

22  debts, other than this.  Under your analysis, Free Speech would

23  still be rendered ineligible, right?

24          MR. KIMPLER:  That's right.

25          THE COURT:  Right, but that's what I'm saying.  It's

1   the same thing.  It's the flip side of what you're saying.

2   They're both -- they both -- in other words, it works, it harms

3   in both ways.  Right?  You could find yourself with a debtor

4   who was completely intentional about the order in which it was

5   filing.  You could also harm a completely innocent filer, as

6   well, who had nothing to do with the case.

7           MR. KIMPLER:  But -- that's fair, Your Honor.  I

8   think the --

9           THE COURT:  And let's just say it's -- here's -- I'll

10  give you the pressure point that I've been thinking about.

11          Let's just say -- and I'll give you two different

12  hypotheticals, just -- and I'll push the other side, I assure

13  you.  Let's just say the debtor was liquidating, okay?  For

14  liquidating 11, which is permitted under a Subchapter V.  All

15  right?  At that point, they wouldn't be engaged in commercial

16  activities after the 363, so the debtor would commit a 363 and

17  a 363 sale, no longer engaged in business.  And you're telling

18  me that that net debtor is now rendered ineligible under

19  Subchapter V.  Right?

20          That's the scenario one that you're telling me.

21  Because you're saying that the word "engaged" doesn't mean as

22  of the petition date, it just means that they're not engaged.

23  And you said earlier that if a debtor's not engaged, then that

24  would render them ineligible.  So a debtor who is -- sells or

25  liquidates as contemplated under Subchapter V or engages in a

1   going out of business sale or decides it needs to sell a major

2   asset and is no longer engaged in business, is no longer

3   eligible, right?

4          The concern that I have is that what you're saying is

5   that someone can float in and out of Subchapter V for reasons

6   that may be intentional, but may not also be intentional.  And

7   that's what concerns me.

8          MR. KIMPLER:  So on the liquidation point, I think

9   that Congress has very different concerns at mind so -- in

10  mind.  So for example --

11         THE COURT:  Where are you getting that from?

12         MR. LOHAN:  -- in your example --

13         THE COURT:  Where are you getting that from in the

14  text?

15         MR. KIMPLER:  I'm getting it because of the purpose

16  of Subchapter V is to essentially avoid --

17         THE COURT:  Where are you getting the purpose of

18  Subchapter V in the text?

19         MR. KIMPLER:  In the statute, that there's no

20  absolute priority rule.  So the benefit -- the key benefit of

21  Subchapter V is that it -- an owner of a small business can

22  retain its equity ownership.

23         THE COURT:  But that's for different reasons, right?

24  Because that debtor is now going to be working for three to

25  five years consent -- theoretically, they're under the

1   consensual plan or on a non-consensual basis for three to five

2   years.  So the debtor can continue to work and is motivated to

3   continue to work for its creditors for the next three to five

4   years.  It's incentivized because it will be able to keep --

5   that's not telling me what the purpose of Subchapter V is.

6           MR. KIMPLER:  What I was implying, Your Honor, is

7   that a liquidating sale, a quick 363 sale, you don't need

8   Subchapter V to do that.

9           THE COURT:  But you can do it.  You can do it under

10  Subchapter V.

11          MR. KIMPLER:  You can, but the -- in my view, the

12  primary benefit of Subchapter V is to retain your equity

13  ownership.  And if you're going to do a 363 sale --

14          THE COURT:  Even under a consensual plan?

15          MR. KIMPLER:  -- there's no -- I'm sorry?

16          THE COURT:  Why would you need -- under a consensual

17  plan, you wouldn't need the absolute priority rule.  You

18  wouldn't need to cramdown the plan on anyone.

19          MR. KIMPLER:  You wouldn't need to.  If you're

20  selling all of the assets in a 363 sale, Your Honor, you would

21  not care about retention of the equity interest.

22          THE COURT:  Right.  But you would still be rendered

23  ineligible under Subchapter V.  Maybe you didn't want to have a

24  creditors' committee.  Maybe you just wanted to get in and out

25  really fast without -- maybe you didn't want to file a

1  disclosure statement.  The costs could be associated, could be

2  tremendous.  And really, why do debtors choose to file for

3  bankruptcy?  You don't know a particular case.

4        It's the floating in and out that concerns me about

5  this position.  I've got concerns about their position as well,

6  but that's what concerns me.  It's the floating in and out,

7  like it could happen at any point.

8        MR. KIMPLER:  Right.  I -- listen, I agree, Your

9  Honor, that you never can tell with absolute certainty the

10  purpose somebody files for bankruptcy or chooses one section or

11  the other.  What we know is that in determining eligibility

12  here, essentially the key feature is the quantum of debt.  And

13  Congress has said when you get over that level, you're just not

14  entitled to those expedient processes.

15        So to me, the possibility that you might float out is

16  subject to an ongoing, at all times, debt limitation.  When the

17  debts exceed $7 and a half million, Congress has said creditors

18  are entitled to different rights.

19        THE COURT:  Talk to me.  I know they're going to

20  mention the rule, 1020(a), right?

21        MR. KIMPLER:  Yes.

22        THE COURT:  What's your argument on that?

23        MR. KIMPLER:  So the first thing I would say, Your

24  Honor, is that if you agree with us on our interpretation of

25  1182, then I believe this argument's a bit of a red herring in

1    the sense that you can independently, if you conclude they're

2    ineligible, you can revoke their Subchapter V election.

3                We cited a case in our papers.  This will be the

4    second, and I promise the only other case I'll cite to you,

5    National Small Business Alliance.  That's out of the D.C. --

6                THE COURT:  You can cite as many cases as you want,

7    Counselor.

8                MR. KIMPLER:  -- bankruptcy last year.

9                THE COURT:  Right.

10               MR. KIMPLER:  But there, the court revoked a

11   Subchapter V election irrespective of a motion filed under

12   1020.

13               The second thing I would say, Your Honor, is that I

14   don't think anybody here seriously disputes, we could not have

15   raised this argument in compliance with Rule 1020.  Rule 1020

16   said we would have had to have filed the objection by

17   October 7th of 2022.

18               THE COURT:  But maybe that's what Congress means, is

19   that you're going to have finality one way or the other, and we

20   shouldn't be -- maybe (B) and (A) do -- are read together and

21   Rule 1020(a) says this is the last date that we stopped

22   checking.  Right?

23               MR. KIMPLER:  I think to get to that, I think you

24   would first have to conclude that --

25               THE COURT:  (B) and (A).

1        MR. KIMPLER:  (A) governs (B).  And I think the

2   statutory analysis that I started with doesn't permit that.  I

3   think once you get comfortable that (B) stands on its own, that

4   it's not qualified by (A), I don't know where you would moor

5   that argument but there is some necessity to check as of the

6   petition date that is only found in (A).

7        THE COURT:  As of the petition date, yeah.  I got it.

8   That makes sense.

9        MR. KIMPLER:  So we -- the disqualifying triggering

10  event here did not happen until December.  So we could not have

11  complied with Rule 1020.  But if you then went on to an

12  excusable neglect analysis --

13       THE COURT:  Where do you find excusable neglect in

14  the statute?  We -- we're doing statutory construction.  Where

15  do you find that standard?

16       MR. KIMPLER:  In Rule 9006, allows the Court -- just

17  because the only issue here is Rule 1020 --

18       THE COURT:  Right.

19       MR. KIMPLER:  -- Rule 1020 can be extended for

20  excusable neglect under Rule 9006.

21       THE COURT:  Okay.

22       MR. KIMPLER:  If we're going through that analysis,

23  Your Honor, I think the first thing you have to ask is what is

24  the delay we're talking about?  I don't think it's appropriate

25  to say that the delay is from October when the first deadline

1  was until February 15th when we filed our motion.

2          I would argue that the appropriate delay is from

3  December of 2022 until February of 2023, a period of about 65,

4  70 days.  And I would make a couple of points.  We conceivably

5  could have filed this motion on December 3rd, 2022, the day

6  after Alex Jones filed his individual case.  It would have

7  required me to be a lot smarter and act a lot faster.  But one

8  reason that that wasn't done, Your Honor, is because the

9  judgments were not entered until December 22nd, and there could

10  have been an argument that the claims were contingent.  So when

11  I think about the delay for purposes of excusable neglect, I

12  start December 22nd to February 15th, a period of about a month

13  and a half.

14          I would also say that I think it was appropriate for

15  us to wait to see the initial Jones schedules, where Jones, for

16  the very first time and different from his petition, admitted

17  that our claims were liquidated.  Once those schedules were

18  filed on February 14th, and we had known that that was the date

19  from prior hearings before you; we filed our motion the very

20  next day.  We thought at that point we had the record to come

21  into this Court and say that this was inappropriate.

22          So I think that the families acted expeditiously.

23  And I would say if you go through an excusable neglect

24  standard, many courts, although I don't believe the Fifth

25  Circuit has adopted this definitively, say that the most

1  important of the four standards is whether the delay was

2  outside of the movant's control.  Again, here, we could not

3  have moved before December.

4           When you look at the prejudice that is caused to the

5  debtor, I'm aware of none.  I'm aware of no progress that was

6  made in this case between December 22nd of 2022 and

7  February 15th of 2023.

8           And the other thing I would say about prejudice, Your

9  Honor, is maybe we should just zoom out for one second.  This

10  is a Subchapter V case where the sole owner is in a Chapter 11

11  case.  The notion that we need to expedite and go forward with

12  a Subchapter V plan so that the equity of that business can be

13  held by a Chapter 11 debtor who hasn't filed a plan or

14  completed his schedules yet, I think also cuts against any

15  notion that there's really prejudice to the debtor here.

16           So, Your Honor, our view is that the motion was

17  timely; that whether or not the motion was timely, you have

18  ample authority to revoke the election, especially if you agree

19  with our statutory interpretation.

20           THE COURT:  Where does the Court have the authority

21  to -- where is it in this Code that I have the authority to do

22  what you're asking?

23           MR. KIMPLER:  So I start with 1182(1)(B) where it

24  says very clearly a debtor may not be these categories.  I

25  think you can then go to 105 to say if there is a clear litmus

1   test about who is and who is not eligible, there must be a

2   remedy to revoke that.

3           THE COURT:  What do you think happens?  I know this

4   is a question that both of you are wondering.  What -- if I do

5   revoke, then what happens to the case?

6           MR. KIMPLER:  I -- the case should continue as a

7   regular Chapter 11 case.

8           THE COURT:  Where did -- where is that in the Code?

9           MR. KIMPLER:  It would be -- again, if you revoke the

10  election, it would just be -- you'd be left -- I mean, because

11  Subchapter V is obviously a subchapter of Chapter 11..

12          THE COURT:  In other words, the debtor filed on the

13  petition that it seeks to elect and only the debtor can elect.

14  So if I revoke, then why does that put the debtor on -- in a

15  regular 11?  Right?

16          In other words, if a debtor went in thinking -- let's

17  just put innocent debtor, you know.  I'm not saying this one

18  isn't.  What I'm saying is a debtor with no litigation.  It's

19  just a debt, a pure debt issue where the parent files and it's

20  part of (audio interference).

21          Debtor elects to proceed under Subchapter V and

22  wanted to -- the owner wanted to retain the equity in the

23  business.  Right?  Now rendered ineligible, now it's now

24  subject to a completely different standard with no way out.

25  Right?  Or unless it -- the debtor would -- then it's up to the

1  debtor to then file a motion to dismiss his own case.

2          But where do -- where is the transition happen to an

3  11?  Where do -- where is it that the petition to proceed under

4  an 11 Sub V, revoked means automatically appoint a committee,

5  render someone to disclosure statements?  Where is that in the

6  Code, or in the Rules?

7          MR. KIMPLER:  So it's not expressly in the Code.  And

8  now I'm going to break my rule and cite a couple of other

9  cases.

10          THE COURT:  No, no, no.  I want you to cite -- I'm

11  wrestling with these issues and that's why I'm asking.

12          MR. KIMPLER:  So there are -- this issue has come up

13  on other elements of Sub -- sorry -- Subparagraph (B),

14  specifically the "being affiliate of" a securities filing.  We

15  cited to you the case In re Phenom Marketing [sic] and In re

16  Serendipity Labs.  In both of those cases, and as well as the

17  National Small Business Alliance case I cited earlier, in all

18  three of those cases, the court grappled with this issue.  And

19  I think frankly, the court took a practical view in each

20  instance to say, what would be the effects of -- you're right.

21  I think the sole statutory basis would be to just dismiss the

22  case or maybe convert it.  And the courts there said that's too

23  disruptive, that could be prejudicial to the creditors, it

24  could be value destructive.

25          And that informed our view here in the relief we were

1  seeking.  Again, we're not trying to be a bull in the China

2  shop and destructive.  We wanted to have the case continue in

3  Chapter 11.  But the honest answer to your question, Your

4  Honor, is that there is no specific provision of Title 11 that

5  governs this.

6       There is a provision that says who is not eligible.

7  There is a rule that clearly contemplates that you can object

8  to the election.  And there is Rule -- I'm sorry -- Section

9  105.  And there are at least three courts that have looked at

10  this and concluded that the appropriate remedy is to revoke the

11  election and move forward as a regular Chapter 11.

12       THE COURT:  Okay.

13       MR. KIMPLER:  Your Honor, I -- the last thing I'd

14  like to just emphasize here is that revoking the election in

15  this case I think is particularly important.  This is not a

16  typical Subchapter V case.  This is not the ma and pa pizza

17  shop.  This is a debtor with 1.4 billion in liabilities, 200

18  times the statutory limit.  To the extent Congress enacted

19  Subchapter V to permit quick expedient reorganizations, that

20  has already failed here.  We are eight months in the case.

21       And what we heard on Friday night -- I won't beat my

22  drum again -- tells us that we have significant concerns about

23  who is in charge of this debtor, whether they take their

24  fiduciary duties as a debtor in possession seriously.  I don't

25  think Free Speech is entitled, as a statutory matter, to the

1  benefits of Subchapter V, and I certainly don't think they

2  deserve it.

3          I think the creditors of this debtor are entitled to

4  the full suite of protections that Chapter 11 offers.  That

5  includes the appointment of an official creditors' committee

6  that can look into the facts that we have just recently

7  learned.  It includes the ability to appoint a true Chapter 11

8  trustee.  It includes the ability to get a disclosure statement

9  and adequate disclosures, and it includes critical protections

10 under Section 1129, including the absolute priority rule.

11         Those requirements of 1129 that apply in a regular

12 Chapter 11 and don't apply in a Subchapter V, those are

13 critical because it's Congress constantly rebalancing the

14 rights of debtor and creditors.  And what Congress has said --

15 and this ties back to where we started, 1182(1)(B) -- when you

16 are part of an affiliated group of debtors with more than $7

17 and a half million of liabilities, Congress has decided that

18 that balance of rights, that frankly tilts towards the debtor

19 in a Subchapter V case, no longer is appropriate, and that you

20 need the balance that is provided more fully in Section 1129 of

21 the Bankruptcy Code.

22         So, Your Honor, I think that this was an important

23 motion when we filed it in February.  I think it's even more

24 important today.

25         THE COURT:  Thank you very much.

1              MR. KIMPLER:  Thank you.

2              THE COURT:  Let me just, yeah.  What I would ask is -

3  - come on up, Ms. Hardy.  Anyone in support of the motion, I

4  would ask to go first and then we'll go to parties who oppose.

5              MS. HARDY:  Thank you, Your Honor.  Again, Jennifer

6  Hardy of Willkie Farr on behalf of the Texas plaintiffs.

7              Your Honor, Mr. Kimpler very ably covered each of our

8  joint arguments, and I certainly endorse his words and I

9  won't -- will not repeat each of them or his arguments.  But,

10  you know, one thing that you had discussed with him really

11  struck me, and that's the argument about finality.  And as

12  bankruptcy petitioner -- practitioners, the bench and bar,

13  that's certainly a concept that we're used to.

14              In order to allow the process to proceed in an

15  expeditious and orderly way, we have bar dates so that

16  creditors, you know, have a designated time to file claims, and

17  if not, their rights are prejudiced.  But at the same time, we

18  do have exceptions to those rules.  We have Rule 9006(b), which

19  specifically sets forth that in certain instances where there

20  is excusable neglect, that finality that we typically seek can

21  be reopened.

22              The Supreme Court has clearly articulated that the

23  excusable neglect determination is at bottom, an equitable one,

24  taking account of all relevant circumstances surrounding the

25  party's emission -- omission.  And that's In re Pioneer,

1  507 U.S. 380.

2  Your Honor, as Mr. Kimpler ably noted, here we have a

3  debtor that would not be entitled to file a Sub V case today,

4  regardless of the affiliated debtor.  In fact, a jury in Texas

5  awarded certain plaintiffs damages in excess of $45 million

6  just a week after the FSS case was filed.

7  Here we have movants who were literally unable to

8  file, the plaintiffs.  We were literally unable to file a

9  motion to revoke by the deadline set forth in B.R. 1020 because

10  the circumstances that gave rise to the revocation did not

11  arise until two months after the deadline.  And that was a

12  circumstance entirely in Mr. Jones's control, not the

13  plaintiffs', the date of the filing of his petition.

14  So when you examine the Supreme Court factors for

15  excusable neglect, including as interpreted by the Fifth

16  Circuit, each and every excusable neglect factor weighs in

17  favor of the plaintiffs.  Factor one is danger of prejudice to

18  the debtor.  Conversion will only serve the goal of greater

19  judicial efficiency in these cases.  It would allow for

20  jointly-administered cases with a joint Chapter 11 plan, which

21  could be mediated collectively instead of piecemeal.

22  And the debtors' assertion -- only assertion that it

23  would be -- the prejudice would revolve around a potential for

24  increased fees if the UCC is appointed and U.S. Trustee fees

25  must be paid.  However, the Fifth Circuit recently held in In

1  re CJ Holdings, 27 F.4th 1105, that additional litigation costs

2  and other legal fees were not enough to constitute prejudice to

3  the debtor because if so, each excusable neglect case would

4  fail solely on those grounds.

5         The length of the delay and the potential impact on

6  these proceedings were also addressed by Mr. Kimpler.  The

7  plaintiffs filed their motion as promptly as possible, giving

8  the timing of the Jones case.  This was not a case of many

9  months or years of delay.  And in fact, we're at the beginning

10 of the plan mediation process and we're waiting for more robust

11 disclosure from the debtor before proceeding further on that

12 path.  So therefore, the revocation delay -- revocation motion

13 will not delay the plan process.

14        The third factor, the reason for the delay, including

15 whether it was in the control of the movant, obviously weighs

16 in favor of the plaintiffs.

17        The fourth factor, good faith:  The plaintiffs, as

18 Mr. Kimpler noted, are acting to secure more robust protections

19 for creditors that are available in traditional Chapter 11.

20 Certainly a matter of good faith.

21        So unless you have any specific questions for me,

22 Your Honor --

23             THE COURT:  No.  No, I appreciate it.

24             MS. HARDY:  Thank you.

25             THE COURT:  Thank you.

```
 1              MS. HARDY:  We request obviously the revocation of
 2   the chapter -- of the Sub V.
 3              THE COURT:  Thank you.  Good afternoon.
 4              MR. NGUYEN:  Good afternoon, Your Honor.  Ha Nguyen
 5   for the U.S. Trustee.  Your Honor, this is truly an issue of
 6   first impression, and I can say that with confidence because we
 7   went around asking our colleagues around the country to see
 8   whether this issue has come up before.  We've looked for
 9   guidance that might help guide this Court in making a
10   determination.  We -- unfortunately, Your Honor, we did not
11   find any of those guidance.
12              So we are here today to give the Court our position
13   on this.  And when I said -- when we read 1182, and literally
14   when I said there's not -- when I say "reading," it's not our
15   interpretation of 1182.  What we are doing is we're actually
16   reading the text of 1182.  And looking at subpart (a) and
17   subpart (b), there's just not -- you can't read "as of the
18   petition date" in subpart (b).  I know Your Honor is struggling
19   with the ramifications of floating in and out.  But in terms of
20   reading the statute and applying statutory construction,
21   sometimes ramification happens and we have to interpret the
22   text as it's written by Congress.
23              So, Your Honor, I will be reading --
24              THE COURT:  I think we should always do that,
25   Mr. Nguyen.
```

1            MR. NGUYEN:  I agree, Your Honor.

2            THE COURT:  And I know you agree with me.

3            MR. NGUYEN:  I agree, Your Honor.  And in our short

4  response, we've read the statute and we made a judgment call,

5  and we believe the correct reading of 1182 is on the

6  plaintiffs' side in terms of when you should apply --

7            THE COURT:  Here's a question for all of -- for

8  everyone on that side.  I'm not sure the standard is petition

9  date either.  I think the standard is statement of election

10  date.  So, if one makes a statement of election on the petition

11  date, that's the date that governs.  If it's a standard on --

12  debtor could always amend its petition.

13            MR. NGUYEN:  Correct.

14            THE COURT:  And it's amended, right?  So you're not

15  just looking petition date.  You're looking at statement of

16  election date.  And that's what seems to be triggered on 1020,

17  right?  That's what triggers 1020.  That's why 1020 can go

18  after that.  So why isn't that the date?

19            MR. NGUYEN:  Your Honor, it's because the statute

20  says as of the petition date.

21            THE COURT:  For money.  You've got to qualify.  You

22  have to have that debt on the petition that date, right?

23            MR. NGUYEN:  That's correct, Your Honor.

24            THE COURT:  But it's made on the statement of

25  election.  So, theoretically, the petition date is always going

1  to work on that, because -- and then you have 30 days to check,

2  or -- the later of 30 dates or after a 341 meeting, unless the

3  debtor amends to elect Subchapter V on a different date.  You

4  still have to satisfy the debt as of the petition date.

5            MR. NGUYEN:  That's true for subpart (a).

6            THE COURT:  So you're saying -- so you're in -- okay.

7  So let me throw the hypothetical at you then.  Let's just say

8  an unaffiliated -- no, an affiliate, one who owns 20 percent

9  more files for personal bankruptcy, has nothing to do with the

10 debt.  And let's just say this debtor is in a Subchapter V, in

11 the middle of plan confirmation.  You're saying it just goes

12 poof, debtor's rendered ineligible in an 11 and now has to file

13 a new plan and disclosure statement, has to now get a

14 creditors' committee, and now the case gets dragged on for the

15 next six months.  That's what you're saying happens.

16           MR. NGUYEN:  That --

17           THE COURT:  You're saying the code -- that's what

18 Congress intended.

19           MR. NGUYEN:  Your Honor, that is the plain reading

20 of --

21           THE COURT:  I'm asking you to tell me where the plain

22 reading says that.

23           MR. NGUYEN:  Your Honor, it's who may be a debtor.

24           THE COURT:  Right.

25           MR. NGUYEN:  To --

1          THE COURT:  You're going to say, see, if you read it

2     all the way together, Lopez, then you never have to deal with

3     this question because every time -- there's just the 30-day

4     challenge period, and that's what Congress did, right?  Just

5     like a bar date.  Sometimes it --

6          MR. NGUYEN:  Judge, but the 30-day challenge period,

7     it's for subpart (a).

8          THE COURT:  Where do you see that in 1020?

9          MR. NGUYEN:  In --

10          THE COURT:  I'm asking you where the language in

11    1020(a) says that.

12          MR. NGUYEN:  Your Honor, it's just applying Rule 1020

13    factfully.  There is no way for this --

14          THE COURT:  But you're weaving in and out of

15    practically, unless you say what the code said.

16          MR. NGUYEN:  Understood, Your Honor, and --

17          THE COURT:  Mr. Battaglia, I've got questions for

18    you, too.  This is not going to be a free ride for anyone.  I'm

19    just pushing --

20          MR. BATTAGLIA:  Little beads of sweat, Your Honor.

21          THE COURT:  We're sticking with the text, and that's

22    the textualist's analysis.  And I'm a big textualist, right?

23          MR. BATTAGLIA:  Correct.

24          THE COURT:  As every bankruptcy judge is.  Let's just

25    stick with the text.  Tell me where it says it.

 1            MR. NGUYEN:  Your Honor, just the situation that we

 2  have, Rule 1020 just can't apply to subpart (b) in this

 3  particular situation.

 4            THE COURT:  Then why would there be rules that apply

 5  to when a statement -- why --

 6            MR. NGUYEN:  Your Honor, I don't think there's a --

 7            THE COURT:  You're saying that 1020(a) is just

 8  essentially rendered meaningless because, at any point an

 9  affiliate files, then 1020(a) is meaningless.

10            MR. NGUYEN:  Your Honor, that's -- 1020(a) applies to

11  subpart (a) of the petition date --

12            THE COURT:  Tell me where it says that in the text.

13            MR. NGUYEN:  It doesn't render it meaningless because

14  you --

15            THE COURT:  No, no.  Tell me where it says it only

16  applies to subpart (a).

17            MR. NGUYEN:  Your Honor, I will stipulate it doesn't

18  say that, but in terms of applying --

19            THE COURT:  Say it in (b) or part (c)?

20            MR. NGUYEN:  I'm sorry, Your Honor?

21            THE COURT:  Doesn't say it in part (b) or part (c),

22  right?

23            MR. NGUYEN:  It doesn't.  And --

24            THE COURT:  What is the purpose of Bankruptcy Rule

25  1020 then?

1            MR. NGUYEN:  It's to evaluate the debtor at -- when

2    the debtor files a bankruptcy case, to evaluate the debt as of

3    the petition date.  There are cases where we -- where creditors

4    do object to a debtor's debt.

5            THE COURT:  Uh-huh.

6            MR. NGUYEN:  But 1020, you can't really apply it to

7    subpart (b) because it's talking about an affiliate debtor's

8    debt.  So, if you apply 1020 in a way that -- only within that

9    30 days, you're actually rendering -- you're doing the

10   opposite.  You're rendering subpart (b) meaningless by --

11           THE COURT:  Are you familiar -- you deal with

12   consumer cases.  Are you familiar with any other chapter of the

13   Bankruptcy Code where a debtor by a post-petition act can lose

14   eligibility?

15           MR. NGUYEN:  No, Your Honor.  This is -- it's based

16   on the definition under 1182, and that's how we're reading it.

17           THE COURT:  Understood.

18           MR. NGUYEN:  Your Honor, I think 1020 really applies

19   to subpart (b) -- subpart (a), and that's our position.  But

20   then the question is should the Court consider a motion.

21   Because there's really no rule that tells you when to actually

22   -- when is the deadline to object to a designation when an

23   affiliate debtor comes in.

24           I think the question comes down to a question of

25   equity now, because there's really no rule that applies to this

1   very situation.  And I think the Court, in determining whether

2   to revoke the designation or allow the debtor to remain in

3   Subchapter V or even hear the motion at all is a question of

4   equity.  And it's a question of whether these plaintiffs sat on

5   their rights, based on how -- the chronicle of --

6              THE COURT:  How do you feel about a month and a half?

7              MR. NGUYEN:  Your Honor, I think it -- I don't --

8              THE COURT:  Sophisticated counsel, right?

9              MR. NGUYEN:  Understood, Your Honor.  But I don't

10  believe they slept on their rights.  I think --

11             THE COURT:  You think waiting on the debtor to file a

12  schedule to then confirm what a liquidated debt is --

13             MR. NGUYEN:  It's -- there was -- I mean, the debtors

14  have --

15             THE COURT:  It's got to work for everyone now, right?

16             MR. NGUYEN:  Understood.  The debtors can always

17  schedule their claims as contingent based on appeals.  There

18  are arguments for it, and these particular plaintiffs, I don't

19  believe, sat on their rights, and they brought their

20  appropriate motion at the appropriate time.

21             THE COURT:  Okay.

22             MR. NGUYEN:  Thank you, Your Honor.

23             THE COURT:  Thank you.

24             Now, if anyone on the line wishes to address the

25  Court, please hit "five star" if you do, in support of the

 1  motion.

 2          Hold on.  I muted a (212) line.  I don't know whether

 3  you to wish to address the Court in connection with the motion,

 4  and I apologize if I didn't see you earlier.  If not, please

 5  put your phone on mute.

 6          MS. PORTER:  Good afternoon, Your Honor.  I think

 7  that's me.  This is Katherine Porter from the Committee.

 8          THE COURT:  Ah, yes.

 9          MR. PORTER:  I had raised my hand -- good afternoon.

10  I had my raised my hand to speak earlier on the question of the

11  disclosures, not on this topic, so --

12          THE COURT:  Ah.  Ms. Porter, I --

13          MS. PORTER:  -- we don't have any (audio

14  interference) --

15          THE COURT:  I apologize.  I apologize.  And please

16  feel free to wave, and -- it's been done before, and I don't

17  take offense to it.  I apologize.

18          Okay.  Mr. Battaglia, your turn.

19          MR. BATTAGLIA:  Put me in the hot box to start --

20          THE COURT:  No.

21          MR. BATTAGLIA:  -- or can I get some words in

22  edgewise first?

23          THE COURT:  Absolutely.  Just get close to the mic.

24  I want to make sure we can hear you.

25          MR. BATTAGLIA:  Yes, sir.  Your Honor, let me start

1   with the facts that are undisputed.  Free Speech filed its

2   voluntary petition on July 29th of '22, properly designated its

3   filing as a small business debtor under Subchapter V on its

4   voluntary petition.  There's no dispute that, on the petition

5   date, Free Speech met the definition of a debtor under 1182;

6   that is it was a person; it was engaged in commercial business

7   activities; the activity did not include the business of owning

8   single-asset real estate; had aggregate debts that met the

9   $7.5 million cap, excluding debts to insiders, and 50 percent

10  or more of those debts arose from the debtor's business

11  activities.

12          The 341 meeting was concluded in this case on

13  September 7th, 2022, and Free Speech has never amended its,

14  quote, "statement," which is a word that seems to be used in

15  the statute and rules, although not so much on the petition

16  itself.  But they've never amended its sub (b) designation.

17          The movants now seek to revoke that designation, and

18  we think that the motion fails for at least two reasons.  And

19  I'm going to start in reverse order, save the more esoteric,

20  statutory interpretation stuff for -- let my brain continue to

21  process.

22          But the first is, it's just untimely.  And yes,

23  Rule 1020 says what it says, and it sets a deadline.  And what

24  the plaintiffs -- what the movants are telling you here is we

25  don't need no stinking rules.  Those rules don't apply to us.

1           The rules do apply.  And Rule 9006 gives them a --

2    the ability to do something about the deadline that's set in

3    1020.  It says that you can -- even after the deadline has

4    expired -- you can file a motion under excusable neglect.

5           Well, we stand here today, probably almost a month

6    after I filed my original response for Free Speech raising this

7    issue, and they've still not filed a motion under 9006.

8    There's no motion here asking you to extend the deadline.

9    They've argued about it, and they certainly, in their reply,

10   talk about it, even though they submit to you that it

11   absolutely does not apply to them, for some reason that's

12   unclear to me.

13          THE COURT:  I think what they're arguing is that 9006

14   -- excuse me, 1020, could never really have applied because

15   Jones filed well after any conceivable period to object to the

16   Free Speech.  What's your response to that?

17          MR. BATTAGLIA:  They should have filed a motion under

18   9006 and raised that as a basis for excusable neglect, but they

19   haven't done so.  They don't get to ignore the rules.  And I

20   would agree if their interpretation of the statute is

21   appropriate, and I don't think that it is, that they might have

22   had a basis to file a 9006 motion.

23          THE COURT:  What about their point it's going to lead

24   to potential -- I think "abuse" is probably the right word.

25   Mr. Kimpler would -- where someone -- strategic debtor is going

1    to time it, right, and they're going to say, well, we want the

2    first debtor in Sub V and we want the second debtor in 11.

3    Just wait until after the challenge period and then file the

4    affiliate.

5           MR. BATTAGLIA:  Come before this Court as quickly as

6    possible and file a motion to enlarge the time because the

7    predicate act did not occur within the 1020 time limits.

8    That's what I would have done.  That's what the rules

9    contemplate being done.  That's not what happened here.

10          And notwithstanding Mr. Kimpler's argument that,

11   well, yes, the judgments had come back -- the verdicts had come

12   back, but the judgments weren't entered, there's ample case law

13   that says that you don't need the judgment to be entered in

14   order for a debt to no longer be contingent and unliquidated.

15          And these are -- you're going to hear me say it

16   again -- capable, sophisticated law firms.  That case law is

17   really not seriously disputed out there, that -- and I --

18   probably reflected in the fact that Jones didn't file a

19   Subchapter V case on December 2nd.  He filed a Chapter 11 case.

20   Because I think they knew it wouldn't have withstood scrutiny

21   under the case law.

22          So they knew as of December 2nd, not December 22nd.

23   And we're talking about groups of movants here that are

24   represented by no fewer than 20 lawyers.  A lot of them are

25   sitting here in the courtroom today.  Three major international

1   law firms have stepped in to represent, at various times, the

2   movants.  This wouldn't have been hard.  75 days they waited to

3   come before you.  And then they didn't even have the courtesy

4   to ask you for relief under 9006 asking for an enlargement of

5   time.

6          So this is untimely.  It's just flat untimely.  And

7   on that basis alone, it should be denied.

8          THE COURT:  But where's the harm?

9          MR. BATTAGLIA:  Where's the harm?

10          THE COURT:  Uh-huh.

11          MR. BATTAGLIA:  I guess if we were here under a 9006

12  motion, we could have that conversation.  But we're not.

13  Where's the harm?  Oh, good -- the harm is multiple.  A debtor

14  elects to file under a certain chapter.  And that, under the --

15  I don't have cases to cite you because it's black letter law.

16  The debtor is entitled some deference.  The debtor's election

17  and choice of remedies is always entitled some deference as a

18  starting point.

19          Number two, the benefits of a Subchapter V are

20  multiple.  Yes, the absence of the absolute priority is one of

21  them.  And maybe it's the most important.  Maybe it's not, as

22  you say.  I've had plenty of debtors.  The idea that we don't

23  have a committee.  The idea that we have a neutral whose --

24  comes in and whose sole purpose or one of their primary

25  purposes is to try to negotiate between the parties is another.

 1  The fact that you don't have U.S. Trustee's fees.  And here,

 2  we're talking about 60-, $70,000 a quarter in U.S. Trustee's

 3  fees.  All of those are huge benefits to a debtor.  I don't

 4  have to file a disclosure statement.  I don't have to have the

 5  interval between the disclosure statement and the plan.  I

 6  don't have to even ballot the plan.  The proof elements are

 7  substantially different.

 8          THE COURT:  But what they're saying is no one -- 60,

 9  75 days.  But nothing has really happened between then, right?

10  This case has been stagnant because the parties have been in

11  mediation.  What's the real harm?

12          MR. BATTAGLIA:  Well, the debtor's filed a plan.  So

13  if we're not going to get to mediation, let's get to plan

14  confirmation.  I'd rather mediate.  As you'll recall from our

15  hearings, Judge, the last time -- I think it was the last time

16  we were here -- I was prepared to file my plan of

17  reorganization and you graciously offered me an extension.  And

18  I thought maybe it would be best to keep peace in the land not

19  to file the plan.  They immediately responded by filing this

20  motion.  So, obviously, peace in the land is not that

21  important.  And so we filed our plan.

22          I'd been holding off because I thought we were

23  mediating.  And I don't want to -- I'm not going to go into the

24  mediation other than to say that any suggestion that the delay

25  is entirely based on either my debtor or Mr. Jones' estate is

1  wrong.  The mediation hasn't progressed for a multitude of

2  reasons.  I'm not going into them.  I'm not going to go into

3  them.

4         THE COURT:  Let's just skip it, because I don't know

5  what's happening --

6         MR. BATTAGLIA:  I understand.

7         THE COURT:  -- nor am I --

8         MR. BATTAGLIA:  The suggestion was made, and I simply

9  want to refute it.

10        So 75 days, with the level of sophistication, the

11 number of bodies that they can throw at things, is not

12 excusable neglect.  They should have brought this issue to you

13 sooner.

14        So we've never suggested that there isn't the ability

15 to challenge an election or a statement.  But Rule 1020 clearly

16 contemplates that.  And as they graciously admit, there's no

17 case law on point on the issues.  They seem to rely on National

18 Small Business Clients --

19        THE COURT:  Everyone keeps reminding me of that

20 point.  I appreciate it.

21        MR. BATTAGLIA:  Yeah.  I wish there -- I think I wish

22 there was.

23        THE COURT:  To be honest with you -- and I'm just

24 speaking for me -- I find reasoning far more important than the

25 fact that -- there could be three cases, but the reasoning in

1  those cases -- and I'm -- that's not to say that the reasoning

2  in these cases isn't incredibly important, but the fact that

3  there's not a case is fine with me.  And the fact that there

4  could be three cases addressing it could be fine with me.  It

5  just depends on the reasoning in these cases.  And clearly

6  these judges who have written on these issues, or issues that

7  are ancillary to it, really took a lot of time, and I

8  appreciate it.

9            MR. BATTAGLIA:  They did.  And they had different

10 cases.  And there are a number of holes.  I think we've all

11 been around Subchapter V long enough to recognize some of them

12 in the way the statute was drafted.  For example, the debtor

13 has the sole authority to file a plan of reorganization.

14 Mr. Martin and I confronted this issue in a case in San Antonio

15 not too terribly long ago.  And the debtor's dispossessed.  The

16 debtor's removed.  No one else can file a plan.

17            Where do we go?  That's a road that doesn't seem to

18 end.  Well, National Small Business, that's exactly what was

19 involved there.  The debtor had been dispossessed.  They'd

20 filed five amended plans of reorganization.  Confirmation was

21 denied.  The Court was stuck on a road to nowhere.

22            And so the Court didn't revoke under any definition

23 of 1182.  It revoked under 105.  And it revoked for a variety

24 of reasons that were specific to the facts of that case.

25            THE COURT:  Do you think I have authority under 105

1    to revoke?

2            MR. BATTAGLIA:  I think 105 is a refuge for people

3    who don't have any statutory case authority.

4            THE COURT:  Appreciate that.  But answer my question.

5    Do you think I have the authority to revoke under 105?

6            MR. BATTAGLIA:  I think it's a rather broad

7    interpretation, particularly when you look at the statute.  I

8    mean, I hate to suggest that you have any limitations on your

9    power under 105.  I think the Courts have dealt with it.  And

10   I'm not prepared to address that more specifically on than

11   that, Judge.  I wish I could, but there's only so much my brain

12   can handle at one time.

13           THE COURT:  I guess that's my job, huh?

14           MR. BATTAGLIA:  Yes, sir.

15           THE COURT:  Okay.

16           MR. BATTAGLIA:  So -- and when we look at the other

17   two cases that they've cited, Serendipity and Phenomenon

18   Marketing, those were timely filed under 1020 objections to the

19   election.  They didn't involve any of the issues that are

20   before the Court here today.  It was simply that this is an

21   affiliated reporting company, and therefore it's ineligible

22   under -- I guess it's (c) and --

23           THE COURT:  What about the textual analysis?

24           MR. BATTAGLIA:  Well, let's get to that.  So I think

25   that everybody has told you the language of the statute is

 1  neither vague nor ambiguous.  Okay?  So we're all sitting here
 2  saying here you go, Judge.  It is a question of statutory
 3  construction and interpretation.  And I think that they have
 4  ignored certain rules that we're to abide by, and that the
 5  Court is instructed by in the Supreme Court.  And you know,
 6  they're cited here in my papers, that what the Court is
 7  supposed to do is give meaning to all the words of a statute,
 8  not to isolate words and remove them.  I think one Supreme
 9  Court case calls it the "blue pencil rule."  You don't get to
10  strike out the stuff that's not good for you.

11          They suggest to you that -- I'm just going to call
12  them subsections (a) and (b), that subsections (a) and (b) are
13  ships passing in the night.  Under their interpretation, if two
14  affiliated debtors have debts less than seven and a half
15  million dollars at any time, they don't need to meet any of the
16  requirements under subsection (a).  They don't need to be
17  engaged in commercial activities.  They can be single-asset
18  real estate owners.  And the majority of their debts need not
19  arise from business activity.

20          In other words, what they want you to do is keep all
21  of the other requirements under (a), but just get rid of that
22  little temporal phrase in there, "as of the petition date."
23  Just get rid of that.  Everything else either they want to
24  supplant it, or alternatively they're telling you that (b)
25  applies without (a), and that can't be, because it says

1  "subject to" are the first three words of the section.  And at

2  the end of (a) it says "and."  They are clearly conjoined.

3  There's no disjunctive here.

4         And what (b) does is it simply modifies the debt

5  limitation to say include the debts of the affiliate.  It

6  doesn't strike "as of the petition date."  It just doesn't.

7  And I don't know how they get around just writing out words

8  that are inconvenient to them, but that's what they've chosen

9  to do.

10         THE COURT:  But aren't they really arguing that

11  you're looking at it backwards, right?  That (b) can happen at

12  any time, and that (a) -- and that the subject of Paragraph (b)

13  means that (b) can show up at any given time, right?  Something

14  could happen post-petition that could affect (a).  And so, if a

15  debtor -- a parent files or an affiliate files, then the

16  debtor's rendered ineligible under Subchapter V and I have the

17  power to revoke using 105.

18         MR. BATTAGLIA:  Under (a) the debts -- the valid

19  non-contingent, unliquidated debts can change, and do change.

20  And in fact, in one of the cases -- I think it's the Parking

21  Management case, the debtor filed bankruptcy.  It had a PPP

22  loan that hadn't yet been forgiven, and immediately rejected

23  multiple leases.  And the Court said, you know, we're just

24  opening up eligibility determination to post-petition events,

25  even if deemed to apply retroactively, is contrary to the

1  purpose and spirit of Subchapter V and could nullify the very

2  benefits it is intended to convey.

3          THE COURT:  That was the debtor --

4          MR. BATTAGLIA:  So why is that any different?  An

5  affiliate files versus a debt becomes non-contingent?

6          THE COURT:  Because the debt is fixed as of the

7  petition date, right?  And at the time that it was filed, I

8  think they would say.  I think Mr. Kimpler would tell me to --

9  you know, let's focus on engage.  There is a bunch of other

10  things that aren't subject to the petition date, and he thinks

11  that at any point, even (a) could -- something could render a

12  debtor ineligible under (a) as well.

13          MR. BATTAGLIA:  Well, I think that if the definition

14  of "debtor" includes all of the elements, engaged in business,

15  not owning single-asset real estate, then it has to be applied

16  as of the petition date.

17          THE COURT:  What's your thought about the

18  hypothetical that I gave the other side, about first file --

19  debtor files a Subchapter V case, has its own board, own

20  management, made the decision to file, and then a subsequent

21  parent files for debt unrelated?  Do you think that that

22  renders the debtor ineligible, the first filer?

23          MR. BATTAGLIA:  No, I don't.  I don't think it

24  renders the debtor ineligible.  I think that each debtor has to

25  be looked at independently.  And yes, the Court should

1  consider, if on the date of filing or if on the petition date

2  the affiliate debts would appropriately be included and would

3  increase the debtor above the seven and a half million dollar

4  eligibility cap.  And that wasn't true when FSS filed.  And

5  nobody's alleged otherwise.

6          THE COURT:  But let's say I have the power to do it

7  under 105.  Why shouldn't I revoke?  Why shouldn't I revoke the

8  election of the Subchapter V debtor at this time, in light of

9  everything that's transpired -- or not transpired during this

10  case?  This case has been going on for quite some time.  And I

11  got it, the parties have been in mediation.  I think the

12  families would tell me -- or the plaintiffs, I should say,

13  would tell me it's all in the best interest.  You know, we've

14  got disclosure issues and we have issues that are -- that have

15  not yet been fully addressed.  Why don't we get a committee on

16  board and deal with it?

17          MR. BATTAGLIA:  Well, I think the first thing is --

18  that the Court has to consider, and the plaintiffs overlook

19  this, movants overlook this regularly, is they aren't the only

20  creditors of Free Speech Systems.  Yes, at a billion-four --

21          THE COURT:  But a big one.

22          MR. BATTAGLIA:  A billion-four, if that number is

23  meaningful, then -- I mean, I understand what the judgments

24  are.  I'm not going to -- they are what they are.  But I assure

25  you, to a creditor that's owed $100,000 or $50,000, that's real

1  money, too.  And it's important to them.  And by somehow

2  revoking under 105, if the Court was inclined to do so, you've

3  just handed complete control of this case over to plaintiffs,

4  to the detriment of the other creditors of the case.

5          I mean, people don't like Mr. Lemmon's client and

6  they think that his --

7          THE COURT:  But if there was an unsecured creditors'

8  committee, how could you really say that we turned it over to

9  the detriment?

10          MR. BATTAGLIA:  Well, there's an Unsecured Creditors'

11  Committee in Mr. Jones' case, and it's entirely populated by

12  plaintiffs.

13          THE COURT:  Now we're dealing with hypotheticals.

14          MR. BATTAGLIA:  I mean -- who would swamp the

15  committee, who would control -- control isn't just by

16  committee.  It's by confirmation standards.  They'd have a

17  blocking -- complete blocking position.  Nobody could ever

18  confirm a plan over their opposition.

19          And the other prejudice, of course, is the cost, as

20  there would be meaningful increase in cost.  And this estate is

21  already in a position where it's borne, you know, close to

22  three quarters of a million dollars in professional and

23  restructuring fees, and you know, is that the push that kills

24  the goose that lays the golden egg here?

25          Is there a case to continue?  And look, I understand

1  the emotions of this.  And I've been careful never to comment

2  before this Court on any of those attributes from the movants'

3  perspective or from my client's perspective.  Because I'm a

4  bankruptcy lawyer.  I deal in money.  I deal in restructuring

5  and in terms and in finances.

6          And that's all I have the ability to control.  I

7  don't have the ability to restore anybody to a position prior.

8  I don't have the ability to erase what's happened.  All I have

9  is money.  And if -- that's what this case is about, and that's

10 what I understand, and have always understood bankruptcy to be

11 about is paying creditors, then I think we end up not doing

12 that with any of them.  I think this case collapses under its

13 own weight.  And maybe that's the goal.  I don't know.

14         So prejudice, Judge?  I think that's the prejudice.

15 And I think it's extreme.

16         I think -- let me just address one more thing.  The

17 Bartenwerfer case, and I feel so sorry for the debtor there,

18 having that name.  And I've always thought Battaglia could be

19 difficult, but Bartenwerfer.  But you know, the idea that that

20 case is instructive here, dealing with 523(a)(2)(A), (B), and

21 (C), these are different statutes.  They are each a different

22 basis to deny dischargability of a specific debt.  And they are

23 in the disjunctive.

24         And so the fact that the first one says "procured by

25 fraud" without reflection on who is the fraudster, and the next

1    ones talk about "by the debtor" doesn't instruct here at all.

2    That's not the case with the statute that we're dealing with

3    here.  We've got a statute that says "subject to" and has a

4    conjunctive between the two -- the (a) and (b) sections.

5             I think another thing that might be instructive is

6    the definition of the word "debtor" in 101.  Because Section

7    101 says that a debtor is a person concerning which a case

8    under this title has been commenced.  Seems to instruct that we

9    should look at the dates.

10            So, Your Honor, we think that, under all of the

11   circumstances here, that the correct, plain language

12   interpretation of the statute is to read (a) and (b) in the

13   conjunctive.  And I think the rational interpretation is that

14   (b) simply adds to the eligibility dollar cap by including the

15   amount owed to an affiliate debtor on the petition date or the

16   statement date if you choose.

17            I think that's all it does.  It doesn't create a wild

18   card that we apply six months down the road, a year down the

19   road, and it doesn't change to create this in and out that one

20   can be a Sub V debtor on day one and not on day two, and then

21   again on day three, and not on day four.  That's what the

22   statute says, Judge, and we ask that you apply it.

23            THE COURT:  Thank you.

24            Anyone else wish to address the Court with respect to

25   the -- I'll go with the -- taking those who are in favor, those

1  who are against.  Anyone else, just maybe not for or against,

2  but filed something and want to say something?

3          MS. FREEMAN:  Hello, Judge.  Liz Freeman on behalf of

4  Melissa Haselden, the Sub V trustee.  Judge, we filed a very

5  limited response, primarily as an officer of the court, and

6  hopefully to assist the Court in its analysis here, not so much

7  because we're trying to advocate a position in this case in a

8  vacuum, but instead because how Subchapter V, you know,

9  provisions are interpreted, you know, are important to the

10  trustee.  We believe that they're important to the Court.

11          And we are mindful of the importance of this

12  particular decision, not only in the case, but across the

13  spectrum of Subchapter V juris prudence.  We have a statute

14  that is not especially well written.  Congress amended 1182 to

15  address one problem, and through the addition of a lot of the

16  language created a whole nother set of problems.

17          It is not a situation where we think that the

18  statute's incredibly clear.  You know, we don't have the

19  benefit of black letter law that clearly dictates exactly what

20  the Court should do.  So we think that what the Court needs to

21  evaluate is two primary things.  First, the appropriate

22  utilization of Section 105.  In U.S. v. Sutton, the U.S.

23  Supreme Court provided that 105 was used to be basically a gap

24  filler, to assist the Court in facilitating the provisions of

25  the Bankruptcy Code that currently existed.  And it warned

1  against the interpretation of 105 as authorizing the Court to

2  be a roving commission on equity.

3        So, while I am frequently a party that will file a

4  pleading utilizing 105, I appreciate the benefits of 105.  I

5  think that it can be a helper provision, but needs to be

6  interpreted as a helper provision for the provisions of the

7  code itself, and not be utilized to try to do equity in a case

8  where perhaps there is case law or there is a statutory

9  provision that we don't like.  And we're concerned that that

10 may be the situation here.  We don't believe that utilization

11 of 105 to remove the election is appropriate in this case.

12       With regards to the interpretation of the debt limits

13 and whether or not the debts of the affiliate should be looked

14 at on the petition date of the debtor itself, or on the filing

15 of the subsequent entity, it appears to us, to the trustee,

16 that the snapshot rule is instructive here.

17       With the exception of certain findings of the Fifth

18 Circuit with regards to homestead exemptions, it is generally

19 viewed that, when you have debt limitations and temporal

20 limitations in the bankruptcy code, that you look at a snapshot

21 of the situation on the petition date itself.  This is true for

22 eligibility for Chapter 13.  This is the basis of the decision

23 that was made by the court in the Parking Management case.

24       The trustee's belief here is that it is appropriate

25 to take a snapshot of the debt, of the debtor, and its

1  affiliates that were also debtors on the filing date.  And the

2  trustee is concerned that in situations where you have

3  affiliates that file later on, and well after the deadline for

4  objecting to the certification of the Sub V, that that simply

5  runs against the grain, the way that the bankruptcy code works

6  in so many other sections.  There just isn't precedent under

7  code for that type of interpretation, and we believe that, if

8  the Court were to make that finding, that can set a dangerous

9  precedent in Subchapter V cases.

10        The trustee is concerned about examples that you

11  raised, where you have an affiliate that file a later

12  Chapter 11 case.  I would also suggest that you could run into

13  situations where you have an affiliate file a Chapter 7 and

14  choose to liquidate, or perhaps you have an individual who's a

15  proprietor of a business in a Sub V case later file a

16  Chapter 13.  Would the mortgage debt of that individual cause

17  the Sub V debtor to later become ineligible for that case?

18        We think that the cleanest interpretation,

19  Your Honor, is for the judge to utilize the theory of the

20  snapshot rule, look at the language of the statute, evaluate

21  the debt of the debtor and its debtor affiliates on the

22  petition date, and determine eligibility on that date, and

23  decline to utilize Section 105 to remove the certification of

24  the Sub V.

25        THE COURT:  Thank you.

1           MS. FREEMAN:  I'm happy to answer any questions you

2   may have.

3           THE COURT:  No questions.  Thank you.

4           MR. KIMPLER:  Your Honor, if I could just have two

5   more minutes?

6           THE COURT:  Absolutely.  No, no, no.  Absolutely.  I

7   want you to take as much time as you need.  This is important.

8           MR. KIMPLER:  Again, it's Kyle Kimpler from Paul

9   Weiss on behalf of the Connecticut plaintiffs.  Your Honor, I

10  wanted to start with a little bit of the colloquy between --

11          THE COURT:  Actually, before you start, Mr. Kimpler.

12  Ms. Stephenson had her hand up and I want to make sure that I'm

13  being --

14          MR. KIMPLER:  Of course.

15          THE COURT:  No, no.  I literally just saw the hand

16  raise feature that I -- Ms. Stephenson, do you have any

17  comments before --

18          MS. STEPHENSON:  Just briefly, Your Honor --

19          THE COURT:  -- Mr. Kimpler, related to this?

20          MS. STEPHENSON:  Yes.  Yes, Your Honor.  Just in

21  support.  Just very brief, Your Honor.

22          THE COURT:  Support of what?

23          MS. STEPHENSON:  Oh, I'm sorry.  I'm sorry.  In

24  support of the Sub V trustee and FSS's arguments.  Is that

25  okay, Your Honor?  I'll keep it very brief.

```
 1              THE COURT:  Go ahead.
 2              MS. STEPHENSON:  Your Honor, we just wanted to add
 3   our support for the arguments made by Mr. Battaglia and the
 4   Sub V -- the Sub V trustee, just very quickly.  We believe
 5   that, you know, that this case will be used in the future as
 6   support in other cases, you know, however Your Honor comes down
 7   on this.
 8              This is definitely, as a case of first impression,
 9   going to be an issue that is used a lot.  And as a bankruptcy
10   practitioner myself, I am wondering, you know, how we are going
11   to advise our clients on, you know, in future Sub V cases as
12   to, you know, when does the measuring stop, and what we're
13   going to tell our clients?
14              And as far as 105 is concerned, you know, I would
15   echo the statements of the Sub V trustee that it's a provision
16   that needs to dance with another bankruptcy code section that
17   -- that came from Judge Houser when she was my professor at SMU
18   -- that 105 needed to dance with another code section.
19              And these parties, Your Honor -- I just wanted to
20   remind everyone that these parties, the movants, did
21   successfully object to the joint administration motion that
22   Mr. Jones filed initially in his bankruptcy case on the basis
23   that FSS was a Sub V debtor and Mr. Jones was a Chapter 11
24   debtor.  And that's why we weren't able to jointly administer
25   these cases.
```

1          So -- and I'll just say in parting, you know, in

2    conclusion, FSS -- if FSS is not going to be a Sub V debtor, we

3    will need to sort of drastically rethink, you know, how the

4    Jones case is going to proceed.  That's all.  Thank you,

5    Your Honor.

6          THE COURT:  Thank you.

7          Mr. Kimpler.  I promise I'm not going to pay

8    attention to anyone else on the -- you've got my full

9    attention.

10         MR. KIMPLER:  Your Honor, you can pay attention to

11   whoever you would like to.

12         THE COURT:  No, no.

13         MR. KIMPLER:  Kyle Kimpler, again, from Paul Weiss,

14   on behalf of the Connecticut plaintiffs.  Your Honor, I wanted

15   to start with the conversation you had with Mr. Ha [sic] and a

16   couple questions you had raised.

17         One question was is anybody in this courtroom aware

18   of a rule where a debtor loses eligibility post-petition.  I am

19   not.  What I am aware of is that the only other sections of the

20   bankruptcy code that impose these types of eligibility

21   requirements all use the words "as of the petition date."  If

22   you look at Section 109(e) of the bankruptcy code, which

23   governs Chapter 13 eligibility.  If you look to a lot of the

24   cases you're hearing about, Parking Management, where the Court

25   was asking, you know, whether leases rejected on day one.  You

1   know, if you read that decision, it could not be more clear

2   that that decision is grounded in the language of Section

3   1182(1)(a) which says, as of the petition date.

4           So no, I am not aware of any case where a debtor

5   loses eligibility post filing.  That's because all of those

6   other cases have statutory language that says "as of the

7   petition date."

8           I also wanted to talk about the Rule 1020 and I

9   think, you know, Your Honor, is struggling maybe, hopefully

10  not, on, you know, how you get there to give this relief.  So I

11  want to go back, Your Honor, to Rule 1020, because I think

12  everything we've been focused on today is Rule 1020(b).

13          1020(b) says that the U.S. Trustee or a party in

14  interest can file an objection within 30 days.  Doesn't talk

15  about what the Court can do.  So what I would point Your Honor

16  to is Rule 1020(a), and in particular the last sentence of

17  Rule 1020(a).  I'll quote, "The status of the case as a small

18  business case or a case under Subchapter V Chapter 11 shall be

19  in accordance with the debtor's statement unless and until the

20  Court enters an order finding that the debtor's statement is

21  incorrect."

22          There is no temporal limitation there.  If this Court

23  determines that the statement is incorrect, this Court has the

24  authority to revoke the Subchapter V election.  So that then

25  raises the question.  Is the date -- the debtor's statement

1   correct?  And when you go back to 1182, and you read it, it

2   says, "the term 'debtor' does not include any member of a group

3   of affiliated debtors that has aggregate, non-contingent,

4   liquidated, secured and unsecured debts in an amount greater

5   than $7.5 million."

6        In my view, that is the end of the analysis.  You

7   don't have to read (a) to conclude that the debtor is not

8   eligible.  The requirements of (b) stand on their own.  And the

9   one thing I have not heard from any of my opponents here is how

10  does the word "subject to" in (a) mean that it is, in fact, (b)

11  that is governed by (a), and not the other way around?

12        It is subparagraph (a) that is subject to

13  subparagraph (b).  Subparagraph (b) controls in the event of a

14  conflict.  It is the governing provision, and it stands on its

15  own.  The debtor does not satisfy it.  Its election in its

16  petition sitting here today is not correct.  And under Rule

17  1020(a), this Court, I believe, has ample authority to revoke

18  that election.

19        Turning quickly, Your Honor, to the comments from

20  counsel for Free Speech.  There was a suggestion that the

21  claims were liquidated on December 2nd, so the fact that the

22  judgments were entered on December 22nd is of no moment.  The

23  debtor does not agree with that position.  The petition they

24  filed on December 2nd said the families' claims were

25  unliquidated.  And in any event, I think we are splitting hairs

1    at this point.  There is -- whether the delay that we are

2    measuring is from December 2nd or December 22nd to

3    February 15th, I don't really believe is material to the

4    ultimate analysis of whether there is excusable neglect, if

5    even that were the standard.

6         I think the real question is what is the harm?  And

7    the only thing I heard articulated as the harm of granting this

8    relief is that the debtor will lose access to Subchapter V,

9    that the debtor may have to have a creditors' committee, that

10   the debtor may have to comply with rules that it doesn't want

11   to.  And that is just not a proper articulation of harm under

12   the excusable neglect standard.

13        An analogy would be a claimant filing a late -- a

14   motion to file a late proof of claim and -- under Pioneer.  And

15   the Court asks, well, what is the harm of me allowing this late

16   claim?  And the debtor says, well, if that claim is allowed,

17   then I have to honor the claim.  But that's not the standard.

18   If it was the standard, then there would never be excusable

19   neglect.

20        On the statutory analysis argument, we heard that we

21   are trying to write out words of the statute.  I don't

22   understand that argument, Your Honor.  There is not a single

23   word in 1182 that I am not giving effect to.  The words "as of

24   the petition date" matter.  They matter in subparagraph (a) and

25   they matter when you're measuring the debts of the debtor.

1   Subparagraph (b) is a separate, stand-alone section, and our

2   interpretation of the statute does not "blue pencil" or leave

3   out any words.  There is not one word that is surplus, under

4   our interpretation.

5           I'm going to briefly respond to the argument that

6   there are other creditors that don't like the relief that the

7   families are seeking --

8           THE COURT:  You don't have to worry about that.

9           MR. KIMPLER:  They've not raised an objection.  And

10  then finally, on this, quote, unquote "snapshot" rule.  Again,

11  the snapshot rule comes from cases applying provisions that

12  have the words "as of the petition date."  That is the origin

13  of the snapshot rule.  That's the articulation of the court in

14  the Parking Management case.  There is no similar language in

15  subparagraph (b).

16          Your Honor, I think that's all I had, unless you had

17  questions of me.

18          THE COURT:  No, no, no.  Very much appreciate all

19  the --

20          MR. KIMPLER:  Thank you.

21          THE COURT:  -- arguments of the parties.

22          MR. KIMPLER:  Appreciate your time.

23          THE COURT:  I want to check -- you all have given me

24  something to think about, and I want to check on something.

25  I'm going to rule today.  Give me -- I want to go back and just

1  check on one thing before I come out and render a decision.

2       It is 2:48.  When we come back, I will -- I'm going

3  to keep the line unmuted.  I'm going to mute the line here.

4  Just be careful, folks.  I'm going to come back at 3:10 and

5  render the decision.  Twenty minutes.  Okay.

6     (Recess taken at 2:48 p.m.)

7     (Proceedings resumed at 3:11 p.m.)

8       THE COURT:  Good afternoon, everyone.  This is Judge

9  Lopez, back on the record in Free Speech Systems, addressing

10  the motion filed by the Texas and Connecticut plaintiffs to

11  revoke the Subchapter V election of the debtor.

12       I'm going to -- well, let's see.  The entire line is

13  now muted.  Okay.  No, not really.  For those who had their

14  lines unmuted by the Court, I'd ask that you please mute your

15  line so I can read the decision in.  I will let the parties

16  know, in light of everyone telling me it's a matter of first

17  impression, I'll -- give me a day or two, and I will dot my I's

18  and cross my T's and get something out that the parties can

19  have in writing.  It's important enough, and I want to make

20  sure everybody has something in writing.

21       I'm going to read the decision in here.  What I

22  submit will not be materially different.  Might be some editing

23  stuff, but the substance will be there.  So okay.

24       This relates to Docket 468.  I'm going to note the

25  debtor filed a voluntary bankruptcy petition in July of 2022

1   and elected to proceed as a Subchapter V case.  The petition

2   was signed initially by the debtor's former CRO.  And in

3   December 2022, Alex Jones, who owns the debtor, filed a

4   separate Chapter 11 case.

5           The Connecticut plaintiffs and the Texas plaintiffs

6   acknowledge that the debtor was eligible as a Subchapter V

7   debtor at the time of filing, but argue it lost eligibility

8   after Jones started his bankruptcy case.  So they seek an order

9   revoking the debtor's Subchapter V election and changing this

10  case to a traditional Chapter 11 one.

11          Thus, the Court must examine whether eligibility of a

12  Subchapter V debtor may be impacted by post-petition bankruptcy

13  filing of an affiliate, whether the Court has the power to

14  revoke a Subchapter V election and, if so, under what

15  circumstances is appropriate.

16          After carefully analyzing the text and structure of

17  the Bankruptcy Code and the arguments of counsel, I'm going to

18  find that the debtor remains eligible under Subchapter V, and

19  that it's also in the best interest of the estate and its

20  creditors to stay as a Subchapter V case for now.

21          By now it's well-known that the plaintiffs sued the

22  debtor and Jones in Texas and Connecticut state courts.  These

23  lawsuits eventually resulted in default judgments.  But before

24  the damages trial in Texas concluded, damages trial in

25  Connecticut started, the debtor started this bankruptcy case

1  and elected to proceed under Subchapter V.  I would note the

2  Bankruptcy Code provides that it is the debtor who makes the

3  election under Subchapter V.

4       Early into this case, the Court entered agreed orders

5  modifying the automatic stay to allow the state court actions

6  to conclude.  In October of 2022, a jury awarded about

7  1.5 billion in damages to the Connecticut plaintiffs.  In

8  December 2022, Jones started his bankruptcy case.  Several

9  months later, in February 2022 [sic] the plaintiffs moved to

10  revoke the debtor's Subchapter V election.  They argue that the

11  debtor stopped qualifying as an eligible Subchapter V debtor

12  once Jones filed his Chapter 11 case.  The plaintiffs asked the

13  Court to revoke the Subchapter V election rather than dismiss

14  the case or convert it because they believe it serves the best

15  interests of the debtor's estate and its creditors, reflects

16  Congressional intent in enacting Subchapter V, and is the most

17  constructive path forward.

18       The U.S. Trustee filed a response supporting the

19  plaintiff's motion.

20       The debtor disagrees for several reasons.  First, it

21  argues the Court lacks authority to de-designate a Subchapter V

22  election because no provision of the Bankruptcy Code allows for

23  it.  Second, the bankruptcy -- the debtor maintains its

24  Subchapter V eligibility and it was not impacted by Jones'

25  case, and that the text of the Bankruptcy Code supports its

1    position.  And finally, it believes that staying in Subchapter

2    V serves the best interests of all parties, given the current

3    state of this case and the cost involved in a traditional

4    Chapter 11.

5            This is a core proceeding under 28 U.S.C. Section

6    157(b)(2)(A).  The Court has jurisdiction under 28 U.S.C. 1334.

7    And I'll note that the parties express an implied consent, also

8    provides the Court constitutional authority to enter a final

9    judgment.

10           The legal dispute requires an in-depth analysis of

11   Subchapter V of the Bankruptcy Code.  Thus, as always, the

12   Court begins with the text.  Fifth Circuit has said in

13   Whitlock v. Lowe, 945 F.3d 943, "In matters of statutory

14   interpretation, the text is always the alpha."

15           Supreme Court has said "Words and phrases in a

16   statute are considered holistically, including the full text

17   language, as well as the punctuation structure and the subject

18   matter.  Statutes should be construed so that effect is given

19   to all of its provisions so that no part will be inoperative or

20   superfluous, void, or insignificant."  You'll have the cases.

21           And finally, "The preeminent canon of statutory

22   interpretation requires [the court] to presume that [the]

23   legislature says in its statute what it means and means in a

24   statute what it says there."

25           Section 1182(1) defines a Subchapter V "debtor," and

1  I put "debtor" in quotes, and lists the eligibility

2  requirements.  1182(1) says, among other things, that subject

3  to subparagraph (b) the debtor may not have more than 7.5

4  million in aggregate, non-contingent, liquidated secured and

5  unsecured debts as of the date of the filing of the petition.

6          Subparagraph (b) says that the term "debtor" -- and I

7  use that in quotes -- does not include any member or group of

8  affiliated debtors in a bankruptcy that has aggregate debts

9  above the 7.5 million cap.  That's a general definition.

10          Plaintiffs focus on the fact that subparagraph (b)

11  does not include the phrase "as of the petition date" of the --

12  as of the -- excuse me -- "as of the date of the filing of the

13  petition."  So, according to them, that makes subparagraph (a)

14  temporal with respect to the debt, and subparagraph (b) a

15  continuing obligation.  Thus, if an affiliate of the debtor

16  later files a traditional Chapter 11 case or 7 with debts

17  exceeding the cap, it makes the first debtor ineligible under

18  Subchapter V.  Plaintiffs believe that the debtor lost

19  eligibility once Jones filed the bankruptcy case because he's

20  an affiliate of the debtor whose debts exceed the 7.5 million

21  cap.

22          The debtor disagrees and argues that eligibility is

23  determined and fixed as of the petition date, subject to a

24  challenge period under Bankruptcy Rule 1020 had already

25  expired.

1          The text and structure of the Bankruptcy Code and the

2    bankruptcy rules prove that the debtor is right.  Bankruptcy

3    Rule 1020(a) requires a debtor to state in its voluntary

4    petition if it elects to proceed under Subchapter V.  Question

5    8 of the voluntarily petition, which is Official Form 201,

6    requires a debtor seeking to proceed under Subchapter V to

7    check a box stating that the debtor is a debtor as defined in

8    1182(1) and its aggregate, non-contingent liquidated dates,

9    excluding insiders or affiliate, are less than 7.5 million, and

10   it chooses to proceed under Subchapter V.

11         1182(1)(a) states that subject to subparagraph (b)

12   states -- excuse me.  Section 1182(1)(a) states that it's

13   subject to subparagraph (b).  So a debtor must satisfy both

14   prongs on the petition date before it should check the box

15   electing to proceed as a Subchapter V case.

16         Sub (b) is therefore a petition date check on a

17   filing debtor to make sure there isn't already an affiliate in

18   bankruptcy with debts exceeding the cap, and check that the

19   debtor isn't part of a group of affiliated debtors filing on

20   the same day.  This check would also apply if a debtor later

21   amended its voluntary petition, for example, under Bankruptcy

22   Rule 1009.  So, subparagraphs (a) and (b) are to be construed

23   together at the same time, all the time.

24         No one disputes that the debtor's election to proceed

25   under Subchapter V on its petition date, Jones is in a

1  traditional Chapter 11 case.  It wasn't eligible for Subchapter

2  V on his petition date because the debtor had started the

3  bankruptcy case, and the judgments in the Texas and Connecticut

4  lawsuits were liquidated; in other words, he would have failed

5  1181 -- 1182(1)(a) and (b).

6       The bankruptcy rules confirm a voluntary petition

7  date or subsequent amendment date eligibility analysis.

8  Bankruptcy Rule 1020(a) says a bankruptcy case proceeds in

9  accordance with a debtor's statement of election in the

10  petition unless and until the Court enters an order finding

11  that the debtor's statement is incorrect.  1020(b) allows

12  parties to challenge the debtor's statement of election no

13  later than 30 days after the meeting of creditors under

14  Section 341 of the Bankruptcy Code, or within 30 days after any

15  amendment, whichever is later.

16       So, to recap, the debtor makes the statement of

17  election to proceed under Subchapter V in a bankruptcy

18  petition, then proceeds in accordance with the statement of

19  election and, unless the Court findings that the statement is

20  incorrect, the date or statement of election on its voluntary

21  petition and the basis for making it as of that day remain

22  true, and the time provided for it under Rule 1020(b) has long

23  expired in this case.

24       The plaintiffs correctly note that Jones filed his

25  case after the applicable challenge period expired.  I mean,

1   technically, you didn't have a chance to timely object until

2   then, although waiting at least over 60 days after the Jones

3   petition date is considerably late, regardless.

4           It doesn't change the answer here.  Section 1182 in

5   the bankruptcy rules must be construed strictly according to

6   the text and how they comport within the overall structure of

7   Subchapter V.  There is no rule or procedure to challenge a

8   debtor's eligibility under Subchapter V beyond the period in

9   Rule 1020(b).  Thus, eligibility is best construed as fixed

10  after the challenge period under Rule 1020(b) expires.

11          It's the only way to construe the text in a manner

12  that gives meaning to every word of Section 1182 in the

13  bankruptcy rules.  It's not the role of a Court to second-guess

14  Congress's judgment about the need for finality on this point.

15  For this, I cite the Bartenwerfer decision.

16          The plaintiffs believe that the Court should consider

17  an objection under 1020(b) under excusable neglect.  While

18  9006(b) would permit it on a motion made after the expiration

19  after the specified period permitting the act to be done,

20  excusable neglect is the failure to timely perform a duty due

21  to circumstances that were beyond the reasonable control of the

22  person whose duty it was to perform.  Determining whether the

23  movants have established excusable neglect, the Fifth Circuit

24  have considered certain factors, including the danger of

25  prejudice to the debtor, the length and delay of its potential

1  impact on judicial proceedings, the reason for delay, and

2  whether the movant has acted in good faith.  Good faith is not

3  an issue here today.

4          The inquiry at the bottom is an equitable one.  The

5  burden to show excusable neglect is a common one.  I would note

6  that at the outset Mr. Battaglia is right.  There has never

7  been a motion for -- seeking excusable neglect.  The first time

8  excusable neglect was raised was actually in the reply brief.

9  So there's never been a formal motion seeking an extension of

10  time.  There is substantial harm to the debtor for the reasons

11  I will give to you in a moment and explain more below.

12          Subchapter V in many ways is substantially different

13  than a traditional Chapter 11 case in terms of the pace of the

14  case, the statutory requirements of the case.  In many ways

15  they're the same, but in many ways, the material ways, they're

16  very different.

17          I would note that at least 65 days is more than

18  enough time to have brought a challenge to the Subchapter V

19  election.  I would note that these are the Texas and

20  Connecticut plaintiffs.  The sophistication of counsel

21  argument, I understand it, but it really bears no -- to me,

22  they're all brilliant lawyers here.  (Indiscernible) so it did

23  nothing that's even questionable, even remotely questionable.

24  I just think that the time period -- and I understand why they

25  did what they did.  I just think there's been more than enough

1 | time to bring one, and I think that that factor brings

2 | substantial harm to the debtor.

3 |        Limiting eligibility challenges to the debtor's

4 | statement of election, right, also makes practical sense in a

5 | Subchapter V case.  Subchapter V is a streamlined Chapter 11

6 | process, and a debtor has to work from the outset.  The Court

7 | must hold a status conference 60 days into a case to further

8 | the expeditious and economic resolution of the case.

9 |        No later than 14 days before the status conference,

10 | the debtor is required to submit a status report detailing

11 | efforts undertaken to obtain a consensual Chapter 11 plan.  And

12 | only the debtor can file a plan.  And it must do so no later

13 | than 90 days in a case unless the Court fins that the needs for

14 | an extension is attributable to circumstances for which the

15 | debtor should not justly be held accountable.  All right.  And

16 | if the debtor fails to timely file a plan, it constitutes, in

17 | this Court's opinion, cause to dismiss the case.

18 |        I would note that there's a Subchapter V plan, and I

19 | have found that there's been necessity for an extension in this

20 | case.  If post-petition events lead to ineligibility and

21 | revocation, it means that debtors can float in and out of

22 | Subchapter V at any time.  That's the problem highlighted in

23 | the In Re Parking Management decision cited by the debtor.

24 | While that case focused on eligibility and the debtor's own

25 | debts, rather than the aggregate debts of a group of affiliated

1   debtors, the court held generally that opening up the

2   eligibility determinations to post-petition events, even if

3   deemed to apply retroactively, is contrary to the purpose and

4   spirit of Subchapter V and could nullify the very benefits it

5   intended to convey.

6         A rolling eligibility trap could also punish an

7   innocent Subchapter V debtor.  For example, a corporate debtor

8   with its own board could decide to file a Subchapter V case and

9   be subject to losing eligibility, presumably even while

10  soliciting a plan, just because a parent company with a

11  separate board, and perhaps even its own separate independent

12  debt, decided to file its own case later on.  A better reasoned

13  approach is to allow the first case to proceed after the

14  challenge period expires and prohibit the second one from

15  proceeding under Subchapter V if it tried to do so.

16        I believe there's a reason the plaintiffs asked the

17  Court to revoke the Subchapter V 11 using, among other things,

18  Section 105 of the Bankruptcy Code, that the Bankruptcy Code

19  and the bankruptcy rules don't provide a standard for assessing

20  a motion to amend a bankruptcy petition to revoke a Subchapter

21  V election (indiscernible) the Court to revoke it outright.

22        There is a decision holding that a court is empowered

23  to de-designate a Subchapter V case and allow it to proceed as

24  a regular Chapter 11 pursuant to, among other things, Section

25  105.  That's the National Small Business Alliance case.  The

1    facts in that case, including a failed attempt to confirm a

2    fifth amended and revised Chapter 11 plan, are from from

3    present here.  And as the Bankruptcy Court for the District of

4    Delaware recently explained in In Re ComedyMX, "The decision to

5    proceed under Subchapter V is within the exclusive province of

6    the debtor.  There can be no suggestion that a creditor may

7    move a court to amend a petition to designate a case as one

8    under Subchapter V over a debtor's objection.  Notwithstanding

9    the language of Rule 1009(a), stating that a petition may be

10   amended on a motion of a party in interest, it cannot be argued

11   that parties in interest have carte blanche to file a motion

12   seeking to move debtors in or out of Subchapter V as they see

13   fit."

14         Revocation leads to additional problems.  If this

15   Court were to revoke a Subchapter V election, Subchapter V

16   trustee would be immediately discharged, but nothing in the

17   code allows for this.  Right?  On the contrary, 1183(c) states

18   that the service of the trustee, right, in a Subchapter V case

19   terminates when the plan is substantially consummated.  Right?

20   There's no procedure for what happens to a Subchapter V

21   trustee, and that's because it's not contemplated by the code.

22         Without express authority from the Bankruptcy Code to

23   revoke a Subchapter V election, this Court won't do it.

24   Nothing is also in the code to suggest that any revocation

25   authority the Court may hold means a Subchapter V case is

1    converted to a traditional Chapter 11 case.  Bankruptcy Code

2    authorizes dismissal or conversion for cause and debtors may

3    elect to amend their petition.

4        Subchapter V differs from a traditional Chapter 11

5    case in material ways.  Consider, for example, the plan

6    confirmation process.  Subchapter V debtor has the right to

7    seek confirmation of a non-consensual plan, even if no class of

8    creditors votes for it, and the absolute priority rule wouldn't

9    apply.  Forcing the debtor to conform to a new Chapter 11

10   process with increased attendant costs, new deadlines, debtor

11   in this case would likely have to file an entirely new

12   Chapter 11 plan, right, and wait for the formation of an

13   unsecured creditors' committee.  There's a time delay here.

14   None of that is prescribed under the code.

15       In any event, even if the Court could revoke a

16   Subchapter V selection, it wouldn't do so in this case.  The

17   primary reason the damages portion of the Texas and Connecticut

18   cases concluded was that this court entered an agreed order

19   modifying the stay to allow them to proceed and to conclude,

20   and the debtor, the plaintiffs, and Jones, currently engaged in

21   mediation, to the best of the Court's knowledge.  The debtors

22   also filed a Subchapter V plan and two non-dischargability

23   adversary cases have started against the debtor.  The issues

24   that will define this case are quickly coming to a head, and

25   this Court is ready to address them with all due process.

```
 1              So, for the reasons stated above, I'm going to order
 2   that the motion to revoke the debtor's Subchapter V election is
 3   denied.  I'll get you something more official in writing.  I
 4   appreciate all the arguments from all the parties.  Give me a
 5   day or two to make sure that my Blue-booking and all that stuff
 6   is done correctly.  Nothing will substantially change.  I think
 7   everyone's entitled to that in writing.  There's an audio that
 8   provides for it.
 9              I appreciate all the arguments of the parties.  You
10   know, a lot has been said about timing.  I'm honored that some
11   of the smartest lawyers in America have been appearing in this
12   case to talk about these issues, and it only makes the process
13   all the better, allows the Court to consider issues.  So I
14   appreciate Texas counsel, Connecticut counsel, debtor's
15   counsel, Subchapter V trustee and her counsel, and United
16   States Trustee.
17              That's my ruling.  I'll get you something in writing.
18   I think everyone deserves a written decision on this one.  It's
19   important that you have it, and (indiscernible) just wait for
20   that.
21              I am -- I do want to stress the importance.  I think
22   what this case has shown me for sure, which is on everyone's
23   mind -- no question about it -- is we've got to focus these
24   cases and figure out either the plan is confirmed, not
25   confirmed, deal with dischargability issues.  So I am going to
```

1   look at my calendar.  And if I can do it earlier, I'll do it

2   earlier, in terms of scheduling.  I don't think there's many --

3   y'all can tell me in terms of how much time everybody's going

4   to need.

5        So I'd ask plaintiff's counsel to -- why don't you

6   get with Mr. Battaglia and just start figuring out what dates

7   would look like.  I won't stand in the way of a reasonable

8   scheduling order.  But I do agree it's been a lot of time in

9   this case, and I understand the parties are in mediation.  And

10  I don't like talking while parties are in the middle of

11  mediation.  And I have no idea what's happening in mediation.

12  And so I don't know whether things are positive or not

13  positive, and that's not for me to know.  The process works

14  better and it's intended for me not to know anything, but I

15  would stress I'm ready to answer questions and I'm ready to

16  deal -- tee the issues up before me, and let me take them up

17  one at a time, and we'll deal with them in due course.

18        Everybody's time is going to be respected.  I don't

19  want to rush anything.  But the issues that need to come before

20  me, I'm going to start pushing that they get before me in

21  reasonable time, not just in the Free Speech case, but in

22  Mr. Jones' case as well.  I think we need to set a status

23  conference in that one, as well.  I haven't looked at that case

24  as well.  But -- and I understand the parties are going to work

25  on -- and I don't want to get in the way of discussions on a

1    potential agreed order.  But if there's not one, then I want to

2    take that issue up as well.  I'll be ready to deal with it.

3              Any questions about anything?  Okay.  Everyone, thank

4    you for your time.  Have a good day.

5         (Proceedings concluded at 3:34 p.m.)

6                              * * * * *

7

8

9

10

11

12

13

14                     **C E R T I F I C A T I O N**

15

16         I, Alicia Jarrett, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428    DATE: April 5, 2023

25   ACCESS TRANSCRIPTS, LLC