## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 22 - 60043** |
| **FREE SPEECH SYSTEMS, LLC,** | § | |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

### SHANNON & LEE LLP'S OMNIBUS REPLY TO OBJECTIONS TO ADMINISTRATIVE EXPENSE MOTION

Shannon & Lee LLP ("S&L") replies to the objections by the United States Trustee [ECF No. 267] (the "UST Objection"), Alex Jones [ECF No. 268] (the "AEJ Limited Objection"), and the Debtor and Subchapter V Trustee [ECF No. 269] (the "Debtor/Trustee Objection") to Shannon & Lee LLP's Motion for Order Allowing Administrative Expense Claim and Granting Related Relief [ECF No. 251] (the "Administrative Expense Motion") as follows:

### INTRODUCTION

#### A. Background

1.      The Debtor filed its application to employ S&L [ECF No. 85] (the "S&L Employment Application") on August 20, 2022. The Debtor sought to employ S&L as co-counsel along with the Law Firm of Ray W. Battaglia PLLC (the "Battaglia Firm"). The primary responsibility of the Battaglia Firm was to provide legal advice regarding strategy for the Debtor's chapter 11 case and implementation of that strategy. The Debtor contemplated that S&L's focus would be issues involving the Sandy Hook Litigation and routine, day-to-day matters.

2.      The U.S. Trustee filed an objection to the S&L Employment Application on September 12, 2022, and amended the objection on September 14, 2022 [ECF No. 154] (the "S&L Employment Application Objection"). Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique

De La Rosa, and Marcel Fontaine (collectively, the "Texas Plaintiffs") and David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Donna Soto, Carlee Soto Parisi, Carlos M. Soto, Jillian Soto-Marino, William Aldenberg, William Sherlach, and Robert Parker (collectively, the "Connecticut Plaintiffs, and together with the Texas Plaintiffs, the "Sandy Hook Plaintiffs") joined the S&L Employment Application Objection. [ECF No. 159].

3.     The U.S. Trustee did not dispute the factual allegations made in the S&L Employment Application. Instead, the U.S. Trustee asked the Court to deny the S&L Employment Application because S&L attorney Kyung Lee did not supplement the Rule 2014 disclosures for Kyung S. Lee PLLC ("KSLPLLC") in the chapter 11 cases previously jointly administered under Case No. 22-60020 (the "IW Cases") for InfoW, LLC, Prison Planet TV, LLC, and IW Health, LLC (the "IW Debtors"). The U.S. Trustee argued that Lee was required to supplement his disclosures to reflect that he had agreed to meet and met with the Debtor on May 24, 2022, where potential restructuring options for the Debtor were discussed. At the September 13, 2022, hearing before this Court, the U.S. Trustee confirmed that this was the only basis for the S&L Employment Application Objection (Sept. 13, 2022, Hrg. Tr. 36:1-9). The Sandy Hook Plaintiffs did not expand upon the U.S. Trustee's objection in their joinder filed on September 15, 2022.

4.     The Debtor, through S&L, filed a reply to the UST Employment Application Objection [ECF No. 166] (the "S&L Employment Application Reply") on September 16, 2022. In the S&L Employment Application Reply, the Debtor argued that (a) Lee's disclosures in the IW Cases complied with Bankruptcy Rule 2014 because the IW Debtors were no longer seeking to obtain court approval of their professionals' employment, (b) the S&L Employment Application should be granted notwithstanding any failure of Lee and KSLPLLC to supplement their

disclosures in the IW Cases, and (c) if the Court believed that a penalty should be imposed on S&L in the Debtor's case for Lee's failure to supplement his disclosures in the IW Cases, the Court should reduce S&L's allowable compensation.

5.    The Court held a hearing on the S&L Employment Application on September 20, 2022 (the "September 20 Hearing"). The Debtor recited in its opening statement that no party in interest disputed that S&L was disinterested. (Sept. 20, 2022, Hrg. Tr. 19:24-20:20:7). In the U.S. Trustee's opening statement, counsel for the U.S. Trustee confirmed that the non-disclosure was the only basis for the S&L Employment Application Objection. (Sept. 20, 2022, Hrg. Tr. 44:5-15). The Sandy Hook Plaintiffs also indicated that candor and disclosure was the only basis for their joinder. (Sept. 20, 2022, Hrg. Tr. 47:17-21). As the Court stated after the close of evidence, neither party had talked about what it means to hold an adverse interest to the estate. (Sept. 20, 2022, Hrg. Tr. 210:13-18). The Court ultimately denied the S&L Employment Application, seemingly at least in part on the grounds that S&L had a predisposition under circumstances that actually or potentially rendered such predisposition a bias against the estate and amounted to an interest materially adverse to the estate. (*See* Sept. 20, 2022, Hrg. Tr. 234:15-24, 248:13-14).

6.    On October 4, 2022, S&L filed Shannon & Lee LLP's Motion Pursuant to Rule 59 of the Federal Rules of Civil Procedure for Rehearing on the Issue of Disinterestedness with Respect to the Debtor's Application to Employ Shannon & Lee LLP [ECF No. 206] (the "Rule 59 Motion"). The Rule 59 Motion requests a rehearing on the issue of disinterestedness on the grounds of unfair surprise. S&L seeks to present additional evidence and arguments at a rehearing pursuant to Rule 59(a) because the issue of disinterestedness was not raised or disputed prior to the September 20 Hearing. S&L contends that under the circumstances it did not have a full and fair opportunity to litigate the issue and seeks to present additional evidence that it would have

marshalled had it known that disinterestedness was an issue in controversy at the September 20 Hearing.

7.      The U.S. Trustee and Alex Jones filed objections to the Rule 59 Motion [ECF Nos. 217 & 223]. The Sandy Hook Plaintiffs joined the U.S. Trustee's objection. [ECF No. 226]. Central to the U.S. Trustee and Alex Jones's objections to the Rule 59 Motion is their assertion that S&L did not have standing or statutory authority to bring the Rule 59 Motion.[1] S&L filed replies to the objections to the Rule 59 Motion [ECF Nos. 218 & 270].

8.      While S&L contends that Rule 59(a) relief is appropriate under the circumstances, S&L continued to evaluate the Court's ruling at the September 20 Hearing in light of the position taken by the U.S. Trustee and Jones. The Court's ruling does not foreclose other avenues for S&L to address its primary motivation for filing the Rule 59 Motion and expressly left open questions about S&L's retention and work done prior to its ruling. (Sept. 20, 2022, Hrg. Tr. 256:14-17). The Court also indicated that all parties' rights were reserved on these questions and with respect to compensation. (Sept. 20, 2022, Hrg. Tr. 256:25-257:8). Considering the Court's statements and the positions of the U.S. Trustee and Jones, S&L filed the Administrative Expense Motion on October 24, 2022, as an alternative to the Rule 59 Motion.

9.      In the Administrative Expense Motion, S&L seeks the allowance of an administrative expense in the amount of $320,196.25 under various theories. First, S&L seeks retroactive approval of its employment for the limited period from the Petition Date through the September 20 Hearing under Bankruptcy Code § 327(a) or 327(e), award of compensation under Bankruptcy Code § 330, and allowance of an administrative expense under Bankruptcy Code § 503(b)(2). Second, S&L seeks *de facto* retroactive approval of its employment for the limited

---

[1] Based on the statements of Jones' counsel at the October 12, 2022, hearing, it is not clear whether Jones continues to oppose the Rule 59 Motion on this basis.

period from the Petition Date through the September 20 Hearing and allowance of an administrative expense under Bankruptcy Code § 503(b)(1) for services and expenses necessary to preserve the estate. Third, even absent actual or *de facto* approval of its employment, S&L seeks allowance of an administrative expense for the out-of-pocket expenses S&L incurred that would have otherwise been borne by the estate. Fourth, even absent actual or *de facto* approval of its employment, S&L seeks authority to apply its prepetition Retainer to reimburse S&L for the Debtor's chapter 11 filing fee consistent with the prepetition engagement letter between the Debtor and S&L. S&L also seeks authority to apply its prepetition Retainer to the amount of any otherwise allowed administrative expense claim.[2]

10.     There were three (3) objections filed to the Administrative Expense Motion. In broad terms, the U.S. Trustee, the Debtor, and the Subchapter V Trustee oppose the allowance of an administrative expense absent the Court's approval of S&L's limited employment. Alex Jones filed a limited objection indicating that he does not oppose the amount of the administrative expense requested—reflecting a discount of $62,475—but disputes that immediate payment beyond S&L's prepetition Retainer is appropriate because of the Debtor's financial condition.

**B.  Summary of Objections to the Administrative Expense Motion and Replies**

11.     The underlying dispute appears limited. The Plaintiffs and Alex Jones oppose the Rule 59 Motion but not the Administrative Expense Motion (subject to the reductions therein).[3] The Debtor and the Subchapter V Trustee did not object to the Rule 59 Motion but oppose the Administrative Expense Motion. Only the U.S. Trustee objected to both. But neither the Debtor,

---

[2] The proposed order attached to the Administrative Expense Motion contemplates that any allowed administrative expense exceeding the Retainer would be paid pursuant to a plan of reorganization or as otherwise agreed by the Debtor and subject to restrictions on the use of cash collateral.

[3] At the October 12, 2022, hearing, Jones's counsel indicated that his opposition to the Rule 59 Motion was that it might prevent the Debtor from moving forward with a new chief restructuring officer and that Jones sought to prevent any waiver of his common interest privilege. It is not clear whether Jones continues to oppose the Rule 59 Motion after clarification of the relief that S&L seeks therein.

the Subchapter V Trustee, nor the U.S. Trustee (a) dispute that the Court can and should consider retroactive approval of S&L's limited employment through the Administrative Expense Motion, (b) assert that S&L holds or represents an interest adverse to the estate, or (c) argue that the compensation and expenses sought by S&L would not be reasonable under section 330 if that provision applies. Their unstated position appears to be simply that the Administrative Expense Motion cannot be granted unless the Court *does* retroactively approve S&L's limited employment. While S&L contends that there are also other available mechanisms available, that is one of the alternatives presented. *See* Administrative Expense Motion ¶¶ 26-30.

12.     Notwithstanding the apparent limited scope of the dispute, S&L responds in detail to the arguments set out in the objections in this Reply. The arguments raised in the objections to the Administrative Expense Motion and S&L's replies thereto are summarized below.

        *i.     UST Objection*

13.     The U.S. Trustee filed the UST Objection on November 14, 2022. The U.S. Trustee objects (a) to compensation under Bankruptcy Code § 330 because S&L has not been employed under Bankruptcy Code § 327; (b) to an administrative expense claim for fees and expenses under Bankruptcy Code § 503(b)(1)(A) because the section does not apply to professional fees, at least where the professional does not meet the requirements of Bankruptcy Code § 327; (c) to retroactive employment under Bankruptcy Code § 327(e) because the Debtor did not specifically seek to employ S&L under that provision and S&L provided some services related to "conducting the case" as that term is used Bankruptcy Code § 327(e); (d) to the use of the S&L's prepetition retainer for the Debtor's filing fee for this chapter 11 case because Bankruptcy Code § 363(c) can only be invoked by the Debtor and such payment is not ordinary course; and (e) to the consensual resolution of the disputes in the Administrative Expense Motion and the Rule 59 Motion.

14.     Although expressly raised in paragraphs 26-28 of the Administrative Expense Motion, the UST Objection does not address the Court's ability to retroactively authorize S&L's employment through the September 20 Hearing pursuant to Bankruptcy Code § 327(a) in connection with an application for compensation, as indicated by *In re Triangle Chems.*, 697 F.2d 1280 (5th Cir. 1983). The Fifth Circuit's decision was not called into question by *Lamie v. United States Tr.*, 540 U.S. 526 (2004), which dealt with compensation under Bankruptcy Code § 330 for the attorney of a chapter 7 debtor that *could not* have been employed under Bankruptcy Code § 327. Retroactive approval of S&L's employment through the September 20 Hearing is consistent with the Court's ruling and appropriate in light of the existence of lead counsel, the expansion of the Subchapter V Trustee's duties, the limited scope of the duties of a subchapter v debtor. Neither collateral estoppel nor law of the case doctrines prevent retroactive approval of S&L's employment on the limited basis requested in the Administrative Expense Motion and the UST Objection presents no arguments why retroactive approval of the limited employment cannot or should not be approved. S&L submits that it meets the relevant standards and the Court can and should retroactively approve the limited employment requested.

15.     The U.S. Trustee's argument with respect to Bankruptcy Code § 327(e) also fails to address the ability of a professional to seek approval of its own employment in connection with a request for compensation and further disregards the relevant caselaw about what constitutes "conducting the case" under the statute. S&L can seek approval of its employment through a request for compensation. And while certain of the services provided by S&L would not fall under the scope of employment under section 327(e) and therefore would not be compensable, the majority of the services S&L provided were related to the matters designated as S&L's primary

responsibility in the S&L Employment Application and for which S&L seeks approval of its employment under section 327(e) in the alternative.

16.     S&L disagrees with the U.S. Trustee's blanket assertion that Bankruptcy Code § 503(b)(1)(A) cannot provide a mechanism for the payment of professional fees or expenses. Even if a professional cannot look to the higher standards applied to administrative expenses under section 503(b)(1)(A) where it does not meet the requirements of section 327, *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474 (B.A.P. 9th Cir. 1996), indicates that fees can be allowed as an administrative expense under section 503(b)(1)(A) where the professional *does* meet the standards of section 327 but is unable to seek approval of its own employment for some reason. In responding to this point, the U.S. Trustee does not and cannot articulate any adverse interest or assert that the adverse interest is present under the limited scope of employment sought. The U.S. Trustee asserts only that the S&L Employment Application was denied because the Court found the professionals had a material adverse interest to the Debtor's estate. Further, even if Bankruptcy Code § 503(b)(1)(A) is entirely unavailable for a professional's fees, S&L contends that the provision applies to out-of-pocket expenses that would have otherwise been borne by the estate. The U.S. Trustee presents no argument why these expenses (e.g., the cost of serving pleadings and notices) would not be necessary costs of preserving the estate.

17.     The U.S. Trustee's argument with respect to Bankruptcy Code § 363(c) does not respond to the limited relief sought by S&L. The Administrative Expense Motion seeks only authority for S&L to apply the Retainer to the Debtor's filing fee consistent with the terms of S&L's engagement letter with the Debtor. This meets the horizontal and vertical standards usually applied to determine whether a transaction is in the ordinary course. And there must be some mechanism to allow payments of a filing fee—which is in practice only payable after the filing of

a petition—from amounts held in an attorney's trust account when that is what is contemplated in the relevant engagement agreement.

18. The U.S. Trustee's assertion that the parties cannot consensually resolve the Administrative Expense Motion and Rule 59 Motion is also misplaced. The authority cited by the U.S. Trustee—*Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings Inc.)*, 508 B.R. 283 (S.D.N.Y. 2014)—indicates only that the parties cannot consent around the relevant standard that will apply. That case involved a plan of reorganization providing that the individual committee members' reasonable professional fees would be treated as administrative expenses without requiring any showing of substantial contribution. *Id.* at 287. That is not the situation presented here. S&L contends that (a) a rehearing under Rule 59(a) is appropriate; (b) S&L meets the standards for retroactive approval of its employment or *de facto* retroactive approval of its employment in connection with the Administrative Expense Motion; (c) S&L's services and expenses meet the standards for the award of compensation and reimbursement under section 330 in the amount of $320,196.25; (d) S&L's services and expenses meet the standard under section 503(b)(1)(A) in the amount of $123,597.01; and (e) even absent actual or *de facto* approval of its employment, S&L has a valid administrative expense claim for expenses that would have otherwise been borne by the estate and should be able to apply the Retainer to the Debtor's filing fee. And no party in interest has articulated any interest held or represented by S&L that is adverse to the Debtor's estate. A compromise here would not seek to alter the provisions of the Bankruptcy Code, but rather resolve (ostensibly) disputed application of the Bankruptcy Code to the particular facts.

  *ii. Debtor/Trustee Objection*

19. The Debtor and the Subchapter V Trustee filed their Debtor/Trustee Objection on November 14, 2022. The Debtor and Subchapter V Trustee argue that as an unretained

professional, S&L is not able to seek compensation pursuant to Bankruptcy Code §§ 330 or 503. The Debtor/Trustee Objection does not assert that (a) retroactive employment under Bankruptcy Code § 327(a) or (e) would be inappropriate, (b) S&L is not entitled to reimbursement of out of pocket expenses under Bankruptcy Code § 503(b)(1), or (c) S&L is not entitled to apply the prepetition Retainer for reimbursement of the Debtor's filing fee to initiate the chapter 11 case.

20.     The arguments advanced in the Debtor/Trustee Objection overlap those of the UST Objection. The Debtor and Subchapter V Trustee present a few additional authorities, while the U.S. Trustee makes additional arguments. S&L responds to and addresses together the Debtor/Trustee Objection and UST Objection in more detail below.

###### iii.    *AEJ Limited Objection*

21.     Alex Jones filed a limited objection to the Administrative Expense Motion on grounds different from the U.S. Trustee, the Debtor, or the Subchapter V Trustee. Jones does not oppose the allowance of the Requested Administrative Expense Claim—subject to the discount described in the Administrative Expense Motion—or the application of the Retainer to the allowed amounts but "does not agree that the payment schedule is reasonable for the current status of this FSS Chapter 11 Case." AEJ Limited Objection ¶ 10. Jones asserts, in essence, that the $62,475.00 reduction in fees reflected in the Administrative Expense Motion should be *required* even absent S&L's voluntary reduction.

22.     Alex Jones makes two arguments in the AEJ Limited Objection. <u>First</u>, Jones takes issue with the services S&L provided the Debtor in connection with addressing the Court's concerns about the disclosures of Lee and Schwartz in the IW Cases and that Jones should be shouldering his share of the expenses for the Connecticut state court trial. Jones asserts that S&L should have made particular arguments that would have been beneficial to Jones, including that Jones (a) was entitled to indemnity from the Debtor, (b) paid 100% of the Debtor's legal fees

10

before the bankruptcy filing, and (c) purchased $400,000 in consignment products to cover the Debtor's inability to obtain product due to purported failures of the Debtor's CRO. <u>Second</u>, Jones asserts that S&L's compensation should be considered in light of the compensation paid in the IW Cases.

23.     As specifically detailed below, Alex Jones' arguments are misplaced. S&L *did* present arguments and evidence about the reasons the Rule 2014 disclosures were not supplemented in the IW Cases. And although not raised prior the September 20 Hearing or the close of evidence—preventing the Debtor and S&L from fully addressing the issue—S&L also told the Court the reasons for the Debtor's decision to pay Jones's travel expenses for the Connecticut trial and 100% of the state court counsel costs. Moreover, S&L could not have presented the arguments that Jones asserts it should have because they did not reflect the Debtor's position as of the September 20 Hearing, involved matters of which S&L was not aware, or are not true. And while S&L does not oppose disclosure of the compensation paid for services to the IW Debtors—none was paid in the IW Cases—that compensation is not relevant to the appropriate compensation for services provided to the Debtor in this chapter 11 case.

## REPLY TO ARGUMENTS THAT S&L IS NOT ENTITLED TO COMPENSATION BECAUSE S&L'S EMPLOYMENT HAS NOT BEEN APPROVED

24.     The U.S. Trustee, Debtor, and Subchapter V Trustee take the position that S&L cannot be allowed an administrative expense for compensation under Bankruptcy Code §§ 330 and 503(b)(1)(2) because S&L has not yet had its employment approved under Bankruptcy Code § 327(a). But none of the objections present any argument that the Court cannot or should not consider retroactive approval of S&L's employment for services provided through the September 20 Hearing. Nor does any party in interest object to the retroactive approval of S&L's employment under Bankruptcy Code § 327(a) on the limited basis set out in the Administrative Expense Motion.

11

This was an express basis for the relief requested by S&L. *See* Administrative Expense Motion ¶¶ 26-28.

25.     Retroactive approval of S&L's employment in connection with the Administrative Expense Motion is within the Court's authority and appropriate here. Such approval is consistent with the Court's ruling at the September 20 Hearing, it is not prevented by the doctrines of collateral estoppel or law of the case, and S&L meets the requirements for retroactive approval of the limited scope of employment requested in the Administrative Expense Motion.

**A. The Court Has Authority to Retroactively Approve S&L's Employment in Connection with the Administrative Expense Motion.**

26.     The Fifth Circuit Court of Appeals held in *In re Triangle Chemicals*, 697 F.2d 1280 (5th Cir. 1983), that bankruptcy courts have the discretion to retroactively approve the employment of professionals in connection with a fee application. In *Triangle Chemicals*, the bankruptcy court denied an attorney's application for compensation because no order approving the attorney's employment had been entered. *Id.* at 1281-82. The bankruptcy court held that it did not have discretion to consider retroactive approval of the employment. *Id.* The Fifth Circuit panel vacated the order and remanded the matter to the bankruptcy court, holding that the employment could be retroactively approved where exceptional circumstances exist. *Id.* at 1282. Other courts have also concluded that retroactive approval of a professional's employment may be considered in connection with an application for compensation. *E.g.*, *In re McKenzie*, 2013 Bankr. LEXIS 2672, at *2-*3 (Bankr. E.D. Tenn. July 2, 2013) (2013 WL 3335168); *In re Little Greek Rest.*, 205 B.R. 484, 486 (Bankr. E.D. La. 1996); *In re Saybrook Mfg. Co.*, 108 B.R. 366, 369-70 (Bankr. M.D. Ga. 1989); *see also In re Mohiuddin*, 627 B.R. 875, 884 (Bankr. S.D. Tex. 2021) (retroactively expanding the scope of attorney's employment under Bankruptcy Code § 327(e) in connection with an application for compensation).

12

27.     *Lamie v. United States Trustee*, 540 U.S. 526 (2004), does not abrogate or call into question *Triangle Chemicals*.[4] In *Lamie*, the attorney for a debtor sought compensation under Bankruptcy Code § 330 for services provided to the debtor after the case was converted to chapter 7. *Id.* at 532. The bankruptcy court denied the compensation based on the plain language of the statute and the district court and court of appeals affirmed the ruling. *Id.* The U.S. Supreme Court also affirmed, reasoning that the plain language of section 330(a)(1) did not authorize compensation for the attorney for a chapter 7 debtor—as opposed to the attorney for a debtor in possession with the powers of a trustee pursuant to Bankruptcy Code §§ 1107 or 1184—that was not employed by the trustee pursuant to section 327. *Id.* at 538-39. Retroactive approval of the employment was not an issue in *Lamie* and *could not* have been an issue because Bankruptcy Code § 327 does not provide for the employment of professionals by a chapter 7 debtor *qua* debtor.[5]

28.     *Decloutte v. Austin (In re Decloutte)*, 2018 Bankr. LEXIS 1869 (Bankr. S.D. Tex. June 20, 2018)—the only other case cited in the objections in opposition to S&L's request for compensation under section 330 and administrative expense under section 503(b)(2)—indicates that the court *should* consider retroactive approval of employment. In *Decloutte*, the attorney to a chapter 13 debtor used her position as counsel to take advantage of the debtor by misappropriating

---

[4] Although neither the U.S. Trustee, the Debtor, nor the Subchapter V Trustee claim that *Lamie* abrogates or calls into question *Triangle Chemicals*, these parties cite *Lamie* in their objections to the Administrative Expense Motion. *See* UST Objection ¶¶ 10-11; Debtor/Trustee Objection ¶¶ 11-12.

[5] The Supreme Court expressly stated that the statutory scheme did not prevent a debtor's attorney from representing the estate and therefore being entitled to receive compensation under Bankruptcy Code § 330, subject to employment by the trustee:

> Compensation for debtors' attorneys working on chapter 7 bankruptcies, moreover, is not altogether prohibited. Sections 327 and 330, taken together, allow chapter 7 trustees to engage attorneys, including debtors' counsel, and allow courts to award them fees. *See* §§ 327(a) and (e). Section 327's limitation on debtors' incurring debts for professional services without the chapter 7 trustee's approval is not absurd. In the context of a chapter 7 liquidation it advances the trustee's responsibility for preserving the estate.

*Lamie*, 540 U.S. at 537.

estate property, filed false statements before the court, and facilitated criminal charges against the debtor based on knowingly false representations to silence the debtor. *Id.* at \*38. Among the issues considered and decided by the Court was whether to grant retroactive employment of the attorney to represent the debtor and her estate as divorce counsel made contemporaneously with an application for compensation. *Id.* at \*39-\*40. The bankruptcy court denied the retroactive approval of the employment because the attorney "offer[ed] no legitimate explanation that would support *nunc pro tunc* approval."[6] *Id.* at \*41. The point relevant here is that the court ___**considered**___ retroactive approval of the professional's employment on the merits—*Decloutte* is not a case where the "plain wording of the statute" ended the inquiry.

## B. Neither Collateral Estoppel nor Law of the Case Prevent Retroactive Approval of S&L's Employment on the Limited Basis Sought in the Administrative Expense Motion.

29.     No party in interest asserts that collateral estoppel nor the law of the case doctrine prevent the Court from considering and retroactively approving S&L's employment, as requested in the Administrative Expense Motion. These are affirmative defenses that generally must be raised by a party or otherwise waived. *See Ngomi Kariuki v. Tarango*, 709 F.3d 495, 508 (5th Cir. 2013). But even if the issues had been raised, neither collateral estoppel nor the law of the case doctrine prevent the Court from considering and retroactively approving S&L's employment.

### i.     *Consideration of retroactive employment is consistent with the Court's ruling at the September 20 Hearing.*

30.     At the core of the collateral estoppel and law of the case doctrines is the idea that matters finally decided by courts should usually remain decided. Collateral estoppel provides that once a court has decided an issue of fact or law necessary to a final ruling, that decision may

---

[6] The facts in *Delcoutte* were extreme. The bankruptcy court indicated that it would have denied the attorney's request for compensation even if it had approved retroactive employment. *In re Decloutte*, 2018 Bankr. LEXIS 1869, at \*43.

preclude relitigation of the issue in a different proceeding if certain elements are present. *In re Reddy Ice Holdings, Inc.*, 611 B.R. 802, 808 (Bankr. N.D. Tex. 2020). The law of the case doctrine—when applied to a court's own prior decision—is a discretionary practice whereby courts generally refuse to reopen issues that have been decided in the proceeding. *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)). The doctrines are aimed at conserving judicial resources and preventing inconsistent decisions.

31. The goals of the collateral estoppel and law of the case doctrines are not implicated here. In its ruling at the September 20 Hearing, the Court left open questions about S&L's retention for the work performed prior to that date. (Sept. 20, 2022, Hrg. Tr. 256:14-17 ("I understand that that's going to require some questions as to where that leaves Shannon and Lee and Mr. Schwartz in terms of you know, retention and the work that they've done.")). The Court also stated all rights were reserved with the respect to the issue of compensation for the work performed prior to the ruling. (Sept. 20, 2022, Hrg. Tr. 257:3-4). While the Court denied the specific relief requested in the S&L Employment Application—to approve the Debtor's employment of S&L going forward—it expressly left open other issues, including retention and compensation related to the work previously performed. Retroactive approval of S&L's employment in connection with the Administrative Expense Motion would therefore not be inconsistent with the Court's ruling.

32. It makes sense under the circumstances that the Court would rule solely on the issue before it at the September 20 Hearing. While the Court had concerns about whether S&L could impartially represent the Debtor in making difficult decisions about Alex Jones and PQPR (Sept. 20, 2022, Hrg. Tr. 247:4-11), these concerns were not raised by any party in interest or actually litigated by the parties at the September 20 Hearing (Sept. 20, 2022, Hrg. Tr. 210:13-18). And they

were about *potential conflicts* relevant to issues that were not clearly within the scope of the Debtor's duties as a subchapter v debtor.[7] Denying the Debtor's request for ongoing employment of S&L while leaving open issues of approval of limited employment and compensation for work already performed allowed the case to move forward and is in line with the doctrines of collateral estoppel and law of the case.[8] Leaving these other issues open for a further hearing is also consistent with other decisions in this district where the court has raised issues in connection with employment that were not the focus of a hearing or briefing by the parties. *See In re LTHM Houston-Operations, LLC*, 2014 Bankr. LEXIS 4495, at *9-10 (Bankr. S.D. Tex. Oct. 24, 2014) (2014 WL 5449737) (setting an additional hearing on an issue identified by the Court in connection with an application to employ but that was not the focus of the original hearing or the briefing).

> ii. *The necessary elements for collateral estoppel are not present.*

33. Collateral estoppel would not apply to prevent retroactive employment of S&L for services provided prior to the Court's ruling even if it had been raised by a party and the Court did not expressly leave the issue open. Collateral estoppel applies to final orders when: (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; ***and*** (3) the determination of the issue in the prior proceeding was a critical and necessary part of the ruling in the prior proceeding.[9] *In re Reddy Ice Holdings, Inc.*, 611 B.R.

---

[7] Employment under Bankruptcy Code § 327(a) governs employment of professionals to represent or assist the trustee or debtor in possession in carrying out its duties under the Bankruptcy Code. The Debtor's duties as debtor in possession do not include investigating the acts, conduct, assets, liabilities, and financial condition of the Debtor, the operation of the Debtor's business, or the desirability of the continuance of such business. *See* 11 U.S.C. §§ 1184(b) & 1106; (Sept. 20, 2022, Hrg. Tr. 251:1-3). To the extent that the speculative conflicts concerning the Court were to arise, it would be in the decision of whether to pursue claims against Jones and PQPR or assert defenses to the claims asserted by these parties.

[8] For the avoidance of doubt, S&L asserts the Court's ruling at the September 20 Hearing was erroneous and that the S&L Employment Application should have been granted.

[9] There is uncertainty as to whether an order denying an application to employ a professional is a final order. Some courts have held that orders that grant or deny applications to employ professionals are interlocutory. *E.g., Simon v. Amir (In re Amir)*, 436 B.R. 1, 12 (B.A.P. 6th Cir. 2010); *Green v. Gray*, 2013 U.S. Dist. LEXIS 38640, at *16-*17

802, 809-10 (Bankr. N.D. Tex. 2020) (quoting *Rabo Agrifinance, Inc. v. Terra XXI, Ltd.*, 583 F.3d 348, 353 (5th Cir. 2009)). None of the required elements are present here.

34.     The issues at stake between the S&L Employment Application and the Administrative Expense Motion are not identical. In the S&L Employment Application, the Debtor sought to employ S&L on an ongoing basis. In the Administrative Expense Motion, S&L seeks retroactive approval of its employment only through the September 20 Hearing. Even if, for the sake of argument, S&L has a predisposition interfering with its ability to impartially advise the Debtor as debtor in possession with respect to the difficult decisions that may arise related to Jones and PQPR, that is not implicated in S&L's ability to provide the services to the Debtor through the September 20 Hearing. And under the "catchall provision" of Bankruptcy Code § 101(14)(C)— referenced by the Court in its ruling—the relevant inquiry is whether S&L possesses a predisposition under circumstances that render the predisposition a bias against the estate. *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir. 2005).  The scope of S&L's employment requested in the Administrative Expense Motion are among the circumstances that the Court should consider in determining whether S&L has an adverse interest for "any other reason."

35.     S&L's disinterestedness was also not actually litigated at the September 20 Hearing. "'The requirement that an issue be "actually litigated" for collateral estoppel purposes simply requires that the issue is raised, contested by the parties, submitted for determination by

---

(D. Mass. Mar. 18, 2013) (2013 WL 1124731); *cf. Rozelle v. Lowe*, 2016 U.S. Dist. LEXIS 194416, at *7 (W.D. Tex. Mar. 29, 2016) ("The Court agrees with Appellee that Appellants do not have an automatic right to appeal under Section 158(a)(1) because the order being appealed is not 'final.'"). However, this line of reasoning was called into serious question by *Ritzen Group., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582 (2020), in which the Supreme Court held that an order denying a motion for relief from stay was a final order. *See In re Glenview Health Care Facility, Inc.*, 2020 Bankr. LEXIS 329 (B.A.P. 6th Cir. Feb. 5, 2020) (indicating that the previous precedent in the Sixth Circuit may need to be reconsidered in light of *Ritzen Group*). If the order denying the S&L Employment Application is *not* a final order, that only makes it even more clear that collateral estoppel does not apply.

the court, and determined.'" *In re Reddy Ice Holdings, Inc.*, 611 B.R. at 810 (quoting *In re Keaty*, 397 F.3d 264, 272 (5th Cir. 2005)). No party in interest asserted that S&L was not a disinterested person at or prior to the September 20 Hearing. The U.S. Trustee opposed the S&L Employment Application because Lee did not supplement the Rule 2014 disclosures for KSLPLLC in the IW Cases. S&L Employment Application Objection ¶ 1. At the September 13, 2022, hearing before the Court, counsel for the U.S. Trustee confirmed that this was the sole basis for the objection. (Sept. 13, 2022, Hrg. Tr. 36:1-9). Counsel for the U.S. Trustee indicated in his opening statement at the September 20 Hearing that Lee's failure to supplement was the only reason the U.S. Trustee sought the denial of the S&L Employment Application. (Sept. 20, 2022, Hrg. Tr. 44:5-7). And after the close of evidence, the Court noted that "no one ever talked about . . . what it means to hold an adverse interest to the debtor or to the estate." (Sept. 20, 2022, Hrg. Tr. 210:16-18). The issue simply was not raised or contested by the parties in a way that would give rise to collateral estoppel.

36.     Further, any ruling that S&L had an actual conflict was not a critical and necessary part of the Court's ruling at the September 20 Hearing. An apparent conflict that may give rise to an adverse interest falls into one of three categories: (a) actual conflicts of interest; (b) potential conflicts of interest, and (c) appearances of conflict.[10] *E.g.*, *In re Boy Scouts of Am.*, 35 F.4th 149, 157 (3d Cir. 2022).  Courts have discretion to approve employment of a professional where there

---

[10] "An actual conflict of interest is 'an active competition between two interests, in which one interest can only be served at the expense of the other.'" *In re Ampal-Am. Israel Corp.*, 534 B.R. 569, 581 (Bankr. S.D.N.Y. 2015), *aff'd*, 554 B.R. 604 (S.D.N.Y. 2016), *aff'd*, 691 F. App'x 12 (2d Cir. 2017) (quoting *In re Diva Jewelry Design, Inc.*, 367 B.R. 463, 472 (Bankr. S.D.N.Y.2007)) (citing also *In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y.1998). A potential conflict is where the parties are currently aligned but may turn out to be adverse on an issue in the future. *See, e.g.*, *id.*; *In re Schwindt*, 2013 Bankr. LEXIS 342, at *17 (Bankr. D. Colo. Jan. 28, 2013) (2013 WL 321297) (finding only a potential dispute where there were common interests; *In re Contractor Tech., Ltd.*, 2006 U.S. Dist. LEXIS 34466, at *24 (S.D. Tex. May 30, 2006) (affirming decision to authorize employment of attorney where "[a]ny conflict of interest of [attorney] is merely a potential conflict because there have been no avoidance or other claims identified so far against any of [attorney's] eight creditor-clients").

exists a potential conflict but must deny employment—at least absent the presence of separate counsel to address conflicts—if there exists an actual conflict.[11] *See, e.g.*, *id.* at 158 ("Attorneys with actual conflicts face *per se* disqualification, but disqualification is at the court's discretion for attorneys with potential conflicts."); *In re Contractor Tech., Ltd.*, 2006 U.S. Dist. LEXIS 34466, at *27 (S.D. Tex. May 30, 2006) (affirming bankruptcy court approval of employment where "there is at best only a potential conflict of interest between [attorney] and the Trustee"); *In re 2000 St. James Place, L.P*, 2010 Bankr. LEXIS 1246, at *4 (Bankr. S.D. Tex. Apr. 19, 2010) ("In the instant case, although there is a strong potential for conflict, there is no evidence as of yet of an actual conflict. Thus, the court will approve Debtor's employment of [attorney]."). The Court's ruling with respect to the S&L Employment Application is equally consistent with a finding of only a potential conflict, in which case the Court would have at least the discretion to approve the limited employment of S&L through the September 20 Hearing.[12] And the S&L Employment Application Objection sought denial on separate, entirely discretionary grounds.

    iii.    *Application of the law of the case doctrine is discretionary and exceptions apply under the facts here.*

37.    Nor does the law of the case doctrine prevent retroactive approval of S&L's employment in connection with the Administrative Expense Motion. "'When the law of the case doctrine is applied by a court to its own prior decisions, it is properly characterized as discretionary in nature.'" *Greener v. Cadle Co.*, 298 B.R. 82, 94 (N.D. Tex. 2003) (quoting *United States v. O'Keefe*, 169 F.3d 281, 283 (5th Cir. 1999)). A court can *always* revisit its prior decisions or the

---

[11] The involvement of the Battaglia Firm as lead counsel advising the Debtor on strategy fills effectively the same role as conflicts counsel in this case. Where conflict's counsel is present, courts may approve employment of separate counsel notwithstanding an asserted conflict. *See, e.g.*, *In re Relativity Media, LLC*, 2018 Bankr. LEXIS 2037, at *19 (Bankr. S.D.N.Y. July 6, 2018); *Exco Res. v. Milbank*, 2003 U.S. Dist. LEXIS 1442, at *26 (S.D.N.Y. Jan. 28, 2003).

[12] The Court indicated that its concern was that representation of the Debtor as debtor in possession "may include making difficult decisions about other parties, if necessary" (Sept. 20, 2022, Hrg. Tr. 247:9-11), referencing claims against PQPR and Alex Jones. At most, this would be a potential conflict.

decisions of a coordinate court. *Id.* The doctrine "is not a barrier to correction of judicial error and is in no way sacrosanct." *Id.* at 95 (citing *Loumar, Inc. v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983)).

38.     Courts have frequently declined to apply the law of the case doctrine in three situations: (1) The evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; and (3) the earlier decision is clearly erroneous and would work a manifest injustice. *See United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002). The first and third exceptions apply here.

39.     As set out in the Rule 59 Motion, S&L seeks to present evidence directly relevant to the issue of whether S&L had a predisposition in favor of Alex Jones or PQPR that created bias against the estate.[13] This evidence includes, among other things, (a) S&L's prepetition analysis of PQPR's asserted secured claim and representations on behalf of the Debtor in related negotiations; (b) S&L's response to PQPR's requested destruction of information; (c) the scheduling of PQPR's asserted secured claim as disputed; (d) S&L's initial response to Alex Jones's requested extension of the automatic stay regarding the Connecticut Litigation; (e) S&L's independent questioning of Alex Jones's asserted indemnity; (f) the alter ego finding regarding the Texas Litigation; (g) the preparation, submission, and presenting of the proposed cash collateral order submitted to the Court on September 13, 2022; and (h) the negotiations surrounding the Debtor's agreement to lift the stay regarding the Connecticut Litigation, including Alex Jones's negotiation posture that he may cease his involvement with the Debtor. Although S&L submits that it did not have a full and fair opportunity to present such evidence at the September 20 Hearing, which justifies the Court granting a rehearing, S&L should also be able to present such evidence in connection with its

---

[13] S&L filed the Administrative Expense Motion based on the arguments made by the U.S. Trustee and Alex Jones in their objections to the Rule 59 Motion. To the extent that the Court considers retroactive employment of S&L on the merits of whether S&L meets the requirements of Bankruptcy Code § 327 in connection the Administrative Expense motion, the Rule 59 Motion is irrelevant, if not technically moot.

request for retroactive approval of its limited employment through the Administrative Expense Motion, even if the Court denies the Rule 59 Motion. S&L intends to submit further evidence that did not exist at the September 20 Hearing.[14]

40.    Additional evidence of which the Court can take judicial notice is *already* before the Court. For example, the Court referenced in its ruling that the Debtor's estate had not made any claims against PQPR in the fifty-three (53) days between the Petition Date and the September 20 Hearing. (Sept. 20, 2022, Hrg. Tr. 246:16). Despite the removal of S&L as co-counsel and the replacement of Schwartz as CRO, the Debtor still has not brought an action against PQPR and continues to seek entry interim cash collateral orders rather than attempting to partially address the issue at a final cash collateral hearing. *See* Fourth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [ECF No. 238]; Fifth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [ECF No. 258]; Sixth Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [ECF No. 287]; Seventh Interim Order Authorizing Debtor's Use of Cash Collateral and Providing Partial Adequate Protection [ECF No. 333]. And despite the Court's expansion of the Subchapter V Trustee's duties to include investigation of PQPR's claim and file a statement detailing her findings as soon as practicable (Sept. 20, 2022, Hrg. Tr. 254:3-7, 254:22-24), this has not yet occurred. At the time of the filing of this Reply, one-hundred (100) days have elapsed since the September 20 Hearing.

---

[14] For example, S&L provided services to the Debtor that ultimately resulted in the deal struck by the Debtor's replacement CRO Patrick Magill reflected in the Debtor's Emergency Motion for Entry of Order Authorizing Debtor to Enter into Financial Services Agreement [ECF No. 273] and Debtor's Emergency Motion for Entry of Order Authorizing Debtor to Enter into Product Fulfilment Agreement [ECF No. 276] filed by the Debtor on November 15, 2022. S&L's services provided prior to the September 20 Hearing enabled the Debtor to substantially uncouple its business from PQPR and obtain better economic terms through the arrangement with the third-party. Assisting the Debtor in pursuing this change to its business model tends to demonstrate that S&L did not have any predisposition that interfered with its ability to represent the Debtor in matters that benefited the Debtor's estate to the potential detriment of PQPR or Alex Jones.

41.     All of that makes perfect sense. Some of the potential causes of action and defenses with respect to PQPR and its asserted claim are complicated and may be more efficiently and effectively addressed in the mediation or other consensual resolution.[15] But the Debtor was in discussions about potential mediation prior to the September 20 Hearing. (Sept. 20, 2022, Hrg. Tr. 9:11-16). The interim cash collateral orders do not release any rights to contest the validity or seek avoidance of PQPR's claim. And, as asserted by the Subchapter V Trustee in connection with the application to employ of M3 Advisory Partners, the issue requires expert financial analysis.[16]

42.     The Court also questioned the Debtor's request for authority to hire an appellate attorney and pay 60% of the fees for such attorney, with Alex Jones paying 40%. (Sept. 20, 2022, Hrg. Tr. 215:19-20). But the Debtor continued to seek authority to retain appellate counsel under the 60/40 split prior to Jones's agreement with the Sandy Hook Plaintiffs [ECF No. 329]. The

---

[15] The Subchapter V Trustee indicated in the Subchapter V Trustee's First Interim Status Report [ECF No. 227] (the "First Trustee Report") and Subchapter V Trustee's Second Interim Status Report [ECF No. 285] (the "Second Trustee Report") that she has interviewed and received certain financial information from various parties. By November 21, 2022—sixty-two (62) days after the expansion of her duties—the Subchapter V Trustee had "identified a number of potential claims and causes of action[]." Second Trustee Report ¶ 4.l. The Subchapter V Trustee noted, however, that she expected certain of these claims to be the subject of the mediation. *Id.* And despite that there is every reason to believe that the Subchapter V Trustee has been diligent in performing her duties, she had not completed her investigation by December 19, 2022. (Dec. 19, 2022, Hrg. Tr. 47:24-48:16). The issue is simply complicated, requires careful analysis, and is not something that could be accomplished in fifty-three (53) days of the case considering the other matters requiring attention in the case.

[16] In the Subchapter V Trustee's application to employ M3 [ECF No. 282] (the "M3 Employment Application"), the Subchapter V Trustee indicated that the employment was necessary "[b]ecause of the anticipated complexity investigating the matters ordered by the Court and facilitating development of a confirmable plan in this complicated case . . . ." M3 Employment Application ¶ 10. Further, in the Subchapter V Trustee's response to PQPR's objections to the M3 Employment Application [ECF No. 327] (the "M3 Employment Application Reply"), the Subchapter V Trustee represented to the Court:

> As further described in the M3 Application, the Subchapter V Trustee seeks retention of M3 Advisory Partners, LP ("M3") as financial advisor to assist in executing her duties as Subchapter V Trustee. Pursuant to this Court's order, the Subchapter V Trustee's duties were expanded and she was tasked with undertaking an investigation. The Investigation includes reviewing many years worth of transfers and transactions with numerous parties. The records maintained by the parties are incomplete and generally not in good order. The scattered information complicates the process. The Subchapter V Trustee requires the assistance of a financial advisor in fulfilling her duties.

M3 Employment Application Reply ¶ 2 (footnotes omitted). S&L believes that the Subchapter V Trustee is absolutely correct. But that was just as true in the first fifty-three (53) days of the case.

Court approved the Debtor's request to employ appellate counsel on December 19, 2022.[17] (Dec. 19, 2022, Hrg. Tr. 30:22-25). And for good reason. The Sandy Hook Plaintiffs have indicated that they may seek to oppose the dischargeablity of their claims. And the Sandy Hook Plaintiffs actively *desire* the appeals to go through absent a settlement to finally conclude the litigation and opposed Alex Jones's attempts to reimpose the stay. None of that was unforeseeable on September 14, 2022, when the Debtor filed its application to employ appellate counsel [ECF No. 155]. And the credible ability to go forward with an appeal was important to settlement negotiations.

43.     The Court further questioned the Debtor's proposed repayment of $750,000 to PQPR for the purchase of inventory that would be subject to a 90/10 split of proceeds in favor of the Debtor, instead of the 20/80 split of proceeds in favor of PQPR. (Sept. 20, 2022, Hrg. Tr. 215:21-23). Again, the Debtor has continued to pursue this after the September 20 Hearing. (Dec. 19, 2022, Hrg. Tr. 11:4-7); [ECF No. 333]. This decision also makes sense. The benefit to the Debtor's estate of receiving 90% of the proceeds from the related product instead of 20%, pursuant to prepetition Forbearance Agreement between PQPR and the Debtor, exceeds the cost to the Debtor's estate of the payments to PQPR. While other parties have negotiated for clawback rights, no one has opposed the payments from purported cash collateral being made initially.

---

[17] The court granted authority to employ appellate counsel on a 50/50 division of fees instead of the originally proposed 60/40 basis. [ECF No. 348]. But the Debtor sought a hearing on the retention at the 60/40 division, despite the lack of objection to a 50/50 division, because Alex Jones would not agree to that division prior to his deal with the Sandy Hook Plaintiffs [ECF No. 329]. And according to the representations of Jones's counsel at the December 19, 2022, the caveat to his agreement to the 50/50 division was that Jones would seek his full annualized salary of $1.3 million from the Debtor. (Dec. 19, 2022, Hrg. Tr. 14:2-6, 32:11-13). This would be an increase of approximately $60,000 per month. Jones has also represented that he may be required to seek alternative employment absent receiving his full salary. (Dec. 19, 2022, Hrg. Tr. 38:17-20, 40:23-25). Further, Jones filed a motion seeking to set a date by which the Debtor must assume or reject his employment contract [ECF No. 349]. This is the situation that S&L's negotiations with Jones for the 60/40 split (Sept. 20, 2022, Hrg. Tr. 64:17-65:4) were trying to avoid. Absent a negotiated agreement, assumption could require not just the $60,000 per month going forward but also cure for past salary and assumption of other terms of the Employment Agreement.

23

44.     Other additional evidence of which the Court can take judicial notice comes from the positions and statements of Alex Jones in this case. In the AEJ Limited Objection, Jones asserts that S&L should have represented reasons favorable to Jones regarding the Debtor's proposed payment of Jones's travel expenses to attend the Connecticut Litigation and 100% of state court counsel fees.[18] AEJ Limited Objection ¶ 10. That S&L did not argue those points demonstrates that S&L was not taking direction from Jones or asserting positions to benefit Jones. Further, the *actual* reason behind the Debtor's decision—that it was demanded by Jones to continue employment with the Debtor (Sept. 20, 2022, Hrg. Tr. 216:10-13) and necessary to reach a deal with the Connecticut Plaintiffs regarding relief from the stay (Sept. 20, 2022, Hrg. Tr. 10:20-25)— was reflected at the the December 19, 2022, hearing. Jones's counsel asserted that he may be required to seek employment other than with the Debtor absent receiving adequate consideration from the Debtor. (Dec. 19, 2022, Hrg. Tr. 38:17-20, 40:23-25). And both Jones and the Debtor represented that this would leave the Debtor unable to operate. (Dec. 19, 2022, Hrg. Tr. 32:3-6, 38:15-16).

45.     S&L also submits that the Court's prior ruling contained clear error. As set out in S&L's reply to the U.S. Trustee's objection to the Rule 59 Motion [ECF No. 270] (the "Rule 59 Reply"), several factual predicates to the Court's ruling fall under the *higher* standard of manifest error. Rule 59 Reply ¶ 15 n.7. Among the other issues amounting to clear error are the following:

   a.   *There was No Evidence at the September 20 Hearing that S&L Presently Held or Represented Any Interest Adverse to the Debtor's Estate*—The inquiry under Bankruptcy Code § 327(a) is whether the professional *presently* holds an adverse interest or *concurrently* represents a party with such adverse interest. *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 623 (2d Cir. 1999); *In re Muma Servs., Inc.*, 286 B.R. 583, 590 (Bankr. D. Del. 2002); *Greene v. InforMD, LLC*, 2018 U.S. Dist. LEXIS 124062, at *8 (M.D. La. July 25, 2018) (2018 WL 3579470). The issue was whether S&L had a "meaningful incentive" to act contrary to the best interests of the Debtor's

---

[18] Jones asserts that S&L's voluntary reduction in the Administrative Expense Motion would be required because of this purported failure.

bankruptcy estate, *In re Quality Bev. Co.*, 216 B.R. 592, 595 (Bankr. S.D. Tex. 1995), or a "personal interest" contrary to the interests of the bankruptcy estate, *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 355 (5th Cir. 2005). Further, such meaningful incentive or personal interest must be supported by evidence. *See In re McDermott Int'l, Inc.*, 614 B.R. 244, 255 (Bankr. S.D. Tex. 2020) (approving retention of a professional because there was no evidence of an adverse interest). There was no evidence of an adverse interest at the September 20 Hearing.[19] And while PQPR and Alex Jones have interests adverse to the Debtor's estate, there is no evidence indicating that S&L represented these parties. Indeed, the evidence introduced at the September 20 Hearing indicated that S&L *did not* represent these parties (Sept. 20, 2022, Hrg. Tr. 61:23-62:1, 62:16-20; 131:15-132:5, 149:23-150:4); Debtor's Ex. 3 [ECF No. 163-3]; Debtor's Ex. 5 [ECF No. 163-5]; Debtor's Ex. 6 [ECF No. 163-6]) and that S&L advised and represented the Debtor in taking positions directly adverse to these parties (Sept. 20, 2022, Hrg. Tr. 62:21-65:16).

b. _The Court Had Discretion to Grant the S&L Employment Application Despite any Potential Conflict in Pursuing Actions or Defenses against PQPR or Jones_—The Court indicated in its ruling that it was not sure that its decision was discretionary because the Court thought there was a material adverse interest against the estate (Sept. 20, 2022, Hrg. Tr. 248:13-14). The Court indicated that it was concerned about whether S&L could impartially represent the Debtor in making difficult decisions about Alex Jones and PQPR (Sept. 20, 2022, Hrg. Tr. 247:8-11). But even if S&L might have a predisposition affecting its ability to pursuing claims or defenses against PQPR or Jones if that later became necessary, this was only a potential conflict. *See In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998) (reasoning that a potential conflict is a dispute that may become active if certain contingencies arise). Bankruptcy courts have discretion to approve the employment of a professional where there is only a potential conflict. *In re Boy Scouts of Am.*, 35 F.4th 149, 158 (3d Cir. 2022) ("Attorneys with actual conflicts face *per se* disqualification, but disqualification is at the court's discretion for attorneys with potential conflicts."); *In re Contractor Tech., Ltd.*, 2006 U.S. Dist. LEXIS 34466, at *27 (S.D. Tex. May 30, 2006) (affirming bankruptcy court approval of employment where "there is at best only a potential conflict of interest between [attorney] and the Trustee"); *In re 2000 St. James Place, L.P.*, 2010 Bankr. LEXIS 1246, at *5 (Bankr. S.D. Tex. Apr. 19, 2010) ("In the instant case, although there is a strong potential for conflict, there is no evidence as of yet of an actual conflict. Thus, the court will approve Debtor's employment of [attorney]."). And the actualization of any potential conflict with respect to pursuing claims or defenses against Jones or PQPR was remote. First, as recognized in the Court's

---

[19] With respect to S&L, the counsel for the U.S. Trustee speculated about the Debtor's proposed 60/40 division of state court counsel fees between Jones and the Debtor and discussions between the counsel and Lee, concluding that "I don't understand why 40/60." (Sept. 20, 2022, Hrg. Tr. 225:8-23). But that is not evidence. The actual evidence was that (a) the Debtor told Jones that he would have to pay a proportionate share and the agreement for a 60/40 split was negotiated with Jones arguing that he had already cut back his regular salary (Sept. 20, 2022, Hrg. Tr. 64:23-65:4) and (b) Schwartz made the decisions for the Debtor. (Sept. 20, 2022, Hrg. Tr. 196:7-9). Further, even if the U.S. Trustee's statements *were* evidence, the appearance of conflict is legally insufficient to warrant denial of an application to employ. *In re Contractor Tech., Ltd.*, 2006 U.S. Dist. LEXIS 34466, at *29 (S.D. Tex. May 30, 2006); *see also In re Marvel Entm't Grp.*, 140 F.3d 463, 477 (3d Cir. 1998) (reasoning that the "appearance of impropriety" or "horrible imaginings alone" do not amount to an adverse interest).

ruling at the September 20 Hearing, a subchapter v debtor is not mandated to investigate its own actions, conduct, assets, or liabilities. (Sept. 20, 2022, Hrg. Tr. 251:1-8). The Debtor's employment of S&L to assist the Debtor in fulfilling its duties as a subchapter v debtor in possession would not involve claims or defenses against Jones or PQPR except in an avoidance action or objection to claim. Second, the Debtor engaged the Battaglia Firm to provide legal advice regarding strategy and implementation of that strategy in the case, with S&L's primary responsibility being "the day-to-day management of the case, issues involving the Sandy Hook Litigation, and all routine activities typical to the Chapter 11 Case." S&L Employment Application ¶ 22. The Battaglia Law Firm had primary responsibility to advise the Debtor whether to bring an action against PQPR or Jones and the timing of any objection to claim. Third, the Court expanded the Subchapter V Trustee's duties to include the investigation contemplated by Bankruptcy Code § 1183 and particularly directed the Trustee to the secured claim asserted by PQPR and prepetition draws by Alex Jones. (Sept. 20, 2022, Hrg. Tr. 254:3-21). The likelihood of S&L advising the Debtor to ignore the Subchapter V Trustee's recommendation with respect to such causes of action or defenses is vanishingly remote.[20] *See In re Contractor Tech., Ltd.*, 2006 U.S. Dist. LEXIS 34466, at *27 (S.D. Tex. May 30, 2006) ("[A]s a practical matter, because St. Paul raised this issue, the Trustee and his employed professionals are likely to give more careful review to the payments to these eight creditors than to any others."). At a minimum, the Court had discretion under the circumstances.

c.  *Lee's Failure to Supplement His Disclosures for KSLPLLC after the IW Debtors Decided to Dismiss their Cases Does Not Suggest an Adverse Interest*—As the U.S. Trustee argued to this Court, Bankruptcy Rule 2014 "has one primary purpose—to facilitate strict compliance with section 327." S&L Employment Application Objection ¶ 45. And as the relevant caselaw indicates, the duty to make continuing disclosures is not contained in the text of Bankruptcy Rule 2014 but rather implied with respect to parties employed pursuant to section 327 or seeking court approval of their employment. *See, e.g.*, *In re C & C Demo, Inc.*, 273 B.R. 502, 506-07 (Bankr. E.D. Tex. 2001) (holding that although Rule 2014(a) does not expressly require supplemental or continuing disclosure, this duty is implied by § 327); *In re Keller Fin. Serv. of Florida*, 243 B.R. 806, 813 (Bankr. M.D. Fla. 1999) (finding duty of continuing disclosure under Rule 2014(a) that is implied by requirements of Bankruptcy Code § 327); *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) ("Rule 2014(a) does not expressly require supplemental or continuing disclosure. . . . Nevertheless, section 327(a) implies a duty of continuing disclosure, and requires professionals to reveal connections that arise after their retention."). Supplemental disclosure in the IW Cases would have been irrelevant to compliance with section 327 in those cases. The U.S. Trustee argued that the applications to employ professionals should be decided only after the Court's decision on the U.S. Trustee's

---

[20] S&L already represented the Debtor in making statements to the Court that PQPR's asserted claim and lien were subject to probable avoidance actions. *See* Debtor's Response to the Sandy Hook Families' Corrected Motion to Expedite Motion to (I) Appoint Tort Claimants Committee and (II) Remove the Debtor in Possession ¶ 8 n.4 [ECF No. 113] (indicating that the Debtor recognized that PQPR's claim and lien may be avoidable and for this reason the Debtor did not agree to limitations on challenging such claim and lien). It is difficult to even *imagine* that S&L would make such a representation to the Court and then advise the Debtor to dispute the existence of such potential actions against PQPR when recommended by the Subchapter V Trustee. And horrible imaginings do not amount to an adverse interest. *In re Marvel Entm't Grp.*, 140 F.3d 463, 477 (3d Cir. 1998).

motion to dismiss and the Court agreed with this position. (May 19, 2022, Hrg. Tr. 14:9-15:9, 23:2-8, Debtor's Ex. 22 [ECF No. 163-22], U.S. Trustee's Ex. 14 [ECF No. 165-14]). When Lee met with the Debtor on May 24, 2022, the IW Debtor's had already decided to dismiss their cases rather than incurring the expense of litigating with the U.S. Trustee. On May 21, 2022, Lee recommended to Schwartz that the IW Debtors agree to dismiss their cases (Debtor's Ex. 24 [ECF No. 163-24]) and by May 23, 2022, Lee was working on obtaining dismissal of the IW Debtor's chapter 11 cases (Debtor's Ex. 25 [ECF No. 163-25]). On May 25, 2022, Lee informed counsel for the U.S. Trustee that the IW Debtor's would agree to dismiss their cases and counsel for the U.S. Trustee suggested a stipulation dismissing the cases instead of an independent motion, which Lee worked on with counsel to the U.S. Trustee's counsel until the stipulation of dismissal was filed on June 1, 2022. (Debtor's Ex. 26, [ECF No.163-26]). Even if Lee was required to supplement his Bankruptcy Rule 2014 disclosures under these circumstances, his failure to do so does not suggest an interest adverse to the Debtor's estate. Lee's evaluation was consistent with the text of Bankruptcy Rule 2014, the purpose of the rule, and the cases interpreting it.

d. _There was no Failure of Disclosure by S&L in the Debtor's Case_—The Court indicated in its ruling at the September 20 Hearing that there was a lack of candor in the Debtor's bankruptcy case. (Sept. 20, 2022, Hrg. Tr. 253:6-7). If the Court's finding was that there was a lack of candor by S&L, this is completely contrary to the evidence. The Court indicated that the $80,000 travel expense in the proposed Third Amended Cash Collateral Order [ECF No. 148] was not called to the Court's attention.[21] (Sept. 20, 2022, Hrg. Tr. 244:10-11). But this was negotiated among the parties and was filed and presented by the Court by the Battaglia Firm. (Sept. 13, 2022, Hrg. Tr. 5:24-7:22; Sept. 20, 2022, Hrg. Tr. 13:4-7). Any finding that a matter set out in public filings with the Court and presented by another attorney was a failure to disclose by S&L is clear error.

---

[21] The U.S. Trustee alleged in connection with other matters that Schwartz did not disclose that the Debtor overhauled its in-house fulfilment process prior to bankruptcy. At the August 12, 2022, hearing in the Debtor's chapter 11 case, counsel for the U.S. Trustee represented to the Court that "[w]e heard nothing about the chang[e] in fulfilment" at the August 3 hearing despite Schwartz being on the witness stand for nearly six hours. (Aug. 12, 2022, Hrg. Tr. 13:10-19). But this allegation was about _Schwartz_ and is simply not true. As indicated in the August 3, 2022, hearing transcript—which was admitted into evidence at the September 20 Hearing as the U.S. Trustee's Exhibit 15 [ECF No. 165-15]—the change to fulfilment _was_ disclosed:

- In the Debtor's opening statement, Mr. Battaglia informed the Court that prior to the Petition Date the Debtor, took efforts to improve its business operations including "changing the cost structure in the way that fulfilment is handled of product sales to reduce the overall overhead to the estate, [reducing] the headcount to the estate." (Aug. 3, 2022, Hrg. Tr. 47:6-9).

- Further, Schwartz testified about the Debtor's fulfilment process and the prepetition changes to the process. (Aug. 3, 2022, Hrg. Tr. 67:8-68:4, 71:3-72:5).

The U.S. Trustee also raised at the September 20 Hearing, that the Debtor's prepetition payment to KSLPLLC for services provided by that firm from May 24 to May 31, 2022, was not reflected in the Debtor's Statement of Financial Affairs. (U.S. Trustee's Ex. 2 [ECF No. 165-2]), which was signed by Schwartz. But as indicated in the Court's ruling (Sept. 20, 2022, Hrg. Tr. 232:15-17) payment to KSLPLLC _was_ referenced in the S&L Employment Application. (Debtor's Ex. 1 [ECF No. 163-1], at p.5 n.1). There is no evidence to suggest that the omission from the SOFA was the result of S&L's failure to disclose.

**C. Retroactive Approval of S&L's Employment for Services Provided Through the September 20 Hearing is Appropriate.**

46.     Retroactive approval of the Debtor's limited employment of S&L for the period from the Petition Date through the September 20 Hearing is appropriate. There are exceptional circumstances justifying consideration of such retroactive approval through the Administrative Expense Motion and S&L meets the requirements for employment on the limited basis requested in the Administrative Expense Motion.

   *i.*    *Exceptional circumstances justify consideration of retroactive employment of S&L in connection with the Administrative Expense Motion.*

47.     Retroactive employment of a professional through an application for compensation is appropriate where there are "rare or exceptional circumstances[.]" *In re Triangle Chems.*, 697 F.2d 1280, 1289 (5th Cir. 1983); *accord In re Mohiuddin*, 627 B.R. 875, 884 (Bankr. S.D. Tex. 2021) (retroactively expanding scope of employment under Bankruptcy Code § 327 in connection with a fee application). Exceptional circumstances exist here.

48.     This is not a case where S&L is seeking untimely approval of its employment.[22] Pursuant to Bankruptcy Local Rule 2014-1(b)(1), the S&L Employment Application was deemed filed contemporaneous with S&L's commencement of provision of services to the Debtor as debtor in possession in this chapter 11 case. S&L filed the Rule 59 Motion prior to expiration of the period for such motion set out in Bankruptcy Rule 9023, and therefore the order denying the S&L

---

[22] Even if S&L was untimely in seeking approval of its employment, however, the circumstances would support retroactive consideration. S&L was under considerable time pressure to begin providing services for the Debtor. Immediately after the filing of the Debtor's chapter 11 case, S&L had to obtain a setting on the Debtor's motion to modify the automatic stay with respect to the Heslin/Lewis Suits [ECF No. 2]. The Debtor filed its chapter 11 case on a Friday, and a hearing on the motion to modify the automatic stay was held the following Monday morning. Several other emergency matters required S&L's services prior to consideration of the S&L Employment Application. Among other things, S&L (a) had to prepare a response to an emergency motion to remand in the removed Connecticut Litigation where the Connecticut Plaintiffs sought fees on three (3) days' notice of the deadline [*see* Adv. No. 22-05019 (Bankr. D. Conn.), Dkt. Nos. 5, 10 &14]; (b) address issues regarding fulfillment of orders [*see* ECF No. 55]; (c) respond to the Connecticut Plaintiff's motion for relief from stay [ECF No. 15]; and (d) provide information and discovery to the Sandy Hook Plaintiffs.

Employment Application is not yet a final order. S&L filed the Administrative Expense Motion in light of the arguments made in the objections of the U.S. Trustee and Jones to the Rule 59 Motion as an alternative consistent with those parties' position and the Court's ruling at the September 20 Hearing.

49.     Further, in its ruling at the September 20 Hearing, the Court expressly left open questions regarding S&L's retention. (Sept. 20, 2022, Hrg. Tr. 256:14-17). At that time, however, the Debtor was left without management due to the denial of the Debtor's application to employ Schwartz as CRO. The Debtor was also put in a position where it had to decide whether to incur substantial expense on the issue and distract the Battaglia Firm from other matters necessary for the case prior to finding a replacement CRO. As a practical matter, the Debtor was unable to seek approval of limited retention of S&L.

50.     Where a debtor in possession does not endeavor to obtain approval of the employment of a professional that has provided services to the debtor or ceases seeking approval of such employment, the professional has standing to pursue its own employment. *See Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474, 479-80 (B.A.P. 9th Cir. 1996); *Blocksom v. Brown (In re Brown)*, 555 B.R. 854, 859 (Bankr. S.D. Ga. 2016) ("A trustee should not be allowed to leverage an exclusive ability to file employment applications against a professional seeking to be employed and compensated for services already performed."). This is an exceptional circumstance justifying consideration of retroactive approval of S&L's employment through the Administrative Expense Motion.

51.     Finally, the amount of the Requested Administrative Expense Claim is consistent with the amount contemplated by the interim cash collateral orders that were agreed to by the parties and approved by the Court. In the Third Amended Cash Collateral Order [ECF No. 151],

the Debtor received authority to use PQPR's asserted cash collateral to pay $207,348.36 to S&L during the relevant time period, subject to interim compensation procedures. The then-pending motion for interim compensation procedures [ECF No. 135], contemplated a procedure for allowing on an interim basis 80% of requested fees. Including the prepetition Retainer of $50,822.68, the total amount of compensation contemplated in the Third Amended Cash Collateral Order was $310,008.13.[23] The Requested Administrative Expense Claim of $325,215.85 is consistent with the expectations of the parties in interest.

> ii. *S&L is disinterested under at least the circumstances of limited employment for services provided by S&L through the September 20 Hearing.*

52.     S&L does not have or represent any interest adverse to the Debtor's estate. Neither S&L nor the attorneys associated with the firm: (a) are a creditor, equity security holder, or insider of the Debtor; (b) is or was ever a director, officer, or employee of the debtor; (c) possess or assert any economic interest lessening the value of the Debtor's bankruptcy estate or creating a potential dispute in which the estate is a rival claimant; or (d) represent or have ever represented Alex Jones, PQPR, or any other creditor in this chapter 11 case. Nor does S&L or the attorneys associated with the firm have any predisposition that limits or interferes with the ability of S&L to provide unbiased advice to the Debtor as debtor in possession.

53.     The concerns identified in the Court's ruling at the September 20 Hearing surrounded S&L's ability to provide unbiased advice with on matters involving claims and defenses against PQPR and Alex Jones. (Sept. 20, 2022, Hrg. Tr. 247:8-11). The evidence in connection with the Administrative Expense Motion will address these concerns.[24]

---

[23] ($207,348.36 / 0.8) + $50,822.68 = $310,008.13

[24] Much of the evidence that S&L will submit is summarized in the Rule 59 Motion; however, S&L will also seek to introduce additional evidence. For example, S&L attorney R. J. Shannon sent the email attached as Exhibit A to counsel for the Texas Plaintiffs on August 8, 2022. In that email, Shannon informed the Texas Plaintiffs of the Debtor's

54.     But even if, for the sake of argument, S&L had some predisposition limiting its ability to pursue actions or defenses to Alex Jones or PQPR under certain circumstances, that predisposition would **_not_** hinder S&L's ability to provide unbiased advice with respect to the limited scope of services relevant prior to the September 20 Hearing. As the Court recognized in its ruling at the September 20 Hearing, whether a proposed professional is disinterested requires attention to the circumstances that may impair a professional's ability to offer impartial advice to its client. (Sept. 20, 2022, Hrg. Tr. 235:1-4). The scope of the proposed employment and limitations to that employment are among the circumstances that the Court should consider.

55.     The Court's concerns were not issues that arose in the first fifty-three (53) days of the Debtor's chapter 11 case that comprise the period for which S&L seeks retroactive approval of its employment through the Administrative Expense Motion. During that time, the Debtor was focused on administrative matters and how to address the Sandy Hook Litigation without untenable interruption to its business or administrative expense incurred in drawn out litigation with the Sandy Hook Plaintiffs. Under the circumstances of employment limited to services provided through the September 20 Hearing, the potential of a conflict actualizing at some later time would not amount to an interest adverse to the Debtor's estate.

### REPLY TO ARGUMENT THAT RETROACTIVE EMPLOYMENT UNDER BANKRUPTCY CODE § 327(e) IS NOT AVAILABLE

56.     The U.S. Trustee argues that retroactive employment under Bankruptcy Code § 327(e) is not available because (a) S&L is not the appropriate party to seek its employment under

---

basis for designating PQPR as an insider and cautioned about positions that could harm the chances of successfully prosecuting an action against PQPR. In particular, Shannon warned that if the Texas Plaintiffs obtained a finding establishing that "PQPR is not an insider, we lose the extended preference lookback period w/r/t PQPR and make getting its lien avoided more of an up-hill battle" and that "[a]n unavoidable PQPR lien also opens up paths for Alex Jones to terminate his employment with the Debtor, force it into liquidation, credit bid for the assets, and continue on at a different entity to the detriment of the bankruptcy estate and your clients." Shannon also indicated that while he did not think that avoidability of the lien obviated the need for permission to use cash collateral prior to the actual avoidance, it would be a good outcome if the Sandy Hook Plaintiffs were successful in that endeavor.

section 327(e) and (b) the scope of services reflected in the S&L Employment Application do not fall within the ambit of section 327(e). These arguments are inconsistent with applicable caselaw and the circumstances of this chapter 11 case.

### A. S&L Can Seek Approval of its Employment in Connection with the Administrative Expense Motion.

57. The U.S. Trustee asserts that the plain language of Bankruptcy Code § 327(e) provides that only the Debtor—as debtor in possession—can seek approval of its employment of S&L under that provision. UST Objection ¶ 23. This is contrary to the statutory language and relevant authority.

58. The language of Bankruptcy Code § 327(e) does not limit the party that can seek the approval of the employment of a professional. The statute provides:

> The trustee, with the court's approval, may employ, for a specified purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

While the statute requires that the trustee—or debtor in possession pursuant to Bankruptcy Code §§ 1107 or 1184—be the party to employ the professional, it is silent about which parties may seek court approval of the employment. Moreover, Bankruptcy Code § 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." The statutory framework does not prevent S&L from seeking the relief requested in the Administrative Expense Motion.

59. Relevant authority supports S&L's position. A professional may seek approval of its own employment for services rendered to a debtor in possession pursuant to an engagement agreement with the debtor in possession where the Debtor ceases pursuing the approval of such employment. *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474, 480 (B.A.P. 9th

32

Cir. 1996); *Blocksom v. Brown (In re Brown)*, 555 B.R. 854, 859 (Bankr. S.D. Ga. 2016) ("A trustee should not be allowed to leverage an exclusive ability to file employment applications against a professional seeking to be employed and compensated for services already performed."); *cf.* Bankruptcy Local Rule 2014-1(a) (requiring that an application for employment "by an attorney for the debtor" include certain information). An application for compensation and attendant administrative expense claim is an appropriate mechanism to seek such approval. *See In re Triangle Chems.*, 697 F.2d 1280, 1282 (5th Cir. 1983); *In re McKenzie*, 2013 Bankr. LEXIS 2672, at *2-*3 (Bankr. E.D. Tenn. July 2, 2013) (2013 WL 3335168); *In re Little Greek Rest.*, 205 B.R. 484, 486 (Bankr. E.D. La. 1996); *In re Saybrook Mfg. Co.*, 108 B.R. 366, 369-70 (Bankr. M.D. Ga. 1989); *see also In re Mohiuddin*, 627 B.R. 875, 884 (Bankr. S.D. Tex. 2021) (retroactively expanding the scope of attorney's employment under Bankruptcy Code § 327(e) in connection with an application for compensation).

60. The U.S. Trustee presents no argument as to why S&L cannot seek retroactive approval of its employment on a limited basis under Bankruptcy Code § 327(e). In its ruling at the September 20 Hearing, the Court left open the issue of where its decision left S&L in terms of retention for work previously done and compensation (Sept. 20, 2022, Hrg. Tr. 256:14-257:4). Courts have considered applications to employ under Bankruptcy Code § 327(e) after denial of an application under section 327(a). *Stapleton v. Woodworkers Warehouse, Inc. (In re Woodworkers Warehouse, Inc.)*, 323 B.R. 403, 405 (D. Del. 2005); *In re Star Ready Mix, Inc.*, 2008 Bankr. LEXIS 3400, at *5-*6 (Bankr. E.D. Cal. Dec. 18, 2008) (2008 WL 5338746) ("This court has already denied the Trustee's application to employ Klein as general counsel based on Klein's prior and concurrent representation of a creditor with interests adverse to the bankruptcy estate and that ruling is now final. That ruling, however, did not foreclose the possibility of Klein's employment

under § 327(e).");*see also* 3 COLLIER ON BANKRUPTCY ¶ 327.04[9] ("Although an attorney's lack of disinterestedness may preclude employment by the trustee for general purposes in conducting a bankruptcy case, the attorney may still be retained by the estate for a 'special purpose.'"). The S&L Employment Application did not limit the subsection of Bankruptcy Code § 327 under which the Debtor sought to employ S&L.[25] *See* S&L Employment Application ¶ 2. And, as set out further below, the S&L Employment Application indicated that the Debtor sought to employ S&L for clearly limited purposes while the Battaglia Firm was responsible for the strategy of the Debtor's chapter 11 case and the implementation of that strategy. *Id.* at ¶ 22.

## B. Retroactive Approval of S&L's Employment under Bankruptcy Code § 327(e) is Appropriate.

61.     S&L meets the standards for employment under Bankruptcy Code § 327(e) for the limited matters contemplated to be S&L's primary responsibilities set out in the S&L Employment Application. These matters include those related to (a) administrative matters such as the preparing and filing of notices, serving pleadings, and complying with local rules requirements, (b) matters related to enabling the Sandy Hook Litigation to continue to judgment, and (c) specific matters requested by the Debtor or lead bankruptcy counsel.

62.     Employment under Bankruptcy Code § 327(e) is appropriate where five (5) elements are present: (1) employment by the trustee or debtor in possession for a specified special purpose; (2) the specified purpose is not to represent the trustee or debtor in possession in conducting the case; (3) the professional is an attorney that represented the debtor; (4) the employment is in the best interest of the bankruptcy estate, and (5) the attorney does not represent

---

[25] While the S&L Employment Application argued that S&L met the standard for employment under section 327(a), the higher standard for disinterestedness under that provision subsumes entirely the similar standard for employment under section 327(e).

or hold any interest adverse to the debtor or the estate with respect to the matter on which the attorney is to be employed. 11 U.S.C. § 327(e). S&L satisfies each of these requirements.

> i. *The Debtor engaged S&L for specified limited purposes and S&L seeks, in the alternative, retroactive approval of its employment on such specified limited purposes.*

63.     The S&L Employment Application indicated that the Debtor sought to employ S&L for specified limited purposes. The Debtor contemplated that S&L would "be primarily responsible for the day-to-day management of the case, issues involving the Sandy Hook Litigation, and all routine activities typical to the Chapter 11 Case." S&L Employment Application ¶ 22. The Battaglia Firm's primary responsibility was to "provide legal advice regarding strategy for the Chapter 11 Case and implementation of that strategy." *Id.* The Debtor engaged S&L to provide a limited scope of services to the Debtor while the Battaglia Firm was responsible for advising the Debtor with respect to the direction of the chapter 11 case and the actions necessary to effectuate the Debtor's restructuring.

64.     Similarly, S&L seeks in the alternative through the Administrative Expense Motion retroactive approval of its employment from the Petition Date through the September 20 Hearing for a specified limited purpose. The limited purposes for which S&L seeks retroactive approval of its employment through the Administrative Expense Motion are (a) administrative matters such as the preparing and filing of notices, serving pleadings, and complying with local rules requirements, (b) matters related to enabling the Sandy Hook Litigation to continue to judgment, and (c) specific matters requested by the Debtor or lead bankruptcy counsel. Administrative Expense Motion ¶ 29.

> ii. *The limited purposes for which the Debtor engaged S&L and for which S&L seeks retroactive approval of its employment are not "conducting the case" under Bankruptcy Code § 327(e).*

65.     The statutory of framework of Bankruptcy Code § 327(e) excludes "conducting the case" from the specified purposes for which employment may be approved under that provision.

Courts may approve employment under section 327(e) for a specified purpose as long as that specified purpose is not "conducting the case."

66.     Courts have interpreted "conducting the case" to involve the preparation of the chapter 11 plan, liquidating the estate, and assisting in the claims objection process. *In re Hart Oil & Gas, Inc.*, 2013 Bankr. LEXIS 3128, at *8 (Bankr. D.N.M. Aug. 2, 2013) (2013 WL 3992252) (collecting cases); *see also* 3 COLLIER ON BANKRUPTCY ¶ 327.04[9][c] ("The reference to 'conducting the case' in section 327(e) includes those matters that form a part of the administration of the case under the Code. In a reorganization case, these matters include assisting in formulating a plan and assisting the trustee in carrying out required investigations . . . ."). Where there is another attorney serving as general bankruptcy counsel, special counsel may be retained for limited bankruptcy matters including obtaining court approval for the use of cash collateral, selling assets and disposing of related executory contracts, and preparing and negotiating a key employee retention program and providing payment to critical personnel of the debtor. *Stapleton v. Woodworkers Warehouse, Inc. (In re Woodworkers Warehouse, Inc.)*, 323 B.R. 403, 408 (D. Del. 2005). Matters other than "conducting the case" fall within the scope of Bankruptcy Code § 327(e).

67.     The limited purposes for which S&L seeks retroactive approval of its employment by the Debtor—(a) administrative matters such as the preparing and filing of notices, serving pleadings, and complying with local rules requirements, (b) matters related to enabling the Sandy Hook Litigation to continue to judgment, and (c) specific matters requested by the Debtor or lead bankruptcy counsel—are not the kind of core restructuring matters that courts have held to be "conducting the case" as that term is used in Bankruptcy Code § 327(e). Under the division of responsibilities contemplated in the S&L Employment Application and for which S&L seeks

approval of in the Administrative Expense Motion, the Battaglia Firm would be responsible for advising the Debtor with respect to the strategy and matters amounting to "conducting the case."

      iii.    *The Debtor engaged S&L as an attorney and S&L seeks retroactive approval of its employment as an attorney.*

68.    There can be no reasonable dispute that the Debtor engaged S&L as an attorney or that S&L seeks retroactive approval of its employment as an attorney. As set out in the S&L Employment Application, the Debtor engaged S&L as an attorney. And S&L seeks compensation and retroactive authorization of its employment as an attorney.

      iv.    *S&L Represented the Debtor prior to the Petition Date.*

69.    It should similarly be undisputed that S&L represented the Debtor prior to the Petition Date. The Debtor executed an engagement letter retaining S&L on June 6, 2022, effective retroactively to May 24, 2022.[26] S&L began providing services to the Debtor on June 1, 2022 [ECF No. 163-3 at p.2].

      v.    *Employment of S&L for the limited purposes for which S&L seeks retroactive approval of its employment was in the best interests of the Debtor's bankruptcy estate.*

70.    The Debtor's engagement of S&L for the limited purposes for which S&L seeks retroactive approval of its employment was in the best interests of the Debtor's bankruptcy estate. S&L attorneys had deep knowledge of the Sandy Hook Litigation and their involvement allowed the Battaglia Firm to focus on strategy and the implementation of that strategy to conduct the Debtor's chapter 11 case. The Debtor needed additional counsel and S&L was particularly qualified to assist on the litigation issues.

---

[26] As indicated in the engagement letter, S&L was formed on June 1, 2022. However, Kyung Lee through KSLPLLC familiarized himself with background on the Debtor, conferenced with counsel for PQPR, and began working on a first-day declaration prior to that date. [ECF No. 163-9]. S&L began providing services to the Debtor on June 1, 2022 [ECF No. 163-3 at p.1].

71.     S&L attorneys had extensive knowledge of the Sandy Hook Litigation as the result of their involvement in the IW Cases and work for the Debtor prior to the Petition Date. S&L attorneys were familiar with factual and legal issues of the litigation as well as the intersection of those issues with applicable bankruptcy law.[27] Issues surrounding the Sandy Hook Litigation and the automatic stay with respect to those actions were significant aspects of the early part of the Debtor's chapter 11 case and required substantial attention. Any new attorney would require substantial time to become familiar with the issues—for which the Debtor would incur substantial expense—and cause delay in resolving these issues in the Debtor's chapter 11 case.

72.     Further, the Debtor's engagement of S&L to address the issues surrounding the Sandy Hook Litigation and automatic stay provided the Debtor's lead counsel bandwidth to focus on strategy and implementation of that strategy to conduct the Debtor's chapter 11 case. The Battaglia Firm is a single attorney law firm, and as Mr. Battaglia represented to the Court at the September 20 Hearing, co-counsel was necessary to address the numerous issues in the early part of this case.[28] (Sept. 20, 2022, Hrg. Tr. 222:6-16). S&L provided at least 523.1 hours of services for the Debtor from the Petition Date through the September 20 Hearing on issues that would have otherwise required Mr. Battaglia's attention.

73.     The Debtor's engagement of S&L enabled the Debtor to move its chapter 11 case forward enough by the September 20 Hearing that it had a draft plan of reorganization prepared and was able to begin discussions about mediation with the Sandy Hook Plaintiffs. (*See* Sept. 20,

---

[27] For example, S&L had previously researched extensively whether the Sandy Hook Plaintiffs' claims fell under 28 U.S.C. § 157(b)(5) under caselaw in both the Southern District of Texas and the District of Connecticut. This allowed the Debtor to prepare its response to the Connecticut Plaintiffs' motion for relief from stay and respond to Alex Jones's request for stay of remand more efficiently than could have been handled by another firm.

[28] For example, S&L represented the Debtor in an emergency hearing in the U.S. Bankruptcy Court for the District of Connecticut on the same day that an emergency hearing with respect to amending the interim cash collateral order was held in this Court. It is unlikely that Mr. Battaglia could have prepared and argued both without co-counsel.

Hrg. Tr. 7:25-8:19, 9:11-16). Getting to this point required the Debtor to address numerous initial matters and reach a solution that would enable the Connecticut Litigation to continue without destroying the Debtor's ability to reorganize. This outcome required the retention of counsel in addition to the Battaglia Firm that was familiar with the details of the Sandy Hook Litigation.

> vi. *S&L does not and did not during the engagement period represent or hold any interest adverse to the debtor or the estate with respect to the limited purposes for which S&L seeks retroactive approval of its employment under Bankruptcy Code § 327(e).*

74. Even if S&L was not entirely disinterested for purposes of approval of employment under Bankruptcy Code § 327(a), S&L does not and did not during the engagement period represent or hold any interest adverse to the Debtor or the estate with respect to (a) administrative matters such as the preparing and filing of notices, serving pleadings, and complying with local rules requirements, (b) matters related to enabling the Sandy Hook Litigation to continue to judgment, and (c) specific matters requested by the Debtor or lead bankruptcy counsel. S&L therefore meets this element for approval of its employment under Bankruptcy Code § 327(e).

75. An entity has an adverse interest to the estate where (a) it possesses or asserts any economic interest that would tend to lessen the value of the bankruptcy estate or would create either an actual or potential dispute in which the estate is a rival claimant or (b) possesses a predisposition under circumstances that renders the predisposition a bias against the estate. *See I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir. 2005). The "definition must be employed with an eye to the specific facts of each case, and with attention to circumstances that may impair a professional's ability to offer impartial, disinterested advice to his or her client." *Id.* The question is whether S&L has a "meaningful incentive" to act contrary to the best interests of the Debtor's bankruptcy estate, *In re Quality Bev. Co.*, 216 B.R. 592, 595

(Bankr. S.D. Tex. 1995), or "personal interest" contrary to the interests of the bankruptcy estate, *In re W. Delta Oil Co.*, 432 F.3d at 355.

76.     S&L does not and did not during the engagement period represent any other party in connection with the Debtor's chapter 11 case or the Sandy Hook Litigation. Although S&L attorneys previously represented the IW Debtors in the litigation, (a) the Texas Plaintiffs released their claims against the IW Debtors by May 19, 2022; (b) the Connecticut Plaintiffs dismissed their claims against the IW Debtors with prejudice between May 13 and May 26, 2022;[29] and (c) the IW Debtors are not creditors in the Debtor's chapter 11 case. S&L does not and never has represented Alex Jones, PQPR, or any other party in interest in this chapter 11 case. [ECF Nos. 163-5 & 163-6]; (Sept. 20, 2022, Hrg. Tr. 61:23-62:1, 62:19-20, 131:15-132:5, 149:23-150:4). The S&L engagement agreement expressly provides that the representation of the Debtor did not include any "parents, subsidiaries, employees, officers, owners, or affiliates (including commonly owned companies) . . . ." [ECF No. 163-3, at p. 6 of 12]. Further, S&L took affirmative steps prepetition to ensure that Jones would not have control over the Debtor's restructuring. [ECF No. 178-1, 178-2, 178-3]; (Sept. 20, 2022, Hrg. Tr. 95:14-96:1).

77.     Similarly, S&L does not and did not during the engagement period possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or create either an actual or potential dispute with the Debtor with respect to the limited purposes for which S&L seeks retroactive approval of its employment under Bankruptcy Code § 327(e). The only economic interest S&L has in the Debtor's chapter 11 case is with respect to any administrative expense

---

[29] The Connecticut Plaintiffs filed a notice of dismissal of their claims with prejudice against the IW Debtors with the U.S. Bankruptcy Court for the District of Connecticut on May 13, 2022, along with an unopposed motion for dismissal of the claims with prejudice. [ECF No. 163-20]. The Connecticut Bankruptcy Court held a hearing on May 24, 2022, at which it granted the unopposed motion to dismiss and requested a proposed order. The Connecticut Bankruptcy Court entered the proposed order submitted by the Connecticut Plaintiffs on May 26, 2022. [Adv. No. 22-05006 (Bankr. D. Conn.), Dkt. No. 28].

claim allowed by the Court for the services provided and expenses incurred on behalf of the Debtor as debtor in possession.

78.     Nor does S&L possess any predisposition under circumstances that would render such predisposition a bias against the Debtor or the bankruptcy estate with respect to the limited purposes for which S&L seeks retroactive approval of its employment under Bankruptcy Code§ 327(e). *West Delta Oil* illustrates the kind of situation that might give rise to a predisposition amounting to an adverse interest. In that case, the attorney for the debtor in possession simultaneously represented the debtor and sought to acquire a financial interest in the debtor along with a group of other investors. *In re W. Delta Oil Co.*, 432 F.3d at 356-57. In reaching its holding that the attorney possessed an adverse interest, the Fifth Circuit Court of Appeals reasoned that:

> A lawyer who simultaneously represents a debtor in a bankruptcy proceeding and seeks to acquire a financial interest in the debtor faces myriad quandaries, particularly in the liquidation context. In essence, the lawyer is representing a seller (the debtor) and a buyer (himself). Efforts to preserve and enhance the value of the seller's assets will work inevitably against the buyer's interest in purchasing at the lowest price possible. In addition, efforts to market the seller to other potential bidders may drive up the price, forcing buyers to increase their bids. Moreover, opting to reorganize rather than liquidate may reduce or eliminate possible avenues for anyone wishing to acquire specific economic interests. In short, by operating as a potential buyer, a lawyer for a bankruptcy estate possesses a predisposition to reduce the price of the estate's assets which works to the detriment of the estate, its creditors, and its equity stakeholders.

*Id.* at 356. A predisposition creates an adverse interest where the circumstances give rise to a *personal interest* that the professional has in the bankruptcy case. *See id.* at 355 ("[A]ttorneys engaged in the conduct of a bankruptcy case should be free of the slightest personal interest . . . ." (internal quotation marks omitted)). S&L does not have any personal interest predisposing it to take actions contrary to the Debtor or the estate with respect to (a) administrative matters such as the preparing and filing of notices, serving pleadings, and complying with local rules requirements,

(b) matters related to enabling the Sandy Hook Litigation to continue to judgment, or (c) specific matters requested by the Debtor or lead bankruptcy counsel.

79.     With respect to administrative matters and matters requested by the Debtor and lead bankruptcy counsel, S&L submits that it is unreasonable that any personal interest even *could* exist. There is no room for personal interest on matters like obtaining service of pleadings and notices of hearings, preparing the status report required by Bankruptcy Code § 1188(c), or representing the Debtor at the section 341 meeting. And matters requested by the Debtor or lead bankruptcy counsel outside of S&L's primary responsibility necessarily involve the evaluation by another counsel.

80.     Further, the positions represented in this chapter 11 case and the IW Cases indicate that S&L and its professionals has no predisposition with respect to the Sandy Hook Litigation. In this chapter 11 case, S&L represented the Debtor in seeking to maintain the automatic stay to the extent necessary to preserve the Debtor's estate and in agreeing to and affirmatively seeking modification of the automatic stay where beneficial to the estate. *See* Debtor's Response to Emergency Motion for Relief from the Automatic Stay [ECF No. 78]; Agreed Order Modifying the Automatic Stay to Allow the Connecticut Litigation to Continue to Final Judgement [ECF No. 117]; Debtor's Emergency Motion for an Order Modifying the Automatic Stay to Allow the Heslin[]/Lewis State Court Suit to Continue to Judgement [ECF No. 2]. S&L also represented the Debtor in rejecting Alex Jones's request to extend the automatic stay as to him individually. In the IW Cases, S&L professionals removed and opposed remand of the Sandy Hook Litigation absent dismissal of the claims against the IW Debtors with prejudice, [Adv. No. 22-01023-hcm (Bankr. W.D. Tex.), Dkt. No. 9]; [Adv. No. 22-05004 (Bankr. D. Conn.), Dkt. No. 22], but sought to *expedite* dismissal of the claims against the IW Debtor with prejudice and attendant remand of the

removed litigation when offered by the Plaintiffs, [Case No. 22-60020 (Bankr. S.D. Tex.), Dkt. Nos. 91-15 & 91-16]. S&L was agnostic about whether the Sandy Hook Litigation claims were determined in state court or bankruptcy court, except to the extent it affected the relevant bankruptcy estates.

C. **The Majority of Services S&L Provided to the Debtor During the Engagement Period Do Not Constitute Representing the Debtor in "Conducting the Case."**

81.     The U.S. Trustee argues that the Court cannot retroactively approve S&L's employment under Bankruptcy Code § 327(e) because the services provided by S&L include representation on matters that are "conducting the case." UST Objection ¶ 24. But this does not present a serious obstacle. A professional is not entitled to compensation for services that exceed the scope of its employment. *See, e.g.*, *In re Mohiuddin*, 627 B.R. 875, 880 (Bankr. S.D. Tex. 2021) ("Estate professionals are not entitled to compensation for work exceeding the scope of the order authorizing the professional's employment."). If the Court retroactively approved S&L's employment under Bankruptcy Code § 327(e), only the services falling under the relevant scope of the employment would be compensable.

82.     Most of the services provided by S&L would be appropriate under Bankruptcy Code § 327(e).  As set out in the Administrative Expense Motion, the largest portion of the services provided by S&L to the Debtor were related to the Sandy Hook Litigation and reflected in the Litigation (116.4 hours; $80,536.25), Relief from Stay Proceedings (82.9 hours; $60,632.50), and Fee/Employment Applications (71.9 hours; $44,535.00) categories. The services in these categories that were not related to the Sandy Hook Litigation were largely either administrative matters or matters the Debtor designated for S&L to handle. The services provided in other categories also largely reflect matters that S&L was asked to handle. For example, S&L was tasked

with responding to the Tort Committee Motion [ECF no. 102] and the attendant the motion to expedite [ECF No. 107], and S&L recorded such services under the Case Administration category.

83.    Certain services provided by S&L, however, do not fall within the scope of § 327(e). For example, S&L professionals provided 15.5 hours of services under the Plan and Disclosure Statement Category and 2.7 hours of services in the Claims Administration and Objections category. While these services benefited the estate and were related to matters involving the Sandy Hook Litigation—e.g., the analysis of Jones's asserted indemnity claim was relevant in the Debtor's rejection of Jones's request for the Debtor to seek extension of the automatic stay—they likely amount to providing services related to "conducting the case" as that term is used in Bankruptcy Code § 327(e).

84.    The law is clear on what the effect would be if the Court retroactively approves S&L's employment under section 327(e). Only the matters within the scope of employment would be compensable. But the thrust of the services provided by S&L were for the particular purpose identified in the S&L Employment Application to be S&L's primary responsibility and for which S&L seeks retroactive approval of its employment under Bankruptcy Code § 327(e) in the alternative.

## REPLY TO ARGUMENTS THAT S&L IS NOT ENTITLED TO COMPENSATION OR EXPENSES UNDER BANKRUPTCY CODE § 503(b)(1)(A)

85.    The UST Objection and Debtor/Trustee Objection oppose allowance of an administrative expense under Bankruptcy Code § 503(b)(1)(A) for S&L's fees. But their arguments do not undercut the position that S&L actually asserts.

86.    S&L submits that even if the Court adopts the U.S. Trustee's mistaken assertion that S&L cannot seek retroactive approval of its limited employment under section 327, the Court can still grant *de facto* approval of S&L's employment and allow an administrative expense under

section 503(b)(1)(A) because S&L meets the substantive requirements of section 327. Further, expenses incurred by S&L that would otherwise have been borne by the estate—e.g., the cost of serving pleadings—are properly administrative expenses of the estate even absent S&L's ability to meet the substantive requirements of section 327.

### A. Bankruptcy Code § 503(b)(1)(A) Provides a Mechanism to Allow an Administrative Expense Claim for S&L's Fees if the Court Determines that S&L Does Not Have the Ability to Seek Approval of its Employment.

87.     The UST Objection and the Debtor/Trustee Objection cite numerous cases supporting the proposition that Bankruptcy Code § 503(b)(1)(A) cannot be used to circumvent the substantive requirements of Bankruptcy Code § 327. S&L agrees that this is consistent with the weight of authority.[30]

88.     However, this either misunderstands or ignores S&L's actual argument with respect to section 503(b)(1)(A). S&L's contention that section 503(b)(1)(A) can form a basis to allow fees where the professional's employment could have been approved under section 327 but for the professional's inability to seek approval of its own employment for some reason. *Mehdipour v.*

---

[30] S&L contends that this authority is no longer persuasive in light of subsequent developments in the law on the standards applied to professional compensation under Bankruptcy Code § 330. The premise underlying these decisions is that allowing professional compensation under section 503(b)(1)(A) would render nugatory sections 327, 330, and/or 503(b)(2). *See, e.g., F/S Airlease II v. Simon*, 844 F.2d 99, 109 (3d Cir. 1988). While this would be sound if the same standard applied to allowance of compensation under section 330 (and thus allowance as an administrative expense under 503(b)(2)) and an administrative expense under section 503(b)(1)(A), the standards are no longer the same. An administrative expense under section 503(b)(1)(A) requires showing that the goods or services received by the bankruptcy estate in exchange for the obligation directly benefit the estate. *McBride v. Riley (In re Riley)*, 923 F.3d 433, 439 (5th Cir. 2019). While binding Fifth Circuit precedent *previously* required a professional's services to have resulted an identifiable, tangible, and material benefit to the estate for an award of compensation under section 330 viewed retrospectively, this was abrogated by the Fifth Circuit Court of Appeals sitting *en banc* in *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266 (5th Cir. 2015), in which the Fifth Circuit adopted a prospective standard focused on whether the services were reasonably likely to benefit the estate at the time the services were provided. *Id.* at 268. Therefore, there are amounts allowable under sections 330 and 503(b)(2) that would *not* be allowable under 503(b)(1), even where both provisions are available. *Cf. In re Riley*, 923 F.3d at 440-41 (so holding with respect to expenses). Sections 327, 330, and 503(b)(2) would not be rendered nugatory by the existence of an alternative mechanism that requires a higher showing, covers less, and does not provide the same certainty.

45

*Marcus & Millichap (In re Mehdipour)*, 202 B.R. 474 (B.A.P. 9th Cir. 1996), *aff'd* 139 F.3d 1303 (9th Cir. 1998), supports S&L's position.

89.     It is not clear that any objecting party disagrees with this application of section 503(b)(1) and *Mehdipour*. Neither the Debtor nor the Subchapter V Trustee oppose the Rule 59 Motion or S&L's ability to seek retroactive approval of its limited employment under Bankruptcy Code § 327(a) or (e). The Plaintiffs oppose the Rule 59 Motion but not the Administrative Expense Motion. Alex Jones possibly still opposes the Rule 59 Motion but not the Administrative Expense Motion to the extent that the Requested Administrative Expense Claim includes S&L's voluntary reduction. The U.S. Trustee does not directly argue against retroactive approval of S&L's limited employment under Bankruptcy Code § 327(a) and asserts that S&L's reliance on *Mehdipour* is misplaced because the S&L Employment Application was denied due to the Court's finding that S&L had a material adverse interest, not because *Mehdipour* does not apply or was wrongly decided. Nevertheless, to the extent that a dispute could be inferred from the UST Objection or the Debtor/Trustee Objection, S&L addresses the issue below.

        *i.*   *Mehdipour is applicable if the Court adopts the position urged by the U.S. Trustee that S&L lacks authority to seek approval of its limited employment.*

90.     In *Mehdipour*, a debtor in possession engaged a broker to market and sell real property owned by the bankruptcy estate. 202 B.R. at 477. The debtor filed an application to employ the broker but later withdrew the application.[31] *Id.* The bankruptcy court ruled that the broker lacked standing to file its own application seeking approval of its employment. *Id.* The bankruptcy court granted, however, the broker's application for an administrative expense under

---

[31] The debtor in *Mehdipour* withdrew the application after it learned that the real estate agent providing services to the debtor through the broker (a) assisted the purchaser of the property (who was also a client of the agent) in finding partners for the acquisition of the property, (b) contacted his business partner in other transactions about the potential deal, and (c) loaned money to the purchaser for an escrow deposit for the property. 202 B.R. at 477. The bankruptcy court held that notwithstanding these connections the broker was disinterested and did not hold a participatory interest in the purchaser. *Id.* at 480.

Bankruptcy Code § 503(b)(1)(A), which the debtor appealed. *Id.* at 477-78. The Bankruptcy Appellate Panel for the Ninth Circuit affirmed the ruling of the bankruptcy court. *Id.* at 481. The 9th Circuit also affirmed. *Mehdipour v. Marcus & Millichap (In re Mehdipour)*, 139 F.3d 1303, 1303 (9th Cir. 1998) (per curiam).

91.     In reaching its decision to affirm, the BAP reasoned that section 503(b)(1) was available to allow professional fees where the professional meets the requirements of section 327. *In re Mehdipour*, 202 B.R. at 478-79. Relevant to the Court's decision was that there was no practical method for the professional to obtain approval of its employment under the circumstances. *See id.* at 479 ("[The broker] availed itself of every potential method for obtaining court approval of its employment. After its application was denied, [the broker]'s only recourse was to apply for fees pursuant to § 503."). The bankruptcy court's allowance of the administrative expense under Bankruptcy Code § 503(b)(1)(A) was *de facto* retroactive approval of the professional's employment. *Id.* at 480.

92.     While *Mehdipour* addresses a particular and uncommon situation, the position advanced by the U.S. Trustee would create an analogous situation here. The U.S. Trustee argues that S&L does not have the ability to (a) pursue the Rule 59 Motion or (b) seek retroactive approval of its employment under Bankruptcy Code § 327(e).[32] The Court should reject those arguments.[33] But if it does not, the reasoning of *Mehdipour* applies and the Court should consider the same relevant factors under Bankruptcy Code § 503(b)(1)(A). The point of the Ninth Circuit BAP's

---

[32] The UST Objection does not, however, argue that S&L is not able to seek retroactive approval of its employment under Bankruptcy Code § 327(a).

[33] *Mehdipour* notes that the bankruptcy court's ruling that the broker did not have standing was in error. 202 B.R. at 479. According to the BAP, "[s]ection 327 does not, by its terms, limit standing of a professional to seek employment." *Id.*

decision is that what matters is whether the professional meets the standard for employment under Bankruptcy Code § 327.

      ii.    *Mehdipour is consistent with Gemini Interests and other decisions holding that Bankruptcy Code § 503(b) does not provide a way to avoid the substantive requirements of Bankruptcy Code § 327.*

93.    The UST Objection arguably implies that S&L's reading of *Mehdipour* is inconsistent with *In re 1002 Gemini Interests LLC*, 2015 Bankr. LEXIS 612 (Bankr. S.D. Tex. Feb. 27, 2015) (2015 WL 913542). But there is no inconsistency. *Gemini Interests* and related authority did not address the situation at issue in *Mehdipour* or that the U.S. Trustee's position would create here. Indeed, *Gemini Interests* expressly considered retroactive employment on the merits. *Id.* at 41-42. While *Gemini Interests* and other cases indicate that section 503(b) cannot be used to get around the substantive requirements of section 327, those authorities do not prohibit allowing a claim under that section where that is the only recourse for consideration of a professional's employment on the merits.

94.    In *Gemini Interests*, the bankruptcy court denied allowance of certain requested compensation by an examiner (9.3 hours) and his counsel (30.5 hours) for services that exceeded the scope of the examiner's duties under the relevant appointment order. *See id.* at *15-*22, *24-*33. The examiner and his professionals sought in the alternative that the fees be allowed as substantial contribution claims under Bankruptcy Code § 503(b)(3). *Id.* at 38-39. The court denied the request for allowance of the fees under section 503(b)(3), adopting the reasoning of several circuit court decisions holding that professionals could not circumvent the requirements of section 327 through section 503(b).[34] *Id.* at 39.

---

[34] *Gemini Interests* was decided prior to the Fifth Circuit's abrogation in *Woerner* of the retrospective "material benefit to the estate" standard for professional compensation under Bankruptcy Code § 330. The bankruptcy court's opinion in *Gemini Interests* was published on February 27, 2015. The Fifth Circuit's *en banc* opinion in *Woerner* was published on April 9, 2015. It is questionable whether the reasoning in *Gemini Interest* still stands.

95.     However, the court in *Gemini Interests* expressly evaluated whether to retroactively expand the powers of the examiner and his counsel. *Id.* at 41-42. The examiner failed to establish excusable neglect for the delay in seeking the expansion of the appointment and employment orders and so was not entitled to such retroactive expansion.[35] *Id.* The court did not need to address the issue that the U.S. Trustee seeks to create here and the 9th Circuit BAP addressed in *Mehdipour*—where the professional meets the requirements of one or more provisions of section 327 but lacks standing to seek approval of its employment.

96.     Similarly, the other authorities cited in the UST Objection and the Debtor/Trustee Objection for the proposition that Bankruptcy Code § 503(b) does not provide an alternative to the substantive requirements of Bankruptcy Code § 327 did not address a situation where the professional was unable to seek consideration of retroactive employment on the merits. In many of these cases, retroactive approval of employment was expressly considered. *See, e.g.*, *F/S Airlease II v. Simon*, 844 F.2d 99, 105-108 (3d Cir. 1988) (evaluating whether retroactive approval of employment of professional appropriate); *Cushman & Wakefield v. Keren P'ship (in Re Keren P'shp.)*, 189 F.3d 86, 87-88 (2d Cir. 1999) (affirming bankruptcy court's decision to deny retroactive approval of professional's employment); *In re Cutler Mfg. Corp.*, 95 B.R. 230, 231 (Bankr. M.D. Fla. 1989) ("This Court has found [the professional] was not eligible to be employed as a professional. If these individual persons had sought to be employed as a professional, they, too, would have been denied because they are not disinterested persons. They cannot now come to this Court *upon the same facts and evidence* and seek to establish under § 503 rights they could

---

[35] The court also questioned without deciding whether it had "the authority to retroactively expand the scope of a professional's powers in order to approve that professional's compensation for work that was performed outside the scope of the original retention order." *In re 1002 Gemini Interests LLC*, 2015 Bankr. LEXIS 612, at *41-*42. But in the subsequent case of *In re Mohiuddin*, 627 B.R. 875(Bankr. S.D. Tex. 2021), the same judge—Judge Marvin Isgur— held that the court *did* have the authority to retroactively expand the scope of professionals. *Id.* at 884.

not acquire under § 327." (emphasis supplied)). In others, the ability of the professional to seek retroactive approval of its employment was referenced in the decision. *See, e.g.*, *In re S. Diversified Props., Inc.*, 110 B.R. 992, 996 (Bankr. N.D. Ga. 1990) (noting that the professional neither requested retroactive approval of employment nor showed exceptional circumstances); *Shapiro Buchman LLP v. Gore Bros. (In re Monument Auto Detail)*, 226 B.R. 219, 226 (B.A.P. 9th Cir. 1998) (evaluating the professional's assertion regarding retroactive employment that it failed to seek from the bankruptcy court); *McCutchen, Doyle, Brown & Enersen v. Official Comm. of Unsecured Creditors (In re Weibel, Inc.)*, 176 B.R. 209, 213 (B.A.P. 9th Cir. 1994) (holding that the professional failed to establish that it met the requirements for employment of Bankruptcy Code § 327); *cf. In re Albrecht*, 245 B.R. 666, 668 (B.A.P. 10th Cir. 2000) (noting that the professional's employment had been approved as special counsel after previously being denied under section 327(a)). In the remaining authorities, the facts at issue did not involve a situation where the professional met the requirements for retroactive approval of its employment but lacked standing to seek such approval. *See In re Milwaukee Engraving Co.*, 219 F.3d 635 (7th Cir. 2000); *In re Garden Ridge Corp.*, 326 B.R. 278, 281 (Bankr. D. Del. 2005) (referencing also the ability to seek retroactive approval of employment). By and large, these cases reject the limitations on standing that the U.S. Trustee asserts here and would make *Mehdipour* applicable.

97.     That *Mehdipour* is not inconsistent with these decisions is reflected in the argument presented in the UST Objection. According to the U.S. Trustee:

> the decision in *Mehdipour* was not intended to allow professionals who do not meet the retention requirements under Section 327 other means to obtain payment of their fees. The Ninth Circuit BAP made that clear in stating: "[c]ompensation under § 503 does not allow the professional to sidestep the requirements of § 327 and 330—the professional must still be disinterested and not hold any adverse interest." *Mehdipour*, 202 B.R. at 479.

UST Objection ¶ 20. S&L does not disagree with the U.S. Trustee's reading of *Mehdipour*. But the decision does mean something—that courts can consider a professional's compensation under the relevant standards of Bankruptcy Code § 327 and retroactive approval employment notwithstanding unusual circumstances preventing formal approval of that employment.

       iii.   *The denial of the S&L Employment Application does not prevent evaluation of whether S&L meets the requirements of §327 in connection with the Administrative Expense Motion.*

98.     Directly addressing S&L's position, the UST Objection states that S&L's reliance on *Mehdipour* is misplaced because the S&L Employment Application was denied as the result of the Court's finding that S&L had an adverse interest. UST Objection ¶ 20. This argument is flawed.

99.     As addressed above, neither collateral estoppel nor the law of the case doctrine applies with respect to the Administrative Expense Motion. *Supra* ¶¶ 29-45. The Court stated in its ruling at the September 20 Hearing that its decision would require further questions about S&L's retention and work performed and that all parties' rights were reserved regarding compensation for work performed for the Debtor prior to the ruling. (Sept. 20, 2022, Hrg. Tr. 256:14-257:4). Collateral estoppel does not apply because (a) the issues at stake are not identical S&L seeks a more limited scope of employment in the administrative expense motion, (b) the issue of S&L's disinterestedness was not "actually litigated" because it was not raised or contested by the parties, and (c) the issue of S&L's disinterestedness was not a critical and necessary part of the Court's decision because the decision is consistent with a potential conflict that is not an issue in light of the limited employment and the U.S. Trustee argued for an independent, entirely discretionary basis to deny the S&L Employment Application. The law of the case doctrine is discretionary and exceptions to the general doctrine are present because (x) S&L seeks to present substantial additional evidence on the issue of its disinterestedness and (y) the Court's ruling at the September 20 Hearing was clear error.

100.     The real question is whether S&L *actually has* an adverse interest and what any adverse interest entails. The U.S. Trustee does not directly assert that S&L has an adverse interest, but rather that the Court previously found that S&L had one. UST Objection ¶ 20. Neither the U.S. Trustee, any other party in interest, nor the Court has articulated *what* that adverse interest is. Neither the U.S. Trustee nor any party in interest has argued for the existence of this adverse interest in connection with the S&L Employment Application or the Administrative Expense Motion. S&L contends that this is because no such adverse interest exists.

101.     S&L seeks to establish that it does not hold or represent any adverse interest in connection with either (a) the Rule 59 Motion; (b) retroactive approval of S&L's employment in connection with a request for administrative expense under section 330 and 503(b)(2); or (c) *de facto* retroactive approval of S&L's employment in connection with a request for administrative expense under section 503(b)(1). To the extent that the U.S. Trustee does not oppose consideration of this issue by the Court, but rather just consideration in connection with the request under Bankruptcy Code § 503(b)(1), the dispute is not material. S&L raised *Mehdipour* because of the position taken by the U.S. Trustee.

**B.  Bankruptcy Code § 503(b)(1)(A) Provides a Mechanism for Reimbursement of S&L's Out-of-Pocket Expenses that Would Have Been Borne by the Debtor.**

102.     Neither the UST Objection, the Debtor/Trustee Objection, nor the AEJ Limited Objection directly oppose S&L's request for reimbursement of expenses under Bankruptcy Code § 503(b)(1)(A). However, the U.S. Trustee's arguments could possibly apply to reimbursement of these expenses.

103.     S&L contends that at least expenses that would otherwise be payable by the Debtor as administrative expenses under Bankruptcy Code § 503(b)(1) are reimbursable to S&L under that provision. These include, among other things, the costs of noticing pleadings and hearings that

would have otherwise been borne by the Debtor and payable by the Debtor's estate. *Cf. In re Sanchez Energy Corp.*, 2021 Bankr. LEXIS 1175, at *32 (Bankr. S.D. Tex. May 3, 2021) (2021 WL 1747364) (reasoning that the debtor in possession would have been obligated to provide notice if the applicant had not provided such notice for the debtor).

104.     The Fifth Circuit's reasoning in *McBride v. Riley (In re Riley)*, 923 F.3d 433 (5th Cir. 2019), supports S&L's position. The U.S. Trustee argues that *Riley* does not apply because the issue was related to a chapter 13 case. But this overlooks *how* the Fifth Circuit analyzed the issue before it and the statutory scheme of Bankruptcy Code § 503.

105.     The relevant issue in *Riley* was whether the bankruptcy court committed legal error by concluding that certain expenses incurred by the attorney for a chapter 13 debtor were "not reimbursable as necessary expenses to preserve the estate under 11 U.S.C. § 503(b)(1)." *Id.* at 437. The Fifth Circuit panel did not reject the reimbursement out of hand—for example, by holding that such reimbursement could only occur pursuant to sections 330(a) and 503(b)(2)—but instead analyzed the expenses under the standard two prong test applicable to all other asserted section 503(b)(1) claims. According to *Riley*, the standard is: "First, the debt must arise from a post-petition transaction with the estate, rather than a transaction with the debtor personally; second, the goods or services received in exchange for the debt must directly benefit the estate." *Id.* at 439. While *Riley* ultimately held that the expenses at issue did not qualify as expenses necessary to preserve the estate, *id.*, what is relevant here is the way that the Fifth Circuit analyzed the issue.

106.     Section 503 does not make a distinction between attorneys for chapter 13 debtors and attorneys for chapter 11 debtors in possession. Rather, Bankruptcy Code § 503(b)(2) provides that administrative expenses include "compensation and reimbursement awarded under section 330(a) of [the Bankruptcy Code.]" The difference lies in what is required for an award under

section 330(a) for an attorney to a chapter 13 debtor and an attorney for a chapter 11 debtor. If Bankruptcy Code § 503(b)(1) provides an alternative mechanism for allowance of expenses incurred by an attorney for a chapter 13 debtor that could also potentially be allowed under section 330(a)—as the Fifth Circuit's reasoning in *Riley* indicates it does—it would also provide an alternative for the allowance of expenses for attorneys for chapter 11 debtors.

107.    *Riley* also demonstrates why this reading of section 503 does not render any provision of the Bankruptcy Code meaningless. Some expenses *may be* reimbursable under Bankruptcy Code §§ 330(a) and 503(b)(2) that *are not as a matter of law* reimbursable under Bankruptcy Code § 503(b)(1). *Id.* at 440,443. This applies for an attorney for a chapter 11 debtor in possession just as much as it does for an attorney for a chapter 13 debtor. Bankruptcy Code § 330(a)(1)(B) provides for reimbursement for actual and necessary expenses related to providing services reasonably likely to benefit the debtor's estate viewed prospectively. *See Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 276 (5th Cir. 2015). Under Bankruptcy Code § 503(b)(1)(A), the costs and expenses must *actually be* necessary for preserving the estate. *See In re Riley*, 923 F.3d at 439.

## REPLY TO ARGUMENT THAT S&L IS NOT ENTITLED TO APPLY ITS RETAINER TO PAY THE FILING FEE FOR THE DEBTOR'S CHAPTER 11 CASE

108.    The U.S. Trustee argues that S&L improperly seeks to invoke Bankruptcy Code § 363(c) as a basis for payment of its professional fees and expenses. But that is not the relief sought in the Administrative Expense Motion.

109.    S&L seeks to apply its Retainer to the $1,738.00 filing fee incurred by the Debtor in this chapter 11 case. Administrative Expense Motion ¶ 43. Under the engagement agreement between the Debtor and S&L (the "Engagement Agreement"), the Debtor was required to reimburse S&L for filing fees, which would be included in S&L's invoices to the Debtor if paid

by S&L. (Debtor's Ex. 3 at p.12 [ECF No. 163-3]). The use of the Retainer to pay the filing fee according to the Engagement Agreement is in the ordinary course of business for the Debtor.

110.　Courts have utilized a "horizontal" test and a "vertical" test to determine whether a transaction falls within a debtor in possession's ordinary course of business. *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013). The horizontal test "requires the court to look to similar businesses and determines whether the transaction at issue is one that would normally be entered into by a similar business." 3 COLLIER ON BANKRUPTCY ¶ 363.03[1]. The vertical test asks "whether the transaction is one that creditors would reasonable expect the debtor to enter into." *Id.*

111.　Both the horizontal and vertical tests support approving application of the Retainer to the filing fee as an ordinary course expense here. Section 1930 of title 28 of the United States Code required the Debtor to pay the filing fee upon commencing its chapter 11 case. The use of retainer funds held in trust by an attorney for a debtor in possession to pay this required filing fee pursuant to an engagement agreement is a common practice. The transaction is therefore one that would normally be entered into by a business filing a chapter 11 case and could be reasonably anticipated by creditors.

112.　Further, the Debtor does not oppose the use of the Retainer to cover the filing fee as requested in the Administrative Expense Motion. The Debtor and the Subchapter V Trustee oppose only the allowance of an administrative expense for S&L's fees, absent court approval of S&L's employment.[36]

---

[36] Further, as set out above, neither the Debtor nor the Subchapter V Trustee oppose the Rule 59 Motion nor present any argument in the Debtor/Trustee Objection against retroactive employment of S&L.

**REPLY TO ARGUMENT THAT THE PARTIES CANNOT CONSENSUALLY
RESOLVE THE DISPUTES IN THE ADMINISTRATIVE EXPENSE MOTION, THE
RULE 59 MOTION, AND OTHER OSTENSIBLE DISPUTES**

113. The U.S. Trustee argues in essence that the parties cannot consensually resolve the Administrative Expense Motion, the Rule 59 Motion, and S&L's right to appeal the denial of the S&L Employment Application. *See* UST Objection ¶¶ 29-30. Under the U.S. Trustee's view, the parties would be required to litigate the matters to conclusion, including any appeals.

114. The U.S. Trustee cites *Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings Inc.)*, 508 B.R. 283 (S.D.N.Y. 2014), in support of this position. In *Lehman*, members of the official committee of unsecured creditors sought an administrative expense for the fees of professionals retained by the individual committee members. *Id.* at 287. The proposed plan of reorganization provided that the individual committee members' reasonable professional fees would be treated as administrative expenses, and the bankruptcy court confirmed the plan. *Id.* at 287-88. In accordance with the plan, the individual committee members filed applications for the payment of their individual professional fees, which the bankruptcy court granted over the Region 2 U.S. Trustee's objection. *Id.* at 288. The U.S. District Court for the Southern District of New York reversed the bankruptcy court's ruling, reasoning that "because § 503(b)—the sole source of administrative expense—excludes paying professional fee expenses on the basis of committee membership, the Individual Members cannot have their professional fee expenses paid as administrative expenses solely on the basis of their committee membership." *Id.* at 290-92, 296. The district court remanded the proceeding to the bankruptcy court to determine whether the individual committee members made substantial contributions that would entitle them to have their professional fee expenses paid as administrative expense claims under Bankruptcy Code § 503(b)(4). *Id.* at 296.

115.    As cases interpreting *Lehman* have explained, however, the decision does not prevent settlement of asserted professional fees where there exists a mechanism for the payment of the professional fees at issue. *See City of Rockford v. Mallinckrodt PLC (In re Mallinckrodt PLC)*, 2022 U.S. Dist. LEXIS 54785, at *39 (D. Del. Mar. 28, 2022) (2022 WL 906458); *In re Mallinckrodt PLC*, 639 B.R. 837, 906 n. 229 (Bankr. D. Del. 2022); *In re Purdue Pharma L.P.*, 633 B.R. 53, 66 (Bankr. S.D.N.Y. 2021), overruled on other grounds by 635 B.R. 26 (S.D.N.Y. 2021); *In re Stearns Holdings*, LLC, 607 B.R. 781, 793 (Bankr. S.D.N.Y. 2019). The issue in *Lehman* was that the plan provided for the payment of the individual committee members' legal fees without requiring them to show any substantial contribution. It did not involve the settlement of asserted but disputed substantial contribution claims, but rather sought to avoid entirely the need to demonstrate substantial contribution.

116.    Here, any settlement of the Administrative Expense Motion would also result in a settlement of (a) the Rule 59 Motion; (b) potential appeal of the denial of the S&L Employment Application; (c) retroactive approval of S&L's employment for the limited period under Bankruptcy Code § 327(a); (d) retroactive approval of S&L's employment for the limited period and under limited scope under Bankruptcy Code § 327(e); (e) *de facto* retroactive approval of S&L's employment for matters outside of any conflict as in *Mehdipour*; (f) S&L's right to an administrative expense for out-of-pocket expenses that would otherwise have been borne by the Debtor; (g) S&L's right to apply the Retainer to the Debtor's filing fee; and (h) S&L's appellate rights. Further, no party has asserted that S&L actually has or represents any interest adverse to the Debtor's estate, and the Court's ruling left open questions about S&L's retention and the work performed prior to the September 20 Hearing. There is a basis for the relief S&L requests. Rather

than rewriting the Bankruptcy Code as in *Lehman*, a settlement here would resolve the (ostensible) dispute regarding the application of the Bankruptcy Code to the facts present here.

## REPLY TO ARGUMENTS OF ALEX JONES

117.    The arguments in the AEJ Limited Objection are substantially different from those of the U.S. Trustee, the Debtor, or the Subchapter V Trustee. Jones does not oppose the allowance of S&L's requested administrative expense claim—subject to the discount set out in the Administrative Expense Motion—or the application of the Retainer to such amount, but "does not agree the payment schedule is reasonable for the current status of this FSS Chapter 11 case." AEJ Limited Objection ¶ 10. Jones asserts, however, that the amount of the voluntary discount would be *required* absent the voluntary discount because S&L did not make certain arguments that would have been beneficial to Jones's positions in the Debtor's chapter 11 case. Further, Jones contends that the Court should consider the professional fees paid in the IW Cases in determining appropriate compensation.

118.    Although there is no apparent dispute—S&L did not seek any specific payment schedule for its Requested Administrative Expense Claim other than application of the Retainer—S&L replies to Jones's arguments below.

A.    **Alex Jones's Arguments that S&L Did Not Address the Issues Set out in the Objection to the S&L Employment Application and Should Have Raised Other Points at the September 20 Hearing Are Misplaced.**

119.    Jones argues that S&L's fees should be reduced to the amount indicated in the Administrative Expense Motion even absent S&L's voluntary reduction of $62,475.00. Jones asserts that S&L did not adequately respond to the concerns relating to (a) Lee and Schwartz not supplementing their disclosures in the IW Cases or (b) the Debtor's initial proposal to pay Alex Jones's travel expenses and the fees for state court counsel related to the Connecticut Litigation.

Jones submits that S&L should have presented certain arguments that coincidentally would benefit Jones vis-à-vis the Debtor's estate in other matters.

120.    Jones's arguments are misplaced. <u>First</u>, the Debtor and S&L *did* present arguments and evidence surrounding the reasons Lee did not supplement the Rule 2014 disclosures in the IW Cases. <u>Second</u>, the Debtor—through S&L and the Battaglia Firm—also informed the Court of the actual reasons behind the Debtor's proposed payment of Jones's travel expenses and 100% of the costs of the state court litigators related to the Connecticut Litigation. The issue was not raised until after the close of evidence, however, preventing more substantive argument and evidence from being presented at the September 20 Hearing. And <u>third</u>, even if the issues were raised prior to the hearing, S&L could not have made the arguments and representations that Jones asserts it should have.

> i.    *The reasons that Lee and Schwartz did not supplement their Rule 2014 disclosures in the IW Cases were addressed at the September 20 Hearing.*

121.    The Debtor and S&L did in fact address at the September 20 Hearing the reasons that Lee and Schwartz did not supplement their Rule 2014 disclosures in the IW Cases. This was briefed and the focus of the September 20 Hearing. Lee and Schwartz did not believe that supplemental disclosure was required under the circumstances because the IW Debtors had agreed with the U.S. Trustee's demand to dismiss their cases and were no longer seeking to have their employment approved by the Court (Sept. 20, 2022, Hrg. Tr. 89:2-18, 92:11-94:22, 132:24-133:5, 169:16-170:11). They may have been mistaken, but the reasons were presented to the Court at the September 20 Hearing.

ii.   *The Debtor presented arguments regarding the proposed payment by the Debtor of Alex Jones's travel expenses and fees for state court counsel related to the Connecticut Litigation.*

122.   As set out in detail in the Rule 59 Motion and the reply to the U.S. Trustee's objection thereto, issues surrounding the Debtor's proposed payment for Alex Jones's travel expenses or 100% of the cost for state court counsel were not raised in the U.S. Trustee's objection to the S&L Employment Application or at the September 20 Hearing until after the close of evidence. The U.S. Trustee's objection to the to the S&L employment application raised a single issue—the action the Court should take as the result of Lee not supplementing the Rule 2014 verified statement for the employment of KSLPLLC in the IW Cases. The objection did not dispute S&L's disinterestedness. Counsel for the U.S. Trustee confirmed that this was the sole issue at the September 13 Hearing. (Sept. 13, 2022, Hrg. Tr. 36:6-9). And the Debtor's proposed payment for Alex Jones's travel expenses or 100% of the state court counsel expenses was not raised in connection with the S&L Employment Application until after the close of evidence. (Sept. 20, 2022, Hrg. Tr. 215:8-23).

123.   After the close of evidence, the Court questioned *who* was making the decisions for the Debtor's estate to propose to pay the travel expense for Alex Jones to testify in the Connecticut Litigation, the fees for state-court counsel for the Connecticut Litigation, and other matters.[37] (Sept. 20, 2022, Hrg. Tr. 215:8-23). The Court focused the inquiry to the person making the decision for the Debtor.[38] (Sept. 20, 2022, Hrg. Tr. 216:4-9).

---

[37] After the Debtor's opening statement, the Court indicated that the question it was focused on is whether there was a "throughline" from the IW Cases to the Debtor's chapter 11 case. (Sept. 20, 2022, Hrg. Tr. 28:5-8). The evidence introduced was that the decisions in the IW Cases were based on the benefit to the IW Debtors and their estates. (Sept. 20, 2022, Hearing 83:10-84:3, 88:12-91:3, 142:17-144:8, 162:1-24, 163:7-11, 170:4-11, 175:20-176:10, 177:11-15, 206:11-207:9).

[38] The Court returned to the inquiry of who was making the decisions multiple times. (Sept. 20, 2022, Hrg. Tr. 216:4-9, 217:1-2).

124. The Debtor, through S&L, responded to the Court's question indicating that the decision was made by Schwartz after a demand by Alex Jones and arm's-length negotiations. (Sept. 20, 2022, Hrg. Tr. 215:24-216:13, 217:1-3). Further, S&L represented to the Court that the give and take between the Debtor and Jones was because Jones was the most important person to the financial viability of the company and its restructuring efforts, and the proposed payments were necessary to maintain Jones's support of the Debtor and continuing his involvement with the company. (Sept. 20, 2022, Hrg. Tr. 216:10-13, 217:19-21).

125. Mr. Battaglia for the Debtor added additional considerations that went into the decision. Mr. Battaglia pointed out that other factors informing the Debtor's decision were (a) Jones's ability to pay, (b) the risk of the state court attorneys not willing to go forward, and (c) the necessity that the Debtor produce Jones as a witness in the Connecticut Litigation. (Sept. 20, 2022, Hrg. Tr. 221:4-18).

126. The proposed payment of travel expenses and 100% of state court counsel expenses was not raised prior to the September 20 Hearing so that the Debtor and S&L could prepare more substantive argument and evidence. But even if it was, the S&L would not have made the particular arguments preferred by Alex Jones. While Jones put forward reasons for his demands—including his asserted indemnity, that he provided services to the Debtor despite not receiving his contractual salary, and his efforts to support the Debtor's bankruptcy cases—the motivation for the Debtor was that Jones indicated that an agreement was necessary for Jones's continued support of the Debtor, the Debtor's need to ensure that it had representation in the Connecticut Litigation to reach

agreement with the Connecticut Plaintiffs regarding their motion for relief from stay, and the Debtor's need to produce Jones as a witness in the Connecticut Litigation.[39]

127.    The reasons Jones believed that his demands had merit was, at most, ancillary to the Debtor's decision. That Jones had at least some colorable basis for his demands and had acted to support the Debtor's reorganization efforts would have certainly been appropriate factors for Schwartz, as the Debtor's CRO, to consider.[40] But it was not central to the decision-making process. And without the opportunity to delve into these potential secondary considerations, S&L was not able to make representations about them to the Court at the September 20 Hearing.

> iii.    *The Debtor had not adopted the position that Alex Jones was entitled to his asserted an indemnity and S&L had reason to doubt the asserted indemnity.*

128.    As communicated to Jones's counsel prior to the September 20 Hearing, the Debtor had not adopted Alex Jones's position on his asserted indemnity. Further, S&L was aware of facts and law suggesting that Jones was *not* entitled to the indemnity. S&L simply could not have made the arguments that Jones asserts it should have presented to the Court.

129.    Under Texas law, a member or manager of a limited liability company is not automatically entitled to indemnity. Section 101.402 of the Texas Business Organizations Code provides that "[a] limited liability company may: (1) indemnify a person; (2) pay in advance or reimburse expenses incurred by a persona; and (3) purchase or procure or establish and maintain insurance or other arrangement to indemnify or hold harmless a person."[41] For purposes of the

---

[39] The issue of Jones's continued support of the Debtor came up at the December 19, 2022, hearing before this Court. After previously only agreeing to a 60/40 split of attorney fees with respect to Texas appellate counsel, Jones ultimately assented to a 50/50 division of fees. But his counsel at the hearing indicated that the caveat was that Jones would seek his full salary of $1.3 million annualized. (Dec. 19, 2022, Hrg. Tr. 14:2-6). And Jones's counsel indicated that absent Jones receiving his full contractual salary or some other negotiated amount, he may have to seek third-party employment. (Dec. 19, 2022, Hrg. Tr. 38:17-20, 40:23-25). The issue for the Debtor and its estate is that Jones's continued involvement is necessary to the Debtor. (Dec. 19, 2022, Hrg. Tr. 32:3-13, 37:17-22, 38:15-17).

[40] If Jones had been entirely unreasonable in his demands or uniformly antagonistic to the Debtor's restructuring efforts, assent to Jones' demands may have been less likely.

[41] The Debtor is a Texas limited liability company and Alex Jones is the sole member of the Debtor.

statute, a "'person' includes a member, manager, or officer of a limited liability company or an assignee of a membership interest in the company." The use of "may" in the statute indicates that the indemnification is permissive rather than mandatory. *Pedernal Energy, LLC v. Bruington Eng'g, LTD.*, 536 S.W.3d 487, 492 (Tex. 2017) (citing Tex. Gov't Code § 311.016(1)).

130.    Section 26.01 of the Texas Business and Commercial Code requires "a promise of one person to answer for the debt, default, or miscarriage of another person" to be reflected in a signed writing in order for such promise to be enforceable. The statute applies to indemnification, subject to ordinary exceptions to statute of frauds defenses. *See ALCOA v. Hydrochem Indus. Servs.*, 2005 Tex. App. LEXIS 2010, at *12 (Tex. App. Mar. 17, 2005).

131.    The Debtor's governing documents do not provide for indemnification of members or managers. Attached as <u>Exhibit B</u> hereto is a copy of the Debtor's company agreement (the "<u>Company Agreement</u>").[42] The only reference to any indemnification or reimbursement rights is reflected in paragraph 11.02 of the Company Agreement and provides only for indemnification of a "Liquidator" and references "the indemnification rights set forth in the Certification of Formation." According to the paragraph 1.01 of the Company Agreement, the Certificate of Formation was filed with the Texas Secretary of State on November 16, 2007.

132.    A copy of the Certificate of Formation dated November 16, 2007, for Free Speech Systems, LLC, on file with the Texas Secretary of State is attached hereto as <u>Exhibit C</u> (the "<u>Debtor Certificate of Formation</u>"). The Debtor Certificate of Formation contains no mention of any indemnification or reimbursement rights.[43]

---

[42] The Debtor's company agreement was previously admitted into evidence as Debtor's Exhibit 32 at the September 20 Hearing. [ECF No. 163-32].

[43] A certificate of correction was filed with the Secretary of State on January 3, 2008 (the "<u>Debtor Certificate of Correction</u>"), a copy of which is attached as <u>Exhibit D</u> hereto. The Certificate of Correction also does not mention any indemnification or reimbursement rights.

133.     Attached as <u>Exhibit E</u> hereto is a copy of the employment agreement between the Debtor and Alex Jones dated April 14, 2022 (the "<u>AEJ Employment Agreement</u>"). Paragraph 10 of the AEJ Employment Agreement provides that "Employer agrees to indemnify and hold harmless, and furnish and pay counsel of Employee['s] choice, in the event that claims or suit are brought against Alex Jones arising out if his performance of this Employment Agreement, unless such claims are established by clear and convincing evidence to have arisen from Alex Jones['s] actual fraud." However, the first paragraph of the AEJ Employment Agreement indicates that "[t]his Employment Agreement and accompanying Employee Annuity and Life Insurance Plan is entered into by and between Employer Free Speech Systems, LLC . . . and Alex Jones, Employee ___*on April 14, 2022*___ . . . ." (emphasis added). Each of the lawsuits comprising the Sandy Hook Litigation was commenced and related to acts occurring prior to April 14, 2022.

134.     S&L attorneys analyzed the indemnity issue in connection with other matters prior to the September 20 Hearing. On August 5, 2022, S&L attorney R. J. Shannon spent 1.1 hours analyzing Jones's proof of claim filed in the Debtor's chapter 11 case, reviewing relevant documents for contractual indemnity, and drafting an email to the Debtor's CRO and counsel regarding the same. [ECF No. 251-2, at p.3]. On August 16, 2022, Shannon informed Jones's attorney by email that although Jones asserted an indemnity claim "it's not in any of the documents prior to April 2022." [ECF No. 206-7, at p.1]. On August 18, 2022, S&L attorney Kyung Lee spent 1.5 hours analyzing issues regarding whether the Debtor Company Agreement provided for indemnification of a member or manager and whether a member or manager was entitled to indemnification as a matter of law. [ECF No. 251-2, at p.9]. The issue was relevant to providing

documents to the Connecticut Plaintiffs and Jones's request that the Debtor seek to extend the automatic stay to him with respect to the Connecticut Litigation.[44]

135.     Jones's desire that the Debtor have accepted his asserted indemnity claim and made that argument at the September 20 Hearing is understandable, but that was just not the case. And it would not have been an appropriate for S&L to reference Jones's asserted indemnity to the Court when there were significant reasons to doubt its validity. Even if Jones *is* entitled to indemnification from the Debtor, that was not so obvious that failing to raise that point at the September 20 Hearing justifies reducing S&L's compensation.

    *iv.*    *Alex Jones did not pay 100% of the Debtor's Legal Fees Prior to the filing of the Debtor's Chapter 11 Case.*

136.     S&L's fees were paid from funds belonging to the Debtor. The initial retainer S&L received originated directly from the Debtor. The payment S&L received on July 28, 2022, was paid from Schwartz Associates LLC's client trust account. On information and belief based on representations from Schwartz, these funds belonged to the Debtor and were paid to Schwartz Associates' client trust account directly from the Debtor. Schwartz testified about this at the September 20 Hearing. (*See* Sept. 20, 2022, Hrg. Tr. 174:3-13). S&L has no reason to believe Schwartz's testimony or his prior representations to S&L were inaccurate.

    *v.*    *S&L was not aware that Alex Jones purchased $400,000 in consignment products and, assuming that he did, it would not have been directly relevant.*

137.     If Alex Jones purchased $400,000 in consignment products to cover the Debtor's inability to obtain product prior to the September 20 Hearing, S&L was not aware of this

---

[44] If Jones was unambiguously entitled to an indemnity, this would support extending the automatic stay to Jones with respect to the Connecticut Litigation. There were other reasons to decline Jones's request—e.g., it might make it more likely that the Court would modify the stay to allow the litigation to also continue against the Debtor—but the issue was important to the Debtor's evaluation.

transaction or involved in its execution. S&L could not have raised it to the Court at the September 20 Hearing.

138.    Further, if S&L had been aware of Jones's alleged purchase of the consignment products, it would not have changed the position asserted at the September 20 Hearing. As represented at the September 20 Hearing, the reason for the proposed payments was that Jones demanded this to continue his involvement with the Debtor and to agree to the Debtor's deal with the Connecticut Plaintiffs regarding their lift stay motion.[45]

**B.    S&L Does Not Oppose Disclosure of Payment of Professional Fees Paid Relating to the IW Debtors' Restructuring, But Such Fees Are Not Relevant to the Appropriate Compensation in this Chapter 11 Case.**

139.    Alex Jones argues that the Court should consider the fees paid for services provided to the IW Debtors in determining the appropriate compensation in the Debtor's chapter 11 case. AEJ Limited Objection at p.5. S&L does not oppose the disclosure, but the fees paid relating to the IW Debtors' restructuring are not relevant to compensation for services provided to the Debtor.

*i.    Fees paid for services provided to the IW Debtors.*

140.    Employment of the IW Debtors' proposed professionals was never taken up by the Court. The U.S. Trustee argued that employment of any professionals in the IW Cases should not be considered until after the decision on its motion to dismiss because approval of employment would be unnecessary in the event of dismissal allowing the IW Debtors to address compensation

---

[45] Jones's agreement to the resolution of the Connecticut Plaintiffs' lift stay motion was necessary for at least three (3) reasons. First, the Connecticut Plaintiffs required Jones to agree to certain parts of the agreed lift stay order as a condition of their agreement with the Debtor. Second, Jones's consent was required as a practical matter for the Debtor's prepetition state court counsel to continue representing the Debtor and engaging separate counsel would cost the Debtor's estate significantly more and make agreeing to lift the stay with respect to the Connecticut Litigation unfeasible. Third, the principal problem to the Debtor's estate presented by allowing the Connecticut Litigation to continue was that it would require Jones to be off the air for a significant period of time, but Jones had the right to attend the entire trial. The deal that the Debtor cut with the Connecticut Plaintiffs to minimize the disruption of the Connecticut Litigation would have been meaningless if Jones decided to attend the entire trial notwithstanding that deal.

66

of their professionals outside of bankruptcy.[46] (May 19, 2022, Hrg. Tr. 14:9-15:9). The Court agreed that the Schwartz employment application should not be considered until after its decision on the dismissal of the IW Debtor's cases. (May 19, 2022, Hrg. Tr. 23:2-8) (the Court stating that it did not want to address the application to employ the CRO and other matters until "after we know on the motion to dismiss"). The KSLPLLC employment application was never set for hearing.

141.     The IW Debtors agreed to the dismissal of their cases and finalized a stipulation of dismissal with the U.S. Trustee that was filed on June 1, 2022 [ECF No. 163-27] (the "IW Dismissal Stipulation"). Consistent with the U.S. Trustee's position, the IW Dismissal Stipulation provided a mechanism for the payment for the Subchapter V Trustee, but left compensation of the IW Debtors' proposed professionals to applicable nonbankrutpcy law. The Court entered the IW Dismissal Stipulation on June 10, 2022. [ECF No. 163-22].

142.     The fees paid and expenses reimbursed to the law firms with which S&L attorneys were involved for services to the IW Debtors were made prior to the filing of the IW Cases or after their dismissal. Parkins Lee & Rubio LLP/Parkins & Rubio LLP received fees totaling

---

[46] As represented by attorney Jayson Ruff, the U.S. Trustee's position was that:

> The only other comment I would say is to the extent that the Court does push that out, assuming these cases are dismissed, then we don't think that any of the other pending motions applications should be heard until that same date after that time. . . .
>
> If these cases aren't to continue, then none of that is really necessary. The cases can get dismissed. You know, the debtors can go ahead and pay their creditors, including their professionals however they want to. The only thing we probably would want to have some treatment for in the dismissal order, again, assuming that's the route that we end up toing, is to allow for Ms. [Haselden] to apply for her fees and make sure that this Court retains jurisdiction for the payment of her fees.

(May 19, 2022, Hrg. Tr. 14:9-13, 15:1-9). This was in line with discussions among counsel for the U.S. Trustee and the IW Debtors. [ECF No. 163-18].

$321,670.93 and expenses totaling $7,976.50. KSPLLC/S&L received fees totaling $68,307.50 and no expenses.

143.    On information and belief, all or nearly all of the funds paid to the IW Debtors' professionals came from the "Initial Trust Funding" under the Declaration of Trust for the 2022 Litigation Settlement Trust (the "Declaration of Trust"), a copy of which is attached hereto as Exhibit F. These funds were to be paid to the trust by Alex Jones to pay the costs of administration of the IW Cases and professional fees. Declaration of Trust, at p.45. The source of the funds were to be from the proceeds of Jones's exempt property. *Id.* Jones was represented by counsel in the negotiation of the Declaration of Trust.

> ii.    *The compensation paid for services provided to the IW Debtors is not relevant to the Requested Administrative Expense Claim.*

144.    The standard relevant to evaluating requested compensation under Bankruptcy Code § 330 is whether it is reasonable for the services that were actually provided and necessary to achieve a reasonably likely benefit to the estate. *See* 11 U.S.C. § 330(a); *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 276 (5th Cir. 2015). Among the relevant factors are: (i) time and labor required; (ii) the novelty and difficulty of the questions; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the professional due to acceptance of the case; (v) the customary fee; (vi) whether the fee is contingent or fixed; (vii) time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases. *In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1298-99 (5th Cir. 1977). The fees earned for services provided to the IW Debtors do not factor into the appropriate compensation under this framework.

145.    Arguably, the fees paid by the IW Debtors for services provided by S&L attorneys would be relevant if S&L was seeking a fee enhancement. S&L *does* contend that the familiarity of its attorneys with the Sandy Hook Litigation made the firm especially qualified to perform the services set out as S&L's primary responsibility in the S&L Employment Application. And without this familiarity and knowledge, S&L would not have been able to achieve the results described in the Administrative Expense Motion without expending substantially more time. This could be a factor supporting a fee enhancement if S&L's attorneys—or the firms employing them—had already been compensated for developing that relevant knowledge. But S&L does not seek any fee enhancement in the Administrative Expense Motion.

146.    There is no basis for reducing otherwise allowable compensation in this case because of fees paid by the IW Debtors for services related to their restructuring. The IW debtors received substantial benefits from the services provided to them. As the result of the services provided, the IW Debtors resolved liabilities that total approximately $1.5 billion while continuing to own their assets and incurring no obligation to make ongoing payments

147.    The IW Debtors remained subject to the Sandy Hook Litigation when they filed their petitions for chapter 11 relief. The IW Debtors had unsuccessfully sought dismissal of the claims against them—including because they did not participate in the alleged tortious conduct[47]—

---

[47] In the Heslin and Fontaine suits, InfoW, LLC argued that it was not a proper defendant because there was no evidence that it actively participated in the publication of the defamatory statements. *See Infowars, LLC v. Fontaine*, 2019 Tex. App. LEXIS 9303, at *4 (Tex. App. Oct. 24, 2019) (2019 WL 5444400); *Jones v. Heslin*, 2020 Tex. App. LEXIS 2441, at *15 (Tex. App. Mar. 25, 2020) (2020 WL 1452025). In affirming the trial court's denial of the motions to dismiss the actions under the Texas Citizens Participation Act, the Texas Court of Appeals held that there was clear and specific evidence supporting a rational inference that InfoW, LLC was involved in the operation of the Infowars.com website. *Heslin*, 2020 Tex. App. LEXIS 2441, at *16 ("We conclude, as we did in *Fontaine*, that the Terms of Use show that users of Infowars.com initiated a relationship with Infowars, LLC, and that Infowars, LLC, was involved in the website's operation."). While the Texas Plaintiffs took the position in the IW Cases that InfoW was not a proper subchapter v debtor because it did not engage in sufficient business activities, this was contrary to their assertions in the state court litigation and the decisions of both the state trial court and the state court of appeals ruling in their favor.

and were subject to default judgements for discovery abuses. By May 13, 2022, the Connecticut Plaintiffs had filed with the U.S. Bankruptcy Court for the District of Connecticut (a) a notice of dismissal with prejudice of their claims against the IW Debtors and (b) an unopposed motion to dismiss their claims against the IW Debtors.[48] (ECF No. 163-20). By May 19, 2022, the IW Debtors and the Texas Plaintiffs had reached an agreement releasing the claims against the IW Debtors. (ECF No. 163-21). In exchange, the IW Debtors agreed to not oppose remand of the removed Sandy Hook Litigation. The IW Debtors received more than they could have reasonably hoped for as the result of the services provided by their professionals.

## **CONCLUSION**

148.    For the reasons set out above, the Court should overrule the UST Objection, Debtor/Trustee Objection, and AEJ Limited Objection and grant the Administrative Expense Motion. Even if the Court accepts all of the arguments and positions set out in the objections, they do not undercut that the Court has the discretion to consider retroactive approval of S&L's limited employment from the Petition Date through the September 20 Hearing, or present any reason to deny S&L's request for such approval requested in the Administrative Expense Motion. No party in interest has ever asserted that S&L holds or represents an interest adverse to the estate. And no party in interest has disputed that the amount of the Requested Administrative Expense Claim— as already reduced—reflects reasonable compensation for the services S&L provided to the Debtor.

149.    The dispute appears to revolve around the appropriate mechanism and characterization. The Debtor and Subchapter V Trustee do not oppose the Rule 59 Motion. The

---

[48] The U.S. Bankruptcy Court for the District of Connecticut granted the motion to dismiss with prejudice the claims against the IW Debtors on May 24, 2022, and requested a proposed order. The proposed order was submitted on May 25, 2022, and the order was entered by the court on May 26, 2022.

Sandy Hook Plaintiffs and Alex Jones do not oppose the Administrative Expense Motion, subject to S&L's voluntary reduction. And while the U.S. Trustee opposes both, he does not dispute that the Court has the authority to retroactively approve S&L's employment for the period from the Petition Date through the September 20 Hearing in connection with the Administrative Expense Motion or argue that such retroactive approval would be inappropriate here. S&L contends that any of the bases submitted would be appropriate and drafted the proposed order accompanying the Administrative Expense Motion to be agnostic about the basis. The Court should not let disagreement over technicalities distract it from reaching the correct result.

Dated: December 29, 2022                    **SHANNON & LEE LLP**

                                            /s/ *R. J. Shannon*
                                            Kyung S. Lee
                                            State Bar No. 12128400
                                            klee@shannonleellp.com
                                            R. J. Shannon
                                            State Bar No. 24108062
                                            rshannon@shannonleellp.com
                                            700 Milam Street, STE 1300
                                            Houston, Texas 77002
                                            Tel. (713) 714-5770

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served by the Court's CM/ECF system on all parties registered to receive such service on the date of filing.

                                            /s/ *R. J. Shannon*

**EXHIBIT A**

**August 8, 2022, Email from R. Shannon to J. Martin**

# R. J. Shannon

| | |
|---|---|
| **From:** | R. J. Shannon |
| **Sent:** | Monday, August 8, 2022 7:09 PM |
| **To:** | Martin, Jarrod B.; rbattaglialaw@outlook.com; Kyung S. Lee |
| **Subject:** | Re: FSS |

Jarrod—

Your clients have alleged that PQPR was an insider in the TUFTA action, but below are the bases for PQPR being an insider that we have identified. There may be others, but I don't think that PQPR disputes that it is an insider so I'm not going to try to parse them.

## Way 1 (Statutory):

1) Bankruptcy Code § 101(31)(E) includes in the definition of an insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor";

2) Bankruptcy Code § 101(2)(B) in the definition of "affiliate" a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, . . . by an entity that directly or indirectly owns controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . .";

3) Alex Jones indirectly owns or controls 20% or more of PQPR and directly owns 20% or more of the Debtor;

4) Therefore, PQPR and the Debtor are affiliates and insiders.

## Way 2 (Statutory):

1) Bankruptcy Code § 101(31)(E) includes as the definition of an insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor";

2) Alex Jones is an affiliate of Free Speech Systems;
   a. Bankruptcy Code § 101(2)(A) provides that an "affiliate" includes an "entity that directly owns, controls with the power to vote, 20 percent or more of the outstanding voting securities by the debtor";
   b. Alex Jones directly owns more that 20% of the outstanding voting securities of the Debtor.

3) PQPR is an insider to Alex Jones.
   a. Bankruptcy Code § 101(2)(B) provides that an "affiliate" also includes a "corporation 20% or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with the power to vote, but the debtor";
   b. Alex Jones indirectly owns or controls 20% or more of the outstanding voting securities in PQPR and is thus an affiliate;

4) Therefore, PQPR is an affiliate and insider of the Debtor.

## Way 3 (Non-Statutory)*:

1) Bankruptcy Code § 101(31)(E) includes as the definition of an insider an "affiliate, or insider of an affiliate as if such affiliate were the debtor";

1

2) Alex Jones is an affiliate of Free Speech Systems;
   a. Bankruptcy Code § 101(2)(A) provides that an "affiliate" includes an "entity that directly owns, controls with the power to vote, 20 percent or more of the outstanding voting securities by the debtor";
   b. Alex Jones directly owns more that 20% of the outstanding voting securities of the Debtor.

3) PQPR is controlled by Dr. David Jones;

4) Dr. David Jones is Alex Jones' father, and thus an insider of Alex Jones if he was a debtor under Bankruptcy Code § 101(31)(A)(i);

5) This is substantially similar to statutory insiders under the Bankruptcy Code and PQPR is therefore a non-statutory insider.

*Bankruptcy Code § 1182(1)(A) does not except only the debt to *statutory* insiders from the cap.

Your clients may just be looking for a way to challenge PQPR's lien on the grounds that it is avoidable (I don't think that gets around the need for permission to use cash collateral prior to that avoidance but good for you if you are successful) but you should think long and hard about where the path leads if you are looking for a ruling that PQPR is __*not*__ an insider. Plaintiffs in the TUFTA action have already quixotically asserted and put on evidence in the Heslin/Lewis trial that FSS was solvent to the tune of at least $135 million, which I'm sure had Steve Lemmon jumping for joy. If you get a finding that establishes that PQPR is not an insider, we lose the extended preference lookback period w/r/t PQPR and make getting its lien avoided more of an up-hill battle. An unavoidable PQPR lien also opens up paths for Alex Jones to terminate his employment with the Debtor, force it into liquidation, credit bid for the assets, and continue on at a different entity to the detriment of the bankruptcy estate and your clients.

Thanks,
R. J.

**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294

---

**From:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>
**Date:** Monday, August 8, 2022 at 4:41 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: FSS

Following up.

Also, Ray, discovery is about to be sent to FSS and PQPR. I think everyone is aiming for depositions for august 19 and 22. Can we agree that discovery will be produced by August 16? Call me if you want to discuss. 832-580-6261. If I don't hear from you I'll call you tomorrow.

Get Outlook for iOS

---

**From:** Martin, Jarrod B.
**Sent:** Sunday, August 7, 2022 2:15:36 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>; rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>; Kyung S.

Lee <klee@shannonleellp.com>
**Subject:** RE: FSS

RJ, a follow-up question: Could you explain how PQPR is a statutory insider or affiliate for purposes of the sub v debt limit?

Jarrod B. Martin
Shareholder

Chamberlain Hrdlicka
Attorneys at Law

Direct: 713.356.1280
E-Mail: jarrod.martin@chamberlainlaw.com

---

**From:** R. J. Shannon <rshannon@shannonleellp.com>
**Sent:** Saturday, August 6, 2022 8:07 PM
**To:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>; rbattaglialaw@outlook.com; Kyung S. Lee <klee@shannonleellp.com>
**Subject:** Re: FSS

**\*\*EXTERNAL EMAIL\*\***

---

Jarrod—See attached. Kelly Jones' interest was apparently transferred to Alex Jones in connection with their divorce, but we don't have a copy of the divorce decree.

**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294

---

**From:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>
**Date:** Saturday, August 6, 2022 at 7:16 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>, rbattaglialaw@outlook.com <rbattaglialaw@outlook.com>, Kyung S. Lee <klee@shannonleellp.com>
**Subject:** RE: FSS

Thanks. Can you send me the relevant corporate documents for the Debtor (LLC agreement, etc.)?

Jarrod B. Martin
Shareholder

Chamberlain Hrdlicka
Attorneys at Law

Direct: 713.356.1280
E-Mail: jarrod.martin@chamberlainlaw.com

---

**From:** R. J. Shannon <rshannon@shannonleellp.com>
**Sent:** Friday, August 5, 2022 10:51 AM
**To:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>; rbattaglialaw@outlook.com; Kyung S. Lee <klee@shannonleellp.com>
**Subject:** RE: FSS

**\*\*EXTERNAL EMAIL\*\***

---

Jarrod,

See the attached employment agreement between the Debtor and Alex Jones.

Thanks,
R. J.

--
**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294
rshannon@shannonleellp.com

---

**From:** Martin, Jarrod B. <Jarrod.Martin@chamberlainlaw.com>
**Sent:** Thursday, August 4, 2022 2:29 PM
**To:** rbattaglialaw@outlook.com; Kyung S. Lee <klee@shannonleellp.com>; R. J. Shannon <rshannon@shannonleellp.com>
**Subject:** FSS

Can you guys send me the April 2022 Jones employment agreement?

Jarrod

Get Outlook for iOS

# EXHIBIT B

## Debtor Company Agreement

## COMPANY AGREEMENT OF
## FREE SPEECH SYSTEMS, LLC

THIS COMPANY AGREEMENT OF FREE SPEECH SYSTEMS, LLC, a Texas limited liability company (this "Agreement"), is dated effective November 16, 2007 (the "Effective Date"), by the undersigned initial Members (defined herein) and Managers (defined herein) of the Company.

### 1. Formation of the Company.

**1.01 Filing of Certificate of Formation.** The Certificate of Formation for the Company was filed with, and a certificate evidencing filing was issued by, the Secretary of State of the State of Texas on the Effective Date.

**1.02 Initial and Additional Members.** The names and addresses of the initial Members of the Company are as set forth on Schedule A of this Agreement. At the date hereof, there are no other Members of the Company and no other Person has any right to take part in the ownership or management of the Company. Additional Members of the Company shall be admitted only upon the approval of a Required Interest.

**1.03 Term of the Company.** The Company shall exist for the duration specified in the Certificate of Formation (which may be perpetual), unless sooner terminated in accordance with this Agreement. No provision of this Agreement (including, without limitation, the provisions of Section 10) shall be deemed or construed to constitute the Company a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of any other member or Manager, for any purposes other than federal and state tax purposes.

### 2. Organization of the Company.

**2.01 Name of the Company.** The name of the Company is "Free Speech Systems, LLC." The Managers may cause the Company to do business under one or more assumed names.

**2.02 Registered Office.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the initial registered office named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.

**2.03 Principal Office.** The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 101.501 of the TBOC. The Company may have such other offices as the Managers may designate from time to time.

**2.04** **Purpose.** The sole purpose of the Company shall be to operate such businesses as the Members choose from time to time and shall have all the specified rights, powers, and duties set forth in the TBOC.

3. **Definitions.**

**3.01** **Certain Defined Terms.** The capitalized terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Section 3.01.

**"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments: (i) credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and (ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

**"Agreement"** means this Agreement, including Schedule A, as originally executed and as subsequently amended from time to time.

**"Capital Account"** means the Capital Account maintained for each Member pursuant to Section 4.04 of this Agreement.

**"Capital Contribution"** means, as to any Member, the sum of the following: (i) the Member's Initial Capital Contribution; plus (ii) the Member's Additional Capital Contributions, if any. "Initial Capital Contributions" means, as to any Member, the contributions described in Section 4.01. "Additional Capital Contributions" means, as to any Member, the contributions described in Section 4.02.

**"Certificate of Formation"** means the Certificate of Formation of the Company described in Section 1 of this Agreement, as may be amended from time to time by appropriate filing with the Secretary of State of Texas.

**"Code"** means to the Internal Revenue Code of 1986, as it has been and may be amended.

**"Company"** means Free Speech Systems, LLC, a Texas limited liability company, as such limited liability company may from time to time be constituted.

**"Company Minimum Gain"** shall have the meaning of "partnership minimum gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

**"Company Property"** or **"Company Properties"** means all interests, properties and rights of any type owned by the Company, whether owned by the Company at the date of its formation or thereafter acquired.

- 2 -

"**Default Interest Rate**" means the rate per annum equal to the lesser of (i) the most recent prime rate as quoted in the Wall Street Journal, and (ii) the maximum rate permitted by applicable law.

"**Managers**" means, as of any date, the Person or Persons who are then managing the business of the Company in accordance with Section 8 of this Agreement.

"**Member Nonrecourse Debt**" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"**Member Nonrecourse Deductions**" has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"**Members**" means, as of any date, to the Persons who then own Percentage Interests in the Company. The current Members are listed on Schedule A.

"**Membership Interest**" means, as of any date, a Member's share of the Company's income, gain, loss, deduction and credits and the right to receive distributions from the Company expressed by such Member's Percentage Interest, but does not include (i) the right of the holder thereof to participate in the management of the business or affairs of the Company, (ii) the right of the holder thereof to consent, approve, reject or disapprove any act of the Company, or (iii) the right of the holder thereof to be a Member.

"**Net Cash From Operations**" means the gross cash proceeds from the operations of the Company less the portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers. "Net Cash From Operations" shall not be reduced by depreciation, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition and the definition of "Net Cash from Sales or Refinancings."

"**Net Cash from Sales or Refinancings**" means the net cash proceeds of the Company from all sales and other dispositions of Company Property other than in the ordinary course of business (such as the sale or condemnation of all or a portion of the Property, a refinancing of all or a portion of the Property pursuant to a refinancing transaction or the receipt of casualty, litigation proceeds, or accelerated lease payments), less any portion thereof used to pay or establish reserves for all expenses, debt payments, capital improvements, replacements, and contingencies of the Company, all as determined by the Managers, and shall include all principal and interest payments with respect to any note or other obligation received by the Company in connection with such a capital transaction.

"**Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

- 3 -

**"Nonrecourse Liability"** has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

**"Percentage Interest"** means the interest of each Member in the Company as set forth opposite the Member's name on the attached Schedule A, as may be adjusted from time to time in accordance with the provisions of this Agreement.

"**Permitted Transferee**" means any of the following:

(1)     Alex Jones, Kelly Jones, and any of their descendants;

(2)     Any corporation, partnership, limited liability company, or other entity 100% of the beneficial ownership of which is owned by Permitted Transferees;

(3)     Any charitable foundation established by an individual referenced in (1) above; or

(4)     Any trust set up for the primary benefit of one or more of the individuals referenced in (1) above or for the benefit of a charitable foundation referenced in (3) above.

**"Person"** means any natural person, limited liability company, general partnership, limited partnership, corporation, joint venture, business trust, real estate investment trust, cooperative, association, trust, estate or other entity or organization.

**"Profits"** and **"Losses"** means the net book income or net book loss, as the case may be, of the Company determined in accordance with the principles for computing "book" income and "book" loss under Section 1.704-1(b)(2)(iv) of the Treasury Regulations; provided, however, that items of income, gain, loss, deduction and credit specially allocated pursuant to the provisions of Section 5.03 shall be excluded from the computation of Profits and Losses.

**"Required Interest"** means Members holding in aggregate fifty-one percent (51.00%) or more of the Percentage Interests then held by all Members.

**"Standard Rate"** means a per annum rate of interest equal to ten percent (10%), compounded annually.

**"Tax Distribution"** with respect to any Member for any taxable year of the Company, means an amount of cash equal to the product of (i) the Profit and items of income and gain (reduced by Losses plus any items of loss and deduction) allocated to such Member for such taxable year pursuant to Section 5 and (ii) the highest marginal effective federal income tax rate applicable to an individual in effect from time to time during such taxable year.

**"TBOC"** means the Texas Business Organizations Code, as it may be amended from time to time.

- 4 -

**"Treasury Regulations"** means those regulations promulgated under the Code.

**"Unrecovered Capital Contribution"** means, as of any day, a Member's Capital Contribution adjusted as follows: (i) increased by the amount of any Company liabilities which, in connection with distributions pursuant to Sections 6.02(b) and 10.04(b), are assumed by such Member or are secured by any Company Property distributed to such Member; and (ii) reduced by the amount of cash and the fair market value (as determined by the Managers) of any Company Property distributed to such Member pursuant to Sections 6.02(b) and 10.04(b) and the amount of any liabilities of such Member assumed by the Company or which are secured by any Company Property contributed by such Member to the Company. In the event any Person transfers all or any portion of his Membership Interest, the transferee shall succeed to the Unrecovered Capital Contribution of the transferor to the extent it relates to the transferred Membership Interest.

**3.02    Other Defined Terms.** Other capitalized terms not defined in Section 3.01 shall have the meanings specified in the other sections of this Agreement.

### 4.    Capital of the Company.

**4.01    Initial Capital Contributions.** Each Member shall contribute to the capital of the Company the amount set forth as such Member's "Initial Capital Contribution" on Schedule A.

**4.02    Additional Capital Contributions.** The Managers may from time to time call upon the Members to make additional contributions to the capital of the Company pursuant to such terms and conditions as are specified by the Managers. The Members may (but shall not be required to) make Additional Capital Contributions to the Company. All Additional Capital Contributions shall be made within thirty (30) days after the Members have received notice thereof from the Managers. For purposes of this Agreement, "Additional Capital Contribution" means, as to any Member, such Member's pro rata share, based upon such Member's Percentage Interest, of the additional sums determined by the Managers to be required for the operation of the Company.

**4.03    Failure to Make Additional Capital Contributions.** If any Member fails to pay all or any portion of an additional assessment after due notice, then the Managers may recoup any deficiency by arranging for additional advances to be made by those Members that are willing to fund some portion of the deficiency, in such proportions as the Managers and the participating Members agree. In any event, if any funds are advanced hereunder on other than a pro rata basis, all such advances made by any Member hereunder (including each Member's pro rata advance) shall be considered loans to the Company and shall accrue interest at a per annum rate equal to the Standard Rate.

**4.04    Capital Accounts.** A Capital Account shall be established and maintained for each Member. It is the intention of the Members that the Capital Accounts be maintained in accordance with Section 1.704-1(b) of the Regulations. In that regard, each Member's Capital Account shall be:

(a)    Increased by:

- 5 -

(i)     The amount of money contributed by that Member to the Company;

(ii)     The fair market value of property or services contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to within the meaning of Section 752 of the Code); and

(iii)     Allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax, and

(b)     Decreased by:

(i)     The amount of money distributed to that Member by the Company;

(ii)     The fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to within the meaning of Section 752 of the Code);

(iii)     Allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code; and

(iv)     Allocations of Company loss and deduction (or items thereof).

A Member's Capital Account also shall be adjusted as provided in Treas. Reg. § 1.704-1(b)(2)(iv)(e) to reflect the distribution of property to a Member, and otherwise adjusted as required by Treas. Reg. § 1.704-1(b)(2)(iv) or 1.704-1(b)(4). On the transfer of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. §1.704-1(b)(2)(iv)(l).

**4.05     Return of Capital Contributions; Company Property.** Except as otherwise provided herein or in the TBOC, no Member shall have the right to withdraw, or receive any return of, his Capital Contribution. No interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts. Company Property shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company Property or any portion thereof. Title to any or all Company Property may be held in the name of the Company or one or more nominees, as the Managers may determine. All Company Property shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such Company Property is held.

**5.     Allocations.**

**5.01     Allocation of Profits.** After giving effect to the special allocations set forth in Section 5.03, Profits for each taxable year shall be allocated in the following order and priority:

- 6 -

(a)     First, to the Members in an amount equal to the excess, if any, of (i) the cumulative Losses allocated pursuant to Section 5.02(a)(ii) for all prior taxable years, over (ii) the cumulative Profits allocated pursuant to this Section 5.01(a) for all prior taxable years; and

(b)     Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

**5.02    Allocation of Losses.** After giving effect to the special allocations set forth in Section 5.03, Losses for any taxable year shall be allocated as set forth in Section 5.02(a), subject to the limitations in Section 5.02(b).

(a)     Losses for any taxable year shall be allocated in the following order and priority;

(i)     First, to the Members in accordance with their respective Percentage Interests in an amount equal to the excess, if any, of (A) the cumulative Profits allocated pursuant to Section 5.01(b) for all prior taxable years, over (B) the cumulative Losses allocated pursuant to this Section 5.02(a)(i) for all prior taxable years; and

(ii)     Then, the balance, if any, to the Members in accordance with their respective Percentage Interests.

(b)     The Losses allocated pursuant to Section 5.02(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any taxable year. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 5.02(a), the limitation set forth in this Section 5.02(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

**5.03    Special Allocations.** The following special allocations shall be made in the following order:

(a)     Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Company Minimum Gain during any taxable year, each Member shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.03(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)     Member Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 5, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company taxable year, each

- 7 -

Person who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to such Person's share of the net decrease in Company Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.03(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided that an allocation pursuant to this Section 5.03(c) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 5 have been tentatively made as if this Section 5.03(c) were not in this Agreement.

(d)     Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any taxable year that is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 5.03(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 5 have been tentatively made as if Section 5.03(c) and this Section 5.03(d) were not in this Agreement.

(e)     Nonrecourse Deductions. All Nonrecourse Deductions for any taxable year shall be specially allocated among the Members in proportion to their Percentage Interests.

(f)     Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

(g)     Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1(b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations, to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of his Membership Interest, the

- 8 -

amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their respective Percentage Interests in the event that Section 1.704-1(b)(2)(iv)(m)(2) of the Treasury Regulations applies, or to the Member to whom such distribution was made in the event that Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations applies.

**5.04    Curative Allocations.** The allocations required by Section 5.03 and this Section 5.04 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income gain, loss, or deduction pursuant to this Section 5.04. Therefore, notwithstanding any other provision of this Section 5 (other than the Regulatory Allocations), the Managers shall make such offsetting special allocations in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 5.01.

**5.05    Section 704(c) Allocations.** In accordance with Section 704(c) of the Code, income, gain, loss and deduction concerning any property contributed to the Company shall, solely for tax purposes, be allocated among the Members to take account of any variation between the adjusted tax basis of such property and the agreed fair market value of such property upon contribution. If the agreed fair market value of any Company asset is adjusted pursuant to this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted tax basis of such asset for federal income tax purposes and its adjusted fair market value in the same manner as under Section 704(c) of the Code. Allocations under this Section 5.05 are solely for purposes of federal income taxes and shall not affect or be taken into account in computing any Member's Capital Account.

**5.06    Other Allocation Rules.** In the event Members are admitted to the Company on different dates, the Profits or Losses allocated to the Members for each such taxable year during which Members are so admitted shall be allocated among the Members in proportion to the number and class of Interests each holds from time to time during such taxable year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Managers. Solely for purposes of determining a Member's proportionate share of the Company's "excess nonrecourse liabilities" within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, and solely for such purpose, the Member's Percentage Interest is specified to be his applicable Interest. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for the year.

**5.07    Allocations on Transfer.** Income, gain, loss, deduction or credit attributable to any Company interest which has been transferred shall be allocated between the assignor and the assignee as follows:

(a)    For the months prior to the transfer, to the assignor;

(b)    For the months subsequent to the transfer, to the assignee; and

(c)     For the month of the transfer, to the assignee if the transfer occurs on or before the 15th day of such month and to the assignor if occurring thereafter.

For purposes of the above allocation, income, gains, losses, deductions and credits shall be allocated equally among the months of the taxable year without regard to Company operations during such months.

## 6.     Distributions.

**6.01     Distributions of Net Cash from Operations.** Except as otherwise provided in Section 10, Net Cash from Operations, if any, shall be distributed to the Members within thirty (30) days after the end of each taxable year, in the following order and priority:

(a)     First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Operations distributed to a Member under this Section 6.01(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c) of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.01(a), and (ii) no such distribution of Net Cash from Operations shall be made pursuant to this Section 6.01(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business; and

(b)     Then, the balance, to the Members in accordance with their respective Percentage Interests.

**6.02     Distributions of Net Cash from Sales or Refinancings.** Except as otherwise provided in Section 10, Net Cash from Sales or Refinancings shall be distributed, within thirty (30) days following the receipt thereof, in the following order and priority:

(a)     First, to each Member in accordance with such Member's Tax Distribution with respect to such taxable year; provided, however, that (i) amounts of Net Cash from Sales or Refinancings distributed to a Member under this Section 6.02(a) shall be treated as an advance of any distributions to which such Member would otherwise be entitled under Sections 6.01(b) and 6.02(c)of this Agreement and the amounts otherwise distributable to a Member under Sections 6.01(b) and 6.02(c) of this Agreement shall be reduced by the amount distributed pursuant to this Section 6.02(a), and (ii) no such distribution of Net Cash from Sales or Refinancings shall be made pursuant to this Section 6.02(a) should the Managers determine, in their discretion, that such distribution would adversely affect the Company or its business;

(b)     Then, to the Members in an amount equal to their Unrecovered Capital Contributions, payable in proportion to the unpaid amounts thereof; and

(c)     Then, the balance, to the Members in accordance with their respective Percentage Interests.

**6.03     Amounts Withheld.** All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company, the Members and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in

respect of any Member or any Person owning an interest, directly or indirectly, in such Member shall be treated as amounts distributed to the Member with respect to which such amount was withheld pursuant to this Section 6.03 for all purposes under this Agreement. The Managers are authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law and shall allocate any such amounts to the Members with respect to which such amount was withheld.

## 7.   Fiscal Matters; Books and Records.

**7.01   Bank Accounts; Investments.**  Capital Contributions, revenues and any other Company funds shall be deposited by the Managers in a bank account established in the name of the Company, or shall be invested by the Managers in furtherance of the purpose of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company purpose, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

**7.02   Records Required by TBOC; Right of Inspection.** During the term of the Company and for a period of four (4) years thereafter, the Managers, at the expense of the Company, shall maintain in the Company's principal office in the United States specified in Section 2 all records required to be kept pursuant to the TBOC. On written request stating the purpose, a Member or an assignee of a Member's Percentage Interest may examine and copy in person or by such Person's representative, at any reasonable time, for any proper purpose, and at such Person's expense, records required to be maintained under the TBOC.

**7.03   Books and Records of Account.**  The Managers, at the expense of the Company, shall maintain for the Company adequate books and records of account that shall be maintained on the method of accounting selected by the Managers and on a basis consistent with appropriate provisions of the Code, containing, among other entries, a Capital Account for each Member.

**7.04   Tax Returns and Information.**  The Members intend for the Company to be treated as a partnership for tax purposes. The Managers shall prepare or cause to be prepared all federal, state and local income and other tax returns that the Company is required to file. Within the shorter of: (a) such period as may be required by applicable law or regulation; or (b) seventy-five (75) days after the end of each calendar year, the Managers shall send or deliver to each Person who was a Member at any time during such year such tax information as shall be reasonably necessary for the preparation by such Person of his federal income tax return and state income and other tax returns.

**7.05   Tax Elections.**  The Company shall be treated as a partnership for federal income tax purposes and neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law.

**7.06   "Tax Matters Member."**  The Managers designate Alex Jones as the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. The tax matters partner shall inform each other Member of all significant matters that may come to his attention in his capacity as "tax matters partner" by giving notice thereof on or before the fifth day after

- 11 -

becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.

## 8.    Management of the Company.

**8.01    Management.** The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managers. The Managers shall have authority to cause the Company to do business in jurisdictions other than the State of Texas. Pursuant to the TBOC, the existence of the Company began upon the effective date of the Certificate of Formation. The initial Manager of the Company shall be Alex Jones, and he shall serve in such capacity until such time as his successor or successors have been duly elected by the approval of a Required Interest.

**8.02    Powers of Managers/Delegation of Authority.** The Managers shall have no power to cause the Company to do any act outside the purpose of the Company as set forth in Section 2.04. Subject to the foregoing limitation and all other limitations in this Agreement, the Managers, shall have full, complete and exclusive power to manage and control the Company, and shall have the authority to take any action they deem to be necessary, convenient or advisable in connection with the management of the Company.

**8.03    Action by Managers.** Unless otherwise expressly provided in this Agreement, at any meeting of the Managers, a majority (by number) of the Managers shall constitute a quorum for the transaction of business, and an act of a majority (by number) of the Managers who are present at such a meeting at which a quorum is present shall be the act of the Managers. A meeting of the Managers shall be held at the principal office of the Company upon five (5) days' notice. Any action that may be taken at a meeting of the Managers or any committee of the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all of those Persons entitled to vote at that meeting on the particular action, and such consent shall have the same force and effect as a unanimous vote of the Managers or such committee or designated group of Managers at a meeting duly called and held. No notice shall be required in connection with the use of a written consent pursuant to this Section 8.

## 9.    Membership in the Company.

**9.01    Rights, Powers and Obligations of Members.** No Member (other than a Manager or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company. No Member (including any Member who is a Manager or officer) shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

**9.02    Action by Members.** Commencing with the calendar year next following the calendar year in which the Company was organized, annual meetings of the Members shall be held on the first Thursday of January at 10:00 a.m., local time. Special meetings of the Members may be called by resolution of a Required Interest upon five (5) days' notice, for the purpose of addressing any matter upon which the Members may vote under this Agreement. A Required Interest shall constitute (i) a quorum for the transaction of business, and (ii) the act of the Members. All meetings of Members shall be held at the principal office of the Company as provided in Section 2. Any action that may be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by

a Required Interest or Members holding in aggregate the Percentage Interests required to approve such action under the TBOC, the Certificate of Formation or this Agreement.

### 10.   Restrictions Upon Membership Interests.

**10.01 Generally.**   The ownership and transferability of Interests in the Company are substantially restricted. Neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred or encumbered except as otherwise set forth in this Agreement.   Capital is material to the business and investment objectives of the Company and its federal tax status. An unauthorized transfer of a Member's Membership Interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure.   These restrictions upon ownership and transfer are not intended as a penalty, but as a method to protect and preserve existing relationships based upon trust and the Company's capital and its financial ability to continue its business.   Except as provided in this Agreement, neither record title nor beneficial ownership of all or any part of a Member's Membership Interest may be transferred without the prior written approval of a Required Interest.

**10.02 Authorized Transfers at Death.**   An individual Member may transfer all or any part of his Membership Interest at his death to a Permitted Transferee without obtaining the approval of a Required Interest. In addition, a trust with an individual beneficiary who has a limited or unlimited testamentary power of appointment may transfer all or any part of its Membership Interest at the death of such individual to a Permitted Transferee without obtaining the approval of a Required Interest. A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.02, shall become a Substituted Member without the approval of a Required Interest.

The transfer may be accomplished pursuant to (1) the terms of the properly probated last will and testament of a Member; (2) the exercise of a limited or unlimited testamentary power of appointment; (3) the terms of any trust set up for the primary benefit of one or more Permitted Transferees; or (4) pursuant to an acknowledged assignment instrument, effective as of the date of the Member's death, delivered to and signed by the Manager prior to the death of the Member.

If there has been no pre-arranged transfer as provided above, the executor, administrator, guardian, conservator, or legal representative of a deceased or incompetent Member may exercise all the deceased or incompetent Member's rights and powers necessary to settle the Member's estate or administer the Member's property.   However, the estate of a deceased or incompetent Member shall not have the right to become a Substituted Member without the approval of a Required Interest.

**10.03 Authorized Estate Planning Transfers.**   An individual Member may make transfers of all or any part of his Membership Interest, with or without consideration, to a Permitted Transferee without obtaining the approval of a Required Interest. In addition, a trust with an individual beneficiary who has a limited or unlimited right to make a disposition of all or any part of his interest in the trust during his lifetime may transfer all or any part of its Membership Interest to a Permitted Transferee with or without consideration, without obtaining the approval of a Required Interest. A Permitted Transferee, upon receiving a transfer of all or any part of a Membership Interest under the terms of this Section 10.03, shall become a Substituted Member without the approval of a Required Interest.

- 13 -

**10.04 Nonrecognition of an Unauthorized Transfer.** The Company will not be required to recognize the interest of any transferee or assignee who has obtained a purported Membership Interest as the result of a transfer or assignment that is not authorized by this Agreement (an "Unauthorized Transfer"). If there is doubt as to who owns a Membership Interest or who is entitled to distributions or to the proceeds upon liquidation of the Company, the Manager may accumulate such distributions or liquidation proceeds until the issue is resolved.

**10.05 Effect of Unauthorized Transfers.** If a Member makes an Unauthorized Transfer of all or any part of a Membership Interest, the Company will have the unilateral option to acquire the interest of the transferee or assignee, or any fraction or part thereof (referred to in this Section 10.05 as the "Unauthorized Interest"), upon the following terms and conditions.

(a)     The Company will have the option to acquire the Unauthorized Interest by giving written notice to the transferee or assignee of its intent to purchase the Unauthorized Interest within ninety (90) days from the date it is finally determined that the Company is required to recognize the transfer or assignment of the Unauthorized Interest.

(b)     The valuation date for the determination of the purchase price of the Unauthorized Interest will be the first day of the month following the month in which such written notice is delivered.

(c)     Unless the Company and the transferee or assignee agree otherwise, the purchase price for the Unauthorized Interest shall be its fair market value as determined in the manner provided in Schedule B.

(d)     Closing of the sale will occur at the principal office of the Company at 10 o'clock a.m. on the first Tuesday of the month following the month in which the fair market value was finally determined in accordance with the provisions of Schedule B.

(e)     In order to reduce the burden upon the resources of the Company, the Company will have the option, to be exercised in writing delivered at closing, to pay its purchase money obligation in fifteen (15) equal annual installments (or in annual installments for the remaining term of the Company if less than fifteen (15) years) with interest at the Default Interest Rate. The first installment of principal, with interest, will be due and payable on the first day of the calendar year following closing, and subsequent annual installments, with accrued interest, will be due and payable on the first day of each succeeding calendar year until the entire amount of the obligation is paid. The Company will have the right to prepay all or any part of the purchase money obligation at any time without penalty.

(f)     Upon the approval of a Required Interest, other than the Member whose interest is to be acquired, the Manager may assign the Company's option to purchase to one or more of the remaining Members and when done, any rights or obligations imposed upon the Company will instead become, by substitution, the rights and obligations of such Members.

(g)     Neither the transferee or assignee of an Unauthorized Interest or the Member causing the transfer or assignment, will have the right to vote on Company matters during the prescribed option period.

**10.06 Deemed Unauthorized Transfers.** In the event that any of the following events occur with respect to a Member, such Member will be deemed to have made an

- 14 -

Unauthorized Transfer of his Membership Interest, and the provisions of Section 10.05 will apply:

      (a)      the assignment of all or any part of a Member's Membership Interest for the benefit of creditors;

      (b)      the Bankruptcy of a Member;

      (c)      the appointment of a receiver for all or substantially all of the assets of a Member;

      (d)      the levy of an attachment, sequestration, garnishment, or charging order against all or any part of a Member's Membership Interest; or

      (e)      a purported transfer or encumbrance by operation of law or otherwise of all or any part of a Member's Membership Interest, except as expressly permitted under this Agreement.

### 10.07 Admission of Substituted Members.

      (a)      Except as otherwise provided in Sections 10.02 and 10.03 of this Agreement, no assignee of all or any part of a Membership Interest shall have the right to become a Substituted Member except with the approval of a Required Interest, the granting or denying of which consent shall be in the sole discretion of those constituting the approval of a Required Interest, and, if granted, may be granted subject to whatever conditions, if any, those constituting the approval of a Required Interest may require. Notwithstanding any other provision of this Agreement, in no event may an assignor of all or any part of a Membership Interest make or enter into an agreement, oral or written, with an assignee or potential assignee of such interest under which the assignor agrees to exercise its residual rights in the Company at the discretion or instruction of any assignee of such interest, and any such purported agreement shall be null and void.

      (b)      Notwithstanding any granting of the approval of a Required Interest under paragraph (a) of this Section 10.07, and notwithstanding the provisions of Sections 10.02 and 10.03, the admission of an assignee as a Substituted Member shall be further conditioned as follows:

      (i)      the assignment instrument and such other instruments as the Managers may deem necessary or desirable to effect the admission of the assignee as a Substituted Member being in form and substance satisfactory to the Managers;

      (ii)      the assignor and assignee executing such other instrument or instruments as the Managers may deem necessary or desirable to effectuate such admission;

      (iii)      the assignee and the assignee's spouse (if any) accepting and adopting in writing all the terms and provisions of this Agreement, as the same may have been amended;

(iv)   the assignee and/or the assignor paying or obligating themselves to pay all reasonable expenses connected with such admission (as determined by the Managers, but which the Managers shall have the right to waive), including, but not limited to, the cost of the preparation, filing, and publishing of any appropriate documents; and

(v)   such other conditions as the Managers may reasonably impose.

(c)   In the event that an assignee seeking to become a Substituted Member under this Section 10.07 is an assignee of all or any part of a Membership Interest of a Manager, then all decisions in this Section 10.07 are to be made by the other Manager(s), if any, or if there is no other Manager, then by a Unanimity of Interest of the Members.

**10.08   Status of a Substituted Member.**   A "Substituted Member" is an assignee of all or any part of a Membership Interest admitted to all the rights and subject to all of the obligations of a Member in the Company. Any such Substituted Member shall be treated as a Member. In the event an assignee becomes a Substituted Member, such Substituted Member shall be deemed to have received its interest in the Company from the Member who assigned such interest, and will have the same rights to receive distributions and to be allocated tax items as the Member with respect to which such assignee is becoming a Substituted Member.

**10.09   Assignee of a Membership Interest.**   Any person or entity who acquires all or any part of a Membership Interest and who has not been admitted as a Substituted Member shall be entitled to receive Company distributions attributable to such Interest, but shall have no voting or managerial rights.

**10.10   Membership Interest Pledge or Encumbrance.**   No Member may grant a security interest in or otherwise pledge, hypothecate, or encumber all or any part of his Membership Interest or such Member's distributions without obtaining the approval of a Required Interest. It is understood that the Members are under no obligation to give consent nor are they subject to liability for withholding consent.

## 11.   Dissolution and Winding Up.

**11.01   Events Causing Dissolution.**   The Company shall be dissolved upon the first of the following events to occur: (a) the expiration of the term of duration of the Company, if any, set forth in the Certificate of Formation; (b) the written consent of a Required Interest at any time to dissolve and wind up the affairs of the Company; or (c) the occurrence of any other event that causes the dissolution of a limited liability company under the TBOC.

**11.02   Winding Up.**   If the Company is dissolved pursuant to Section 11.01, the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.

(a)   Appointment of Liquidator.   The winding up of the Company's affairs shall be supervised by a Liquidator. The Liquidator shall be the Managers or, if the Members prefer, a liquidator or liquidating committee selected by a Required Interest.

(b)   Powers of Liquidator.   In winding up the affairs of the Company, the Liquidator shall have full right and unlimited discretion, for and on behalf of the Company: (i)

- 16 -

to prosecute and defend civil, criminal or administrative suits; (ii) to collect Company assets, including obligations owed to the Company; (iii) to settle and close the Company's business; (iv) to dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions; (v) to pay all reasonable selling costs and other expenses incurred in connection with the winding up out of the proceeds of the disposition of Company Property; (vi) to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; (vii) to distribute any remaining proceeds from the sale of Company Property to the Members; (viii) to prepare, execute, acknowledge and file articles of dissolution under the TBOC and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and (ix) to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Managers under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties and functions. The Liquidator (if not the Managers) shall not be liable as a Manager to the Members and shall, while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth in the Certificate of Formation.

**11.03 Compensation of Liquidator.** The Liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the Liquidator and a Required Interest.

**11.04 Liquidation.** Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the Liquidator shall distribute the proceeds of such sales, and any Company Property that is to be distributed in kind, to the following groups in the following order of priority:

(a) First, to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors (other than for past due Company distributions), of the Company, whether by payment or establishment of reserves; and

(b) Then, to the Members, in accordance with, and in the ratio of, the positive balances in their respective Capital Accounts.

The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group. If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Percentage Interests of each Member in such group.

**11.05 Final Report.** Within a reasonable time following the completion of the liquidation, the Liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions pursuant to Section 11.04.

**11.06 Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, and notwithstanding that the deficit, if any, in the Capital Account of any Member results from or is

- 17 -

attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## 12. Miscellaneous.

**12.01 Notices.** All notices given pursuant to this Agreement shall be in writing and shall either be (i) mailed by first class mail, postage prepaid, registered or certified with return receipt requested, or (ii) hand delivered to the intended addressee. Notice so mailed shall be effective upon the expiration of three (3) days after its deposit and notice given by hand delivery shall be effective upon actual receipt by the addressee. For purposes of notice, the addresses of the Members shall be as set forth under their respective names on the attached Schedule A; provided, however, that each Member shall have the right to change his address for purposes of notice hereunder to any other physical address by the giving of thirty (30) days' notice to the other Members in the manner set forth above.

**12.02 Governing Law.** This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of Texas. In particular, this Agreement is intended to comply with the requirements of the TBOC and the Certificate of Formation. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the TBOC or any provision of the Certificate of Formation, the TBOC and the Certificate of Formation, in that order of priority, will control.

**12.03 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

**12.04 Amendment.** Except as expressly provided herein, this Agreement may be amended only by action of a Required Interest.

**12.05 Construction; Headings.** The Article and Section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article or Section. Whenever required by the context, as used in this Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

**12.06 Creditors Not Benefited.** Nothing in this Agreement is intended to benefit any creditor of the Company or a Member. No creditor of the Company or a Member will be entitled to require the Managers to solicit or accept any loan or additional capital contribution for the Company or to enforce any right which the Company or any Member may have against a Member, whether arising under this Agreement or otherwise.

**12.07 Arbitration.** Any controversy, claim or dispute arising out of or relating to this Agreement or any other agreements referred to herein, shall be settled by binding arbitration in Austin, Travis County, Texas. Such arbitration shall be conducted in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association

- 18 -

("AAA"), with the following exceptions if in conflict: (a) one arbitrator shall be chosen by AAA; (b) each party to the arbitration will pay its pro rata share of the expenses and fees of the arbitrator, together with other expenses of the arbitration incurred or approved by the arbitrator; and (c) arbitration may proceed in the absence of any party if written notice (pursuant to the AAA's rules and regulations) of the proceedings has been given to such party. The parties agree to abide by all decisions and awards rendered in such proceedings. Such decisions and awards rendered by the arbitrator shall be final and conclusive and may be entered in any court having jurisdiction thereof as a basis of judgment and of the issuance of execution for its collection. All such controversies, claims or disputes shall be settled in this manner in lieu of any action at law or equity; provided, however, that nothing in this subsection shall be construed as precluding the bringing an action for injunctive relief or other equitable relief. The arbitrator shall not have the right to award punitive damages or speculative damages to either party and shall not have the power to amend this Agreement. The arbitrator shall be required to follow applicable law. IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO.

**12.08 Entire Agreement.** This Agreement (including the heading on the first page hereof), the schedules and exhibits attached hereto and specifically referenced herein, collectively contain the entire agreement among the Members relating to the subject matter hereof and all prior agreements relative hereto which are not contained herein are terminated.

This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document.

**[Signature Page Follows]**

EXECUTED to be effective as of the Effective Date.

**Members:**

Kelly Jones

Alex Jones

**Managers:**

Alex Jones

SIGNATURE PAGE

## SCHEDULE A

### Names, Addresses, Initial Capital Contributions and Percentage Interests

| Members: | Initial Capital Contributions: | Percentage Interest: |
|---|---|---|
| Kelly Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas 78746 | $51.00 | 51% |
| Alex Jones<br>6601 Dogwood Creek Drive<br>Austin, Texas 78746 | $49.00 | 49% |
| **Totals:** | **$100.00** | **100.00%** |

## SCHEDULE B

## DETERMINATION OF FAIR MARKET VALUE
## OF MEMBERSHIP INTEREST

In the event a determination of the fair market value of all or any part of a Membership Interest is required pursuant to the terms of this Agreement, the following provisions shall apply.

A. The fair market value of all or any part of a Membership Interest shall be the price at which the interest would change hands between a willing seller and a willing buyer, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts, including, but not limited to, all facts relevant for determining under Sections 2031 and 2512 of the Code the fair market value of closely held entity interests which may not be withdrawn before the end of the term of the Company.

B. Purchaser and Seller shall first attempt to determine the fair market value of the affected Membership Interest or any part thereof (the "Affected Interest") by agreement. If Seller and Membership are unable to agree on the fair market value of the Affected Interest within fifteen (15) days after Purchaser has notified Seller of its intent to purchase the Affected Interest, each of Seller and Purchaser shall, within the period of an additional fifteen (15) days, name a qualified appraiser and supply the name of such appraiser to the other party. If either Seller or Purchaser fails to appoint an appraiser, the determination of the fair market value of the Affected Interest shall be made by the sole appraiser appointed. Within the period of thirty (30) days after the appointment of the second appraiser, the two appraisers shall separately determine the fair market value of the Affected Interest and shall provide copies of their written reports to each of Seller and Purchaser. If the difference between the two appraisal reports is ten percent (10%) or less (the higher report being less than the lower report multiplied by 1.01) the average of the appraisals shall conclusively determine the fair market value of the Affected Interest. If the difference between the two appraisal reports is greater than ten percent (10%), the two appraisers shall appoint a third appraiser who shall select between the two appraisal reports as to the fair market value of the Affected Interest, and the opinion of the third appraiser shall be conclusive of the fair market value of the Affected Interest.

C. For purposes hereof, an appraiser shall be "qualified" if he would be considered an expert for purposes of giving testimony as to the fair market value per Interest in the Company in a judicial or similar proceeding. The costs and expenses of the appraiser selected by Seller or Purchaser shall be borne by the party selecting the appraiser. The costs and expenses of a common appraiser shall be borne equally by the Seller and Purchaser.

D. During the period of time that a determination of the fair market value of the Affected Interest is being conducted pursuant to the procedures set forth in this Schedule B, all time periods for notice or exercise of any rights related to the purchase shall be suspended. Upon the final determination of fair market value, all time limits shall automatically commence.

# EXHIBIT C

**Debtor Certificate of Formation**



Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation
Limited Liability Company**

**Filed in the Office of the
Secretary of State of Texas
Filing #: 800898797 11/16/2007
Document #: 193325990002
Image Generated Electronically
for Web Filing**

## Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Free Speech Systems, LLC

The name of the entity must contain the words "Limited Liability Company" or "Limited Company," or an accepted abbreviation of such terms. The name must not be the same as, deceptively similar to or similar to that of an existing corporate, limited liability company, or limited partnership name on file with the secretary of state. A preliminary check for "name availability" is recommended.

## Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**

**Elizabeth  M.  Schurig**

C. The business address of the registered agent and the registered office address is:

**Street Address:**

**100 Congress Avenue 22nd Floor   Austin  TX  78701**

## Article 3 - Governing Authority

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: **Kelly     Jones**                      Title: **Manager**

Address: **6601 Dogwood Creek Drive    Austin  TX, USA  78746**

Manager 2: **Alex     Jones**                       Title: **Manager**

Address: **6601 Dogwood Creek Drive    Austin  TX, USA  78746**

## Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

## Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

| **Organizer** |
|---|

The name and address of the organizer are set forth below.

**Elizabeth M. Schurig**        **100 Congress Avenue 22nd Floor Austin, TX 78701**

| **Effectiveness of Filing** |
|---|

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

| **Execution** |
|---|

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

**Elizabeth M. Schurig**

Signature of Organizer

**FILING OFFICE COPY**

# **EXHIBIT D**

**Debtor Certificate of Correction**

Case 22-60043 Document 56-2 Filed in TXSB on 04/26/2022 Page 104 of 117

**Form 403**
**(Revised 01/06)**

Return in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
**Filing Fee: $15**

**Certificate of Correction**

This space reserved for office use.

**F I L E D**
In the Office of the
Secretary of State of Texas

JAN 03 2008

Corporations Section

## Entity Information

The name of the filing entity is:

Free Speech Systems, LLC

State the name of the entity as currently shown in the records of the secretary of state. If the certificate of correction corrects the name of the entity, state the present name and not the name as it will be corrected.

The file number issued to the filing entity by the secretary of state is: 800898797

## Filing Instrument to be Corrected

The filing instrument to be corrected is : Certificate of Formation
The date the filing instrument was filed with the secretary of state: 11/16/2007
*mm/dd/yyyy*

## Identification of Errors and Corrections
(Indicate the errors that have been made by checking the appropriate box or boxes; then provide the corrected text.)

☐ The entity name is inaccurate or erroneously stated. The corrected entity name is:

☐ The registered agent name is inaccurate or erroneously stated. The corrected registered agent name is:

Corrected Registered Agent
(Complete either A or B, but not both.)

A. The registered agent is an organization (cannot be entity named above) by the name of:

**OR**

B. The registered agent is an individual resident of the state whose name is:

*First*          *Middle*     *Last Name*                                    *Suffix*

RECEIVED

JAN 0 3 2008

Form 403   Secretary of State                           3

☐ The registered office address is inaccurate or erroneously stated. The corrected registered office address is:

Corrected Registered Office Address

TX

| | | | |
|---|---|---|---|
| *Street Address (No P.O. Box)* | *City* | *State* | *Zip Code* |

☐ The purpose of the entity is inaccurate or erroneously stated. The purpose is corrected to read as follows:

☐ The period of duration of the entity is inaccurate or erroneously stated.

The period of duration is corrected to read as follows:

## Identification of Other Errors and Corrections

(Indicate the other errors and corrections that have been made by checking and completing the appropriate box or boxes.)

☐ **Other errors and corrections**. The following inaccuracies and errors in the filing instrument are corrected as follows:

☐ **Add**   Each of the following provisions was omitted and should be added to the filing instrument. The identification or reference of each added provision and the full text of the provision is set forth below.

☑ **Alter**   The following identified provisions of the filing instrument contain inaccuracies or errors to be corrected. The full text of each corrected provision is set forth below:

Article 3 - Governing Authority
Alex Jones, Manager
910 West Mary Street, Austin, Texas 78704

☑ **Delete**   Each of the provisions identified below was included in error and should be deleted.

Article 3 - Governing Authority
Kelly Jones, Manager
6601 Dogwood Creek Drive, Austin, Texas 78746

☐ **Defective Execution**    The filing instrument was defectively or erroneously signed, sealed, acknowledged or verified.    Attached is a correctly signed, sealed, acknowledged or verified instrument.

## Statement Regarding Correction

The filing instrument identified in this certificate was an inaccurate record of the event or transaction evidenced in the instrument, contained an inaccurate or erroneous statement, or was defectively or erroneously signed, sealed, acknowledged or verified. This certificate of correction is submitted for the purpose of correcting the filing instrument.

## Effectiveness of Filing

After the secretary of state files the certificate of correction, the filing instrument is considered to have been corrected on the date the filing instrument was originally filed except as to persons adversely affected. As to persons adversely affected by the correction, the filing instrument is considered to have been corrected on the date the certificate of correction is filed by the secretary of state.

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.


Date:    12|15|2001


Signature and title of authorized person (see instructions)

**EXHIBIT E**


**AEJ Employment Agreement**

# FREE SPEECH SYSTEMS, LLC
# EMPLOYMENT AGREEMENT
## and accompanying
## EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN

This Employment Agreement and accompanying Employee Annuity and Life Insurance Plan is entered into by and between Employer **Free Speech Systems, LLC**, (herein the "Company" or the "Employer") and Alex Jones, Employee on April 14, 2022, as follows:

Whereas, it is the intention of the Employer to employ Alex Jones to render his personal services to Employer in exchange for compensation for his personal services ("Current Wages" or "Wage") upon and subject to the terms and conditions hereinafter set out; and

Whereas, it is the intention of the Employer to provide an employer plan and program (herein the Company" and its Annuity and Life Insurance Program" or the "Plan") whereby an Employee Alexander Jones (as described herein) of the Company may, through this Company's Plan, make designations of dedication of Wages and salaries, compensation, bonus or other compensation for Employees personal services rendered ("Compensation" or "Current Wages") to and at the direction of Employer are to be used for the purchase in the name of the Employee by Employer as and if earned, and from time to time, Annuity Contracts as described and defined in of Article § 1108.001 *et seq* of the Texas Insurance Code and other applicable laws of the State of Texas and the United States of America, whereby the Employee's Current Wages for services rendered to or for the benefit of the Company are administered so as to be paid directly by the Company, pursuant to this Employer Annuity and Life Insurance Plan provided in the statute, to an insurance company issuing the Plan administered annuity and life insurance.

NOW, THEREFORE Alex Jones and the Employer agree as follows:

# I.
## EMPLOYMENT AGREEMENT

1. The Employer employs Alex Jones and Alex Jones hereby accepts employment with the Company, upon and subject to the terms and conditions hereinafter set forth.

2. Alex Jones shall be employed by Employer to continue to broadcast his public programing and Employer shall continue to furnish all assistance necessary to allow Alex Jones to continue his public broadcast.

3. Alex Jones shall further to continue to promote products and services agreed to by Employer and Employer shall continue to furnish all assistance necessary, including processing of credit card charges for the products and services.

4. Alex Jones shall have the unrestricted right to use the Employer's trademarks, tradenames, intellectual property and web cites maintained, including the Inforwar web site and

Employment Agreement and
Annuit Plan

web domain for all purposes in furtherance of his public broadcast.

5    Alex Jones agrees to devote all of the time necessary to continue his public broadcasts and allow his brand to be used in advertising and promotions as he has done in the past and Employer agrees to furnish all support staff and facilities to continue such support as it has done in the past and to maintain Employer's trademarks, tradenames, intellectual property and websites maintained, including the Inforwar web site and web domain for all purposes in furtherance of his public broadcast.

6.    Alex Jones agrees to devote such time as necessary to accomplish his continued public broadcast but shall not be restricted in other projects or programs from time to time in the sole discretion of Alex Jones.

7.    As Wages for his personal services under this Employment Agreement Alex Jones will be paid the annual sum of $1,300,000.00 in bi-monthly payments and shall reimburse Alex Jones for all expenses incurred in this employment and in any efforts to promote the broadcast, including travel, meals, lodging, cell phone, and other expenses.    All Wages for personal services by Alex Jones will be subject to the EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN attached hereto as Exhibit "1" which terms are incorporated herein by reference for all purposes as if set out herein verbatim.

8.    The Employment of Alex Jones is on an "at will" basis which may be terminated by either party without cause.  Upon termination Alex Jones shall have (i). all wages accrued to him under this Employment Agreement subject to the Annuity election as set out in Exhibit "1"; and (ii)  an irrevocable assignment of the exclusive use (but not the ownership) for a period of four years after termination, of all of Employer's trademarks, tradenames, intellectual property and websites maintained, including the Inforwar web site and web domain.

9.    The Parties agree that other than claims of Alex Jones arising under the Annuity and Life Insurance Program, or the Indemnity portion herein below, in no event will any dispute between the Parties result in a claim or the aggregate of all claims, of more than $5,000.00 and such claims made not paid within 30 days of the demand shall be subject to a ½ day arbitration that must be started and commenced not more than 60 days from the written demand.

10.    Employer agrees to indemnify and hold harmless, and furnish and pay counsel of Employees choice, in the event that claims or suit are brought against Alex Jones arising out of his performance of this Employment Agreement, unless such claims are established by clear and convincing evidence to have arisen from Alex Jones actual fraud.

11.    This Employment Agreement may be amended or modified from time to time by written agreement of the Parties.

12.    There are no third-party beneficiaries intended to be entitled to any rights or remedies under or pursuant to the terms of this Employment Agreement.

13.    This Agreement shall be interpreted in accordance with and governed by the laws

Employment Agreement and
Annuit Plan

of Texas without regard to any conflict of laws principles. All disputes arising out of or in connection with this Agreement shall be subject to the sole and exclusive jurisdiction of the state or federal courts of, and located in, Harris County, Texas.

14.     No portion of this Employment Agreement is severable and no waiver of any of the provisions of this Agreement shall be effective unless made in writing and signed both Parties.

15.     Because of the nature of the relationship of Employee to Employer, the Employer waives any and all fiduciary duties or fiduciary obligations that otherwise may arise from this relationship, and the parties agree that Alex Jones has no liability to Employer except for acts of actual fraud, established by final order under clear and convincing evidence.

16.     This Employment Agreement may be executed in multiple counterparts each of which shall be deemed an original.

REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK

Employment Agreement and
Annuit Plan

**EMPLOYER:**
**FREE SPEECH SYSTEMS, LLC**

_Melinda Flores_

Melinda Flores, authorized agent
Internal Accounting and Records

_Alex Jones_

EMPLOYEE: **ALEX JONES**

**Attachment:** Exhibit "1" **EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN**

Page 4 of 10

Employment Agreement and
Annuit Plan

# EXHIBIT "1".
## EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN

This Plan shall be implemented effective April 1, 2022, and shall apply, at the election of the Employee, to all Current Wages due to the Employee as salary, wages, and bonuses for personal services rendered to the Company earned after the "Effective Date." The Plan shall include the following provisions, as may be amended from time to time:

## ARTICLE I
## DEFINITIONS

1.01 <u>EXECUTIVE COMMITTEE</u>. Executing and administering this Company Annuity and Life Insurance Program is: Free Speech Systems L.L.C., (herein the "Executive Committee") as named from time to time by the member or manager of Employer. This Plan is effective and in full force notwithstanding a vacancy in the position an executive or Committee Member.

1.02 <u>PLAN</u>. The name of the Plan as adopted by the Company is: FREE SPEECH SYSTEMS, LLC EMPLOYEE ANNUITY AND LIFE INSURANCE PLAN.

1.03 <u>EMPLOYEE</u>. The following Employees are eligible to participate in the Plan:
    (a) No exclusions, except as provided in Article II.
    (b) An Employee having prior service with the Company (or its predecessor) on a full time basis for longer than two (2) consecutive years shall be entitled to designate a portion of that Employee's Current Wages for personal services the Employee has rendered to the Company (and for which the Company is otherwise obligated to compensate the Employee) for payment by the Company directly to the designated insurance company issuing the annuity and life insurance for the purchase of an annuity and life insurance qualified under Article § 1108.001 *et seq* of the Texas Insurance Code, as amended, in the name of and for the sole benefit of the Employee or his/her designated beneficiaries.

1.04 <u>DISTRIBUTIONS</u>.
**Treatment of Elective Distributions**.

    (a) "Contribution" as used herein is the elective contributions of the Employee, of that portion of the Current Wages for personal services rendered to Company, to be paid over by the Company on the Employee's behalf to the insurance company issuing the Employee designated annuity and life insurance exclusively in the name of the Employee and for the exclusive benefit of the Employee. Wages shall include a set salary together with any bonus or earn-out payments based upon an agreed percentage of product sales gross earnings by the Employer, as reported by Employer (collectively "Wage" or "Wages").
    (b) The annuity and life insurance to be purchased shall be as designated by the

Page 5 of 10

Employee, and the Company shall have no responsibility to make such designation or to ensure that such designation is in any manner a safe, proper or adequate investment; provided however, so long as the Employee elects to remain in the Plan, the Employee may not make any payments on the designated purchased annuity and life insurance except through this Plan.

(c)     In addition, each Employee shall be required to sign a written designation naming each insurance company issuing any annuity and life insurance elected by the Employee which such designation shall include a complete release of Company for any liability with respect to the Company's dealings with such insurance company.  In particular, the release shall also caution the Employee that their designation of the insurance company  and the purchase by the Company of the annuity and life insurance on behalf of the Employee will not be investigated at any time by the Company for the purpose of determining the soundness of the insurance company, the appropriateness of the investment, or the future likelihood of return on the investment, the protection afforded by law of the investment, or otherwise.

(d)      In every case the Company shall have no liability to the Employee or the particular insurance company except to turn over exclusively for the Employee's benefit all such designated Wages, including all Annuities purchased from time to time.

(e)     Upon such proper written designation, and upon the qualification of the Employee under the requirements of any such insurance company's requirements to issue an annuity and life insurance to or for the benefit of such Employee, the Company shall withhold from the Employee the gross  amount of Current Wages (after deduction of all tax obligations imposed upon the Company and the Employee by law, if any, including the FICA and withholding tax obligations of the Employee) necessary to equal the amount of "Net Wages" designated to be paid to the insurance company to purchase the annuity and life insurance.

(f)     Upon proper designation by the Employee, only the Company shall directly distribute to such insurance company issuing the Employee designated annuity and life insurance, all such Net Wages designated by the Employee in writing from time to time.

(g)     Once the proper payment has been made by the Company to the insurance company issuing the annuity and life insurance, the Company shall have no further responsibility or liability for the payment of such Net Wage and the Employee agrees to, and shall specifically be deemed to have, released the Company for all claims arising out of the payment by Company to the insurance company issuing the annuity and life insurance.

(h)     In the event that the Employer is joined in, or named in, any attachment, garnishment, collection proceeding at law or in equity, the Employer may at its election withhold such wages and deposit same into the registry of the Court having or asserting jurisdiction over such funds so as to determine the respective rights to the wages being withheld from the Employee, in which event the Employer shall be entitled to recover its reasonable attorneys fees and costs either from the creditor or party seeking attachment, garnishment, or the like, or from the wages as the Court may order.

(i)     Once the life insurance or annuity payment has been made by the Company, the treatment of such payments by the insurance company, by the Internal Revenue Service, any third parties claiming an interest or by the Employee shall be subject to all existing tax laws; that is, the Employee shall own the policy or annuity and shall remain liable for all taxes accrued, if any, upon such Net Wages paid to the insurance company over and above the amounts required to be withheld by law by the Company, and the Company shall withhold any Employee portion as may be required by applicable tax law in the same amount as if such payment had been made

Page 6 of 10

directly to the Employees. Such withheld portion shall be held in trust by the Employer and timely turned over to the appropriate taxing unit as required by such law, directly by the Company.

(j)    At any time after the annuity and life insurance has been issued and taken out, except as otherwise herein provided, the Company shall own no interest in the annuity and life insurance and its sole responsibility shall be to timely turn over the Current Wages designated by the Employee to the insurance company for the purpose of application of such funds to the purchase of the qualified annuity and/or life insurance.

(k)    The Company shall keep an accurate record of, and shall administer only, the payments made to the insurance company issuing the annuity and life insurance, and all of the requests for such payment made by the Employee to the Company. Additionally, the Employee shall only be permitted to make twelve (12) Payment Designations per year, which would include, however, twelve (12) pay periods and/or twelve (12) bonus pay periods.

### 1.05   PLAN YEAR/LIMITATION YEAR.

**Plan Year**. Plan Year means: The 12 consecutive month period ending every December 31st of each year (the first Plan year consisting, beginning on the Effective Date and ending on December 31 of that year).

### 1.06   EFFECTIVE DATE.

**New Plan**. The "Effective Date" of the Plan is: December 31, 2021, after which Current Wages earned may become subject to this Plan.

### 1.07   HOUR OF SERVICE. The crediting method for Wages Earned is: The actual method set out in any employment agreement between Employer and Employee providing for salary and salary earn-outs for sales performance, and such other compensation based on a minimum number of Platform shows or interviews per quarter
.

## ARTICLE II
## EMPLOYEE PARTICIPANTS

### 2.01   ELIGIBILITY

**Eligibility conditions**. To become a Participant in the Plan, an Employee must satisfy the following eligibility conditions:

(a)    Attainment of age 21

(b)    Service requirement. ONE year of full-time service without an intervening Break in Service (including service of the Company's predecessor businesses).

**Time of Participation**. An Employee may become a Participant immediately following the date the Employee completes the eligibility conditions and deliver a Payment Designation Form to the Executive Committee.

### 2.02   YEAR OF SERVICE - PARTICIPATION.

**Hours of Service**. An Hourly Employee must complete 1,500 Hours per year to be considered in Service. A non-hourly employee must earn and be eligible for payment of commission wages before becoming eligible as set out herein.

## ARTICLE III
### EMPLOYER CONTRIBUTIONS AND FORFEITURES

3.01 <u>AMOUNT</u>. The amount of the Employer's annual contribution to the Annuity and Life Insurance will be as follows:

(a) The Company will not contribute to the Plan with respect to any period unless provided by special designation in writing of the Company and provided that such contributions are deemed wages for personal services rendered or bonus designated to a particular Employee.

(b) The Company shall not be entitled to any part or portion of the Annuity and Life Insurance benefit, and no forfeiture rights inure to the Company in any Contributions made by the Employee.

(c) The Company shall administer the payment of funds to the insurance company, shall account to the Employee for all record keeping concerning any annuities purchased, and shall, from time to time in the sole discretion of the Company, report to the Employee concerning the annuity and life insurance transactions, values, and other information furnished to the Company by the insurance company or other sources.

3.02 <u>INTERFERENCE WITH PLAN</u>. Consistent with Section 5.02 hereinbelow, The Company shall not honor nor in any circumstance pay or turn over to any third party, whether individual, private entity, or governmental entity on any claim made against the subject of this Plan, it being the express intention of the parties to this Plan that every Employee right earned under his or her participation in this Plan shall be exempt from any such claim, seizure, garnishment, attachment, or other action or proceeding and shall be treated for all purposes as if a spendthrift trust as to any unpaid Current Wages, and as fully exempt property as to any earned Annuity Contract or Life Insurance purchased by the Company, as well as all proceeds thereof paid at any time to or for the benefit of Employee.

3.03. Defense and Indemnity: Employer shall defend this Plan and the protection provided under this plan for the Annuities and Life Insurance purchased which if purchased pursuant to the Texas statutory provisions shall be exempt as to the contracts or policies and proceeds thereof. Employer will defend against any claim made by any third party and only if such defense is successful, all costs of defense may be assessed against any future purchase of any Annuity or Life Insurance under this Plan.

## ARTICLE IV
### TERMINATION OF SERVICE - PARTICIPANT VESTING

4.01 <u>NORMAL RETIREMENT</u>. Normal Retirement Age under the Plan is the later of the date the Participant attains sixty-five (65) years of age or the fifth (5th) anniversary of the first day of the Plan Year in which the Participant commenced participation in the Plan. However, the Employee may terminate participation in the Plan at any time without forfeiture of any earned Income

4.02   <u>VESTING SCHEDULE</u>. The Company elects the following vesting schedule: Immediate vesting, 100% nonforfeitable at all times. Employee may not assign nor encumber his or her interest in or rights under this Plan prior the issuance, from time to time, of the Annuities provided herein. This Plan, to the extent that assets are held from wages of the Employee, is in the nature of a spendthrift trust that cannot be attached, levied, garnished, or otherwise encumbered by any third party.

**ARTICLE V**
**TIME AND METHOD OF PAYMENTS OF BENEFITS**

5.01   <u>TIME OF PAYMENT OF ACCRUED BENEFIT</u>.

**Distribution date**.

    (a)     The Employee elects any distribution dates through dealings directly with the annuity and life insurance issuer subject to the provisions of this Plan. Any penalty for early distribution shall be the sole responsibility of the Employee.

    (b)     The Employee may terminate participation under this Plan at any time and be entitled to a distribution as the particular annuity and life insurance contract selected by the Employee and may deal with such insurance or annuity at the Employee's sole discretion. This right, however, is non-alienable, and shall not terminate any exemption rights pursuant to Texas law (including the Texas Insurance Code) and is further subject to Section 5.02 hereof.

5.02   <u>ALIENATION</u>
    (a)     Subject to the exceptions provided below, and while the Employer is a participant in this Plan or is the owner of any annuity and life insurance acquired as a participant of this Plan, no benefit which shall be payable out of the Annuity and Life Insurance Fund to any person (including a Participant Employee or his Beneficiary) nor shall any benefit be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; and no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements or torts of any such person nor shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized by the Trustee, except to such extent as may be required by law. It is the intention of Employer to protect the insurance benefits and annuity benefits provided in this program as set forth in the Texas Insurance Code and any other Texas exemption law protecting individual's assets from garnishment, attachment, sequestration, alienation, involuntary sale, transfer, or assignment, or voluntary pledge, encumbrance, or charge which would defeat any exemption right of the Employee.
    (b)     This provision shall not apply to the extent a Participant or Beneficiary withdraws from participation in the Plan in whole or in part, and:
        (i)     has canceled or terminated the annuity and life insurance acquired while a Plan participant, in whole or in part (and if not in whole, then as applicable to the partial termination); or
        (ii)     has the annuity and life insurance or any particular annuity and life

Page 9 of 10

insurance previously acquired as a participant of this Plan administered by the individual participant Employee, with respect, however, only to premiums paid after the Employee has completely withdrawn from the Plan.

## ARTICLE VI
## EXECUTIVE COMMITTEE - DUTIES WITH RESPECT
## TO PARTICIPANT'S ACCOUNTS

6.01 The Executive Committee duties herein shall be only to

    a.     determine from time to time the eligibility of any Employee request to participate in the Plan; and

    b.     to insure that the Company is keeping accurate books and records of this Plan distribution and administration of the Employee's designated wages; and

    c.     institute such procedures or Plan rules as necessary to accomplish the Plan purpose, including, but not limited to, Employee relations regarding Plan participation or administration, and to selection (only at the request of an Employee) of an annuity and life insurance contract.

6.02     The Company shall fully indemnify and hold harmless each and every Executive Committee member from any and all claims by any third party arising out of this Plan.

## ARTICLE VII
## AMENDMENT, MODIFICATION OR TERMINATION

7.01     Upon recommendation of the Executive Committee, the Board of Directors of the Company may amend, modify, or terminate this Plan provided, however, no amendment shall in any manner reduce or impair the Employee's rights in acquired Annuities or Insurance Policies, no impair the entitlement and exemption afforded by law in favor of the Employee.

A full copy of this Plan and any modifications or changes may be obtained from the offices of the Executive Committee at the Employer's office.

Employment Agreement and
Annuit Plan