**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 22-60043 |
| | § | |
| FREE SPEECH SYSTEMS, LLC, | § | Chapter 11 (Subchapter V) |
| | § | |
| Debtor | § | |

# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| In re: | ) Case No. 22-__60043____ |
| | ) |
| FREE SPEECH SYSTEMS, LLC, | ) Chapter 11 (Subchapter V) |
| | ) |
| Debtor. | ) |
| | ) |

**DECLARATION OF W. MARC SCHWARTZ IN SUPPORT OF**
**VOLUNTARY PETITION AND FIRST DAY MOTIONS**

I, W. Marc Schwartz, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.       My name is W. Marc Schwartz ("Schwartz").

2.       I submit this Declaration based on personal knowledge in support of the voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed by Free Speech Systems, LLC (the "Debtor" or "FSS") on the date hereof (the "Petition Date"). I further submit this Declaration to assist this Court and parties-in-interest in understanding the circumstances that compelled the commencement of the Debtor's chapter 11 case (the "Chapter 11 Case").

3.       The relief sought in the First Day Motions should enable the Debtor to administer its estate effectively. I have reviewed the First Day Motions, and I believe the requested relief is necessary to ensure the success of the Chapter 11 Case.

4.       Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.      I am a founder of Schwartz & Associates, LLC ("SALLC"). SALLC has its principal offices at 712 Main Street, Suite 1830, Houston, Texas. SALLC has been engaged in business since 2019. The primary business of SALLC is bankruptcy and financial restructuring consulting, serving as financial/economic experts in civil litigation matters and, serving as court appointed receivers in federal and state court matters.  The firm is also licensed as an Investigations Company by the Texas Department of Public Safety.

6.      SALLC's services include financial forensics, supervising business operations as a trustee, examiner with expanded powers or receiver, valuing business assets and income tax related services    My firm represents individuals, companies and courts in a variety of assignments,  including serving as a Chief Restructuring Officer, financial adviser, trustee or examiner in bankruptcy matters; working as a testifying or consulting expert on damages and economic issues for parties involved in litigation and as a special master for courts where litigation matters are pending; serving as a court appointed receiver in state and federal courts.

7.      I earned a Bachelor of Arts degree from Princeton University and a Master's in Business Administration degree from the University of Chicago Booth School of Business. I am licensed in Texas as a Certified Public Accountant, Certified in Financial Forensics by the American Institute of Certified Public Accountants, a Certified Fraud Examiner, and a Licensed Private Investigator.

8.      I have extensive experience serving as a fiduciary in bankruptcy cases as either a Chapter 11 Trustee, a Chief Restructuring Officer, or an Examiner with expanded powers. I have also acted as a receiver over several individuals and entities under state and federal law.

9.      On June 7, 2022, the Debtor confirmed my retention as the Debtor's Chief Restructuring Officer (the "CRO") and SALLC as its financial advisors as of May 19, 2022.

10. On the Petition Date, FSS filed its petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court, Southern District of Texas, Victoria Division (the "Bankruptcy Court"). FSS properly qualified to file as a Subchapter V Debtor under Chapter 11 of the Bankruptcy Code.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A. Background to Creation of Free Speech Systems, LLC

11. Born in 1974, Alex Jones ("Alex Jones" or "Jones") is the son of Carol Jones, a homemaker, and David Jones, a prominent dentist. Jones moved from Dallas to Austin as a teenager.

12. In the early 1990s, Austin was a dirt-cheap home to artists, musicians, and zine makers[1]. According to Shannon Burke, a local talk-radio host, "the perfect incubator for [Alex Jones]. It's that libertarian and weirdness blend that wouldn't have worked had he been born in Milwaukee." *Buzzfeed*, May 6, 2017 (Charlie Warzel) (hereafter "*Buzzfeed*").

13. Austin Public Access ("ACTV"), the TV station where Jones got his first big break showcased that weirdness. In the 1990s, ACTV "was wild and unmoderated — like the YouTube of its time," Brian Blake, the station's longtime producer and IT director, explained. For Jones, then just out of high school, it was a huge opportunity — a chance to spend an hour in front of a camera saying pretty much anything he wanted to Austin's night owls. *Buzzfeed*.

14. From his first broadcast, Jones targeted the threat of the New World Order, which he had first encountered in the book *None Dare Call It Conspiracy*, discovered on his father's bookshelf. His earliest monologues were stark and raw; Jones would deliver his monologues

---

[1] Wikipedia defines it as "a small circulation self-published work of original or appropriated texts and images usually reproduced via photocopier" - although the term is often used to describe any magazine aimed at a niche audience.

from a bare table, surrounded by stacks of newspaper and often fumbling his words. But the message and the intensity were indistinguishable from the Jones on the air in 2017. *Buzzfeed*. Jones was a modest public-access success.

15.    Alex and his father then found an opportunity in 1996 for Alex to do a talk show on the Austin talk radio station KJFK-FM. He started hosting a show called "The Final Edition". To secure Jones a spot on the station, Jones' father became his son's first on-air advertiser. The show lasted for three years. "Alex Jones" *Southern Poverty Law Center ("SPLC").*

16.    Alex Jones was a natural.

17.    The "Final Edition" lasted until 1999, when he was fired because his views made it difficult to attract commercial sponsors despite high ratings and winning the best Austin talk radio host show awards. *SPLC*.

18.    Upon being terminated, Alex Jones immediately set up an ISDN line in his house and began independently broadcasting via Infowars.com and national syndication by Genesis Communications to AM, FM, and shortwave stations. *SPLC*.

19.    When Jones started broadcasting on the radio in the late 1990s, he closely followed the talk radio playbook, he built a large and devoted audience of far-right conspiracy-theory believers. He sold radio advertising, videos, books, and T-shirts. From there, he expanded by establishing a website, making, and selling his own conspiracy-oriented documentary films, and, then launching PrisonPlanet.tv, a subscription-only streaming-video service that offered instant access to the films. *Intelligencer*, May 2017. Alex's syndication soon reached almost 100 stations. *SPLC*.

20.    The predecessor operation of FSS in 2004 was an operation with just a handful of employees.  Alex Jones had a tiny office in the far south of Austin. He had two employees at

that time. One of the two employees tended to the warehouse operations. It was also not clear where Alex Jones broadcast at that time. *Jacobson Deposition*, P30.[2]

21.     As his business grew, Alex formed FSS in November 2007 to support his various family business opportunities. Getting into broadcasting had been a family idea, and running a business associated with his radio broadcasting continued to be a family business.

22.     By 2010, Jones had a full-size facility. He had over 60 people on his staff and a full-blown studio. *Jacobson Deposition*, P30. FSS's operation in 2010 were dramatically different in "every way, shape and form", *Jacobson Deposition*, PP30-31, from his 1990 operations.

23.     While Alex's broadcasting technology significantly improved, he did not retain professional managers to run his burgeoning business. It continued to be run by members of his family, friends, and employees whom he had known in high school.

24.     After 2013, Alex Jones' media formula changed from website and films to a website and radio. *Jacobson Deposition*, PP30-31. While his media formula changed, Alex still did not employ professionally trained and experienced business managers at FSS.

25.     The post 2013 business model of FSS recognized that it was a "single talent business" *to wit*, Alex Jones, singularly drove sales on his Infowars.com website. FSS began to make available dietary supplements: products such as InfoWarsLife Silver Bullet Colloidal Silver; Infowars Life Brain Force Plus; InfoWars Life Super Male Vitality; Infowars Life Liver Shield. Supplements "completely transformed" Infowars. Most of FSS' revenue to this day comes from sales of dietary supplements.

---

[2] Oral and Videotaped Deposition of Robert Jacobson, March 20, 2019, Scarlett Lewis v. Alex. E. Jones (Texas).

26.     Alex Jones' show is syndicated by the Genesis Communications Network ("GCN"). Instead of charging syndication fees to radio stations, GCN uses what is called the barter model. GCN offers the content for no cost, and, in exchange, GCN reserves the right to sell national advertising against the programs, generally four minutes per hour.

**B. Present Business of Free Speech Systems, LLC**

27.     FSS is presently engaged in the business of producing and syndicating Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, airs via GCN on over 100 radio stations across the United States and via the internet through the website Infowars.com.

28.     On its Infowars.com website today, FSS makes available to customers dietary supplements ("Supplements"), including Bodease, Krill Oil, Ultimate Fish Oil, DNA Force Plus, Vitamin D3 Gummies, Ultimate Immune Support Pack, Pollen Block, and other health products, including Tea Tree Shampoo. The website also has available books, t-shirts, and other products ("Non-Supplements") Jones advertises during his radio talk show.

29.     The vast majority of FSS revenues comes from the sale of Supplements, which have traditionally been supplied by or contracted for by PQPR, an affiliated entity, described below.

30.     As of July 15, 2022, FSS employs a workforce of 58 individuals, the majority of whom have a direct reporting relationship to Alex Jones. In one building in Austin, Texas, FSS has four studios where online and traditional broadcast production is provided. The Alex Jones Show and other shows are produced in these studios. An adjacent building contains administrative offices and customer support. In a separate location in Austin, Texas, FSS has a

building where warehousing and product sales fulfillment takes place. *David Jones Deposition*, P13.[3] All the buildings and offices are leased.

31.     FSS has a unique audience that is highly loyal to Alex Jones and purchases products based on Alex Jones' credibility. Product sales from Infowars.com stores are a significant source of revenue for FSS. Historically, approximately 80% of FSS' revenue is derived from product sales, of the remainder, 11% is historically from advertising and the balance from a variety of sources. *David Jones Deposition*, P47.

### C.  The Relationship Between Alex Jones and FSS

32.     FSS, as employer, and Alex Jones, as employee, are parties to an Employment Agreement and Accompanying Employee Annuity and Life Insurance Plan, dated April 14, 2022 (the "Jones Employment Agreement").

33.     Under the Jones Employment Agreement, Jones agrees to promote products and services agreed to by the Employer, and permits Alex to use FSS's trademarks, tradenames, intellectual property and web site, including the Infowars website. Jones Employment Agreement, ¶¶ 3, 4.

34.     All of FSS' wages to him are subject to the Employee Annuity And Life Insurance Plan (Employee Annuity Plan), attached to the Jones Employment Agreement. Jones Employment Agreement. Under the Employee Annuity Plan, the employee may designate a portion or all his/her salary to purchase an annuity and life insurance, in amounts determined by the employee, from an insurance company to be selected.  Employees with more than two years of full-time consecutive service with FSS are eligible to participate in the Employee Annuity Plan.

---

[3] Oral and Videotaped Deposition of David R. Jones, May 16, 2019, Eric Lafferty, et. al. v. Alex Emeric Jones, et. al. (Connecticut).

35.     The CRO is continuing to evaluate whether the estate has causes of action to claw back any payments or distributions to Alex Jones.

### D.  The Debtor' Owners and Management

36.     At its formation, Alex Jones and Kelly Jones owned 49% and 51% of the membership interests in FSS.

37.     Alex and Kelly Jones divorced in 2015. Upon their divorce, Jones became the sole owner of FSS.

38.      Since then, Alex Jones has been the Managing Member of FSS.

39.     Since inception, Alex Jones has been a "single talent business", *to wit*, without him and his show, there would neither be any InfoWars nor internet sales. Unfortunately, Jones failed to bring on board the necessary management skills to manage what was once a small family business but had become a $70 to $80 million a year enterprise. Jones and his employees continued to run the business with an inverted T structure, where essentially everyone reported to Alex, as though it was still a family business.

40.     Since May 19, 2022, FSS has retained Schwartz as its Chief Restructuring Officer ("CRO"), with broad powers to review the company's past financial performance, analyze the condition of FSS's books and records and evaluate whether FSS is a business that can be reorganized. SALLC was retained to perform various accounting and forensic work associated with his mandate.

41.     In addition, FSS retained Jeffery Shulse ("Shulse") as FSS' Business Manager. Shulse has been parachuted into FSS's offices in Austin to take over FSS' accounting and financial functions and work with Schwartz and SALLC to (a) implement viable accounting and

financial management functions; (b) implement sorely needed internal accounting controls, and (c) establish uniform accounting expense and personnel policies. With a BBA in accounting from the University of Houston and a J.D. from the University of Houston Law Center, Shulse has over twenty years' experience in providing business, operational and financial consulting to businesses and as a CFO and CEO of businesses in the oil and gas production and construction industries.

42.    The preliminary conclusions reached by me about FSS are:

(a) Although FSS had a controller and two bookkeepers, the 2021 general ledger had not been completed and the books have not been closed, and almost no transactions have been recorded in the 2022 general ledger. As a result, no financial statements were produced for FSS for the 18 months preceding my engagement. SALLC found no bank reconciliations for 2021 or 2022;

(b) FSS personnel expressed no criticism of not receiving any financial reports to assist them in managing their functional responsibilities and, in fact, appear to be unaware of the management information available to them from timely prepared and detailed financial statements and analyses;

(c) Internal accounting controls were inadequate, including lack of segregation of duties, written monthly, quarterly, and annual closing schedules, lack of supervisory review of key accounting functions including vendor set up, bank reconciliations, inventory reconciliations, or billings to PQPR Holdings Limited, LLC ("PQPR");

(d) Invoices from PQPR for payment for product it had acquired and sold to FSS were not paid or not paid in full, resulting in a liability to PQPR in excess of $50 million.

## E.  The Relationship of FSS and PQPR

### *Background Information About PQPR*

43.     PQPR was founded in 2013. The business began operations in September 2013.

44.     PQPR is engaged in the online sale and marketing of primarily nutritional supplements which it sells under its own label as well as acquiring nutritional supplements for FSS which it markets under its InfoWars label. PQPR also advertises its products exclusively through FSS/The Alex Jones Show for which it receives a bulk discount. PQPR also sells outside the FSS/Alex Jones show channels.

45.     PQPR is managed by David Jones. Alex Jones is not a manager of PQPR.

46.     The current owners and their ownership interests in PQPR are as follows:

|  | % Owned |
|---|---|
| PLJR Holdings | 80.00% |
| JLJR Holdings, LLC | 20.00% |
| Total | 100.00% |

47.     Through AEJ Austin Holdings, LLC, Jones has an effective 72% membership interest in PLJR Holdings, LLC ("PLJR").   Mrs. Carol Jones owns an 80.00% interest in, and Dr. David Jones holds the remaining 20.00% membership interest in JLJR Holdings, LLC ("JLJR").

48.     Alex Jones is not a manager of either PLJR or JLJR.

### *Commercial Relationship Between FSS and PQPR*

49.     As discussed previously, FSS sells two groups of products on its Infowarsstore.com website: Supplements and Non-Supplements. The selection of nutritional supplements to be sold is determined by Alex Jones, David Jones, and staff of FSS. Currently, FSS places orders for Supplements with PQPR which then places the order with the original manufacturer.  FSS pays PQPR, as its agent, funds required to purchase product, which then pays

the manufacturer and manages the delivery and certification of the products. Pricing of the Supplements is done by FSS.

50.     Non-Supplements consist of "Infowars" merchandise, ranging from T-shirts to silver coins. This group of merchandise is handled solely by FSS employees, starting from the selection of the merchandise, placing of the merchandise on the Infowars website, ordering of and paying for the product.

51.     Alex Jones promotes both the Supplements and Non-Supplements during his daily broadcast and is the principal driving factor promoting the sale of products to his audience.

52.     In the past, PQPR ordered and paid for Supplements which it marked up and then sold to FSS for distribution. As a result of FSS's inability to pay PQPR in full for the PQPR merchandise over several years, FSS became indebted to PQPR in a significant amount by 2020. The parties memorialized the indebtedness between the parties in 2020.

*The Entry into the Secured Notes*

53.     On or about August 13, 2020, FSS and PQPR executed a Promissory Note in the principal amount of $29,588,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR through December 31, 2018 (the "2020 Secured Note"). The 2020 Secured Note matures on August 1, 2050, interest is due and payable annually. The 2020 Secured Note bears interest at 1.75%.

54.     The 2020 Secured Note is secured by a Security Agreement entered into as of August 13, 2020, between FSS and PQPR (the "2020 Security Agreement"). The 2020 Security Agreement provides in paragraph II that the "Collateral" securing the repayment of the 2020 Secured Note consists of all personal property owned by FSS.

55.     On November 18, 2020, PQPR filed a UCC-1 Financing Statement with the Texas Secretary of State ("November 18 UCC Financing Statement").

11

56.     On or about November 10, 2021, FSS and PQPR entered into a second Promissory Note in the principal amount of $25,300,000.00 made payable to PQPR, which memorialized the accrued obligations of FSS to PQPR from January 1, 2019 to December 31, 2020 (the "2021 Secured Note"). Principal and interest of $1,939,644.81 is due on each anniversary of the 2021 Secured Note. The 2021 Secured Note bears interest at 1.8% and matures on November 10, 2036.

57.     The 2021 Secured Note is secured by the 2020 Security Agreement and the November 18 UCC Financing Statement.

58.     As of the Petition Date, $53,646,6876.82 of principal and $11,787.16 of interest are owed under the two Secured Notes.

59.     PQPR has been the primary source of Supplements for the Infowars website and has contributed to most of the revenue attributable to FSS. Maintaining access to the Supplement supply, along with Alex Jones being on the air, is critical to the reorganization of FSS.

### F.  FSS Needs a Credit Card Processor

60.     An essential component of FSS's Infowarsstore.com business with which it could not survive is a credit card processor. Without the ability to process credit card transaction, FSS's business could not operate.  Processing a credit card transaction is a complex process. The process was made more difficult when financial institutions and media sites deplatformed FSS starting in 2018.

61.     Credit card processing refers to a multi-step process necessary to successfully complete payments made with a credit card. Credit card processing involves numerous entities. This includes the consumer, merchant, payment gateway, credit card processor, card network, issuing bank, and acquiring bank.

62.     The key players in credit card processing are:

- **Customer –** the person making a purchase.
- **Merchant –** the person or organization selling a product or service to the customer making a purchase.
- **Payment gateway –** this refers to the technology that connects a merchant to a payment processor. This process involves integrating with card-present (i.e., in-store purchases) and card-not-present (i.e., online purchases) payment environments, obtaining the payment information of customers' transactions, sending these details to a payment processor or merchant bank, and then sending an "approved" or "declined" message to the merchant.
- **Credit card processor –** (or payment processor) this is the organization that helps the merchant, credit card network, and the cardholder's bank communicate. Credit card processors and merchants must comply with the Payment Card Industry Data Security Standard (PCI DSS).
- **Card network –** (also called credit card network or credit card brand) this is the customers' credit card brand, such as Discover, Mastercard, or Visa. These networks must set assessment and interchange fees.
- **Issuing bank –** (also known as the cardholder's bank or consumer bank) this refers to the bank providing customers with their credit card. The issuing bank will determine whether the cardholder's account has the funds to fulfill a transaction. If the account meets these requirements, the issuing bank will release those funds for settlement.
- **Acquiring bank –** (or merchant bank) this is the merchant's bank, which is used for storing its business funds and receiving money from transactions. This type of bank can provide card readers and equipment to merchants, allowing merchants to accept card payments. Acquiring banks can also serve as credit card processors.

63.     In April 2018, FSS had accounts on YouTube, Facebook, Twitter, Periscope, Pinterest, Instagram. *Michael Zimmerman Deposition*[4], P35. FSS also had the ability to access banks and credit card processors without any problems prior to April 2018.

---

[4] Videotaped Oral Deposition of Michael Zimmerman, November 26, 2019, Neil Heslin v. Alex E. Jones (Texas).

64.     After the commencement of the Sandy Hook Litigation by the Texas and Connecticut Plaintiffs, FSS and Infowars.com were de-platformed from many important internet, social media, and other financial transaction accounts.

65.     Customers utilize credit or debit cards to purchase merchandise on the Infowarsstore.com website. FSS had to locate a credit card processor and a bank that would do business with it, after FSS was shunned by financial institutions and deplatformed on media sites starting in 2018.

66.     FSS entered into an agreement with a company as of October 1, 2021, to provide credit card processing for FSS.  A third-party processor receives payments from the credit card companies. The company receives credit card receipt proceeds and based on information provided by FSS and PQPR, including which entity owns the inventory that was sold, allocates funds between FSS and PQPR and transfers the amounts allocated to FSS and PQPR's respective banks. This process occurs every federally recognized business day.

67.     FSS pays the company a fee of 4% of the total amount of all credit card charges processed under the agreement and reimbursement of all costs incurred, including all credit card processing charges incurred in processing FSS' credit card charges.

68.     In addition to the fee, the agreement provided that the company withhold from FSS' net receipts $11,000.00 per business day and remit that amount to PQPR to pay principal and interest on the promissory notes executed by FSS in favor of PQPR.

69.     In a forbearance agreement entered into prior to the Petition Date, the parties agreed to reduce the amount being withheld from FSS' net receipts to $2,500.00 per business day for the thirty days following July 12, 2022, when the payment increases to $5,500.00 per business day for an additional thirty days, at which time the payment increases to $11,000.00 per day.

70.     The forbearance agreement also provides that FSS will receive 20% of the proceeds of all sales of products purchased by PQPR (with PQPR receiving 80%) of such proceeds.  In turn, PQPR will receive 10% of the proceeds of all sales of products purchased by FSS (with FSS receiving 90%).  This split was to reimburse the respective parties for setting up supply chains, obtaining required governmental certifications, negotiating with vendors, procuring and paying for product, and overhead.

### G.  Sandy Hook and Litigation Resulting Therefrom

71.     The Debtors' financial distress stems from statements made by Alex Jones and other employees of FSS in the wake of the December 14, 2012, mass shooting at Sandy Hook Elementary School in which 20 children and 6 educators were killed by Adam Lanza. Certain parents of the deceased victims of the Sandy Hook shooting assert, among other things, that these statements were defamatory and inflicted emotional distress.

72.     The crux of the allegations in these lawsuits are that Alex Jones and FSS employees said or implied that the Sandy Hook massacre did not happen and that the parents were participants in a conspiracy against the public.

73.     In 2018, certain aggrieved parties (the "Texas Plaintiffs") commenced state-court actions against one or more of the Debtors styled as: ***(a)*** *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; ***(b)*** *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas; ***(c)*** *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-001842, in the 345th District Court of Travis County, Texas; ***(d)*** *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC,*

*and Kit Daniels*, Cause No. D-1-GN-18-001605 in the 459th District Court for Travis County, Texas; and *(e) Neil Heslin, Scarlett Lewis, Leonard Pozner, Veronique De La Rosa, Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, PQPR Holdings Limited LLC, JLJR Holdings, LLC, PLJR Holdings, LLC, Carol Jones, David Jones, PQPR Holdings, LLC, JLJR Holdings Limited, LLC, AEJ Holdings, LLC, AEJ Trust 2018*, Cause No. D-1-GN-22-001610, in the 200th District Court for Travis County (collectively, as may have been consolidated, the "Texas State Court Litigation").

74.     These two actions: *(a) Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas; *(b) Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas (the "Heslin/Lewis Suit") have been consolidated. Judge Maya Gamble is presently conducting a trial of the Heslin/Lewis Suit.

75.     As a result of the filing of FSS' bankruptcy, the Texas State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

76.     In 2018, certain other parties (the "Connecticut Plaintiffs") brought actions in Connecticut styled:

- *Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg v. Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Wolfgang Halbig, Corey T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046436-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046437-S in the Superior Court of Connecticut, Waterbury Division;

- *William Sherlach and Robert Parker v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc.*, Cause No. X06-UWY-CV-18-6046438-S in the Superior Court of Connecticut, Waterbury Division (collectively, the "Connecticut State Court Litigation" together with the Texas State Court Litigation are hereinafter referred to as the "Sandy Hook Lawsuits").

77. As a result of the filing of FSS' bankruptcy, the Connecticut State Court Litigation has been stayed by the automatic stay provision of the Bankruptcy Code.

78. Jones, FSS, and the Debtors have spent more than $15.0 million in legal fees and costs since commencement of the Sandy Hook Lawsuits.

79. Despite the substantial amount spent, both the Texas and Connecticut courts have imposed multiple sanctions and ruled that Jones and FSS have failed to comply with discovery requirements such that judgment on liability has been entered against them by default.

80. InfoW, LLC f/k/a Infowars, LLC ("InfoW" and together with its affiliate debtors IWHealth, LLC and Prison Planet tv, Ltd., the "InfoWDebtors"), filed a voluntary petition for chapter 11 bankruptcy relief in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division (the "Bankruptcy Court"), on April 18, 2022 (the "Petition Date"), initiating Case No. 22-60020 in that court (the "Bankruptcy Case").

81. The purpose of the Bankruptcy Case was to provide a mechanism to efficiently determine and pay *all* claims against the InfoWDebtors and joint tortfeasors in full. To support this, the equity of the InfoWDebtors was assigned to the Liquidation Settlement Trust (for the benefit of the Plaintiffs[5] and others) prior to the Petition Date, and the InfoWDebtors, with separate counsel and financial advisors, negotiated the Plan Support Agreement

17

82.     Among other things, the Plan Support Agreement obligated Jones and FSS (together with Jones, the "<u>Third-Party Funding Contributors</u>") to fund $10.0 million to pay litigation claimants. The total consideration would have been more than $500,000 per litigation claimant. Additional consideration may have been negotiated over the course of the InfoWDebtors' Bankruptcy Case

83.     Prior to the Petition Date of the InfoWDebtors' bankruptcy cases, the InfoWDebtors' and the Third-Party Funding Contributors incurred and paid more than $15.0 million in legal costs. The savings from liquidating the claims in a central forum were essential to the administration of the InfoWDebtors' bankruptcy estates and ultimately paying creditors in full. Absent centralized administration—which may include determination by a jury—the funds available would have been  cannibalized in successive trials over a five-month period.

84.     Rather than negotiate with the InfoWDebtors and the Third-Party Funding Contributors, the Plaintiffs first sought to dismiss the InfoWDebtors' Bankruptcy Case, and, then abruptly, even though Plaintiffs had sued InfoW four years ago, dismissed with prejudice InfoW and, where relevant, the other two debtors within 2 months of the Petition Date.

85.      The primary goal of InfoWDebtors in the Bankruptcy Case was to engage the Plaintiffs in a global settlement. While unable to achieve that goal, the Bankruptcy Case resulted in the dismissal with prejudice of all claims against InfoW, IW Health and Prison Planet from any and all claims held by the Plaintiffs.

**H.  Current Financial Condition of Debtor**

86.     Attached hereto as **Exhibit "A"** is a comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

87. Attached hereto as **Exhibit "B"** is a comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

88. Attached hereto as **Exhibit "C"** is a comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

## I.    Critical Motions to Commence the Chapter 11 Case

### First Day Motions

89. Contemporaneously herewith, the Debtor has filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtor's business operations and facilitate the efficient administration of the Chapter 11 Case. The First Day Motions include the following:

- **Schedules and Statements Extension Motion**. *Debtor's Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief.*

- **Cash Collateral Motion**. *Debtor's Emergency Motion For An Interim And Final Order (I) Authorizing The Use Of Cash Collateral Pursuant To Sections 105, 361, and 363 of The Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 4001(B), And (II) Granting Adequate Protection To The Pre-Petition Secured Lender.*

- **Critical Vendors Motion**. *Debtor's Motion for an Order (A) Authorizing The Debtor To Pay Prepetition Obligations Of Certain Critical Vendors, And (B) Granting Related Relief.*

- **Utilities Motion**. *Debtor's Emergency Motion For Entry Of An Order: (I) Approving Debtor's Proposed Form Of Adequate Assurance Of Payment For Future Utility Services; (II) Approving Adequate Assurance Procedures; Prohibiting Utility Providers From Altering, Refusing Or Discontinuing Service; And (Iv) Granting Related Relief.*

- **Relief from Stay Motion**. *Debtor's Emergency Motion For An Order Modifying The Automatic Stay To Allow The Heslin/Lewis State Court Suit To Continue To Judgement.*

90.     The First Day Motions seek authority to, among other things, obtain authority to use cash collateral of PQPR to operate the business of FSS in the ordinary course, including maintaining the studios for Jones to produce his shows, purchase critically needed Supplements and operate the sale business of merchandise sales from the InfowarsStore.com website, pay claims of certain vendors and suppliers to ensure that the Debtor's business operations are not disrupted by the Chapter 11 Case, provide payments and protection to various utilities to assure that they provide essential services to the Debtor, and grant the Texas Plaintiffs relief from the automatic stay provision of 11 U.S.C § 362(a) so as to permit the Heslin\Lewis Suit to continue to judgment uninterrupted by the automatic stay.

91.     The Debtor has tailored its requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtor and its estate. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtor's operations and any delay in grating the relief described in the First Day Motions

could hinder the Debtor's operations and cause irreparable harm. The failure to receive the requested relief during the first twenty-one (21) days of the Chapter 11 Case would severely disrupt the Debtor's operations at this important juncture.

92.     I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtor's successful reorganization, and (c) best serves the Debtor's estate. I have reviewed each of the First Day Motions. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions, as further described below.

## **Procedural Motion**

93.     **Schedules and Statements Extension Motion**. The Debtor seeks entry of an order (a) extending the deadline by which the Debtor must file its schedule of assets and liabilities, schedules of current income and expenditures, schedule of executory contracts and unexpired leases and statement of financial affairs by an additional 14 days for a total of 29 days from the Petition Date, without prejudice to the Debtor's ability to request additional extensions.

94.     Schwartz, Shulse and SALLC have literally been drinking from a firehose since their retention. While they have accomplished much, the company continues to face issues on a daily basis that requires emergency, urgent and immediate attention from this group. Furthermore, locating accurate financial records is a tedious task at FSS, as the record keeping for orders, invoices, expense reports, American Express charge reports are not well-organized. All other records on the computer system also require additional time to retrieve.

95.     Given the complexity of the Debtor's business and financial affairs, and the critical matters that the Debtor's management and professionals were required to address prior

to Petition Date, the Debtor was not able to complete the Schedules and Statements as of the Petition Date.

96.    I believe that the relief requested in the Schedules and Statements Extension Moton is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

### Operational Motions

97.    **Cash Collateral Motion**[6]. The Debtor must have access to and use of cash collateral to operate its business. Prior to the Petition Date, FSS and PQPR engaged in extensive and difficult negotiations over the use of cash collateral. The negotiations were complicated by PQPR's significant and important commercial role with FSS. PQPR acts as a lender, provides Supplements and handles essential accounting and revenue division functions for FSS' business.

98.    The Debtor requires the use of cash collateral to purchase Supplements and Non-Supplements to sell on its Infowarsstore.com website,  pay reasonable and necessary operating expenses, including, but not limited to, employee payroll, rent, utilities, lease payments, marketing, taxes, and insurance. Without use of cash collateral, FSS could not operate its business, pay its employees and operate the studios where Alex Jones produces his shows.

99.    Working with Alex Jones, PQPR, FSS employees, Shulse and SALLC, I have developed a 13-Week Cash Flow Forecast showing the Sources and Uses of Cash for FSS commencing as of July 30, 2022. A true and correct copy of the 13-Week Cash Flow Forecast is attached hereto as **Exhibit "D"**. Based on the assumptions made in the forecast, I project that FSS will operate with a positive ending cash balance at the conclusion of the 13-week period.

---

[6] The Debtor is in possession of certain funds which are not proceeds of PQPR's collateral.  Accordingly, the Debtor does not concede that those funds constitute cash collateral of PQPR.  Nevertheless, net proceeds received by the Debtor from online merchandise sales including PQPR products are PQPR's cash collateral.

100.     The use of cash collateral required in the next fourteen (14) days from the Petition Date is also set forth on the budgets attached hereto as **Exhibit D**. The Debtor's proposed emergency use of cash collateral is necessary to preserve the value of the Debtor's estate for the benefit of all creditors, including the PQPR, during the first fourteen (14) days of the Chapter 11 Case (the "Interim Period").

101.     The Debtor's proposed offer of adequate protection on an interim basis is set forth in the proposed Interim Cash Collateral Order. It includes replacement liens solely to the extent of any validly perfected, unavoidable security interest as of the Petition Date, and a priority administrative claim to the extent of the diminution of value of PQPR's collateral, if any. As described further in the proposed Interim Cash Collateral Order, the proposed replacement liens and priority administrative claim shall be subject to a carve-out for unpaid fees owed to the clerk of this Court or the United States Trustee, if any, and court-approved administrative expense claims of estate professionals.

102.     PQPR and FSS have engaged in extensive negotiations over a protracted duration to arrive at the interim agreement, which the parties will further negotiate into a final agreement. Due to FSS's affiliation with Alex Jones, the CRO made a decision that time was best spent negotiating the most favorable use of cash collateral agreement with PQPR rather than seeking any alternative third-party lender or source of capital to operate FSS.

103.     Without access to the use of cash collateral of PQPR, FSS could not retain the employees to produce The Alex Jones Show, purchase critically needed inventory to sell on the Infowarsstore.com website and to operate its fulfillment business once a customer makes a purchase.

104.     **Critical Vendors Motion.** The Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay, in the ordinary course of business, prepetition

amounts owing on account of claims of critical vendors identified on Schedule "1" to the Critical Vendors Motion (collectively, the "Critical Vendors") in an amount not to exceed $359,544.62. In addition, the Debtor requests that the Court schedule a final hearing in approximately twenty-one (21) days after the entry of an interim order, or as soon thereafter as is convenient for the Court, to consider approval of the Critical Vendors Motion on a final basis.

105.    After an extensive review and analysis of the Debtor's vendors, the Debtor and its professionals identified the vendors that supply products and services vital to the Debtor's continued operation. The Debtor relies on products and services from its Critical Vendors to operate its business, and, depend on the timely provision of specialized services to provide top-quality content and services to its customer base.

106.    The Critical Vendors procure and provide key services to producing and transmitting The Alex Jones Show. The Critical Vendors are instrumental in the timely fulfillment of Supplement or Non-Supplements to the customer base. If they fail to provide their mission-critical goods and services, the business of FSS would grind to a halt.

107.    I understand that the Debtor's trade relationship with its Critical Vendors is not governed by long-term contracts, and the Debtor believes those trade relationships will deteriorate, causing disruption to the Debtor's operations if the Debtor is unable to pay Critical Vendors. Accordingly, payment of the Critical Vendors is essential to avoid costly interruption and disturbances to the Debtor's business during the Chapter 11 Case.

108.    Subject to Court's approval, I understand the Debtor intends to pay Critical Vendors only to the extent necessary to preserve its business. The Debtor's CRO will review, assess, and make payment on account of these claims. In return for paying these claims, the Debtor will use commercially reasonable efforts to condition payment of Critical Vendors upon each claimant's agreement to continue supplying goods and services to the Debtor in accordance

with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtor in its reasonable business judgement.

109.    I believe that the relief requested in the Critical Vendors Motion is in the best interest of the Debtor's estate, its creditors and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

110.    **Utilities Motion**. The Debtors seeks entry of an order (a) approving the Debtor's proposed adequate assurance of payment for future utility services under section 366 of the Bankruptcy Code, (b) prohibiting the utility providers from altering, refusing, or discontinuing services, (c) approving the Debtor's propose adequate assurance procedures, and, (d) granting related relief.

111.    In connection with the operation of its business, the Debtor obtains electricity, telecommunications and other similar services from a number of utility providers or brokers. Uninterrupted utility services are essential to the Debtor's ongoing business operations and the overall success of the Chapter 11 Case. The utility services are essential for the Debtor to maintain its business and to operate its corporate offices and essential for daily operations. The studios and warehouse in Austin, Texas require electricity, telecommunications, internet, and other utility services to operate. Should any utility provider refuse or discontinue service, even for a brief period, the Debtor's business operations would be needlessly disrupted.

112.    To the best of Debtor's knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition utility services.

**Proposed Adequate Assurance**

113.    The Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner. Cash held by the Debtor and cash generated in the ordinary course of

business will provide sufficient liquidity to pay the Debtor's Utility Service obligations in accordance with its prepetition practice.

114.    The Debtor submits that the Debtor's ability to pay for future utility services with cash on hand in accordance with its prepetition practices (the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of Bankruptcy Code section 366.

### *Adequate Assurance Procedures*

115.    Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment (each an "Additional Assurance Request") pursuant to the adequate assurance procedures set forth in the proposed Order (the "Adequate Assurance Procedures").

116.    The proposed Adequate Assurance Procedures are as follows:

Any Utility Provider desiring additional assurances of payment in the form of deposits, prepayments or otherwise must serve an Additional Assurance Request on the Notice Parties (as defined in the Order). An Additional Assurance Request may be made at any time.

Any Additional Assurance Request must: (i) be in writing; (ii) identify the location for which the Utility Services are provided; (iii) summarize the Debtor's payment history relevant to the affected account(s), including any security deposits; and (iv) explain why the Utility Provider believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.

Upon the Debtor's receipt of any Additional Assurance Request, the Debtor shall promptly negotiate with such Utility Provider to resolve such Utility Provider's Additional Assurance Request.

The Debtor may, without further order from the Court, resolve any Additional Assurance Request by mutual agreement with a Utility Provider, and the Debtor may, in connection with any such agreement, provide such Utility Provider with additional adequate assurance of payment, including, but not limited to, cash deposits, prepayments or other forms of security if the Debtor believes that such adequate assurance is reasonable in its business judgment, subject to the terms of any cash collateral or other financing order entered by the Court; provided, however, that the Debtor shall maintain a summary

record of such agreements and their respective terms, and such summary record and the agreements themselves shall be available to any official committee appointed in this chapter 11 case and the U.S. Trustee upon request.

If the Debtor and the Utility Provider are not able to reach an alternative resolution within 14 days of receipt of the Additional Assurance Request, the Debtor will request a hearing before the Court to determine the adequacy of assurances of payment with respect to a particular Utility Provider (the "Determination Hearing"), pursuant to Bankruptcy Code section 366(c)(3). Pending resolution of any such Determination Hearing, the Utility Provider filing such Additional Assurance Request shall be prohibited from altering, refusing, or discontinuing Utility Services to the Debtor on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

In addition, if an amount relating to Utility Services provided post-petition by a Utility Provider is unpaid, and remains unpaid beyond any applicable grace period, such Utility Provider may request additional adequate assurance pursuant to the Adequate Assurance Procedures.

The Adequate Assurance Procedures sets forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtor to continue its business operations uninterrupted. More specifically, the Adequate Assurance Procedures permits a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Additional Assurance Request upon certain notice parties. The Debtor, in its discretion, may then resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court. If the Additional Assurance Request cannot be resolved by mutual agreement, the Debtor may seek Court resolution of the Additional Assurance Request. Unless and until a Utility Provider files an objection or serves an Additional Assurance Request, such Utility Provider shall be: (i) deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with Bankruptcy Code section 366; and (ii) forbidden to discontinue, alter or refuse services to, or discriminate against, the Debtor on account of any unpaid prepetition

27

charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

117.    I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its businesses in chapter 11 without disruption.

118.    **Heslin/Lewis Relief from Stay Motion.** Plaintiffs in Texas and Connecticut have commenced suits against Alex Jones and FSS relating to certain statement made by Jones regarding the Sandy Hook shooting. Two of the Texas State Court Suits—*Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer*, Cause No. D-1-GN-18-001835, in the 261st District Court of Travis County, Texas and *Scarlett Lewis v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC*, Cause No. D-1-GN-18-006623, in the 53rd District Court for Travis County, Texas—have been consolidated as the Heslin/Lewis Suit.  Judge Maya Guerra Gamble, 459th Civil District Court, Travis County (the "Texas State Court") is presiding over the Heslin/Lewis Suit.

119.    The trial of the Heslin/Lewis Suit was ongoing as of the Petition Date. On July 25, 2022, the Texas State Court held *voir dire* of jurors and a jury was empaneled. The Texas State Court began taking evidence in the Heslin/Lewis Suit on July 26, 2022. As the result of the filing of the Debtor's petition for chapter 11 relief, the Heslin/Lewis Suit is stayed by Bankruptcy Code section 362.

120.    The Debtor believes that it is in the best interests of its estate and creditors for the Heslin/Lewis Suit to continue to judgement notwithstanding the commencement of this Chapter 11 Case. Substantial resources of the Debtor and Plaintiffs Heslin and Lewis have already been expended in the Heslin/Lewis Suit to empanel a jury and present evidence to that jury. Based on representations made by counsel for Heslin and Lewis in the Bankruptcy Case of InfoW, LLC

28

previously before this Court, the Debtor believes that Heslin and Lewis desire a final judgment from the Texas State Court and would seek relief from the automatic stay absent this request by the Debtor.[7]

121.    The Debtor seeks emergency consideration of this Motion on or before 8:30 a.m. on August 1, 2022, or as soon thereafter as the Court's schedule will allow. A jury has been empaneled and trial is underway in the Heslin/Lewis Suit, scheduled to continue at 9:00 a.m. on Monday, August 1, 2022. Emergency relief is necessary to prevent delay in the Heslin/Lewis Suit to the detriment of the Debtor, Plaintiffs Heslin and Lewis, and the members of the jury serving in the Heslin/Lewis Suit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of July, 2022.

W. Marc Schwartz, as Chief Restructuring
Officer of Free Speech Systems, LLC

---

[7] In the InfoW, LLC chapter 11 case, counsel for the Texas Plaintiffs indicated at the April 22, 2022, hearing that the Texas Plaintiffs would be seeking relief from the automatic stay to continue litigation. According to counsel for the Texas Plaintiffs, the "cases are every bit as much about having a determination final made for them, them having their day in court in which Mr.Jones is held accountable for his conduct. So it's not just about a liquidating claims procedure, it is very emotional." *In re InfoW, LLC*, Case No. 22-60020 (Bankr. S.D. Tex.) [ECF No. 39] at 73:8-12.

Exhibit "A"

Comparative Profit and Loss Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 202.

**Exhibit A**

| Free Speech Systems LLC<br>Comparative Profit and Loss Statement<br>For the Year Ended December 31, 2021 and the Five Months<br>Ended May 31, 2021 |
|---|

|  | 2021 | 2022 |
|---|---|---|
| **Income** | | |
| Product Sales | $ 52,661,022.49 | $ 10,969,769.29 |
| Advertising Income | 5,761,997.51 | - |
| Donations | 710,154.12 | 2,876,213.86 |
| Fulfillment Services | 3,533,223.00 | - |
| Administrative Services | 1,903,898.95 | - |
| Media Production Sales | - | 475,000.00 |
| Infowars Health | 38,123.60 | - |
| Prison Planet | 4,877.62 | - |
| Uncategorized Income | 357,344.56 | - |
| *Total Income* | *64,970,641.85* | *14,320,983.15* |
| Cost of Goods Sold | 51,878,333.73 | 4,936,453.79 |
| *Gross Profit* | *$ 13,092,308.12* | *$ 9,384,529.36* |
| **Expenses** | | |
| Advertising & Promotion | 364,387.73 | 107,994.01 |
| Computer/IT/IP Expense | 5,036,717.02 | 1,307,339.15 |
| Insurance Expense | 54,558.40 | 31,898.90 |
| Office & Administrative Expense | 277,863.76 | 26,373.93 |
| Contract Services | 1,591,039.49 | 359,592.69 |
| Professional Fees | 4,126,906.48 | 1,623,771.42 |
| Occupancy | 1,624,864.40 | 345,602.34 |
| Utilities | 115,461.34 | 127,855.13 |
| Taxes Paid | 50,281.71 | 4,409.71 |
| Telephone Expense | 304,776.62 | 85,341.24 |
| Personnel & Payroll Expenses | 6,879,811.39 | 2,157,298.60 |
| Travel | 975,711.28 | 64,900.23 |
| Equipment Purchase | 123,696.05 | - |
| Production | 393,712.54 | - |
| Radio Show | 145,177.77 | - |
| Royalties | 1,197,472.71 | - |
| Equipment Rental | 27,322.86 | - |
| Meals and Entertainment | 97,486.31 | - |
| Uncategorized Expense | - | 103,815.00 |
| *Total Expenses* | *23,387,247.86* | *6,346,192.35* |
| *Net Operating Income* | *$ (10,294,939.74)* | *$ 3,038,337.01* |
| **Other Income** | **507,168.04** | **1,019,713.81** |
| **Other Expenses** | 18,963.30 | 206.15 |
| Interest Expense | 857,498.17 | 397,669.19 |
| Donation | 10,000.00 | - |
| Amortization Expense | 35,361.28 | 5,937.50 |
| Depreciation Expense | 209,888.00 | 98,750.20 |
| AMEX Charges | - | 1,653,383.31 |
| *Total Other Expenses* | *1,131,710.75* | *2,155,946.35* |
| *Net Other Income* | *(624,542.71)* | *(1,136,232.54)* |
| **Net Income** | **$ (10,919,482.45)** | **$ 1,902,104.47** |

Exhibit "B"

Comparative Balance Sheet of FSS as of May 31, 2022 and December 31, 2021.

**Exhibit B**

| | | | | |
|---|---|---|---|---|
| **Free Speech Systems LLC** | | | | |
| **Comparative Balance Sheet** | | | | |
| **As of December 31, 2021 and May 31, 2022** | | | | |

| | | **2021** | | **2022** |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current Assets** | | | | |
| Cash | $ | 1,508,720.21 | $ | 1,159,247.90 |
| Accounts Receivable | | 10,187,121.95 | | 10,013,413.22 |
| **Other Current Assets** | | | | |
| Invenotry | | 1,732,603.13 | | 910,116.84 |
| Prepaid Expenses | | 446,475.64 | | 114,136.99 |
| Due from PQPR | | (500.00) | | - |
| Advance To Elevated Solutions | | 27,870.00 | | - |
| *Total Other Current Assets* | | *2,206,448.77* | | *1,024,253.83* |
| *Total Current Assets* | | *13,902,290.93* | | *12,196,914.95* |
| **Fixed Assets** | | 1,679,438.66 | | 1,580,779.46 |
| **Other Assets** | | | | |
| Intangible Assets | | 21,270.83 | | 15,333.33 |
| Security Deposits | | 534,560.00 | | 534,560.00 |
| *Total Other Assets* | | *555,830.83* | | *549,893.33* |
| *Total Assets* | $ | *16,137,560.42* | $ | *14,327,587.74* |
| **Liabilities and Equity** | | | | |
| **Liabilities** | | | | |
| **Current Liabilities** | | | | |
| Accounts Payable | $ | 4,732,966.89 | $ | 1,217,685.58 |
| Credit Cards | | 152,367.42 | | 207,984.04 |
| **Other Current Liabilities** | | | | |
| David Jones Advance | | 150,000.00 | | 150,000.00 |
| Advances from PQPR | | - | | 571,920.57 |
| Due to PQPR | | 23,058,367.00 | | 23,058,367.00 |
| *Total Other Current Liabilities* | | *23,208,367.00* | | *23,780,287.57* |
| *Total Current Liabilities* | | *28,093,701.31* | | *25,205,957.19* |
| **Long Term Liabilities** | | | | |
| Note Due to PQPR | | 54,580,405.22 | | 53,845,074.41 |
| Note Payable - Winnebago | | 93,505.62 | | 82,524.37 |
| *Total Long Term Liabilities* | | *54,673,910.84* | | *53,927,598.78* |
| *Total Liabilities* | $ | *82,767,612.15* | $ | *79,133,555.97* |
| **Equity** | | | | |
| Member's Equity | | (774,291.44) | | - |
| Member Draws | | (61,937,862.26) | | (254,014.00) |
| Member Contributions | | 4,305,810.14 | | 311,350.00 |
| Opening Balance Equity | | - | | (66,765,408.70) |
| Retained Earnings | | 2,695,774.28 | | |
| Net Income | | (10,919,482.45) | | 1,902,104.47 |
| *Total Equity* | $ | *(66,630,051.73)* | $ | *(64,805,968.23)* |
| *Total Liabilities and Equity* | $ | *16,137,560.42* | $ | *14,327,587.74* |

Exhibit "C"

Comparative Cash Flow Statement for FSS for the period January 1, 2022, through May 31, 2022 and the year ended December 31, 2021.

**Exhibit C**

---

**Free Speech Systems, LLC**
**Statement of Cash Flows**

**For the Year Ended December 31, 2021 and the Five Months Ended May 31, 2022**

---

|  | 2021 | 2022 |
|---|---|---|
| **Operating Activities** | | |
| **Net Income** | **($10,919,482.45)** | **$1,902,104.47** |
| **Adjustments to reconcile Net Income to Net Cash provided by operations:** | - | - |
| 11000 Accounts Receivable | (10,187,121.95) | 173,708.73 |
| 12000 Inventory | (94,344.61) | 822,486.29 |
| 13000 Prepaid Expenses:13010 Prepaid Insurance | - | - |
| 13000 Prepaid Expenses:13020 Prepaid Software Licenses | - | - |
| Pre-paid Vendor Deposits | - | - |
| 13000 Prepaid Expenses:13040 Prepaid Legal | - | - |
| 13000 Prepaid Expenses:13070 Other Prepaid Expenses | - | - |
| Advance To Elevated Solutions | - | - |
| Prepaid Expenses | (403,821.24) | 65,286.20 |
| Accumulated Depreciation | 209,887.99 | 98,750.20 |
| Accumulated Amortization | 35,361.29 | 2,708.35 |
| 20000 Accounts Payable | 3,005,707.55 | (3,410,484.85) |
| 22000 Credit Card Payable | (236,394.79) | 207,984.04 |
| Advances from PQPR | - | 571,920.57 |
| David Jones Advance | 150,000.00 | - |
| Due to PQPR | (2,229,789.04) | - |
| Interest Payable - PQPR | (200,022.99) | - |
| **Net cash provided by operating activities** | **($20,870,020.24)** | **$434,464.00** |
| **Investing Activities** | - | - |
| 15000 Property and Equipment | (522,121.65) | (91.00) |
| 17100 Security Deposits | (500,000.00) | - |
| 17300 Intangible Assets | (5,500.00) | 3,229.15 |
| **Net cash provided by investing activities** | **($1,027,621.65)** | **$3,138.15** |
| **Financing Activities** | | |
| 27000 Note Due to PQPR:2021/11/10 $25,300,000 Note | 24,992,405.22 | (735,330.81) |
| Note Payable - Winnebago | (18,832.81) | (10,981.25) |
| 31000 Opening Balance Equity | - | - |
| Member's Equity | (23,193.36) | (98,098.40) |
| 33000 Distributions to Member:33100 Member Draws | - | - |
| 33000 Distributions to Member:Owner investments | - | - |
| Net Member Distributions | (2,100,362.40) | 57,336.00 |
| **Net cash provided by financing activities** | **22,850,016.65** | **(787,074.46)** |
| **Net cash increase for period** | **$952,374.76** | **($349,472.31)** |

Exhibit "D"

13-Week Cash Flow Forecast for FSS

**Exhibit D**

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Number** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| **Income** | | | | | | | | | | | | | | |
| Product Sales | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 595,489.01 | $ 7,741,357.16 |
| Advertising | - | - | - | 480,166.46 | - | - | - | 480,166.46 | - | - | - | 480,166.46 | - | 1,440,499.38 |
| Donations | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | 3,141.25 | $ 40,836.21 |
| **Total Income** | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 598,630.26 | 598,630.26 | 1,078,796.72 | 598,630.26 | 9,222,692.75 |
| **Selling & Product Costs** | | | | | | | | | | | | | | |
| Inventory Purchase | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (76,155.17) | (990,017.27) |
| Repay PQPR Inventory | (250,000.00) | - | - | (500,000.00) | - | - | - | - | - | - | - | - | - | (750,000.00) |
| Merchant Account Fees | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (26,797.01) | (348,361.07) |
| Shipping cost for drop ship orders | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (7,911.81) | (102,853.59) |
| Fulfillment Services | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (95,278.24) | (1,238,617.15) |
| Processor Fees | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (23,819.56) | (309,654.29) |
| eCommerce Store Maintenance | (27,270.00) | - | - | - | (27,270.00) | - | - | - | (27,270.00) | - | - | - | - | (81,810.00) |
| Texas Sales Tax | (5,337.87) | - | - | - | (5,337.87) | - | - | - | (5,337.87) | - | - | - | - | (16,013.61) |
| **Total Cost of Goods Sold** | (262,569.67) | (479,561.80) | (229,961.80) | (729,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (262,569.67) | (229,961.80) | (229,961.80) | (229,961.80) | (229,961.80) | (3,837,326.97) |
| **Operating Expenses** | | | | | | | | | | | | | | |
| **Advertising & Promotion** | | | | | | | | | | | | | | |
| Advertising & Promotion | (3,041.98) | - | - | - | (3,041.98) | - | - | - | (3,041.98) | - | - | - | - | (9,125.93) |
| Print Media | (3,000.00) | - | - | - | (3,000.00) | - | - | - | (3,000.00) | - | - | - | - | (9,000.00) |
| Radio Show Advertising | (11,500.00) | - | - | - | (11,500.00) | - | - | - | (11,500.00) | - | - | - | - | (34,500.00) |
| **Total Advertising & Promotion** | (17,541.98) | - | - | - | (17,541.98) | - | - | - | (17,541.98) | - | - | - | - | (52,625.93) |
| **Computer/IT/IP Expense** | | | | | | | | | | | | | | |
| Internet & TV services | (2,082.90) | - | (1,608.39) | - | (2,082.90) | - | (1,608.39) | - | (2,082.90) | - | (1,608.39) | - | - | (11,073.89) |
| Software License Fees | (140.80) | - | - | - | (140.80) | - | - | - | (140.80) | - | - | - | - | (422.40) |
| Server Hosting Service | (28,595.13) | - | - | - | (28,595.13) | - | - | - | (28,595.13) | - | - | - | - | (85,785.40) |
| CDN Video Cloud Storage | (55,728.00) | - | - | - | (55,728.00) | - | - | - | (55,728.00) | - | - | - | - | (167,184.00) |
| Satellite Service | (137,282.93) | - | - | - | (137,282.93) | - | - | - | (137,282.93) | - | - | - | - | (411,848.78) |
| Imaging License Fee | (9,201.25) | - | - | - | (9,201.25) | - | - | - | (9,201.25) | - | - | - | - | (27,603.75) |
| Software & Apps | (5,000.00) | - | - | - | (5,000.00) | - | - | - | (5,000.00) | - | - | - | - | (15,000.00) |
| Website Hosting | - | - | (266.50) | - | - | - | (266.50) | - | - | - | (266.50) | - | - | (799.50) |
| **Total Computer/IT/IP Expense** | (238,031.01) | - | (1,874.89) | - | (238,031.01) | - | (1,874.89) | - | (238,031.01) | - | (1,874.89) | - | - | (719,717.72) |
| Insurance | (2,166.50) | - | - | - | (2,166.50) | - | - | - | (2,166.50) | - | - | - | - | (6,499.50) |
| **Office & Administrative Expense** | | | | | | | | | | | | | | |
| Bank Fees & Service Charges | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (45.90) | (596.74) |
| Equipment Rental | (1,989.90) | - | - | - | (1,989.90) | - | - | - | (1,989.90) | - | - | - | - | (5,969.69) |
| Office Supplies/Printing/Copy | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (2.10) | (27.31) |
| Business Meals | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (280.46) | (3,645.97) |
| **Total Office & Administrative Expense** | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (2,318.36) | (328.46) | (328.46) | (328.46) | (328.46) | (10,239.71) |
| Outsourced Services | (45,980.00) | - | - | - | (45,980.00) | - | - | - | (45,980.00) | - | - | - | - | (137,940.00) |
| Consulting Services | (22,670.00) | - | (12,000.00) | - | (22,670.00) | - | (12,000.00) | - | (22,670.00) | - | (12,000.00) | - | - | (104,010.00) |
| **Utilities** | | | | | | | | | | | | | | |
| Electricity | - | - | (5,107.63) | - | - | - | (5,107.63) | - | - | - | (5,107.63) | - | - | (15,322.89) |
| HVAC | (256.19) | - | - | - | (256.19) | - | - | - | (256.19) | - | - | - | - | (768.58) |
| CAM Charges | (20,364.16) | - | - | - | (20,364.16) | - | - | - | (20,364.16) | - | - | - | - | (61,092.48) |
| Water & Sewer | (1,708.55) | - | - | - | (1,708.55) | - | - | - | (1,708.55) | - | - | - | - | (5,125.66) |
| Gas Service | (132.09) | - | - | - | (132.09) | - | - | - | (132.09) | - | - | - | - | (396.28) |
| Pest Control | (244.65) | - | - | - | (244.65) | - | - | - | (244.65) | - | - | - | - | (733.95) |
| Waste Management | (351.81) | - | - | - | (351.81) | - | - | - | (351.81) | - | - | - | - | (1,055.43) |
| **Total Utilities** | (23,057.46) | - | (5,107.63) | - | (23,057.46) | - | (5,107.63) | - | (23,057.46) | - | (5,107.63) | - | - | (84,495.27) |
| **Occupancy** | | | | | | | | | | | | | | |
| Rent | (33,408.51) | - | - | - | (33,408.51) | - | - | - | (33,408.51) | - | - | - | - | (100,225.53) |
| Office Security | (31,111.90) | - | - | - | (31,111.90) | - | - | - | (31,111.90) | - | - | - | - | (93,335.69) |
| Repair & Maintenance - Building | (1,777.19) | - | - | - | (1,777.19) | - | - | - | (1,777.19) | - | - | - | - | (5,331.56) |
| Janitorial | (5,983.33) | - | - | - | (5,983.33) | - | - | - | (5,983.33) | - | - | - | - | (17,950.00) |
| **Total Occupancy** | (72,280.93) | - | - | - | (72,280.93) | - | - | - | (72,280.93) | - | - | - | - | (216,842.78) |
| Supplies | (1,258.02) | - | - | - | (1,258.02) | - | - | - | (1,258.02) | - | - | - | - | (3,774.07) |

**Free Speech Systems LLC**
**Forecasted 13 Week Cash Flow Budget**
Between July 30, 2022 and October 28, 2022

| | Period | 07/30/2022-08/05/2022 | 08/06/2022-08/12/2022 | 08/13/2022-08/19/2022 | 08/20/2022-08/26/2022 | 08/27/2022-09/02/2022 | 09/03/2022-09/09/2022 | 09/10/2022-09/16/2022 | 09/17/2022-09/23/2022 | 09/24/2022-09/30/2022 | 10/01/2022-10/07/2022 | 10/08/2022-10/14/2022 | 10/15/2022-10/21/2022 | 10/22/2022-10/28/2022 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | | (18,337.88) | - | - | - | (18,337.88) | - | - | - | (18,337.88) | - | - | - | - | (55,013.65) |
| **Personnel Expenses** | | | | | | | | | | | | | | | |
| Salaries & Wages - Base | | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | - | (168,467.44) | (1,179,272.08) |
| Payroll Tax | | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | - | (13,971.09) | (97,797.65) |
| Alex Jones Salary | | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | - | (54,166.67) | (379,166.67) |
| **Total Personnel Expenses** | | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | - | (236,605.20) | (1,656,236.39) |
| **Travel** | | | | | | | | | | | | | | | |
| Mileage/Parking/Tolls | | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (99.69) | (1,295.98) |
| Vehicle Leases | | - | (1,470.56) | - | - | - | (1,470.56) | - | - | - | - | (1,470.56) | - | - | (4,411.68) |
| **Total Travel Expenses** | | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (99.69) | (99.69) | (1,570.25) | (99.69) | (99.69) | (5,707.66) |
| **Total Operating Expenses** | | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (1,898.71) | (256,015.88) | (428.15) | (680,347.03) | (428.15) | (238,503.91) | (19,410.68) | (237,033.35) | (3,053,102.68) |
| **Non-Operating Expenses** | | | | | | | | | | | | | | | |
| Payment on PQPR Note | | (12,500.00) | (15,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (27,500.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (55,000.00) | (523,000.00) |
| AMEX Payment | | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | (172,390.28) | - | - | (1,034,341.69) |
| **Total Other Expenses** | | (184,890.28) | (15,500.00) | (199,890.28) | (27,500.00) | (199,890.28) | (27,500.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (227,390.28) | (55,000.00) | (55,000.00) | (1,557,341.69) |
| **Professional Fees** | | | | | | | | | | | | | | | |
| CRO Fees | | - | - | - | - | - | - | (52,992.00) | - | (35,328.00) | - | - | - | - | (88,320.00) |
| Financial Advisor Fee | | - | - | - | - | - | - | (57,876.00) | - | (40,352.00) | - | - | - | - | (98,228.00) |
| Shannon & Lee LLP | | - | - | - | - | - | - | (40,000.00) | - | (60,000.00) | - | - | - | - | (100,000.00) |
| Ray Battaglia | | - | - | - | - | - | - | (24,000.00) | - | (24,000.00) | - | - | - | - | (48,000.00) |
| **Total Professional Fees** | | - | - | - | - | - | - | (174,868.00) | - | (159,680.00) | - | - | - | - | (334,548.00) |
| **Total Cash Flow** | | $ (529,176.72) | $ 101,269.75 | $ (87,237.70) | $ 320,906.77 | $ (544,176.72) | $ 339,269.75 | $ (289,605.70) | $ 793,406.77 | $ (731,356.72) | $ 313,240.31 | $ (97,225.73) | $ 774,424.24 | $ 76,635.11 | 440,373.41 |