**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| FREE SPEECH SYSTEMS LLC, | ) | Case No. 22-60043 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**EXHIBIT 16**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|                  |   |                               |
|------------------|---|-------------------------------|
| In re:           | § | Chapter 11 (Subchapter V)     |
| FREE SPEECH SYSTEMS LLC, | § |                     |
|                  | § | Case No. 22-60043 (CML)       |
|                  | § |                               |
| Debtor.          | § | Jointly Administered          |

## SUBCHAPTER V TRUSTEE'S INITIAL FINDINGS
## OF FREE SPEECH SYSTEMS, LLC INVESTIGATION

Melissa Haselden, the subchapter V trustee (the "Trustee") conducted an investigation pursuant to order of the United States Bankruptcy Court for the Southern District of Texas (the "Court") expanding her powers and directing a review of certain matters [Docket No. 183][1], including potential claims, causes of action, and distributions made by FSS to its principal, Alexander E. Jones ("Alex Jones" or "Mr. Jones").

## Introduction

At the conclusion of a hearing on September 20, 2022, the Court expanded the Trustee's duties under section 1183(b)(2), to "investigate the acts, conduct, assets, liabilities, and financial condition of the Debtor, the operation of the Debtor's business, and the desirability of the continuation of the business."[2] The Court provided the Trustee guidance in articulating several specific areas of inquiry reflected below:

1) The amount and validity of the alleged PQPR Holdings Limited LLC ("PQPR") secured debt;

2) Draws made by Alex Jones in 2021 and 2022;

3) Whether there is an insider relationship with FSS' credit card processor; and

4) Potential compensation to Shannon Lee and Schwartz Associates LLC.

This report will also address utilization of bitcoin / cryptocurrency donations, provide a high-level overview of the pre-petition and post-petition management structure and key personnel at FSS, and identify certain potential causes of action of the estate.

This report consists of eleven sections: (I) The Big Picture; (II) Investigative Process; (III) The Validity of PQPR's Debt; (IV) Distributions to Alex Jones; (V) Analysis of Credit Card Processor Relationship; (VI) Cryptocurrency/Bitcoin; (VII) Mountain Way Marketing LLC;

---

[1] References to docket number mean the docket number for the Free Speech Systems, LLC bankruptcy case number 22-60043.
[2] September 20, 2022 Hr'g Tr. at 253–54.

1

(VIII) Shannon Lee and Schwartz Associates LLC Compensation; (IX) Operational Improvement Under CRO; (X) Viability of FSS; and (XI) Initial Conclusions.

## I) <u>THE BIG PICTURE</u>

The Debtor, Free Speech Systems, LLC ("<u>FSS</u>" or "<u>Debtor</u>"), was formed on November 16, 2007 as a media company. FSS operates as a platform for broadcasting Alex Jones' InfoWars production. FSS also operates an online platform for the sale of books, nutritional supplements, coins and collectibles, long-term stored foods, and assorted t-shirts, bumper stickers and other miscellaneous items. FSS sells products it sources itself in addition to products supplied by third parties with a profit-sharing arrangement.

FSS is currently a single member LLC and Alex Jones is currently the sole member.[3] Based on the Trustee's interviews with employees and those doing business with FSS as well as the Trustee's review of FSS' accounting and financial practices, FSS did not generally observe corporate formalities. Prior to the bankruptcy filing, FSS lacked virtually any internal accounting controls. Documentation of transactions was lacking. Handshake deals were commonplace. FSS' internal accounting operations raised concerns about proper allocations among FSS' suppliers, including PQPR as well as potential conflicts with Alex Jones' personal accounting practices. A significant number of insider transactions existed.

Alex Jones and certain of his family members have interests in a number of entities, many of which do or have done business with FSS. A chart reflecting some these entities is attached to this report as **Exhibit 1**. As further discussed herein, FSS' most significant business dealings with an affiliate are those involving PQPR, which is owned indirectly by Alex Jones (72%) and his parents (28%).

In addition to transactions with affiliates, FSS also engaged in business dealings with associates of Alex Jones. There was an increasing pattern of friends and family transactions over the last decade, accelerating in and around 2018. The balance of economic favor typically weighed heavily in favor of the counterparty. Unraveling and understanding the tangle of transactions is challenging given the lack of documentation associated with most deals. The Trustee has pieced together many of these deals through interviews, bank statements and piecemeal records of the parties. It also appears that 2018 is when FSS began experiencing significant cash flow problems.

It is not possible to determine many of the answers to the Court's questions with absolute certainty, given the general lack of recordkeeping, inconsistent accounting, commingling of accounts, and atypical way of doing business. As the Court will see throughout this report, the records the Trustee has obtained through this investigation reveal numerous instances of apparent financial gymnastics by Alex Jones and Dr. David Jones—presumably to some end. For example, the email below shows the degree to which distributions to Alex Jones were complicated by seemingly unnecessary machinations:

---

[3] FSS was formed as Texas limited liability company by Alex Jones and his former spouse. Alex Jones became the sole member of FSS as a result of the finalized divorce decree between the parties in 2015.



Point being, the Trustee has had to make subjective calls in a number of instances, particularly regarding classification of payments to or on behalf of Alex Jones. This report reflects the best efforts of the Trustee and her professionals in addressing the questions posed by the Court and bringing transparency to the Debtor's financial affairs.

### General Overview of FSS' Management Structure

Since at least 2014, FSS has been predominately managed by two people—Alex Jones and his father, Dr. David Jones. While other individuals were employed or paid to run the day-to-day operations of the business at various times throughout this period—including ████████ ████████████████ the ultimate decision makers for the business were Alex Jones and Dr. David Jones.

Prior to the appointment of the current CRO, the employees of FSS did not have clearly defined roles. The majority of the individuals interviewed were either unable to identify their official job title or stated that such titles were meaningless in terms of how the business was operated and their job responsibilities. This lack of structure was exacerbated by the fact that FSS experienced a high amount of turnover and had difficulty attracting employees to replace individuals who left. This resulted in frequent, and often unexpected, internal promotions and shifting responsibilities for FSS' employees. As such, this report will focus on providing transparency into the practical knowledge and responsibilities of key individuals at FSS, rather than a recitation of their formal titles.

## II) **INVESTIGATIVE PROCESS**

The Trustee employed professionals to assist in her investigation: 1) legal counsel, The Law Office of Liz Freeman PLLC and Jackson Walker LLP, and 2) financial advisor, M3 Advisory Partners, LP ("M3"). The Trustee worked to conduct an investigation in an independent, focused, and efficient manner. A brief overview of the investigation is provided below in an effort to give context to the facts, conclusions, and the limitations of this report. In preparing this report, the Trustee relied upon statements by third parties, financial records from FSS and its affiliates, and other documents produced in response to subpoenas served by the Trustee. Some of these documents, in particular the financial records from FSS and its affiliates, were incomplete, inconsistent, or were not prepared contemporaneously with the information recorded. The Trustee endeavored to corroborate the information, but the accuracy of the data is an inherent limitation of this report.

### A. Overview of the Investigation To Date

**Persons Interviewed**

The Trustee and her counsel interviewed a substantial number of individuals as part of the investigation. Many of the persons were interviewed more than once. Below is a list of those interviewed, along with a brief statement explaining their relationship to FSS, Alex Jones, or InfoWars generally. For the Court's convenience, the list is broken up into two sections—(1) key personnel and decision makers at FSS; and (2) additional persons with knowledge interviewed by the Trustee.

*Key Personnel*

1. **Alex Jones**—Alex Jones is the founder, sole member, and highest grossing media personality for FSS. When the Trustee's powers were first expanded, Mr. Jones provided an operational overview of FSS while the Trustee was onsite. The Trustee requested a meeting with Mr. Jones and was informed by his counsel that he would not be available until April and that it was counsel's preference to present Mr. Jones only once for a 2004 examination by all interested parties. While the Trustee has not had the opportunity to independently interview Mr. Jones at this time, the Trustee monitored and participated in the 341 interviews held in Mr. Jones personal bankruptcy case and conversed at length with his current bankruptcy counsel and financial advisors regarding the issues raised in this report.

2. **Dr. David Jones**—Dr. David Jones ("Dr. Jones") is the father of Alex Jones, founder, manager and co-owner of PQPR and other entities doing business with FSS. He also served as Director of Human Resources for FSS until 2020 or 2021. Dr. Jones appears to have substantial involvement in Alex Jones' personal affairs and dealings with related entities. It would be hard to overstate the influence and scope of Dr. Jones' role at FSS. Based on the Trustee's interviews of Dr. Jones, as well as other FSS employees, Dr. Jones was one of the key persons at FSS. Dr. Jones was instrumental in directing the financial decision making and business operations of FSS. For example, FSS' bookkeeper, ▮▮▮▮▮▮▮▮, regularly looked to Dr. Jones for approval of which of FSS' creditors and vendors should be paid and

4

in what amounts, including the alleged debts owed to PQPR. Dr. Jones also assisted in onboarding new employees and negotiating agreements for new products or marketing affiliations on behalf of FSS. Dr. Jones appears to have received millions of dollars over the course of his involvement with FSS and through his interest in PQPR.

3. ███████████████████████████████████████████ is a consultant and entrepreneur who has had extensive dealings with FSS, PQPR, Alex Jones, and Dr. Jones. ████████████ and Alex Jones have known one another since approximately 2012. The relationship began because Alex Jones promoted and sold a turmeric tincture supplement produced by ████████████. Soon after, ████████████ began consulting on a semi-frequent basis with Alex Jones, FSS, and PQPR to assist InfoWars with development, procuring, and distributing its nutrition and supplement products. Additionally, after FSS received notice that its credit card processor was ending their business relationship with FSS, Alex Jones sought ████████████ assistance in finding a new credit card processing service, which ████████████ provided. To date, ████████████ received millions of dollars through his dealings with FSS, PQPR, and Alex Jones.

4. **Robert Roe**—Robert "Bob" Roe ("<u>Bob Roe</u>" or "<u>Mr. Roe</u>") is the Managing Director and Co-Founder of Acuity CxO, LLC, a public accounting firm. Mr. Roe was retained in April 2020 to review, analyze, and restate transactions between PQPR and FSS. Specifically, Mr. Roe was retained by PQPR to validate both the amount and authenticity of the PQPR Debt, which he alleges to have done in or around November 2020. Though initially retained by PQPR, Mr. Roe went on to do additional work for both PQPR and FSS. Given the close nature of these businesses, Mr. Roe admitted that the line between which company he worked for was blurred at times. Similarly, given the lack of corporate formalities observed by FSS and PQPR as well as the lack of written agreements and documentation, the nuance of Mr. Roe's work was consequently limited.

5. **Patrick Riley**—Patrick Riley ("<u>Riley</u>" or "<u>Mr. Riley</u>") was Alex Jones' former personal trainer who became an FSS employee with various roles within the company. Mr. Riley utilized an existing company that he owned and later created multiple companies to conduct do business with FSS, including Blue Ascension Logistics LLC ("<u>Blue Ascension</u>")—the warehouse fulfillment service entity FSS relied on for its distributions at the time FSS filed for bankruptcy. The Court authorized FSS to enter into the agreement with Blue Ascension on August 8, 2022. Blue Ascension has been paid more than $█████ for the services it provided to FSS between August 8, 2020 through December 9, 2022, when FSS terminated its relationship with Blue Ascension. Patrick Riley, through other businesses he controls, received more than $█████[4] related to his business dealings with FSS.

6. ███████████████████████████████████████████ is a former FSS contractor and current owner of ████████████████████████. When he was employed at FSS, ████████████ was responsible for overseeing the day-to-day operations at FSS. After leaving FSS and taking over ownership of ████ from Dr. David Jones, ████ ████████ consulted with FSS and assisted them in the development and sale of new product



---

[4] Of this amount, an aggregate of $█████ was paid to three other businesses ████████████ and Patrick Riley, another former FSS employee.

lines.  In order to understand the financial arrangements between ████████, FSS, and Alex Jones, it is necessary to briefly explain the origin and relationship between FSS and ████.

a.  **Brief Overview of ████—████** is a company initially formed by Dr. Jones in March 2021, but ███████████████, to produce limited edition silver commemorative coins for sale on InfoWars.  Each of these coins was limited to 10,000 units per coin.  The first run of these coins sold out quickly and generated $1.2MM in gross revenue.  Subsequent limited edition "Patriot Collectible" silver coins have been advertised on InfoWars and FSS was paid through a revenue split agreement with ████  Though the idea for the coins was ████ ████████ Dr. Jones was the initial owner of ████  Persons with knowledge of the transaction explain the reason was that Dr. Jones' wife, Carol Jones, provided the initial capital for the first run of commemorative coins through her daughter's, Marleigh Jones Rivera[5], company—BellaMac LLC ("BellaMac").  No one has been able to adequately explain to the Trustee why the first coin run was structured this way.  Regardless, after Carol Jones' initial investment was repaid to BellaMac with interest, ████████████████████████████████████████████████████.  Since then, ████ served as a broker between FSS/Alex Jones and potential marketing affiliates and manufacturers to assist FSS in procuring, marketing, and distributing new products as well as sourcing new advertising relationships.  It bears noting that, for some of these brokered deals, ████ would be paid directly by the marketing affiliates—rather than FSS—and would then retain an agreed-upon percentage of the revenue and remit the remainder to FSS.  The reason this is important is because it means that the money earned by ████ through these deals is not readily apparent from FSS' own records.  This problem is compounded by the fact that in at least one of these arrangements—an arrangement between ████ FSS, and ████████████████████ ████████████████ was also paid an unknown percentage directly by the marketing affiliate.  At the time of this report, the Trustee is in the process of obtaining the financial documents necessary to confirm the business relationships between FSS and ████ directly from ████████████████. ████████ was subpoenaed and has been cooperative.  He agreed to provide the Trustee with the requested information. ████████ objected to the Trustee's subpoena and filed a motion to quash.[6]  The Trustee is currently working to resolve these issues with his counsel and reserves the right to seek to compel compliance with the subpoena.

7. ████████████████████████████████████████████ was the bookkeeper for FSS from 2016 through the bankruptcy filing.  She also provided and continues to provide bookkeeping services for PQPR on a contractor basis through a separate bookkeeping

---

[5] Public records indicate that Ms. Rivera is the manager of BellaMac.  Upon information and belief, she is also the sole member of MRJR Holdings Limited LLC ("MRJR"), which has received $████ between October 16, 2019–February 25, 2022.

[6] Docket No. 545.

company she formed after starting work at FSS. Initially, ████ worked under the supervision of FSS' controller, ████████. ████ managed the intercompany billings between FSS and PQPR as well as their respective accounts payable and accounts receivable. In 2018, ████████ left FSS. ████' role then expanded to include bank reconciliation, credit card reconciliation, journal entries, and month-end closing processing. She also managed the cash flow received by FSS and made recommendations as to how funds should be used in order to keep both FSS and PQPR in operation. This work included prioritizing of each company needed to be paid each week. Based on her interview, ████ looked primarily to Dr. David Jones for approval of her recommendations and direction as to how to allocate the funds generated by the sale of products and advertising on InfoWars between FSS, PQPR, Alex Jones, and the debts and obligations of the companies.[7] ████ also took direction from ████, ████ and Alex Jones regarding where money should be sent. Notably, although ████ updated the accounts payable and accounts receivable each month, she did not calculate or investigate the accuracy of these numbers. Instead, she relied on reports provided to her by other employees.

8. ████████ is a consultant with extensive business dealings with FSS, Alex Jones, PQPR, and ████ including product development and fulfillment, credit card processing, marketing, and likely other business ventures that the Trustee continues to investigate. The Trustee has concerns regarding the financial dealings between ████ and FSS; however, ████ objected to the Trustee's subpoena and thus the complete scope of ████ involvement with FSS remains unknown at this time. The Trustee is working to resolve these issues with ████ counsel. She may seek to compel compliance with the subpoena if a resolution is not reached. Among the issues that cause concern, the most pressing is that the Trustee is unable to determine the amount of money ████ and his entities have been paid related to his business dealings with FSS and whether there are any ongoing undisclosed transactions or dealings that are detrimental to the Debtor's estate and its creditors. Based on what information the Trustee obtained to date, the Trustee expects the amounts ████ received related to his agreements with FSS and Alex Jones to be substantial.



### Additional Persons

1. **Mark Schwartz**—Mark Schwartz is a restructuring professional who worked with FSS and certain of its affiliated entities. He operated as the proposed CRO for FSS in its bankruptcy case until September 20, 2022.

2. ████████ is a long-time employee of FSS on the operations side of the business. At the time FSS filed for bankruptcy, ████ was the closest thing FSS had to a general manager who was not a member of the Jones family. Though currently employed at FSS, ████ also owns a company that ████████ ████████ received approximately $55,000 from FSS between March 2021 and February 2022. The Trustee was informed that ████ has never done work for FSS, only PQPR. Although Trustee has not been able

---

[7] *See generally* **Exhibit 6**.

to determine the work related to this payment with certainty, it is possible that this payment was part of the administrative expenses that PQPR was billed for—and which FSS received a credit—in selling PQPR's products on the InfoWars store.

3.  **John Haarmann**—John Haarmann ("Haarmann" or "Mr. Haarmann") is a current FSS employee on the production side of the business. He is also the founder and owner of Mountain Way Marketing LLC ("Mountain Way"), which has been paid approximately $265,000[8] to date for work related to FSS. Alex Jones is entitled to receive 90% of the revenue paid to Mountain Way Marketing through an unwritten agreement between Mountain Way Marketing and Alex Jones.

4.  ████████████████████████████████ is a former FSS employee who worked with FSS from 2007–2020 and served as its general manager from approximately 2017–2020. ████████████ is also the founder and owner of ████████████████████ ████████ formed at the alleged request of Alex Jones to oversee FSS' warehouse and distribution services. While he was an employee at FSS, ████████ was paid over $████████[9] from FSS, in addition to his salary, through several business ventures he owned.

5.  **Patrick Magill**—Patrick Magill ("Mr. Magill") is the current Chief Restructuring Officer ("CRO") of FSS. Mr. Magill was appointed by the Court as CRO on October 13, 2022. Mr. Magill and employees and contractors of FSS working at Mr. Magill's direction were relied on heavily and frequently by the Trustee for the provision of information regarding operations of FSS.

At the time of this report, the Trustee is awaiting the return of sworn declarations from Dr. David Jones, ████████████, and Robert Roe regarding the statements made in their interviews. The Trustee expects to circulate similar declarations to ████████████████ ████ regarding the same after the receipt of their final document production. The Trustee also is coordinating with counsel to conduct a formal interview of Alex Jones, likely to occur in April.

<u>Document Collection and Review</u>

In addition to interviewing persons with knowledge, the Trustee also collected and reviewed tens of thousands of documents in an effort to verify the facts and statements of FSS employees, consultants, contractors and Alex Jones. The Trustee's review included:

1.  **Records from FSS**—QuickBooks files from 2013 through 2021 (the prepetition 2022 records were not maintained contemporaneously and were thus unavailable and unreliable[10]), bank account statements, bank reconciliations, credit card statements, tax returns, documents prepared by retained financial professionals for FSS, invoices sent and received, documents related to FSS' corporate structure, emails, and the contracts and agreements—to the extent such relationships were documented—between FSS and third

---

[8] Additional information regarding this matter can be found in Section VII regarding Mountain Way.
[9] Of this amount, an aggregate of $████████ was paid to three other businesses ████████████ and Patrick Riley, another former FSS employee.
[10] Marc Schwartz attempted to create the prepetition 2022 records in QuickBooks. He made no representation as to the accuracy of these records. Trustee's financial advisors found gaps in these QuickBooks entries. Although gaps exist, Trustee considered these records in the preparation of this report.

parties. Trustee's financial advisors advised that certain materials (QuickBooks Export Files) are suspected to have originated from QuickBooks, but which cannot be replicated by a current export presumably due to retroactive adjustments made by Marc Schwartz and Associates and potentially other unknown parties. Those files would include the Profit and Loss Statement, Balance Sheets for 2013-2021 and the member equity transactions exports. Other materials relied on were fresh exports from the current state of the FSS QuickBooks database.

2. **Records from PQPR**—QuickBooks reports from 2013 through 2021 (the 2022 records were not maintained contemporaneously and were thus unavailable), bank account statements, bank reconciliations, invoices sent and received, tax returns, debt analyses, member distribution reports, documents related to PQPR's corporate structure, emails, and the contracts and agreements—to the extent such relationships were documents—between PQPR and third parties.

3. **Records from FSS' Employees/Consultants**—Select correspondence, contracts, agreements, and financial records for key consultants and contractors, including: ██████ ████████████████████████████████████ Patrick Riley, and John Haarmann.[11]

4. **Records from Ancillary Proceedings**—The Trustee reviewed relevant pleadings and records from the Sandy Hook lawsuits against Alex Jones and FSS, including deposition transcripts of ████████████████████████████████████████ The Trustee additionally reviewed the pleadings and hearings related to Alex Jones' personal bankruptcy as well as select pleadings and financial disclosures from Alex Jones' divorce proceeding. The Trustee also reviewed court dockets and select pleadings in other relevant legal matters of record.

5. **Tangible Property and Paper Records**—In addition to the electronic records received by the Trustee, the Trustee also reviewed a substantial number of hard copy records only available onsite at FSS. Similarly, the Trustee also reviewed hard copy records for PQPR, including quarterly and monthly compilations of invoices, bank statements, and reconciliations.

6. **Other Public Filings**—Trustee has also reviewed numerous public filings including Secretary of State records in Texas, Nevada, Wyoming, and Delaware; County Clerk records in Texas and Nevada; and real property records in various counties in Texas.

<u>Site Inspections</u>

In addition to the review of documents, the Trustee also conducted multiple site inspections at FSS, as well as Blue Ascension, to investigate first-hand the day-to-day operations of the business and review and assess the tangible property, information, and assets onsite.

---

[11] The Trustee expects to receive additional documents from some of these individuals. To the extent the Trustee receives any documents that would materially supplement the information contained in this report, the Trustee will promptly notify the Court.

<u>Additional Diligence Efforts</u>

The Trustee also undertook the following additional actions as part of her investigation:

1. **Public Records Search**—Select Secretary of State searches for each of FSS' employees and key consultants to identify businesses formed by FSS employees in order to determine whether any employee or consultant owned businesses were FSS vendors or otherwise doing business with any Jones family member.[12]

2. **Independent Asset Analysis**—Conducted nationwide universal asset searches to identify potentially undisclosed FSS assets.

3. **Sworn Testimony Review**—Review of select Texas trial testimony available on YouTube.

4. **InfoWars Review**—Select review of the Alex Jones Show and InfoWars website to monitor current advertisers and marketing relationships.

5. **Debt Perfection Analysis**—Review of UCC-1 financial statements filed with regard to FSS.

## III) <u>THE VALIDITY OF PQPR'S DEBT</u>

### A. Overview of PQPR and the PQPR Debt

PQPR is a wholesale distributer and supplement provider that was formed by Dr. David Jones and Alex Jones (indirectly) in 2013 to procure and sell supplements and nutraceuticals to FSS. These products would then be sold to FSS' customers. FSS would collect payment through credit card transactions and the funds would be deposited into FSS' bank account.

The Trustee and her counsel, led by M3, conducted a review of the timeline, situation, and other factors leading up to the execution by FSS of the first promissory note to PQPR on August 13, 2020,[13] and the second promissory note to PQPR on November 10, 2021.[14] The purported debt obligations to PQPR are collectively referred to as "the PQPR Debt".

Following interviews with current and former employees and representatives of FSS and PQPR and the review of documents provided during the investigation, the Trustee came to understand much of the inter-workings of PQPR and FSS.

---

[12] A schedule detailing the companies formed by FSS employees and consultants is attached as **Exhibit 13**.

[13] *See* **Exhibit 4**, August 13, 2020 Promissory Note between FSS and PQPR.

[14] *See* **Exhibit 5**, November 10, 2021 Promissory Note between FSS and PQPR.

Based on observations and conclusions drawn from that review, it is the Trustee's belief that the PQPR Debt should not retain secured status or payment priority senior or pari passu with creditors of FSS. There are a number of factors that lead to the Trustee's conclusion.

Common Ownership

The chart below reflects the ownership of FSS and PQPR.



FSS and PQPR are related entities with common control by Alex Jones, the sole owner of FSS. PQPR is held, both directly and indirectly, by Alex Jones and his parents, Dr. David Jones and Carol Jones. Alex Jones indirectly holds 72% of PQPR Holdings, through his 90% ownership of PJLR LLC, which directly holds 80% of PQPR. Dr. Jones and Carol Jones, in aggregate, hold the remaining 28% of PQPR. PQPR is an affiliate of FSS and cannot be recognized as a third-party. A subsidiary is a company that has at least 51% of its ownership held by another company, typically referred to as the parent company.[15]

Common Use of Systems, Personnel and Facilities

FSS and PQPR historically operated using the same cash management system, physical locations, computer systems, and a common employee base. At times, FSS and PQPR held accounts at the same bank with the same individuals (Alex Jones/Dr. David Jones/███████ ████████████████████) having access to those accounts and ability to transfer funds between the accounts held by various parties. For at least some period of time, this access was through a single shared login, which granted access to both PQPR's and FSS' bank accounts. PQPR warehoused its inventory in a building leased by FSS. Historically, through 2021, PQPR had *no employees* of its own. Certain employees of FSS would perform various functions for

---

[15] *Subsidiary*, CORPORATE FINANCE INSTITUTE (Dec. 12, 2022)
https://corporatefinanceinstitute.com/resources/accounting/subsidiary-definition/.

PQPR, including accounting and human resources. Those associated costs, primarily for labor, were invoiced back to PQPR.  is not an accountant. She did not personally calculate the PQPR numbers or investigate their accuracy.

███████ generally managed the cash flow received by FSS and PQPR and made recommendations as to how funds should be deployed in order to keep both businesses in operation. ███████ generally looked to Dr. Jones for approval of her recommendations and direction as to how to allocate the funds generated by the sale of products and advertising on InfoWars between FSS, PQPR, Alex Jones, and the debts and obligations of the companies. She would also take direction from ███████, or Alex Jones as to use of funds.

<u>Failure to Observe Corporate Formalities</u>

FSS and PQPR did not transact at arm's length. FSS and PQPR did not have a contract, price sheet, or formal written agreement governing their relationship, including prices charged. Alex Jones is the sole owner of FSS, while also indirectly, holding 72% of PQPR. Despite claims that Alex Jones does not act as a manager of PQPR, his majority ownership indicates he holds significant influence in controlling PQPR. It is further understood that he, in providing advertising services for PQPR products, exercised sole discretion in which products are pushed to his audience. His choices are at times contrary to the stated desires of FSS employees.

Dr. Jones primarily controls the business activities of PQPR and has substantial influence with regard to FSS.[16] Alex Jones and Dr. Jones managed the business affairs of FSS, PQPR, trusts and other business enterprises through common e-mail accounts and what can best be described as a centralized cash management system.

The lack of consequences for the failure of FSS to repay asserted obligations to PQPR is telling. In a true third-party lender-debtor relationship, failure to make obligated payments typically results in certain penalties ranging from financial penalties to a declaration of default. From 2014 to 2020, FSS allegedly accrued $54.88MM of debt owed to PQPR with virtually no consequence. Dr. Jones did send a letter on behalf of PQPR to Alex Jones at FSS on December 29, 2019 indicating concern with regard to nonpayment[17]. This letter was sent just over a week after a Texas judge denied dismissal of the Texas Sandy Hook lawsuit and ordered payment of $100,000 in attorneys' fees.[18] PQPR continued to provide FSS with products with no record of a

---

[16] *See* **Exhibit 6**.
[17] *See* **Exhibit 6** at 33, ███████████████
[18] Paul J. Weber, *Judge Orders Alex Jones to Pay $100,000 in Sandy Hook Case*, PBS NEWS HOUR (Dec. 31, 2019) https://www.pbs.org/newshour/nation/judge-orders-alex-jones-to-pay-100000-in-sandy-hook-case.

forbearance agreement until July 10, 2022.[19]  This is despite almost two years passing after the execution of the first promissory note and eight months after the execution of the second promissory note.  The sudden enforcement of the obligation to pay under those notes, particularly within such close proximity to July 29, 2022 FSS' chapter 11 filing and in the immediate aftermath of the voluntary dismissal of the three related bankruptcy cases[20] does not have the appearance of a routine enforcement.  Rather, it appears to be a preparatory action and an attempt to legitimize the debt.

### B.  Observations Regarding Transactions between FSS and PQPR

The narrative surrounding PQPR and FSS' business relationship has been a shifting one.  Initially, we were informed by Bob Roe—an accountant PQPR engaged to evaluate the relationship between PQPR and FSS—that PQPR generally sold products to FSS at a "wholesale" price of approximately 200% of costs for the products.  Then, FSS would further mark up the products an additional amount, depending upon the product, to the "retail price".  FSS then sold the products to its customers through the InfoWars platform.  PQPR and FSS shared in the profits of the final sales, with FSS receiving a 20% to 30% "commission" on each sale with PQPR receiving the remaining net profits.  This relationship is reflected in the following cash flow chart reflecting the flow of funds.

---

[19] On July 10, 2022, PQPR and FSS executed a forbearance agreement.
[20] Bankruptcy cases of InfoW, LLC, Prison Planet TV, LLC, and IWHealth, LLC, jointly administered under Case No. 22-60020 in the United States Bankruptcy Court for the Southern District of Texas were voluntarily dismissed on June 10, 2022.



* Effectively AEJ 2018 Trust owns 72% interest in PQPR Holdings Limited LLC

At some point, Bob Roe's explanation of PQPR's and FSS' relationship changed. Mr. Roe indicated that PQPR sold its products at the retail price to FSS' customers through the InfoWars platform, after which FSS sold the products to its customers at the same retail price. Instead of FSS being paid a commission for the sale, FSS was only paid fees for advertising, fulfillment, and administration from the sales of products (the cost of these services was initially borne by FSS) purchased from PQPR while PQPR was entitled to 100% of the profit from the same sales.

Given PQPR and FSS' common ownership, lack of corporate formalities, and the way they collectively managed revenue generated from product sales on the InfoWars platform, the "formal" business relationship between PQPR and FSS is mostly irrelevant. Regardless, because the latter understanding—FSS only being paid fees for advertising, fulfillment, and administration—is the one assumed in the debt analyses provided by Mr. Roe in support of the PQPR Debt, the Trustee has focused this report on that alleged relationship.

As reflected on the Balance Sheets,[21] amounts owed by FSS to PQPR, and owed by PQPR to FSS, historically (from 2013 through 2019), were recorded by FSS using three accounts: "Due to PQPR", "Due from PQPR", and "Accounts Receivable – PQPR".[22] Such accounts are typical for intercompany (related party) accounting.

---

[21] *See* **Exhibit 7**, FSS Annual Balance Sheets.
[22] *See* **Exhibit 8**, Sampling of PQPR and FSS Historical Monthly Income Statements.

14

Beginning in August 2020, a portion of the intercompany payable was reclassified as secured debt with the execution of a promissory note in the amount of $29.588MM dated August 13, 2020. This note purported to memorialize the net amount owed by FSS to PQPR through 2018. A second promissory note was executed for $25.3MM on November 10, 2021 to memorialize the net amount owed for 2019 and 2020.

Below is a table created by M3 showing the historical intercompany balances, notes payables and cumulative Jones draws for the years ended 2013 through 2021. For the period from 2013 through August 2020, FSS reported the PQPR transactions as intercompany (i.e., related party). It is not until August 2020 that certain amounts are reclassified as "Note Payables".



It is also noteworthy to compare figures at the end of 2021 as shown in the charts below. The Total Due to PQPR ($67.8MM) to the Cumulative Jones Family Draws ($62.4MM). It ultimately benefitted Alex Jones personally to allow the build-up of the balance owed to PQPR.



The graph below also compares the increased PQPR debt with Jones family draws:

**Chart 2 – Overlay of Cumulative Jones Family Gross Draws and Net PQPR Payable**



*Notes*
*There are $4.8MM of Equity Contributions which are not captured above*
**2022 is currently excluded as data is not available for all chart elements.*
*Net Due to PQPR is calculated as the balance of "Due to PQPR," less the balances of "Due from PQPR" and "Accounts Receivable - PQPR"*

The Trustee and her professionals analyzed the composition of the Net Due to PQPR amounts for 2013 through 2018 and observed the Net Due to PQPR was credited (increased) based on an apparent obligation of FSS to remit 100% of gross sales proceeds associated with

16

products PQPR supplied that were sold by FSS. The transactions appeared to be more closely aligned to a consignment arrangement despite there being no such formal agreement. In a typical consignment arrangement, there is typically an agreed upon sharing of revenues or gross profits. However, the arrangement observed here is even more favorable to PQPR, the consignor, in that FSS, as consignee, did not appear to have any right to share in any revenue (or gross profit), formally or informally.

## C. Timeline of Events

The chart below provides a snapshot of key events relating to PQPR.

### Timeline of Events Pertinent to FSS/Alex Jones/PQPR



Timing of Execution of the Notes

The creation of PQPR in 2013 coincided with the commencement of divorce proceedings involving Alex Jones and his former wife and Dr. David Jones substantial involvement with FSS. It also coincided with the immediate aftermath of the Sandy Hook events and the beginning of Alex Jones conspiracy related comments regarding the same[23]. Thereafter, there came to be a pattern of increasingly creating entities to do business with FSS by insiders of FSS and associates of those insiders. A timeline of these businesses is reflected in **Exhibit 3**.

---

[23] The Sandy Hook school shooting transpired on December 14, 2012. Alex Jones first made conspiracy related comments on or about December 19, 2012.

Several notable developments occurred in the Texas and Connecticut Sandy Hook litigation shortly before, and immediately after, the second promissory note for $25.3MM was executed on November 10, 2021.

- On September 27, 2021, forty-four days before the second promissory note was executed, default judgements were entered against Alex Jones in the Heslin, Lewis, and Pozner/De La Rosa cases in Texas, largely predicated on a failure of Jones to abide by court orders and turn over documents to the plaintiffs.[24]

- On November 15, 2021, five days after the second promissory note was executed, a default judgement was entered against Alex Jones in the Connecticut proceedings, again for Jones' refusal to turn over proper financial and web analytics data, which had previously been ordered by the court.[25]

It is difficult to accept that the establishment of the two promissory notes with PQPR were merely coincidental.

### D. The PQPR Debt Terms are Not Market

Interest Rate Examination

The first $29.588MM promissory note and the second $25.3MM promissory note bear interest at 1.75%[26] and 1.80%,[27] respectively. On the dates of execution of each Note, the 30 Year US Treasury Rate closed at 1.431% and 1.909%.[28] FSS tried unsuccessfully to secure financing from traditional banks. The interest rates associated with the two notes further indicate that PQPR and FSS did not conduct business as true third parties or at arms-length.

Lack of Consideration

It is unclear if there was any consideration given by PQPR to FSS for memorialization of the intercompany balance and the granting of a security interest when either Note was executed. The Trustee did not find evidence of a plausible ultimatum served by PQPR to FSS threatening to

---

[24] Default Judgement Orders in Heslin v. Jones, Pozner/De La Rosa v. Jones, and Lewis v. Jones dated September 27, 2021; *See* **Exhibit 9**.

[25] *Alex Jones Liable by Default in Sandy Hook Elementary Defamation Suit*, FIRST AMENDMENT WATCH AT NEW YORK UNIVERSITY (Nov. 15, 2021) https://firstamendmentwatch.org/judge-finds-alex-jones-liable-by-default-in-sandy-hook-elementary-defamation-suit/.

[26] *See* **Exhibit 4**, August 13, 2020 Promissory Note between FSS and PQPR.

[27] *See* **Exhibit 5**, November 10, 2021 Promissory Note between FSS and PQPR.

[28] *U.S. 30 Year Treasury Bond*, WALL ST. J. MARKETS https://www.wsj.com/market-data/quotes/bond/BX/TMUBMUSD30Y/historical-prices.

cease providing goods and services if not for execution of the Notes. In fact, Dr. David Jones, the manager of PQPR directed how much FSS would ultimately pay to PQPR[29].

<u>Enforceability</u>

The Notes include an event of default if "a judgement in excess of $100,000 is entered against Maker [FSS]." The Security Agreement, governing both notes, states in Section V.6., "any judgement, arbitration award, fine or penalty for an amount in excess of $500,000" to be an event of default.[30]

At the time the second Note was executed on November 10, 2021, several default judgements had already been entered in the Connecticut Sandy Hook litigation. The likelihood of damages exceeding the $100,000 level specified in the agreement, for an event of default, was all but a certainty.

### E. Ability of PQPR to Operate Despite Non-Payment by FSS

PQPR and FSS operated using a centralized cash management system, something typically seen in corporations with multiple entities. The understanding—not memorialized in any formal agreement, but rather recounted in narrative by parties historically involved with PQPR, including its former accountant—was that FSS would remit the full amount of gross sales proceeds, of PQPR sourced products, to PQPR each month. That pattern held true for December 2014 and January 2015 during which sales proceeds for those months were indeed remitted to PQPR in those same months; proceeds for February 2015 sales were remitted in March 2015, with a marginal payment having occurred in February 2015 and no payment having been made during April 2015.

Beginning in mid-2015, FSS embarked on a strategic mission to augment its broadcasting business around this time but found itself unable to access capital in traditional financial markets. FSS had been largely deplatformed with Alex Jones being labelled as "toxic". Financial institutions were unwilling to risk reputational damage in doing business with Alex Jones or any of his related entities. To address this lack of access, FSS began withholding payments which would have otherwise been remitted to PQPR. The funds were reportedly used to invest in the development of the FSS broadcasting infrastructure including studios.

Beginning in May 2015, FSS generally made payments in "round-number" denominations to PQPR. These payment amounts were determined by ███████████, the primary bookkeeper of FSS and PQPR and approved by Dr. David Jones. After reviewing relevant documents and emails, and interviewing various parties, it appears that ████████ would examine FSS and PQPR

---

[29] *See generally* **Exhibit 6**.
[30] *See* **Exhibit 10**, August 13, 2020 Security Agreement between FSS and PQPR.

general ledgers side-by-side, estimate the near-term cash needs for PQPR, and then seek approval from Dr. Jones to send that estimated amount from FSS to PQPR.

During 2015, Debtor's records reflect PQPR product sales averaged just over $2.0MM per month with FSS charges to PQPR, for advertising, fulfillment, and administrative services, averaging $829,000 per month, a substantial portion of which relates to actual costs incurred by FSS. FSS' monthly payments to PQPR averaged $1.2MM. By the end of 2015, the intercompany balance settled at $396,000.

For the period of January 2016 through December 2018, monthly PQPR product sales averaged double the 2015 number to reach $4.0MM. The monthly offsetting charges from FSS exhibit a much more tepid rise to $1.1MM, a 33% increase. The monthly FSS payments to PQPR increased 70% over 2015 to $2.0MM. Based on those monthly average observations, for the thirty-six months comprising calendar years 2016–2018, the intercompany balance grew at a monthly rate of $831,000. The total amount eventually settled at $29.588MM owed by FSS to PQPR at the end of 2018. It was this amount that was memorialized in the first promissory note on August 13, 2020.



FSS Income and Margins - 2013 - 2021

Notes
(1) Total Income is nomenclature used by Quickbooks and has been deemed to be the equivalent of total revenues

The allowance by PQPR to permit the balance to grow at that rate for such a sustained period is uncharacteristic for any third-party vendor and further indicates that these two entities were not engaged in arms-length transactions. Furthermore, PQPR was able to continue operating because ████████, working more closely with Dr. Jones, had full visibility into the financial

needs of PQPR and FSS. ████████, under the direction of Dr. Jones, sent just enough money to PQPR for PQPR to maintain its own good standing with vendors and third parties.[31]

### Summary Conclusion of PQPR Debt

FSS and PQPR have substantial overlap in ownership, and consequently management, by virtue of two persons, Alex Jones and Dr. Jones, Alex Jones being the sole owner of FSS and majority owner of PQPR. Observation of corporate formalities was virtually non-existent with the two entities using common systems, facilities, and employees. FSS and PQPR did not have a written agreement or even a price sheet agreed to between them. FSS did not create purchase orders for products procured through PQPR. Rather, invoicing and payment was accomplished through the use of a QuickBooks system on an ad hoc basis. One bookkeeper, ████████, largely managed and analyzed the books of both entities. Historically, having had zero employees, PQPR relied entirely on certain employees of FSS. PQPR and FSS in essence utilized a centralized cash management system. Funds flowed through accounts of FSS, PQPR and other affiliated entities on an as needed basis as directed by Alex Jones, Dr. Jones or ████████. It is difficult to view FSS and PQPR as anything but one entity.

The PQPR relationship acted to remove profit margins from FSS. The projections filed by FSS with the Plan add clarity to the problematic relationship between FSS and PQPR.[32] The projections reflect how FSS operating with typical cost on credit may be profitable. FSS, through the efforts of the CRO, developed a business with a third party fulfillment system. FSS has largely removed middlemen (including PQPR) who were draining resources to take full advantage of potential margins. The Trustee did not independently diligence the forecast. However, the Trustee has no reason to doubt the forecasts prepared by FSS.

The Trustee believes that the PQPR Debt should not retain secured status or payment priority senior or pari passu with creditors of FSS. The grounds and mechanisms for this are numerous. The PQPR Debt could be reclassified and recognized as an intercompany payable or substantive consolidation applied. Alternatively, the PQPR Debt could be equitably subordinated to the unrelated party third party vendors, creditors and judgments. The PQPR Debt is also subject to reclassification as an equity contribution or avoidance pursuant to the Bankruptcy Code and the Texas Property Code. This is a nonexclusive list of claims, causes of action or remedies which might be available with regard to PQPR and the PQPR Debt.

---

[31] **Exhibit 6**, at 23, ████████████████████████.
[32] *See* Docket No. 502, Chapter 11 Plan with Exhibits.

## IV) **DISTRIBUTIONS TO ALEX JONES**

Alex Jones is the sole member of FSS. He is also the primary broadcast talent. In addition to concerns regarding FSS's problematic accounting practices in general, multiple sources interviewed as part of the investigation detailed allegations of efforts to move profit generators and opportunities from FSS to businesses owned by family or associates of Mr. Jones. Certain of those businesses had agreements with Mr. Jones to share profits with him.

The Court instructed Trustee to investigate the $62MM in draws alleged to have been taken from FSS by Jones in 2021 and 2022. Trustee conducted an investigation of this matter, with the assistance of Trustee's financial advisors, and determined that the transactions attributable to the $62MM in member draws[33] occurred over twelve years rather than a two year period. These distributions include purchases/services accounted for as equity draws along with cash withdrawals.

The Trustee began her review with an export of QuickBooks data attributable to FSS member draws and contributions. This schedule contained over 7800 lines of transactions for the period from 2008–2021.

Trustee and her financial advisors reviewed the member draw report, as well as subsequent draws and contributions through July 2022. However, the Trustee did not independently corroborated the accuracy or completeness of the transactions received from FSS. Based on the financial information provided by FSS, a summary analysis of the draws and contributions for the periods 2010–July 2022[34] ("Draw Analysis") is attached.[35] The Draw Analysis reflects aggregate draws from January 2010–July 2022 in the amount of $63,461,882 and member contributions of $4,770,575 (including compensation of $74,522), resulting in net draws of $58,691,307 for the period. The Draw Analysis also sorts the draws into several categories based upon similarities and establishes the percentage that each category represents to the aggregate draws.

In 2021, the gross draws attributable to Mr. Jones were $3,166,828, including $1,454,703 in cash withdrawals offset by $1,066,407 in owner contributions, resulting in net draws of $2,100,421.

In 2022, up to the Petition Date, total draws attributable to Mr. Jones were $1,066,407, including $877.296.00 in cash withdrawals[36], with no offsetting contributions.

---

[33] The draws and contributions result discussed herein are the combined draws for Alex Jones and his former spouse who were the two members of the Debtor from formation through 2015 when the parties finalized a divorce. At that time, Mr. Jones became the sole member of FSS.

[34] Trustee's analysis does not include member transfers and contributions prior 2010 due to the age and immateriality of the same.

[35] **Exhibit 11**.

[36] Not included in the cash distributions for 2022 is a withdrawal from FSS' bank account on July 27, 2022 in the amount of $1,097,484.50, which was wire transferred to an account at Veritext Bank. The Trustee is in the process of investigating whether this wire transfer was for the benefit of Alex Jones, which would increase the cash distributions by the transferred amount.

Trustee and her professionals also analyzed the aggregate draws from the periods January 2010–July 2022.  The Trustee determined that the two largest categories of draws reflected in the Draw Analysis relate Taxes (federal and property) in the aggregate amount $32,264,987 and cash draws in the aggregate amount of $18,527,293.[37]  These two categories of draws represent 80.0% of the total member draws during the relevant periods.

Other material member draws during the 2010–2022 time period relate to the following: (i) personal construction expenses ($2,908,850); (ii) divorce settlement related payments ($2,239,815); and (iii) professional services/fees ($1,329,900).  These three categories collectively represent 10.2% of the aggregate member draws.  Other categories attributable to member draws are itemized in the Draw Analysis. The Draw Analysis also details the variance in member draws by year.  A chart reflecting the annual gross draws by year is below.

**Chart 1 - Annual Jones Family Gross Draws from FSS**



*Notes*
*There are $4.8MM of Equity Contributions which are not captured above. 2022 Data pertains to the pre-petition period of January 1, 2022 through July 28, 2022 and is based on a QuickBooks export from the same QuickBooks system which has generally been suspected to be incomplete for the year 2022*

Trustee shall continue efforts to determine if the transaction identified in Footnote 3 should be characterized as a member draw or if any other additional or undisclosed transactions exist.

---

[37] *Id.*

## V) ANALYSIS OF CREDIT CARD PROCESSOR RELATIONSHIP

The Court further ordered that the Trustee review the relationship between FSS and Auriam Services, LLC ("Auriam"), its credit card intermediary. Specifically, the Trustee was required to investigate if the credit card processor is an "insider" of FSS. Under 11 U.S.C. 101(31)(B) an insider is defined as follows:

> (31) The term "insider" includes—
>      (B) if the debtor is a corporation—
>           (i) director of the debtor;
>           (ii) officer of the debtor;
>           (iii) person in control of the debtor;
>           (iv) partnership in which the debtor is a general partner;
>           (v) general partner of the debtor; or
>           (vi) relative of a general partner, director, officer, or person in control of the debtor.

Trustee's investigation into Auriam's relationship with FSS reflects that, under the Bankruptcy Code definition, Auriam does not meet the technical statutory definition of an "insider". However, a significant relationship between the principal of Auriam and his other business entities has existed with FSS and PQPR. A summary of the Auriam and FSS and PQPR relationship is discussed below based on the information derived from the interviews and review of relevant documents as detailed in Section II(A) of this report pertaining to ███████.

### A. Pre-Petition Background of FSS and Auriam

FSS sells products on its InfoWars platform. Sales of product is how FSS derives the bulk of its income. Payment by customers for these products is almost always made by credit card. Historically, FSS contracted with traditional institutions to process credit card transactions. However, after Alex Jones was deplatformed in mid–2018, traditional banking and credit card processing institutions began to terminate their relationships with FSS. Financial relationships with FSS were considered high risk in terms of optics for the financial institution. In 2021, FSS received notice from its existing credit card processor that the relationship would be terminated within a few months. FSS representatives were unable find a new processor to manage its credit card processing needs. At the time, FSS representatives approached ███████ to assist in procuring a credit card processing service.

███████ was able to find a credit card processor, subject to a third-party buffer and indemnification, which he agreed to provide through Auriam.[38] On or about October 1, 2021, ███████ and FSS entered into a Financial Services Agreement whereby Auriam agreed to facilitate credit card processing services on behalf of FSS in exchange for a fee ("Auriam Agreement"). Essentially, Auriam acted as the buffer between the credit card processor and FSS and indemnified the acquiring bank for unpaid chargebacks. The Auriam Agreement required a 10-year commitment from FSS and provided for payment to Auriam of a fee equal to 10% of total

---

[38] The sole member of Auriam is ███████ a Delaware corporation whose sole interest holder and president is ███████. The Auriam Agreement is executed by ███████. Upon information and belief ███████ are the same entity.

credit card charges, plus all normal credit card processing fees charged by the credit card processor. Additionally, the Auriam Agreement required that FSS remit a $500,000 deposit to be held in the event of unpaid chargebacks.

The Auriam Agreement also includes a Memorandum of Understanding between Auriam, FSS and PQPR (the "MOU") which provided the following remittance schedule of funds received by Auriam—first, funds used to pay fees charged by credit card processor; then, 10% to Auriam for its services; then, 80% of sale of PQPR product allocated to PQPR; then, $11,000 per calendar day to PQPR to pay down outstanding balance; and finally, any remaining funds to FSS.

On or about July 10, 2022, the parties to the MOU executed a 60-day forbearance agreement that temporarily reduced Auriam fees to 4% of sales; modified the allocation of receipts between the parties; and temporarily reduced the daily payment to PQPR by 50%. The forbearance also required that FSS pay 100% of fulfillment and shipping costs for all sold inventory, whether owned by PQPR or FSS. Under the agreement, Auriam would remit payment in accordance with the agreed upon amounts. Throughout the span of the Auriam Agreement, Auriam provided regular settlement reports to FSS detailing the allocation of receipts and payments.

### B. Post-Petition Transactions with Auriam

FSS initiated its Subchapter V, Chapter 11 case on July 29, 2022, during the pendency of the forbearance agreement with Auriam and PQPR. During the bankruptcy case, cash collateral orders were entered further reducing the payment to PQPR to $5,000 per week. The forbearance was ultimately extended and Auriam continued to perform at the reduced rate but indicated that the contract rate of 10% would be imposed once the forbearance terminated. On November 21, 2022, the Court entered an order authorizing FSS to enter into a financial services agreement with a new financial services intermediary to act as a buffer with the credit card processor at a lower rate. On December 19, 2022, the Court authorized the rejection of the Auriam Agreement. Auriam continues to hold the $500,000 security deposit from FSS. The Trustee understands that the parties are in discussions regarding the return of a substantial portion of the deposit immediately, with a portion to be held in reserve for a longer period in the event of credit card chargebacks.

## VI) CRYPTOCURRENCY/BITCOIN

FSS sells products through its website Inforwarsstore.com (the "FSS Website"). In addition, the FSS Website also allows customers to donate to InfoWars to help keep the program on air. Prior to FSS' bankruptcy filing, customers were able to donate to FSS by several methods, including using bitcoin or other cryptocurrencies.[39] The FSS Website contained a link for customers to use in order to donate bitcoin or cryptocurrency. When a donation was made, the funds would be directed into a digital wallet owned by Alex Jones.

Financial advisors for Alex Jones provided the Trustee with a record from a digital wallet linked to the FSS Website donation page and owned by Mr. Jones. The record contains transactions between August 3, 2021 through December 3, 2022 and reflects that 8402.13 units bitcoin/cryptocurrency were deposited into the digital wallet during this time period. Each

---

[39] The CRO removed these links and FSS no longer accepts donations or payments with cryptocurrency.

transaction in the record contains a timestamp with date and time that the sale or receipt of assets occurred. The currency was subsequently sold at various intervals and spot prices, resulting in the realization of net proceeds in the amount of $7,547,141.61. FSS bank records indicate that on various dates between May 3, 2022 and August 16, 2022 an aggregate amount of $6,625,000 of the sale proceeds was deposited into FSS' bank account.

The remaining balance of $922,141.61 was not directly paid to FSS. Financial advisors for Mr. Jones investigating this matter indicated that $734,943 of the remaining balance was used for the benefit of FSS to pay professionals and purchase inventory. The Trustee is awaiting receipt of evidence of the same. This matter remains under investigation.

## VII) MOUNTAIN WAY MARKETING LLC

On March 24, 2023, the Trustee filed a status report with the Court indicating that the CRO discovered that advertising was being sold by Mountain Way Marketing, LLC on the InfoWars broadcast for which FSS was not receiving compensation.[40] Mountain Way is owned by a current employee of FSS, and profits are split with Alex Jones, with Mr. Jones receiving 90% of revenue, and Mountain Way's principal receiving the remaining 10%. At the time of the Trustee's report, Mountain Way indicated that a total of $243,742.09 had been collected, with $157,272.76 of this amount distributed to Alex Jones. Since then, Trustee was advised that $243,742.09 was remitted to FSS. However, Mountain Way advised that an additional $22,030.05 was paid to this Mountain Way's principal as a bonus in 2022. This bonus was purportedly paid without the knowledge or involvement of Alex Jones. This amount has not yet been returned to FSS. FSS is in discussions regarding the return of the claimed "bonus". The Trustee was also been informed that Mountain Way is in the process of notifying the affected customers to remit any future payments related to these matters to FSS. Trustee continues to investigate and monitor this matter.

## VIII) SHANNON LEE AND SCHWARTZ LLC COMPENSATION

Part of the Trustee's directive from the Court at the September 20, 2022 hearing was to provide guidance as to the amount of compensation for Shannon & Lee and Schwartz Associates LLC, if any, related to services provided up to September 20, 2022. Since the hearing, a Motion to Approve Compromise Under Rule 9019 (the "Motion") is currently pending before the Court [Docket No. 515] that resolves these issues. The Trustee has no objection to the relief sought in the Motion and does not believe that any further comment is required.

## IX) OPERATIONAL IMPROVEMENT UNDER CRO

On October 13, 2022, Patrick Magill was appointed as CRO of FSS after the Court denied the employment of the former proposed candidate. Since the CRO has been in place, he has brought transparency and order to the chaos of FSS. He has also worked diligently to increase FSS' profitability. Some of the operational improvements made by the CRO include revamping

---

[40] On March 24, 2023, the Debtor also filed a notice advising the Court about this matter.

various departments, negotiating new deals more favorable to FSS, including for product acquisition as well as fulfillment and storage.

The CRO has eliminated FSS' dependency on PQPR for purchasing inventory and replaced it with a third-party supplier that provides for transparency and profitability. This new third-party company also provides fulfillment for FSS at a much lower cost than the prior provider. These changes have increased FSS' profitability, which is reflected in the monthly operating reports. The CRO also brought the Debtor's post-petition books and records current, reduced head count and employee overtime, and generally improved the work environment for FSS' 45+ employees. The CRO holds weekly meetings for every department and requires accountability. These operational changes have also greatly increased employee productivity and morale.

The CRO also overhauled the customer service department and retrained personnel, which leads to increased sales. Standards and processes have also been implemented in the accounting department so that the books and records can be routinely maintained and updated. The CRO is also in the process of inventorying and bar-coding company assets.

Additionally, the CRO implemented several other cost saving measures, such as replacing outside software consulting firm (which was previously owned by former FSS employees) at a monthly cost of $25,000, with in-house personnel performing these same functions for a fraction of the cost.

FSS' business model relies on new and changing products. The CRO monitors the products being promoted to ensure FSS inventory represents a significant majority of products sold, as opposed to consigned product from third parties. The CRO also renegotiated contracts and agreements with various businesses, including advertisers, regarding the split of revenue between FSS and the other company in favor of more revenue for FSS. In fact, the CRO was recently able to negotiate a new agreement with a large vendor who terminated their relationship with FSS prior to the bankruptcy filing. This agreement has the potential to materially increase sales and FSS' revenue. The CRO also brought in a marketing group to assist with brokering a deal between FSS and a new advertiser to earn additional revenue. Prior advertising deals with former consultants have been terminated.

Importantly, the CRO continues to be transparent and regularly updates the Trustee regarding the status of the business and timely reports any concerns.

## X) <u>VIABILITY OF FSS</u>

The Court requested that the Trustee review the desirability of continuation of the business. It was this inquiry that was perhaps the most challenging in the early days of the investigation. With regard to determining FSS' viability, it bears reiterating the degree to which the Trustee's investigation benefitted from the CRO's stabilization of operations at FSS. In a short amount of time, the CRO was able to facilitate the exchange of the information necessary for the Trustee to better understand the business, both historically and going forward. This information, coupled with the additional transparency provided by Alex Jones' individual bankruptcy filing and the

27

subsequent ability to liaise with Jones' retained financial advisors and counsel employed for his case, has ultimately led the Trustee to the following determination.

The Trustee believes that there is a potentially viable business around which a restructured business could exist. As it stands today, the CRO already accomplished a substantial turnaround of the business, including rooting out a number of insiders and outside of market transactions with associates of FSS. To the CRO's knowledge, there are no ongoing businesses or transactions with employees or affiliates of Alex Jones other than those already disclosed.

The CRO also severed ties or is executing a transition away from any persons he did not believe were necessary to operation of the business. These efforts notwithstanding, it bears noting that the estate *does* require some third-party middleman relationships to operate due to the history of deplatforming FSS has experienced and the nature of its business.

Based on the Trustee's investigation to date, however, one thing is clear. The viability of FSS as a restructured business is dependent upon the involvement of a strong operations leader or team with final authority to ensure observance of corporate formalities and avoidance of transactions diverting profits outside the company. FSS is a media and retail company employing nearly 50 people. There is now in place a solid infrastructure that exists around a company that could operate. In the near term, FSS benefits from Alex Jones as a marquee player. Similarly, the Trustee believes that a binding contract that commits Alex Jones to a good-faith effort to generate revenue for FSS would be a central component of any plan. In the future, it is possible that the Company could operate with Mr. Jones in a reduced role.

## XI) **INITIAL CONCLUSIONS**

While the investigation remains ongoing in some regards, the evidence obtained thus far suggests the following:

1. FSS may have claims to avoid transfers of property from FSS under sections 547 and 548 of the Bankruptcy Code and companion Texas statutes against a number of parties. At this time the Trustee is not commenting on the viability of such claims. Additionally, with regard to certain parties, even if viable claims exist, the ability to collect on any judgment is questionable. The Trustee is not opining at this time on whether it is in the best interest to pursue any claim or cause of action.

2. Based on the lack of corporate formalities, comingling of assets, and general course of dealings between PQPR and FSS, including Dr. Jones' clear involvement in directing which of FSS' creditors were paid, the Trustee does not believe that the asserted secured PQPR Debt is legitimate. At a minimum, bases exist to subordinate, reclassify or otherwise avoid the obligations reflected by the Notes.

3. With respect to the alleged $62MM in draws by Alex Jones in 2021–22, the records reflect that these draws occurred over a twelve-year period. These draws included both cash withdrawals and payments to third parties by FSS on behalf of Alex Jones that were classified as equity draws.

4. After the deplatforming in 2018, the credit card processing relationships with FSS were and remain a point of vulnerability for the business. Because of this FSS has struggled since 2018 to obtain a market-rate credit card processing relationship. The court asked the Trustee whether Auriam was an insider of FSS. Based on the Trustee's investigation, while Auriam was formed by a pre-existing business associate of Alex Jones and FSS, it does not appear to be an insider of FSS as that term is defined under section 101(31) of the Bankruptcy Code.

5. Mr. Jones is the sole member of FSS. Given the accounting and financial problems, as well as avoidable transfers, it is possible that Mr. Jones did not properly carry out his fiduciary duties to the company to ensure proper financial controls. Mr. Jones also engaged in a number of self-dealing transactions. FSS may have claims against Mr. Jones for breach of fiduciary duty. The Trustee notes that FSS did not carry D&O insurance at any time.

6. There is a viable path forward for FSS with enough controls and a strong operations leader to manage the financial health of the business.

Dated: April 4, 2023

/s/ *Elizabeth Freeman*

**HASELDEN FARROW PLC**
Melissa A. Haselden (TX State Bar No. 00794778)
700 Milam, Suite 1300
Pennzoil Place
Houston, TX 77003
Telephone: (832) 819-1139
Facsimile: (866) 405=6038

- and -

**LAW OFFICE OF LIZ FREEMAN**
Liz Freeman (TX Bar No. 2400922)
PO Box 61209
Houston, TX 77208-1209
Telephone: (832) 779-3580
Email: liz@lizfreemanlaw.com

**JACKSON WALKER LLP**
Sean Gallagher (TX Bar No. 24101781)
100 Congress Ave., Suite 1100
Austin, TX 78701
Telephone: (512) 236-2014
Facsimile: (713) 752-4221
Email: sgallagher@jw.com

*Counsel for Melissa Haselden, Subchapter V Trustee*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 4, 2023 a true and correct copy of the above and foregoing was served via CM/ECF to all parties registered to receive electronic notice.

<u>/s/ *Elizabeth Freeman*</u>
Elizabeth Freeman

## <u>EXHIBIT 1</u>

**Entity Chart**

***filed under seal***

**<u>EXHIBIT 2</u>**

**Employee Entity Compilation**

***filed under seal***

# **EXHIBIT 3**

**August 13, 2020 Promissory Note between FSS and PQPR**

*filed under seal*

**<u>EXHIBIT 4</u>**

**August 13, 2020 Promissory Note between FSS and PQPR**

*filed under seal*

# EXHIBIT 5

**November 10, 2021 Promissory Note between FSS and PQPR**

*filed under seal*

## **EXHIBIT 6**

**Relevant Email Compilation**

*filed under seal*

## <u>EXHIBIT 7</u>

**FSS Annual Balance Sheets**
*filed under seal*

**EXHIBIT 8**

**Sampling of PQPR and FSS Historical Monthly Income Statements**

*filed under seal*

# EXHIBIT 9

**Balance Sheet**

*filed under seal*

# EXHIBIT 10

**August 13, 2020 Security Agreement between FSS and PQPR**

*filed under seal*

**<u>EXHIBIT 11</u>**

**Draws Analysis**

***filed under seal***

## **EXHIBIT 12**

**Relevant Email**

***filed under seal***

## <u>EXHIBIT 13</u>

**Schedule of companies formed by FSS employees and consultants**

*filed under seal*