**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **FREE SPEECH SYSTEMS, LLC,** | § | **Case No. 22-60043** |
| | § | |
| **DEBTOR.** | § | **Chapter 11 (Subchapter V)** |
| | § | |

---

> **Emergency relief has been requested. Relief is requested not later than November 21, 2022, at 2:00 p.m.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on November 21, 2022, at 2:00 p.m.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "judgelopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "electronic appearance" link on Judge Lopez's home page. Select the case name, complete the required fields, and click "submit" to complete your appearance.**

### DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR TO ENTER INTO PRODUCT FULFILLMENT AGREEMENT

FREE SPEECH SYSTEMS, LLC. ("Debtor" of "FSS") debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case") and files this Motion (the "Motion") seeking entry of an order, pursuant to sections 105(a), 363, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor to enter into a Fulfillment Agreement (the

**PQPR Exhibit 1**

"Agreement") with _____ ("SAI"), and granting such other and further relief as necessary or appropriate. In further support of this Motion, the Debtor would show the Court as follows:

## JURISDICTION

1.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 363, 1107, and 1108 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 6003 and 6004.

## BACKGROUND

4.      On July 29, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor has continued to operate its businesses and manage its affairs as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.      The Debtor is engaged in the business of producing and syndicating Alex Jones' radio and video talk shows and selling products targeted to Jones' loyal fan base via the Internet. Today, FSS produces Alex Jones' syndicated news/talk show (The Alex Jones Show) from Austin, Texas, which airs via the Genesis Communications Network on over 100 radio stations across the United States and via the internet through websites including Infowars.com.

6.      On its Infowars.com[1] website today, FSS makes available for sale to customers assorted dietary supplements. The website also has available books, t-shirts and other products Jones advertises during his radio talk show. The vast majority of FSS revenues comes from sales of dietary supplements.

7.      FSS purchases to sell on its website two categories of products: (a) dietary supplements ("Supplements"), and (b) books, DVDs, t-shirts, and other merchandise ("Non-Supplements"). FSS relied

---

[1] FSS licenses the Inforwars.com domain and trademark for InfoWars from InfoW, LLC.

**PQPR Exhibit 1**

on PQPR to source Supplements as no other vendor would supply the Supplements for Jones to advertise on his shows. PQPR ordered and paid for Supplements, which it marked up, and then sold to FSS. Jones would publicize the Supplements on his show and FSS and/or PQPR fulfilled the orders to ship to its customers.

8.      As to Non-Supplements, FSS purchased the products, sold them, and fulfilled the sale through its own employees from its warehouse in Austin. Depending on whether a Supplement or Non-Supplement was sold, FSS and PQPR split the cost of the sale on an agreed formula.

9.      Pursuant to a forbearance agreement executed between PQPR and FSS on July 12, 2022 the formula for allocation of product sales proceeds was modified to provide that FSS would receive 20% of the proceeds of all sales of products purchased by PQPR (with PQPR receiving 80%) of such proceeds. In turn, PQPR receives 10% of the proceeds of all sales of products purchased by FSS (with FSS receiving 90%). This split was negotiated to reimburse the respective parties for setting up supply chains, obtaining required governmental certifications, negotiating with vendors, procuring and paying for product, and overhead.

10.      Since 2018 FSS has had difficulty finding third parties willing and able to fulfill product sales. In the past, both FSS and PQPR attempted to provide fulfillment services for product sales. Recently, FSS employed Blue Ascension, LLC ("Blue Ascension ") to take over this function. Blue Ascension charges FSS a flat fee per order regardless of the size of each order. Under the Blue Ascension agreement, FSS pays $14 per order for shipping and an additional $6 per order for ancillary fulfillment services.

11.      The modified terms with PQPR were intended to allow the Debtor to purchase more product directly and receive a larger share of the profit margin from product sales and the transition to Blue Ascension was intended to extricate the Debtor from the fulfillment business.

12.      The transaction proposed in this Motion is intended to complete the transition of the Debtor's business model to fully outsource its product supply chain and third party logistics through a single provider.

PQPR Exhibit 1

13.      The Fulfillment Agreement with SAI (attached as Exhibit "A") provides that SAI will source diet, nutritional, health and wellness products at the direction of FSS from a product list at specified prices set forth therein.  Products not identified in the product list may be sourced at prices negotiated between SAI and FSS.  Products will be private labeled by SAI as instructed by FSS.

14.      SAI will also provide fulfillment services (shipping and handling) of product sales in accordance with FSS' instructions.  SAI will also manage all product returns.  Fulfillment pricing varies depending upon the size and weight of each order.  A copy of the packaging and shipping rates is attached to the Agreement.

15.      SAI is not charging the Debtor for its services.  SAI is serving as a "white label reseller" White label resellers act as intermediaries having contracted directly with a product supplier and 3PL[2].  The use of a white label reseller is necessary because parties are reluctant to enter into a relationship directly with the Debtor.

16.      SAI has no prior relationship with the Debtor and is not an insider or affiliate of the Debtor as defined at 11 USC §§101(2) and (31).  The sole shareholder of SAI,                    or an entity related to Mr.          has sold product through the Debtor's sales channel in the past but has no current business relationship with the Debtor.  The Debtor has identified the following additional relationships between Mr. and entities currently engaged or to be engaged in business with the Debtor:

   a.  Mr.          is  the  sole  shareholder  of                                        .
       (                    ") which the Debtor seeks to engage as credit card processor in a contemporaneously filed motion.  If approved,          will be entitled to a service fee of 1.5% of all credit card transactions on behalf of FSS.

   b.  Mr.          is an employee of                                        is an electronic payment processor and processes the Debtor's credit card payments. earns of fee of 4.5% of all credit card transactions on behalf of FSS.          is

---

[2] 3PL's are third party logistics providers that provide outsourcing supply chain management including product distribution, warehousing, inventory management, product assembly, packing shipping and record keeping.

PQPR Exhibit 1

aware of Mr. Cicack's relationship with            and has advised in writing that it approves of the arrangement between FSS and

    c.    Mr.          is the sole owner of SAI. Under the terms of the Agreement with SAI Mr.          will receive no compensation or remuneration from FSS or the entities he contracts with to provide product sourcing and fulfillment services.

17.    Neither Alex Jones or any member of his family or any employee (current or former) of FSS (or any affiliate) or PQPR Holdings Limited, LLC (or any of its owners, officers, employees, or affiliates), (i) own any interest in SAI or          (ii) have any contractual relationships with Mr.          SAI or          or (iii) receive (currently or in the future) any form of remuneration from Mr.          , SAI or          . Conversely neither SAI,          nor Mr.          (i) own any interest in FSS, PQPR Holdings Limited, LLC (or any of their affiliates), (ii) have any contractual relationships with Alex Jones or any member of his family, FSS (other than contracts approved by Order of this Court), or PQPR Holdings Limited, LLC (or any of their affiliates, owners or employees), or (iii) receive any remuneration from Alex Jones or any member of his family, FSS, PQPR Holdings Limited, LLC (or any of their affiliates, owners or employees) that has or will not be approved by Order of this Court.

## RELIEF REQUESTED

18.    By this Motion, the Debtor seeks entry of an Order authorizing the Debtor to operate under the Agreement with the SAI which is consistent with the Debtor's historical and customary practices but under significantly improved terms.

## BASIS FOR RELIEF

**A. Debtor Requests Authority Enter into the Agreement in The Ordinary Course of Business.**

19.    Debtor requests that it be authorized to operate under the Agreement in the ordinary and customary course of business.

20.    The financial terms of the Agreement with SAI will improve the Debtor's profitability while at the same time simplifying and streamlining its operations. Currently the Debtor bears the risk of

PQPR Exhibit 1

financial loss with respect to products its purchases if they are purchased in quantities or at prices that exceed customer demand.  Under the SAI Agreement, other than low minimum purchase requirements, SAI bears the risk regarding unsold product.

21.     Further, while SAI product pricing may be higher than product pricing under FSS' existing product sourcing with PQPR, the existing agreement with PQPR allocates ten percent (10%) of net sale receipts to PQPR.  Some of the product pricing from SAI is lower than FSS currently pays suppliers.  On average, SAI's prices are within ten percent (10%) of FSS' current product pricing.

22.     FSS currently pays $20 per shipment to FSS for fulfillment services.  SAI's fulfillment charges will be significantly lower than Blue Ascension.  SAI fulfillment charges vary by weight and package size.  Based on the weight and size of the average FSS order, FSS anticipates that the average shipping cost per package will be less than $10 per shipment. FSS expects that SAI's terms will be accretive to the Debtor's income and cash flow.

23.     Section 363(b) Bankruptcy Code addresses a debtor's use of property of the estate outside the ordinary course of the debtor's business and applies a business judgment test in evaluating such transactions.  In order to satisfy its fiduciary duty a debtor in possession must show an "articulated business justification, good business judgment, or sound business reasons." *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011).

24.     While FSS has sourced and sold product through a variety of transactions which are similar to the SAI Agreement, in an abundance of caution the Debtor seeks approval of the Agreement under section 363(b) of the Bankruptcy Code. The Agreement with SAI will simplify the Debtor's operations, avoid the need to finance product purchases, provide "just in time" product sourcing, making new products more readily available to customers, significantly reduce fulfillment costs and increase profitability.  The Debtor believes that the requirements of the business judgment test are met.

**B.     Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

PQPR Exhibit 1

25.     To implement the foregoing successfully, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

WHEREFORE, for the reasons set forth above the Debtor respectfully requests that the Court enter an order in the form attached as Exhibit B (i) authorizing the Debtor to enter into the Agreement as described above, consistent with Debtor's historical and customary practices and (ii) granting any and all such other relief as the Court deems just and proper.

Respectfully submitted this November 15, 2022.

THE LAW OFFICES OF RAY BATTAGLIA, PLLC.
66 Granburg Circle
San Antonio, Texas 78218
Telephone (210) 601-9405
Email: rbattaglialaw@outlook.com


By:  /s/  Raymond W. Battaglia
        Raymond W. Battaglia
        Texas Bar No. 01918055

**ATTORNEYS FOR THE DEBTOR IN POSSESSION**

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was filed with the Court and served electronically upon those parties registered to receive electronic notice via the Court's CM/ECF system, as set forth below. I further certify that it has been transmitted by first class mail to the parties on the attached service list.

/s/ Raymond W. Battaglia
Raymond W. Battaglia

**PQPR Exhibit 1**



EXHIBIT

A

exhibitsticker.com

This Fulfillment Agreement (this "Agreement") is entered on [_____] (the "Effective Date"), by and between [____] [_____] Inc having offices at 4548 Valley Spring Dr. Westlake Village, CA 91362, U.S.A. ("[_____] Inc") and [_____], a [_____], having offices at [_____], ("Client"). [_____] [_____] Inc and Client may be individuals referred to herein as a "Party" and collectively referred to herein as "Parties".

WHEREAS, [_____] Inc provides product sourcing and fulfillment services for direct response marketers that market diet, nutritional, health and wellness products through various distribution channels;

WHEREAS, Client desires to retain [_____] [_____] Inc to provide product sourcing and fulfillment services and [_____] Inc desires to provide the same pursuant to the terms hereof,

NOW, THEREFORE, in consideration of the promises and mutual covenants described herein, the parties agree as follows:

ARTICLE I

ENGAGEMENT OF [_____] Inc; FEES

1.1 Engagement. As of the Effective Date, Client hereby retains [_____] Inc to perform the Services (as defined below) including such activities as may be related, ancillary, or necessary to perform the Services.

3.2 Manner of Payment; Late Payments. Payments by Client to [_____] Inc under this Agreement shall be made by electronic fund transfers, check, or, other mutually accepted means. Late payments under this Article III shall bear interest at the prime rate plus ten percent (10%) per annum or the maximum amount permitted by applicable law, whichever is less.

3.3 Taxes. All amounts payable for Services hereunder are exclusive of any taxes. All taxes and other charges imposed by any taxing authority on any Service or Product shall be added to the appropriate invoice and shall be payable by Client in accordance with Section 3.1. ARTICLE IV

TERMINATION; OBLIGATIONS UPON TERMINATION

4.1 Termination by Either Party. This Agreement may be terminated by either Party upon providing the other Party ninety (90) days written notice of such Party's desire to terminate this Agreement.

4.2 Termination by [_____] Inc. In the event that (i) [_____] Inc believes that Client's conduct or its Products or violate Applicable Law or pose a threat to [_____] [_____] Inc' business or reputation; (ii) Client fails to satisfy the Minimum Threshold; or (iii) Client fails to remit to all outstanding amounts on or before the Due Date, then [_____] Inc shall have the option to suspend the provision of Services or terminate this Agreement.

4.3 Obligations upon Termination. Client shall be obligated to remit all amounts owing to [_____] Inc

PQPR Exhibit 1

███████████████████████

**1.2 Services.** ████████████ Inc shall provide product sourcing and fulfillment services for Client for such Products as set forth on Appendix A (the "Services"). The Parties hereby agree and acknowledge that the Services provided by ████████████ Inc may be modified upon the mutual consent of the Parties.

**1.3 Fees.** For ████████████ Inc' performance of the Services, Client shall pay ████████████ Inc such amounts as provided on Appendix A (the "Fees"). The amount of the Fees may be modified by the mutual consent of the Parties.

**1.4 Return Instructions.** ████████████ Inc will sort any returns to the best of its ability to inspect safety seals and determine which bottles can be resold. To do this, ████████████ Inc may charge Client a flat fee per return. ████████████ Inc accepts no liability for its performance of these services.

**1.5 Compliance with Laws; Non-Infringement.** Client shall be solely responsible for compliance with any applicable federal and state laws and regulations relating to the Product and Services, which includes, but shall not be limited to, any labeling, information or sales methods related to the Product and Services. Additionally, Client hereby covenants that the Product and any sales efforts and labeling related thereto shall comply with all federal and state laws and regulations, and, that such laws and regulations include, but, shall not be limited to (i) any Federal Trade Commission rules and regulations, including, but not limited to the "Mail Order Rule", "Telemarketing Sales Rule," and any other rules and regulations, relating to advertising, solicitation or otherwise; (ii) any Food and Drug Administration rules and regulations, including, but not limited to any labeling guidelines which may

upon the termination of this Agreement.

**4.4 Survival.** The terms and conditions of the following provisions shall survive the termination or expiration of this Agreement: Sections 1.3, 1.4, 1.5, 1.7, 1.9, 1.10, 1.11, 1.12, 2.2, 4.3, 4.4 and Article III, Article V, Article VI and Article VII.

ARTICLE V

LIMITATION OF LIABILITY

**5.1 Limitation of Liability.** IT IS UNDERSTOOD AND AGREED THAT ████████████ Inc' LIABILITY WHETHER IN CONTRACT, IN TORT, UNDER ANY WARRANTY, IN NEGLIGENCE OR OTHERWISE SHALL NOT EXCEED THE RETURN OF THE AMOUNT OF THE PURCHASE PRICE PAID BY CUSTOMER FOR SUCH SPECIFIC SERVICE OR PRODUCT AND UNDER NO CIRCUMSTANCES SHALL ████ ████████ Inc BE LIABLE FOR SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES. THE PRICE STATED FOR THE SERVICES IS A CONSIDERATION IN LIMITING ████ ████████ Inc' LIABILITY. NO ACTION, REGARDLESS OF FORM, ARISING OUT OF THE TRANSACTIONS UNDER THIS AGREEMENT MAY BE BROUGHT BY CUSTOMER MORE THAN ONE YEAR AFTER THE CAUSE OF ACTION HAS ACCRUED.

**5.2 Disclaimer of Warranties.** EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, ████████████ Inc MAKES NO, AND DISCLAIMS ALL, WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON INFRINGEMENT, WITH RESPECT TO THE SERVICES AND THE PRODUCTS.

**PQPR Exhibit 1**



relate to point size, type, label format and product claims; and (iii) all other federal and state rules and regulations which relate to the Product and Services (collectively, "Applicable Law") . Client hereby agrees and acknowledges that ███ ███████ Inc shall not have any obligations with respect to any Products or Services being in compliance with Applicable Law.

1.6 ███████████ Inc Obligations. ███████ ██████ Inc hereby covenants and agrees that it shall, during the term of this Agreement, perform the Services in a commercially reasonable manner. ███████████ Inc further covenants and agrees that it shall maintain reasonably accurate records and accounts of all transactions relating to the Services performed pursuant to this Agreement.

1.7 Client Obligations. Client hereby covenants and agrees that (i) it shall pay ███████████ Inc for Services in accordance with Article III of this Agreement; (ii) it shall provide ███████ ██████████ Inc with all documents and information necessary for ███████████ Inc to perform the Services pursuant to this Agreement; and (iii) it shall comply with Applicable Law.

1.8 Right to Subcontract. In the performance of its obligations hereunder, ███████████ Inc shall have the right, in its sole discretion, to subcontract its rights and responsibilities to any third party, provided that ███████████ Inc shall remain responsible for the performance of any such third party.

1. **Independent Contractors. The Parties to this Agreement are independent contractors. Neither Party is an agent, representative or employee of the other Party. Neither Party will have any right, power or authority to enter into any agreement for or on behalf of, or incur**

███████████ Inc MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE QUALITY, SUITABILITY OR ADEQUACY OF THE SERVICES OR THE PRODUCTS FOR ANY PURPOSE OR USE.5.3

Force Majeure.

Any delay in or failure of performance by ███████ ██████████ Inc under this Agreement will not be considered a breach of this Agreement and will be excused to the extent caused by any occurrence beyond the reasonable control of ███████████ Inc, including, but not limited to, acts of God, any deficiencies or failures of third-party providers to provide the Product(s), strikes, lockouts, slowdown, power outages or war.

**5.4. Client Indemnity. Client agrees to indemnify and hold ███████████████ Inc, its affiliates, employees, officers, directors and shareholders harmless from and against any claims, suits, actions or proceedings (a "Claim") brought and damages, costs (including attorney's fees) or judgments awarded against ███████████████ Inc that arise from or in connection with: (i) claims by any person or entity to the extent that such Claims are based upon or arise out of the Client's acts or omissions; (ii) breach by the Client of this Agreement, (iii) the Client's failure to comply with Applicable Law; and (iv) Client's failure to be the exclusive owner of any intellectual property, trademarks, designs and all goodwill associated with the Services, the Product, and any labeling or design services applied to such Product by ███████ ██████ Inc or otherwise.**

ARTICLE VI

CONFIDENTIALITY



**any obligation or liability of, or to otherwise bind, the other Party. This Agreement will not be interpreted or construed to create an association, agency, joint venture or partnership between the Parties or to impose any liability attributable to such a relationship upon either Party.**

1.10 Cooperation. The Parties will use good faith efforts to cooperate with each other in all matters relating to the provision and receipt of the Services, including, without limitation, cooperating in connection with obtaining all consents, approvals licenses or sublicenses reasonably necessary in order for ▓▓▓▓▓▓▓ Inc to perform the Services. Client shall be solely responsible for any costs incurred by ▓▓▓ ▓▓▓▓ Inc in connection with obtaining such consents or approvals or procuring such licenses or sublicenses. In the event that ▓▓▓ ▓▓▓▓ Inc reasonably believes that it is unable to provide any Service because of a failure to obtain any consent, approval, license or sublicense, the parties shall in good faith discuss and agree to an alternative approach; provided that, in no event shall ▓▓▓▓▓▓▓ Inc be required to provide such Service until such time that the Parties have agreed to an alternative approach or the relevant consent, approval, license or sublicense has been obtained. Client shall be solely responsible for any increased cost in providing a Service resulting from any agreed alternative approach.

1.11 Sourcing of Product. Client hereby agrees and acknowledges that (i) ▓▓▓▓▓▓▓ Inc does not manufacture the Product and rather purchases the Product from a third-party on behalf of Client; and (ii) ▓▓▓▓▓▓ Inc shall not be liable for any deficiencies, recalls, inconsistencies or any other issue relating to the manufacture of the Product.

6.1 Confidentiality. Each Party shall hold, and shall cause its employees, accountants, attorneys and other authorized representatives to hold, in confidence, and shall otherwise not disclose to anyone other than each of their respective accountants, attorneys and other authorized representatives, together with such other individuals or organizations as may from time to time be authorized in writing by the other Party or as may otherwise be required by any administrative body or required by law, all documents, records, data and information of each Party ("Confidential Information") disclosed by such Party to the other Party in connection with the performance of this Agreement. Confidential Information shall not include information that (1) is already or otherwise becomes publicly available through no act of receiving Party; (2) is lawfully received by receiving Party from third parties subject to no restriction of disclosure; or (3) can be shown by receiving Party to have been independently developed by such Party. Each Party shall promptly notify the other Party of any subpoena or other request or demand made to such Party seeking documents, records, data or information concerning the other Party or the Services provided hereunder, and shall resist production of any such materials consistent with its obligations pursuant to this Article. Neither Party shall use the Confidential Information of the other Party except to exercise its rights and perform its obligations hereunder.

ARTICLE VI

MISCELLANEOUS

7.1 Further Assurances. ▓▓▓▓▓▓▓▓ Inc and Client agree, upon the reasonable request of the other, to execute, acknowledge and deliver any and all

PQPR Exhibit 1

1.12   Content and Trademark Ownership and License.  Each party (the "Granting Party") hereby grants the other party (the "Receiving Party") a royalty free, non-exclusive, worldwide limited license to use, reproduce, publish, display, perform and distribute the Granting Party's applicable trademarks and service marks in connection with all marketing and distribution to carry out the express purpose of this Agreement.  The Receiving Party agrees that such marks are the exclusive property of the Granting Party and that all usage of such marks and any goodwill established by the use of such marks shall inure to the benefit of the Granting Party and that this Agreement does not confer any goodwill or other interests in such marks on the Receiving Party.  Neither party shall adopt or attempt to register any trademark, trade name, or service mark, which is confusingly similar to the other party's marks.  Termination of this Agreement shall immediately terminate the license(s) granted. Client represents and warrants that Client is the exclusive owner of any intellectual property, trademarks, designs and all goodwill associated with the Services, the Product(s), and any labeling or design services applied to such Product by ▌▌▌▌▌▌ Inc or otherwise, and, that Client entering into and performing this Agreement will not violate any contract to which it is a party or any court order to which it is subject.

ARTICLE II

PERFORMANCE OF SERVICES

2.1  Minimum Purchase Amount.  In recognition of ▌▌▌▌▌▌ Inc' fixed expenses associated with being available to provide Services to Client, Client agrees and acknowledges that it shall be required to cause ▌▌▌▌▌▌ Inc to fulfill, at a minimum, one thousand dollars worth of products and/or services per month. (the "Minimum Threshold")

uch further in  trument  , and to do and perform any and all such other acts as may be necessary or appropriate in order to carry out the intent and purposes of this Agreement.

7.2 Waivers or Modifications. No waiver, modification or cancellation of any term or condition of this Agreement shall be effective unless executed in writing by the Party to be charged therewith. No written waiver shall excuse the performance of any act(  ) other than tho  e specifically referred to therein. A waiver of any breach by any Party hereunder shall not constitute a waiver of any subsequent breach(es) by such Party hereunder

7 3 Governing Law  Thi  Agreement   hall be governed by the laws of the State of Colorado (regardless of the laws that might otherwise govern under applicable principles of conflicts of law) a   to all matter  , including, but not limited to, matters of validity, construction, effect, performance and remedies.

7.4 Notices. Except as expressly otherwise provided herein, all notices, requests, demands, waiver  and other communication   under thi Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or by facsimile transmission or mailed (certified or regi  tered mail, po  tage prepaid, return receipt requested) to the address provided for such Party in the preamble to this Agreement.

7.5 Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable, such provi  ion will be fully   evered and thi   Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision never comprised a part hereof; and the remaining provi  ion   hereof will remain in full force and

**PQPR Exhibit 1**

2.2. Shipments. ███████████ Inc shall not be responsible for (i) any errors in shipping caused by improper addresses or mistakes provided by Client; and (ii) any late or undelivered shipments caused by customs or any shipping provider. Any errors in shipping caused by mistakes of ███████████ Inc will be reshipped at no additional charge to Client. Client agrees that it shall be solely responsible for all customer service relating to ███████████ Inc' performance of the Services and Client shall promptly notify ███████████ Inc of any shipping changes or errors prior to shipment. Client acknowledges and agrees that once any Product has been shipped by ███████████ Inc shall no longer have any authority to modify any shipping instructions for such Product.

ARTICLE III

INVOICES; PAYMENT TERMS

3.1 Fees for Services; Invoices. ███████████ Inc shall invoice Client on a weekly basis. Invoices shall specify the weekly Fees for, and provide reasonable detail regarding, the Services rendered during the previous month. The Fees shall be in accordance with such Appendix or as otherwise agreed to by the Parties. Invoices shall also include any adjustments required for credits or Product returns that were given or occurred during the previous month, in accordance with Article I of this Agreement. ███████████ Inc' invoices shall be due and payable not later than seven (7) days after the date of the invoice (the "Due Date"). In the event Client fails to remit to all outstanding amounts on or before the Due Date, then ███████████ Inc shall have the option to suspend the provision of Services or terminate this Agreement.

effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in its terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

7.6 Entire Agreement. This Agreement and any Appendix referenced or attached hereto and thereto constitute the entire agreement between the Parties hereto. 7.7 Assignment. ███████████ Inc shall have the right to assign this Agreement.

7.8 Binding Agreement. This Agreement is binding upon, and inures to the benefit of, the Parties and their respective successors. Nothing in this Agreement, expressed or implied, is intended to confer on any person, other than the Parties or their respective successors, any rights, remedies or liabilities under this Agreement.

7.9 Counterparts. This Agreement may be executed in one or more counterparts, each of which when so executed shall be deemed an original, and such counterparts together shall constitute one and the same instrument.

7.10 No Impairment of Rights. No delay or omission by either Party hereto in exercising any right, power or privilege hereunder will impair such right, power or privilege, nor will any single or partial exercise of any such right, power or privilege preclude any further exercise thereof or the exercise of any other right, power or privilege.

IN WITNESS WHEREOF, the parties have caused this Fulfillment Agreement to be executed by their duly authorized representatives as of the day and year first above written.



| _____ Inc | [Company.Name] |
|---|---|
| ██████████<br>President | Signer:<br>Company name: |

Appendix A

1. Product. The "Product" shall be various dietary supplements and health and beauty products as agreed to by Client and ██████████ Inc.

2. Services. The "Services" shall consist of the following:
   - A. ██████████ Inc shall purchase the Product from a third-party provider on behalf of Client.
   - B. ██████████ Inc shall place labeling on the Product as instructed by Client.
   - C. Upon ██████████ Inc' receipt of proper instructions for fulfillment from Client for any particular customer order, ██████████ Inc shall perform all packing, shipping and tracking functions necessary to fulfill the order and ship Product.

3. Pricing. Client shall be obligated to compensate ██████████ Inc the amounts set forth on any invoice provided to Client by ██████████ Inc.

4. Deposit. A one-time non-refundable ($1,000) deposit will be required to open a fulfillment account. This fee is for set up and integration into our system. However, this deposit will be applied to any fulfillment invoice you receive in the first 60 days.

5. Minimum. All fulfillment accounts will have a minimum spend of $1000 per month.

- The Parties hereby agree and acknowledge that Client and ShipOffers may modify the terms of this Appendix A verbally and that such modifications shall be integrated into this Fulfillment Agreement.

PQPR Exhibit 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 22-60043** |
| **FREE SPEECH SYSTEMS, LLC.,** | § | **Chapter 11 (Subchapter V)** |
| | § | |
| | § | |
| **Debtor.** | § | |

**ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDER**
**AUTHORIZING DEBTOR TO ENTER INTO FULFILLMENT AGREEMENT**

On November 15, 2022, the above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>" or "<u>FSS</u>") in the above-captioned chapter 11 case (the "<u>Case</u>"), filed its *Emergency Motion for Entry of Order Authorizing Debtor to Enter into Fulfillment Agreement* ("<u>Motion</u>") after due deliberation and consideration and sufficient cause appearing therefor;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

The Motion is hereby granted and the Debtor is authorized to enter into the Fulfillment Agreement with _____. attached to the Motion as Exhibit A.

Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a), and the Bankruptcy Local Rules are satisfied by such notice.

Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon entry. The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Order.

Houston, Texas
Dated: August ___, 2022

_____
UNITED STATES BANKRUPTCY JUDGE



EXHIBIT

B

PQPR Exhibit 1

Elevated Solutions Group
28 Maplewood Drive
Cos Cob, CT 06870

Christopher Sadowski
c/o Copycat Legal PLLC
3111 N. University Drive STE 301
Coral Springs, FL 33065

Atomial LLC
1920 E. Riverside Dr.
Suite A-120 #124
Austin, TX 78741

Cloudflare, Inc
Dept LA 24609
Pasadena, CA 91185-4609

Jacquelyn Blott
200 University Blvd
Suite 225 #251
Round Rock, TX 78665

Joel Skousen
PO Box 565
Spring City, UT 84662

Commerce CDN, LLC
221 E 63rd Street
Savannah, GA 31405

Paul Watson
9 Riverdale Road
Ranmoor Sheffield
South Yorkshire S10 3FA
United Kingdom

Brennan Gilmore
c/o Civil rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001

Greenair, Inc
23569 Center Ridge Rd
Westlake, OH 44145

**PQPR Exhibit 1**

Edgecast, Inc
Dept CH 18120
Palatine, IL 60055

Ready Alliance Group, Inc
PO Box 1709
Sandpoint, ID 83864

Getty Images, Inc
PO Box 953604
St. Louis, MO 63195-3604

RatsMedical.com
c/o Rapid Medical
120 N Redwood Rd
North Salt Lake, UT 84054

David Icke Books Limited
c/o Ickonic Enterprises Limited
St. Helen's House King Street
Derby DE1 3EE
United Kingdom

WWCR
1300 WWCR Ave
Nashville, TN 37218-3800

JW JIB Productions, LLC
2921 Carvelle Drive
Riviera Beach, FL 33404

CustomTattoNow.com
16107 Kensington Dr. #172
Sugar Land, TX 77479

AT&T
PO Box 5001
Carol Stream, IL 60197-5001

Justin Lair
1313 Lookout Ave
Klamath Falls, OR 97601

PQPR Holdings Limited, LLC
c/o Stephen Lemmon
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746

**PQPR Exhibit 1**

Attn: Shelby Jordan
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 900
Corpus Christi, Texas 78401

Stephen A Roberts
Stephen A Roberts, P.C.
1400 Marshall Ln
Austin, TX 78703

Attn: Eric Henzy
Zeisler & Zeisler P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604

Attn: Daniel DeSouza
Copycat Legal PLLC
3111 N. University Drive, Suite 301
Coral Springs, FL 33065

John D Malone
Attorney at Law
5400 Bosque Blvd., Ste. 650
Waco, TX 76710

Jason Starks
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

Richard A. Cochrane
Akin Gump Strauss Hauer & Feld
2300 N. Field Street
Suite 1800
Dallas, TX 75201

Lynn Hamilton Butler
Husch Blackwell LP
111 Congress Ave., #1400
Austin, Texas 78701

**PQPR Exhibit 1**